IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-1644 (MN) |
| | ) | |
| UNITED STATES SUGAR | ) | |
| CORPORATION, UNITED SUGARS | ) | |
| CORPORATION, IMPERIAL SUGAR | ) | |
| COMPANY, and LOUIS DREYFUS | ) | |
| COMPANY LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' ANSWER AND DEFENSES

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Brian P. Egan (#6227)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
began@morrisnichols.com

*Attorneys for Defendant United States Sugar
Corporation*

HOGAN MCDANIEL
Daniel K. Hogan (#2814)
Daniel C. Kerrick (#5027)
1311 Delaware Avenue, Suite 1
Wilmington, DE 19806
(302) 656-7540
dhogan@dkhogan.com
dckerrick@dkhogan.com

*Attorneys for Defendant United Sugars
Corporation*

RICHARDS, LAYTON & FINGER. P.A.
Kelly E. Farnan (#4395)
One Rodney Square
Wilmington, DE 19801
(302) 651-7700
farnan@rlf.com

*Attorneys for Defendants Imperial Sugar
Company and Louis Dreyfus Company LLC*

January 10, 2022

## DEFENDANTS' ANSWER TO COMPLAINT AND DEFENSES

Defendants United States Sugar Corporation ("U.S. Sugar"), United Sugars Corporation ("United"), Louis Dreyfus Company LLC ("LDC"), and Imperial Sugar Company ("Imperial") (collectively, "Defendants") respond as follows to the allegations set forth in Plaintiff United States of America's November 23, 2021 Complaint.

## PRELIMINARY STATEMENT

1.      U.S. Sugar is a 90-year old farming company based in Clewiston, Florida that grows and processes sugar cane, citrus, and fresh vegetables.  In March 2021, U.S. Sugar announced that it would acquire the business and assets of Imperial, a sugar refiner processing imported raw sugar and owned by LDC, whose parent is a Dutch company.  The purpose of U.S. Sugar's acquisition (the "Transaction") is simple: to provide an additional refinery for sugar cane grown by U.S. Sugar's Florida farmers and thereby expand domestic sugar production in order to better serve customers throughout the country and ensure that customers have more a dependable, secure, and cost-effective supply of sugar.  U.S. Sugar plans do so by investing in Imperial's Port Wentworth, Georgia refinery to make it more efficient—the same strategy U.S. Sugar employed at its Clewiston, Florida refinery.  As a result, this transaction will guarantee that Imperial continues to operate long into the future—to the benefit not only of its customers, but also of the hundreds of Imperial employees.  Without the acquisition, Imperial will at best continue to be a supplier of high-priced refined sugar dependent on high-cost raw sugar imports from Mexico.  At worst, Imperial's Port Wentworth refinery may no longer be able to serve customers in the future if it cannot secure lower cost supplies of raw sugar.  LDC has attempted to sell Imperial for years and ceased making capital improvements in the Imperial refinery, consistent with its divestment from other sugar businesses.

2.      Nonetheless, the Department of Justice ("DOJ") sued to block the Transaction, claiming that it will harm customers in a limited geographic area that it has gerrymandered for purposes of this lawsuit—i.e., the area it defines as the "Southeast." DOJ's Complaint is based on a static, contrived, and internally inconsistent view of how competition for the sale of refined sugar occurs today. DOJ alleges, incorrectly, that the cost of transporting sugar is so high that only suppliers located near customer facilities can compete for their business. The reality is that sugar flows readily and cost-effectively throughout the United States. A network of trains, trucks, and terminals allow customers to buy refined sugar at competitive prices from suppliers located throughout the country. Today, more than a dozen companies vigorously compete to sell sugar to customers in the Southeast (however defined). DOJ's own Complaint acknowledges that 40 percent or more of that sugar comes from outside that area, including more than half of the refined sugar sold by United, which comes from beets grown and processed in the upper Midwest. Notwithstanding these facts, DOJ bases its lawsuit on the bald assumption that third-party suppliers located in areas that already supply the Southeast would be unable to sufficiently increase sales to customers in that purported market if a price increase were attempted post-acquisition. That makes no sense. DOJ's position is further undermined by the fact that one of the largest domestic sugar producers in the country, Louisiana Sugar Refiners, LLC ("LSR") recently announced plans to increase its sugar refining capabilities by 50% by early next year. As DOJ's Complaint acknowledges, LSR already is the third-largest seller of refined sugar to customers in the Southeast, and provides customers in that region with almost as much refined sugar as the amount of sugar produced by U.S. Sugar. With a planned 50% increase in refining capabilities, post-acquisition, LSR would have a clear incentive and ability to increase sales to customers in the Southeast in response to any attempted price increase, preventing any harm from the acquisition.

3.     Although DOJ seeks to block this procompetitive transaction based on a theory that it might lead to higher prices for a small number of customers in a gerrymandered regional market, DOJ ignores that Congress has empowered the U.S. Department of Agriculture ("USDA") to control the supply of sugar flowing into and throughout the country.  The USDA regulates the amount of sugar that is marketed from domestic production each year, as well as the amount of sugar that can be imported from abroad.  Congress has tasked the USDA with ensuring that there is an adequate supply of sugar available in the United States at reasonable prices.  The USDA is uniquely able to prevent the harm that DOJ claims will occur if the acquisition is not enjoined.  If any supplier, including Defendants after the merger, attempted to raise prices or restrict supply, the USDA would have numerous tools to increase sugar supplies and thereby deter or counteract any such attempt.  Under such circumstances, injunctive relief is not appropriate.

4.     DOJ claims that this is a "straightforward case."  It is not.  The Transaction is not even fairly characterized as one between "horizontal competitors."  U.S. Sugar—the entity acquiring Imperial—does not sell the refined sugar it produces at all, much less in competition with Imperial.  United, a separate legal entity and agricultural marketing cooperative, sells the sugar that U.S. Sugar produces.  The complex vertical relationships between U.S. Sugar and Imperial and between U.S. Sugar and United—all of which USDA oversees and regulates—take this case far outside of the typical horizontal merger analysis in which DOJ attempts to shoehorn it.  Indeed, it is clear this is not a "straightforward case" because DOJ has done something highly unusual here.  In a typical challenge under Section 7 of the Clayton Act, which empowers the DOJ to challenge acquisitions but not other conduct, the government usually sues only the merging parties.  It did not do that here but instead also named United, which is not a party to the Transaction, as a defendant.  It did this because all of the alleged harms DOJ asserts in its

Complaint do not stem from the Transaction, i.e., U.S. Sugar's acquisition of Imperial. Rather, the alleged harms DOJ claims will occur result from a separate distribution agreement between U.S. Sugar and United, under which United will market Imperial's refined sugar going forward. DOJ is misusing Section 7 of the Clayton Act.

5.     DOJ's claim that this challenge is "not a close call" also is remarkable considering the scant documents and testimony underlying its decision to sue. Despite investigating the Transaction for eight months and demanding that Defendants provide it with *triple the amount of time* that Congress gave the DOJ under the Hart-Scott-Rodino Act to conduct the last phase of its investigation, DOJ elected not to take a single third-party deposition or elicit even one declaration from a third-party expressing concern about the Transaction.

6.     DOJ misunderstands the rationale for this deal, how refined sugar flows cost-effectively across the United States, and the number of firms that compete aggressively to supply refined sugar to customers located in the Southeast and elsewhere in the country. This procompetitive deal is not—and never has been—about raising prices. Nor could it be, given the vigorous competition United and Imperial face today and the powerful customers to which they sell. These large customers have numerous options to meet their refined sugar needs, and that will continue to be the case post-acquisition. Market realities, including the many tools wielded by the USDA to regulate sugar supplies—and therefore refined sugar prices—will prevent any harm to consumers resulting from the Transaction. Specific responses to Plaintiff's allegations are made below.

## SPECIFIC RESPONSES TO PLAINTIFF'S ALLEGATIONS

Defendants deny all factual allegations set forth in the Complaint unless expressly admitted. Any admission herein is limited to the express language of the response and shall not

be deemed an implied admission of additional facts. Defendants need not admit or deny legal conclusions or arguments. Although Defendants need not admit or deny legal conclusions or arguments, Defendants affirmatively deny that they have violated any federal law, including any federal antitrust law, and assert that the United States should be denied the relief it requests.

Defendants do not respond to the headings set forth in the Complaint. To the extent any headings contain any factual allegations, they are denied.

The first paragraph of the preamble to the Complaint characterizes this action and asserts legal conclusions and argument to which no response is required. To the extent that a response is deemed necessary, Defendants admit that the United States purports to bring a civil action under Section 7 of the Clayton Act to prevent U.S. Sugar from acquiring Imperial. Defendants deny, however, that the United States has any legitimate claim against Defendants, that the Transaction violates the Clayton Act, or that the United States is entitled to any relief. Defendants deny that the United States' market definition or geographic market are accurate, and further deny that the Transaction will result in a duopoly, harm customers, strain supply chains, or lead to higher prices for American consumers. Defendants admit that U.S. Sugar is an American grower of sugar cane, and a member of United, an agricultural marketing cooperative. Defendants further admit that United has responsibilities for marketing its producer-members' refined sugar, which include negotiating the sales prices of that product with United's customers. Defendants deny in all other respects the allegations in the first paragraph of the preamble to the Complaint.

The second paragraph of the preamble to the Complaint characterizes this action and asserts legal conclusions and argument to which no response is required. To the extent that a response is deemed necessary, Defendants admit that United strives to supply the sugar needs of an array of customers located across the United States. Defendants further admit that Imperial operates a port

refinery located in Port Wentworth, Georgia that refines raw sugar.  Defendants deny in all other

respects the allegations in the second paragraph of the preamble to the Complaint.

Defendants further answer the numbered paragraphs of the Complaint as follows:

## I. INTRODUCTION

**Paragraph 1:**

**Sugar is a ubiquitous ingredient found in almost every American's kitchen and in Americans' favorite foods and beverages.  It is refined from sugar beets or sugarcane and sold to wholesale customers in various forms (e.g., granulated, liquid, and powdered) and varieties (e.g., white and brown sugar).  It then makes its way onto grocery shelves and into the foods Americans eat every day.  In 2020, the average American consumed 40 pounds of refined sugar.**

Response to Paragraph 1:

Defendants admit that refined sugar is an ingredient found in many foods and that refined

sugar can be made by processing sugar beets or by refining raw sugar derived from sugar cane.

Defendants further admit that refined sugar is sold to customers in various forms and varieties, and

that customers have many options to choose from when deciding which kind of refined sugar to

buy.  Defendants lack knowledge or information sufficient to form a belief about the truth of the

remaining allegations in Paragraph 1 and deny those allegations on that basis.

**Paragraph 2:**

**U.S. Sugar sells its sugar through United, a marketing cooperative that is jointly owned and controlled by U.S. Sugar and three other sugar producers.  The four owners of United do not compete with one another; United manages all aspects of the sale and marketing of its owners' sugar, including deciding whether to submit a bid for a particular customer and what price to charge.  If U.S. Sugar acquires Imperial, United would also gain control over the sale and marketing of all sugar produced by Imperial, thereby eliminating competition between United and Imperial.**

Response to Paragraph 2:

Defendants deny the allegations in Paragraph 2, except admit that U.S. Sugar is a 90-year

old American grower of sugar cane that belongs to an agricultural marketing cooperative called

United.  Defendants admit that United operates on behalf of its four members, which include U.S.

Sugar and three other American producers (or cooperatives of producers) of refined sugar. Defendants admit that U.S. Sugar does not sell or market the refined sugar that it produces, and that United has responsibilities for marketing its producer-members' refined sugar, which include locating customers and negotiating the sales contracts for its members' product. To the extent that Paragraph 2 asserts legal conclusions and argument, no response is required. Defendants deny any remaining allegations in Paragraph 2.

**Paragraph 3**:

**United and Imperial are two of the three largest suppliers of refined sugar to grocery stores, distributors, and food and beverage manufacturers located across the regions defined by the U.S. Census Bureau as the East South Central and South Atlantic United States, an area that stretches from Mississippi to Delaware ("the Southeast"). Transportation costs can add thousands of dollars to the total cost of a delivery, and the need to ship refined sugar even a few hundred additional miles can yield a substantially higher total price for the customer. Based on data from United, shipping refined sugar an additional 500 miles by truck would increase the price of delivered sugar by over 10 percent. Making the same shipment entirely via rail, which is often impossible, would increase the price of delivered sugar by more than five percent. Because of these transportation costs, wholesale customers in the Southeast rely heavily on producers that have large refineries located nearby. United has an advantage in this region through its ability to sell sugar from U.S. Sugar's refinery in Florida, as well as from other United members' refineries. Imperial is also well positioned to serve customers in the Southeast from its refinery in Savannah, Georgia. Buying from United and Imperial helps customers in the Southeast keep costs low, and ensures they continue to have reliable and affordable access to this essential ingredient for their products. In addition to United and Imperial, large conglomerate ASR, often referred to by its "Domino" brand name, has significant sales in the Southeast owing to its major refineries in Florida, Maryland, and Louisiana.**

Response to Paragraph 3:

Paragraph 3 contains Plaintiff's definition of the so-called "Southeast", to which no response is required. To the extent that a response is required, Defendants deny that Plaintiff's gerrymandered definition of the "Southeast" (which includes Delaware but excludes Arkansas and Louisiana) accurately comprises the states located in the southeastern United States or constitutes a proper geographic market under the antitrust laws. Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 3, except that

Defendants admit that United markets refined sugar to customers in the so-called "Southeast" (as Plaintiff purports to define it) from both U.S. Sugar's Clewiston refinery *and* from the processing facilities owned by United's members in Minnesota, Montana, North Dakota and Wyoming (often by way of storage facilities and transfer use stations scattered across the Midwest and East Coast)—all at a competitive price.  Indeed, just within the United States, sugar flows hundreds of miles or more in the ordinary course to meet demand, and there are even more refiners around the world who can and do easily ship large amounts of refined sugar into the United States.  U.S. customers thus have many options for purchasing whatever amounts of refined sugar they need from an array of domestic and foreign sellers.  Because customers have many options to which they can turn for their refined sugar needs, Defendants deny that any customers in the so-called "Southeast" depend on competition between United, Imperial, and ASR to obtain sugar at a competitive price.  This is particularly true because Imperial is a high-cost supplier that does not compete closely with United on the majority of each company's sales.

**Paragraph 4:**

**If the transaction is completed, just two multibillion-dollar corporations, United and Domino, would control approximately 75 percent of sugar sales in the Southeast, a region where over 5.5 billion pounds of refined sugar are purchased each year.  As shown in the estimated shares figure below, although other sugar suppliers sometimes sell to customers in the Southeast, they provide much smaller quantities because they operate at a significant disadvantage due to transportation and shipping costs and/or capacity constraints, among other competitive limitations.  Other suppliers therefore would have limited ability or incentive to constrain the dominance of United and Domino.  United and Domino would be even more dominant in Imperial's backyard: Georgia and the five states that border it.  For these states, more distant suppliers face even higher transportation costs, and consequently they are more limited in their ability to compete effectively.**



Response to Paragraph 4:

Defendants deny the allegations in Paragraph 4 and respond that numerous refined sugar suppliers from around the world compete aggressively for sales in the so-called "Southeast" subject to the limitations imposed by the USDA's Federal Sugar program (which regulates the quantity of refined sugar in the United States). Because customers have many potential suppliers, Defendants deny that any customers depend on competition between United, Imperial, and ASR to obtain sugar at a competitive price. This is particularly true because Imperial is a high-cost supplier that does not compete closely with United on the majority of each company's sales. Defendants further respond that the chart titled "Estimated Post-Merger Shares In The Southeast" is misleading, if not incorrect, and also shows that a significant amount of the customers in the so-called "Southeast" obtain sugar produced outside the "Southeast." For example, the chart indicates that United supplies most of the refined sugar it sells to customers in the DOJ's purported relevant market from facilities located in the upper Midwest where the "Other United Refiners" operate.

And customers in the so-called "Southeast" have even closer options in LSR and National Sugar Marketing ("NSM").

**Paragraph 5:**

**Today, United and Imperial compete head-to-head to supply refined sugar to customers across the Southeast. This competition has led to lower prices, better service reliability, and better product quality for wholesale customers in this region. For example, for many years, United and Imperial have competed fiercely with one another to win the business of a large American food manufacturer, leading Imperial's Vice President of Sales to complain, "on EVERY bid we have won on the auction and we were #1 in price, United has come back in after the fact . . . with a lower price and then got the business." In another instance, when United and Imperial were competing to win the business of another major food manufacturer, United acknowledged that it had "a significant freight disadvantage over one competitor in Savanah [sic], GA which is why [United] went with a much lower" price to retain the business. United's only competitor in Savannah is Imperial. The proposed acquisition would eliminate this competition, enabling United to raise prices and reduce quality and service reliability for customers throughout the Southeast, to the detriment of millions of American consumers, including families who would be forced to pay more to stock their kitchen pantries.**

Response to Paragraph 5:

Defendants deny the allegations in Paragraph 5, except admit that *U.S. Sugar* does not compete against Imperial in the sale of refined sugar. Defendants further state that customers in the so-called "Southeast" have many options beyond United and Imperial to which they can turn for their refined sugar needs, and deny that any customer properly depends on competition between United and Imperial to buy sugar at a competitive price. Sugar regularly flows hundreds of miles or more to meet demand. Defendants further respond that the selective quotation of unidentified written material in the third and fourth sentences of Paragraph 5 is taken out of context and misleading; and that the full content of that written material speaks for itself and does not support Plaintiff's case. Defendants further deny that the Transaction will harm American consumers. Sugar prices comprise only a tiny percent of the cost of foods containing sugar, and fluctuating sugar prices have virtually no effect on the prices that American consumers pay at grocery stores for products that contain sugar. Regardless, U.S. Sugar is not acquiring Imperial so that United

can raise prices.  U.S. Sugar is acquiring Imperial because U.S. Sugar currently grows and mills more raw sugar than its Clewiston plant can refine.  Owning Imperial's Port Wentworth facility—which depends upon foreign imports of raw sugar to survive—will allow U.S. Sugar to reduce costs and increase output, while expanding the suite of products and packaging options that are available to customers from the combined entities.  It will also allow U.S. Sugar, through United, to reduce customer delivery costs by coordinating shipments across its two facilities (while ensuring security of supply to customers in the event of an outage at another facility).  U.S. Sugar further plans to implement a series of operational improvements at Port Wentworth to increase the plant's production of refined sugar on an annual basis.  These merger-specific efficiencies will substantially benefit customers and, in turn, American consumers—all while providing American farmers with a farmer-owned home for the raw sugar they produce.

**Paragraph 6:**

**The proposed acquisition also would increase the likelihood that United and Domino, the two largest remaining refiners, will find it in their mutual self-interest to coordinate rather than compete on price, quality, and service reliability.  Indeed, after the acquisition was announced, Domino's Vice President of Commodities Purchasing told his colleagues that he had spoken directly with Imperial's CEO.  Reporting on that conversation, the Domino executive opined that U.S. Sugar's proposed acquisition of Imperial "likely is a good thing for us." Likewise, Domino's Director of National Accounts observed: "It's going to be more important than ever to stay close to United. . . . This is setting up to smell a bit like ADM/Cargill in the corn sweetener industry.  2 players that account for ~65% of the industry."**

Response to Paragraph 6:

Paragraph 6 asserts legal argument and conclusions that do not warrant a response.  To the extent that a response is required, Defendants deny the allegations in Paragraph 6 and further state that the selective quotations of unidentified written material in the third, fourth, fifth, and sixth sentences of Paragraph 6 are taken out of context and misleading; and that the full content of that written material speaks for itself and does not support Plaintiff's case.

**Paragraph 7:**

Although the proposed acquisition would be "a good thing" for billion-dollar refined sugar companies, it would not be good for competition, or for wholesale customers and American consumers. For the reasons discussed below, the proposed acquisition would likely result in substantial harm to wholesale customers and other American consumers in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and should be blocked.

Response to Paragraph 7:

Paragraph 7 asserts legal argument and conclusions that do not warrant a response. To the extent that a response is required, Defendants deny any allegations in Paragraph 7 and state that the selective, out-of-context quotation in the first sentence of Paragraph 7 is inaccurate and misleading. Defendants further deny that Plaintiff is entitled to any relief in this action. The Transaction is highly procompetitive as set forth in Defendants' Response to Paragraph 5, *supra*, and will substantially benefit customers and consumers through increased output, additional product offerings, lower costs, improved supply security, and enhanced quality and service—all while ensuring that American farmers can themselves refine the raw sugar they produce.

## II. DEFENDANTS AND THE PROPOSED TRANSACTION

**Paragraph 8:**

U.S. Sugar is the world's largest vertically-integrated cane sugar milling and refining corporation, capable of processing 850,000 tons of refined sugar per year. It owns over 200,000 acres of land in central Florida, as well as a cane milling facility and a nearby cane sugar refinery in Clewiston, Florida. U.S. Sugar harvests cane from the land owned by the company, mills that cane into raw sugar, and then converts that raw sugar into refined sugar at the Clewiston refinery. U.S. Sugar is one of four member-owners of United, a marketing cooperative that markets and sells all of the refined sugar produced by U.S. Sugar and its three other member-owners. In 2020, U.S. Sugar received payments of $533 million from United, representing the company's share of United's net profits from sales of the refined sugar produced by the member-owners. U.S. Sugar is a Delaware corporation headquartered in Florida.

Response to Paragraph 8:

Defendants admit that U.S. Sugar is a 90-year old American farming company that grows and harvests sugar cane on 200,000 acres in central Florida, mills its harvested sugar cane into raw

sugar at its mill in Clewiston, Florida, and refines that raw sugar at its refinery in Clewiston, Florida. Defendants admit the allegations in the fourth, fifth and sixth sentences of Paragraph 8. Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 8 because the Complaint does not identify the metrics used as a basis for those allegations; Defendants deny those allegations on that basis.

**Paragraph 9:**

**As discussed above, United is a cooperative owned by four sugar refiners: U.S. Sugar, American Crystal Sugar Company, Minn-Dak Farmers Cooperative, and Wyoming Sugar Company. Its member-owners operate nine sugar refineries located in Florida, Minnesota, Montana, North Dakota, and Wyoming. In 2020, United generated $1.8 billion in sales. United is a Minnesota corporation with headquarters in Minnesota.**

Response to Paragraph 9:

Defendants admit that United is an agricultural marketing cooperative that operates on behalf of its four producer-members: U.S. Sugar, American Crystal Sugar Company, Minn-Dak Farmers Cooperative, and Wyoming Sugar Company. Defendants admit that United is headquartered in Minnesota and that its members operate nine refineries located in Florida, Minnesota, Montana, North Dakota, and Wyoming. Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 9 because the Complaint does not identify the metrics used as a basis for those allegations; Defendants deny those allegations on that basis.

**Paragraph 10:**

**Defendant Louis Dreyfus Company LLC ("Louis Dreyfus") is a worldwide leader in sugar trading and merchandising. Louis Dreyfus is a Delaware corporation with several U.S. offices.**

Response to Paragraph 10:

Defendants admit that LDC—i.e., Louis Dreyfus Company LLC—is a Delaware limited liability company. Defendants deny that LDC is a worldwide leader in sugar trading and

merchandising; however, Defendants acknowledge that this is an accurate characterization of certain foreign affiliates of LDC.

**Paragraph 11:**

**Imperial is a wholly-owned subsidiary of Louis Dreyfus, with headquarters in Sugar Land, Texas.  Imperial produces refined sugar in the United States and independently markets and sells its refined sugar products.  Imperial has a cane sugar refinery in Savannah, Georgia and an intermediate sugar transfer and liquification facility in Ludlow, Kentucky. Imperial's revenues exceeded $700 million in 2020.**

Response to Paragraph 11:

Defendants admit that Imperial is owned by LDC and maintains offices in Sugar Land, Texas.  Defendants admit that Imperial refines and sells sugar, has a cane sugar refinery in Port Wentworth, Georgia, and owns a sugar transfer and liquification facility in Ludlow, Kentucky. Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in the fourth sentence of Paragraph 11 because the Complaint does not identify the metrics used as a basis for those allegations.  Defendants further deny any remaining allegations in Paragraph 11.

**Paragraph 12:**

**In 2019, on behalf of itself and its members, United sought to acquire Imperial but Louis Dreyfus rejected United's offer as too low.  Shortly thereafter, one of United's member-owners, U.S. Sugar, pursued the acquisition of Imperial.**

Response to Paragraph 12:

Defendants deny the allegations in Paragraph 12 as incomplete and misleading, except admit that (i) in 2019, United made an offer to purchase the business and assets of Imperial but was unable to come to terms with LDC, and (ii) U.S. Sugar began discussions to acquire Imperial's business and assets after no other viable buyers for Imperial emerged following a nearly three-year period in which LDC tried to market the business for sale.

**Paragraph 13:**

On March 24, 2021, U.S. Sugar and Louis Dreyfus entered into an asset purchase agreement whereby U.S. Sugar would acquire all of Imperial's assets for approximately $315 million. United, U.S. Sugar, Imperial, and Louis Dreyfus simultaneously entered into a side letter agreement dated March 24, 2021, whereby United agreed to comply with certain obligations of the asset purchase agreement. On April 20, 2021, United entered into an agreement with U.S. Sugar and the other member-owners pursuant to which United would market and sell all of the refined sugar produced by Imperial if U.S. Sugar is permitted to acquire Imperial.

Response to Paragraph 13:

Defendants deny the allegations in Paragraph 13, except admit that U.S. Sugar and LDC entered into an asset purchase agreement on March 24, 2021, to which Defendants refer for its contents. Defendants further state that to the extent that Paragraph 13 purports to identify and describe a March 24, 2021 letter agreement, Defendants refer to that written document for its contents. Defendants state that the characterization of an April 20, 2021 written document in Paragraph 13 is inaccurate and misleading, and refer to that document for its contents.

### III.  INDUSTRY OVERVIEW

A.    **The Sugar Production Process**

**Paragraph 14:**

Refined sugar can be produced from either cane or beets. In the United States, sugarcane is grown only in the tropical and semitropical climates of Florida, Louisiana, and Texas. Sugar beets are grown in a range of temperate climate conditions across eleven states: California, Colorado, Idaho, Michigan, Minnesota, Montana, Nebraska, North Dakota, Oregon, Washington, and Wyoming. Sugarcane is not a genetically modified crop, while sugar beets grown in the United States are genetically modified. After it is harvested, sugarcane is converted to "raw" sugar at sugar mills, and then the raw sugar is processed into refined sugar at refineries. Harvested sugar beets are processed in a single facility where they are converted into refined sugar directly with no milling process required.

Response to Paragraph 14:

Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in the fourth sentence of Paragraph 14. Defendants admit the remaining allegations in Paragraph 14.

**Paragraph 15:**

Refined sugar is predominantly sold in granulated form, including the familiar dry white granulated sugar that many households stock in their kitchens. Refined sugar also may be modified into liquid sugar (by dissolving granulated sugar in water or, for a few liquid-only producers, by melting raw sugar), brown sugar (by adding molasses to granulated sugar), or powdered sugar (by pulverizing granulated sugar and adding corn starch).

Response to Paragraph 15:

Defendants admit the allegations in Paragraph 15.

**Paragraph 16:**

As only a portion of the raw sugar necessary to meet the demand of domestic sugarcane refineries is produced domestically, some domestic sugar refiners import raw sugar into the United States. On the East Coast, only Imperial and Domino refine imported raw sugar into dry forms of refined sugar. Pursuant to agreements between the United States and other sugar exporting countries, a limited quantity of raw cane sugar and refined sugar may be imported into the United States at low tariffs or duty-free. The U.S. Department of Agriculture ("USDA") has authority to increase the quantity of imports from Mexico and other exporting countries under certain circumstances.

Response to Paragraph 16:

Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 16, except admit that some domestic sugar refiners and/or distributors can and do import raw and refined sugar into the United States, and that the federal government heavily regulates the supply of domestic sugar to ensure that an adequate quantity of sugar is available to consumers at a reasonable price. Defendants further admit that the USDA can and does increase the quantity of imports from Mexico and other countries under certain circumstances—including to counteract high domestic sugar prices where the USDA believes it is appropriate to do so. Defendants additionally state that the Federal Sugar Program—which includes the USDA's use of domestic marketing allotments, price support loans, tariff-rate quotas, the Feedstock Flexibility Program, and international trade agreements—is designed to ensure that American sugar farmers

can effectively compete against heavily-subsidized foreign imports that would otherwise threaten domestic food supply.

**Paragraph 17:**

**The USDA administers a sugar loan program that essentially sets a floor for raw and refined sugar prices; however, the USDA does not prescribe the price that sugar refiners may charge their customers for refined sugar, nor does the USDA set the terms and conditions of private contracts between sugar refiners and their customers. Since early 2014, for example, the wholesale price of sugar has increased substantially.**

Response to Paragraph 17:

Defendants admit that the USDA administers the Federal Sugar Program, which regulates the quantity of sugar sold in the United States and protects against sugar prices that are either too low or too high.  Defendants admit that USDA's non-recourse loans constitute one component of the Federal Sugar Program, and set a floor for raw and refined sugar prices.  Defendants further respond that USDA can and does take action to address prices that it believes are too high.  Defendants state that the allegations in the final sentence of Paragraph 17 are incomplete and misleading; as a result of the U.S. Government's antidumping investigation in 2014, the United States entered into international agreements overseen by the Department of Commerce, including the Mexican Sugar Suspension Agreements, which have influenced the wholesale price of sugar since 2014.

**B.      Producers of Refined Sugar**

**Paragraph 18:**

**Few companies refine sugar in the United States.  Only four companies produce dry refined cane sugar: the Defendants, Domino, and Louisiana Sugar Refinery ("LSR"). Domino has cane refineries in California, Florida, Louisiana, Maryland, and New York. LSR has a cane refinery in Louisiana and markets and sells all of its refined sugar through its partner, Cargill.  There are also two small liquid refiners—CSC Sugar and Sucro Sourcing—that produce liquid cane sugar directly from raw sugar, but these liquid refiners do not produce any dry refined sugar in the United States.**

Response to Paragraph 18:

Defendants deny the allegations in the first sentence of Paragraph 18 and state that, upon information and belief, there are at least ten sugar producers in the United States alone—and that number does not account for the dozens of companies around the world that can and do easily ship large amounts of refined sugar into the United States.  U.S. customers thus have many options for purchasing whatever amounts of refined sugar they need from an array of domestic and foreign sellers.  That is particularly true because sugar flows hundreds of miles or more to meet demand.  Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 18, except admit on information and belief that U.S. Sugar, LSR, ASR, CSC Sugar, and Sucro Sourcing (and potentially others) all refine raw sugar in the United States.

**Paragraph 19:**

**In addition to United's beet sugar member-owners, there are three other beet sugar producers—National Sugar Marketing ("NSM"), Michigan Sugar, and Western Sugar. NSM is a marketing entity that sells refined sugar made by two beet cooperatives, which have beet processing facilities in California, Idaho, and Minnesota.  NSM makes only a small volume of sales to customers in the Southeast.  Michigan Sugar has beet processing facilities in Michigan with negligible sales to customers in the Southeast.  Finally, Western Sugar has beet processing facilities in Colorado, Montana, Nebraska, and Wyoming.  Western Sugar sells primarily to customers west of the Mississippi River and has negligible sales to customers in the Southeast.**

Response to Paragraph 19:

Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 19, except admit that there are numerous beet sugar producers in the United States, including producers that market through NSM, Michigan Sugar, Western Sugar, and the affiliated members of those companies.  Defendants further admit that some combination of NSM (which is headquartered in Atlanta, Georgia), Michigan Sugar, and Western Sugar can and do sell refined sugar to customers located in the so-called "Southeast."  Defendants deny,

however, that Plaintiff's definition of the "Southeast" either accurately includes the states comprising the southeastern United States, or constitutes a proper geographic market for purposes of this case, as set forth in Defendants' response to Paragraph 3, *supra*.

## C.    Marketing and Distribution to Customers

**Paragraph 20**:

**Sugar producers market and sell refined sugar to wholesale customers including retailers, food and beverage manufacturers, and distributors that re-sell refined sugar to other customers. Each customer may have slightly different needs and preferences. For instance, some customers are looking only for granulated sugar, whereas others may want liquid sugar, and other customers may be able to purchase or use either. Some customers require refined cane sugar in order to market their products as "Non-GMO" or as containing "pure cane sugar," whereas other customers may be willing to purchase either cane or beet sugar. Whatever specifications a customer may have, all of these forms of sugar are refined sugar.**

Response to Paragraph 20:

Defendants deny the allegations in the first sentence of Paragraph 20 because not all producers sell and market refined sugar to customers. U.S. Sugar, for example, does not sell or market the refined sugar that it produces. Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 20, except state that customers have many options for obtaining their refined sugar needs, whatever their preferences may be.

**Paragraph 21**:

**Customers can buy granulated refined sugar in either bulk or packaged form and have it shipped by train or truck. Packaged granulated refined sugar comes in various sizes (e.g., 10- or 50-pound bags, 2,400-pound supersacks) and is typically delivered by truck. Certain customers operate facilities that can readily accommodate deliveries of granulated refined sugar in bulk. Such customers often prefer bulk shipments because it is more efficient and reduces labor costs. Other customers are not set up to receive bulk deliveries of granulated refined sugar.**

Response to Paragraph 21:

Defendants admit the allegations in Paragraph 21, and state that granulated refined sugar is available to customers in a variety of different forms or ways—including in bulk or packaged form, packaged in various sized bags or sacks, and shipped by train or truck. Defendants also admit that customers have many options to choose from when buying refined sugar.

**Paragraph 22:**

**Customers typically purchase refined sugar annually pursuant to a request for proposal or other form of bid solicitation. As part of the bidding process, customers specify the type or variety of refined sugar products required (e.g., granulated, brown, powdered, or liquid), whether the customer requires cane sugar, volume requirements, and delivery locations. Prices and terms of sale are finalized in individual negotiations. Customers rely on competition between refined sugar producers to obtain competitive prices and to ensure product quality and reliable service.**

Response to Paragraph 22:

Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 22, except admit that numerous sellers of refined sugar compete for sales to customers, including distributors and marketers of refined sugar. Defendants deny that customers of refined sugar necessarily rely on competition between refined sugar *producers* to obtain competitive prices.

**Paragraph 23:**

**Sugar producers' customers include sugar distributors that resell refined sugar to their own customers. Distributors primarily serve as a sales channel for sugar producers to reach smaller customers. United and Imperial both have separate sales teams focused on the distributor customer channel. Distributors have no capability to process raw sugar into refined sugar. Instead, they are essentially resellers that rely largely on domestic sugar producers to source granulated refined sugar. Distributors may also source from some of the limited quantities of granulated refined sugar imports. Distributors generally resell the same refined sugar products they purchase from producers, but some distributors further process the granulated refined sugar they purchase from producers to create brown, powdered, or liquid sugar for resale. Distributors tend to sell to customers on a spot basis (i.e., a one-time transaction) or focus on serving customers that need less than a full truckload of sugar for a given delivery. Larger customers do not generally purchase from distributors because buying directly from the sugar producers is typically the most cost-competitive**

20

**option.  In addition, many customers that require or prefer bulk shipments do not view the limited quantities of imported sugar sold by distributors as a viable option due to many factors.  These reasons include the labor cost to empty the imported packaged bags into bulk containers, and concerns about the quality and safety of imported sugar.**

Response to Paragraph 23:

Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 23, except admit that distributors compete aggressively for sales of refined sugar across the United States and provide many customers with an important option for supplying their refined sugar needs at a competitive price.  Defendants further respond that distributors can and do purchase refined sugar at a competitive price from importers (and their affiliates) that ship large quantities of refined sugar into the United States every year.

**Paragraph 24:**

**Customers pay a delivered price, i.e., one that includes transportation costs.  The distance between a sugar producer and the customer is a significant determining factor in the price a customer pays for refined sugar.  Transportation costs make up a significant percentage of the delivered cost of refined sugar.  Shorter shipping distances also reduce the likelihood of shipping delays, which can be very costly for customers that depend on a reliable supply of ingredients to run their facilities.  Longer shipping distances also increase the likelihood of damage to the refined sugar.  For these reasons, customers often buy refined sugar from producers in close proximity.**

Response to Paragraph 24:

Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 24, except admit that some suppliers charge a delivered price to their customers.  Defendants further respond that sugar flows hundreds of miles or more across the United States, and customers can and do purchase refined sugar at competitive prices from suppliers across the U.S., as well as from importers (and their affiliates) that ship large quantities of refined sugar into the United States every year.

## IV.  RELEVANT MARKETS

**Paragraph 25:**

Courts define a relevant market to help determine the areas of competition most likely to be affected by a merger.  A relevant market has both a product and a geographic dimension.

Response to Paragraph 25:

Paragraph 25 asserts legal conclusions and argument that do not require a response.  To the extent that a response is required, Defendants state that Plaintiff has failed to properly define the relevant market(s).

**Paragraph 26:**

Unless enjoined, the proposed transaction would result in anticompetitive effects in the production and sale of refined sugar sold to wholesale customers such as industrial food and beverage manufacturers, distributors, and retailers located in (1) the Southeastern United States and (2) Georgia, where Imperial's refinery resides, and its bordering states. As recognized by the Supreme Court and the U.S. Department of Justice and Federal Trade Commission *Horizontal Merger Guidelines*, the focus in defining product markets is the extent of substitution in response to changes in price or quality.  One tool used to assess the extent to which products are substitutes, and thus whether they belong in the same market, is known as the "hypothetical monopolist" test.  This test, as described in the *Horizontal Merger Guidelines*, asks whether a firm that is the only seller of a product (a hypothetical monopolist) could profitably impose a price increase—specifically, a small but significant and non-transitory increase in price—on at least one product sold by the merging firms in the relevant product market.  As described below, the relevant markets satisfy this hypothetical monopolist test.

Response to Paragraph 26:

Paragraph 26 asserts legal conclusions and argument, which do not require a response. Paragraph 26 also purports to paraphrase and characterize the U.S. Department of Justice and Federal Trade Commission's *Horizontal Merger Guidelines*, which is a written document that speaks for itself.  Defendants deny any remaining allegations in Paragraph 26, and state that Plaintiff has failed properly to define the relevant market(s).

**A.      The Production and Sale of Refined Sugar is a Relevant Product Market**

**Paragraph 27:**

**The production and sale of refined sugar is a relevant product and a line of commerce under Section 7 of the Clayton Act and is a relevant product market in which competitive effects can be assessed.  Refined sugar is food-grade sugar that is produced by refining either sugar beets or raw cane sugar.  Although some customers may not see beet sugar and cane sugar as substitutes, and the acquisition would result in even higher concentration in the sale of cane sugar, it is not necessary to consider separate markets for refined beet sugar and refined cane sugar to determine that the acquisition is likely to lessen competition.  Refined sugar is sold primarily as granulated refined sugar but may also be sold as liquid sugar, brown sugar, or powdered sugar.  An industrial food or beverage customer that uses refined sugar in its products is unlikely to switch to using another sweetener because it would require changing recipes, production methods, and product labeling, which risks depressing demand for its products.  Similarly, grocery stores and other retail customers are unlikely to replace sugar on their shelves with other sweetener products because American households demand sugar for uses like baking cookies and sweetening coffee.  Other kinds of sweeteners, such as high fructose corn syrup, are not reasonable substitutes for sugar.**

Response to Paragraph 27:

Defendants deny the allegations in Paragraph 27, except admit that refined sugar can be produced from processing sugar beets or refining raw cane sugar, refined sugar is food-grade sugar, and refined sugar is available to customers in numerous forms, including as granulated, liquid, brown, and powdered sugar.   Defendants further respond that Paragraph 27 asserts legal conclusions and argument that do not require a response.  To the extent that a response is required, Defendants deny the remaining allegations in Paragraph 27, and state that Plaintiff has failed to properly define the relevant market(s).

**Paragraph 28:**

**For these reasons, the production and sale of refined sugar satisfies the well-accepted hypothetical monopolist test set forth in the *Horizontal Merger Guidelines*.  A hypothetical monopolist of the production and sale of refined sugar would likely raise prices by a small but significant and non-transitory amount because substitution away from refined sugar would be insufficient to make that price increase unprofitable.  Accordingly, the production and sale of refined sugar constitutes a relevant product market and line of commerce under Section 7 of the Clayton Act.**

Response to Paragraph 28:

Paragraph 28 asserts legal conclusions and argument that do not require a response. Paragraph 28 also purports to paraphrase and/or characterize the U.S. Department of Justice and Federal Trade Commission's *Horizontal Merger Guidelines*, a written document that speaks for itself. Defendants deny the remaining allegations in Paragraph 28, and state that Plaintiff has failed properly to define the relevant market(s).

**B.   The Proposed Transaction Would Harm Customers in Two Relevant Geographic Markets**

**Paragraph 29**:

**The proposed transaction would harm customers across the Southeast. Within this broader geographic market is a narrower region, spanning Georgia and bordering states, in which the harm from the transaction is likely to be especially acute because the Imperial refinery is located in Georgia. The competition between United and Imperial is particularly important for customers in these states. This narrower region also constitutes a relevant geographic market in which the competitive effects of the proposed transaction should be evaluated.**

Response to Paragraph 29:

Defendants deny the allegations in Paragraph 29 and specifically deny that either the "Southeast" or "Georgia and its bordering states" constitute a relevant geographic market under the antitrust laws. Defendants further respond that the Transaction is highly procompetitive and will substantially benefit customers and consumers through increased output, additional product offerings, lowered costs, improved supply security, and enhanced quality and service—all while ensuring that American farmers can refine the raw sugar they produce.

**Paragraph 30**:

**When a supplier can price differently based on a customer's location, the relevant geographic market may be defined based on the locations of targeted customers. Refined sugar producers can and do charge different prices to customers in different areas. They negotiate prices with each individual customer for each individual customer location. In addition, the cost to transport refined sugar limits the geographic reach from which a customer can cost-effectively buy refined sugar. Moreover, due to the transportation costs,**

**concerns over quality, and risks of contamination, most customers cannot practically buy refined sugar from a different customer located outside of the relevant geographic market (i.e., by engaging in arbitrage).**

Response to Paragraph 30:

Paragraph 30 asserts legal conclusions and argument that do not require a response. To the extent that a response is required, Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in the second and third sentences of Paragraph 30 and deny those allegations on that basis. Defendants deny the remaining allegations in Paragraph 30 and respond that, because sugar flows hundreds of miles or more to meet demand, customers can and do purchase refined sugar at competitive prices from suppliers across the country, as well as from importers (and their affiliates) shipping large quantities of refined sugar into the United States every year.

**(1)    The Southeast is a Relevant Geographic Market**

**Paragraph 31:**

**United and Imperial compete vigorously for customers with food and beverage manufacturing facilities, distribution warehouses, or retail stores across the Southeast, a region that includes the areas that the U.S. Census Bureau defines as the East South Central and the South Atlantic: Alabama, Delaware, the District of Columbia, Florida, Georgia, Kentucky, Maryland, Mississippi, North Carolina, South Carolina, Tennessee, Virginia, and West Virginia.**

Response to Paragraph 31:

Paragraph 31 contains Plaintiff's definition of the "Southeast", to which no response is required. To the extent that a response is required, Defendants deny that Plaintiff's gerrymandered definition of the "Southeast" (which, among other things, includes Delaware but excludes Arkansas and Louisiana) accurately comprises the states located in the southeastern United States or constitutes a proper geographic market under the antitrust laws. Defendants further respond that customers in the so-called "Southeast" and elsewhere can and do buy refined sugar—at competitive prices—from numerous other suppliers across the country, as well as from importers

(and their affiliates) shipping refined sugar into the United States from around the world.  Because customers have many options to which they can turn for their refined sugar needs in a variety of locations, Defendants deny that any customers in the so-called "Southeast" properly depend on competition between United and Imperial to obtain a competitive price for sugar.   This is particularly true because Imperial is a high-cost supplier that does not compete closely with United on the majority of each company's sales.   Defendants deny the remaining allegations in Paragraph 31.

**Paragraph 32:**

**The Southeast is a relevant geographic market under Section 7 of the Clayton Act. Customers with manufacturing facilities, retail stores, or distribution warehouses in the Southeast do not have reasonable substitutes for refined sugar in this geographic region. Thus, a hypothetical monopolist producer of refined sugar sold to customers that have manufacturing facilities, retail stores, or distribution warehouses in the Southeast would likely increase prices by at least a small but significant and non-transitory amount.  This price increase would not be defeated by substitution away from refined sugar or by arbitrage.**

Response to Paragraph 32:

Paragraph 32 asserts legal conclusions and arguments that do not require a response.  To the extent that a response is necessary, Defendants deny the allegations in Paragraph 32. Defendants specifically deny that the so-called "Southeast" constitutes a relevant geographic market under the antitrust laws, for the reasons set forth in Defendants' response to Paragraph 31, *supra*.  Defendants further respond that customers in the so-called "Southeast" and elsewhere can and do buy refined sugar—at competitive prices—from numerous other suppliers across the country (including producers, marketers, and distributors of refined sugar), as well as from importers (and their affiliates) shipping refined sugar into the United States from around the world. Because customers have many options to which they can turn for their refined sugar needs in a

variety of locations, Defendants deny that any customers in the so-called "Southeast" depend on

competition between United and Imperial to obtain a competitive price for sugar.

### (2)     Georgia and Its Bordering States is a Relevant Geographic Market

<u>Paragraph 33</u>:

**Within the Southeast, customers in Georgia and its bordering states would face particularly acute harm because United and Imperial are especially close competitors for these customers given Defendants' refinery locations and the locations of other sugar producers.  Therefore, it is also appropriate to assess the competitive effects of the proposed transaction by considering the effects on customers within this narrower area.  Accordingly, the states of Alabama, Florida, Georgia, North Carolina, South Carolina, and Tennessee constitute a relevant geographic market and section of the country under Section 7 of the Clayton Act.  This geographic market encompasses Georgia, where the Imperial refinery is located, and its bordering states.**

<u>Response to Paragraph 33</u>:

Paragraph 33 asserts legal conclusions and argument that do not require a response.  To the

extent that a response is necessary, Defendants deny the allegations in Paragraph 33.  Defendants

specifically deny that "Georgia and its bordering states" constitutes a relevant geographic market

under the antitrust laws.

<u>Paragraph 34</u>:

**The states constituting this narrower relevant market are shaded red in Figure 1 below, a March 2020 United presentation to the United Executive Committee, comprised of the CEOs of United's four member-owners, with the title "Regional Markets Overview." As United's Executive Vice President of Industrial Sales explained, this Regional Markets Overview presentation was provided to assist with analyzing "what geographies would result . . . in the best net selling price" for the incremental refined sugar volume United's members planned to produce.  Each shaded geographic region of Figure 1 represents the "Supplier Backyards"—or, as the executive explained, the "geographies in which the producers that are identified in those various regions have freight advantage." This Regional Markets Overview identifies United (by selling the refined sugar produced at U.S. Sugar's Clewiston refinery), Imperial, and Domino (by selling out of its South Bay, Florida refinery) as the producers with a freight cost advantage over other refined sugar producers for customers located in the red-shaded states.**



Figure 1. United Map Identifying Competitors' Regional Freight Cost Advantages

Response to Paragraph 34:

Defendants deny the allegations in Paragraph 34.  Defendants further respond that the selective quotation of written and testimonial material in Paragraph 34 is taken out of context and misleading; the full documents speak for themselves and do not support Plaintiff's case.

**Paragraph 35:**

**The narrower market of Georgia and bordering states satisfies the hypothetical monopolist test and is a relevant geographic market under Section 7 of the Clayton Act. Customers located in Georgia and its bordering states do not have reasonable alternatives to purchasing refined sugar in this narrower market.  Thus, a hypothetical monopolist producer of refined sugar sold to customers with manufacturing facilities, retail stores, or distribution warehouses in Georgia and its bordering states would likely increase prices by at least a small but significant and non-transitory amount.  This price increase would not be defeated by substitution away from refined sugar or by arbitrage.**

Response to Paragraph 35:

Paragraph 35 asserts legal conclusions and argument that do not require a response.  To the extent that a response is required, Defendants deny the allegations in Paragraph 35.  Defendants specifically deny that "Georgia and its bordering states" constitutes a relevant geographic market under the antitrust laws.  Defendants further respond that customers in Georgia and elsewhere can

and do buy refined sugar—at competitive prices—from numerous other suppliers located all across the country, as well as from importers (and their affiliates) shipping refined sugar into the United States from around the world. Because customers have many options to which they can turn for their refined sugar needs in a variety of locations, Defendants deny that any customers in Georgia and its bordering states properly depend on competition between United and Imperial to obtain a competitive price for sugar.

## V. ANTICOMPETITIVE EFFECTS

**Paragraph 36:**

> **The proposed transaction would leave only two major refined sugar producers supplying to both relevant geographic markets—United (selling its member-owners' sugar production) and Domino. Together, these companies would control about 75 percent of refined sugar sales to customers in each relevant geographic market. Important head-to-head competition between United and Imperial would be eliminated, and these already concentrated markets would become even more concentrated. As a result of this disruption to the competitive process, United would likely raise prices and face reduced pressure to provide reliable service and a high-quality product. The proposed transaction also would increase the likelihood of coordination between United and Domino. Unless enjoined, the proposed acquisition would raise costs for food and beverage manufacturers, retailers, distributors, and ultimately American households.**

Response to Paragraph 36:

Defendants deny the allegations in Paragraph 36. Following the Transaction, customers will still have many options for buying quality refined sugar at a competitive price—including dozens of producers, marketers, and distributors that sell refined sugar produced both domestically and abroad. Many customers in DOJ's alleged relevant geographic markets already purchase refined sugar from suppliers other than United, Imperial, and ASR, and all customers could turn to those and other suppliers, including producers such as LSR that plan to increase production in the near future, to prevent any attempted price increases. Defendants further respond that the Transaction itself is highly procompetitive and will substantially benefit customers and consumers through increased output, additional product offerings, lowered costs, improved supply security,

and enhanced quality and service—all while ensuring that American farmers can refine the raw

sugar they produce.

## A.     The Transaction is Presumptively Unlawful in the Relevant Markets

**Paragraph 37:**

**The Supreme Court has held that mergers that significantly increase concentration in concentrated markets are presumptively anticompetitive and unlawful.  To measure market concentration, courts often use the Herfindahl-Hirschman Index ("HHI").  HHIs range from 0 in markets with no concentration to 10,000 in markets where one firm has 100 percent market share.  Courts have found that mergers that increase the HHI by more than 200 and result in an HHI above 2,500 in any market are presumed to be anticompetitive.**

Response to Paragraph 37:

Paragraph 37 asserts legal conclusions and argument that do not require a response.  To the

extent that a response is necessary, Defendants deny the allegations in Paragraph 37.

**Paragraph 38:**

**Using this measure, the proposed acquisition is presumed anticompetitive in both relevant markets and thus is presumptively unlawful.  United makes all of the pricing and selling decisions on behalf of all its member-owners, and if the transaction is completed would make all pricing and selling decisions for Imperial as well.  United, not its individual members, is viewed as the competitor in the market by Imperial, other refined sugar suppliers, and customers.  Therefore, to reflect these market realities, the proper measure of concentration combines all of United's sales in the relevant markets.  In the market for the production and sale of refined sugar to customers located in the Southeast, the proposed acquisition of Imperial would significantly increase concentration, from an HHI of about 2,000 to an HHI of over 2,800, an increase of over 800 points.  Similarly, in the market for the production and sale of refined sugar to customers located in Georgia and its bordering states, the proposed acquisition of Imperial would significantly increase concentration, from an HHI of over 2,000 to an HHI of over 3,100, an increase of over 1,100 points.**

Response to Paragraph 38:

Paragraph 38 asserts legal conclusions and argument that do not require a response.  To the

extent that a response is necessary, Defendants deny the allegations in Paragraph 38, except admit

that United has responsibilities for marketing its producer-members' refined sugar, and locates

buyers, negotiates pricing, and coordinates sales, pursuant to this end.  Defendants further state

that U.S. Sugar does not market or sell refined sugar and, therefore, does not compete against

Imperial in any relevant antitrust market.  Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in the third sentence of Paragraph 38 regarding the views of other entities.

**Paragraph 39:**

**These market concentration measures understate the likelihood that the transaction would harm competition.  Some customers have specific preferences or needs for granulated refined sugar instead of liquid sugar; some customers have specific needs or preferences for bulk shipments over bagged sugar; and some customers have specific needs or preferences for cane sugar over beet sugar.  All of these factors make Imperial and United particularly close competitors for many customers and, after the proposed transaction, United would likely be able to target these customers for additional price increases.**

Response to Paragraph 39:

Defendants deny the allegations in Paragraph 39, except admit that customers can and do purchase refined sugar in numerous forms, varieties, and sizes from numerous suppliers according to their preferences.  Defendants further respond that, because Imperial is a foreign-owned, high-cost sugar refinery, it does not compete closely with United on the vast majority of each company's sales.

**B.     The Proposed Transaction Would Eliminate Head-to-Head Competition between United and Imperial in Both Relevant Markets**

**Paragraph 40:**

**United and Imperial often compete head-to-head to win customers' contracts.  This competition has resulted in lower prices and more reliable service.**

Response to Paragraph 40:

Defendants deny the allegations in Paragraph 40.

**Paragraph 41:**

**For example, for a certain large industrial customer with facilities across the United States, including in the relevant markets, United understood that Imperial was the customer's current supplier for a particular plant in the Southeast, having lost the business as the incumbent to Imperial a few years earlier.  In bidding for this customer's 2022 refined sugar supply, United had its "eye on" winning this business back.  United's bidding strategy focused on estimating and beating the delivered price Imperial would offer.  United even**

**reached out to the railroad carrier serving Imperial and the customer to obtain competitive intelligence on Imperial's freight cost. Ultimately, United dropped its bid price significantly and won the business back for 2022.**

Response to Paragraph 41:

Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 41 and deny those allegations on that basis.

**Paragraph 42:**

**For another large industrial customer's 2020-2021 sugar needs in the Southeast, United learned that the customer "decided to go with 'Savannah'"—in other words, Imperial. United lost the bid to Imperial because United's freight costs and additional charges were "not competitive compared to the competition," but United "was not too far off from competition."**

Response to Paragraph 42:

Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 42 and deny those allegations on that basis. Defendants further respond that the selective quotation of unidentified documents and/or testimony in Paragraph 42 is taken out of context and misleading, and that the full content of that written material speaks for itself and does not support Plaintiff's case.

**Paragraph 43:**

**United and Imperial do not just compete against each other aggressively for large industrial customers. For example, in 2020, United and Imperial were competing for a family-owned company's Southeast business. After the customer indicated that Imperial's price was too high to retain the business, Imperial came back with a lower price. The Imperial sales manager noted that it "Took a bit of back and forth, I thought we lost it, but we got it." In another bidding event for a regional, family-operated bakery in the Southeast, Imperial learned that incumbent United had lowered its bid price to maintain the business. Imperial therefore "want[ed] to offer [the customer] our very best, right off the top" and submitted a bid. "United came back" and bettered its previous offer, but Imperial was still able to win the business. The following year United wrested it back.**

Response to Paragraph 43:

Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 43 and deny those allegations on that basis. Defendants further respond

that the selective quotation of unidentified written material in Paragraph 43 is taken out of context and misleading, and that the document speaks for itself and does not support Plaintiff's case.

**Paragraph 44:**

**Customers use this head-to-head competition between United and Imperial as leverage in pricing negotiations.  For example, when Imperial competed to win a large retail chain's business in the Southeast and Northeast, Imperial understood from the customer's feedback that Imperial was "competing with United cane" and was asked if Imperial had "any room to go down [in price] slightly." Imperial responded by reducing its bid price and won the customer's business.**

Response to Paragraph 44:

Defendants deny the allegations in the first sentence of Paragraph 44 and further respond that because customers have many other suppliers in the United States to which they can turn for their refined sugar needs, they do not properly require competition between United and Imperial to obtain competitive prices.  Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 44 and deny those allegations on that basis.  Defendants further respond that the selective quotation of unidentified documents and/or testimony in Paragraph 44 is taken out of context and misleading, and that the full content of that written material speaks for itself and does not support Plaintiff's case.

**Paragraph 45:**

**Customers similarly rely on head-to-head competition between the parties to negotiate more reliable terms of service.  For example, during the 2020 RFP process, United and Imperial competed to supply one food manufacturer's refined sugar.  After awarding Imperial the business, the customer notified United that its loss "really came down to service."**

Response to Paragraph 45:

Defendants deny the allegations in the first sentence of Paragraph 45.  Defendants further respond that United's customers include powerful buyers with a variety of tools at their disposal to ensure that they receive competitive pricing, service, and quality on their refined sugar purchases.  Among other things, these customers have many other suppliers in the United States

to which they can turn for their refined sugar needs and do not properly require competition between United and Imperial to obtain a competitive price. Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 45, except state that the selective quotation of unidentified documents and/or testimony in Paragraph 45 is taken out of context and misleading, and that the full content of that written material speaks for itself and does not support Plaintiff's case.

**Paragraph 46:**

**United and Imperial often view each other as close competitors for a given customer's business and assess each other's ability to supply the customer. For example, for one large industrial customer, Imperial took steps not to "tip off United" when reaching out to truck carriers to secure freight pricing to include in its bid. Given the proximity of their refineries to each other, United and Imperial sometimes proactively lower prices to win business over the other. For example, a United sales manager informed a customer in the Southeast that United had "a significant freight disadvantage over one competitor in Savanah [sic], GA [i.e., Imperial] which is why [United] went with a much lower" price to maintain the business.**

Response to Paragraph 46:

Defendants deny the allegations in Paragraph 46. Defendants further respond that, because Imperial is a high-cost supplier, it does not compete closely with United on the vast majority of each company's sales. Defendants further respond that the selective quotation of unidentified written material in Paragraph 46 is taken out of context and misleading; and that the full content of that written material speaks for itself and does not support Plaintiff's case.

**Paragraph 47:**

**Imperial has been an important competitive constraint on United in both relevant markets. The proposed transaction would eliminate this important competitive pressure, likely leading United to increase prices and face reduced pressure to provide reliable service.**

Response to Paragraph 47:

Defendants deny the allegations in Paragraph 47. Defendants further respond that, because Imperial is a high-cost import refiner, it does not act as an important competitive constraint on United in any relevant market and its competitive significance will only continue to decline but-

for this merger.  Not only this, but the Transaction is highly procompetitive and will benefit customers and consumers with increased output, additional product offerings, lowered costs, improved supply security, and enhanced quality and service.

**C.    The Proposed Transaction Would Increase the Incentive and Ability of Industry Giants United and Domino to Coordinate to Raise Prices and Reduce Quality**

**Paragraph 48:**

**Post-transaction, the few remaining producers of sugar would be more likely to coordinate with one another to the detriment of customers.  In both relevant markets, just two remaining producers, United and Domino, would control the overwhelming majority of sales.  With few significant rivals, it would be easier for the two to coordinate to raise prices to customers, such as by raising prices in parallel or refraining from trying to win one another's existing customers.  Indeed, after the deal was announced, a Domino Vice President apparently spoke directly with Imperial's CEO, and then the Domino Vice President reported back to his colleagues that he thought the U.S. Sugar/Imperial transaction "likely is a good thing for us." During the same discussion with the Domino Vice President, a Domino national sales director noted that "[i]t's going to be more important than ever to stay close to United."**

Response to Paragraph 48:

Defendants deny the allegations in Paragraph 48.  Defendants further respond that many aspects of the sugar industry make it not conducive to successful coordination amongst suppliers and the selective quotation of unidentified documents in Paragraph 48 is taken out of context and misleading; and that the full content of that written material speaks for itself and does not support Plaintiff's case.

**Paragraph 49:**

**The transaction would more closely align the incentives of United and Domino, increasing the likelihood of coordination on price or other dimensions of competition.  The number of firms in a market is an important factor in assessing the ease of coordination, as are the size, product offerings, and other characteristics of those firms.  In particular, firms that are more similarly situated often have similar interests and therefore find it easier to coordinate on price or output.  Today, Domino is a very large vertically integrated firm that imports some raw sugar, whereas United is somewhat smaller and imports nothing, and Imperial is the smallest of the three and has no domestic sugar growing business to defend against imports.  After the acquisition, Imperial would be eliminated as an independent force, and United and Domino would both be very large firms with similar market shares and a similar level of vertical integration.  Both would benefit from a competitive détente.**

Response to Paragraph 49:

Paragraph 49 asserts legal conclusions and argument that do not require a response.  To the extent that a response is required, Defendants deny the allegations in Paragraph 49 and note that many aspects of the sugar industry make it not conducive to successful coordination amongst suppliers.  Defendants further respond that they lack knowledge or information sufficient to form a belief about the truth of the allegations in the fourth and fifth sentences of Paragraph 49 because the Complaint does not identify the metrics used as a basis for those allegations; Defendants deny those allegations on that basis.

**Paragraph 50:**

**The refined sugar market is vulnerable to such coordinated interaction between competitors due to a number of factors.  Refined sugar is a relatively homogenous product, and there are high barriers to entry.  Refined sugar prices are also relatively transparent, and sugar producers regularly monitor their competitors' prices.  Both United and Imperial obtain competitive information about their rivals' pricing and capacity decisions from a variety of sources, including customers, distributors, and brokers.  This transparency is sufficient for firms to discern when their rivals are undercutting them on price or generally increasing prices.  It enables competitors to signal to each other to indicate a willingness to increase price and encourage others to do the same.  In one instance, United raised prices in part to "send[] a message" to its competitors "that we were not interested in allowing the market to slip lower." United's CEO testified that he was "confident" that "word got back" to United's competitors.**

Response to Paragraph 50:

Defendants deny the allegations in Paragraph 50 and note that many aspects of the sugar industry make it not conducive to successful coordination amongst suppliers.  Defendants further respond that the selective quotation of unidentified documents and/or testimony in Paragraph 50 is taken out of context and misleading, and that the full content of that written material speaks for itself and does not support Plaintiff's case.   To the extent that Paragraph 50 asserts legal conclusions and argument, no response is required.

36

**Paragraph 51:**

Likewise, producers can readily identify which competitors are serving particular customers.  For example, United's Executive Vice President of Industrial Sales testified that "[m]ost of the trucking companies are aligned with one source or another" and "[t]he railcars are all numbered, so we . . . identify the routing of the car and understand where it was last loaded." He further testified that United can "send the sales manager to look at a bulk rail siting or a receiving location and figure out who's trucking the sugar in there" and thus "over time we come to understand what competitors might be at one location or another, or all." This transparency is sufficient for competitors to avoid competing too aggressively to poach one another's existing customers.  For example, when Imperial was considering dropping its bid price to a customer in the Southeast in order to be more competitive with United, Imperial's Senior Vice President of Sales warned the CEO, "The main downside would be snatching something from United just as they are starting to show some upside price movement."

Response to Paragraph 51:

Defendants deny the allegations in Paragraph 51 and note that many aspects of the sugar industry make it not conducive to successful coordination amongst suppliers.  Defendants further respond that the selective quotation of unidentified documents and/or testimony in Paragraph 51 is taken out of context and misleading, and that the full content of that written material speaks for itself and does not support Plaintiff's case.

**Paragraph 52:**

Moreover, producers other than United and Domino would benefit from increased prices and therefore would not have the incentive to frustrate increased coordinated interaction between United and Domino.  Other producers also would not have the ability to undermine coordinated behavior by United and Domino by expanding sales into the relevant markets.  The small shares of other refined sugar producers in the relevant markets demonstrate that competition is regional and largely determined by transportation costs.  These costs also make it unlikely that these refined sugar producers would significantly increase sales into the relevant geographic markets in response to a price increase.

Response to Paragraph 52:

Defendants deny the allegations in Paragraph 52.

**Paragraph 53:**

Similarly, distributors would lack the ability to constrain the prices charged by refined sugar producers like United and Domino.  The prices and quantities of refined sugar that distributors can offer are dependent upon, and largely controlled by, the prices and

terms set by the sugar producers, including United and Domino.  Indeed, sugar suppliers like United and Domino have the power to adjust terms and prices charged to distributors to curb their ability to compete.

Response to Paragraph 53:

Defendants deny the allegations in Paragraph 53.

**D.    The Most Vulnerable Customers Would Suffer Particularly Acute Harm**

**Paragraph 54:**

Although United and Imperial compete in a relevant market that includes the sale of sugar refined from both sugarcane and beets, when assessing likely competitors and deciding what price to offer, United and Imperial factor in whether the customer has a specific demand for cane sugar.  For customers that purchase only cane sugar, such as for non-GMO or other marketing purposes, United and Imperial are particularly close substitutes.  Cane-only customers are unlikely to turn to a beet sugar producer in the event the price of cane sugar increases.  Beet sugar producers cannot switch to refining cane sugar at their beet sugar processing facilities.  Thus, customers that strongly prefer cane sugar over beet sugar are likely to face greater harm from the acquisition than other customers.

Response to Paragraph 54:

Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in the third and fourth sentences of Paragraph 54.  Defendants deny the remaining allegations in Paragraph 54.

**Paragraph 55:**

Similarly, many customers need or prefer to use granulated refined sugar due to established product specifications or specialized manufacturing processes and therefore are unlikely to switch to liquid sugar if prices increase for granulated refined sugar.  These customers would likely suffer greater harm, as liquid-only sugar producers like CSC Sugar and Sucro Sourcing are not options even if they operate close to the customer.

Response to Paragraph 55:

Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in the first sentence of Paragraph 55.  Defendants deny the remaining allegations in Paragraph 55.

## VI.  ABSENCE OF COUNTERVAILING FACTORS

**A.**    **Entry and Expansion Will Not Prevent the Substantial Harm Threatened by this Deal**

**Paragraph 56:**

New entry or expansion by existing producers of refined sugar is unlikely to prevent or remedy the transaction's likely anticompetitive effects in the relevant markets.  There are high barriers to building a sugar refinery, including the cost and time to develop sufficient refining capacity to serve the relevant geographic markets.  Existing sugar producers that do not currently serve these markets are unlikely to begin shipping a significant quantity of refined sugar into the relevant geographic markets due to the same factors—mainly transportation costs—that make them uncompetitive in these markets today.

Response to Paragraph 56:

Defendants deny the allegations in Paragraph 56.  Defendants further respond that the USDA can and does increase import levels from foreign suppliers when domestic sugar prices rise beyond a level that the USDA deems reasonable.  The federal government thus can readily allow low-cost raw or refined sugar to flow into the so-called "Southeast" (or any area in the United States) multiple times a year in order to drive down refined sugar prices should prices ever reach levels the USDA deems unreasonable post-Transaction.  Defendants further state that one of the largest domestic producers in the country—LSR—recently announced plans to increase its sugar refining capabilities by 50% by early next year.  Defendants state that, according to DOJ's Complaint, LSR is already the third-largest seller of refined sugar to customers in the so-called "Southeast" making it ideally suited to expand sales into the region to respond to any attempted price increase post-Transaction.

**B.**    **USDA's Sugar Policy Will Not Prevent the Substantial Harm Threatened by this Deal**

**Paragraph 57:**

Defendants have claimed that USDA's sugar program would safeguard against the substantial harm threatened by this deal.  But USDA's sugar program is not a substitute for antitrust enforcement and will not protect American grocers, food and beverage manufacturers, or consumers from the likely harm from this acquisition.  Put simply,

**competition matters.  USDA's program exists today, and yet it is vigorous competition among sugar refiners—not federal regulation—that sets the prices and terms of sale for refined sugar and that ensures that American families and food producers receive quality products and reliable service.  Indeed, despite the USDA's role, there are significant regional variations in the prices charged to customers due to differences in competitive conditions in each area. Elimination of this robust domestic competition would result in higher prices and lower quality products and services.  It would also further strain beleaguered supply chains by forcing customers to turn to more distant or foreign suppliers for alternatives.  Thus, the transaction is unlawful under Section 7 of the Clayton Act, and challenging it on that basis does not conflict with or impede the regulations administered by the USDA.  The Supreme Court has rejected the argument that antitrust laws have no role in regulated industries, including in agriculture. *See United States v. Borden Co.*, 308 U.S. 188, 202 (1939); *Maryland & Virginia Milk Producers Ass'n v. United States*, 362 U.S. 458 (1960).  Rather, Section 7 requires "that forces of competition be allowed to operate within the broad framework of governmental regulation of the industry." *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 371-372 (1963).**

Response to Paragraph 57:

Defendants deny the allegations in Paragraph 57, except admit that the USDA administers the Federal Sugar Program, which regulates the quantity of sugar sold in the United States and protects against refined sugar prices that are either too high or too low.  As part of this Federal Sugar Program—which includes the USDA's use of domestic marketing allotments, price support loans, tariff-rate quotas, the Flexibility Feedstock Program and international trade agreements—the USDA can and does increase imports when necessary to lower domestic sugar prices and to allow consumers to purchase an adequate supply of sugar at reasonable prices.  The USDA thus has the ability to increase the amount of low-price raw or refined sugar flowing into the "Southeast" multiple times a year in order to respond to any post-Transaction price increase that the USDA deems unreasonable.  The remaining allegations in Paragraph 57 assert legal conclusions and argument that do not require a response.  The Transaction is not unlawful; to the contrary, it is good for consumers, farmers, and competition.

**Paragraph 58:**

**USDA's sugar program exists to support robust domestic sugarcane and sugar beet farming.  Nothing about the combination of two of the country's largest sugar refining**

40

**corporations is necessary to ensure that American sugarcane and sugar beet farmers can continue to earn a good living.  To the extent that American sugar farming needs additional support, USDA has the requisite policy tools.  This merger is not necessary.**

Response to Paragraph 58:

Defendants deny the allegations in Paragraph 58.  Defendants further respond that USDA can and does use multiple levers at its disposal to increase and decrease the price and/or quantity of domestically-refined sugar, and to ensure that American sugar farmers can effectively compete against heavily-subsidized foreign imports that would otherwise threaten domestic food supply and potentially create national security risks.

**C.     There Are No Merger-Specific Efficiencies That Outweigh the Substantial Harm Threatened by this Deal**

**Paragraph 59:**

**Defendants have claimed that this deal would allow U.S. Sugar to improve Imperial's operations.  But such improvements can be achieved without eliminating the significant competition at stake in this deal.  Time and again, history has shown that competition—not consolidation—drives corporations to improve their products.  Grocers, food and beverage manufacturers, and consumers will be better off if these rivals continue to compete for their business.**

Response to Paragraph 59:

Paragraph 59 asserts conclusions and argument that do not require a response.  To the extent that a response is necessary, Defendants deny the remaining allegations in Paragraph 59 and respond that the Transaction will result in overwhelming merger-specific efficiencies that will benefit customers and consumers of refined sugar, as set forth in Defendants' response to Paragraph 5 *supra*, such that the Transaction is in the public interest.

**VII.  JURISDICTION AND VENUE**

**Paragraph 60:**

**The United States brings this action under Section 15 of the Clayton Act, as amended, 15 U.S.C. § 25, to prevent and restrain the Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.  This Court has subject matter jurisdiction over this action under Section 15 of the Clayton Act, 15 U.S.C. § 25.**

Response to Paragraph 60:

Defendants admit that Plaintiff has filed its Complaint pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 25, and that Plaintiff purports to seek to prevent and restrain Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. §18.  Defendants deny that the Transaction would lessen competition in any market or otherwise violate the Clayton Act, and deny that Plaintiff is entitled to any relief.  Defendants admit that the Court has subject matter jurisdiction over this action under Section 15 of the Clayton Act, 15 U.S.C. § 25.

**Paragraph 61:**

**Defendants U.S. Sugar, United, Imperial, and Louis Dreyfus are engaged in interstate commerce and in activities substantially affecting interstate commerce.  Either directly or indirectly, Defendants process and sell refined sugar to customers in the United States, including in Delaware and throughout the Southeast.  They are engaged in a regular, continuous, and substantial flow of interstate commerce, and their sales of refined sugar have had a substantial effect on interstate commerce.**

Response to Paragraph 61:

Defendants admit that they engage in interstate commerce.  Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 61 as to any other entities, and deny the allegations on that basis.

**Paragraph 62:**

**This Court has personal jurisdiction over each Defendant.  U.S. Sugar, United, Imperial, and Louis Dreyfus transact business within this district.  U.S. Sugar and Louis Dreyfus are incorporated in this district.**

Response to Paragraph 62:

Defendants admit that U.S. Sugar and LDC were formed in Delaware and that the Court has personal jurisdiction over each Defendant.

**Paragraph 63:**

**Venue is proper in this district under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. §§ 1391(b) and (c).**

Response to Paragraph 63:

Paragraph 63 asserts legal conclusions and argument to which no response is required.  To the extent that a response is deemed necessary, Defendants deny that this district is the proper venue for this action.

## VIII.  VIOLATIONS ALLEGED

**Paragraph 64:**

**Unless enjoined, U.S. Sugar's proposed acquisition of Imperial, as well as United's agreement to market and sell Imperial's refined sugar in the event of the closing of the proposed transaction, are likely to substantially lessen competition in the relevant markets in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.**

Response to Paragraph 64:

Paragraph 64 asserts legal conclusions and argument to which no response is required.  To the extent that a response is deemed necessary, Defendants deny the allegations in Paragraph 64.

**Paragraph 65:**

**The acquisition would likely have the following anticompetitive effects, among others, in the relevant markets:**

    **i.**    **competition between United and Imperial in the production and sale of refined sugar to customers in the Southeast and in Georgia and its bordering states would be eliminated;**

    **ii.**    **the acquisition would increase the likelihood of, or enable, successful anticompetitive competitor coordination in the production and sale of refined sugar to customers in the Southeast, as well as in Georgia and its bordering states;**

    **iii.**    **competition in the relevant markets would be reduced generally;**

    **iv.**    **prices of refined sugar would likely increase to levels above what would prevail absent the transaction, forcing retailers, food and beverage manufacturers, and distributors in the Southeast and in Georgia and its bordering states to pay higher prices to buy refined sugar;**

    **v.**    **the quality of refined sugar would likely be reduced; and**

    **vi.**    **customer service, including delivery reliability, and choice would likely be reduced.**

Response to Paragraph 65:

Paragraph 65 asserts legal conclusions and argument to which no response is required.  To the extent that a response is deemed necessary, Defendants deny the allegations in Paragraph 65, including all subparts.

## IX.  REQUEST FOR RELIEF

**Paragraph 66:**

**The United States requests that the Court:**

    **(a)**    **adjudge U.S. Sugar's acquisition of Imperial to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;**

    **(b)**    **permanently enjoin Defendants from consummating U.S. Sugar's proposed acquisition of Imperial, from implementing United's agreement to sell the sugar products of Imperial, and from entering into or carrying out any other transaction by which control of the assets or business of Imperial would be combined with U.S. Sugar and/or United;**

    **(c)**    **award the United States its costs of this action; and**

    **(d)**    **grant the United States such other relief as the Court deems just and proper.**

Response to Paragraph 66:

Paragraph 66 consists of Plaintiff's prayer for relief to which no response is required.  To the extent that a response is required, Defendants deny that Plaintiff is entitled to the relief sought in the Complaint or to any relief whatsoever.

Defendants deny the allegations in the Complaint, whether express or implied, that are not specifically addressed herein.

## **DEFENDANTS' DEFENSES**

Defendants expressly reserve the right to plead additional affirmative or other defenses should discovery reveal any such defenses.  Defendants assert the following defenses, without assuming the burden of proof on such defenses that would otherwise rest with Plaintiff.

1.      The Complaint fails to state a claim upon which relief can be granted.

2.      The harm Plaintiff alleges is not a result of, and is independent of, the Transaction and is not the type of harm that Section 7 is designed to prevent.

3.      Plaintiff's claims are too speculative to support any claim for which relief can be granted.

4.      Plaintiff has failed to allege any appropriate product or geographic market or markets.

5.      Plaintiff has failed to establish that Defendants exercise market power with respect to any relevant market.

6.      Plaintiff has failed to establish that the Transaction is likely to have any anticompetitive effect, whether unilateral or coordinated, or result in any anticompetitive harm to customers or consumers, in any relevant market.

7.      The customers at issue in the Complaint have a variety of tools and options to ensure that they receive competitive pricing and terms.

8.      Plaintiff has failed to establish that the Transaction is likely to have any anticompetitive effect in any relevant market because Imperial is a weakened competitor, and its competitive significance will only decline over time but-for the Transaction.

9.      Plaintiff has failed to establish that the Transaction is likely to have any anticompetitive effect in any relevant market because the Federal Sugar Program administered by the USDA ensures that, irrespective of the Transaction, an adequate quantity of sugar is available to American consumers at reasonable prices.

10.      Plaintiff has failed to establish that the Transaction is likely to have any anticompetitive effect in any relevant market because entry by new market participants and/or

expansion by existing market participants will be timely, likely, and sufficient to undo any such effects.

11.     Plaintiff's claim is barred, in whole or in part, by the immunities and exemptions conferred by the Capper-Volstead Act, 7 U.S.C. 291-02, and Section 6 of the Clayton Act, 15 U.S.C. 17.

12.     To the extent not set forth above, Plaintiff's claim is barred, in whole or in part, because it is precluded and/or preempted by federal oversight of the conduct at issue and/or immune from scrutiny.

13.     U.S. Sugar's acquisition of Imperial will be procompetitive.  The Transaction will result in overwhelming merger-specific efficiencies, cost synergies, and other procompetitive effects that will benefit customers and consumers.

14.     The injunctive relief that Plaintiff seeks is inconsistent with the public interest and the equities favor consummation of the Transaction.

15.     United is not a proper defendant, and Plaintiff is entitled to no relief against it.


Defendants have not knowingly or intentionally waived any applicable defenses and reserve the right to assert and rely upon other applicable defenses that may become available or apparent during discovery.  Defendants reserve the right to amend or seek to amend their Answer and/or defenses.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jack B. Blumenfeld*

_____

OF COUNSEL:

Lawrence E. Buterman
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

Amanda P. Reeves
Jennifer L. Giordano
Lindsey S. Champlin
Molly M. Barron
David L. Johnson
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2200

Christopher S. Yates
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600

Elyse M. Greenwald
LATHAM & WATKINS LLP
10250 Constellation Boulevard, Suite 1100
Los Angeles, CA 90067
(213) 485-1234

Jack B. Blumenfeld (#1014)
Brian P. Egan (#6227)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
began@morrisnichols.com

*Attorneys for Defendant United States Sugar Corporation*

HOGAN MCDANIEL

*/s/ Daniel K. Hogan*

OF COUNSEL:

Peter J. Schwingler
STINSON LLP
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
(612) 335-1564

Daniel K. Hogan (#2814)
Daniel C. Kerrick (#5027)
1311 Delaware Avenue
Wilmington, DE 19806
(302) 656-7540
dan@dkhogan.com
dckerrick@dkhogan.com

*Attorneys for Defendant United Sugars
Corporation*

RICHARDS, LAYTON & FINGER, P.A.

*/s/ Kelly E. Farnan*

OF COUNSEL:

Christine A. Varney
David R. Marriott
Peter T. Barbur
Timothy G. Cameron
Daniel K. Zach
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eight Avenue
New York, NY 10019
(212) 474-1000

Amanda L. Wait
Vic Domen
NORTON ROSE FULBRIGHT US LLP
799 Ninth Street, NW, Suite 1000
Washington, DC 20001
(202) 662-4550

Darryl Wade Anderson
NORTON ROSE FULBRIGHT US LLP
McKinney Street, Suite 5100
Houston, TX 77010
(713) 651-5562

Kelly E. Farnan (#4395)
920 North King Street
Wilmington, DE 19801
(302) 651-7700
farnan@rlf.com

*Attorneys for Defendants Imperial Sugar
Company and Louis Dreyfus Company LLC*

48

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 10, 2022, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on January 10, 2022, upon the following in the manner indicated:

Laura D. Hatcher, Esquire                                    *VIA ELECTRONIC MAIL*
Shamoor Anis, Esquire
UNITED STATES ATTORNEY'S OFFICE
DISTRICT OF DELAWARE
1313 North Market Street, Suite 400
Wilmington, DE  19801
*Attorneys for Plaintiff*

Brian Hanna, Esquire                                          *VIA ELECTRONIC MAIL*
John R. Thornburgh II, Esquire
Jonathan Y. Mincer, Esquire
Jessica J. Taticchi, Esquire
Jenigh J. Garrett, Esquire
Chinita M. Sinkler, Esquire
Jill Ptacek, Esquire
U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
450 Fifth Street, NW, Suite 8000
Washington, DC  20530
*Attorneys for Plaintiff*


                                                             */s/ Jack B. Blumenfeld*

                                                             _____
                                                             Jack B. Blumenfeld (#1014)