# Pretrial Order
# Exhibit 2A

## Plaintiff's Statement of Contested Facts

1. The Clewiston refinery operated at an annual capacity rate of about ■■■ for refined granulated sugar in 2020.

2. The Clewiston refinery operated at an annual capacity rate of about ■■■ for liquid sugar in 2020.

3. U.S. Sugar, through its marketer United Sugars Corporation ("USC"), uses third parties to produce super sacks of refined sugar, which United then sells to wholesale customers.

4. U.S. Sugar does not market refined sugar under its own name.

5. In 2020, U.S. Sugar received payments of $533 million from United, representing the company's share of United's net sales.

6. As of April 5, 2021, U.S. Sugar, through its wholly owned subsidiary South Bay Growers ("SBG"), had an ownership interest of ■■ of SCGC.

7. It would cost ■■ billion and take three to four years to replace U.S. Sugar's sugar mill.

8. It would cost ■■ million and take three years to replace U.S. Sugar's sugar refinery.

9. The members of United do not compete with each other for the sale of refined sugar.

10. The NSP paid to United Sugar members is calculated as follows:



11. If a United member's facility is unable to provide sugar, for example, due to equipment outages, United has the option of using sugar from one of the eight other member facilities to fulfill a contract instead.

12. The Imperial refinery has the capability to process ██████ pounds of cane sugar daily.

13. Imperial has storage capacity at Port Wentworth sufficient to store up to ██████ supply of raw sugar.

14. Replacing the Port Wentworth refinery would cost in excess of ████ million and take approximately two to three years to build.

15. To continue operating Imperial's Port Wentworth facility at the level it operates today, U.S. Sugar will need to import raw sugar as an input.

16. The price Imperial pays for raw sugar does not prevent it from competing on price for sales of refined sugar.

17. United employees, including CEO Matt Wineinger and V.P. of Strategy Steven Hines, assisted U.S. Sugar in its assessment of Imperial's assets.

18. After U.S. Sugar acquires Imperial's assets, United will market a volume of refined sugar ████████████████.

19. The proposed transaction does not increase the total amount of domestic raw sugar available to sugar refiners in the United States.

20. U.S. Sugar's acquisition of Imperial's assets does not increase opportunities for Florida farmers to grow or sell more sugarcane.

21. Raw sugar is not food grade.

22. Sugarcane used to make refined sugar in the United States is not genetically modified, while sugar beets used to produce refined sugar the United States are genetically modified

23. Refined sugar also may be modified into liquid sugar (by dissolving granulated sugar in water or, for a few liquid-only producers, by melting raw sugar), brown sugar (by adding molasses to granulated sugar), or powdered sugar (by pulverizing granulated sugar and adding corn starch).

24. Sugar producers, either directly or via their marketing affiliates, market and sell refined sugar to wholesale customers including retailers, food and beverage manufacturers, and distributors that re-sell refined sugar to other customers.

25. Refined sugar prices typically are negotiated on a customer-by-customer basis in response to a customer requesting a quote for a particular product mix and volume.

26. Customer contracts specify the types of sugar, format, delivery location, and form and timing of delivery.

27. Some customers prefer cane sugar over beet sugar so that they can market their products as "non-GMO" or so they can claim their products contain "pure cane sugar".

28. Some customers prefer cane sugar over beet sugar as they perceive that cane sugar performs differently in their products than beet sugar.

29. Some customers seek to enter into tolling arrangements as the pricing mechanism for some of their refined sugar purchases.

30. Typically, in a tolling arrangement the refined sugar purchaser will execute financial futures contracts for raw sugar which they deliver to the refiner (rather than the refiner "sourcing" the raw sugar).

31. As part of a tolling agreement, the buyer negotiates a fixed refining fee with the refiners.

32. Tolling agreements provide refined sugar users a mechanism to manage the risk of changes in the price of refined sugar.

33. Imperial offers tolling agreements to refined sugar customers; United does not offer tolling agreements.

34. United and Imperial make the majority of their refined sugar sales pursuant to longer term contracts (3-12 months in duration) rather than through spot sales.

35. Most wholesale customers pay a delivered price rather than picking up sugar at the processing plant.

36. Retailers and industrial food manufacturers frequently purchase sugar by conducting individual RFPs for supply contracts, with such contract commonly lasting approximately a year.

37. Prices offered by suppliers to customers vary based on transportation costs, making pricing dependent on the individual circumstances and location of each customer.

38. The magnitude of transportation costs associated with a potential sale can aid a producer in determining whether it will be economical for a producer to serve a particular customer.

39. Transportation costs are affected by distance traveled, mode of shipping, use of forward facilities, rail rates and interchange fees.

40. Some customers contract with more than one supplier for a given product at a given location to minimize risk of supply interruptions.

41. Customers rely on competition between refined sugar producers to obtain competitive prices and to ensure product quality and reliable service.

42. Some distributors purchase imported refined sugar for domestic resale.

43. Some U.S. sugar users prefer not to use imported refined sugar due to quality concerns.

44. Some U.S. sugar users prefer not to use imported refined sugar because of logistics concerns.



52. The estimated replacement cost for the entire LSR facility is approximately ▮ million and would take approximately ▮ years to replace.

53. Raws-to-liquid sugar is typically higher color than liquid sugar made from adding water to refined granulated sugar.

54. CSC produces only liquid refined sugar.

55. Distributors resell refined sugar purchased from predominantly from domestic sugar producers.

56. United and Imperial predominantly view distributors as customers or third-party partners.

57. Distributors typically sell to a different customer set than those approached by processors, such as small-to-medium-sized customers. Distributors typically deliver sugar to their customers by truck and not by rail.

58. If a distributor customer of United or Imperial resells sugar in a manner United or Imperial find objectionable, United and Imperial have the option of raising prices to the distributor or ceasing to sell to the distributor.

59. United has a strategy of disintermediating distributors.

60. Larger industrial and retail customers typically do not enter into annual contracts with distributors for their refined sugar purchases because buying directly from the sugar processors is generally the most cost-competitive option.

61. The United States is net deficit producer of refined sugar; domestic cane and beet growers do not grow enough cane and beets to meet domestic demand for refined sugar.

62. The United States Department of Agriculture ("USDA") administers various programs pursuant to regulations and statutes intended to regulate the supply of sugar available to

meet domestic demand. Colloquially, the actions taken by USDA under these regulations and statutes are referred to the U.S. "Sugar Program."

63. The U.S. Sugar program restricts the amount of sugar available to the U.S. market.

64. The USDA estimates how much sugar will be used for human consumption in the United States each marketing year (October through September), and it allots "not less than 85 percent" of that estimated quantity to domestic processors of sugarcane and sugar beets. This allotment to domestic processors of sugar case and sugar beets is referred to as the "Overall Allotment Quantity" or OAQ.

65. The OAQ is split between beet sugar (54.35%) and cane sugar (45.65%) processors. Then each individual processor of beet sugar or cane sugar receives a specific marketing allocation. The specific marketing allocation each processer receives is based on fixed allocations set by statute.

66. The U.S.-Mexico Suspension Agreements limit the quantity of sugar exported from Mexico into the United States and set minimum prices for Mexican sugar exports to the United States.

67. The USDA may request that the Department of Commerce increase the amount of sugar Mexico is allowed to export to the United States under the U.S.-Mexico Suspension Agreements when the USDA believes additional supply of sugar is necessary.

68. The USDA has the ability during the fiscal year to increase the TRQs allowing imports of raw and refined sugar from countries other than Mexico that are subject to low or no tariffs. After April 1 of each year, USDA may do so when it believes additional supply

of sugar is necessary. Prior to April 1 of each year, USDA may only increase TRQs when it finds an "emergency shortage of sugar" exists.

69. Imports of raw sugar under tariff preferences are allocated to raw and refined sugar, with a greater percentage allotted to raw sugar.

70. Imported refined sugar is exclusively cane sugar and encompasses granulated refined, organic and some specialty sugars.

71. The USDA does not have authority to review mergers or asset acquisitions among U.S. sugar refiners to ensure such actions do not violate Section 7 of the Clayton Act.

72. The USDA does not set the prices for domestic sales of raw or refined sugar.

73. The USDA does not set the terms of contracts between refined sugar sellers and buyers or play a direct role in negotiations between sellers and buyers.

74. The USDA has no ability to monitor contract prices for refined sugar.

75. Nothing in the Sugar Program requires the USDA to manage the program to ensure domestic prices paid by sugar users remain reasonable.

76. The USDA cannot direct where imports of raw and refined sugar will enter the United States, which customers will purchase the imports, or the price paid by purchasing customers.

77. The USDA's ability to increase the amount of imports into the United States does not ensure a competitive (reasonable) price for refined sugar purchased by customers in Alabama, Delaware, the District of Columbia, Florida, Georgia, Kentucky, Maryland, Mississippi, North Carolina, South Carolina, Tennessee, Virginia, or West Virginia.

78. U.S. Sugar sells refined sugar through its marketing affiliate United Sugars Corporation.

79. The production and sale of refined sugar is a relevant product and line of commerce under Section 7 of the Clayton Act.

80. Demand for refined sugar is inelastic.

81. Industrial food and beverage customers that use refined sugar in their products are unlikely to switch to using another sweetener such as corn syrup, because it would require changing recipes, production methods, or product labeling, and could create a risk of perceived health concerns with those customers' products.

82. Retail customers are unlikely to replace refined sugar with other kinds of sweeteners, such as corn syrup, because such sweeteners are not reasonable substitutes for sugar.

83. Because refined sugar products such as brown, powdered and liquid sugar are derived from refined sugar (with the exception of some refined liquid sugar that is derived directly from raw sugar), the supply of all refined sugar products is ultimately controlled by the same set of sugar producers and therefore have similar supply constraints.

84. Alabama, Delaware, the District of Columbia, Florida, Georgia, Kentucky, Maryland, Mississippi, North Carolina, South Carolina, Tennessee, Virginia, and West Virginia constitute a relevant geographic market.

85. Georgia and its bordering states, Alabama, Florida, North Carolina, South Carolina, and Tennessee, constitute a relevant geographic market.

86. Wholesale refined sugar customers typically pay a delivered price, i.e., one that includes transportation costs.

87. Sugar is a heavy, low value commodity which makes controlling the cost of transportation vital.

88. Transportation costs play a significant role in determining the price at which a supplier may profitably supply a refined sugar customer.

89. Shorter shipping distances reduce the likelihood of shipping delays, which can be costly for customers that depend on a reliable supply of ingredients to run their facilities.

90. Liquid sugar can only be shipped economically approximately 200 miles from the place of manufacture.

91. Liquid sugar spoils quickly limiting the total time over which it can safely be transported.

92. Net of transportation costs, regional price differences exist for refined sugar.

93. Transportation costs can add thousands of dollars to the total cost of delivery to a particular location.

94. The cost to transport refined sugar affects the geographic reach from which a customer can cost-effectively buy refined sugar.

95. The proposed transaction is presumptively unlawful in the market for the production and sale of refined sugars to customers in Alabama, Delaware, the District of Columbia, Florida, Georgia, Kentucky, Maryland, Mississippi, North Carolina, South Carolina, Tennessee, Virginia, and West Virginia.

96. The proposed transaction is presumptively unlawful in the market for the production and sale of refined sugars to customers in Georgia and its bordering states (Alabama, Florida, Georgia, North Carolina, South Carolina, and Tennessee).

97. The proposed transaction will give U.S. Sugar, via its marketing affiliate United, the incentive and ability to increase the price of U.S. Sugar's and Imperial's refined sugar.

98.  The proposed transaction likely would substantially lessen competition in the relevant markets, resulting in harm to U.S. customers.

99.  The proposed transaction will likely reduce choice, service, and quality in the relevant refined sugar markets.

100. Industrial food or beverage customers that prefer non-GMO refined sugar are more vulnerable to harm from the transaction because they are unlikely to switch to beet sugar if the price of cane sugar increases.

101. As a result of the lost competition between U.S. Sugar, via its marketing affiliate United, and Imperial, the proposed transaction will likely harm U.S. customers.

102. U.S. Sugar, through its marketing affiliate United, and Imperial compete across several dimensions, including on price, quality, and service to win business from U.S. wholesale customers.

103. U.S. Sugar, through its marketing affiliate United, competes against Imperial to sell refined sugar to customers located in Alabama, Delaware, District of Columbia, Florida, Georgia, Kentucky, Maryland, Mississippi, North Carolina, South Carolina, Tennessee, Virginia and West Virginia.

104. Imperial competes against U.S. Sugar, through its marketing affiliate United, to sell refined sugar to customers located in Alabama, Delaware, District of Columbia, Florida, Georgia, Kentucky, Maryland, Mississippi, North Carolina, South Carolina, Tennessee, Virginia and West Virginia.

105. In the past three years, U.S. Sugar, through its marketing affiliate United, and Imperial have competed to sell refined sugar to some of the same customers for delivery in

Alabama, Delaware, District of Columbia, Florida, Georgia, Kentucky, Maryland, Mississippi, North Carolina, South Carolina, Tennessee, Virginia or West Virginia.

106. The U.S. Sugar facility in Clewiston is well-positioned to serve customer locations in Alabama, Delaware, District of Columbia, Florida, Georgia, Kentucky, Maryland, Mississippi, North Carolina, South Carolina, Tennessee, Virginia and West Virginia.

107. The Imperial facility in Port Wentworth is well positioned to serve customer locations in Alabama, Delaware, District of Columbia, Florida, Georgia, Kentucky, Maryland, Mississippi, North Carolina, South Carolina, Tennessee, Virginia and West Virginia.

108. ASR's facilities in Florida, Louisiana and Maryland are well-positioned to serve customer locations in Alabama, Delaware, District of Columbia, Florida, Georgia, Kentucky, Maryland, Mississippi, North Carolina, South Carolina, Tennessee, Virginia and West Virginia.

109. Competition between United and Imperial has led to lower prices for wholesale customers in in Alabama, Delaware, District of Columbia, Florida, Georgia, Kentucky, Maryland, Mississippi, North Carolina, South Carolina, Tennessee, Virginia and West Virginia.

110. Competition between United and Imperial has led to better service reliability for wholesale customers in in Alabama, Delaware, District of Columbia, Florida, Georgia, Kentucky, Maryland, Mississippi, North Carolina, South Carolina, Tennessee, Virginia and West Virginia.

111. Competition between United and Imperial has led to better product quality for wholesale customers in in Alabama, Delaware, District of Columbia, Florida, Georgia,

Kentucky, Maryland, Mississippi, North Carolina, South Carolina, Tennessee, Virginia and West Virginia.

112. Refined sugar processors and marketers gather intelligence regarding competitors' prices and sold positions from a variety sources, including distributors, brokers, consultants, analysts, industrial and retail customers and industry publications.

113. Refined sugar processors and marketers share competitive intelligence through third parties.

114. Sugar industry publications report aggregated, current bulk spot refined sugar prices by type of refined sugar (beet or cane) and by region of the country.

115. Sugar industry publications do not publish spot pricing for specific sugar processors.

116. Sugar industry publications that report spot pricing communicate with domestic sugar processors to gather the sugar processors' current pricing.

117. United provides current spot pricing to its customers through its customer portal but does not otherwise publish its current spot prices.

118. Entry and expansion will not be timely, likely, or sufficient to prevent the proposed transaction's anticompetitive effects.

119. There are high barriers to entry in the refined sugar market.

120. New entry or expansion of other sugar refiners is unlikely to replace the lost competition from Imperial.

121. A new port cane refinery, capable of producing refined sugar, would likely cost from $250 million to in " ███████████ and take up to ███ years to build.

122. A new beet processing facility would cost a minimum of $300 million – and as much as ███████ for a United member facility – and take at least two years to construct.

123. An entity desiring to begin refined sugar production in the U.S. or to expand existing processing operations will need to secure a source of sugar beets or raw sugar.

124. The proposed transaction will not change the transportation options available to United's refined sugar competitors to serve customers located in the Southeast.

125. The Defendants' claimed efficiencies cannot justify the likely harm to competition flowing from the proposed transaction.

126. The Defendants' claimed efficiencies are not cognizable, not verifiable, and/or not merger specific.

127. Since acquiring Imperial in 2012, LDC has made substantial capital investments to maximize operational excellence at the Port Wentworth refinery, including granulated activated carbon decolorization, adding invert sugar production, D boiler tube installation, sweet water evaporator and Gramercy Bosch line re-installation.

128. In its March 4, 2020 Management Presentation, LDC highlighted several select future CAPEX projects planned to maintain Imperial's leadership, including adding a new affination station ██████████), replacing carb cells ██████████) and replacing Imperial's existing decolorization station ██████████).

129. In 2009, LDC built new state-of-the-art packaging operations as part of the ██ million rebuilt Port Wentworth.

130. U.S. Sugar's 5-year capital plan for the Imperial assets projects an average annual capital spend of ██████████ beginning in 2022.

131. U.S. Sugar has identified five documents it provided to the government as part of the Hart-Scott Rodino (HSR) process as containing the modeling and analysis of the synergies and efficiencies that will result from the proposed transaction. The most

recently-dated document is a November 9, 2020 presentation written by BDO. U.S. Sugar has not updated its synergy analysis since November 9, 2020.

132. None of the financial modeling done by United or U.S. Sugar to analyze the Proposed Transaction modeled lower prices for sugar users resulting from the alleged synergies created by the transaction.

133. Prior to the Proposed Transaction, the potential capital projects being contemplated by United for the Clewiston refinery included replacing Clewiston's retail line and adding or expanding capability to package supersacks and 50lb bags.

134. Imperial's Port Wentworth refinery cannot currently receive raw sugar by rail.

135. U.S. Sugar has no formal plan to build the rail access necessary for the Port Wentworth refinery to receive raw sugar by rail.

136. U.S. Sugar has not estimated a cost for building the rail access necessary for the Port Wentworth refinery to receive raw sugar by rail.

137. U.S. Sugar plans to source raw sugar for the planned increased production at Port Wentworth ██████████████████████████████████████ ██████████████████████████████████████

138. Any raw sugar milled by ██████████████████████████████ ██████████████████████████████████████ ██████████████

139. Shipping raw sugar by barge ██████████████████████ requires Jones Act registered vessels.

140. U.S. Sugar does not own any Jones Act vessels.

141. The purported operational efficiencies are not merger specific.

142. During 2019 and 2020, customers that had contracted to buy beet sugar from the beet processors that had declared force majeure sought to fulfil some of their sugar needs from Imperial.

# Pretrial Order

# Exhibit 2B

## DEFENDANTS' STATEMENT OF CONTESTED FACTS

Pursuant to Local Rule 16.3(c)(4), Defendants set forth the issues of fact which they contend remain to be litigated at trial:

## I.   THE PARTIES

### A.   U.S. Sugar

1.   United States Sugar Corporation ("U.S. Sugar") is a 90-year old farming company that grows and processes sugar cane, citrus, and fresh vegetables.

2.   U.S. Sugar mills its sugar cane into raw sugar and then refines the raw sugar into refined sugar at its facilities in Clewiston, Florida.

3.   U.S. Sugar does not sell the refined sugar that it produces to customers.

4.   U.S. Sugar does not set the price for refined sugar that its agricultural cooperative, United Sugars Corporation, offers to customers.

5.   U.S. Sugar currently grows more sugar cane than it has the capacity to process at its Clewiston refinery.

### B.   United Sugars

6.   United Sugars Corporation ("United") does not produce any refined sugar.

7.   United sells refined sugar to customers throughout the United States.

8.   United has no role in determining the amount of refined sugar produced by its members.

9.   United aims to lower its inventory position as much as possible prior to the start of the beet crop harvest each year.

10.   The members of United do not set prices for refined sugar that United offers to customers.

11.     The members of United do not have any input about which customers United sells refined sugar to, the contract terms between United and its customers, or the source of sugar used by United to supply customers.

12.     Each member of United chooses its output independently.

13.     United's employees are incentivized to sell all of the sugar supplied by United's members, even if selling the additional output produced by one member benefits that member and hurts the other members.

14.     United's members do not have unified incentives in every instance, and United's actions do not reflect the incentives of all of its members when those incentives diverge.

15.     The members of United split the revenue generated by United on a pro rata basis (i.e., the revenue pool is split based upon the volume supplied by each member).

16.     The autonomy of United's members in choosing their output and the pro rata nature of the revenue pool means that the incentives of United's members can diverge.

17.     None of United's members rely primarily on imported or purchased raw sugar in their production process.

18.     U.S. Sugar, not United, is purchasing Imperial.

**C.     Imperial Sugar Company**

19.     Imperial Sugar Company ("Imperial") does not grow sugar cane, and it does not mill sugar cane into raw sugar.

20.     Imperial must purchase raw sugar to operate its Port Wentworth refinery.

21.     Imperial does not have consistent access to domestic supplies of raw sugar and relies primarily on imported raw sugar.

22.     Imperial struggles to compete on price with other domestic refiners because its cost structure is inherently higher given its reliance on imports, including imports on which it has to pay tariffs.

23.     Imperial's high input costs negatively impact Imperial's operations.

24.     The Port Wentworth refinery currently does not and cannot cost effectively run at full capacity.

25.     The Port Wentworth refinery has significant excess refining and packaging capacity that it cannot use because Imperial cannot economically supply the plant with enough raw sugar to fully utilize capacity.

26.     Imperial's uncertain access to raw sugar makes it extremely difficult to justify investment into projects that would significantly reduce costs and/or improve efficiency over the long-term.

27.     The Port Wentworth refinery is not an efficient plant and that is not likely to change so long as it remains dependent on imported raw sugar.

### D.     Plaintiff

28.     Plaintiff, the United States, through the U.S. Department of Agriculture ("USDA"), has the ability to control the supply, and thus the price, of refined sugar in the United States.

## II.     THE PROPOSED TRANSACTION

29.     Louis Dreyfus Company LLC ("LDC") has been evaluating options for the Imperial business, including a potential sale or shutdown, since at least 2016.

30.     LDC has ceased making capital improvements in Port Wentworth.

31.　U.S. Sugar began discussions to acquire Imperial's business and assets after no viable buyers for Imperial emerged following a nearly three-year period in which LDC tried to market the business for sale.

32.　LDC has considered alternative potential transactions with a wide range of buyers including Mexican sugar producers and the Pantaleon Group; none of those potential transactions have panned out.

33.　U.S. Sugar is acquiring Imperial in order to provide an additional refinery for the sugar cane grown by U.S. Sugar's Florida farmers; expand domestic sugar production; offer a broader product slate; and ensure that customers have a more dependable, secure, and cost-effective supply of sugar.

34.　U.S. Sugar intends to invest in Imperial's Port Wentworth refinery to make it a more efficient facility.

35.　The transaction will ensure that Imperial's Port Wentworth refinery continues to operate.

36.　Without the transaction, Imperial will, at best, continue to be a supplier of high-priced refined sugar dependent on high-cost raw sugar imports.

37.　As domestic demand for raw sugar by other companies increases, it will only become more difficult for Imperial to cost-effectively obtain the raw sugar that it needs.

38.　With heightened competition for raw sugar imported under preferential quotas, Imperial will likely be forced to increasingly turn to the most expensive means of importing foreign raw sugar (i.e., high tier imports).

39.　If U.S. Sugar is unable to acquire Imperial, Imperial is likely to continue to lose competitive significance, and the Port Wentworth facility may no longer be able to serve customers in the future if it cannot secure lower-cost supplies of raw sugar.

### III.    THE SUGAR INDUSTRY

#### A.    Sugar Production and Refined Sugar Producers

40.    Refined sugar made from sugar beets and sugar cane is chemically identical and indistinguishable.

41.    Once sugar cane is harvested, it must be milled into raw sugar before it can be refined.

42.    Sugar cane begins to lose sucrose once it is harvested, so it is generally milled within 24 hours after harvesting.

43.    Raw sugar, which is sometimes referred to as "raws," can be transported or sold in its unrefined form.

44.    Typically, raw sugar is transported to a cane sugar refinery for further processing.  This processing creates refined sugar.

45.    Some refiners, including CSC Sugar LLC ("CSC"), Sucro Can Sourcing, LLC ("Sucro Sourcing"), Sugar Services LLC ("Sugar Services"), L&S Sweeteners, and Zucrum Foods, LLC a/k/a Zucarmex ("Zucarmex"), can convert raw sugar directly into refined liquid sugar.

46.    Sugar cane refiners in the United States include: U.S. Sugar, Imperial, American Sugar Refining, Inc./Domino Sugar ("ASR" or "Domino"), Cargill, Inc. ("Cargill")/Louisiana Sugar Refining ("LSR"), CSC, Sugar Services, L&S Sweeteners, Sucro Sourcing, and Zucarmex.

47.    In addition to the refined sugar produced in the United States, refined sugar is imported into the United States from Mexico and a number of other countries around the world.

#### B.    Refined Sugar Sellers

48.    Refined sugar is sold to customers by a variety of different entities.

49. Entities that sell refined sugar in the United States acquire the refined sugar that they sell in a variety of ways—some grow sugar beets or sugar cane and produce refined sugar from them while others purchase already refined sugar from others and then resell it, repackage it, or process it further into refined sugar products.

50. The following is a non-exhaustive list of the entities that sell refined sugar to customers in and throughout the United States:  ASR/Domino, Cargill/LSR, CSC, Imperial, Michigan Sugar Company ("Michigan Sugar"), National Sugar Marketing ("National"), Sucro Sourcing, United, Western Sugar Cooperative ("Western"), Zucarmex, Indiana Sugars, Inc. ("Indiana Sugars"), and a variety of other distributors.

### 1. ASR/Domino

51. Domino produces approximately 65 million cwt (hundredweight, or 100 lbs.) of refined sugar per year across its refineries.

52. The Sugar Cane Growers Cooperative of Florida ("SCGC") provides Domino with some raw sugar.  ████████████████████████████████████████████ ██████████████████████████████████████████.

53. ████████████████████████████████████████████ ████.

54. ████████████████████████████████████████████ ██████████████████████████████████████████ ██████████████.

55. ████████████████████████████████████████████ ██████████████████████████████████████████ ████.

56. ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████

57. ███████████████████████████████████████████

██████████████████████████████

58. Domino routinely competes for sales against a variety of sellers of refined sugar including LSR/Cargill, Imperial, CSC, Michigan Sugar, National, Western, United, Indiana Sugars, and other distributors, among others.

### 2. LSR/Cargill

59. LSR is the largest purchaser of Louisiana-grown sugar cane, which it refines into approximately 17 million cwt of refined sugar a year at its refinery in Gramercy, Louisiana, near the port of New Orleans.

60. LSR was formed to be the outlet for raw sugar produced by sugar cane farmers in Louisiana.

61. ███████████████████████████████████████

████████████████████████████████████████████

█████████████████████

62. ████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████.

63. Cargill has a distribution network that includes terminals and liquid sugar manufacturing facilities ██████████████████████████████████████

██████████████████████████████.

7

███████████████████████████████

64.     LSR has announced plans to expand the capacity of its Gramercy, Louisiana refinery,

████████████████████████████████████████████████████████████████

██████████████████████████████████████.

65.     LSR routinely competes for sales against a variety of sellers of refined sugar including

        Domino, Imperial, CSC, Michigan Sugar, National, Western, United, Indiana Sugars, and

        other distributors, among others.

66.     ████████████████████████████████████████████████████████████████

        ██████████████████████████████████████

        **3.     CSC**

67.     CSC operates plants in the United States and Mexico that primarily convert raw sugar

        into liquid sugar and repackage dry sugar.

68.     ████████████████████████████████████████████████████████

        ████████████████████████████████.

69.     ████████████████████████████████████████████████████████

        ███████████████████████████████████

70.     ████████████████████████████████████████████████████████

        █████

71.     ████████████████████████████████████████████████████████████████

        ████████████████████████████████████████████████████████████████

        ████████████████████████████████████

72.     CSC routinely competes for sales against a variety of sellers of refined sugar including

        Domino, LSR/Cargill, Imperial, Michigan Sugar, National, United, Indiana Sugars, and

        other distributors, among others.

8

███████████████████████████L

### 4.   Michigan Sugar

73.   Michigan Sugar is an agricultural cooperative that is required to sell all of the refined sugar produced from the sugar beets that its members grow.

74.   Michigan Sugar produces approximately 12 million cwt of refined sugar per year.

75.   Michigan Sugar has four sugar beet processing facilities, a powdered sugar production facility in Michigan, as well as a liquid sucrose production facility and two bulk storage facilities in Ohio.

76.   

77.

78.

### 5.   National

79.   In addition to selling refined beet sugar produced by its members, National also sells refined cane sugar from Sucden Americas.

80.

■■■■■■■■■■■■■■■■■■■■■■■■■■■■

81.  National routinely competes for sales against a variety of sellers of refined sugar including Domino, LSR/Cargill, CSC, Imperial, Michigan Sugar, Western, United, Indiana Sugars, and other distributors, among others.

### 6.  Sucro Sourcing/Sucro Can

82.  Sucro Sourcing (also known as Sucro Can) is a sugar refiner and seller.

83.  ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■.

84.  ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■.

85.  ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■.

86.  In December 2021, Sucro Sourcing acquired assets previously owned by Marigold in Atlanta, Georgia, and University Park, Illinois, including sugar distribution warehouses and a transfer station, ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■.

87.  ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■.

### 7.  Western

88.  Western grows sugar beets in Colorado, Montana, Nebraska, and Wyoming.

89.  Western processes the harvested sugar beets in four facilities, one in each of Colorado, Montana, Nebraska, and Wyoming.

90.  ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

██████████████████████████████

91.   ████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████ .

### 8.   Zucarmex

92.   Zucarmex, a trade name for the company Zucrum, refines and melts sugar at several

North American facilities, including one liquid refinery in California.

93.   ██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████ .

94.   ████████████████████████████████████████████ .

### 9.   Indiana Sugars

95.   Indiana Sugars is a value-added distributor headquartered in Gary, Indiana.

96.   ██████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

████████████████ 

97.   ██████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████

████████████████████ .

98.   ██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████ .



99. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.

100. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇

### 10.    Distributors

101.   Distributors constitute a diverse category of sellers of refined sugar.

102.   Some distributors add value to customers by performing services such as repackaging products or changing the form of products (e.g., producing liquid sugar from dry sugar).

103.   Some distributors sell other products and ingredients besides refined sugar.

104.   Some distributors can create liquid sugar from raw sugar (e.g., L&S Sweeteners, Sucro Sourcing, Sugar Services, and Zucarmex).

105.   Distributors have distribution networks that allow them to cost-effectively move sugar including across and throughout the United States.

106.   Prominent distributors include Archer-Daniels-Midland Company ("ADM"), Batory Foods, Inc., Evergreen Sweeteners, Inc., Indiana Sugars, L&S Sweeteners, Pullman Sugar, LLC, Sweeteners Plus, LLC, and Sweetener Supply Corporation.

107.   Distributors compete with domestic refiners to sell refined sugar to customers.

108.   Distributors can and do buy imported refined sugar and resell it to customers located in the United States, including in Plaintiff's alleged geographic markets.

109.   In 2020, imported refined sugar accounted for 8% of sales of refined sugar in the U.S.

110. ██████████████████████████████████████████████████████

     ███████ .

**C.    Refined Sugar Customers**

111.   Refined sugar is sold to a wide variety of customers.

112.   Some customers are industrial firms like PepsiCo, Inc. and General Mills, Inc. that use refined sugar to make products such as snacks, beverages, dairy products, and baked goods.

113.   Another type of customer is food service companies such as Sysco Corporation and US Foods, which sell refined sugar to restaurants, convenience stores, and others.

114.   There are also retail customers, such as the Kroger Company and Costco Wholesale Corporation, that sell refined sugar to end consumers.

115.   Customers buy a variety of types and package sizes of refined sugar.

116.   Many customers procure refined sugar by issuing a request for proposal ("RFP") to multiple suppliers.

117.   Many customers issue RFPs for nationwide supply by suppliers.

118.   Some customers use blind auctions in order to decide which supplier will receive their business.

119.   Customers such as ████████████ issue blanket volume awards to their largest suppliers and the suppliers can and do shift their supply of sugar from one plant to another depending on customer needs.

120.   Many industrial customers have large procurement departments and commodity risk analysts who track the #16 raw sugar index and other market indices as part of supporting the customer's effort to obtain refined sugar at the best possible price.

121.   Many industrial customers, including beverage makers, cereal makers, and candy

manufacturers, use liquid sugar.

122.   Depending on the type of customer, and their particular refined sugar needs, many

different companies may be able to service a particular customer.

123.   Some customers have the ability to process granulated refined sugar into other refined

sugar products, such as powdered sugar.

**D.   The Flow of Refined Sugar in the United States**

124.   Sugar supply and sugar demand are unevenly distributed throughout the United States.

125.   Some regions of the United States have excess supply and some have excess demand.

126.   In the southern part of the United States, as defined by the USDA, the supply of refined

sugar exceeds demand.

127.   As a result of regional supply imbalances, refined sugar often travels long distances

across states and regions.

128.   ████████████████████████████████████████████████████████

████████████████████████████████████.

129.   There are not sustained regional variations in refined sugar prices because suppliers ship

refined sugar long distances in order to meet demand at attractive prices to the supplier.

130.   During the beet freeze of late 2019 and early 2020, regional prices for sugar largely

moved together.

131.   Refined sugar travels across states and regions mostly by rail or truck.

132.   Suppliers often have logistics networks that allow them to move refined sugar long

distances efficiently.

133.   Refined sugar is imported in large quantities from overseas countries into ports in the South, including Mobile, Alabama; Tampa, Florida; New Orleans, Louisiana; and Laredo, Texas.

134.   Supplier networks take advantage of bulk rail for moving large shipments of refined sugar long distances.

135.   Suppliers often use trucks to ship refined sugar the "last" mile.

136.   Some customers can receive bulk refined sugar by rail.

137.   Many customers also pick up refined sugar themselves directly from suppliers' facilities.

138.   Customers that pick up refined sugar directly from suppliers use their own logistics networks or arrange their own logistics.

139.   Some sellers have locations that convert dry refined sugar into liquid sugar (this is called "melting" or "liquifying").

140.   Sellers can transport dry sugar to a melt location close to a customer to minimize the distance needed to ship liquid sugar.

**E.      The Federal Sugar Program**

141.   The sale of raw and refined sugar in the United States is highly regulated.

142.   The United States has long had a federal policy to support American farmers, including American sugar farmers, by ensuring that they can make enough money for their crops to stay in business.

143.   At the same time, the federal government also wants to ensure that sugar prices do not get too high for the many businesses (known as sugar "users") that need to buy sugar to resell or to use as ingredients in the products they make.

144. This federal policy is embodied in a series of statutes, regulations, and international trade agreements that are known as the Federal Sugar Program.

145. The USDA is the federal executive agency that is tasked with running the Federal Sugar Program and maintaining an appropriate balance between sugar supply, demand, and price.

146. The USDA operates the Federal Sugar Program to ensure adequate supplies of both raw and refined sugar at reasonable prices.

147. To accomplish this objective, the Federal Sugar Program gives the USDA a series of tools to control the supply of raw and refined sugar that is available for sale in the United States because controlling supply is one way that the government can seek to control the price of sugar.

148. The USDA uses these tools to ensure that prices do not get too high (because the marketplace is undersupplied) or too low (because the market is oversupplied).

149. The USDA regulates to ensure "adequate supplies," which it believes result in reasonable prices.

150. One metric that the USDA uses to maintain reasonable prices is the "stocks-to-use ratio" or "SUR," which is the ratio of ending sugar stocks divided by total use.

151. Since the 1990s, the USDA has managed the Federal Sugar Program to keep the SUR between 13.5% and 15.5%; the USDA typically considers the prices that result from that range to be reasonable.

152. When the SUR veers above 15.5% or below 13.5%, the USDA will typically take action to bring the SUR back in range.

153.   There are five major aspects of the Federal Sugar Program:  (1) nonrecourse loans to sugar processors; (2) the Feedstock Flexibility Program; (3) domestic marketing allotments for sugar processors; (4) a system of tariff rate quotas on sugar imports under various World Trade Organization and free trade agreement rules; and (5) control over the supply of imports from Mexico under agreements first entered into in December 2014, and subsequently amended, that are known as the U.S.-Mexico Suspension Agreements.

154.   The first two components of the Federal Sugar Program—nonrecourse loans and the Feedstock Flexibility Program—provide domestic price supports, providing a price floor.

155.   The other three components of the Federal Sugar Program—domestic marketing allotments, import tariffs, and the U.S.-Mexico Suspension Agreements' import limits— give the USDA the power to control sugar supply.  These are the tools the USDA can use, and has used, to increase supply when it believes that additional supply is needed to maintain reasonable prices.

### 1.   Marketing Allotments

156.   Marketing allotments restrict domestic supply, but the USDA can allow individual processors to sell more using multiple mechanisms.

157.   The purpose of domestic marketing allotments is to limit the supply of sugar available for sale in the United States from domestic sources.

158.   Marketing allotments limit the quantity of sugar that each individual domestic processor can sell during each marketing year, which runs from October 1 to September 30.

159.   Processors cannot, as a matter of law, sell more than their marketing allotments into the domestic food-use market.

160. At the beginning of each marketing year, the USDA determines each processor's initial marketing allotment by first forecasting sugar demand for the year in a monthly report called the World Agricultural Supply and Demand Estimates, or "WASDE."

161. The USDA then establishes something called the overall allotment quantity ("OAQ") at not less than 85 percent of the annual forecasted demand.

162. Although the USDA has typically set the initial OAQ at 85% of demand, it can set OAQ at more than 85% of demand and has done so in the past.

163. The USDA divides the OAQ among the individual sugar cane and sugar beet processors in the United States, with 54% allocated to sugar beet processors and 46% allocated to sugar cane processors.  These allocations establish each processor's initial marketing allotment for the year.

164. If the USDA determines that additional sugar supply is needed, it can take different actions (alone or in combination) to increase the amount that domestic processors are permitted to sell.

165. For example, the USDA can increase the OAQ itself, which would allow all domestic processors to market more.

166. The USDA can also reassign marketing allotments among different processors to enable particular processors to sell more sugar.

167. In December 2021, the USDA did both of these things (increase the OAQ and reassigned marketing allotments) to increase supply, and it did so specifically to address what it characterized as "current high sugar prices."

## 2.  Trade Agreements

168. World sugar prices have an important impact on the U.S. sugar industry.

169.   There are many countries around the world that produce sugar for export and, in any given year, there is typically a substantial quantity of sugar available to be imported into the United States.

170.   World sugar prices are typically far below U.S. sugar prices, so that if the United States were to allow all of that low-price foreign sugar to enter the United States freely, that would cause U.S. sugar prices to plummet and would risk triggering domestic loan forfeitures.

171.   Various international trade agreements require the United States to allow sugar imports at low- or no-duty, but the USDA can permit additional low-cost imports.

172.   As part of the North American Free Trade Agreement, beginning on January 1, 2008, the United States permitted unrestricted sugar imports from Mexico duty-free.  Thereafter, due to a confluence of events that restricted supply—including the Imperial plant explosion, the world financial crisis, and limits on imports from other countries—U.S. sugar prices spiked.

173.   Those high prices attracted massive quantities of imports from Mexico.  The influx of all of that unrestricted Mexican sugar caused U.S. sugar prices to plummet.  Prices dropped so low that they triggered loan forfeitures in 2013.

174.   The International Trade Commission opened investigations into Mexico's export activities—an anti-dumping investigation and a countervailing duty investigation.

175.   In December 2014, the United States and Mexico entered into two agreements—known as the U.S.-Mexico Suspension Agreements—that restrict the volume of imports from Mexico each year and also set minimum prices for those imports.

176. The USDA can increase Mexican export limits when it believes that additional supplies are necessary to maintain reasonable prices.

177. Although the U.S.-Mexico Suspension Agreements are technically administered by the U.S. Department of Commerce, the USDA is the agency that determines how much sugar Mexico can export to the United States each year under those agreements.  This is known as the Mexican export limit or "MEL."

178. The USDA can and does increase the Mexican export limit throughout the year when the USDA determines that the United States needs additional supply of raw or refined sugar to maintain reasonable prices.

### 3.  Tariff Rate Quotas ("TRQs")

179. The USDA can also increase the availability of lower-cost imports from other countries under the tariff rate quota ("TRQ") system.

180. In addition to the U.S.-Mexico Suspension Agreements, the United States has entered into a number of other international trade agreements (with the World Trade Organization and other free trade partners) that govern sugar imports from countries other than Mexico.  These agreements require that the United States allow a minimum amount of low-priced foreign sugar into the United States from those countries at low- or no-duty.

181. The tariff rate quota or TRQ specifies the amount of sugar that can be imported into the United States at low- or no-duty.

182. There is no limit on the volume or frequency of TRQ increases the USDA may decide upon.

183. Imports above the TRQ amount can still come into the United States but they are subject to a higher tariff and are therefore more expensive.

184. There is no limit on the amount of "high-tier" or "Tier 2" sugar that can be imported into the United States

185. The USDA has several tools it can use to increase the amount of sugar that is imported at low- or no-duty.  For example, during a marketing year, the USDA can (and does) increase TRQs for both raw and refined sugar when it believes that additional imports are needed to ensure adequate supplies are available at reasonable prices.

186. The USDA also can (and does) reallocate TRQs from countries that might not be able to meet their quotas to other countries that are able to ship additional raw sugar.

187. The USDA also can (and does) extend the period during which imports may enter the United States and still be counted against a particular year's quota.

188. The USDA takes these actions because importing the lower-cost TRQ sugar helps to maintain reasonable domestic prices.

189. Because TRQ sugar enters the country at low- or no-duty, the USDA believes it can operate as an effective price constraint in the U.S. marketplace.

190. More expensive Tier 2 sugar operates as a different type of price constraint than TRQ sugar.  Tier 2 sugar effectively sets a price ceiling for domestic prices.  If domestic prices rise above Tier 2 prices, then buyers can purchase Tier 2 sugar instead of domestic sugar.

191. The USDA views large quantities of Tier 2 sugar entering the United States as a signal that supplies are not adequate and prices are not reasonable.

192. Significant Tier 2 imports can cause the USDA to take actions to increase supply.

193. If prices for refined sugar in Plaintiff's alleged geographic markets were to increase after the proposed transaction, the USDA has a variety of tools at its disposal to increase the supply of raw and refined sugar and thereby lower prices.

## IV.     MARKET DEFINITION

### A.     Product Market

194.   The "production and sale of refined sugar" is not a relevant product and line of commerce under Section 7 of the Clayton Act.

195.   The "production and sale of refined sugar" is not an industry-recognized product market.

196.   Customers do not care whether the firm that supplies their refined sugar also produces that sugar.

197.   Customers purchase large amounts of refined sugar from entities that produce no refined sugar.

198.   Customers view sugar sold by entities that did not refine it as a close substitute for sugar sold by entities that did refine it.

199.   Customers routinely purchase refined sugar from entities that produce refined sugar and from entities that do not produce refined sugar.

200.   There is no basis for excluding sugar that was not produced and sold by a single firm from the product market.

201.   United is not the relevant economic actor for the purposes of assessing the competitive effects of the proposed transaction.

202.   Distributors compete with other suppliers to supply refined sugar to wholesale customers.

203.   Customers view distributors as substitutes for refiners and other suppliers.

204.   Producers view distributors as competitors for the sale of refined sugar to wholesale customers.

205.    Distributors provide value-added services that customers value, including melting
        granulated refined sugar into liquid and invert sugar, and those value-added services are
        part of the reason that distributors are seen by customers as viable competitors.

206.    Many distributors import a significant amount of refined sugar.

207.    The ability to import refined sugar gives distributors significant independence from
        domestic refiners.

208.    Distributors are a substitute for other refined sugar suppliers, and sales by distributors
        should be included in the product market.

209.    Distributors often purchase refined sugar in one location and then sell it in another.

        **B.      Geographic Market**

210.    Plaintiff has not identified any viable relevant geographic market.

211.    Plaintiff's alleged "Southeast"—the states of Alabama, Delaware, the District of
        Columbia, Florida, Georgia, Kentucky, Maryland, Mississippi, North Carolina, South
        Carolina, Tennessee, Virginia, and West Virginia—does not constitute a relevant
        geographic market.

212.    Plaintiff's alleged geographic market of "Georgia and its bordering states," which
        includes Alabama, Florida, North Carolina, South Carolina, and Tennessee, is not a
        relevant geographic market.

213.    Neither of Plaintiff's alleged relevant geographic markets is commonly recognized by
        industry participants or by the USDA.

214.    Both of Plaintiff's proposed relevant geographic markets are arbitrary and
        gerrymandered.

215.   Refined sugar travels significant distances within the United States and into the United
       States (in the case of imports).

216.   Neither of the alleged relevant geographic markets encompasses the areas in which
       United and Imperial sell refined sugar to wholesale customers.

217.   Prices for refined sugar in the two alleged geographic markets are not significantly
       different from prices for refined sugar elsewhere in the United States.

## V.   COMPETITIVE EFFECTS

218.   The proposed transaction is not presumptively unlawful or anticompetitive in any
       relevant market, including those alleged by Plaintiff.

219.   The proposed transaction is not likely to substantially lessen competition in the alleged
       relevant markets.

220.   The proposed transaction will not give United the incentive nor the ability to increase the
       price of refined sugar in any relevant market.

221.   The proposed transaction is not likely to reduce choice, service, or quality in the sale of
       refined sugar in any relevant market.

222.   The proposed transaction is not likely to result in harm to U.S. customers.

### A.   The Proposed Transaction Is Not Likely to Lead to Higher Prices

223.   United and Imperial are differentiated competitors and not close competitors.

224.   United is a low-cost supplier that supplies customers with high volumes.

225.   Imperial is a high-cost refinery that, on average, supplies customers with smaller
       volumes.

226. Imperial's dependence upon purchased (and, predominantly, high-cost imported) raw sugar means it incurs higher costs to produce refined sugar than U.S. Sugar, which produces its own raw sugar.

227. Imperial's raw sugar cost is significantly higher than that of U.S. Sugar.

228. Imperial's position as a high-cost supplier is well known by market participants.

229. Imperial itself acknowledges that it is a high-cost supplier.

230. United and Imperial compete with a variety of other refined sugar suppliers, including other domestic refiners and distributors, to sell refined sugar products to customers in the alleged relevant markets.

231. U.S. Sugar does not sell any refined sugar and thus does not compete against Imperial to sell refined sugar.

232. The proposed transaction will not lead to increased prices of refined sugar for customers.

233. Customers with a preference for cane sugar will not be particularly vulnerable to price increases as a result of the proposed transaction.

234. Customers with a preference for non-GMO refined sugar will not be particularly vulnerable to harm from the proposed transaction.

235. The proposed transaction is unlikely to result in a decrease in competition in any relevant market.

236. Economic models support the conclusion that the proposed transaction is unlikely to result in a decrease in competition in any relevant market.

237. The USDA has not supported Plaintiff's position that this transaction is likely to harm competition or raise prices.

238. As the USDA economist, Dr. Barbara Fecso, testified "the merger would have a beneficial impact on the domestic sugar industry" and "could result in lower refined sales prices."

**B.    Entry and Expansion Is Likely to Prevent Any Post-Transaction Price Increase**

239. Entry and expansion from existing and new competitors would be timely and sufficient to prevent any potential price increases post-transaction.

240. Barriers to entry and expansion in the market to supply refined sugar are low, and there are multiple examples of recent expansion, including by LSR, CSC, and others.

241. Recent entry and expansion by suppliers show that barriers to entry and expansion are low.

242. LSR's previous and ongoing expansion of its Gramercy refinery shows that barriers to entry and barriers to expansion are low.

243. LSR has expanded its Gramercy refinery in the recent past and announced plans to continue doing so.

244. 

245. LSR plans to further increase capacity of its Gramercy refinery to approximately ▮ ▮ of refined sugar annually.

246.



247. ████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

███████████████

248. Michigan Sugar is undertaking a capital investment to improve its "desugarization" process, which will result in an additional 0.8 million cwt of annual refined sugar production.

249. Michigan Sugar's capacity expansion will come from improving Michigan Sugar's facilities for extracting refined sugar from the molasses byproduct that is generated while processing sugar beets.

250. ████████████████████████████████

251. Michigan Sugar's decision to invest in its desugarization capabilities is another example of the ability of existing producers to quickly increase and expand their refined sugar output.

252. ████████████████████████████████

████████████████████████████████

████████████████████████████████

█████████████████.

253. ████████████████████████████████

████████████████████████████████

████████████████████████████████.



254. ████████████████████████████████████████████████████████

████████████ .

255. Sucro Sourcing plans to build a new $19 million refinery in New York state to serve the Great Lakes region that will be operational in 2024.

256. The capacity of Sucro Sourcing's new refinery in New York is expected to be 6.6 million cwt of sugar per year.

257. Sucro Sourcing's refinery will create an additional source of refined sugar and increase competition.

258. Sucro Sourcing's refinery in New York also shows that barriers to entry are low.

259. CSC has constructed four new micro refineries around the country in the Eastern United States in the past 10 years, including in Virginia, Tennessee, Pennsylvania, and Texas.

260. CSC's recently-built micro refineries are often in very close proximity to customer production facilities.



261. ██████████████████████████████████████████████████████

██████ .

262. ██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████ .

263. The higher the price of refined sugar, the more attractive an investment in a micro refinery becomes.

264. The USDA also has the ability to increase the supply of refined sugar available from both domestic and foreign suppliers.

### C.    The Proposed Transaction Is Unlikely to Increase the Probability of Coordination

265.    The proposed transaction is unlikely to increase the probability of coordination between or among competitors in the sugar industry.

266.    The refined sugar industry is not vulnerable to coordinated effects.

267.    The refined sugar industry includes a number of potential "maverick" or "disruptor" firms, including, but not limited to, Cargill, CSC, Sucro Sourcing, and distributors.

268.    Imperial is not a "maverick" firm, and U.S. Sugar's proposed acquisition of Imperial will not remove a "maverick" firm from the refined sugar industry.

269.    The procurement auctions used by refined sugar customers make coordination less likely.

270.    Large, annual procurement contracts are common in the wholesale refined sugar market.

271.    Large refined sugar customers are highly-sophisticated purchasers.

272.    The presence of large, sophisticated customers means that coordinated interaction is less likely to be successful.

273.    Suppliers frequently do not know who they are competing against for a customer's business.

274.    Suppliers have no knowledge of their competitors' actual transaction prices negotiated with customers.

275.    There is no past history of coordination in the refined sugar industry.

276.    The demand for refined sugar is elastic.

277.    The proposed transaction is unlikely to make the refined sugar industry more vulnerable to coordinated conduct.

278.    The proposed transaction is unlikely to increase the risk of coordination between Domino and United.

279.   ███████ is concerned that the merger will increase competition and harm ███████ .

280.   ███ is concerned that the merger will increase competition and harm ███ .

281.   ███ does not believe the merger will result in any harm to sugar purchasers.

282.   ████████ does not believe the merger will result in any harm to sugar purchasers.

## VI.   THE PROPOSED TRANSACTION IS PRO-COMPETITIVE

283.   U.S. Sugar's proposed acquisition of Imperial is pro-competitive.

284.   The proposed transaction will result in verifiable efficiencies that are merger-specific.

285.   U.S. Sugar's proposed acquisition of Imperial will improve raw sugar supply security at Port Wentworth.

286.   One consequence of Imperial's insecurity of supply is that Imperial often cannot produce as much refined sugar as it would like.

287.   Imperial's insecurity of supply not only hampers Imperial's ability to compete but also dulls the incentive of its owner, LDC, to invest in the Port Wentworth refinery.

288.   Post-transaction, U.S. Sugar will be able to utilize more of the raw sugar milled from its sugar cane at Port Wentworth.

289.   Bringing together U.S. Sugar's raw sugar with Imperial's refining capabilities will improve Port Wentworth's access to competitively priced raw sugar and allow the refinery to operate more efficiently.

290.   Increased raw sugar supply security will increase the profitability of investing in Port Wentworth by increasing its de facto maximum output.

291.   The increase in raw sugar security will allow Port Wentworth to expand its output.

292.   U.S. Sugar's plan to increase output at Port Wentworth is an integral part of the transaction's motivation and is included in U.S. Sugar's financial modeling of the transaction.

293.   U.S. Sugar plans to increase production at the Port Wentworth refinery and run the facility at or near its full production capacity through its operational excellence program: phased capital expenditures, increased efficiency and run time, proactive maintenance, and consistent run times and output.

294.   U.S. Sugar estimates that it will invest over $65.5 million in Port Wentworth over the next four years.

295.   The proposed transaction will also lower United's cost to serve its customers due to the transportation and network efficiencies that will result from Port Wentworth's refined sugar being marketed by United.

296.   By pooling members' sugar together for distribution and operating its distribution system as a single, multi-node network, United creates substantial distribution synergies and cost-savings for its members.

297.   Adding Imperial to the United network will reduce logistical constraints by increasing the available points for shipments to customers.

298.   United has estimated that the merger will generate $12–$13 million in transportation cost savings.

299.   The reduction in transportation costs will give United an incentive to price more aggressively, which will likely lead to sales to new customers.

300.   The expansion of Port Wentworth will provide the additional refined sugar needed to serve these new customers.

301. United's more aggressive pricing will likely force rivals to respond and will likely result in lower prices for customers.

302. The proposed transaction will also enhance supply chain security and reliability for consumers.

303. With the addition of Port Wentworth, United will have the flexibility to meet customer demand and protect against natural disasters or other calamities.

304. Today, United and U.S. Sugar face the distinct possibility of severe Florida weather taking U.S. Sugar's sole refinery in Clewiston offline or weather events (such as the one leading to the 2019 beet freeze) harming other United members' beet crops in the Red River Valley.

305. Post-transaction, U.S. Sugar will be able to rely on Imperial's refinery should a natural disaster or severe weather take Clewiston offline.

306. Post-transaction, United will also be better able to hedge against severe weather and ensure that it can continue to service customers without interruption.

307. By adding Imperial's capabilities, U.S. Sugar will also be able to produce a full suite of sugar products, including brown and powdered sugar, which will allow United to sell those products to a broader range of customers, and allow it to better compete for customers.

308. Absent the transaction going through, LDC has no plans to materially invest in the Port Wentworth refinery and has no expectation that its output will increase.