# Pretrial Order Exhibit 3A

<u>**UNITED STATES' STATEMENT OF ISSUES OF LAW**</u>
<u>**THAT REMAIN TO BE LITIGATED**</u>

Pursuant to Local Rule 16.3(c)(5), the United States submits the following issues of law that the United States believes remain to be litigated:

1. Whether United States Sugar Corporation's ("U.S. Sugar") proposed acquisition of Imperial Sugar Company ("Imperial") ("proposed transaction") is likely to substantially lessen competition in any line of commerce, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, is an issue to be litigated.

    a. Section 7 of the Clayton Act prohibits a merger "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition." 15 U.S.C. § 18.

    b. "Congress used the words *may be* substantially to lessen competition . . . to indicate that its concern was with probabilities, not certainties, . . . rendering Section 7's definition of antitrust liability relatively expansive." *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 337 (3d Cir. 2016) (internal quotation marks and citations omitted).

    c. The United States must show there is a "reasonable probability" that the merger will result in anticompetitive effects. *United States v. Energy Sols., Inc.*, 265 F. Supp. 3d 415, 435–36 (D. Del. 2017) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)). "The government need not prove anticompetitive effects 'with "certainty."'" *Id.* at 436 (quoting *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 719 (D.C. Cir. 2001)). "But neither will a 'mere possibility' suffice." *Id.* (quoting *FTC v. Consolidated Foods Corp.*, 380 U.S. 592, 598 (1965)).

    d. "Section 7 claims are typically assessed under a 'burden-shifting framework.'" *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015) (quoting *Chicago Bridge & Iron Co. v. FTC*, 534 F.3d 410, 423 (5th Cir. 2008)). Under that framework, "the Government must establish a prima facie case that the merger is anticompetitive." *Penn State*, 838 F.3d at 337. "To establish a prima facie case, the Government must (1) propose [a] proper relevant market and (2) show that the effect of the merger in that market is likely to be anticompetitive." *Id.* at 337–38. "Once the Government has established a prima facie case that the merger may substantially lessen competition, the burden shifts to the [defendants] to rebut the Government's prima facie case." *Id.* at 347. If the defendants "successfully rebut the Government's prima facie case, 'the burden of production shifts back to the Government and merges with the ultimate burden of persuasion, which is incumbent on the Government at all times.'" *Id.* at 337 (quoting *Saint Alphonsus*, 778 F.3d at 783).

    e. A merger is unlawful under Section 7 if it is likely to result in a substantial lessening of competition in "any line of commerce" in "any section of the

1

country."  15 U.S.C. § 18.  Thus, "if anticompetitive effects of a merger are probable in 'any' significant market," the merger violates Section 7.  *Brown Shoe*, 370 U.S. at 337.  *See also United States v. Anthem, Inc.*, 855 F.3d 345, 368 (D.C. Cir. 2017) (harm in a single market is "a sufficient basis for enjoining the merger").

f.  To resolve a Section 7 claim, courts regularly consult the Department of Justice and Federal Trade Commission's *Horizontal Merger Guidelines* ("*Guidelines*"). *See, e.g.*, *Penn State*, 838 F.3d at 338 n.2 ("Although the Merger Guidelines are not binding on the courts, they are often used as persuasive authority.") (quoting *Saint Alphonsus*, 778 F.3d at 784 n.9); *Energy Sols.*, 265 F. Supp. 3d at 446 (citing the *Guidelines* in its analysis); *Chicago Bridge*, 534 F.3d at 431 n.11 ("Merger Guidelines are often used as persuasive authority when deciding if a particular acquisition violates anti-trust laws.").

g.  Defendants may argue that the fact that U.S. Sugar uses United Sugars Corporation ("United") as its sales and marketing agent means that U.S. Sugar does not compete with Imperial and therefore the proposed transaction is outside the reach of Section 7 of the Clayton Act.

   i.  "Whether an antitrust violation exists necessarily depends on a careful analysis of market realities." *NCAA v. Alston*, 141 S. Ct. 2141, 2158 (2021). The Supreme Court has long eschewed "formalistic distinctions in favor of a functional consideration of how the parties involved in the alleged anticompetitive conduct actually operate." *American Needle, Inc. v. NFL*, 560 U.S. 183, 191 (2010); *accord Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 467 (1992) (The Court "has preferred to resolve antitrust claims on a case-by-case basis, focusing on the 'particular facts disclosed by the record.'" (citations omitted)).

   ii.  "Antitrust policy requires the courts to seek the economic substance of an arrangement, not merely its form.  The 'substance' of an arrangement often depends on the economic incentive of the parties." *Weiss v. York Hosp.*, 745 F.2d 786, 815 (3d Cir. 1984) (citations omitted).  In the context of Section 7 of the Clayton Act, courts focus on the "commercial realities" of the proposed transaction, *see, e.g.*, *Penn State*, 838 F.3d at 342, rather than "allow corporate forms to be used as a tool to flout antitrust laws," *Community Publishers, Inc. v. Donrey Corp.*, 882 F. Supp. 138, 141 (W.D. Ark. 1995), *aff'd sub nom. Community Publishers, Inc. v. DR Partners*, 139 F.3d 1180, 1183 (8th Cir. 1998).

h.  Defendants also may attempt to argue that this transaction is principally a vertical merger and should be analyzed as such.

   i.  A horizontal merger is a merger "between companies performing similar functions in the production or sale of comparable goods or services[.]" *Brown Shoe*, 370 U.S. at 334.  *See also General Foods Corp. v. FTC*, 386 F.2d 936,

944 (3d Cir. 1967) (a horizontal merger is a merger between "direct competitor[s]"); *Guidelines* § 1 (a horizontal merger is a merger "involving actual or potential competitors").

ii.   A vertical merger is a merger "between companies standing in a supplier-customer relationship." *Brown Shoe*, 370 U.S. at 323; *General Foods*, 386 F.2d at 944 (a vertical merger is a merger between "buyer and seller").

iii.   A merger can present both horizontal and vertical concerns. *See Brown Shoe*, 370 U.S. at 323–46 (discussing separately "the vertical aspects of the merger" and "the horizontal aspects of the merger"); *see also United Nuclear Corp. v. Combustion Eng'g, Inc.*, 302 F. Supp. 539, 555 (E.D. Pa. 1969) ("Having determined that this acquisition violates Section 7 because of its horizontal effects, I need not, strictly speaking, consider its vertical implications.").

2.   Whether the "production and sale of refined sugar" is a relevant product market and line of commerce under Section 7 of the Clayton Act, 15 U.S.C. § 18, is an issue to be litigated.

a.   Section 7 of the Clayton Act prohibits a merger "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition." 15 U.S.C. § 18.

b.   "Congress prescribed a pragmatic, factual approach to the definition of the relevant market and not a formal, legalistic one." *Penn State*, 838 F.3d at 335 (quoting *Brown Shoe*, 370 U.S. at 336). "[A] market cannot be defined with absolute certainty." *Ansell Inc. v. Schmid Lab'ys, Inc.*, 757 F. Supp. 467, 476 (D.N.J. 1991), *aff'd*, 941 F.2d 1200 (3d Cir. 1991).

c.   "The relevant market is defined in terms of two components: the product market and the geographic market." *Penn State*, 838 F.3d at 338; *see also Brown Shoe*, 370 U.S. at 324; *United States v. Aetna, Inc.*, 240 F. Supp. 3d 1, 19 (D.D.C. 2017).

d.   A relevant product market "is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956); *Allen-Myland, Inc. v. IBM Corp.*, 33 F.3d 194, 206 (3d Cir. 1994).

e.   Courts may determine the interchangeability of products with reference to "practical indicia," or "*Brown Shoe* factors," including "industry or public recognition of the [product market] as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe*, 370 U.S. at 325; *accord Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 199 (3d Cir. 1992); *see also Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 437 (3d Cir. 1997) (factors for finding reasonable

3

interchangeability "include price, use, and qualities") (quoting *Tunis Bros. Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 722 (3d Cir. 1991)). *Brown Shoe*'s "practical indicia," however, are "not necessarily criteria to be rigidly applied." *FTC v. Swedish Match*, 131 F. Supp. 2d 151, 159 (D.D.C. 2000). *See also International Tel. & Tel. Corp. v. General Tel. Elecs. Corp.*, 518 F.2d 913, 932 (9th Cir. 1975) (explaining that *Brown Shoe*'s practical indicia were meant as "practical aids . . . rather than with the view that their presence or absence would dispose, in talismanic fashion, of the submarket issue").

f.   Courts also use the hypothetical monopolist test described in § 4.1.1 of the *Guidelines* to assess whether a group of products within a candidate market could be a relevant antitrust market, i.e., whether they are reasonably interchangeable. *See, e.g.*, *Aetna*, 240 F. Supp. 3d at 20; *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 194, 198 (D.D.C. 2017), *aff'd*, 855 F.3d 345 (D.C. Cir. 2017); *United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 51–52 (D.D.C. 2011). "[T]he hypothetical monopolist test asks whether a hypothetical monopolist of all the products within a proposed market would likely impose a 'small but significant and non-transitory increase in price' ('SSNIP')—typically of five or ten percent—on at least one product in the market, including one sold by the merging firms." *Aetna*, 240 F. Supp. 3d at 20 (citing *Guidelines* §§ 4.1.1, 4.1.2). "Whether the hypothetical monopolist can profitably impose the price increase depends, in part, on the amount of substitution outside the proposed market. 'If enough consumers are able to substitute away from the hypothetical monopolist's product to another product and thereby make a price increase unprofitable, then the relevant market cannot include only the monopolist's product and must also include the substitute goods.'" *Id.* (quoting *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 33 (D.D.C. 2015)). "But if substitution outside the proposed market is relatively low, then the hypothetical monopolist would likely impose the price increase without sacrificing a large number of sales. In that case, the price increase might be profitable, and the hypothetical monopolist's products would constitute the proper antitrust market." *Id.* at 20–21. *See also FTC v. Whole Foods*, 548 F.3d 1028, 1038 (D.C. Cir. 2008) (Brown, J.); *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 121 (D.D.C. 2016) (*Staples II*).

g.   The relevant market does not necessarily include all substitutes; it need include only "reasonable substitutes." *Sysco*, 113 F. Supp. 3d at 26 (quoting *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 46 (D.D.C. 1998)); *accord Allen-Myland*, 33 F.3d at 207 (considering whether "peripherals and software are reasonable substitutes for mainframes"). As the Supreme Court has explained, "[f]or every product, substitutes exist. But a relevant market cannot meaningfully encompass [an] infinite range [of products]. The circle must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn." *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 612 n.31 (1953). *See also Whole Foods*, 548 F.3d at 1037 (Brown, J.) (The reasonable interchangeability of products "depends not only on the ease and speed with which customers can substitute it and the desirability of doing so, but also on the cost of substitution.") (internal citations omitted).

4

3.  Whether (a) the Census Bureau's South Atlantic and East South Central census divisions (Alabama, Delaware, District of Columbia, Florida, Georgia, Kentucky, Maryland, Mississippi, North Carolina, South Carolina, Tennessee, Virginia, and West Virginia) ("broader market") and (b) Georgia and the states bordering Georgia (Alabama, Florida, Georgia, North Carolina, South Carolina, and Tennessee) ("narrower market"), are relevant geographic markets for the product market identified above under Section 7 of the Clayton Act, 15 U.S.C. § 18, are issues to be litigated.

    a.  Section 7 of the Clayton Act prohibits a merger "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition."  15 U.S.C. § 18.

    b.  The relevant geographic market in a horizontal merger case "is not where the parties to the merger do business or even where they compete, but where, within the area of competitive overlap, the effect of the merger on competition will be direct and immediate."  *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 357 (1963).  *See also Anthem*, 236 F. Supp. 3d at 202, 204 (rejecting defendants' argument that geographic market of 14 non-contiguous states was gerrymandered and finding those states "comprise an 'area of competitive overlap'") (quoting *Philadelphia Nat'l Bank*, 374 U.S. at 357).

    c.  "The criteria to be used in determining the appropriate geographic market are essentially similar to those used to determine the relevant product market."  *Brown Shoe*, 370 U.S. at 336.  The geographic market must "'correspond to the commercial realities of the industry,'" which are "[d]etermined within the specific context of each case."  *Penn State*, 838 F.3d at 338 (quoting *Brown Shoe*, 370 U.S. at 336).  "The commercial realities considered when defining the relevant geographic market include: where the parties market their products; the size, cumbersomeness, and perishability of the products; regulatory requirements impeding the free flow of competing goods into or out of the area; shipping costs and limitations; the area within which the defendant and its competitors view themselves as competing; and other factors bearing upon where customers might realistically look to buy the product."  *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 442–43 (4th Cir. 2011).

    d.  "The relevant geographic market 'is that area in which a potential buyer may rationally look for the goods or services he seeks.'"  *Penn State*, 838 F.3d at 338 (quoting *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 212 (3d Cir. 2005)).  "The size of the relevant geographic market depends on a number of factors, including '[p]rice data and such corroborative factors as transportation costs, delivery limitations, customer convenience and preference, and the location and facilities of other producers and distributors.'"  *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1027 (10th Cir. 2002) (quoting *T. Harris Young & Assocs. v. Marquette Elecs., Inc.*, 931 F.2d 816, 823 (11th Cir. 1991)).

e. "The scope of geographic markets often depends on transportation costs." *Guidelines* § 4.2.  *See also Kolon Indus.*, 637 F.3d at 443 ("shipping costs" are factor in determining geographic market); *National Beverage Sys., Inc. v. Leonard Fountain Specialities, Inc.*, No. 12–10658, 2012 WL 2389870, *3 (E.D. Mich. June 25, 2012) (accepting alleged geographic market limited to three counties based on allegation that "[b]ecause syrups are sold in boxes weighing 50 lbs., and delivery costs increase as the distance from the packaging facility increases, customers located far from the packaging facility are not economical to service").

f. As is also true for product markets, the hypothetical monopolist test is one method for defining a relevant geographic market.  *Penn State*, 838 F.3d at 338 ("A common method employed by courts and the [government] to determine the relevant geographic market is the hypothetical monopolist test."); *Guidelines* § 4.2.  Under the test, "if a hypothetical monopolist could impose [a SSNIP] in the proposed market, the market is properly defined.  If, however, consumers would respond to a SSNIP by purchasing the product from outside the proposed market, thereby making the SSNIP unprofitable, the proposed market definition is too narrow."  *Penn State*, 838 F.3d at 338 (citing *Guidelines* § 4).

g. "When the hypothetical monopolist could discriminate based on customer location, the Agencies may define geographic markets based on the locations of targeted customers.  Geographic markets of this type often apply when suppliers deliver their products or services to customers' locations.  Geographic markets of this type encompass the region into which sales are made.  Competitors in the market are firms that sell to customers in the specified region.  Some suppliers that sell into the relevant market may be located outside the boundaries of the geographic market."  *Guidelines* § 4.2.2 (footnote omitted).  *See Kolon Indus.*, 637 F.3d at 444 (defining geographic market for a global product around customers located in the United States because U.S. purchasers could not practicably turn to product sold outside the United States); *United States v. Dean Foods Co.*, No. 10-CV-59, 2010 WL 1417926, *4 (E.D. Wis. Apr. 7, 2010) (accepting for purposes of motion to dismiss relevant geographic market defined around customers located near acquired milk processor based on allegation that milk "has a limited shelf life and is costly to transport"); *United States v. Bazaarvoice, Inc.*, No. 13-CV-0133, 2014 WL 203966,*29 (N.D. Cal. Jan. 8, 2014) (discussing market in which "a hypothetical monopolist can identify and target price increases to a particular group of customers based on geography because those customers cannot engage in arbitrage with customers in another geographic area"); *see also Guidelines* § 3 ("Arbitrage between customers at different geographic locations may be impractical due to transportation costs.").

h. "An element of 'fuzziness'" is inherent in defining a geographic market.  *United States v. Connecticut Nat'l Bank*, 418 U.S. 656, 669 (1974) (quoting *Philadelphia Nat'l Bank*, 374 U.S. at 360 n.37).  Accordingly, a geographic market need not be defined "with scientific precision."  *Id.*; *Guidelines* § 4.  Section 7 of the Clayton Act "requires merely that the Government prove the merger may have a substantial anticompetitive effect somewhere in the United States—'in any

6

section' of the United States.  This phrase does not call for the delineation of a 'section of the country' by metes and bounds as a surveyor would lay off a plot of ground."  *United States v. Pabst Brewing Co.*, 384 U.S. 546, 549 (1966); *accord Joseph Ciccone & Sons, Inc. v. Eastern Indus., Inc.*, 559 F. Supp. 671, 674 (E.D. Pa. 1983).

 i. Even if a broader geographic market also could be defined, that would not preclude defining a smaller market (sometimes called a submarket) for purposes of analyzing the transaction at issue.  *See, e.g.*, *Brown Shoe*, 370 U.S. at 336 (explaining that geographic "submarkets" may be contained within larger markets); *Pabst Brewing*, 384 U.S. at 548–49 (holding that Wisconsin, a three-state area including Wisconsin, and the United States as a whole all constitute relevant geographic markets).

4. Whether the United States can establish a prima facie case that the proposed transaction is likely to have anticompetitive effects is an issue to be litigated.

 a. The United States can establish that the proposed transaction is likely to have anticompetitive effects in two ways:  1) by "showing a high market concentration," *Penn State*, 838 F.3d at 347; or 2) by demonstrating that the merger "is likely to encourage one or more firms to raise price, reduce output, diminish innovation, or otherwise harm customers as a result of diminished competitive constraints or incentives," *Guidelines* § 1.

 b. Whether the United States can establish anticompetitive effects by showing that the proposed transaction would substantially increase market concentration in either of the two relevant markets is an issue to be litigated.

  i. The United States can establish a presumption that the merger will substantially lessen competition by making "a *prima facie* showing that the acquisition in this case will result in a significant market share and an undue increase in concentration" in the relevant market.  *Staples II*, 190 F. Supp. 3d at 127 (quoting *Swedish Match*, 131 F. Supp. 2d at 166).  "[A] merger which produces a firm controlling an undue percentage of the relevant market, and results in a significant increase in the concentration of firms in that market is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects."  *Philadelphia Nat'l Bank*, 374 U.S. at 363.

  ii. Courts therefore consider post-transaction market concentration, and the change in concentration caused by the transaction, in analyzing the competitive effects of a merger under Section 7.  "Market concentration is a function of the number of firms in a market and their respective market shares."  *Staples II*, 190 F. Supp. 3d at 128 (quoting *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 123 (D.D.C. 2004))  While there is no fixed threshold for high market concentration, the Supreme Court has specifically held that a post-merger market share of 30%, and a "significant" increase in market

concentration, triggered a presumption of illegality. *Philadelphia Nat'l Bank*, 374 U.S. at 364 ("Without attempting to specify the smallest [resulting] market share which would still be considered to threaten undue concentration, we are clear that 30% presents that threat."); *see also United States v. Continental Can Co.*, 378 U.S. 441, 461 (1964) (finding a merger presumptively anticompetitive where the acquiring firm's market share increased from 21.9% to 25%); *H&R Block*, 833 F. Supp. 2d at 72 (finding a presumption of competitive harm where a merger would cause the acquiring firm's share to increase from 15.6% to 28.4%).

iii. Courts also look to market-concentration thresholds set in the *Guidelines* to determine whether the merger will result in high market concentration. *See, e.g.*, *Penn State*, 838 F.3d at 346–47. The *Guidelines* measure market concentration by the Herfindahl–Hirschmann Index (HHI), which is "calculated by summing the squares of the individual firms' market shares." *Guidelines* § 5.3. "The Government can establish a prima facie case simply by showing a high market concentration based on HHI numbers." *Penn State*, 838 F.3d at 347. Under the *Guidelines*, a merger is presumed to be anticompetitive if it would cause the HHI to increase by more than 200 points, and result in an HHI greater than 2,500, in any relevant market. *Guidelines* § 5.3; s*ee also Penn State*, 838 F.3d at 346–47; *Energy Sols.*, 265 F. Supp. 3d at 441.

iv. "The measurement of market shares and market concentration is not an end in itself, but is useful to the extent it illuminates the merger's likely competitive effects." *Guidelines* § 4.0. In speaking of competitive effects, the Supreme Court noted, "[s]uch a prediction is sound only if it is based upon a firm understanding of the structure of the relevant market." *Philadelphia Nat'l Bank*, 374 U.S. at 362.

v. Once the government shows that the merger is presumptively anticompetitive under the parameters set forth in the *Guidelines*, the government has "established a prima facie case that the merger may substantially lessen competition," and the burden shifts to the defendants "to rebut the Government's prima facie case." *Penn State*, 838 F.3d at 347.

c. Defendants may argue that United's sales from sugar refined by United's three owners besides U.S. Sugar (i.e., American Crystal Sugar Co., Minn-Dak Farmers Cooperative, and Wyoming Sugar Co.) should not be attributed to the combined U.S. Sugar/Imperial for purposes of evaluating market concentration following the proposed transaction. Where the market realities show that different firms effectively compete as a single or coordinated unit in the relevant market, however, courts combine those firms' market shares for purposes of determining market shares and concentration. *See Anthem*, 236 F. Supp. 3d at 210 (combining the market presence of Anthem and the other Blue Cross licensees for purposes of calculating market shares); *Community Publishers*, 139 F.3d at 1183 (affirming district court's decision to "aggregate the interests of NAT and Donrey for

8

purposes of Section 7 analysis"); *Consolidated Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 261 (2d Cir. 1989) (affirming decision to combine market shares of disparate owners of defendant for purposes of market share calculations for Section 7 claim because "the intertwined relationships among Anglo, De Beers, Minorco, and the Oppenheimer family warrant attribution of aggregate market power to Minorco").

d.  Defendants also may argue that sales by distributors of refined sugar purchased from domestic producers should be treated the same as sales by refiners themselves when calculating market shares in the relevant market even though distributors have no independent refining capability and must purchase refined sugar from refiners.

   i.  "The goal in defining the relevant market is to identify the market participants . . . that restrain an individual firm's ability to raise prices or restrict output." *Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 496 (2d Cir. 2004); *FTC v. Advocate Health Care Network*, 841 F.3d 460, 469 (7th Cir. 2016) (noting that the relevant market need include only "the competitors that would 'substantially constrain [the firm's] price-increasing ability'" (quoting *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 228 (2d Cir. 1999)).

   ii.  Applying these principles, courts do not consider firms operating at different levels of the distribution chain to be in the same relevant market even though they may sell to the same customers.  *See Allen-Myland*, 33 F.3d at 202 (holding third-party lessors of IBM computers should not be assigned market shares in competition with IBM because IBM sold the computers to the leasing companies and assigning share to the leasing companies would be double-counting:  "New computers are, of course, already in the relevant market as defined by AMI.  It was therefore incorrect to add them in again when end users lease new computers rather than purchase them outright.  In this situation, leasing companies provide nothing more than an alternate way of *financing* a new computer, but do nothing to increase the *supply* of new machines."); *Avnet, Inc. v. FTC*, 511 F.2d 70, 78 (7th Cir. 1975) (two groups of firms that "perform significantly different functions and operate at significantly different levels of distribution" are properly placed in different markets); *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 425 (2d Cir. 1945) (for purposes of measuring Alcoa's market share of ingot market, market should not include sale of ingots previously sold by Alcoa and then salvaged and resold by other firms); *see also New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 195, 202–03 (S.D.N.Y. 2020) (firms that must lease RAN (radio access network) should not be treated as independent competitors of firms that control RAN access, and the firms that must lease RAN from the other firms should not be attributed their own market shares for purposes of analyzing merger of two firms that control their own RAN access).

e.  Demonstrating high market concentration "does not exhaust the possible ways to prove a § 7 violation on the merits." *Whole Foods*, 548 F.3d at 1036 (Brown, J.); *Penn State*, 838 F.3d at 346 (describing market concentration as a "useful indicator," but not as the only indicator, "of the likely competitive, or anticompetitive, effects of a merger"); *Chicago Bridge*, 534 F.3d at 433 ("Even excluding the HHIs, the Government's other evidence independently suffices to establish a *prima facie* case . . . .").

f.  The government may establish its prima facie case, or bolster a prima facie case already established through evidence of high market concentration, through evidence that the proposed transaction would harm customers as a result of diminished competitive constraints or incentives. *See Heinz*, 246 F.3d at 717 ("the FTC's market concentration statistics are bolstered by the indisputable fact that the merger will eliminate competition between the two merging parties"); *Sysco*, 113 F. Supp. 3d at 65 ("Evidence of probable unilateral effects strengthens the FTC's *prima facie* case that the merger will lessen competition in the national customer market.").

g.  "Courts examine two types of effects that may arise from mergers: coordinated effects and unilateral effects." *Anthem*, 236 F. Supp.3d at 215; *see also Guidelines* §§ 6–7.

h.  Whether the United States can show that the proposed transaction likely would result in anticompetitive unilateral effects is an issue to be litigated.

   i.  "Unilateral effects refers to a merger's elimination of competition between the two merging companies, which 'may alone constitute a substantial lessening of competition.'" *Anthem*, 236 F. Supp. 3d at 216 (quoting *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 568–69 (6th Cir. 2014)); *see also Guidelines* § 6.  Unilateral effects are likely "if the acquiring firm will have the incentive to raise prices or reduce quality after the acquisition, independent of competitive responses from other firms." *H&R Block*, 833 F. Supp. 2d at 81; *Aetna*, 240 F. Supp. 3d at 43 (same).

   ii.  "The elimination of competition between two firms that results from their merger may alone constitute a substantial lessening of competition." *Staples II*, 190 F. Supp. 3d at 131 (citing *Guidelines* § 6); *Aetna*, 240 F. Supp. 3d at 43.  Particularly in a "highly concentrated market," the loss of "significant head-to-head competition" is "certainly an important consideration when analyzing possible anti-competitive effects," *FTC v. Staples, Inc.* ("*Staples I*"), 970 F. Supp. 1066, 1083 (D.D.C. 1997), because the loss of such a competitive constraint may allow the merged firm to raise prices, restrict output, or otherwise exercise market power.  Accordingly, "[m]ergers that eliminate head-to-head competition between close competitors often result in a lessening of competition." *Staples II*, 190 F. Supp. 3d at 131 (citing *Guidelines* § 6); *accord Heinz*, 246 F.3d at 716–17 (holding that the

Government's prima facie case was "bolstered by the indisputable fact that the merger will eliminate competition between the two merging parties").

iii. The elimination of head-to-head competition is particularly likely to lead to unilateral effects if the products of the merging firms are close substitutes for a significant number of consumers. *See FTC v. Libbey, Inc.*, 211 F. Supp. 2d 34, 47–48 (D.D.C. 2002); *Swedish Match*, 131 F. Supp. 2d at 169 ("[T]he weight of the evidence demonstrates that a unilateral price increase by Swedish Match is likely after the acquisition because it will eliminate one of Swedish Match's primary direct competitors.").

iv. A merger can have harmful unilateral effects, however, "even where the merging parties are not the only, or the two largest, competitors in the market." *Aetna*, 240 F. Supp. 3d at 43 (citing *Sysco*, 113 F. Supp. 3d at 62); *Heinz*, 246 F.3d at 718; *H&R Block*, 833 F. Supp. 2d at 83–84. Further, "[t]he acquired firm need not be the other's closest competitor to have an anticompetitive effect; the merging parties only need to be close competitors." *Anthem*, 236 F. Supp. 3d at 216. That another firm might be a closer competitor is "beside the point" for purposes of evaluating unilateral effects. *Id.* A merger also can substantially lessen competition even in markets where one of the merging parties wins bids more frequently than the other. *See Energy Sols.*, 265 F. Supp. 3d at 439 ("Anti-trust law does not distinguish between effective and ineffective competitors."); *see also United States v. El Paso Nat. Gas Co.*, 376 U.S. 651, 661 (1964) ("Unsuccessful bidders are no less competitors than the successful ones.").

v. A merger can substantially lessen competition by increasing the bargaining or negotiating leverage of the merged firm. In industries in which "buyers commonly negotiate with more than one seller, and may play sellers off against one another," the merger of two competing sellers could result in a lessening of competition because "buyers will be prevented from playing the sellers off against one another in negotiations." *Sysco*, 113 F. Supp. 3d at 62 (quoting *Guidelines* § 6.2); *see also Penn State*, 838 F.3d at 346 (finding that "the increase in the Hospitals' bargaining leverage as a result of the merger will allow the post-merger combined Hershey/Pinnacle to profitably impose a SSNIP on payors"); *Saint Alphonsus*, 778 F.3d at 786–87 (finding that the merged firm would use its increased bargaining power to raise prices); *ProMedica*, 749 F.3d at 562, 570 (finding that as a firm's dominance in a market increases, so too does its bargaining power, or leverage in demanding higher rates).

vi. A firm's ability to target particular customers for price increases is also relevant to unilateral effects analysis. "[W]hen the merging sellers are likely to know which buyers they are best and second best placed to serve, any anticompetitive unilateral effects are apt to be targeted at those buyers." *Guidelines* § 6.2. "When price discrimination is feasible, adverse competitive effects on targeted customers can arise, even if such effects will not arise for

11

other customers.  A price increase for targeted customers may be profitable even if a price increase for all customers would not be profitable because too many other customers would substitute away." *Guidelines* § 3; *see also FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 46–47 (D.D.C. 2018); *Staples II*, 190 F. Supp. 3d at 117–18.

vii. "Relevant evidence of a merger's potential unilateral effects include the merging companies' ordinary course of business documents, testimony of industry participants, and the history of head-to-head competition between the two merging parties." *Anthem*, 236 F. Supp. 3d at 216; *see also Aetna*, 240 F. Supp. 3d at 44–46 (discussing evidence of head-to-head competition between Aetna and Humana).

viii. Courts also rely on expert testimony, including economic analyses tailored to the facts of the case, to evaluate whether the transaction is likely to result in harmful unilateral effects. *See, e.g.*, *Anthem*, 236 F. Supp. 3d at 212 (discussing government expert's testimony regarding price effects); *Aetna*, 240 F. Supp. 3d at 47 (finding government expert's merger simulation "predicts that the merged firm would have the incentive and ability to increase quality-adjusted premiums").  For example, courts have considered economic testimony relating to upward pricing pressure (UPP) models and merger simulations as part of evaluating whether the transaction is likely to result in unilateral effects. *See, e.g.*, *Sysco*, 113 F. Supp. 3d at 66–67 (discussing expert's auction model merger simulation and concluding that the model "strengthens the FTC's *prima facie* case that the merger will substantially lessen competition in the market for national customers"); *Anthem*, 236 F. Supp. 3d at 212 (discussing expert's UPP analysis); *Wilhelmsen*, 341 F. Supp. 3d at 64 (discussing expert's gross upward pricing pressure analysis).

i. Whether the United States can show that the proposed transaction likely would result in anticompetitive coordinated effects is an issue to be litigated.

i. Merger law "rests upon the theory that, where rivals are few, firms will be able to coordinate their behavior, either by overt collusion or implicit understanding, in order to restrict output and achieve profits above competitive levels." *Heinz,* 246 F.3d at 715 (citing *FTC v. PPG Indus., Inc.*, 798 F.2d 1500, 1503 (D.C. Cir. 1986)); *see also Anthem*, 236 F. Supp. 3d at 206, 215–16.  "The theory follows that, absent extraordinary circumstances, a merger that results in an increase in concentration above certain levels 'raise[s] a likelihood of interdependent anticompetitive conduct.'" *FTC v. CCC Holdings Inc.*, 605 F. Supp. 2d 26, 60 (D.D.C. 2009) (quoting *PPG Indus., 798 F.2d at 1503 (internal citation omitted)). *See also FTC v. University Health, Inc.,* 938 F.2d 1206, 1218 n.24 (11th Cir.1991) (high concentration makes it "easier for firms in the market to collude, expressly or tacitly, and thereby force price above or farther above the competitive level").

ii. "A merger may diminish competition by enabling or encouraging post-merger coordinated interaction among firms in the relevant market that harms customers. Coordinated interaction involves conduct by multiple firms that is profitable for each of them only as a result of the accommodating reactions of the others." *Guidelines* § 7. "The ability of rival firms to engage in coordinated conduct depends on the strength and predictability of rivals' responses to a price change or other competitive initiative. Under some circumstances, a merger can result in market concentration sufficient to strengthen such responses or enable multiple firms in the market to predict them more confidently, thereby affecting the competitive incentives of multiple firms in the market, not just the merged firm." *Id.*

iii. "Whether a merger will make coordinated interaction more likely depends on whether market conditions, on the whole, are conducive to reaching terms of coordination and detecting and punishing deviations from those terms." *H&R Block*, 833 F. Supp. 2d at 77 (quoting *CCC Holdings*, 605 F. Supp. 2d at 60). Courts have found that "[t]he combination of a concentrated market and barriers to entry is a recipe for price coordination." *Heinz*, 246 F.3d at 724. Other market conditions that courts have found make markets more susceptible to coordination include: (1) evidence of prior collusion or coordination in the industry, *see H&R Block*, 833 F. Supp. 2d at 77–78 (citing *Guidelines* § 7.2); *Hospital Corp. of Am. v. FTC*, 807 F.2d 1381, 1388 (7th Cir. 1986) ("there is a tradition . . . of cooperation between competing hospitals in Chattanooga"); (2) relatively transparent prices and observable competitive initiatives, *H&R Block*, 833 F. Supp. 2d at 78; *CCC Holdings*, 605 F. Supp. 2d at 62, 65; *Swedish Match*, 131 F. Supp. 2d at 168; Guidelines § 7.2; and (3) relatively homogeneous, undifferentiated products, *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 905 (7th Cir. 1989).

5. Whether Defendants can prove that any countervailing factors or affirmative defenses exist and are sufficient to counteract the alleged competitive harm in each of the markets is an issue remaining to be litigated.

   a. "The more compelling the prima facie case, the more evidence the defendant must present to rebut it successfully." *United States v. Baker Hughes Inc.*, 908 F.2d 981, 991 (D.C. Cir. 1990); *Anthem*, 855 F.3d at 349–50; *see also Penn State*, 838 F.3d at 350 (quoting *Guidelines* § 10 and requiring "extraordinarily great cognizable efficiencies" to overcome the government's strong prima facie case).

   b. Not only must Defendants show that "'the market-share statistics [give] an inaccurate account of the [merger's] probable effects on competition' in the relevant market," *Heinz*, 246 F.3d at 715 (alternations in original) (quoting *United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 120 (1975)), but Defendants also must rebut the unilateral- and coordinated-effects evidence for each market by showing that the evidence does not accurately reflect the likely competitive effects of the merger. *ProMedica*, 749 F.3d at 571–72 ("That the [Government] did not merely rest upon the [market-concentration] presumption, but instead

13

discussed a wide range of evidence that buttresses it, makes [the defendant's] task more difficult still. . . . [The defendant's] task, then, is to overcome not merely the presumption of anticompetitive effects, but also the [buttressing evidence].").

c.  Defendants may assert that the proposed transaction is immune from antitrust liability under the Capper-Volstead Act.

    i.  The Capper-Volstead Act does not give exclusive jurisdiction to the Secretary of Agriculture and thereby exclude any prosecution under the federal antitrust laws.  *United States v. Borden Co.*, 308 U.S. 188, 200 (1939); *Maryland & Va. Milk Producers Ass'n v. United States*, 362 U.S. 458, 462–63 (1960).  "We hold that the privilege the Capper-Volstead Act grants producers to conduct their affairs collectively does not include a privilege to combine with competitors so as to use a monopoly position as a lever further to suppress competition by and among independent producers and processors."  *Maryland & Va. Milk Producers Ass'n*, 362 U.S. at 472.  Thus, "[t]he Capper-Volstead Act cannot immunize a cooperative's acquisition of a competing non-cooperative business when the acquisition is violative of Section 7 of the Clayton Act."  *United States v. Rice Growers Ass'n*, No. S-84-1066, 1986 WL 12561, *4 n.5 (E.D. Cal. Jan. 31, 1986).

d.  Defendants may contend that the U.S. Department of Agriculture's role in the sugar industry would prevent any harm from the proposed transaction in the relevant markets and therefore rebuts the United States' prima facie case.

    i.  "Antitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue.  Part of that attention to economic context is an awareness of the significance of regulation."  *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 411 (2004).  However, as "the antitrust laws represent a fundamental national economic policy . . . we cannot lightly assume that the enactment of a special regulatory scheme for particular aspects of an industry was intended to render the more general provisions of the antitrust laws wholly inapplicable to that industry."  *Carnation Co. v. Pacific Westbound Conf.*, 383 U.S. 213, 218 (1966).  Rather, Section 7 requires "that the forces of competition be allowed to operate within the broad framework of governmental regulation of the industry."  *Philadelphia Nat'l Bank*, 374 U.S. at 371–72.

    ii.  Even in an industry where prices are directly regulated, the regulator's approval of the prices does not foreclose the possibility that "the combination among [competitors] violated the Sherman Act."  *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 415 (1986) (reviewing *Keogh v. Chicago & Nw. Ry. Co.*, 260 U.S. 156 (1922), and reaffirming that filed rates are subject to antitrust scrutiny); *see also Georgia v. Pennsylvania R.R. Co.*, 324 U.S. 439, 460–61 (1945) (When filed rates in a regulated industry are restricted to a "'zone of reasonableness' [that] exists between maxima and minima," anticompetitive conduct "within that zone" can "constitute

14

violations of the anti-trust laws."); *Town of Norwood v. New England Power Co.*, 202 F.3d 408, 422 (1st Cir. 2000) ("mergers or sales of assets by federally regulated utilities have been left open to antitrust challenge even though the resulting rates were subject to federal regulation and even though the merger or sale had been explicitly approved by the regulator").  A merger can have anticompetitive effects where regulation "would constrain somewhat the merged firm's ability to increase premiums dramatically, [but] it would not completely curtail it."  *Aetna*, 240 F. Supp. 3d at 51.

iii.  In addressing the contention that regulation leaves "no opening for the anticompetitive effects that the Government posits," courts carefully evaluate whether the regulations at issue would prevent the specific types of harm the merger likely otherwise would cause.  *Aetna*, 240 F. Supp. 3d at 47–52 (rejecting defendants' argument that the extensive government regulation of Medicare Advantage plans would prevent harm from the merger).  As part of this analysis, courts consider the likely effectiveness of the regulatory tools to prevent the harms alleged and whether those tools have been used in the past in similar contexts.  *See id.* at 49 (finding regulation a "poor tool for regulating [Medicare Advantage] plan price or quality"); *id.* at 52 ("In short, the record here suggests that CMS [Centers for Medicare and Medicaid Services] has not exerted considerable influence at the bid level before the proposed merger.  That makes it very difficult for the Court to conclude that it would effectively do so after a merger.").

e.  Defendants may contend that the United States' showing of anticompetitive effects fails to take into account that Imperial is a weakened competitor that will not be able to maintain its present competitive position in the relevant markets.

i.  "The 'weakened competitor' argument is only persuasive when the defendants 'make[ ] a substantial showing that the acquired firm's weakness, <u>which cannot be resolved by any competitive means</u>, would cause that firm's market share to reduce to a level that would undermine the government's prima facie case.'"  *Aetna*, 240 F. Supp. 3d at 92 (quoting *University Health*, 938 F.2d at 1221) (alteration in original).  The weakened competitor defense has been described as "the Hail–Mary pass of presumptively doomed mergers," *ProMedica*, 749 F.3d at 572, and the "weakest ground of all for justifying a merger," *Arch Coal*, 329 F. Supp. 2d at 154 (quoting *Kaiser Aluminum & Chem. Corp. v. FTC*, 652 F.2d 1324, 1339 (7th Cir. 1981)).

ii.  "Courts 'credit such a defense only in rare cases.'"  *ProMedica*, 749 F.3d at 572 (rejecting argument where hospital's market share was increasing prior to merger and it "had sufficient cash reserves to pay all of its obligations and meet its capital needs") (citation omitted).  *See also University Health*, 938 F.2d at 1221 (rejecting defendants' speculation "based on ambiguous evidence" that hospital to be acquired "would not be an effective competitor in the future").

15

iii. The weakened competitor defense is "disfavored because it fails to account for the fact that 'financial difficulties not raising a significant threat of failure are typically remedied in a moderate length of time,' whereas a merger is a relatively permanent action that eliminates the potential for future competition between the merging parties." *Aetna*, 240 F. Supp. 3d at 92 (quoting 4A Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 963a3 (4th ed. 2016)); *see also University Health*, 938 F.2d at 1221 ("The acquisition of a financially weak company in effect hands over its customers to the financially strong, thereby deterring competition by preventing others from acquiring those customers, making entry into the market more difficult.") (quoting *Kaiser Aluminum*, 652 F.2d at 1339).

f. Defendants may contend that the United States' proof of harm to competition fails to take into account that some buyers of refined sugar are large, sophisticated companies.

i. "'[T]he presence of powerful buyers alone' is not presumed to prevent adverse competitive consequences from the merger." *Anthem*, 236 F. Supp. 3d at 221 (quoting *Guidelines* § 8). "In assessing a power buyer argument, the court should 'examine the choices available to powerful buyers and how those choices likely would change due to the merger,' keeping in mind that '[n]ormally, a merger that eliminates a supplier whose presence contributed significantly to a buyer's negotiating leverage will harm that buyer.'" *Wilhelmsen*, 341 F. Supp. 3d at 70 (quoting *Guidelines* §8); *see also Sysco*, 113 F. Supp. 3d at 48 (reduction in alternatives means that "power buyers' ability to constrain price and avoid price discrimination can be correspondingly diminished").

ii. Courts reject "power buyer" defenses where merging parties fail "to identify any *new* strategy or alternative likely to emerge post-merger," and instead, focus on "strategies that are already part of the competitive landscape and which have no promise of becoming more effective." *Wilhelmsen*, 341 F. Supp. 3d at 71; *see also Anthem*, 236 F. Supp. 3d at 221 (holding loss of negotiating leverage that would result from merger "undermines the defense contention that customers will be able to wield their seasoned human resource managers and consultants to counteract the anticompetitive effects of the merger").

iii. Similarly, courts reject "power buyer" defenses based on speculation about how buyers might react to price increases without proof that such buyer strategies would be successful. *See Energy Sols.*, 265 F. Supp. 3d at 442 n.18 (defendants "did not present any evidence to support the assertion beyond some anecdotal evidence that customers have raised the issue of storage in negotiations" and "defendants have not shown that prices actually changed in response to a threat of storage").

iv. Courts also reject "power buyer" defenses where not all buyers would be in a position to push back against an exercise of market power by the merged firm. *See United States v. United Tote, Inc.*, 768 F. Supp. 1064, 1085–86 (D. Del. 1991) (rejecting argument where market had a mix of "large, sophisticated facilities" as well as smaller ones); *Cardinal Health*, 12 F. Supp. 2d at 61 (existence of large customers with "buyer power" cannot undermine the government's prima facie case where there were different types of customers in market).

g. Defendants may attempt to establish that anticompetitive effects in the relevant markets are unlikely by showing that "new firms can easily enter or existing firms can easily expand into the relevant product market in response to supracompetitive pricing." *See Energy Sols.*, 265 F. Supp. 3d at 443 (citing *Cardinal Health,* 12 F. Supp. 2d at 54–55); *Anthem*, 236 F. Supp. 3d at 221–22.

i. Defendants bear the burden of proving that entry by new firms or expansion by existing firms will be "timely, likely and sufficient in its magnitude, character, and scope" to counteract the anticompetitive effects of the merger. *Energy Sols.*, 265 F. Supp. 3d at 443 (quoting *H&R Block*, 833 F. Supp. 2d at 73).

ii. Entry or expansion is timely "only if it is rapid enough to deter or render insignificant the anticompetitive effects of the merger." *Energy Sols.*, 265 F. Supp. 3d at 443. *See also Anthem*, 236 F. Supp. 3d at 221–22 (to be timely, "'entry must be rapid enough to make unprofitable overall the actions causing those effects and thus leading to entry, even though those actions would be profitable until entry takes effect' and 'rapid enough that customers are not significantly harmed by the merger'") (quoting *Guidelines* § 9.1); *Staples II*, 190 F. Supp. 3d at 133 ("The relevant time frame for consideration in this forward looking exercise is two to three years.").

iii. Entry or expansion is likely "only if it would be profitable and feasible, accounting for all the attendant costs and difficulties," and taking into consideration the history of entry into the relevant market. *Energy Sols.*, 265 F. Supp. 3d at 443–44; *see also CCC Holdings*, 605 F. Supp. 2d at 47–48 ("The history of entry into the relevant market is a central factor in assessing the likelihood of entry in the future.") (citing *Cardinal Health*, 12 F. Supp. 2d at 56).

iv. Entry or expansion is sufficient only if it is "significant enough" to "counteract a merger's anticompetitive effects," that is, "'fill the competitive void that will result' if the merger proceeds." *Anthem*, 236 F. Supp. 3d at 222 (quoting *Sysco*, 113 F. Supp. 3d at 80). *See also Energy Sols.*, 265 F. Supp. 3d at 443 (for entry or expansion to be sufficient, the new firm(s) must be able to "affect pricing" and have sufficient "scale to compete on the same playing field" as the merged firm).

v.  Anecdotal evidence of potential new entry or expansion "by itself, is not sufficient to show that [the new entry] is an effective constraint on anti-competitive pricing." *Energy Sols.*, 265 F. Supp. 3d at 442; *see also University Health*, 938 F.2d at 1223 (holding that defendants' rebuttal must be grounded in facts and not speculation).

vi.  "How easily firms may enter or expand is determined by the barriers to entry." *Energy Sols.*, 265 F. Supp. 3d at 443 (citing *Cardinal Health*, 12 F. Supp. 2d at 54–55).  Potential barriers to entry include, among other things, regulatory requirements, high capital costs, technological obstacles, and entrenched customer relationships.  *See Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007); *Cardinal Health*, 12 F. Supp. 2d at 57 (economies of scale and strength of reputation can give the merging parties an advantage over new entrants, "serv[ing] as barriers to competitors as they attempt to grow significantly in size").

h.  Defendants may attempt to establish that anticompetitive effects in the relevant market are unlikely by showing that the proposed transaction will result in efficiencies.

i.  Courts that have entertained efficiencies defenses subject them to "demanding scrutiny."  *See Penn State*, 838 F.3d at 349 (reversing district court decision that "did not address whether those claimed efficiencies meet the demanding scrutiny that the efficiencies defense requires").  In cases involving high concentration levels, courts "must undertake a rigorous analysis of the kinds of efficiencies being urged by the parties in order to ensure that those 'efficiencies' represent more than mere speculation and promises about post-merger behavior."  *CCC Holdings*, 605 F. Supp. 2d at 72 (citing *Heinz*, 246 F.3d at 721).  Where the proposed transaction would result in a large increase in concentration in a highly concentrated market, "extraordinarily great cognizable efficiencies [are] necessary to prevent the merger from being anticompetitive."  *Penn State*, 838 F.3d at 350 (quoting *Guidelines* § 10).

ii.  For efficiencies to be cognizable, they (1) must "offset the anticompetitive concerns in highly concentrated markets"; (2) must be "merger specific"; (3) "must be verifiable"; (4) must be shown in "real" terms; and (5) "must not arise from anticompetitive reductions in output or service."  *Penn State*, 838 F.3d at 348–49 (citations omitted); *see also Heinz*, 246 F.3d at 720–22; *Guidelines* § 10.

iii.  Claimed efficiencies are not "merger specific" if they can "be achieved by either company alone because, if they can, the merger's asserted benefits can be achieved without the concomitant loss of a competitor."  *Heinz*, 246 F.3d at 722.  *See also Penn State*, 838 F.2d at 351 (rejecting efficiencies claim as not merger specific where defendants were "capable of independently engaging" in the purported efficiency).  An efficiency is not merger specific just because it might be easier to achieve through an otherwise anticompetitive merger.

*See Anthem*, 855 F.3d at 357 (rejecting defense where defendant failed to show "how intensive the effort has been" to achieve the goal without a merger); *Heinz*, 246 F.3d at 722 (rejecting argument that merger would allow party to develop better products where party did not address whether it could have achieved this result "by investing more money in product development and promotion").

    iv.   Claimed efficiencies are not "verifiable" if they "are vague, speculative, or otherwise cannot be verified by reasonable means." *Guidelines* § 10; *Anthem*, 855 F.3d at 359. Courts do not credit efficiencies claims based on "speculative, self-serving assertions." *University Health*, 938 F.2d at 1223 (rejecting defense where defendants "did not specifically explain . . . how these efficiencies would be created and maintained"); *see also Penn State*, 838 F.3d at 350 (rejecting defense where "evidence was ambiguous at best" that the defendant needed to undertake the expenses that the merger purportedly would avoid); *Anthem*, 855 F.3d at 364 ("If merging companies could defeat a Clayton Act challenge by offering expert testimony of fantastical cost savings, Section 7 would be dead letter."). Further, "[t]he longer it takes for an efficiency to materialize, the more speculative it can be." *Anthem*, 855 F.3d at 360 (citing *Guidelines* § 10 & n.15). *See also CCC Holdings*, 605 F. Supp. 2d at 73 (where defendants acknowledged efficiencies could take several years or more to achieve, court did not "place great weight on the predicted cost savings resulting from that consolidation because there is no telling when those savings might begin to accrue or whether they will actually materialize").

    v.   "Irrespective of whatever benefits the merger may bestow upon" the defendants, the defendants "must demonstrate that such a benefit would ultimately be passed on to consumers." *Penn State*, 838 F.3d at 351. "An efficiencies analysis requires more than speculative assurances that a benefit enjoyed by the [defendants] will also be enjoyed by the public." *Id.* Thus, where the merger potentially harms consumer by creating upward pricing pressure, "only efficiencies that create an equivalent downward pricing pressure can be viewed as 'sufficient to reverse the merger's potential to harm consumers.'" *Anthem*, 855 F.3d at 362 (quoting *Guidelines* § 10). *See also CCC Holdings*, 605 F. Supp. 2d at 74 ("there is no evidence to suggest that a sufficient percentage of those savings will accrue to the benefit of the consumers to offset the potential for increased prices"); *Swedish Match*, 131 F. Supp. 2d at 172 ("defendants have not detailed what proportion they will pass on and how that will defeat the likely price increases in this market").

6.   Whether the Court should issue injunctive relief precluding Defendants from consummating the proposed transaction, or from entering into or carrying out any other transaction by which control of the assets or businesses of U.S. Sugar and Imperial would be combined, is an issue to be litigated.

a.  This Court has the authority "to prevent and restrain" violations of Section 7 of the Clayton Act.  15 U.S.C. § 25.  Accordingly, Section 7 aims "to arrest incipient threats to competition."  *United States v. Penn-Olin Chem. Co.*, 378 U.S. 158, 170–71 (1964).  It is "a prophylactic measure" meant to stop competitive harms before they can occur.  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 485 (1977).

b.  Once the government establishes that a merger violates Section 7, "all doubts as to the remedy are to be resolved in its favor."  *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 334 (1961).

c.  The preferred remedy for a merger violating Section 7 is for the court to issue a "full stop injunction" preventing the parties from completing their unlawful merger.  *PPG Indus.*, 798 F.2d at 1506–07; *see also Philadelphia Nat'l Bank*, 374 U.S. at 363 (stating that if the government establishes a prima facie case and the defendants fail to clearly rebut that case, the merger "must be enjoined").

7.  Whether Defendants should reimburse the United States for its costs of litigating this action is an issue to be litigated.

8.  Additional issues to be litigated include:  any motions *in limine* or issues raised by objections to evidence.

Pretrial Order

Exhibit 3B

## Defendants' Statement of Issues of Law Which Remain to be Litigated

Pursuant to Local Rule 16.3(c)(5), United States Sugar Corporation ("U.S. Sugar"), United Sugars Corporation ("United"), Imperial Sugar Company ("Imperial"), and Louis Dreyfus Company LLC ("Louis Dreyfus") (collectively, the "Defendants"), respectfully submit the following issues of law which remain to be litigated:

1. Whether Plaintiff has failed to establish that the proposed transaction is likely to substantially lessen competition in any properly defined relevant market under the Clayton Act is an issue which remains to be litigated.

   a. Section 7 of the Clayton Act does not prohibit acquisitions unless "in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition." 15 U.S.C. § 18 (2018). "Mere acquisition by one corporation of . . . a competitor, even though it result[s] in some lessening of competition, is not forbidden; the act deals only with such acquisitions as probably will result in lessening competition to a substantial degree." *Int'l Shoe Co. v. F.T.C.*, 280 U.S. 291, 298 (1930).

   b. The Section 7 inquiry is necessarily "forward-looking," *Crane Co. v. Harsco Corp.*, 509 F. Supp. 115, 125 (D. Del. 1981), and a "mere possibility" of harm will not suffice. *United States v. Sabre Corp.*, 452 F. Supp. 3d 97, 135 (D. Del. 2020) (citation omitted), *vacated as moot,* 2020 WL 4915824 (3d Cir. July 20, 2020) ("[T]his Order should not be construed as detracting from the persuasive force of the District Court's decision, should courts and litigants find its reasoning persuasive"). Rather, Plaintiff must prove that the challenged transaction is "likely to lessen competition substantially" in a relevant market, *United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 189 (D.D.C. 2018) (citation omitted), *aff'd,* 916 F.3d 1029 (D.C. Cir. 2019), and that a substantial lessening of competition is "sufficiently probable and imminent." *United States v. Marine Bancorp.*, 418 U.S. 602, 623 n.22 (1974) (citation omitted).

   c. Under the Section 7 burden-shifting framework, Plaintiff carries the burden to "establish[] a prima facie case that the proposed merger is anticompetitive by (1) identifying the proper relevant market and (2) showing that the effects of the merger are likely to be anticompetitive." *Sabre*, 452 F. Supp. 3d at 135. As a threshold matter, Plaintiff must establish proof that the merger will result in both an undue concentration in the relevant market and a "significant increase in the concentration of firms in that market." *United States v. Baker Hughes Inc.*, 908 F.2d 981, 990 (D.C. Cir. 1990) (quoting *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 363 (1963)); *see also Sabre*, 452 F. Supp. 3d at 135.

   d. The linchpin of this standard is Plaintiff's obligation to identify a relevant market, which has both a product and a geographic component. *F.T.C. v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 338 (3d Cir. 2016); *see also United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1110 (N.D. Cal. 2004) (describing market

definition as the "'necessary predicate' to finding anticompetitive effects" (quoting *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 593 (1957))).

e.     Failure to identify a relevant market means the court must conclude Plaintiff has not carried its burden as a matter of law. *Sabre*, 452 F. Supp. 3d at 144; *see also F.T.C. v. Thomas Jefferson Univ.*, 505 F. Supp. 3d 522, 557 (E.D. Pa. 2020) (holding that where the government failed to prove the relevant market, "the Government has not identified a single relevant market to make its prima facie case"); *F.T.C. v. Lab'y Corp. of Am.*, No. 10-1873, 2011 WL 3100372, at *19-21 (C.D. Cal. Mar. 2, 2011) (finding that "[t]he FTC fail[ed] to establish its prima facie case" and noting that "[m]arket shares must be measured in the proper relevant product and geographic market; alleging market shares in some other market is inadequate" (citation omitted)).

2.     Whether Plaintiff has failed to establish a relevant product and geographic market is an issue that remains to be litigated.

a.     In defining a product and geographic market, courts apply the same principles of market definition to claims brought under Section 7 of the Clayton Act as those brought under Sections 1 and 2 of the Sherman Act. *See, e.g., United States v. Grinnell Corp.*, 384 U.S. 563, 573 (1966) ("We see no reason to differentiate between 'line' of commerce in the context of the Clayton Act and 'part' of commerce for purposes of the Sherman Act."); *United States v. Syufy Enters.*, 712 F. Supp. 1386, 1396 (N.D. Cal. 1989) ("The relevant market is generally the same for cases brought under either Section 2 of the Sherman Act or Section 7 of the Clayton Act."), *aff'd*, 903 F.2d 659 (9th Cir. 1990). The purpose of market definition is to provide a tool to determine if the defendant(s) have market power. *Consul, Ltd. v. Transco Energy Co.*, 805 F.2d 490, 495 (4th Cir. 1986).

i.     Market definition is a "pragmatic" and "factual" exercise and "not a formal, legalistic one." *Brown Shoe Co. v. United States*, 370 U.S. 294, 336 (1962). It is "dependent upon the special characteristics of the industry involved." *Penn State Hershey*, 838 F.3d at 335 (internal quotation marks and citations omitted). In other words, a properly identified relevant market must "correspond to the commercial realities of the industry." *Brown Shoe*, 370 U.S. at 336.

ii.     To determine if the market corresponds to the "commercial realities" of the industry, courts rely on the *Brown Shoe* factors: "industry or public recognition of the [relevant market] as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.* at 325.

b.     Whether the "Production and Sale of Refined Sugar" is a relevant product market is an issue that remains to be litigated.

i.      A product market must include the "area of effective competition,"
        *Sabre*, 452 F. Supp. 3d at 135 (citation omitted), and "must . . .
        correspond to the commercial realities of the industry." *Brown Shoe*,
        370 U.S. at 336-37. "No party can expect to gerrymander its way to
        an antitrust victory without due regard for the market realities." *Sabre*,
        452 F. Supp. 3d at 139-40 (quoting *It's My Party, Inc. v. Live Nation,
        Inc.*, 811 F.3d 676, 683 (4th Cir. 2016)).

ii.     Product markets are "almost always defined by demand substitution."
        *F.T.C. v. RAG-Stiftung* ("*Evonik*"), 436 F. Supp. 3d 278, 292 (D.D.C.
        2020). "Demand substitution describes 'customers' ability and
        willingness to substitute away from one product to another in response
        to a price increase or a corresponding non-price change such as a
        reduction in product quality or service.'" *Id.* (quoting U.S. Dep't of
        Just. & Fed. Trade Comm'n, Horizontal Merger Guidelines (2010)
        ("Horizontal Merger Guidelines") § 4).

        1.      A properly defined product market must include all products that
                (1) are "reasonably interchangeable" – meaning that consumers
                can substitute the use of one product for another and (2)
                demonstrate cross-elasticity of demand, meaning that consumers
                will substitute those products in response to changing prices. *See
                Sabre*, 452 F. Supp. 3d at 139 (citing *Brown Shoe*, 370 U.S. at
                325).

        2.      "When aggregating products into a relevant market, courts focus
                on demand substitution because it illuminates whether customers
                can switch to one product and constrain anticompetitive pricing
                in another." *Evonik*, 436 F. Supp. 3d at 292 (citation omitted).

iii.    Product markets are impermissibly under inclusive if they fail to
        include all reasonably interchangeable products that constrain a
        defendant's pricing. *See AD/SAT v. Associated Press*, 181 F.3d 216,
        228 (2d Cir. 1999) ("If the sales of other producers substantially
        constrain the price-increasing ability of the hypothetical cartel, these
        others are part of the market.").

        1.      The bounds of a relevant product market cannot be determined
                by the anecdotal preferences of a subset of customers because
                "the issue is not what [products] the customers would *like or
                prefer*," but rather "what they could do in the event of" a post-
                merger price increase. *Oracle*, 331 F. Supp. 2d at 1131-32
                (emphasis in original); *see also Queen City Pizza, Inc. v.
                Domino's Pizza, Inc.*, 124 F.3d 430, 438 (3d Cir. 1997) ("The
                test for a relevant market is not commodities reasonably
                interchangeable by a particular plaintiff, but commodities

reasonably interchangeable by consumers for the same purposes."). It is well-settled that a customer or consumer's preferences do not create separate markets for antitrust purposes. *US Football League v. N.F.L.*, 842 F.2d 1335, 1361 (2d Cir. 1988) ("The fact that a cable contract might be less desirable, even much less desirable, to a league than a network contract is not relevant to determining the product submarket."); *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063-64 (9th Cir. 2001) (plaintiff's preference to stay in Los Angeles does not create a market limited to UCLA women's soccer program).

2. "The test for a relevant product market is whether the 'commodities [are] reasonably interchangeable by consumers for the same purposes' – not whether it is feasible to convert all users to only one of those commodities." *Sabre*, 452 F. Supp. 3d at 142 (quoting *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956)); *see also F.T.C. v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 122 (D.D.C. 2004) ("In determining interchangeability, therefore, the Court must consider the degree to which buyers treat the products as interchangeable, but need not find that all buyers will substitute one commodity for another."); *Sabre*, 452 F. Supp. 3d at 142 (finding airline.com was in the OTA book services market because "[a]irlines can switch from offering at least some of their leisure travel tickets from OTAs to airline.com").

iv. The sale of refined sugar by distributors to customers in head-to-head competition with refiners such as Imperial, cooperatives such as United, and others reflect competitive, in-market sales under Section 7.

1. The competitive set for the purpose of determining the relevant product market are those suppliers who offer reasonably interchangeable products and who customers can practicably turn to in the event of a post-closing price increase. In the case of a commodity, this is all sellers of the same product. *See E.I. du Pont*, 351 U.S. at 395 (noting that relevant market can be determined by determining whether "commodities [are] reasonably interchangeable by consumers for the same purposes").

2. Applying these principles, courts routinely conclude that distributors compete in the same relevant product market as their suppliers provided those distributors behave as competitors in the ordinary course. *See, e.g., PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 418 (5th Cir. 2010) ("The second

proposed market definition is similarly legally insufficient. 'Wholesale sale' does not adequately define the relevant market, because the relevant market definition must focus on the product rather than the distribution level."); *Ajir v. Exxon Corp.*, 185 F.3d 865, 1999 WL 394510, *3-4 (9th Cir. 1999) ("Exxon and its jobbers are in a vertical relationship to each other in that the jobbers serve as distributors of Exxon's products.  However, they also are potential competitors in the sale of gasoline to retail stations, which is a horizontal relationship. . . .  It cannot be seriously argued that different brands of gasoline are not reasonably interchangeable as far as the consumer is concerned."); *Jennings Oil Co. v. Mobil Oil Corp.*, 539 F. Supp. 1349, 1351 (S.D.N.Y. 1982) (denying motion for summary judgment where the issue was whether Mobil Oil competed with its distributors and noting that "there is evidence that retailers supplied by the branded distributors compete with retailers supplied directly by Mobil").

3.  Plaintiff's cited cases are not to the contrary and generally reflect that in monopolization cases, courts have held that if a party has monopoly power (Plaintiff does not, and cannot, argue that U.S. Sugar – or United since Plaintiff conflates U.S. Sugar and United – has or will have monopoly power), the distributors that resell the product are in a different market. *See, e.g.*, *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 424-25 (2d Cir. 1945) (holding that secondary aluminum ingot sold downstream by distributors was not in the same market as virgin aluminum ingot where Alcoa controlled 90% of the market for virgin ingot; as such because all secondary ingot was ultimately derived from virgin ingot, Alcoa, by properly exercising its power over the supply of virgin, could indirectly control the supply of secondary ingot as well); *Allen-Myland, Inc. v. I.B.M. Corp.*, 33 F.3d 194, 203 (3d Cir. 1994) (holding that IBM and its resellers were not in the same market, but that sales from non-IBM computers sold by distributors were in the market and noting "to the extent that leasing companies deal in used, non-IBM mainframes that have not already been counted in the sales market, these machines belong in the relevant market for large-scale mainframe computers").  Applying these cases to the Section 7 context, to exclude distributors from the market, Plaintiff must prove there is a plausible risk of input foreclosure – *i.e.*, that the merger will give U.S. Sugar (or United since Plaintiff conflates U.S. Sugar and United) the incentive and ability to deprive distributors of refined sugar and that the distributors cannot practically turn to other alternatives such as other sellers or imports.

c.    Whether (a) the "Southeast market" alleged in Plaintiff's Complaint (Alabama, Delaware, District of Colombia, Florida, Georgia, Kentucky, Maryland, Mississippi, North Carolina, South Carolina, Tennessee, Virginia, and West Virginia) and (b) the "Georgia and states bordering Georgia market" alleged in Plaintiff's Complaint (Alabama, Florida, Georgia, North Carolina, South Carolina, and Tennessee) are relevant geographic markets is an issue that remains to be litigated.

    i.    Plaintiff must establish the relevant geographic market, which is defined as the "area in which a potential buyer may rationally look for the goods or services he seeks." *Penn State Hershey,* 838 F.3d at 338 (quotation marks and citation omitted); *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961) (defining the geographic market as the region "in which the seller operates, and to which the purchaser can practicably turn for supplies"); *F.T.C. v. Tenet Health Care Corp.*, 186 F.3d 1045, 1054-55 (8th Cir. 1999) (finding the FTC's geographic market "too narrow" where it excluded "practical alternatives" for many competitors).

    ii.    "[A] market's geographic scope must 'correspond to the commercial realities of the industry' being considered and 'be economically significant.'" *Penn State Hershey*, 838 F.3d at 338 (quoting *Brown Shoe*, 370 U.S. at 336-37). "The commercial realities considered when defining the relevant geographic market include: where the parties market their products; the size, cumbersomeness, and perishability of the products; regulatory requirements impeding the free flow of competing goods into or out of the area; shipping costs and limitations; the area within which the defendant and its competitors view themselves as competing; and other factors bearing upon where customers might realistically look to buy the product." *E.I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 442-43 (4th Cir. 2011).

    iii.    Whether Plaintiff can establish its two geographic markets on the basis of price discrimination evidence is an issue that remains to be litigated.

        1.    Courts should be wary of inferring market power exists (or will exist) on the basis of price discrimination evidence because "price discrimination may be quite consistent with robust, although imperfect competition." Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, ¶ 517b (2021) ("Areeda"); *see Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 44-45 (2006) (rejecting the idea that a court can infer market power from evidence of price discrimination standing alone and noting that while price discrimination "may provide evidence of market power . . . it is generally recognized that it also occurs in fully competitive markets").

        2.    To establish a geographic market based on a theory of price discrimination, Plaintiff must establish several factors.

a.    First, Plaintiff must establish that Defendants can ascertain that there is a group of customers who are similarly situated and thus can be successfully targeted – *i.e.*, if a seller does not know which customers it has market power over and which it does not, it cannot successfully raise prices and instead risks losing sales. Horizontal Merger Guidelines § 4.1.4 (noting that defining a market around targeted customers requires finding that sellers "could profitably target a subset of customers for price increases").

b.    Second, Plaintiff bears the burden of showing why customers cannot turn to products originating outside its alleged geographic market. *See Sabre*, 452 F. Supp. 3d at 142-43 (finding DOJ failed by not accounting for sales originating from outside the United States (citing *Dicar, Inc. v. Stafford Corrugated Prods., Inc.*, No. 05-5426, 2010 WL 988548, at *12 (D.N.J. Mar. 12, 2010) ("Where, as here, there is no indication that a consumer would be unable to purchase a product abroad, the Court will not arbitrarily limit the geographical market to the U.S."))); *United States v. Country Lake Foods, Inc.*, 754 F. Supp. 669, 676, 678 (D. Minn. 1990) (rejecting DOJ's Section 7 challenge on the basis that "the government [failed to] show[] probability of success in [defining] a relevant geographic market" where "the government understated the size of the relevant geographic market because it did not gather sufficient information addressing the issue of where purchasers could practicably turn for fluid milk in the face of a nontransitory price increase among MSP/MSA dairies"); *Oracle*, 331 F. Supp. 2d at 1112 ("If consumers respond by buying the product from suppliers outside the smallest area, the geographic market boundary must be expanded." (citation omitted)); *see also Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 726 (3d Cir. 1991) (rejecting plaintiff's geographic market where customers testified "that they did not limit themselves to such a restricted geographic region either when purchasing tractors or seeking service" and where "each one of these mushroom farmers had purchased at least one tractor from outside the suggested Kennett Square geographical area."); *T. Harris Young & Assocs., Inc. v. Marquette Elecs., Inc.*, 931 F.2d 816, 823-24 (11th Cir. 1991) (rejecting plaintiff's market definition where plaintiff "presented no evidence that could support an inference that consumers within the nine-state area could not turn to outside sellers if the prices increased within the nine-state area" where "the evidence indicated that consumers could

and did turn to outside suppliers" and "the prices inside and outside the territory were virtually the same").

i.  One factor courts sometimes consider in this determination is whether Plaintiff can meet its burden through proper application of the Hypothetical Monopolist Test, under which the Court asks "whether a hypothetical monopolist controlling the products in the alleged market could profitably impose at least a small but significant and non-transitory increase in price (SSNIP), generally assumed to be about five percent, on at least one product in the market." *Evonik*, 436 F. Supp. 3d at 293 (citation omitted); Horizontal Merger Guidelines § 4.1.1.

ii.  Evidence of likely entry, repositioning, arbitrage or expansion into the geographic market that suggests the targeted customer set has a broader set of choices beyond Plaintiff's purported competitive set and market shares suggests Plaintiff has not identified a relevant geographic market. Horizontal Merger Guidelines § 4.2.2 ("A region forms a relevant geographic market if this price increase would not be defeated by substitution away from the relevant product or by arbitrage, e.g., customers in the region travelling outside it to purchase the relevant product.").

iii.  Courts look to economic tests regarding imports into or exports from a claimed market in evaluating whether the claimed geographic market is sound. *Oracle*, 331 F. Supp. 2d at 1161 (rejecting geographic market because DOJ's expert did not apply the Elzinga-Hogarty test and explaining that "the E-H test 'measures the accuracy of a market delineation by determining the amount of either imports into or exports from a tentative market. The test is based on the assumption that if an area has significant exports or imports, then that area is not a relevant geographic market. Under the [test], exports or imports greater than 10% suggest that the market examined is not a relevant market.'" (quoting *Country Lake Foods*, 754 F. Supp. at 672 n.2)). Citing its origin in analyzing beer mergers, Plaintiff has explained that "[t]he Elzinga-Hogarty test was designed to analyze commodity movements, not

hospital mergers."  FTC & Dep't of J., Improving Health Care: A Dose of Competition, Ch. 4 § (II)(A)(1) (2004), https://www.justice.gov/atr/chapter-4-competition-law-hospitals#2a1.

c. Third, the court must find that Plaintiff's geographic market is not arbitrary – *i.e.*, that it does not arbitrarily select a region or group of customers in conflict with market realities. *Sabre*, 452 F. Supp. 3d at 143 (finding "DOJ's geographic market is a contortion" where it purposefully excluded a category of suppliers from the market); *F.T.C. v. Tronox Ltd.*, 332 F. Supp. 3d 187, 202-03 (D.D.C. 2018) (evidence that competitors and customers do not agree with a proposed geographic market provides evidence that the geographic market is inconsistent with "commercial realities" and wrong as a matter of law); *Tenet Health Care*, 186 F.3d at 1053-54 (rejecting FTC market as "too narrow" where FTC improperly discounted the extent to which 22% of customers already used hospitals outside of the FTC's market); *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 627 (5th Cir. 2002) (finding plaintiff's geographic market overly narrow and noting that "for an area to qualify as being economically significant, it must contain an appreciable segment of the product market" and "[w]hether a segment is appreciable depends upon whether it includes either an appreciable proportion of the product market as a whole, or a proportion of the product market which is largely segregated from, independent of, or not affected by competition elsewhere" (internal quotation marks and citation omitted)); *It's My Party*, 811 F.3d at 683 (affirming summary judgment in part because the district court "was not required to accept uncritically two market definitions . . . that coincidentally fit plaintiff's precise circumstances").

iv. Transportation costs standing alone are not a reason to define a market narrowly.  *See* Areeda ¶ 517b (explaining that price discrimination cannot be used as a basis to infer market power "without reference to costs, for price differences on sales to different buyers are not discriminatory if costs differ in the same proportion").  This is because if customers pay different prices *due to different costs*, the fact that some pay higher prices cannot be attributed to market power, but is instead due to the fact that the costs to serve are different.  *Id.* ¶ 517c1 (explaining why cost differentials are not a basis for inferring market power); *see RSR Corp. v. F.T.C.*, 602 F.2d 1317, 1323 (9th Cir. 1979) (finding nationwide geographic market and noting that "[a]lthough the FTC recognized that high trucking costs cause secondary producers to ship most of their product to customers

within a few hundred miles, evidence was presented to show that the distances over which secondary lead producers were willing to ship products varied according to economic and market conditions, including plant size, secondary lead prices in a certain region, and fluctuations in transportation costs").

3.   Whether Plaintiff can carry its burden to establish a prima facie case that the proposed transaction is likely to have anticompetitive effects where the market share statistics and HHIs[1] give an inaccurate account of the merger's probable effects on competition in the relevant market is an issue which remains to be litigated.

  a.   There is an open question in this case as to whether it should be analyzed as a horizontal or vertical transaction given that the merging parties do not compete in the downstream sale of refined sugar.  There is also an open question as to whether Plaintiff can attempt to block the transaction based on the supposed effect that U.S. Sugar's marketing agreement with United will have on United's size (and the resulting effects on competition).  This impacts whether, to carry its burden under prong one of the Section 7 burden-shifting standard, Plaintiff can argue that it is entitled to a presumption that the transaction is anticompetitive or whether it must make a fact-specific showing that the transaction is anticompetitive.

   i.   In a typical horizontal case between direct competitors, if the government carries its burden to establish that the transaction is prima facie anticompetitive because it will result in "undue concentration," it obtains the benefit of a legal presumption, under which the transaction is presumed to be anticompetitive.  *Baker Hughes*, 908 F.2d at 982-83.

   ii.   In contrast, in a vertical merger – *i.e.*, where the theory of harm is loss of price competition and the merging parties do not compete in downstream sales – Plaintiff cannot obtain the benefit of this presumption and rely on concentration measures to establish its prima facie case.  *United States v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019) (noting that in a vertical merger "the government cannot use a short cut to establish a presumption of anticompetitive effect through statistics about the change in market concentration, because vertical mergers produce no immediate change in the relevant market share").  Instead, Plaintiff must make a "fact-specific" showing that the proposed merger is "likely to be anticompetitive."  *Id.*

  b.   Even if this Court concludes that the transaction should be analyzed as a horizontal transaction, Plaintiff is not entitled to a presumption of illegality simply based on market concentration statistics but must instead prove that the merger will result in "undue concentration" in the relevant market to obtain the benefit of the

---

[1]   "HHI" stands for the Herfindahl-Hirschman Index, which is a calculation that can be used to measure market concentration.  The HHI is calculated by squaring the market share of each firm competing in the market and summing the resulting numbers.  Horizontal Merger Guidelines § 5.3.

presumption. *Baker Hughes*, 908 F.2d at 982; *see also Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018) (noting that "legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law" (citation omitted)).

i.   Market share and HHI calculations cannot be relied upon where they "ignore[] industry realities." *Sabre*, 452 F. Supp. 3d at 144 (noting that DOJ's economist's "HHI cannot be relied on because it ignores industry realities" and therefore the HHI numbers do not "satisfy DOJ's prima facie burden" and "do not give rise to a presumption of harm to competition"); *Country Lake Foods*, 754 F. Supp. at 680 (finding "competitive factors exist . . . that the HHI does not measure," and that the HHI calculation was not an accurate reflection of market power); *see also* Areeda ¶ 309b ("Most statistical methodologies in economics are designed to verify rather than falsify, and verification is often established to the researcher's satisfaction by evidence that is no more than minimally consistent with the hypothesis.").

ii.  That is particularly the case where, as the Horizontal Merger Guidelines reflect, in "markets for homogeneous products, a firm's competitive significance may derive principally from its ability and incentive to rapidly expand production in the relevant market in response to a price increase or output reduction by others in that market." Horizontal Merger Guidelines § 5.2. "In such markets, capacities or reserves may better reflect the future competitive significance of suppliers than revenues, and the Agencies may calculate market shares using those measures." *Id.*

iii. "Statistics reflecting the shares of the market controlled by the industry leaders and the parties to the merger are, of course, the primary index of market power; but only a further examination of the particular market—its structure, history and probable future—can provide the appropriate setting for judging the probable anticompetitive effect of the merger." *Brown Shoe*, 370 U.S. at 322 n.38.

iv.  The government typically provides not only statistical evidence but "direct evidence" in the form of ordinary course evidence to establish its prima facie case. *F.T.C. v. Hackensack Meridian Health*, No. 20-18140, 2021 WL 4145062, at *21 (D.N.J. Aug. 4, 2021) (collecting cases where the government put forward "direct evidence" to carry its initial burden and citing ordinary course documents from the merging parties that they were "fierce but respected competitor[s]" and a concern by customers that the transaction will lead to higher prices), *aff'd,* 2022 WL 840463 (3d Cir. Mar. 22, 2022).

c.   If Plaintiff shows that a transaction is likely to result in a substantial lessening of competition in a relevant market, under the second prong of the Section 7 burden-shifting standard, "[d]efendants can . . . rebut this presumption by demonstrating

that the [government]'s prima facie case and market-share statistics inaccurately predict the merger's probable effects in the relevant market." *Evonik*, 436 F. Supp. 3d at 291 (citation omitted); *see also AT&T*, 310 F. Supp. 3d at 191 (noting the burden of production "shifts to defendants to provide sufficient evidence that the prima facie case inaccurately predicts the relevant transaction's probable effect on future competition" (internal quotation marks and citation omitted)).

i.    The standard for the quantum of evidence defendants must produce to shift the burden back is relatively low. *Baker Hughes*, 908 F.2d at 990-91 (defendants are not required to "'clearly' disprove anticompetitive effect[s]," but rather to make a 'showing'").

ii.   "It is a foundation of Section 7 doctrine, disputed by no authority cited by the government, that evidence on a variety of factors can rebut a prima facie case." *Id.* at 984.

iii.  Defendants may rebut the presumption either by "showing why a given transaction is unlikely to substantially lessen competition, or by discrediting the data underlying the initial presumption in the governments' favor." *Id.* at 991. Defendants may rely on "nonstatistical market evidence raising doubts about the persuasive quality of the [government's] statistics or . . . economic circumstances undermining the predictive validity of the government's statistical presentation." *Arch Coal*, 329 F. Supp. 2d at 130 n.13.

iv.   Courts have held that Defendants have carried their burden based on several different factors.

      1.   The "absence of significant barriers" which enable other competitors to expand and reposition given that in the absence of such barriers "a company probably cannot maintain supracompetitive pricing for any length of time" can provide a dispositive basis for rejecting a government's merger challenge. *Baker Hughes*, 908 F.2d at 987; *see also Sabre*, 452 F. Supp. 3d at 145 ("[D]efendants can rebut the government's prima facie case by showing that the relevant market exhibits low barriers to entry." (citing *United States v. Energy Sols., Inc.*, 265 F. Supp. 3d 415, 443 (D. Del. 2017)); *F.T.C. v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 55 (D.D.C. 1998) ("A court's finding that there exists ease of entry into the relevant product market can be sufficient to offset the government's prima facie case of anti-competitiveness. The [government's] own Merger Guidelines state that where ease of entry exists, 'the merger raises no antitrust concern and ordinarily requires no further analysis.'" (citing U.S. Dep't of Just. & Fed. Trade Comm'n, Horizontal Merger Guidelines § 3.0 (1992))); *see also Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1336 (7th Cir. 1986) ("Market share reflects current sales, but

today's sales do not always indicate power over sales and price tomorrow." (citation omitted)).

2. The "sophistication" of customers where "buyers closely examine available options and typically insist on receiving multiple, confidential bids for each order" and such sophistication "was likely to promote competition even in a highly concentrated market" can also provide a basis for finding the defendants have refuted the government's showing. *Baker Hughes*, 908 F.2d at 986; *Evonik*, 436 F. Supp. 3d at 315.

3. Evidence that a weakened competitor that is declining in competitive significance, where the government's statistics regarding concentration in the wake of the merger inaccurately portray the post-merger company's weak competitive stature, can also provide a basis for overcoming the presumption. *United States v. Gen. Dynamics*, 415 U.S. 486 (1974).

4. Arguments related to efficiencies resulting from the merger may also be relevant in opposing the government's case. *Oracle*, 331 F. Supp. 2d at 1110 (citing *Tenet Health Care,* 186 F.3d at 1054-55).

5. Finally, evidence that a transaction operates in a regulated market can be particularly relevant to assessing the prospect of anticompetitive effects. *Marine Bancorp.*, 418 U.S. at 627, 639.

4. Whether Plaintiff has failed to establish that the transaction is likely to result in a substantial lessening of competition in any relevant market is an issue which remains to be litigated.

a. Once defendants rebut the government's prima facie case, "the burden of production shifts back to the [g]overnment and merges with the ultimate burden of persuasion, which is incumbent on the [g]overnment at all times." *Sabre*, 452 F. Supp. 3d at 135 (citation omitted). "Ultimately, the government's burden is to prove, by a preponderance of the evidence, a reasonable probability that the merger . . . will substantially lessen competition" in the relevant market. *Id.* Even when a merger may "result in some lessening of competition," it still is "not forbidden" by Section 7, which "deals only with such acquisitions as probably will result in lessening competition to a *substantial degree*." *Int'l Shoe*, 280 U.S. at 298 (emphasis added) (citation omitted).

b. Whether the transaction will result in a substantial lessening of competition by causing unilateral effects is an issue which remains to be litigated.

i. To carry its burden to show unilateral effects, Plaintiff must show that the transaction "will eliminate direct competition between the two merging firms, even if all other firms in the market continue to compete independently" and that doing so will result in anticompetitive effects

13

in the form of an increase in price or a reduction in output. *Oracle*, 331 F. Supp. 2d at 1113 (citation omitted).

ii.    Evidence that rivals will remain and threaten to steal business refutes a finding of unilateral effects. *Sabre*, 452 F. Supp. 3d at 147 (refusing to find potential anticompetitive effects where the sellers' "rivals will likely further constrain [the buyer's] ability to raise prices").

iii.    For homogeneous products, the Merger Guidelines emphasize that unilateral effects are most likely to arise if a firm can engage in "a unilateral output suppression strategy," Horizontal Merger Guidelines § 6.3, meaning that competition, entry and expansion by existing competitors are not likely to defeat the merged firm's attempted price increase by increasing their own output and taking share from the merged firm. *See, e.g.*, *Ball Mem'l Hosp.*, 784 F.2d at 1335 ("[A] firm's share of current sales does not reflect an ability to reduce the total output in the market, and therefore it does not convey power over price. Other firms may be able, for example, to divert production into the market from outside. They may be able to convert other productive capacity to the product in question or import the product from out of the area. If firms are able to enter, expand, or import sufficiently quickly, that may counteract a reduction in output by existing firms."); *United States v. Waste Mgmt., Inc.*, 743 F.2d 976, 984 (2d Cir. 1984) (relying on ease of entry to hold that merger did not substantially lessen competition, and noting that firm's 48.8% market share "does not accurately reflect future market power").

iv.    Plaintiff often seeks to carry its burden on unilateral effects by relying on company documents that reveal plans to increase prices. *Sabre*, 452 F. Supp. 3d at 147 (holding DOJ did not carry its burden where the documentary evidence showed that there was no plan to raise prices). That is because where Plaintiff's theory is that the transaction will result in a loss of head-to-head competition that will force customers to pay higher prices, Plaintiff must show that "a forward-looking analysis" proves that, post-merger, the acquirer will likely raise prices. *Id.* at 146-47.

v.    The regulatory overlay imposed by the USDA is a market dynamic that further precludes the possibility that the transaction will result in a substantial lessening of competition.

1.    The Supreme Court has made clear that a merger must be "viewed[] in the context of its particular industry," and that only a close "examination of the particular market--its structure, history and probable future--can provide the appropriate setting for judging the probable anticompetitive effect of the merger." *Brown Shoe*, 370 U.S. at 321-22 & n.38.

2.    This rule is underscored by the longstanding recognition that the application of antitrust law generally – and the analysis of anticompetitive effects specifically – must appropriately consider the impact of overlapping industry regulation. *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 411 (2004) ("Antitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue," including "awareness of the significance of regulation."); *see Town of Concord v. Boston Edison Co.*, 915 F.2d 17, 22 (1st Cir. 1990) (Breyer, J.) (noting that "where regulatory and antitrust regimes co-exist, antitrust analysis must sensitively recognize and reflect the distinctive economic and legal setting of the regulated industry to which it applies" (internal quotation marks and citations omitted)).

3.    In this context, it would be improper to ignore the regulated nature of the sugar industry by the USDA, which "endow[s] the industry with special characteristics," *United States v. Nat'l Ass'n of Broads.*, 536 F. Supp. 149, 156 (D.D.C. 1982), and "may accomplish the same end" as Section 7 of the Clayton Act, *United States v. F.C.C.*, 652 F.2d 72, 106 (D.C. Cir. 1980) (en banc)).

4.    This is particularly true in an industry like this one in which the USDA regulates supply and entry. *Marine Bancorp.*, 418 U.S. at 627, 639 (affirming dismissal of a challenge to a bank merger and noting that the Section 7 analysis "must take into account the unique federal and state regulatory restraints on entry into that line of commerce" where the "case concern[ed] an industry in which new entry is extensively regulated by the State and Federal Governments"). For this reason, the Court should be wary of any suggestion by Plaintiff that the USDA's role in regulating imports and ultimately output is not relevant to the competitive effects assessment.

c.    Whether the transaction will result in cognizable coordinated effects is an issue that remains to be litigated.

i.    To carry its burden and demonstrate that a transaction is likely to substantially harm competition in a relevant market based on a coordinated effects theory, Plaintiff must show that the transaction creates or increases the likelihood of an explicit agreement to coordinate or "tacit" coordination, the purpose of which is to enable the market participants to "restrict output and achieve profits above competitive levels." *Evonik*, 436 F. Supp. 3d at 313 (citation omitted).

ii.    When, as here, the government's theory is one of "tacit" (as opposed to explicit) coordination, the analysis of potential coordinated effects is a two-step inquiry. *Id.* (citing Horizontal Merger Guidelines § 7). "Tacit

15

coordination," which is not itself illegal, is enforced by "the 'detection and punishment of deviations'" and "depends on the strength and predictability of rivals' responses to a price change or other competitive initiative." *Id.* (quoting Horizontal Merger Guidelines § 7).

iii.   The first step requires the government to establish that the market is conducive to coordination, and, if so, the second step requires the government to show that "the merger may enhance that vulnerability." *Id.* (quoting Horizontal Merger Guidelines § 7.1).

iv.   As the government's own cases show, as to the first step, courts consider a wide variety of factors to assess whether the market is conducive to coordination and no one factor is determinative. *See, e.g., United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 77-81 (D.D.C. 2011). However, most courts that have found a market is vulnerable to coordination have done so because, among other things, there was a history of prior collusion among the participants. *See, e.g., id.* at 78; *see also* Horizontal Merger Guidelines § 7.2 ("[M]arket conditions are conducive to coordinated interaction if firms representing a substantial share in the relevant market appear to have previously engaged in express collusion affecting the relevant market . . . .").

1.   Defendants can also rebut any showing that a market is vulnerable to coordination with evidence that:

a.   sales are made pursuant to confidential RFP processes run by sophisticated customers where suppliers do not know who else is bidding, *Evonik*, 436 F. Supp. 3d at 314; *Arch Coal*, 329 F. Supp. 2d at 143-44;

b.   sales are for large, annual contracts where each sale is high stakes, *Evonik*, 436 F. Supp. 3d at 314-15; *compare id. with H&R Block*, 833 F. Supp. 2d at 78-79 (finding coordination likely where transactions were "small, numerous and spread among a mass of individual consumers");

c.   actual transaction prices are kept confidential, *Evonik,* 436 F. Supp. 3d at 315-316;

d.   sophisticated and powerful customers that are well equipped to defeat coordination, *id*. at 315; and

e.   the market is characterized by heterogeneous and unpredictable pricing, *id.* at 316.

2.   Evidence showing that the economic incentives of defendants or other market participants are not conducive to collectively reducing output also weighs against a finding that a transaction is

substantially likely to result in coordinated effects. *See United States v. Archer-Daniels-Midland Co.*, 781 F. Supp. 1400, 1423 (S.D. Iowa 1991) ("This economic incentive to maintain full production, combined with seasonal excess capacity, works against the likelihood of any collusive price raising scheme which would require output restrictions.").

v. If Plaintiff advances to the second step, "even where a market 'shows signs of vulnerability to coordinated conduct,'" a court cannot block a merger under Section 7 unless it has "a credible basis on which to conclude that the merger may enhance that vulnerability." *Evonik,* 436 F. Supp. 3d at 313 (quoting Horizontal Merger Guidelines § 7.1).

1. Where a transaction involves "[t]he 'loss of a firm that does not behave as a maverick [it] is unlikely to lead to increased coordination.'" *Arch Coal*, 329 F. Supp. 2d at 150 (quoting William J. Kolasky, Deputy Assistant Attorney General, Antitrust Division, United States Dep't of Just., Coordinated Effects in Merger Review: From Dead Frenchmen to Beautiful Minds and Mavericks, Address Before the ABA Section of Antitrust Law Spring Meeting (Apr. 24, 2002), http:// www.usdoj.gov/atr/public/speeches/11050.htm (internal citations omitted)). "In the context of antitrust law, a maverick has been defined as a particularly aggressive competitor that 'plays a disruptive role in the market to the benefit of customers.'" *H&R Block*, 833 F. Supp. 2d at 79 (quoting Horizontal Merger Guidelines § 2.1.5).

2. Conversely, where mavericks will remain post-merger, then increased coordination is not likely. *See New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 235 (S.D.N.Y. 2020) (finding two pricing mavericks would remain post-transaction as a reason why increased coordination was not likely).

d. In considering whether Plaintiff has carried its burden to show anticompetitive effects, the Court should also consider merger-specific efficiencies resulting from the transaction. *Id.* at 207 ("The trend among lower courts has thus been to recognize or at least assume that evidence of efficiencies may rebut the presumption that a merger's effects will be anticompetitive, even if such evidence could not be used as a defense to an actually anticompetitive merger.").