UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff,*<br><br>v.<br><br>UNITED STATES SUGAR CORPORATION, UNITED SUGARS CORPORATION, IMPERIAL SUGAR COMPANY, and LOUIS DREYFUS COMPANY, LLC,<br><br>*Defendants.* | Case No. 21:1644 (MN) |

**MEMORANDUM OF LAW IN SUPPORT OF NON-PARTY INDIANA SUGARS, INC.'S MOTION TO SEAL COMPETITIVELY SENSITIVE DATA AND LIMITED PORTIONS OF JOHN YONOVER'S DEPOSITION TRANSCRIPT**

Plaintiff United States of America ("Plaintiff") and Defendants United States Sugar Corp., United Sugars Corp., Imperial Sugar Co., and Louis Dreyfus Co. LLC (collectively, "Defendants," and together with Plaintiff, "Parties") have designated non-party Indiana Sugars, Inc.'s ("Indiana Sugars") competitively sensitive data and portions of its President's deposition transcript for use at trial. Indiana Sugars respectfully moves the Court to seal these data and portions of the transcript to avoid public disclosure of Indiana Sugars' competitively sensitive information. This is appropriate because (1) the limited, discrete set of information (three documents and limited designations from one deposition transcript) that Indiana Sugars seeks to seal reveals some of Indiana Sugars' most closely held trade secrets, including expansion plans, customer information, and supplier information, (2) Indiana Sugars would be severely injured by the release of this information, (3) Indiana Sugars is a non-party, and (4) there are multiple narrowly tailored methods of maintaining the confidentiality of this information.

{00146334-}                                                   1

## I. Procedural History

Non-party Indiana Sugars received a document subpoena from Plaintiff on January 5, 2022. Indiana Sugars met and conferred in good faith with Plaintiff concerning this subpoena and agreed to produce transactional data concerning sales that it made in the Southeastern United States[1] from 2016 to 2021. This data was produced on January 31, 2022, marked as INDSUG00001, and designated as "Confidential" under the Court's January 3, 2022 Protective Order. An illustrative sample of these data is submitted to the Court as Exhibit A.[2]

While negotiating Plaintiff's subpoena, Indiana Sugars received a subpoena from Defendants on January 21, 2022. Indiana Sugars also met and conferred in good faith with Defendants concerning this subpoena and agreed to produce additional data. These data included (1) annual lists of Indiana Sugars' top ten sugar suppliers for each year between 2016 and 2021, ranked by the amount of sugar supplied to Indiana Sugars, which data was marked as INDSUG00002, and (2) information on the total sales made by Indiana Sugars to its five largest customers in the Southeastern United States for each year between 2016 and 2021, which data was marked as INDSUG00003. INDSUG00002 was produced on February 18, 2022, and INDSUG00003 was produced on February 23, 2022. Both data sets were marked as "Confidential" under the Court's January 3, 2022 Protective Order. These data are submitted to the Court as Exhibits B and C, respectively.

---

[1] As noted in Indiana Sugars' production letter to the parties concerning INDSUG00001, these data include sales made in Alabama, Arkansas, Delaware, Florida, Georgia, Kentucky, Louisiana, Maryland, Mississippi, North Carolina, South Carolina, Tennessee, Virginia, and West Virginia. No sales were made in Washington, DC. These states include the twelve states identified in Plaintiff's complaint as well as Louisiana and Arkansas.

[2] Indiana Sugars has submitted redacted versions of the exhibits to this motion as attachments to the public filing of this motion. Indiana Sugars has separately moved for leave to file unredacted versions of these exhibits under seal.
  Separately, the data in INDSUG00001 was produced in an Excel file that has approximately 725 pages when printed. Accordingly, Indiana Sugars has printed the first page of this file, which is a representative sample, and submitted it as Exhibit A.

{00146334-}                                          2

Plaintiff and Defendants then served Indiana Sugars, and specifically its President and Chief Operating Officer John Yonover, with subpoenas to appear at a deposition. Indiana Sugars and Mr. Yonover coordinated with the parties to schedule the deposition, and Mr. Yonover appeared and gave testimony at a deposition on February 24, 2022. Indiana Sugars designated portions of the transcript of that deposition as "Confidential" under the Court's January 3, 2022 Protective Order. The transcript is submitted to the Court as Exhibit D.

The Parties then informed Indiana Sugars that they had designated the data Indiana Sugars had produced, as well as portions of Mr. Yonover's deposition transcript, as potential exhibits for trial. Specifically, Plaintiff informed Indiana Sugars on March 10 that both INDSUG00001 (JTX010) and INDSUG00003 (PTX083, DTX-116) appeared on the United States' trial exhibit list. And on March 11, Defendants informed Indiana Sugars that their trial exhibit list included INDSUG00001, INDSUG00002 (DTX-115), INDSUG00003, and Mr. Yonover's deposition transcript. Defendants later provided specific designations to the deposition transcript. Pursuant to this Court's instructions, Indiana Sugars notified the Parties on March 21 that it objected to the public disclosure of INDSUG00001, INDSUG00002, and INDSUG00003, as well as to portions of Mr. Yonover's deposition transcript.

Neither Party has taken issue with Indiana Sugars' assertion of confidentiality with respect to INDSUG00001, INDSUG00002, and INDSUG00003, or the data reflected therein. Likewise, the Defendants have confirmed that they have no objection to Indiana Sugars' assertion of confidentiality with respect to the portions of Mr. Yonover's deposition that the Defendants have designated for trial.[3] Indiana Sugars now respectfully asks this Court to ensure that this

---

[3] Plaintiff did not designate Mr. Yonover's deposition for use at trial in the first instance, although it subsequently cross-designated portions of the transcript. Indiana Sugars had initially marked several of these cross-designations as confidential, but subsequently agreed to remove all confidentiality claims from Plaintiff's cross-

information—which is both highly sensitive and narrowly circumscribed—remains confidential through trial.

## II. Legal Standards

Two standards are relevant to the sealing of documents and transcripts at trial. *See In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*, 924 F.3d 662, 672–74 (3d Cir. 2019). The first of these standards derives from the common law right of access to judicial records. *See id.* at 672. A "judicial record" is a document that "has been filed with the court . . . or otherwise somehow incorporated or integrated into a district court's adjudicatory proceedings." *Id.* (citation omitted). Once a document becomes a judicial record, a common law presumption of access attaches. *Publicker Industries, Inc. v. Cohen*, 733 F.2d 1059, 1066 (3d Cir. 1984). However, the common law right of access is "not absolute" and "may be rebutted." *In re Avandia*, 924 F.3d 672. The party seeking to overcome the presumption of access must show "that the material is the kind of information that courts will protect and that disclosure will work a clearly defined and serious injury to the party seeking closure." *Id.* (citation omitted).

The second standard arises from the "First Amendment right of access to civil trials." *In re Avandia,* 924 F.3d at 673. The First Amendment right of access is more robust than the common law right of access. *In re Cendant Corp.*, 260 F.3d 183, 198 n. 13 (3d Cir. 2001). However, as with the common law right of access, this right is "not absolute." *In re Avandia,* 924 F.3d at 673 (citation omitted). "The party seeking closure may rebut the presumption of openness only if able to demonstrate 'an overriding interest [in excluding the public] based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.'" *Id.* (citation

---

designations. Plaintiff and Indiana Sugars are now in agreement that no portions of Plaintiff's cross-designations raise confidentiality concerns.

{00146334-} 4

omitted). As when overcoming the common law right of access, "[t]he party seeking closure or sealing in the face of the First Amendment right of access 'bears the burden of showing that the material is the kind of information that courts will protect and that there is good cause for the order to issue.'" *Id.* (citation omitted). "Good cause means 'that disclosure will work a clearly defined and serious injury to the party seeking closure,'" and "[t]he injury must be shown with specificity." *Id.* (citation omitted). "[A]n interest in safeguarding a trade secret may overcome a presumption of openness." *Id.* (quoting *Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059, 1073 (3d Cir. 1984)).

### III.   Argument

The Court should seal Indiana Sugars' data and select portions of Mr. Yonover's deposition transcript to avoid public disclosure of Indiana Sugars' trade secrets. As noted above, sealing—under both the common law and First Amendment standards—is appropriate where (A) "the material is the kind of information that courts will protect" and (B) "there is good cause for the order to issue." *In re Avandia,* 924 F.3d at 673 (citation omitted). Both requirements are satisfied here, and Indiana Sugars' interests in preserving the confidentiality of its data are further heightened because it is a non-party. Finally, as detailed below, there are multiple narrowly tailored methods of maintaining the confidentiality of this information, which the Court could adopt with minimal disruption to the trial.

####   A.   The deposition transcript and data reveal some of Indiana Sugars' most closely held trade secrets.

The materials which Indiana Sugars asks this Court to seal contain expansion plans, detailed pricing and volume data, customer information, and supplier information. These sort of "trade secret[s]" are precisely "the kind of information that courts will protect," even in the face

of countervailing First Amendment interests. *In re Avandia,* 924 F.3d at 673 (citation omitted).[4] As the Third Circuit requires a "document-by-document" analysis of whether materials should be sealed, *id.*, Indiana Sugars walks through these documents below, demonstrating that each document contains the sort of trade secrets that courts protect from public disclosure.

### 1.      Selections from Mr. Yonover's Deposition Testimony

Mr. Yonover's deposition transcript (Exhibit D[5]) contains testimony concerning three discrete, highly sensitive topics, which Indiana Sugars moves the Court to seal. For ease of reference, Indiana Sugars has highlighted those very limited portions of the deposition for which it seeks protection. *See generally* Exhibit D.

First, during his deposition, Mr. Yonover discussed the potential location of a new plant that Indiana Sugars is contemplating. *See* Yonover Tr. at 93:8–93:9, 96:1. Indiana Sugars' exploration of additional facilities is incredibly sensitive and is very closely held, even within Indiana Sugars. The specific states being considered for the expansion are even more sensitive,

---

[4] "[A]n interest in safeguarding a trade secret may overcome a presumption of openness," *In re Avandia,* 924 F.3d at 673 ((quoting *Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059, 1073 (3d Cir. 1984))). *See, e.g.*, *Piramal Healthcare UK, Ltd. v. Novartis AG*, No. CV1912651SRCCLW, 2019 WL 11307647, at *2 (D.N.J. Oct. 10, 2019) ("The interest in protecting confidential information warrants the entry of an Order sealing D.E. 38, 42, 43, 47 and 49 as these documents contains highly confidential commercial information, as well as sensitive, proprietary business information within the meaning of Federal Rule of Civil Procedure 26(c)(1)(G) and which could cause Piramal and a non-party to this litigation substantive competitive harm if disclosed to the public and to competitors."); *TVIIM, LLC v. McAfee, Inc.*, No. 13-CV-04545-HSG, 2015 WL 4448022, at *3–4 (N.D.Cal. July 19, 2015) (granting motion to seal documents containing product-specific profit margins, average sales prices, number of units sold, and confidential product pricing information); *AsetekDanmark A/S v. CMI USA, Inc.*, No. 13-CV-00457-JST, 2015 WL 4511036, at *2 (N.D. Cal. July23, 2015) (granting motion to seal filings containing sales figures, profit margins, and royalty rates); *In re Am. Bus. Fin. Servives, Inc.*, No. 05-10203 MFW, 2008 WL 3906894, at *3 (Bankr. D. Del. Aug. 20, 2008) ("[A] Court may enter an order to protect trade secrets, commercial information and even to prevent embarrassment to a producing party."); *Bracco Diagnostics, Inc. v. Amersham Health Inc.*, No. CIVA 3-6025FLW, 2007WL 2085350, at *6 (D. N.J. July 18, 2007) ("Commercially sensitive information, such as information from which profit margins can be deduced, and from which a litigant's market competitiveness may be harmed is often sealed from public access.").

[5] Indiana Sugars has filed relevant excerpts of Mr. Yonover's deposition transcript, including the portions of the transcript that it seeks to seal, as Exhibit D to this motion. As with the other exhibits, a redacted version of this exhibit has been filed as an attachment to this motion, and Indiana Sugars has separately moved for leave to file unredacted versions of these exhibits under seal for the Court's consideration.

{00146334-}                                                6

and—as explained in more detail below—the public release of this information would harm Indiana Sugars. *See* Decl. of J. Yonover (Exhibit E) at ¶¶ 25–26. This sort of particularized strategic planning information is routinely sealed. *See, e.g.*, *Syngenta Crop Prot., LLC v. Willowood, LLC*, No. 1:15-CV-274, 2017 WL 6001818, at *7 (M.D.N.C. Dec. 4, 2017) (granting motion to seal portions of trial exhibits that contained "market strategies" and "business plans"); *see also Sec. & Exch. Comm'n v. Telegram Grp. Inc.*, No. 19-CV-9439-PKC, 2020 WL 3264264, at *3 (S.D.N.Y. June 17, 2020) ("The demonstration of a valid need to protect the confidentiality of proprietary business information, such as internal analyses, *business strategies*, or customer negotiations, may be a legitimate basis to rebut the public's presumption of access to judicial documents." (emphasis added)).

Second, Mr. Yonover also discussed a list of Indiana Sugars' largest suppliers—INDSUG00002 (Exhibit B), which Indiana Sugars separately moves to seal below—identifying Indiana Sugars' largest supplier for the last three years, its second largest supplier for two of those years, and the relative position of several other suppliers (including Defendant Imperial Sugar Co.). *See* Yonover Tr. at 61:9, 61:13–61:14, 63:24, 64:3, 64:14–64:15, 65:20, 66:7, 66:13, 66:25. These trade secrets are highly competitively sensitive because their release would erode Indiana Sugars' bargaining power with its suppliers. *See* Decl. of J. Yonover (Exhibit E) at ¶¶ 8–10; *see also infra*. This is the precise sort of information that courts regularly seal. *See, e.g.*, *Diversified Indus., Inc. v. Vinyl Trends, Inc.*, No. CV 13-6194-JBS-JS, 2016 WL 6897783, at *4 (D.N.J. Nov. 22, 2016) (granting motion "to seal the name of Plaintiff's raw materials supplier"); *In re Application Pursuant to 28 U.S.C. §1782 of Michael Kors, L.L.C.*, No. 2:15-CV-01978-CCC-JBC, 2015 WL 13036666, at *3 (D.N.J. June 23, 2015) ("There are legitimate public and private interests which warrant the protection of BTR's confidential commercial information, *including*

*the names of its suppliers* or other business information that might harm its competitive standing." (emphasis added)).

Third, Mr. Yonover also testified about the size of Indiana Sugars' business—specifically, the volume of sugar that it buys and sells annually. *See* Yonover Tr. at 92:1, 92:13–92:14. Indiana Sugars is a privately held corporation, and so, as a general matter, it is not required to share this information and takes great pains to keep the information confidential. *See* Decl. of J. Yonover (Exhibit E) at ¶¶ 2, 20–23. Indeed, this information on the size of the company is one of the most closely held pieces of information possessed by Indiana Sugars. This information about the size of Indiana Sugars is particularly sensitive because of the nature of Indiana Sugars' business. Indiana Sugars is a value-added distributor—its primary business involves buying and selling in the sugar market to its advantage—and public knowledge about Indiana Sugars' size (*i.e.*, how much it needs to buy and sell) would harm it in the marketplace, as described in more detail below. *See id.* at ¶¶ 21–22. Again, these sorts of financial trade secrets are routinely sealed. *See, e.g.*, *TVIIM*, 2015 WL 4448022, at *3–4 (granting motion to seal portions of trial exhibits containing financial trade secrets, including information on the "number of units sold").

Together, these highly sensitive portions of Mr. Yonover's deposition cover parts of a mere 16 lines of transcribed testimony.

    **2.    SKU-level transactional sales data, including unique customer identifiers, SKU information, order value, and order volume**

In addition to the deposition transcript, the Parties have also indicated that they intend to introduce three different datasets concerning Indiana Sugars' business. The first of these is SKU-level transactional sales data, which reveals a wealth of Indiana Sugars' confidential pricing information. *See* Exhibit A (INDSUG00001). These data are incredibly granular, as they assign each customer a unique identifier number, which can be used along with other information (*e.g.*,

{00146334-}  8

zip code) to identify customers by name. The transactional data also contain information on each customer's order value and volume, again at a SKU level. Taken together, this information can be easily used to calculate the prices for a wide variety of products that are included in the data. Suppliers (like Defendants) could use this information to derive estimated profit margins for Indiana Sugars, as they sell Indiana Sugars the primary upstream inputs for these products. Moreover, these data are very recent—running through December 2021, less than five months ago—and so the information they reveal is all the more sensitive. This sort of detailed pricing and volume information is precisely the sort of trade secret data that courts regularly seal. *See, e.g.*, *TVIIM*, 2015 WL 4448022, at *3–4 (granting motion to seal portions of trial exhibits containing product-specific profit margins, average sales prices, and number of units sold).[6]

### 3. Information on the total sales made by Indiana Sugars to its five largest customers in the Southeastern United States for each year between 2016 and 2021

Indiana Sugars also produced a document that summarizes the above-referenced transactional data by identifying Indiana Sugars' five largest customers in the Southeast in each of the covered years, along with their purchase volumes in dollars. *See* Exhibit C (INDSUG00003). This document makes explicit what could be derived with more effort from the transactional data, *i.e.*, who Indiana Sugars' most important customers are and how much they buy each year. For

---

[6] *See also Genentech, Inc. v. Amgen, Inc.*, No. 17-1407-CFC, 2020 WL 9432700, at *6 (D. Del. Sept. 2, 2020) (granting motion to seal documents containing "anticipated market share and penetration, sales volume, or pricing and discount strategy"), *report and recommendation adopted*, No. CV 17-1407-CFC, 2020 WL 9432702 (D. Del. Oct. 1, 2020); *AsetekDanmark*, 2015 WL 4511036, at *2 (granting motion to seal filings containing sales figures, profit margins, and royalty rates); *Apple Inc. v. Samsung Electronics Co.*, 727 F.3d 1214, 1223 (2013) (holding trial court abused its discretion by not sealing portions of documents "containing detailed product-specific financial information, including costs, sales, profits, and profit margins"); *Bracco Diagnostics*, 2007 WL 2085350, at *6 ("Commercially sensitive information, such as information from which profit margins can be deduced, and from which a litigant's market competitiveness may be harmed is often sealed from public access.").

the same reasons discussed with respect to the transactional data, these trade secrets are highly sensitive and regularly sealed.

> **4.    Annual lists of Indiana Sugars' top ten sugar suppliers for each year between 2016 and 2021, ranked by the amount of sugar supplied to Indiana Sugars**

Indiana Sugars also produced annual lists of its top ten suppliers for each year between 2016 and 2021, ranked by the amount of sugar supplied to Indiana Sugars. *See* Exhibit B (INDSUG00002). The Parties have indicated that they will also introduce this data at trial. Indiana Sugars—a closely held private company—has taken pains to ensure this information is not available to its suppliers, competitors, or customers. These data are incredibly sensitive, as suppliers could use the data to determine Indiana Sugars' relative dependence on the supplier. *See* Decl. of J. Yonover (Exhibit E) at ¶¶ 8–10. As noted above, data like these about supplier relationships are routinely sealed by courts.

In short, all of the materials that Indiana Sugars seeks to seal (the limited selections from Mr. Yonover's deposition and the competitively sensitive data) are "the kind of information that courts will protect." *In re Avandia,* 924 F.3d at 673 (citation omitted).

> **B.    Indiana Sugars would be severely injured by the release of this information.**

Not only is this "the kind of information that courts will protect," but "there is good cause for the order to issue" here because Indiana Sugars will suffer discrete and severe injuries if any of these materials are released. *In re Avandia,* 924 F.3d at 673 (citation omitted). Again, Indiana Sugars discusses below these harms on a document-by-document basis.

### 1. Selections from Mr. Yonover's Deposition Testimony

Public disclosure of Mr. Yonover's testimony concerning the potential location of Indiana Sugars' new facility would be damaging to Indiana Sugars, as competitors could seek to beat Indiana Sugars into the relevant markets or target the customers that Indiana Sugars is aiming to serve through this expansion. *See* Decl. of J. Yonover (Exhibit E) at ¶¶ 25–26. Disclosure of this information would undermine the aims of antitrust law, as Indiana Sugars' strategic plans to expand and to bring increased competition to the region at issue in this litigation would be undercut and undermined by the simple fact that Indiana Sugars was subpoenaed as a non-party. The disclosure of this trade secret would materially harm Indiana Sugars' business.

Public disclosure of Mr. Yonover's testimony concerning the ranked order of Indiana Sugars' largest suppliers would be similarly harmful, as Indiana Sugars' suppliers (including Defendants) would gain unfair leverage against Indiana Sugars if they received access to this information through the litigation. *See* Decl. of J. Yonover (Exhibit E) at ¶¶ 8–10. For example, the single supplier who was Indiana Sugars' largest supplier each of the past three years, and who is identified in this deposition testimony, could seek to use Indiana Sugars' dependence on them as a bargaining chip to force Indiana Sugars to pay higher prices.

Disclosure of information concerning Indiana Sugars' size would also be very valuable to Indiana Sugars' competitors, suppliers, and customers because this information would give these counterparties insight into the volumes of sugar that Indiana Sugars needs to purchase and sell. *See* Decl. of J. Yonover (Exhibit E) at ¶¶ 20–23. The information would provide insight to suppliers on whether Indiana Sugars needs to buy more sugar to satisfy its existing commitments, eroding Indiana Sugars' negotiating position. Supplier-competitors could also use this information

in deciding what prices to charge Indiana Sugars for sugar and whether or when to target Indiana Sugars' customers for themselves. *See id.* at ¶ 23.

### 2. SKU-level transactional sales data, including unique customer identifiers, SKU information, order value, and order volume

The transactional sales data produced by Indiana Sugars are highly commercially sensitive, and their disclosure would be ruinous to Indiana Sugars. In particular, Indiana Sugars' competitors' access to the transactional sales data would provide Indiana Sugars' competitors (including Defendants) the ability to approach Indiana Sugars' customers with tailored offers on the prices, volumes, and products that these customers are currently purchasing from Indiana Sugars. This danger is especially acute because certain of Indiana Sugars' competitors are also its suppliers—these competitors could use this data to cut Indiana Sugars out of the equation altogether. *See* Decl. of J. Yonover (Exhibit E) at ¶ 13.

Suppliers could also use this information in their negotiations with Indiana Sugars. Because these suppliers would have data on how much they charged Indiana Sugars for certain products and how much Indiana Sugars charged its customers for those same products, they could easily use this information to derive estimated profit margins for Indiana Sugars. They could then use this information to push Indiana Sugars to pay more for the product, seeking to capture Indiana Sugars' profits for themselves. *See* Decl. of J. Yonover (Exhibit E) at ¶ 14.

Moreover, customers would be able to see the prices that Indiana Sugars charged to other customers for the same products that they purchased. This would give customers significant negotiating power vis-à-vis Indiana Sugars, allowing them each to seek the lowest price that Indiana Sugars has ever charged for the products at issue. *See* Decl. of J. Yonover (Exhibit E) at ¶ 15.

### 3. Information on the total sales made by Indiana Sugars to its five largest customers in the Southeastern United States for each year between 2016 and 2021

The information on Indiana Sugars' largest customers is also incredibly sensitive for essentially the same reasons. This data identifies Indiana Sugars' largest customers in the Southeast and shows how much each purchased in dollars in any given year. It could be used by Indiana Sugars' competitors—in combination with the transactional level data—to target Indiana Sugars' most important customers with full knowledge of the products, volumes, and pricing that Indiana Sugars was offering to them. *See* Decl. of J. Yonover (Exhibit E) at ¶ 17. Public disclosure of this information would harm Indiana Sugars.

### 4. Annual lists of Indiana Sugars' top ten sugar suppliers for each year between 2016 and 2021, ranked by the amount of sugar supplied to Indiana Sugars

Public disclosure of the annual lists of Indiana Sugars' top ten sugar suppliers would seriously harm Indiana Sugars' business. With access to these data, Indiana Sugars' suppliers would gain significant negotiating leverage against Indiana Sugars. Each would know the extent to which Indiana Sugars has historically relied on it for purchases and who else Indiana Sugars has turned to for supply. *See* Decl. of J. Yonover (Exhibit E) at ¶¶ 8–10. The value of this information would only increase if disclosed in conjunction with the other data at issue here, including Indiana Sugars' transaction-level pricing data. In particular, suppliers who are also competitors could use Indiana Sugars' pricing data to estimate the company's profit margins. Armed with this information, as well as detailed information about Indiana Sugars' supply sources, would give those suppliers a considerable advantage in negotiating with Indiana Sugars. *See* Decl. of J. Yonover (Exhibit E) at ¶ 9. Public access to this information would harm Indiana Sugars.

In short, courts prevent potential disclosure to the public of this information for the precise reason that Indiana Sugars objects to its disclosure here—that disclosure would cause "specific, concrete, particularized" competitive harm to Indiana Sugars' business. *Genentech*, 2020 WL 9432700, at *2.

### C.  Indiana Sugars is a non-party.

Indiana Sugars' status as a non-party further supports the sealing of this information. The U.S. Court of Appeals for the Third Circuit has repeatedly given special solicitude to third parties seeking to seal their materials. *See, e.g.*, *Fed. Trade Comm'n v. Thomas Jefferson Univ.*, No. 21-1817, 2022 WL 473024, at *3 (3d Cir. Feb. 16, 2022) (remanding for reconsideration of Aetna's motion to seal and emphasizing that it was a "a non-party"); *Republic of Philippines v. Westinghouse Elec. Corp.*, 949 F.2d 653, 662 (3d Cir. 1991) (distinguishing prior case because "the information accorded confidentiality in [the earlier case] was material produced by a non-party witness rather than, as here, information offered by a party in the litigation in support of a motion it hoped would be dispositive"); *see also Thomas Jefferson Univ.*, 2022 WL 473024, at *4 (Rendell, J. concurring) ("Salient considerations include, inter alia, a demonstrable risk of current harm, *the movant's status as a nonparty*, and the adjudicatory significance of the exhibits." (emphasis added and citations omitted)).  Indiana Sugars neither encouraged this litigation nor has taken an active role in supporting the transaction.  It is a true bystander.  Indiana Sugars' status as a non-party counsels in favor of sealing here.

### D. There are multiple narrowly tailored methods of maintaining the confidentiality of this information with minimal disruption to the trial.

Finally, there are several narrowly tailored ways this Court can maintain the confidentiality of Indiana Sugars' trade secrets without limiting access to other non-confidential information or otherwise disrupting the trial.

First, with respect to the three documents at issue, Indiana Sugars understands that the Parties have proposed submitting unredacted versions of confidential documents to the Court, without displaying confidential information to the courtroom. *See* Tr. of April 4 Pretrial Conference at 15:2–7, 15:17–23. This approach is narrowly tailored to shield the confidentiality of trade secrets, without limiting public access to other less confidential information and without interfering with the Court's ability to efficiently manage this trial. Because neither Party has objected to Indiana Sugars' assertion of confidentiality over these documents, Indiana Sugars expects that the Parties will—with the Court's permission—adhere to this process for Indiana Sugars' documents.

Second, there are several narrowly tailored ways that this Court may protect against the disclosure of sensitive information contained within Mr. Yonover's deposition testimony. Indiana Sugars understands that "the introduction of excerpts of deposition testimony into evidence will only be through playing video of such excerpts during trial." Joint Pretrial Order at ¶ 21. And Indiana Sugars further acknowledges this Court's reluctance to seal the courtroom during trial proceedings. *See* Tr. of April 4 Pretrial Conference at 13:4-6, 13:11-13. However, while sealing the courtroom while the testimony at issue is played would preserve the confidentiality of this information, less disruptive solutions for sealing the limited sections of Mr. Yonover's deposition are also possible. First, the Court could direct the Defendants to mute (or "bleep" out) the audio during the limited portions of the deposition video that correspond to the highlighted testimony in

Exhibit D to this Motion. The Defendants could of course provide the Court with an unredacted transcript of Mr. Yonover's testimony to ensure that the Court is able to review the complete record. Alternatively, the Court could watch and listen to these limited portions of Mr. Yonover's deposition without broadcasting the audio or visual feed to the rest of the courtroom. And finally, the Court could simply admit these portions of Mr. Yonover's deposition transcript into the record (and then seal them) without playing a video of the deposition itself. Each of these procedures would adequately protect Indiana Sugars' legitimate interests in preserving its competitively sensitive data without limiting access to other non-confidential information.

Indiana Sugars respectfully requests that the Court adopt these measures (or similar measures suggested by other third parties) to safeguard Indiana Sugars' competitively sensitive information.

\*   \*   \*

In sum, the information at issue here is the sort of highly sensitive, narrowly tailored information that courts routinely seal, even in the face of countervailing First Amendment interests. Such treatment is necessary here because Indiana Sugars' competitors' access to Indiana Sugars' financial information would be ruinous to Indiana Sugars, a third-party who neither invited nor initiated this litigation. Indiana Sugars respectfully moves the Court to adopt one of the narrowly tailored methods of maintaining the confidentiality of this information described above.

<table>
<tr><td>Dated: April 11, 2022</td><td>/s/ Robert D. Cecil, Jr.<br>Robert D. Cecil, Jr., Esquire<br>Tybout, Redfearn & Pell<br>501 Carr Road, Suite 300<br>Wilmington, DE 19809<br>(302) 657-5512<br>rcecil@trplaw.com<br><br>and<br><br>Nicholas Giles (admitted *pro hac vice*)<br>Joshua Wade (admitted *pro hac vice*)<br>McGuireWoods LLP<br>800 E. Canal St.<br>Richmond, VA 23219<br>(804) 775-4760<br>ngiles@mcguirewoods.com<br><br>*Attorneys for Non-party Indiana Sugars, Inc.*</td></tr>
</table>