# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA,

        *Plaintiff*,

      v.

UNITED STATES SUGAR CORPORATION,
UNITED SUGARS CORPORATION,
IMPERIAL SUGAR COMPANY, and
LOUIS DREYFUS COMPANY LLC,

        *Defendants*.

Civil Action No. 1:21-cv-01644-MN

███████████████

## PLAINTIFF UNITED STATES OF AMERICA'S PRETRIAL BRIEF

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................................. 1

II. ARGUMENT ..................................................................................................................... 3

   A. The Proposed Transaction Is a Horizontal Merger within the Scope of Section 7 of the Clayton Act ................................................................................................................. 5

   B. The Production and Sale of Refined Sugar in the Narrower and Broader Geographic Areas Constitute Relevant Antitrust Markets ................................................................ 6

     1. The Production and Sale of Refined Sugar Is a Relevant Product Market ..................... 7

     2. The Narrower and Broader Geographic Areas Near Defendants' Refineries Constitute Relevant Geographic Markets ................................................................... 7

     3. Both Relevant Markets Satisfy the Hypothetical Monopolist Test ............................... 10

   C. The Proposed Acquisition Is Likely to Harm Competition in Both Relevant Markets ..... 11

     1. The Transaction Is Presumptively Anticompetitive ..................................................... 11

     2. The Transaction Is Likely to Result in Harmful Unilateral Effects .............................. 13

     3. The Transaction Is Likely to Result in Harmful Coordinated Effects ........................... 15

   D. Defendants Cannot Rebut the United States' Prima Facie Case ........................................ 16

     1. USDA's Sugar Program Would Not Prevent the Harm to Competition ........................ 17

     2. None of Defendants' Other Rebuttal Arguments Can Overcome the United States' Prima Facie Case ....................................................................................................... 18

III. CONCLUSION .................................................................................................................. 20

# TABLE OF AUTHORITIES

**Cases**

*Allen-Myland, Inc. v. IBM Corp.*,
  33 F.3d 194 (3d Cir. 1994)............................................................................ 7, 12, 13

*Am. Needle, Inc. v. Nat'l Football League*,
  560 U.S. 183 (2010)............................................................................................... 5

*American Crystal Sugar Co. v. Cuban-Am. Sugar Co.*,
  152 F. Supp. 387 (S.D.N.Y. 1957), *aff'd*, 259 F.2d 524 (2d Cir. 1958).................. 8

*American Crystal Sugar Co. v. Cuban-Am. Sugar Co.*,
  259 F.2d 524 (2d Cir. 1958)............................................................................. 8, 17

*Avnet, Inc. v. FTC*,
  511 F.2d 70 (7th Cir. 1975) ................................................................................ 12

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962).......................................................................................... 6, 8

*Chicago Bridge & Iron Co. v. FTC*,
  534 F.3d 410 (5th Cir. 2008) ................................................................................ 4

*Community Publishers, Inc. v. Donrey Corp.*,
  882 F. Supp. 138 (W.D. Ark. 1995) *aff'd sub nom. Community Publishers, Inc. v. DR
  Partners*, 139 F.3d 1180 (8th Cir. 1998) ............................................................. 5

*FTC v. Advocate Health Care Network*,
  841 F.3d 460 (7th Cir. 2016) .............................................................................. 12

*FTC v. H.J. Heinz Co.*,
  246 F.3d 708 (D.C. Cir. 2001) ................................................................... 3, 15, 17

*FTC v. Hackensack Meridian Health, Inc.*,
  -- F.4th --, 2022 WL 840463 (3d Cir. March 22, 2022) .................................. passim

*FTC v. Penn State Hershey Med. Ctr.*,
  838 F.3d 327 (3d Cir. 2016).......................................................................... passim

*FTC v. Procter & Gamble Co.*,
  386 U.S. 568 (1967).......................................................................................... 20

*FTC v. Swedish Match*,
  131 F. Supp. 2d 151 (D.D.C. 2000) .................................................................... 16

*FTC v. Sysco Corp.*,
  113 F. Supp. 3d 1 (D.D.C. 2015) .......................................................................... 7

*FTC v. Tronox Ltd.*,
  332 F. Supp. 3d 187 (D.D.C. 2018) ......................................................... 9, 15, 20

*FTC v. Univ. Health, Inc.*,
  938 F.2d 1206 (11th Cir. 1991) .......................................................................... 16

*FTC v. Wilh. Wilhelmsen Holding ASA*,
    341 F. Supp. 3d 27 (D.D.C. 2018) ................................................................. 19

*Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*,
    386 F.3d 485 (2d Cir. 2004) ...................................................................... 12

*Georgia v. Penn. R.R. Co.*,
    324 U.S. 439 (1945) ..................................................................................... 17

*Hosp. Corp. of Am. v. FTC*,
    807 F.2d 1381 (7th Cir. 1986) ................................................................... 16

*Maryland & Va. Milk Producers Ass'n v. United States*,
    362 U.S. 458 (1960) ..................................................................................... 17

*United States v. E. I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956) ....................................................................................... 7

*New York v. Deutsche Telekom AG*,
    439 F. Supp. 3d 179 (S.D.N.Y. 2020) ....................................................... 13

*ProMedica Health Sys., Inc. v. FTC*,
    749 F.3d 559 (6th Cir. 2014) ..................................................... 14, 17, 18

*United States v. Aetna, Inc.*,
    240 F. Supp. 3d 1 (D.D.C. 2017) ............................................... 14, 17, 18

*United States v. Aluminum Co. of Am.*,
    148 F.2d 416 (2d Cir. 1945) ...................................................................... 13

*United States v. Anthem, Inc.*,
    236 F. Supp. 3d 171 (D.D.C. 2017), *aff'd*, 855 F.3d 345 (D.C. Cir. 2017) ............. 7, 13, 14, 15

*United States v. Anthem, Inc.*,
    855 F.3d 345 (D.C. Cir. 2017) .............................................................. 4, 17

*United States v. Borden Co.*,
    308 U.S. 188 (1939) ..................................................................................... 17

*United States v. Conn. Nat'l Bank*,
    418 U.S. 656 (1974) ..................................................................................... 8, 9

*United States v. Dean Foods Co.*,
    No. 10-CV-59, 2010 WL 1417926 (E.D. Wis. Apr. 7, 2010) ...................... 9

*United States v. Energy Sols., Inc.*,
    265 F. Supp. 3d 415 (D. Del. 2017) .................................................. 4, 15, 19

*United States v. H&R Block, Inc.*,
    833 F. Supp. 2d 36 (D.D.C. 2011) .......................................................... 14, 15

*United States v. Pabst Brewing Co.*,
    384 U.S. 546 (1966) ..................................................................................... 8, 9

*United States v. Phila. Nat'l Bank*,
    374 U.S. 321 (1963)............................................................................ passim

*United States v. Rice Growers Ass'n*,
    No. S-84-1066, 1986 WL 12561 (E.D. Cal. Jan. 31, 1986)……...…………………………...17

*United States v. United Tote, Inc.*,
    768 F. Supp. 1064 (D. Del. 1991)...................................................................... 19

*Weiss v. York Hosp.*,
    745 F.2d 786 (3d Cr. 1984)............................................................................. 5

## Statutes

7 U.S.C. §§ 1359bb *et seq.*................................................................................ 18

15 U.S.C. § 18.................................................................................................. 3, 5

## Other Authorities

Dept. of Justice and FTC Horizontal Merger Guidelines (2010)……..………………………….passim

# I.     INTRODUCTION

Two of the three largest sugar producers that sell across a wide portion of the United States propose to combine and eliminate competition through a merger. Customers that rely on that competition would be hurt; they would be left facing a duopoly, with the two remaining large firms controlling over 70% of the sales in the region. The proposed merger is presumptively unlawful under Supreme Court and Third Circuit precedent. The merger is an uncomplicated combination of significant competitors: it eliminates substantial competition, makes coordination easier for the two remaining large firms, and it should be blocked.

United States Sugar Corporation ("U.S. Sugar") seeks to acquire Imperial Sugar Company ("Imperial"). U.S. Sugar has delegated exclusive control of its sales, marketing, and pricing decisions to United Sugars Corporation ("United"). United competes with Imperial to sell refined sugar to customers. If U.S. Sugar acquires Imperial, then Imperial and United will no longer compete with each other. The question before the Court is therefore straightforward: Is there a reasonable probability that, by ending the competition between United and Imperial, the proposed acquisition would lessen competition substantially? Put another way, is the competition today between Imperial and United important?

The evidence at trial will show that it is. Imperial and United have high combined shares in a well-defined market. That alone shows important competition, and establishes a presumption that the proposed merger violates Section 7 of the Clayton Act according to both the Supreme Court and the Third Circuit. *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 363 (1963); *FTC v. Hackensack Meridian Health, Inc.*, -- F.4th --, 2022 WL 840463, *8 (3d Cir. March 22, 2022).

Defendants' only real argument to contest this presumption of illegality is to insist that competition between sugar suppliers is national. That is incorrect. The Court will hear documentary, testimonial, and expert evidence that, because sugar is expensive to ship,

1

competition between suppliers is regional. This means that customers in different parts of the country have very different competitive options and cannot effectively turn to more distant suppliers if ones nearby raise prices. This commercial reality is also reflected in vastly different market shares for suppliers in different regions of the country. Customers in states in the Southeast and further up the East Coast mostly choose among nearby suppliers: United, Imperial, Domino, and, to a lesser extent, Cargill. These customers cannot cost-effectively turn to more distant suppliers like Western Sugar or National Sugar Marketing (NSM). The regional geographic markets alleged in the complaint are supported by ordinary-course documents and robust economic analysis, and the presumption of illegality is not sensitive to the precise boundaries chosen. As the United States' economic expert will show, adding or subtracting a few states does not change the outcome. Defendants' quibbling with the exact boundaries of the markets does not defeat the presumption; as the Supreme Court has recognized, there is some "fuzziness . . . inherent in any attempt to delineate the relevant geographical market." *Phila. Nat'l Bank*, 374 U.S. at 360 n.37.

On top of the high combined market shares, the United States will—but is not required to—offer additional evidence that the transaction is likely to cause harm. Individual competitive examples from customer testimony and Defendants' ordinary course of business documents will reinforce the market share evidence by showing that customers benefit from the head-to-head competition between Imperial and United that the merger would eliminate. The evidence will also show that competition between Imperial and United is poised to intensify as United pursues a strategy of targeting more sales to customers in Imperial's "backyard." Moreover, the evidence will show that the market is susceptible to coordination and that the transaction is likely to increase harmful coordination between the remaining United/Domino duopoly. United and

Domino already engage in coordinated activity—including sharing pricing and other sensitive information through intermediaries—demonstrating that they have both the means and motivation to raise prices in tandem. Removal of a common competitor—Imperial—would make coordination easier and more profitable for United and Domino.

After the United States establishes this presumption, bolstered by evidence of the loss of head-to-head competition between United and Imperial and the likelihood of even more extensive coordination, the burden of production will shift to Defendants. They will not be able to show, as they must to defeat the presumption, that "the market-share statistics [give] an inaccurate account of the [merger's] probable effects." *See FTC v. H.J. Heinz Co.*, 246 F.3d 708, 715 (D.C. Cir. 2001) (citation omitted). Nor will they be able to show that the other evidence of harm does not accurately reflect the likely effects of the merger. Defendants will not produce any economic analysis that successfully refutes the United States' market analysis. Defendants will not prove that entry is easy, that the transaction will generate significant cognizable efficiencies, or that government regulations render competition unimportant in this industry.

To preserve the important competition between United and Imperial that helps ensure that American families and businesses have reliable and affordable access to this staple food ingredient, the Court should enjoin U.S. Sugar's acquisition of Imperial.

## II.     ARGUMENT

Section 7 of the Clayton Act prohibits an acquisition "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition." 15 U.S.C. § 18. "Congress used the words '*may be substantially to lessen competition*' . . . to indicate that its concern was with probabilities, not certainties, . . . rendering Section 7's definition of antitrust liability relatively expansive." *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 337 (3d Cir. 2016) (internal quotation marks and

3

citation omitted). To prevail on a Section 7 claim, the "government need not prove anticompetitive effects 'with certainty,'" but need only show that there is a "reasonable probability" that the transaction will result in anticompetitive effects. *United States v. Energy Sols., Inc.*, 265 F. Supp. 3d 415, 435–36 (D. Del. 2017) (citations omitted).

Courts evaluate Section 7 claims under a burden-shifting framework. *Hackensack*, 2022 WL 840463, at *2. To establish a prima facie case, the United States must show that the merger presents a reasonable probability of anticompetitive effects in a relevant market. *Id.* "While there is no bright-line rule . . . the Supreme Court has held that a post-merger market share of 30% triggered the presumption of anticompetitive effects." *Energy Sols.*, 265 F. Supp. 3d at 441 (citing *Phila. Nat'l Bank*, 374 U.S. at 364). The United States also "may establish a prima facie case by showing a high market concentration based on HHI [concentration] numbers alone." *Hackensack*, 2022 WL 840463, at *8. Alternatively, or in addition, the United States may produce other evidence demonstrating that the merger may lead to anticompetitive effects. *Id.*; *Chicago Bridge & Iron Co. v. FTC*, 534 F.3d 410, 433 (5th Cir. 2008). In this case, the United States will establish a prima facie case using concentration statistics, and also will bolster that case with other evidence that the merger has a reasonable probability of harming competition.

Once the United States establishes its prima facie case, the burden shifts to Defendants to rebut it. *Hackensack*, 2022 WL 840463, at *2. To satisfy this burden, Defendants must "sufficiently discredit" the evidence underlying the prima facie case, or prove that the prima facie case "inaccurately predicts" the merger's likely effect on competition. *United States v. Anthem, Inc.*, 855 F.3d 345, 349 (D.C. Cir. 2017). If Defendants meet this burden, "the burden of production shifts back to the Government." *Penn State*, 838 F.3d at 337 (citation omitted).

## A. The Proposed Transaction Is a Horizontal Merger within the Scope of Section 7 of the Clayton Act

This merger will eliminate the important competition between Imperial and United. Defendants appear to claim that the United States' Section 7 claim must fail because U.S. Sugar—the acquirer—does not itself sell refined sugar in competition with Imperial. In other words, Defendants argue that because U.S. Sugar has chosen to delegate its sales and marketing function to its agent United, the proposed transaction falls outside the Clayton Act's ambit. But Section 7 explicitly focuses on an acquisition's *effects*, not its form. 15 U.S.C. § 18 ("No person . . . shall acquire, *directly or indirectly* . . . where in any line of commerce . . . the *effect* of such acquisition may be substantially to lessen competition.") (emphases added). The Court should reject Defendants' attempt to use "corporate forms . . . as a tool to flout antitrust laws." *Community Publishers, Inc. v. Donrey Corp.*, 882 F. Supp. 138, 141 (W.D. Ark. 1995), *aff'd sub nom. Community Publishers, Inc. v. DR Partners*, 139 F.3d 1180 (8th Cir. 1998).

"Antitrust policy requires the courts to seek the economic substance of an arrangement, not merely its form." *Weiss v. York Hosp.*, 745 F.2d 786, 815 (3d Cir. 1984). Courts "must always consider the commercial realities of the industry involved," *Hackensack*, 2022 WL 840463, at *4, and eschew "formalistic distinctions in favor of a functional consideration of how the parties involved . . . actually operate," *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 191 (2010). In the sugar refining business, the "commercial reality" is that firms sometimes use separate corporate entities for their production and sales functions.[1] United sets the prices, determines the sales strategy, and handles all the negotiations with customers that purchase refined sugar produced by U.S. Sugar and the three other member-owners. U.S. Sugar and the other United owners operate through a single competitor: United. PTX490 at 4 ("By pooling

---

[1] For example, NSM is the marketing entity for two beet sugar cooperatives.

your sugar with the sugar produced by 3 other sugar processors, we have a much larger presence in the market. We like to call this the 'Power of One'."); Wineinger (United) CID Dep. 47, 56. United competes extensively against Imperial today, and would control the sale of Imperial's sugar post-merger, making U.S. Sugar's proposed acquisition of Imperial a horizontal merger.

**B.    The Production and Sale of Refined Sugar in the Narrower and Broader Geographic Areas Constitute Relevant Antitrust Markets**

The purpose of defining a relevant market in a Section 7 case is to illuminate the competitive effects of a proposed merger by highlighting the zone of competition most likely to be harmed. Market definition is not an end in itself, but rather a tool to analyze the effects of the specific transaction at issue. Dept. of Justice and FTC Horizontal Merger Guidelines ("*Guidelines*") § 4 (2010) ("[M]arket definition helps specify the line of commerce and section of the country in which the competitive concern arises.").[2] A relevant antitrust market has two components: a product market ("line of commerce") and a geographic market ("section of the country"). *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962).

The United States has defined two relevant markets for evaluating the proposed acquisition: the production and sale of refined sugar to customers in Georgia and neighboring states (the "narrower market" consisting of Alabama, Georgia, Florida, North Carolina, South Carolina, and Tennessee), and the production and sale of refined sugar to customers in the states in the Census Bureau's South Atlantic and East South Central divisions (the "broader market" of Alabama, Delaware, District of Columbia, Florida, Georgia, Kentucky, Maryland, Mississippi, North Carolina, South Carolina, Tennessee, Virginia, and West Virginia). The record will show that both of these markets are appropriate relevant markets for evaluating the likely effects of

---

[2] The *Guidelines* are "often used as persuasive authority" by courts. *Hackensack*, 2022 WL 840463, at *3 n.3 (quoting *Penn State*, 838 F.3d at 338 n.2).

U.S. Sugar's proposed acquisition of Imperial.

### 1. The Production and Sale of Refined Sugar Is a Relevant Product Market

A product market "is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956); *Allen-Myland, Inc. v. IBM Corp.*, 33 F.3d 194, 206 (3d Cir. 1994). The relevant product market need not include all substitutes, only "reasonable substitutes." *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 25 (D.D.C. 2015).

Defendants do not seriously dispute that refined sugar is a relevant product. Refined sugar includes food-safe sugar produced from either sugar cane or sugar beets and can be supplied in dry or liquid form and as white, brown, or powdered sugar. Other forms of sweeteners, such as corn syrup, maple syrup, or "artificial" sweeteners, are not close enough substitutes for refined sugar to be included in the relevant product market.

### 2. The Narrower and Broader Geographic Areas Near Defendants' Refineries Constitute Relevant Geographic Markets

Consistent with the overall purpose of market definition, the relevant geographic market "is not where the parties to the merger do business or even where they compete, but where, within the area of competitive overlap, the effect of the merger on competition will be direct and immediate." *Phila. Nat'l Bank*, 374 U.S. at 357; *see also United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 202, 204 (D.D.C. 2017) (holding geographic market of 14 non-contiguous states "comprise[s] an 'area of competitive overlap'" and rejecting defendants' argument that the government's geographic market was "gerrymander[ed]") (quoting *Phila. Nat'l Bank*), *aff'd*, 855 F.3d 345 (D.C. Cir. 2017).

The geographic market must "'correspond to the commercial realities of the industry,'" which are "[d]etermined within the specific context of each case." *Penn State*, 838 F.3d at 338

(quoting *Brown Shoe*, 370 U.S. at 336). In industries with "high transportation costs," such costs may be a critical factor in determining the scope of the geographic market. *See Phila. Nat'l Bank*, 374 U.S. at 358–59 (citing *American Crystal Sugar Co. v. Cuban-Am. Sugar Co.*, 152 F. Supp. 387, 398 (S.D.N.Y. 1957), *aff'd*, 259 F.2d 524 (2d Cir. 1958)); *see also Guidelines* § 4.2. In *American Crystal Sugar*, which involved a merger in the same industry at issue here, the court found two relevant markets: a market for refined sugar sold in a ten-state region along the Mississippi River, and a smaller three-state market within that larger region. The district court held that these markets "correspond[ed] to the commercial realities of the sugar industry . . . because [of] the impact of freight rates on sugar prices." 152 F. Supp. at 398. The Second Circuit affirmed, noting that the merging parties were "better situated to supply this territory" where they had a "locational advantage" over refiners in other parts of the country. 259 F.2d at 529. The fact that the parties sold 50% or more of their sugar in the ten-state region underscored that this was "a proper geographic market" for evaluating the transaction at issue. *Id.* at 528–29.

As in *American Crystal Sugar*, courts have long recognized that there is not necessarily only one relevant market for analyzing a merger. Within a broader product or geographic market, "well-defined submarkets may exist which, in themselves, constitute [relevant markets] for antitrust purposes." *Brown Shoe*, 370 U.S. at 325, 336; *United States v. Pabst Brewing Co.*, 384 U.S. 546, 548–49 (1966) (holding that Wisconsin, a three-state area including Wisconsin, and the United States as a whole all constituted relevant geographic markets). While there may be "some artificiality" in setting market boundaries, "such fuzziness would seem inherent in any attempt to delineate the relevant geographic market." *Phila. Nat'l Bank*, 374 U.S. at 360 n.37. "An element of 'fuzziness'" is therefore not a reason for a court to reject a proposed geographic market, as the geographic market need not be defined "with scientific precision." *United States v. Conn. Nat'l*

*Bank*, 418 U.S. 656, 669 (1974). Section 7 "requires merely that the Government prove the merger may have a substantial anticompetitive effect somewhere in the United States—'in any section' of the United States"—a phrase that "does not call for the delineation of a 'section of the country' by metes and bounds." *Pabst*, 384 U.S. at 549.

In cases where sellers can charge different prices to customers in different areas (e.g., due to high transportation costs), courts and agencies often define geographic markets based on the location of customers. "Geographic markets of this type encompass the region into which sales are made."[3] *FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187, 206 (D.D.C. 2018) (quoting *Guidelines* § 4.2.2); *see also United States v. Dean Foods Co.*, No. 10-CV-59, 2010 WL 1417926, *4 (E.D. Wis. Apr. 7, 2010) (accepting geographic market defined around customers located near acquired milk processor because milk "has a limited shelf life and is costly to transport").

The United States' two geographic markets are defined around the areas in which Defendants are well-positioned to compete based on the location of their refineries. Refined sugar is costly to transport, and refiners set price offers based in part on the cost of transporting the sugar to the customer's location. *See* Henneberry (Imperial) Dep. 112–13; Simons (NSM) Dep. 81; PTX163 (Imperial has a "locational advantage" for customers in Georgia). The two markets do not include every state in which United and Imperial compete, but they do include the "section of the country" within the "area of competitive overlap" where the effects of the proposed transaction will be felt most acutely. *See Phila. Nat'l Bank*, 374 U.S. at 357.

The "narrower" and "broader" markets also correspond to the "commercial realities" reflected in evidence from the parties and others in the industry. The narrower market

---

[3] Competitors in markets defined around customer locations are those "firms that sell to customers in the specified region," some of which "may be located outside the boundaries of the geographic market." *Guidelines* § 4.2.2.

encompasses the exact same states that United calls the "Supplier Backyard" for its Clewiston, Florida refinery and Imperial's Port Wentworth, Georgia refinery. PTX452 at 20. A 2021 presentation by an industry consultant describes Imperial's "Primary Marketing Region," which roughly corresponds to the broader market. PTX217 at 6. Other United documents also point to similar groupings of states as being competitively significant. *See* PTX330 at 15, PTX348 at 31. The United States' economic expert Dr. Rothman will show that refiners' market shares closely track where their refineries are located. United, Imperial, and Domino sell almost 80% of the sugar in their "backyard" (i.e., the narrower market), whereas NSM, which markets for refineries in California, Idaho, and Minnesota, sells ███████ of the sugar in that region.

### 3. Both Relevant Markets Satisfy the Hypothetical Monopolist Test

Courts often use an analytical method called the hypothetical monopolist test to determine whether a given set of products, and a given geography, constitute a relevant market. *Hackensack*, 2022 WL 840463, at *3. "A proposed market is properly defined, under this test, if a hypothetical monopolist who owns all the firms in the proposed market could profitably impose a small but significant non-transitory increase in price ('SSNIP') on buyers in that market." *Id.* "The hypothetical monopolist test ensures that markets are not defined too narrowly, but it does not lead to a single relevant market." *Guidelines* § 4.1.1.

The hypothetical monopolist test confirms that the proposed markets are both relevant antitrust markets. Dr. Rothman will testify that a hypothetical monopolist of refined sugar sold in the narrower and broader geographic markets would be able to profitably raise price. First, the quantity of sugar demanded changes relatively little in response to changes in price. Second, not enough customers would substitute to purchases made outside the market to prevent the hypothetical monopolist from increasing price. A number of factors would make such shifting impracticable for most customers. Customers are unlikely to be able to purchase outside the

10

relevant markets, such as from distributors, to avoid a price increase because most customers receive refined sugar delivered to their locations and it would be difficult, inconvenient, and costly to arrange for sugar to be re-shipped from a location outside the markets.

### C. THE PROPOSED ACQUISITION IS LIKELY TO HARM COMPETITION IN BOTH RELEVANT MARKETS

#### 1. The Transaction Is Presumptively Anticompetitive

The United States can show likely harm, and establish a presumption of illegality, by showing that a merger would create a firm with an undue market share and result in a significant increase in concentration. *Phila. Nat'l Bank*, 374 U.S. at 363; *Hackensack*, 2022 WL 840463, at *8. To assess whether an acquisition would result in harmful market concentration, courts and agencies commonly use the Herfindahl-Hirschmann Index ("HHI"). *Hackensack*, 2022 WL 840463, at *7 (citing *Guidelines* § 5.3). The Third Circuit has adopted the *Guidelines* standard, holding that a market with an HHI above 2,500 is "highly concentrated," and that a merger that increases the HHI by more than 200 points and results in a highly concentrated market is presumptively anticompetitive. *Id.* at *7–8.

Dr. Rothman's analysis of market shares will show that the merger is presumptively anticompetitive in both relevant markets. These concentration figures, shown below, greatly exceed the thresholds to find a proposed transaction presumptively illegal. *See Hackensack*, 2022 WL 840463, at *8 (noting "[a]nticompetitive effects can occur at even lower thresholds").

|  | United & Imperial Combined Share | Post-Merger HHI | Increase in HHI from Merger | United/Imperial & Domino Share |
|---|---|---|---|---|
| Narrower Market | 54% | 3,658 | 1,393 | 79% |
| Broader Market | 46% | 3,035 | 1,011 | 74% |

Distributors are properly excluded from these market shares. Distributors do not refine sugar themselves but instead purchase sugar from refiners like United and Imperial. "The goal in defining the relevant market is to identify the market participants . . . that restrain an individual

11

firm's ability to raise prices or restrict output." *Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc*., 386 F.3d 485, 496 (2d Cir. 2004); *FTC v. Advocate Health Care Network*, 841 F.3d 460, 469 (7th Cir. 2016) (relevant market need include only "the competitors that would 'substantially constrain [the firm's] price-increasing ability'") (citation omitted). Distributors are unable to constrain refiners' prices because they must purchase refined sugar and earn a margin for themselves. Kling (Batory) Dep. 110–11; Yonover (Indiana Sugars) Dep. 86, 88.

   Distributors serve a different function in the market than refiners. Distributors are resellers and distribution partners to refiners. Swart (United) Dep. 125–26. Depending on a customer's needs and location, a refiner can choose to sell directly to the customer or sell to the customer via a distributor. Distributors often serve ██████████████████████████ ██████████████████████████████████████████████████████ ███████████████████████. Kling (Batory) Dep. 23–26; Riippa (General Mills) Dep. 156; Hamill (Kraft) Dep. 45; Simons (NSM) Dep. 53. When refiners are able to sell directly to a distributor's customers, they may stop partnering with that distributor. ████████████████; Swart (United) Dep. 123; PTX452 at 34. Defendants' own ordinary-course documents recognize that distributors operate at a different level of the supply chain than sugar refiners and marketers. PTX330 at 5. Because distributors "perform significantly different functions and operate at significantly different levels of distribution," they should not be considered competitors in the same relevant markets as Defendants. *See Avnet, Inc. v. FTC*, 511 F.2d 70, 78 (7th Cir. 1975).

   When one set of firms—like the distributors here—does not increase the overall supply of a product, those firms should not be assigned market shares in competition with the firms that make the product, regardless of whether both groups sell to the same customers. In *Allen-Myland*, the Third Circuit rejected the district court's reasoning that computer lessors should be

considered in the same relevant market as original equipment manufacturers like IBM because, per the district court, "[f]rom a consumer's standpoint, they are an alternative source of computer equipment" and "[t]hey compete with IBM." 33 F.3d at 202. Instead, the Third Circuit held that "[n]ew computers are, of course, already in the relevant market . . . [and] [i]t was therefore incorrect to add them in again when end users lease new computers rather than purchase them outright." *Id.* As the court explained, "[l]easing companies do not increase the number of new mainframes, as they still must purchase them from their manufacturers. Thus, to the extent that IBM had the power to set prices, that power would not be diminished, or at most would only slightly be diminished, by its sales to leasing companies rather than end users." *Id.* (footnote omitted). Defendants never explain why including distributors' resale of sugar bought from refiners would be appropriate for analyzing the competitive effects of a merger between two producers of refined sugar. *See also United States v. Aluminum Co. of Am.*, 148 F.2d 416, 425 (2d Cir. 1945) (for measuring Alcoa's share of ingot market, market should not include sale of ingots previously sold by Alcoa and then salvaged and resold by other firms); *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 195, 202–03 (S.D.N.Y. 2020) (applying Section 7 and holding that firms that resold wireless service "should not be considered independent competitors" in the wireless market).

### 2.    The Transaction Is Likely to Result in Harmful Unilateral Effects

The evidence that the proposed transaction would significantly increase concentration and lead to highly concentrated markets establishes the United States' prima facie case. Courts also consider evidence of two types of effects from horizontal mergers: unilateral and coordinated effects. *Anthem*, 236 F. Supp. 3d at 215. The record here will show that U.S. Sugar's acquisition of Imperial is likely to cause both unilateral and coordinated effects. "This direct evidence strengthens the probability that the merger will likely lead to anticompetitive effects

and, thus, the [government's] prima facie case." *Hackensack*, 2022 WL 840463, at *8.

Unilateral effects are harm caused by "a merger's elimination of competition between the two merging companies." *Anthem*, 236 F. Supp. 3d at 216. They are likely "if the acquiring firm will have the incentive to raise prices or reduce quality after the acquisition, independent of competitive responses from other firms." *United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 81 (D.D.C. 2011). "[T]he elimination of competition between two firms that results from their merger may alone constitute a substantial lessening of competition." *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 569 (6th Cir. 2014) (quoting *Guidelines* § 6).

The proposed acquisition is likely to substantially lessen competition by eliminating head-to-head competition between United and Imperial. United and Imperial are two of only three companies with sugar refineries in the relevant geographic markets. As Dr. Rothman will testify, there is significant overlap in both the geographic areas and customers served by United and Imperial. United and Imperial frequently compete directly for the same business and customers switch back and forth between them to obtain the best terms. *See, e.g.*, PTX163, PTX370, PTX459, PTX564.

Defendants contend that unilateral effects are unlikely because Imperial primarily uses imported raw sugar to feed its refinery. Even if this fact reduces Imperial's profit margins relative to its competitors, the record will show that Imperial and United nonetheless frequently compete on price. *See, e.g.*, PTX154, PTX395, PTX416, PTX464. This argument also disregards that customers care about more than just price—United and Imperial also compete on product quality and service.[4] PTX147, PTX461.

---

[4] A merger can have harmful unilateral effects "even where the merging parties are not the only, or the two largest, competitors in the market." *United States v. Aetna, Inc.*, 240 F. Supp. 3d 1, 43 (D.D.C. 2017). "The acquired firm need not be the other's closest competitor to have an

The transaction also would harm customers in the relevant markets by eliminating increased future competition between United and Imperial. Currently, U.S. Sugar's Clewiston refinery lacks the facilities needed to produce super sacks (2,000 pound bags) of granulated sugar. United also sees an opportunity to increase sales of 50-pound bags to customers in the Southeast, but would need to expand packaging capacity at Clewiston to target these additional sales. PTX452 at 34. Imperial already sells both of these products. Prior to U.S. Sugar agreeing to acquire Imperial, United executives had recommended adding these packaging capabilities at Clewiston, which would have allowed United to target more sales to customers in the Southeast. PTX348 at 28, PTX380, PTX452 at 34. The proposed transaction deprives customers of the benefit of this expanded competition.

### 3. The Transaction Is Likely to Result in Harmful Coordinated Effects

Coordinated effects refers to rivals "coordinat[ing] their behavior, either by overt collusion or implicit understanding, in order to restrict output and achieve profits above competitive levels." *Heinz*, 246 F.3d at 715. Merger law recognizes that such anticompetitive coordination is likely "where rivals are few." *Id.* Sugar refiners already engage in coordinated interaction and the proposed transaction likely would result in even more extensive coordination.

This transaction would result in just two companies controlling over 70% of the market— a situation ripe for coordination. The evidence will further show "real-world proof of meaningful market incentives to manage prices" to the mutual benefit of refiners. *See Tronox*, 332 F. Supp. 3d at 208; *see also H&R Block*, 833 F. Supp. 2d at 77–78 (finding support for theory that "coordination would likely take the form of mutual recognition that neither firm has an interest"

---

anticompetitive effect . . . ." *Anthem*, 236 F. Supp. 3d at 216. Similarly, a merger can substantially lessen competition where one of the merging parties wins bids more frequently than the other. *See Energy Sols.*, 265 F. Supp. 3d at 439 ("Anti-trust law does not distinguish between effective and ineffective competitors.").

in driving prices lower). Refiners recognize their interdependence and discuss strategically pulling punches in their bids against each other. *See, e.g.*, PTX450 (discussing strategy to raise prices and send "a message to NSM and other competitors that we were not interested in allowing the market to slip lower"); PTX250 (expressing concern that offering a low price to win business away from United "would be snatching something from United just as they are starting to show some upside price movement"); PTX483 (United pays "particular attention to expected competitive pricing responses," so the "key is stay balanced, thoughtful where the moves will initiate relatively smaller reactions"); PTX055 (noting Domino ███████████████████████ ████████████████████████████████████████████████████).

Not satisfied with only closely monitoring each other's prices, *see, e.g.*, PTX127, PTX141, United and Domino go so far as to use intermediaries to exchange competitively sensitive information. *See, e.g.*, PTX049, PTX397. *See generally* United States' Motion in Limine. This is actual coordinated interaction, and after removing a competitor United and Domino likely would coordinate even more extensively. *See Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1388–89 (7th Cir. 1986) (Posner, J.) (routine exchange of "intimate information on prices" among competitors "facilitates collusion and therefore entitles [the government] to worry even more about large horizontal acquisitions in this industry"); *FTC v. Swedish Match*, 131 F. Supp. 2d 151, 168 (D.D.C. 2000) (merger would exacerbate problem of competitors tracking and following each other's prices). Concentration will increase dramatically, which makes it "easier for firms in the market to collude." *FTC v. Univ. Health, Inc.,* 938 F.2d 1206, 1218 n.24 (11th Cir. 1991). As Dr. Rothman will testify, United would have an even stronger incentive post-transaction to anticipate how Domino would respond to United's pricing actions.

### D.     Defendants Cannot Rebut the United States' Prima Facie Case

To rebut the United States' prima facie case, Defendants must show both that (1) "the

market-share statistics [give] an inaccurate account of the [merger's] probable effects on competition," *Heinz*, 246 F.3d at 715 (citation omitted), and (2) the United States' unilateral- and coordinated-effects evidence does not accurately reflect the likely competitive effects of the merger, *ProMedica*, 749 F.3d at 571–72. "The more compelling the prima facie case, the more evidence the defendant must present to rebut it successfully." *Anthem*, 855 F.3d at 349–50 (citation omitted); *see also Hackensack*, 2022 WL 840463, at \*11. None of Defendants' rebuttal arguments are sufficient to undermine the United States' prima facie showing.

### 1. USDA's Sugar Program Would Not Prevent the Harm to Competition

USDA's role in the sugar industry in no way lessens the importance of healthy competition among producers of refined sugar.[5] Section 7 requires "that the forces of competition be allowed to operate within the broad framework of governmental regulation of the industry." *Phila. Nat'l Bank*, 374 U.S. at 372. Even in an industry where prices are directly regulated and restricted to a "zone of reasonableness," anticompetitive conduct "within that zone" can "constitute violations of the anti-trust laws." *Georgia v. Penn. R.R. Co.*, 324 U.S. 439, 460–61 (1945); *Aetna*, 240 F. Supp. 3d at 48, 52 (rejecting defense argument that regulation leaves "no opening for the anticompetitive effects that the Government posits" because regulations at issue "serve primarily to set 'the boundaries or the contours' for competition").

Consistent with these principles, in *American Crystal Sugar*, the Second Circuit blocked a merger of sugar refiners notwithstanding government regulation of the industry because there was "still available room for competition in the sale and distribution of refined sugar." 259 F.2d

---

[5] Defendants have no possible argument that the Capper-Volstead Act provides Clayton Act immunity. *See United States v. Borden Co.*, 308 U.S. 188, 200 (1939); *Maryland & Va. Milk Producers Ass'n v. United States*, 362 U.S. 458, 462–63, 472 (1960); *United States v. Rice Growers Ass'n*, No. S-84-1066, 1986 WL 12561, \*4 n.5 (E.D. Cal. Jan. 31, 1986) ("The Capper-Volstead Act cannot immunize a cooperative's acquisition of a competing non-cooperative business when the acquisition is violative of Section 7 of the Clayton Act.").

at 527. That remains true today. Under the Farm Bill, 7 U.S.C. §§ 1359bb *et seq.*, USDA's mandate is (1) to manage the supply of sugar to keep prices *above* certain minimum levels and (2) to ensure an adequate supply in the United States. USDA has no mandate—or ability—to monitor or set the prices at which sugar is sold. Contract prices are "set by private negotiations," and "USDA is not involved in the contract terms at all." Fecso (USDA) Dep. 244–45. When USDA determines that the domestic supply of sugar is inadequate, it can increase the amount of sugar that may be imported, but it cannot direct imports to a specific region of the country. *Id*. In the event of a price increase following the merger, there is no guarantee that USDA would take any action at all, or that any action it might take would be efficacious. Indeed, even though sugar prices recently have been elevated, according to USDA's Dr. Fecso, "[t]here's little room for us to bring in raw sugar imports to help with prices." *Id.* at 189–90, 192–93. All of these factors make clear that USDA regulation was not "designed to deter and remedy anticompetitive harm" and cannot be counted on to do so here. *See Aetna*, 240 F. Supp. 3d at 48, 52.

## 2. None of Defendants' Other Rebuttal Arguments Can Overcome the United States' Prima Facie Case

Defendants make a number of other arguments, none of which individually or collectively can rebut the United States' prima facie showing. *First*, any argument that Imperial is a "weakened competitor" should be swiftly rejected. Courts rarely credit this type of defense— "the Hail-Mary pass of presumptively doomed mergers"—and this is not even close to being one of the "rare cases" in which a weakened competitor defense might have merit. *See ProMedica*, 749 F.3d at 572. Imperial is a strong competitor and, far from being in dire financial condition, it earned ███████████████████████████████████████████████████. LDC/Imperial Amended Response to Interrog. No. 2.

*Second*, Defendants point to limited examples of expansion in the sugar industry, but they

18

bear the burden of showing that entry by new firms or expansion by existing firms will be "timely, likely and sufficient in its magnitude, character, and scope" to counteract the anticompetitive effects of the merger. *Energy Sols.*, 265 F. Supp. 3d at 443 (citation omitted). Evidence relating to LSR (Cargill) and raw sugar "melters" cannot meet this standard. ███████ ██████████████████████████████████████████████. Faucheux (LSR) Dep. 110–11. █████████████████████████████████████████████████████████████████████ ███████████████████████████. *Id.* at 140–41. "Melters" produce a different type of sugar than Defendants, one that many of Defendants' customers could not use and which United's Swart characterized as "hardly a threat to our business." PTX429.

     *Third*, Defendants incorrectly argue that the presence of large, sophisticated customers undercuts the United States' prima face case. This argument must fail because "whatever leverage [customers] will have after the merger, they have that leverage now." *Penn State*, 838 F.3d at 346. Defendants cannot identify "any *new* strategy or alternative likely to emerge post-merger" that would allow customers to avoid price increases. *See FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 71 (D.D.C. 2018). Defendants' argument also should be rejected because Defendants have a mix of customers, not all of which are large and sophisticated. *See United States v. United Tote, Inc.*, 768 F. Supp. 1064, 1085–86 (D. Del. 1991).

     *Fourth*, none of Defendants' proffered efficiencies "meet the demanding scrutiny that the efficiencies defense requires." *See Penn State*, 838 F.3d at 349. Although both the Supreme Court and the Third Circuit have expressed skepticism about efficiencies defenses, some circuits have been "tentatively willing to recognize the defense," but only if defendants prove a merger's efficiencies would result in improved, rather than lessened, competition in the relevant market. *Hackensack*, 2022 WL 840463, at *11. No circuit court has ever held that the efficiencies

19

defense was successfully invoked. *Id.* For claimed efficiencies to be cognizable at all, they must be "merger specific," "verifiable," and "real," and Defendants must establish that any purported benefits would be passed on to their customers. *Penn State*, 838 F.3d at 348–49, 351; *Hackensack*, 2022 WL 840463, at *12. Defendants' claim that they would enhance competition by implementing "best practices" to increase output at Port Wentworth post-merger is neither verifiable nor merger-specific. *See Tronox*, 332 F. Supp. 3d at 215–16 (rejecting as unverifiable defendant's claim that it would use its purported "'unique skill set' and expertise . . . to boost production"). Defendants' contention that the merger would improve Port Wentworth's access to a reliable source of raw sugar is neither verifiable nor merger-specific, and is not a real efficiency at all because it merely shifts raw sugar from one refiner to another; nothing about Defendants' purported plan would decrease costs of sugar or increase the overall supply in the market. Finally, none of Defendants' proffered efficiencies claims are cognizable because there is no evidence that they would result in lower prices or other benefits for customers and thus improve competition in the relevant markets. To the contrary, Defendants' deal modeling shows all synergies being passed on to United's members to increase their profits rather than being used to lower prices to United's customers. JTX032 at Tab 4; Wood (U.S. Sugar) Dep. 135, 299; S. Hines (United) Dep. 189–91. Such "[p]ossible economies cannot be used as a defense to illegality." *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 580 (1967).

## III.    CONCLUSION

U.S. Sugar's acquisition of Imperial likely would substantially lessen competition for the production and sale of refined sugar in both the narrower and broader geographic markets. The Court therefore should enjoin U.S. Sugar from acquiring Imperial.

Respectfully submitted,


/s/ Shamoor Anis
SHAMOOR ANIS
LAURA D. HATCHER (#5098)
  Chief, Civil Division
United States Attorney's Office
District of Delaware
1313 N. Market Street, Suite 400
Wilmington, Delaware 19801
Tel.: (302) 573-6205
shamoor.anis@usdoj.gov
laura.hatcher@usdoj.gov


/s/ Brian Hanna
BRIAN HANNA
SCOTT A. WESTRICH
JILL PTACEK

Attorneys for the United States
U.S. Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 8000
Washington, DC 20530
Tel.: (202) 460-4294
brian.hanna2@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on April 11, 2022, a true and correct copy of the foregoing was served on all counsel of record via email.

/s/ Brian Hanna
BRIAN HANNA

U.S.  Department of Justice, Antitrust Division
450 Fifth Street, NW, Suite 8000
Washington, DC 20530
Phone: 202-460-4294
Email: brian.hanna2@usdoj.gov
*Attorney for Plaintiff United States of America*