IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 21-1644 (MN) |
| UNITED STATES SUGAR | ) | |
| CORPORATION, UNITED SUGARS | ) | ▮▮▮▮▮▮▮▮▮▮▮ |
| CORPORATION, IMPERIAL SUGAR | ) | |
| COMPANY, and LOUIS DREYFUS | ) | |
| COMPANY LLC, | ) | REDACTED - PUBLIC VERSION |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' PRE-TRIAL BRIEF

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Brian P. Egan (#6227)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
began@morrisnichols.com

*Attorneys for Defendant United States Sugar Corporation*

HOGAN MCDANIEL
Daniel K. Hogan (# 2841)
Daniel C. Kerrick (#5027)
1311 Delaware Avenue, Suite 1
Wilmington, DE 19806
(302) 656-7540
dhogan@dkhogan.com
dckerrick@dkhogan.com

*Attorneys for Defendant United Sugars Corporation*

RICHARDS, LAYTON & FINGER. P.A.
Kelly E. Farnan (# 4395)
One Rodney Square
Wilmington, DE 19801
(302) 651-7700
farnan@rlf.com

*Attorneys for Defendants Imperial Sugar Company and Louis Dreyfus Company LLC*

Originally Filed: April 11, 2022
Redacted Version Filed: April 15, 2022

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................1

STATEMENT OF FACTS .........................................................................................3

    I.     The Sale Of Refined Sugar Is Highly Competitive Across The U.S. ......................3

    II.    The USDA's Role In Regulating Supply And Price................................................6

    III.   Absent The Proposed Transaction, Imperial Will Continue To Struggle
         and Decline In Competitive Significance ..................................................7

    IV.   The Proposed Transaction Will Revitalize Imperial and Benefit Customers .........7

ARGUMENT ..............................................................................................................8

    I.     Plaintiff Cannot Carry Its Burden To Prove Its Proffered Markets ......................8

         A.    Plaintiff's "Production and Sale" Market Arbitrarily Excludes
                Distributors And Plaintiff Ignores Half of Wholesale Customers ..............9

         B.    Plaintiff Fails To Carry Its Burden To Prove A Relevant
                Geographic Market ..................................................................................10

         C.    Plaintiff's Failure to Define a Proper Relevant Market Is
                Dispositive ..............................................................................................14

    II.    Plaintiff Cannot Carry Its Burden To Show That The Transaction Is Likely
         To Lead To a Substantial Reduction of Competition In Its Relevant
         Market ...................................................................................................14

         A.    Plaintiff Cannot Show That U.S. Sugar's Control Over Imperial
                Sugar Will Result In Anticompetitive Unilateral Effects .........................15

         B.    Plaintiff Cannot Carry Its Burden Based On A Coordinated Effects
                Theory ....................................................................................................17

         C.    Plaintiff's Role In Regulating Output Undercuts Any Prospect That
                The Transaction Will Have Sustained Anticompetitive Effects ...............19

# TABLE OF AUTHORITIES

## CASES

*Ball Mem'l Hosp., Inc. v. Mutual Hosp. Ins., Inc.*,
784 F.2d 1325 (7th Cir. 1986) ............................................................. 15

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) ............................................................. 9, 20

*Concord v. Bos. Edison Co.*,
915 F.2d 17 (1st Cir. 1990) ............................................................. 20

*E.I. du Pont de Nemours & Co. v. Kolon Indus.*,
637 F.3d 435 (4th Cir. 2011) ............................................................. 10

*F.T.C. v. Arch Coal*,
329 F. Supp. 2d 109 (D.D.C. 2004) ............................................................. 8, 14, 18, 19

*F.T.C. v. Penn State Hershey Med. Ctr.*,
838 F.3d 327 (3d Cir. 2016) ............................................................. 10

*F.T.C. v. RAG-Stiftung*,
436 F. Supp. 3d 278 (D.D.C. 2020) ............................................................. 14, 17, 18

*F.T.C. v. Thomas Jefferson Univ.*,
505 F. Supp. 3d 522 (E.D. Pa. 2020) ............................................................. 12

*In re Altria Grp., Inc. & JUUL Labs, Inc.*,
No. 9393, 2022 WL 622476 70 (F.T.C. Feb. 23, 2022) ............................................................. 13

*Int'l Shoe Co. v. F.T.C.*,
280 U.S. 291 (1930) ............................................................. 8

*It's My Party, Inc. v. Live Nation, Inc.*,
811 F.3d 676 (4th Cir. 2016) ............................................................. 13

*New York v. Deutsche Telekom AG*,
439 F. Supp. 3d 179 (S.D.N.Y. 2020) ............................................................. 19

*Ohio v. Am. Express Co.*,
138 S. Ct. 2274 (2018) ............................................................. 3

*PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*,
615 F.3d 412 (5th Cir. 2010) ............................................................. 10

*RSR Corp. v. F.T.C.*,
602 F.2d 1317 (9th Cir. 1979) ............................................................. 13

*United States v. Baker Hughes*,
    908 F.2d 981 (D.C. Cir. 1990)................................................................ 14

*United States v. F.C.C.*,
    652 F.2d 72 (D.C. Cir. 1980)................................................................. 20

*United States v. Gen. Dynamics Corp.*,
    415 U.S. 486 (1974) ........................................................................... 14

*United States v. Marine Bancorp.*,
    418 U.S. 602 (1974) ........................................................................... 20

*United States v. Nat'l Ass'n of Broads.*,
    536 F. Supp. 149 (D.D.C. 1982) ............................................................ 20

*United States v. Oracle*,
    331 F. Supp. 2d 1098 (N.D. Cal. 2004) ..................................... 9, 10, 15

*United States v. Phila. Nat'l Bank*,
    374 U.S. 321, 363 (1963) ...................................................................... 8

*United States v. Sabre Corp.*,
    452 F. Supp. 3d 97 (D. Del. 2020) ................................................. passim

*United States v. U.S. Gypsum Co.*,
    438 U.S. 422 (1978) ........................................................................... 19

*Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ........................................................................... 20

## STATUTES

15 U.S.C. § 18.............................................................................................. 8

## OTHER AUTHORITIES

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and
    Their Application (2021) ........................................................ 12, 13, 19

Carl Shapiro, U.S. Dep't of J., Update from the Antitrust Division, Remarks as Prepared for the
    ABA Antitrust Law Fall Forum 24 (Nov. 18, 2010) .............................. 17

Horizontal Merger Guidelines (2010) ........................................... 15, 17, 18

## INTRODUCTION

United States Sugar Corporation ("U.S. Sugar") is a 90-year-old Florida company that is majority owned by its farmers, employees, a children's hospital, and a large charity. It is acquiring Imperial Sugar Company ("Imperial")—a Dutch-owned refiner of predominantly imported raw sugar—so that it can increase the amount of sugar it refines and provide customers with greater security against weather and other supply chain risks. U.S. Sugar plans to accomplish this by increasing efficiency at Imperial's Port Wentworth plant, just as it has done at its own facility. The transaction will facilitate "greater domestic production, a range of supply, [and] built-in redundancies" to protect against weather events, consistent with Executive Branch mandates.[1]

Plaintiff must show that the transaction is likely to cause substantial harm in a relevant market. Plaintiff claims that the transaction will harm competition for the production and sale of refined sugar in two markets: a "Southeastern market" (an amalgam of states from Florida to north of the Mason–Dixon line) and a "Georgia Plus market" (including Georgia and the states that touch it). Both are flawed. The law is clear that geographic market definition requires ascertaining customers' supplier choices in the context of "commercial realities": who sells what where, how far product travels to customers, and which suppliers can expand or reposition to meet demand in the event of a price increase. Plaintiff's proposed geographic markets, however, have nothing to do with commercial realities. Plaintiff's Southeastern market includes Delaware, West Virginia, and Maryland, even though Imperial sells more sugar in Texas, Indiana, Pennsylvania, Ohio, Missouri, and New Jersey. Plaintiff's Georgia Plus market includes Florida and Alabama, but not Texas or Indiana where Imperial sells substantially more sugar. The reason for Plaintiff's gerrymandering is obvious—Plaintiff must show high combined shares to claim a presumption of

---

[1] America's Supply Chains, Proclamation No. 14,017, 86 Fed. Reg. 11,849 (Feb. 24, 2021).

anticompetitive effect. It can't. Plaintiff's entire case is premised on flawed logic regarding competition, and a disregard for how sugar moves around the U.S. to fulfill demand.

Plaintiff's failure to prove a relevant market should end the Court's legal analysis, but there are other reasons why Plaintiff will be unable to carry its burden. Chief among those is that the facts preclude a finding of anticompetitive effects. There is no evidence showing that the purpose or effect of this deal will be to raise prices. Nor could it—Imperial is a high-priced, import-reliant supplier that does not constrain refined sugar prices today. Likewise, Plaintiff has not amassed testimony showing wide-ranging, representative customer concerns that the transaction will substantially increase prices anywhere. Plaintiff seeks to block a transaction to protect customers who do not need protecting: there are many sources of refined sugar today and almost half of the refined sugar purchased in the southeast comes from suppliers outside of the southeast, including suppliers that are expanding. The numerous suppliers that customers can turn to during their bid processes will remain. Nor can Plaintiff show that the transaction will result in price increases based on purported information exchanges by companies other than the merging parties. It is virtually unprecedented for a court to block a merger solely on "coordinated effects" evidence, and no court has done so on a similar dearth of evidence.

Beyond the facts, the crux of Plaintiff's argument that it can show anticompetitive effects is based on an expert opinion that (1) would find any region where Imperial and United Sugars Corporation ("United") (the cooperative that sells U.S. Sugar's refined sugar) compete to be a relevant market, from a single plant to a kaleidoscope of states to the entire United States; (2) is based on an economic model that does not apply to homogeneous products and which has been previously rejected; and (3) the transaction will result in unilateral effects that are within a recognized safe harbor (and therefore are not "substantial"). This is not enough.

Compounding matters, the USDA has the authority and ability to regulate imports and ensure that a "reasonable supply" of refined sugar is available at a "reasonable price." That fact debunks any claim that the transaction will allow the merged firm to increase prices. The person charged with overseeing the regulation of the import, production, and supply of sugar is a Ph.D. economist employed by Plaintiff at the USDA. She will testify *for Defendants* that customers will benefit from the transaction, competition will insulate customers from any price increase, and the USDA can increase imports if prices do increase, with the effect of *reducing* prices.

In short, Plaintiff attempts to concoct a market not recognized by anyone in the industry, and to inflate the merging parties' shares of that fictitious market, all to try to shoehorn itself into a presumption in its Merger Guidelines that the transaction is anticompetitive. The law has no tolerance for this. *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018) ("[L]egal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law."). And, regardless, the facts do not support a finding that the transaction will *likely result in substantial anticompetitive effects*, as the law requires. Plaintiff cannot carry its burden and the Court should deny its request to block the transaction.

## STATEMENT OF FACTS

### I.    The Sale Of Refined Sugar Is Highly Competitive Across The U.S.

Refined sugar demand and supply are unevenly distributed across the U.S. and, as one would expect in a well-functioning market, refined sugar flows from regions of surplus to regions of deficit. It flows from the south into the northeast, from the west to the midwest, and from the midwest into the south and northeast. *Indeed, large quantities of beet sugar grown and processed in Minnesota, Michigan, and states to their west are sold in Plaintiff's Southeast region.* Sugar is also imported in large quantities into ports in the south. Sugar is able to economically flow long distances because freight costs depend not just on geographical distance but also on other factors

such as backhaul rates, railroad interchanges, and rate structures. The flow of refined sugar across the U.S. enables suppliers to effectively serve customers located far outside of their immediate geographic area. Suppliers across the country compete to sell refined sugar to wholesale customers across the U.S. in direct competition with United and Imperial, including:

*Cargill/LSR.* LSR produces 17 million hundredweight (100 pounds or "cwt") of refined sugar a year at its refinery in Louisiana, which is in the process of being expanded. Cargill sells all the sugar refined by LSR through a distribution network that includes Cargill terminals and liquid sugar manufacturing facilities in Maryland and Tennessee and third-party facilities in ███████████████████████████████████, and ████. Cargill is expanding its sales portfolio to sell the additional sugar that LSR plans to refine and competes intensely for customers across the country, including in the southeast. Cargill currently supplies customers such as ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████. Cargill is also targeting ██████████████████████████████████████████, as potential growth opportunities in the future due to the ongoing LSR expansion.

*CSC Sugar.* CSC operates plants that convert raw sugar into liquid sugar and repackage dry sugar. Its refineries are located in (1) Covington, Tennessee; (2) Dallas, Texas; (3) El Paso, Texas; (4) Fairless Hills, Pennsylvania; and (5) Harrisonburg, Virginia. CSC is a disruptor in the sugar refining industry and has built multiple micro-refineries at which it produces refined liquid sugar. CSC's micro-refineries are often built in close proximity to customer locations, and CSC has already built a number in or near the Plaintiff's Southeast. CSC's micro-refineries can be built in ████████ for about ████████, which means that CSC can quickly respond to any increase in prices (or customers can sponsor CSC's expansion).

***Distributors.***  Large and active distributors include ADM, Batory Foods, Evergreen, Indiana Sugars, Pullman, Sweeteners Plus, and Sweetener Supply.  They purchase imported refined sugar or domestic refined sugar from a variety of sellers, and often add value for customers in the form of repackaging bulk rail sugar into bagged sugar or changing the form of sugar (e.g., melting raw or refined sugar into liquid sugar, producing powdered sugar from granulated sugar).  Distributors compete on price against their suppliers because they buy, store, and sell sugar opportunistically.  Distributors also have networks, including transfer stations, that allow them to store and cost-effectively transport sugar.  Distributors compete intensely for sales to customers across the U.S., including in the southeast.  For example, Indiana Sugars sold to large customers such as █████████████████████████████████████████████████████████████████ ████████████████████████████.  Batory Foods is a large distributor that sells to customers in ████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████.

***Domino/ASR.***  Domino has sugar refineries located in (1) Baltimore, Maryland; (2) Chalmette, Louisiana; (3) Crockett, California; (4) Okeelanta, Florida; and (5) Yonkers, New York.  Domino supplies many companies, including █████████████████████████████ ████████████████████████████████████████.

***Michigan Sugar.***  Michigan has four sugar beet processing facilities, a powdered sugar production facility in Michigan, and a liquid sucrose production facility and two bulk storage facilities in Ohio.  It is undertaking improvements that will increase its output, and enable it to increase sales into states like ████████████████████████████████████████████.

***NSM.***  NSM is a marketing cooperative that arranges the sales, marketing, packaging, and distribution of refined sugar produced by Amalgamated Sugar and the Southern Minnesota Beet

Sugar Cooperative. NSM also markets refined sugar that Sucden Americas imports into the U.S., including refined sugar imports into Plaintiff's Southeast. NSM is a large supplier to customers across the country, including in Plaintiff's Southeast, such as ███████████████████ ████████████████████████████████████████████████████████████ ███████████████████.

**Western.** Western grows sugar beets in Colorado, Montana, Nebraska, and Wyoming. It processes sugar beets in four facilities, one in each state. Western ships refined sugar into Plaintiff's claimed markets, including to █████████████████████████████████████.

## II.    The USDA's Role In Regulating Supply And Price

The sale of raw and refined sugar is highly regulated by a series of statutes, regulations, and international trade agreements known, collectively, as the Sugar Program. USDA operates the Sugar Program to ensure "adequate supplies of both raw and refined sugar *at reasonable prices*." The Sugar Program gives USDA a series of tools to control supply, because controlling supply is one way that the Government can seek to influence price.

Barbara Fecso, a Ph.D. economist with over 25 years of experience at USDA and the longest-tenured USDA employee managing the Sugar Program, believes that the proposed transaction (1) will not harm competition or result in higher sugar prices; (2) will benefit the domestic sugar industry, and (3) is likely to result in *lower* prices. Even if United tried to increase prices post-transaction, competitors would respond to undercut those prices, or USDA would use any of its many tools to increase supply and reduce prices, as Dr. Fecso confirmed. The possibility that USDA can increase supply and reduce price is not just theoretical: USDA has taken such actions when the supply of sugar is inadequate.

### III. Absent The Proposed Transaction, Imperial Will Continue To Struggle and Decline In Competitive Significance

Imperial struggles today to compete on price with firms that market domestically sourced sugar because its cost structure is inherently higher due to its reliance on imports, including imports on which it must pay high tariffs. Imperial's higher input costs translate to higher prices to customers. Imperial's parent, LDC, has been unsuccessfully seeking to sell the Imperial refinery for years. If U.S. Sugar is unable to acquire Imperial, Imperial is likely to continue its decline.

### IV. The Proposed Transaction Will Revitalize Imperial and Benefit Customers

With this transaction, U.S. Sugar seeks to integrate its sugar cane farming operations with Imperial's refinery to create a more competitive, cost-effective, and efficient refinery. The transaction will result in a number of improvements, including:

***Improved Raw Sugar Supply.*** Unlike most producers, Imperial has no committed raw sugar source and must buy raw sugar to make refined sugar. Due to increasing domestic demand for raw sugar, Imperial has increasingly turned to expensive foreign imports. This means that its refinery has higher input costs and that it makes no sense to invest to expand its production. U.S. Sugar grows more sugar cane than it can currently process. Post-transaction, U.S. Sugar will be able to send raw sugar to be refined at Imperial's facility.

***Increased Output.*** Consistent with its operating philosophy, U.S. Sugar plans to increase production to reduce unit costs and run the Imperial refinery at or near its full production capacity. U.S. Sugar increased its own production by over 36 percent between 2015 and 2020.

***Transportation Cost Savings.*** Shipping and logistics savings will also reduce Imperial's costs relative to today. Bringing Imperial's production into the United cooperative is expected to achieve at least $12-13 million in shipping and logistics efficiencies. These savings will benefit

customers by allowing United to offer lower delivered costs to customers and also force other suppliers to compete with lower prices of their own.

*Better Supply Security For Customers.* With Imperial, U.S. Sugar and United will have supply-chain flexibility to meet demand and protect against natural disasters or other calamities.

## ARGUMENT

Section 7 of the Clayton Act only prohibits transactions if "the effect of such acquisition may be *substantially* to lessen competition." 15 U.S.C. § 18 (emphasis added); *see also Int'l Shoe Co. v. F.T.C.*, 280 U.S. 291, 298 (1930) (noting that "some lessening of competition, is not forbidden"). A "mere possibility" of harm will not suffice. *United States v. Sabre Corp.*, 452 F. Supp. 3d 97, 135 (D. Del. 2020). Rather, Plaintiff must prove "that a substantial lessening of competition will be sufficiently probable and imminent to warrant relief." *F.T.C. v. Arch Coal*, 329 F. Supp. 2d 109, 115 (D.D.C. 2004). Under Section 7, Plaintiff must "establish[] a prima facie case that the proposed merger is anticompetitive by (1) identifying the proper relevant market and (2) showing that the effects of the merger are likely to be anticompetitive." *Sabre*, 452 F. Supp. 3d at 135; *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 363 (1963). The linchpin of this standard is Plaintiff's obligation to prove a relevant market; its failure to do so means the Court must conclude Plaintiff has not carried its initial burden as a matter of law. *Sabre*, 452 F. Supp. 3d at 144. If Plaintiff carries its initial burden, once Defendants show that Plaintiff's prima facie case inaccurately predicts the merger's effects in the relevant market, the "burden of production shifts back to the [g]overnment," *id.* at 135, to show the merger will "substantially lessen competition" in the relevant market. *Id.*

## I. Plaintiff Cannot Carry Its Burden To Prove Its Proffered Markets

Plaintiff bases its case on a market definition that bears no connection to reality, defies common sense, and is unsupported by facts or reliable economic analysis. Plaintiff must prove a

relevant product market *and* a relevant geographic market.  Market definition is a "pragmatic" and "factual" exercise, "not a formal, legalistic one," *Brown Shoe Co. v. United States*, 370 U.S. 294, 336 (1962), and is designed to determine the "area of effective competition," *Sabre*, 452 F. Supp. 3d at 135, consistent with "the commercial realities of the industry."  *Brown Shoe*, 370 U.S. at 336. To determine if the market corresponds to the "commercial realities" of the industry, courts rely on the *Brown Shoe* factors: "industry or public recognition of the [relevant market] as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors."  *Id.* at 325.  Plaintiff's proposed markets fail this test.

### A. Plaintiff's "Production and Sale" Market Arbitrarily Excludes Distributors And Plaintiff Ignores Half of Wholesale Customers

A properly defined product market must include all products that (1) are "reasonabl[y] interchangeable," meaning that consumers can substitute the use of one product for another, and (2) demonstrate cross-elasticity of demand, meaning that consumers will substitute those products in response to changing prices.  *See Sabre*, 452 F. Supp. 3d at 139.  Product markets are under-inclusive if they fail to include all reasonably interchangeable products that constrain a defendant's pricing and cannot be determined by the anecdotal preferences of a subset of customers because "the issue is not what [products] the customers would *like* or *prefer*," but rather "what they *could* do" in the event of a post-merger price increase.  *United States v. Oracle*, 331 F. Supp. 2d 1098, 1131-32 (N.D. Cal. 2004).  Plaintiff does not dispute that distributors sell refined sugar that is "reasonably interchangeable by [customers] for the same purposes."  *Sabre*, 452 F. Supp. 3d at 142.  Instead, it argues that the product market should *exclude* distributors because they source some of their refined sugar from the merging parties—and other domestic suppliers—and therefore such distributors will not be price competitive post-closing.  Many distributors have multiple

sources of supply, including imported sugar. Plaintiff's contention that distributors are competitively irrelevant is factually wrong, and its basis for arguing that they should be gerrymandered out of the market is untenable as a matter of law. *See, e.g.*, *PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 418 (5th Cir. 2010) (rejecting "wholesale" market because "market definition must focus on the product rather than the distribution level").

Moreover, Plaintiff could have defined a market limited to wholesale industrial customers (such as Kraft), but did not do so. Notably, there is a total failure of proof as to *half* of the wholesale sales of refined sugar in Plaintiff's claimed market, namely sales to retailers such as Dollar General or Kroger, food service companies such as Sysco, and restaurant chains such as Dunkin Donuts.

### B. Plaintiff Fails To Carry Its Burden To Prove A Relevant Geographic Market

Geographic market definition is a pragmatic exercise intended to assess the "commercial realities of the industry." *F.T.C. v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 338 (3d Cir. 2016). Plaintiff bears the burden to define the geographic market, which is the "area in which a potential buyer may rationally look for the goods or services he seeks." *Id.* Courts look at real-world factors including "where the parties market their products; the size, cumbersomeness, and perishability of the products; regulatory requirements impeding the free flow of competing goods . . . ; shipping costs and limitations; [and] the area within which the defendant and its competitors view themselves as competing." *E.I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 442-43 (4th Cir. 2011). If customers turn to suppliers outside a proposed geographic market, the market is too narrow. *See Sabre*, 452 F. Supp. 3d at 142-43 (rejecting market that failed to account for sales originating outside the relevant market); *Oracle*, 331 F. Supp. 2d at 1161 ("exports or imports greater than 10% suggest that the market examined is not a relevant market").

1.    **Plaintiff's Geographic Markets Are Arbitrary and Inconsistent With Commercial Realities**

More than a dozen firms sell refined sugar today in Plaintiff's geographic markets. Additional firms have the opportunity to reposition if needed. Plaintiff's gerrymandered areas are not properly defined geographic markets under the law and are inconsistent with the realities of the refined sugar industry and the flow of sugar throughout the U.S. As an example, even though Plaintiff includes Delaware in its geographic market, Imperial sells more sugar to customers in multiple states that Plaintiff excludes from its market, such as Texas, Indiana, and Pennsylvania.[2] Sugar flows cost-effectively throughout the U.S. from areas of excess supply to areas of demand, well beyond the arbitrary confines of Plaintiff's proposed geographic markets. A nationwide network of railroads, interstate highways, and transfer stations allows customers to buy refined sugar at competitive prices from suppliers located throughout the country.

Customers inside Plaintiff's alleged geographic markets source refined sugar from suppliers located outside those areas; nearly half of the sugar sold in Plaintiff's Southeast market is shipped from outside of it. For example, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

Moreover, refined sugar suppliers can and do quickly shift sales to meet demand. Cargill

---

[2] In its opposition to Defendants' motion to transfer, Plaintiff asserted that "Defendants are also the largest sellers of sugar to customers in Delaware." D.I. 30 at 2. That claim is wrong, as ████████

is currently expanding its sales portfolio to sell the additional sugar that LSR plans to refine as part of its expansion. Michigan is expanding. Likewise, CSC and others have a history of quickly building micro-refineries in close proximity to customer locations in response to demand.

### 2. Plaintiff's Expert Dr. Rothman Provides No Reason To Ignore Clear Commercial Realties

Plaintiff attempts to justify its geographic market by claiming that its markets are "logical" because "geographic proximity to wholesale customers matters" and "United and Imperial operate refineries" that are "well-situated to supply wholesale customers" in Plaintiff's claimed markets. There are many issues with this contention. For starters, Plaintiff will claim that Dr. Rothman's analysis of the Plaintiff's alleged markets indicates that they pass the "hypothetical monopolist test" and, therefore, proper. However, Dr. Rothman admitted that, according to his analysis, any geographic space where United and Imperial both sell products—whether it be a single plant; a collection of states; or the entire United States—would constitute a relevant geographic market. This admission shows that Dr. Rothman's approach has no limiting principle and makes his conclusions inconsistent with real-world evidence and unhelpful to the Court in figuring out where to analyze the potential effects of the merger. *See F.T.C. v. Thomas Jefferson Univ.*, 505 F. Supp. 3d 522, 541 (E.D. Pa. 2020) ("geographic market determination is not merely a 'statistical exercise' looking for a hypothetical monopolist that can [increase prices]").

Additionally, transportation costs standing alone are not a reason to define a market narrowly. This is because if customers pay different prices *due to different costs*, the fact that some pay higher prices cannot be attributed to market power, but is instead due to the fact that the costs to serve are different. *See* Areeda, Antitrust Law ¶ 517b (2021) (explaining that price discrimination cannot be used as a basis to infer market power "without reference to costs, for price differences on sales to different buyers are not discriminatory if costs differ in the same

proportion"); *id.* ¶ 517c1 (explaining why cost differentials are not a basis for inferring market power). For this reason, courts have found that markets for commodities are broad even where the product must travel long distances. *See RSR Corp. v. F.T.C.*, 602 F.2d 1317, 1323 (9th Cir. 1979) (finding nationwide geographic market notwithstanding high trucking costs). Defendants' expert economist, Dr. Hill, took Dr. Rothman and Plaintiff at their word regarding the importance of transportation costs and analyzed competition focusing on transportation costs by building an economic model and showing that Dr. Rothman is wrong. In his Reply Report, Dr. Rothman walks away from the importance of transportation costs—which just serves to demonstrate that the "logic" underlying Plaintiff's claimed geographic markets is flawed.

The commercial realities are that (1) suppliers outside of the claimed markets supply close to half of the refined sugar purchased by wholesale customers in those claimed markets, and (2) sugar prices in Plaintiff's markets are not systemically different from prices in the rest of the country—precisely because suppliers can and do ship refined sugar thousands of miles to areas of demand. Plaintiff's geographic markets bear no resemblance to the commercial realities of the industry and the Court should reject them. *Sabre*, 452 F. Supp. 3d at 143 (finding the "DOJ's geographic market is a 'contortion'" where it purposefully excluded a category of suppliers from the market); *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 683 (4th Cir. 2016) (district court "was not required to accept uncritically two market definitions . . . that coincidentally fit plaintiff's precise circumstances"). Dr. Rothman has previously attempted to define markets on two occasions and both times the Government was held not to have carried its burden under Section 7. *See, e.g.*, *In re Altria Grp., Inc. & JUUL Labs, Inc.*, No. 9393, 2022 WL 622476, at *55, 70 n.37 (F.T.C. Feb. 23, 2022) ("Dr. Rothman's post-Transaction HHI calculations are not

economically sound."); *F.T.C. v. RAG-Stiftung*, 436 F. Supp. 3d 278, 299 (D.D.C. 2020) ("*Evonik*") (rejecting alleged relevant market). The Court should do the same here.

### C. Plaintiff's Failure to Define a Proper Relevant Market Is Dispositive

Having failed to define a relevant market, Plaintiff cannot show that the transaction is likely to substantially reduce competition. Its case fails on that basis. *Sabre*, 452 F. Supp. 3d at 144.

## II. Plaintiff Cannot Carry Its Burden To Show That The Transaction Is Likely To Lead To a Substantial Reduction of Competition In Its Relevant Market

To carry its ultimate burden, Plaintiff must prove that the transaction is likely to have "substantial" anticompetitive effects in a relevant market.[3] Critically, Plaintiff has not identified a single ordinary course of business document that shows this transaction will have the effect of raising prices. That is a big problem for Plaintiff's case. *Sabre*, 452 F. Supp. 3d at 147 (holding Plaintiff did not carry its burden where the documentary evidence showed that there was no plan to raise prices). Where Plaintiff's theory is that the transaction will result in a loss of head-to-head competition that will force customers to pay higher prices, it must show that "a forward-looking analysis" proves that, post-merger, the acquirer likely will raise prices. *Id.* at 146.

In cases where Plaintiff has prevailed, it has virtually always carried this burden by showing that a merger would enable the acquirer to unilaterally increase price or reduce output

---

[3] Defendants will offer evidence sufficient to rebut the initial presumption, including evidence: (1) that competitors can reposition and enter from different regions or expand output, *Sabre*, 452 F. Supp. 3d at 145; (2) of "sophisticat[ed]" customers that "closely examine available options and typically insist on receiving multiple, confidential bids for each order" and are "likely to promote competition even in a highly concentrated market," *United States v. Baker Hughes*, 908 F.2d 981, 986 (D.C. Cir. 1990); *Evonik*, 436 F. Supp. 3d at 315; (3) that the Government's statistics regarding post-merger concentration fail to accurately portray the merging company's weak competitive stature given Imperial's declining competitive significance, *United States v. Gen. Dynamics Corp.*, 415 U.S. 486 (1974); and (4) that market-share statistics derived from Plaintiff's markets "produce an inaccurate account of the merger's probable effects on competition in the relevant market," *Arch Coal*, 329 F. Supp. 2d at 116.

post-transaction. But there is so much competition here that Plaintiff cannot do that. Plaintiff is left with the more onerous burden of showing that this is the exceptional case where the Court should block the transaction **solely** because the transaction likely will result in these same substantial effects by facilitating coordination. The evidence on this falls far short as well.

### A. Plaintiff Cannot Show That U.S. Sugar's Control Over Imperial Sugar Will Result In Anticompetitive Unilateral Effects

To prove unilateral effects, Plaintiff must show that the transaction "will eliminate direct competition between the two merging firms, even if all other firms in the market continue to compete independently" *and* that doing so will result in anticompetitive effects in the form of an increase in price or a reduction in output. *Oracle*, 331 F. Supp. 2d at 1113. It is insufficient to merely point out that the merging parties sometimes compete for the sale of refined sugar. Rather, Plaintiff must demonstrate that the transaction will remove an important competitive constraint and will enable prices to rise substantially post-merger. Plaintiff cannot meet this burden.

Market conditions needed to demonstrate unilateral effects do not exist here. First, unilateral effects are unlikely to arise here, where customers can turn to other suppliers in response to a price increase. *Id.* at 1117-18. Second, unilateral effects are unlikely in bidding markets— like the sugar industry—where customers can seek (or threaten to seek) to obtain bids from alternative suppliers. Third, for homogeneous products like sugar, Plaintiff's own Merger Guidelines and case law emphasize that unilateral effects are most likely to arise if a firm can engage in "a unilateral output suppression strategy," Horizontal Merger Guidelines § 6.3 (2010) ("Guidelines"), such that competition, entry, and expansion is unlikely to defeat an attempted price increase. Without that evidence, unilateral effects are implausible. *See, e.g.*, *Ball Mem'l Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1335 (7th Cir. 1986) ("a firm's share of current

sales does not reflect an ability to reduce the total output in the market" or convey "power over price" where firms can enter the market to "counteract a reduction in output").

Plaintiff and Dr. Rothman combine U.S. Sugar's supply with those of United's beet members to arrive at higher market shares. But doing so reveals a flaw with any unilateral effects theory: *U.S. Sugar intends to increase output of sugar and United must sell all of the sugar supplied by its members*. As Dr. Rothman's opening report explained, "a firm that produces a greater quantity will sell more units, but it will likely need to offer lower prices to do so." As Dr. Hill also explains, because United is an agricultural cooperative that does not control its members' output, it cannot engage in an "output suppression strategy" that could increase prices. Setting this aside, Defendants expect Plaintiff will offer two categories of evidence to show unilateral effects: isolated examples of head-to-head competition and Dr. Rothman's opinions. Neither is sufficient.

### 1. A Handful of Examples Of Head-to-Head Competition Do Not Demonstrate The Transaction Will Substantially Lessen Competition

Plaintiff's theory cannot be that Defendants compete today and occasionally reduce prices in response to the other. Instead, Plaintiff must show that Defendants' head-to-head competition is so significant that its removal means Defendants will likely inflict *substantial* anticompetitive harm to the relevant market—not simply to a few customers. Defendants expect that Plaintiff's direct evidence of unilateral effects will rest on a few factual vignettes designed to create the impression that there are instances of competition that exist today that will not exist in the future. These examples border on statistically irrelevant when one considers there are thousands of customers engaging in negotiations with many suppliers every year; indeed, Dr. Rothman did not quantitatively analyze the frequency in which the parties compete head-to-head and, therefore, cannot establish that these examples show the deal is likely to substantially harm competition. The loss of a few instances of head-to-head competition does not show unilateral effects where rivals

will remain and threaten to steal business and "likely further constrain [the buyer's] ability to raise prices." *Sabre*, 452 F. Supp. 3d at 147.

### 2. Dr. Rothman's Opinions Do Not Demonstrate The Transaction Will Result In Unilateral Effects

There are many problems with Dr. Rothman's analysis. First, although he is not a Ph.D. economist, Dr. Rothman ran economic models to attempt to show post-acquisition price effects, but he admits he got the formula wrong.[4] Second, and as a result, *the predicted price effects went down by over 50%*, from 6.8% in his opening report to 3.2% in his reply report. If the projected price effect is small, significant unilateral price effects are unlikely, which Dr. Rothman proves.[5] Third, his approach relies on an upward pricing pressure analysis which, according to Plaintiff's Guidelines, is appropriate for differentiated products; refined sugar is a commodity. Fourth, Dr. Hill's properly applied models show predicted price effects well below 1%. The transaction will not have substantial unilateral effects and Dr. Rothman fails to present evidence to the contrary.

### B. Plaintiff Cannot Carry Its Burden Based On A Coordinated Effects Theory

Plaintiff attempts to distract from the fatal flaws of its case by trying to establish supposedly improper information exchanges between United and Domino, neither of which is a party to the deal. Plaintiff cannot show that the transaction creates the likelihood of an explicit agreement to coordinate or "tacit" coordination, to enable the market participants to "restrict output and achieve

---

[4] Dr. Rothman's use of the same model was rejected as "unreliable" in *Evonik*, 436 F. Supp. 3d at 319 n.33, for three reasons that apply here: (1) the product at issue is not a differentiated product (see Guidelines § 6.1); (2) customers have substantial bargaining power; and (3) Dr. Rothman provides no evidence of actual pass through rates.

[5] The results of Dr. Rothman's gross upward pricing pressure index ("GUPPI") analysis also confirm the merger is unlikely to result in unilateral price effects. As a Guidelines drafter explained, "unilateral price effects for a given product are unlikely if the [GUPPI] for that product is less than 5%" and Dr. Rothman's GUPPI estimates for the combined firm were all below 5%. *See* Carl Shapiro, U.S. Dep't of J., *Update from the Antitrust Division*, Remarks for the ABA Antitrust Fall Forum 24 (Nov. 18, 2010).

profits above competitive levels." *Evonik*, 436 F. Supp. 3d at 313. Rather, the evidence is that (i) the characteristics of the sugar industry and the agricultural cooperatives that participate in it make the industry ill-suited to coordination, (ii) there has been no coordination between United and Domino, and (iii) the transaction in no way makes the industry more susceptible to coordination.

Plaintiff must establish that the industry is conducive to coordination and then must show that "the merger may enhance that vulnerability." *Id.* (quoting Guidelines § 7.1). Neither of these elements can be met. The refined sugar industry is not conducive to coordination. Critically, several major suppliers—United, NSM, Michigan, and Western—are structured as cooperatives. That means they are obligated to sell all of the sugar each of their members produce each year, even though they have no control over the volume that each member decides to produce. Thus, major suppliers are simply unable to withhold supply in order to try to raise prices.

Other characteristics underscore why this industry is not susceptible to coordination and why Dr. Rothman's opinions on coordinated effects should be rejected for the same reasons as they were in *Evonik*. Refined sugar is sold pursuant to **RFPs** that incentivize suppliers to submit aggressive bids. *See Evonik*, 436 F. Supp. 3d at 314; *Arch Coal*, 329 F. Supp. 2d at 143-44. The vast majority of refined sugar sales are for **large, annual contracts** where each sale is high stakes. *See Evonik*, 436 F. Supp. 3d at 314-15. **Actual transaction prices between suppliers and customers are kept confidential**. *See id.* at 315-16. Refined sugar is sold to **sophisticated and powerful customers** like General Mills, Kraft, Post, PepsiCo, McKee, and Hershey, which are well equipped to defeat any attempted coordination. *Id.* at 315. And refined sugar sales have **heterogeneous and unpredictable pricing**—sugar is priced on a delivered basis to customer locations that incorporates freight cost and other cost differentials. *See id.* at 316 (finding pricing heterogeneous where freight was a factor in pricing).

Plaintiff will not be able to establish that the proposed transaction will make the refined sugar industry more susceptible to coordination. Where, as here, a transaction involves the loss of a firm that does not behave as a "maverick" (i.e., a disruptive competitor), courts find that the transaction is unlikely to lead to increased coordination. *Arch Coal*, 329 F. Supp. 2d at 150. Imperial is not a maverick: it has higher costs and consequently higher prices than nearly every other sugar supplier. Further, pricing mavericks like Cargill and CSC will remain post-transaction, are expanding, and thus will have even more incentive to price aggressively to sell additional volumes. *See New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 235 (S.D.N.Y. 2020) (finding remaining pricing mavericks as a reason why increased coordination was not likely).

Plaintiff's assertions regarding the sharing of spot prices with third-party analysts changes none of this. Spot prices are list prices, and are neither confidential nor difficult to obtain. United's spot prices are available 24/7 to customers through a portal on its website. Information relating to spot prices, crop performance, and demand for refined sugar is regularly provided to customers, brokers that work for customers, and Plaintiff's own agency and industry regulator, the USDA.[6] Plaintiff cannot present evidence of actual coordination between United and Domino because United does not use competitor spot pricing in negotiating and setting individual customer prices.

### C.  Plaintiff's Role In Regulating Output Undercuts Any Prospect That The Transaction Will Have Sustained Anticompetitive Effects

Plaintiff must show the transaction likely will result in durable market power that will produce a sustained, non-transitory price increase. *Areeda*, ¶ 506d (noting "substantial market

---

[6] Because this information is relevant to customers, third-party analysts also collect and publish it in newsletters and other customer communications. USDA publishes similar information on a monthly basis as part of its stated desire to "facilitate information sharing among stakeholders and generate the transparency that leads to well-functioning open markets." Even direct information exchanges can benefit consumers, help regulatory efficiency, and "render markets more, rather than less, competitive." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978).

power can persist only when there are significant and continuing barriers to expansion and entry" and "transitory power may safely be ignored by antitrust law"). The USDA's active role in regulating output further undercuts the prospect of anticompetitive effects.

A merger must be "viewed[] in the context of its particular industry," and only a close "examination of the particular market—its structure, history and probable future—can provide the appropriate setting for judging the probable anticompetitive effect of the merger." *Brown Shoe*, 370 U.S. at 321-22 & n.38. Underscoring this is the principle that the analysis of anticompetitive effects must consider the impact of overlapping industry regulation. *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 411 (2004) (antitrust analysis must be "attuned to the particular structure and circumstances of the industry at issue," including parallel regulation); *see Concord v. Bos. Edison Co.*, 915 F.2d 17, 22 (1st Cir. 1990) (Breyer, J.) (same).

In this context, it would be improper to ignore the regulated nature of the sugar industry by the USDA, which "endow[s] the industry with special characteristics," *United States v. Nat'l Ass'n of Broads.*, 536 F. Supp. 149, 156 (D.D.C. 1982), and "may accomplish the same end" as Section 7 of the Clayton Act, *United States v. F.C.C.*, 652 F.2d 72, 106 (D.C. Cir. 1980) (en banc). The USDA regulates supply and entry. *United States v. Marine Bancorp.*, 418 U.S. 602, 627, 639 (1974) (dismissing challenge to a bank merger; noting Section 7 "must take into account the unique federal and state regulatory restraints on entry into that line of commerce"); *see also Verizon Commc'ns*, 540 U.S. at 413 (finding the FCC's regulatory regime facilitated entry and therefore was a reason to decline to find antitrust liability). The Court should be wary of any suggestion that the USDA's role in regulating imports and output is irrelevant to the competitive effects assessment—particularly where there is no factual or economic basis for finding that those effects are substantial.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Brian P. Egan*

Jack B. Blumenfeld (#1014)
Brian P. Egan (#6227)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
began@morrisnichols.com

*Attorneys for Defendant United States Sugar Corporation*

OF COUNSEL:

Lawrence E. Buterman
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

Amanda P. Reeves
Jennifer L. Giordano
Lindsey S. Champlin
Molly M. Barron
David L. Johnson
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004-1304
(202) 637-2200

Christopher S. Yates
Kelly Smith Fayne
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600

Elyse M. Greenwald
LATHAM & WATKINS LLP
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
(213) 485-1234

HOGAN MCDANIEL

*/s/ Daniel K. Hogan*

OF COUNSEL:

Peter J. Schwingler
Jonathan Ripa
STINSON LLP
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
(612) 335-1974

Daniel K. Hogan (#2814)
Daniel C. Kerrick (#5027)
1311 Delaware Avenue, Suite 1
Wilmington, DE 19806
(302) 656-7540
dan@dkhogan.com
dckerrick@dkhogan.com

*Attorneys for Defendant United Sugars Corporation*

RICHARDS, LAYTON & FINGER, P.A.

*/s/ Kelly E. Farnan*

OF COUNSEL:

Christine A. Varney
David R. Marriott
Peter T. Barbur
Timothy G. Cameron
Daniel K. Zach
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019

Amanda L. Wait
Vic Domen
NORTON ROSE FULBRIGHT US LLP
799 Ninth Street, NW, Suite 1000
Washington, DC 20001
(202) 662-4550

Darryl Wade Anderson
NORTON ROSE FULBRIGHT US LLP
1301 McKinney St. Suite 5100
Houston, TX 77010
(713) 651-5562

April 11, 2022

Kelly E. Farnan (#4395)
920 N. King St.
Wilmington, DE 19801
(302) 651-7700
farnan@rlf.com

*Attorneys for Defendants Imperial Sugar Company and Louis Dreyfus Company LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on April 15, 2022, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on April 15, 2022, upon the following in the manner indicated:

Laura D. Hatcher, Esquire                    *VIA ELECTRONIC MAIL*
Shamoor Anis, Esquire
UNITED STATES ATTORNEY'S OFFICE
DISTRICT OF DELAWARE
1313 North Market Street, Suite 400
Wilmington, DE  19801
*Attorneys for Plaintiff*

Brian Hanna, Esquire                         *VIA ELECTRONIC MAIL*
John R. Thornburgh II, Esquire
Jonathan Y. Mincer, Esquire
Jessica J. Taticchi, Esquire
Jenigh J. Garrett, Esquire
Chinita M. Sinkler, Esquire
Jill Ptacek, Esquire
Curtis Wayne Strong, Esquire
Michael E. Wolin, Esquire
George C. Nierlich, Esquire
Stephanie E. Pearl, Esquire
Brian R. Young, Esquire
David A. Geiger, Esquire
U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
450 Fifth Street, NW, Suite 8000
Washington, DC  20530
*Attorneys for Plaintiff*

Thomas P. DeMatteo, Esquire                  *VIA ELECTRONIC MAIL*
UNITED STATES DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Avenue NW
Washington, DC  20530
*Attorneys for Plaintiff*

Ryan M. Sandrock, Esquire                                    *VIA ELECTRONIC MAIL*
UNITED STATES DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
450 Golden Gate Avenue
San Francisco, CA  94102
*Attorneys for Plaintiff*


/s/ Brian P. Egan
_____
Brian P. Egan (#6227)