## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              *Plaintiff*,<br><br>     v.<br><br>UNITED STATES SUGAR CORPORATION,<br>UNITED SUGARS CORPORATION,<br>IMPERIAL SUGAR COMPANY, and LOUIS<br>DREYFUS COMPANY LLC.<br>              *Defendants*. | Civil Action No. 1:21-cv-01644-MN<br><br>FILED UNDER SEAL |

## PLAINTIFF UNITED STATES OF AMERICA'S POST-TRIAL BRIEF

**TABLE OF CONTENTS**

I.      INTRODUCTION AND SUMMARY OF ARGUMENT ................................................. 1

II.     THE LEGAL STANDARD FOR MERGER CASES ........................................................ 3

III.    THE EVIDENCE ESTABLISHES TWO RELEVANT GEOGRAPHIC MARKETS FOR
        ANALYZING THIS MERGER ...................................................................................... 5

        A.    Evidence of High Freight Costs Supports the Narrower and Broader Markets...... 6

        B.    Testimony and Ordinary-Course Documents Support the Narrower and Broader
              Markets ........................................................................................................... 9

        C.    The Hypothetical Monopolist Test Confirms the Narrower and Broader Markets
              Are Properly Defined Antitrust Markets ............................................................ 11

        D.    The United States' Geographic Markets Are Well-Grounded in Facts and Law
              ...................................................................................................................... 13

IV.     DISTRIBUTORS ARE PROPERLY EXCLUDED FROM THE RELEVANT MARKET
        AND NOT ASSIGNED MARKET SHARES ................................................................ 15

        A.    Distributors That Do Not Refine Sugar Are Not Sellers in the Product Market .. 15

        B.    Distributors Do Not Independently Constrain Refiners ...................................... 18

V.      MARKET SHARES AND MARKET CONCENTRATION MEASURES EACH SHOW
        THAT THE TRANSACTION IS PRESUMPTIVELY UNLAWFUL ............................ 20

VI.     THE PROPOSED ACQUISITION WOULD ELIMINATE DIRECT COMPETITION
        BETWEEN UNITED AND IMPERIAL, LEADING TO HIGHER PRICES AND
        REDUCED QUALITY ................................................................................................ 23

        A.    United and Imperial Are Close Head-To-Head Competitors Today ................... 24

        B.    Competition Between United and Imperial is Poised to Intensify Absent the
              Transaction .................................................................................................... 27

        C.    Economic Analysis Confirms a Reasonable Probability of Harm from the
              Elimination of Head-to-Head Competition ........................................................ 28

VII.    THE PROPOSED ACQUISITION IS UNLAWFUL BECAUSE IT IS LIKELY TO
        LEAD TO COORDINATED EFFECTS ...................................................................... 30

VIII.   DEFENDANTS HAVE NOT REBUTTED THE UNITED STATES' PRIMA FACIE
        CASE ........................................................................................................................ 34

        A.    Defendants Have Not Proven Imperial Is a Weakened Competitor .................... 34

        B.    Imperial's Higher Cost Structure Does Not Prevent It from Being an Important
              Competitive Constraint .................................................................................... 36

        C.    USDA Regulation Will Not Prevent Harm to Competition ................................. 38

        D.    Defendants Have Not Proven That Expansion Will Offset Anticompetitive Harm
              ...................................................................................................................... 41

        E.    Defendants' Purported Efficiencies Are Not Cognizable and Do Not Offset
              Competitive Harm ........................................................................................... 43

IX.     CONCLUSION .......................................................................................................... 45

# TABLE OF AUTHORITIES

## Cases

*Allen-Myland, Inc. v. International Business Machines Corp.*,
  33 F.3d 194 (3d Cir. 1994) .................................................................................................. 16, 19

*American Crystal Sugar Co. v. Cuban-Am. Sugar Co.*,
  152 F. Supp. 387 (S.D.N.Y. 1957) .......................................................................... 6, 9, 20, 40

*American Crystal Sugar Co. v. Cuban-Am. Sugar Co.*,
  259 F.2d 524 (2d Cir. 1958) ...................................................................................... 6, 9, 40

*American Hospital Supply Corp. v. Hospital Products Ltd.*,
  780 F.2d 589 (7th Cir. 1986) ............................................................................................ 33

*Avnet, Inc. v. FTC*,
  511 F.2d 70 (7th Cir. 1975) .............................................................................................. 16

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962) .................................................................................................. passim

*Chicago Bridge & Iron Co. v. FTC*,
  534 F.3d 410 (5th Cir. 2008) .............................................................................................. 4

*FTC v. Advocate Health Care Network*,
  841 F.3d 460 (7th Cir. 2016) ............................................................................................ 18

*FTC v. CCC Holdings, Inc.*,
  605 F. Supp. 2d 26 (D.D.C. 2009) ................................................................................. 31, 34

*FTC v. Hackensack Meridian Health*,
  30 F.4th 160, 166 (3d Cir. 2022) ................................................................................. passim

*FTC v. H.J. Heinz Co.*,
  246 F.3d 708 (D.C. Cir. 2001) ..................................................................................... passim

*FTC v. Penn State Hershey Medical Center*,
  838 F.3d 327 (3d Cir. 2016) ........................................................................................ passim

*FTC v. Phoebe Putney Health System, Inc.*,
  568 U.S. 216 (2013) ........................................................................................................ 38

*FTC v. Procter & Gamble Co.*,
  386 U.S. 568 (1967) ........................................................................................................ 45

*FTC v. Staples, Inc.*,
  190 F. Supp. 3d 100 (D.D.C. 2016) ............................................................................... 15, 23

*FTC v. Swedish Match,*
  131 F. Supp. 2d 151 (D.D.C. 2000) ............................................................................. 33

*FTC v. Sysco Corp.,*
  113 F. Supp. 3d 1 (D.D.C. 2015) ................................................................................. 23

*FTC v. University Health, Inc.,*
  332 F. Supp. 3d 187 (D.D.C. 2018) ...................................................................... 36, 37

*FTC v. Tronox Ltd.,*
  332 F. Supp. 3d 187 (D.D.C. 2018) ............................................................ 31, 33, 34, 44

*FTC v. Wilh. Wilhelmsen Holding ASA,*
  341 F. Supp. 3d 27 (D.D.C. 2018) ............................................................................... 29

*Geneva Pharmaceuticals Technology Corp. v. Barr Laboratories, Inc.,*
  386 F.3d 485 (2d Cir. 2004) ........................................................................................ 18

*Georgia v. Penn. R.R. Co.,*
  324 U.S. 439 (1945) ..................................................................................................... 40

*Hospital Corp. of America v. FTC,*
  807 F.2d 1381 (7th Cir. 1986) .......................................................................... 3, 28, 33

*Luria Bros. & Co. v. FTC,*
  389 F.2d 847 (3d Cir. 1968) .......................................................................................... 6

*Maryland & Virginia Milk Producers Association v. United States,*
  362 U.S. 458 (1960) ..................................................................................................... 38

*National Gerimedical Hospital & Gerontology Center v. Blue Cross of Kansas City,*
  452 U.S. 378 (1981) ..................................................................................................... 38

*New York v. Deutsche Telekom AG,*
  439 F. Supp. 3d 179 (S.D.N.Y. 2020) .......................................................................... 20

*Promedica Health System, Inc. v. FTC,*
  749 F.3d (6d Cir. 2014) ................................................................................................ 35

*Reynolds Metals Co. v. FTC,*
  309 F.2d 223 (D.C. Cir. 1962) ..................................................................................... 16

*Stanley Works v. FTC,*
  469 F.2d 498 (2d Cir. 1972) ......................................................................................... 27

*United States v. Aetna, Inc.,*
  240 F. Supp. 3d 1 (D.D.C. 2017) .......................................................................... passim

*United States v. Aluminum Co. of America,*
   148 F.2d 416 (2d Cir. 1945).................................................................... 19

*United States v. Anthem, Inc.,*
   236 F. Supp. 3d 171 (D.D.C. 2017) ................................................... passim

*United States v. Anthem, Inc.,*
   855 F.3d 345 (D.C. Cir. 2017) ........................................................... 4, 44

*United States v. Borden Co.,*
   308 U.S. 188 (1939) ............................................................................. 38

*United States v. Connecticut National Bank,*
   418 U.S. 656 (1974) ............................................................................. 13

*United States v. Continental Can Co.,*
   378 U.S. 441 (1964) ............................................................................. 22

*United States v. Dean Foods,*
   No. 10-CV-59, 2010 WL 1417926 (E.D. Wis. Apr. 7, 2010)................... 16

*United States v. El Paso Natural Gas Co.,*
   376 U.S. 651 (1964) ............................................................................. 36

*United States v. Energy Solutions, Inc.,*
   265 F. Supp. 3d 415 (D. Del. 2017)................................................. passim

*United States v. Falstaff Brewing Corp.,*
   410 U.S. 526 (1973) ............................................................................. 16

*United States v. First National State Bancorp.,*
   499 F. Supp. 793 (D.N.J. 1980) .......................................................... 13

*United States v. General Dynamics Corp.,*
   415 U.S. 486 (1974) ............................................................................. 16

*United States v. H & R Block, Inc.,*
   833 F. Supp. 2d 36 (D.D.C. 2011) .................................................. passim

*United States v. Pabst Brewing Co.,*
   384 U.S. 546 (1966) ..................................................................... 5, 13, 16

*United States v. Philadelphia National Bank,*
   374 U.S. 321 (1963) .......................................................................... passim

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP,*
   540 U.S. 398 (2004)......................................................................... 38, 39

**Statutes**

7 U.S.C. §§ 1359bb *et seq.*................................................................. 39

15 U.S.C. § 18 ................................................................................ 1, 3

P.L. 115-334...................................................................................... 41

**Other Authorities**

Dep't of Justice and FTC, Horizontal Merger Guidelines (2010) ....................................... passim

## I.     INTRODUCTION AND SUMMARY OF ARGUMENT

Competition between United and Imperial matters. It saves customers millions of dollars each year and spurs the companies to improve their quality and service. This competition would be lost if U.S. Sugar is allowed to acquire Imperial. Sugar customers across twelve states would be at the mercy of United and Domino, an effective duopoly that would control about three-quarters of the sales in that area. The result would be higher prices, lower quality, and less reliable service for customers from small candy-makers to major bottlers. The proposed acquisition violates the Clayton Act's prohibition on mergers whose effect "may be substantially to lessen competition" in "any section of the country," 15 U.S.C. § 18, and it should be enjoined.

The customers most likely to be hurt by this proposed merger are those found in the narrower and broader markets alleged in the complaint. The narrower market corresponds to what United describes as the "backyard" of Imperial and U.S. Sugar, with the broader market expanding the region further out to capture even more of the competition between Defendants. These markets reflect the commercial reality that sugar is expensive to ship. High freight costs mean that competition from faraway producers is not as significant as competition from nearby ones. And those faraway plants are not effective alternatives for Defendants' customers located in the broader or narrower markets. This is not a novel set of facts; for decades courts have analyzed mergers in industries with high freight costs (including the sugar industry itself) and have consistently defined regional markets. And courts have consistently concluded that such mergers can cause harm in multiple overlapping regional markets, as it does here.

United's and Imperial's significance as competitors in the narrower and broader markets means the merger will result in a substantial increase in concentration in both. Thus, the merger is presumptively illegal. In fact, Defendants are such large competitors that the presumption of illegality extends even to the unnecessarily broad markets suggested by Defendants' expert.

1

Other evidence introduced at trial bolsters the United States' prima facie case. First, because their plants are close together, United and Imperial frequently bid each other's prices down in head-to-head competition that the merger would eliminate. Second, the sugar market is vulnerable to coordination, in particular between United and Domino. That vulnerability would increase as that duo—which already shares information and sends signals to one another in an attempt to avoid price wars—would control about three quarters of the relevant markets. Both the loss of head-to-head competition and the increased risk of coordination provide *independent* grounds for finding the merger illegal even if the Court adopts markets that do not lead to a presumption or finds that Defendants adequately rebutted that presumption.

Of course, Defendants have not actually rebutted the presumption. Their efforts to dispute the borders of the relevant markets are contrary to well-established law and do not undermine the evidence that the merger is likely to harm customers in Defendants' backyards. Their argument that sugar will "flow" from other parts of the country to prevent the harm from this merger ignores Defendants' own documents and the testimony of nearly every witness at trial, including their own executives, that moving sugar long distances is expensive. Defendants' efforts to lean on distributors as a competitive alternative for some customers overlooks the distributors' obvious limitation: distributors do not create any supply, and thus would not be able to constrain the pricing, output, or quality of the combined firm. Distributors "compete" against sugar refiners in the relevant markets by buying sugar from the refiners themselves, or from more-distant (and thus more expensive) refineries, and reselling it with an additional markup. Courts have consistently rejected that such resellers are true competitors that should be included in the market with producers. Defendants' arguments that regulation from USDA can solve the

problems the merger creates ignore both the limitations of those regulations and the long-established role the antitrust laws play in protecting competition in highly regulated industries.

Defendants' final suggestion—that Imperial is so weak as to create no competitive pressure—is squarely refuted by the evidence. The hard data show that Imperial has sold around 20% of the refined sugar purchased in the relevant markets consistently for the past several years. Tr. 611:12–612:1, 630:14–631:4 (Rothman). Each customer reflected in that market share chose Imperial for a reason. Some, like ███████████, picked Imperial in part because it offered the lowest price, *see, e.g.*, ███████████; others, like Pepsi, chose Imperial because it offered better service quality, *see, e.g.*, Tr. 246:10–248:21 (J. Hines); still others, like ████ ████, purchased from Imperial even when it was the *highest* price in order to ensure reliability, *see, e.g.*, ███████████. And other customers, like Danone and ███████████, did not choose Imperial but nevertheless benefited from its presence in the market as an alternative. *See, e.g.*, PTX395 at -857; ███████████. The proposed acquisition would eliminate this meaningful competition, and therefore it should be blocked.

## II.  THE LEGAL STANDARD FOR MERGER CASES

Section 7 of the Clayton Act prohibits one company from buying another when "the effect of such acquisition may be substantially to lessen competition." 15 U.S.C. § 18. As the Third Circuit has emphasized, "Congress used the words '*may be* substantially to lessen competition' to indicate that its concern was with probabilities, not certainties." *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 337 (3d Cir. 2016).

To prevail, the United States need only show a "reasonable probability" that the transaction will result in anticompetitive effects in a relevant market. *United States v. Energy Sols., Inc.*, 265 F. Supp. 3d 415, 435–36 (D. Del. 2017) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 436 (1962)); *see also Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1389 (7th

Cir. 1986) ("Section 7 does not require proof that a merger or other acquisition has caused higher prices in the affected market. All that is necessary is that the merger create an appreciable danger of such consequences in the future."). A relevant antitrust market has two components: a product market ("line of commerce") and a geographic market ("section of the country"). *Brown Shoe*, 370 U.S. at 324.

Courts evaluate Section 7 claims under a burden-shifting framework. *FTC v. Hackensack Meridian Health*, 30 F.4th 160, 166 (3d Cir. 2022). The United States may establish a prima facie case of illegality in any of three ways. First, the United States can establish its prima facie case by "showing that the merger would produce a firm controlling an 'undue percentage of the relevant market' and result in a 'significant increase' in market concentration." *Energy Sols.*, 265 F. Supp. 3d at 440 (quoting *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 362 (1963)). "While there is no bright-line rule . . . the Supreme Court has held that a post-merger market share of 30% triggered the presumption of anticompetitive effects." *Id.* at 441 (citing *Phila. Nat'l Bank*, 374 U.S. at 364). Second, the United States "may establish a prima facie case by showing a high market concentration based on HHI [a concentration metric] numbers alone." *Hackensack*, 30 F.4th at 172. Finally, the United States may also establish its prima facie case through other evidence demonstrating that the merger may lead to anticompetitive effects. *Id.* at 172–73; *Chicago Bridge & Iron Co. v. FTC*, 534 F.3d 410, 433 (5th Cir. 2008).

Once the United States establishes its prima facie case, the burden shifts to Defendants to "sufficiently discredit" the evidence of a prima facie violation or prove that the prima facie case "inaccurately predicts" the likely effects of the merger on competition. *United States v. Anthem, Inc.*, 855 F.3d 345, 349 (D.C. Cir. 2017). Only then does "the burden of production shift[] back to the Government, and merge[] with the ultimate burden of persuasion, which is incumbent on

the Government at all times." *Penn State*, 838 F.3d at 337.

## III.  THE EVIDENCE ESTABLISHES TWO RELEVANT GEOGRAPHIC MARKETS FOR ANALYZING THIS MERGER

"[T]he relevant geographic market is that area in which a potential [customer] may rationally look for the goods or services he seeks." *Penn State*, 838 F.3d at 338. Market definition "is not an end in itself," but rather a tool to help focus the analysis on the customers most likely to be affected by the loss of competition due to a proposed merger. Dep't of Justice and FTC Horizontal Merger Guidelines ("*Guidelines*") § 4 (2010).[1] "Proof of the section of the country where the anticompetitive effect exists is entirely subsidiary to the crucial question . . . whether a merger may substantially lessen competition anywhere in the United States." *United States v. Pabst Brewing Co.*, 384 U.S. 546, 549–50 (1966). Accordingly, contrary to suggestions by Defendants and their economist, the relevant market "is not where the parties to the merger do business or even where they compete, but where, *within* the area of competitive overlap, the effect of the merger on competition will be direct and immediate." *Phila. Nat'l Bank*, 374 U.S. at 357 (emphasis added).

To focus on the customers that the merger would directly and immediately affect, the United States defined two markets in the areas around Imperial's sole refinery in Port Wentworth, Georgia: (i) sales to customers in Georgia and its bordering states (Alabama, Florida, North Carolina, South Carolina, and Tennessee) (the "narrower market") and (ii) sales to customers in the same states plus Delaware, the District of Columbia, Kentucky, Maryland, Mississippi, Virginia, and West Virginia ("the broader market").[2] Existing precedent and the

---

[1] The *Guidelines* are "often used as persuasive authority" by courts. *Hackensack*, 30 F.4th at 167 n.3.

[2] Courts and agencies often define geographic markets based on the location of customers. *Hackensack*, 30 F.4th at 167; *Guidelines* § 4.2.2. Defendants' expert concedes that defining markets around customer locations is appropriate in this case. Tr. 978:13–18 (Hill).

evidence from trial demonstrate that both markets are properly defined.

 The relevant geographic market must "correspond to the commercial realities of the industry." *Hackensack*, 30 F.4th at 166–67 (quoting *Brown Shoe*, 370 U.S. at 336–37). When defining geographic markets, courts often look to sources of evidence including "practical indicia," such as industry or public recognition of a market, *Brown Shoe*, 379 U.S. at 325, and economic analysis, which often takes the form of the hypothetical monopolist test, *see, e.g.*, *Hackensack*, 30 F.4th at 167. In industries with "high transportation costs," these sources of evidence tend to point to localized geographic markets. *Phila. Nat'l Bank*, 374 U.S. at 358–59 (citing *Am. Crystal Sugar Co. v. Cuban-Am. Sugar Co.*, 152 F. Supp. 387, 398 (S.D.N.Y. 1957), *aff'd*, 259 F.2d 524 (2d Cir. 1958)); *see also Luria Bros. & Co. v. FTC*, 389 F.2d 847, 864 (3d Cir. 1968) (defining market around region where the merging parties were the two largest suppliers because, "due to the prohibitive costs of transportation," customers tended to purchase from nearby suppliers).

The evidence here establishes that the narrower and broader markets comport with commercial realities and are properly defined geographic markets. First, the evidence shows that customers face high freight costs, and therefore that customers in the area around Imperial's refinery choose between different competitive options than customers elsewhere. Second, other testimony and ordinary-course documents also support defining the narrower and broader markets. Finally, the hypothetical monopolist test confirms these are both valid markets.

### A.  Evidence of High Freight Costs Supports the Narrower and Broader Markets

The trial evidence overwhelmingly shows that, due to freight costs, competition is regional. Customers generally choose from refiners located nearby because those refiners can offer lower prices than ones located further away.

Both United and Imperial acknowledge the importance of freight costs to competition in

6

the industry. For example, a March 2020 update to the United Executive Committee (consisting of the CEOs of the United member-owners, including U.S. Sugar CEO Robert Buker) contained a map defining "Regional Markets" around different "Supplier Backyards." PTX452 at -448; *see* Tr. 147:23–148:4 (Swart). These "supplier backyards" are the areas in which nearby producers have a "freight advantage" over more distant rivals. Tr. 150:22–25, 151:9–12, 152:4–8 (Swart). Moreover, in determining whether to bid, and what price to bid, for a particular customer's business, competitors routinely consider which other competitors could likely serve that customer's location. For instance, Imperial regularly estimates the likely freight costs of its competitors for a customer's shipping location to "understand which competitors could bring in sugar and which competitors could not bring in sugar to that location." Tr. 228:18–229:2 (J. Hines). For a bid request from Molson-Coors, for example, Imperial assessed it has "a locational advantage" in Georgia, but "freight differentials" rendered it uncompetitive in Texas. PTX163 at -832–33. *See also* PFOF Section III.B.1.

Similarly, representatives of *every non-party company that appeared live at trial* testified to the importance of freight costs. Tr. 81:9–13 (Riippa/General Mills) ("freight" may determine what suppliers "remain competitive in a given area"); Tr. 372:10–13 (Cagle/Piedmont Candy) ("it would be obvious the closer [sugar suppliers] are to our facility the better it would be from a freight perspective"); Tr. 440:18–441:6 (Sproull/Domino) (Domino considers transportation costs when deciding whether to bid, what to bid, and who the likely competitors are). The testimony of non-parties offered via deposition was similar. █████████████████████ ████████████████████████████████████████████; Tr. 733:20–25 (Hamill/Kraft); Tr. 349:17–23 (Simons/NSM); Tr. 703:7–10, 704:7–705:2 (Figueroa/Michigan Sugar) (Michigan Sugar is a "regional sugar supplier . . . not coast to coast . . . not national" because of "freight

transportation costs"); Tr. 720:1–10 (Brown/IFPC); Tr. 1032:21–25 (Crown/Post); Tr. 1038:10–16 (Farmer/CSC); Tr. 1062:19–22 (Yonover/Indiana Sugars); Tr. 1083:11–15 (Bechard/Hostess); Tr. 1101:11–15 (Petibon/Danone) ("Transportation is a key cost driver in [] sugar."); *see also* PFOF Section III.B.1–2.

Sugar producers' relative market shares across different regions reflect the importance of freight costs. Sugar refiners generally sell more to nearby customers than they do to customers farther away. A company like NSM, with refineries in Minnesota, Idaho, and California, has a very high share of sales in the far west, but very few sales in the narrower market. Tr. 596:4–597:22 (Rothman); *see also* PFOF Section III.B.5.

Prices also reflect that competition varies by region. *See Brown Shoe*, 370 U.S. at 325 ("practical indicia" include differences in prices). Dr. Barbara Fecso of the USDA testified that sugar prices "[are] broken out by region because there is no one national price for sugar in the country, the price is dependent on location, population [centers], transportation to get it to the buyer, things like that." Tr. 890:8–13 (Fecso). Other industry participants also testified that prices vary regionally. *See, e.g.*, Tr. 229:6–18 (J. Hines). Documents show companies regularly tracking regional variations in price. *See, e.g.*, PTX042 at -593 (showing F.O.B. prices $0.50-$2.00 per hundredweight higher in the southeast than the Midwest); PTX053 at -850–51 (showing higher F.O.B. prices in the southeast than in the Midwest). In closing, Defense counsel attempted to confuse the issue by referring to a graph created and presented by Dr. Hill showing United's prices in different regions over time. Tr. 1184:19–22. But this was a *normalized* graph, where the price in each region was set to be equal in the month before the beet freeze, an approach that artificially eliminates price differences among regions. *See* Tr. 930:7–932:23 (Hill) (discussing DDX008 at 15, a demonstrative slide showing a y-axis of "% of price," not actual

8

prices). The *actual prices* in each region in the underlying data are different, consistent with the documents and testimony of market participants that prices vary by region. *See* PFOF Section III.B.3.

The same commercial realities that existed when the court blocked a merger of sugar refiners in *American Crystal Sugar* continue today. Then, as now, "the impact of freight rates on sugar prices" supported defining regional markets rather than a national one. 152 F. Supp. at 398. Then, as now, certain refiners are "better situated to supply th[e] territory" where they have a "locational advantage" over refiners in other parts of the country. *Am. Crystal Sugar*, 259 F.2d at 529; Tr. 596:7–597:12 (Rothman). Therefore, it remains appropriate to define regional markets for sugar around the area the merging refiners are "in especially active competition" with one another because of their respective "locational advantage[s]." 259 F.2d at 528–29.

## B.   Testimony and Ordinary-Course Documents Support the Narrower and Broader Markets

Other evidence—including Defendants' testimony and ordinary-course documents—reinforces the conclusion that the southeast and adjacent states are distinct markets. *See Brown Shoe*, 370 U.S. at 325 (practical indicia include "industry or public recognition" of the market). The United March 2020 presentation referenced above includes an update on "Regional Markets Overview" focusing on the "Florida / Southeast Market." PTX452 at -429; Tr. 148:15–149:2 (Swart). That presentation defined a specific region of the country as the "Southeast" and proposed that United adopt a competitive strategy, modeled on its "Chicago Strategy," for the southeast region. PTX452 at -448, -457, -462; Tr. 152:24–154:17 (Swart). Both United and Imperial employ sales managers assigned to the "southeast." Tr. 569:23–570:11 (Campbell); Tr. 221:17–22, 222:5–8 (J. Hines). Mr. Swart testified that there is a "southeast market" into which United predominantly supplies sugar from U.S. Sugar's Clewiston refinery. Tr. 152:9–19

9

(Swart). Even in its analysis of the potential acquisition, United assessed that one benefit was "access to attractive southeast [] demand." PTX348 at 28; Tr. 565:22–566:18 (Wineinger). The evidence from non-parties similarly shows the southeast is a distinct market. *See, e.g.,* ███████

████████████████████████████████████████████████████████████████

██████ ; PTX154 at -280 (Costco purchases sugar separately for "Northeast" and "Southeast" divisions); *see also* PFOF Section III.B.4. Industry publication *The Sosland Report* likewise treats the southeast as a distinct region. Tr. 229:12–18 (J. Hines).

Although the boundaries of the southeast are not precisely consistent from document to document, the relevant markets are supported by Defendants' own ordinary-course documents. United's map depicting the "Supplier Backyards" defines the "Southeast" as the exact same states as the United States' narrower market. PTX452 at -448, -457. Just like United, ████████ defined a "Southeast" region in the ordinary course of business as comprising the exact same states as the narrower market. ██████████ . Imperial also separately monitors shipments in a "southeast region" that includes five of the six states in the United States' narrower market. Tr. 982:7–23 (Hill). In connection with a meeting with Pepsi, a significant sugar purchaser, Imperial executives reviewed a map defining Imperial's "Primary Marketing Region" as including Georgia, Alabama, North Carolina, South Carolina, and portions of Florida, Mississippi, Tennessee, Kentucky, West Virginia, and Virginia. PTX217 at -271; Tr. 225:8–19, 226:10–15 (J. Hines). The United States' broader market simply adds to the narrower market the contiguous states of Mississippi, Delaware, Kentucky, Maryland, Virginia, West Virginia, and the District of Columbia—all identified as part of Imperial's primary or secondary marketing region in this map. PTX217 at -071. Shown together, the similarity between the southeast regions defined by United and U.S. Sugar, Imperial, ██████ , and the United States is striking.

10

*Compare* PTX452 at -448, PTX217 at -071, and ████████████ *with* United States Closing

Slide 13; *see also United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 197–98 (D.D.C. 2017)

(finding market for sale of insurance to companies with more than 5,000 employees even though

there was "no industry consensus" for this cut off, because "small variations and the existence of

some exceptions does not negate the force of the evidence").

### C.  The Hypothetical Monopolist Test Confirms the Narrower and Broader Markets Are Properly Defined Antitrust Markets

Courts, including the Third Circuit, frequently use an analytical tool called the

hypothetical monopolist test to determine whether a given set of products, and a given

geography, constitute a relevant market. *Hackensack*, 30 F.4th at 167. Under this test, a proposed

market is properly defined if a hypothetical monopolist of all sales to customers in the market

would be likely to successfully impose a small but significant price increase (called a "SSNIP").

*Guidelines* § 4.1.1; *see also Hackensack*, 30 F.4th at 167. "The hypothetical monopolist test

ensures that markets are not defined too narrowly, but it does not lead to a single relevant

market. The [government] may evaluate a merger in any relevant market satisfying the test,

guided by the overarching principle that the purpose of defining the market and measuring

market shares is to illuminate the evaluation of competitive effects." *Guidelines* § 4.1.1.

The United States' expert, Dr. Dov Rothman, evaluated the narrower and broader

markets alleged in the complaint using the hypothetical monopolist test and concluded that they

are both properly defined antitrust markets. *See* Tr. 591:20–592:7, 593:7–595:25, 599:9–600:20.

Dr. Rothman's analysis demonstrates that if a hypothetical monopolist tried to raise prices in the

relevant markets, not enough customers would purchase sugar outside the market and ship it in to

make the price increase unprofitable. *See generally* PFOF Section III.B.6. Despite Defendants'

protests, Dr. Rothman's analysis properly accounts for customers who make purchases outside

11

the geographic markets to try to avoid a price increase (called "arbitrage"). First, customers would not purchase enough sugar from distributors located outside the relevant geographic markets to defeat a price increase. Tr. 600:14–20 (Rothman). Such purchases from distributors would be "a high cost option," as "distributors would be attaching their own markup" and distributors "generally ship by truck and shipping refined sugar long distance by truck is costly." Tr. 600:16–20, 610:14–611:2 (Rothman). Second, customers would face similar difficulties obtaining refined sugar at any of their own facilities outside the relevant geographic markets and reshipping the refined sugar to their facilities in the relevant markets. Tr. 654:22–655:21 (Rothman). "[M]ost customers don't have locations outside of the market, and [] even for the customers that do," having refined sugar shipped to one location and then reshipping it to another facility "would be costly and inefficient." Tr. 655:4–17 (Rothman). Finally, customers arranging for transportation themselves to pick up sugar at supplier locations outside of the relevant markets would be insufficient to defeat a price increase as, according to even Dr. Hill, only "three percent of customers" in the relevant markets do this. Tr. 936:15–22, 979:10–13 (Hill).

Defendants' expert, Dr. Hill, criticized Dr. Rothman's opinion, but conceded *he did not conduct a single hypothetical monopolist test in this case*—not for the United States' markets nor for the two markets proposed by Defendants. Tr. 984:17–20, 985:6–15 ("Q. So there is no hypothetical monopolist test that you run in your report in which either of the geographic markets defined in the complaint actually fail the test, correct? A. That's correct."). Without performing his own hypothetical monopolist test, Dr. Hill neither demonstrates that his abstract criticisms translate into real proof that the relevant markets are too narrow, nor establishes that Dr. Rothman's calculations were incorrect in any way that actually matters to the outcome. Dr. Hill did not even do the work to verify that his *own* proposed markets passed the test, so the only

12

properly defined relevant markets in the record are those alleged in the complaint.

### D.  The United States' Geographic Markets Are Well-Grounded in Facts and Law

Defendants' criticisms that the United States' geographic markets are "arbitrary" should be dismissed. Defendants portrayed market definition as the outcome of a precise process that leads to the identification of the one true relevant market. *See, e.g.*, Tr. 1172:8–22. This is not the law. There is no single, correct relevant market for reviewing a transaction; even within a broader market, "well-defined submarkets may exist which, in themselves, constitute [relevant markets] for antitrust purposes." *Brown Shoe*, 370 U.S. at 325, 336. In *Pabst*, for example, the Supreme Court held that (i) Wisconsin, (ii) a three-state area including Wisconsin, and (iii) the United States as a whole all constituted relevant geographic markets for the production and sale of beer. 384 U.S. at 552; *see also Guidelines* § 4.1.1 (there is no "single relevant market"). Courts recognize that geographic market definition always has some "artificiality" and that some "fuzziness" is "inherent" in the exercise. *Phila. Nat'l Bank*, 374 U.S. at 360 n.37; *see also United States v. Conn. Nat'l Bank*, 418 U.S. 656, 669 (1974) ("[a]n element of 'fuzziness'" is not a reason for a court to reject a proposed geographic market, as the geographic market "need not . . . be defined with scientific precision"); *United States v. First Nat'l State Bancorp.*, 499 F. Supp. 793, 812 (D.N.J. 1980) (accepting geographic markets even though "the court recognizes that the alleged markets may be arbitrary at the margins"). Section 7 "requires merely that the Government prove the merger may have a substantial anticompetitive effect somewhere in the United States—'in *any* section' of the United States"—a phrase that "does not call for the delineation of a 'section of the country' by metes and bounds." *Pabst*, 384 U.S. at 549 (emphasis in original); *Guidelines* § 4 ("Relevant markets need not have precise metes and bounds.").

The fact that United and Imperial make sales outside the relevant markets does not undermine Dr. Rothman's analysis or his application of the hypothetical monopolist test, nor

render the alleged markets "arbitrary." *E.g.*, Tr. 921:14–922:3 (Hill). Again, the purpose of market definition is not to identify every location the parties compete, but to identify where, "within the area of competitive overlap, the effect of the merger on competition will be direct and immediate." *Phila. Nat'l Bank*, 374 U.S. at 357. Even if a few additional states could plausibly be part of a relevant market, that would not undermine the United States' relevant markets, since there is no single relevant market. Because a merger is unlawful if it is shown to be anticompetitive in *any* market, *see Brown Shoe*, 370 U.S. at 325, it is irrelevant that the merging parties also make sales outside the two relevant geographic markets.

Defendants also argue that the exact contours of the relevant markets lack support because they do not align precisely with the regions discussed in party and third-party documents. *See, e.g.*, Tr. 1185:14–1186:8. Companies do not typically define antitrust markets or perform the hypothetical monopolist test in the ordinary course of business, so it is not unusual for there to be some variation in how they describe the areas that are competitively significant to them. But here there are in fact ordinary-course documents supporting the United States' markets. Defendants' only alleged regional market, the "Competitive Overlap" region, however, is unsupported by *any* ordinary-course documents. This region groups together states—like Michigan, Ohio, and Texas—where sugar purchasers have vastly different competitive options. *See* Tr. 603:11–604:13 (Rothman); Tr. 986:16–988:22 (Hill). For instance, Dr. Hill's opinion that Michigan should be included in the relevant market is contrary to the testimony of Michigan Sugar's Vice President of Sales and Marketing, Pedro Figueroa, who explained that Michigan Sugar has a "regional focus" with a regional footprint that does not extend any further into the southeast than the "fringes of northern Kentucky"—indicating that customers in Michigan and Ohio, where Michigan Sugar has facilities, have different options than customers in the merging

14

parties' backyards. Tr. 704:7–706:10 (Figueroa). As a result, these areas should not be combined into the same market.

Finally, this Court should disregard Defendants' baseless argument that Dr. Rothman's testimony is invalid because he did not choose the relevant markets to analyze. The question is not who chose the markets to analyze but whether the facts, economic analysis, and law show that they are relevant markets. It is standard practice for antitrust agencies, with input from their "own economists," to determine which relevant markets to allege; Dr. Rothman is not required to have personally selected them. *See FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 125–26 (D.D.C. 2016) (rejecting criticism of expert for not selecting the relevant markets on his own and not testing other candidate markets).

## IV.   DISTRIBUTORS ARE PROPERLY EXCLUDED FROM THE RELEVANT MARKET AND NOT ASSIGNED MARKET SHARES

The parties agree that the relevant product is refined sugar; the only dispute regarding product market is whether distributors are properly excluded from the market and from the market shares. *See* Tr. 1138:12–13. The proper focus for this case is competitors that produce and sell refined sugar, and not distributors that resell sugar that they have purchased from refiners. This treatment of resellers is consistent with nearly a century of antitrust law, the factual record in this case, and sound economics. Distributors are *customers* and distribution partners of refiners; they are not an independent constraint on refiners' ability to increase prices.

### A.  Distributors That Do Not Refine Sugar Are Not Sellers in the Product Market

Defendants compete to produce refined sugar and sell it to wholesale customers, and so the product market in this case should be defined to include that competition. *See Brown Shoe*, 370 U.S. at 326 (product market should be drawn broad enough to encompass the competition that exists between the merging firms). After the acquisition, the merged firm could only be

15

constrained by other refined sugar producers, not by distributors that only *resell* and do not produce themselves. In *Allen-Myland, Inc. v. International Business Machines Corp.*, for instance, the Third Circuit held that even though companies that purchased and then leased computer mainframes were "[f]rom a consumer's standpoint, [] an alternative source" to original manufacturers, the lessors were appropriately excluded from the market because they "do not increase the number of new mainframes, as they still must purchase them from their manufacturers." 33 F.3d 194, 202 (3d Cir. 1994); *see also Avnet, Inc. v. FTC*, 511 F.2d 70, 78 (7th Cir. 1975) (two groups of firms that "perform significantly different functions and operate at significantly different levels of distribution" are properly placed in different markets). In the foundational case *Brown Shoe*, the Supreme Court separately analyzed the effects of a merger in two different product markets, each at a different level of the supply chain: the "production" of shoes and sale of them at wholesale, and "in the sale of shoes at retail." 370 U.S. at 297, 335.

Here, the market is defined around the top level of the refined sugar supply chain—producing the sugar and selling it to wholesale customers—because that is the level of the supply chain where Imperial competes today and where its competition will be eliminated by the proposed acquisition. Such product market definitions are commonplace.[3] As Dr. Hill acknowledged, distributors were excluded from the market in a case he worked on where the product was milk, another consumable commodity. Tr. 1004:21–1005:5; *see United States v. Dean Foods*, No. 10-CV-59, 2010 WL 1417926, at *5 (E.D. Wis. Apr. 7, 2010).

---

[3] *See, e.g.*, *Pabst*, 384 U.S. at 548 ("production and sale of beer in the United States and in various sections thereof"); *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 527 (1973) ("the relevant product market is the production and sale of beer, and the six New England States compose the geographic market"); *United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 490 (1974) ("the production and sale of coal in either or both of two geographic markets"); *Reynolds Metals Co. v. FTC*, 309 F.2d 223, 227 (D.C. Cir. 1962) ("the production and sale of florist foil may rationally be defined . . . as comprising the relevant line of commerce").

16

Defendants essentially argue that the product market definition should be expanded to include not just the production and sale of refined sugar, but the production, sale, *and resale* of refined sugar. Tr. 666:2–15 (Rothman). There is no basis for such an expansion. Under the hypothetical monopolist test, distributors are customers of refiners, so distributors would be "hit with the higher prices themselves" and they "wouldn't be able to prevent prices from going up." Tr. 593:7–15 (Rothman); *see Guidelines* § 4.1.2 (the hypothetical monopolist test looks at the imposition of a SSNIP on "customers"). ███████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████

Most distributors, like ████████████, explain that they are not producers and do not compete with producers because they must buy sugar from producers, add their own margin, and resell. ████████████ Dr. Hill argued that "[s]ome distributors refine their own sugar. Some distributors melt sugar." Tr. 1001:3–5. While a few "distributors" are also producers because they serve a dual role of melting some raw sugar into refined liquid sugar, Dr. Rothman *included such distributors* in the relevant markets and assigned them market shares. Specifically, Dr. Rothman included the market shares of Zucarmex, Sucro Sourcing, and L&S Sweeteners— companies that both resell refined sugar purchased from refiners and also refine some liquid sugar on their own. The actual sales of these small hybrid producer/distributors in the relevant markets are simply de minimis and round to zero percent. Tr. 611:6–612:1. In other words, all companies—foreign and domestic—that refine sugar sold into the relevant markets are included as market participants and their sales in the relevant markets are included in the market shares.[4]

---

[4] In closing argument, Defendants' counsel mischaracterized Dr. Rothman's market shares as excluding imports that distributors resell. Tr. 1179:12–18. This is incorrect: Dr. Rothman

17

**B.  Distributors Do Not Independently Constrain Refiners**

As the record in this case shows, distributors cannot constrain refiners because they depend on refiners to obtain their key input of refined sugar. "The goal in defining the relevant market is to identify the market participants . . . that restrain an individual firm's ability to raise prices or restrict output." *Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 496 (2d Cir. 2004); *see also FTC v. Advocate Health Care Network*, 841 F.3d 460, 469 (7th Cir. 2016) (relevant market need include only "the competitors that would substantially constrain [the firm's] price-increasing ability") (internal quotations omitted). As the Guidelines explain, market shares should reflect firms' competitive significance. *See Guidelines* § 5.2.[5]

The record in this case shows that distributors are not an independent constraint on domestic refiners and thus should not be included in the product market or assigned market shares. Distributors depend on refiners to obtain refined sugar and need to add a margin on top of the price that they pay for that refined sugar to stay profitable. PFOF Section IV.A.2. As a result, distributors do not constrain refiners, but instead serve smaller customers (e.g., customers who need less than a truckload of sugar), fill gaps in larger customers' annual sugar purchases, or provide additional products or services not offered by the refiners. Tr. 84:18–23, ████████ (Riippa); Tr. 325:3–5, 331:13–22 (Kling); Tr. 344:25–345:9 (Simons); Tr. 457:4–22 (Speece); ███████████████; ████████████████. Defendants' own ordinary-course documents characterize distributors as customers and do not assign them market shares. Tr.

_____

included all imports sold into the relevant markets in his market shares. Tr. 611:6–612:1 (Rothman). Dr. Rothman's market shares include the sales of "[a]ll producers of refined sugar that make sales of refined sugar to customers in the relevant market regardless of where the producers themselves are located." Tr. 605:20–606:3 (Rothman).
[5] The Guidelines explain that shares are ordinarily only assigned to "all firms that currently *produce* products in the relevant market" and to other market participants only "if this can be done to *reliably reflect their competitive significance.*" *Guidelines* § 5.2 (emphasis added).

534:25–535:16 (Wineinger); PTX330 at 5–6; *see also* Tr. 1125:14–1126:6 (Carter). Refiners partner with distributors when it suits them, and they disintermediate distributors and sell directly to end-use customers when it does not. *See, e.g.*, Tr. 143:15–147:15 (Swart discussing United's use of the Montgomery dome to reduce its dependence on distributors and sell more refined sugar directly to small- and medium-sized customers); PTX250 at -058. Tellingly, even Defendants do not argue that distributors should be assigned market shares for all of their refined sugar sales in the relevant markets. In their closing argument, Defendants "admit[ted] there are certainly instances where distributors are not acting as a competitive constraint." Tr. 1178:18–1179:11. Similarly, Dr. Hill conceded that at least some sales by distributors should be attributed back to the refiners who produced the sugar. Tr. 1004:5–20.

On the basis of such facts, the case law strongly supports not assigning any market shares to resellers. In the seminal *Alcoa* case,[6] the court held that the resale of aluminum ingot should not be attributed market share even though "for most purposes it competes upon a substantial equality with 'virgin'" ingot. *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 424–25 (2d Cir. 1945). The court explained that a producer of aluminum knows that the aluminum can be resold in competition with its product, and it factors that into its production and pricing decisions. *Id.* at 425; *see also Allen-Myland,* 33 F.3d at 202–04 (computer lessors should not be treated as participants in the same relevant market as original equipment manufacturers like IBM because the lessors depend on the manufacturers to obtain the computers and cannot constrain manufacturers' "power to set prices"). In a recent decision regarding T-Mobile's proposed acquisition of Sprint, the court did not treat resellers of mobile wireless services as market

---

[6] This decision has "special weight" because it was certified to the Second Circuit by the U.S. Supreme Court, and it has been adopted by the Third Circuit. *Allen-Myland*, 33 F.3d at 202 n.10.

participants, but instead assigned their sales to their suppliers for purposes of calculating market shares. *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 195, 200, 202 (S.D.N.Y. 2020). The court explained that resellers were not "independent competitors" that could "constrain the [suppliers'] market power" because they "lack[ed] a network of [their] own" and "necessarily rel[ied]" on their suppliers' networks. *Id.* at 200–01.

*American Crystal Sugar* further illustrates this point. The district court included only refiners in its market share calculations. *See* 152 F. Supp. at 401 (share appendix). While Defendants tried to muddy this point in their closing argument, Tr. 1174:1–3, the Second Circuit's offhand reference to a market for the "distribution" of sugar does not undermine how the district court actually defined market participants. As that court explained, "While many levels of activity in the sugar industry can be identified, *the conduct of sugar refiners in selling their product is here of prime relevance*." 152 F. Supp. at 396 (emphasis added). So too today.

## V. MARKET SHARES AND MARKET CONCENTRATION MEASURES EACH SHOW THAT THE TRANSACTION IS PRESUMPTIVELY UNLAWFUL

The United States has established that the transaction is presumptively illegal because it would create a firm with an undue market share and would result in a significant increase in concentration. The combined United/Imperial would have a post-transaction market share of 54% in the narrower market and 46% in the broader market. Tr. 611:12–612:1 (Rothman). Together, United and Domino would control about three-quarters of each relevant market. *Id.* These high post-transaction market shares and the significant increase in concentration triggers a presumption that the transaction is likely to substantially lessen competition. *Phila. Nat'l Bank*, 374 U.S. at 364 ("Without attempting to specify the smallest market share which would still be considered to threaten undue concentration, we are clear that 30% presents that threat."); *Energy Sols.*, 265 F. Supp. 3d at 441.

Alternatively, the United States established a "prima facie case by showing a high market concentration based on HHI numbers alone." *Hackensack*, 30 F.4th at 172. The HHI, or Herfindahl-Hirschman Index, is calculated by "summing the squares of the market shares of each market participant." *Id.* A market with an HHI above 2,500 is "highly concentrated," and a merger that increases the HHI by more than 200 points and results in a highly concentrated market is presumptively anticompetitive. *Id.* at 172–73. "But the [government] is not required to show extraordinary numbers to make out a prima facie case that the merger would have anticompetitive effects. Anticompetitive effects can occur at even lower thresholds, as evidenced by the Guidelines. For instance, a moderately concentrated market (with a total HHI below 2,500) involving only more than a hundred-point increase 'potentially raise[s] significant competitive concerns and [may] warrant scrutiny.'" *Id.* at 173 (quoting *Guidelines* § 5.3). In this case, the numbers are in fact "extraordinary," far above the relevant thresholds: in the narrower market, the post-transaction HHI is 3,658 and the change in HHI is 1,393, and in the broader market, the post-transaction HHI is 3,035 and the change in HHI is 1,011. Tr. 613:3–6 (Rothman). Thus, the presumption applies whether considering market shares or market concentration measures—both of which are separate means to determine whether the transaction is presumptively anticompetitive and unlawful.

The applicability of the presumption in this case is not a close call; the transaction would be presumptively unlawful even if the relevant geographic markets were broader than those alleged by the United States. Defendants derided the "arbitrariness" of excluding individual states like Pennsylvania or Texas, but tellingly never advanced any evidence that the concentration picture would be meaningfully different if the markets were broadened marginally. In fact, Dr. Rothman testified that even if the broader market were extended all the way out to

21

include Texas, Arkansas, Oklahoma, and Louisiana, the presumption would still apply. Tr. 613:22–614:13. Notably, the addition of these four states to the broader market would correspond to the so-called "USDA South" region, which USDA uses to track and report certain information. Tr. 614:10–13. United's Dirk Swart testified that United considers USDA regions, including the USDA South, when analyzing demand in the ordinary course of business. Tr. 171:19–172:1, 172:19–23; PTX452 at -447. Thus, even if the Court concluded that the only relevant market for this transaction was as broad as the entire USDA South, the transaction would still be presumptively unlawful. *See also* Tr. 626:6–13 (Rothman) (explaining that broadening the market would bring in additional customers with different supplier options and thereby decrease the average harm per customer but would increase the total predicted harm).[7]

Only by implausibly arguing that the market should be extended all the way out to Texas *and* all the way up to Michigan were Defendants able to pull the HHI figures just below the threshold for a "highly concentrated" market into the "moderately concentrated" range, Tr. 940:2-15, 994:2–17 (Hill) (discussing DDX008 at 19), but even in this gerrymandered "competitive overlap" region the transaction would still be presumptively anticompetitive based on market shares. In this "competitive overlap" region, *based on Dr. Hill's own calculations*, the combined United/Imperial would climb to first place with a 37% market share, far ahead of second-place Domino at 27%. Tr. 993:13–20 (Hill). Even looking at Defendants' proposed national market, Dr. Hill calculated that the combined market share of United and Imperial

---

[7] It is well settled that the Court is not limited to considering the exact markets that the government alleged; the Court should enjoin the merger if the Court finds a reasonable probability of harm in any relevant market based on the evidence presented. *See United States v. Cont'l Can Co.*, 378 U.S. 441, 457 (1964) (finding harm in market "not pressed upon the District Court"); *Energy Sols.*, 265 F. Supp. 3d at 436–37 (finding a different market than the one alleged by the government).

22

would climb to over 30%, making the firm the new market leader. Tr. 992:17–993:9 (Hill). Thus, even in the purported national and "competitive overlap" markets that Defendants advocate— although each is broader than necessary to be the proper relevant market—the transaction still would be presumptively unlawful based on market shares under *Philadelphia National Bank*.

## VI.   THE PROPOSED ACQUISITION WOULD ELIMINATE DIRECT COMPETITION BETWEEN UNITED AND IMPERIAL, LEADING TO HIGHER PRICES AND REDUCED QUALITY

"Mergers that eliminate head-to-head competition between close competitors often result in a lessening of competition." *Staples*, 190 F. Supp. 3d at 131; *see also FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 61 (D.D.C. 2015) ("Courts have recognized that a merger that eliminates head-to-head competition between close competitors can result in a substantial lessening of competition."). In particular, a merger between two significant direct competitors may have "unilateral effects," meaning that "the acquiring firm will have the incentive to raise prices or reduce quality after the acquisition, independent of competitive responses from other firms." *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 81 (D.D.C. 2011); *see also FTC v. H.J. Heinz Co.*, 246 F.3d 708, 718 (D.C. Cir. 2001) (noting that record evidence indicates the merging firms "price against each other, . . . are present in the same areas, [and] depress each other's prices").

The merging firms do not need to be the largest or only close competitors in the relevant markets for there to be unilateral effects. *Sysco*, 113 F. Supp. 3d at 62 ("the merging parties need not be the top two firms to cause unilateral effects"); *see also United States v. Aetna, Inc.*, 240 F. Supp. 3d 1, 43 (D.D.C. 2017); *Anthem*, 236 F. Supp. 3d at 216. In *H & R Block*, for example, a company not part of the proposed merger—Intuit, the maker of TurboTax—had a market share of over 60% and was the closest competitor to both merging companies, but the court nonetheless enjoined the merger. 833 F. Supp. 2d at 44, 83–84. Similarly, in *Heinz*, the D.C.

23

Circuit enjoined the merger of two baby food manufacturers even though a third company, Gerber, was the largest and closest competitor of both defendants. 246 F.3d at 718–19, 727.

While the market concentration levels discussed above are sufficient to establish that the proposed acquisition is presumptively anticompetitive in both relevant markets (and thereby to shift the burden to Defendants), the United States also introduced additional evidence of unilateral effects that bolsters the prima facie case that the merger is anticompetitive, including evidence of significant head-to-head competition between United and Imperial that would be eliminated by the merger and evidence that this competition was poised to increase.

### A.  United and Imperial Are Close Head-To-Head Competitors Today

The record demonstrates that United and Imperial are meaningful direct competitors in both the narrower and broader markets. Witnesses from United, Imperial, and third parties all testified at trial that the two companies closely compete for business across both relevant geographic markets. PFOF Section IV.B. United's March 2020 Executive Committee update identified Imperial's Port Wentworth refinery and Domino's South Bay refinery as the only two other refineries besides Clewiston with a freight advantage in the southeast. PTX452 at -448; Tr. 151:9–12 (Swart). Similarly, an Imperial business analysis identified "United in Florida" as a "close competitor." DTX219 at -226. Batory Foods' Matthew Kling explained that he viewed the southeast as "not very competitive," ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮ Tr. 328:12–25, 332:19–22. Indeed, United and Imperial compete for the business of large industrial customers with multiple facilities (such as Pepsi, Molson Coors, General Mills, and Campbell Soup), smaller industrial customers (like Piedmont Candy, Great American Cookie, and Helm's Cotton Candy), distributors (such as IFPC), and retail customers (like Costco). PFOF Section IV.B; Tr. 727:7–11 (Brown).

This direct competition between United and Imperial across the southeast benefits

24

customers through lower prices, better service, and better product quality.[8] For instance, United

was previously the incumbent supplier to Pepsi's Wytheville, Virginia facility, but Imperial won

the business from United in 2019. Tr. 244:18–24 (J. Hines). Imperial learned that Pepsi was

concerned about the "lumpy" sugar United had delivered from its Clewiston refinery that was

"hard to get out of railcars." PTX147 at -688. "Not once did [United] send anyone in to review

the system, sugar or attempt to solve any of their issues." PTX147 at -688. After Imperial won

the business, Pepsi was "thrilled" that Imperial employees helped Pepsi unload the sugar and

"offer[ed] suggestions on how to improve the unloading process." PTX147 at -688. Two years

later, United wrestled the business back from Imperial after lowering its prices at Pepsi's request.

PTX417; Tr. 141:3–21 (Swart).

As another example, Mr. Cagle from Piedmont Candy explained how Piedmont Candy

benefited from head-to-head competition between United and Imperial. Piedmont Candy, located

outside Charlotte, North Carolina, ███████████████████████████████████████

████████████████████████████████████████████████████ Tr. 382:16–383:14

(Cagle). ███████████████████████████████████████████████████████████████

████████████████████████ Tr. 382:16–383:5. In 2020, ███████████████████████

████████████████████████████████████████████████ Tr. 379:22–380:2;

---

[8] Defendants argue focusing on United, not U.S. Sugar, as the relevant economic actor overstates the competition at stake because United's member-owners do not all share the same incentives. Tr. 915:22–917:4 (Hill). In reality, all four member-owners have aligned incentives because they act as one economic actor through United, which sells all of the member-owners' sugar, has sole discretion over pricing, and instructs its member-owners on a weekly basis how much sugar to produce in what packages. Tr. 124:24–125:1, 126:11–14 (Swart); Tr. 532:2–7 (Wineinger). Even assuming *arguendo* that United's members do not always have perfectly aligned incentives, Defendants offered no evidence that such differing incentives have ever had any practical impact on United's business decisions. Defendants' expert Dr. Hill provided a theoretical example of potentially differing incentives among United's owners as a result of the 2020 beet freeze, but he did not claim this had any impact on how United marketed or sold sugar. Tr. 916:7–917:4 (Hill).

JTX027. ████████████████████████████████████

Tr. 380:11–382:4. ████████████████████████████████████

████████████████████████████████ Tr. 384:14–22.

Even customers who did not ultimately choose Imperial benefited from competition between United and Imperial. To win the business of Danone's Jacksonville, Florida plant, United's Director of Strategic Accounts Eric Speece led with a lower price than he otherwise would have because he knew United had a "significant freight disadvantage" to Imperial. PTX395 at -857; Tr. 459:8–20 (Speece). And after receiving feedback from Danone that United's bid was *still* too high relative to the competition, Mr. Speece agreed to lower United's price even *more* to win the business. PTX395 at -857; Tr. 459:21–460:2. Similarly, Bud's Best Cookies successfully got United to match Imperial's lower price offer for its 2021 business after the company switched between United and Imperial the two previous years. Tr. 575:4–12 (Campbell); PTX464. All this competition would be lost if the transaction were consummated.

Defendants deride these numerous examples of head-to-head competition as anecdotal, "unique unicorn[s] . . . not representative of anything." Tr. 1188:18–20. Defendants are trying to set the bar impossibly high; obviously, the United States cannot tell every customer's story. *Cf. Phila. Nat'l Bank*, 374 U.S. at 362–63 (explaining that the reliance on market shares is necessary to avoid "a too-broad economic investigation" in "the interest of sound and practical judicial administration"). Far from being unusual, these examples of head-to-head competition between United and Imperial are exactly what one would expect to see given the companies' high shares in the relevant markets, the commercial reality of the importance of freight costs, and the fact

that Imperial's Savannah refinery and the Clewiston refinery are located close to one another.[9]

### B. Competition Between United and Imperial Is Poised to Intensify Absent the Transaction

The trial record also demonstrates that, absent the transaction, head-to-head competition between United and Imperial would increase in the southeast. By preventing this from occurring, the merger would cause even more substantial unilateral effects than suggested by the evidence above. *See Stanley Works v. FTC*, 469 F.2d 498, 508 (2d Cir. 1972) (holding that "the elimination of competition resulting from the merger was substantial" because one party was "an active competitor in the [market] at the time" and "the record indicates that [it] would have been *a more active competitor in the future*, absent merger") (emphasis added).

Prior to the transaction, United intended to pursue a competitive strategy to increase its sales in the southeast similar to its earlier "Chicago" strategy. *See* PFOF Section IV.B.4. Pursuant to the "Chicago" strategy, United utilized a new dome storage facility outside Chicago to increase its sales of higher-margin bagged sugar to customers in the area. Tr. 144:8–146:20 (Swart); PTX507 at -777. Like in Chicago, United intended to expand its sales in the southeast of certain bagged sugar products with better margins than sales of bulk sugar. Tr. 299:6–22 (S. Hines); PTX380 at -035. Mr. Hines noted in an email to United colleagues their plan was to "*attack the market like Chicago*." Tr. 300:24–301:6; PTX380 at -035. Imperial already has significant bagging capabilities, so this expansion would bring Imperial and United even closer

---

[9] Defendants argue that the unilateral effects of the proposed transaction are overstated because United is incapable of raising prices. Tr. 1170:16–25. First, this claim ignores that United's employees are focused on maximizing the net selling price of United's sugar to benefit United and its member-owners, and in fact United executives' own compensation is tied to receiving the highest price. Tr. 128:5–7 (Swart); Tr. 531:11–532:1 (Wineinger). Second, if the transaction is consummated, any competition with Imperial will be eliminated, which will put less downward pressure on United's pricing going forward. Tr. 588:6–15 (Rothman). "A logical implication of [Defendants'] argument is that," even if United bought all other refiners, "its prices wouldn't go down [even though] it wouldn't be facing any more competition." Tr. 588:12–15 (Rothman).

27

into competition with one another. United management presented this "Southeast Strategy" to the United Executive Committee for approval, Tr. 153:5–8 (Swart); PTX452 at -462, however, United did not implement the strategy or pursue a new facility in the southeast because the company instead decided to pursue an acquisition of Imperial, Tr. 301:23–302:10 (S. Hines). If the transaction is allowed to proceed, this likely future increase in competition between United and Imperial will not occur.

### C.  Economic Analysis Confirms a Reasonable Probability of Harm from the Elimination of Head-to-Head Competition

A precise quantification of the loss of competition is not required to enjoin a merger. As the Supreme Court explained, Section 7 imposes "no definite quantitative or qualitative tests"; indeed, it "reflects a conscious avoidance of exclusively mathematical tests." *Brown Shoe*, 370 U.S. at 321 & n.36; *see also Hosp. Corp. of Am.*, 807 F.2d at 1389 ("Section 7 does not require proof that a merger or other acquisition has caused higher prices in the affected market. All that is necessary is that the merger create an appreciable danger of such consequences in the future."). The test is whether a merger is likely to reduce *competition* substantially, not whether prices increase more than some set percentage. Economic analysis showing that prices are likely to increase for customers by a measurable amount is simply one form of evidence that the *competition* threatened by the merger is substantial. *Cf. H & R Block*, 833 F. Supp. 2d at 81–88 (finding "a reasonable likelihood of unilateral effects" even though the United States' quantification of the likely price effects was "imprecise").

Here, Dr. Rothman presented a robust economic analysis predicting that the proposed acquisition will lead to "significant price effects." Tr. 625:18–22; *see* PFOF Section IV.B.5. In particular, Dr. Rothman used a second-score bidding merger simulation model to predict that the

28

proposed acquisition would likely cause prices to rise. Tr. 622:22–25.[10] Such merger simulations

are commonly used and accepted for predicting the price effects of mergers and acquisitions. *See*

*Anthem*, 236 F. Supp. 3d at 212 (citing cases); *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F.

Supp. 3d 27, 64–65 (D.D.C. 2018). Dr. Rothman's merger simulation model used real-world

inputs, including Defendants' sales data and actual profit margins, so the model was "grounded

in market realities." Tr. 624:1–5. When Imperial and United are the first- and second-best

choices for a customer, the head-to-head competition between them drives prices down. The

model assesses how frequently this situation is likely to occur based on state-level share data,

and then predicts that, if Imperial is eliminated as a competitor, United would be able to raise

prices up to the level of the third-best bid, as shown by actual margin data. Tr. 623:12–624:25

(Rothman).

　　　　In closing argument, Defendants' counsel incorrectly stated that "Dr. Rothman never

actually put the percentages [of price effects] in front of us." Tr. 1175:25–1176:3. In fact, Dr.

Rothman testified that based on this model the proposed acquisition would increase prices to

United and Imperial's customers by approximately 3–4% from the loss of head-to-head

competition alone, resulting in annual harm to customers of $30.5 million in the narrower market

and $36.2 million in the broader market. Tr. 625:5–22. Dr. Rothman also extended this analysis

to account for the likely increase in coordinated interaction, *see infra* Section VII, predicting that

the proposed acquisition would increase prices to United's and Imperial's customers in total by

5–7%, resulting in annual harm to customers of $58.1 million in the narrower market and $72.6

---

[10] Dr. Rothman also used a unilateral effects "screening tool" called the gross upward pricing pressure index ("GUPPI"), which showed broadly similar results. Tr. 623:1–5. At trial, Dr. Rothman focused on his "more sophisticated" second-score bidding merger simulation model, which "better matches the way in which most refined sugar is sold." Tr. 623:6–11.

million in the broader market. Tr. 627:17–628:5.

Defendants' counsel attempted to minimize the significance of these figures by misstating that Dr. Rothman's model predicts "in some instances a one percent price increase," Tr. 1176:1–7, but this is incorrect. This illusory statistic comes from Dr. Hill averaging the harm "across all customers" in the relevant markets, including customers of suppliers *other than United and Imperial*. Tr. 953:21–954:3 (Hill). In other words, Dr. Hill distorted the results of Dr. Rothman's model by dividing by a larger denominator—both affected and unaffected customers—to make it appear the model shows lower price effects for affected customers than it does.[11] Defendants also pretend that a SSNIP, which "is employed solely as a methodological tool for performing the hypothetical monopolist test," *Guidelines*, § 4.1.1, provides a threshold for showing price effects, Tr. 1183:18–25. This is incorrect: a SSNIP "is not a tolerance level for price increases resulting from a merger." *Guidelines*, § 4.1.1. In any event, regardless of the percentage increase, Defendants acknowledged that Dr. Rothman's model predicts "big absolute number[s]" of price effects. Tr. 1176:3–7.

## VII.  THE PROPOSED ACQUISITION IS UNLAWFUL BECAUSE IT IS LIKELY TO LEAD TO COORDINATED EFFECTS

The structural dynamics of the sugar industry, coupled with United and Domino's already cozy relationship, pose a substantial risk that Imperial's exit as a competitor will result in anticompetitive coordination between United and Domino. This risk provides an independent basis for condemning the proposed transaction under Section 7.[12]

---

[11] Dr. Hill also criticized Dr. Rothman's model for not predicting margins for United and Imperial that match their respective actual margins. Tr. 951:19–25. This criticism is similarly misleading. Dr. Rothman explained that his model uses both United's and Imperial's margins as inputs because "both provide relevant information about competitive dynamics," Tr. 625:1–4, so the model correctly predicts the average of United's and Imperial's margins.

[12] A merger can cause both unilateral and coordinated effects; a reasonable likelihood of causing either type of effect is sufficient basis to enjoin it. *See, e.g.*, *H & R Block*, 833 F. Supp. 2d at 81.

A central concern of merger policy is coordinated effects—when firms "coordinate their behavior . . . in order to restrict output and achieve profits above competitive levels." *Heinz*, 246 F.3d at 715. Section 7 bars a merger when there is a "reasonable probability" of coordinated effects. *FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187, 208 (D.D.C. 2018). Coordinated effects are not limited to explicit collusion—indeed, they are meant to capture tacit agreements and other parallel accommodating conduct that may not constitute a violation of Section 1 of the Sherman Act. *Guidelines* § 7. The Clayton Act prohibits mergers that increase the likelihood of such coordination precisely because of the difficulties in reaching this sort of "[t]acit coordination" under the Sherman Act. *Heinz*, 246 F.3d at 725; *see Brown Shoe*, 370 U.S. at 318 n.32 (Section 7 of Clayton Act "was intended to reach incipient monopolies and trade restraints outside the scope of the Sherman Act").

The structural dynamics of the sugar industry pose a high risk of anticompetitive coordinated effects, and this risk would be exacerbated by the proposed merger. Courts recognize that manufacturers of non-differentiated, commodity products have "meaningful market incentives to manage prices" to their joint benefit. *Tronox*, 332 F. Supp. 3d at 208. Competitors often find it easier to "[r]each[] terms of coordination" and "detect deviations from the terms of coordination" when they deal in relatively homogenous products and have insight into each other's prices or other terms of dealing. *FTC v. CCC Holdings, Inc.*, 605 F. Supp. 2d 26, 61–62 (D.D.C. 2009). These conditions characterize the refined sugar industry: Not only is refined sugar a commodity, but rivals closely monitor one another to glean information about pricing and sold positions. Tr. 160:16–18 (Swart); Tr. 459:21–460:5 (Speece); Tr. 488:17–22 (Henderson); Tr. 811:6–11 (Gorrell); Tr. 622:1–622:8 (Rothman); PTX127 at -308–09; PTX028 at -753; PTX041 at -195; *see also* PFOF Section IV.C.1.

31

"In an oligopolistic market characterized by few producers," firms often engage in "interdependent pricing," which refers to "setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests with respect to price and output decisions." *Heinz*, 246 F.3d at 724 n.23. This sort of interdependent pricing characterizes the sugar industry, in which the major players strategically account for both the price signals they are sending and the ones they are receiving. Internal emails among United, Imperial, and Domino employees show that, when these entities bid against their rivals for customers' business, they tactically anticipate each other's reactions and carefully consider whether their bids will contribute to industry-wide price declines. PTX483 at -379 (Hanson: "[W]here we are looking at taking share from competitors we need to factor in competitive responses."); PTX250 at -508 (Henneberry: "The main downside [to offering a potential customer a lower price] would be snatching something from United just as they are starting to show some upside price movement."); PTX426 at -170 (Speece: expressing "real concern" about a competitive supplier's prices, noting that United "[m]ay want to communicate pricing earlier than the colloquium to send a msg"). Firms may avoid bidding against (or underbidding) their rivals when they fear that a low bid will signal that the bidder wants to engage in a price war. PTX450 at -378 (Wineinger: United "pull[ed] some older offers while sending a message to NSM and other competitors that we were not interested in allowing the market to slip lower"); PTX055 at -048 (Henderson: "I would love to get aggressive" on giving ██████ a price quote but "[w]e would like to avoid sending a signal out to competitors that we are chasing business and lowering pricing"); *see also* PFOF Section IV.C.1.

While the market structure alone is sufficient to warrant a conclusion that this merger will result in anticompetitive coordinated effects, the Court heard voluminous evidence that United

and Domino *already* send signals to each other—through an intermediary—about current pricing, future pricing, pricing strategies, and sold positions. PFOF Section IV.C.2. United's documents indicate that it uses these information exchanges to send "key messages," PTX426 at -170, and "indicate" its views, PTX430 at -010, on prices and market conditions. Because it "facilitates collusion," this sort of "routine[] exchange [of] intimate information on prices" "entitles the [United States] to worry even more about large horizontal acquisitions in this industry." *Hosp. Corp. of Am.*, 807 F.2d at 1389; *see Tronox*, 332 F. Supp. 3d at 210 (transaction that would leave two firms controlling nearly three-quarters of market would "likely increase . . . incentives and make implicit price coordination easier"); *FTC v. Swedish Match*, 131 F. Supp. 2d 151, 168 (D.D.C. 2000) ("oligopolistic behavior," including monitoring and matching each other's prices, reflected "pattern of anticompetitive behavior stem[ming] from high concentration in the market" that would be exacerbated by "increasing that concentration").

The type of coordination to which the sugar industry is vulnerable, and which has already occurred to some extent, will accelerate if Imperial exits. *See* PFOF Section IV.C.2. Eliminating a competitor will only enhance the incentives for coordination, not only because "it is easier for two firms to collude without being detected than for three to do so," *Am. Hosp. Supply Corp. v. Hosp. Prods. Ltd.*, 780 F.2d 589, 602 (7th Cir. 1986), but also because the increased concentration "reinforce[s] . . . oligopolistic market structures in which tacit coordination can occur," *Heinz*, 246 F.3d at 725. If the merger proceeds, United and Domino collectively would control 74% of the broader market and 79% of the narrower market, and in both markets the next largest refiner would control only 7%. Tr. 611:12–612:1 (Rothman). "With only two dominant firms left in the market, the incentives to preserve market shares would be even greater, and the costs of price cutting riskier, as an attempt by either firm to undercut the other may result in a

33

debilitating race to the bottom." *CCC Holdings*, 605 F. Supp. 2d at 67; Tr. 622:9–21 (Rothman).

The United States has offered "real-world proof of meaningful market incentives" and opportunities to coordinate on price—incentives and opportunities that will be significantly enhanced by a merger that threatens to leave two firms with around three-quarters of the relevant markets. *See Tronox*, 332 F. Supp. 3d at 208, 210. This evidence establishes the likelihood that the merger will lead to increased coordination and provides an independent basis for barring the transaction. *See H & R Block*, 833 F. Supp. 2d at 81.

## VIII.   DEFENDANTS HAVE NOT REBUTTED THE UNITED STATES' PRIMA FACIE CASE

Because the United States established a prima facie case that the transaction is anticompetitive, the burden shifts to Defendants to "show either that the combination would not have anticompetitive effects or that the anticompetitive effects of the merger will be offset by extraordinary efficiencies resulting from the merger." *Hackensack*, 30 F.4th at 175. Defendants have not carried this burden.

### A.   Defendants Have Not Proven Imperial Is a Weakened Competitor

Without going so far as to claim a "failing" firm defense, Defendants nevertheless imply that Imperial is in a weak financial condition and may not continue to be as successful going forward as it has been historically. D.I. 185 (Defs.' Pretrial Br.) 14 n.3. To claim a weakened competitor defense, Defendants must "make[] a substantial showing that the acquired firm's weakness, <u>which cannot be resolved by any competitive means</u>, would cause that firm's market share to reduce to a level that would undermine the government's prima facie case." *Aetna*, 240 F. Supp. 3d at 92 (emphasis in original). In other words, Defendants must show that Imperial's current market share so overstates its likely future market share that the United States would not establish a presumption of illegality. Courts rarely credit this type of defense, "the Hail-Mary

34

pass of presumptively doomed mergers." *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 572 (6th Cir. 2014). This is not one of the "rare cases" in which such a defense has merit. *Id.*

Dr. Rothman showed that Imperial's shares have been stable over the 2018 to 2021 period in both the narrower and broader geographic markets. Tr. 630:22–631:4. There is no evidence this pattern is likely to change. Imperial's average production (or "melt rate") has been consistent, if not increasing, over the past few years. Tr. 841:22–25 (Smith); JTX035 at 15 (increased raw melt from 2017 to 2020); ███████████████████████████████ ██████████████████████████████.[13] And, during roughly the same period, Imperial has been increasing the refinery's operating days. Tr. 846:9–12 (Smith); JTX035 at 11; *see also* PFOF Section VIII. Defendants' failure to produce any evidence that Imperial's market share is likely to decrease at all, let alone to levels that would undermine the structural presumption, is fatal to its weakened competitor defense. *See Aetna*, 240 F. Supp. 3d at 92–93.[14]

Defendants' efforts to describe Imperial as declining are not supported by the facts. Imperial describes itself in presentations to potential buyers as a "best-in-class refiner" with a "state-of-the art packaging facility." PTX350 at 8; *see also* Tr. 223:20–22 (J. Hines); Tr. 841:19–21 (Smith). Far from being in dire straits, Imperial is financially stable. Consistent with Dr.

___

[13] Dr. Fecso testified that Imperial's melt rates help inform her opinion about Imperial's market position. Tr. 898:4–12. Dr. Fecso also testified in response to a question from the Court that she thought Imperial's market share has been declining. Tr. 898:13–18. However, the actual data produced in this case (including Imperial's internal data, not shared with USDA or Dr. Fecso) shows otherwise. Tr. 630:22–631:4 (Dr. Rothman's analysis of this data). Plaintiff is unaware of any analysis or ordinary-course documents produced by Defendants refuting Dr. Rothman's analysis that Imperial's market share has been stable.

[14] If anything, the record suggests Imperial might become a more significant competitor if policy changes give Imperial more access to raw sugar. *See* Tr. 773:5–11 (Buker) (should the Farm Bill expire, "a port refinery [like Imperial], which imports raw sugar, is [in] a much better economic situation than growing it here in the United States"); JTX034 at 2 (rationale for the deal includes "hedge" against Farm Bill changes).

Rothman's analysis, Imperial has returned over ███████ in incremental cash to LDC (net of capital investments) since LDC bought the company ten years ago. Tr. 821:14–822:3 (Gorrell); PTX117 at -487. LDC purchased Imperial for $203 million in 2012, PTX350 at 6, and U.S. Sugar agreed to buy it for $315 million less than ten years later, PSAF ¶ 44. LDC's exclusive financial advisor projected Imperial's profitability would continue to increase. PSAF ¶ 40. Imperial has been paying its CEO discretionary bonuses, including a ███████ bonus last year. Tr. 822:11–823:13 (Gorrell); JTX051 at Fig. A. And since 2012, LDC has made over $101 million in capital investments in Port Wentworth. PTX350 at 9. Imperial's October 2021 year-to-date bottom-line earnings before tax ("EBT") were approximately ███████, demonstrating that Imperial operates at a profit in its present state. PTX117 at -486.

### B. Imperial's Higher Cost Structure Does Not Prevent It from Being an Important Competitive Constraint

Unable to show that Imperial is declining, Defendants instead make an even softer rebuttal, pointing to Imperial's higher cost structure and arguing that this somehow negates the record of customers benefiting from competition between Imperial and United in the relevant markets. This argument has no basis in the law and is wrong on the facts.

The acquisition of a "weak[er]" company is not immune from Section 7 scrutiny. *See FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1221 (11th Cir. 1991). This is because "[a]nti-trust law does not distinguish between effective and ineffective competitors." *Energy Sols.*, 265 F. Supp. 3d at 439 (citing *United States v. El Paso Nat. Gas Co.*, 376 U.S. 651, 661 (1964)). Contrary to Defendants' apparent position, a merger can substantially lessen competition even where one of the merging parties wins bids less frequently than the other. *El Paso Nat. Gas*, 376 U.S. at 661. A merger can also have harmful effects "even where the merging parties are not the only, or the two largest, competitors in the market." *Aetna*, 240 F. Supp. 3d at 43. "The acquired

firm need not be the other's closest competitor to have an anticompetitive effect . . . ." *Anthem*, 236 F. Supp. 3d at 216.

The facts show that Imperial's presence in the market has an effect on price, notwithstanding its cost structure. When Imperial's refinery went offline in 2008 due to an explosion, domestic sugar prices skyrocketed. Tr. 892:8–893:2 (Fecso). Although Imperial often (though not always) has higher input costs than its vertically integrated rivals, the evidence shows that over the past several years, Imperial has nevertheless been consistently successful in winning approximately 20% of the business in the narrower market and 17% in the broader market. Tr. 630:14–631:4 (Rothman). In some cases, Imperial is successful because it offers a lower price than its competitors, despite its input cost disadvantage. *See, e.g.*, Tr. 272:1–4 (Henneberry). Sometimes Imperial is successful because its locational advantage can partially or completely offset the higher input costs. *See, e.g.*, Tr. 271:13–24 (Henneberry). And in other instances, like ███████████████████, customers purchase from Imperial despite it being *higher* priced than some of its competitors to ensure reliability of supply. ███████ ██████████████████. As Mr. Henneberry and other Imperial executives explained, Imperial competes not only on price, but on service, reliability, and quality as well. Tr. 269:11–270:12; *see also* Tr. 1007:22–1009:4 (Hill admitting to non-price factors that drive competition).

As would be expected given Imperial's significant market share, the record is replete with examples of it successfully competing on price. *See* PFOF Section IV.B.1–2. The fact that Imperial has an input cost disadvantage compared to other refiners does not mean its competitive presence in the market is unimportant, nor does it refute the United States' prima facie case. *See Univ. Health*, 938 F.2d at 1221 (defendants failed to show that the plaintiff's market share statistics did not sufficiently account for the acquired firm's "alleged shortcomings").

### C.        USDA Regulation Will Not Prevent Harm to Competition

Defendants wrongly argue that there is no role for antitrust law here because USDA can act as a "backstop against any risk of anticompetitive effects" from the proposed transaction. Tr. 63:10–11; Defs.' Pretrial Br. 3. By disclaiming the need for antitrust enforcement, Defendants effectively seek implied immunity, which is "disfavored" "given the fundamental national values of free enterprise and economic competition that are embodied in the federal antitrust laws." *FTC v. Phoebe Putney Health System, Inc*., 568 U.S. 216, 225 (2013). Implied immunity is inappropriate here because there is no "clear repugnancy between the antitrust laws and the regulatory system." *Nat'l Gerimed. Hosp. & Gerontology Ctr. v. Blue Cross of Kan. City*, 452 U.S. 378, 388 (1981); *Md. & Va. Milk Producers Ass'n v. United States*, 362 U.S. 458, 469–70 (1960) (Agricultural Adjustment Act did not displace application of Section 7 to acquisition by agricultural cooperative); *United States v. Borden Co.*, 308 U.S. 188, 197–201 (1939) (Secretary of Agriculture's authority under the Agricultural Act did not displace the Sherman Act).

Unable to meet the stringent standard for implied immunity, Defendants assert that regulatory tools designed for other purposes can solve any competition problem arising from this merger. Citing a case from the telecommunications industry, Defendants argue that "the analysis of anticompetitive effects must consider the impact of overlapping industry regulation." Defs.' Pretrial Br. 20 (citing *Verizon Comm'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004)). But Defendants proffer no evidence that USDA could or would remediate the loss of competition from the merger. *See* PFOF Section VI. Rather, they rely solely on the prospect of future action by USDA that might eventually limit some part of the anticompetitive effects. Neither *Trinko* nor the Supreme Court's merger jurisprudence supports the displacement of Section 7 in these circumstances—what, in effect, would be a radical extension of implied

immunity.[15]

As a matter of fact, the USDA sugar program was not "designed to deter and remedy anticompetitive harm." *Trinko,* 540 U.S. at 412. Thus, Defendants cannot show that application of Section 7 would be unnecessary because regulation would "completely curtail" the predicted harm to competition. *Aetna*, 240 F. Supp. 3d at 51. The USDA sugar program is designed to support American *farmers*, not sugar consumers, and its mandate is to (1) ensure an adequate supply of raw and refined sugar in the United States and (2) to do so in a way that ensures prices remain above forfeiture levels so that the program operates at no cost to the federal government.[16] 7 U.S.C. §§ 1359bb *et seq.*; Tr. 859:7–17, 886:13–25 (Fecso). As Congress made clear when enacting an earlier iteration of the program, it "is a price-influencing mechanism but it leaves ample room for keen price competition once sugar comes within the quota system." Staff of the House Comm. on Agric., 91st Cong., The United States Sugar Program 10 (Comm. Print 1971). That fundamental attribute of the program has not changed in the iterations of the program since. Today, the record shows that USDA intervenes from time to time when spot prices spike or dive for extended periods of time, but it has no ability to dictate or even monitor contractual prices negotiated between sugar producers and their customers. Tr. 889:24–891:2

---

[15] *Trinko* involved Section 2 of the Sherman Act, not Section 7 of the Clayton Act. "[Section] 7 of the Clayton Act was intended to reach incipient monopolies and trade restraints outside the scope of the Sherman Act." *Brown Shoe*, 370 U.S. at 318 n.32. *Trinko* has never been understood to displace Section 7 review even of telecommunications mergers, and the Antitrust Division has reviewed and challenged numerous such mergers in recent years.

[16] Defendants place significant emphasis on Additional U.S. Note 5(a)(ii) to Chapter 17 of the Harmonized Tariff Schedule, but that provision does not modify the purpose of the sugar program or the tools available to USDA. The provision provides the Secretary of Agriculture with discretion to increase the quantity of sugar available in the United States to "meet domestic demand at reasonable prices," but it provides no definition for what constitutes reasonable prices—for whom, where, or in what quantity—nor has USDA promulgated a definition of the term. Tr. 887:22–25 (Fecso). As a result, this provision is open to the interpretation of the ultimate decisionmaker of the sugar program. Tr. 886:6–11, 887:22–25 (Fecso).

(Fecso). Nor does USDA have the ability to determine regional sugar prices; it cannot direct sugar imports to specific ports of the country, and does not even know how its interventions will affect prices across regions. Tr. 888:1–10 (Fecso).

It is well established that where regulations restrict prices to a "zone of reasonableness," anticompetitive conduct "within that zone" can "constitute violations of the anti-trust laws." *Georgia v. Penn. R.R. Co.*, 324 U.S. 439, 460–62 (1945) (holding that the defendants could still violate the antitrust laws despite the presence of rate regulation). For instance, in *Philadelphia National Bank*, the Court blocked a merger in the heavily regulated bank industry because, "[i]n the range between the maximum fixed by state usury laws and the practical minimum set by federal fiscal policies . . . , bankers are free to price their loans as they choose." 374 U.S. at 328; *see also Aetna*, 240 F. Supp. 3d at 48, 52 (rejecting defense argument that regulation leaves "no opening for the anticompetitive effects that the Government posits" because regulations at issue "serve primarily to set 'the boundaries or the contours' for competition"). Similarly, in the same industry at issue here, the Second Circuit affirmed a lower court's decision to block a merger of sugar refiners notwithstanding government regulation of the industry under an earlier but similar iteration of the sugar program, finding that there was "still available room for competition." *Am. Crystal Sugar*, 259 F.2d at 527; *see also Am. Crystal Sugar*, 152 F. Supp. at 397, 400 (enjoining merger of two sugar producers even after finding that the Sugar Act of 1948 was the "basic statute controlling the whole industry").

Even when USDA does intervene in the market, any price impact is uncertain and not always immediate. After the Imperial refinery explosion in February 2008, sugar prices "skyrocketed" to two-to-three times forfeiture support levels and remained elevated for close to three years. Tr. 892:8–893:2 (Fecso); DTX515 at 26. During this three-year period, USDA took

several actions to increase the supply of sugar available in the United States, but it was not until

the fall of 2011 that refined sugar prices started to fall. DTX515 at 26. Another round of market

interventions over the last two years has similarly failed to bring prices down. Tr. 894:9–895:5;

DTX515 at 26.

Moreover, USDA has no ability to regulate non-price competition, such as customer

service. *See* Tr. 890:25–891:2 (Fecso). Such non-price competition can exist even when prices

are controlled, and a merger can be blocked in a regulated market when it threatens non-price

competition. *See Phila. Nat'l Bank*, 374 U.S. at 368 (discussing various non-price aspects of

banking competition not subject to regulation). Because USDA does not regulate product quality

and does not regulate the price of sugar within the zone of reasonableness, quality and price will

normally be determined by competitive forces. If mergers increase the concentration in these

markets, prices will go up and customer service will go down, both to the detriment of

consumers and in violation of antitrust law.[17]

### D.  Defendants Have Not Proven That Expansion Will Offset Anticompetitive Harm

The evidence firmly establishes that sugar is expensive to ship and sugar suppliers

therefore focus on selling to customers located relatively close to their facilities. *See supra*

Section III. Defendants' counsel even admitted during closing argument that "sugar flows at a

cost." Tr. 1183:14–15. Nevertheless, Defendants' counsel tries to argue that this cost is not

"prohibitive" and that "for the government's case to hold up, they have to establish . . . that

suppliers can't ship an ounce more sugar into that area or anyone's product out of it, even if

prices were to go up significantly." Tr. 42:19–25, 1183:14–15. This misstates the law. First, it is

---

[17] The Farm Bill is currently scheduled to sunset in 2023. *See* P.L. 115-334 at § 1301 (2018). As
U.S. Sugar CEO Robert Buker acknowledged, there is no guarantee the USDA sugar program
will be renewed in its current form. Tr. 773:7–11; *see also* JTX034 at 2 (rationale for the deal
includes "hedge" against potential changes to the Farm Bill).

*Defendants*, not the United States, that "carry the burden to show that ease of expansion is sufficient to fill the competitive void that will result if defendants are permitted to purchase their acquisition target." *H & R Block*, 833 F. Supp. 2d at 73 (internal quotation marks omitted); *accord Energy Sols.*, 265 F. Supp. 3d at 443. Second, Defendants' burden is to show, not merely that "an ounce more sugar" would enter in response to a price increase, but that the purported entry or expansion would be "timely, likely and sufficient in its magnitude, character, and scope" to replace the competition lost by the elimination of Imperial as an independent competitor. *See Energy Sols.*, 265 F. Supp. 3d at 443. Defendants fail to meet their burden.

Defendants speculate that a post-merger price increase would cause sugar suppliers that now focus on different regions to begin shipping more refined sugar into the relevant markets. Tr. 1186:20–24. But, as Dr. Rothman explained, it would be inefficient for a sugar "supplier like NSM [that] has a certain amount of sugar that it can sell over a given period of time" to shift its business practices and divert sales to customers in the relevant markets, where it is less well-positioned to compete. Tr. 598:17–25, 631:15–632:3. Defendants have not shown otherwise. On the contrary, ████ and Michigan Sugar witnesses testified they have no plans to increase sales in the southeast. *See* ███████████ ; Tr. 705:3–706:15 (Figueroa); *see also* PFOF Section V.

Defendants only point to "anecdotal" information of potential expansion that is "not necessarily tied to the relevant geography." *Anthem*, 236 F. Supp. 3d at 222. Specifically, Defendants point to examples of expansion by CSC and Sucro Sourcing, two raw sugar melters, and LSR's announcement that it plans to increase its capacity in Gramercy, Louisiana. Tr. 941:18–942:8 (Hill). But, according to CSC CEO Paul Farmer, melters compete in only a "very specific narrow market" segment, specifically the sale of high-color liquid sugar. Tr. 1044:4–6 (Farmer); *see* Tr. 159:12–160:1 (Swart). Melters do not produce granulated sugar, which

42

accounts for approximately 80% of refined sugar sales in the relevant markets. Tr. 120:23–121:4 (Riippa); Tr. 632:16–23 (Rothman); Tr. 1035:21–1036:10 (Farmer). CSC's Farmer also testified "liquid sugar is uneconomical to ship more than probably 250 miles" and that, to his knowledge, CSC never competed with the merging parties. Tr. 1038:10–16, 1044:12–1045:12. LSR, which focuses its sales in a different supplier backyard than the merging parties, Tr. 604:3–8 (Rothman), has announced a planned expansion, but this is ███████████████████████ ██████████████████████████████████" Tr. 1114:18–20, 1116:4–6 (Carter); Tr. 1128:22–1129:20 (Faucheux). ████████████████████████████████

████████ Tr. 1131:12–19 (Faucheux). Defendants also have not shown that the planned expansion would increase the total amount of refined sugar available to customers; ██████████ ████████████████████████████████████████████████████████. Tr. 1133:24–1134:12 (Faucheux). Additionally, the planned expansion was announced in May 2021, JTX022 at -174, so it could not have been a response to price increases resulting from the proposed acquisition, *see H & R Block*, 833 F. Supp. 2d at 76 (evaluating whether competitors were "poised to expand in response to a price increase"). Defendants therefore have failed to prove there is likely to be sufficient entry or expansion to "'fill the competitive void that will result' if the merger proceeds." *Anthem*, 236 F. Supp. 3d at 222.

### E. Defendants' Purported Efficiencies Are Not Cognizable and Do Not Offset Competitive Harm

Defendants' efficiency arguments fail to "meet the demanding scrutiny that the efficiencies defense requires." *See Penn State*, 838 F.3d at 349. The Supreme Court and Third Circuit have expressed skepticism about efficiencies defenses, *id.* at 347–48, and no appellate court has ever held that the efficiencies defense was successfully invoked, *Hackensack*, 30 F.4th at 176. The Third Circuit has explained that for claimed efficiencies to be cognizable, they must

"offset the anticompetitive concerns in highly concentrated markets," be "merger specific," "verifiable, not speculative," and "real," "not arise from anticompetitive reductions in output or service," and Defendants must establish that any purported benefits would be passed on to their customers. *Penn State*, 838 F.3d at 348–49, 351; *Hackensack*, 30 F.4th at 176.

Defendants offer only a laundry list of the same kinds of efficiencies that have been consistently rejected by courts, including the Third Circuit. *See* PFOF Section VII. Defendants claim that by implementing a series of "metrics" at Port Wentworth, the merged firm would increase output at the plant and thus enhance competition. Tr. 837:7–18, 845:9–21 (Smith). First, this vague claim is a classic unverifiable efficiency. *See Tronox*, 332 F. Supp. 3d at 215–16 (rejecting as unverifiable defendant's claim that it would use its purported "'unique skill set' and expertise . . . to boost production"). Second, it is not merger specific: Defendants fail to show why Imperial could not implement U.S. Sugar's proposed plan for Port Wentworth on its own. *See* Tr. 842:5–843:24 (Smith). Defendants fail to verify the proposed plan's "stretch goal" of increasing output by 10 days per year or to explain why this is only possible through the merger. Tr. 846:22–847:7 (Smith); JTX035 at 11; *Anthem*, 855 F.3d at 360. Defendants also fail to explain why U.S. Sugar's capital expenditures plan for Port Wentworth (based off Imperial's *own plan*), could not be achieved by Imperial without the merger. Tr. 847:24–848:7 (Smith); Tr. 633:15–24 (Rothman); *Heinz*, 246 F.3d at 722. Likewise, Defendants have offered no evidence suggesting that the claimed "efficiency" of improving access to a reliable source of domestic raw sugar, Tr. 772:5–14 (Buker), is verifiable or merger-specific. *Heinz*, 246 F.3d at 722; *Penn State*, 838 F.2d at 351 (rejecting efficiencies claim as not merger specific where defendants were "capable of independently engaging in" the purported efficiency); *Anthem*, 855 F.3d at 357 (rejecting defense where defendant failed to show "how intensive the effort has been" to achieve

44

the goal without a merger). The unsupported and unquantified assertions that the transaction could "actually lower prices because [the merged firm is] going to be an aggressive seller of [this additional sugar]," Tr. 562:18–20 (Wineinger); *see also* Tr. 778:16–779:2 (Buker); Tr. 854:18–855:4 (Fecso),[18] are insufficient to meet Defendants' high burden to show any savings "would ultimately be passed on to consumers." *Penn State*, 838 F.3d at 351.

Defendants also fail to show that post-transaction freight savings would be enough to "offset the anticompetitive concerns." *Penn State*, 838 F.3d at 348. The claimed distribution savings of $12-13 million[19] "wouldn't be close to offsetting the harm from the proposed acquisition." Tr. 634:13–22 (Rothman); *see also* Tr. 1017:11–14 (Hill). Moreover, the freight savings analysis done by United only contemplated increases to United member-owners' revenue. Tr. 314:17–315:6 (S. Hines). United neither "model[ed] [n]or consider[ed] giving . . . customers lower prices as a result of these savings." Tr. 315:19–316:15 (S. Hines). Such "[p]ossible economies cannot be used as a defense to illegality." *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 580 (1967); *Hackensack*, 30 F.4th at 177.

## IX.    CONCLUSION

For the foregoing reasons, the proposed transaction is likely to substantially lessen competition for the production and sale of refined sugar to wholesale customers in the relevant markets. The Court should therefore enjoin U.S. Sugar from acquiring Imperial.

---

[18] Dr. Fecso admitted that she was not provided, nor did she review, any data that supported the transaction's purported efficiencies. Tr. 882:24–884:6 (Fecso).
[19] Dr. Hill admitted $10 million was likely the more accurate number. Tr. 1015:11–18.

Respectfully submitted,

/s/ Shamoor Anis
SHAMOOR ANIS
LAURA D. HATCHER (#5098)
  Chief, Civil Division
United States Attorney's Office
District of Delaware
1313 N. Market Street, Suite 400
Wilmington, Delaware 19801
Tel.: (302) 573-6205
shamoor.anis@usdoj.gov
laura.hatcher@usdoj.gov

/s/ Brian Hanna
BRIAN HANNA
DAVID A. GEIGER
MICHAEL WOLIN
ROBERT LEPORE
JONATHAN MINCER
STEPHANIE PEARL
JOHN THORNBURGH
SCOTT A. WESTRICH

Attorneys for the United States
U.S. Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 8000
Washington, DC 20530
Tel.: (202) 460-4294
brian.hanna2@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 6, 2022, a true and correct copy of the foregoing was

served on all counsel of record via email.

/s/ Brian Hanna
BRIAN HANNA

U.S. Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 8000
Washington, DC 20530
Tel.: (202) 460-4294
brian.hanna2@usdoj.gov