# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff*, | Civil Action No. 1:21-cv-01644-MN |
| v. | **FILED UNDER SEAL** |
| UNITED STATES SUGAR CORPORATION, UNITED SUGARS CORPORATION, IMPERIAL SUGAR COMPANY, and LOUIS DREYFUS COMPANY LLC., | |
| *Defendants*. | |

## <u>PROPOSED FINDINGS OF FACT OF THE UNITED STATES</u>

## TABLE OF CONTENTS

I.     DEFENDANTS AND THE PROPOSED TRANSACTION.............................................. 1

    A. Defendants................................................................................................................. 1

    B. The Proposed Transaction ........................................................................................ 3

II.    INDUSTRY BACKGROUND ............................................................................................ 4

    A. Refined Sugar Production ......................................................................................... 4

        1. Domestic cane refiners ................................................................................ 4

        2. Domestic beet producers .............................................................................. 5

        3. Liquid refiners ............................................................................................. 6

        4. Foreign refiners ........................................................................................... 6

    B. The Sale of Refined Sugar ....................................................................................... 7

        1. Sales to industrial and retail customers ...................................................... 7

        2. Sales to distributors ..................................................................................... 9

    C. USDA Sugar Program............................................................................................. 10

III.   THE UNITED STATES HAS PROPERLY DEFINED TWO RELEVANT MARKETS
      FOR ANALYZING THE COMPETITIVE EFFECTS OF THE TRANSACTION ........ 12

    A. The Production and Sale of Refined Sugar is a Relevant Product Market ..................... 12

    B. The Narrower and Broader Markets are Proper Relevant Geographic Markets for
       Analyzing the Transaction ...................................................................................... 13

        1. High transportation costs cause competition for sugar to be regional ...................... 14

        2. Shipping longer distances can create additional concerns for both suppliers and
           customers.................................................................................................... 18

        3. Sugar prices tend to vary regionally............................................................ 18

        4. Industry participants recognize distinct regional markets........................... 20

        5. Market shares of suppliers varies substantially by region.......................... 23

6.  Dr. Rothman's robust economic analysis supports the alleged Relevant Geographic Markets ........................................................................................................... 24

7.  Dr. Hill defines no alternative market, and his alternative regions include regions where competitive conditions are significantly different .......................................... 27

IV.  THE PROPOSED TRANSACTION WOULD SUBSTANTIALLY LESSEN COMPETITION ........................................................................................................ 28

A.  The Proposed Transaction is Presumptively Unlawful in any Potential Relevant Geographic Market Based on Market Shares and Market Concentration ...................... 28

1.  United is the relevant economic entity for purposes of evaluating the transaction ... 30

2.  Distributors are not independent competitive constraints and should not be assigned market shares ............................................................................................................. 32

B.  Unilateral Effects ........................................................................................................ 36

1.  United and Imperial are significant competitors in the relevant markets ................. 36

2.  Competition between United and Imperial has resulted in lower prices for large and small customers alike ................................................................................................ 38

3.  United and Imperial compete on terms of quality and service reliability, thus benefitting customers ................................................................................................ 42

4.  Absent the acquisition, competition between United and Imperial would intensify in the Southeast .............................................................................................................. 42

5.  Dr. Rothman's robust economic analysis confirms that customers will be harmed from the elimination of head-to-head competition .................................................... 45

C.  The Transaction Is Likely to Result in Harmful Coordinated Effects ........................... 48

1.  The relevant markets are vulnerable to coordinated effects ...................................... 48

2.  United and Domino use intermediaries to exchange competitively sensitive information ................................................................................................................. 51

3.  There is past history of price fixing in the sugar industry facilitated by a third-party information exchange ................................................................................................ 56

4.  Dr. Rothman's conservative economic analysis illustrates that significant harm would likely result from increased coordinated effects as a result of the merger ..... 56

V.      ENTRY AND REPOSITIONING IS NOT LIKELY TO BE TIMELY, LIKELY OR
        SUFFICIENT TO NEGATE ANTICOMPETITIVE EFFECTS.....................................58

    A.  Construction of a New Sugar Refinery Would be Costly and Take Time....................58

    B.  Announced Expansion Projects by LSR, Michigan Sugar and Sucro Can Sourcing will
        not Mitigate Anticompetitive Effects.................................................................58

        1.  Expansions by Michigan Sugar and LSR are unlikely be timely or sufficient to
            constrain post-transaction price increases in the relevant markets ..........................58

    C.  Competitors Largely Selling Outside the Relevant Markets are Unlikely to Divert Sales
        to the Relevant Markets if Prices Increase .......................................................62

VI.     USDA ACTIONS ARE NOT LIKELY TO MITIGATE ANTICOMPETITIVE
        EFFECTS......................................................................................................63

VII.    DEFENDANTS' CLAIMED EFFICIENCIES CANNOT JUSTIFY THE LIKELY
        HARM TO COMPETITION BECAUSE THE PURPORTED EFFICIENCIES ARE
        NOT VERIFIABLE OR MERGER SPECIFIC.................................................67

    A.  Diverting a Limited Amount of Raw Sugar from Refiners Like ASR to the Port
        Wentworth Refinery Is Not a Verifiable, Merger-Specific Efficiency ........................67

    B.  Diverting a Limited Amount of Raw Sugar from Refiners Like ASR to the Port
        Wentworth Refinery Is Not a Verifiable, Merger-Specific Efficiency ........................69

    C.  Defendants' Purported Transportation Efficiencies, If Any, Would Accrue to United But
        Not to United's Customers.............................................................................71

    D.  Defendants' Other Purported Efficiencies, If Any, Would Accrue to United But Not to
        United's Customers ......................................................................................72

VIII.   IMPERIAL IS A STRONG COMPETITOR .................................................72

## I.      DEFENDANTS AND THE PROPOSED TRANSACTION

### A.      Defendants

1.      **U.S. Sugar Corporation** ("U.S. Sugar") is a Delaware corporation, headquartered in Clewiston, Florida. Pretrial Order Ex. 1, Parties' Statement of Admitted Facts ("PSAF"), D.I. 173A, ¶ 1. It owns and operates a cane mill and cane refinery in Clewiston, Florida that produces about 850,000 tons of refined sugar cane annually. PSAF, ¶¶ 2-3, 5.

2.      U.S. Sugar is a member of **United Sugars Corporation** ("United"), a Capper-Volstead agricultural marketing cooperative based in Edina, Minnesota. PSAF, ¶¶ 12, 14. United markets and sells all of the refined sugar produced by U.S. Sugar and its other member owners. Defendants' Answer and Defenses, 1:21-cv-01644-MN, D.I. 72 ("Defendants' Answer") Response to ¶ 2 at 6-7; PSAF, ¶¶ 12, 14. In addition to U.S. Sugar, United has three other member-owners: American Crystal Sugar Corporation, Minn-Dak Farmers Cooperative, and Wyoming Sugar Company, LLC, which all grow and process sugar beets. PSAF, ¶ 15. U.S. Sugar joined United in 1998, when its Clewiston refinery became operational. PSAF, ¶¶ 4, 13.

3.      United markets all sugar produced from U.S. Sugar's Clewiston refinery and the other members-owner's eight production facilities located in Minnesota, Montana, North Dakota and Wyoming. PSAF, ¶ 17. As structured, the four member-owners of United approach customers as a single competitor. PSAF, ¶¶ 19-21; Tr. 537:9-538:12 (Wineinger/United). Specifically, United handles locating customers, negotiating the sales contracts for its members' products, and arranging logistics. PSAF, ¶ 25; Tr.780:5-7 (Buker/U.S. Sugar). United sets the prices for all of the products it markets on its members' behalf. PSAF, ¶ 25; Defendants' Answer, Response to ¶ 2 at 6-7. On a weekly basis, United directs its member-owners as to which products to produce and in what form (e.g., 50-pound bags) based on short- and long-term needs as determined by United. Tr. 532:2-13 (Wineinger/United); *see also* PSAF, ¶ 23 ("United

tells its members what further processing their refined sugar might need (*e.g.*, converting granulated refined sugar into brown, powdered, or liquid forms), and what packaging to use."). United's member-owners cannot override this directive from United except for breakdowns in equipment. Tr. 532:8-17 (Wineinger/United).

4.       United sells bulk refined sugar and related products, such as granulated, powdered, brown and liquid sugar in a variety of package sizes, including 2 lb., 4 lb., 5 lb., 10 lb., 25 lb., and 50 lb. bags, and supersacks. PSAF, ¶ 26. United sells to the industrial, distributor, and retail channels. Tr. 123:20-124:6, 125:24-125:1 (Swart/United).

5.       United's revenues were approximately $2.24 billion in 2019 and $1.8 billion in 2020. PSAF, ¶ 18. U.S. Sugar received over $530 million from United in 2020, representing its share of United's net profits from sales of the refined sugar produced by the member-owners. Defendants' Answer, Response to ¶ 8 at 12-13.

6.       **Imperial Sugar Company** ("Imperial"), headquartered in Sugar Land, Texas, operates a 900,000 metric ton capacity cane sugar refinery and integrated liquid sugar production facility located in Port Wentworth, near Savannah, Georgia, and a sugar transfer and liquification facility in Ludlow, Kentucky. PTX350 at 9; PSAF, ¶¶ 30, 35. Imperial has the capacity to process six million pounds of cane sugar daily. PTX350 at 5. It produced over 15 million hundredweight[1] ("cwt") of refined sugar in 2019, and over 16 million cwt of refined sugar in 2020. JTX035 at -015. Imperial does not own any cane farming or milling assets; it primarily refines imported raw sugar. PSAF, ¶ 36.

7.       Like United, Imperial sells bulk refined sugar and related products, such as

---

[1] A hundredweight is one hundred pounds. Tr. 135:17-21 (Swart/United).

granulated, brown, powdered, and liquid sugar, and similarly sells them in various package sizes, including 1 lb., 2 lb., 4 lb., 5 lb., 10 lb., 25 lb., and 50 lb. packages, as well as supersacks and totes. PSAF, ¶¶ 31-32.

8.      Imperial sells to the industrial, food service/distributor, and retail channels. Tr. 255:2-9 (Hines/Imperial). Imperial's key customers include Pepsi, Hershey's, and Mars Wrigley in the industrial channel; Costco, Kroger, and Walmart in the consumer channel; and US Food Service and Indiana Sugars in the distributor channel. PTX 350 at 11; Tr. 255:2-9 (Hines/Imperial).

9.      For the period January 2021 to October 2021, Imperial had gross sales of $█ million and a gross margin of $█ million. PTX117 at -484, -486, and -500.

10.     Imperial is an indirect, wholly owned subsidiary of Defendant Louis Dreyfus Company LLC ("LDC"), a Delaware company. PSAF, ¶¶ 27, 28.

**B.      The Proposed Transaction**

11.     United began pursuing a potential acquisition of Imperial in late 2018. Tr. 535:18-536:8 (Wineinger/United). In May 2019, United made a preliminary, non-binding offer to LDC to acquire the assets of Imperial in a range of $█ million. PSAF, ¶ 41. In August 2019, United increased its offer to LDC to $█ million. PSAF. ¶ 41. LDC rejected both offers, believing them to be too low. Tr. 536:16-21 (Wineinger/United); Tr. 780:23-781:1 (Buker/U.S. Sugar); PSAF, ¶ 41.

12.     When United and LDC were unable to reach an agreement, U.S. Sugar began discussions with LDC to acquire Imperial. Defendants' Answer, Response to ¶ 12 at 14.

13.     On March 24, 2021, Defendants LDC and U.S. Sugar entered into an asset purchase agreement for U.S. Sugar subsidiary, Ibis Acquisition, to acquire the Imperial assets

from LDC for $315 million. PSAF, ¶¶ 44-45. On April 20, 2021, United entered into an

amendment to its agreement with its member-owners whereby upon closing of U.S. Sugar's

acquisition of Imperial, United would market the refined sugar produced at Imperial's Port

Wentworth refinery. JTX041 at -153 (amendment); JTX040 (2007 United/U.S. Sugar Marketing

Agreement); PSAF, ¶ 48.

## II.     INDUSTRY BACKGROUND

### A.     Refined Sugar Production

14.     Refined sugar is food-grade sugar produced by refining raw cane sugar or sugar

beets. PSAF, ¶ 49. In the United States, sugar cane is grown in Florida, Louisiana, and Texas,

while sugar beets are grown in eleven states: California, Colorado, Idaho, Michigan, Minnesota,

Montana, Nebraska, North Dakota, Oregon, Washington, and Wyoming. PSAF, ¶¶ 50-51.

15.     After harvesting, sugarcane is converted to "raw" sugar at mills, and then

processed into refined sugar at refineries. PSAF, ¶ 52. Harvested sugar beets are processed in a

single facility where they are converted into refined sugar directly with no milling process

required. PSAF, ¶ 53. Beet sugar in the United States is genetically modified. Tr. 275:25-276:1

(Henneberry/Imperial).

#### 1.     Domestic cane refiners

16.     Only four companies produce dry granulated refined cane sugar in the United

States: Defendants U.S. Sugar and Imperial, American Sugar Refining Group International

("ASR" or its most popular brand name "Domino") and Louisiana Sugar Refining ("LSR"). Tr.

75:14-19 (Riippa/General Mills); PTX330 at 5.

17.     Domino, which is owned by Florida Crystals Corporation ("FCC") and Sugar

Cane Growers Cooperative ("SCGC"), operates four cane refineries in Crockett, California;

Chalmette, Louisiana; Baltimore, Maryland; and Yonkers, New York. PSAF, ¶¶ 60-61. FCC also

owns a sugar refinery in Okeelanta, Florida that refines Florida-milled raw sugar, and sugar cane

mills in Osceola and Okeelanta, Florida. PSAF, ¶¶ 62-63. Domino also imports raw sugar. Tr.

754:9-11 (Olson/ASR).

18.    LSR operates a cane sugar refinery in Gramercy, Louisiana. PSAF, ¶ 65. LSR is a

50/50 joint venture between Cargill Inc. and the Louisiana Sugar Growers and Refiners, Inc.

(SUGAR), an agricultural marketing cooperative, consisting of eight sugar mills and associated

growers. PSAF, ¶ 66-67. Cargill has the ████████████████████████████ of the

refined sugar produced by LSR, which sources all of its raw sugar from SUGAR. PSAF, ¶ 68-70.

████████████████████████████████████ PSAF, ¶ 71. ████████

████████████████████████████████████ PSAF, ¶ 72; Tr.

1134:8-12 (Faucheux/LSR).

### 2.    Domestic beet producers

19.    In addition to the members of United, *see supra* ¶ 2, entities that produce refined

sugar from sugar beets in the United States include: Amalgamated Sugar Company

("Amalgamated"); Southern Minnesota Beet Sugar Cooperative ("Southern Minn."); Michigan

Sugar Company; and Western Sugar Cooperative. PSAF, ¶ 74.

20.    National Sugar Marketing Cooperative ("NSM") is the exclusive marketer and

seller of all the refined sugar produced by Amalgamated and Southern Minn., who are members

of NSM. PSAF, ¶ 77. Amalgamated owns and operates three beet processing plants located in

Idaho. PSAF, ¶ 75. Southern Minn. owns and operates a beet processing facility in Minnesota

and one in southern California. PSAF, ¶ 76. NSM also markets refined sugar in the United States

for Sucden Americas Corporation ("Sucden"), a refined sugar importer and trader. PSAF, ¶ 77.

Sucden does not produce refined sugar in the United States and predominantly sells imported

sugar. PSAF, ¶ 78; Tr. 343:1-13 (Simons/NSM).

21.     Michigan Sugar Company, a grower owned cooperative, operates four beet processing plants in Michigan, and a liquid melting facility in Ohio. PSAF, ¶ 79.

22.     Western Sugar Cooperative ("Western") owns and operates four sugar beet processing plants located in Colorado, Montana, Nebraska and Wyoming. PSAF, ¶ 80.

### 3.     Liquid refiners

23.     Some companies in the United States have set up operations to convert raw sugar directly to refined liquid sugar. PSAF, ¶ 81. CSC Sugar ("CSC") is the largest independent company in the United States that coverts raw sugar directly to liquid sugar. PSAF, ¶ 83. CSC produces refined sugar and operates refineries in five locations: (1) Covington, Tennessee; (2) Dallas, Texas; (3) El Paso, Texas; (4) Fairless Hills, Pennsylvania; and (5) Harrisonburg, Virginia. PSAF, ¶ 83.

### 4.     Foreign refiners

24.     Foreign producers of refined sugar sell into the United States, but foreign-refined sugar is generally more expensive and of an inferior quality than domestically refined sugar. *See, e.g.*, Tr. 343:14-344:11 (Simons/NSM) (CEO testifying that foreign refined sugar can often be hard and lumpy, of an improper color and the wrong granulation size); ██████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████   Foreign-refined sugar can also pose a food safety risk. ████████████████

██████████████████████████████████████████

████████████████████████████████

███████████████████████

### B.      The Sale of Refined Sugar

25.      Refined sugar is predominantly sold in granulated form, including the familiar dry white granulated sugar that many households stock in their kitchens. Defendants' Answer, Response to ¶ 15 at 16; Tr. 632:19-20 (Rothman) ("Around 80 percent of the refined sugar sold in the relevant market[s] is dry granulated sugar."). In addition to granulated sugar, refined sugar is also sold in other forms after it has been modified into liquid sugar (by dissolving granulated sugar in water or, for a few liquid-only producers, by melting raw sugar), brown sugar (by adding molasses to granulated sugar), or powdered sugar (by pulverizing granulated sugar and adding corn starch). Defendants' Answer, Response to ¶ 15 at 16.

26.      Sugar producers, either directly or via their marketing affiliates (*e.g.*, United and NSM), market and sell refined sugar to wholesale customers, including industrial food processors, retailers, and distributors. Tr. 534:16-535:9 (Wineinger/United); PTX330 at 5.

27.      These customers can buy refined sugar in either bulk, packaged, or liquid form. PSAF, ¶ 54. Bulk refined sugar may be delivered by rail, truck or barge. PSAF, ¶ 55. Some customers operate facilities that can readily accommodate deliveries of granulated refined sugar in bulk form by rail or by truck. PSAF, ¶ 57. Some customers are not set up to receive bulk deliveries of granulated refined sugar by rail or by truck. PSAF, ¶ 58.

#### 1.      Sales to industrial and retail customers

28.      Retailers and industrial food manufacturers frequently purchase sugar by issuing requests for proposals ("RFPs") for supply contracts. PSAF, ¶ 59. Industrial customer contracts commonly enter supply contracts lasting approximately a year. *See, e.g.*, Tr. 346:10-15 (Simons/NSM) (90% of NSM's customers are on annual contracts); Tr. 372:21-22

7

(Cagle/Piedmont Candy). Customer requests may include the plant locations, contract volume, whether sugar should be delivered in bulk, bagged or liquid, the product specifications (e.g., granulation size, color), and how delivery should be made (e.g., by rail or truck). *See, e.g.*, Tr. 80:3-9 (Riippa/General Mills); ████████████████████. Some customers specify a cane sugar only requirement, and so will not accept beet sugar. Tr. 126:1-6 (Swart/United); Tr. 234:6-18 (Hines/Imperial); Tr. 441:10-19 (Sproull/Domino) (some customers are willing to pay a small price premium for cane sugar); ███████████████████████████████

████████████████.

29.     Customers, particularly larger industrial customers, may seek multiple suppliers of refined sugar for a given location to ensure continuity of supply and manage supply chain risk. ████████████████████████; ████████████████████; Tr. 1033:1-9 (Crown/Post); Tr. 286:22-287:6 (Henneberry/Imperial).

30.     Customers rely heavily on competition between refined sugar producers to obtain competitive prices and to ensure product quality and reliable service. *See, e.g.*, Tr. 81:14-21, 82:7-10, 82:18-83:2 (Riippa/General Mills) (testifying that delivered price is a predominant factor considered when purchasing sugar but quality and reliability also matter when awarding bids); Tr. 367:11-23, 382:16-383:14 (Cagle/Piedmont Candy) (testifying that price and reliable service matters because "for every penny . . ., it [is] around $120,000 worth of profit" and

████████████████████████████████████████████

████████████████████████; Tr. 232:7-9 (232:7-12 (Hines/Imperial) (confirming that customers might select suppliers based on reliability and Imperial differentiates itself from competitors based on reliability). As United's Executive Vice President Sales explained, customers use pricing obtained from alternative suppliers in negotiations with United

to "leverage the price down" resulting in lower prices. Tr. 160:19-161:6 (Swart/United).

### 2.   Sales to distributors

31.     Sugar refiners and their sales marketers also sell to distributors as customers, resellers, and distribution partners, effectively using distributors to reach more customers. Tr. 535:6-9 (Wineinger/United); Tr. 255:2-9 (Hines/Imperial); PTX330 at 5 (identifying distributors in part of the "Sugar Buyers/Channels" step in the sugar supply chain, operating downstream from refiners as customers and resellers); Tr. 1003:5-17 (Hill) (agreeing that refiners sometimes refer to distributors as partners).

32.     Distributors resell refined sugar they purchase from both domestic and foreign refiners, including from United and Imperial. ███████████████████; Tr. 121:18-21 (Riippa/General Mills); Tr. 719:18-22 (Brown/IFPC). Given the customer concerns about imported foreign-produced refined sugar described above, distributors tend to purchase the majority of these imports. *See, e.g.*, Tr. 1062:4-6 (Yonover/Indiana) (testifying that they buy imported refined sugar); Tr. 719:18-22 (Brown/IFPC); ████████████████████ ██████████████████████████████████████████ ██████████████████████████; Tr. 219:10-14 (Hanson/United) (distributors are the primary importers of refined imports).

33.     Andrew Carter of Cargill, testified that distributors are among Cargill's largest customers. Tr. 1125:21-23 (Carter/Cargill). Mr. Carter does not view distributors such as Batory to be "direct" competitors of Cargill as "I don't believe Batory refines sugar. They don't have an integrated supply chain [like Cargill's and] I think they have a different business model in terms of customer charges and selling than we do." Tr. 1125:24-1126:6 (Carter/Cargill).

34.     In addition to acting as resellers for sugar refiners, distributors sometimes partner

with processors to facilitate serving customer contracts. *See, e.g.*, DTX193 at -595 (Imperial using Sweeteners Plus to facilitate delivery of liquid sugar to Hershey); Tr. 722:23-723:11 (Brown/IFPC) (distributor IFPC negotiated a liquid sugar sale to a North Carolina customer and then arranged to have Imperial supply and deliver the sugar to the customer).

35.      Notably, distributors often reach smaller customers than the refined sugar producers do (e.g., customers who need less than a truckload), fill gaps in larger customers' annual sugar purchases, or distribute other ingredients along with sugar. Tr. 457:9-11 (Speece/United) (distributors serve smaller end customers than United); ███████████████ ████████████████████████████████████████████; Tr. 325:3-7, 331:13-22) (Kling/Batory) (Batory has "[a] lot" of customers that "want to purchase other ingredients for delivery at the same time" and offers customers ████████████ ██████ of sugar, which is a ████████ of Batory's business, while refiners do not.); Tr. 344:25-345:9 (Simons/NSM) (Distributors "maybe provide only a pallet's worth of product, versus we are looking to be Tons-R-Us"); ████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████; Tr. 1087:4-13 (Krause/McKee) (McKee would buy from distributors in an "emergency situation.").

**C.      USDA Sugar Program**

36.      The United States Department of Agriculture (USDA) sugar program is embedded in the Farm Bill and set to expire in 2023. Pub. L. No. 115-334 §1301(a)(3); 7 U.S.C. 7272(i).

37.     The sugar program is designed to support American farmers and has a dual mandate to: (1) ensure that there are adequate supplies of raw and refined sugar in the domestic market, and (2) do so in a way that ensures the prices of raw and refined sugar remain above loan forfeiture levels so that the program operates at no cost to the federal government. PSAF, ¶ 86; 797:4-14 (Gorrell/Imperial); Tr. 859:7-860:2, 886:13-25 (Fecso/USDA).

38.     USDA has no mandate—or ability—to monitor or set the price at which domestic refiners sell refined sugar. Tr. 890:14-891:2 (Fecso/USDA); Tr. 791:16-792:2 (Buker/US Sugar).

39.     USDA has no authority to review sugar-related transactions for compliance with federal antitrust laws; that is left to the Department of Justice. Tr. 880:23-881:6 (Fecso/USDA). USDA has no official position on the proposed transaction. Tr. 882:4-8 (Fecso/USDA).

40.     The USDA uses domestic marketing allotments and international trade agreements to manage the supply of raw and refined sugar in the United States. PSAF, ¶¶90-91, 93; Tr. 867:4-15, 894:23-895:5 (Fecso/USDA). USDA allots "not less than 85 percent" of the estimated quantity of sugar needed for domestic human consumption to domestic processors of sugarcane and sugar beets. 7 USC § 1359bb(b)(1)(B); DTX 219 at -234; Tr. 285:19-23 (Henneberry/Imperial). Beet and cane processors cannot market more than their allotment in a given fiscal year. PTX330 at 10; Tr. 867:16-19, 868:10-17 (Fecso/USDA); Tr. 711:11-25 (Figueroa/Michigan Sugar).

41.     International treaties and agreements permit a certain quantity of raw and refined sugar to be imported into the United States at low- or no-duty tariffs. PSAF, ¶ 90; Tr. 797:22-798:1 (Gorrell/Imperial). Low- or no-duty tariff sugar is referred to as tariff-rate quota (TRQ) sugar. Tr. 871:14-23 (Fecso/USDA). USDA, in conjunction with the Office of the U.S. Trade Representative, implements the TRQ system. PSAF, ¶ 91.

11

42.     Sugar in excess of the TRQ quantity may enter the United States at the full-duty rate and is referred to as "high-tier" or "Tier 2" sugar. PSAF, ¶ 92; Tr. 559:19-24 (Wineinger/United). The Tier 2 price of refined sugar in the United States is not a constant, specific price, but rather depends on the world price of sugar, the cost of transportation, and the duty. Tr. 895:24-896:7 (Fecso/USDA).

43.     Unlike sugar imported under the TRQ system, the price and quantity of sugar imported from Mexico on an annual basis must comply with, and is limited by, the Suspension Agreements, under which the USDA manages the amount of imported Mexican sugar. Tr. 873:25-874:8, 893:20-894:5 (Fecso/USDA); PSAF, ¶ 93; Tr. 796:21-797:2 (Gorrell/Imperial).

44.     The Harmonized Tariff Schedule of the United States ("HTSUS") governs the classification of merchandise imported into the United States and determines the tariff rate for a particular good. *See* 19 U.S.C. §§ 3001, 3004. The notes preceding the Tariff Schedule for Sugars and Sugar Confectionery provide that "[w]henever the Secretary believes that domestic supplies of sugars may be inadequate to meet domestic demand at reasonable prices, the Secretary may modify any quantitative limitations [on imports] . . . ." HTSUS Ch. 17, Additional U.S. Note 5(a)(ii); PSAF, ¶ 94. USDA action under the HTSUS is therefore discretionary. Tr. 873:1-5 (Fecso/USDA). Neither the HTSUS nor USDA define the term "reasonable prices" as used in the HTSUS, PSAF, ¶ 95; Tr. 887:16-25 (Fecso/USDA), so "there is no price" under the HTSUS, "[j]ust words." Tr. 754:12-18 (Olson/ASR).

## III.    THE UNITED STATES HAS PROPERLY DEFINED TWO RELEVANT MARKETS FOR ANALYZING THE COMPETITIVE EFFECTS OF THE TRANSACTION

### A.    The Production and Sale of Refined Sugar is a Relevant Product Market

45.     There is no dispute that the product at issue in this case is refined sugar made from either sugar beets or sugarcane and produced in all of its forms (e.g., granulated, powdered,

brown, and liquid). Tr. 1137:24-1138:16. There are no reasonable substitutes for refined sugar. Tr. 589:24-591:19; 592:18-593:6 (Rothman) (testifying that the production and sale of refined sugar satisfies the hypothetical monopolist test ("HMT")).

46.    Defendants argue that the product market should be expanded to include resales of refined sugar by distributors. But distributors are customers of refiners, so they would be subject themselves to a small but significant non-transitory increase in price ("SSNIP") imposed by a hypothetical monopolist of the production and sale of refined sugar, and they cannot constrain such a price increase. Tr. 593:7-15 (Rothman).

### B.    The Narrower and Broader Markets are Proper Relevant Geographic Markets for Analyzing the Transaction

47.    Given the importance of transportation costs in the sugar industry, customers located nearest to Imperial and U.S. Sugar are most likely to be victims of increased prices if the Court were to allow the merger to proceed. The factual question is where to draw the line to assess the effects of the merger; that is, where the potential for harm is the greatest. Tr. 597:13-22, 603:2-4, 604:25-605:4, 613:24-614:2 (Rothman). Those areas are: (1) the broader region defined by the U.S. Census Bureau as the East South Central and South Atlantic United States (Alabama, the District of Columbia, Delaware, Florida, Georgia, Kentucky, Maryland, Mississippi, North Carolina, South Carolina, Tennessee, Virginia and West Virginia), and (2) the narrower region of Georgia and its bordering states (Alabama, Florida, Georgia, North Carolina, South Carolina and Tennessee). Both are proper geographic antitrust markets. Tr. 585:6-14, 593:16-594:8, 596:4-601:15 (Rothman).

48.    Although overbroad (because there are meaningfully different competitive options for customers in Texas), Tr. 604:3-13 (Rothman); Tr. 987:21-988:19 (Hill), the USDA South could also constitute an antitrust market. Tr. 650:6-651:16 (Rothman); *see also* Tr. 172:19-23

(Swart/United) (United uses the USDA defined regions "typically" to "analyze the demand flows"); Tr. 217:5-7 (Hanson/United) (United typically categorizes states by the USDA regions).

### 1.    High transportation costs cause competition for sugar to be regional

49.    Most customers pay a delivered price, *i.e.*, one that includes freight costs, rather than picking up sugar at the refinery. Tr. 375:8-22 (Cagle/Piedmont); Tr. 347:14-16 (Simons/NSM); Tr. 81:9-10 (Riippa/General Mills); 1032:14-20 (Crown/Post); Tr. 1083:16-23 (Bechard/Hostess). The cost of freight is a significant component of the total price paid by customers to receive sugar. Tr. 81:4-13 (Riippa/General Mills); Tr. 232:1-3 (Hines/Imperial); ███████████████████████; ████████████████████████; Tr. 455:9-23 (Speece/United); Tr. 733:17-25 (Hamill/Kraft).

50.    There is widespread recognition in the industry that proximity to customer location gives certain suppliers a freight advantage and can affect competitiveness. United recognizes that U.S. Sugar, Imperial, and Domino have a freight cost advantage to serve customers located in the southeast. Tr. 152:4-8 (Swart/United). United has defined different markets in the country where sugar producers have a freight cost advantage to serve customers in those areas. Tr. 150:22-25 (Swart/United); *see also* PTX452 at -448. United "predominately" supplies its customers in the Southeast from the Clewiston refinery as the associated freight costs are lower than shipping sugar from the Red River Valley beet sugar plants. Tr. 152:15-23.

51.    According to United's Director of Strategic Accounts, freight costs have impacted United's competitiveness in certain locations. Tr. 455:16-19 (Speece/United). When bidding to supply Danone's location in Jacksonville, Florida, Mr. Speece recognized that United had "a significant freight disadvantage over one competitor in Savannah, Georgia," which was Imperial. PTX395 at -857; Tr. 459:8-15 (Speece/United); *see also* PTX416 at-696 (estimating Imperial's

14

freight cost to serve Pepsi's location in Wytheville, Virginia to inform United's decision to revise its bid price).

52.     Similarly, when deciding what price to quote, Imperial considers the customer's shipping location to assess which competitors could possibly ship into the customer location. Tr. 228:6-23 (Hines/Imperial). For a customer with locations in Texas and Georgia, Imperial's Vice President of Sales and Marketing, Jeana Hines, observed that Imperial was not likely to be competitive at the Texas location due to Imperial's freight costs compared to competitors. Tr. 233:20-234:5 (Hines/Imperial). Imperial's Senior Vice President of Sales, Patrick Henneberry, agreed that Imperial had a "locational advantage" for the Georgia location and would be "luck[y]" to be within "a dollar" of its competitors' pricing in Texas. PTX163 at -832-33; Tr. 234:19-235:8 (Hines/Imperial); *see also* DTX219 at -220 (stating Imperial's reliance on the Norfolk Southern railroad for deliveries "makes it difficult to compete west of the Mississippi"). When bidding to supply cane-only sugar needs for Pepsi's Wytheville, Virginia location, Ms. Hines assessed that the likely competition was United out of Florida or Domino and did not believe that LSR (the only other cane sugar refiner) would be competing due to freight costs. Tr. 242:20-244:17 (Hines/Imperial); PTX164 at -933. Imperial also tends to sell more in the southeast than the northeast because it is more expensive for it to ship to the northeast. Tr. 226:20-227:2 (Hines/Imperial).

53.     NSM's CEO explained that customer location is an important consideration "just from a freight standpoint of where we expect to be competitive." Tr. 347:21-24 (Simons/NSM). Mr. Simons elaborated that, for the "most part, freight rates are, linear. Further mile – more miles you go, the more cost there is, whether it be truck or rail." Tr. 348:20-22 (Simons/NSM). Thus, he testified that for truck deliveries, "[w]e believe about 250 miles outside of either a facility or a

warehouse or a terminal is more than likely going to limit, due to governmental regulations, on driver hours." Tr. 348:9-15 (Simons/NSM). NSM ▮▮ makes ▮▮ of its sales in the broader market because of "freights costs and rail turn." Tr. 349:17-23 (Simons/NSM).

54.     Michigan's Vice President of Sales and Marketing, Pedro Figueroa, similarly explained that Michigan Sugar is a "regional sugar supplier . . . because "[i]t's a limitation on freight transportation costs to get to our customers" and thus "the farther we get away, the more freight cost that we are encountering" which "has an effect on our competitiveness overall." Tr. 703:7-10, 704:7-705:2 (Figueroa/Michigan). Michigan Sugar has almost no sales in Alabama, Florida, Georgia, Tennessee, or Delaware, and "the outer fringe of what [Michigan Sugar] will service will be the northern Kentucky market." Tr. 705:18-21, 706:3-10 (Figueroa/Michigan); *see also* Tr. 731:6-17 (Hamill/Kraft) (describing Michigan as a "regional player" because "Michigan tends to be only competitive in a certain region of the country" which is "more or less in Michigan" and "Ohio.").

55.     Domino also considers transportation costs when determining the likely competition for a customer. Tr. 440:18-441:6 (Sproull/Domino). Domino recognized that "based on geography" being in geographical proximity "between Baltimore and Florida" (a region that roughly matches the broader market), it would not be allowed to buy Imperial, because it would create "an antitrust concern." Tr. 759:14-22 (Olson/ASR).

56.     General Mills recognizes that a supplier's "geographic proximity" to General Mill's locations can affect the supplier's competitiveness. Tr. 80:21-81:3 (Riippa/General Mills). Because freight is a "significant" component of the delivered price, proximity "would allow [the supplier] to remain competitive in a given area." Tr. 81:4-13 (Riippa/General Mills); *see also* JTX007 at -403 ▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████████████████████████████.

57.     The COO of Batory Foods, Matt Kling, testified that ████████████████████

████████████████████████████ like sugar and can amount to ████████████████

██████████ of the delivered product, which can make it ████████████████████████

██████████████ Tr. 327:19-24, 330:12-17 (Kling/Batory). With respect to the shipping into the

Southeast, Mr. Kling stated "the freight lanes going from the Gulf to the east are not necessarily

competitive. They're generally not freight lanes that . . . carriers aspire to transport product in."

Tr. 329:1-4 (Kling/Batory). When pressed by Defendants regarding an instance where ██████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████ Tr. 334:6-19 (Kling/Batory).

58.     Other customers similarly testified about the impact of freight and distance. The

CEO of Piedmont Candy testified that "[i]n order for [sugar suppliers] to be competitively priced

and be able to service us, it would be obvious the closer they are to our facility the better it

would be from a freight perspective." Tr. 372:10-13 (Cagle/Piedmont). The Director of

Commodity Procurement at Hostess testified that a supplier close to Hostess's facility in Georgia

would have a price advantage and "the farther the distance, the more expensive the product is."

Tr. 1083:1-15 (Bechard/Hostess). International Food Products ("IFPC") uses ████████████

████████████████████ because ████████████████████████████████ Tr. 719:23-

720:10 (Brown/IFPC). And the sugar buyer at Kraft Heinz testified that a supplier's distance

from Kraft Heinz's facilities will affect the overall price "based on the freight rate that the

supplier is able to provide to that Kraft Heinz location." Tr. 733:20-25 (Hamill/Kraft).

### 2. Shipping longer distances can create additional concerns for both suppliers and customers

59.    Shipping distance can factor into a supplier's ability to provide reliable service. Tr. 372:3-20 (Cagle/Piedmont Candy); Tr. 352:8-15 (Simons/NSM) ████████████████

████████████████████████████████████████████

████████████████████████████; Tr. 1037:13-19 (Farmer/CSC Sugar) ("transit times on the railcars are unreliable" and "[r]ailroads are not that reliable when it comes to just in time" deliveries.). Shipping sugar long distances via railcar also can have other disadvantages, including risks of damage to the sugar. Tr. 1037:20-1038:9 (Farmer/CSC Sugar).

60.    Shipping sugar longer distances also imposes an opportunity cost. Tr. 348:22-349:4 (Simons/NSM) ("Another key component is the [customer's] ability to turn our railcars, and the amount of time a railcar is away from our facility. Just simple math, if my railcar leaves Renville, Minnesota, and it takes 40 days to come back, versus my ability to ship a customer and I get it back in 20, I can turn it twice to the same railcar that would be for one railcar going 40 days. That's a major decision point for us when we are looking at freight.").

### 3. Sugar prices tend to vary regionally

61.    The price of refined sugar also tends to vary depending on the region of the country. Tr. 229:16-18 (Hines/Imperial). Dr. Barbara Fecso of the USDA testified that refined sugar prices are "broken out by region because there is no one national price for sugar in the country, the price is dependent on location, population centers, transportation to get it to the buyer, things like that." Tr. 890:8-13 (Fecso/USDA). Suppliers also identify pricing by region. *See e.g.*, PTX389 at -329, -330 (describing prices for "S.E. cane sugar" and that "United set FY22 cane prices at $38.50 Southeast"); PTX 393 at -533 (noting that prices are "down on the coasts and up in south"); PTX041 at -195 (noting the pricing of competitors "specific to the

Southeast"); PTX042 at -593 (stating that "[p]rices in the Southeast are steady"); PTX049 at-600 (noting the different United pricing for the RRV and Southeast); PTX053 at -850-51 (showing higher F.O.B. prices in the southeast than the midwest); PTX063 at -319 (Domino providing southeast-specific pricing: "$39.50 fob bulk for ASR Southeast").

62.     The Sosland Report, an industry publication, also reports general refined sugar pricing by region, including for the West Coast, Midwest, Northeast, Gulf, and Southeast regions of the United States. Tr. 229:6-15.

63.     Dr. Hill's testimony that prices adjust nationally is misleading, as he never presents any evidence of actual price levels in separate regions. Tr. 930:6-931:6 (Hill). Instead, he acknowledges that Dr. Rothman's analysis of his data illustrated that United's prices do, in fact, vary by region. Tr. 932:8-23 (Hill). Dr. Hill's reliance on the 2019-2020 beet freeze is extremely misleading. Tr. 930:6-931:6 (Hill). Specifically, Dr. Hill testified that his graph showed "United's refined sugar prices broken out by something called USDA regions." Tr. 930:6-12 (Hill). In truth, Dr. Hill normalized prices to 100% in September 2019, a month before the beet freeze, an approach that masks the differences between the prices at that time and going forward. DDX008 at 15. Not surprisingly, Dr. Hill never testified that prices "equalize" across regions; instead he testified only that prices "adjust" nationally, an ambiguous term that Dr. Hill never explains. Tr. 931:2-6 (Hill). In contrast, Dr. Hill did testify that prices did not "equalize" across different regions in his discussion of the Tronox matter. Tr. 933:14-21 (Hill).

64.     Dr. Hill cites no ordinary course documents showing that refiners set a national price, Tr. 990:21-24 (Hill), and concedes that customers generally get location-specific pricing. Tr. 991:11-16 (Hill). Even more strikingly, Dr. Hill takes no actual position on whether there is in fact a national market. Tr. 988:23-989:4 (Hill).

#### 4.    Industry participants recognize distinct regional markets

65.    Multiple entities in the sugar industry recognize distinct regional markets that generally align with the region covered by the narrower and broader Markets. For example, for a March 16, 2020 meeting of the United Executive Committee (i.e., the CEOs of United's member-owners, including the CEO of U.S. Sugar, Bob Buker), Tr. 147:23-148:4 (Swart/United), United's management discussed and recommended a "Southeast Strategy" that focused on increasing United's competitiveness in an area United called the "Florida/Southeast Market," which covered the states of Alabama, Florida, Georgia, North Carolina, South Carolina, and Tennessee. PTX452 at -429, -448. To aid the presentation, United's management prepared a PowerPoint presentation with the title "Regional Markets Overview." PTX452 at -445. As part of the presentation, United prepared the following map of the United States with different regional markets defined by where a sugar producer has a freight cost advantage to serve customers located in the defined market. Tr. 150:3-151:12 (Swart/United); PTX452 at -448.



66.    United calls these defined markets as "Supplier Backyards," meaning the markets in which the sugar producers located in the market have a "freight advantage." Tr. 151:9-12 (Swart/United). United's assessment is that United's member-owner, U.S. Sugar, as well as

Imperial and Domino, have a freight advantage to supply sugar to customers located in the market United calls the Southeast. Tr. 151:9-12, 152:1-152:8 (Swart/United). This market analysis was prepared by United's Director of Marketing, Steven Hanson, who is in charge of managing United's software program that United uses for various market analyses, including identifying the most profitable opportunities. Tr. 193:22-194:7 (Hanson/United). As part of this modeling capability, United considers the estimated freight costs of its competitors based on shipping origin and destination. Tr. 194:11-195:3 (Hanson/United); PTX481 at-163.

67.     When United pursued a potential acquisition of Imperial in 2019, United believed acquiring Imperial "would likely provide access to attractive southeast . . . demand . . . ." PTX348 at -28; Tr. 305:3-8 (confirming that Seine means Imperial).

68.     Imperial tracks shipments by region and defines the Southeast similarly to United: Alabama, Florida, Georgia, North Carolina, and South Carolina. Tr. 982:7-19 (Hill). Imperial considers the states of Alabama, Mississippi, Florida, Georgia, North Carolina, South Carolina, Kentucky and Tennessee as its "core geography" for sale of supersacks. Tr. 223:23-224:9 (Hines/Imperial). Imperial has a regional sales manager that focuses on sales to customers in the Southeast, which covers Alabama, Georgia, Florida, North Carolina, South Carolina, Kentucky, and Tennessee, Tr. 221:17-222:4 (Hines/Imperial), This is only region where Imperial has a specific sales manager focused on the region. Tr. 222:5-8 (Hines/Imperial).

69.     Imperial's view on sales regions is similar to those of McKeany-Flavell, which Imperial uses as an industry broker. PTX217 at -071; Tr. 224:14-16 (Hines/Imperial). McKeany-Flavell describes Imperial's "primary marketing area" as the region of the United States that generally spans the majority of the Broader Market:



70.     PTX217 at -071. This defined "primary marketing area" matches the area

Imperial considers to be the "core geography" of its supersack business. Tr. 227:9-16

(Hines/Imperial). Ms. Hines never disputed McKeany-Flavell's view. Tr. 227:17-228:4

(Hines/Imperial).

71.     ███████ likewise assesses the customer demand and refining capacity by region

and in the ordinary course of business defines the Southeast the same way United does:

Alabama, Florida, Georgia, North Carolina, South Carolina, and Tennessee. DTX041 at-574.

72.     Numerous ordinary course documents from Domino, United, Imperial, and other

industry participants consider regional sugar markets including the southeast. *See, e.g.*, PTX046

at -769 (Domino's Adam Whittaker writes about the U.S. Sugar acquisition of Imperial: ███████

███████████████████████████████████████████████████████████

PTX063 at -319 (Domino's Alan Henderson provided southeast-specific pricing to Rich

Wistisen: "$39.50 fob bulk for ASR Southeast"); PTX350 at -31 (tracking sales by Census

Bureau region); PTX380 at -035 (United's Steve Hines sets meeting on "SE Product Mix –

Status and Next Steps"); PTX154 at -280 (Imperial emails regarding Costco sugar purchases in

northeast and southeast); DTX193 at -595 (Imperial email separately describing supply and

22

demand in southeast and northeast); PTX389 at -330 (Sosland Sweetener Report publishing regional refined sugar prices, including "S.E. cane sugar"); PTX042 at -593 (Wistisen report stating that "[p]rices in the Southeast are steady"). Similarly, Michigan Sugar described a regional "competitive landscape" including the "south" with the same three domestic refiners: Imperial, Domino, and United (plus imports). DTX034 at -007. After the Imperial acquisition was announced, McKeany-Flavell observed "[c]onsolidation of the cane industry could strengthen cane markets, particularly in the southeast." PTX474 at -807.

### 5. Market shares of suppliers varies substantially by region

73. Consistent with the idea that shipping sugar long distances is expensive and competition is therefore regional, Dr. Rothman has calculated that refiners' regional shares are closely related to where their refineries are located. Tr, 596:4-597:12 (Rothman). He testified that in the states in the far west constituting the "backyard" of NSM and a Domino plant in California, NSM accounts for 47% of the sales while Imperial has a share of "basically zero percent." Tr. 596:17-597:7 (Rothman). Likewise, in the states identified by United as constituting the "backyard" of U.S. Sugar, Imperial, and Domino's Florida refinery (the same states as in the narrower market), Imperial has 20% share, while NSM has only 2%. Tr. 596:6-597:12 (Rothman). As Dr. Rothman explained, "[t]his isn't an accident. Imperial is well positioned to supply customers in the southeast," but not to supply "customers in the far west," and NSM's positioning is the reverse. Tr. 596:22-597:8 (Rothman).

74. Dr. Rothman's assessment is consistent with the testimony from United's Executive Vice President of Sales, Dirk Swart, who confirmed that United's highest concentration of sales are in the Upper Midwest (where United's member owners' beet sugar facilities are located) and second highest concentration of sales are in the Southeast (where U.S.

Sugar's cane sugar refinery is located). Tr. 151:13-152:14 (Swart/United).

75.     Dr. Hill did not dispute or rebut these calculations. Tr. 983:24-984:12 (Hill).

### 6.     Dr. Rothman's robust economic analysis supports the alleged Relevant Geographic Markets

76.     Both experts agree that it is proper to define the relevant geographic markets in this case around customer locations. Tr. 602:1-8 (Rothman); Tr. 978:13-18 (Hill).

77.     The hypothetical monopolist test evaluates whether the complete elimination of competition between refiners to sell refined sugar to wholesale customers in the relevant markets would lead to a SSNIP or whether such customers could substitute sufficiently to a reseller of refined sugar outside the relevant markets, called arbitrage, to defeat a SSNIP. Tr. 590:4-21, 594:9-596:3, 599:9-600:13 (Rothman).

78.     Dr. Rothman showed that customers in the relevant markets would not be able to arbitrage sufficiently to defeat a SSNIP and so the alleged geographic markets are proper relevant antitrust markets. Tr. 593:16-21, 600:1-13 (Rothman).

79.     First, purchasing from distributors located outside the relevant geographic markets would be insufficient to defeat a SSNIP. Tr. 600:1-13 (Rothman). This is because purchasing from distributors outside the relevant markets would be "a high cost option," given that distributors would add "their own markup to the refined sugar" that they resell to other customers. Tr. 600:14-20, 610:14-611:2 (Rothman); *see also infra*, ¶ 103. Additionally, distributors "generally ship by truck and shipping refined sugar long distance by truck is costly." Tr. 600:14-20, 610:20-611:2 (Rothman); *see also* Tr. 331:13-332:1 (Kling/Batory) ███████████

████████████████████████████████; Tr. 333:16-24

(Kling/Batory) ████████████████████████████████████████

████████████████████████████████████████████; ████████

██████████████████████████████████████████

█████████████████████████████████████

████████████████████; Tr. 723:3-8 (Brown/IFPC) (if IFPC tried to ship refined sugar

more than 350 miles, "the freight would be very exorbitant, so we wouldn't be competitive"); █

█████████████████████████████████████████

████████████████████████████; Tr. 1062:19-22

(Yonover/Indiana Sugars) ("the majority of our customers are within 250 miles").

80.     Second, customers obtaining refined sugar at their facilities outside the relevant

geographic markets and reshipping the refined sugar to their facilities in the relevant markets

would be insufficient to defeat a SSNIP. Tr. 654:22-655:21 (Rothman). This is because "most

customers don't have locations outside of the market, and even for the customers that do,"

shipping and reshipping refined sugar "would be costly and inefficient." Tr. 655:4-17

(Rothman).  Dr. Hill agrees that most customers in the relevant markets do not have locations

outside the relevant markets. Tr. 936:23-937:8 (Hill).[2]

81.     Third, customers arranging for transportation to pick up sugar at supplier

locations outside of the relevant markets does not appear to be an attractive option for customers,

and would likely be insufficient to defeat a SSNIP, as, according to even Dr. Hill, only "three

percent of customers" in the relevant markets do this. Tr. 936:15-22, 979:10-13 (Hill).

82.     Finally, Dr. Hill's criticism of Dr. Rothman's arbitrage analysis is unfounded. Dr.

Hill is incorrect that Dr. Rothman does not adequately account for the possibility that "imports

---

[2] Dr. Hill argues only that the outcome is different "if you weight customers by volume," but that demonstrates only that a few large customers have locations in multiple regions. Tr. 936:25-937:8 (Hill).

that are currently going to other parts of the country . . . could be redirected into" the relevant markets. Tr. 935:2-5 (Hill). Dr. Rothman includes imports as competitors in the market and attributes them share. Tr. 605:20-25, 611:12-18. As such, Dr. Rothman properly includes imports as part of the hypothetical monopolist which includes "all of the producers of refined sugar." Tr. 666:3-8. However, to the extent that imports may be redirected through arbitrage, Dr. Rothman's hypothetical monopolist test considers the possibility of arbitrage from all locations outside the relevant markets. Tr. 599:18-600:20. Dr. Hill also is incorrect that General Mills' volume contract with United provides a potential form of arbitrage. Tr. 937:9-18 (Hill). That contract covers sales by United into the relevant markets, and allocates costs based on General Mills' ship-to locations, Tr. 103:11-20, so, if United were to raise prices post-merger, it would not provide an alternative source of supply that General Mills could use to avoid those price increases, *see* Tr. 654:16-656:3 (Rothman).

83.     Dr. Hill's criticisms of Dr. Rothman's hypothetical monopolist test do not account for the additional costs of transporting sugar from outside the relevant markets; Dr. Hill never testified as to what those costs would be, or how they would affect the hypothetical monopolist test that Dr. Rothman ran. Tr. 934:6-937:18. This is significant because it was precisely those transportation costs that form a key basis for Dr. Rothman's hypothetical monopolist test, Tr. 600:14-20, Tr. 655:4-21 (Rothman), and Dr. Hill never challenged those calculations; instead, he relies on mere assertions of what customers "could" do, without any corresponding mathematical calculations to determine whether the costs of doing so would render such options likely at any significant level. Tr. 934:6-937:18 (Hill).

84.     Tellingly, Dr. Hill never even attempted to present a hypothetical monopolist test in order to demonstrate that the geographic markets actually fail the test and are too narrow. Tr.

26

984:12-985:14 (Hill).

> **7.    Dr. Hill defines no alternative market, and his alternative regions include regions where competitive conditions are significantly different**

85.     Dr. Hill takes no position on whether the regions he proposes are in fact relevant markets, and never ran a hypothetical monopolist test on either one of them. Tr. 985:16-986:11, 988:23-989:4 (Hill).

86.     Dr. Hill's "competitive overlap" region is analytically flawed and he concedes that there is no competitive overlap test in the Horizontal Merger Guidelines. Tr. 986:12-15 (Hill). Dr. Hill also concedes that companies can sell into different geographic markets, Tr. 980:24-981:1 (Hill), and that it is not necessarily sound economics to assume that everywhere two companies compete must comprise a single market, Tr. 980:19-23 (Hill). Dr. Hill also conceded that economists should typically focus on narrower markets, because defining an overly broad market introduces substitutes that are not actually close substitutes, and gives those substitutes too much weight. Tr. 979:14-980:16 (Hill).

87.     Dr. Hill's competitive overlap region, however, does just that, as it purposely includes states where competitive conditions are obviously different. For example, Dr. Hill's competitive overlap region includes both Michigan and Ohio, where, according to Dr. Hill's own backup data, Michigan Sugar has massive market shares: 57% in Michigan and 44% in Ohio. Tr. 986:16-987:6 (Hill). By contrast, Dr. Hill also concedes it would not be surprising to him that his own backup data shows Michigan Sugar's market share to be 1% in Georgia, 0.1% in Florida, and 0.1% in South Carolina. Tr. 987:7-17 (Hill). Dr. Hill's competitive overlap region is therefore "too broad" and "brings in areas of the country in which customers have meaningfully different competitive options," which ends up confusing the competitive effects analysis. Tr.

603:11-604:13 (Rothman).

88.     Dr. Hill's national region is even more overbroad, and includes areas where competitive conditions differ enormously. Tr. 602:9-603:10 (Rothman). For example, Dr. Hill concedes that he has not analyzed choices made by customers in Southern California to determine whether they routinely consider the same refiner options as customers in and around Georgia. Tr. 991:16-21 (Hill). Dr. Hill hasn't reviewed any evidence at all relating to which companies make bids to serve customers in Southern California. Tr. 991:23-992:1 (Hill). Dr. Hill's national region would include areas where Imperial is not likely to be a significant competitive constraint, such as the Northeast, Mountain, West Coast, Alaska and Hawaii regions, where Imperial makes only 1-2% of its sales combined. 992:8-16 (Hill).

## IV.     THE PROPOSED TRANSACTION WOULD SUBSTANTIALLY LESSEN COMPETITION

### A.     The Proposed Transaction is Presumptively Unlawful in any Potential Relevant Geographic Market Based on Market Shares and Market Concentration

89.     The Horizontal Merger Guidelines provide a standard method to measure market concentration: the Herfindahl Hirschman Index (HHI). Tr. 612:7-18 (Rothman). A merger or an acquisition that results in a post-transaction HHI of greater than 2,500 and a change in HHI of 200 or more is presumed likely to enhance market power. Tr. 612:19-25 (Rothman). U.S. Sugar's proposed acquisition of Imperial would lead to market shares and concentration levels far beyond these thresholds in the narrower and broader markets, and is therefore "presumed likely to enhance market power." Tr. 612:10-613:12, 613:13-17 (Rothman).

90.     Dr. Rothman measured both market shares and market concentration to aid in the assessment of the competitive effects of the proposed transaction, following the Horizontal Merger Guidelines, Tr. 611:3-9, 612:7-18 (Rothman), and calculated the following market shares

for each market participant, using 2021 data, Tr. 611:10-612:1 (Rothman):

|  | Narrower Market | Broader Market |
|---|---|---|
| United | 34% | 29% |
| Imperial | 20% | 17% |
| ASR/Domino | 25% | 28% |
| LSR/Cargill | 7% | 7% |
| CSC | 3% | 6% |
| NSM | 2% | 3% |
| Michigan Sugar | 0% | 1% |
| Western Sugar | 0% | 1% |
| Zucarmex | 0% | 0% |
| Sucro Sourcing | 0% | 0% |
| L&S Sweeteners | 0% | 0% |
| Imports | 7% | 7% |

91.    The measures of market concentration in the narrower market and broader market both exceed the threshold that raise significant competitive concerns by wide margins. Tr. 613:13-17 (Rothman). Using 2021 data, the post-acquisition HHI would be 3,658 and the change in HHI would be 1,393 in the narrower market; the position-acquisition HHI would be 3,035 and the change in HHI would be 1,011 in the broader market. Tr. 613:25-613:6 (Rothman).

92.    Dr. Rothman measured the market share of any producer of refined sugar that makes sales of refined sugar to customers located in the narrower or broader market, including any foreign producer of refined sugar; in other words, the location of the supplier did not matter. Tr. 605:20-606:3 (Rothman). To calculate each market participant's market share, Dr. Rothman took the participant's sales of refined sugar to customers in each of the narrower market and broader market and divided by the total sales to customers in each respective market. Tr. 611:6-9 (Rothman). For the reasons discussed *infra*, ¶¶ 99-103, Dr. Rothman assigned market shares to any and all domestic and foreign producers of refined sugar selling to customers in the relevant markets, but did not assign market shares to non-producers, such as distributors and other resellers. Tr. 605:20-606:17 (Rothman). Dr. Hill used the same methodology as Dr. Rothman for

measuring market shares and concentration levels. Tr. 994:6-8 (Hill).

93.     Including areas outside the narrower and broader markets does not change the conclusion. For example, Dr. Rothman also calculated the HHI market concentration for the USDA South region, which includes the states in the broader market plus the states of Texas, Oklahoma, Arkansas, and Louisiana—a region that United sometimes uses to evaluate customer demand in the ordinary course. Tr. 172:19-23 (Swart/United). Dr. Rothman found that for the USDA South region the post-acquisition HHI would be greater than 2,500 and the change in HHI would be greater than 200.  Tr. 613:18-614:7 (Rothman).

94.     Even Dr. Hill's proposed regions would result in a presumption that the proposed transaction is unlawful as the resulting market shares are higher than 30% and there is a significant increase in concentration. Tr. 992:21-993:9 (Hill). Dr. Hill testified that based on his calculation in the national region, the merged firm would have a 31% market share, Domino a 25% share, and NSM as the only other refiner with a market share of more than 10%. Tr. 992:21-993:9. (Hill). The increase in HHI in the all United States region would be about 300 using both 2020 and 2021 data. Tr. 994:9-11 (Hill). Similarly, Dr. Hill testified that the combined market share of United and Imperial in the region he calls the "Competitive Overlap Region" would be 37%, with Domino having a market share of 27% and no other refiner with a market share of more than 9%. Tr. 993:13-994:1 (Hill). The increase in HHI in the Competitive Overlap region would be between 400 and 600 points using both 2020 and 2021 data. Tr. 994:12-15 (Hill).

### 1.     United is the relevant economic entity for purposes of evaluating the transaction

95.     To evaluate this proposed acquisition, Dr. Rothman determined that United, rather than U.S. Sugar, is the relevant economic actor because United is the "one economic entity" that markets, sells, and prices the refined sugar produced by its member-owners. Tr. 587:12-18

(Rothman). United's member-owners "don't set prices, they don't compete on price, they operate as one economic unit and that's United." Tr. 677:8-13 (Rothman); Tr. 126:11-13 (Swart/United); Tr. 538:8-12 (Wineinger/United) (confirming that United competes as one in the market); PTX490 at -112 ("By pooling your sugar with the sugar produced by 3 other sugar processors, we have a much larger presence in the market. We like to call this the 'Power of One.'").

96.     United's member-owners have aligned incentives. All members of United are paid the same price for the sale of refined sugar based on a net selling price ("NSP"), which is the net revenue (i.e., the delivered price that the customer pays United) received by United from the customer less the cost to make the sale. PSAF, ¶ 20; Tr. 126:25-127:12 (Swart/United). Each United member-owner benefits financially from the sale of sugar regardless of whether the member-owner actually produced the sugar. Tr. 127:13-128:4 (Swart/United). United's member-owners incentivize United to maximize the NSP to the benefit of United, its members, and the bonus compensation of United's CEO. Tr. 128:5-7 (Swart/United) (part of the job function of United's Executive Vice President of Sales is to maximize the NSP); Tr.531:6-532:1 (Wineinger/United) (incentive bonus of United CEO is tied to achieving or exceeding the target NSP set by Executive Committee and weighted 75% toward achieving the NSP target).

97.     Dr. Hill's suggestion otherwise, that United members "do not necessarily have aligned incentives," Tr. 914:14-16 (Hill), is wrong. It is based on: (a) "illustrative" figures that are made up, Tr. 995:25-996:5; and (b) a beet freeze that was not the result of any strategic choice by the member-owners. Tr. 996:6-996:13 (Hill). Dr. Hill has not provided the Court with any evidence that the distinction between United and its member-owners is material, as he has not analyzed how any alleged divergence between the United member-owners' interests would affect the transaction, Tr. 996:14-17 (Hill), and concedes that if there was a large difference in

incentives between the member-owners, they might not have an incentive to stay in the cooperative at all. Tr. 998:5-8.

98.     More importantly, Dr. Hill agreed with the essential facts that demonstrate why United is the appropriate economic entity to evaluate the transaction. Specifically, Dr. Hill admitted that: United does not provide multiple bids separately for each member-owner; United sets a single bid on behalf of its member-owners for a particular RFP at a given point in time; and United member-owners have the same incentives on the price of the bid submitted. Tr. 995:1-995:18 (Hill); *see also* Tr. 127:13-128:4 (Swart/United) (testimony of United's Ex. V.P. of Sales explaining that each United member-owner benefits financially from the sale of sugar regardless of which member produced the sugar). Tellingly, Dr. Hill, like Dr. Rothman, used United sales in his own economic modeling of the proposed transaction. Tr. 995:19-24 (Hill).

### 2.     Distributors are not independent competitive constraints and should not be assigned market shares

99.     In calculating market shares, Dr. Rothman assigned shares to refiners selling to customers in the relevant market, regardless of where they are located (including foreign refiners). Tr. 605:20-606:3 (Rothman). Dr. Rothman, did not, however, find that distributors selling in the relevant markets are market participants or assign distributors market shares for the purpose of evaluating the transaction. Tr. 606:4-6 (Rothman). As Dr. Rothman explained, treating "distributors as market participants would dramatically overstate their competitive significance" because distributors are distribution partners that "refiners are using . . . to reach other customers" —therefore distributors do not impose a competitive constraint on refiners beyond that provided by the refiner with which they are partnering. Tr. 606:7-607:9 (Rothman). In other words, a refiner *benefits* from sales by its distribution partner, even if the distributor wins a bid in competition with the refiner, because the result of that distributor's "win" is that

"the distributor will purchase more refined sugar" from the refiner, such that the refiner is effectively "making a sale to that customer through the distributor." Tr. 609:4-20 (Rothman). Dr. Rothman's conclusion was corroborated by the trial testimony of the CEO of International Food Products, a distributor, when he explained that Imperial is "getting the benefit of selling the sugar and we're the ones . . . selling it as well to [the customer]. So they're selling to us, and we're selling to [the customer]" and thus Imperial is "getting a sale of the sugar"). Tr. 723:12-22 (Brown/IFPC).

100.    Dr. Hill concedes that refiners collectively control the critical input of refined sugar for distributors that are not refiners in their own right, Tr. 1001:6-10 (Hill), and that it is important for distributors to have independent sources of supply. Tr. 1001:11-13 (Hill). Dr. Hill also recognizes that refiners have the option of choosing to distribute their own sugar directly to all customers rather than selling to distributors, as United has done for certain customers in Chicago. Tr. 1002:20-1003:4 (Hill). Refiners may refer customers to distributors at times for smaller orders of sugar, and refiners sometimes refer to distributors as partners. Tr. 1003:11-17 (Hill). Dr. Hill recognizes that distributors do not compete to serve all customers, Tr. 919:9-15 (Hill), that refiners can benefit from sales by distributors, and that where a distributor is a distribution arm, those sales should count towards the refiner's market share. Tr. 1004:5-11 (Hill). Dr. Hill conceded that in the Dean Foods merger case, which he worked on, Tr. 939:15-17 (Hill), distributors of milk were not assigned market share, Tr. 1004:21-1005:5 (Hill).

101.    Tellingly, Dr. Hill takes no position whatsoever regarding how often distributors are independent constraints to refiners or what their market share ought to be; he also did not attempt to make any such estimate in his economic models. Tr. 1004:12-20 (Hill). That is because, as a factual matter, even if Dr. Hill's mistaken position that distributors should be

assigned share were actually correct, any such estimate is likely to be small. Dr. Hill's own slides showed a large portion of distributor's sources coming from refined sugar imports, which Dr. Rothman already credits in his market share calculations. Tr. 1001:14-20 (Hill). It is especially unlikely that distributors will compete effectively with a merged Imperial and United reselling refined sugar they purchase directly from the merged firm, not only because distributors add a markup, Tr. 1002:17-19 (Hill), but also because distributors want to maintain good relationships with their suppliers. *See, e.g.,* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. That leaves only about 15-20% of distributors' supply that is neither from imports nor one of the merging parties, according to Dr. Hill. Tr. 1001:14-1002:14 (Hill). Of that 15-20%, even under Dr. Hill's view, only a fraction should be allocated to distributors independently. *See* Tr. 919:9-15; Tr. 1004:5-14 (Hill). Given that the most prominent example provided by Dr. Hill at trial, ▮▮▮▮▮▮▮, accounts for ▮▮▮▮▮▮ of sales in the broader market, Tr. 918:4-11 (Hill), the effect on Dr. Rothman's market share and concentration level calculations of including distributors (to the degree Dr. Hill claims they would be a constraint and to the degree their sales are not already included) are likely to be inconsequential.[3]

102.    Dr. Rothman's treatment of distributors for the purpose of evaluating the effects of the proposed acquisition aligns with the ordinary-course evidence. As part of educating its member-owner U.S. Sugar on the industry structure, United prepared a presentation that assigned no market share whatsoever to distributors and instead described distributors as a sales channel. Tr. 534:10-535:16 (Wineinger/United); PTX330 at -5-6. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[3] Dr. Hill testified that ▮▮▮▮▮▮ sales were ▮▮▮▮▮▮▮▮▮ and the numbers he testified to calculate to ▮. 20% of ▮ equals ▮, only a portion of which would function as a constraint on refiners in the broader market, even under Dr. Hill's proposed view, which would not impact Dr. Rothman's calculations in any material way.

██████████████████████████ PTX030 at -401 ███████████████████████

████████████████████████████████████████████████████████.

103.     Distributors are not independent competitive forces in the market, because they

must purchase refined sugar from sugar producers and earn a margin on top of that cost. As the

CEO of Batory Foods explained, Batory Foods is buying from sugar producers and is trying to

"extract value from what we do" so █████████████████████████████████████

████████████████████████████. Tr. 330:18-19, 324:23-325:7,

███████████████████████. For example, as to competing with United on price, █████████

█████████████████████████████████████████████████

████████████████████████████. The CEO of another distributor, ███████

█████████████████████████████████████████████████

███████████████████████████; *see also* ███████████

█████████████████████████████████████████████████

████████████████████████████████████████████. Other

large purchasers of sugar similarly recognized that distributor prices are more expensive than

buying directly from the sugar producers. ████████████████████████; Tr. 1083:24-

1084:4 (Bechard/Hostess) (Hostess does not use distributors "[b]ecause traditionally the prices

are more expensive" as the "distributor has to make money").

104.     As the only source for distributors' sugar, sugar producers can also influence

distributors' competitiveness by increasing the price at which the distributor must pay in the first

instance ███████████████████████████████████████████████

████████████████████████████████. In fact, United's strategy over

time has been to reduce the volume of its sales to distributors and accordingly increase the price

it charges distributors for the purchase of sugar. Tr. 145:16-147:16 (Swart/United) (describing United's "Chicago Strategy" that enabled United to increase prices to distributors); PTX507 at -777 (describing United's strategy as "Eliminat[ing] dependence on Batory Foods . . . [and] "Increas[ing] prices to Chicago area distributors"). Recognizing the success of this Chicago Strategy, United's management recommended pursuing a similar strategy in the Southeast. Tr. 147:11-19, 153:2-154:20 (Swart/United); PTX452 at -462 (recommending a "Southeast Strategy" that was "Similar to Chicago Strategy" in which United would "reduce volume with distributor"). In the wake of the public announcement of the Imperial acquisition, a Domino salesperson observed that ███████████████████████████████████████████

███████████████████████████████████████████████████████████████

███ PTX046 at -769; Tr. 344:20-24 (listing Evergreen as a distributor). ██████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████ DTX041 at -571.

B.    Unilateral Effects

1.    United and Imperial are significant competitors in the relevant markets

105.    Despite the Defendants' protests to the contrary, as recognized in an internal analysis prepared with the assistance of Imperial's CEO, Imperial views "United in Florida" as one of its "close competitors." DTX219 at -226; Tr. 798:17-799:6 (Gorrell/Imperial) (Imperial CEO testifying that he helped to create the PowerPoint presentation that is DTX219).

106.    United and Imperial closely compete against one another to win customers' business in the relevant markets. *See, e.g.*, *infra* ¶¶ 110-115, 118; PTX163 at -833 (noting that Imperial has always lost Molson Coors' facility in Georgia to "United cane"); Tr. 131:8-12

(Swart/United) (United competes against Imperial for Pepsi in Atlanta, Georgia and Wytheville, Virginia); PTX094 (native Excel) at tab "Sheet 1"; Tr. 278:25-279:10 (Henneberry/Imperial) (Imperial recognizing that its competition for Hospitality Mint's facility, located in Boone, North Carolina is "United"); PTX192 (native Excel) at tab "Sheet 1"; Tr. 277:22-278:11 (Henneberry/Imperial) (Competition for Helm's Candy business in Virginia is recorded by Imperial as "Domino and United"); PTX469 at-118 ("Imperial use to sell [Great American Cookie] and lost the business to use due to an issue at Imperial."); PTX470 at -121 ("Received word from [Great American Cookie] that we were not awarded any business for 2020 . . . I believe Imperial might have gotten back in."). In a March 2020 presentation to the United Executive Committee, United management identified Imperial and Domino as sugar producers with freight cost advantages in the Southeast. Tr. 151:9-12, 152:4-8 (Swart/United), PTX452 at -448 (Supplier Backyards map).

107.    Customers recognize United and Imperial are significant competitors. *See, e.g.*, PTX414 at -481, Tr. 462:13-464:5 (Speece/United) (in April 2021 Pepsi asked United whether it could cover any supply for its Virginia facility noting that "we also asked Imperial, so first in wins. We will take what we can get due to Domino fire."); ██████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████.

108.    United and Imperial are also part of a limited set of options for customers who require cane sugar. *See, e.g*., PTX163 at -832-833 (recognizing that because the Molson Coors business "has to be cane," that the only competition would be United, Domino, or LSR); Tr. 242:5-244:2 (Hines/Imperial) (Imperial expected likely competition for Pepsi's Wytheville,

Virginia location, which required cane sugar at the time, would be United out of Florida or Domino, not LSR), PTX164 at -933 (same); Tr. 368:5-370:7 (Cagle/Piedmont) (Piedmont Candy uses only pure cane sugar to make its candy); ███████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████. For United's industrial customers, about 13-15 percent of United's sales volume are for customers that specify cane-sugar only. Tr. 125:24-126:10 (Swart/United). When competing for a cane sugar only customer, United and Imperial know beet sugar suppliers would not be competing for the business. Tr. 234:15-18 (Hines/Imperial); Tr. 126:1-6 (Swart/United).

109.    Additionally, there is far more competition between Imperial and United than can be covered during fourteen hours at trial. Dr. Hill conceded that according to his own report, United overlaps on 54% of Imperial customers in the narrower market and 56% of Imperial customers in the broader market, while Imperial overlaps on 38% of United customers in the narrower market and 77% of United customers in the broader market.  Tr. 998:5-1000:21 (Hill). The significant market shares that Imperial and United hold in the relevant geographic markets also result in a presumption that the proposed acquisition is likely to enhance market power under the Horizontal Merger Guidelines. Tr. 605:5-19 (Rothman).

### 2.    Competition between United and Imperial has resulted in lower prices for large and small customers alike

110.    The price of refined sugar matters to customers, large and small. Post's Thomas Crown testified that "in the sugar business, a penny a pound or two pennies a pound makes a big difference." Tr. 1031:21-1032:9 (Crown/Post). Piedmont Candy's Heath Cagle likewise explained that refined sugar is "our biggest ingredient, it's our biggest spend by far," and "[s]o a penny more a pound if we purchase 12 million pounds, that's around $120,000 worth of profit"

for that purchase. Tr. 367:11-23 (Cagle/Piedmont). McKee Foods' William Keith Krause

testified that the price of refined sugar is "one of our biggest spends and we buy so much that a

penny a pound represents ███████████████." Tr. 1090:16-22 (Krause/McKee).

111.    United and Imperial compete to offer customers the lowest price which has

resulted in lower prices in negotiation with both large and small customers located in the relevant

markets. *See*, *e.g.*, *infra* PFOF ¶¶ 112-116; PTX154 at -280-81, Tr. 240:3-242:3 (Hines/Imperial)

(after learning that it was competing against "United cane" to supply Costco and needed to lower

its price to be more competitive, Imperial dropped its bid price by 9 cents); PTX370 at -666, Tr.

460:20-461:13 (Speece/United) (United using Imperial's estimated pricing to compare United's

competitive bid to supply Campbell Soup in North Carolina); PTX250 at -057, Tr. 281:8-24,

295:2-6 (Henneberry/Imperial) (Imperial estimating United's pricing to compete for DCB's

business and ultimately lowering its price to compete).



112.    ████████████████████████████████████████

████████████████████████████████ Tr. 96:21-24 (Riippa/General Mills). ████

████████████████████████████████████████████

██████████████████████████████ Tr. 96:25-97:8 (Riippa/General

Mills) ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████ *See* JTX008 (native Excel)

at tab "Sheet 1." For General Mills' facility in Murfreesboro, Tennessee, Imperial's Jeana Hines

reported to Imperial's CEO in 2018 that "on EVERY bid we have won on the auction and we

were #1 in price, United has come back in after the fact . . . with a lower price and then got the

business." PTX137 at-120, Tr. 237:24-238:6 (Hines/Imperial). █████████████████

████████████████████████████████████████████████████████

████████████████ *See* JTX008 (native Excel) at tab "Sheet 1".

113.    United and Imperial have been in a protracted battle to win Pepsi's business in

Wytheville, Virginia, beginning with Imperial securing the business from incumbent United in

2019. Tr. 244:18-24 (Hines/Imperial) (confirming that Imperial ultimately won the business from

incumbent United); PTX164 at-933 (Pepsi asking Imperial to quote Pepsi's Wytheville, Virginia

bulk rail business for 2019); Tr. 131:16-21 (Swart/United) (confirming that a few years ago

United lost the Pepsi business in Wytheville, Virginia to Imperial). For Pepsi's 2022 RFP,

United had its "eye on Wytheville" and identified Imperial as the competition to win back the

Wytheville, Virginia business. PTX416 at -696, Tr. 133:21-134:5, 137:10-13 (Swart/United).

United then bid aggressively by increasing the competitive discount it offered to Pepsi for the

Wytheville, Virginia location from $███/cwt to $███/cwt for bulk sugar and $███/cwt for

liquid sugar. PTX416 at -696 (noting that United's initial offer included a competitive discount

of $███/cwt); Tr. 135:8-16 (Swart/United) (confirming that the competitive discount of $███

discussed in PTX 416 was United's original offer); PTX417 (in column K of Rows 34 and 35,

listing the agreed-upon competitive discount for Wytheville, Virginia as $███/cwt for bulk rail

sugar and $███ for liquid sugar); Tr. 142:24-143:14 (Swart/United) (confirming that the

discount listed in column K of Rows 34 and 35 of PTX417 represented the final agreed

competitive discount for the Wytheville, Virginia location).

114.    During the last five years, Imperial and United have competed to supply Piedmont

Candy in Lexington, North Carolina with sugar in the relevant markets. Tr. 384:23-25

(Cagle/Piedmont) ██████████████████████████████████████████████████



██████. In 2021, ██████████████████████████████

████████████████████████████████████████████████

████ JTX027 (native Excel) (compare comments in cells D9 and E9); PTX220 at -959 ████

████████████████████████████████; PTX322 at -441 █████████████

███████████████. ████████████████████████ after United responded to Piedmont's

request for a price reduction by saying it "is going to have to pass on this opportunity, as we just

cannot make that number work." PTX465, at -734, Tr. 580:23-581:4 (Campbell/United). ████

██████████████████████████████ Tr. 384:21-22 (Cagle/Piedmont).

115.    Imperial and United have likewise competed to supply Bud's Best Cookies in

Birmingham, Alabama in recent years, with United winning the business in 2019, Imperial

wining the business in 2020, and United lowering its pricing by "matching Imperial's quote" to

win the business back for 2021. Tr. 575:4-12, 572:17-19 (Campbell/United) (United won Bud's

Best Cookies in Alabama for 2019); PTX145 at -683 (confirming that Imperial won the 2020

business after "United came back in, and offered them better"); PTX150 at-395 (recording

United as the competition for Bud's Best Cookies for 2020 business); PTX464 at -187 (United

"matching Imperial's quote" for the 2021 business).

116.    Furthermore, Imperial's presence in the relevant markets as a competitor

incentivizes United to lower its prices to customers regardless of whether Imperial successfully

competes for a specific customer. *See, e.g.*, PTX395 at -857, Tr. 458:17-460:5 (Speece/United)

(United offered customer Danone a lower starting price as United assumed it was competing

with Imperial to win the business over Imperial); ██████████████████████████

████████████████████████████████████████████████

██████████████████████████████.

### 3. United and Imperial compete on terms of quality and service reliability, thus benefitting customers

117.    Product quality and service reliability are also important to customers. *See, e.g.*, Tr. Tr. 733:4-19 (Hamill/Kraft) (Kraft Heinz values "Quality, service, price" when selecting a sugar supplier); Tr. 81:14-82:1 (Riippa/General Mills) (When selecting suppliers, General Mills considers service reliability, such as on time arrival to keep the factories running); Tr. 82:18-83:2 (Riippa/General Mills) (General Mills seeks to ensure "the sugar coming in would be free of foreign material and perform as well in our operating systems to make our finished products."); PTX461 at -322 (United was seeking to regain Bud's Best Cookies' business from Imperial based on "awesome customer service" after losing it due to United "delivery issues").

118.    Imperial and United compete to provide higher levels of quality and reliability, thus benefitting customers. *See, e.g.*, Tr. 269:11-270:12 (Henneberry/Imperial) (Imperial wins business due to the quality of its sugar and its timely delivery, which is "part of reliable customer service"); Tr. 232:7-12 (Hines/Imperial) (Imperial strives to differentiate itself by having the best reliability); Tr. at 577:1-4 (Campbell/United) ("customer service, quality, [and] on time delivery [are] examples of things that United can try to win business"). In 2019, Imperial learned that United had been supplying Pepsi's Wytheville, Virginia with lumpy sugar that had been difficult to unload out of railcars and "[n]ot once did they send anyone in to review the system, sugar or attempt to solve any of their issues." PTX147 at -688. Imperial offered "suggestions on how to improve the unloading process" and Pepsi was "thrilled" at the advice. PTX147 at -688; *see also* Tr. 246:10–248:21 (Hines/Imperial).

### 4. Absent the acquisition, competition between United and Imperial would intensify in the Southeast

119.    In 2018, United began exploring opportunities to expand capability at the Clewiston refinery to produce and sell higher-margin packaged sugar products to customers

mostly located in the Southeast. Tr. 298:23-299:21 (Hines/United); PTX380 at -035 (discussing the addition of packaging capacity for better "SE product mix" and putting "2 sales reps in Florida"). The goal was to implement a sales strategy in the Southeast similar to the strategy that United implemented in the Chicago area with great success. Tr. 300:23-301:8 (Hines/United); Tr. 199:9-200:5 (Hanson/United); Tr. 147:11-19; 153:23-25 (Swart/United); PTX452, at -462. Or as United's Vice President of Strategy, Steve Hines, put it, "Attack the market like Chicago." PTX380 at -035.

120.    United was especially focused on increasing its capacity to sell 50-pound bags and 2000-pound supersacks to small- and medium-sized customers located in the Southeast, where United observed increasing customer demand for industrial bag products. Tr. 300:15-301:2 (Hines/United); Tr. 155:6-10 (Swart/United); PTX380 at -035; PTX452 at -459, -462. United's strategy was not dependent on an acquisition of Imperial. Tr. 155:11-14 (Swart/United).

121.    In 2019, United created a sales plan that modeled increasing the Clewiston capacity to produce and sell 50-pound bags, United's "most profitable product," by 2.5 million hundredweight, which required installing a new 50-pound packaging line. PTX483 at -379 & -380 – Summary Buildout. United shared with its members estimated capital projections for expanding 50-pound packaging and adding a new supersack packaging line at Clewiston. Tr. 536:22-537:1 (Wineinger/United); PTX490 at -28. United identified sales opportunities for this Clewiston expansion that mostly targeted sales to customers located throughout the relevant markets, as represented by the blue dots depicted on the map from the United presentation excerpted below. Tr. 541:8-24 (Wineinger/United); PTX348 at -31.



122.    Ultimately, at a March 2020 meeting of the United Executive Committee,
United's senior management recommended a "Southeast Strategy" that included adding capacity
to produce 50-pounds bags and supersacks at Clewiston, as well as adding sales managers to
support the expansion. Tr. 155:7-10 (Swart/United); PTX452, at -462.

123.    Imperial and United already compete for sales of 50-pound bags and supersacks
to customers in the Southeast, so United's expansion would make them even closer competitors.
*See e.g.*, PTX154 (showing Imperial competing against "United cane" for the sale of 50-pound
bags to Costco in the Southeast); Tr. 239:3-240:6 (Hines/Imperial); JTX027 at -006 ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮ Tr. 376:5-14, 379:22-380:2, 397:4-6 (Cagle/Piedmont), ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮ ; PTX348 at -32 (identifying the customer locations of United's "existing"
supersack sales). Indeed, while "working to find a way to improve access to this demand" for
"key products" such as 50-pound bags and supersacks in the Southeast, United recognized that
"this attractive demand may already be sold by" Imperial, including as much as 40-60% of the

demand. PTX348 at -28, -29; Tr. 306:23-307:424 (Hines/United); *see also* DTX219 at -226 (noting that 75% of Imperial's margins is made selling packaged products, including 50-pound bags); Tr. 227:9-13 (Hines/Imperial) (identifying Imperials' "core geography" for the sale of totes, depending on the year, is Alabama, Mississippi, Florida, Georgia, North Carolina, South Carolina, Kentucky, and Tennessee).

124.    Imperial predicted this competitive threat from United when it assessed that "close competitors such as United in Florida should invest in an efficient packaging line, reshape their sales force, and attack Imperial . . . ." DTX219, at -226.

125.    United ultimately did not invest in this expansion at Clewiston because United instead pursued acquiring Imperial. Tr. 301:10-302:10 (Hines/United). United assumed that the Imperial acquisition would give United the necessary capacity to target these increased sales in the Southeast while avoiding altogether or delaying spending the capital to expand 50-pound bag capacity at Clewiston. Tr. 542:1-8 (Wineinger/United); PTX348 at -31 (identifying $3 million in 1-time capital avoidance or delay of capital expansion for 50-pound bags at Clewiston due to the Imperial acquisition); *see also* Tr. 156:7-157:4 (Swart/United) (observing that if U.S. Sugar acquires Imperial, United might not have to invest in the Clewiston expansion).

### 5.    Dr. Rothman's robust economic analysis confirms that customers will be harmed from the elimination of head-to-head competition

126.    Dr. Rothman presented robust economic analysis that predicted "significant price effects" as a result of the proposed transaction. Tr. 625:18-22 (Rothman). Dr. Rothman calculated the harm that would result from this loss of this head-to-head competition using a second-score bidding merger simulation model, which "better matches the way in which most refined sugar is sold". Tr. 623:1-11 (Rothman). Dr. Rothman's model found that the elimination of head-to-head competition between United and Imperial would cause prices to increase by 3-

4% and would increase the *annual* cost of refined sugar to customers by $30.5 million in the narrower market and $36.2 million in the broader market. Tr. 625:5-17 (Rothman). Dr. Rothman's second-score bidding model is "grounded in market realities," as its two key inputs are actual state-level shares and actual margins. Tr. 624:1-25 (Rothman). The model uses actual state-level shares to estimate "the likelihood that United and Imperial are the two best bidders for a given customer" and it uses actual margins to determine "the intensity of competition," specifically to estimate "how much worse … the third best bid [is] relative to the second best bid." Tr. 624:5-25 (Rothman).

127.    Dr. Rothman's model uses both United and Imperial margins because "they both provide relevant information about competitive dynamics" in the industry. Tr. 625:2-4 (Rothman). Thus, Dr. Hill's criticism of Dr. Rothman's model for not accurately predicting United's and Imperial's individual margins is misleading: Dr. Rothman's model uses both companies' margins together for the same estimate of how the second-best bid compares to the third-best bid, Tr. 624:13-625:4 (Rothman), so the model by design takes and combines United's and Imperial's margins rather than aiming to match each company's margins individually. Furthermore, Dr. Hill admits that, when Dr. Rothman checks the validity of the model by using only one of the two firm's margins, the model correctly matches the input. "When he gives it just United margins, the model matches United margins," and "when he gives it Imperial's margins, it matches Imperial margins." Tr. 953:8-13 (Hill). Dr. Hill treats the margin calibration employed by the model as a mistake by Dr. Rothman, rather than a deliberate feature of the model. Tr. 951:19-25 (Hill).

128.    Dr. Hill's modeling also predicted prices increases in both the broader and narrower markets, albeit of lesser magnitude than what Dr. Rothman found. Tr. 960:22-962:5.

Dr. Hill, however, mischaracterized Dr. Rothman's model as showing "results [that] were actually not terribly dissimilar to mine." Tr. 961:9-11 (Hill). Specifically, Dr. Hill distorted the price effects that Dr. Rothman's model predicts by averaging Dr. Rothman's annual harm numbers "across all customers in" the relevant markets, including customers of suppliers *other than United and Imperial*, for which Dr. Hill admitted Dr. Rothman's "model doesn't predict . . . any price effect." Tr. 953:21-954:3 (Hill). Nevertheless, while Dr. Hill disputes how price effects should be interpreted in terms of a percentage price increase, he does not dispute the dollar value of the harm calculated by Dr. Rothman. Tr. 962:11-23 (Hill), Tr. 686:7-12 (Rothman). To the extent that Dr. Hill's predicted percentage price increases are "in a similar ballpark" of his recalibration of Dr. Rothman's percentage price increases, both economic experts generally agree regarding the dollar harm. Tr. 962:17-23 (Hill).

129.    Dr. Hill's bidding model and relative cost model are unreliable and biased towards showing small amounts of harm; both models' predicted price effects are based *only* on differences in transportation costs between refined sugar suppliers. Tr. 1005:18-1007:3, 1009:5-1010:10 (Hill) (testifying that the effects calculated in the bidding model is driven solely by transportation costs differences, and that coefficient estimates on freight cost variables "dictate" how those changes correspond to a change in price). But transportation costs are not "the only thing that matters" for competition; instead, "suppliers find other ways to impose competitive pressure on each other." Tr. 672:5-17 (Rothman); *see also supra*, § IV.B. Dr. Hill admitted that factors besides transportation costs drive competition in the industry, including reliability, product quality, customer service, particular specifications for sugar, delivery time, sold position, competing sales opportunities, credit terms and payment options, and packaging options. Tr. 1007:22-1009:4 (Hill).

130.     As a result, Dr. Hill's models do not reflect reality; they would predict small price differences (and therefore small harm numbers) based on the mere thirty-mile distance between U.S. Sugar's Clewiston refinery and ASR's South Bay refinery, but Dr. Hill remained conveniently ignorant of evidence showing that the real-world differences in bids submitted by United and ASR are sometimes orders of magnitude greater than what his model would predict. Tr. 1010:11-1011:3 (Hill) (testifying that he had not heard testimony at trial related to bid figures for GM and Piedmont). Dr. Hill's own models show that transportation costs do not, in fact, "dictate" the outcome, Tr. 1009:12-21 (Hill), showing that for 89% of the customers that United supplies, United does not have the lowest transportation costs, Tr. 672:18-673:1 (Rothman).

### C.     The Transaction Is Likely to Result in Harmful Coordinated Effects

131.     The Horizontal Merger Guidelines explain that, if a proposed acquisition is likely to increase the risk of coordinated effects, even if that conduct is not illegal in and of itself and is "not pursuant to any type of agreement," that can be a way in which a merger can result in harm. Tr. 616:10-16 (Rothman). Even strategic interdependence, or "parallel accommodating conduct" of sugar suppliers can "soften competition." Tr. 616:12-20 (Rothman).

#### 1.     The relevant markets are vulnerable to coordinated effects

132.     The sugar industry is vulnerable to coordinated interaction because of the structural dynamics, as well as the evidence of competitors engaging in and recognizing their strategic interdependence. Tr. 621:23-622:8 (Rothman) (describing "evidence that indicates the industry is vulnerable to coordinated interaction").

133.     Refined sugar is a commodity product. ███████████████; Tr. 667:12-19 (Rothman).

134.     Competitors closely monitor one another's pricing and sold positions, sometimes in ways that might be otherwise permissible under the antitrust laws, but which would be simpler

with one fewer competitor in the market. *See* Tr. 160:16-18 (Swart/United); Tr. 459:21-460:5 (Speece/United); Tr. 488:17-22 (Henderson/Domino); PTX127 (Imperial seeking information on Domino's pricing); PTX029; PTX041 at -195; Tr. 621:23-622:8 (Rothman); Tr. 229:6-15, 248:22-24 (Hines/Imperial) (describing the Sosland Report as a weekly publication that reports general pricing the market by region, including the Southeast); Tr. 447:7-448:1 (Sproull/Domino), PTX028 at -753 (Domino obtaining estimates of pricing from all US sugar refiners, including pricing for United and Imperial, by attending a single industry event).

135.     In addition, the proposed acquisition would result in few significant rivals in the relevant markets. United and Domino would control 79% of the narrower market and 74% of the broader market. Tr. 611:12-25 (Rothman). The next largest competitor, LSR, has a market share of only 7%. Tr. 611:12-25 (Rothman).

136.     The two remaining largest competitors—United and Domino—have connected ownership interests that further raise the risks of coordination. U.S. Sugar has an ownership interest in SCGC through U.S. Sugar's wholly-owned subsidiary South Bay Growers. Tr. 787:9-12 (Buker/U.S. Sugar). SCGC, in turn, is one of the two owners of Domino. PSAF, ⁋ 60. Key personnel at Domino and Imperial are also close personal friends. *See* Tr. 755:24-756:5 (Olson/ASR) (Domino's Mark Olson describes Imperial's Mike Gorrell as a "trusted friend").

137.     There is ample evidence that United and others recognize their strategic interdependence, accounting for price signals they send as well as receive. Tr. 542:10-12 (Wineinger/United); 621:22-622:7 (Rothman). United sends messages or signals to competitors about pricing and consider how its own actions may cause market-wide prices to decline. For example, United's CEO, Mr. Wineinger, explained a strategic decision whereby United "pull[ed] some older offers while sending a message to NSM and other competitors that we were not

interested in allowing the market to slip lower." Tr. 543:13-544:5. (Wineinger/United) and PTX450 at -378. And United at times pulls its competitive punches for fear of prices dropping. Tr. 202:1-203:8 (Hanson/United), PTX483 at -379 ("As with all plans of this nature where we are looking at taking share from competitors we need to factor in competitive responses . . . . In our minds the key is stay balanced, thoughtful where the moves will initiate relatively smaller reactions . . . .").

138.    Imperial and Domino similarly anticipate competitive reactions, use pricing to send signals to competitors, and consider how their actions may cause market prices to decline. PTX250 at -058 (Imperial's Henneberry expressing concern that lowering pricing "would be snatching something from United just as they are starting to show some upside price movement"); PTX055 at -048 (Domino's Henderson explaining a decision not to get "aggressive" on pricing because Domino "would like to avoid sending a signal out to competitors that we are chasing business and lowering pricing"). Domino's Robert Sproull instructed Henderson to "signal to the market" that there would be tightness and Domino would "maintain price." Tr. 445:11-23 (Sproull/Domino), PTX029 at -907.

139.    Domino recognizes that U.S. Sugar's acquisition of Imperial is a "good thing" for Domino because it helps to align United's pricing strategy with Domino's. PTX046 at -768. Domino's Adam Whittaker wrote that after U.S. Sugar acquires Imperial: "[i]t's going to be more important than ever to stay close to United" and "[t]his is setting up to smell a bit like ADM/Cargill in the corn sweetener industry. 2 players that account for ~65% of the industry..." PTX046 at -768. After speaking with his "trusted friend," the Imperial's CEO, Domino's Mark Olson wrote that following the transaction, United/U.S. Sugar would be more likely to follow Imperial's "cane price approach," "which likely is a good thing for [Domino]." PTX046 at -768;

Tr. 756:4-5, 756:17-757:13 (Olson/ASR). Mr. Olson explained that the "cane price approach" refers to pricing refined sugar based on the market price of raw sugar, which United's members do not need to consider before the Imperial acquisition (because United's members currently grow their own beets or sugar cane) but would need to consider after the acquisition because Imperial would need to buy raw sugar (as Domino already does). Tr. 757:21-758:14 (Olson/ASR).

### 2. United and Domino use intermediaries to exchange competitively sensitive information

140. At other times, refiners monitor each other in ways that are *not* acceptable under existing antitrust laws. As direct evidence that the market is vulnerable to coordinated interaction, United and Domino have for years shared competitively sensitive information—including current pricing, future pricing, and sold positions—with one another through intermediaries such as Richard Wistisen, an industry analyst.

141. The information exchanged through Mr. Wistisen throughout the fiscal year includes the companies' current pricing, future or forward pricing, pricing strategies, and sold positions. *E.g.*, PTX393 (current pricing, crop production, and sold positions); PTX406 (current pricing); PTX426 (current pricing); PTX043 (current pricing); PTX048 (current pricing and future pricing strategy); PTX049 (future pricing and sold positions); PTX051 (current and future pricing and sold positions); PTX059 (current and future pricing, sold positions, and future pricing strategies); PTX063 (current and future pricing, sold positions); PTX064 (current and future pricing, sold positions, and future pricing strategies); PTX065 (current and future pricing, sold positions, and future pricing strategies). The pricing included spot prices and contract prices. Tr. 493:19-494:6 (Henderson/Domino). Current spot prices can also be turned into contract prices. Tr. 500:17-22 (Henderson/Domino). A sold position is the percent of a seller's supply of

refined sugar that has been sold. Tr. 78:25-79:5 (Riippa/General Mills); Tr. 164:22-165:1,

182:24-183:3 (Swart/United). As a seller's sold position increases, that seller will generally raise

prices. Tr. 466:17-468:13 (Speece/United); Tr. 78:22-79:5 (Riippa/General Mills); Tr. 165:2-15

(Swart/United); Tr. 1008:16-20 (Hill); PTX041 at -194 ███████████████████████

███████████████████████████; Tr. 183:8-10 (Swart/United); Tr. 620:14-18

(Rothman) (sold position "provides information about the extent to which a supplier will or will

not be aggressive on price going forward").

142.    United and Domino provided accurate information to each other through Mr.

Wistisen. Tr. 495:22-496:3 (Henderson/Domino) (United was typically "upfront" with the

information provided to Mr. Wistisen); Tr. 505:5-10 (Henderson/Domino) (Domino provides

accurate information to Mr. Wistisen). Mr. Wistisen was clear to both United and Domino that

he speaks with the other company and that the information comes directly from them. *See*

PTX393 at -531 (Mr. Wistisen wrote to United: "ASR saying back up to $40.50 to $41");

PTX064 at -237 (Mr. Wistisen told Mr. Henderson that "the United [pricing and sold position]

info I provided was direct from them this morning. They held a big huddle yesterday (sounded

like all sales reps/VP were present), and those numbers were the result"); Tr. 499:9-12, 504:11-

13 (Henderson/Domino) (Mr. Henderson understood that information had come directly from

United through Mr. Wistisen).

143.    Mr. Wistisen provides information on pricing and sold position to United and

Domino rapidly, often within hours of having received it. On September 21, 2020, within

minutes Mr. Wistisen separately asked United's Mr. Speece and Domino's Mr. Henderson if

there was "anything new of interest on the pricing front?" PTX393 at -532 and PTX051 at -150.

Mr. Speece and Mr. Henderson each responded with their company's respective pricing and sold

positions. *Id.* On September 22, less than three hours after getting Mr. Henderson's response, Mr. Wistisen provided to Mr. Speece and Mr. Henderson the information from each other in emails less than a minute apart. PTX393 at -531 and PTX051 at -148.

144.    In another example, Mr. Speece provided United's current pricing to Mr. Wistisen and informed him that he did not "anticipate any changes to our prices." PTX406 at -137. After confirming the information with Mr. Speece by phone, PTX406 at -136-137, Mr. Wistisen wrote to Domino's Mr. Henderson a few hours later and told Henderson that he had a "[l]ong conversation with United" and that United "won't set FY22 price list until March, but the plan remains to hold steady at $36.50 and $38.50." PTX048 at -147.

145.    United and Domino personnel also received sensitive pricing and sold position information from Mr. Wistisen on other sellers. Tr. 480:15-481:2 (Speece/United) and PTX426 at -170 (Mr. Wistisen wrote to Mr. Speece: "one processor saying they might start around 35.00 net Midwest, but fully expect it to go lower by couple dollars"); Tr. 473:2-11 (Speece/United) and PTX389 at -329 (Mr. Wistisen wrote to Mr. Speece: "NSM $36 Midwest gross and $38 Pacific (but still not from horses mouth, dammit!)"); PTX059 at -971 (reporting Western's spot and forward pricing and sold postion).

146.    Information on pricing and sold position is competitively sensitive. United's Mr. Wineinger testified that he expects his people to treat United's sold position as confidential and keep that information close to the vest. Tr. 546:22-547:3 (Wineinger/United). Domino's Mr. Sproull explained that Domino has a written code of conduct with an ethics policy that prevents any Domino employee from directly talking about Domino's pricing with a representative of one of Domino's competitors. Tr. 449:24-450:11 (Sproull/Domino); Tr. 470:10-19 (Speece/United) (United does not publish on its website the company's current beet and cane prices); Tr. 471:21-

472:1 (Speece/United) (United does not publish on its website or in its customer portal the percentage of its crop that is booked for the current fiscal year); Tr. 529:13-530:1 (Henderson/Domino) (USDA does not provide supply or pricing information for specific sugar refiners). With respect to Imperial, Mr. Gorrell stated that Imperial's company policy prohibits sharing spot pricing information with competitors. Tr. 829:15-25 (Gorrell/Imperial).

147.    United and Domino rely on and use the sensitive information they exchange through Mr. Wistisen. *E.g.*, Tr. 448:13-449:21 (Sproull/Domino) and PTX030 at -401 (Domino's Mr. Sproull forwarded pricing information from Mr. Wistisen to others at ASR with a recommendation of what price Domino would have to offer to win a specific customer's business); Tr. 481:12-18 (Speece/United) (after receiving intelligence on a beet processor's pricing in the Midwest, Mr. Speece expressed concern that the processor, "likely NSM," was selling at too low a price given NSM's "freight advantage," so Mr. Speece suggested that United "may want to communicate pricing earlier than the colloquium to send a message"); *cf.* Tr. 517:3-12 (Henderson/Domino) (Mr. Henderson received information from an analyst that *Imperial was sold out*, and he considered this to be "good competitive intelligence" *that justified a higher price*). Mr. Henderson frequently forwarded the information to his sales team and his superior. Tr. 510:14-24 (Henderson/Domino) (Henderson received, and forward to his subordinates, information from Mr. Wistisen that United would likely be adding bookings and raising prices over the following month, and "not by just a dollar"); Tr. 511:13-23 (Henderson/Domino) (Mr. Henderson sent to his boss, Mr. Sproull, information on competitors' inventory position that he received from Mr. Wistisen); PTX039; PTX048; PTX059; PTX063. United not only received information from Mr. Wistisen but affirmatively used him to signal competitors. PTX426 at -170 (United used Mr. Wistisen to send signals to competitors); Tr.

163:15-165:15 (Swart/United) and PTX432 at -776 (United's Mr. Swart told Mr. Speece that he wanted Mr. Wistisen to "hear" that United's current beet sugar price was $36.50 and cane sugar price was $38 but United was contemplating increasing its prices given is sold position); PTX430 at -010 (Mr. Speece and Mr. Swart discussed what they wanted to "indicate" to Mr. Wistisen before deciding to continue the conversation by phone).

148.     By contrast, there is no evidence that Imperial has had any discussions with competitors through Mr. Wistisen or any other go-between. Imperial is engaged in competitive decision making by estimating United's price and evaluating market information to determine the best price it can offer to its customers. Tr. 281:8-24 (Henneberry/Imperial); PTX250.

149.     The sharing of information on pricing and sold position between United and Domino affects prices. Tr. 160:23-161:23 (Swart/United) (Swart testified that if he had "better information about what [his] competitor's actual prices were, [he] could better avoid these destructive situations" of customers using pricing information to negotiate better prices); Tr. 79:6-15 (Riippa/General Mills) (competitors sharing this information harms customers). For example, when Domino's Henderson learned from an industry analyst that Imperial was sold out of refined sugar, he explained that this gave Domino a justification for a premium, or a higher price. PTX053 at -848 (Domino's Henderson wrote: "Imperial being sold out gives us justification for a premium"); Tr. 517:9-12 (Henderson/Domino).

150.     At another time, Domino did not provide ███████████ with a competitive bid for its ███ sugar supply because Domino wanted "to avoid sending a signal out to competitors that [it was] chasing business and lowering prices." Tr. 618:1-620:4 (Rothman); PTX055 at -048. The result was that, while ███████████ "was able to get Imperial and United to bring down their bids" to the same, lowest all-in price, Domino offered the highest all-in price of all bidders.

Tr. 619:20-620:4 (Rothman); ▮▮▮▮▮▮ .

### 3. There is past history of price fixing in the sugar industry facilitated by a third-party information exchange

151.     This is not the first time that problematic coordinated conduct has occurred in this

industry. There is history of sugar refiners using "brokers to act as go-betweens in carrying price

information and exchanging assurances on price actions between and among refiners" to

facilitate price fixing. *U.S. v. Great Western Sugar Comp*. et. al., Civil No. 74-2674-SW, ¶¶ 14-

15 (N.D. Cal., Dec. 19, 1974) (complaint brought by the United States in 1974 against Great

Western Sugar Company, American Crystal Sugar Company, Amalgamated Sugar Company,

and other sugar refiners). The defendants in that case entered a consent decree with the

Department of Justice in 1978, where they were enjoined from, among other things, "agreeing to

fix prices or announce price changes in advance for the sale of refined sugar … and from

exchanging information, directly or indirectly, as to the sale of refined sugar." *U.S. v. Great

Western Sugar et. al.*, Final Judgment, Civil No. 74-2674-SW.

### 4. Dr. Rothman's conservative economic analysis illustrates that significant harm would likely result from increased coordinated effects as a result of the merger

152.     Dr. Rothman found that "[t]he proposed acquisition would likely increase the

extent of . . . coordinated interaction by" (1) "making United larger," which would "increase the

incentives [of United and ASR] to behave strategically and [to] anticipate how [they] will

respond to each other," and (2) "eliminating Imperial as an independent competitive constraint,"

which would "increase[] the benefits from coordinated interaction." Tr. 622:9-21 (Rothman).

153.     Dr. Rothman also found that the likely increased coordinated interaction, together

with the loss of head-to-head competition, would cause price increases of 5-7% and increase the

*annual* cost of refined sugar to customers by $58.1 million in the narrower market and $72.6

million in the broader market. Tr. 627:17-628:5 (Rothman).

154.    These predicted harm numbers were based on a scenario in which United and ASR refrain from bidding against each other in 10% of bidding opportunities pre-merger and 30% of bidding opportunities post-merger. Tr. 627:6-12 (Rothman). Dr. Rothman also estimated the price effects in "all possible scenarios in increments of at least ten percent," and across all ranges, the predicted price effects range from 4% to 12%. Tr. 626:18-627:5 (Rothman). The scenario that Dr. Rothman used to report likely price effects is "closer to the lower end of the range" of scenarios that he considered. Tr. 627:13-16 (Rothman).

155.    Dr. Hill agrees that coordinated effects theories are alive and well, that scholarly literature has recognized that coordinated effects theories have been and remain integral to antitrust enforcement, and that the antitrust agencies can prevail on coordinated effects theories solely by showing an increased risk of tacit coordination. Tr. 971:20-974:8 (Hill). Nevertheless, Dr. Hill limits his review of the evidence to structural conditions in the industry and several emails presented in Dr. Rothman's report. Tr. 964:24-969:10; 974:9-975:1 (Hill) (limited his response to "the emails that Dr. Rothman cites in his report"). Dr. Hill did not see all of the evidence in the case, Tr. 975:11-22, and comes to the wrong conclusions about the type of information that has been exchanged, positing that "similar information is available from other sources," Tr. 974:19-21 (Hill), and that the information exchanged through Mr. Wistisen was "largely not competitively sensitive." Tr. 977:6-24 (Hill). Dr. Hill also asserts that the sugar industry has changed so drastically since 1974 that prior evidence of price-fixing and information exchanges in the industry should be ignored. Tr. 976:7-977:4 (Hill). Dr. Hill's testimony on these points is not credible.

## V.   ENTRY AND REPOSITIONING IS NOT LIKELY TO BE TIMELY, LIKELY OR SUFFICIENT TO NEGATE ANTICOMPETITIVE EFFECTS

### A.   Construction of a New Sugar Refinery Would be Costly and Take Time

156.   Given the significant cost and time necessary to construct a cane refinery, greenfield entry into the production and sale of granulated cane sugar is unlikely to occur in time to thwart any post-transaction price increases. Tr. 1131:20-1132:5 (Faucheux/LSR) (replacing LSR's cane sugar refinery would cost approximately $▮ million and take ▮▮▮▮ to build); PTX350 at 10 (replacing Imperial's refinery would cost more than $475 million excluding the value of intangible assets).

### B.   Announced Expansion Projects by LSR, Michigan Sugar and Sucro Can Sourcing will not Mitigate Anticompetitive Effects

157.   Despite evidence that building a new sugar refinery costs hundreds of millions of dollars, Defendants' expert nonetheless asserts that there are "low barriers to entry and expansion" in the sugar production industry. Tr. 913:13-18 (Hill). In support of this conclusion, Dr. Hill points to four examples: LSR's announced expansion of its refinery; Michigan Sugar's plans to make improvements to maintain its sugar output at an existing Michigan facility; Sucro Can Sourcing's opening a liquid sugar refinery in northwest New York; and CSC Sugar's mere existence and history of having built a handful of liquid sugar refineries in the U.S. over the past seventeen years. Tr. 941:20-942:8 (Hill).  However, as Dr. Rothman testified, such expansion is unlikely to mitigate the harm from the transaction. Tr. 631:15-18 (Rothman).

#### 1.   Expansions by Michigan Sugar and LSR are unlikely be timely or sufficient to constrain post-transaction price increases in the relevant markets

158.   LSR's CEO, Larry Faucheux, testified that reaching LSR's publicized 1.5 million tons of capacity expansion is "a lofty aspiration of LSR." Tr. 1129:17-20 (Faucheux/LSR); *accord* Tr. 1116:4-6, 1114:18-20 (Carter/Cargill) (describing announced expansion as a ▮▮▮▮

███████████████████. In reality, the planned expansion is projected to increase the refinery's potential capacity to refine raw sugar from about ███████ tons annually to about ██████ tons, "or roughly 20-25 percent." JTX050 at 2; Tr. 1129:21-1130:18 (Faucheux/LSR); Tr. 1112:11-14 (Carter/Cargill). Moreover, LSR's CEO cautioned that sugar production is not consistent every year because it is an agricultural product therefore ██████

████████████████████████████████████████████ ██████ Tr. 1130:13-20 (Faucheux/LSR). Additionally, the planned expansion was announced in May 2021, JTX022 at -174, and was therefore not a response to price increases from the proposed acquisition.

159.    The completion date for any LSR expansion is far from certain. At one point, Mr. Faucheux testified that LSR's hope is to have the expansion ████████████████████ ██████ Tr. 1134:19-22 (Faucheux/LSR); *see also* Tr. 1124:13-22 (Carter/Cargill) ████████ ████████████████████████████. Yet elsewhere in his testimony, Mr. Faucheux stated that LSR has ███████████████ ██████. Tr. 1131:12-19 (Faucheux/LSR). While discussing the timing ████████████ ████████████████████, Mr. Faucheux ████████████████ ███████████████████████████████ ███████████████████████████ Tr. 1133:5-16 (Faucheux/LSR). Similarly, Andy Carter of Cargill, which markets LSR's refined sugar output, ████████████████████████████ ████████████████████. Tr. 1114:18-20, 1122:14-17 (Carter/Cargill).

160.    To support any increase in output, LSR plans to use raw sugar that its co-owner SUGAR ████████████████████████████. Tr. 1134:4-12

(Faucheux/LSR); PSAF, ¶¶ 71,72. Thus, once LSR's new capacity comes on line, ███████████

████████████████████████████████████████████████████

████████████████████. *See id.*

161.    As for Dr. Hill's Michigan Sugar example, Michigan Sugar's head of sales Pedro Figueroa did testify that Michigan has plans to make process improvements which will enable it to produce up to 80 million pounds more sugar annually projected to be completed in spring of 2024. Tr. 713:20-714:6, 714:18-20 (Figueroa/Michigan Sugar).

162.    However, Mr. Figueroa stated Michigan Sugar "will try to keep as much of it as we can in our geographical area," i.e., the Great Lakes area. Tr. 714:21-715:1 (Figueroa/ Michigan Sugar). He further explained that producing more sugar "doesn't necessarily translate into an expansion of our geographical coverage." Tr. 706:11-15 (Figueroa/Michigan Sugar). Today, transportation costs limit Michigan's sales footprint to about 450 miles from its Michigan plants. Tr. 704:20-23 (Figueroa/Michigan Sugar).  In addition, ███████████████████

████████████████████████████████████████████████████

████████████████ DTX034 at -009.

163.    As to expansion by liquid refiners, several customers testified that for certain of their products and/or locations, they cannot use liquid sugar. Tr. 735:20-736:1 (Hamill/Kraft) (Kraft could not switch from using dry sugar at Dover to make its Country Time Lemonade or pudding dessert mixes); Tr. 369:2-24 (Cagle/Piedmont) (liquid sugar causes production issues when making Red Bird mints and is more expensive than dry); Tr. 120:23-121:4 (Riippa/General Mills) (General Mills' Covington, Georgia plant requires bulk dry sugar).

164.    Furthermore, there are liquid sugar customers that cannot use the "high color" liquid most frequently produced by raws-to-liquid refiners. DTX219 at -224 (Imperial

presentation noting that competition from "melt stations" is limited by "demand for low-grade refined sugar."). Upon learning Sucro Can Sourcing would be opening a liquid refinery in New York, United's Dirk Swart commented, "so, just one more CSC type operation . . . . So small, high color liquid sucrose. We don't like it, but it's hardly a threat to our business." PTX429 at -975; *see also* Tr. 461:14-25 (Speece/United) (Kellogg reporting issues with supplier Sucro Can at Kellogg's Memphis facility); PTX370 (May 2021 email stating Kellogg may give United all its Memphis business "because of issues with supply and color with Sucrocan").

165.    Finally, the cost to ship liquid sugar and the shelf-life of the product limits the geographic area in which a new liquid plant can provide competitive pressure. Tr. 1044:21-24 (Farmer testified that CSC's sales of liquid sugar in the south are generally limited to sales to customers in located in close proximity to CSC's plants). According to CSC's CEO, "on average, we say liquid sugar is uneconomical to ship more than probably 250 miles. Tr. 1038:10-16 (Farmer/CSC); *see also* Tr. 723:3-8 (Brown/IFPC) (shipping liquid sugar outside of a 350-mile radius "would be very exorbitant, so we wouldn't be competitive."); DTX041 at -567

████████████████████████████████████████████████████████████

████████████████████████████████; Tr. 1123:4-14 (Carter/Cargill) █████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████.

166.    As for CSC specifically, CSC has no plans to build any new facilities in Georgia or the Southeast. Tr. 1055:5-8 (Farmer/CSC). But even if expansion by liquid refiners such as CSC were to occur in response to the transaction, such new capacity would not protect from price increases to the 80% or more of customers in the relevant markets that require dry granulated sugar. Tr. 632:16-23 (Rothman); DTX043 at -490, -492 ███████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████ ;
PTX330 at -3 (United presentation to U.S. Sugar estimating liquid sugar accounted for 14% of national refined sugar demand in 2019).  Indeed, CSC's CEO characterized the market segment served by his company as "a very specific narrow market," specifically for high color liquid sugar. 1044:2-6, 1048:7-11 (Farmer/CSC).

### C. Competitors Largely Selling Outside the Relevant Markets are Unlikely to Divert Sales to the Relevant Markets if Prices Increase

167.    Suppliers that currently have a smaller share of sales to customers in the relevant markets would not likely reposition themselves to "try to compete more in the relevant markets in response to higher prices" there because "suppliers have an economic incentive to . . . focus where they compete[] where they're relatively well situated to compete." Tr. 631:20-632:3 (Rothman). For example, "NSM is well situated to compete for customers in the far west by virtue of it ha[ving] four processing facilities out there," and "[t]he proposed acquisition wouldn't change that." Tr. 632:4-8 (Rothman). This is because "NSM has a certain amount of sugar that it can sell over a given period of time, and it has an economic incentive to focus on competing in the areas where it's best positioned to compete" rather than trying to capitalize on higher prices in a market where its competition is significantly better positioned to compete than NSM is. Tr. 598:17-599:7 (Rothman). It is not that suppliers would not try to reposition at all, just that any repositioning "would not be sufficient to prevent harm from the proposed acquisition." Tr. 662:4-12 (Rothman). Most importantly, expansion by producers outside the relevant market will remain subject to the same freight constraints that limit their competitiveness in the relevant markets today. Tr. 347:25-349:4 (Simons/NSM) (NSM's sales into the southeast limited by "freight costs and rail turns"); DTX034 at 9 (for Michigan Sugar,



). Tr. 704:15-19 (Figueroa/Michigan Sugar) (freight cost "has an effect on our competitiveness overall").

168.    NSM's CEO also testified that NSM makes only an ███████████ ██████ of its sales in the relevant markets, and ██████████████████████. Tr. 349:17-20, 353:3-5 (Simons/NSM). Mr. Simons also was not aware of ███████████ ████████████████████████████. Tr. 353:12-354:2 (Simons/NSM). Defendants have not established that expansion will in fact take place, or that they would in fact counteract a price increase in the relevant markets.

169.    Dr. Hill testified that several refineries may be expanding. Tr. 941:18-942:8. However, Dr. Hill never contends that these plans are in response to a price increase in any of the markets alleged in the complaint, and does not provide any analysis of those companies' future sales plans, their opportunity costs of selling in areas where they have strong sales today, or the costs of selling into the markets alleged in the complaint. Tr. 941:18-942:8 (Hill). In fact, Dr. Hill admits to having done no analysis at all to determine how much prices would need to rise to incentivize entry. Tr. 1017:21-24.

## VI.    USDA ACTIONS ARE NOT LIKELY TO MITIGATE ANTICOMPETITIVE EFFECTS

170.    USDA cannot supersede buyers and sellers in the marketplace or stand in the stead of competition because the agency does not have the tools necessary to address anticompetitive effects. Tr. 899:9-18, 890:14-891:2 (Fecso/USDA). USDA's dual mandate is clear: to maintain an adequate supply of raw and refined sugar and to keep domestic prices above the loan forfeiture rate. *See supra*, § III.C. Keeping sugar prices above forfeiture levels would not help address the competitive effects of the proposed acquisition because this mandate is "to

keep prices elevated" rather than to decrease prices. Tr. 630:1-630:6 (Rothman).

171.    The tools available to USDA to manage the domestic supply of sugar are not designed to effectively mitigate anticompetitive price increases in the sugar market. Tr. 867:4-7, 899:9-18, 890:14-891:2 (Fecso/USDA). The sugar program decisionmaker, often a USDA undersecretary, retains the ultimate discretion to determine which tools to utilize and how much additional sugar to make available in the United States. Tr. 851:10-17 885:16-21, 867:3-6 (Fecso/USDA). Even in times of rising prices, USDA may focus on ensuring adequate supplies of sugar in the domestic market, not pricing concerns, when acting to increase the supply of sugar. Tr.888:24-889:22 (Fecso/USDA); PTX300 at 3; DTX515 at 26. As a result, the sugar program actions are not consistent across time even when market conditions are similar. Tr. 886:6-11 (Fecso/USDA).

172.    Regardless of design, the tools available to USDA to manage the domestic supply are inadequate to address anticompetitive harm. Tr. 899:9-18 (Fecso/USDA). USDA has no ability to dictate or even monitor contractual prices negotiated between sugar producers and their customers. Tr. 890:2-20 (Fecso/USDA). USDA also has no ability to direct sugar imports to specifics ports in the United States. Tr. 888:1-4 (Fecso/USDA). And when USDA does act to increase the supply of sugar, it does not know how these actions will affect regional prices. Tr. 888:4-9 (Fecso/USDA). Finally, USDA has "no involvement" in the relationship between sugar producers and their customers, and as a result, has no ability to dictate the customer service that refined sugar customers receive. Tr. 890:24-891:1 (Fecso/USDA).

173.    Even with the sugar program, competition works to affects prices in the market and the quality of service and product offerings. *See supra*, § IV.B. As United's Dirk Swart explained, competitors strongly influence United's prices and more competition increases the

likelihood that United would have to make an exception to its minimum margin sales parameters. Tr. 128:14-130:18, 131:1-3 (Swart/United).

174.    When USDA does act, the impact on sugar prices is neither quick nor certain. After the Imperial refinery explosion in February 2008, sugar prices "skyrocketed" to two-to-three times forfeiture support levels and remained elevated for close to three years. Tr. 892:7-893:2 (Fecso/USDA); DTX515 at 26. During this three-year period USDA took several actions to increase the supply of sugar available in the United States, but it was not until the fall of 2011 that sugar prices started to fall. DTX515 at 26. USDA actions in the last two years to increase the supply of sugar have been similarly ineffectual in lowering prices, with current domestic refined sugar prices on average more than 15 cents above forfeiture levels. Tr. 894:9-895:11; DTX515 at 26; *see also* PTX106; Tr. 824:7-825:14 (Gorrell/Imperial) (explaining that USDA actions in 2021 to increase the supply of sugar was insufficient to prevent Imperial from having to raise its refined sugar prices).

175.    Dr. Fecso's personal opinion about the proposed transaction is not supported by the record in this case. Tr. 882:2-3 (Fecso/USDA). Beyond examining sugar processors' sales data over time, Dr. Fecso did not undertake any quantitative analysis of the proposed transaction. Tr. 881:10-23 (Fecso/USDA). Her opinion about the potential efficiencies that could be associated with the proposed transaction is based only on a single conversation with executives from the parties the day before the transaction was publicly announced. Tr. 882:16-23 (Fecso/USDA). The executives did not show Dr. Fecso any data to support their claims about the efficiencies, and Dr. Fecso acknowledged her opinion on this topic was an educated guess. Tr. 882:24-883:25 (Fecso/USDA). In fact, Dr. Fecso was not provided any documents or communications that were produced to the Department of Justice in this litigation. Tr. 884:11-14

65

(Fecso/USDA). Finally, Dr. Fecso testified that Imperial's melt rates informed her opinion about Imperial's current Imperial's market position, Tr. 898:4-12 (Fecso/USDA). The testimony and data produced in this case shows Imperial's melt rate has been consistent, if not increasing. JTX035 at 15 (increased raw melt from 2017 to 2020); PTX117 at -494 (consistent melt rate year over year with ███████████████████████████).

176.    Dr. Fecso also cannot predict with any level of certainty future USDA sugar program actions. Tr. 899:9-18. Dr. Fecso is not currently, nor has she ever been, the ultimate decisionmaker for the sugar program, and she is not even aware of the sources of information the ultimate decisionmaker relies on to make decisions about the sugar program. Tr. 885:17-21, 885:22-886:1 (Fecso/USDA). As. Dr. Fecso acknowledged, there is no way to even know the identity of future sugar program decisionmakers. Tr. 886:2-5 (USDA/Fecso).

177.    Finally, there is also no guarantee that the sugar program and related regulations will remain as they exist today. A version of the current sugar program has been in place since at least 1981, Tr. 850:20-851:1 (Fecso/USDA), but is set to expire in 2023. P.L. 115-334 at § 1301 (2018). As Mr. Buker testified, at least "twice in modern history" Congress declined to renew the sugar program. Tr. 773:7-11 (Buker/US Sugar). Indeed, prior to 1981, there was a seven-year period when there were no domestic sugar price supports in place. Remy Jurenas, Cong. Rsch Serv., RL33541, Background on Sugar Policy Issues, at 1 (2007). Similarly, Mexico had unrestricted access to the American market following the implementation of the North American Free Trade Agreement (NAFTA), but the 2014 Suspension Agreements put restrictions back in place on the quantity and price of sugar that could be imported into the United States. Tr. 873:25-874:8, 893:2-7 (Fecso/USDA).

178.    Even Dr. Hill does not take the view that USDA allows additional imports every

time prices rise to particular customers or in particular regions and makes no prediction at all about whether USDA would act if prices were to increase in a given region. Tr. 1018:16-1019:3 (Hill). Dr. Hill also has no reason to believe that USDA will change its view on the appropriate stocks-to-use ratio if the merger is approved, has not analyzed whether the USDA has increased imports based on the price of refined sugar when the stocks-to-use ratio remained between 13.5% and 15.5%, and makes no prediction at all that USDA would in fact allow additional imports if prices to customers rise as a result of the merger. Tr. 1019:9-1020:4 (Hill).

## VII.   DEFENDANTS' CLAIMED EFFICIENCIES CANNOT JUSTIFY THE LIKELY HARM TO COMPETITION BECAUSE THE PURPORTED EFFICIENCIES ARE NOT VERIFIABLE OR MERGER SPECIFIC

179.    Steven Hines led the synergies analysis for United's potential acquisition of Imperial; no one at U.S. Sugar was involved in the calculations he put together. Tr. 303:15-304:6 (Hines/United). Mr. Hines took those purported synergies he prepared for United and used the same data sources for U.S. Sugar's proposed acquisition. Tr. 303:5-14 (Hines/United). U.S. Sugar's CFO Elaine Wood was purportedly in charge of any synergy analysis by U.S. Sugar (Tr. 791:6-10 (Buker/U.S. Sugar)), but defendants declined to call her to testify.

180.    United's financial modeling included increased margins and higher prices, but never lower prices to customers. Tr. 316:10-15, 321:2-16 (Hines/United); PTX547 at -876.

### A.    Diverting a Limited Amount of Raw Sugar from Refiners Like ASR to the Port Wentworth Refinery Is Not a Verifiable, Merger-Specific Efficiency

181.    U.S. Sugar is purportedly acquiring Imperial in part because U.S. Sugar produces more sugar cane than it can refine. Tr. 771:21-773:11 (Buker/U.S. Sugar).

182.    U.S. Sugar sells excess sugar cane each year to other raw sugar mills because U.S. Sugar cannot refine more raw sugar at its refinery in Clewiston. Tr. 770:4-14 (Buker/U.S. Sugar). Once U.S. Sugar's excess cane is sold to the third-party mills, the mills process the cane

into raw sugar and sell the raw sugar to sugar refiners like ASR/Domino. Tr. 786:17-787:2 (Buker/U.S. Sugar). Domino must import raw sugar because Domino's melt requirements are in excess of domestic raw sugar supply. Tr. 754:9-11 (Olson/ASR).

183.    U.S. Sugar's excess cane accounts for only 10-15% of the cane delivered each year to U.S. Sugar. Tr. 784:8-24 (Buker/U.S. Sugar); *see also* PTX509 at -189 (chart showing tons of cane produced, milled and refined). U.S. Sugar has no major plans to increase the amount of sugar cane that U.S. Sugar grows or acquires. Tr. 786:7-16 (Buker/U.S. Sugar).

184.    U.S. Sugar's excess cane is also only a small portion of the supply needed at Port Wentworth. U.S. Sugar's excess sugar cane results in about 1.5 to 3 million hundredweight (cwt) of raw sugar that could be sent to Port Wentworth. Tr. 774:21-775:1 (Buker/U.S. Sugar). By comparison, the Port Wentworth facility used over 17 million cwt of raw sugar in 2020 (resulting in over 16 million cwt of refined sugar) and is projected by U.S. Sugar to use nearly 19 million cwt of raw sugar in 2025 (resulting in about 17.5 million cwt of refined sugar). JTX035 at 15.

185.    U.S. Sugar recognizes that it does not produce enough excess sugar cane to fully supply Port Wentworth. Tr. 776:11-22, 788:8-12 (Buker/U.S. Sugar).

186.    One month after signing the agreement to acquire Imperial, U.S. Sugar's CEO wrote to the Secretary of Agriculture, advocating for the first time in support of raw sugar imports: "In addition, going forward, U.S. Sugar will continue to support robust raw sugar imports because it will need large amounts of imported raw sugar to operate the Port Wentworth facility like Imperial Sugar does today." PTX229 (letter) at -286; Tr. 788:19-789:22 (Buker/U.S. Sugar); PTX304 (agreement).

187.    Defendants have not established that U.S. Sugar's diversion of raw sugar from refiners like ASR to Port Wentworth will increase the total supply of raw sugar for domestic

refiners; instead, if raw sugar milled from U.S. Sugar's cane goes to Savannah after the U.S. Sugar/Imperial transaction closes, refiners like ASR will be more dependent on imports "one to one." Tr. 759:8-13 (Olson/ASR).

188.    Moreover, the raw sugar that U.S. Sugar would divert to Port Wentworth is priced by reference ███████████████████████, not some other metric reflecting purported efficiencies. Tr. 787:15-788:6 (Buker/U.S. Sugar), DTX514 at 5.

189.    As Dr. Rothman summarized, "increasing the amount of domestic raw sugar purchased" for Port Wentworth "is not in and of itself an efficiency" but just purchasing "more of a given input," and Defendants "have not claimed that this would result in cost savings . . . that would serve to offset harm." Tr. 633:15-24 (Rothman).

190.    Dr. Hill did not even attempt to establish that these plans constitute cognizable efficiencies: (1) he testified that he did not evaluate how much more secure the supply of sugar would be at Port Wentworth with the merger compared with what Imperial is doing today, Tr. 1011:4-11 (Hill); (2) he did not analyze whether whoever loses access to that sugar supply would be less able to constrain a merger of United and Imperial, Tr. 1011:12-1012:10 (Hill); (3) nor did Dr. Hill conduct any independent evaluation of the opportunity costs for U.S. Sugar or SCGC of selling sugar to Port Wentworth as compared to selling to whoever is currently purchasing the raw sugar today, Tr. 10112:1-5 (Hill); and (4) he did not find that the overall amount of sugar will increase in any market as a result of the merger, Tr. 1012:6-12 (Hill).

### B.    Diverting a Limited Amount of Raw Sugar from Refiners Like ASR to the Port Wentworth Refinery Is Not a Verifiable, Merger-Specific Efficiency

191.    U.S. Sugar asserts that it will increase production at the Port Wentworth refinery. Defs. Opening St. Slides at 30. But U.S. Sugar has not committed to any specific plans for the Port Wentworth facility if the transaction closes. Tr. 791:2-5 (Buker/U.S. Sugar).

192.    U.S. Sugar's general proposed plans for Port Wentworth do not increase the refinery's overall capacity, but instead seek to increase capacity utilization modestly. Tr. 845:13-18 (Smith/U.S. Sugar); JTX035 at 4; *see also* DTX041 at -571 (ASR assessed that ██████████ ████████████████████████████ ).

193.    In 2020, Imperial operated the Port Wentworth facility for 345 days. JTX035 at 11. U.S. Sugar's "stretch goal" for the facility is to increase operating days from 345 to 355 within five years. Tr. 846:22-25 (Smith/U.S. Sugar). Even these modest plans are just an "operational aspiration," as a "desire to run a facility with more shifts," for example, is just "a different operational choice" that Imperial may have been able to "make on its own" rather than an efficiency. Tr. 633:25-634:12 (Rothman). And U.S. Sugar did not discuss with anyone at Imperial whether the modest increase to operating 355 days a year would be feasible. Tr. 847:1-4 (Smith/U.S. Sugar).

194.    Dr. Hill's testimony confirmed that U.S. Sugar's plans are not verifiable. Dr. Hill testified that U.S. Sugar's financial model estimating increased output merely sets production equal to sales quantity, which Dr. Hill did no independent evaluation to verify. Tr. 1012:13-1013:10 (Hill). And Dr. Hill also testified that the conservative scenario in the financial model actually shows no increases at all from 2021 to 2025. Tr. 1012:21-1013:5 (Hill).

195.    U.S. Sugar's plans for the Port Wentworth refinery are not merger specific. U.S. Sugar personnel admitted that Imperial had been increasing its average monthly raw sugar melt in recent years. Tr. 841:19-25 (Smith/U.S. Sugar); JTX035 at 11. U.S. Sugar's capital plan was based on Imperial's capital plan. Tr. 847:24-848:2 (Smith/U.S. Sugar), JTX035 at 15.

196.    U.S. Sugar's plans, like Imperial's plans, focus on sustaining the facility. Tr. 795:12-18 (Gorrell/Imperial) (Imperial focused on maintenance at Port Wentworth); Tr. 847:13-

23 (Smith/U.S. Sugar) (U.S. Sugar's plans for Port Wentworth are for "sustaining" investments which means repairing or replacing existing equipment). U.S. Sugar's plans also relied on the work of third parties. Tr. 842:9-843:24 (Smith/U.S. Sugar); *see also* PTX512 at -310; JTX035 at 5. Defendants offered no evidence that Imperial could not obtain similar help if needed.

197.    U.S. Sugar personnel admitted that Imperial already has the necessary know-how for U.S. Sugar's plans: "U.S. Sugar can implement this plan because ***Imperial*** has all the people in place, the engineers, the knowledge, and the know-how to do the projects" identified by U.S. Sugar. Tr. 848:3-7 (Smith/U.S. Sugar) (emphasis added), JTX035 at 15.

### C.    Defendants' Purported Transportation Efficiencies, If Any, Would Accrue to United But Not to United's Customers

198.    United estimated potential distribution synergies in connection with the proposed transaction. Tr. 309:6-12 (Hines/United); Tr. 560:19-561:4 (Wineinger/United); PTX486. United modeled the savings or cost associated with moving the origin of certain customers' refined sugar shipments to the Red River Valley, Clewiston, or Port Wentworth. Tr. 311:18-312:4 (Hines/United); PTX486 at -748 (native Excel) at tab "Total Summary."

199.    The claimed transportation cost savings of up to $12-13 million "wouldn't come close to offsetting the harm from the proposed acquisition." Tr. 634:17-22 (Rothman). Dr. Hill agrees that these efficiencies make a very small difference in his model. Tr. 1017:11-14 (Hill).

200.    Dr. Hill overestimated transportation efficiencies by at least $2 million. Tr. 1015:11-18. Dr. Hill also made another mistake with respect to how the efficiencies are modeled: although it is not his understanding that the merging parties contemplated that the cost of shipping from the same location to the same customer would go down, the cost of shipping from the same location is lower in his model. Tr. 1017:3-10 (Hill).

201.    Despite analyzing synergies in connection with the proposed transaction for close

to two years, back to March 2019, United never modeled or considered giving customers lower prices as a result of the distribution savings United calculated. Tr. 316:10-15 (Hines/United); PTX486. United's Steven Hines testified that the distribution savings would increase the NSP dollars available to United's member-owners. Tr. 315:3-6 (Hines/United); 634:23-635:3 (Rothman) ("in modeling the potential . . . distribution cost savings, . . . [t]he working assumption [wa]s that any savings would go back to the member owners"); PTX486.

### D. Defendants' Other Purported Efficiencies, If Any, Would Accrue to United But Not to United's Customers

202.    As part of the synergies analysis used in connection with U.S. Sugar's proposed acquisition of Imperial, United contemplated replacing some of its current sales of lower margin products with increased sales of higher margin products, but these are all products that United sells today. Tr. 305:12-19 (Hines/United), PTX348 at 28. But United discounted some of the potential synergies by 40-60% due to uncertainty about "cannibalization," in other words, out of concern that Imperial may today already be fulfilling some of the anticipated customer demand for bagged sugar products. Tr. 307:13-24 (Hines/United), PTX348 at 29.

203.    Some of the "synergies" United calculated would be nothing more than the increased returns the combined company would get from exiting some lower margin sales in exchange for higher margin sales. Tr. 307:4-12 (Hines/United), PTX348 at 29.

204.    The purported weather synergies apparently derive from simply having a second facility. Tr. 772:25-773:7 (Buker/U.S. Sugar). But from a customer's standpoint, there will be the same number of refineries in the relevant market as before the transaction; the difference is that Clewiston and Port Wentworth would no longer compete.

## VIII.  IMPERIAL IS A STRONG COMPETITOR

205.    Notwithstanding its higher cost structure, Imperial has been successfully and

consistently winning business, as evidenced by its stable market share in both the broader and narrower geographic markets from 2018 to 2021. Tr. 630:14-631:4 (Rothman). Over the past several years, Imperial has been successful in consistently winning around 20% of the business in the narrower market and 17% of the broader market. Tr. 630:24-631:4 (Rothman). Specifically, in the narrower market, Imperial's share was 19 percent in 2018 and 20 percent in 2021. In the broader market, Imperial's share was 14 percent in 2018 and 17 percent in 2021. Tr. 630:24-631:4 (Rothman).

206.     Imperial's current market share properly reflects its competitive significance in the market today. Imperial wins business by offering lower pricing sometimes, as well as by competing on non-price dimensions such as providing reliable service, or because its locational advantage offsets is higher cost. *See supra*, § IV.B. Imperial has also been increasing it average melt rate over and the refinery's operating days over the last few years. Tr. 841:22-25 (Smith/U.S. Sugar); PTX117 at -494 (stable melt rate year over year ███████████████ for 2021); JTX035 at 15 (increased raw melt from 2016 to 2020).

207.     Imperial's success at consistently winning business and maintaining its significant market share is consistent with the fact Imperial is in sound, stable financial condition, contrary to Defendants' suggestions otherwise at trial. Tr. 821:10-822:3 (Gorrell/Imperial) (confirming that the cash return less working capital is positive); PTX117 at -487 (documenting that Imperial has returned over $███████ in incremental cash to LDC (net of capital investments) since LDC acquired Imperial ten years ago). LDC's exclusive financial advisor projected that Imperial's profitability would be positive and continue increasing through 2028. PSAF, ¶ 40. In accord with financial projections, as recently as the period from January to October, 2021, Imperial's bottom line earnings before tax (EBT), net of all costs, were approximately $█

73

██. PTX117 at -484, -486. Imperial's CEO has also earned a discretionary bonus each year

for the last three years, including a $█████ bonus last year. Tr. 822:14-823:13

(Gorrell/Imperial); JTX051. In light of these positive profits, the stability of Imperial's market

shares in the alleged markets and the fact that Imperial's year-over-year output has remained

stable in recent years jointly refute the suggestion that Imperial is a firm in decline. PTX117 at -

494.

208.    LDC's sound investments have contributed to Imperial's operational excellence

and strength in the market. After fully acquiring the Imperial assets in 2012, LDC has made at

least $101 million in capex investments in Port Wentworth, "to maximize operational

excellence." PTX350 at 9, 23; *see also id.* at 22 ("Imperial Sugar's facilities are proven and well-

invested"; "Operational excellence at every manufacturing link of the refining process").

209.    Imperial also views itself as a strong competitor for the production and sale of

refined sugar. For example, Imperial calls itself a "best-in-class refiner" with a "state-of the art

packaging facility" and a company that "has evolved into an industry leader." PTX350 at 6, 8;

*see also* PSAF, ¶ 39; Tr. 223:20-22 (Hines/Imperial); Tr. 841:19-21 (Smith/U.S. Sugar). Imperial

benefits from relevant market share for its Imperial brand in Texas and its Dixie brand in the

southeast. DTX219 at 17. Imperial's brands are "a significant barrier to entry" and a "major

mitigant" that protects Imperial. DTX219 at 17. In addition to packaged sugar, Imperial is able to

store approximately three months of raw sugar at the Port Wentworth facility. PTX 350 at 13.

Imperial's raw sugar storage is an "important risk management tool" that enables the company to

offer a flexible approach to purchasing sugar and gives it the ability to "arbitrage world market

versus domestic market" time spreads. PTX350 at 13, 18.

210.    Given Imperial's ability to continue to leverage these strategic advantages going

forward, it is positioned to continue to successfully compete for the production and sale of refined sugar. Imperial has remained competitive amidst the price, trade, and regulatory fluctuations that are the hallmark of the sugar market. Tr. 817:24-818:8, 818:23-819:7 (Gorrell/Imperial); Tr. 294:8-295:6, 295:12-16 (Henneberry/Imperial). As of 2020, Imperial is capable of producing refined sugar without using bone char, PSAF, ¶ 33, making it a more viable competitor for certain customers. *See, e.g.*, Tr. 1100:21-1101:4 (Petibon/Danone). Additionally, congressional action in 2023 could alter the regulatory framework and place "a port refinery which imports raw sugar [in] a much better economic situation than [producers] growing [sugar] in the United States." Tr. 773:7-11 (Buker/U.S. Sugar); *see also* JTX034 at 2 (rationale for the deal includes "hedge" against Farm Bill changes).

211.    LDC's decision to sell Imperial, Tr. 795:22-796:7 (Gorrell/Imperial), was not a result of Imperial's inability to provide a financial return to its parent. Imperial's lifetime total incremental cash to LDC from December 2012 through October 2021 was over ███████ dollars and its total lifetime EBIDTA during the same reporting period was over ███████ ████ dollars. PTX117 at -487. Far from being in dire financial straits, LDC rejected two offers from United to acquire Imperial as being too low, holding out for U.S. Sugar to acquire Imperial at a higher price. *See supra* ¶¶ 11-13.

212.    Imperial's agreement to enter into an exclusivity agreement with U.S. Sugar further evidences its financial solvency. One month after U.S. Sugar made its May 2020 indication of interest (IOI), LDC and U.S. Sugar entered an exclusivity agreement, that prohibited direct or indirect solicitations of interest from third parties. PSAF, ¶¶ 42-43. LDC and US Sugar agreed to extensions of the exclusivity period until the parties executed the Asset Purchase Agreement on March 24, 2021. PSAF, ¶¶ 43-44. As a result of the exclusivity period, LDC has not pursued a sale of Imperial's assets since June 12, 2020.

Respectfully submitted,


/s/ Shamoor Anis
SHAMOOR ANIS
LAURA D. HATCHER (#5098)
  Chief, Civil Division
United States Attorney's Office
District of Delaware
1313 N. Market Street, Suite 400
Wilmington, Delaware 19801
Tel.: (302) 573-6205
shamoor.anis@usdoj.gov
laura.hatcher@usdoj.gov


/s/ Brian Hanna
BRIAN HANNA
CURTIS STRONG
JENIGH GARRETT
GEORGE NIERLICH
JILL PTACEK
CHINITA SINKLER
JESSICA TATICCHI

Attorneys for the United States
U.S. Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 8000
Washington, DC 20530
Tel.: (202) 460-4294
brian.hanna2@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on May 6, 2022, a true and correct copy of the foregoing was served on all counsel of record via email.

/s/ Brian Hanna

BRIAN HANNA


U.S. Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 8000
Washington, DC 20530
Tel.: (202) 460-4294
brian.hanna2@usdoj.gov