08:03:09 1

```
                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF DELAWARE
```

2

3

UNITED STATES OF AMERICA,      )

4                               ) VOLUME 1
                 Plaintiff,     )

5                               ) C.A. No. 21-1644(MN)
        v.                      )

6                               )
UNITED STATES SUGAR            )

7  CORPORATION, et al.,          )
                               )

8                 Defendants.    )

9

10                       Monday, April 18, 2022
                         8:30 a.m.

11                       Bench Trial

12                        844 King Street
                         Wilmington, Delaware

13

14

BEFORE:   THE HONORABLE MARYELLEN NOREIKA

15              United States District Court Judge

16

APPEARANCES:

17

18                  UNITED STATES ATTORNEY'S OFFICE
                    BY:  SHAMOOR ANIS, ESQ.

19
                    -and-

20
                    U.S. DEPARTMENT OF JUSTICE

21                  BY:  BRIAN E. HANNA, ESQ.
                    BY:  CHINITA M. SINKLER, ESQ.

22                  BY:  ROBERT LEPORE, ESQ.
                    BY:  CURTIS STRONG, ESQ.

23                  BY:  RYAN SANDROCK, ESQ.
                    BY:  JENIGH GARRETT, ESQ.

24                  BY:  JOHN THORNBURGH, ESQ.

25
                         Counsel for the Plaintiff

APPEARANCES CONTINUED:

          MORRIS NICHOLS ARSHT & TUNNELL LLP
          BY:  JACK BLUMENFELD, ESQ.
          BY:  BRIAN P. EGAN, ESQ.

          -and-

          LATHAM & WATKINS LLP
          BY:  JENNIFER GIORDANO, ESQ.
          BY:  LAWRENCE E. BUTERMAN, ESQ.
          BY:  CHRISTOPHER YATES, ESQ.
          BY:  AMANDA REEVES, ESQ.
          BY:  MOLLY M. BARRON, ESQ.

               Counsel for the Defendant
               United States Sugar Corporation


          RICHARDS LAYTON & FINGER
          BY:  KELLY FARNAN, ESQ.

          -and-

          CRAVATH SWAINE & MOORE LLP
          BY:  TIMOTHY G. CAMERON, ESQ.
          BY:  DAVID R. MARRIOTT, ESQ.
          BY:  DANIEL K. ZACH, ESQ.
          BY:  LINDSAY J. TIMLIN, ESQ.
          BY:  HANNAH DWYER, ESQ.

               Counsel for Defendants
               Imperial Sugar Company and
               Louis Dreyfus Holding


          HOGAN McDANIEL
          BY:  DANIEL KERRICK, ESQ.

          -and-

          STINSON, LLP
          BY:  PETER J. SCHWINGLER, ESQ.

               Counsel for the Defendant
               United Sugars Corporation

1

08:38:09 2          THE COURT:  Good morning.  Goodness.  This is --

08:38:14 3  you can be seated.  Is this all the people -- are you with

08:38:18 4  the parties?

08:38:20 5          MR. SNOW:  No, ma'am.

08:38:21 6          THE COURT:  I don't want up that close to our

08:38:24 7  people so I need you to back up.

08:38:27 8          Okay.  Let start with some introductions.

08:38:29 9          MR. ANIS:  Good morning, Your Honor.  Shamoor

08:38:35 10 Anis here from the United States Attorneys Office for the

08:38:38 11 District of Delaware on behalf of the United States.  I'm

08:38:40 12 joined at counsel table by Brian Hanna, Michael Wolin,

08:38:45 13 Chinita Sinkler and Bobby Lepore.

08:38:46 14         THE COURT:  Good morning.

08:38:49 15         MR. ANIS:  Assisting with the technology will

08:38:51 16 also be William Snow.

08:38:52 17         THE COURT:  Good morning.  I have a limit of

08:38:54 18 like nine people in here.  Are we under these limits?  It

08:38:57 19 looks ridiculous, especially since we have COVID issues.

08:39:02 20         MR. BLUMENFELD:  Your Honor, for US Sugars, we

08:39:04 21 have seven people here.  I believe there are third-party

08:39:07 22 lawyers here this morning also because of the

08:39:11 23 confidentiality issues.

08:39:12 24         THE COURT:  All right.

08:39:13 25         MR. BLUMENFELD:  And we will as the trial goes

08:39:17 1   on, we'll have people coming and going.

08:39:20 2               THE COURT:  I don't want this many people in the

08:39:21 3   courtroom.  If I'm allowing -- I think I have allowed you

08:39:26 4   guys to broadcast it, then I don't want this many people in

08:39:30 5   the courtroom when I'm getting e-mails about people having

08:39:35 6   COVID.

08:39:35 7               MR. BLUMENFELD:  Your Honor, we will reduce the

08:39:37 8   number of people to the minimum.

08:39:39 9               Jack Blumenfeld for US Sugars.

08:39:41 10              THE COURT:  You're used to my moods,

08:39:44 11  Mr. Blumenfeld.

08:39:45 12              MR. BLUMENFELD:  Excuse me?

08:39:46 13              THE COURT:  You're used to my moods so you can

08:39:48 14  deal with it on a Monday morning.

08:39:50 15              MR. BLUMENFELD:  I'm here with Lawrence Buterman

08:39:52 16  for Latham who is going to do the opening, Chris Brown from

08:39:57 17  Latham, Elyse Greenwald from Latham, Chris Yates from Latham

08:40:02 18  and in the first row we have Luke Kurts, who is the general

08:40:06 19  counsel at US Sugars and Bob Buker who is the president of

08:40:10 20  US Sugars.

08:40:11 21              THE COURT:  All right.  Good morning.

08:40:12 22              MS. FARNAN:  Good morning, Your Honor, Kelly

08:40:17 23  Farnan from Richards, Layton & Finger on behalf of LDC and

08:40:21 24  Imperial.  I'm joined at counsel table by Tim Cameron, we

08:40:25 25  have Daniel Zach and Hannah Dwyer.  And then we also have

08:40:33  1   two client representatives, one from Imperial, the president

08:40:37  2   and CEO, Mike Gorrell.  And from LDC, we have Neil Grealy

08:40:42  3   who is the chief legal officer of LDC North America.

08:40:45  4           THE COURT:  Good morning to all of you as well.

08:40:47  5   We have some third parties.

08:40:53  6           MR. KERRICK:  Good morning, Your Honor.  Daniel

08:40:54  7   Kerrick on behalf of Hogan McDaniel.  I'm joined by my

08:40:57  8   co-counsel Peter Schwingler.  Also I'm joined by the CEO

08:41:00  9   Matthew Wineinger.

08:41:03  10          THE COURT:  Good morning.  And we have some

08:41:04  11  third parties here.  I guess we'll deal with those as we go

08:41:08  12  through these things.  What I am planning to do is take this

08:41:11  13  out of the trial time of the party who wants to introduce

08:41:15  14  the evidence.  If I find out that there is a reason why

08:41:19  15  that's not fair, I will go back and retroactively

08:41:23  16  redistribute the time, but for now, I guess we need to deal

08:41:27  17  with plaintiff's letter or e-mail from this morning.

08:41:30  18          So plaintiff's intention to request the Court to

08:41:34  19  close the courtroom for a portion of the live testimony of

08:41:36  20  plaintiff Aaron Riippa to protect the confidentiality of

08:41:39  21  General Mills' competitively sensitive information, and for

08:41:44  22  that one, is the government planning to simply -- how much

08:41:50  23  time are we doing?  Are you going to put it all together?

08:41:54  24  What is the plan?

08:41:55  25          MR. WOLIN:  Yes, Your Honor, we're planning a

08:41:58  1    total of forty-five-minute examination of Mr. Riippa, the

08:42:01  2    last ten minutes of that examination we will seek to seal

08:42:04  3    the courtroom to protect General Mills' sensitive and

08:42:08  4    confidentiality information.

08:42:09  5          THE COURT:  How sensitive is it?  Why do we need

08:42:12  6    -- can I see the documents?  What is it that you're going to

08:42:15  7    be doing that you can't do by just pointing me to things in

08:42:19  8    a document, like what is it that you have to say or show on

08:42:23  9    the record?

08:42:24 10          MR. WOLIN:  Your Honor, it includes information

08:42:26 11    about General Mills, possibilities for suppliers, which if

08:42:32 12    the buyers knew which suppliers General Mills was able to

08:42:36 13    use, they could use it to General Mills' detriment.  It

08:42:40 14    would be both documents and testimony on that topic, also

08:42:43 15    specific bid prices, specific confidential data and terms of

08:42:48 16    contract awards that General Mills has given out.

08:42:51 17    Spreadsheets that detail confidential information and terms

08:42:54 18    of bid offers from various suppliers.

08:42:56 19          THE COURT:  But I'm asking, is that stuff you

08:42:58 20    need to say on the record and show in the courtroom?  That's

08:43:02 21    my question, because we talked about this at the pretrial

08:43:05 22    conference where one of you said we didn't have to ask

08:43:10 23    questions.  I understand this is confidential and if you

08:43:12 24    need to show it, I have to consider this request to close

08:43:15 25    the courtroom.  I'm trying to explore whether I have to do

08:43:18 1    that.

08:43:19 2              MR. WOLIN:  Yes, Your Honor, there is testimony

08:43:20 3    that we seek to offer from Mr. Riippa that could not be

08:43:24 4    shown in the documents, only that would need to be elicited

08:43:27 5    on the record.

08:43:28 6              THE COURT:  All right.  And you're representing

08:43:30 7    it's about ten minutes?

08:43:32 8              MR. WOLIN:  Yes, Your Honor.

08:43:33 9              THE COURT:  And you're going to do it together

08:43:35 10   at the end of the direct?

08:43:36 11             MR. WOLIN:  Yes, Your Honor.

08:43:37 12             THE COURT:  And any cross that's going to be

08:43:39 13   done on that, you're going to do at the beginning?

08:43:43 14             MS. GREENWALD:  Good morning, Your Honor.  Elyse

08:43:45 15   Greenwald from US Sugar.

08:43:46 16             Yes, we don't believe we need to seal the

08:43:49 17   courtroom, but if there is an extended seal, we can do that

08:43:52 18   portion right after the direct.

08:43:54 19             THE COURT:  And you're going to have to get up

08:43:56 20   and be quick about it so we can open the courtroom, but I

08:44:00 21   will allow you to seal that particular stuff.

08:44:02 22             What's next.

08:44:02 23             MR. WOLIN:  Thank you, Your Honor.

08:44:05 24             The second issue involved deposition testimony

08:44:07 25   from certain third-party witnesses that the government seeks

08:44:10 1    to offer either later this afternoon or first thing

08:44:14 2    tomorrow, depending on how quickly things go.  It's

08:44:17 3    testimony from sugar purchasers, sugar distributors and

08:44:22 4    other sugar refiners.  Of those six witnesses that we intend

08:44:26 5    to call, three of them will also be called by the defendant

08:44:32 6    at that time, we'll have all the designations from both

08:44:35 7    sides together.

08:44:36 8              THE COURT:  Is the defendant asking to seal the

08:44:37 9    courtroom?

08:44:38 10             MS. GREENWALD:  We have no objection to sealing

08:44:41 11   the courtroom.

08:44:41 12             THE COURT:  Yeah, but are you asking?

08:44:44 13             MS. GREENWALD:  The third parties have made that

08:44:47 14   request.

08:44:49 15             THE COURT:  So you don't want it sealed, because

08:44:51 16   you got the information from the third parties you're making

08:44:54 17   that request?

08:44:55 18             MS. GREENWALD:  That's right.

08:44:56 19             THE COURT:  Is that right?

08:44:57 20             MS. GREENWALD:  Yes, Your Honor.

08:44:59 21             THE COURT:  All right.  How much of this -- I

08:45:02 22   guess with the deposition it's hard to -- how much is really

08:45:02 23   sensitive?  I have these depositions.  A lot of this looks

08:45:02 24   like it's not terribly sensitive at all.

08:45:12 25             MR. WOLIN:  Your Honor, it's just a portion of

08:45:17 1   the deposition but it starts with the nonconfidential

08:45:21 2   testimony in such a way that it would be inconceivable to

08:45:24 3   splice it.

08:45:24 4           THE COURT:  We will close the courtroom for

08:45:26 5   those depositions.  By tomorrow, you must give portions of,

08:45:30 6   you know, redacted out portions from the transcript, tell

08:45:33 7   the court reporter so that we can have a sealed and unsealed

08:45:38 8   and the portions that are not sealed will be unsealed.

08:45:40 9           MR. WOLIN:  Yes, Your Honor.

08:45:42 10           THE COURT:  What's next?

08:45:43 11           MR. WOLIN:  The last issues we have teed up on

08:45:46 12   our e-mail was the confidentiality of information supplied

08:45:48 13   by ASR.  We have continued to work with ASR since we sent

08:45:56 14   the e-mail last night.  We appreciate their efforts to

08:45:59 15   resolved this issue, four of the five issues that we raised.

08:46:01 16   We believe that the other one we will resolve today.  It's

08:46:03 17   for a document that will come up tomorrow.

08:46:05 18           THE COURT:  So why don't we give you until

08:46:07 19   tomorrow to figure that out.

08:46:10 20           MR. WOLIN:  Yes, Your Honor, that will be great.

08:46:11 21           THE COURT:  Anything else we have to do?  I'm

08:46:14 22   supposed to admit someone.

08:46:18 23           MR. WOLIN:  Thank you, Your Honor.

08:46:19 24           MR. SEAMANS:  Good morning, Your Honor.  Thank

08:46:21 25   you.  John Seamans from Abrams & Bayliss.  I'm here to

08:46:25 1    respectfully move the admission of my friend and colleague,

08:46:29 2    Garrett Veres to the Bar of the United States District Court

08:46:31 3    for the District of Delaware.

08:46:33 4                THE COURT:  All right.

08:46:34 5                MR. SEAMANS:  Mr. Veres will be representing ASR

08:46:37 6    today.

08:46:37 7                THE COURT:  Mr. Veres, welcome.  The motion is

08:46:40 8    granted and welcome.  Mr. Buckson, do you want to swear him

08:46:43 9    in.

08:46:45 10                COURT DEPUTY:  Please raise your right hand.

08:46:46 11                You do solemnly swear to the best of your

08:46:49 12    knowledge and ability, you will support and defend the

08:46:52 13    constitution of the United States against all enemies,

08:46:52 14    foreign and domestic, and that you will bear true faith and

08:46:52 15    allegiance to the same; that you take this obligation freely

08:47:00 16    without any mental reservation or purpose of evasion, and

08:47:01 17    that you will demean yourself as an attorney, proctor, and

08:47:05 18    solicitor of this Court uprightly and according to the law.

08:47:08 19                MR. VERES:  I do.

08:47:09 20                THE COURT:  Thank you.

08:47:11 21                MR. VERES:  Thank you.

08:47:11 22                THE COURT:  Does ASR, you don't have to say

08:47:12 23    anything today, right, because you're still negotiating, do

08:47:12 24    I have that right?

08:47:20 25                MR. VERES:  I think that's right, Your Honor.

08:47:21 1          THE COURT:  Great.  Anything else we need to

08:47:24 2    deal with before we start?

08:47:27 3          MR. HANNA:  Yes, Your Honor.  Brian Hanna for

08:47:29 4    the United States.  Just a couple of housekeeping questions.

08:47:32 5          THE COURT:  We are still on the clock, right,

08:47:36 6    Mark?

08:47:36 7          MR. HANNA:  We do anticipate introducing or

08:47:40 8    moving to admit confidential exhibits and I wanted to ask

08:47:44 9    your preference for admission of confidential information

08:47:47 10   exhibits, you would move for admission of their original PTX

08:47:52 11   1 under seal, and then I wanted to ask you if your

08:47:56 12   preference is for the redacted version to move that in as

08:47:59 13   PTX 1R.

08:48:03 14         THE COURT:  I don't want the redacted version

08:48:05 15   but if there is a reason, you can work that out with my

08:48:08 16   deputy.

08:48:12 17         MR. HANNA:  Okay.  Your Honor will have a copy

08:48:13 18   of that version.

08:48:14 19         The other item I wanted to ask, I mentioned that

08:48:17 20   pretrial conference that the witness sequester rule would be

08:48:22 21   in place.  I wanted just to get clarification that that

08:48:26 22   would not apply to both sides for the experts.  We

08:48:30 23   anticipate that they would need to listen to some of the

08:48:34 24   testimony during trial.  I just want to clarify, with your

08:48:39 25   permission, that the experts would not be subject to the

sequester rule.

THE COURT:  They're not.

MR. HANNA:  And I wanted to just state that the government is planning to reserve a small amount of time for its rebuttal case.  Probably no more than an hour.  I just wanted to let you know that the government was planning to have a potential rebuttal case.

THE COURT:  That's fine.  You can use whatever time you have left.  I don't keep track where you are.  If you have an hour left of rebuttal, go for it.  If you don't, I'm not going to tell you to stop when you get to an hour.

MR. HANNA:  Thank you, Your Honor.  At the pretrial conference Your Honor indicated that you were considering different options for closing and for purposes of helping us.

THE COURT:  I think I want to hear it.  Plan on me wanting me to hear closings.

MR. HANNA:  Is it going to be after this week?

THE COURT:  No, it's going to be within the time you have this week.

MR. HANNA:  Thank you, Your Honor.

I guess finally, Your Honor, we sent a letter, I think on Friday or Thursday with respect to one of United employees, Ms. Campbell.  You graciously granted that she could be here remote.  We tried to work that out and due to

08:50:02 1    the availability and logistics of the court, the district

08:50:06 2    court where she resides, we're not able to do that.  So both

08:50:13 3    sides agreed that we could play her short video deposition.

08:50:16 4    She's more than a hundred miles away and not available.

08:50:20 5                 THE COURT:  Okay.

08:50:21 6                 MR. HANNA:  I just wanted to clarify that.

08:50:23 7                 THE COURT:  Thanks.  I appreciate that.

08:50:25 8                 MR. HANNA:  Nothing further, Your Honor.

08:50:27 9                 THE COURT:  All right.  Anything else from the

08:50:29 10   defendants?

08:50:31 11                MR. BUTERMAN:  No, Your Honor.

08:50:32 12                THE COURT:  Great.  Let's begin.

08:50:42 13                MR. HANNA:  May I proceed, Your Honor?

08:51:05 14                THE COURT:  Please.

08:51:06 15                MR. HANNA:  Brian Hanna for the United States.

08:51:09 16   May it please the Court, this case --

08:51:11 17                THE COURT:  Hold on.  We got to stop that.  Do

08:51:24 18   you want to try again, see if it's still doing it.

08:51:29 19                MR. HANNA:  May it please the Court.

08:51:31 20                THE COURT:  Thank you.

08:51:32 21                MR. HANNA:  May it please the Court, Your Honor,

08:51:35 22   this case is straightforward.  As a result of a merger, two

08:51:40 23   large sellers of sugar will become one.  The two large

08:51:44 24   sellers are United and Imperial, and they compete to sell

08:51:45 25   sugar to food processors, distributors and grocery stores.

08:51:53   1          Now there is no serious dispute over the product

08:51:57   2   at issue in this case, it's sugar.  We're all familiar with

08:52:01   3   this product.  Sugar is everywhere in our daily lives.  It's

08:52:05   4   a stable ingredient in many of the favorite foods that we

08:52:09   5   eat.  The main issue in this case, Your Honor, is where does

08:52:15   6   United and Imperial compete?  Where is that competition

08:52:19   7   important?  And the evidence will show that sugar is

08:52:23   8   expensive to ship and that is just a commercial reality of

08:52:27   9   this industry and it always has been a commercial reality of

08:52:30  10   this industry.

08:52:31  11          Everyone working in the sugar industry knows

08:52:34  12   this reality.  You will hear testimony from the parties,

08:52:38  13   from customers, and from competitors that acknowledge this

08:52:43  14   reality.  And Your Honor will hear one customer say freight

08:52:47  15   is an unforgiving cost.  And the trial record will be full

08:52:52  16   of evidence that competition is regional because of freight

08:52:57  17   cost.

08:52:57  18          United has US Sugar's plant in Florida and

08:53:03  19   Imperial has its sugar plant in Savannah, Georgia, so the

08:53:07  20   evidence will show that United and Imperial are both well

08:53:11  21   situated to compete for and supply customers in the

08:53:13  22   southeast and through the Mid-Atlantic so that is where

08:53:18  23   competition would be affected from this merger.  Competition

08:53:22  24   between United and Imperial has forced them to lower prices

08:53:26  25   and provide a better quality services.  That competition and

08:53:30 1   all those benefits would be eliminated if one of United's

08:53:35 2   owners, US Sugar is allowed to acquire Imperial.  And the

08:53:40 3   evidence will show that combined, United and Imperial will

08:53:44 4   have a market share of nearly 50 percent or even higher in

08:53:48 5   the southeast and up through the Mid-Atlantic.  These market

08:53:52 6   shares reflect the choices that customers have today, and

08:53:57 7   the merger will take away a choice that the market shares

08:54:01 8   tell us has been important to customers.  And that choice is

08:54:05 9   Imperial.

08:54:05 10          The market shares statistics alone create a

08:54:09 11  presumption that this merger would harm customers in

08:54:13 12  violation of Section 7 of the Clayton Act.  And the proposed

08:54:18 13  merger would leave customers located in the relevant markets

08:54:21 14  with a dualopoly, United and Domino, they refer to as ASR

08:54:29 15  sometimes, they would control over 70 percent of sales to

08:54:33 16  those customers in the southeast and up to the Mid-Atlantic

08:54:36 17  and the evidence will show today United and Domino, they

08:54:39 18  look for ways to achieve higher prices by avoiding

08:54:43 19  aggressive competition.

08:54:44 20          And one of the ways they try to achieve higher

08:54:47 21  prices is by using a go between, some sort of consultant as

08:54:52 22  a conduit to exchange pricing and selling capacity

08:54:56 23  information.  And the evidence will show that this

08:54:59 24  competitive information is sent back and forth between

08:55:02 25  United and Domino.  So we can see that United and Domino

08:55:09  1   have both the means and the incentive to coordinate the

08:55:12  2   pricing actions in the market.  So we should be even more

08:55:18  3   worried about this merger.

08:55:20  4          By eliminating Imperial, this merger would make

08:55:23  5   it easier for United and Domino to be successful at this

08:55:28  6   kind of behavior that tends to lessen competition.  This

08:55:33  7   week we will bring in customers to show how competition

08:55:36  8   between United and Imperial has been important to them.

08:55:41  9   After openings, Your Honor will hear from a very large

08:55:44 10   customer, General Mills, and that evidence will show that

08:55:47 11   General Mills has benefited from competition between United

08:55:52 12   and Imperial.

08:55:53 13          Tomorrow Your Honor will hear from a much

08:55:55 14   smaller customer, Piedmont Candy, and that evidence will

08:55:59 15   also show that Piedmont has benefited from competition

08:56:03 16   between United and Imperial.  And we can also look at the

08:56:08 17   defendants' own documents to see how competition between

08:56:10 18   United and Imperial has benefited customers and it will be

08:56:15 19   clear from that evidence that United and Imperial compete

08:56:20 20   and that competition has driven prices lower, so we can take

08:56:24 21   a look at the evidence now, some of it.

08:56:27 22          Here on the first slide we have United trying to

08:56:30 23   win business from Bud's Best Cookie.  It's a cookie company

08:56:35 24   in Alabama.  We can see that United in this e-mail is

08:56:38 25   matching Imperial's quote lowering price to be more

08:56:43 1    competitive with Imperial.  That is price competition right

08:56:47 2    here on this document.  And the merger would eliminate that

08:56:50 3    competition.  This competition matters and it deserves

08:56:56 4    protection.

08:56:57 5            We can look at another e-mail.  This e-mail is

08:57:00 6    from Imperial's vice-president of sales.  She will testify

08:57:02 7    in this case, in this example, Imperial is competing hard

08:57:06 8    for the business of Costco in the southeast.  We can see

08:57:09 9    from Ms. Hines' e-mail that they are competing with United

08:57:14 10   Cane, that's what she says.  That means United is competing

08:57:17 11   with the sugar produced by US Sugar in Florida.  So Imperial

08:57:21 12   is asking -- is asked by this customer if there is as we see

08:57:24 13   on this slide any room to go down slightly.  So right there

08:57:29 14   Imperial understands it needs to lower its price to beat out

08:57:33 15   United and that evidence -- and the evidence will show that

08:57:37 16   Imperial in fact lowered its price and won some of this

08:57:41 17   business from Costco.  The merger would eliminate that

08:57:44 18   competition.  This is competition that matters, and it

08:57:48 19   deserves protection, Your Honor.

08:57:49 20           So we can see that competition between United

08:57:52 21   and Imperial has benefited customers.  And looking at that

08:57:55 22   evidence is important when evaluating the effects of the

08:58:00 23   merger.  And we have additional tools to help us evaluate

08:58:06 24   the effects of competition from the merger.  One of those

08:58:10 25   tools is market definition.

Now, defining a market can seem formalistic but there is a substantive reason to do this to evaluate mergers.  Market definition helps identify what competition is likely to be lost.  You know, there are two components to market definition, a product market and a geographic market. As I said earlier there is really no dispute that the relevant product market in this case is refined sugar. Refined sugar is a familiar product.  It's the sugar we all eat.  Refined sugar can take many forms.  We have some pictures on the screen here.  Granulated sugar, it's that white crystalized sugar that is probably sitting in a jar in nearly every kitchen across America.  The output of the refining process is this granulated sugar and the granulated sugar can take many forms, powdered sugar, brown sugar, and liquid sugar.

Next, we considered geographic market and I said earlier, this is the main issue in this case.  For geographic market, as we can see from this *Philadelphia National Bank* Supreme Court case, for geographic market we don't focus on everywhere United and Imperial do business or even everywhere they compete.  As the Supreme Court said in *Philadelphia National Bank,* we focus on where the effect on competition would be direct and needed.

Where does competition really matter, Your Honor?  We can look at the documents in this case to see

08:59:44 1   where competition between United and Imperial matters.

08:59:48 2   Let's take a look at some of the evidence.  Up here on the

08:59:51 3   slide we see a presentation prepared by the CEOs of United

08:59:57 4   owners including the CEO of US Sugar, Bob Buker.  The title

09:00:03 5   of this presentation, we can see it on the upper left-hand

09:00:06 6   side is regional market overview.  And that makes sense,

09:00:10 7   Your Honor.  United considers sugar markets to be regional.

09:00:15 8          On the right side we see the title of this map

09:00:17 9   from United, USC definition, supplier backyards.  United is

09:00:24 10  defining what it can considers to be regional markets.

09:00:28 11  United defines each market here by where each sugar producer

09:00:32 12  has freight cost advantages serving customers in those

09:00:36 13  various regions and from this document we can see the

09:00:39 14  southeast, the collection of states in red there, Your

09:00:41 15  Honor, that is where United operates, US Sugar and Imperial

09:00:45 16  have a freight cost advantage.  United considers the

09:00:51 17  six-state region in the southeast to be their backyard.  So

09:00:57 18  that's a good place to start with defining a market to

09:00:59 19  evaluate this merger.

09:01:01 20         And on the slide we have put up here, Your Honor

09:01:04 21  can see that's where we started.  In its complaint, the

09:01:06 22  government first alleged a relevant market that spans from

09:01:11 23  Georgia and its bordering states.  And on the slide here we

09:01:16 24  nickname it the narrow market.  It's a collection of states

09:01:21 25  in red on that supplier backyard map that we just looked at.

Now, we can see in the evidence and we can

observe that competition between United and Imperial matters

to customers beyond this narrow market.  So we expanded the

market out to these states and redefined a relevant market

that's slightly broader and we nicknamed it the broader

market.

Following the case law in the Horizontal Merger

Guidelines, we defined both these markets based on where the

customers are located.  What this means, Your Honor, if a

supplier has sales to customers located in one of these

states, that supplier is in the market and we give that

supplier market share.  It doesn't matter where the supplier

is located.  That's well-accepted merger analysis.

We are focused on the competitive options

available to customers.  And as the evidence will show, it

turns out more distant suppliers have a much lower market

share in these markets than United and Imperial or Domino.

It's harder for more distant suppliers to be competitive in

the relevant market because of freight costs.

THE COURT:  Where is Domino located?

MR. HANNA:  Domino, they have several, they're

pretty national.  If you look in Florida, one of the

triangles there is a Domino plant.  Domino also has a plant

in Baltimore, Maryland, and a plant in Yonkers, New York,

and they have a refinery also in Louisiana.  You can see

Domino is right around that region where the relevant

markets are.

It's harder for more distant buyers to be

competitive in these relevant markets because of freight

costs.  Competition tends to be regional and that's what

United was indicating in that slide we looked at earlier.

We can see this evidence of regional competition in the

market shares.  Let's take a look at some of the evidence in

this case.

This map is looking at two different supplier

backyard regions in the United supplier backyard map that we

just looked at.  We can see from this that United and

Imperial have very high market shares in that collection of

red states, the southeast, that's their backyard, so that

makes sense.  On the other hand, we can see that NSM who is

really big out west, forty-seven percent market share, that

also makes sense.  NSM has sugar plants in Idaho and

California and not surprisingly, NSM is very small in the

southeast, only two percent.  And we can see from this map

where competition between United and Imperial is important

to customers.  It's the southeast region.

Now, Your Honor, this is not the first time a

court has had to evaluate the effect of a merger involving

two sugar producers.  The Second Circuit did in *American

Crystal v. Cuban American Sugar*.  In that case there were

two alleged geographic markets, a narrow market in three

states and a broader market spanning ten states.  And the

Second Circuit affirmed those markets noting that the

merging companies were better situated to supply customers

in those regions because it had quote a locational

advantage, a locational advantage over other refiners in

other parts of the country.  These things freight dynamics

have played in that sugar case, are alive and well in

today's sugar market.  We can look at the defendants' own

documents to see that.

        Here we have an e-mail from the senior

vice-president of sales at Imperial, Patrick Henneberry, and

Imperial is competing for a customer's business in Georgia,

its own backyard.  And we can see Mr. Henneberry says

Imperial has a locational advantage over the competition for

this customer in Georgia.  Locational advantage, that's the

exact same term that the Second Circuit used to describe the

freight dynamics in that case.  And Mr. Henneberry means the

same thing, Imperial's freight costs will be lower, lower

than the competition for this customer.  And the evidence

will show that freight dynamics informed Imperial's pricing

strategy for this customer.

        We can look at another document from United,

this is United's director of strategic accounts, Eric

Speece.  And he'll testify later in this case as well.  And

they're competing for a customer in Jacksonville, Florida. We can see from the highlighted text that he says United has a significant freight disadvantage over one competitor in Savannah, Georgia, and that's why United lowered its price. The one competitor he's referring to is Imperial who has a plant in Savannah, Georgia.  So United thought Imperial would have a lower freight cost than this customer, a freight disadvantage, so United preemptively lowered its price out of the gate to be more competitive to Imperial. This shows how freight cost effects price United competitiveness to reach this customer.  This shows Imperial's mere presence in this market is constraining United's price.

        Your Honor will also hear from customers on this topic.  They will say that transportation cost effects the options available to them at competitive prices.  So all of this ordinary course evidence will show that sugar markets are regional and that's largely due to freight costs.

        So now, how does the government establish its prima facie case that there is a reasonable probability that the merger would produce anticompetitive effect in these relevant markets?  To prove its case, the government can establish a presumption that the merger is anticompetitive. And there is two ways that the government can establish this presumption.  First, market shares, market shares alone can

establish a presumption of a post-merger market share of thirty percent is enough to trigger this presumption, that is what a court in this district in the *Energy Solutions* case held following Supreme Court precedent.

So we can -- there is a second way to establish a presumption and that's based on market concentration. Courts look at market concentration using another analytical tool used the Herfindahl-Hirschman Index or HHI. Courts rely on this HHI concentration routinely because it's a good indicator of the likely effect of competition on a merger. We can see that the Third Circuit in the FTC Hackensack case just affirmed this. There is presumption of harm in merger if the post merger HHI concentration is above 2,500, and the increase in that concentration is more than 200.

The experience has shown that the more concentrated the market the less competition there is. Less competition means higher prices and lower quality and service. So let's take a look at the market shares in HHI and our case. We can see here on the slide for both relevant markets we will establish the presumption. On the left we have the market shares, and in a narrow market, the post-merger market share of United will be 54 percent. And in the broader market, United post-merger market share will be 46 percent. Well above the presumption. The same with HHI as we can see in both relevant markets, well above the

presumption.

Now, we expect the defendant to quibble over where we draw the boundaries of the relevant markets, but it doesn't matter.  The evidence will show that the precise boundaries do not change the outcome of this analysis.  We can add states but the picture is the same.  United's market share will be significant, more than 30 percent.  The post-merger market will be concentrated and there will be a dramatic increase in concentration and the market will be dominated by two equally large suppliers, United and Domino.  And as I said, in the Hackensack case, the Third Circuit just reaffirmed last month that courts need no further evidence than this market share analysis, full stop, to establish the presumption.

And what this means Your Honor, once this presumption is established the burden shifts to the defendant to try to produce evidence that the market share statistics do not paint an accurate picture of the merger's probable effects on competition.  The defendants will not be able to do that.

So Your Honor, we could rest our case on establishing a presumption of harm, but we will not do that.  On top of the market shares that HHI concentration analysis, we will show additional evidence that this merger would likely cause harm.  Earlier, I showed Your Honor some

09:10:49 1  documents from the defendant illustrating current

09:10:52 2  head-to-head competition between United and Imperial and how

09:10:55 3  that has been driving prices lower.  That is direct evidence

09:11:00 4  that strengthens this presumption that the merger would be

09:11:03 5  anticompetitive.  In addition to this evidence, the evidence

09:11:07 6  will show that competition between United and Imperial is

09:11:10 7  likely to only intensify in the future, if they remain

09:11:17 8  independent competitors.  Independent of this merger, United

09:11:20 9  is looking to compete harder in the southeast and United was

09:11:24 10  going to put resources into doing that.  That's what

09:11:27 11  United's own documents will show.  And we have some of that

09:11:29 12  evidence here on the slide that we have up on the public

09:11:32 13  screen.  On the left side we have an e-mail from United's

09:11:35 14  vice-president of strategy, Steve Hines.  He also will

09:11:38 15  testify in this case.  And we can see United is considering

09:11:41 16  ways to compete harder in the southeast, SE products, that

09:11:46 17  means selling more sugar in the southeast.  And we can see

09:11:49 18  that the goal is to attack the market like Chicago and that

09:11:54 19  market is considered the southeast.

09:11:59 20          Chicago in that e-mail is a reference to a sale

09:12:01 21  strategy that United put in place in the Chicago area to

09:12:06 22  increase its profit and we can see on the documents on the

09:12:09 23  right side their claim to deploy that Chicago strategy to

09:12:12 24  the southeast, we can see that document, southeast strategy.

09:12:18 25          To support this strategy, United's top

09:12:23 1    executives recommended adding equipment, equipment for

09:12:27 2    bagging at the Clewiston Refinery so it could increase its

09:12:34 3    sales to customers in the southeast and they recommended

09:12:37 4    hiring sales manager to support this expansion.  United has

09:12:40 5    not yet moved forward with this expansion and the testimony

09:12:42 6    will show that rather than doing the hard work of competing,

09:12:46 7    they're trying to acquire Imperial.  Acquisition instead of

09:12:51 8    competition.

09:12:53 9           Now, let's talk about coordinated effects.  On

09:12:59 10   top of losing the head-to-head competition between United

09:13:03 11   and Imperial, we will present evidence that this merger

09:13:06 12   would likely increase a risk of harmful coordinated effects.

09:13:11 13   So what do we mean by coordinated effects, Your Honor?

09:13:14 14   There are you different kind of coordinated conduct by

09:13:18 15   competitors all of which tend to lessen competition.  We all

09:13:22 16   know that it's harmful for competitors to get into smoke

09:13:26 17   filled rooms and to agree to raise prices, but competitors

09:13:30 18   don't need to be in a smoke filled room to achieve the same

09:13:34 19   result.  One competitor can raise its price and the other

09:13:37 20   competitors can see that happening in the market and they

09:13:40 21   can realize that they would be better off raising their own

09:13:42 22   prices instead of competing more aggressively, or

09:13:42 23   competitors can take a step further and they can find ways

09:13:42 24   to signal each other directly or indirectly to accommodate

09:13:52 25   each other's pricing actions in the market.  When evaluating

09:13:58 1   the effect of a merger, we worry about this kind of behavior

09:14:01 2   because the fewer competitors there are, the easier it is

09:14:05 3   for this type of behavior to be successful.

09:14:08 4          To show that the relevant markets in this case

09:14:12 5   are vulnerable to this type of conduct the evidence will

09:14:16 6   show that competitors, especially United and Domino, are

09:14:19 7   already doing this kind of coordinated conduct that tends to

09:14:24 8   lessen competition.  Let's take a look at some of the

09:14:27 9   evidence.

09:14:27 10          On the slide here, we have an e-mail from

09:14:31 11   Domino's vice-president of industrial sales, Alan Henderson

09:14:36 12   discussing a price quote to a customer.  The evidence will

09:14:39 13   show that one of Henderson's subordinates reports that they

09:14:44 14   know Domino is competing against Domino and Imperial and he

09:14:48 15   asked for authority to cut prices.  But here in this e-mail

09:14:52 16   we can see that Henderson refuses to cut prices as much as

09:14:57 17   he would like to, and he says we would like to avoid sending

09:15:02 18   out a signal to competitors that Domino is chasing business

09:15:06 19   and lowering pricing.  What this means is Domino was not

09:15:09 20   willing to cut its price for this customer.  We can see here

09:15:12 21   in this e-mail, Domino is trying to keep prices high and

09:15:17 22   he's counting on his few remaining competitors to do the

09:15:21 23   same.  But the evidence will show Imperial was willing to

09:15:24 24   lower its price.  We have redacted the name of this customer

09:15:27 25   and you will hear from this customer later at trial and the

evidence will show that Imperial was willing to drop its price for this customer for this bid.  This pulling of punches is textbook, textbook coordinated activity that tends to lessen competition in the market.  With Imperial out of the mix, this strategy is likely to be more successful.  And United and Domino don't just stop at this type of coordination, they use a go between, Richard Wistisen, who is supposed to be some sort of consultant. They use him as a conduit to exchange pricing and they are selling capacity information.

You will see that evidence that United and Domino, who are supposed to be competitors have be been telegraphing their pricing strategy to one another while providing competitively sensitive information to this go between, Wistisen.  Let's take a look at just one of these e-mail exchanges.  We can see this go between, Wistisen, e-mailed United and Domino less than an hour apart, he asked virtually the same question, what are you hearing on prices.

On the next slide we can look at United and Domino's responses to Wistisen.  On the left, we can see United structure response to the go between, United shares its current pricing information and goes on to share United's future pricing plan saying that United will probably go higher given our strong sold position.  Sold position means selling capacity.  How much sugar has United

09:17:03 1    sold so how much more sugar does United have left to sell.

09:17:08 2    And the evidence will show with a strong sold position, you

09:17:11 3    feel less pressure to discount prices.  And this is really

09:17:15 4    important, if you know your competitor has a large

09:17:18 5    percentage of its available sugar, then they are less likely

09:17:22 6    to compete aggressively by discounting prices.  So you know,

09:17:27 7    you are more likely to be successful in raising your own

09:17:30 8    prices.  On the right, we see Domino's response to this go

09:17:35 9    between's question and we see Domino's share its pricing

09:17:43 10   information.  Dominoes also shared paid coverage that is 85

09:17:44 11   to 90 percent, that's sold position.

09:17:47 12         At this point Your Honor, the go between has

09:17:50 13   received pricing information from United and from Domino.

09:17:53 14   So now, what does he do with it?  We can see that on the

09:17:55 15   next slide.  The next morning, Wistisen takes this Domino

09:18:00 16   pricing information and selling capacity and he sends it

09:18:03 17   back to United and Wistisen writes here in this e-mail, ASR

09:18:09 18   is saying that prices are going up, he provides the specific

09:18:13 19   numbers and their sold position.

09:18:15 20         And now we go to the next page we can see

09:18:18 21   Wistisen does what he does with United information, we see

09:18:22 22   here Wistisen takes the United pricing information and sends

09:18:26 23   it back to Domino, he confirmed that United said that they

09:18:30 24   will "probably be taking prices higher given strong sold

09:18:35 25   position."  How can this kind of information exchange we see

here lead to less competition in the market?  When you know your competitor's prices or that your competitor is raising prices, it's easier to avoid a price fight.

The evidence will show that Wistisen routinely communicated with both United and Domino about their pricing, their pricing strategies and about market sold position.  This information, these information exchanges are powerful evidence that the sugar market is already vulnerable to coordinated conduct.  United and Domino have demonstrated the means and the incentives to coordinate their pricing.  That means that mergers in this industry have an especially high risk of making this kind of coordinated behavior even worse just because there is one less company involved.  This is where Judge Posner warned about in the Seventh Circuit, HCA versus FTC, why competitors routinely exchange pricing information, we are entitled to worry even more about large mergers in the industry.

Now, Your Honor, we expect defendants to try to wash their hands of this evidence by saying they're merely exchanging spot prices.  Now the antitrust laws do not have an exception for exchanging current spot pricing, and it doesn't use make it okay to use a go between like Mr. Wistisen to do this exchanging.  But in any event as we saw in these e-mail exchanges that we have on the slide, the

09:20:13 1  evidence will show that these exchanges go well beyond

09:20:17 2  exchanging current spot pricing.  United and Domino shared

09:20:20 3  future pricing strategies and they divulge their selling

09:20:24 4  capacity information, that's coordination.

09:20:28 5          Now all of this evidence, the competitive

09:20:31 6  effects from the head-to-head competition to the loss of

09:20:34 7  expected increase in competition, to this evidence of

09:20:39 8  coordinated activity, all of that evidence is consistent

09:20:42 9  with and it bolsters the statistical evidence that this

09:20:46 10 merger is presumptively unlawful.  So that evidence will

09:20:51 11 establish your prima facie case and then the burden will

09:20:55 12 shift to the defendants to rebut that evidence.  But none of

09:20:58 13 their arguments will discredit the market shares or the

09:21:01 14 concentration analysis that the government will put forth in

09:21:05 15 this case.

09:21:05 16         Let me address just a few of their defenses.  We

09:21:10 17 expect defendants to say we should treat distributors just

09:21:14 18 like sugar producers are treated.  Distributors have to buy

09:21:20 19 sugar from the sugar producers.  This argument from the

09:21:25 20 defendants, distributors are dependant on sugar producers.

09:21:29 21 The evidence will show the following.  To reach customers

09:21:32 22 sugar first needs to be refined.  Distributors have no

09:21:36 23 refining capacity, nor independent access to sugar.

09:21:41 24 Distributors must first buy the sugar from producers at

09:21:45 25 arm's length and the evidence will show that distributors

09:21:50 1   have the ability to adjust their pricing to encumber the

09:21:55 2   distributor's ability to sell.

09:21:56 3            On the screen, Your Honor, we have a document

09:21:58 4   prepared for the United board of directors and it's

09:22:01 5   regarding a strategy in Chicago.  And that strategy entailed

09:22:08 6   reducing the amount of sugar it sold to distributors in the

09:22:11 7   Chicago area.  In turn United increased the price of the

09:22:16 8   sugar it did sell to distributors in the area.  So from this

09:22:19 9   evidence, we can see that distributors are subject to the

09:22:22 10  market power of producers from which they have to buy the

09:22:23 11  sugar, similar to any other customer.

09:22:27 12           We also expect defendants will claim there are

09:22:31 13  small efficiencies, but the Third Circuit is skeptical that

09:22:35 14  such a defense exist.  And it also set a high bar to meet an

09:22:39 15  efficiency defense.  And defendants will not be able to

09:22:42 16  overcome that high bar.

09:22:45 17           And finally, Your Honor, let me address the

09:22:47 18  notion that more government regulation, the notion that more

09:22:53 19  government regulation is going to solve the problem.  This

09:22:56 20  ignores the commercial reality that competition still

09:23:00 21  matters in the sugar industry.  Even regulated industries

09:23:04 22  need competition.  And the Supreme Court has made clear that

09:23:08 23  competition still matters in regulated industries.

09:23:12 24           Now, I want to be clear, USDA regulation is a

09:23:16 25  market fact.  USDA regulation puts the price first and

09:23:23 1    foremost, but USDA's role does not displace competition.

09:23:27 2    USDA regulation is no substitute for the enforcement of

09:23:33 3    antitrust laws.  We don't rely on government to deliver the

09:23:36 4    sugar, nor set the price of sugar.

09:23:38 5              THE COURT:  But they're setting a floor, meaning

09:23:41 6    what, they can't charge less?

09:23:43 7              MR. HANNA:  They set a price floor, effectively

09:23:46 8    a price floor, the price of sugar is never going to below a

09:23:51 9    certain price.  There is no ceiling on that.  What we're

09:23:53 10   worried about is higher prices.

09:23:54 11             THE COURT:  I understand, but they can't go

09:23:56 12   below that price, so -- right, the government will not let

09:24:01 13   them sell below that price.

09:24:03 14             MR. HANNA:  Well, effectively they won't because

09:24:07 15   the producers could forfeit, think of it as loan program so

09:24:11 16   effectively they could forfeit all the sugar and the

09:24:15 17   government would then have to sell that sugar.  That's why

09:24:17 18   effectively it's a price floor.  What we're concerned about

09:24:21 19   in this merger --

09:24:22 20             THE COURT:  I know what you're concerned about.

09:24:24 21   I think it is kind of funny that there is a floor meaning

09:24:27 22   you can't go below something and yet you're worried about

09:24:32 23   price going too high.  Right?

09:24:33 24             MR. HANNA:  Right, because the USDA regulations

09:24:36 25   does not have any -- does not --

09:24:40 1          THE COURT:  I know it doesn't cap it, but they

09:24:44 2  couldn't give it away.  Never mind.  We'll get to it later.

09:24:47 3  Go ahead.

09:24:49 4          MR. HANNA:  We will show evidence at this trial,

09:24:53 5  Your Honor, that suppliers and customers are negotiating

09:24:57 6  every day to determine the price of sugar.  In America we

09:25:01 7  rely on competition to set prices.  Defendants are asking us

09:25:06 8  to trust regulations, but the law tells us to trust

09:25:11 9  competition.  The very argument from the defendants will not

09:25:16 10  rebut the presumption.  Competition between United and

09:25:20 11  Imperial matters today and it will continue to matter in the

09:25:23 12  future.  We seek to prevent the elimination of this

09:25:27 13  competition.  Therefore, when the evidence is all in, we

09:25:31 14  will ask Your Honor to enjoin the merger between US Sugar

09:25:35 15  and Imperial.

09:25:36 16          Thank you for your time and consideration.

09:25:37 17          THE COURT:  Thank you.

09:25:45 18          MR. BUTERMAN:  Good morning, Your Honor.  Larry

09:26:12 19  Buterman on behalf of US Sugar.  And I am going to be

09:26:15 20  providing the main presentation for the defendants and then

09:26:17 21  afterward my colleague, Mr. Tim Cameron, will follow-up with

09:26:22 22  some brief words on behalf of Imperial.

09:26:25 23          Your Honor, this case is about one thing and one

09:26:27 24  thing only, will US Sugar owning Imperial lead to

09:26:30 25  substantially higher sugar prices?  In other words, is

09:26:34 1    Imperial today a stand-alone entity keeping prices

09:26:38 2    significantly lower in this industry than they would be

09:26:41 3    otherwise?

09:26:42 4            Now, the government just presented a theory

09:26:45 5    based on market shares and legal presumptions.  It's a

09:26:50 6    theory that focuses on an arbitrary set of states and only

09:26:53 7    looks at certain suppliers and customers within those

09:26:56 8    states, and actively ignores everything else.

09:27:00 9            But what I am going to talk about today is not

09:27:02 10   theory but rather reality, and specifically the real world

09:27:08 11   facts and commercial realities of the sugar industry, and

09:27:11 12   the parties to this transaction, US Sugar and Imperial.  And

09:27:16 13   it's critical that we talk about facts instead of theory

09:27:19 14   because at the end of the day it's the facts that explain

09:27:22 15   why this transaction simply cannot lead to higher prices.

09:27:28 16   We will show that the government's theory is illogical and

09:27:32 17   the evidence simply does not support it.

09:27:34 18           When I say the evidence, let me be clear what

09:27:37 19   I'm talking about.  Neither the documents, the witnesses,

09:27:41 20   nor the industry experts back up the theory that the

09:27:45 21   government is postulating.  Let me take each of those in

09:27:49 22   turn.

09:27:49 23           First, there are no documents indicating that US

09:27:52 24   Sugar's acquisition of Imperial is motivated by a desire to

09:27:55 25   eliminate competition or to raise prices, or that US Sugar,

09:28:01 1   its marketing cooperative United or frankly anyone else in

09:28:05 2   the industry thinks that that's going to happen and that's

09:28:09 3   important because successful government challenges typically

09:28:12 4   focus on contemporaneous evidence that the merging parties

09:28:16 5   and others believe that the transaction is going to

09:28:19 6   substantially lessen competition and lead to higher prices.

09:28:22 7        Second, unlike the typical merger challenge,

09:28:26 8   we're not going to hear from a parade of customers

09:28:29 9   complaining about this deal or asserting that it's going to

09:28:32 10   lead to higher prices.  Customers instead are going to

09:28:35 11   testify that they have plenty of options when it comes to

09:28:38 12   purchasing sugar.  And that this transaction simply will not

09:28:43 13   change that.

09:28:45 14        And third, and perhaps most uniquely, here there

09:28:49 15   are industry experts at the USDA who regulate the sugar

09:28:54 16   industry and the only one that we're going to hear from is

09:28:57 17   Dr. Barbara Fecso who is the Ph.D. economist who runs the

09:29:03 18   country's sugar program.  And Dr. Fecso will testify that

09:29:06 19   based on her twenty-five years of real world experience

09:29:09 20   analyzing the industry, that she believes contrary to the

09:29:14 21   government's theory that this transaction will benefit the

09:29:17 22   marketplace and not lead to higher prices or other harms.

09:29:20 23        Now, at the same time, Dr. Fecso is going to

09:29:24 24   testify that even if prices were to go up in the future as a

09:29:27 25   result of this deal, that the government has the tools

available to remedy that themselves.

Your Honor, if the government's theory were straightforward and correct as they claim, they would have support, but the lack of documents, customer testimony, and backing from the regulatory agency that oversees the sugar industry, those are glaring evidentiary failures.  And they highlight that the government's case just does not comport with industry reality.

And the reason that's critical is because in the country's most well-known merger case, Brown Shoe, the Supreme Court noted that merger analysis has to be pragmatic and factual, it has to correspond to commercial and industry realities, it has to be grounded in common sense.  And respectfully the government's case here is not.

So with that said, what I would like to do this morning is first discuss three commercial realities that help explain why the government's theory does not make sense in the real world.

Second, I am going to provide some background on why US Sugar is actually seeking to acquire Imperial.  And third, I want to discuss some of the key issues relating to the government's market definition and competitive effects analysis.

Let's begin with the commercial realities.  And the fundamental reality of the sugar industry that the

government ignores is that sugar flows.  Ultimately, what we will show is that the flow of sugar is critical to understanding why the government's proposed geographic market in this case doesn't work and is truly gerrymandered.  But for now just focus on the underlying facts.  Sugar is made in only two parts of the country.  Sugar is produced from beets and in cold climates up north in the area known as the Red River Valley of Minnesota and North Dakota and nearby states like Wyoming, Michigan and Montana; while sugar made from cane is produced down south in areas like Florida, Texas, Georgia and Louisiana.  And the resulting sugar that comes from beets and cane is chemically identical.

Now, despite the fact that sugar is only made in a limited number of states, sugar flows throughout the entire country.  Sugar from up north flows down to customers in the central states, flows over to the southeast and flows across to the northeast.  While the sugar produced down south flows up the East Coast through the southeast and also to the central states.  And at the same time sugar produced up north and south is also making its way all the way to the West Coast.

Now, sugar is flowing as companies are constantly adjusting their distribution plans in order to enure that they're delivering the products in the most

09:32:26  1  efficient manner.  Companies are taking advantage of

09:32:30  2  inexpensive rail freight and a network of transportation to

09:32:34  3  ship sugar across the country.  What you'll see on these

09:32:37  4  slides, Your Honor, are a few ordinary course documents

09:32:41  5  where industry participants recognize the reality of sugar

09:32:45  6  flowing.  And I mention this because the government spent a

09:32:49  7  lot of time on slides that they say -- that they claim

09:32:52  8  supports one of their proposed markets.

09:32:55  9         Well, this is a slide from the same

09:32:57 10  presentation, in fact the slide that comes right after the

09:32:59 11  one they showed you.  And it's not the only one, Your Honor.

09:33:06 12  There other slides in this presentation and others, and what

09:33:09 13  they show is that industry participants look at the market

09:33:13 14  in numerous different ways.  But regardless, regardless of

09:33:17 15  how they look at it, what they all recognize is that sugar

09:33:22 16  flows in and out of regions easily.  And it's not just that

09:33:28 17  sugar is flowing within this country, sugar is also flowing

09:33:33 18  into this country.  Today there are forty countries that are

09:33:37 19  shipping sugar into the United States and are able to do so

09:33:41 20  at competitive prices.

09:33:42 21         Now, the reason why sugar flowing is so critical

09:33:47 22  is because as we heard, the government's theory hinges on

09:33:50 23  the idea that after US Sugar acquires Imperial, United will

09:33:55 24  be able to raise prices in the government's claimed market

09:33:59 25  which incidentally is not that market, Your Honor.  And

09:34:03 1   companies will not be able to ship sugar into the southeast

09:34:06 2   to defeat those price increases.  But the reality today is

09:34:11 3   that virtually every customer in the government's geographic

09:34:16 4   market solicits bids from sugar companies all across the

09:34:20 5   United States, both those located within the government's

09:34:22 6   relevant markets and those outside.

09:34:24 7          And as a result of that, Your Honor, as you can

09:34:27 8   see right here, under current market prices, significant

09:34:31 9   amounts of sugar are being shipped into the government's

09:34:35 10  relevant markets from locations all across the country.

09:34:41 11         And if there is any doubt about this point, we

09:34:44 12  can just look at the government's complaint.  And here is a

09:34:48 13  chart from their complaint.  And if you look at those blue

09:34:52 14  boxes, Your Honor, what they show is that United is actually

09:34:56 15  shipping more sugar to customers in the government's

09:35:00 16  proposed southeast market from those beet producers up north

09:35:05 17  in Minnesota, Montana, North Dakota and Wyoming, they are

09:35:11 18  shipping from US Sugar's facility in Clewiston, Florida

09:35:16 19  which is located in the government's proposed southeast

09:35:19 20  market.  This chart also shows a couple of other things,

09:35:22 21  including that ASR and LSR are shipping in sugar from

09:35:28 22  Louisiana and NSM is shipping in sugar from the same states

09:35:33 23  up north as United.  In fact, in 2020, close to half of the

09:35:38 24  sugar sold to customers in the southeast came from suppliers

09:35:42 25  located outside of the government's alleged relevant market.

Counsel in his opening said that competition is regional, but how is the competition regional if there is as much sugar being sold from outside the region as within, it just doesn't make any sense.  And if that much sugar is already pouring into the southeast, then if United were to try to raise prices, well logically, suppliers would just sell more sugar into the area to get the benefit of those higher prices, and what economics and the law tell us is that if that were to happen, well then the prices would just not go up.

By the way, Your Honor, it's not just that there is sugar pouring into the southeast, but as I mentioned earlier, there is also sugar flowing through the southeast so companies like LSR who is in Louisiana, they ship their sugar from Louisiana up to customers in the northeast in railcars that go through the government's proposed southeast market.  If prices were to go up, all they would need to do is literally stop their trains along the way and sell that sugar to customers for more money.  But for the government's case to hold up, they have to establish that that just won't happen.  That somehow the amount of sugar that's going into the southeast today, that that's a hard cap, that suppliers can't ship an ounce more sugar into that area or anyone's product out of it, even if prices were to go up significantly.  The government has no evidence and that's

going to doom their case from the outset.

Now, the second commercial reality that explains why the government's theory just doesn't work here is that Imperial is not typically a competitive constraint on United or anyone else regardless of market shares or how close it is physically located to customers.  And the evidence will show that Imperial's cost structure is higher than that of its competitors.  And that is because unlike companies like US Sugar, ASR, Domino, LSR and others, Imperial just doesn't grow sugarcane, instead Imperial purchases raw sugar primarily from foreign sources and then refines it.  To understand the magnitude of this issue, this is a chart which shows in 2021, how much more expensive it was for Imperial to get raw sugar than it was for US Sugar.  What we can see on this chart, is that for US Sugar to get to the step of having raw sugar to refine, it cost about $22 per hundred pounds.  But for Imperial, that cost in 2021 was about $29, roughly 30 percent higher.

Now, you'll hear from Mr. Gorrell, the CEO of Imperial, how the higher cost to acquire his raw sugar makes it extremely difficult for Imperial to compete on a regular basis with companies like United, Cargill, Domino, NSM and others, and indeed that's one of the reasons that Imperial's owners have decided to sell the company because a company that starts off with production costs that are

thirty percent higher than its competitors just is not going

to be a competitive constraint in the market.

So how does this play out and affect Imperial's

business?  Let's take one example, Kraft Heinz.  Kraft Heinz

is responsible for almost all wholesale sugar purchased in

Delaware.  And as we know, Delaware is in the government's

alleged southeast relevant market.  And Kraft, they get

their sugar shipped into Delaware from companies both within

and outside of that alleged southeast.  And of the companies

that supply Kraft's Delaware facility, Imperial is located

one of the closest.  When you have look at the prices that

Kraft is paying in 2022 for sugar delivered to its Delaware

plant, what you see is the Imperial is the most expensive

option and by a lot.

Your Honor, we did not put these numbers on the

board but Your Honor has them in the material.

THE COURT:  Okay.

MR. BUTERMAN:  And they reflect something that

we're going to see time and time again over the next several

days, and that is that Imperial is just not typically a

competitive constraint when it comes to sugar sales, no

matter how close or how far it is from a customer.  And

unless the government can establish that Imperial is

operating today as a significant competitive constraint, it

cannot credibly contend that Imperial's acquisition is going

to substantially impact competition.  When we move away from theories and market shares and legal presumptions and we then we look at what the industry participants actually believe and experience, What we see is the pricing reality that's taking place with Kraft in Delaware, that's something that almost every customer that we will hear from in this case echoes.  Let's just look at a few.  And actually I shouldn't say we're going to look at a few, we're going to look at all of them, Your Honor.  These are all of the customers that will appear in this case.

This is Brill, a bakery ingredients company and we'll hear from Brill that the Imperial's prices to Brill's facility in Georgia, which is also where Imperial's facility is located, have been higher than suppliers much further away, including NSM that beet producer all the way up north. We're going to hear from Hostess that Imperial was higher priced than other suppliers, even to Hostess's Georgia's facility.  And because Imperial is so high priced, the representative couldn't even say whether he preferred to have Imperial remain independent in the market.

We'll hear from McKee who makes Little Debbie snack cakes, who will say that they haven't purchased any sugar from Imperial since at least 2016 because Imperial was not competitive on price and the prices that McKee has received since 2016 have not been influenced by Imperial.

I missed one.  Let's go back.  We'll hear from Danone, the makers of Dannon Yogurt products who have a plant in Florida and they'll testify that they haven't bought from Imperial in four years and that Imperial doesn't compete in their business.  We'll hear from Post that Imperial hasn't been competitive on pricing, to the Post North Carolina facility even though it's one of the closest refineries.

We're going to hear from General Mills and we have blocked out their actual testimony again because they requested it for broadcasting, and what they are going to testify is going to be that they didn't award any bulk sugar contracts this year to Imperial.  In 2021 they purchased more refined sugar from at least six companies.  We're going to hear from Kraft that of the thirty-seven plants, Imperial is only servicing that one Delaware facility and that it's by far the most expensive supplier.  That is what all the customers in this case are going to testify about what is going on in the real world, all except for one exception, a small North Carolina peppermint puff manufacturer named Piedmont, whose purchaser has testified he has made no effort to understand what his supplier options are.

Now, typically the concern in merger challenges is that a company that was keeping prices low is being removed from the market, but the government hasn't even

09:44:03 1    attempted to claim that Imperial is keeping prices low in

09:44:07 2    the market.  As the customer observations that we just

09:44:11 3    looked at made clear, that's just not what's going on here.

09:44:14 4    But for the government's theory to work, they must establish

09:44:17 5    that by purchasing the high cost supplier in this industry,

09:44:20 6    somehow that's going to lead to higher prices.

09:44:24 7    Respectfully, that makes no sense.  As defendants' expert,

09:44:29 8    Dr. Hill, will testify, when you're charging more than

09:44:33 9    everyone else, which tends to be the case with respect to

09:44:36 10   Imperial, you just aren't a competitive constraint on others

09:44:40 11   prices.  And for that reason as well, this acquisition

09:44:44 12   simply will not lead to higher prices.

09:44:48 13          Now, there is a third and final commercial

09:44:52 14   reality that I want to talk about which explains why the

09:44:55 15   government's theory here just doesn't work.  And that

09:44:58 16   reality is that United, which is the entity that sells US

09:45:03 17   Sugar's sugar, United is structured in such a way that it

09:45:08 18   actually cannot do the very thing that the government's

09:45:12 19   expert says is necessary to raise prices which is to

09:45:15 20   withhold supply from the marketplace.

09:45:17 21          We will hear more about this during trial, but

09:45:20 22   the key thing to understand is that United has a different

09:45:23 23   structure than most businesses in the United States.  United

09:45:27 24   is an agricultural cooperative, and as such it's obligated

09:45:32 25   to sell all the sugar that its members produce.  Now, at the

09:45:37 1    same time, United's members are each incentivized to produce

09:45:43 2    as much sugar as they can because they get paid for all the

09:45:46 3    sugar they produce.  So basic economics, which is confirmed

09:45:51 4    by the government's expert, it dictates to get those higher

09:45:54 5    prices what you have to do is you have to withhold supply,

09:45:58 6    you have to sell less sugar, but United simply can't do

09:46:02 7    that, it doesn't have the power to stop selling sugar.

09:46:05 8    Again, the real world facts here just don't support the

09:46:08 9    government's theory of harm.

09:46:11 10            So with that backdrop, what I would like to do

09:46:15 11   now is just briefly talk about US Sugar and why US Sugar is

09:46:20 12   actually doing this deal.  To begin, Your Honor, this is US

09:46:23 13   Sugar.  It's a ninety-year old farming company based in

09:46:27 14   Clewiston, Florida which is halfway between Fort Myers and

09:46:31 15   Palm Beach.  US Sugar grows sugarcane, sweet corn, citrus

09:46:37 16   and other vegetables and the company is owned primarily by

09:46:40 17   its farmers and by its employees and a large charitable

09:46:44 18   organization, it's run by Dr. Bob Buker, who is here and

09:46:48 19   will testify in a couple of days.  As you'll hear from

09:46:52 20   Mr. Buker it was his decision for US Sugar to purchase

09:46:55 21   Imperial.  He will testify to the many rationales, but it

09:46:59 22   all starts with one simple fact.  Today, US Sugar's farmers

09:47:04 23   grow more sugarcane than they can make into refined sugar

09:47:08 24   and they need additional refining capacity.

09:47:11 25            At the same time, Imperial because of its higher

production costs and the lack of a steady supply of sugar, of raw sugar, they just can't operate as efficiently as they would like to.  This transaction, it solves that imbalance. After this acquisition, US Sugar is going to modernize and increase the efficiency of the Imperial plant and use it to process the excess raw that it previously couldn't process. And that's going to result in more sugar being produced in the very geographic area that the government says it's concerned about.  And as the government's economic expert admits, if you're going to be producing more of a product, the price of it is going to go down.  It's another reality that just shows why the government's theory doesn't work.

Now, beyond that there are a host of other reasons why US Sugar decided to acquire Imperial and why it believes this transaction will be beneficial.  And I have listed them here, and Mr. Buker is going to testify about them later this week.  And as we'll see, these justifications will benefit US Sugar, Imperial Sugar and their customers by providing them with enhanced surety of supply and other benefits that companies can't generally achieve on their own without the deal.

So with that, I now want to take my remaining time to focus our discussion on a couple of elements of Section 7 analysis, and specifically market definition and competitive effects.  And I'm going to begin with market

definition which is intended to allow the court to determine what product and what customers specifically may be impacted by the transaction.

Here as we're going to see, the government's market definition, it reflects numerous strategic choices which limit both the suppliers and the customers in the market and thereby inflate the parties' market shares.  But like the rest of the government's theory, the choices made by the government simply do not align with how the industry or its participants operate.  And that's important because the government has to establish both a relevant product market and a relevant geographic market.  And if the government's market definition fails for any reason with respect to either of those, its case is over, we're done.

So let's look at product market.  Now, normally a relevant product market contains just that, some sort of object, be it hydrogen peroxide, airline ticket software, soda or soybeans.  Counsel here in its opening said repeatedly that the product market here is not in dispute, it's refined sugar.  But that's not what they put in their complaint, Your Honor.  Here is what they said.  They defined the relevant product market as not only based on the object, namely refined sugar, but also based on who is making it and who is selling it.

Now, the experts are going to talk about this a

09:50:26 1   lot more in detail, but what's important to understand now

09:50:29 2   is that the decision to focus on the production and sale of

09:50:32 3   refined sugar as opposed to just refined sugar or the sale

09:50:36 4   of refined sugar, well, that artificially limits the number

09:50:42 5   of suppliers in this case dramatically by excluding all

09:50:47 6   distributors and other entities that do not produce the

09:50:55 7   sugar that they sell.  In essence, by defining the market as

09:50:57 8   the production and sale of refined sugar.  It's a way for

09:51:00 9   the government to try to make it seem like there are fewer

09:51:04 10  competitors than there actually are.  And frankly again it

09:51:07 11  just does not make sense.  The real world evidence is that

09:51:11 12  customers today regularly solicit bids both from companies

09:51:16 13  that produce their sugar alongside companies that do not,

09:51:21 14  and they decide between the two when they make their

09:51:24 15  purchasing decision.  Even the government's witness,

09:51:28 16  Piedmont, that peppermint puff company, they're going to

09:51:32 17  testify that they do exactly that.  They solicit bids both

09:51:36 18  from those who would be within the government's relevant

09:51:40 19  market and those who would not, alongside one another.  But

09:51:42 20  the government's market definition --

09:51:42 21          THE COURT:  Is the government's market

09:51:48 22  definition in your view, it leaves out distributors?

09:51:52 23  Anything else?

09:51:52 24          MR. BUTERMAN:  It leaves out distributors and it

09:51:59 25  also creates a problem, Your Honor, in that there is a

09:52:02 1  question as to who actually is a producer of sugar versus

09:52:09 2  who is a producer and seller.  For instance, looking at this

09:52:13 3  definition, actually neither United nor US Sugar is in the

09:52:18 4  relevant market because one is the producer of the sugar,

09:52:22 5  the other one is the seller.  And that's a reality that

09:52:24 6  happens in this industry a lot.

09:52:26 7            And part of the problem again, it goes back to

09:52:29 8  this issue of looking at how the government assumes that

09:52:35 9  price is going to be affected here.  Because United isn't

09:52:39 10 producing the sugar and has no say into how much sugar is

09:52:42 11 being produced by its members, it just doesn't have those

09:52:46 12 tools to affect price the way that the government contends.

09:52:52 13 Our expert is going to talk about this a little bit, Your

09:52:55 14 Honor, but you could run through virtually all the companies

09:52:58 15 in the industry and there are numerous questions as to who

09:53:02 16 is in, who is out, if you use this definition.

09:53:06 17            Now, one thing I want to just point out here is

09:53:12 18 that the government's market definition, it treats every

09:53:16 19 single distributor sale in the alleged relevant market as if

09:53:21 20 it didn't happen.  And that's regardless of price, customers

09:53:24 21 or competition.  So I understand that the government's

09:53:28 22 position is well, in certain instances, a distributor may

09:53:35 23 not really be as competitive with someone who produces their

09:53:39 24 own sugar, but that's not the defining line that they take.

09:53:42 25 They say because that's a reality in certain instances, we

have to discount every single distributor sale.  There is

not one distributor sale that they -- to a wholesale

customer in the relevant markets that they count.  And as

that's a radical position that finds no support in the real

world and it dooms the government's product market.

There is another problem with the government's

product market and that's why while it artificially limits

the number of suppliers, it also increases without any basis

the number of customers who the government claims are going

to be harmed.

So the government claims that the relevant

product market here includes sugar sold to all wholesale

customers.  And wholesale customers are not just the

industrial customers like Hostess or Danone that purchase

sugar to make their products, it's also retail customers

like Wal-Mart and Dollar General who purchase sugar in

smaller packaging to resell them in their stores.  And

retail customers, they make up a significant portion of the

customers in the government's claimed market.

As we will hear over the course of the next few

days, in the real world, retail customers are viewed very

differently from industrial customers.  Companies have

different sales personnel and sale strategy for retail

customers as opposed to industrial customers and retail

customers experience very different competitive options when

09:55:16 1   buying refined sugar.  But there will be no evidence

09:55:24 2   presented in this case from any retail customers.  The

09:55:29 3   government did not subpoena a single retail customer for

09:55:33 4   documents or testimony, none will appear here.  And so for a

09:55:39 5   significant portion of the customers in the government's

09:55:42 6   alleged relevant markets, the government simply has no basis

09:55:47 7   for even claiming that they will be harmed by this

09:55:50 8   transaction.  This is another reason why the government's

09:55:52 9   case fails.

09:55:53 10          So now I would like to turn to geographic market

09:56:02 11   which is a topic that we are going to talk a lot about in

09:56:05 12   this case.  And I'm not going to focus today on a

09:56:09 13   sixty-five-year old case from another jurisdiction that

09:56:13 14   analyzed different markets, I'll save that for closing.  But

09:56:16 15   when we do talk about geographic markets, geographic markets

09:56:22 16   are the areas where consumers can practically turn to their

09:56:25 17   alternative sources of the product.  And as we note here,

09:56:29 18   the government has proposed two limited geographic markets,

09:56:33 19   Georgia plus its surrounding states market and the states

09:56:37 20   which the government refers to as the Southeast.  Normally

09:56:40 21   when the government proposes a market that has geographic

09:56:45 22   boundaries, there is a logical reason why they do so.  The

09:56:48 23   product in question may be fragile, it may be hazardous, it

09:56:52 24   may need to be refrigerated or it's difficult to package or

09:56:55 25   difficult to transport long distances.  But when it comes to

sugar, none of that is the case.  Sugar is literally poured into railcars or trucks for transportation and it flows all across the country.  And again, it also comes into this country from all across the world.  In fact, the evidence will show that when it comes to transporting goods, there are few products that are as easy and cheap to transport in this country as sugar.  The reality that sugar is so easy to transport, well, it's one of the reasons why almost half the sugar in the government's claimed geographic markets is able to come from outside those areas.  That wouldn't be possible if what the government said about the cost and how difficult it is to transport sugar were true.

So that's why the theory makes no sense to begin with.  So there really is no reason why the geographic markets here should be limited.  But the government nonetheless claims that they are, and in doing so what we will see is they rely almost exclusively on their expert, Dr. Rothman, to support their theory.  And as the evidence will show, this is a big problem for the government because Dr. Rothman did not conduct any analysis to determine if the alleged relevant markets were the right markets.  Instead, as we can see on this chart, he merely took the markets that the government pled in its complaint and decided that they could, could constitute relevant markets under a test used in market definition called a Hypothetical Monopolist Test.

09:58:47  1   This matters because Dr. Rothman actually admits and he

09:58:50  2   admitted during his deposition that his Hypothetical

09:58:57  3   Monopolist Test it would confirm that any geographic market

09:58:59  4   where Imperial and United both sell constitutes a relevant

09:59:03  5   market from a single facility to a combination of states to

09:59:07  6   the entire nation.  With respect to Dr. Rothman, a test that

09:59:16  7   includes everything and excludes nothing is not much of a

09:59:19  8   test.

09:59:21  9           Now, Your Honor, we'll hear from Dr. Hill, the

09:59:26 10   defendants' expert, that there are a number of choices in

09:59:29 11   terms of which states the government included and which they

09:59:32 12   excluded from a geographic market that simply do not make

09:59:36 13   sense.  States where Imperial sells significant amounts of

09:59:40 14   sugar were left out of the proposed relevant markets while

09:59:44 15   states where Imperial sells comparably less sugar were

09:59:48 16   included.  The government even excluded the state of

09:59:52 17   Louisiana that has two refineries closer to about half the

09:59:56 18   customers in the government's relevant markets than US Sugar

10:00:00 19   and ASR's Florida refineries which that are within the

10:00:04 20   proposed market.  And they did that even though as they said

10:00:07 21   in their opening, the proximity of suppliers to customers is

10:00:11 22   a critical factor for their geographic market.

10:00:14 23           So as you can see here on this chart, for all

10:00:16 24   the customers in the green area, and I just want to be clear

10:00:22 25   that that entire colored area, that's the government's

10:00:25 1   relevant, proposed relevant southeast market, but for all

10:00:30 2   the customers in the green, including those in Atlanta,

10:00:34 3   Georgia, that LSR facility is closer to them than US Sugar's

10:00:42 4   Louisiana and LSR are left out of the market.

10:00:46 5          Now, the government in its pretrial brief they

10:00:50 6   tried to dismiss these choices by arguing that they reflect

10:00:55 7   fuzziness around the borders which they say is permissible

10:00:59 8   under the law, that's the word they use on the first page of

10:01:02 9   their brief to describe their own geographic markets here.

10:01:06 10  But respectfully, this is something very different than a

10:01:12 11  debate about whether a particular state on the margin should

10:01:15 12  or should not be included in a proposed market.  Rather as

10:01:18 13  you'll see this is an exercise that involved choosing and

10:01:22 14  excluding states specifically for the purpose of being able

10:01:25 15  to claim market shares high enough to give the government a

10:01:28 16  legal presumption.  There is nothing fuzzy about this.

10:01:32 17  We'll hear from Dr. Hill that this is just not the way

10:01:36 18  geographic market definition is done.  By selecting the

10:01:38 19  geographic market not based on industry recognition, but

10:01:42 20  instead based on market shares, what the government did was

10:01:44 21  render the test meaningless.  Dr. Rothman was not

10:01:48 22  determining what the relevant market was, but rather only

10:01:51 23  whether the market that had been strategically chosen for

10:01:52 24  him could be a relevant market using a test that could not

10:01:55 25  be failed.  Indeed Dr. Rothman, he can't even state which of

10:02:04 1   the two alleged relevant markets is more appropriate, even

10:02:09 2   though one is completely contained within the other.

10:02:13 3            Now, these are by far not the only problems with

10:02:16 4   Dr. Rothman's analysis as we'll discuss in a second, but

10:02:20 5   they do highlight why the government's geographic markets

10:02:25 6   fail.

10:02:25 7            This brings me, Your Honor, to competitive

10:02:27 8   effects.  And the Supreme Court said a long time ago in the

10:02:32 9   case of International Shoe, that if you're trying to decide

10:02:36 10  whether one company purchasing another is going to

10:02:39 11  substantially lessen competition, one of the first things

10:02:42 12  you need to do is determine how substantial they're

10:02:46 13  competing today.  And the government actually doesn't even

10:02:48 14  dispute that this is the relevant question.  They said so in

10:02:51 15  their pretrial brief.  Is the competition today between

10:02:57 16  Imperial and United important?  Their question.  But as

10:03:00 17  we'll see, all the government and its experts point to are

10:03:05 18  some anecdotes about head-to-head competition between

10:03:09 19  Imperial and United.  In the opening, I counted four.  So we

10:03:12 20  went ahead and we asked the government's expert how often do

10:03:12 21  Imperial and United actually compete head to head with one

10:03:24 22  another, and remarkably he said he hadn't done the analysis.

10:03:28 23  He didn't do the work.

10:03:31 24            Your Honor, this is another failure of proof,

10:03:35 25  and it's a major one.  The government is asking this Court

10:03:39 1   to block this transaction because it will supposedly

10:03:43 2   substantially lessen competition, but the evidence will show

10:03:47 3   that the government has no idea how substantial that

10:03:52 4   competition between Imperial is to begin with.  And this is

10:03:56 5   despite the fact that the government has at least four

10:03:59 6   years' worth of data from the merging parties and they spoke

10:04:05 7   to 100 customers during their pre-lawsuit investigation and

10:04:09 8   they took almost thirty-five depositions in this case.  But

10:04:12 9   neither the government nor its experts have any idea how

10:04:16 10  often US Sugar and Imperial are competing with one another

10:04:20 11  for any customer's business.  And just to put it in

10:04:23 12  perspective, there are 428 customers that we've been able to

10:04:30 13  identify extremely conservatively in the government's

10:04:34 14  Georgia plus market, and there are 543 customers that we

10:04:40 15  have been able to identify conservatively in the

10:04:44 16  government's southeast market.  And they had four years of

10:04:47 17  data.  And we heard a total of four instances of competition

10:04:55 18  during their opening.

10:04:57 19          Now, as we've seen, the industry realities, they

10:05:01 20  support this idea that United and Imperial just aren't

10:05:05 21  particularly close competitors.  And that's a fact that even

10:05:08 22  the government's economics back up.  What we'll see is that

10:05:12 23  the government's expert, Dr. Rothman, he did a test to model

10:05:17 24  what was the extent or what's the extent of the price

10:05:20 25  increase that he would think would result from this

10:05:22 1   transaction.  And while Dr. Rothman was certainly attempting

10:05:26 2   to show that this transaction would lead to a lot of harm,

10:05:30 3   when he did his model all he came up with was that prices

10:05:35 4   might go up three percent.  Actually, Dr. Rothman's initial

10:05:38 5   model it predicted much higher pricing increases, over

10:05:44 6   fifty percent higher than what they ultimately arrived at.

10:05:47 7   But what happened is Dr. Rothman had to admit that when he

10:05:51 8   got that 6.8 percent there, he had used the wrong formula.

10:05:55 9   And when he corrected it, it went to 3.2.

10:05:59 10          Now, obviously that's over fifty percent change.

10:06:03 11  But what's also important is that it brought that number

10:06:06 12  down below five percent.  And that's important because

10:06:11 13  experts and the government's own guidelines, they typically

10:06:16 14  characterize findings of below five percent as small and

10:06:21 15  insignificant.

10:06:24 16          There are a litany of other errors with

10:06:27 17  Dr. Rothman's approach, and in fact, every time that

10:06:32 18  Dr. Rothman has testified in a Section 7 case, on market

10:06:35 19  definition or competitive effects, his findings have been

10:06:38 20  rejected by the courts as being unreliable.  And here,

10:06:42 21  Dr. Rothman, he's predicting the same analysis, using the

10:06:42 22  same models as he did in those other cases where the courts

10:06:52 23  rejected him, and there is no reason why the results here

10:06:52 24  should be any different.

10:06:57 25          So that leaves just the issue of coordinated

10:07:01 1    effects which looks to whether the competitors will be more

10:07:06 2    likely to coordinate and implement higher prices together as

10:07:09 3    a result of this transaction.  And for all the reasons that

10:07:13 4    we've talked about, we're never even going to get to

10:07:16 5    coordinated effects because of all the problems with the

10:07:19 6    market definition.  But focusing on the government's theory

10:07:23 7    here, it's largely that United and ASR, neither of whom are

10:07:29 8    parties to this transaction, they share certain information

10:07:32 9    with third-party analysts, and from that that the government

10:07:38 10   argues once US Sugar owns Imperial, that United and ASR are

10:07:42 11   going to stop competing with one another on bids in order to

10:07:46 12   raise prices.

10:07:47 13        Once again, this is a claim and a theory that

10:07:50 14   makes no sense in the real world.  First, the information

10:07:54 15   that's being provided to the analysts here, it's neither

10:07:58 16   confidential nor competitively sensitive.  It's information

10:08:02 17   that's available on United's website and it's provided to

10:08:06 18   customers on behalf.  We're going to hear from the

10:08:10 19   government's witness, Piedmont, that even they get this

10:08:14 20   information freely from companies in the industry, they just

10:08:17 21   ask them and it's provided.

10:08:18 22        And second, we're also going to hear that

10:08:22 23   because again, that United is a cooperative, it actually

10:08:26 24   can't do what the government theorizes, it can't stop

10:08:29 25   selling sugar to get higher prices.  And that's what the

10:08:34 1   government's theory is, it's nothing more.  That's what

10:08:38 2   their expert will tell us and you positively hear.  His only

10:08:42 3   theory of coordination is that after this transaction goes

10:08:46 4   through that perhaps United and Domino are going to stop

10:08:49 5   bidding on opportunities.  United can't do that, it has to

10:08:54 6   sell all the sugar that its members produce.

10:08:58 7            Now, the government mentioned sold positions in

10:09:03 8   addition to these prices.  And I also want to be clear that

10:09:06 9   when we are talking about the prices, we're talking about

10:09:10 10  spot prices.  Over approximately 95 percent of the sales in

10:09:14 11  this country are not made based on spot, they're based on

10:09:18 12  long-term contracts.  So we're talking about the remaining

10:09:22 13  spot prices which again are the list prices.  If somebody

10:09:25 14  wanted to go into the market today and just buy some extra

10:09:29 15  sugar because they needed it, and that's why it's readily

10:09:34 16  available, it's not just that they're readily available and

10:09:38 17  provided by the companies, they're also just published by

10:09:41 18  these third-party analysts and they're used by everybody in

10:09:44 19  the industry, customers and in fact the USDA.  The USDA,

10:09:48 20  they routinely communicate with these third-party analysts

10:09:52 21  and publish their information.  So if there really was

10:09:55 22  something wrong with what's going on here in terms of

10:10:00 23  publishing these spot prices or these sold positions, well,

10:10:02 24  presumably the USDA, which is part of the plaintiff here,

10:10:10 25  they would have said something.

10:10:14  1              Now this same theory of coordination, it was

10:10:17  2       proposed by Dr. Rothman in a case brought by the Federal

10:10:23  3       Trade Commission called Evonik.  In that case they looked at

10:10:27  4       a host of factors and what they ultimately determined was

10:10:30  5       that Dr. Rothman's theory was just off base.  As we're going

10:10:34  6       to see over the next coming days, almost all of those same

10:10:39  7       factors, they apply here.  And they mean that Dr. Rothman's

10:10:42  8       theory again just doesn't match the real world factors.

10:10:48  9              Finally, I want to talk for a minute about the

10:10:50 10       USDA, because despite everything else, USDA does act as a

10:10:56 11       backstop against any risk of anticompetitive effects.  As we

10:11:01 12       know, the sale of sugar in the United States is heavily

10:11:03 13       regulated by the USDA and it's done to ensure that there is

10:11:07 14       adequate supplies of raw and refined sugar available at

10:11:11 15       reasonable prices.  There it is, Your Honor, from the USDA.

10:11:15 16       The USDA has numerous tools that allow it to control the

10:11:19 17       supply of raw and refined sugar that's available for sale

10:11:23 18       and they have been very explicit that they use these tools

10:11:27 19       to cure high sugar prices.

10:11:29 20              Now, the only witness from the USDA who is going

10:11:32 21       to testify here in this case is the economist who runs that

10:11:35 22       program, and her name is Dr. Fecso.  She knows this industry

10:11:41 23       better than anyone, better than anyone in this courtroom,

10:11:42 24       better than anyone in the United States.  Her testimony will

10:11:45 25       be that the government's theories here, they're simply

10:11:53 1    incorrect.   In fact, Dr. Fecso believes that this proposed

10:11:57 2    transaction is going to again benefit the domestic sugar

10:12:02 3    industry and is likely to result in lower prices.

10:12:05 4         Now, the government doesn't really contest that

10:12:08 5    if prices went up here that it could take action to fix

10:12:12 6    those prices, but their argument is that this court, this

10:12:17 7    court should block this transaction nonetheless because they

10:12:21 8    might decide not to use those powers.   Well, that's not a

10:12:25 9    reason to employ the drastic and extraordinary remedy of

10:12:30 10   preventing companies from completing their deal.

10:12:34 11        But in any event, the fact of the matter is that

10:12:36 12   we'll hear the testimony of the CEO of United and

10:12:41 13   Mr. Wineinger and others, sugar sellers, they're all aware

10:12:45 14   that the government could take action to lower prices and

10:12:48 15   that in and of itself acts as a deterrent that prevents them

10:12:51 16   from even attempting to raise prices above a competitive

10:12:57 17   level.   It's another industry reality that doesn't comport

10:13:00 18   with the government's theory.

10:13:01 19        With that, Your Honor, we look forward to

10:13:05 20   presenting our evidence over the coming days and

10:13:07 21   establishing that in the real world, US Sugar's acquisition

10:13:11 22   of Imperial will benefit customers and consumers and that

10:13:15 23   the government simply cannot come close to meeting its heavy

10:13:20 24   burden of establishing that this transaction may

10:13:22 25   substantially lessen competition.

10:13:24 1            Thank you.

10:13:25 2            THE COURT:  Thank you.

10:13:29 3            MR. CAMERON:  Good morning, Your Honor.  Tim

10:13:36 4    Cameron on behalf of the Louis Dreyfus Company and Imperial

10:13:40 5    Sugar.

10:13:41 6            Your Honor, we join in Mr. Buterman's opening

10:13:43 7    but with your permission I would like to take just five

10:13:46 8    minutes to make five quick points as to what the evidence in

10:13:49 9    this case will show regarding Imperial's view on its place

10:13:53 10   in the industry, why it currently struggles to compete, and

10:13:57 11   why it will continue to do so in the future, and why this

10:14:01 12   merger is not anticompetitive.

10:14:03 13           The five points, Your Honor, are on the slide

10:14:06 14   and I believe you have a copy in your book as well.  Turning

10:14:09 15   to point one, Your Honor, Imperial has no access to low cost

10:14:15 16   domestically grown raw cane sugar.  Instead, it must rely on

10:14:21 17   high cost imported raw sugar to run its refinery.  Imported

10:14:27 18   raw cane sugar costs significantly more than the cost of

10:14:29 19   domestic raw sugar.

10:14:32 20           Mr. Buterman during his opening referred to the

10:14:35 21   fact that in 2021, he put up a chart, the cost of raw sugar

10:14:39 22   to US Sugar was $22 per hundred pounds, while for Imperial

10:14:45 23   it was 29.  But that figure is not static, Your Honor, and

10:14:50 24   that problem is something that remains very much an issue

10:14:54 25   today.  Indeed today for Imperial, that cost has increased

10:14:59 1    in 2022 from $29 to $37 per hundred pounds.  And that

10:15:06 2    disparity, Your Honor, coupled with the fact that raw sugar

10:15:11 3    cost is 70 to 80 percent of Imperial's total costs, is why

10:15:17 4    Imperial's prices for refined sugar are almost always higher

10:15:21 5    than other suppliers and often by a lot.  That's not all,

10:15:29 6    because supply of imported raw sugar is restricted.

10:15:32 7    Imperial's refinery typically runs at less than full

10:15:36 8    capacity, on average basis somewhere around 75 percent

10:15:40 9    capacity, but sometimes, Your Honor, as low as 60 to

10:15:45 10   65 percent.

10:15:45 11         Secondly, Your Honor, we will show regulations

10:15:47 12   in the sugar industry are designed to ensure that all

10:15:51 13   domestically sourced sugar is sold each year, but Imperial

10:15:55 14   is different.  It's reliance on high cost imported raw sugar

10:16:00 15   first forces it to serve as a residual supplier that

10:16:04 16   typically cannot sell successfully against lower cost

10:16:07 17   suppliers, except during narrow windows of time, like the

10:16:11 18   end of the annual selling cycle where domestic producers

10:16:16 19   have already sold much of their sugar for the year and are

10:16:19 20   low on stock and customers then turn to Imperial.  That's

10:16:22 21   not to say that Imperial doesn't make sales during the rest

10:16:26 22   of the year, it does, and it makes some sales throughout the

10:16:30 23   year either as a backup supplier to customers, indeed often

10:16:34 24   it's the third or fourth backup supplier, to fill in for

10:16:38 25   other suppliers that could experience unexpected

10:16:40 1  disruptions, or when imported raw sugar prices are

10:16:45 2  uncharacteristically low.  It also makes sales to customers

10:16:49 3  that are not served in any significant way by other

10:16:55 4  suppliers such as United.  And one example of that, Your

10:16:57 5  Honor, is the food service segment.  But the key is this,

10:17:00 6  when it makes those types of sales, Imperial is serving a

10:17:05 7  different role in the market, often not competing directly

10:17:09 8  with United or any other lower cost suppliers or providing

10:17:13 9  any kind of significant competitive constraint on them.

10:17:17 10            Turning to point three, then, Your Honor,

10:17:21 11  Mr. Buterman spoke at some length about the numerous

10:17:24 12  problems with the DOJ's proposed geographic market.  All I

10:17:28 13  would add is that the evidence will show in the case that

10:17:31 14  neither of the DOJ's proposed markets, what they referred to

10:17:36 15  as the narrow market or the broader market is consistent

10:17:39 16  with the commercial realities of Imperial's business.

10:17:42 17            THE COURT:  Is it the defendants' position that

10:17:43 18  the commercial realities are what, nationwide?

10:17:48 19            MR. CAMERON:  In essence, yes.  Imperial

10:17:50 20  competes or tries to sell its product around the country.

10:17:52 21  Mr. Gorrell will testify that for Imperial it sells the vast

10:17:56 22  majority of its sugar really from Texas up to Chicago and

10:18:02 23  east of that, but they also do sell west.  And even more

10:18:06 24  than that, they compete with suppliers all over the country

10:18:08 25  to sell sugar.  So yes, the market is absolutely much, much

10:18:13 1    broader than anything that's been contended by the DOJ in

10:18:18 2    this case.   Indeed, Imperial consistent with that, Your

10:18:21 3    Honor, Imperial doesn't have sales regions at all, let alone

10:18:25 4    ones that correspond to the markets proposed by the DOJ.

10:18:29 5    Imperial, as I mentioned, sells its product far more broadly

10:18:33 6    than the alleged markets proposed by the DOJ.  And key

10:18:37 7    points, Your Honor, some of Imperial's top selling states

10:18:40 8    like Texas rank third for Imperial in sales by volume in

10:18:45 9    2021, third, are inexplicably excluded from both of the

10:18:51 10    markets proposed by the government.

10:18:53 11          The other point, Your Honor, is that distant

10:18:56 12    competitors, located well outside what the DOJ described as

10:19:00 13    their broader market frequently compete with Imperial inside

10:19:05 14    that market, undercut Imperial on price and win customer

10:19:09 15    business from Imperial and that happens all the time.  And

10:19:13 16    they're able to do that because even though Imperial may

10:19:16 17    have some advantage on freight costs in that area, its raw

10:19:21 18    sugar costs are typically so much higher than its

10:19:24 19    competitors that it still can't come close to competing with

10:19:28 20    them on price.

10:19:30 21          And Your Honor, this hard reality from Imperial

10:19:34 22    is best illustrated by the following example, beet

10:19:39 23    manufacturers that Mr. Buterman referred to who are located

10:19:42 24    in the midwest and northwest of the country can often grow,

10:19:47 25    process, refine, and ship their refined sugar from the

10:19:51  1    midwest and northwest into Georgia and indeed, Your Honor,

10:19:55  2    into Savannah where Imperial's refinery is located, more

10:20:00  3    cheaply than Imperial can acquire the imported raw sugar

10:20:04  4    that it needs to actually run its refinery.  So it's a

10:20:09  5    dramatic difference.

10:20:10  6         Finally, Your Honor, none of these challenges

10:20:13  7    that are faced by Imperial are changing any time soon.

10:20:17  8    Consequently, absent this transaction, Imperial will remain

10:20:22  9    competitively handicapped to the high price of imported raw

10:20:27 10    sugar. Without any guarantee of supply, it will continue to

10:20:32 11    suffer from aging facilities being run at around 75 percent

10:20:38 12    of the capacity and often significantly lower than that,

10:20:41 13    with capital expenditures being made only to maintain

10:20:44 14    operations and to preserve safety and health.  And, Your

10:20:47 15    Honor, as Mr. Gorrell, Imperial's CEO will testify, he is

10:20:52 16    extremely concerned about what lies ahead for this business

10:20:55 17    absent this transaction.

10:20:57 18         Thank you, Your Honor.

10:20:58 19         THE COURT:  All right.  Thank you.  Who is your

10:21:02 20    first witness?

10:21:02 21         MS. SINKLER:  Good morning, Your Honor.  Chinita

10:21:11 22    Sinkler for the United States of America.  And we call our

10:21:11 23    first witness is Mr. Aaron Riippa who is the business

10:21:44 24    sourcing manager at General Mills.

10:21:44 25         THE COURT:  Make sure you get the direct and the

Riippa - direct

10:21:49 1 cross binders, and the witness should come up with them.  I

10:21:53 2 see one.

10:21:54 3                 MS. SINKLER:  I gave him the direct already.

10:21:56 4                 THE COURT:  But we want him to have the direct

10:21:58 5 and cross when he goes up.

10:22:00 6                 MS. SINKLER:  It's up there already, Your Honor.

10:22:03 7 On the stand.

10:22:04 8                 THE COURT:  Okay.  Thank you.

10:22:06 9                 MS. SINKLER:  You're welcome.

10:22:09 10                 COURT CLERK:  Please raise your right hand.

10:22:12 11 Please state and spell your full name for the record.

10:22:14 12                 THE WITNESS:  Aaron Michael Riippa.  Want me to

10:22:18 13 spell the whole thing?  A-A-R-O-N, M-I-C-H-A-E-L,

10:22:23 14 R-I-I-P-P-A.

10:22:24 15                 AARON MICHAEL RIIPPA, having been duly sworn,

10:22:31 16 was examined and testified as follows:

10:22:37 17                 MS. SINKLER:  May I proceed, Your Honor?

10:22:43 18                 THE COURT:  Please.

10:22:44 19                 MS. SINKLER:  Thank you.

10:22:45 20                         DIRECT EXAMINATION

10:22:45 21 BY MS. SINKLER:

10:22:46 22 Q.     Good morning, Mr. Riippa.

10:22:47 23 A.     Good morning.

10:22:48 24 Q.     You have two binders of exhibits up there.  You can

10:22:51 25 just leave them there right now.  Once we get to the

Riippa - direct

10:22:53 1  documents, I'll let you know.  Okay?

10:22:55 2  A.    Okay.

10:22:55 3  Q.    Would you please state your full name for the record

10:22:58 4  and spell your last name?

10:22:59 5  A.    Aaron Michael Riippa.  R-I-I-P-P-A.

10:23:05 6  Q.    Where do you work?

10:23:06 7  A.    General Mills.

10:23:07 8  Q.    Where is General Mills headquartered?

10:23:09 9  A.    Minneapolis, Minnesota.

10:23:11 10  Q.    What type of business is General Mills?

10:23:13 11  A.    A food manufacturing company.

10:23:15 12  Q.    What are some of the brands that General Mills makes?

10:23:19 13  A.    Things like cereal, so Cheerios, Cinnamon Toast

10:23:25 14  Crunch, Nature Valley and different snack products, Betty

10:23:30 15  Crocker cake mix, canned refrigerated dough, such as

10:23:36 16  Pillsbury crescent rolls, sweet rolls, soup, and a whole

10:23:38 17  host of other products as well.

10:23:40 18  Q.    How many manufacturing plants does General Mills have

10:23:42 19  in the United States?

10:23:44 20  A.    We have over fifteen plants and then dozens of

10:23:47 21  external company manufacturer locations that we contract

10:23:50 22  with.

10:23:53 23  Q.    Are your manufacturing plants located all around the

10:23:56 24  country?

10:23:56 25  A.    They are, yes.

Riippa - direct

10:23:57 1   Q.     Let's talk a little bit about your job history.  How

10:24:00 2   long have you worked at General Mills?

10:24:02 3   A.     It will be eleven years this May.

10:24:05 4   Q.     What is your current role at the company?

10:24:08 5   A.     My current role is the sourcing business leader in

10:24:13 6   our meals and baking operating system.

10:24:14 7   Q.     What do you do as sourcing business leader?

10:24:17 8   A.     I am integrated within the operating unit which

10:24:22 9   houses our business team which is the marketing team that

10:24:26 10   owns the PNL of our brand.  I am the liaison between the

10:24:31 11   broader sourcing organization and those brand marketing

10:24:36 12   teams and those supply teams and I manage those structures.

10:24:39 13   Q.     Could you explain how your current job relates to the

10:24:42 14   purchase of sugar for General Mills?

10:24:44 15   A.     Yes.  So being the liaison between the sourcing

10:24:51 16   organization, I'm aware of all of the inputs that would go

10:24:53 17   into those, the different ingredients, the market exposures,

10:24:57 18   the price volatiles related to that, translating those

10:25:00 19   messages back to the marketing teams as part of that, the

10:25:02 20   sugar being a very significant input for the product

10:25:07 21   portfolio that I support.

10:25:08 22   Q.     How long have you been in your current position?

10:25:10 23   A.     It will be one year this summer.

10:25:14 24   Q.     What was your job before that?

10:25:16 25   A.     I was the senior sourcing manager, leading our sweet

Riippa - direct

10:25:21 1   commodities portfolio.

10:25:23 2   Q.      What did you do as the senior sourcing manager?

10:25:26 3   A.      I would manage a team of buyers that had all things

10:25:31 4   sweet commodities which would include individually managing

10:25:34 5   our sugar portfolio, but also had things such as cocoa,

10:25:38 6   chocolate, honey, non-fructose sweeteners and marshmallow as

10:25:44 7   well, and was responsible for all aspects of the broader

10:25:49 8   category management including price, price market,

10:25:57 9   understanding, contracting decisions, supplier relationship

10:26:02 10  management, productivity and cost savings initiatives just

10:26:05 11  to name a few.

10:26:06 12  Q.      What did you do in regards to the sugar portfolio?

10:26:09 13  A.      I managed all the day-to-day responsibilities and the

10:26:12 14  vendor relationship management, contracting aspects of the

10:26:18 15  sugar.

10:26:19 16  Q.      Does that involve negotiating with suppliers?

10:26:22 17  A.      Yes, it did.

10:26:23 18  Q.      During that time were you doing anything to stay

10:26:28 19  abreast of the sugar market?

10:26:29 20  A.      Yes.

10:26:30 21  Q.      What were you doing?

10:26:32 22  A.      We would review different market intelligence

10:26:38 23  reports, we would meet often with different suppliers and

10:26:42 24  producers in the industry and analyst groups, and it was

10:26:50 25  just kind of a -- part of the day-to-day responsibility to

Riippa - direct

10:26:54 1    staying abreast of the changing market conditions relating

10:26:57 2    to sugar.

10:26:58 3    Q.      How long were you in that position?

10:27:00 4    A.      About two years.

10:27:02 5    Q.      How long in total have you been a part of the

10:27:07 6    sourcing team at General Mills?

10:27:08 7    A.      My entire time with General Mills.

10:27:10 8    Q.      Let's talk a little bit more specifically about the

10:27:13 9    sugar that General Mills buys.  Does General Mills buy and

10:27:16 10   use refined sugar to make its products?

10:27:19 11   A.      Yes, we do.

10:27:20 12   Q.      What is refined sugar?

10:27:22 13   A.      Refined sugar would be derived from either a beet or

10:27:28 14   cane origin source and then molasses and other content

10:27:34 15   extracted from it, leaving a fine granulated white crystal

10:27:39 16   sugar.

10:27:39 17   Q.      What type of refined sugar is General Mills buying?

10:27:43 18   A.      We have -- we buy a few different things, but the

10:27:50 19   majority of our spend is in with one specification that

10:27:54 20   designated either beet or cane sugar as what's known as DSU

10:28:00 21   or extra fine granulated.

10:28:03 22   Q.      Does General Mills also buy liquid sugar?

10:28:06 23   A.      We do, yes.

10:28:06 24   Q.      How does extra fine granulated that you referred to

10:28:12 25   relate to the sugar that most of us make, have at our

Riippa - direct

10:28:17 1    kitchen table?

10:28:17 2    A.      To my understanding it would be the equivalent of

10:28:20 3    what you would see in sugar that you would buy from the

10:28:24 4    grocery store or at a restaurant.

10:28:28 5    Q.      Are you familiar with the term high fructose corn

10:28:33 6    syrup or HFCS?

10:28:35 7    A.      Yes, I am.

10:28:35 8    Q.      What is that?

10:28:37 9    A.      That's a sweetener derived from corn.

10:28:39 10   Q.      I want to talk a little bit about the company's sugar

10:28:44 11   purchases.  Approximately how many of General Mills' U.S.

10:28:47 12   manufacturing plants use refined sugar?

10:28:50 13   A.      I believe just about all of them.

10:28:53 14   Q.      And are you familiar with some of the companies that

10:28:58 15   make refined sugar from cane in the United States?

10:29:01 16   A.      Yes, I am.

10:29:02 17   Q.      Would you name them, please?

10:29:04 18   A.      Imperial Sugar, US Sugar Corporation, Domino Sugar or

10:29:10 19   ASR, and Louisiana Sugar Refineries.

10:29:12 20   Q.      Where are those companies's refineries located?

10:29:12 21   A.      LSR and Domino would be in the New Orleans area.  US

10:29:22 22   Sugar is in Florida and Imperial in Savannah, Georgia.

10:29:22 23   Q.      Does General Mills buy sugar from Imperial?

10:29:32 24   A.      Yes, we do.

10:29:32 25   Q.      Does General Mills buy sugar from United?

Riippa - direct

10:29:36  1    A.      Yes, we do.

10:29:37  2    Q.      When General Mills is buying sugar from United, do

10:29:41  3    you ever deal with anyone at US Sugar?

10:29:44  4    A.      Not directly.

10:29:45  5    Q.      Who does General Mills deal with at United when

10:29:48  6    you're buying sugar?

10:29:50  7    A.      We would work through our main account team which

10:29:55  8    would be our direct account representative, Tim Minton, the

10:29:59  9    leadership team at United, Dirk Swart, and then occasionally

10:30:07 10    Steve Hanson for market updates and information regarding.

10:30:13 11    Q.      Are you familiar with some of the companies that make

10:30:15 12    refined sugar from beets in the United States?

10:30:18 13    A.      Yes, I am.

10:30:18 14    Q.      Who are they?

10:30:20 15    A.      Michigan Sugar, United Sugar, National Sugar

10:30:27 16    Marketing, and Western Sugar.

10:30:29 17    Q.      Where are those company's refineries located.

10:30:33 18    A.      Michigan Sugar is in the state of Michigan.  NSM or

10:30:41 19    National Sugar Marketing is in both Minnesota and greater

10:30:45 20    plains region, so Idaho, United Sugar in the Red River

10:30:52 21    Valley area which would be North Dakota and Minnesota and

10:30:58 22    Western Sugar which would be the Colorado/Nebraska/Montana

10:31:02 23    area.

10:31:04 24    Q.      Are you aware of sugar distributors of refined sugar?

10:31:08 25    A.      Yes I am.

Riippa - direct

10:31:09  1    Q.       What is a sugar distributor?

10:31:10  2    A.       A sugar distributor depending on their size and scope

10:31:13  3    of how many sweeteners they manage would be a reseller of

10:31:18  4    sugar products.

10:31:19  5    Q.       Would you tell us approximately how much sugar

10:31:23  6    General Mills buys each year in the United States?

10:31:27  7    A.       About 700 million pounds of granulated sugar, about

10:31:31  8    100 million pounds of liquid sugar.  And about 20 million

10:31:36  9    pounds of specialty sugar.

10:31:37 10    Q.       And generally, would you tell us what General Mills'

10:31:42 11    yearly spend on sugar is in the United States?

10:31:45 12    A.       Probably around $200 million, plus or minus depending

10:31:49 13    on the year.

10:31:50 14    Q.       Now, I have just a few questions about how General

10:31:54 15    Mills buys its sugar.  Does General Mills use any contracts

10:31:58 16    to buy sugar?

10:31:59 17    A.       Yes, we do.

10:32:00 18    Q.       What time frame do these contracts tend to cover?

10:32:04 19    A.       They tend to cover a calendar year basically.

10:32:07 20    Q.       Could you describe for us the type of contracts that

10:32:10 21    General Mills uses?

10:32:12 22    A.       In terms of bidding or when we secure?

10:32:16 23    Q.       Do you use any type of volume contracts?

10:32:20 24    A.       Yes.  We do volume contracts.

10:32:25 25    Q.       What is that?

Riippa - direct

A.      That means we agree to a certain volume and price or set of prices depending on the plant that it's delivered rate for the period of time in question.

Q.      Is there a time of year when General Mills does its annual contracting for sugar?

A.      We tend to start our contracting activities in the springtime.

Q.      Why is that?

A.      There is an industry event called the International Sweeteners Colloquium which is viewed as the formal kickoff to contracting season with industry participants and industry users.

Q.      And why does the contracting tend to happen around that time frame?

A.      I don't know the specific origin of it, but it is a convenient event nonetheless when there are all your suppliers and customers are together in which you can have individual meetings, talk about price expectations, growing expectations, and ultimately the kind of first draft of what they believe their pricing will be for the next calendar year.

Q.      Are you familiar with the term sold position?

A.      I am, yes.

Q.      Why does that context matter?

A.      A sold position for our use at General Mills would

Riippa - direct

10:33:55  1   reference how much a vendor has sold of their book

10:34:00  2   business, and we would interpret that as being the more sold

10:34:05  3   someone is, the potential for less lower prices, they're

10:34:11  4   less competitive, and a lower sold position might equal more

10:34:17  5   opportunity from a buying side.

10:34:18  6   Q.      How does it affect General Mills, if at all, if your

10:34:25  7   sugar suppliers were sharing the sold information with one

10:34:29  8   another?

10:34:29  9   A.      That would have a negative impact to our buying.

10:34:33 10   Q.      Why?

10:34:33 11   A.      As referenced, our belief if they knew what other

10:34:41 12   people were potentially going to offer, how much they would

10:34:45 13   offer or how aggressive someone else would be, could

10:34:48 14   potentially dictate what type pricing they would submit to

10:34:51 15   us.

10:34:54 16   Q.      Does General Mills use a request for proposal or an

10:34:59 17   RFP process to buy its sugar?

10:35:02 18   A.      Yes, we do.

10:35:03 19   Q.      Would you describe the RFP process at just a high

10:35:07 20   level for us?

10:35:08 21   A.      Yep.  So at -- following the event we will do an RFP,

10:35:12 22   request proposal, different pricing structures, different

10:35:15 23   mechanisms can be within that but fundamentally it's

10:35:21 24   facilitated by a third-party sourcing organization for us

10:35:25 25   called GEP and it invites vendors to participate and provide

Riippa - direct

10:35:31 1    their price and then we use that as the framework of our

10:35:36 2    negotiation process moving forward.

10:35:37 3    Q.      And specifically what specifications are included in

10:35:40 4    General Mills' RFP?

10:35:42 5    A.      Generally, the main one is our main bulk sugar.

10:35:51 6    Q.      How is the sugar that is purchased under the RFP

10:35:55 7    delivered to General Mills' plants?

10:35:58 8    A.      The main volume is done either via bulk truck or bulk

10:36:03 9    rail.

10:36:04 10   Q.      Why do some plants receive delivery of sugar via

10:36:11 11   truck and other receive via rail?

10:36:13 12   A.      Typically our larger using plants that have a lot of

10:36:17 13   sugar have been able to historically afford the capital

10:36:22 14   required to bring in bulk ingredients and/or they have

10:36:26 15   access to a rail line that would facilitate that transaction

10:36:31 16   smoothly.  And then others just potentially don't use enough

10:36:35 17   sugar or enough bulk ingredients to justify the capital.

10:36:40 18   Q.      Does the RFP that General Mills uses, include all the

10:36:44 19   facilities around the United States?

10:36:47 20   A.      For the most part, yes.

10:36:50 21   Q.      In general, do the same suppliers bid for every

10:36:54 22   facility?

10:36:54 23   A.      No, they do not.

10:36:55 24   Q.      Why not?

10:36:57 25   A.      We will open up the bid to anyone that can feed all

Riippa - direct

10:37:06 1    the plants and some choose to only bid on certain ones,

10:37:10 2    either based on historical deliveries there or a geographic

10:37:16 3    proximity to their location.

10:37:18 4    Q.    What do you mean by a geographic proximity?

10:37:22 5    A.    The closer our facility is to their production

10:37:28 6    location, might be a plant that they would be interested in

10:37:33 7    providing a price on.

10:37:34 8    Q.    And to your understanding, why does that matter?

10:37:38 9    A.    From a freight perspective, sugar is contracted and

10:37:43 10   measured off of a delivered price, and so the freight

10:37:48 11   component, although not the biggest part, but still can be

10:37:52 12   significant, is -- would allow them to remain competitive in

10:37:59 13   a given area.

10:38:01 14   Q.    What factors determine whether a vendor will be

10:38:04 15   awarded a contract to supply particular manufacturing plants

10:38:09 16   for General Mills?

10:38:09 17   A.    Predominantly will be, price driven and then

10:38:13 18   secondarily would be service driven.

10:38:16 19   Q.    What do you mean by price?

10:38:18 20   A.    Price would be that delivered price I referenced

10:38:22 21   which is the FOB plus freight would be the delivery price.

10:38:26 22   Q.    What do you mean by service?

10:38:28 23   A.    Service is the on time arrival of either a truck or a

10:38:35 24   railcar to our plants when our purchase orders had asked for

10:38:39 25   that sugar to be there, so the ability to consistently do

Riippa - direct

10:38:44 1    that is important consideration.

10:38:47 2    Q.      Anything else?

10:38:49 3    A.      You those would be the two primary factors.

10:38:53 4    Different payment terms which would be different extended

10:38:57 5    payment terms in which General Mills would pay for our

10:39:01 6    invoices, it could be a third consideration as well.

10:39:06 7    Q.      In general, are there any criteria that are important

10:39:10 8    when evaluating who will supply General Mills with sugar

10:39:16 9    year after year?

10:39:17 10   A.      Price would be the biggest factor in that.

10:39:21 11   Q.      Any other factors?

10:39:23 12   A.      Service, reliability and consistency in previous

10:39:29 13   performance could certainly influence that.  But we have

10:39:35 14   known relationships with all the sugar producers in the

10:39:38 15   country, and so we also feel confident in people's ability

10:39:43 16   to service our plants as well, so price is the majority

10:39:47 17   decision criteria.

10:39:49 18   Q.      Do you consider quality at all?

10:39:52 19   A.      We do, yes.

10:39:54 20   Q.      How so?

10:39:56 21   A.      We would want to make sure that our -- the sugar

10:40:00 22   coming in would be free of foreign material and perform as

10:40:04 23   well in our operating systems to make our finished products.

10:40:07 24   So if there was a vendor that had a series of known issues

10:40:12 25   and considerations, either poor material or sugar that did

Riippa - direct

10:40:15 1    not perform or was not free flowing it would be part of our

10:40:19 2    consideration for that.

10:40:21 3    Q.      Is there any type of qualification process that

10:40:24 4    General Mills uses for new sugar supplier?

10:40:27 5    A.      Yes.

10:40:28 6    Q.      Would you describe that process?

10:40:30 7    A.      If we were to onboard a new sugar vendor, it would be

10:40:35 8    very similar to how we would onboard any ingredient vendor

10:40:39 9    and it would really start with a visit to their producing

10:40:42 10   facility to understand if it's made in a food safe way, good

10:40:47 11   manufacturing practices.  And then we would receive samples

10:40:50 12   of that product and run them in different finished product

10:40:53 13   that it would be used in to make sure that it did not drive

10:40:57 14   any changes to our consumer.

10:40:59 15   Q.      How important is it that the refined sugar that

10:41:03 16   General Mills buys meets safety standards?

10:41:05 17   A.      Very important.

10:41:06 18   Q.      How so?

10:41:07 19   A.      Well making sure there is no foreign material or not

10:41:12 20   appropriate objects to be found in food is very important

10:41:12 21   for our company, and the trust we built with consumers over

10:41:24 22   the years.

10:41:24 23   Q.      Does General Mills take any steps to ensure that the

10:41:28 24   sugar it's buying meets their safety standards?

10:41:32 25   A.      We do.

Riippa - direct

10:41:32 1    Q.      What steps do you take?

10:41:33 2    A.      Most of our plants would have -- we would visit our

10:41:37 3    vendor locations and make sure that they are operating in

10:41:40 4    that safe manufacturing, and most of our plants we will then

10:41:45 5    have metal detection, magnets, other preventative streams

10:41:52 6    that would help stop any of those things entering into our

10:41:57 7    operations.

10:41:57 8    Q.      Anything else?

10:42:00 9    A.      No.

10:42:03 10   Q.      Does General Mills make spot purchases of sugar?

10:42:06 11   A.      We do occasionally, yes.

10:42:08 12   Q.      What is spot purchasing?

10:42:09 13   A.      Spot purchasing would be needing to go and secure an

10:42:12 14   incremental or defined set of volume at a given plant or a

10:42:18 15   very specific time, generated by not -- having exceeded your

10:42:25 16   contract coverage or the vendor that is contracted for a

10:42:30 17   given plant not being able to service that facility.

10:42:35 18   Q.      How does one go about making spot purchases?

10:42:39 19   A.      Typically when you need to make a spot purchase it is

10:42:44 20   in an urgent and short notice environment so it tends to be

10:42:44 21   e-mailing or calling other vendors, mostly sugar

10:42:52 22   distributors to see if they can service a plant at a given

10:42:52 23   time at a given quantity.

10:43:05 24   Q.      I want to ask you a few questions about the USDA

10:43:05 25   sugar program.  Are you familiar with the USDA sugar

Riippa - direct

10:43:11 1    program?

10:43:12 2    A.      Yes, I am.

10:43:13 3    Q.      Why are you familiar with that program?

10:43:16 4    A.      In -- when on boarding and managing the sugar desk it

10:43:23 5    is a critical part of the on boarding process.  It

10:43:27 6    fundamentally governs how sugar operates in this country so

10:43:32 7    you become very well versed in that program.  And then I

10:43:36 8    joined the desk a couple of months before a force majeure

10:43:42 9    event and so learned very quickly how the sugar program

10:43:46 10   worked as a result of that.

10:43:47 11   Q.      And from your perspective as a customer, what is the

10:43:50 12   USDA's role?

10:43:53 13   A.      From my understanding, their role informed by the

10:43:59 14   injury perspective is they will help solve for supply of

10:44:05 15   sugar to ensure there is an adequate supply of sugar in our

10:44:09 16   country.

10:44:09 17   Q.      Have you ever communicated with the USDA about

10:44:12 18   Mexican sugar imports?

10:44:14 19   A.      Yes, we have.

10:44:15 20   Q.      When was that?

10:44:17 21   A.      I believe that was last March or April of 2021.

10:44:24 22   Q.      And can you tell us what happened?

10:44:26 23   A.      We had two conversations with the USDA in

10:44:32 24   understanding what their recommendations would be to

10:44:35 25   increase the amount of supply of refined sugar into this

Riippa - direct

10:44:39 1    country, to provide a price alleviation for what we were

10:44:43 2    seeing being transacted on the market related to sugar.  And

10:44:50 3    coming out of that, they did not take any direct action from

10:44:55 4    our conversation with them, but I do believe that in the

10:44:58 5    months and weeks that followed they did increase some sugar

10:45:03 6    from Mexico.

10:45:05 7    Q.       And did General Mills see any impact on the prices it

10:45:10 8    was paying for sugar in the USDA action?

10:45:14 9    A.       No.

10:45:15 10   Q.       You mentioned force majeure.  What was that?

10:45:19 11   A.       There was two bad sugar harvests, one in the Red

10:45:28 12   River Valley represented by United Sugar and then one was

10:45:31 13   Western Sugar that they were unable to harvest a significant

10:45:34 14   amount of their sugar beets and thus both of those vendors

10:45:40 15   claimed force majeure, which was a reduction in our

10:45:44 16   contracted quantities.

10:45:45 17   Q.       What did that mean for General Mills?

10:45:46 18   A.       That means that we were ones, before that we had all

10:45:51 19   of our sugar met before the next calendar year, so we had to

10:45:57 20   go and find new sugar to replace the quantities that were

10:46:02 21   reduced by.

10:46:02 22   Q.       Let's talk a little bit more about the facilities.

10:46:02 23   You testified earlier that General Mills has facilities all

10:46:11 24   around the United States.  How many plants does it have in

10:46:14 25   Covington, Georgia?

Riippa - direct

10:46:15 1    A.        We have two plants in Covington, Georgia.

10:46:19 2    Q.        What kind of products are made in Covington, Georgia?

10:46:23 3    A.        Cereal, most obvious thing is like Cinnamon Toast

10:46:27 4    Crunch and snacks like Nature Valley.

10:46:31 5    Q.        How is refined sugar delivered to the Covington

10:46:35 6    plant.

10:46:35 7    A.        In bulk truck.

10:46:37 8    Q.        Is any delivered via rail?

10:46:39 9    A.        No.

10:46:41 10   Q.        Why not?

10:46:42 11   A.        We have not been able to do the -- to have the

10:46:45 12   capital investment work out which would meet our internal

10:46:51 13   guidance to support that, and then we have not -- we have

10:46:54 14   also not recommended it for sugar to be via bulk as well.

10:47:02 15   Q.        Why is that?

10:47:03 16   A.        Based on feedback from the vendors including United

10:47:07 17   about the change in humidity and temperature from Florida

10:47:13 18   and Georgia potentially causing clumping or performance

10:47:17 19   issues when it arrived at our plant.

10:47:19 20   Q.        Could you explain a little bit more what you mean?

10:47:21 21   A.        So, we have had some instances in the past and our

10:47:27 22   belief or assumption is that in very humid climates when

10:47:32 23   sugar is loaded into a railcar which has over 200,000

10:47:37 24   pounds, that moisture as it moves north, moves into less

10:47:41 25   humid conditions and kind of rumbling of the rail and the

Riippa - direct

10:47:45 1    transit time it takes, can lead to significant clumping or

10:47:48 2    issues where sugar sticks to the walls of the railcar and

10:47:52 3    cannot be dislodged and cannot be used.

10:47:55 4    Q.    Have you heard of any such issues using trucks?

10:47:59 5    A.    No.

10:48:00 6    Q.    Now, I would like you, Mr. Riippa, to take a look at

10:48:05 7    a document in your binder.  Could you turn to JTX 008.

10:48:10 8              MS. SINKLER:  I'm going to ask the Court at this

10:48:12 9    time not to display it on the public screen because it has

10:48:16 10   competitively sensitive information.

10:48:19 11              And the binder is PDF version of this, Your

10:48:23 12   Honor, and the native Excel actually may have some hidden

10:48:28 13   screens that have not been opened.  Plaintiff and defendants

10:48:32 14   agreed to make sure all the screens are opened in your

10:48:36 15   system.

10:48:36 16              THE COURT:  Was someone going to put it on my

10:48:39 17   screen?  I thought someone could do that.

10:48:40 18              MS. SINKLER:  Not the public screen.  Are you

10:48:50 19   able to see it, Your Honor?

10:48:52 20              THE COURT:  In theory.  I can't see a number on

10:48:52 21   there.

10:49:02 22              MS. SINKLER:  It was a native cover.

10:49:05 23              THE COURT:  I can see it.  I can't read it.  The

10:49:05 24   font is so small, I can't read them.

10:49:11 25              MS. SINKLER:  I'm sorry.  I can give you a hard

Riippa - direct

10:49:14 1    copy.

10:49:14 2                THE COURT:  I can pull it up.  What exhibit is

10:49:16 3    it?

10:49:18 4                MS. SINKLER:  JTX 008.

10:49:23 5                THE COURT:  Okay.  Thank you.  You just have to

10:49:28 6    tell me what tab.

10:49:34 7                MS. SINKLER:  What tab?

10:49:35 8                THE COURT:  It's an Excel document.  There are

10:49:38 9    tabs at the bottom and the picture that is on my screen here

10:49:42 10   has red and green things on it, and the first page of it

10:49:45 11   does not, so I don't know what I have, consolidated response

10:49:50 12   payment terms, S & G actuals, Michigan revised.

10:49:55 13               MS. SINKLER:  Right, I think some of the tabs

10:49:57 14   are hidden on the Excel, so you have to unhide them.  You

10:50:03 15   have to select columns E and AP on the tab at the top and

10:50:10 16   right click to unhide the tab.

10:50:12 17               THE COURT:  I have no idea what that means.  You

10:50:27 18   have to tell me again what to do.

10:50:30 19               MS. SINKLER:  I think what you do is you click

10:50:32 20   on the tabs at the top, and you see E and AP, column

10:50:37 21   headings and you highlight those.  And then right click

10:50:41 22   unhide.  And it should open up.

10:51:03 23               THE COURT:  Do you have stuff highlighted on

10:51:05 24   here in different colors than what's on my sheet?

10:51:08 25               MS. SINKLER:  No, they are in different colors.

Riippa - direct

10:51:13  1          THE WITNESS:  I think if you scroll.

10:51:25  2          THE COURT:  If you guys could give us this stuff

10:51:27  3  in the right format, it would help because you're just

10:51:31  4  wasting your time in trying to figure this out.  Or you can

10:51:35  5  do it this way if you want.

10:51:43  6          Okay.  I got it.  Thank you.

10:51:46  7          MS. SINKLER:  Thank you.

10:51:47  8  BY MS. SINKLER:

10:51:50  9  Q.      Do you recognize JTX 008?

10:51:53 10  A.      Yes, I do.

10:51:53 11  Q.      What is it?

10:51:55 12  A.      This is our following the bid event, this is the -- a

10:52:03 13  consolidation half of the pricing, vendor locations, and

10:52:10 14  then a color coding to designate the competitiveness or the

10:52:16 15  lowest price compared to the highest price.

10:52:19 16  Q.      Did you prepare JTX 008 in the ordinary course of

10:52:23 17  your duties at General Mills?

10:52:24 18  A.      Yes, I did.

10:52:25 19  Q.      Does General Mills routinely prepare such reports to

10:52:28 20  reflect bids?

10:52:29 21  A.      Yes, we do.

10:52:31 22          MS. SINKLER:  Your Honor, I would like to offer

10:52:33 23  JTX 008 into evidence.  And it's been designated as a

10:52:36 24  confidential document.

10:52:36 25          THE COURT:  Any objection?

Riippa - direct

10:52:40  1          MR. YATES:  No objection, Your Honor.

10:52:41  2          THE COURT:  All right.  It's so admitted.

10:52:43  3          (JTX Exhibit No. 008 was admitted into

10:52:43  4  evidence.)

10:52:43  5  BY MS. SINKLER:

10:52:49  6  Q.     Mr. Riippa, I'm going to ask you a few questions

10:52:52  7  about the document.  First of all, do you see the

10:52:54  8  consolidated response tab at the bottom.  Would you describe

10:52:58  9  generally what the consolidated response tab is doing?

10:53:01 10  A.     This is showing all the different responses we've

10:53:06 11  received, the starting in column C down would be all of our

10:53:11 12  plant locations.  Column D would have the method in which

10:53:21 13  sugar would be delivered.  Column E would have two price

10:53:25 14  represented in millions of pounds, and then through the rest

10:53:29 15  of the sheet would be the vendors broken down by their FOB

10:53:35 16  price delivered and then delivered price offering.

10:53:40 17  Q.     Thank you.

10:53:40 18          And if you look at line 5 starting at E, page

10:53:55 19  22, volume in pounds, do you see that?

10:53:57 20  A.     Yes.

10:53:57 21  Q.     Right next to it, it says FOB dollar sign/CWT, right

10:54:02 22  under F5.

10:54:02 23  A.     Yes.

10:54:02 24  Q.     What is CWT referring to?

10:54:02 25  A.     That is referring to a hundredweight price.  And so

Riippa - direct

10:54:16 1    if -- so you would move the decimal point over two spots to

10:54:21 2    the left to get a per pound price.

10:54:23 3    Q.    Could you give us an example?

10:54:25 4    A.    If something was $50 a hundredweight, you would move

10:54:29 5    it twice and therefore it would be $0.50 a pound.

10:54:34 6    Q.    Thank you.

10:54:35 7             Are all the reported prices on JTX 008 on a

10:54:39 8    hundredweight basis?

10:54:40 9    A.    Yes, they are.

10:54:44 10    Q.    First, let's focus on Covington, Georgia on lines 13

10:54:49 11    and 14 of JTX 008.  Do you see that?

10:54:53 12    A.    Yes.

10:54:54 13    Q.    Will you just tell us the cells that reflect the

10:54:59 14    vendors who bid to supply Covington, Georgia?

10:55:02 15    A.    It would be in sales F through H1.  And then U

10:55:15 16    through Z1.  And AJ through AL1.

10:55:30 17    Q.    According to JTX 008, what sales showed who had the

10:55:37 18    lowest delivered price bid of the three companies listed in

10:55:41 19    the previous cell?

10:55:45 20    A.    That would be the cell Z 13 and 14.

10:55:51 21    Q.    And which cell JTX 008 shows the facility from where

10:56:01 22    the winning bidder would be supplying sugar from?

10:56:04 23    A.    That would be X through Z3.

10:56:10 24             THE COURT:  I don't know what any of this means,

10:56:12 25    X through Z3.  I thought I was following along and now I'm

Riippa - direct

10:56:17 1    just -- X through Z3.  I see X through Z, I don't know what

10:56:24 2    3 means.

10:56:27 3              MS. SINKLER:  So the number to the left on the

10:56:31 4    Excel, on JTX 008, the 3, and then --

10:56:38 5              THE COURT:  I have no idea what you're talking

10:56:40 6    about.  I have X, Y and Z, and I see for lines 13 and 14,

10:56:49 7    Covington, Georgia, there are numbers.  But I'm missing the

10:56:53 8    3.  I just don't know what you're talking about.

10:57:05 9              MS. SINKLER:  If you go back to which cell shows

10:57:10 10   the facility, the winning bidder, would be the final sugar

10:57:23 11   comp.

10:57:23 12             THE COURT:  I have no idea what you're talking

10:57:24 13   about.

10:57:26 14             MS. SINKLER:  Do you see the X, Y, Z at the top?

10:57:29 15             THE COURT:  Yes, I have the X, Y, Z.  I don't

10:57:32 16   see the 3.

10:57:34 17             MS. SINKLER:  The 3 is on the left, the far

10:57:36 18   left, if you go all the way across to the right under X, Y,

10:57:40 19   Z, that's what he's referring to as the 3.

10:57:42 20             THE COURT:  So its the name of the city and

10:57:47 21   state, that's X, Y, Z, you can't tell me that on the record.

10:57:51 22             MS. SINKLER:  That would identify for him

10:57:54 23   specifically who the supplier was that bid.

10:57:57 24             THE COURT:  Truly, is that highly competitive

10:57:59 25   information?  I need someone to help me out here because

Riippa - direct

10:58:05  1   this is -- we are making this trial impossible to figure out

10:58:08  2   on the record with this code that is going to make it very

10:58:14  3   difficult for us in post-trial briefing.  So who -- I don't

10:58:19  4   understand.

10:58:20  5               MS. SINKLER:  I think what the company --

10:58:22  6               THE COURT:  We're talking about -- some of these

10:58:25  7   parties here are parties in this case.

10:58:27  8               MS. SINKLER:  Right.

10:58:27  9               THE COURT:  And we can't say whether or not -- I

10:58:30 10   mean, what?  You can't even say the states?

10:58:41 11               MS. SINKLER:  We can, just going back to the

10:58:44 12   prices, the specific prices, because we don't want to do the

10:58:49 13   specific prices on the public record.

10:58:51 14               THE COURT:  Okay.

10:58:51 15               MS. SINKLER:  Is that all right?

10:58:55 16   BY MS. SINKLER:

10:58:56 17   Q.    According to JTX 008, which cells show who has the

10:59:01 18   next lowest prices to supply Covington?

10:59:05 19   A.    H13 and 14.

10:59:12 20   Q.    Finally, which cells show who have the highest bid to

10:59:22 21   supply Covington?

10:59:23 22   A.    AL 13 and 14.

10:59:26 23               MS. SINKLER:  At this time Your Honor --

10:59:28 24               THE COURT:  Let me figure it out.  I now

10:59:31 25   understand it.  But I am not understanding who it is because

Riippa - direct

10:59:35 1    he's clearly been prepared to spit these names out and I

10:59:39 2    need to find them.

10:59:41 3              MS. SINKLER:  All right.

10:59:42 4              THE COURT:  Okay.  When you guys do post-trial

10:59:48 5    briefing, if you don't specify who these people are, it's

10:59:52 6    going to be very difficult for you to win.  We're just going

10:59:56 7    to sit here and say AB4, anyway, go ahead.

11:00:04 8              MS. SINKLER:  At this time I would request to

11:00:06 9    close the courtroom for the rest of the witness's testimony.

11:00:09 10   We'll be eliciting confidential information.

11:00:13 11             THE COURT:  Anyone who is not in protective

11:00:16 12   order, we are going to be eliciting third-party highly

11:00:20 13   confidential information.  There is a record that's been

11:00:23 14   made in the submissions that this is highly competitive and

11:00:31 15   would be prejudice to the parties.  And we're going to shut

11:00:37 16   off the streaming, too.

11:01:01 17             (Courtroom sealed.)

11:01:15 18   ██████████████████████████████

11:01:17 19   ████████████████████

11:01:17 20   █████████████

11:01:18 21   █  ████████████████████████████████████

11:01:28 22   ██████████████████████████████████████

11:01:37 23   ████████████████████

11:01:42 24   █  █████████████████████████████████████

11:01:48 25   ██████████████████████████████

Riippa - direct



Riippa - direct



11:03:14  1

11:03:22  2

11:03:22  3

11:03:22  4

11:03:23  5

11:03:27  6

11:03:33  7

11:03:36  8

11:03:39  9

11:03:45 10

11:03:47 11

11:03:48 12

11:03:57 13

11:03:59 14

11:04:00 15

11:04:02 16

11:04:06 17

11:04:17 18

11:04:22 19

11:04:22 20

11:04:25 21

11:04:26 22

11:04:30 23

11:04:33 24

11:04:34 25   to supply

Riippa - direct



Riippa - direct



Riippa - direct



Riippa - direct



Riippa - direct

| | |
|---|---|
| 11:11:01 1 | █████████████████████████████ |
| 11:11:06 2 | ████████████████████ |
| 11:11:09 3 | █  ████████████ |
| 11:11:10 4 | █  █████████████████ |
| 11:11:13 5 | ██████████████████████████████ |
| 11:11:17 6 | ███████████████████████████ |
| 11:11:22 7 | █  █████████████████████████ |
| 11:11:26 8 | ███████████████████████ |
| 11:11:29 9 | █  █████████ |

10    MS. SINKLER:  I have no further questions at

11  this time, Your Honor.

12    THE COURT:  All right.  So let's do the cross

13  just on anything you have on this, and then -- you don't

14  have.

15    MR. YATES:  I don't think we need to do anything

16  on the confidential sealed record.

17    THE COURT:  Okay.  We'll open the sealed record

18  but let's take our morning break.

19    COURT CLERK:  All rise.

20    (A brief recess was taken.)

21    THE COURT:  All right.  Please be seated.

22    Cross-exam.

23    MR. YATES:  Good morning, Your Honor.  Chris

24  Yates of Latham & Watkins for US Sugar.  May I proceed?

25    THE COURT:  Yes, please.

Riippa - cross

**CROSS-EXAMINATION**

BY MR. YATES:

Q.      Thank you.  Nice to seen you again, Mr. Riippa.

         Mr. Riippa, let's start where Ms. Sinkler ended
and spend a lot of time with the Covington, Georgia plants.
Is that all right?

A.      Yes.

Q.      For 2022, those two plants were being supplied by
United, correct?

A.      Correct.

Q.      For 2022, United and General Mills entered into
what's called a blanket volume agreement which covers nine
different plants from New York to Iowa to Tennessee to
Georgia, correct?

A.      Correct.

Q.      And as part of that blanket volume agreement, General
Mills allowed United to`raise the price for the supplies for
the Covington, Georgia plants in exchange for a price
reduction in other parts of the country.  Isn't that true?

A.      That is correct.

Q.      And Imperial didn't bid on any of the other plants
that are covered by the blanket volume contract with United,
did it?

A.      Correct.

Q.      Okay.  Including Centerville, Tennessee?

Riippa - cross

11:30:12  1    A.      Correct.

11:30:13  2    Q.      Murfreesburo, Tennessee?

11:30:16  3    A.      Correct.

11:30:16  4    Q.      As part of its blanket volume agreement with United,

11:30:20  5    General Mills ultimately agreed to a price for the

11:30:25  6    Covington, Georgia plants there's higher than the price that

11:30:29  7    the DOJ showed you, right?

11:30:32  8    A.      Can you say it again?

11:30:34  9    Q.      Sure.

11:30:35 10            Do you recall Ms. Sinkler went through the

11:30:39 11    spreadsheet and she isolated the price that United bid, do

11:30:45 12    you recall that?

11:30:45 13    A.      Yes.

11:30:45 14    Q.      Do you recall that what ended up happening was

11:30:48 15    General Mills and United said United, you can charge a

11:30:51 16    higher price to Covington, Georgia and a price even higher

11:30:54 17    than the Imperial price?

11:30:55 18    A.      I cannot recall the specifics.

11:30:57 19    Q.      Okay.  But what did happen was General Mills wanted a

11:31:02 20    price reduction in other parts of the country from United,

11:31:02 21    correct?

11:31:02 22    A.      Correct.

11:31:02 23    Q.      And General Mills agreed to a higher price for

11:31:10 24    Covington, Georgia in exchange for a lower price in other

11:31:14 25    parts of the country; right?

Riippa - cross

11:31:15  1    A.      Correct.

11:31:17  2    Q.      Okay.  And that's because General Mills cares about

11:31:19  3    its overall spend, the overall price it's paying for refined

11:31:24  4    sugar throughout the United States; correct?

11:31:26  5    A.      Correct.

11:31:30  6    Q.      Let's talk briefly about another General Mills

11:31:32  7    facility in Georgia, that's a company packing facility in

11:31:37  8    Rome, Georgia?

11:31:38  9    A.      Yes.

11:31:38 10    Q.      For 2022, Cargill, LSR Cargill is contracted to

11:31:45 11    supply that facility, correct?

11:31:47 12    A.      I believe so.

11:31:47 13    Q.      And Cargill is the sole supplier of that facility in

11:31:52 14    Rome, Georgia, correct?

11:31:53 15    A.      Yes.

11:31:53 16    Q.      For calendar year 2022, General Mills didn't contract

11:31:57 17    with Imperial to supply that facility, did it?

11:32:00 18    A.      Correct.

11:32:00 19    Q.      That's even though Imperial is located in the state

11:32:02 20    of Georgia, right?

11:32:04 21    A.      To my knowledge, yes.

11:32:05 22    Q.      And I think you said that General Mills has fifteen

11:32:09 23    plants and dozens of co-packing locations, correct?

11:32:12 24    A.      Correct.

11:32:12 25    Q.      The only plants in the United States that Imperial

Riippa - cross

11:32:16 1    bid on were the two plants in Covington, Georgia and the one

11:32:21 2    plant in Rome, Georgia in 2022, correct?

11:32:23 3    A.     I would have to look and see.

11:32:25 4    Q.     Well, we could look at JTX 008, and we'll do that

11:32:30 5    after in the post-trial briefing?

11:32:32 6    A.     Okay.

11:32:33 7    Q.     To the best of your recollection, Imperial did not

11:32:35 8    bid on any of General Mills' plants in Tennessee; is that

11:32:40 9    right?

11:32:40 10   A.     Correct.

11:32:41 11   Q.     And didn't bid on any General Mills' facility or

11:32:45 12   co-packing facility in Kentucky or any other state; correct?

11:32:49 13   A.     Correct.

11:32:50 14   Q.     I think, let me just confirm, when General Mills

11:32:53 15   wants to purchase refined sugar, it typically issues

11:32:57 16   requests for proposal to suppliers, correct?

11:33:01 17   A.     Correct.

11:33:01 18   Q.     And does General Mills use the fact that it's a large

11:33:04 19   purchaser of refined sugar to retain favorable pricing

11:33:10 20   terms?

11:33:10 21   A.     Yes, we do.

11:33:12 22   Q.     I think what you told me in deposition was that

11:33:18 23   General Mills uses its economy of scale to obtain the best

11:33:21 24   prices possible, right?

11:33:22 25   A.     I believe so.

Riippa - cross

11:33:22 1  Q.      Let's talk a bit further about these blanket volume

11:33:27 2  contracts that General Mills entered into with certain sugar

11:33:31 3  suppliers.  Is it true with a blanket volume contract

11:33:35 4  General Mills retains the flexibility to shift sugar

11:33:39 5  deliveries between its various plants?

11:33:41 6  A.      Yes.

11:33:41 7  Q.      And with this blanket volume contract, General Mills

11:33:46 8  can shift the supply of refined sugar from among its various

11:33:52 9  plants, correct?

11:33:53 10 A.      Yes.

11:33:53 11 Q.      And let's use United as an example.  There is a

11:33:59 12 blanket volume contract with United and General Mills,

11:34:02 13 correct?

11:34:02 14 A.      Correct.

11:34:03 15 Q.      With a blanket volume contract, General Mills has the

11:34:07 16 ability to tell United that it wants to shift the delivery

11:34:10 17 of a certain number of thousands of pounds or tens of

11:34:13 18 thousands of pounds of sugar from let's say Murfreesburo,

11:34:17 19 Tennessee to Cedar Rapids, Iowa, correct?

11:34:20 20 A.      Correct.

11:34:20 21 Q.      And the converse is true, isn't it, General Mills has

11:34:23 22 the ability to tell United please send the sugar that was

11:34:27 23 going to go to Cedar Rapids, Iowa to Murfreesburo, Tennessee

11:34:30 24 instead?

11:34:35 25 A.      With enough notice there is flexibility to do that,

Riippa - cross

11:34:35  1    yes.

11:34:36  2    Q.      The reason General Mills does that is because General

11:34:39  3    Mills wants the flexibility to shift the supply of sugar to

11:34:42  4    its various plants around the country, correct?

11:34:44  5    A.      That is correct.

11:34:50  6    Q.      I mentioned Murfreesburo, Tennessee.  General Mills

11:34:53  7    has two plants in Murfreesburo Tennessee correct?

11:34:57  8    A.      Yes.

11:34:58  9    Q.      And one of those plants makes Pillsbury products,

11:35:02 10    right.

11:35:02 11    A.      Yes.

11:35:02 12    Q.      And the other one makes Yoplait Yogurt?

11:35:06 13    A.      Yes.

11:35:07 14    Q.      And General Mills purchases a very large amount of

11:35:10 15    sugar for those two plants in Murfreesburo?

11:35:13 16    A.      I believe that is correct.

11:35:15 17    Q.      About 200 million pounds?

11:35:18 18    A.      I believe so, yes.

11:35:19 19    Q.      Out of the 750 million pounds that it buys yearly?

11:35:22 20    A.      Some of that would be the liquid sugar which is not

11:35:22 21    in the 750 million.

11:35:22 22    Q.      Fair to say that Murfreesburo is one of General

11:35:30 23    Mills' larger sugar using locations in the United States?

11:35:33 24    A.      That is correct.

11:35:36 25    Q.      And in 2022 General Mills contacted with United in

Riippa - cross

11:35:43 1    Cargill to deliver the bulk sugar, correct?

11:35:47 2    A.      Yes.

11:35:47 3    Q.      And United was supplied the Murfreesburo, Tennessee

11:35:51 4    plant with beet sugar, is that right?

11:35:52 5    A.      On occasion, yes.

11:35:55 6    Q.      And that comes down to Tennessee to Murfreesburo,

11:35:57 7    Tennessee from the Red River Valley, right?

11:36:01 8    A.      Yes.

11:36:01 9    Q.      Comes all the way down from the boarder of North

11:36:05 10   Dakota and Minnesota, correct?

11:36:06 11   A.      Correct.

11:36:07 12   Q.      And the sugar that General Mills purchases from LSR

11:36:12 13   and Cargill, that comes up to Tennessee from Louisiana, is

11:36:17 14   that correct?

11:36:17 15   A.      That is correct.

11:36:17 16   Q.      You mentioned liquid sugar.  General Mills buys

11:36:21 17   liquid sugar for its Murfreesburo, Tennessee plant from a

11:36:25 18   company we haven't discussed in this trial yet called CSC,

11:36:30 19   correct?

11:36:30 20   A.      That is correct.

11:36:32 21   Q.      Is CSC the sole supplier of liquid sugar to the

11:36:32 22   Murfreesburo, Tennessee plants?

11:36:32 23   A.      Yes, they are.

11:36:39 24   Q.      And CSC supplies a significant quantity of liquid

11:36:42 25   sugar to those plants?

Riippa - cross

11:36:45 1    A.       That is correct.

11:36:45 2    Q.       Much of the hundred million pounds of liquid sugar

11:36:48 3    that General Mills buys on an annual basis?

11:36:52 4    A.       Correct.

11:36:52 5    Q.       And you testified, I believe on direct that about

11:36:56 6    something called the International Sweeteners Colloquium.

11:37:00 7    Do you recall that?

11:37:01 8    A.       Yes, I do.

11:37:02 9    Q.       You helped prepare presentations in advance of those

11:37:07 10   meetings, is that correct?

11:37:07 11   A.       That is correct.

11:37:08 12   Q.       Let's take a look at JTX 007 which I will ask the

11:37:12 13   court not to display on the public screen since General

11:37:17 14   Mills has marked it as confidential.  Let me know when you

11:37:21 15   have that, sir.

11:37:22 16   A.       What was the -- I have the --

11:37:25 17   Q.       JTX-007.  Do you have that?

11:37:28 18   A.       Yes.

11:37:28 19   Q.       Would you turn to the slide that ends in the Bates

11:37:31 20   number 407, it's entitled CSC Sugar.

11:37:42 21   A.       Yes.

11:37:42 22   Q.       And JTX-007, this is the document you prepared in the

11:37:49 23   ordinary course of your job duties at General Mills, is that

11:37:52 24   correct?

11:37:52 25   A.       That is correct.

Riippa - cross

11:37:53 1    Q.      And to prepare for meetings with suppliers and others

11:37:56 2    at the International Sweeteners Colloquium in 2020, correct?

11:38:00 3    A.      That is correct.

11:38:01 4    Q.      And you meet with analysts, industry analysts at the

11:38:06 5    colloquium?

11:38:07 6    A.      Yes.

11:38:07 7    Q.      And you meet with sugar suppliers?

11:38:09 8    A.      Yep.

11:38:09 9    Q.      You said earlier I think on direct that it's the

11:38:13 10   beginning of the contracting season for the next year, is

11:38:16 11   that correct?

11:38:16 12   A.      That is correct.

11:38:17 13   Q.      Take a look at the slide for the meeting with CSC

11:38:21 14   Sugar.  Do you have that, sir?

11:38:23 15   A.      Yes.

11:38:23 16   Q.      Under the heading background, do you see it says CSC

11:38:27 17   has built a business around raw sugar trade and as a

11:38:32 18   disrupter in the finished product phase for sugar?

11:38:35 19   A.      Yes.

11:38:36 20   Q.      Is it fair to say that General Mills perceived CSC to

11:38:41 21   be a disrupter in the sugar space in the United States?

11:38:44 22   A.      Yes, we do.

11:38:46 23   Q.      Is that because CSC has built new liquid facilities

11:38:50 24   that have disrupted supply and demand dynamics in the sugar

11:38:55 25   industry?

Riippa - cross

11:38:55 1    A.      That is one factor, yes.

11:38:56 2    Q.      What are the others?

11:38:58 3    A.      Their ability to take the raw sugar and make higher

11:39:01 4    color sugar which would drive cost savings projects for

11:39:06 5    General Mills, and that would be the other factor.

11:39:11 6    Q.      In fact, under background, it talks about some of the

11:39:14 7    substantial cost savings to General Mills from working with

11:39:18 8    a company like CSC?

11:39:21 9    A.      That is correct.

11:39:21 10   Q.      And under supplier interests in General Mills, do you

11:39:27 11   see that, sir?

11:39:28 12   A.      Yes.

11:39:29 13   Q.      Do you see it says open new liquid sugar lanes, even

11:39:35 14   willing to adopt and build manufacturing sites close to GMI,

11:39:41 15   General Mills, do you see that?

11:39:41 16   A.      Yes.

11:39:42 17   Q.      Does that mean that CSC Sugar has expressed a

11:39:47 18   willingness to build new manufacturing facilities close to

11:39:51 19   General Mills plants?

11:39:52 20   A.      Yes, they have.

11:39:54 21   Q.      If you turn to slide 404, sir.  This is a slide to

11:40:01 22   prepare for a meeting with Batory Foods?

11:40:01 23   A.      Yes.

11:40:07 24   Q.      In your direct, Batory Foods was referred to as a

11:40:12 25   distributor, correct?

Riippa - cross

| | |
|---|---|
| 11:40:14 | 1 |
| 11:40:14 | 2 |
| 11:40:19 | 3 |
| 11:40:21 | 4 |
| 11:40:22 | 5 |
| 11:40:25 | 6 |
| 11:40:27 | 7 |
| 11:40:27 | 8 |
| 11:40:33 | 9 |
| 11:40:40 | 10 |
| 11:40:41 | 11 |
| 11:40:41 | 12 |
| 11:40:46 | 13 |
| 11:40:47 | 14 |
| 11:40:49 | 15 |
| 11:40:51 | 16 |
| 11:40:57 | 17 |
| 11:40:59 | 18 |
| 11:41:03 | 19 |
| 11:41:07 | 20 |
| 11:41:14 | 21 |
| 11:41:17 | 22 |
| 11:41:17 | 23 |
| 11:41:19 | 24 |
| 11:41:22 | 25 |

A.      Yes.

Q.      But Batory Foods takes refined sugar and produces powdered sugar for General Mills, does it not?

A.      That's correct, yes.

Q.      And General Mills has purchased powdered sugar from Batory Foods; correct?

A.      Yes.

Q.      And it also says under Batory Foods, Batory Foods is a big sugar buyer in NAR, North American Region, 500 million pounds.  Do you see that?

A.      Yes.

Q.      Is that the quantity of sugar that Batory is buying on an annual basis?

A.      That was shared with us, so I'm not sure you have the scope of that, but I believe so.

Q.      Is Batory an example of a distributor who General Mills turns to when it needs to make spot purchases?

A.      They are one of our distributors, yes.

Q.      Let's take a look at slide, the slide that's immediately prior to this one, that's on Bates number 403. Is this slide one that's being prepared for a meeting with Imperial?

A.      Yes, it is.

Q.      And do you see under supplier interests in General Mills that there are two sub-bullets?

Riippa - cross

11:41:27  1    A.      Yes.

11:41:28  2    Q.      And the second one is they don't really need us?

11:41:33  3    A.      Yes.

11:41:33  4    Q.      And you told me in your deposition that General

11:41:37  5    Mills' view is Imperial doesn't price its refined sugar to

11:41:42  6    win General Mills' business?

11:41:43  7    A.      That is correct.

11:41:44  8    Q.      In fact, Imperial's pricing to General Mills is

11:41:47  9    particularly higher than the pricing of other General Mills

11:41:51  10   suppliers, isn't that true?

11:41:53  11   A.      Yes.

11:41:54  12   Q.      Now, Mr. Riippa, you also attended the colloquium in

11:42:00  13   the spring of 2021, correct?

11:42:02  14   A.      I do not believe there was a colloquium in 2021.

11:42:07  15   Q.      You prepared slides in advance of a virtual

11:42:11  16   colloquium in 2021, right?

11:42:14  17   A.      Yes.

11:42:14  18   Q.      Please take a look at what's been marked as JTX 009,

11:42:19  19   sir, in your binder.  Is this a presentation that you helped

11:42:30  20   prepare in the ordinary course of your job duties at General

11:42:32  21   Mills?

11:42:32  22   A.      Yes, it is.

11:42:34  23   Q.      And at this time, General Mills had already entered

11:42:36  24   into its contracts for calendar year 2021 and it was

11:42:42  25   beginning the contracting process for calendar year 2022,

Riippa - cross

11:42:46 1  correct?

11:42:47 2  A.      That is correct.

11:42:47 3  Q.      Let's turn to the second slide in the deck, the one

11:42:50 4  that's titled NAR Sugar Book Summary Calendar 2021.  Do you

11:42:56 5  see that?

11:42:57 6  A.      Yes.

11:42:57 7  Q.      And this slide shows General Mills refined sugar

11:43:03 8  purchases from certain suppliers for calendar years 2017

11:43:08 9  through 2021; correct?

11:43:09 10  A.      Correct.

11:43:11 11  Q.      And General Mills' largest suppliers of refined sugar

11:43:15 12  by volume for those years were Michigan Sugar, NSM and

11:43:20 13  United, correct?

11:43:21 14  A.      That is correct.

11:43:22 15  Q.      And General Mills also purchased refined sugar from

11:43:26 16  Cargill, Western, Domino, Imperial, and CSC between 2017 and

11:43:32 17  2021; is that correct?

11:43:33 18  A.      That is correct.

11:43:34 19  Q.      And General Mills also bought refined sugar such as

11:43:38 20  powder sugar from Batory and Indiana during that time

11:43:42 21  period?

11:43:44 22  A.      Yes.

11:43:44 23  Q.      Were there other suppliers of refined sugar to

11:43:47 24  General Mills during that time period, sir?

11:43:52 25  A.      Yes.  McGill via Batory, related to the force majeure

Riippa - cross

11:44:02 1   purchases we needed to make.

11:44:04 2   Q.     And General Mills' sugar purchases for calendar year

11:44:08 3   2021 are reflected in this slide by the light purple bar;

11:44:13 4   correct?

11:44:13 5   A.     That is correct.

11:44:14 6   Q.     And is it true that in calendar year 2021, General

11:44:18 7   Mills purchased more refined sugar from each of NSM, United,

11:44:23 8   Michigan, Cargill, Western, and CSC than it did from

11:44:29 9   Imperial?

11:44:30 10   A.     It appears that it did, yes.

11:44:32 11   Q.     Of all the suppliers listed on this slide from whom

11:44:36 12   General Mills purchased refined sugar in 2021, Imperial was

11:44:40 13   the smallest; correct?

11:44:43 14   A.     I believe so.  Domino would be the smallest.  I don't

11:44:49 15   believe they have a bar.

11:44:50 16   Q.     Domino, you didn't buy any sugar from Domino in 2021,

11:44:54 17   correct?

11:44:54 18   A.     I don't believe so.

11:44:55 19   Q.     But of the ones that you were purchased refined sugar

11:44:59 20   from, Imperial was the smallest?

11:45:01 21   A.     Yes.

11:45:01 22   Q.     Do you see the text at the top of page 2 of JTX 009,

11:45:06 23   sir, that indicates the total quantity of refined sugar

11:45:10 24   General Mills purchased in calendar year 2021?

11:45:12 25   A.     Yes.

Riippa - cross

11:45:13 1    Q.      That's 750 million pounds?

11:45:17 2    A.      Correct.

11:45:17 3    Q.      General Mills bought a very small fraction of its

11:45:21 4    overall sugar purchases, about one percent from Imperial in

11:45:24 5    calendar year 2021, correct?

11:45:27 6    A.      I believe so.

11:45:27 7            THE COURT:  Is this document, I mean, is this

11:45:29 8    one that we're only doing on the small screen and not on the

11:45:32 9    big one?

11:45:34 10           MR. YATES:  Yes, Your Honor.  General Mills has

11:45:37 11   asked that it be kept confidential.

11:45:39 12           THE COURT:  That's okay.  For the reasons set

11:45:41 13   forth in their submissions, I granted that, I just want to

11:45:45 14   make sure.

11:45:46 15           MR. YATES:  I appreciate it.  I think we can do

11:45:49 16   it all on the public record.

11:45:51 17           THE COURT:  This one, okay.

11:45:53 18   BY MR. YATES:

11:45:54 19   Q.      Do you see on the right-hand portion of this same

11:45:57 20   slide it says 90 percent of GMI book is beet sugar?

11:46:02 21   A.      Yes.

11:46:02 22   Q.      That means that in 2021, 90 percent of General Mills

11:46:12 23   sugar purchases were beet?

11:46:12 24   A.      Correct.

11:46:14 25   Q.      Imperial is a cane only supplier?

Riippa - cross

11:46:17 1    A.     Yep correct.

11:46:18 2    Q.     The percentage of refined sugar that was beet sugar

11:46:21 3    that General Mills made that increased from eight percent in

11:46:27 4    2020 to 9 percent in 2021, correct?

11:46:29 5    A.     I do not recall the specifics of that number.

11:46:31 6    Q.     By 2021 there was 90 percent, correct?

11:46:34 7    A.     Correct.

11:46:35 8    Q.     In 2021 according to the same slide, cane suppliers

11:46:40 9    lost share at General Mills due to cost, correct?

11:46:43 10   A.     That is correct.

11:46:44 11   Q.     Domino is a cane only supplier, correct?

11:46:47 12   A.     Correct.

11:46:47 13   Q.     And General Mills made no purchases in 2021 from

11:46:51 14   Domino, correct?

11:46:52 15   A.     I believe so, correct.

11:46:53 16   Q.     And between 2020 and 2021, United lost volume to

11:46:59 17   General Mills, isn't that true?

11:47:02 18   A.     Yes.

11:47:04 19   Q.     And that was because of United inability to meet

11:47:08 20   General Mills' price targets, correct?

11:47:11 21   A.     I cannot recall the specifics.

11:47:12 22   Q.     Well, let's take a look at DTX-098.

11:47:30 23          For the record DTX-098, is that an e-mail from

11:47:33 24   your boss at the time, Christophe Laurent to a variety of

11:47:40 25   individuals at General Mills attaching a PowerPoint slide?

Riippa - cross

11:47:42  1    A.        Christophe is a peer sourcing manager to me, yes, our

11:47:47  2    sourcing leadership.

11:47:48  3    Q.        Fair enough.

11:47:49  4              If you go to the second page of this document,

11:47:51  5    sir.  This page is seeking approval of General Mills sugar

11:47:59  6    purchase contracts for calendar year 2021; correct?

11:48:03  7    A.        That is correct.

11:48:04  8    Q.        And you see that it says under C 21 allocation?

11:48:10  9    A.        Yes.

11:48:10 10    Q.        United's volume decreases and it's got a number based

11:48:14 11    on inability to reach target price submitted by General

11:48:19 12    Mills?

11:48:19 13    A.        That is correct.

11:48:19 14    Q.        So General Mills set a target price and if United

11:48:23 15    didn't meet it, their volume was going to go down, correct?

11:48:26 16    A.        I believe so.

11:48:27 17    Q.        In fact, if you go up in this document, sir, do you

11:48:30 18    see it talks about General Mills forcing pressure on all

11:48:34 19    suppliers who are expecting an earlier cover from General

11:48:38 20    Mills, do you see that, top of the page, sir, under context,

11:48:42 21    last paragraph, last sentence in the paragraph.

11:48:48 22    A.        Yes.  Yep.

11:48:52 23    Q.        Now, let's talk for a moment again about Imperial.

11:48:57 24    For calendar year 2022, General Mills didn't contract with

11:49:02 25    Imperial to supply any bulk sugar, correct, if Imperial was

Riippa - redirect

11:49:09 1    supplying less than one percent of General Mills' refined

11:49:12 2    sugar in 2021, correct?

11:49:13 3    A.      I believe so.

11:49:15 4    Q.      And Imperial supplied no bulk refined sugar to

11:49:19 5    General Mills in 2022; correct?

11:49:24 6    A.      That is correct.

11:49:27 7                  MR. YATES:  Your Honor, I would like to move

11:49:28 8    into evidence JTX-008, 009 and DTX-098.

11:49:33 9                  THE COURT:  Any objection?  There might be a

11:49:37 10   correction.

11:49:38 11                 MR. YATES:  007, my apologies.

11:49:40 12                 THE COURT:  Any objection?

11:49:41 13                 MS. SINKLER:  No.

11:49:41 14                 THE COURT:  All right.  Thank you.

11:49:43 15                 (The above exhibit were admitted into evidence.)

11:49:44 16                 MR. YATES:  No further questions, Your Honor.

11:49:45 17   Thank you.

11:49:46 18                 THE COURT:  Thank you.

11:49:47 19                 Redirect.

11:49:47 20                 MS. SINKLER:  Yes, Your Honor.

11:49:53 21                      REDIRECT EXAMINATION

11:49:53 22   BY MS. SINKLER:

11:50:03 23   Q.      On cross Mr. Yates asked you about CSC.  Can General

11:50:08 24   Mills use CSC to supply Covington, Georgia?

11:50:11 25   A.      We cannot.

Riippa - redirect

11:50:12 1  Q.      Why not?

11:50:13 2  A.      They are a liquid sugar supplier, not a bulk dry

11:50:17 3  granulated sugar supplier, and they do not have assets to

11:50:21 4  meet our needs in Covington.

11:50:24 5  Q.      You were also asked about Murfreesboro Tennessee.

11:50:28 6  When United is supplying sugar to Murfreesboro Tennessee and

11:50:34 7  bidding to supply Murfreesboro do they bid to supply from

11:50:38 8  Florida or the Red River Valley?

11:50:40 9  A.      Most assumptions would be based out of Florida and

11:50:43 10 then some conversation about either some quantity or

11:50:48 11 contingency plan from the Red River Valley if needed.

11:50:51 12 Q.      Is General Mills paying United based on a Florida

11:50:55 13 quoted price or a Red River Valley quoted price?

11:50:58 14 A.      Most are Florida.

11:51:02 15 Q.      You were also asked about Rome, Georgia.  How many

11:51:07 16 suppliers in total bid to supply Rome, Georgia for 2022?

11:51:12 17 A.      I cannot recall specifically.

11:51:17 18 Q.      You were also asked about Batory Foods.  Do you know

11:51:21 19 where Batory Foods obtains the refined sugar that it uses to

11:51:25 20 make the powdered sugar for General Mills?

11:51:28 21 A.      From United.

11:51:33 22 Q.      I want to refer you back to JTX-007.  And it's the

11:51:43 23 page that has Bates 403 ending in 403.  Do you see that?

11:52:07 24 A.      Yes.

11:52:09 25 Q.      Do you see under background it's well situated to

Riippa - redirect

11:52:14 1    serve the Covington plant as well as smaller southeastern

11:52:19 2    end points?

11:52:19 3    A.       Yes.

11:52:20 4    Q.       What does that mean?

11:52:21 5    A.       That means that I believe geographically they're

11:52:24 6    about, from the Savannah refinery to the Covington plant is

11:52:28 7    about an hour or so drive, and then also Rome, Georgia

11:52:32 8    facility is also not far away, so that was our comment, is

11:52:36 9    that they're very close geographically to our plants.

11:52:40 10            MS. SINKLER:  Thank you, Mr. Riippa.  I don't

11:52:42 11   have any further questions.

11:52:43 12            THE COURT:  Thank you very much, sir.  You are

11:52:45 13   excused.

11:52:46 14            What's next?

11:52:47 15            MR. HANNA:  Your Honor, Brian Hanna for the

11:52:49 16   United States.  At this time United States called Dirk Swart

11:52:51 17   to the stand.  Dirk Swart is the executive vice-president of

11:52:57 18   sales for United Sugars.

11:53:02 19            THE COURT:  Great.  Thank you.

11:53:54 20            COURT CLERK:  Please raise your right hand.

11:54:02 21   Please state and spell your full name for the record.

11:54:02 22            THE WITNESS:  Dirk Francis Swart, D-I-R-K,

11:54:10 23   F-R-A-N-C-I-S, S-W-A-R-T.

11:54:17 24            DIRK FRANCIS SWART, having been duly sworn was

11:54:18 25   examined and testified as follows:

Swart - direct

11:54:40  1                    MR. HANNA:  May I proceed, Your Honor?

11:54:41  2                    THE COURT:  Yes, please.

11:54:41  3                        DIRECT EXAMINATION

11:54:41  4    BY MR. HANNA:

11:54:42  5    Q.        Good morning Mr. Swart.

11:54:43  6    A.        Good morning.

11:54:44  7    Q.        Nice to see you again.  We handed you a binder on

11:54:48  8    your way up.  You may refer to that during your testimony

11:54:50  9    today.  I'll let you know when you need it.

11:54:53 10    A.        Okay.

11:54:54 11    Q.        Mr. Swart, you're the executive vice-president of

11:54:58 12    sales at United Sugar; right?

11:55:00 13    A.        Yes.

11:55:00 14    Q.        And you have been in that position since 2015

11:55:04 15    Murfreeboro correct?

11:55:05 16    A.        That's correct.

11:55:06 17    Q.        And you have been working at United Sugars since it

11:55:09 18    was created back in 1994; correct?

11:55:11 19    A.        That's correct.

11:55:12 20    Q.        And you, sir, oversee the sale and pricing for

11:55:17 21    industrial customers for United, right?

11:55:18 22    A.        Yes.

11:55:19 23    Q.        Now, an industrial customer is a food processor or a

11:55:24 24    distributors of retail?

11:55:26 25    A.        Right.

Swart - direct

Q.      General Mills, for example, would be an example of a industrial food processor, correct?

A.      Correct.

Q.      Batory Foods would be an example of a distributor or resale customer, right?

A.      Right.

Q.      Now, United is a marketing cooperator that is owned by four companies that produce sugar, right?

A.      That's correct.

Q.      And United's four owners are American Crystal Sugar, Minn-Dak Farmers Cooperative, Wyoming Sugar and US Sugar?

A.      That is right.

Q.      US Sugar has the refinery in Clewiston, Florida?

A.      Yes, sir.

Q.      And other owners of United are three sugar producers, right, three beet sugar producers, right?

A.      That's correct.

Q.      The beet sugar production plants are located in Minnesota, North Dakota, Montana and Wyoming, right?

A.      Yes.

Q.      And the area in Minnesota and North Dakota, Montana are referred to as Red River Valley at times?

A.      That's correct.

Q.      And United is the exclusive seller of the sugar produced by those four sugar producers, right?

Swart - direct

11:56:30 1    A.      That's correct.

11:56:31 2    Q.      Now, I want to talk about the type of refined sugar

11:56:33 3    that United sells.  United sells granulated sugar, right?

11:56:37 4    A.      Correct.

11:56:38 5    Q.      And granulated sugar is the white crystalized sugar

11:56:42 6    that we're all familiar with, right?

11:56:44 7    A.      That's right.

11:56:45 8    Q.      United Sugar sells powdered sugar, brown sugar and

11:56:49 9    liquid sugar, right?

11:56:50 10   A.      That's correct.

11:56:50 11   Q.      United sells granulated sugar in bulk form via truck

11:56:55 12   or railcar, right?

11:56:57 13   A.      That's correct.

11:56:58 14   Q.      And United Sugar also sells sugar in various size

11:57:02 15   packaging, right?

11:57:03 16   A.      That's correct.

11:57:04 17   Q.      United sells sugar in 25-pound bags and 50-pound bags

11:57:09 18   correct?

11:57:10 19   A.      That's correct.

11:57:10 20   Q.      United also sells super sacks to customers, right?

11:57:12 21   A.      Yes.

11:57:14 22   Q.      Super sacks are 2,000-pound bags?

11:57:18 23   A.      That is correct.

11:57:19 24   Q.      United also sells retail size bags, right?

11:57:22 25   A.      They do, yes.

Swart - direct

11:57:24  1    Q.       Now, some of United customers specified that they

11:57:28  2    require cane sugar only, right?

11:57:30  3    A.       That's correct, yes.

11:57:32  4    Q.       And for customers that specify cane only sugar, they

11:57:36  5    can't take beet sugar for that product, right?

11:57:38  6    A.       No, that's correct.

11:57:40  7    Q.       And for industrial customers, about 13 to 15 percent

11:57:45  8    of United's sales volume are for customers that specify cane

11:57:50  9    sugar only, right?

11:57:51 10    A.       Yeah, that's about right.

11:57:53 11    Q.       Now, let's talk about the process of United selling

11:57:56 12    sugar to customers.  United has sole discretion over pricing

11:58:00 13    of the sugar produced by the members owners; right?

11:58:03 14    A.       That's correct.

11:58:04 15    Q.       And you, sir, have full pricing authority to set the

11:58:07 16    prices for industrial customers; right?

11:58:09 17    A.       Correct.

11:58:10 18    Q.       Now, the financial return that gets paid back to

11:58:13 19    United owners is what's called the net selling price; is

11:58:17 20    that right?

11:58:17 21    A.       Yes, sir.

11:58:18 22    Q.       And the net selling price is sometimes abbreviated as

11:58:21 23    NSP, correct?

11:58:22 24    A.       Correct.

11:58:22 25    Q.       Now, the net selling price is generally the net

Swart - direct

revenue from the customer minus the cost to make that sale, right?

A.      That's correct.

Q.      And net revenue is the delivered price to have the customer pay?

A.      That's correct.

Q.      The delivered price is the price you have sugar delivered to a particular customer's location; right?

A.      That's correct.

Q.      The transportation cost is a component of the delivered price, right?

A.      Right.

Q.      United paid each owner the net selling price multiplied by the volume of sugar that that owner contributed to the pool for that year; right?

A.      That's correct.

Q.      So each owner of United benefits financially from each sale of sugar regardless if that owner produced the sugar; is that right?

A.      That's correct.

Q.      For example, US Sugar does not have the capability of produce powdered sugar, right?

A.      That's right.

Q.      But one of United owners, American crystal does produced powdered sugar, right?

Swart - direct

11:59:23 1    A.      That's right.

11:59:24 2    Q.      So US Sugar benefits financially from United sale of

11:59:28 3    that powdered sugar produced by American Crystals, right?

11:59:31 4    A.      Right.

11:59:32 5    Q.      Now, sir, part of your job function is to maximize

11:59:36 6    the net selling price of the sugar, right?

11:59:38 7    A.      That's correct.

11:59:39 8    Q.      And United does set the minimum margins for its sales

11:59:44 9    managers to obtain, correct?

11:59:47 10   A.      I don't think I would say that, no.

11:59:49 11   Q.      You don't set minimum margins for your sales

11:59:54 12   managers?

11:59:54 13   A.      We do not.

11:59:55 14   Q.      I took your deposition back in September of 2021.  Do

11:59:59 15   you recall that?

12:00:00 16   A.      Yes, I do.

12:00:01 17   Q.      I would like you to turn to your deposition,

12:00:07 18   page 139, sir?

12:00:08 19   A.      Could you tell me what tab again, please.

12:00:10 20   Q.      It should say CID depo on the exhibits.

12:00:11 21   A.      Okay.

12:00:18 22   Q.      For correction, your deposition was October 6, 2021.

12:00:20 23   Do you see that?

12:00:22 24   A.      Yes.

12:00:27 25   Q.      If you could flip to page 139, sir, and I'm going to

Swart - direct

| | |
|---|---|
| 12:00:32 | 1 |
| 12:00:39 | 2 |
| 12:00:40 | 3 |

1  direct your attention to line 13 first.

2  A.      What line, please?

3  Q.      Page 139, lines 13 through 18.

4  A.      Yeah, I think this is a matter of semantics.  We set

5  minimums for the sales managers as I stated here, but we

6  don't refer to it as margins.  We set a minimum net selling

7  price at which they are free to accept sales from customers,

8  below that they have to advance that opportunity for

9  approval.

10  Q.      At your deposition I did ask you the question:   "Did

11  you set a minimum margin that United looks to obtain?"

12          And your answer was:   "We set minimums for sales

13  managers."

14          Correct?

15  A.      Yes.

16  Q.      You provide exceptions to this minimum sales price

17  but based on the number of competitors that are involved in

18  bid, right?

19  A.      Would you repeat that for me, please?

20  Q.      Do you provide minimum margins or minimum selling

21  price for your managers to obtain, but you have exceptions

22  based on the number of competitors that are involved in a

23  bid; right?

24  A.      Well, sir, I wouldn't say that we -- I wouldn't say

25  that's true.  We make exceptions, but it doesn't necessarily

Swart - direct

12:01:52 1   matter how many competitors are involved on that particular

12:01:57 2   piece of business.  We do make exceptions, but it's based on

12:02:02 3   a host of factors.

12:02:05 4   Q.      Can you look at the same line, page 139 of your

12:02:09 5   deposition, lines 13 through 18, "Question:  Do you set

12:02:12 6   minimum margins that United is looking to obtain?"

12:02:16 7            "Answer:  And we set minimums for the sales

12:02:19 8   managers, but there are -- there are exceptions to those

12:02:22 9   based on the number of -- the competitors that are involve."

12:02:24 10           Do you see that?

12:02:27 11  A.      I see that.

12:02:28 12  Q.      Did I ask you that question and did you give me that

12:02:31 13  answer?

12:02:31 14  A.      Yes, sir, I did.

12:02:32 15  Q.      If there are more competitors bidding then that

12:02:35 16  increases the likelihood that one of these exceptions to the

12:02:39 17  minimum has to be made, right?

12:02:41 18  A.      Yes.

12:02:41 19  Q.      And United is the one negotiating with customers for

12:02:42 20  the sale of sugar on behalf of its owners, right?

12:02:46 21  A.      That's correct.

12:02:48 22  Q.      And during these negotiations there is a give and

12:02:51 23  take between United and the customer related to price;

12:02:54 24  correct?

12:02:55 25  A.      Yes, sir.

Swart - direct

12:02:56 1   Q.       The level at which United competitors price their

12:03:02 2   sugar, strongly influences United price, right?

12:03:06 3   A.       Yes, sir.

12:03:06 4   Q.       I want to look at one of the negotiation with one of

12:03:09 5   your customers.   Pepsi is one of United's largest industrial

12:03:13 6   customers, is that correct?

12:03:14 7   A.       That is correct.

12:03:14 8   Q.       And United has competed against Imperial for Pepsi's

12:03:18 9   business at the locations in Wytheville, Virginia and

12:03:22 10  Atlanta, Georgia?

12:03:23 11  A.       We compete against Imperial there as well as other

12:03:27 12  people.

12:03:27 13  Q.       You compete against Imperial at Wytheville, Virginia

12:03:30 14  and at Atlanta, Georgia?

12:03:32 15  A.       That is correct.

12:03:32 16  Q.       A few years ago United was the supplier at the Pepsi

12:03:39 17  Wytheville, Virginia location?

12:03:39 18  A.       Yes.

12:03:40 19  Q.       And United lost the Pepsi Wytheville, Virginia

12:03:42 20  business to Imperial?

12:03:42 21  A.       Yes.

12:03:47 22  Q.       United was won that Pepsi Wytheville, Virginia

12:03:52 23  business back from Imperial, right?

12:03:52 24  A.       That's right.

12:03:54 25  Q.       I ask you to turn to PTX 416 in your notebook, sir.

Swart - direct

12:03:58  1   There is a tab that's labeled PTX 416 in your notebook.   Do

12:04:11  2   you have 416?

12:04:12  3   A.      I do.

12:04:13  4   Q.      PTX 416 is an e-mail from you, Eric Speece and Ted

12:04:18  5   Guy dated April 26, 2021, correct.

12:04:23  6   A.      Yes.

12:04:25  7            MR. HANNA:  Your Honor, at this time the United

12:04:26  8   States moves to admit PTX 416 into evidence.  I don't

12:04:30  9   believe there is any objections, or we will work them out.

12:04:33  10            MS. GIORDANO:  No objection.

12:04:34  11            THE COURT:  It's admitted.

12:04:36  12            MR. HANNA:  Your Honor, may we publish the

12:04:38  13   document?

12:04:38  14            THE COURT:  Any time it's admitted, you don't

12:04:39  15   have to ask.  Thank you.

12:04:41  16            MR. HANNA:  Thank you, Your Honor.

12:04:41  17            (PTX Exhibit No. 416 was admitted into

12:04:42  18   evidence.)

12:04:42  19   BY MR. HANNA:

12:04:44  20   Q.      Sir, Eric Speece is the director of strategic

12:04:47  21   accounts at United?

12:04:48  22   A.      That is correct.

12:04:49  23   Q.      He's the one that sent you the e-mail, correct?

12:04:51  24   A.      That's correct.

12:04:52  25   Q.      All right.  And Mr. Speece handles the Pepsi

Swart - direct

12:04:55  1    accounts, correct?

12:04:55  2    A.      Correct.

12:04:57  3              MS. GIORDANO:  Your Honor, I'm sorry to

12:05:00  4    interrupt.  This is one that is redacted, I think the

12:05:04  5    government knows that it should not be displayed.

12:05:08  6              MR. HANNA:  It should be the redacted copy.

12:05:11  7              THE COURT:  Thank you.

12:05:12  8              MR. HANNA:  Sorry about that, Your Honor.

12:05:13  9              THE COURT:  So I guess if it's redacted on the

12:05:17 10    public screen then we can't put the unredacted on my private

12:05:21 11    screen.  Let me pull it up in case -- okay, go ahead.

12:05:37 12              MR. HANNA:  Apologies, Your Honor.

12:05:38 13              THE COURT:  That's okay.

12:05:39 14    BY MR. HANNA:

12:05:39 15    Q.      At this time United was negotiating with Pepsi for

12:05:42 16    the 2022 business, right?

12:05:44 17    A.      That's correct.

12:05:45 18    Q.      I want to look at Mr. Speece, do you see where

12:05:51 19    Mr. Speece says Imperial freight to Wytheville?

12:05:56 20    A.      I do.

12:05:57 21    Q.      So, at the time of this e-mail, United had evidence

12:06:00 22    that Imperial was one of the suppliers to the Wytheville,

12:06:04 23    Virginia facility, right?

12:06:06 24    A.      Yes.

12:06:06 25    Q.      And United was competing against Imperial for this

Swart - direct

12:06:09 1    Pepsi Wytheville Virginia facility?

12:06:13 2    A.      Right.  Yes.

12:06:14 3    Q.      The only competitor that Mr. Speece mentions in this

12:06:17 4    e-mail was Imperial, right?

12:06:19 5    A.      That's correct.

12:06:20 6    Q.      And Mr. Speece is providing you Imperial's estimated

12:06:24 7    freight cost to deliver sugar by rail to the Wytheville,

12:06:28 8    Virginia facilities?

12:06:31 9    A.      Yes.

12:06:32 10   Q.      It's been redacted in the public screen, those are

12:06:35 11   estimated freight costs that United is estimating for

12:06:40 12   Imperial, right?

12:06:40 13   A.      That's right.

12:06:41 14   Q.      One of the locations, actually, sorry about that.  If

12:06:46 15   you look below that, you see where it says our price in

12:06:50 16   front of them is, and they be there is some numbers

12:06:53 17   redacted?

12:06:54 18   A.      Yes, I see that.

12:06:55 19   Q.      So at the time, United had already -- at the time of

12:07:00 20   this e-mail, United already made a bid for the Pepsi

12:07:04 21   business, right?

12:07:05 22   A.      That's correct.

12:07:07 23   Q.      And do you see below where it says, where Mr. Speece

12:07:11 24   says our price in front of them is and then there is a

12:07:14 25   dollar figure, and it says competitive discount of and then

Swart - direct

12:07:18  1    there is a redacted dollar figure?

12:07:21  2    A.    Yes, I see that.

12:07:22  3    Q.    And I'm trying -- the unredacted copy is in your

12:07:27  4    notebook, and I would ask you to look at the unredacted

12:07:30  5    copy.  I would caution you not to say the numbers aloud.

12:07:34  6    I'm going to try to do this confidentially.  Your counsel

12:07:38  7    redacted this.

12:07:39  8          So where it says competitive discount of and

12:07:43  9    then there is a dollar figure right next to that.  Do you

12:07:46 10    see that dollar figure?

12:07:47 11    A.    I do.

12:07:47 12    Q.    Now that dollar figure after the competitive discount

12:07:51 13    of, that represents the competitive discount per

12:07:54 14    hundredweight of sugar that you understood United had

12:07:57 15    offered Pepsi in this bid for its business; right?

12:08:02 16    A.    Yes, it was in our original offer, that's right.

12:08:05 17    Q.    Now, CWT is a measure of volume by hundredweight;

12:08:09 18    right?

12:08:09 19    A.    That's correct.

12:08:10 20    Q.    And 100 weight equals a hundred pounds?

12:08:12 21    A.    That's correct.

12:08:12 22    Q.    I want to look at what Mr. Speece told you next.  Do

12:08:16 23    you see Mr. Speece says, discuss giving Pepsi, then again

12:08:21 24    there was a redacted dollar figure there, per hundredweight

12:08:22 25    competitive discount decrease, do you see that?

Swart - direct

12:08:31  1    A.      I do.

12:08:32  2    Q.      That competitive discount number, that redacted

12:08:35  3    number, that that was the -- you understood that was an

12:08:39  4    additional competitive discount that United was willing to

12:08:43  5    give Pepsi for the business, right?

12:08:45  6    A.      That's correct.

12:08:46  7    Q.      Now, he next says we may be able to give them their

12:08:51  8    ask of, again there is a redacted specific dollar value.  Do

12:08:57  9    you see that?

12:08:57 10    A.      I do.

12:08:57 11    Q.      That second redacted dollar figure is the additional

12:09:01 12    discount for hundredweight that you understood Pepsi wanted

12:09:04 13    on top of the initial competitive discount that United

12:09:08 14    offered, correct?

12:09:08 15    A.      Correct.

12:09:09 16    Q.      You see Mr. Speece then identifies two conditions

12:09:14 17    that were in this negotiation with Pepsi, do you see that?

12:09:17 18    A.      I do.

12:09:19 19    Q.      So you understood that United asked Pepsi to consider

12:09:22 20    these conditions in order for United to consider this

12:09:22 21    additional competitive discount that Pepsi was asking for,

12:09:22 22    right?

12:09:32 23    A.      Yes, sir.

12:09:32 24    Q.      I want to look at condition number two.  For

12:09:35 25    condition number two you understood that United wanted Pepsi

Swart - direct

12:09:39 1    to increase Imperial's award volume for the Pepsi bulk rail

12:09:45 2    location, correct?

12:09:46 3    A.       Right.

12:09:47 4    Q.       As part of the condition, Mr. Speece tells you we

12:09:49 5    have our eye on Wytheville.  Do you see that?

12:09:51 6    A.       I do.

12:09:52 7    Q.       You understood Mr. Speece to be referring to the

12:09:55 8    Pepsi Wytheville, Virginia facility.

12:10:00 9    A.       I do.

12:10:01 10   Q.       You understood United was looking to get back into

12:10:03 11   the Pepsi Wytheville, Virginia facility after it lost the

12:10:09 12   business to Imperial?

12:10:12 13   A.       I do.

12:10:12 14   Q.       I would ask you to turn to PTX 417 in your notebook.

12:10:24 15   Do you have that 417 pulled up?

12:10:27 16   A.       I do.

12:10:28 17   Q.       PTX 417 is an e-mail from Eric Speece to some people

12:10:33 18   at Pepsi and he has copied you?

12:10:36 19   A.       Yes, sir.

12:10:36 20   Q.       PTX 417 is a follow-up e-mail to the negotiation of

12:10:41 21   the Pepsi?

12:10:42 22   A.       Yes.

12:10:43 23           MR. HANNA:  Your Honor, United States admits to

12:10:46 24   admit PTX 417 and any objections that we worked out.

12:10:50 25           MS. GIORDANO:  No objection, but I believe it is

Swart - direct

12:10:51 1    a confidential document.

12:10:52 2                    THE COURT:  Okay.

12:10:53 3                    (PTX Exhibit No. 417 was admitted into

12:10:55 4    evidence.)

12:10:55 5    BY MR. HANNA:

12:10:56 6    Q.      Sir, please turn to the bottom of page 2 to the

12:10:58 7    e-mail from Fany Fernandez.  It's at 3:48 p.m.  Do you see

12:11:05 8    that, sir?

12:11:05 9    A.      I do.

12:11:06 10   Q.      This is on page 2?

12:11:07 11   A.      I have got it.

12:11:08 12   Q.      Now, Fany Fernandez is the manager level purchasing

12:11:12 13   agent at Pepsi, right?

12:11:14 14   A.      I think she's director level.

12:11:16 15   Q.      Director level?

12:11:17 16   A.      Yes.

12:11:18 17   Q.      And do you see where she writes, please review the

12:11:22 18   attached.  Overall the ask is of a -- and then there is

12:11:26 19   another redacted dollar figure there, additional discount.

12:11:30 20   Do you see that?

12:11:30 21   A.      I do.

12:11:31 22   Q.      You understood that Pepsi was, again, asking for an

12:11:35 23   additional price discount for hundredweight equal to that

12:11:39 24   dollar figure that's been redacted, right?

12:11:42 25   A.      Correct.

Swart - direct

12:11:43  1    Q.      Now, let's turn the page.  Do you see there is some

12:11:48  2    bullet points that Ms. Fernandez has there.  She wrote the

12:11:53  3    proposal considers the following volume allocation and terms

12:11:58  4    and there are some bullet points.  Do you see that?

12:12:00  5    A.      No, I'm sorry.  Oh, I do, I see it is on the next

12:12:05  6    page.

12:12:06  7    Q.      Yes, sir.  Page 3?

12:12:08  8    A.      Sorry.

12:12:08  9    Q.      No need to apologize.

12:12:10 10            So the first bullet point, do you see where

12:12:13 11    Ms. Fernandez says including blue ridge as originally

12:12:17 12    requested?

12:12:17 13    A.      I do.

12:12:17 14    Q.      So Blue Ridge is the Pepsi Wytheville Virginia

12:12:22 15    facility that we have been talking about today, correct?

12:12:24 16    A.      Correct.

12:12:25 17    Q.      You understand that United agreed to the additional

12:12:28 18    discount per hundredweight mentioned on the previous page,

12:12:32 19    then United would be awarded the business, right?

12:12:34 20    A.      That's correct.

12:12:36 21    Q.      So I want to look at, there is an attached

12:12:40 22    spreadsheet to this document, and Your Honor what we have

12:12:45 23    done here is for ease of asking the questions and the

12:12:50 24    agreement with the parties, we have provided a demonstrative

12:12:54 25    that just shows, it's quite large spreadsheet so we're

Swart - direct

12:12:59 1    showing part of the spreadsheet, I believe counsel has seen

12:13:03 2    them.   We're not marking as an exhibit the underlying

12:13:06 3    spreadsheet attachment will be entered as an exhibit.

12:13:10 4    BY MR. HANNA:

12:13:11 5    Q.    And, sir, this document, if you look at the

12:13:15 6    spreadsheet, do you see the spreadsheet in your note book

12:13:22 7    behind the--

12:13:23 8    A.    I do.

12:13:23 9    Q.    Can you pull it up on the screen.

12:13:38 10          Sir, the prices in the attached spreadsheet that

12:13:41 11   we're looking at are the final seller prices that United and

12:13:44 12   Pepsi agreed to for 2022; is that right?

12:13:47 13   A.    Well, this looks like only a portion of a much larger

12:13:53 14   spreadsheet.

12:13:56 15   Q.    Correct.

12:13:57 16   A.    Are we clear on that.

12:13:58 17   Q.    And if you want to view it on native I'm happy to

12:14:02 18   give it to you.

12:14:02 19   A.    No, I don't need it, but I want to make sure this

12:14:06 20   isn't being considered all of the Pepsi locations and

12:14:06 21   volume.

12:14:10 22   Q.    But the Pepsi locations that are displayed on that

12:14:13 23   demonstrative are locations that you bid on and they are the

12:14:17 24   final prices for those locations that you were awarded

12:14:22 25   volume, right?

Swart - direct

12:14:23 1    A.      Yeah, we were awarded volume to some of these

12:14:26 2    locations.

12:14:27 3    Q.      Now, this spreadsheet shows that United won the

12:14:31 4    Wytheville, Virginia business from 2022 back from Imperial,

12:14:35 5    right?

12:14:35 6    A.      We were -- yes, that's correct.

12:14:37 7    Q.      And if you look at rows I believe it's 34 and 35,

12:14:42 8    that is showing the terms and the price and the locations

12:14:47 9    for the Wytheville, Virginia business?

12:14:51 10   A.      That is correct.

12:14:52 11   Q.      In spreadsheet shows you increased the competitive

12:14:56 12   discount to win Wytheville, Virginia business?

12:15:00 13   A.      These competitive discounts are actually determined

12:15:04 14   by Pepsi.

12:15:04 15   Q.      So you agreed to an increase in competitive discount

12:15:08 16   with Pepsi, right?

12:15:09 17   A.      We agreed to an increase in the total competitive

12:15:13 18   discount, the individual locations and their competitive

12:15:16 19   discounts are determined by Pepsi.

12:15:18 20   Q.      And you agreed to those, right?

12:15:20 21   A.      We did.

12:15:21 22   Q.      Now, let's look at Row 8, column K.  Do you see that?

12:15:30 23   A.      Yes, sir, I do.

12:15:31 24   Q.      That dollar figure in cell K8 is the weighted

12:15:35 25   competitive average competitive discount across all Pepsi

Swart - direct

12:15:40 1   locations that United agreed?

12:15:41 2   A.      That's correct.

12:15:41 3   Q.      And you agreed to the prices of the sugar to the

12:15:44 4   Wytheville, Virginia facility from the Clewiston refinery?

12:15:49 5   A.      That's correct.

12:15:49 6   Q.      And United uses the Clewiston refinery to price the

12:15:53 7   share because the Clewiston refinery is the closest United

12:15:57 8   plant to the Wytheville?

12:15:58 9   A.      Right, that's consistent with our pricing convention,

12:16:03 10  yes.

12:16:03 11  Q.      Your price convention is that you priced the sugar

12:16:06 12  from the United, from the origin that's closest to the

12:16:11 13  customer; right?

12:16:12 14  A.      That's correct.

12:16:14 15  Q.      So you might price the sugar from Clewiston to the

12:16:21 16  location that's closest to Clewiston, right?

12:16:24 17  A.      That is correct.

12:16:25 18  Q.      You do elect sometimes to ship that sugar from

12:16:29 19  somewhere else?

12:16:29 20  A.      That's correct.

12:16:29 21  Q.      But the customer pays the price I believe it's from

12:16:32 22  Clewiston?

12:16:35 23  A.      That's right.

12:16:35 24  Q.      Now, if you look at that spreadsheet and you see the

12:16:42 25  competitive discount for Wytheville, Virginia in rows 34 and

Swart - direct

12:16:47 1   **35?**

12:16:48 2   A.      I do.

12:16:54 3   Q.      And I believe that's row 34 and 35, column K, right?

12:17:04 4   A.      Yes, that's correct.

12:17:05 5   Q.      And that was the competitive discount that you

12:17:08 6   offered and agreed to give Pepsi for the Wytheville,

12:17:12 7   Virginia business, right?

12:17:14 8   A.      Yes, that is.

12:17:14 9   Q.      And if you recall the earlier e-mail, that original

12:17:18 10  competitive discount that United offered to Pepsi, the

12:17:22 11  numbers in this spreadsheet are higher, right?

12:17:26 12  A.      They are to that location, that's correct.

12:17:28 13  Q.      To the Wytheville, Virginia location?

12:17:37 14  A.      That is correct.

12:17:38 15  Q.      I have some questions about United's strategy to

12:17:41 16  reduce sales to distributors in the Chicago area.  I would

12:17:47 17  like you to turn to PTX 507 now, sir.

12:17:57 18  A.      Okay.

12:18:00 19  Q.      PTX 507 is an e-mail from United's CEO Matthew

12:18:07 20  Wineinger dated July 15, 2019, and he copied you on this

12:18:11 21  e-mail?

12:18:11 22  A.      Yes.

12:18:11 23  Q.      And Mr. Wineinger is sending this e-mail with

12:18:15 24  attachment to the United board of directors, correct?

12:18:17 25  A.      Correct.

Swart - direct

12:18:18  1              MR. HANNA:  Your Honor, at this time United

12:18:20  2     States moves to admit PTX 507 into evidence.

12:18:24  3              MS. GIORDANO:  No objection.

12:18:24  4              THE COURT:  All right.  Thank you.

12:18:24  5              (PTX Exhibit No. 507 was admitted into

12:18:28  6     evidence.)

12:18:28  7     BY MR. HANNA:

12:18:29  8     Q.      Sir, I'm going to look at page 2 and look at the

12:18:32  9     agenda for this June 5th, 2019, United board meeting.  Sir,

12:18:38 10     you're listed on this agenda for the update of this two-year

12:18:44 11     audit of the Montgomery dome, right?

12:18:47 12     A.      I am.

12:18:48 13     Q.      Now the Montgomery dome is a storage facility in the

12:18:53 14     Chicago area where the United unloads railcar sugar and

12:18:57 15     transfer that sugar to Chicago area customers; is that

12:19:02 16     right?

12:19:02 17     A.      That is right.

12:19:03 18     Q.      And this dome was put online January 2017, is that

12:19:06 19     right?

12:19:06 20     A.      Yes, that's about right.

12:19:06 21     Q.      And you're recollection is the United Vice-President

12:19:12 22     of Finance, Kae Kaske, presented on this audit for the

12:19:16 23     Montgomery dome, is that right?

12:19:20 24     A.      Kae prepared the deck and did the presenting.

12:19:22 25     Q.      And you attended the presentation?

Swart - direct

12:19:25 1    A.      I did.

12:19:26 2    Q.      And you recall the presentation?

12:19:28 3    A.      I do.

12:19:32 4    Q.      If we can turn to slide 5, page 10 of 59.  Do you see

12:19:41 5    at the top where it says Montgomery post audit increase

12:19:46 6    customer revenue?

12:19:47 7    A.      I do.

12:19:47 8    Q.      Now this slide is describing the sales strategy that

12:19:51 9    United put in place in Chicago, right?

12:19:55 10   A.      Yes, it is.

12:19:56 11   Q.      In the Chicago area?

12:19:59 12   A.      Yeah.

12:20:00 13   Q.      I want to focus on the second bullet point where it

12:20:04 14   says strategy.  Do you see that?

12:20:05 15   A.      I do.

12:20:07 16   Q.      The first note about the strategy says eliminate

12:20:11 17   dependence on Batory Food, do you see that?

12:20:14 18   A.      I do.

12:20:17 19   Q.      Batory Foods is a distributor reseller in the Chicago

12:20:19 20   area that United relied on make sales to customers, right?

12:20:22 21   A.      That's not right, our dependence on Batory Food was

12:20:26 22   for car to truck transfer services and liquification

12:20:31 23   services that the bulk to truck transfer we no longer needed

12:20:36 24   because that's what Montgomery was built to do.

12:20:42 25   Q.      Because you built Montgomery you no longer needed

Swart - direct

12:20:46 1    Batory Foods and other distributors to provide that service

12:20:50 2    to United, right?

12:20:51 3    A.       Right.

12:20:52 4    Q.       One was the bulk rail to truck transfer, right?

12:20:55 5    A.       That's correct.

12:20:56 6    Q.       That would be instead of using Batory Food to help

12:20:59 7    with that, United would go sell directly to customer, right?

12:21:02 8    A.       That's correct.

12:21:05 9    Q.       I want to look at the second note, the second note

12:21:08 10   for strategy says increase direct bag shipments to

12:21:12 11   customers, do you see that?

12:21:13 12   A.       I do.

12:21:13 13   Q.       That strategy was to reduce the volume of bulk sugar

12:21:17 14   that United sold to distributors and instead sell 50 pound

12:21:22 15   bags direct to customers; correct?

12:21:24 16   A.       Well, yeah, the strategy was to sell more sugar

12:21:27 17   directly to small and medium size bag users.

12:21:33 18   Q.       Instead of selling to distributors, United would sell

12:21:36 19   direct to end user customers?

12:21:40 20   A.       Yeah, that's correct.

12:21:41 21   Q.       The third note here says increase prices to Chicago

12:21:42 22   area distributors, do you see that?

12:21:47 23   A.       I do.

12:21:48 24   Q.       So as a consequence of this strategy to eliminate

12:21:52 25   distributors, United was able to increase prices to

Swart - direct

12:21:57  1   distributors in the Chicago area, right?

12:21:59  2   A.      That's correct.  But this -- I didn't prepare this

12:22:04  3   slide, and I think it appropriate to say that increasing the

12:22:09  4   prices to Chicago area distributors was not part of the

12:22:12  5   original strategy.  We did end up getting more money from

12:22:17  6   distributors, we sold a lot of sugar to small and medium

12:22:20  7   size bag users, so that took some of the volume pressure

12:22:24  8   off, and prices to the Chicago area distributors did go up,

12:22:29  9   we were able to reduce the discount that we had to give

12:22:32 10   them.

12:22:34 11   Q.      Now, you considered the sales strategy in Chicago to

12:22:38 12   be a success, right?

12:22:39 13   A.      I do.

12:22:40 14   Q.      And this is sometimes called the Chicago strategy,

12:22:43 15   right?

12:22:44 16   A.      Correct.

12:22:44 17   Q.      And you eventually recommended a similar strategy to

12:22:49 18   be implemented in the southeast correct?

12:22:51 19   A.      Correct.

12:22:52 20   Q.      Let's look at that southeast market strategy.  I

12:22:55 21   would like you to turn to PTX 452 in your notebook, sir.

12:23:02 22   A.      I see that.

12:23:10 23   Q.      PTX 452 is a set of materials for a March 16, 2020,

12:23:15 24   United executive committee meeting.  Is that right?

12:23:18 25   A.      That is correct.

Swart - direct

12:23:19 1    Q.      United executive committee is comprised of the CEOs

12:23:24 2    of United owners including the CEO of US Sugar, Bob Buker,

12:23:30 3    is that correct?

12:23:30 4    A.      That's correct.

12:23:30 5    Q.      You attended this March 16, 2020, executive committee

12:23:34 6    meeting, right?

12:23:35 7    A.      I did.

12:23:35 8         MR. HANNA:  Your Honor, at this time United

12:23:37 9    States moves to admit PTX 452 into evidence.

12:23:40 10        THE COURT:  Any objection?

12:23:42 11        MS. GIORDANO:  No objection, Your Honor.

12:23:43 12        THE COURT:  Thank you.  It's admitted.

12:23:44 13        (PTX Exhibit No. 452 was admitted into

12:23:47 14   evidence.)

12:23:47 15   BY MR. HANNA:

12:23:47 16   Q.      Sir, I want to stick on the first page.  The first

12:23:50 17   page of PTX 452 is an approved agenda for this executive

12:23:55 18   committee meeting on March 16, 2020, is that right?

12:23:58 19   A.      Yes.

12:23:58 20   Q.      Let's focus on the strategic update.  Do you see

12:24:02 21   that?

12:24:02 22   A.      I do.

12:24:02 23   Q.      Now agenda subject number two is identified as

12:24:06 24   regional markets overview, do you see that?

12:24:11 25   A.      I do.

Swart - direct

12:24:12 1   Q.      And in the first subheading under regional markets

12:24:16 2   overview is Florida/Southeast market.  Do you see that?

12:24:20 3   A.      I do.

12:24:21 4   Q.      And then your name, sir, is identified in parenthesis

12:24:27 5   under this regional markets overview, right?

12:24:30 6   A.      It is, yes.

12:24:31 7   Q.      And you participated in the presentation to the

12:24:34 8   executive committee on the subject of regional markets

12:24:37 9   overview, right?

12:24:37 10   A.      You I don't remember presenting any of these

12:24:41 11   materials, the materials were prepared by Steve Hanson, and

12:24:44 12   as I recall it, he did the overwhelming majority of

12:24:49 13   presenting.  I don't recall presenting any of these

12:24:51 14   materials.

12:24:51 15   Q.      But you attended the meeting?

12:24:52 16   A.      I did.

12:24:53 17   Q.      And you attended the session when you discussed the

12:24:56 18   Southeast market and the regional market?

12:24:59 19   A.      I did.

12:25:00 20   Q.      Let's turn to the regional market overview

12:25:03 21   presentation, it starts on page 17.  So this is a regional

12:25:10 22   markets overview supplied that were provided to United, the

12:25:23 23   CEOs of United, right?

12:25:25 24   A.      Yes.

12:25:26 25   Q.      Now, and you reviewed this presentation before it was

Swart - direct

12:25:28  1    presented, right?

12:25:29  2    A.      I did.

12:25:30  3    Q.      Now, let's look -- turn to page 20 of this

12:25:33  4    presentation.  The numbers are on the top right.  Do you see

12:25:50  5    the --

12:25:50  6    A.      Yeah, I'm there.

12:25:51  7    Q.      Do you see the map?

12:25:52  8    A.      I do.

12:25:53  9    Q.      All right.  Now this is a map created by United that

12:25:56 10    shows markets where different sugar producers have freight

12:26:00 11    cost advantages, right?

12:26:02 12    A.      Yeah, it's a map that reflects groups of states and

12:26:07 13    identifies the producing locations within those groups of

12:26:11 14    states.

12:26:11 15    Q.      And the title of the slide is regional markets

12:26:14 16    overview, right?

12:26:15 17    A.      That's correct.

12:26:16 18    Q.      And that's regional markets is being referred to the

12:26:20 19    different collection of states that are in different colors,

12:26:22 20    right?

12:26:22 21    A.      Yeah, that's correct.

12:26:23 22    Q.      And each colored market represents the locations

12:26:28 23    where a sugar producer located in that market has a freight

12:26:33 24    cost advantage, right?

12:26:34 25    A.      That's correct.

Swart - direct

12:26:35 1    Q.        And this map was provided to the CEOs of United had

12:26:41 2    includes Bob Buker?

12:26:42 3    A.        That's correct.

12:26:43 4    Q.        The title of this slide is USC definition (supplier

12:26:47 5    backyard).  Do you see that?

12:26:48 6    A.        I do.

12:26:49 7    Q.        USC means United Sugar Corporation?

12:26:52 8    A.        That's correct.

12:26:52 9    Q.        And supplier backyards means the markets which the

12:26:56 10   producers that are identified in those markets have a

12:27:00 11   freight advantage, right?

12:27:01 12   A.        That's correct.

12:27:02 13   Q.        And the black triangles on this map represent the

12:27:07 14   beet sugar processing facilities, right?

12:27:09 15   A.        Yes, that's correct.

12:27:11 16   Q.        And the black triangles in the orange shaded market

12:27:14 17   are the beet sugar production plans of United and NSM in the

12:27:22 18   Red River Valley?

12:27:22 19   A.        That's correct.

12:27:22 20   Q.        And United's highest concentration of sales is in the

12:27:27 21   upper midwestern states, right?

12:27:31 22   A.        Yes, that's correct.

12:27:32 23   Q.        Now the red triangles on this map represent cane

12:27:37 24   refined sugar, right?

12:27:38 25   A.        That's correct.

Swart - direct

Q.      I want to focus on the collection of states that are shade had in red, the southeast location, do you see that?

A.      I do.

Q.      If a customer is located in the southeast market, US Sugar, Imperial and Domino have a freight cost advantage compared to competitors located outside that southeast market, right?

A.      That's what the map depicts.

Q.      Now, customers that United supplies in the southeast predominantly get sugar from the Clewiston refinery, right?

A.      Predominantly, yes.

Q.      And United's secondary of high concentration of sugar sold is in the southeast market; right?

A.      Yes, that's correct.

Q.      And customers located in a southeast market predominantly get sugar from a Clewiston refinery because Clewiston is the lowest cost way to get sugar to United's customers that are located in the southeast, right?

A.      Yes, that's right.

Q.      And the freight rate from Clewiston into the southeast market are lower than the Red River Valley to the southeast market; right?

A.      Yes, that's correct.

Q.      I want to turn to slide 34 of this regional market presentation.

Swart - direct

12:29:08 1    A.      Do you have a page number?

12:29:12 2    Q.      Page 34.  Ending in Bates number 2462, at the top it

12:29:34 3    says USC southeast strategy.

12:29:38 4    A.      Give me just a second.  Okay.  I see it.

12:29:47 5    Q.      Now, this southeast strategy slide is an overview of

12:29:51 6    what the United management was recommended to the executive

12:29:55 7    committee for sales strategy in the southeast market; right?

12:29:58 8    A.      That's correct.

12:29:59 9    Q.      Now, the left side of this southeast strategy slide

12:30:05 10   is focusing on the sales strategy for industrial customers;

12:30:09 11   right?

12:30:09 12   A.      That's correct.

12:30:11 13   Q.      And on the right side, it's focusing on the sales

12:30:14 14   strategy for the consumer or retail customers?

12:30:17 15   A.      Correct.

12:30:17 16   Q.      I want to focus on the left side, the industrial

12:30:20 17   customers.  Do you see where on the left-hand side slide it

12:30:24 18   says similar to Chicago strategy, do you see that?

12:30:28 19   A.      Yes.

12:30:29 20   Q.      This is referring to the Chicago strategy that we

12:30:32 21   talked about earlier in your testimony, right?

12:30:34 22   A.      That's correct.

12:30:34 23   Q.      And the recommendation was to apply the Chicago sales

12:30:38 24   strategy to the southeast market, right?

12:30:40 25   A.      That is correct.

Swart - direct

12:30:40 1    Q.       Now, the strategy was to margin up by selling more

12:30:44 2    bagged sugar to customers in the southeast market, right?

12:30:48 3    A.       That is correct.

12:30:49 4    Q.       Including 50-pound bags of sugar, right?

12:30:52 5    A.       Yes.   Specifically 50-pound bags.

12:30:56 6    Q.       Now, because United freight advantage out of

12:31:10 7    Clewiston, Florida, United saw an opportunity to win

12:31:13 8    business in the southeast market, right?

12:31:16 9    A.       Yeah, that's true, but I think the bigger issue was

12:31:21 10   that we saw an opportunity to ship more 50-pound fine gran,

12:31:25 11   which is an efficient product for us to manufacture and it

12:31:29 12   increases the net selling price.   So this -- we were focused

12:31:34 13   on the southeast but some of those bags were going to go

12:31:38 14   beyond that red state geographic group.

12:31:42 15   Q.       You saw an opportunity to increase the net selling

12:31:45 16   price into the southeast market, right?

12:31:48 17   A.       That's correct, yes.

12:31:49 18   Q.       50-pound bags is a profitable product for United, is

12:31:54 19   that correct?

12:31:54 20   A.       That's correct.

12:31:55 21   Q.       At the time of this slide, US Sugar did have 50-pound

12:32:00 22   bags packaging capability, right?

12:32:03 23   A.       Yes, we did.

12:32:04 24   Q.       U.S. Sugar still produces 50-pound bags out of

12:32:08 25   Clewiston?

Swart - direct

12:32:09 1    A.       That's correct.

12:32:10 2    Q.       Two 50-pound bagging lines?

12:32:12 3    A.       Yes.

12:32:12 4    Q.       Do you see the bullet point on this slide where it

12:32:15 5    says needs?

12:32:15 6    A.       I do.

12:32:16 7    Q.       United management was recommending, the United

12:32:21 8    management recommendation was to invest in adding 50-pound

12:32:24 9    bag and super sack packaging capability in Clewiston, right?

12:32:30 10   A.       That's correct.

12:32:32 11   Q.       But to your knowledge the southeast strategy being

12:32:36 12   recommended was not dependent on the acquisition of

12:32:39 13   Imperial; right?

12:32:40 14   A.       Yes, to my knowledge, it was not.

12:32:44 15   Q.       The Imperial acquisition means you no longer need to

12:32:49 16   invest in the bagging equipment at Clewiston to compete for

12:32:52 17   more sales in the southeast, right?

12:32:55 18   A.       Well, I don't know that, no.

12:32:56 19   Q.       Well, you understand, it's your understanding that

12:32:59 20   the money for this expansion has not been spent?

12:33:02 21   A.       That's correct.

12:33:02 22   Q.       And you understand that Imperial does have 50-pound

12:33:07 23   bag packaging capability at its refinery?

12:33:12 24   A.       Yes.

12:33:12 25   Q.       And you understand Imperial has super sack capable at

Swart - direct

12:33:17 1   it refinery in Georgia?

12:33:18 2   A.      I believe I understand that.

12:33:19 3   Q.      You believe that United with may not have to spend

12:33:22 4   money on packaging equipment at Clewiston if US Sugar

12:33:28 5   acquires Imperial?

12:33:29 6   A.      I don't know that.

12:33:30 7   Q.      Sir, I took your deposition back in February of this

12:33:33 8   year, do you recall that?

12:33:34 9   A.      I do.

12:33:35 10  Q.      I would like you to turn to your litigation

12:33:39 11  deposition at page 228?

12:33:51 12  A.      What page, please.

12:33:52 13  Q.      148, starting at line 24.  We're going to go through

12:33:59 14  page 149, line 11.  I'll read the question and answer when

12:34:05 15  you have a second to review it.  Are you on page 148

12:34:14 16  line 24?

12:34:15 17  A.      I am 4.

12:34:16 18  Q.      "Question:  How will United in your view benefit from

12:34:20 19  access to these additional packaging assets at Imperial?

12:34:24 20           "Answer:  Well, I believe that depending on how

12:34:27 21  -- what kind of capability there is for packaging 50-pound

12:34:31 22  bags as an example at Imperial that the benefits to United

12:34:34 23  would be that we would have those packaging assets and we

12:34:37 24  might not have to spend the money on the packaging equipment

12:34:40 25  at Clewiston."

Swart - direct

12:34:41 1  A.      I see that.

12:34:42 2  Q.      Did I ask you that question and did you give me that

12:34:44 3  answer?

12:34:45 4  A.      I did.

12:34:45 5  Q.      You can set PTX 452 aside.

12:34:49 6          Now, I would like you to turn to PTX 429 in your

12:34:54 7  notebook.

12:35:14 8  A.      Okay.

12:35:16 9  Q.      Sir, PTX 429 is an e-mail from updated February 11,

12:35:21 10 2021, that you sent to some of your colleagues at United,

12:35:24 11 right?

12:35:24 12 A.      I did.

12:35:25 13 Q.      And you sent this e-mail to a bunch of members of the

12:35:30 14 industrial sales team, right?

12:35:31 15 A.      Well, it's all the members of my team, yes.

12:35:34 16 Q.      All the members of the industrial sale team?

12:35:36 17 A.      Correct.

12:35:37 18         MR. HANNA:  Your Honor, at this time United

12:35:39 19 States moves to admit PTX 429 into evidence.

12:35:42 20         THE COURT:  All right.  It's admitted.

12:35:42 21         (PTX Exhibit No. 429 was admitted into

12:35:42 22 evidence.)

12:35:42 23         MR. HANNA:  I don't believe there are any

12:35:48 24 redactions on this.

12:35:50 25 BY MR. HANNA:

Swart - direct

12:35:50 1    Q.      Sir, in your e-mail you're providing your assessment

12:35:52 2    of a company called Sucro Sourcing, is that right?

12:35:56 3    A.      That's correct.

12:35:56 4    Q.      And prior to this e-mail, you had spoken to one of

12:36:00 5    Sucro Sourcing principles, Don Hill?

12:36:04 6    A.      That's correct.

12:36:05 7    Q.      And you and Mr. Hill talked about Sucro Source's

12:36:09 8    facility being built in Lackawanna, New York?

12:36:13 9    A.      Well, I had talked to, I had talked to him about it.

12:36:19 10   The reason for this e-mail was that there had been a

12:36:23 11   newspaper article I believe that appeared in the Buffalo

12:36:26 12   paper, and it had gotten whipped around the industry and

12:36:31 13   several of the people in my group were forwarding it and

12:36:37 14   were asking questions about what we do about what was going

12:36:41 15   on.

12:36:41 16   Q.      You went and endeavored to find out what you could

12:36:44 17   about this Sucro Sourcing facility in New York, right?

12:36:48 18   A.      Pardon?

12:36:49 19   Q.      You went and endeavored to assess what this facility

12:36:50 20   from Sucro Sourcing in Lackawanna, New York was?

12:36:59 21   A.      Well, there were questions coming as a result of the

12:37:02 22   article.

12:37:02 23   Q.      And your assessment of that facility in Lackawanna

12:37:06 24   from Sucro Sourcing is in the e-mail?

12:37:11 25   A.      I don't remember talking to Don Hill about it.  I

Swart - direct

12:37:14 1    don't think most of this information came either from the

12:37:16 2    article itself or from a guy by the name of Kyle Whitburg

12:37:20 3    from Sweeteners Supplies.

12:37:22 4    Q.    Let's look at what you said in your e-mail, sir.

12:37:25 5    A.    Okay.

12:37:26 6    Q.    Do you see where you said it small 40 to 50,000 ton

12:37:30 7    liquid operation?

12:37:31 8    A.    I do.

12:37:31 9    Q.    And by liquid operation, you mean Sucro Sourcing is

12:37:35 10   producing liquid sugar, right?

12:37:38 11   A.    That's correct.

12:37:39 12   Q.    I want to move down one paragraph.  Do you see where

12:37:46 13   you say so just one more CSC type operation.  Do you see

12:37:50 14   that?

12:37:50 15   A.    I do.

12:37:51 16   Q.    Now CSC is referring to another liquid sugar producer

12:37:56 17   called CSC Sugar, right?

12:37:58 18   A.    That's correct.

12:38:02 19   Q.    I want to go to, I think it's the very bottom of your

12:38:06 20   e-mail, and do you see where you say, "so, small, high color

12:38:11 21   liquid sucrose.  We don't like it, but it's hardly a threat

12:38:16 22   to our business."

12:38:17 23         Do you see that?

12:38:18 24   A.    I do.

12:38:18 25   Q.    That's what you wrote, right?

Swart - direct

12:38:21 1    A.      That's what I wrote, that's correct, because that

12:38:25 2    facility in Lackawanna, New York is not really in a market

12:38:31 3    that we participate aggressively in.

12:38:35 4    Q.      It was your assessment that Sucro Sourcing facility

12:38:38 5    was not a threat to United, right?

12:38:40 6    A.      Because it's in Lackawanna, New York, that is

12:38:45 7    correct.

12:38:45 8    Q.      You can set that document to the side.

12:38:48 9           Now, I want to talk about pricing information in

12:38:51 10   the market.  You testified at your deposition that customers

12:38:55 11   will sometimes convey your competitor's pricing, do you

12:38:59 12   recall that?

12:38:59 13   A.      Yes.

12:39:00 14   Q.      And that is true, right?

12:39:02 15   A.      It is true.

12:39:03 16   Q.      And the customer feedback usually includes how

12:39:07 17   United's pricing compares to United's competitors, right?

12:39:11 18   A.      Yes, that's correct.

12:39:12 19   Q.      And you testified at your deposition that you believe

12:39:15 20   customers use the pricing that they get from alternative

12:39:18 21   suppliers to leverage the price down from United, right?

12:39:21 22   A.      That's correct.

12:39:22 23   Q.      And this strategy of customers using pricing from

12:39:26 24   competitors to leverage prices down is proven to be

12:39:30 25   destructive for United, right?

Swart - direct

12:39:32 1    A.      No, that's correct.

12:39:33 2    Q.      And you believe this dynamic has been destructive

12:39:37 3    because prices get pushed down, correct?

12:39:40 4    A.      During the deposition process, that's correct.

12:39:42 5    Q.      Because they have pricing from your competitors?

12:39:45 6    A.      That's correct.

12:39:46 7    Q.      And you believe that the customers wanted United to

12:39:50 8    believe that they had the lower price in hopes that United

12:39:52 9    is going to continue to reduce its price, right?

12:39:55 10   A.      Correct.

12:39:56 11   Q.      So when competitors offer customers a lower price, it

12:40:00 12   can have an effect on pushing United's prices down?

12:40:04 13   A.      I'm sorry, would you say that again, please.

12:40:06 14   Q.      When competitors offer customers a lower price, it

12:40:10 15   can have an effect of pushing United's prices down, right?

12:40:14 16   A.      Yeah, that's correct.

12:40:16 17   Q.      But it's in United's interests to avoid its prices

12:40:21 18   being pushed down, right?

12:40:22 19   A.      Yeah, that's correct.

12:40:24 20   Q.      Now, if you had better information about what your

12:40:28 21   competitor's actual prices were, you could better avoid

12:40:32 22   these destructive situations, couldn't you?

12:40:37 23   A.      Yes.

12:40:37 24   Q.      Please turn to PTX 432 in your notebook.  Do you have

12:40:52 25   that?

Swart - direct

12:40:56 1    A.      I do.

12:40:57 2    Q.      PTX 432 is an e-mail from you to Mr. Speece and you

12:41:01 3    copied Steve Hanson, right?

12:41:04 4    A.      Yes.

12:41:05 5            MR. HANNA:   Your Honor, at this time the United

12:41:07 6    States moves to admit PTX 432 into evidence.

12:41:10 7            THE COURT:   All right.   Thank you.   It's

12:41:12 8    admitted.

12:41:13 9            (PTX Exhibit No. 432 was admitted into

12:41:14 10   evidence.)

12:41:14 11   BY MR. HANNA:

12:41:15 12   Q.      All right, sir.   I want to direct your attention to

12:41:18 13   the first -- to an e-mail from Mr. Speece from someone named

12:41:24 14   Rich at Commodity Information.   Do you see that e-mail?

12:41:29 15   A.      I do.

12:41:30 16   Q.      November 16, 2020.

12:41:32 17   A.      I do.

12:41:32 18   Q.      Rich at Commodity Information is somebody by the name

12:41:37 19   of Rich Wistisen?

12:41:39 20   A.      That is correct.

12:41:40 21   Q.      I understand Mr. Speece and Mr. Wistisen communicated

12:41:44 22   to each other?

12:41:44 23   A.      Yes, I do.

12:41:47 24   Q.      Mr. Speece is a direct report to you, right?

12:41:49 25   A.      That's correct.

Swart - direct

12:41:49 1    Q.      And you think Mr. Speece is one of the future leaders

12:41:53 2    at United, right?

12:41:55 3    A.      He has been identified, yeah.

12:41:58 4    Q.      Mr. Speece is part of a small group called the

12:42:04 5    Pricing Council that was formed at your suggestion, right?

12:42:08 6    A.      That's correct.

12:42:09 7    Q.      Now, I want to turn to the bottom of Mr. Wistisen's

12:42:14 8    e-mail to Mr. Speece.  Do you see Mr. Wistisen asked

12:42:20 9    Mr. Speece, what are you hearing on domestic and raw and

12:42:25 10   refined pricing?

12:42:26 11   A.      Yes.

12:42:27 12   Q.      He asked Mr. Speece where you would put both spot

12:42:32 13   prices and also forward beet prices, right?

12:42:36 14   A.      Yes, I see that.

12:42:37 15   Q.      Mr. Speece forwarded you this e-mail from

12:42:40 16   Mr. Wistisen with some questions.  I want to look at his

12:42:43 17   e-mail to you.  Back on the first page.  Do you see that,

12:42:48 18   sir?

12:42:48 19   A.      I do.

12:42:48 20   Q.      So Mr. Speece asked you, "Should I let him know we

12:42:52 21   are out of the market for the time being or selectively

12:42:52 22   selling?"

12:42:52 23           That's what he asked you, right?

12:42:52 24   A.      Yes, I see that.

12:42:52 25   Q.      But you actually wanted Mr. Wistisen to hear

Swart - direct

12:43:03 1   something more specific about United's pricing position than

12:43:06 2   what Mr. Speece was asking, right?

12:43:08 3   A.      Well, we participate in his pricing survey, so yeah,

12:43:14 4   I indicated the prices that should go into that survey, yes.

12:43:19 5   Q.      We'll look at your e-mail in a second, but

12:43:23 6   Mr. Speece's question to you didn't say anything about

12:43:25 7   giving Mr. Wistisen pricing or pricing strategy?

12:43:29 8   A.      No, that's correct.

12:43:30 9   Q.      Let's look at your response to Mr. Speece.  You wrote

12:43:34 10  here, "I'd like him to hear $36.50/$38 and probably moving

12:43:44 11  higher based on the strength of the booked position.  Stop

12:43:47 12  short of saying anything about being oversold."

12:43:51 13          That was the specific pricing information that

12:43:54 14  you wanted Mr. Wistisen to hear; right?

12:43:57 15  A.      Yes.

12:43:58 16  Q.      Now, the $36.50 that you refer to in your e-mail is

12:44:04 17  the beet price?

12:44:06 18  A.      Yes.

12:44:06 19  Q.      And the $38 you referenced in your e-mail is cane

12:44:10 20  price?

12:44:11 21  A.      That's correct.

12:44:12 22  Q.      When you said booked position, you're referring to

12:44:15 23  how far along United is to having its sugar sold out, right?

12:44:19 24  A.      That's correct.

12:44:20 25  Q.      That's sold position, right?

Swart - direct

12:44:22 1   A.      That's correct.

12:44:22 2   Q.      Now, when you say moving higher based on the strength

12:44:28 3   of the booked position, you wanted Mr. Wistisen to hear that

12:44:31 4   United was probably increasing its prices because its sold

12:44:35 5   position was strong, right?

12:44:36 6   A.      That's correct.

12:44:36 7   Q.      And you wanted Mr. Speece to convey to Mr. Wistisen

12:44:40 8   that there was pressure to increase United's prices giving

12:44:44 9   the strong sold position, right?

12:44:45 10  A.      I would say it differently, we had contemplating

12:44:49 11  moving the prices up because of the strength of the sold

12:44:51 12  position.

12:44:52 13  Q.      You were contemplating increasing prices in the

12:44:55 14  future and that's what you wanted Mr. Wistisen to hear?

12:44:58 15  A.      Well, yeah.

12:44:59 16          MR. HANNA:  No further questions.

12:45:01 17          THE COURT:  Thank you.

12:45:03 18          Ms. Giordano.

12:45:16 19          MS. GIORDANO:  Jennifer Giordano on behalf of

12:45:17 20  the defendants.

12:45:17 21          THE COURT:  Thank you.  Can you make sure you

12:45:17 22  speak up?

12:45:19 23          MS. GIORDANO:  Is this better?  No, is this

12:45:22 24  better?

12:45:22 25          THE COURT:  Yes.

12:45:24  1          MS. GIORDANO:  I got the right microphone.

12:45:26  2  Great.

12:45:26  3                  CROSS-EXAMINATION

12:45:26  4  BY MS. GIORDANO:

12:45:27  5  Q.      Mr. Swart, how long have you worked at United?

12:45:29  6  A.      I have been with the enterprise forty years.

12:45:31  7  Q.      Does that mean you have been selling sugar for about

12:45:34  8  forty years?

12:45:34  9  A.      Yes, ma'am.

12:45:35 10  Q.      And what responsibilities do you have for setting the

12:45:39 11  price at which United sells sugar to industrial customers,

12:45:43 12  like General Mills, for example, grocers?

12:45:46 13  A.      I have the pricing authority to enter into those

12:45:49 14  contracts.

12:45:49 15  Q.      Do you have any responsibilities for sales to

12:45:53 16  United's retail customers like grocers?

12:45:56 17  A.      No, I don't.

12:45:57 18  Q.      Who at United is responsible for that?

12:46:02 19  A.      Dave Sulsa.

12:46:02 20  Q.      How does the job of selling sugar to industrial

12:46:07 21  customers like you're responsible for compare to the job of

12:46:10 22  selling sugar to retail customers like grocers?

12:46:13 23  A.      Well, the selling process is different and frankly I

12:46:16 24  don't know a lot about that side of the business.

12:46:21 25  Q.      What percentage of United's business is sales to

12:46:26 1    industrial customers as compared to retail customers?

12:46:28 2    A.      It varies a little bit from one year to the next, but

12:46:32 3    typically it's 90 percent.

12:46:34 4    Q.      How does the sales process to an industrial customer

12:46:37 5    typically start?

12:46:38 6    A.      It starts with requests for a proposal or a request

12:46:42 7    for a quote.

12:46:45 8    Q.      Do you typically know who you're bidding against for

12:46:48 9    any particular request for proposal or request for quote?

12:46:52 10   A.      No, customers send those RFQs or RFPs out to a

12:46:58 11   variety of suppliers, they treat that information pretty

12:47:02 12   confidentiality and we rarely understand who is in.

12:47:06 13   Q.      Do you sometimes have some indication who you might

12:47:09 14   be bidding against for particular customers?

12:47:11 15   A.      Yeah, sometimes we do, and over the course of a

12:47:14 16   number of years, from time to time, it will come out in

12:47:19 17   conversation who might be serving one location or another.

12:47:23 18   Q.      You were asked a number of questions about exhibit

12:47:26 19   PTX 452.  That was the regional markets overview

12:47:30 20   presentation from March of 2020.  Do you recall those

12:47:34 21   questions?

12:47:35 22   A.      I do.

12:47:36 23   Q.      Can we put that up on the screen, please, this is not

12:47:39 24   confidential at page 222445.  Thank you.

12:47:44 25           Mr. Swart, what was the purpose of this regional

Swart - cross

12:47:48 1   markets overview?

12:47:49 2   A.      Well, the members of United had made decisions to

12:47:54 3   increase the amount of sugar that they were going to

12:47:57 4   produce, and so our job at United is first and foremost to

12:48:02 5   make sure that we get all the sugar sold, so this -- at this

12:48:06 6   regional markets overview we provided some background

12:48:09 7   information, and we looked at the most profitable ways for

12:48:14 8   us to be able to market that additional production.  And we

12:48:18 9   made recommendations for a 50-pound bag line at Clewiston

12:48:24 10  and we also looked at liquid sugar in the Chicago area.

12:48:29 11  Q.      Why were you discussing that 50-pound bag extension

12:48:33 12  in Florida at the time?

12:48:35 13  A.      Well, 50-pound bags are a profitable item for us.

12:48:40 14  The packaging upcharge that we get in the marketplace is

12:48:45 15  higher than the cost of producing those 50-pound bags.  So

12:48:51 16  all other things being equal, 50-pound bags tend to be a

12:48:55 17  little bit higher margin for us.

12:48:57 18  Q.      What does that mean for United's margins or for its

12:49:03 19  members?

12:49:02 20  A.      Well, it's a little bit higher net selling price on

12:49:07 21  50-pound bags than on bulk.

12:49:10 22  Q.      We talked about United's members a few times here, I

12:49:12 23  think you mentioned it earlier, but just who are United's

12:49:17 24  members?

12:49:17 25  A.      They are American Crystal Sugar headquartered in

12:49:21  1    Morgan, Minnesota.  Minn-Dak Farmers Cooperative is

12:49:25  2    headquartered in Wahpeton, North Dakota.  Wyoming Sugar is

12:49:30  3    in Worland, Wyoming.  And, of course, US Sugar in Clewiston,

12:49:35  4    Florida.

12:49:35  5    Q.    Who determines how much sugar each of those four

12:49:39  6    members produces each year?

12:49:41  7    A.    The individual members make their own production

12:49:44  8    decisions.

12:49:44  9    Q.    What role does United have in that?

12:49:47 10    A.    We have no role in determining how much sugar they

12:49:49 11    produce.

12:49:50 12    Q.    What are United's responsibilities with respect to

12:49:53 13    the refined sugar that each of its four members produces?

12:49:57 14    A.    Well, first and foremost it's our job to make sure

12:50:00 15    that we get that sugar sold and shipped each and every year.

12:50:04 16    And, of course, we're also focused on trying to generate the

12:50:08 17    highest net selling price that we can.

12:50:12 18    Q.    Does United have the option of just selling some of

12:50:17 19    the sugar that its members produced and not selling other

12:50:21 20    quantities or holding or storing other quantities?

12:50:24 21    A.    No, not getting all the sugar sold would be

12:50:27 22    unsatisfactory to the members.

12:50:28 23    Q.    We talked about the term net selling price a few

12:50:31 24    times today.  Can you explain what that is?

12:50:33 25    A.    Yeah, that's the revenue that we get from a sale,

Swart - cross

12:50:38 1   from any customer, and from that we subtract discounts and

12:50:42 2   allowances, we subtract freight costs, packaging,

12:50:48 3   warehousing costs and our own overhead, so it's what we

12:50:52 4   return to our owners as a result of the sale.

12:50:55 5   Q.      And is owner another term you use for your four

12:50:58 6   members?

12:50:59 7   A.      Yes.

12:50:59 8   Q.      Conceptually, so we make sure we're clear, what is

12:51:04 9   the difference between the return to your owners, to your

12:51:06 10  members and the price that the customer pays?

12:51:09 11  A.      Well, it's the price, the net selling price is the

12:51:12 12  price the customer pays, minus all of the expenses

12:51:15 13  associated with making that sale.

12:51:18 14  Q.      Does United seek to increase the return to its

12:51:23 15  members without necessarily increasing the price that the

12:51:26 16  customer is paying?

12:51:27 17  A.      Yeah, absolutely, that was the focus of the 50-pound

12:51:32 18  bag recommendation in Clewiston, we could generate a little

12:51:36 19  bit higher net selling price by installing that 50-pound bag

12:51:40 20  line without assuming any change in our prices, because we

12:51:42 21  produce those products efficiently.

12:51:42 22  Q.      Does raising the price to your customers, does that

12:51:51 23  necessarily mean that United is going to get a higher net

12:51:55 24  selling price or more money for its members?

12:51:55 25  A.      No.  You know, a lot of it has to do with selling and

12:52:01 1  shipping efficiently, and chasing, you know, a few pennies

12:52:07 2  higher on the delivered price, if that sugar is distributed

12:52:11 3  inefficiently or it's in a package that we don't make money

12:52:16 4  on, it does not necessarily mean that the net selling price

12:52:19 5  will be higher.

12:52:20 6  Q.     Just to be clear, does United prioritize selling its

12:52:24 7  sugar most efficiently or holding out for the highest price

12:52:29 8  it can get from the customer?

12:52:31 9  A.     No, we focus on selling and distributing efficiently.

12:52:35 10  Q.     Focusing back on this regional markets overview that

12:52:38 11  you were discussing earlier this morning, did any of the

12:52:41 12  strategies, the regional strategies you were talking about,

12:52:44 13  did any of those involve a plan to raise the price that the

12:52:47 14  customer was going to pay?

12:52:48 15  A.     No.

12:52:49 16  Q.     So what were you trying to do?

12:52:51 17  A.     What we were trying to figure out a way to sell more

12:52:54 18  higher margin product.

12:52:56 19  Q.     Now, the government asked you about a map, they

12:53:00 20  showed you a map in this presentation.  I want to start a

12:53:02 21  little bit earlier than that.  This is slide 19, before the

12:53:08 22  map the government showed you, one page before it.  Just for

12:53:12 23  the record, it's Bates stamped 2447.  What do the colors on

12:53:17 24  this map show?

12:53:18 25  A.     Those, it's the U.S. that is divided into USDA

12:53:24 1    regions, the way USDA would define regions in the U.S.

12:53:29 2    Q.      Just for the record, who is the USDA?

12:53:31 3    A.      That's the Department of Agriculture.  They're the

12:53:34 4    governing body of the sweetener market in the US.

12:53:39 5    Q.      If we click one more page to the next slide 20, 448

12:53:46 6    for the record, this is the map the government showed you.

12:53:49 7    What do the colors on this map, what's being conveyed here?

12:53:52 8    A.      These are just groups of states that have the

12:53:55 9    producing locations identified within them.  And it was our

12:54:00 10   assessment at a point in time of where those -- the states

12:54:05 11   in which the producing locations would have freight

12:54:09 12   advantage.

12:54:11 13   Q.      In the many years that you have worked at United, how

12:54:14 14   often have you seen United break up the country like this

12:54:17 15   with the states in these particular colors?

12:54:20 16   A.      Yeah, not ever before this.  We used this map in a

12:54:25 17   couple of presentations around that period of time.  But we

12:54:29 18   had never done this before and haven't done it since.

12:54:33 19   Q.      What's the more typical way that United thinks or

12:54:36 20   uses maps or what kind of a breakdown to you typically use?

12:54:40 21   A.      Well, all of the demand that's reported by USDA

12:54:44 22   regions, so those are the regions that we use when we

12:54:48 23   typically analyze the demand flows.

12:54:52 24   Q.      Now, what do the colors on this map mean to you in

12:54:57 25   your sort of day-to-day responsibility of selling sugar?

A.      Well, they don't mean anything.  And you know, I
think if you look at the dark green states, those producing
locations in Michigan, certainly Michigan can ship sugar to
Chicago that's in the orange area, in fact less expensively
than we can, Cargill and ASR, those two red dots near
Louisiana have freight rates that allow them to access to
the states that are identified as red.  It just, it doesn't
influence what we do in the normal course of business.

Q.      Let's move to the very next slide in the presentation
which is slide 21, for the record it's Bates stamped 449.
What is this map showing?

A.      This map tries to portray how sugar flows throughout
the U.S. from producing regions, the production will find
demand.  So in the red state areas, the producing locations
that are in that area actually ship sugar into the Midwest,
they ship sugar up the eastern seaboard, the refiners that
are near New Orleans, Louisiana ship sugar from those
refineries into the states that are in red, they ship sugar
into Chicago, they ship sugar up into the northeast.

        We ship sugar from the Red River Valley and NSM
ships sugar from Renville into the Gulf, the light green
shaded areas and down into the red state areas and there is
sugar produced as far away as the Pacific northwest that
finds itself all the way across the country.  I should
mention that we know that there is sugar that's produced in

Swart - cross

that geography that also finds it way into the red state

grouping.

Q.    Can you explain why it is that there are these arrows

all over this map with sugar flowing everywhere, why don't

the producers just sell close to home, why don't in the

yellow states they sell right into yellow states and keep

all their sugar there?

A.    That's a more efficient sale, but selling commodities

is not just a matter -- it becomes a matter of what's

available at a time.  So an opportunity that might come up

for one of those refiners in New Orleans to sell sugar in

Chicago, if it fits their margin requirements, or if it

meets their net selling price objectives, then they're

likely to take that sale at that time.  Holding sugar back

to sell it close to home is just -- it's not a realistic

strategy.

Q.    I think you mentioned a few times that this map

depicts where certain producers have something called a

freight advantage, do you recall that?

A.    I do.

Q.    Does having a freight advantage mean that you're able

to charge higher prices, for example to the customer in the

red states?

A.    No, not at all.  Any attempt to raise the prices is

going to attract volume, it's going to attract production

Swart - cross

12:58:27 1    from alternative places.

12:58:29 2    Q.      So what is the benefit of having a freight advantage

12:58:33 3    then?

12:58:33 4    A.      Well, it's a more efficient sale but it doesn't allow

12:58:40 5    you to increase the delivered price.

12:58:42 6    Q.      When you say it's a more efficient sale but you can't

12:58:47 7    raise the price to the customer what does it enable you to

12:58:50 8    do?

12:58:51 9    A.      It enables you to distribute it more efficiently, it

12:58:54 10   provides for lower freight costs.

12:58:56 11   Q.      Now, the government's theory in this case you

12:59:00 12   understand is that if US Sugar acquires Imperial, United is

12:59:05 13   going to have a freight advantage in those red states over

12:59:10 14   all the other sugar producing competitors in the country and

12:59:13 15   that's going to allow United, the seller of that sugar to

12:59:18 16   raise price to customers that are in those red states.  Do

12:59:21 17   you understand that's the government's theory?

12:59:23 18   A.      I do.

12:59:24 19   Q.      What's your reaction to that as a person responsible

12:59:26 20   for selling sugar for United?

12:59:28 21   A.      That's not going to be able to happen because any

12:59:31 22   attempt to raise prices, whether it be in the red state

12:59:34 23   areas or anyplace else, is going to attract production from

12:59:39 24   outside of that narrow geography.  So an attempt to raise

12:59:42 25   prices in Atlanta is going to attract more sugar from

Swart - cross

12:59:51 1   Cargill and ASR in the New Orleans area, it could attract

12:59:55 2   more sugar from NSM, it could attract more sugar from

13:00:01 3   Western, it could attract more sugar from Baltimore to North

13:00:06 4   Carolina, as an example.

13:00:07 5   Q.      If US Sugar acquires -- I mean, what is your

13:00:10 6   understanding about how much additional sugar you as United

13:00:15 7   might be responsible for selling?

13:00:16 8   A.      I think we -- our estimates are that they produce

13:00:20 9   between 12 and 15 million hundredweight of sugar per year,

13:00:25 10  so that would be a 20, 25 percent increase in the amount of

13:00:29 11  volume that we would have to sell.

13:00:31 12  Q.      And because that additional volume is coming from one

13:00:33 13  of your members, US Sugar, are you, United, will you be

13:00:39 14  responsible for selling all of that sugar?

13:00:41 15  A.      Responsible and obligated to sell it.

13:00:44 16  Q.      If you as United have an additional 20 to 25 percent

13:00:49 17  of sugar to sell, what does that mean for your ability to

13:00:53 18  raise prices, frankly anywhere in the country, but certainly

13:00:57 19  in these red states?

13:00:58 20  A.      It's kind of simple economics, right, we're going to

13:01:02 21  have 20 percent more sugar and it's going to be a difficult

13:01:06 22  task to get it all sold.  I don't see being able to raise

13:01:11 23  the price.

13:01:12 24  Q.      Does the cost of storing sugar, does that have any

13:01:16 25  role in how United prices its sugar?

Swart - cross

A.       It does.  Storing sugar is very expensive.  We built

that Montgomery storage facility.  It holds 1.3 million

hundredweight.  We spent $45 million on that, and on the

margin from time to time we have to put sugar into 2,500

pound tote boxes and the cost is about $3.50, $4.00 a

hundredweight, that's ten percent of the net selling price.

Storing that bulk sugar is an economic disaster.

Q.       You mentioned a few times if you did try to raise

prices, sugar would flow in from some of your competitors.

Who do you think of in particular when you think of who some

of the more aggressive ones are?

A.       Well, most price aggressive competitors of late have

been Cargill coming out of that Gramercy, Louisiana refinery

and NSM.

Q.       Are you aware that Cargill has announced plans to

increase the capacity at its refinery in Gramercy, Louisiana

by as much as 25 percent?

A.       I am.

Q.       What was your reaction when you heard that?

A.       Well, I, my reaction is my job is going to get a lot

tougher.

Q.       You mentioned Cargill and I think it was NSM as the

two most aggressive competitors.  What about Imperial?

A.       They are in the mix.  ASR is in the mix.  There are

places where we compete against CSC and Sucro Sourcing.  So

Swart - cross

13:02:59  1    they're in the mix.

13:03:02  2    Q.      The government alleges that if U.S. Sugar is allowed

13:03:06  3    to buy Imperial, that after the transaction the only two

13:03:09  4    major competitors that are going to be supplying customers

13:03:14  5    in that red state are Domino and United.  What's your

13:03:18  6    reaction to that?

13:03:19  7    A.      I think it's false.  I think Cargill is already

13:03:22  8    shipping sugar into that geography.  NSM is already shipping

13:03:28  9    sugar into that geography, there is sugar flowing from the

13:03:34  10   Red River Valley that that geography.

13:03:37  11   Q.      Does United have any intention of trying to raise

13:03:41  12   prices anywhere in the United States based on the fact that

13:03:43  13   US Sugar could own Imperial?

13:03:46  14   A.      No.

13:03:47  15   Q.      Now, you were also asked some questions in this

13:03:52  16   document and in another document that was PTX 507 about

13:03:55  17   something called United Chicago strategy with respect to

13:04:00  18   distributors.  Do you recall that?

13:04:00  19   A.      I do.

13:04:01  20   Q.      What is the Chicago strategy?  What was it?

13:04:06  21   A.      Well, we had several problems back in 13.  We were

13:04:12  22   handcuffed by poor rail service and bad weather conditions,

13:04:17  23   so the Chicago strategy set out to allow us to build a more

13:04:24  24   bulk capacity closer to the customers.  That was purpose of

13:04:25  25   building the dome, better serve customers, alleviate the

13:04:33 1    hang ups with the rail line.  And as a part of that

13:04:38 2    strategy, we set out to sell more bagged sugar to small and

13:04:42 3    medium sized customers.

13:04:45 4    Q.    So what effects did the Chicago strategy, the

13:04:49 5    strategy in Chicago, have in customers in that area, in

13:04:53 6    terms of their options for bagged sugar?

13:04:55 7    A.    So we were an additional solid option for a lot of

13:04:59 8    those customers.  We have had some success selling those

13:05:03 9    small and medium size bag customers.  And the ultimate

13:05:09 10   weight of price to those users went down.

13:05:14 11   Q.    Did United ever pursue any version of the Chicago

13:05:18 12   strategy in the southeast?

13:05:20 13   A.    No.

13:05:25 14   Q.    If US Sugar were allowed to acquire Imperial, does

13:05:32 15   United have any plans to stop selling sugar to distributors?

13:05:36 16   A.    No.

13:05:37 17   Q.    If United were to try to raise prices to distributors

13:05:41 18   in the southeast in those red states we were looking at,

13:05:44 19   what would happen?

13:05:45 20   A.    Well, they would fill that need from somebody else.

13:05:50 21   We've seen that in Chicago, Batory for example, previously

13:05:56 22   bought quite a bit of sugar from us, we don't sell them much

13:05:59 23   now but they have been able to replace those volumes from

13:06:02 24   alternative sources of supply.

13:06:06 25   Q.    How would you describe the nature of competition with

13:06:10 1    distributors in the Chicago area today?

13:06:12 2    A.      Well, they're intense competitors.  They have made a

13:06:17 3    living buying sugar from sellers at their weak point and we

13:06:23 4    compete aggressively against them.

13:06:27 5    Q.      Turning to another topic, the government showed you

13:06:30 6    an e-mail from someone at United named I remember Eric

13:06:36 7    Speece and it had to do with a communication that Mr. Speece

13:06:40 8    was having with a person named Rich Wistisen.  Do you recall

13:06:44 9    that e-mail?

13:06:44 10   A.      I do.

13:06:44 11   Q.      Who is Rich Wistisen?

13:06:47 12   A.      Rich Wistisen writes a monthly newsletter on sugar,

13:06:54 13   he normally recasts the spot pricing information in there,

13:06:59 14   but he's an analyst that writes a newsletter about the

13:07:03 15   industry.

13:07:05 16   Q.      Why did United or why does United share information

13:07:09 17   about itself with Mr. Wistisen?

13:07:11 18   A.      Well, we know he's going to share information and we

13:07:15 19   want the information that gets shared to be accurate.  It's

13:07:19 20   the same thing that we're telling our customers every time

13:07:22 21   the phone rings or every time there is an e-mail that needs

13:07:27 22   to be responded to, but we see a value in having the

13:07:32 23   information that he publishes be accurate.

13:07:35 24   Q.      You mean the information in his monthly report?

13:07:38 25   A.      That's correct.

Swart - cross

13:07:39  1   Q.      That's an industry wide report?

13:07:41  2   A.      It is.

13:07:42  3   Q.      Why does United care whether the information in

13:07:47  4   Mr. Wistisen's monthly report is accurate?

13:07:50  5   A.      Well, it's widely read by customers.  We also think

13:07:53  6   that the USDA reads that.  Reads other periodicals that

13:07:59  7   write on the industry, like Sosland Milling & Baking News

13:08:05  8   report, Jenkins, Frank Jenkins, JSG Commodities I think it

13:08:12  9   is writes virtually a daily report tracking the industry.

13:08:16 10   And it's read by all of the industry analysts and by USDA.

13:08:20 11   We want what's in there to be accurate.

13:08:23 12   Q.      All those different industry reports you mentioned,

13:08:26 13   do those generally all have the same types of information,

13:08:30 14   they report the same types of information?

13:08:32 15   A.      Yes, typically, yes.

13:08:33 16   Q.      What types of information did the United provide to

13:08:37 17   Mr. Wistisen for his monthly report?

13:08:40 18   A.      Well, we have made a habit of producing his -- of

13:08:46 19   giving him kind of our spot prices at the moment.  We might

13:08:51 20   indicate our sold position from time to time.  He'll ask

13:08:55 21   questions about crop development or if we have any news

13:08:58 22   about how recovery is going.  Which is I guess it's how the

13:09:05 23   recovery of sugar from slicing the sugar beets is going,

13:09:10 24   kind of a barometer of how production is progressing.

13:09:14 25   Q.      How often did United share this type of information

13:09:18 1  with Mr. Wistisen?

13:09:20 2  A.    I don't talk to him myself, but it's my belief that

13:09:24 3  Eric was talking to him about once a month.

13:09:27 4  Q.    You mentioned spot prices, I think.  Are those

13:09:31 5  sometimes called the list prices?

13:09:33 6  A.    Yes.

13:09:34 7  Q.    How much of United's sugar sales are sold on a spot

13:09:41 8  basis, at spot prices versus other prices?

13:09:44 9  A.    Yes.  It's very small.  We're a much more aggressive

13:09:48 10 forward seller.

13:09:49 11 Q.    Do customers have access to United spot prices?

13:09:54 12 A.    Yes, that's -- those are the prices that get quoted

13:09:57 13 any time anybody calls.  They're published in the portal.

13:10:02 14 They're readily available.

13:10:04 15 Q.    You mentioned the portal.  Is that a United website?

13:10:08 16 A.    Well, yeah, it's a -- yeah, it's a portal, it's a

13:10:14 17 customer relationship modeling tool.

13:10:19 18 Q.    And if I go on there today, can you see United's spot

13:10:23 19 prices?

13:10:24 20 A.    Yes.

13:10:25 21 Q.    Does United also share its spot prices and list

13:10:28 22 prices with prospective customers?

13:10:32 23 A.    Yes.

13:10:33 24 Q.    You mentioned the concept of sold position.  What is

13:10:36 25 that?

Swart - cross

A.      Well, it's just a percentage of how far along we are in getting -- gaining full commitment for all of the sugar that's being produced.

Q.      Does United sometimes share its sold position with customers?

A.      Yes, we do, freely.

Q.      And why does that make sense, why would you do that?

A.      Well, as the sold position approaches a hundred percent, we would have -- there would be a tendency to raise the prices, and customers in the name of good customer service, building good relationships, we would convey that sold position to inform the customer the prices might be going up and giving them an opportunity to buy before the price is advanced.

Q.      Is it important for example for the USDA to know when United might be starting to sell out for decisions that USDA might make?

A.      Yeah, it could be.

Q.      Does United sometimes provide its sold position to prospective customers, too?

A.      Yes, we do, it's information that is -- we use pretty freely.

Q.      The specific exhibit the government showed you was from November of 2020, if you recall it, and they were asking you about your indication to Mr. Speece that you

13:11:55 1    wanted to -- you wanted Mr. Wistisen to understand what your

13:11:59 2    current spot prices were and that there was a possibility

13:12:02 3    they might be going up.  Do you recall that?

13:12:04 4    A.      I do.

13:12:06 5    Q.      Was United telling customers that exact same thing at

13:12:10 6    that time in November 2020?

13:12:11 7    A.      Yes, we were.

13:12:13 8    Q.      And do the members of United's sales team typically

13:12:17 9    warn customers and prospective customers when it's

13:12:21 10   considering raising prices?

13:12:23 11   A.      Yes, we do.

13:12:25 12   Q.      Why does that make business sense?

13:12:27 13   A.      Because it helps us drive some additional sales

13:12:30 14   through the door to be honest with you, it helps get people

13:12:34 15   off the fence.

13:12:35 16   Q.      And things like crop yields, how the weather is doing

13:12:39 17   on the harvest, how the beets are slicing, are those

13:12:42 18   conversations you're having regularly with the customers?

13:12:44 19   A.      Yeah, the inquiries come in on all of those topics,

13:12:49 20   more frequently from sophisticated buyers but we share that

13:12:52 21   information freely, it's just part of helping the customer

13:12:52 22   stay informed about what's going on.

13:12:52 23   Q.      Does United share any information, provide any

13:13:02 24   information to Mr. Wistisen that it was not freely providing

13:13:02 25   to customers at the time it was providing it to

Swart - cross

13:13:08 1   **Mr. Wistisen?**

13:13:09 2   A.      **No.**

13:13:11 3   Q.      **As the person responsible for setting the price of**

13:13:14 4   **sugar for industrial customers, did you use the information**

13:13:17 5   **that Mr. Wistisen provided to Mr. Speece for any purpose in**

13:13:23 6   **setting any particular customer price?**

13:13:25 7   A.      **No, customer prices are unique, it's a unique**

13:13:32 8   **negotiation.**

13:13:35 9   Q.      **Is each one individualized?**

13:13:37 10  A.      **Yes.**

13:13:38 11  Q.      **When United provided information to Mr. Wistisen for**

13:13:43 12  **his monthly report, were you trying to coordinate with**

13:13:46 13  **Domino in some way?**

13:13:47 14  A.      **No.  No, there is no love lost between us and Domino.**

13:13:52 15  Q.      **The government asked you a number of questions about**

13:13:56 16  **a 2022 bid for Pepsi.  Do you recall that?**

13:13:59 17  A.      **I do.**

13:14:00 18  Q.      **And I think they talked an awful lot about the**

13:14:05 19  **Wytheville, Virginia plant, do you recall that?**

13:14:07 20  A.      **They did.**

13:14:07 21  Q.      **Is Wytheville, Virginia the only Pepsi plant United**

13:14:11 22  **was bidding on for 2022?**

13:14:11 23  A.      **No, as I recall it, there were -- I think there were**

13:14:17 24  **between 110 and 125 line items in that RFQ.  Some of them**

13:14:21 25  **were duplicates so I think there were probably in the**

13:14:26 1   vicinity, conservatively there were 75 to 80 locations in

13:14:32 2   that RFP.

13:14:33 3   Q.      How does United approach an RFP like that with Pepsi

13:14:38 4   that has so many plants, so many line items, is it plant by

13:14:44 5   plant or do you look at the bid holistically?

13:14:47 6   A.      No, it's about the totality of the deal.  See what we

13:14:52 7   care about is the 5.2 or 5 weight and the net selling price

13:14:57 8   that you have spin out of the bottom right-hand corner of

13:15:03 9   that spreadsheet.  We allow Pepsi to determine what level

13:15:09 10  they want to put those individual competitive discounts.

13:15:12 11  Q.      And the government asked you a number of questions

13:15:16 12  about sort of what he -- we went through one e-mail with

13:15:20 13  Mr. Speece and then went from one number to another number

13:15:25 14  and we won't talk about the numbers.  Does it matter to you

13:15:28 15  as United what particular number Pepsi decides to input for

13:15:33 16  any plant in terms of what competitive discount they put on

13:15:36 17  that chart?

13:15:37 18  A.      No, as I said, I think it was supported in the

13:15:40 19  e-mail, we increased the competitive discount across all of

13:15:42 20  the locations in all of the volumes.  And Pepsi then decides

13:15:47 21  what it is, how it is they want to divide those dollars up

13:15:51 22  among those individual use points.

13:15:52 23  Q.      For 2022, did United win the business at that

13:15:56 24  Wytheville, Virginia plant?

13:15:59 25  A.      We did.

Swart - cross

13:16:00 1  Q.      And what type of sugar does United supply into

13:16:04 2  Virginia?

13:16:05 3  A.      We took that business specifically to be able to ship

13:16:08 4  beet sugar in there.

13:16:09 5  Q.      And where does that beet sugar come from?

13:16:11 6  A.      The Red River Valley.

13:16:13 7  Q.      And what are those states again?

13:16:15 8  A.      Minnesota and North Dakota.

13:16:17 9  Q.      It's not coming out of Clewiston, Florida?

13:16:21 10 A.      Some of it may have come out of Clewiston, I think we

13:16:25 11 were a little long on cars at Clewiston as we entered into

13:16:29 12 the new year, I think we shipped a few.  But the

13:16:32 13 overwhelming majority of that sugar will be supplied from

13:16:36 14 the Red River Valley plants.

13:16:39 15 Q.      Why does --

13:16:40 16        THE COURT:  Do you want to take our lunch break?

13:16:43 17 Q.      This is my last question.

13:16:44 18        Why does it make any sense to ship that beet

13:16:46 19 sugar in from the Red River Valley all the way to --

13:16:50 20 A.      Well, the producers in the Red River Valley are

13:16:53 21 increasing their production, and this landing that spot was

13:16:57 22 part of number one job which is to ensure that we get all of

13:17:03 23 that sugar sold.

13:17:05 24 Q.      Thank you.

13:17:05 25        THE COURT:  All right.  Let's take our lunch

13:17:07 1  break.  We'll come back around 1:50.

13:17:57 2                  (A luncheon recess was taken.)

13:48:32 3                  THE COURT:  All right.  Please be seated.  Let's

13:53:16 4  continue.

13:53:18 5                  MS. GIORDANO:  Thank you, Your Honor.  Ready to

13:53:19 6  proceed?  I have no more questions, Mr. Swart.  Thank you.

13:53:26 7                  THE COURT:  Redirect.

13:53:27 8                  REDIRECT EXAMINATION

13:53:29 9  BY MR. HANNA:

13:53:31 10  Q.      Quick redirect, Your Honor.  Brian Hanna.  All right,

13:53:35 11  Mr. Swart, your counsel asked some questions about

13:53:40 12  industrial versus retail on your questions.  Do you recall

13:53:45 13  that?

13:53:45 14  A.      Yes.

13:53:46 15  Q.      And United produces or it sells retail products;

13:53:50 16  right?

13:53:50 17  A.      That's correct.

13:53:51 18  Q.      United has the retail brand, Crystal Sugar, right?

13:53:56 19  A.      That's correct.

13:53:56 20  Q.      United also sells retail to private labels as well,

13:54:01 21  correct?

13:54:02 22  A.      That's correct.

13:54:03 23  Q.      Can we look at PTX 452.  It's already been admitted

13:54:08 24  into evidence.  This is the regional market overview.  And I

13:54:12 25  want to look at row or slide 34, the USC southeast strategy

Swart - redirect

13:54:24  1    slide again.

13:54:34  2    A.      Okay.

13:54:36  3    Q.      So the right-hand side for the southeast strategy

13:54:39  4    includes the strategy for the consumer per retail sales for

13:54:43  5    United, right?

13:54:47  6    A.      Yes.

13:54:48  7    Q.      And do you see at the top the strategy says focus on

13:54:52  8    additional customer/lanes in the key markets for volume and

13:54:58  9    consuming while maintaining premium NSPs and alignment with

13:55:03 10    consumer sales strategic plan, do you see that?

13:55:05 11    A.      I do.

13:55:06 12    Q.      That was presented on the United board?

13:55:09 13    A.      Correct.

13:55:10 14    Q.      Do you see the needs below that?

13:55:12 15    A.      I do.

13:55:12 16    Q.      That's the recommended needs that the top management

13:55:17 17    at United were recommending to implement this sales strategy

13:55:22 18    for the southeast retail, correct?

13:55:24 19    A.      That's correct.

13:55:24 20    Q.      And bullet 1 underneath says additional full

13:55:28 21    portfolio pack size capability, ten-pound bags and specialty

13:55:33 22    for cane spec requirements desirable freight lanes without

13:55:40 23    adding capacity to balanced market; do you see that?

13:55:42 24    A.      I do see that, right.

13:55:44 25    Q.      That was part of the plan?

Swart - redirect

13:55:45 1    A.        That's what it says.

13:55:46 2    Q.        That was part of the plan for consumer retail

13:55:50 3    strategy in the southeast?

13:55:51 4    A.        Yes, that's retail.

13:55:52 5    Q.        And an additional part of the plan was to add sales

13:55:56 6    managers to open up and add new customers for consumer

13:55:59 7    retail, right?

13:56:00 8    A.        Yes, that's what's on.

13:56:01 9    Q.        That's the strategy for the southeast market, right?

13:56:05 10   A.        Correct.

13:56:06 11   Q.        Set that document aside now.

13:56:08 12            Now, when United sells 50-pound bags, it then

13:56:15 13   tells the owner that's producing the sugar how many bags of

13:56:19 14   50-pound bags of sugar to produce, right?

13:56:22 15   A.        Well, it's not quite like that.  The bag lines run.

13:56:29 16   We don't -- we're not really giving them daily instructions

13:56:33 17   about how much sugar to put into a 50-pound bag.  They fire

13:56:37 18   the lines up early in processing campaign and they continue

13:56:42 19   to run for months.

13:56:42 20   Q.        Based on how many -- how much sale --

13:56:42 21   A.        Yeah, anticipated sales over the course of the year.

13:56:52 22   Q.        And United provides the owners on a weekly basis how

13:56:52 23   much sugar in 50-pound bags United committed to sell, right?

13:57:05 24   A.        Well, I think it happens at a higher level than that.

13:57:11 25   We forecast demand monthly, I don't think -- I don't know

Swart - redirect

13:57:15 1   that there is any weekly communication about what to do with

13:57:18 2   the bag lines.

13:57:20 3   Q.       Now, your counsel asked you some questions about

13:57:25 4   Wytheville, Virginia facility do you recall that?

13:57:28 5   A.       Yes.

13:57:29 6   Q.       And they asked you some questions about Pepsi United

13:57:33 7   delivering beet sugar from the Red River Valley to the

13:57:37 8   Wytheville location, do you recall that?

13:57:38 9   A.       Yes.

13:57:38 10  Q.       You recall when I asked you questions, you testified

13:57:41 11  that United was actually pricing that sugar from the

13:57:45 12  Clewiston refinery, right?

13:57:47 13  A.       That's correct.

13:57:48 14  Q.       Pepsi is paying as if you're delivering that sugar

13:57:52 15  from Clewiston, right?

13:57:55 16  A.       That's the pricing convention that we use, yes.

13:57:56 17  Q.       Now, you also had some questions from your counsel

13:58:00 18  about customer portal, do you recall that?

13:58:03 19  A.       Yes.

13:58:02 20  Q.       I think she said, she asked you could just go on to

13:58:02 21  the portal and access United's pricing, do you recall that?

13:58:11 22  A.       Yes, I do.

13:58:11 23  Q.       Now, your counsel couldn't actually go on to the

13:58:11 24  portal and access that pricing right?

13:58:11 25  A.       Not without gaining previous access, that's right.

Swart - redirect

13:58:21 1    Q.      And the folks that have previous access of the portal

13:58:27 2    that can see your pricing is actual current customers of

13:58:30 3    United, right?

13:58:31 4    A.      Pardon?

13:58:32 5    Q.      Only your current customers can access the portals to

13:58:36 6    see your current pricing, right?

13:58:38 7    A.      That's true, yes.

13:58:39 8    Q.      Your competitors can't go on the portal and see your

13:58:43 9    pricing right?

13:58:44 10   A.      No, they cannot.

13:58:51 11           MR. HANNA:  No further questions, Your Honor.

13:58:53 12           THE COURT:  All right.  Thank you.  Thank you,

13:58:56 13   sir.  You are excused.

13:58:57 14           What's next?

13:59:06 15           MR. SANDROCK:  Good afternoon, Your Honor.  Ryan

13:59:07 16   Sandrock from the United States of American.  We will

13:59:10 17   proceed with our next witness.

13:59:11 18           THE COURT:  Yes.

13:59:13 19           MR. SANDROCK:  Your Honor, the United States

13:59:14 20   calls Steven Hanson, United's products director.

13:59:38 21           COURT CLERK:  Please raise your right hand.

13:59:42 22   Please state and spell your full name.

13:59:46 23           THE WITNESS:  Steven Hanson.  S-T-E-V-E-N,

13:59:51 24   H-A-N-S-O-N.

13:59:54 25           STEVEN HANSON, having been duly sworn was

Hanson - direct

13:59:56 1    examined and testified as follows:

13:59:56 2                    **DIRECT EXAMINATION**

13:59:56 3    BY MR. SANDROCK:

13:59:59 4    Q.    Good afternoon, Mr. Hanson.

14:00:01 5    A.    Good afternoon.

14:00:01 6    Q.    You should have a binder in front of you and you

14:00:04 7    don't need to look at it now, I'll direct it to you a couple

14:00:06 8    of times during the examination, it has some exhibits and a

14:00:10 9    copy of your deposition as well.

14:00:11 10              Can you please state your name for the record,

14:00:15 11   Mr. Hanson?

14:00:15 12   A.    Stephen Hanson.

14:00:16 13   Q.    And your currently employed by United Sugars,

14:00:19 14   correct?

14:00:20 15   A.    I am.

14:00:21 16   Q.    You have been at United for about twenty years,

14:00:24 17   correct?

14:00:24 18   A.    Pretty close, yes.

14:00:26 19   Q.    And your current position is, in fact, titled

14:00:29 20   Director of Industrial Products Bargaining?

14:00:31 21   A.    It is.

14:00:32 22   Q.    One of your activities at United is market analysis,

14:00:36 23   correct?

14:00:36 24   A.    Yes.

14:00:36 25   Q.    And United has a software program called the portal

Hanson - direct

14:00:40 1    that United uses for market analysis?

14:00:42 2    A.       Yes.

14:00:42 3    Q.       And you manage the portal?

14:00:45 4    A.       I do.

14:00:46 5    Q.       The portal can identify the most profitability set of

14:00:51 6    net selling price opportunities correct?

14:00:52 7    A.       That's one of its functions.

14:00:54 8    Q.       And freight costs are an input in United's modeling,

14:00:58 9    right?

14:00:58 10   A.       One of them, yes.

14:00:59 11   Q.       And freight costs are used in the portal?

14:01:01 12   A.       They are.

14:01:02 13   Q.       And freight costs vary, can vary by Zip code,

14:01:07 14   correct?

14:01:07 15   A.       They can.

14:01:08 16   Q.       And the portal takes into account driven differences

14:01:13 17   in freight cost by zip code, correct?

14:01:15 18   A.       They do.

14:01:16 19   Q.       And the portal also has something called a

14:01:19 20   competitive freight application, correct?

14:01:21 21   A.       That's correct.

14:01:21 22   Q.       And the competitive freight application is an

14:01:25 23   estimate of the competitor's freight costs from a certain

14:01:29 24   Zip code?

14:01:30 25   A.       From an origin to and from a Zip code, yes.

Hanson - direct

14:01:35 1    Q.      So it takes into account the to and from Zip code

14:01:40 2    that your competitors would ship from?

14:01:43 3    A.      Yes.

14:01:44 4    Q.      And Mr. Hanson, please turn to PTX 481 in your

14:01:50 5    binder.   There is an e-mail and a slip sheet for an Excel

14:01:55 6    attachment.  We show you the attachment, we will put it on

14:01:58 7    the screen in front of you have as a native.  Do you have

14:02:02 8    that in front of you, Mr. Hanson?

14:02:04 9    A.      I do.

14:02:05 10   Q.      And this is an e-mail you sent to Steve Hines;

14:02:11 11   correct?

14:02:11 12   A.      It is.

14:02:14 13              MR. SANDROCK:  Your Honor, there are no

14:02:15 14   outstanding objections to PTX 481 and the United States

14:02:19 15   moves to admit it into evidence.

14:02:22 16              MR. BUTERMAN:  No objection.

14:02:23 17              THE COURT:  It's admitted.

14:02:24 18              MR. SANDROCK:  Thank you, Your Honor.

14:02:24 19              (PTX Exhibit No. 481 was admitted into

14:02:24 20   evidence.)

14:02:24 21   BY MR. SANDROCK:

14:02:26 22   Q.      Mr. Hines is United Sugars vice-president of

14:02:29 23   strategy, correct?

14:02:29 24   A.      That's correct.

14:02:30 25   Q.      And Mr. Hines at some point asked you for a synergy

Hanson - direct

14:02:34  1  analysis of the transaction that is at issue in this case,

14:02:37  2  right?

14:02:38  3  A.      I believe so.

14:02:40  4  Q.      And this document might have been provided to him as

14:02:43  5  part of that analysis; correct?

14:02:44  6  A.      It might have.

14:02:46  7  Q.      This list identifies some locations utilized in your

14:02:51  8  competitive freight application, correct?

14:02:53  9  A.      That's correct.

14:02:55 10  Q.      And the third location listed on here is Port

14:02:59 11  Wentworth, that is Imperial's facility in Port Wentworth,

14:03:04 12  Georgia, correct?

14:03:05 13  A.      That's correct.

14:03:06 14  Q.      And the fourth location listed in have is Clewiston,

14:03:08 15  that's the US Sugar facility in Clewiston, Florida, correct?

14:03:13 16  A.      That's correct.

14:03:13 17  Q.      And both Clewiston and Port Wentworth are USDA

14:03:19 18  reporters correct?

14:03:20 19  A.      They are.

14:03:20 20  Q.      And USDA reporters are the refiners that are required

14:03:24 21  to report volumes to USDA, correct?

14:03:27 22  A.      That's correct.

14:03:27 23  Q.      And Mr. Hanson, we will turn to the spreadsheet.

14:03:33 24  Ms. Martinez if we could put up the spreadsheet in native

14:03:37 25  that is attached PTX.  I'm sorry, this is marked

Hanson - direct

14:03:42 1   confidential, I believe, counsel.

14:03:47 2         So Your Honor, I don't think we can show it on a

14:03:50 3   public screen.  But we could have it on the screen before

14:03:55 4   Mr. Hanson.

14:04:01 5         Do you see it, Mr. Hanson?

14:04:02 6   A.    I do.

14:04:04 7   Q.    And this it's --

14:04:06 8         THE COURT:  Mine just has the native, it's not

14:04:09 9   on there yet.  Okay.  Tell me what number this is again

14:04:11 10   because I can't see that.

14:04:14 11         MR. SANDROCK:  It is PTX 481, Your Honor.  Do

14:04:23 12   you have it, Your Honor?

14:04:24 13         THE COURT:  No.  Hold on.  Okay.  All right.

14:04:24 14   BY MR. SANDROCK:

14:04:36 15   Q.    Mr. Hanson, you prepared this spreadsheet, correct?

14:04:39 16   A.    I did.

14:04:40 17   Q.    And this is an output of the competitive freight

14:04:43 18   application, correct?

14:04:43 19   A.    I believe so.

14:04:44 20   Q.    And this spreadsheet had columns for freight costs;

14:04:46 21   correct?

14:04:46 22   A.    Yes.

14:04:50 23   Q.    And we can take that down.

14:04:56 24         And Mr. Hanson, you're modeling also helps

14:05:01 25   analyze the product mix for a particular location; correct?

Hanson - direct

14:05:06 1    A.      It includes the product mission for a certain

14:05:09 2    location, yes.

14:05:09 3    Q.      And Mr. Hanson, please turn to PTX 380 in your

14:05:16 4    binder.  And PTX 380 is an August 17, 2018, appointment

14:05:24 5    invitation for Mr. Hines to you and others with the subject

14:05:27 6    SE product mix status and next steps.  Do you have that in

14:05:32 7    front of you?

14:05:33 8    A.      I do.

14:05:34 9            MR. SANDROCK:  And, Your Honor, there are no

14:05:36 10   outstanding objections to PTX 380.  And we request to move

14:05:40 11   it into evidence.

14:05:40 12           MR. BUTERMAN:  No objection.

14:05:41 13           THE COURT:  Thank you.  It's admitted.

14:05:41 14           (PTX Exhibit No. 380 was admitted into

14:05:45 15   evidence.)

14:05:45 16           MR. SANDROCK:  Thank you, Your Honor.

14:05:45 17   BY MR. SANDROCK:

14:05:46 18   Q.      And your understanding is SE in the subject line

14:05:49 19   refers to the southeast?

14:05:52 20   A.      I believe so, yes.

14:05:55 21   Q.      And SE could also mean Clewiston because United

14:05:55 22   conflates the southeast and Clewiston product mix, correct?

14:06:02 23   A.      Yes, that's correct.

14:06:05 24   Q.      And your understanding is Mr. Hines was asking the

14:06:10 25   team to get together to talk about the potential

Hanson - direct

14:06:13 1    contribution of a base case facility?

14:06:16 2    A.    Yes, it looks like that is the case.

14:06:18 3    Q.    And if you look at the first bullet there, it says

14:06:22 4    using the 40-acre site adjacent to Clewiston's property,

14:06:26 5    that was the base case facility; correct?

14:06:33 6    A.    I believe so.

14:06:35 7    Q.    And Mr. Hines -- sorry?

14:06:37 8    A.    I believe so.

14:06:40 9    Q.    And Mr. Hines says that United should attack the

14:06:44 10   market like Chicago.  You understood that to be a reference

14:06:47 11   to the Chicago strategy?

14:06:49 12   A.    We do have a Chicago strategy, yes.

14:06:52 13   Q.    And you understood attack the market like Chicago to

14:06:56 14   be a reference to that strategy?

14:06:59 15   A.    I don't know about attack, but there is a reference

14:07:02 16   to the Chicago strategy, yes.

14:07:04 17   Q.    And attack the market like Chicago, is that reference

14:07:08 18   to the Chicago strategy?

14:07:11 19   A.    Yes.

14:07:12 20   Q.    And the Chicago strategy was a plan to ship bagged

14:07:17 21   product to small customers directly rather than using

14:07:20 22   distributors correct?

14:07:21 23   A.    Yes.

14:07:21 24   Q.    And you used the terms distributors and resellers

14:07:25 25   interchangeably, correct?

Hanson - direct

14:07:26  1    A.      Frequently, yes.

14:07:27  2    Q.      And you understood the reference to market in the

14:07:31  3    attack the market bullet to refer to the area around

14:07:36  4    Clewiston; correct?

14:07:39  5    A.      Yeah.  I mean, that's -- yes.

14:07:42  6    Q.      So that e-mail was from -- that invite was from 2018.

14:07:49  7    Let's move ahead to 2019.  In 2019, Mr. Hanson, you

14:07:55  8    continued working with Mr. Hines on a model that included

14:07:59  9    adding additional capacity in Clewiston; correct?

14:08:02 10    A.      That's correct.

14:08:03 11    Q.      And if you could please turn to PTX 483 in your

14:08:09 12    binder, Mr. Hanson.  So this is an e-mail and a slip sheet

14:08:16 13    for the Excel attachment.  Right now I would like you to

14:08:20 14    please just look at the e-mail.  Do you have that in front

14:08:23 15    of you have?

14:08:24 16    A.      I do.

14:08:25 17    Q.      And you wrote this October 2019 e-mail; correct?

14:08:29 18    A.      I did.

14:08:29 19    Q.      And you put together the sales plan that was attached

14:08:34 20    to this e-mail?

14:08:35 21    A.      In conjunction with our sales team, that's correct.

14:08:40 22             MR. SANDROCK:  And, Your Honor, there are no

14:08:42 23    outstanding objections to PTX 483, the United States ask to

14:08:45 24    move it into evidence.

14:08:46 25             MR. BUTERMAN:  No objection.

Hanson - direct

14:08:47 1          THE COURT:  Thank you.  It's admitted.

14:08:49 2          (PTX Exhibit No. 483 was admitted into

14:08:50 3    evidence.)

14:08:50 4    BY MR. SANDROCK:

14:08:51 5    Q.      I said your e-mail but this e-mail expressed the

14:08:54 6    views not just of yourself but of a collected group of

14:08:59 7    United employees, correct?

14:09:00 8    A.      That's correct.

14:09:00 9    Q.      And you got feedback from multiple people before

14:09:04 10   sending this e-mail, correct?

14:09:05 11   A.      I did.

14:09:06 12   Q.      And you ran the model and portal and landed on the

14:09:09 13   plan set forth in point 1; correct?

14:09:11 14   A.      Yes, that's correct.

14:09:13 15   Q.      And part of the plan is set forth in 1D, and it

14:09:18 16   included adding additional 50-pound granulated bags in

14:09:26 17   Clewiston?

14:09:27 18   A.      Yes.

14:09:28 19   Q.      And the model you put together it took into account

14:09:33 20   competitive responses, correct?

14:09:36 21   A.      The model, the portal does not, but the overall plan

14:09:42 22   did.

14:09:42 23   Q.      So your plan took into account competitive responses,

14:09:46 24   correct?

14:09:47 25   A.      That's correct.

Hanson - direct

Q.      And you wrote, "We paid particular attention to expected competitive pricing responses of a increasing/decreasing market shares."

A.      Correct.  I did write that.

Q.      And you also wrote, "As with all plans of this nature, where we are looking at taking share from competitors, we need to factor into competitive responses."

A.      Yes.

Q.      And you provide an example of a competitive response, for example, adding bulk demand for the competitors is going to cost us in expected lower prices, correct?

A.      It could, yes.

Q.      Adding demand from competitors would cost United because it would lead to lower prices, right?

A.      It's one of the factors that we were considering.

Q.      And you gave the collective view there that the key was to stay balanced, correct?

A.      Yes.

Q.      And that was the collective view, right?

A.      That was.

Q.      And the collective view was balanced moves would initiate relatively smaller competitive reactions; right?

A.      Yes, that's what it says, yes.

Q.      So be balanced on taking market share to make sure that the price response wasn't too strong, right?

Hanson - direct

14:11:08 1    A.      The expectation was to work with customers to not

14:11:22 2    elicit too strong of a reaction because when you're taking

14:11:28 3    share with customers or moving into selling new customers,

14:11:32 4    sometimes price has to drop for us to convert that customer

14:11:36 5    over.

14:11:36 6    Q.      So stay balanced, so the price doesn't drop too much;

14:11:40 7    right?

14:11:40 8    A.      That's right.

14:11:42 9    Q.      And let's move to the attached spreadsheet.  And I

14:11:47 10   think this should be on -- if we can get it on your screen.

14:11:53 11           MS. GARRETT:   I apologize, Your Honor.  I think

14:11:55 12   we have the same issue as last time.  This is PTX 483.  I

14:11:59 13   think actually we can show this on the public screen.  I

14:12:03 14   don't believe there is an objection to PTX --

14:12:07 15   confidentiality issue.  If we can go to the summary build

14:12:11 16   out tab.

14:12:13 17   Q.      Do you have that on the screen in front of you,

14:12:17 18   Mr. Hanson?

14:12:17 19   A.      Yeah, I can see it.

14:12:18 20   Q.      And you put together this spreadsheet; correct?

14:12:22 21   A.      I did.

14:12:22 22   Q.      And line 8 there says install new 2.5 bag line in

14:12:31 23   Clewiston.  I skipped a couple of numbers.  But do you see

14:12:35 24   what I'm referring to, Mr. Hanson?

14:12:36 25   A.      I do.

Hanson - direct

Q.      That's the reference to this proposed new production line in Clewiston, right?

A.      Yes.

Q.      That's a reference to what was in 1D in the e-mail, right?

A.      Right.

Q.      And there is also a column labeled Market Share.  Do you see that, Mr. Hanson?

A.      I do.

Q.      And then there is an asterisk and it says share of USC volume over USDA reporter data, that was the market share definition you used in this report; correct?

A.      That is.

Q.      And the numerator is share of US Sugar's volume -- I'm sorry, the numerator is US Sugar's volume?

A.      It's anticipate United Sugar's volume, this is the total.

Q.      Got it.  So this is the numerator is United's volume?

A.      Yeah, USC.

Q.      And the denominator is the USDA reporter data; is that right?  And the USDA reporter data is just the data provided by USDA reporters, right?

A.      That's correct.

Q.      And USDA reporters do not include distributors, correct?

Hanson - direct

14:13:50 1    A.      That's correct.

14:13:50 2    Q.      And we can put that spreadsheet away.

14:13:56 3            Mr. Hanson, will you please turn to PTX 452 in

14:14:02 4    your binder?

14:14:02 5            MR. SANDROCK:  Your Honor, this exhibit has been

14:14:04 6    admitted already.  And if we could show it on the public

14:14:17 7    screen.  Thank you.

14:14:19 8    Q.      You presented at a March 16, 2020, executive meeting,

14:14:26 9    correct?

14:14:26 10   A.      Yes.

14:14:27 11   Q.      You were one of the people presenting, correct?

14:14:30 12   A.      That's correct.

14:14:31 13   Q.      And you gave a regional markets overview with the

14:14:35 14   regional market identified as the Florida southeast market;

14:14:39 15   correct?

14:14:40 16   A.      That's correct, along with Dirk Swart.

14:14:43 17   Q.      Could you please turn to slide 20, Mr. Hanson.  You

14:14:53 18   created this slide; correct?

14:14:55 19   A.      I did.

14:14:56 20   Q.      And the key, on the left shows Clewiston, South Bay,

14:15:02 21   Imperial in red, correct?

14:15:03 22   A.      Yes.

14:15:04 23   Q.      And the three triangles in the red region corresponds

14:15:07 24   to the USDA reporters in that area; correct?

14:15:11 25   A.      That's correct.

Hanson - direct

14:15:12 1     Q.       And the area in red shows the supplier backyards for

14:15:17 2     those three facilities, correct?

14:15:20 3     A.       They are the states surrounding those three

14:15:23 4     reporters.

14:15:24 5     Q.       And you labeled them as supplier backyards; correct?

14:15:28 6     A.       For this presentation, yes.

14:15:30 7     Q.       Can you move to slide 29, please, Mr. Hanson.  You

14:15:39 8     created this slide as well; correct?

14:15:41 9     A.       I did.

14:15:42 10    Q.       And these are the same states we saw in slide 20;

14:15:48 11    correct?

14:15:48 12    A.       They are.

14:15:50 13    Q.       And the top left says Clewiston, South Bay and Seine,

14:15:59 14    do you see that?

14:15:59 15    A.       I do.

14:16:00 16    Q.       And Seine is a reference to Imperial, correct?

14:16:03 17    A.       Correct.

14:16:03 18    Q.       And this slide also contains -- strike that.

14:16:07 19              You were the author of the comments in the

14:16:10 20    bottom left, correct?

14:16:14 21    A.       I believe it was collectively, but yeah, I wrote the

14:16:18 22    comments on the bottom.

14:16:19 23    Q.       And one of the comments talks about freight rates by

14:16:24 24    region; right?  The second comment.

14:16:31 25    A.       It says low freight rates create a deficit market,

Hanson - direct

14:16:37 1    yes.

14:16:37 2    Q.      And you were comparing the freight rates in the

14:16:40 3    southeast market to freight rates in other markets; correct?

14:16:44 4    A.      Yes.

14:16:45 5    Q.      And the data that United has shows, that freight

14:16:50 6    rates are relatively low coming out of this market as

14:16:54 7    compared to other areas; correct?

14:16:56 8    A.      On average.

14:16:57 9    Q.      The Clewiston rates are relatively lower per mile

14:17:03 10   than Red River Valley rates?

14:17:07 11   A.      On average, yes.

14:17:09 12   Q.      Your conclusion on the slide was based on modeling

14:17:12 13   you did in the portal, correct?

14:17:14 14   A.      That is correct.

14:17:15 15   Q.      And you also analyzed whether -- strike that.

14:17:18 16           You stated a conclusion about whether there were

14:17:21 17   integrated distributor competitors in the southeast market;

14:17:26 18   correct?

14:17:26 19   A.      Yes, I included that comment.

14:17:28 20   Q.      And the comment you made was that there were few

14:17:32 21   integrated distributor competitors in the southeast market;

14:17:36 22   correct?

14:17:37 23   A.      Yes.

14:17:40 24   Q.      Can you please turn to slide 31 of the same

14:17:44 25   presentation, Mr. Hanson.  You also worked on this slide;

Hanson - direct

14:17:54 1    correct?

14:17:54 2    A.      I did.

14:17:55 3    Q.      And this slide also describes the southeast market;

14:18:00 4    correct?

14:18:00 5    A.      Yes.

14:18:01 6    Q.      And can you please turn to slide 34, Mr. Hanson.   You

14:18:10 7    were also involved in preparing this slide; correct?

14:18:14 8    A.      Yes, I was.

14:18:15 9    Q.      And the southeast in the heading is the same

14:18:18 10   southeast market we saw in the map slides; correct?

14:18:23 11   A.      Yes.

14:18:24 12   Q.      And the Chicago strategy is the same Chicago strategy

14:18:29 13   we saw before in the attack the market bullet?

14:18:34 14   A.      I think the word says similar and the focus there was

14:18:38 15   you're going to sell small and medium size customers as we

14:18:43 16   did in Chicago which is the priority of the strategy.

14:18:48 17   Q.      It's the same Chicago strategy we saw in the other

14:18:52 18   document, right?

14:18:54 19   A.      There are similarities.

14:18:55 20   Q.      And it also says that there are means of additional

14:19:02 21   supply chain capacity, do you see that?

14:19:02 22   A.      I do.

14:19:02 23   Q.      So does the need section there mean that by

14:19:02 24   March 2020, United still had not expanded its production

14:19:12 25   lines in Clewiston to implement the Chicago strategy?

Hanson - direct

14:19:20  1    A.      Yes, we hadn't by that point.

14:19:22  2    Q.      Mr. Hanson, I would like you to turn to another

14:19:26  3    exhibit, PTX 474.  Do you have that, Mr. Hanson?

14:19:37  4    A.      I do.

14:19:39  5    Q.      The second e-mail there is an e-mail from you to

14:19:46  6    Kevin Comb at McKeany-Flavell.  Do you see that?

14:19:51  7    A.      I do.

14:19:51  8    Q.      And you wrote this e-mail in April 2021 asking for a

14:19:57  9    slide on the map of sugar beet and sugarcane processors,

14:20:02 10    correct?

14:20:02 11    A.      Yes, that's what it says.

14:20:04 12    Q.      And you said you had a use for that slide; correct?

14:20:10 13    A.      I had a use for the image that was on the slide.

14:20:14 14    Q.      And you had just attended a McKeany-Flavell seminar

14:20:21 15    where you saw this slide; correct?

14:20:24 16    A.      That's correct.

14:20:25 17    Q.      And the document attached to this e-mail is what

14:20:31 18    Mr. Comb sent to you?

14:20:34 19    A.      Yes.

14:20:36 20            MR. SANDROCK:  And Your Honor, the United States

14:20:38 21    moves to admit PTX 474 into evidence.

14:20:41 22            MR. BUTERMAN:  No objection.

14:20:42 23            THE COURT:  Thank you.  It's admitted.

14:20:42 24            (PTX Exhibit No. 474 was admitted into

14:20:45 25    evidence.)

Hanson - direct

BY MR. SANDROCK:

14:20:45 1

14:20:46 2   Q.      If you could turn, look at the slide, Mr. Hanson?

14:20:53 3   A.      I am.

14:20:55 4   Q.      Do you see the circle in Florida and Georgia?

14:21:00 5   A.      Yes, I do.

14:21:02 6   Q.      And that circle in Florida and Georgia is a portion

14:21:07 7   of what we saw in the red region in the map slides that you

14:21:11 8   created, correct?

14:21:14 9   A.      Looks like it's within that region, yes.

14:21:17 10  Q.      And the -- this map shows the same three USDA

14:21:24 11  reporters that we saw on your map; correct?

14:21:34 12  A.      On the initial map, yes.

14:21:36 13  Q.      And the only difference is that this shows the

14:21:43 14  Savannah facility and the Clewiston facility both being

14:21:47 15  controlled by United, correct?

14:21:52 16  A.      It appears so.

14:21:54 17  Q.      Because this slide models --

14:21:56 18  A.      It's hard to see.

14:21:57 19  Q.      The colors are hard to see?

14:21:59 20  A.      Yeah.

14:22:00 21  Q.      This slide models a post acquisition United; correct?

14:22:10 22  A.      Yeah, it looks like that.

14:22:12 23  Q.      April 2021 was after the proposed acquisition had

14:22:17 24  been announced, right?

14:22:19 25  A.      Right, I believe so.

Hanson - direct

14:22:21  1    Q.      And the slide then also has conclusions about or

14:22:26  2    statements about market share and consolidation of the

14:22:30  3    southeast post acquisition, correct?

14:22:34  4    A.      Yes.

14:22:35  5    Q.      And do you see the reference to market share on this

14:22:39  6    document?

14:22:40  7    A.      I do.

14:22:43  8    Q.      This would be a post acquisition market share to your

14:22:47  9    understanding?

14:22:48  10   A.      I don't know.  Frankly I wasn't interested in that

14:22:53  11   data.  I was frankly only interested in the map.

14:22:59  12   Q.      PTX 483 that we saw earlier, which had your analysis

14:23:07  13   of the potential expansion in Clewiston, that also

14:23:16  14   referenced mark share?

14:23:17  15   A.      I believe so.

14:23:18  16   Q.      That's where we saw the market share definition of

14:23:27  17   USDA volume over USDA reported data?

14:23:27  18   A.      Okay.

14:23:28  19   Q.      This slide has market share information, right?

14:23:30  20   A.      It does, but I can barely read the capacity number

14:23:33  21   which is a different definition of market share.

14:23:40  22   Q.      Now, United at some point after the acquisition was

14:23:46  23   announced stopped publishing market share data; correct?

14:23:52  24   A.      So United faced a force -- so I published a market

14:24:00  25   report and in that market report we do have market share

Hanson - direct

14:24:04  1    data, and we had a force majeure event that happened

14:24:09  2    slightly before that, and we removed the market share slides

14:24:13  3    from that market report.

14:24:18  4    Q.      So your testimony is that you stopped publishing

14:24:22  5    market share data due to the force majeure?

14:24:25  6    A.      That's correct.

14:24:26  7    Q.      Mr. Hanson, could you please turn to PTX 367 in your

14:24:33  8    binder.  And you wrote this e-mail, correct?

14:24:44  9    A.      I did.

14:24:46 10            MR. SANDROCK:  And there are no objections to

14:24:47 11    this exhibit.  The United States moves to admit it, Your

14:24:51 12    Honor.

14:24:51 13            MR. BUTERMAN:  No objection.

14:24:52 14            THE COURT:  All right.  Thank you.  It's

14:24:53 15    admitted.

14:24:54 16            (PTX Exhibit No. 367 was admitted into

14:24:55 17    evidence.)

14:24:55 18    BY MR. SANDROCK:

14:24:56 19    Q.      So the top e-mail is from you to Lisa Malloy, right?

14:25:00 20    A.      It is.

14:25:00 21    Q.      It's from November 2021?

14:25:02 22    A.      Yes.

14:25:04 23    Q.      You wrote, "We are not publishing market share charts

14:25:04 24    due to the ongoing Imperial acquisition."

14:25:12 25            Correct?

Hanson - cross

14:25:13 1   A.        I did write that.

14:25:14 2   Q.        You did not write anything about force majeure, did

14:25:17 3   you?

14:25:17 4   A.        I didn't.

14:25:29 5             MR. SANDROCK:  Nothing further at this time for

14:25:32 6   Mr. Hanson.

14:25:33 7             THE COURT:  Thank you.  Cross-exam.

14:25:38 8                      CROSS-EXAMINATION

14:25:48 9   BY MR. BUTERMAN:

14:25:51 10  Q.        Good afternoon, Mr. Hanson.

14:25:53 11  A.        Good afternoon.

14:25:54 12  Q.        Just picking up where counsel left off, when did

14:25:59 13  United stop publishing that market share information?

14:26:05 14  A.        I believe it was November of 2019.

14:26:07 15  Q.        And what was the reason?

14:26:09 16  A.        Because we had endured a force majeure event which

14:26:13 17  dramatically changed our production and supply.

14:26:17 18  Q.        Can you put you Exhibit 474 on the screen.  Go to the

14:26:31 19  slide of the presentation -- counsel was just asking you

14:26:38 20  about this map.  First of all, who is McKeany-Flavell?

14:26:47 21  A.        They are a sugar analyst.

14:26:49 22  Q.        So this wasn't put together by anyone at United, was

14:26:52 23  it?

14:26:52 24  A.        It was not.

14:26:54 25  Q.        And counsel asked you questions about market share

Hanson - cross

14:27:00 1    information.  Looking at this, can you tell me, is this

14:27:05 2    looking at market shares from the perspective of southeast

14:27:10 3    market or is this looking at this from a national market?

14:27:14 4    A.    It looks like a national market.

14:27:19 5    Q.    And by the way, if we look at those numbers on the

14:27:21 6    right, can you see what that word says, the third column

14:27:28 7    down, is that capacity?

14:27:33 8    A.    The capacity is the third row or column, I'm sorry.

14:27:40 9    Q.    Now, just taking a step back, sir, you're the

14:27:43 10   director of industrial products marketing at United, right?

14:27:48 11   A.    I am.

14:27:49 12   Q.    And do you have responsibility for the consumer

14:27:52 13   retail side of the business?

14:27:53 14   A.    I don't.

14:27:54 15   Q.    Is there someone else who has your responsibilities

14:27:58 16   on the consumer side?

14:27:59 17   A.    Yes.

14:28:00 18   Q.    Who is that?

14:28:00 19   A.    Dave Sulsa.

14:28:02 20   Q.    Why is it that Mr. Sulsa has the responsibilities on

14:28:08 21   the consumer side and you do not?

14:28:10 22   A.    It's a different skill set, it's a different type of

14:28:14 23   responsibility.

14:28:14 24   Q.    Are you responsible for determining the price of

14:28:16 25   sugar that any industrial customer pays?

Hanson - cross

14:28:19 1   A.      I am not.

14:28:23 2   Q.      If we could put up PTX 481, please.  Now, counsel

14:28:36 3   asked you some questions about this document, the

14:28:40 4   competitive FOB rates that are here.  Where did you obtain

14:28:48 5   the competitor FOB prices that are blacked out here?

14:28:53 6   A.      I didn't obtain them, I inputted numbers that were

14:28:59 7   within my planning process.

14:29:03 8   Q.      Are these actual competitive FOB prices?

14:29:06 9   A.      No.

14:29:09 10  Q.      Now, counsel also asked you questions about United's

14:29:15 11  use of the competitive freight rate application.  Do you

14:29:18 12  recall that?

14:29:19 13  A.      I do.

14:29:19 14  Q.      What does United use the competitive freight rate

14:29:24 15  application for?

14:29:25 16  A.      Primarily for our targeting and also for pricing

14:29:29 17  analysis purposes.

14:29:29 18  Q.      Is freight cost the only factor that affects a

14:29:33 19  supplier's ability to compete?

14:29:34 20  A.      No, there is many, that's just one factor.

14:29:36 21  Q.      Does the competitive freight application include

14:29:39 22  freight costs for distributors?

14:29:41 23  A.      It does.

14:29:41 24  Q.      And does the competitive freight application include

14:29:45 25  every competitor in every possible routing option?

Hanson - cross

14:29:49  1    A.        No, because ultimately that would be millions of

14:29:52  2    rates, so we need to prioritize them down to a more

14:29:56  3    manageable number.

14:29:57  4    Q.        Let's put PTX 452 on the screen, please.  And the

14:30:07  5    government's counsel asked you questions about the slide

14:30:27  6    ending in 448.  Do you see that?

14:30:34  7    A.        I do.

14:30:35  8    Q.        Just taking a step back, what was the purpose of the

14:30:37  9    regional markets overview presentation?

14:30:40  10   A.        Ultimately we were looking at potentially putting in

14:30:43  11   a new bag line in Clewiston.

14:30:45  12   Q.        And why was United considering expanding its

14:30:50  13   packaging capacity for bags in Clewiston?

14:30:52  14   A.        Because we found that we make more money, we generate

14:30:57  15   a higher NSP on bag product.

14:31:00  16   Q.        NSP is?

14:31:01  17   A.        Our bottom line.

14:31:04  18   Q.        NSP is the delivered price per customer?

14:31:08  19   A.        It is not.

14:31:11  20   Q.        Now, the government asked you about this slide.  I

14:31:20  21   would like to back up to the slide beforehand.  This one is

14:31:27  22   entitled USDA demand.  What do the colors on this map

14:31:32  23   represent?

14:31:32  24   A.        This is the demand by USDA region as reported in

14:31:37  25   monthly USDA data.

Hanson - cross

14:31:41  1    Q.      Now, if we go back to the slide that the government

14:31:46  2    focused you on.  Is this the way that United typically

14:31:50  3    categorized the states?

14:31:51  4    A.      No.

14:31:51  5    Q.      In your seventeen years of working at United, how

14:31:55  6    does United typically categorize states, if it does at all?

14:32:00  7    A.      In the USDA regions.

14:32:02  8    Q.      Turn to the next slide, which the government didn't

14:32:05  9    show you.  Can you tell us what this slide is showing?

14:32:08 10    A.      This is industrial bulk movements.  So as you can

14:32:12 11    see, there is bulk, this is USDA data, bulk shipments moving

14:32:17 12    generally from the west to the east.

14:32:20 13    Q.      And what are the arrows, the red arrows moving out of

14:32:24 14    that area indicating?

14:32:28 15    A.      So there is two red arrows, both over bulk.  One

14:32:34 16    moving in bulk sugar moving from the south into the

14:32:39 17    northeast and the other one into the Midwest.

14:32:42 18    Q.      And what does that represent?

14:32:45 19    A.      It represents suppliers shipping sugar up to

14:32:52 20    customers in different geographies.

14:32:52 21    Q.      There is also an orange arrow coming in and a yellow

14:33:02 22    arrow coming in to those red states.  Do you see those?

14:33:02 23    A.      I do.

14:33:02 24    Q.      What do those represent?

14:33:02 25    A.      Shipments moving into that region from other regions,

14:33:13 1    from the south region, the midwest region.

14:33:17 2    Q.      And why were you putting those arrows moving in and

14:33:23 3    out of the various different color sections?

14:33:28 4    A.      To show that the market moves from one region to the

14:33:33 5    next.

14:33:34 6    Q.      If we look at the next slide.  And we have arrows

14:33:39 7    here as well.  Is this depicting the same phenomenon of

14:33:45 8    sugar moving throughout the country that you just testified

14:33:48 9    to?

14:33:48 10   A.      It does, but it's on bags and not bulk.

14:34:20 11               MR. BUTERMAN:  That's all I have, Your Honor.

14:34:21 12               THE COURT:  All right.  Thank you.

14:34:30 13               MR. SANDROCK:  Thank you, Your Honor, I'll be

14:34:32 14   very brief.

14:34:33 15                      REDIRECT EXAMINATION

14:34:33 16   BY MR. SANDROCK:

14:34:34 17   Q.      Mr. Hanson, could you please look at PTX 474, the

14:34:39 18   McKeany-Flavell slide.  Do you have that in front of you?

14:34:47 19   A.      I do.

14:34:47 20   Q.      And distributors are not listed there for the market

14:34:51 21   share calculation, are they?

14:34:56 22   A.      Looks like you only included the reporters.

14:35:00 23   Q.      And the market share definition in the spreadsheet

14:35:04 24   that you created, only included the USDA reporters, correct?

14:35:14 25   Remember we saw that denominator, USC volumes over USC

Hanson - redirect

14:35:20 1    reporters, you created that, right?

14:35:21 2    A.      Yes, so we know the denominator with USDA data so

14:35:26 3    it's easier to capture market share data when you have a

14:35:30 4    known confident denominator, but we do know that there is

14:35:34 5    additional sugar that is marketed.

14:35:36 6    Q.      And could you turn back to PTX 481, please.  This is

14:35:42 7    the competitive freight application e-mail.  Do you have

14:35:47 8    that, Mr. Hanson?

14:35:48 9    A.      I do.

14:35:49 10   Q.      Distributors are not listed in that cover e-mail, are

14:35:53 11   they?

14:35:55 12   A.      They are.  They're actually the bottom two lines,

14:35:59 13   distributors are the primary importers of Mexican sugar and

14:36:03 14   refined imports.

14:36:04 15   Q.      You don't list any specific distributor in this

14:36:08 16   e-mail, do you?

14:36:09 17   A.      Not a specific one, because there is many.

14:36:12 18            MR. SANDROCK:  No further questions.

14:36:14 19            THE COURT:  All right.  Thank you.  All right.

14:36:18 20   Anything else?  Thank you, sir.  You are excused.

14:36:22 21            What's next?

14:36:22 22            MR. HANNA:  Your Honor, the United States calls

14:36:25 23   the next witness.

14:36:26 24            THE COURT:  Okay.

14:36:27 25            MR. HANNA:  United States calls to the witness

J. Hines - direct

14:36:29 1    stand Jeana Hines who is an adverse witness.  Jeana Hines is

14:36:34 2    the vice-president of sales at Imperial Sugar.

14:36:40 3                    THE COURT:  Okay.

14:37:04 4                    COURT CLERK:  Please raise your right hand.

14:37:11 5    Please state and spell your full name for the record.

14:37:17 6                    THE WITNESS:  Jeana Hensley Hines, J-E-A-N-A,

14:37:24 7    H-E-N-S-L-E-Y, H-I-N-E-S.

14:37:28 8                    JEANA HENSLEY HINES, having been duly sworn was

14:37:31 9    examined and testified as follows:

14:37:39 10                    MR. HANNA:  May I proceed, Your Honor?

14:37:40 11                    THE COURT:  Please.

14:37:40 12                       DIRECT EXAMINATION

14:37:40 13   BY MR. HANNA:

14:37:42 14   Q.       Good afternoon, Ms. Hines.

14:37:43 15   A.       Good afternoon.

14:37:44 16   Q.       I handed you a binder on your way up there.  I might

14:37:49 17   refer to that during your testimony.  I'll let you know when

14:37:51 18   we turn to it.

14:37:52 19   A.       Okay.

14:37:52 20   Q.       Ms. Hines, you're the vice-president of sales and

14:37:52 21   marketing for Imperial Sugar, right?

14:37:52 22   A.       Yes.

14:37:57 23   Q.       You have been vice-president of sales and marketing

14:38:00 24   since 2011, right?

14:38:01 25   A.       Yes.

J. Hines - direct

14:38:02 1    Q.      And you're considered part of the senior management

14:38:05 2    at Imperial, right?

14:38:06 3    A.      Yes.

14:38:07 4    Q.      You have management responsibilities for both

14:38:11 5    industrial customers, distributors and retailers, right?

14:38:14 6    A.      Yes.  And --

14:38:17 7           THE COURT:  Could you put the microphone

14:38:19 8    somewhere near you.  You're not coming through at all.

14:38:34 9    BY MR. HANNA:

14:38:39 10   Q.      Ms. Hines, you report to the senior vice-president of

14:38:42 11   sales, Patrick Henneberry, right?

14:38:44 12   A.      Yes.

14:38:46 13   Q.      And you work with both the Imperial CEO, Mike

14:38:50 14   Gorrell, and Mr. Henneberry to make pricing decisions and

14:38:54 15   negotiate with customers, right?

14:38:55 16   A.      Yes.

14:38:57 17   Q.      And one of your direct reports is Beth Smith who is a

14:39:01 18   regional sales manager; right?

14:39:03 19   A.      Yes.

14:39:02 20   Q.      And Ms. Smith has responsibilities to cover sales to

14:39:08 21   customers in southeastern United States, right?

14:39:10 22   A.      Yes.

14:39:11 23   Q.      The southeast region for Ms. Smith covers Alabama,

14:39:12 24   Georgia, North Carolina, South Carolina, Kentucky and

14:39:20 25   Tennessee, right?

J. Hines - direct

14:39:20 1    A.      And also Florida.

14:39:22 2    Q.      She also covers the Publix industrial sales in

14:39:26 3    Florida, right?

14:39:27 4    A.      Yes.

14:39:27 5    Q.      The southeast region is the only region in the United

14:39:30 6    States in which Imperial has a specific sales manager

14:39:33 7    focusing on the region; right?

14:39:35 8    A.      Yes.

14:39:35 9    Q.      And as far as you recall, Ms. Hines, Imperial has

14:39:39 10   always had a sales manager focusing on the southeast region,

14:39:43 11   right?

14:39:43 12   A.      Since I have been with the company, yes.

14:39:47 13   Q.      And the customers that you directly manage are Pepsi,

14:39:51 14   Costco, Mars and Hershey, is that right?

14:39:54 15   A.      Yes.

14:39:55 16   Q.      Hershey, Imperial has contracted to supply sugar to

14:39:59 17   both the Hershey, Pennsylvania facility as well as the

14:40:06 18   Stuarts Draft, Virginia facility?

14:40:07 19   A.      Those are two of the three yes.

14:40:09 20   Q.      And you competed for the Hershey, Stuarts Draft,

14:40:12 21   Virginia facility in 2022 right?

14:40:12 22   A.      We did bid on the location.

14:40:17 23   Q.      And Imperial has been awarded volume to supply the

14:40:22 24   Hershey Plant in Stuarts Draft, Virginia for the year 2022,

14:40:24 25   right?

J. Hines - direct

14:40:25 1   A.    **Yes.**

14:40:26 2   Q.    **And Imperial has supplied the Hershey plant in**

14:40:31 3  **Stuarts Draft, Virginia for the past five years, right?**

14:40:33 4   A.    **Yes.**

14:40:33 5   Q.    **Let's talk a little bit about what Imperial does.**

14:40:36 6  **Imperial produces various sizes packages of sugar ranging**

14:40:40 7  **from two-pound bags to 50-pound bags, is that right?**

14:40:43 8   A.    **Yes.**

14:40:43 9   Q.    **Imperial also sells super sacks, right?**

14:40:46 10  A.    **Yes.**

14:40:47 11  Q.    **And you sometimes refer to super sacks as a tote,**

14:40:51 12 **right?**

14:40:51 13  A.    **Yes.**

14:40:52 14  Q.    **Now, a tote or a super sack is a 2,000-pound bag.**

14:40:56 15 **Right?**

14:40:56 16  A.    **It can be 2,000 pounds up to 2,400 pounds.**

14:40:59 17  Q.    **Now, Imperial's packaging facility at the refinery in**

14:41:04 18 **Port Wentworth came online in 2009, is that right?**

14:41:11 19  A.    **Yes.**

14:41:12 20  Q.    **And you would agree that Imperial's packaging**

14:41:16 21 **facility is state of the art, right?**

14:41:17 22  A.    **Yes.**

14:41:18 23  Q.    **Now, for Imperial's super sack business, you consider**

14:41:24 24 **Imperial's core geography for those sales to cover, Alabama,**

14:41:29 25 **Mississippi, Florida, Georgia, North Carolina, South**

14:41:33 1    Carolina, Kentucky and Tennessee, right?

14:41:35 2    A.    I would also add Indiana and Illinois into that.

14:41:44 3    Q.    You would consider those states that I just read off

14:41:47 4    to you as your core geography in total?

14:41:51 5    A.    Depends on the year, yes.

14:41:52 6    Q.    So your core geography for the super sacks is,

14:41:57 7    Alabama, Mississippi, Florida, Georgia, North Carolina,

14:42:01 8    South Carolina, Kentucky and Tennessee, right?

14:42:04 9    A.    It would be, depending on the year.

14:42:05 10   Q.    And you refer to that area as being the core

14:42:08 11   geography of the super sack business for Imperial, right?

14:42:12 12   A.    It fluctuates depending on the year, at times,

14:42:16 13   Indiana and Illinois are also in our core area.

14:42:23 14   Q.    Now, the last three or four years Imperial has

14:42:26 15   retained an industry consultant named McKeany-Flavell right?

14:42:31 16   A.    We have used them as a broker, yes.

14:42:34 17   Q.    And McKeany will sometimes give presentations on

14:42:38 18   market information, is that right?

14:42:39 19   A.    To customers, yes.

14:42:40 20   Q.    You have been happy with McKeany's service to you,

14:42:42 21   right?

14:42:50 22   A.    As a broker, they have done a very good job for us.

14:42:52 23   Q.    If you can turn to PTX 217 in your notebook.  By

14:43:01 24   agreement with your attorney we prepared a PDF of the

14:43:05 25   PowerPoint presentation that we'll show you that I provided

J. Hines - direct

14:43:11  1    some page numbers on there.  We have a version that is

14:43:17  2    colored I think it will be easier for you to follow after

14:43:21  3    the black and white version.

14:43:33  4    A.      Yes.

14:43:34  5    Q.      PTX 217 is a presentation that was prepared by

14:43:38  6    McKeany-Flavell, is that right?

14:43:40  7    A.      Yes, for Pepsi.

14:43:42  8    Q.      And you reviewed this document before it went to

14:43:45  9    Pepsi, though, right?

14:43:46 10    A.      No, I did not.

14:43:47 11    Q.      You reviewed the document after Pepsi sent it to you,

14:43:52 12    right?

14:43:52 13    A.      Pepsi sent it to me, yes, and then I looked at it.

14:43:55 14    Q.      And they sent it to you before Pepsi came to Savannah

14:44:00 15    Georgia for a plant tour, right?

14:44:03 16    A.      Yes.

14:44:03 17    Q.      This was prepared for a meeting between Pepsi and

14:44:07 18    Imperial that took place in February of 2020, is that right?

14:44:09 19    A.      Yes.

14:44:11 20            MR. HANNA:  Your Honor, at this time the

14:44:12 21    government moves to admit PTX 217.  Any objections have been

14:44:12 22    resolved.

14:44:12 23            THE COURT:  Any objections, I would like you to

14:44:21 24    say it on the report even though Mr. Hanna said it.

14:44:24 25            MR. ZACH:  No objection.

J. Hines - direct

14:44:24 1          **(PTX Exhibit No. 217 was admitted into**

14:44:35 2   **evidence.)**

14:44:35 3   **BY MR. HANNA:**

14:44:35 4   **Q.      This is a map showing the locations of sugar**

14:44:38 5   **refineries in the United States, right?**

14:44:39 6   **A.      Yes.**

14:44:40 7   **Q.      And this map has a region of the United States that**

14:44:42 8   **is shaded in red, do you see that?**

14:44:44 9   **A.      Yes.**

14:44:45 10  **Q.      And on this map that's shaded, that red shaded region**

14:44:49 11  **is identified as the primary marketing region for Imperial,**

14:44:52 12  **do you see that?**

14:44:53 13  **A.      Yes, that's what McKeany had put in there.**

14:44:58 14  **Q.      And you reviewed this, right?**

14:45:00 15  **A.      I reviewed it.**

14:45:01 16  **Q.      And the blue shaded area on this map was identified**

14:45:05 17  **as the secondary marketing region for Imperial, do you see**

14:45:08 18  **that?**

14:45:08 19  **A.      That's what McKeany has put.**

14:45:11 20  **Q.      And Imperial tends to sell more sugar in the**

14:45:14 21  **southeast than in the northeast, right?**

14:45:16 22  **A.      Yes.**

14:45:16 23  **Q.      And one factor why that is true is because it's more**

14:45:20 24  **expensive for Imperial to ship from Savannah to the**

14:45:23 25  **northeast than to ship to some customers in the southeast,**

J. Hines - direct

right?

A.      Yes.

Q.      Now, because you can be more reliable about delivering sugar to a customer to a quicker basis, that is another reason Imperial sells more sugar in the southeast than the northeast?

A.      That could be one of the reasons, there are also more manufacturing facilities in Georgia.

Q.      Earlier you testified that Imperial's core geography for the super sack business to be Alabama, Mississippi, Florida, Georgia, North Carolina, South Carolina, Kentucky and Tennessee, right?

A.      Depending on the year for totes, yes.

Q.      And that core geography are all the states covered by this red region on this map, right?

A.      That is correct, that's what McKeany put there.

Q.      And after reviewing this, you did not tell McKeany or Pepsi that the depictions of Imperial's primary or secondary market regions were not accurate, right?

A.      No, I did not notify McKeany because Pepsi sent this to me just to see what they had been told about our refinery selection, so I did tell Pepsi that they might want to double-check with McKeany because some information was inaccurate, for instance, the sugar trader that they listed had been gone for four years.

J. Hines - direct

Q.      That was the only information you asked them to correct, right?

A.      Yes, because we were going to discuss our own numbers and everything at the meeting ourselves.

Q.      You can put that document away.

        Now, Ms. Hines, when deciding what price to quote a potential customer you look at the competitors that can bid on the business, right?

A.      Yes, we do.

Q.      And when putting together a bid Imperial will review who you think could compete on the business and what you think the competitor could possibly do for pricing, right?

A.      Yes, we did that as a group.

Q.      And you will look at the customer's shipping location and assess which competitors could possibly ship into that customer's shipping location, right?

A.      Yes.

Q.      I think you told me at your deposition you have a map in your head and by knowing the customer's shipping locations, that helps you understand which competitors could bring in sugar and which competitors could not bring in sugar to that location, right?

A.      Yes.

Q.      Now, Imperial will also estimate the freight cost of the competitors to ship sugar to that customer location,

J. Hines - direct

14:47:49 1    right?

14:47:49 2    A.      Yes, we estimate it.

14:47:50 3    Q.      And so you have an idea of which other competitors

14:47:53 4    are likely to be able to compete on the business, right?

14:47:57 5    A.      At times, yes.

14:47:58 6    Q.      You also look at a report called the Sosland Report

14:48:02 7    that gives a general view of what pricing is by certain

14:48:05 8    areas of the country, right?

14:48:07 9    A.      I do receive the Sosland.

14:48:11 10   Q.      Is it a weekly report that Imperial subscribed to?

14:48:13 11   A.      Yes, we did.

14:48:14 12   Q.      The Sosland Report provides general pricing

14:48:18 13   information for the West Coast, Midwest, Northeast, Gulf and

14:48:23 14   the southeast regions of the United States; right?

14:48:26 15   A.      Yes.

14:48:27 16   Q.      And it's been your observation that prices generally

14:48:31 17   vary by region; right?

14:48:33 18   A.      Yes.

14:48:34 19   Q.      And when assessing what price to bid for a customer,

14:48:38 20   you do not take into account the prices of imported refined

14:48:42 21   sugar; right?

14:48:42 22   A.      Depending on who we think can bring -- who can

14:48:47 23   compete for that business, we may look at it that way.

14:48:51 24   Q.      Now, I took your deposition back in 2021, for DOJ

14:49:00 25   investigation on the merger, do you recall that?

J. Hines - direct

14:49:03 1  A.      Yes.

14:49:03 2  Q.      Can you turn to your deposition that's in your

14:49:06 3  report, in your notebook there, CID deposition, I would like

14:49:10 4  to direct your attention to page 252.  I want to direct your

14:49:20 5  attention to lines 10 through 14.  Are you there, Ms. Hines?

14:49:33 6  A.      Yes.

14:49:34 7  Q.      All right.  So line 10:

14:49:36 8          "QUESTION:  When you're assessing what price to

14:49:38 9  bid for a customer, do you take into account what the import

14:49:43 10 prices of refined sugar are?

14:49:45 11         "ANSWER:  No."

14:49:46 12         Did I ask you that question and did you give me

14:49:48 13 that answer?

14:49:49 14 A.      Excuse me, are you under -- what tab did you say you

14:49:54 15 were underneath again?

14:49:54 16 Q.      The CID depo tab.

14:50:00 17 A.      Sorry.

14:50:07 18 Q.      Page 252, lines 10 to 14.

14:50:10 19 A.      Yes.

14:50:12 20 Q.      All right.  I'll ask you the question again.  The

14:50:14 21 question:  "When you're assessing what price to bid for a

14:50:18 22 customer, do you take into account what the import prices of

14:50:22 23 refined sugar are?"

14:50:24 24         "ANSWER:  No."

14:50:25 25         Did I ask you that question and did you give me

J. Hines - direct

14:50:27  1    that answer?

14:50:27  2    A.      Yes, at that time that was an accurate statement for

14:50:30  3    me back then.

14:50:31  4    Q.      Back in was it September of 2021?

14:50:34  5    A.      Yes.

14:50:38  6    Q.      All right.  When Imperial delivers sugar to the

14:50:40  7    customer's location, the customer pays a delivery price;

14:50:43  8    right?

14:50:43  9    A.      If we deliver it, yes, they do.

14:50:46  10   Q.      And the delivered price is the price the customer

14:50:48  11   pays in total for the sugar to be delivered to the shipping

14:50:52  12   location; right?

14:50:52  13   A.      Yes.

14:50:52  14   Q.      To the customer's location?

14:50:54  15   A.      Yes.

14:50:54  16   Q.      Now, freight costs make up a significant portion of

14:50:58  17   the delivery price, right?

14:50:59  18   A.      Because our raw sugar costs are 70 percent

14:51:03  19   approximately of our costs, yes, the transportation is part

14:51:07  20   of that, and it is significant.

14:51:07  21   Q.      Transportation cost is a significant component of the

14:51:12  22   delivered price, right?

14:51:14  23   A.      Yes, because our raw sugar costs are 70 percent and

14:51:18  24   they can't be changed, so freight rates are significant to

14:51:21  25   us because every penny counts.

J. Hines - direct

14:51:24  1    Q.      That wasn't my question.  My question was freight

14:51:27  2    costs are a significant component of the delivered price?

14:51:30  3    A.      Yes, they are one of the significant components.

14:51:33  4    Q.      Now, price is not the only dimension on which

14:51:37  5    Imperial competes, though, right?

14:51:39  6    A.      Yes.

14:51:39  7    Q.      Another factor customers might consider when

14:51:43  8    selecting a supplier is reliability, right?

14:51:46  9    A.      Yes.

14:51:46  10   Q.      Imperial differentiates itself from competitors by

14:51:50  11   striving to have the best reliability, right?

14:51:52  12   A.      Yes.

14:51:52  13   Q.      Another factor a customer might consider is risk

14:51:56  14   tolerance, right?

14:51:57  15   A.      Yes.

14:51:57  16   Q.      By risk tolerance, some customers may want more than

14:52:02  17   one supplier supplying a location, right?

14:52:04  18   A.      Yes.

14:52:05  19   Q.      Will you turn to PTX 163 in your notebook.  Have you

14:52:21  20   seen PTX 163?

14:52:21  21   A.      Yes.

14:52:26  22   Q.      PTX 163 the Jabber message between you and your boss,

14:52:32  23   Patrick Henneberry, right?

14:52:34  24   A.      Yes.

14:52:35  25            MR. HANNA:  At this time, the United States

J. Hines - direct

14:52:38 1    seeks to admit PTX 163 into evidence.

14:52:42 2                     MR. ZACH:  No objection, Your Honor.

14:52:43 3                     THE COURT:  Thank you.

14:52:43 4                     (PTX Exhibit No. 163 was admitted into

14:52:45 5    evidence.)

14:52:45 6    BY MR. HANNA:

14:52:45 7    Q.       Ms. Hines, I want to direct your attention to the

14:52:47 8    first page of 1:28 you say, you asked Mr. Henneberry, what

14:52:55 9    tolling range for the several year period do you want Kim to

14:52:58 10   give to Molson Coors today.  That's what you wrote, right?

14:53:02 11   A.       Yes, I did.

14:53:03 12   Q.       At the time of the time of your message, Imperial was

14:53:06 13   bidding on a specific bid for Molson Coors, right?

14:53:09 14   A.       She was giving them a price indication at that time.

14:53:12 15   Q.       And the she referred to is Kim Youngblood who reports

14:53:17 16   to you?

14:53:17 17   A.       Yes.

14:53:18 18   Q.       She is an Imperial regional sales manager?

14:53:20 19   A.       Yes.

14:53:22 20   Q.       And Imperial was bidding to supply sugar to the

14:53:27 21   Molson Coors facility in Texas and Georgia, right?

14:53:30 22   A.       Yes.

14:53:30 23   Q.       I want to look at your message at 132 mark.  We have

14:53:39 24   it on your computer screen.  You said, we only have a chance

14:53:42 25   really in Georgia, right?

J. Hines - direct

14:53:50 1   A.      Yes.

14:53:50 2   Q.      So you didn't think Imperial was able -- would be

14:53:53 3   able to be competitive for a Texas Molson Coors facility due

14:53:58 4   to freight costs, right?

14:54:00 5   A.      Yeah.

14:54:00 6   Q.      I want to direct your attention to Mr. Henneberry's

14:54:04 7   message to you at 1:49 at the bottom of the first page up on

14:54:07 8   the screen as well.  Mr. Henneberry asked you, do they care

14:54:12 9   beet or cane, right?

14:54:13 10  A.      Yeah.

14:54:14 11  Q.      And then in your reply, you confirm that Molson

14:54:19 12  Coor's required cane for this business, right?

14:54:21 13  A.      Yes, for this one specific line they were producing,

14:54:25 14  yes.

14:54:25 15  Q.      Now, if you know that a customer like Molson Coors

14:54:29 16  requires cane sugar, then you know that a beet supplier is

14:54:33 17  not going to be able to compete for that business right?

14:54:36 18  A.      Yes.

14:54:36 19  Q.      I want to direct your attention to Mr. Henneberry's

14:54:40 20  long response to you at 2:01 p.m.  Do you see that?

14:54:54 21  Mr. Henneberry says, "For Georgia, we have a locational

14:54:58 22  advantage."

14:55:02 23          That's what he wrote, right?

14:55:02 24  A.      Yes, because of the mileage.

14:55:04 25  Q.      Right.  By locational advantage of Georgia,

J. Hines - direct

14:55:08 1    Imperial's freight cost would be lower than other suppliers

14:55:12 2    that are not close to this Molson Coors facility in Georgia,

14:55:16 3    right?

14:55:16 4    A.      Yes.

14:55:17 5    Q.      Imperial would have advantage because Imperial cost

14:55:21 6    to supply sugar to Molson Coors would be less than the

14:55:24 7    competition, right?

14:55:25 8    A.      That was his estimate, yeah.

14:55:26 9    Q.      Now the competitors he is estimating this message,

14:55:30 10   he's estimating freight cost for LSR, ASR and United, right?

14:55:35 11   A.      Yeah.

14:55:36 12   Q.      And ASR is referred to sometimes as Domino Sugar,

14:55:41 13   right?

14:55:41 14   A.      Yes.

14:55:41 15   Q.      And LSR Sugar sold by Cargill?

14:55:44 16   A.      Yes.

14:55:45 17   Q.      Now, he's not estimating the freight costs of any

14:55:49 18   distributors in this e-mail, right?

14:55:50 19   A.      Not on this chat, no.

14:55:52 20   Q.      Now, I want to direct your attention to your reply to

14:55:56 21   him at 2:01 p.m. right below that.  You inform your boss,

14:56:02 22   Mr. Henneberry, you say, "We have always lost Georgia to

14:56:05 23   United cane on the last three bids."

14:56:07 24           That's what you wrote, right?

14:56:08 25   A.      Yes.

J. Hines - direct

14:56:09  1   Q.      And you actually wrote BIS, but you actually typo,

14:56:13  2   you meant B-I-D-S, bids?

14:56:17  3   A.      Yes.

14:56:17  4   Q.      So on the last three bids from Molson Coors Georgia

14:56:21  5   business, Imperial competed against United on the cane and

14:56:26  6   it should go out of Clewiston Florida refinery?

14:56:29  7   A.      Yes.

14:56:29  8   Q.      Imperial is currently serving Molson Coor's sugar

14:56:34  9   needs for its Georgia facility, right?

14:56:36 10   A.      Yes.

14:57:10 11   Q.      Ms. Hines, if you could turn to PTX 137 in your

14:57:15 12   notebook.  PTX 137 is an e-mail dated August 8, 2018, from

14:57:27 13   you to the CEO of Imperial, Mike Gorrell?

14:57:32 14   A.      Yes, it is.

14:57:34 15          MR. HANNA:  Your Honor, at this time the United

14:57:35 16   States moves to admit PTX 137 into evidence.

14:57:38 17          MR. ZACH:  No objection, Your Honor.

14:57:41 18          THE COURT:  Thank you.  It's admitted.

14:57:41 19          (PTX Exhibit No. 137 was admitted into

14:57:42 20   evidence.)

14:57:42 21   BY MR. HANNA:

14:57:42 22   Q.      Ms. Hines in this e-mail you're informing Mr. Gorrell

14:57:42 23   for a bidding event for General Mills facility in

14:57:50 24   Murfreesburo, Tennessee?

14:57:54 25   A.      Yes.

J. Hines - direct

14:57:55  1    Q.      I want to look at your e-mail at the top of this

14:57:57  2    e-mail chain.  I want to direct your attention to the

14:58:02  3    middle, about five lines down of your e-mail.  We'll

14:58:06  4    highlight it on the computer screen for you.  You tell

14:58:09  5    Mr. Gorrell, that you are not hopeful on this location;

14:58:14  6    right?

14:58:14  7    A.      Yes, I did.

14:58:16  8    Q.      By location, you meant the General Mills facility in

14:58:20  9    Murfreesburo, Tennessee, right?

14:58:23 10    A.      Yes.

14:58:24 11    Q.      I want to direct your attention to something you said

14:58:27 12    about three lines down, you see where he said also on every

14:58:31 13    bid, do you see that?

14:58:32 14    A.      Yes, I did.

14:58:33 15    Q.      You inform Mr. Gorrell in writing here, "Also on

14:58:37 16    every bid we have won on the auction, and we were number one

14:58:41 17    in price.  United has come back in after the fact, Amanda

14:58:46 18    called with a lower price and then got the business."

14:58:49 19            That's what you told Mr. Gorrell, right?

14:58:51 20    A.      That's what my salesperson Kim Youngblood had told

14:58:56 21    me.

14:58:56 22    Q.      And you're reporting that to the CEO of Imperial?

14:59:01 23    A.      Yes.

14:59:02 24    Q.      You understand in the past bid, Imperial had been the

14:59:06 25    lowest bidder for the General Mills Murfreesburo, Tennessee

J. Hines - direct

14:59:10  1   location, right?

14:59:11  2   A.     Yes.

14:59:11  3   Q.     And you understand that United won the General Mills

14:59:14  4   business in Murfreesburo, Tennessee by coming in behind

14:59:19  5   Imperial and lowering its price?

14:59:20  6   A.     That's what Kim had told me.

14:59:24  7   Q.     You can put this document to the side and turn to PTX

14:59:29  8   154 in your notebook.  Do you have 154 up?

14:59:43  9   A.     Yes.

14:59:43  10  Q.     All right.  PTX 154 is an e-mail between you and

14:59:47  11  Imperial sales team between August 31st and September 7th,

14:59:52  12  2018; right?

14:59:55  13  A.     Are you saying 154?

14:59:58  14  Q.     Yes, PTX 154.

15:00:01  15  A.     Okay.

15:00:02  16  Q.     This is about Costco?

15:00:04  17  A.     Yes.

15:00:05  18  Q.     And this is an e-mail that you're on, this e-mail

15:00:10  19  chain between August 31st and September 7th, right?

15:00:12  20  A.     Yes.

15:00:14  21         MR. HANNA:  Your Honor, at this time United

15:00:16  22  States moves to admit PTX 154 into evidence.

15:00:19  23         MR. ZACH:  No objection, Your Honor.

15:00:21  24         THE COURT:  Thank you, it's admitted.

15:00:21  25         (PTX Exhibit No. 154 was admitted into

J. Hines - direct

15:00:23 1    evidence.)

15:00:23 2    BY MR. HANNA:

15:00:24 3    Q.      Ms. Hines, as I said earlier, this is an e-mail about

15:00:27 4    a bidding event for Costco, Southeast and Northeast

15:00:31 5    divisions, right?

15:00:32 6    A.      Yes.

15:00:32 7    Q.      And the Costco Southeast division means the

15:00:36 8    distribution center in Georgia and Florida where Costco

15:00:42 9    ships out to retail outlets in that region?

15:00:44 10   A.      Yes.

15:00:44 11   Q.      The Costco Northeast division means the distribution

15:00:47 12   centers in Maryland and New Jersey that ships out to those

15:00:53 13   centers, right?

15:00:53 14   A.      Yes.

15:00:53 15   Q.      That actually includes the Delaware region, right?

15:00:58 16   A.      Yes.

15:00:58 17   Q.      For this particular Costco bidding opportunity,

15:01:02 18   Imperial was bidding to supply the Costco southeast and

15:01:05 19   northeast division with 25-pound bags and 50-pound bags,

15:01:10 20   right?

15:01:10 21   A.      Yes.

15:01:11 22   Q.      I want to look at your e-mail generated September 7,

15:01:11 23   2018, at 1:09 p.m.  Again, we put it up on the computer

15:01:14 24   screen if it's helpful for you, Ms. Hines.  Do you see where

15:01:21 25   you write, "Costco feedback, any room to go down slightly?

J. Hines - direct

15:01:27 1    Competing with United Cane."

15:01:29 2    A.      Yes.

15:01:30 3    Q.      You understood that United had submitted a competing

15:01:34 4    bid for this Costco bid using sugar out of the Clewiston,

15:01:39 5    Florida refinery, right?

15:01:41 6    A.      Yes.

15:01:41 7    Q.      When you said any room to go down slightly, you

15:01:44 8    understood that Costco wanted Imperial to lower its bid

15:01:48 9    price, right?

15:01:49 10   A.      Yes.

15:01:49 11   Q.      I want to turn to Ms. Hancock, Heidi Hancock's e-mail

15:01:54 12   at 1:23 p.m.  Ms. Hancock is in the sales department at

15:01:59 13   Imperial, right?

15:02:00 14   A.      Yes.

15:02:00 15   Q.      You see she says, "This is priced at net FOB $34.

15:02:09 16   Pat?  Mike?  Thoughts?"

15:02:12 17           Pat and Mike are referring to Patrick Henneberry

15:02:16 18   and Mike Gorrell?

15:02:17 19   A.      Yes.

15:02:18 20   Q.      The initial bid price from Imperial was 34 FOB price,

15:02:24 21   right?

15:02:24 22   A.      Yes.

15:02:24 23   Q.      For this Costco southeast northeast division business

15:02:28 24   right?

15:02:29 25   A.      Yes.

J. Hines - direct

Q.      I want to turn to the next e-mail in this chain which is from Ms. Hancock at 2:45 p.m., I believe it's on page 1. Now, Ms. Hancock is getting back to you with revised pricing from Costco, after you sent some bid intelligence about competing with United Cane right?

A.      Yes, she did.

Q.      I want to go to the top of the next page where her response continues.  And you see where Ms. Hancock says, "The 50-pound are priced net FOB bulk at $33.91.  Good luck."

A.      Yes.

Q.      So Ms. Hancock was given you the green light to offer Costco a lower price to the 50-pound bags from $34 to now $33.91 right?

A.      She was lowering it because of our range we had available to sell.

Q.      She was lower the price that Imperial would offer a Costco customer, right?

A.      Yeah, because we had a price range.

Q.      Imperial, in fact, did offer Costco this lower price of $33.91 per bag, right?

A.      Yes.

Q.      And Costco awarded Imperial some of this business?

A.      Yes, on this one, they did.

Q.      And currently today Imperial supplies the southeast

J. Hines - direct

15:03:52 1    and northeast divisions of Costco with 10-pound bags,

15:03:56 2    25-pound bags and 50-pound bags, right?

15:03:58 3    A.      Yes, we did.

15:04:00 4    Q.      You can set that document to the side.

15:04:02 5            Let's talk about Pepsi Wytheville, Virginia

15:04:07 6    facility.  If you could turn to PTX 164 in your notebook.

15:04:20 7    Do you have PTX 164 pulled up?

15:04:22 8    A.      Yes, I do.

15:04:23 9    Q.      PTX 164 is an e-mail regarding a bidding event for

15:04:27 10   the Pepsi Wytheville, Virginia sugar business in 2019,

15:04:32 11   right?

15:04:32 12   A.      Yes.

15:04:34 13           MR. HANNA:  Your Honor, at this time the United

15:04:36 14   States seek to admit PTX 164 into evidence.

15:04:40 15           MR. ZACH:  No objection.

15:04:41 16           THE COURT:  It's admitted.

15:04:41 17           (PTX Exhibit No. 164 was admitted into

15:04:43 18   evidence.)

15:04:43 19   BY MR. HANNA:

15:04:42 20   Q.      Let's look at your e-mail at the top of this e-mail

15:04:46 21   chain.  You told Mr. Gorrell and Ms. Henneberry, "I would

15:04:51 22   say it's either Domino or United Florida."

15:04:54 23           That's what you wrote?

15:04:55 24   A.      That was me guessing.

15:04:57 25   Q.      You thought the likely competition for the Pepsi

J. Hines - direct

15:05:00 1  Wytheville, Virginia facility would be United out of

15:05:04 2  Clewiston, Florida or Domino?

15:05:07 3  A.      Yes.

15:05:08 4  Q.      And you thought United would competing out Clewiston,

15:05:12 5  Florida, because you had learned that Pepsi for that

15:05:15 6  Wytheville, Virginia facility required cane sugar?

15:05:18 7  A.      I don't recall if they told me cane or not at that

15:05:25 8  time, I don't remember.

15:05:26 9  Q.      If I showed you your deposition, do you think that

15:05:29 10  would refresh your recollection?

15:05:30 11  A.      It could be, but to be honest, I don't remember.  I

15:05:37 12  would have to look back.

15:05:38 13  Q.      Can you turn to your CID deposition.  I want to

15:05:49 14  direct your attention to line 19 through 25.  CID depo 159?

15:05:58 15  A.      Yes.

15:05:58 16  Q.      If you could read to yourself lines 19 through 25.

15:06:05 17  A.      (Witness reviewing.)  Yes, I see that.

15:06:13 18  Q.      Does that refresh your recollection that Pepsi was

15:06:17 19  requiring cane sugar for the Pepsi Wytheville, Virginia

15:06:21 20  facility?

15:06:21 21  A.      At that time they must have been because they

15:06:23 22  converted back and forth.

15:06:25 23  Q.      And likewise, you thought Domino was likely to be the

15:06:28 24  other competition for this Pepsi Wytheville, Virginia

15:06:31 25  business, because you knew at the time they required cane

J. Hines - direct

15:06:35 1    sugar, right?

15:06:36 2    A.      Yes.

15:06:36 3    Q.      LSR produces cane sugar, which is sold by Cargill,

15:06:41 4    right?

15:06:42 5    A.      Yes.

15:06:42 6    Q.      You didn't mention LSR or Cargill in your e-mail,

15:06:46 7    right?

15:06:46 8    A.      No, I did not.

15:06:47 9    Q.      You thought LSR was not competing for this Pepsi

15:06:53 10   Wytheville, Virginia?

15:06:54 11   A.      At that time, no.

15:06:55 12   Q.      Because you thought LSR Cargill was located too far

15:07:00 13   away in Gramercy, Louisiana?

15:07:00 14   A.      Yes.

15:07:03 15   Q.      You never seen LSR Cargill go that far from Louisiana

15:07:07 16   to sell sugar, which could be due to freight cost, right?

15:07:13 17   A.      At that time, yes.

15:07:14 18   Q.      Now ultimately, Imperial did win the Pepsi

15:07:17 19   Wytheville, Virginia business to provide both granulated

15:07:20 20   sugar and liquid sugar, right?

15:07:22 21   A.      Yes.

15:07:22 22   Q.      At the time of this e-mail, United was the incumbent

15:07:27 23   supplier for the Wytheville, Virginia business?

15:07:32 24   A.      Yes, they were.

15:07:32 25   Q.      If you could turn to PTX 147 in your notebook.  PTX

J. Hines - direct

15:07:48  1   147 is the e-mail from Imperial CEO to you and others, dated

15:07:55  2   April 23, 2019, is that right?

15:07:58  3              MR. HANNA:  Your Honor, at this time, United

15:08:01  4   States moves to admit PTX 147 into evidence.

15:08:05  5              MR. ZACH:  No objection, Your Honor.

15:08:06  6              THE COURT:  Thank you.

15:08:06  7              (PTX Exhibit No. 147 was admitted into

15:08:08  8   evidence.)

15:08:08  9   BY MR. HANNA:

15:08:08 10   Q.      This is another e-mail about the Wytheville, Virginia

15:08:12 11   Pepsi facility, right?

15:08:13 12   A.      Yes, it is.

15:08:13 13   Q.      At the top of this e-mail in April of 2019, as of

15:08:18 14   April 2019, Imperial had been serving the Wytheville,

15:08:22 15   Virginia facility for about four months, right?

15:08:23 16   A.      Yes.

15:08:24 17   Q.      Now, I want to direct your attention to the middle of

15:08:27 18   the first page at 11:08 a.m., your e-mail.  Do you see that?

15:08:34 19   You say a little background, do you see that paragraph?

15:08:36 20   A.      Yes.

15:08:37 21   Q.      And then on the second line you inform everybody on

15:08:41 22   this e-mail their cane sugar supply had been from United.

15:08:45 23   That's what you wrote, right?

15:08:46 24   A.      Yes, I did.

15:08:47 25   Q.      Now, you're providing everyone on this e-mail some

J. Hines - direct

15:08:50 1   context of Imperial taking over the Wytheville, Virginia

15:08:53 2   facility from United, right?

15:08:55 3   A.     Yes.

15:08:57 4   Q.     And you had learned that when United was the supplier

15:09:00 5   to this Wytheville, Virginia facility, United had been

15:09:04 6   delivering sugar that was lumpy and it was difficult to get

15:09:07 7   out of the railcars, right?

15:09:09 8   A.     The cane that they had originally shipped had been,

15:09:11 9   and then they had changed it to beet.

15:09:14 10   Q.     You had learned from Pepsi that the cane sugar that

15:09:18 11   had come from Clewiston that United was delivering was lumpy

15:09:22 12   and it was difficult to get out of the railcars, right?

15:09:26 13   A.     Yes, that's what they told us.

15:09:27 14   Q.     You learned that Pepsi did not like how the sugar

15:09:30 15   from United was coming out of the railcars at Wytheville,

15:09:35 16   Virginia, right?

15:09:35 17   A.     For the cane, yes.

15:09:36 18   Q.     Then you write in here, not once did they send anyone

15:09:40 19   in to review the system, sugar, or attempt to solve any of

15:09:42 20   their issues.  That's what you wrote?

15:09:45 21   A.     That's what Pepsi had told me.

15:09:47 22   Q.     And that's what you learned?

15:09:48 23   A.     Yes.

15:09:49 24   Q.     And the they is referring to United, right?

15:09:52 25   A.     Yes.

J. Hines - direct

15:09:53 1   Q.      And so you learned that United not once sent anyone

15:09:56 2   to review the unloading process; right?

15:09:59 3   A.      Yes.

15:09:59 4   Q.      And you learned that United not once sent anyone to

15:10:03 5   inspect the sugar United was delivering to the Pepsi

15:10:07 6   Wytheville, Virginia facility, right?

15:10:08 7   A.      Yes.

15:10:09 8   Q.      And you learned that United never made any attempt to

15:10:11 9   solve any of Pepsi's issues with the quality of the sugar,

15:10:15 10  right?

15:10:15 11  A.      That's what Pepsi had told me, yes.

15:10:17 12  Q.      So after Pepsi told you that in a meeting, Imperial

15:10:22 13  sent Mike Kaminski to the Pepsi Wytheville, Virginia to

15:10:26 14  provide Pepsi suggestions on how to improve the railcar

15:10:30 15  unloading process, right?

15:10:31 16  A.      Actually Mike was actually at that meeting, too, for

15:10:35 17  the meeting itself.

15:10:36 18  Q.      He was at the meeting with Pepsi?

15:10:39 19  A.      Yes, he was in that meeting with me.

15:10:41 20  Q.      And then Mr. Kaminski actually went to the

15:10:44 21  Wytheville, Virginia facility and helped out with the

15:10:47 22  unloading process when the sugar was arriving for Imperial,

15:10:50 23  right?

15:10:50 24  A.      We were actually at the Wytheville location so he

15:10:55 25  just stayed there.

J. Hines - direct

15:10:56 1   Q.      Mr. Kaminski is the plant manager for Imperial

15:10:57 2   Ludlow, Kentucky facility?

15:11:02 3   A.      Yes.

15:11:02 4   Q.      And you understood that he gave suggestions to Pepsi

15:11:06 5   on how to unload to railcars, right?

15:11:08 6   A.      To improve how their unloading system was working,

15:11:12 7   yes.

15:11:12 8   Q.      And you understood that the Pepsi team was thrilled

15:11:15 9   about his advice about the railcar unloading process, right?

15:11:18 10  A.      Yes, that's what was shared with me.

15:11:20 11  Q.      And you wrote in there, after Mike was there, they

15:11:23 12  were thrilled at his advice and our sugar.  That's what you

15:11:26 13  wrote?

15:11:26 14  A.      Yes, it is.

15:11:27 15  Q.      And you understand that the Pepsi team at the

15:11:32 16  Wytheville, Virginia facility location was happy with the

15:11:34 17  quality of the sugar from Imperial?

15:11:35 18  A.      Yes.

15:11:36 19  Q.      Imperial was able to hold on to this Wytheville,

15:11:42 20  Virginia business for the next two years, right?

15:11:42 21  A.      Yes, we were.

15:11:52 22  Q.      Ms. Hines, you were aware of generally what prices

15:11:52 23  other suppliers of refined sugar are selling to customers,

15:11:52 24  right?

15:11:52 25  A.      You can see pricing in the Sosland Report.

J. Hines - direct

15:12:03 1    Q.      You get market intelligence from varied sources,

15:12:06 2    right?

15:12:07 3    A.      Yes, I do.

15:12:08 4    Q.      And one of your sources to get pricing information

15:12:10 5    from competitors is a broker named Jerry Kramer, right?

15:12:14 6    A.      Yes.

15:12:15 7    Q.      If you could please turn to PTX 127 in your notebook.

15:12:30 8            Ms. Hines, PTX 127 is an e-mail from you dated

15:12:34 9    November 15, 2019, where you are responding back to Jerry

15:12:39 10   Kramer who has sent you an e-mail, right?

15:12:41 11   A.      Yes.

15:12:43 12           MR. HANNA:  Your Honor, at this time the United

15:12:45 13   States moves to admit PTX 127 into evidence.

15:12:48 14           MR. ZACH:  No objection, Your Honor.

15:12:49 15           THE COURT:  Thank you.

15:12:49 16           (PTX Exhibit No. 127 was admitted into

15:12:52 17   evidence.)

15:12:52 18   BY MR. HANNA:

15:12:52 19   Q.      Ms. Hines, Mr. Kramer has been in the industry for a

15:12:52 20   very long time, right?

15:12:52 21   A.      Yes, he has.

15:12:52 22   Q.      You have known Mr. Kramer for about fifteen years

15:13:02 23   since you started at Imperial, right?

15:13:02 24   A.      Yes.

15:13:02 25   Q.      The topic of Mr. Kramer's e-mail to you is about

J. Hines - direct

15:13:08 1  Domino Sugar's pricing, right?

15:13:14 2  A.      Yes, he sent it to us, yes.

15:13:15 3  Q.      He sent it to you and Mr. Gorrell and Mr. Henneberry,

15:13:20 4  right?

15:13:20 5  A.      Yes.

15:13:21 6  Q.      All right.  Now I want to focus on Mr. Kramer's

15:13:25 7  initial e-mail to you, I think it's on the second page.  Do

15:13:33 8  you see that Mr. -- you had received some pricing

15:13:35 9  information that Domino has offering industrial customers

15:13:39 10 and distributor customers right?

15:13:42 11 A.      That's what Jerry provided.

15:13:45 12 Q.      He provided it to you, right?

15:13:46 13 A.      To the group, yes.

15:13:48 14 Q.      And Domino is Imperial's competitor, right?

15:13:51 15 A.      Yes.  And he says it's from reliable sources.

15:13:54 16 Q.      He told you he has reliable sources that are

15:13:58 17 providing you that information?

15:13:59 18 A.      Those were his definitions, reliable source.

15:14:03 19 Q.      Mr. Kramer tries to be helpful in this way, in giving

15:14:06 20 you any information that he thought it might be helpful to

15:14:09 21 you, right?

15:14:09 22 A.      He sends a lot of information, yes.

15:14:12 23 Q.      I want to go to your response to him on the, I think

15:14:16 24 it's on the first page at 12:46 p.m.  And your response, you

15:14:26 25 wanted Mr. Kramer to get you the pricing that Domino was

Hines - cross

15:14:30 1    charging retail customers, right?

15:14:31 2    A.      I am asking him if he had seen anything with Domino

15:14:36 3    in the retail side of the business because we had received

15:14:39 4    two requests from two major retailers in the northeast

15:14:43 5    wanting to put the Imperial brand into distribution and I

15:14:46 6    couldn't understand why they wanted it, so I was asking if

15:14:49 7    he had seen anything.

15:14:51 8    Q.      All right.  You wanted him to go out and get Domino's

15:14:55 9    pricing?

15:14:56 10   A.      No, I just wanted to see if he had any ideas of what

15:15:00 11   was going on.

15:15:00 12   Q.      Than you knew that he had reliable sources that could

15:15:03 13   get you Domino pricing information?

15:15:05 14   A.      No, this is the retail side so I don't know if he has

15:15:08 15   anything on the retail side of the business.

15:15:10 16               MR. HANNA:  No further questions, Your Honor.

15:15:12 17               THE COURT:  Thank you.

15:15:14 18               Cross.

15:15:25 19               MR. ZACH:  Good afternoon, Your Honor.  Dan Zach

15:15:29 20   for LDC and Imperial Sugar Company.  May I proceed?

15:15:33 21               THE COURT:  Please.

15:15:33 22                   CROSS-EXAMINATION

15:15:33 23   BY MR. ZACH:

15:15:37 24   Q.      Good afternoon, Ms. Hines.

15:15:38 25   A.      Hello.

Hines - cross

15:15:39 1  Q.      So plaintiff's counsel just asked you a number of

15:15:43 2  questions about different customer interactions and I want

15:15:46 3  to take a step back and begin by talking to you about the

15:15:50 4  broader context of Imperial's business.

15:15:53 5          Does Imperial make most of its refined sugar

15:15:56 6  from imported or domestic raw sugar?

15:15:58 7  A.      Because we are not vertically integrated for cane

15:16:03 8  sugar supply, we get approximately 90 to 95 percent of our

15:16:08 9  raw sugar from imports.

15:16:09 10  Q.      Why does Imperial rely on imports?

15:16:12 11  A.      Because they're not vertically integrated which means

15:16:16 12  we don't have access to domestic raw cane sugar in the US on

15:16:20 13  a consistent basis.

15:16:21 14  Q.      What suppliers can make refined sugar without relying

15:16:25 15  on imports?

15:16:26 16  A.      You got quite a few, you got NSM, Michigan, Western,

15:16:32 17  LSR, Domino and United.

15:16:35 18  Q.      Are Imperial's costs to use imported raw sugar

15:16:39 19  typically higher than those companies that have access to

15:16:42 20  domestic sources?

15:16:42 21  A.      Yes.

15:16:42 22  Q.      As an import refiner, how do Imperial's high raw

15:16:50 23  sugar costs affect the refined sugar prices that Imperial

15:16:52 24  charges?

15:16:52 25  A.      We are almost always higher than competition.

Hines - cross

Q.      And how do Imperial's refined sugar prices compare to those offered by other refined sugar suppliers who have access to domestic sources?

A.      When the raw cane market pricing is high, our refined sugar prices will end up being $5 to $7 higher than our competition, but when it's on an a more average basis, we may only be $1 to $2 higher than competition.

Q.      So there is a range of prices that Imperial buys imported raw sugar at?

A.      Yes.

Q.      And regardless of whether you are at the high end or low end of that range, refined sugar prices tend to be higher than competition?

        MR. HANNA:  Objection.  Leading.

Q.      Does Imperial keep track of its sales of refined sugar in the ordinary course?

A.      Yes, we do.

Q.      What system do you use to track those sales?

A.      PeopleSoft.

Q.      I would like to show you a document, it's in your binder, but we can pull up a redacted version for the public.  And that document is marked DTX 516.  Have you been able to locate the document?

A.      Yes.

Q.      What is DTX 516?

Hines - cross

15:18:10  1    A.      This is a record of our 2021 sales data.

15:18:15  2    Q.      Were you involved in ensuring the accuracy of DTX

15:18:21  3    516?

15:18:21  4    A.      Yes, I was.

15:18:22  5            MR. ZACH:  At this time, Your Honor, I move to

15:18:25  6    enter DTX 516 into evidence.

15:18:28  7            MR. HANNA:  No objection.

15:18:29  8            THE COURT:  Thank you.  It's admitted.

15:18:30  9            (DTX Exhibit No. 516 was admitted into

15:18:31 10    evidence.)

15:18:31 11    BY MR. ZACH:

15:18:32 12    Q.      According to this document, Ms. Hines, what is

15:18:34 13    Imperial's third largest state in terms of volume sales?

15:18:39 14    A.      Texas.

15:18:41 15    Q.      And what percent of Imperial's total sales go to

15:18:45 16    Texas?

15:18:45 17    A.      Eleven percent.

15:18:47 18    Q.      Who are some of Imperial's largest customers in

15:18:51 19    Texas?

15:18:52 20    A.      HEB.  Sam's.  Wal-Mart.

15:18:58 21    Q.      What percentage of Imperial sales go to the state of

15:19:01 22    Indiana?

15:19:01 23    A.      Six percent.

15:19:02 24    Q.      Who are some of Imperial's largest customers in

15:19:07 25    Indiana?

Hines - cross

A.        Indiana Sugar, Pepsi, Kroger, Weston Foods.

Q.        What classes of customers does Imperial sell refined

sugar to?

A.        We sell to three different classes of trade.  We sell

to the industrial channel which our example would be Hershey

or Mars; we sell to the food service/distributor channel,

example would be Indiana Sugar or US Food Service; and the

last would be our retail channel and that would be either a

Kroger or a Wal-Mart.

Q.        What percent of Imperial total refined sugar sales in

2021 went to the retail sector?

A.        21 percent.

Q.        When selling sugar does Imperial focus on any

particular geography?

A.        My job is to sell sugar wherever I can sell it,

historically I'll look at previous customers from the past,

we can go from Texas, up to Wisconsin, up to Pennsylvania,

all the way down to Miami, Florida.

Q.        In the ordinary course, does Imperial define a region

as the southeast in which it operates?

A.        No.

Q.        Based on your experience why do customers choose to

buy sugar from Imperial rather than other suppliers?

A.        They either buy from us because they want to have

multiple suppliers or for our reliability and customer

Hines - cross

15:20:22 1    service.

15:20:22 2    Q.      Why, based on your experience, do some customers want

15:20:25 3    to have multiple suppliers?

15:20:26 4    A.      They want to ensure continuity and supply, take for

15:20:32 5    instance, the hurricane down in the Gulf, they still have

15:20:35 6    sugar coming in.  If there is a big snowstorm or freeze up

15:20:38 7    in the valley for the beets and it is impacted.  They want

15:20:42 8    to make sure they can still have sugar so their operations

15:20:44 9    don't stop.

15:20:44 10   Q.      When trying to secure contracts with customers, does

15:20:48 11   Imperial typically have to submit a bid in a RFP or some

15:20:52 12   other bidding process?

15:20:53 13   A.      For many of our industrial customers, we do.

15:20:56 14   Q.      During those RFP or bidding processes, do you learn

15:20:59 15   what the actual prices submitted by your competitors are?

15:21:05 16   A.      No.

15:21:05 17   Q.      Who do you view to be Imperial's competitors?

15:21:08 18   A.      We have a lot.  I consider Michigan, NSM, CSC, LSR,

15:21:16 19   Domino, United, ADM, Batory Foods, ICI, just to name a few.

15:21:22 20   Q.      Who is NSM?

15:21:25 21   A.      National Sugar Marketing.

15:21:27 22   Q.      What are some examples of customers for which NSM

15:21:31 23   competes with you?

15:21:32 24   A.      We go against them, compete with them Bimbo, Bordon,

15:21:37 25   even Pepsi, Southern Visions, Kings Hawaiian - there are

Hines - cross

1  quite a few.

2  Q.    You mentioned Kings Hawaiian.  Where is that located?

3  A.    Kings Hawaiian is in Flowery Branch, Georgia.

4  Q.    How would NSM be able to compete for Kings Hawaiian

5  based on that?

6  A.    They can do it two different ways, they can either

7  rail beet sugar in from the valley to a transfer station in

8  Atlanta, Georgia, they have an affiliation with Sucden and

9  they can bring in imported cane sugar into that same station

10  in Atlanta and then put it into a bulk truck or liquid truck

11  and ship it to them.

12  Q.    I want to talk now about a number of the customer

13  interactions that plaintiff's counsel talked to you about.

14  Let me ask you in total how many customers does Imperial

15  have?

16  A.    In 2021 we had 208 corporate customers.

17  Q.    In 2022 how many do you have?

18  A.    We're down to 183 corporate customers.

19  Q.    Why is that number falling?

20  A.    Our refined sugar prices were high, so we lost

21  business.

22  Q.    During your direct examination, plaintiff's counsel

23  asked you a number of questions about General Mills.  Do you

24  remember that?

25  A.    Yes.

Hines - cross

15:22:52 1    Q.      And does Imperial currently have a contract to supply

15:22:56 2    bulk trucks to any of General Mills' locations?

15:22:59 3    A.      No.

15:23:00 4    Q.      Does Imperial currently supply General Mills'

15:23:03 5    facility in Tennessee?

15:23:04 6    A.      No.

15:23:05 7    Q.      When was the last time Imperial won General Mills'

15:23:08 8    business anywhere?

15:23:09 9    A.      We haven't won their business in a long time.  I know

15:23:13 10   we helped out in 2017 with nine trucks at that time.

15:23:17 11   Q.      And have you served any General Mills' facilities in

15:23:22 12   Tennessee since then?

15:23:23 13   A.      No.

15:23:24 14   Q.      Why not?

15:23:24 15   A.      Our prices are too high so they can go to CSC that

15:23:29 16   has lower prices or an LSR or an ADM, their prices are all

15:23:35 17   lower than ours.

15:23:36 18   Q.      Plaintiff's counsel asked you about Pepsi as well.

15:23:39 19   Do you remember that?

15:23:39 20   A.      Yes.

15:23:40 21   Q.      How does Pepsi get sugar into its Wytheville

15:23:45 22   location?

15:23:46 23   A.      The primary way is by rail because, 90 percent of

15:23:48 24   Wytheville has to be in railcar sugar.

15:23:52 25   Q.      Given the Wytheville location accepts sugar by rail,

15:23:58 1    who can compete for Pepsi's business at that location?

15:24:02 2    A.       Domino, United, LSR actually could easily do the same

15:24:06 3    mileage as United, and those would be the ones, NSM could

15:24:11 4    because they could rail car sugar in as well.

15:24:14 5    Q.       You had provided testimony today or been asked some

15:24:17 6    questions about whether LSR served that facility.  You said

15:24:23 7    at that time you gave your testimony, you gave the

15:24:25 8    testimony.  Today do you believe that LSR could serve Pepsi

15:24:30 9    in that location?

15:24:32 10   A.       Absolutely.

15:24:32 11   Q.       How would they do that?

15:24:33 12   A.       They would ship it in via a railcar.

15:24:36 13   Q.       Approximately how much sugar does Imperial currently

15:24:40 14   sell to Pepsi?

15:24:44 15   A.       Actually for 2022 business, we have roughly 300,000

15:24:49 16   hundredweight.

15:24:49 17   Q.       Has Imperial's volume for Pepsi fallen overtime?

15:24:53 18   A.       We're actually down about 27 percent versus the

15:24:56 19   previous year.

15:24:57 20   Q.       Why is that?

15:24:58 21   A.       Our prices of refined sugar were too high so we lost

15:25:02 22   business.

15:25:02 23   Q.       Plaintiff's counsel also asked you about Molson

15:25:02 24   Coors.  Do you recall that?

15:25:02 25   A.       Yes.

Hines - cross

15:25:07 1    Q.      And roughly how much of Imperial's total sales volume

15:25:11 2    did Molson Coors account for in 2021?

15:25:15 3    A.      They did .6 percent of our total business.

15:25:20 4    Q.      Less than one percent?

15:25:21 5    A.      Yes.

15:25:23 6    Q.      I want to talk for a moment about some customers that

15:25:28 7    didn't come up in your direct examination.  Are you aware of

15:25:31 8    a company named Post?

15:25:33 9    A.      Yes.

15:25:33 10   Q.      And who's Post?

15:25:35 11   A.      They're a maker of cereals.

15:25:38 12   Q.      Does Imperial compete effectively for Post's business

15:25:41 13   in North Carolina?

15:25:42 14   A.      No, we do not.

15:25:43 15   Q.      Why?

15:25:44 16   A.      Our prices are too high.  In fact, we just did a bid,

15:25:48 17   and the feedback from the buyers was we were $5 a

15:25:51 18   hundredweight higher than our competition.

15:25:56 19   Q.      Are you aware of a company named Hostess?

15:25:58 20   A.      Yes.

15:25:59 21   Q.      Who are they?

15:26:02 22   A.      They make Twinkies and Dingdongs.

15:26:03 23   Q.      Does Imperial compete effectively for Hostess's

15:26:07 24   business?

15:26:07 25   A.      No, we do not.

Hines - cross

15:26:08  1   Q.      Why not?

15:26:09  2   A.      Our prices are to high.  In fact, we're not even

15:26:13  3   asked to bid.

15:26:14  4   Q.      Is that true for the Hostess plant in Georgia?

15:26:16  5   A.      Yes.

15:26:18  6   Q.      Are you aware of a company named Danone?

15:26:20  7   A.      Yes.

15:26:21  8   Q.      Who is Danone?

15:26:22  9   A.      A maker of yogurt and creamers and waters.

15:26:24  10  Q.      Does Imperial compete effectively for Danone's

15:26:28  11  business in Virginia?

15:26:30  12  A.      No.

15:26:30  13  Q.      Why not?

15:26:30  14  A.      Our prices are too high versus CSC.

15:26:35  15  Q.      So Danone is served by CSC?

15:26:39  16  A.      That is my understanding.

15:26:40  17  Q.      Do you have any other examples of instances which CSC

15:26:46  18  has beat Imperial?

15:26:47  19  A.      In the past we've lost business with Unilever.

15:26:52  20  Q.      You were talking with plaintiff's counsel a moment

15:26:55  21  ago, you were asked about PX 217 which is that map, if you

15:27:04  22  recall.

15:27:04  23  A.      Yes.

15:27:05  24  Q.      And actually if we could pull it up.  Do you

15:27:10  25  remember, the map now that it's on the screen here, PX 217?

Hines - cross

A.      Yes.

Q.      And who created PX 217?

A.      It was from McKeany-Flavell.

Q.      From whom did you receive this document?

A.      I received it from Pepsi.

Q.      So Imperial did not create this map, is that right?

A.      No, we did not.

Q.      Does Imperial use this document in the ordinary
course of business for any purpose?

A.      No.

Q.      In the ordinary course of business, does Imperial
keep track of primary or secondary marketing regions?

A.      No.

Q.      Plaintiff's counsel asked you some questions about
Jerry Kramer, and certain information that Imperial receives
from him.  Do you recall that?

A.      Yes.

Q.      Do you believe the information that Mr. Kramer
provides is accurate?

A.      I take it with a grain of salt, he provides a lot of
information, it doesn't say who it's from, it says reliable
sources, I really look at it as kind of a general overview
of what is happening in the market from a supply and demand
at a high level.  It doesn't even give me prices specific to
a customer.

Hines - cross

Q.      Do you use the pricing information that you receive
from Mr. Kramer, such as an e-mail that you talked about in
making any pricing decisions for specific customers?

A.      No, because we have to follow whatever the raw
pricing is at that time and we have a formula that we have
to use, plus our margin which we do have a range of a top
and a bottom and we will not go below that bottom and any
other differential cost to make the specific product, so we
have to follow our pricing model.

Q.      What is a BYA?

A.      It's a buying agreement.

Q.      Do BYA spreadsheets contain a cell in them labeled
competition?

A.      There is one there, yes.

Q.      And who at Imperial ever fills in that cell?

A.      None of the salespeople fill it in other than Beth
Smith.  And when I have asked her about it in the past she's
not even sure if she updates it for each different
spreadsheets she uses.

Q.      Do you use the information in that cell labeled
competition for any purpose in the ordinary course of
business?

A.      No.

Q.      Does the information contained in that cell identify
all of the competitive options that a customer might have

Hines - redirect

15:29:47  1   who is the focus of the BYA document?

15:29:49  2   A.       No.

15:29:56  3              MR. ZACH:   I have no more questions.

15:29:58  4              THE COURT:   Thank you.

15:29:59  5              Redirect, Mr. Hanna

15:30:03  6                 REDIRECT EXAMINATION

15:30:05  7   BY MR. HANNA:

15:30:12  8   Q.       Counsel asked you some questions and you rattled off

15:30:16  9   some competitors, do you recall that?

15:30:18 10   A.       Yes.

15:30:18 11   Q.       Do you recall, I walked you through some of your

15:30:20 12   e-mails, right?

15:30:21 13   A.       Yes.

15:30:21 14   Q.       One of those e-mails was about a Wytheville, Virginia

15:30:25 15   facility for Pepsi.

15:30:26 16   A.       Yes.

15:30:26 17   Q.       And the only two competitors you mentioned in this

15:30:28 18   e-mail was Domino and United Sugar?

15:30:33 19   A.       That was at that time, yes.

15:30:34 20   Q.       You mentioned about a range of margin that Imperial

15:30:38 21   had, right?

15:30:38 22   A.       Yes, we do.

15:30:39 23   Q.       That means you negotiate with customers within that

15:30:42 24   range, right?

15:30:42 25   A.       If we're given approval to do so, yes.

Hines - redirect

15:30:46  1    Q.      What does margin mean?

15:30:48  2    A.      It's the profit you're making on the item.

15:30:51  3    Q.      Okay.  Now, earlier you talk about Costco's business,

15:30:58  4    do you remember that?

15:30:58  5    A.      Yes.

15:30:59  6    Q.      Imperial supplies Costco's northeast division, right?

15:31:03  7    A.      Yes, we supplied their 10 pound for years.

15:31:05  8    Q.      And you said that the northeast division covers

15:31:09  9    Delaware, right?

15:31:10  10   A.      Yes.

15:31:10  11   Q.      So if I went to Costco in Christiana, Delaware which

15:31:14  12   is outside of Wilmington, I would find Imperial sugar there?

15:31:18  13   A.      I would think you would find Imperial 10 pound, I

15:31:21  14   don't know right off the bat.

15:31:23  15   Q.      You would find it in a Costco in Delaware, right?

15:31:26  16   A.      If it's in that group, yes.

15:31:28  17   Q.      All right.  Your counsel showed you DTX 516, a

15:31:34  18   summary of Imperial's sales, do you recall that?

15:31:36  19   A.      Yes.

15:31:36  20   Q.      And if we could pull it up.  I don't know counsel if

15:31:42  21   you have it, DTX 516.  Do you have it available.  Ms. Hines,

15:31:51  22   DTX 516, do you see it?

15:31:51  23   A.      Yes.

15:31:51  24   Q.      Do you see Delaware?

15:31:56  25   A.      Yes, I do.

15:31:59 1    Q.      There is one customer listed there, right?

15:32:01 2    A.      Yes.

15:32:02 3    Q.      And you have more than one customer in Delaware,

15:32:05 4    right?

15:32:05 5    A.      It depends, I would have to go back and look at on

15:32:09 6    the Dover, Delaware could actually be in that store but the

15:32:12 7    warehouse could actually be -- there is one in Monroe

15:32:16 8    Township and one other so it wouldn't show up in the

15:32:19 9    Delaware numbers as ordered in.

15:32:21 10   Q.      Let me ask you a question.  You have Imperial does

15:32:24 11   sell sugar also to Kraft in Dover, Delaware, right?

15:32:28 12   A.      Yes.

15:32:28 13   Q.      And that's one customer, right?

15:32:29 14   A.      Yes.

15:32:30 15   Q.      And you also sell to Costco's northeast division that

15:32:34 16   also delivers into Delaware, right?

15:32:36 17   A.      But the warehouse is not in Delaware for Costco.

15:32:40 18   It's in Maryland, and New Jersey, so we don't deliver to

15:32:46 19   Delaware.

15:32:46 20   Q.      So that sale would be Maryland or New Jersey, but

15:32:50 21   those sales would go to Costco Delaware, right?

15:32:52 22   A.      Yes.

15:32:52 23           MR. HANNA:  No further questions.

15:32:52 24           THE COURT:  Thank you.  Okay.

15:32:52 25           THE WITNESS:  Am I done?

Henneberry - direct

15:32:58 1          THE COURT:  Thank you.  You are excused.

15:33:01 2          What's next?

15:33:08 3          MR. HANNA:  Your Honor, apologize, I was

15:33:11 4   informed, I think I did not move to admit PTX 164.  I ask

15:33:17 5   that it be admitted at this time.

15:33:21 6          THE COURT:  Any objection to PTX 164?

15:33:25 7          MR. ZACH:  Thank you.  No objection.

15:33:27 8          THE COURT:  Thank you.

15:33:27 9          (PTX Exhibit No. 164 was admitted into

15:33:28 10  evidence.)

15:33:28 11         MS. GARRETT:  Good afternoon, Your Honor.

15:33:34 12  Jenigh Garrett for the United States.  Your Honor, may we

15:33:37 13  proceed with the next witness?  Your Honor, the United

15:33:40 14  States calls Patrick Henneberry as an adverse witness.

15:33:45 15  Mr. Henneberry is Senior Vice President for Refined Sugar

15:33:46 16  Marketing and Business Development for Imperial Sugar

15:33:50 17  Company.

15:34:16 18         COURT CLERK:  Please raise your right hand.

15:34:19 19  Please state and spell your name for the record.

15:34:21 20         THE WITNESS:  Patrick Henneberry, P-A-T-R-I-C-K,

15:34:26 21  H-E-N-N-E-B-E-R-R-Y.

15:34:40 22              DIRECT EXAMINATION

15:34:40 23  BY MS. GARRETT:

15:34:42 24  Q.      Good afternoon, Mr. Henneberry.

15:34:46 25  A.      Good afternoon.

Henneberry - direct

15:34:51 1                    MS. GARRETT:  Permission to proceed?

15:34:52 2                    THE COURT:  Yes, please.

15:34:52 3     BY MS. GARRETT:

15:34:54 4     Q.      Mr. Henneberry, you have worked in the sugar industry

15:34:56 5     for about thirty years or more, right?

15:34:58 6     A.      Yes, since 1979.

15:35:01 7     Q.      And currently you are the senior vice-president for

15:35:04 8     refined sugar marketing and business development for

15:35:09 9     Imperial Sugar Company; correct?

15:35:11 10    A.      That's correct.

15:35:11 11    Q.      You worked for Imperial before LDC acquired the

15:35:17 12    company, right?

15:35:17 13    A.      Yes, I did.

15:35:19 14    Q.      And you first came to Imperial in 2002; is that

15:35:22 15    right?

15:35:22 16    A.      That's correct.

15:35:23 17    Q.      As senior vice-president, you supervise the sales

15:35:27 18    team, correct?

15:35:28 19    A.      I oversee the sales team, and Jeana Hines directly

15:35:33 20    supervises.

15:35:34 21    Q.      And you supervise Jeana Hines?

15:35:37 22    A.      Yes, I do.

15:35:37 23    Q.      Now, you also manage Imperial's day to day pricing?

15:35:42 24    A.      Yes I do.

15:35:42 25    Q.      And one of your responsibilities is to give the sales

Henneberry - direct

15:35:46 1  team the price they can offer to a potential customer,

15:35:49 2  right?

15:35:50 3  A.     That's correct.

15:35:51 4  Q.     The sales team asks for prices by submitting a quote

15:35:57 5  request, right?

15:35:58 6  A.     Yes, that's the process.

15:36:01 7  Q.     You also try to make sure Imperial's pricing is

15:36:05 8  consistent with what you believe is going on in the market

15:36:09 9  competitively, correct?

15:36:10 10  A.     I do.

15:36:12 11  Q.     I would like to discuss the process that a buyer

15:36:16 12  would have when purchasing sugar from Imperial for a second.

15:36:20 13  Now, Imperial competes to supply customers of refined sugar;

15:36:25 14  right?

15:36:25 15  A.     Yes, we do.

15:36:26 16  Q.     And some of Imperial's customers may stay with

15:36:31 17  Imperial because Imperial has the better price; right?

15:36:34 18  A.     Among other factors, yes.

15:36:37 19  Q.     Well, some of the other reasons, other than price,

15:36:39 20  that a customer may choose Imperial is the quality of

15:36:42 21  Imperial sugar, right?

15:36:42 22  A.     That's one of the factors.

15:36:48 23  Q.     The granulation Imperial offers is a reason, other

15:36:52 24  than price, that Imperial wins business, correct?

15:36:56 25  A.     From time to time, yes.

Henneberry - direct

15:36:57 1    Q.      Granulation means the size of the sugar, right?

15:37:01 2    A.      That's correct.

15:37:02 3    Q.      Timely delivery is another reason besides price that

15:37:07 4    Imperial wins business, right?

15:37:09 5    A.      That's correct.

15:37:10 6    Q.      Timely delivery is part of reliable customer service,

15:37:16 7    correct?

15:37:16 8    A.      Yes, among other factors, yes.

15:37:18 9    Q.      Well, it's true that reliable customer service is

15:37:21 10   another way Imperial competes with other refined sugar

15:37:25 11   suppliers; is that right?

15:37:26 12   A.      That's correct.

15:37:27 13   Q.      I would like to discuss how customers receive the

15:37:31 14   sugar they buy.  When a customer wants their sugar

15:37:36 15   delivered, Imperial provides a delivered price; right?

15:37:39 16   A.      Yes, generally.

15:37:41 17   Q.      And the delivered price includes freight charges,

15:37:45 18   right?

15:37:45 19   A.      Yes, it does.

15:37:40 20   Q.      The freight charge can vary based on where the

15:37:50 21   customer wants the sugar delivered right?

15:37:52 22   A.      By where the customer wants it delivered, and the

15:37:55 23   form of the sugar and other factors, yes.

15:37:59 24   Q.      Could you please turn to PTX 163 in your binder.

15:38:02 25           MS. GARRETT:  Your Honor, PTX 163 has already

Henneberry - direct

15:38:08 1  been admitted.

15:38:11 2          THE COURT:  Great.  Thank you.

15:38:12 3  BY MS. GARRETT:

15:38:13 4  Q.      PTX 163 is a jabber chat between you and Jeana Hines,

15:38:18 5  correct?

15:38:18 6  A.      That's correct.

15:38:18 7  Q.      And jabber is a type of instant messaging or chat

15:38:24 8  program that you have used, right?

15:38:25 9  A.      Yes, it is.

15:38:26 10 Q.      And instant messaging is one way that you communicate

15:38:31 11 with the sales team in your day-to-day business, right?

15:38:33 12 A.      Yes, that's correct.

15:38:34 13 Q.      Now, I would just like to look at the second page of

15:38:41 14 PTX 163 if we could put that up.  Now, I would like to draw

15:38:50 15 your attention to -- I would like to draw your attention to

15:38:57 16 the language right under your name there, you should be able

15:39:01 17 to see that.  Imperial has a locational advantage in

15:39:04 18 Georgia, right?

15:39:10 19 A.      We have a locational advantage in some cases as to

15:39:14 20 the distance to the customer, but it's not often decisive.

15:39:21 21 Q.      So Imperial has a locational advantage with its

15:39:25 22 location in Georgia, right?

15:39:26 23 A.      Yes, we have a distance advantage which is often

15:39:31 24 overridden by other factors.

15:39:32 25 Q.      Thank you.  We can put that exhibit away.

Henneberry - direct

Now, in the past, Imperial has undercut its

competitor's price; correct?

A.      From time to time, we sell cheaper than others and

win business that way, yes.

Q.      When Imperial has undercut its competitors on price

in the past, it has brought down the market price of sugar,

correct?

A.      We have -- sometimes we are selling into a downward

moving market, but just because you're selling at a cheaper

price doesn't mean you're moving the market down.

Q.      And, but sometimes Imperial has brought down the

market price of sugar with its lower price, right?

A.      Sometimes, that prices declining are one of the main

ways we are able to bring down prices.

Q.      When a customer awards its business to Imperial, the

salesperson records the details of the sale on a

spreadsheet, right?

A.      Yes, that's correct.

Q.      And the spreadsheet the salesperson completes is

called a buying agreement request?

A.      The buying agreement basically means the contract and

the spreadsheet is the form that's filled out to get that

contract into the system.

Q.      And sometimes a buying agreement request is referred

to as a BYA, right?

15:41:01  1    A.      That's correct.

15:41:02  2    Q.      The salesperson submits the BYA to the pricing group,

15:41:06  3    right?

15:41:06  4    A.      Yes.

15:41:08  5    Q.      And Imperial's pricing group receives the e-mail sent

15:41:13  6    to SGL-PricingAdmin@LDC.com, right?

15:41:19  7    A.      That's right.

15:41:20  8    Q.      You also receive e-mails sent to

15:41:27  9    SGL-PricingAdmin@ldc.com?

15:41:27 10    A.      Yes, I do.

15:41:28 11    Q.      After the BYA request goes to pricing it's entered

15:41:32 12    into Imperial's internal system, right?

15:41:34 13    A.      That's right.

15:41:35 14    Q.      Imperial then again creates the contract you

15:41:38 15    mentioned for the customer identified in the BYA, right?

15:41:42 16    A.      Right.

15:41:43 17    Q.      Could you please turn to PTX 150 in your binder.

15:41:49 18    A.      Okay.

15:41:50 19    Q.      PTX 150 is an e-mail attaching a buying agreement

15:41:58 20    request, right?

15:41:58 21    A.      That's correct.

15:41:59 22    Q.      And the e-mail dated here is August 28th -- is

15:42:10 23    September 10th, 2019, correct?

15:42:12 24    A.      That's right.

15:42:12 25    Q.      And you're copied on this e-mail as well, right?

Henneberry - direct

15:42:15 1    A.        Yes.

15:42:16 2              MS. GARRETT:  Your Honor, plaintiffs move to

15:42:18 3    admit PTX 150.

15:42:20 4              MR. ZACH:  No objection, Your Honor.

15:42:21 5              THE COURT:  Thank you.  It's admitted.

15:42:24 6              (PTX Exhibit No. 150 was admitted into

15:42:24 7    evidence.)

15:42:24 8              The Court:  Any we publish, any time it's

15:42:27 9    admitted, you don't have to ask.  It's better to ask.

15:42:34 10   BY MS. GARRETT:

15:42:34 11   Q.        Now, this e-mail is to that SGL pricing admin e-mail

15:42:41 12   address we just discussed, right?

15:42:42 13   A.        Yes.

15:42:43 14   Q.        This sender is Beth Smith, she's a sales associate at

15:42:48 15   Imperial?

15:42:49 16   A.        That's right.

15:42:50 17   Q.        Attached to the e-mail, this is the third page in PTX

15:42:54 18   150, is a PDF of a completed buying agreement request for

15:42:59 19   Bud's Best Cookies.

15:43:00 20   A.        That's right.

15:43:05 21   Q.        Let's turn to the fourth page of PTX 150, it's the

15:43:05 22   second page of the BYA.  The buying agreement request

15:43:12 23   records the type of product that the customer purchases,

15:43:17 24   right?

15:43:17 25   A.        Yes, it does.

Henneberry - direct

Q.      And the product in this buying agreement request is bulk sugar, right?

A.      That's right.

Q.      And the buying agreement request includes a field to record how the sugar is delivered to the customer; right?

A.      In this case it says bulk truck.

Q.      And there is also the field right there the ship, via freight term field, do you see that to the left of the product field?

A.      Yes, I do.

Q.      And there its also recorded that it's by truck, correct?

A.      Yes.

Q.      Now, you rely on your salespeople to provide accurate information when they complete the buying agreement request, right?

A.      That's correct.

Q.      Could we move to the first page.  I would like to draw your attention to the right side of the page.  Now the BYA has a field to record whether the customer accepts beet sugar; correct?

A.      That's correct.

Q.      And some customers do not accept beet sugar, right?

A.      That's correct.

Q.      Beet sugar is genetically modified, right?

Henneberry - direct

15:44:27 1    A.      Yes, it is in the U.S.

15:44:28 2    Q.      The buying agreement request also includes a field to

15:44:33 3    record whether sugar from Mexico is allowed, for that

15:44:38 4    particular customer; right?

15:44:40 5    A.      Yes.

15:44:42 6    Q.      And it's true, that customers with very specific

15:44:46 7    quality control requirements, need to know where their sugar

15:44:49 8    is manufactured, right?

15:44:51 9    A.      Most customers want to pass off on the plants and

15:44:55 10   inspect the plants for the sugar they're using just to make

15:45:01 11   sure they're happy with our processes and confident selling

15:45:04 12   their own product, yes.

15:45:06 13   Q.      So for those customers that have those quality

15:45:09 14   controls, they want to see where their sugar is refined,

15:45:12 15   right?

15:45:12 16   A.      That's right.

15:45:13 17   Q.      I would like to draw your attention to the left side

15:45:15 18   of the page.  Now, PTX 150 records a 2019 date for the Bud's

15:45:25 19   Best Cookies contract, right?

15:45:26 20   A.      That is right.

15:45:26 21   Q.      And PTX 150 also records United as the competition

15:45:31 22   for Bud's Best Cookies, right?

15:45:33 23   A.      It does.

15:45:34 24   Q.      We're going to be finished with PTX 150 for now and I

15:45:38 25   would like to move to PTX 192.  Let me know when you're

Henneberry - direct

15:45:49 1    there.

15:45:51 2    A.      Okay.

15:45:52 3    Q.      PTX 192 is an April 22nd, 2021, e-mail to that same

15:46:01 4    SGL Pricing e-mail address, correct?

15:46:04 5    A.      That's right.

15:46:05 6            MS. GARRETT:  Your Honor, plaintiffs would like

15:46:07 7    to move to admit PTX 192 into evidence.

15:46:11 8            THE COURT:  Might be objection?

15:46:12 9            MR. ZACH:  No objection.

15:46:12 10           THE COURT:  All right.  Thank you.  It's

15:46:14 11   admitted.

15:46:15 12           (PTX Exhibit No. 192 was admitted into

15:46:15 13   evidence.)

15:46:15 14   BY MS. GARRETT:

15:46:16 15   Q.      Can you please turn to the fourth page of PTX 192, it

15:46:20 16   is the second page of the buying agreement request.  And

15:46:23 17   just let me know when you're there?

15:46:25 18   A.      I'm there.

15:46:26 19   Q.      Now this product delivered in PTX 192 was liquid

15:46:31 20   sucrose, right?

15:46:32 21   A.      That's correct.

15:46:33 22   Q.      Can we go back to the first page of the buying

15:46:37 23   agreement request.  The contract, now the contract in PTX

15:46:40 24   192 is a spot contract; right?  If you look over on the left

15:46:52 25   side of the page right there.

Henneberry - direct

15:46:55 1    A.      Yes.  It is, yes.

15:46:58 2    Q.      Okay.  And the contract period, if I take your

15:47:01 3    attention to the right side of the page there, is from

15:47:05 4    April 22nd through April 30th, 2021; correct?

15:47:10 5    A.      That's right.

15:47:11 6    Q.      So back to the left side of the page, PTX 192 records

15:47:17 7    a 2021 date for the Helm's Candy contract right?

15:47:24 8    A.      That's right.

15:47:24 9    Q.      And PTX 192 also records Domino and United as the

15:47:29 10   competition for the Helm's Candy spot contract, right?

15:47:34 11   A.      It does.

15:47:34 12   Q.      And we're finished with PTX 192.

15:47:38 13           I would like to ask you to turn to PTX 94.  And

15:47:45 14   if you could let me know when you're there.

15:47:48 15   A.      Okay.

15:47:48 16   Q.      And PTX 94 is a July 27th, 2018, e-mail sent to that

15:47:55 17   same SGL Pricing e-mail address right?

15:47:59 18   A.      That's right.

15:48:01 19           MS. GARRETT:  Your Honor, plaintiffs move to

15:48:02 20   admit PTX 94.

15:48:04 21           MR. ZACH:  No objection, Your Honor.

15:48:05 22           THE COURT:  All right.  It's admitted.

15:48:05 23           (PTX Exhibit No. 94 was admitted into evidence.)

15:48:05 24   BY MS. GARRETT:

15:48:07 25   Q.      And PTX 94 attaches a buying agreement request,

Henneberry - direct

15:48:12  1    correct, for Hospitality Mints, that should be the third

15:48:18  2    page of PTX 94?

15:48:20  3    A.      Yes, it does.

15:48:21  4    Q.      And I would just like to keep our attention on first

15:48:24  5    page there.  This is a 2018 contract for Hospitality Mints;

15:48:29  6    is that right?

15:48:30  7    A.      Yes, it is.

15:48:30  8    Q.      And the competition recorded on the buying agreement

15:48:34  9    request is United, correct?

15:48:36 10    A.      That's correct.

15:48:37 11    Q.      I need to also look at the contract period, PTX 94 on

15:48:42 12    the right side, it records both volume and the time for

15:48:50 13    which the customer is going to receive the sugar.  Is that

15:48:54 14    right?

15:48:54 15    A.      That's correct.

15:49:00 16    Q.      Thank you.  We can put PTX 94 to the side now.

15:49:04 17            Mr. Henneberry, I'm going to switch gears for a

15:49:09 18    second.  I would like to briefly discuss pricing decisions.

15:49:15 19    There are some pricing decisions you discuss with Imperial's

15:49:18 20    CEO Mike Gorrell?

15:49:21 21    A.      Yes.

15:49:22 22    Q.      One of the ways you communicate with Mr. Gorrell is

15:49:25 23    by e-mail, correct?

15:49:26 24    A.      That's correct.

15:49:27 25    Q.      Mr. Henneberry, could you please turn to PTX 250 of

Henneberry - direct

15:49:32  1    your binder.  And let me know when you're there.

15:49:35  2    A.    I'm there.

15:49:36  3    Q.    PTX 250 is a series of e-mails between you and

15:49:41  4    Mr. Gorrell in June 2018, right?

15:49:44  5    A.    Yes, that's correct.

15:49:45  6    Q.    And you are discussing a potential pricing decision

15:49:49  7    with Mr. Gorrell, is that right?

15:49:52  8    A.    That's right.  We were discussing whether or not to

15:49:55  9    sell to DCB.

15:49:59  10          MS. GARRETT:  Plaintiffs would like to move PTX

15:50:01  11   250 into evidence.

15:50:02  12          MR. ZACH:  No objection, Your Honor.

15:50:03  13          THE COURT:  Thank you.  It's admitted.

15:50:03  14          (PTX Exhibit No. 250 was admitted into

15:50:05  15   evidence.)

15:50:05  16   BY MS. GARRETT:

15:50:05  17   Q.    Now the subject be line of the e-mail has the name of

15:50:08  18   the company, correct?

15:50:09  19   A.    That's right.

15:50:10  20   Q.    And the company listed as DCB, right?

15:50:12  21   A.    Yes, it is.

15:50:12  22   Q.    And DCB refers to Diamond Crystal Brands, right?

15:50:20  23   A.    That's correct.

15:50:21  24   Q.    Diamond Crystal Brand is located in Savannah,

15:50:25  25   Georgia, correct?

Henneberry - direct

15:50:26  1    A.      That's right.

15:50:26  2    Q.      And it's true that Diamond Crystal Brands takes in

15:50:32  3    bulk sugar to produce sugar packets?

15:50:35  4    A.      That's right.

15:50:35  5    Q.      In 2018, you were competing with United for DCB's

15:50:40  6    bulk business in Savannah, correct?

15:50:42  7    A.      That's correct.

15:50:42  8    Q.      While competing for the DCB bulk business you tried

15:50:46  9    to estimate United's price right?

15:50:50 10    A.      We tried to estimate United's price and no doubt

15:50:54 11    others as well.

15:50:54 12    Q.      Well, in this e-mail here, you were discussing

15:50:57 13    estimating United's price, right?

15:51:00 14    A.      That's correct.

15:51:00 15    Q.      And you contemplated lowering Imperial's price

15:51:05 16    40 points to get the DCB business for Imperial, right?

15:51:09 17    A.      No, it's a contemplation, we don't know for sure what

15:51:15 18    the price, we get some guidance, sometimes from buyers, we

15:51:19 19    read the tea leaves, but that's what we're talking about

15:51:22 20    here, what level should we be at.

15:51:22 21    Q.      You're trying to make your best decision based on

15:51:22 22    what you think might be happening in the market, right?

15:51:31 23    A.      What's happening in the market and what we need to

15:51:35 24    have for pricing to make our economics work for Imperial.

15:51:35 25    Q.      But there were downsides to lowering Imperial's price

15:51:42 1    to get the DCB business from United, right?

15:51:47 2    A.    Yes, we were discussing that, we were seeing United's

15:51:54 3    price starting to rise and that's a symptom of the market

15:51:59 4    beginning to tighten. At the beginning of the year, USDA

15:52:04 5    allocates sugar to the domestic grower/processors, unless

15:52:09 6    they use up their allocation and they need to keep their

15:52:12 7    sugar going out of the refinery.

15:52:15 8    Q.    I'm sorry, Mr. Henneberry, I'm going to ask you to

15:52:19 9    answer the question I ask. You'll have a chance when you

15:52:22 10    talk to Mr. Zach to provide more context. There were

15:52:26 11    downsides to lowering Imperial's price to get the DCB

15:52:29 12    business from United, right?

15:52:30 13    A.    There were a couple of potential downsides.

15:52:34 14    Q.    But the main downside was snatching the DCB business

15:52:37 15    from United, just as they we're raising their prices, right?

15:52:44 16    A.    That's the way I phrase it is that basically, these

15:52:48 17    kinds of businesses just tend to be important, because they

15:52:52 18    process, because they're large volume bulk movements and if

15:52:56 19    you take them, they can disrupt their marketing and further

15:53:00 20    repercussions on ours.

15:53:06 21    Q.    Well, we actually discussed this during your

15:53:09 22    deposition. You feared that United might react to Imperial

15:53:13 23    lowering its price by cutting the United prices to other

15:53:14 24    customers going forward, right?

15:53:18 25    A.    Right. The domestic processors need to sell their

Henneberry - cross

15:53:22  1    allocation so --

15:53:24  2                THE COURT:  You can answer yes or no and then

15:53:26  3    give a brief explanation, but you need to get nearer to a

15:53:29  4    microphone because you're soft sounding and making it hard

15:53:37  5    for my court reporter.

15:53:38  6                THE WITNESS:  Sorry.

15:53:39  7    Q.    And you also felt that Imperial lowering its price to

15:53:44  8    obtain the DCB business from United could awaken a sleeping

15:53:48  9    giant, right?

15:53:48 10    A.    I think I said that in my deposition, yes.

15:53:52 11                MS. GARRETT:  Thank you.  The United States

15:53:53 12    passes the witness, Your Honor.

15:53:55 13                THE COURT:  Thank you.

15:54:11 14                MR. ZACH:  Thank you.  May I proceed?

15:54:14 15                THE COURT:  Please.

15:54:15 16                    CROSS-EXAMINATION

15:54:15 17    BY MR. ZACH:

15:54:15 18    Q.    Good afternoon, Mr. Henneberry.

15:54:17 19    A.    Good afternoon.

15:54:18 20    Q.    What are the components that go into the delivered

15:54:25 21    price for refined sugar that Imperial sets for customers?

15:54:30 22    A.    The biggest component is raw sugar, about 80 percent

15:54:33 23    of the price at the moment is raw sugar costs.  We also then

15:54:37 24    have a charge for refining the sugar, we have packaging

15:54:41 25    expenses, the labor and energy that goes into the refining

Henneberry - cross

15:54:46 1    process, we may convert the sugar to granulated white sugar

15:54:50 2    into brown sugar or powdered sugar.  There is a charge for

15:54:55 3    that.  We may finance the purchase of the sugar with the

15:54:58 4    final customer and also there is the transportation to

15:55:00 5    deliver it to the end user's facility.

15:55:04 6    Q.    And does Imperial buy imported raw sugar or is it

15:55:09 7    domestically sourced raw sugar?

15:55:11 8    A.    Predominantly we import raw sugar, probably over

15:55:17 9    90 percent, over the years there is a little bit of domestic

15:55:21 10   sugar that spills over to us, but it's not common.

15:55:23 11   Q.    How do other sellers of refined sugar retain --

15:55:28 12   strike that.

15:55:29 13          How do other sellers of refined sugar get access

15:55:32 14   to their raw sugar?

15:55:34 15   A.    Well, beets and cane are many of them, are

15:55:39 16   cooperatives that are owned by the growers and they process

15:55:42 17   all the sugar that the growers provide them most years.  And

15:55:46 18   others have contractual relationship with the plants that

15:55:51 19   are very near to the refineries in Louisiana and Florida.

15:55:56 20   Q.    Now, talking about the imports that Imperial buys,

15:56:00 21   how are prices for imported raw sugar set?

15:56:04 22   A.    It's a regulated market by the USDA, but within those

15:56:08 23   regulations is a set forward market of physical sugar

15:56:11 24   amongst traders to us directly and by the intercontinental

15:56:16 25   exchanges, number 16 future contract which is for domestic

Henneberry - cross

15:56:23 1    raw sugar.

15:56:24 2    Q.      What's the range of raw sugar costs that you have

15:56:28 3    seen over say, the last five years?

15:56:30 4    A.      Over the last five years we have probably seen prices

15:56:33 5    from, on the low side, $0.25 1/2 to say $0.28 a pound that

15:56:39 6    are more or less in line with the Mexican suspension

15:56:43 7    agreements to support the market, and recently we have seen

15:56:47 8    prices as high as $0.39 a pound last fall and we're

15:56:51 9    currently right around $0.37 a pound.   $0.36, $0.37 a pound.

15:56:58 10   Q.      How do Imperial's raw sugar costs compare to the

15:57:02 11   costs incurred by suppliers of domestic raw sugar?

15:57:06 12   A.      It's difficult to know exactly, but over the last six

15:57:09 13   to eight months, we have seen instances where the refined

15:57:12 14   sugar price offered by our grower competitors is lower than

15:57:15 15   our raw sugar costs.

15:57:19 16   Q.      Have you heard of the term residual supplier?

15:57:23 17   A.      Yes, I have.

15:57:24 18   Q.      What does that term mean?

15:57:25 19   A.      Residual supplier refers to imported raw sugar being

15:57:30 20   a residual in the market.   Each year the USDA sets

15:57:34 21   85 percent of the market for the domestic processors and

15:57:38 22   allocates sugar to each one of them to sell and the balance

15:57:42 23   of 15% is for imported raw sugar.

15:57:42 24   Q.      Is Imperial a residual supplier?

15:57:48 25   A.      Yes.

Henneberry - cross

Q.      How does being a residual supplier affect the type of business that Imperial gets relative to suppliers with domestic sources?

A.      It affects the overall quantity because in a year with a big domestic crop the amount of imported sugar is small, and vice versa.  Its sets our volumes to start with but also we tend to be relegated to a period of time they sell the sugar quickly at the beginning of the year so that they can both fulfill their marketing allocation and keep the sugar moving so it's out of the way of the refinery. And then we're relegated to waiting until the market prices in the imported raw sugar prices, and whatever is left to sell at that point.

Q.      Just so the record is clear, when you say they sell at the beginning of the year, you're referring to suppliers who have access to domestic sources of raw sugar?

A.      Yes, that's correct.

Q.      Is there a particular window of time when Imperial makes most of its refined sugar sales?

A.      We typically sell our sugar from the late summer to early fall.

Q.      Have you heard of the term backup supplier?

A.      Yes, I have.

Q.      What is that?

A.      The backup supplier refers to the desire of a

Henneberry - cross

15:58:57 1    customer to ensure continuity of supply.  So hurricanes come

15:59:02 2    through and some refiners may be put out for a period of

15:59:05 3    time for that, or you can't find trucks for a certain period

15:59:09 4    of time, so it's always good to have another supplier who

15:59:12 5    may be able to stand in from a slightly different area to

15:59:16 6    make sure you have the continuity of supply.

15:59:19 7    Q.      Does Imperial serve as a backup supply for any

15:59:23 8    customers?

15:59:23 9    A.      Yes, we do.

15:59:24 10   Q.      Can you give me some examples?

15:59:25 11   A.      There are many of them, General Mills and ConAgra we

15:59:29 12   tend to be back up suppliers there, Mars and Hershey from

15:59:33 13   time to time, necessarily and perhaps many others.

15:59:35 14   Q.      I would like to talk for a moment about the other

15:59:38 15   components that make up Imperial's prices.  What is the

15:59:41 16   relative importance of freight costs in comprising the

15:59:46 17   overall price that you set for a customer?

15:59:48 18   A.      Compared to raw sugar, it's relatively small.

15:59:52 19   Freight costs are probably around five percent of your

15:59:56 20   common deliveries and maybe up to ten percent for extending

16:00:00 21   pushing sugar through a station.

16:00:01 22   Q.      Where does Imperial sell refined sugar?

16:00:05 23   A.      We sell pretty much all over the country from Maine

16:00:07 24   to Texas and Chicago to Florida, we occasionally sell

16:00:11 25   outside of that range and I think we sell in over 40

Henneberry - cross

16:00:17  1   different states.

16:00:17  2   Q.      Does Imperial use transfer stations?

16:00:21  3   A.      Yes, we do.

16:00:22  4   Q.      What is a transfer station?

16:00:23  5   A.      A transfer station is a facility generally on a rail

16:00:27  6   line where you take in bulk railcars of refined sugar and

16:00:31  7   they're able to break it down to make liquid sugar out of it

16:00:34  8   and put it in liquid truck for local delivery, or into a

16:00:38  9   bulk truck.  Some of them may do packaged goods or powdered

16:00:43 10   sugar, breaking down bulk shipment to move cheaply into more

16:00:48 11   difficult freight.

16:00:48 12   Q.      How does using a transfer station impact

16:00:52 13   transportation costs?

16:00:53 14   A.      It generally keeps it lower for, because you can move

16:00:57 15   long distance for bulk.

16:01:00 16   Q.      Does Imperial always win customer business when it's

16:01:03 17   the closest supplier?

16:01:05 18   A.      No, we do not, DCB is eight miles from us and we

16:01:14 19   compete with both beet and cane, we have seen beet sugar

16:01:17 20   there from Idaho and Red River Valley and cane sugar there

16:01:21 21   out of Floida today as well.

16:01:23 22   Q.      Where is DCB located?

16:01:26 23   A.      Eight miles away in Savannah, Georgia.

16:01:29 24   Q.      And DCB came up in one of the e-mails that you talked

16:01:32 25   about with plaintiffs's counsel?

Henneberry - cross

16:01:34 1   A.      That's correct.

16:01:34 2   Q.      That was referring to a customer that was located in

16:01:37 3   the Savannah area?

16:01:39 4   A.      Yes.

16:01:40 5   Q.      And just to make sure the record is clear, does

16:01:42 6   Imperial always win DCB business, despite it being right in

16:01:49 7   the same town?

16:01:50 8   A.      No, we have not had it far less than we have had it.

16:01:54 9   Q.      Who are Imperial's competitors in your view?

16:01:57 10  A.      Pretty much everyone who sells raw sugar in the

16:02:00 11  country can be our competitor, we have seen beet sugar come

16:02:04 12  into our backyard as I said from Idaho and Minnesota, we see

16:02:08 13  beets coming into the stations in Chattanooga fairly often,

16:02:13 14  Memphis competing with us over there, we see cane sugar as

16:02:17 15  well from both Domino and LSR through the station in

16:02:27 16  Chattanooga and directly into the southeast.  There are

16:02:31 17  customers in that area where sugars coming out of Florida

16:02:35 18  and sort of coming out of New Orleans are more or less equal

16:02:39 19  distances.

16:02:40 20  Q.      Now, how are distributors, in your last answer I

16:02:46 21  think you referred to raw sugar, but I think you may have

16:02:52 22  meant refined sugar?

16:02:52 23  A.      Yes, excuse me, refined sugar.

16:02:57 24  Q.      Just so the record is clear, you mentioned that beets

16:02:59 25  from Idaho came into Savannah.  Do you know what company was

Henneberry - cross

16:03:03 1    selling to DCB in Savannah?

16:03:06 2    A.      I believe it was NSM.

16:03:09 3    Q.      You mentioned distributors in passing.  How are

16:03:12 4    distributors able to compete with Imperial even if they

16:03:15 5    source their supplies from refiners?

16:03:17 6    A.      Distributors some of them are the traders in the

16:03:22 7    market, they'll buy sugar when prices are cheap in their

16:03:26 8    view and hold them directly in their facility to sell them

16:03:31 9    later in time when they believe prices may go up.  We often

16:03:35 10   see different customers competing with us with our own bags

16:03:40 11   later in the year, selling them cheaper than we're currently

16:03:44 12   selling them.

16:03:44 13   Q.      Can you give me ideas of customers where you have

16:03:47 14   seen distributors successfully competing to win the business

16:03:50 15   against Imperial?

16:03:51 16   A.      Yes, we have seen Saint Charles competed with us for

16:03:57 17   McCall farms and offered them directly, we seen I C I do

16:04:01 18   similar things with Sauer Brands just recently, we have seen

16:04:07 19   distributors compete with us for Mars and General Mills out

16:04:10 20   of Atlanta, ADM with McKee Foods putting beet sugar through

16:04:17 21   their facility in Chattanooga.

16:04:21 22   Q.      And plaintiff's counsel asked you about BYA.  Do you

16:04:25 23   recall that?

16:04:25 24   A.      Yes, I do.

16:04:25 25   Q.      What's your understanding of what a BYA is?

Henneberry - cross

A.      BYA is a buying agreement, and the forms we were going over are the templates that are filled out by the salesperson to document what was sold, quantities, time period, pricing, for our own personal records, it records the raw sugar price and our refining charge and it has the freight for the final delivery.

Q.      One of your responsibilities is setting prices for Imperial, is that right?

A.      That's right.

Q.      Do you ever use the information in the BYA forms as part of your responsibilities to set prices?

A.      They're more of a recording of what we have already set.  By the time they get there, the meeting is done, we have sold the sugar.

Q.      Those BYA that you looked at, plaintiff's counsel didn't ask you about it, but there was a cell in that spreadsheet called competition.  Did you see that when you were looking at the spreadsheet?

A.      I did.

Q.      Do you ever use the information in that competition field in the BYA for any business purpose?

A.      I don't.  In my deposition I was sort of surprised that we had it there.  I didn't realize that we were recording that, but it's not really used there.  We have other ways of tracking.

Henneberry - cross

16:05:45 1    Q.      Plaintiff's counsel asked you briefly about a

16:05:49 2    document, PTX 163 and a reference that you made to a

16:05:55 3    locational advantage.  Do you recall that?

16:05:59 4    A.      Yes.

16:06:00 5    Q.      What did you mean when you used the term locational

16:06:03 6    advantage in that setting?

16:06:05 7    A.      Well, relative to what we're trying to move where we

16:06:11 8    are, the closer distance can be a locational advantage.  As

16:06:15 9    I said, there were many other factors that enter into it.

16:06:19 10   Primary among them is the price at which the competing

16:06:23 11   company is often selling their refined sugar on a FOB basis,

16:06:29 12   we add the freight on, even when we're close and have a

16:06:32 13   lower freight, we will still be unable to compete, DCB for

16:06:38 14   example.

16:06:38 15   Q.      Is it fair to say that having a locational advantage

16:06:43 16   doesn't always put you in a position to win business?

16:06:46 17   A.      That's for sure.

16:06:47 18   Q.      Now, plaintiff's counsel asked you about a couple of

16:06:50 19   specific BYAs that I want to briefly talk to you.  First I

16:06:55 20   wanted -- the first I want to address is PTX 145 is the BYA

16:07:02 21   for Bud's Best.  Do you recall that?

16:07:04 22   A.      Yes, I do.

16:07:04 23   Q.      Based on your experience, what --

16:07:07 24           MS. GARRETT:  Objection.  The Bud's Best BYA is

16:07:10 25   PTX 150, I want to make sure the record is clear.

16:07:14 1        MR. ZACH:  Thank you.  Appreciate that.  I stand

16:07:17 2   corrected.

16:07:17 3   BY MR. ZACH:

16:07:17 4   Q.    PTX 150 was the BYA related to Bud's Best.  Do you

16:07:22 5   recall that?

16:07:22 6   A.    I do.

16:07:23 7   Q.    And based on your experience, what other suppliers

16:07:27 8   could compete effectively for customers located where Bud's

16:07:33 9   Best is located?

16:07:34 10  A.    We have a couple of customers located near there,

16:07:36 11  Bud's Best who we have sold once I believe and Milo's Tea

16:07:40 12  where we sold once or twice just around the Birmingham area

16:07:46 13  in Alabama.  It's very close to the facility that ADM has in

16:07:52 14  Chattanooga and that's a rail facility that can break down

16:07:54 15  and produce whole trucks and they provided effective

16:07:58 16  competition for we don't know. Beets or cane or others can

16:08:02 17  go through there from time to time.

16:08:08 18  Q.    Counsel also asked you about a BYA for Hospitality?

16:08:11 19  A.    Yes, I do.

16:08:12 20  Q.    I believe that was PTX 094.

16:08:12 21        Does Imperial still supply sugar to Hospitality?

16:08:12 22  A.    I believe we do, yes.

16:08:21 23  Q.    I'm sorry.  You said you believe you do?

16:08:22 24  A.    I believe we do, yes.

16:08:22 25  Q.    During your examination, plaintiff's counsel

16:08:32 1   discussed PX 250 which was an e-mail between you and Mike

16:08:38 2   Gorrell in which he discussed possible pricing

16:08:40 3   considerations relating to DCB.  Do you remember that?

16:08:43 4   A.      That's right.

16:08:44 5   Q.      And do you remember what time of year that exchange

16:08:47 6   was taking place?

16:08:48 7   A.      That was taking place in June.

16:08:51 8   Q.      And can you describe as a residual supplier what

16:08:55 9   factors affect Imperial's strategy for a making potential

16:08:59 10  sales to a customer like DCB in the early summer?

16:09:02 11  A.      We're getting usually by that time of year, the

16:09:06 12  domestic processors have had several months of selling and

16:09:09 13  they're starting to get their crop well placed, clear

16:09:13 14  enough, still not certain what the size of the crop is, so

16:09:16 15  they begin to slow down generally knowing that they can

16:09:18 16  probably meet their allocations and keep the factories clear

16:09:22 17  of the sugar.  So we're always sort of trying to read tea

16:09:27 18  leaves and understand when is the market going to move up

16:09:30 19  price in the refined, or the raw sugar from imported

16:09:33 20  sources.

16:09:36 21          So what we're trying to figure out here in part

16:09:40 22  is is this moment coming, is it coming to the moment where

16:09:45 23  we can be able to actually begin selling effectively.  And

16:09:48 24  that's what we're trying to judge, and we want to price more

16:09:52 25  aggressively to get it or will this come to us, we're still

Henneberry - redirect

16:10:02 1    trying to understand is the pricing.

16:10:03 2    Q.    What was the ultimate outcome of the discussion

16:10:06 3    between you and Mr. Gorrell as of the --

16:10:08 4    A.    We lowered our prices to try to compete.

16:10:12 5    Q.    I'm sorry.  Can you say it again?

16:10:14 6    A.    We lowered our price to compete.

16:10:16 7            MR. ZACH:  Thank you, Mr. Henneberry.  I have no

16:10:18 8    more questions at this time.

16:10:21 9            THE COURT:  Thank you.  Redirect.

16:10:24 10                   REDIRECT EXAMINATION

16:10:33 11   BY MS. GARRETT:

16:10:38 12   Q.    Mr. Henneberry, Imperial competes to win customers,

16:10:43 13   right?

16:10:43 14   A.    Yes, we have plenty of competition out there.

16:10:47 15   Q.    And Imperial wins customers, right?

16:10:51 16   A.    We do.

16:10:51 17   Q.    I would just like to take a minute to discuss how

16:10:55 18   things might change from year to year.  It is true that what

16:11:00 19   happens in one year might not happen in the next; right?

16:11:02 20   A.    Every year can have a different supply and demand

16:11:02 21   situation, that's true.

16:11:10 22            MS. GARRETT:  Thank you.  No further questions.

16:11:11 23            THE COURT:  All right.  Thank you very much,

16:11:12 24   sir.  You are excused.

16:11:15 25            Let's take our fifteen-minute afternoon break.

16:11:17  1                    (A brief recess was taken.)

16:29:32  2                    THE COURT:  All right.  Please be seated.

16:29:34  3            What's next?

16:29:35  4                    MR. THORNBURGH:  Good afternoon, Your Honor.

16:29:38  5    John Thornburgh from the United States.  May we proceed with

16:29:40  6    the next witness?

16:29:41  7                    THE COURT:  Please.

16:29:42  8                    MR. THORNBURGH:  At this time United States

16:29:44  9    calls Steve Hines as an adverse party witness.  Mr. Hines is

16:29:48 10    the Vice President of Strategy at United Sugar and his

16:29:50 11    testimony will be to competitive effects and purported

16:29:57 12    efficiencies of the proposed transaction.

16:30:11 13                    COURT CLERK:  Please raise your right hand.

16:30:14 14    Please state and spell your full name for the record.

16:30:17 15                    THE WITNESS:  My name is Steven John Hines.

16:30:22 16    S-T-E-V-E-N, J-O-H-N, H-I-N-E-S.

16:30:29 17                    STEVEN JOHN HINES, having been duly sworn was

16:30:33 18    examined and testified as follows:

16:30:35 19                         DIRECT EXAMINATION

16:30:37 20    BY MR. THORNBURGH:

16:30:41 21    Q.      Good afternoon, Mr. Hines.  I handed you a binder or

16:30:44 22    my colleague did while you were on your way up to the

16:30:47 23    witness box.  We may refer to the binder during our time

16:30:51 24    together, I will let you know if and when you need to refer

16:30:54 25    to it.

S. Hines - direct

Mr. Hines, you are currently the vice-president of strategy at United Sugar, correct?

A.      That is correct.

Q.      And you have worked at United Sugars since 1995, right?

A.      Yes, that's correct.

Q.      And other than your first year at United, you have spent the rest of your tenure at the company focused on refined sugar, correct?

A.      Yes.

Q.      And besides Mr. Swart, it is your understanding that you are the longest tenured executive at the company, correct?

A.      Yes.

Q.      And as vice-president of strategy you report to Mr. Wineinger, the president and CEO of United?

A.      Yes, that's correct.

Q.      And your job responsibility as vice-president of strategy are focused on facilitating the strategic planning of the company, correct?

A.      Yes.

Q.      And Mr. Hines, in various points during your tenure at the company, you have worked on determining the most cost effective way to move sugar from United's facilities to the end customer, correct?

S. Hines - direct

16:31:49 1    A.       Yes.   That's correct.

16:31:50 2    Q.       And that includes Mr. Hines helping United maximize

16:31:54 3    its NSP or net sell price for the refined sugar products the

16:31:59 4    company sells; correct?

16:32:00 5    A.       Yes.   Cost is one of the components of NSP.

16:32:05 6    Q.       And Mr. Hines NSP or net selling price is the

16:32:08 7    difference between the revenue that United takes in minus

16:32:11 8    the company's cost, correct?

16:32:13 9    A.       Yes.

16:32:14 10   Q.       And Mr. Hines, United's aggregated NSP is the amount

16:32:20 11   of money that is returned to United's member owners, right?

16:32:24 12   A.       Yes, that's correct.

16:32:25 13   Q.       And Mr. Hines, please turn to tab PTX 380 in your

16:32:30 14   binder.

16:32:30 15            MR. THORNBURGH:   This is Plaintiff's Exhibit 380

16:32:33 16   is found there, Your Honor.   This exhibit has already been

16:32:35 17   admitted into evidence.   Can I publish it?

16:32:37 18            THE COURT:   Yes, absolutely.

16:32:39 19            MR. THORNBURGH:   Thank you.

16:32:39 20   BY MR. THORNBURGH:

16:32:40 21   Q.       Mr. Hines, you recognize this e-mail that you wrote,

16:32:42 22   correct?

16:32:42 23   A.       Yes, I do.

16:32:44 24   Q.       And Mr. Hines, you wrote this e-mail on August 2018

16:32:51 25   as United was exploring building a facility adjacent to the

S. Hines - direct

16:33:02 1   US Sugar refinery in Clewiston, Florida, right?

16:33:06 2   A.     That's not entirely correct.

16:33:08 3   Q.     What is not correct about that, sir?

16:33:11 4   A.     We were looking at an alternative way to package

16:33:21 5   sugar products for sales into the marketplace.

16:33:24 6   Q.     And one of those options that you were looking at

16:33:27 7   Mr. Hines was exploring building a facility adjacent to the

16:33:31 8   US Sugar refinery in Clewiston, correct?

16:33:34 9   A.     Yes.

16:33:34 10   Q.     And Mr. Hines, United was exploring the possibility

16:33:37 11   of building this new facility because packaging capacity at

16:33:41 12   the Clewiston refinery is limited, correct?

16:33:44 13   A.     Yes.

16:33:45 14   Q.     And United has not expanded packaging capacity at the

16:33:50 15   Clewiston refinery since you wrote this e-mail in

16:33:53 16   August 2018, correct?

16:33:54 17   A.     That's correct.

16:33:54 18   Q.     And at the time, Mr. Hines, United was interested in

16:33:59 19   expanding its sales of certain refined sugar products that

16:34:02 20   had better margins than sales of bulk refined sugar,

16:34:02 21   correct?

16:34:02 22   A.     Yes, that's correct.

16:34:02 23   Q.     I want to zoom in here on the bottom of your e-mail,

16:34:12 24   please.   In this e-mail you wrote after a conversation with

16:34:12 25   Bob Buker, Matt would like us to identify a potential

S. Hines - direct

16:34:22 1  contribution of a base case facility.  Did I read that

16:34:25 2  correctly?

16:34:25 3  A.      Yes.

16:34:25 4  Q.      And Matt here refers to your boss and the president

16:34:28 5  of United, Matt Wineinger, correct?

16:34:31 6  A.      Yes.

16:34:32 7  Q.      And then the first bullet down reads using the

16:34:35 8  40-acre site adjacent to Clewiston's property.  That's where

16:34:39 9  you were exploring building the new facility, right?

16:34:42 10 A.      Yes, that's correct.

16:34:43 11 Q.      And then in the third bullet down reads including

16:34:47 12 super sacks, liquid and perhaps other products, brown,

16:34:51 13 powdered, et cetera, do you see that?

16:34:52 14 A.      Yes.

16:34:53 15 Q.      And then in next bullet says grow sales of profitable

16:34:57 16 products over five years at the expense of lower margin

16:35:01 17 sales.  Did I read that correctly?

16:35:02 18 A.      Yes, you did.

16:35:03 19 Q.      So Mr. Hines, United was hoping to replace some of

16:35:06 20 its lower margin sales like bulk sugar with sales of higher

16:35:11 21 margin products like those listed in your e-mail here;

16:35:14 22 correct?

16:35:15 23 A.      Yes.

16:35:17 24 Q.      And then I want to look at the last bullet in your

16:35:20 25 e-mail here, you wrote attack the market like Chicago,

S. Hines - direct

16:35:25 1    correct?

16:35:25 2    A.      Yes.

16:35:25 3    Q.      And that refers to this strategy United implemented

16:35:29 4    in the Chicago area after its Montgomery facility was built,

16:35:34 5    correct?

16:35:37 6    A.      Yes.

16:35:37 7    Q.      Mr. Hines, United did not end up pursuing the new

16:35:41 8    facility in this e-mail?

16:35:44 9    A.      Yes.

16:35:44 10   Q.      And the reason United has not taken any actions for

16:35:48 11   its packaging facility in Clewiston is because the company

16:35:52 12   instead decided to pursue an acquisition of Imperial,

16:35:56 13   correct?

16:35:57 14   A.      No, I don't agree with that.

16:35:58 15   Q.      You don't agree with that?

16:35:59 16   A.      No.

16:36:00 17   Q.      Mr. Hines, United was exploring building a new

16:36:04 18   facility or either building a facility in either Birmingham

16:36:10 19   or Atlanta; correct?

16:36:10 20   A.      Yes.

16:36:10 21   Q.      None of those options were pursued correct?

16:36:13 22   A.      That's correct.

16:36:14 23   Q.      Sir, I want to point you to your tab in your binder

16:36:18 24   marked depo transcript and I'll ask you to go to page 150,

16:36:22 25   please.  Mr. Hines, if I could direct you, please to

S. Hines - direct

16:36:37 1    line 17, please.  And Mr. Hines, I asked you, Mr. Hines,

16:36:44 2    what is your understanding of why United did not end up

16:36:47 3    opening or purchasing a facility in either Birmingham or

16:36:50 4    Atlanta and your answer was this was strictly an evaluation

16:36:54 5    exercise and exploratory in nature and before that occurred,

16:36:57 6    the opportunity to look at the Imperial acquisition would

16:37:01 7    alternatively provide us with the capacity to serve some of

16:37:05 8    those attractive customers.  Mr. Hines, did I ask you that

16:37:08 9    question and did you give me that answer?

16:37:11 10   A.    Yes.

16:37:12 11   Q.    Thank you, sir?

16:37:12 12         Mr. Hines, you can put that document aside.

16:37:15 13         Mr. Hines, before US Sugar agreed to purchase

16:37:21 14   Imperial, United was considering purchasing Imperial

16:37:25 15   instead, correct?

16:37:25 16   A.    Yes.

16:37:26 17   Q.    And when United Sugars was in the process of

16:37:29 18   considering a proposed acquisition of Imperial, you were

16:37:32 19   asked to help develop potential earnings associated with

16:37:33 20   that transaction, correct?

16:37:38 21   A.    Yes.

16:37:38 22   Q.    And Mr. Hines, you also analyzed potential synergies

16:37:42 23   that would result from a United acquisition of Imperial,

16:37:45 24   right?

16:37:45 25   A.    Yes.

S. Hines - direct

16:37:46  1   Q.      And Mr. Hines, you started looking at potential

16:37:49  2   synergies associated with a acquisition of Imperial in

16:37:54  3   March 2018, does that sound right to you?

16:37:56  4   A.      Yes.

16:37:57  5   Q.      And then Mr. Hines, once US Sugar was considering a

16:38:01  6   proposed acquisition of Imperial, you took the synergies

16:38:05  7   analysis that you first put together for a proposed United

16:38:08  8   Imperial transaction and you refined that analysis for the

16:38:11  9   current transaction.  Is that right?

16:38:13 10   A.      Yes, that's correct.

16:38:14 11   Q.      Mr. Hines, the data sources you used for your synergy

16:38:20 12   analysis remained consistent as the buyer changed from

16:38:23 13   United to U.S. sugars, correct?

16:38:31 14   A.      Yes, I think that's -- yes.

16:38:33 15   Q.      And Mr. Hines, you led United's calculation of

16:38:36 16   synergies with regard to US Sugar's acquisition of Imperial,

16:38:41 17   right?

16:38:41 18   A.      Yes, I did.

16:38:42 19   Q.      And you don't recall anyone from US Sugar being

16:38:45 20   involved in the synergies calculations that you computed,

16:38:48 21   correct?

16:38:50 22   A.      No, they were not.

16:38:51 23   Q.      So --

16:38:52 24   A.      Correct.

16:38:55 25   Q.      So, for example, Mr. Hines, Ms. Elaine Wood at US

S. Hines - direct

16:38:58 1   Sugar was not involved in the synergies calculations that

16:39:01 2   you put together; correct?

16:39:02 3   A.      Correct.

16:39:02 4   Q.      And Mr. Buker, U.S. Sugar's CEO was not involved in

16:39:07 5   the synergies calculation that you put together?

16:39:09 6   A.      That's correct.

16:39:09 7   Q.      Mr. Hines, next please turn to tab PTX 348 in your

16:39:14 8   binder.  Mr. Hines, do you recognize this presentation the

16:39:26 9   PTX 348, correct?

16:39:29 10  A.      Hang on one second, please.  Yes, I do.

16:39:35 11          MR. THORNBURGH:  Your Honor, there are no

16:39:37 12  outstanding objections to this exhibit.  Plaintiff moves it

16:39:40 13  into evidence.

16:39:42 14          MS. REEVES:  No objection.

16:39:42 15          THE COURT:  It's admitted.

16:39:42 16          (PTX Exhibit No. 348 was admitted into

16:39:44 17  evidence.)

16:39:44 18  BY MR. THORNBURGH:

16:39:44 19  Q.      Mr. Hines, I'm going to direct you right away to

16:39:47 20  slide 28 which is on the screen in front of you.  This slide

16:39:51 21  is describing a category of synergies that you calculated in

16:39:55 22  connection with a potential United acquisition of Imperial,

16:39:55 23  right?

16:39:58 24  A.      Yes.

16:39:58 25  Q.      And this category synergies you referred to it as

S. Hines - direct

16:40:03 1    product mix upgrade, correct?

16:40:06 2    A.       Yes.

16:40:07 3    Q.       And looking at this first bullet, it reads, Seine

16:40:10 4    would provide access to attractive southeast - southeast

16:40:16 5    demand for key products, do you see that?

16:40:18 6    A.       Yes, I do.

16:40:18 7    Q.       And Seine here refers to Imperial, correct?

16:40:22 8    A.       Yes.

16:40:24 9    Q.       And beneath that bullet there are several refined

16:40:28 10   sugar products listed, correct?

16:40:29 11   A.       Yes.

16:40:29 12   Q.       And so, Mr. Hines, United was hoping to replace some

16:40:34 13   of its current sales of lower margin products with increased

16:40:38 14   sales of the higher margin products listed here, correct?

16:40:41 15   A.       Yes.

16:40:41 16   Q.       But to be clear all of the refined sugar products

16:40:44 17   listed on this slide are products that United sells today;

16:40:48 18   right?

16:40:49 19   A.       Yes, they are.

16:40:51 20   Q.       And so Mr. Hines, United doesn't actually need the

16:40:55 21   Port Wentworth refinery to be able to sell these package

16:40:55 22   products since the company can already do so today; right?

16:41:02 23   A.       Yes.  We can do that today.

16:41:06 24   Q.       Okay.  Go to slide 30, please.

16:41:10 25            And so Mr. Hines, on this slide there is a table

S. Hines - direct

16:41:13 1    and it's describing how United planned to convert customer

16:41:17 2    orders currently for bulk sugar from Clewiston to orders for

16:41:22 3    super sacks in 50-pound bags originating at Port Wentworth;

16:41:28 4    correct?

16:41:28 5    A.       Yes.

16:41:29 6    Q.       So Mr. Hines, United plans to reduce its sales of

16:41:33 7    bulk sugar out of Clewiston as a result of the proposed

16:41:36 8    transaction?

16:41:37 9    A.       I don't agree fully with that.

16:41:40 10   Q.       What do you not agree with, sir?

16:41:43 11   A.       In order to calculate this aspect, I needed to hold

16:41:49 12   the volume constant.  So the increased sales equaled the

16:41:55 13   amount of the reduced sales for the purposes of calculating

16:42:00 14   this synergy.

16:42:02 15   Q.       On this slide, Mr. Hines, you calculated or you model

16:42:06 16   a reduction in the bulk sugar demand that would be refined

16:42:11 17   at the Clewiston refinery, correct?

16:42:13 18   A.       Yes.

16:42:13 19   Q.       And Mr. Hines, this analysis on the screen in front

16:42:16 20   of you does not contemplate the Port Wentworth refinery

16:42:21 21   producing any more refined sugar than it does today, right?

16:42:24 22   A.       That's correct.

16:42:25 23   Q.       Now, I would like to go to slide 29, please.

16:42:29 24            Mr. Hines, this slide is indicating that you

16:42:32 25   estimated that United could quote save $5.6 million annually

S. Hines - direct

16:42:39  1  by converting bulk sugar demand from Clewiston to 50-pound

16:42:43  2  bag and super sack sales from Port Wentworth, right?

16:42:47  3  A.      Yes.

16:42:47  4  Q.      So Mr. Hines, the quote savings that you calculated

16:42:51  5  here was based on the combined company exiting lower margin

16:42:56  6  sales and increasing United's sales of these higher margin

16:42:59  7  products, right?

16:43:00  8  A.      Yes, it does.

16:43:01  9  Q.      Mr. Hines, really the quote savings here that you

16:43:04 10  calculated is the increased returns that the combined

16:43:07 11  company would get from higher margin sales.  Right?

16:43:11 12  A.      Yes.

16:43:13 13  Q.      And then if you look at the bottom of this slide,

16:43:16 14  Mr. Hines, there is a note that the total estimated savings

16:43:19 15  was discounted by 40 to 60 percent due to some uncertainty.

16:43:24 16  Do you see that?

16:43:24 17  A.      Yes.

16:43:25 18  Q.      And then the first bullet listed there is

16:43:30 19  cannibalization risk, do you see that?

16:43:31 20  A.      Yes.

16:43:32 21  Q.      That refers to the fact that Imperial may already

16:43:34 22  today be fulfilling this anticipated demand for bagged

16:43:35 23  sugar, right?

16:43:39 24  A.      Yes.

16:43:40 25  Q.      Thank you.

S. Hines - direct

16:43:41 1              We can put that document aside now, Mr. Hines.

16:43:48 2      Thank you.

16:43:49 3              Mr. Hines, I'm going to next ask that you turn

16:43:53 4      to tab PTX 486 in your binder, please.

16:44:19 5              Mr. Hines, do you recognize this e-mail

16:44:21 6      attachment, correct?

16:44:22 7      A.      Yes.

16:44:22 8      Q.      It's an e-mail that you wrote, correct?

16:44:25 9      A.      Yes.

16:44:26 10             MR. THORNBURGH:  Your Honor, there are no

16:44:28 11     outstanding objections to this exhibit.  We move to admit it

16:44:31 12     into exhibit, please.

16:44:32 13             THE COURT:  Is this 486, you said?

16:44:34 14             MR. THORNBURGH:  Correct, it should be PTX 486,

16:44:37 15     Your Honor, this is an e-mail attachment and I will be

16:44:41 16     asking you to allow me to introduce a demonstrative that's

16:44:44 17     related to it.

16:44:44 18             THE COURT:  Great.  Thank you.

16:44:47 19             MS. REEVES:  No objection.

16:44:49 20             (PTX Exhibit No. 486 was admitted into

16:44:50 21     evidence.)

16:44:50 22             MR. THORNBURGH:  Your Honor, can we publish it?

16:44:52 23     BY MR. THORNBURGH:

16:44:52 24     Q.      Mr. Hines, this is an e-mail that you wrote to your

16:44:55 25     colleague, Mr. Hanson, on October 22nd, 2020, correct?

S. Hines - direct

16:44:58 1    A.      Yes.

16:44:58 2    Q.      And Mr. Hanson assisted you with some of the

16:45:02 3    synergies work that you did in connection with the proposed

16:45:05 4    transaction, correct?

16:45:06 5    A.      Yes.

16:45:06 6    Q.      And the subject line of your e-mail is updated

16:45:09 7    industrial synergies.  Do you see that?

16:45:11 8    A.      Yes.

16:45:12 9    Q.      And industrial synergies here refers to the

16:45:16 10   industrial customer distribution synergies that you

16:45:19 11   calculated, correct?

16:45:20 12   A.      Yes.

16:45:21 13   Q.      And distribution savings, Mr. Hines, was the most

16:45:25 14   significant bucket of synergies that you calculated with

16:45:29 15   regards to the proposed transaction, correct?

16:45:31 16   A.      Yes.  That's correct.

16:45:33 17   Q.      And then the next line in your e-mail starts with

16:45:37 18   Seine 2.0 Synergies.  Do you see that?

16:45:42 19   A.      Yes.

16:45:42 20   Q.      And so Seine 2.0 specifically refers to US Sugar's

16:45:48 21   proposed acquisition of Imperial, right?

16:45:52 22   A.      Yes,

16:45:52 23   Q.      So Seine, Mr. Hines, was a code name used for both

16:45:55 24   the contemplated United acquisition of Imperial and US Sugar

16:46:01 25   proposed acquisition of Imperial, correct?

S. Hines - direct

A.        Yes.

Q.        And Mr. Hines, although you may have updated your

synergies analysis since you sent this e-mail in

October 2020, the methodology that you utilized in the

attachments we're about to look at never materially changed,

right?

A.        Yes, the approach was the same, yes.

Q.        And Mr. Hines, you shared this methodology with

consultant at BDO that work with United and US Sugar on

calculating synergies for the proposed transaction, right?

A.        Yes.

          MR. THORNBURGH:  Your Honor, I now request

permission to introduce a demonstrative that will be

identified PTX 486.  As we discussed, this is an excerpt of

a spreadsheet that was attached to this e-mail that

Mr. Hines and I have been discussing.  And I believe there

are no objections to this demonstrative.

          MS. REEVES:  No objections, Your Honor.

          THE COURT:  Thank you.  Go ahead.

          MR. THORNBURGH:  Your Honor, I'm showing on the

screen a redacted version of the demonstrative.  I believe

you should have an unredacted as should Mr. Hines.

          THE COURT:  When I pull up -- there is a native

-- this is 486?

          MR. THORNBURGH:  This is PDX 486, Your Honor,

16:47:14 1  which was the naming convention used to identify the

16:47:18 2  demonstratives.  It should be a PDF if that's helpful at

16:47:28 3  all.

16:47:48 4            THE COURT:  Sorry about that.  Thank you.  I

16:47:50 5  have it.

16:47:51 6            MR. THORNBURGH:  Great.

16:47:51 7            (PDX Exhibit No. 486 was marked for

16:47:52 8  identification.)

16:47:52 9  BY MR. THORNBURGH:

16:47:53 10  Q.     Mr. Hines, I want to direct your attention to page 1

16:47:56 11  that's up on the screen.  And Mr. Hines, your counsel has

16:47:59 12  designated the numerical values on this page as confidential

16:48:02 13  so I have to try to avoid saying them out loud.  Mr. Hines,

16:48:06 14  this sheet contains your aggregated calculations at this

16:48:10 15  time for purported distribution savings associated with

16:48:14 16  industrial customers for the proposed transaction.  Right?

16:48:17 17  A.     Yes, that's correct.

16:48:18 18  Q.     And more specifically, Mr. Hines, this page is

16:48:22 19  showing the potential volume of refined sugar that would be

16:48:26 20  shifted to or from Port Wentworth, Clewiston and the Red

16:48:32 21  River Valley in connection with United's industrial

16:48:36 22  customers if the proposed transaction was completed.  Is

16:48:40 23  that right?

16:48:40 24  A.     Yes.

16:48:41 25  Q.     And Mr. Hines, you calculated a savings or in some

S. Hines - direct

16:48:45  1  cases an additional cost associated with moving the origins

16:48:49  2  of customer sugar purchases to, or from Clewiston, the Red

16:48:56  3  River Valley or Port Wentworth, right?

16:48:58  4  A.      Yes.

16:48:58  5  Q.      Now, I want to go to the second page of this

16:49:01  6  demonstrative, please.  And again, Mr. Hines, your counsel

16:49:05  7  has designated these values as confidential, so I ask you to

16:49:09  8  try to avoid saying them aloud.

16:49:12  9          Mr. Hines, this sheet contains the customer and

16:49:16 10  product specific data that you used to calculate the summary

16:49:20 11  synergies that we just looked at, correct?

16:49:23 12  A.      Yes.

16:49:23 13  Q.      And so I just want to go through your methodology

16:49:26 14  here a little bit.

16:49:27 15          Mr. Hines column E contains the specific

16:49:31 16  examiner or order at issue that you looked at, right?

16:49:34 17  A.      Yes.

16:49:34 18  Q.      And then column N is the product that is sold to that

16:49:39 19  particular customer in the location referenced in that row;

16:49:42 20  correct?

16:49:42 21  A.      Yes.

16:49:42 22  Q.      And then if we go all the way over to the far right,

16:49:48 23  savings, there you'll find the distribution savings that you

16:49:52 24  have calculated associated with each of these customer

16:49:55 25  products and facilities, right?

S. Hines - direct

16:49:57 1    A.      Yes.

16:49:58 2    Q.      And Mr. Hines, I just want to be very clear, column

16:50:04 3    AM for savings, to calculate that savings you calculated the

16:50:07 4    change in freight costs associated with moving the customer

16:50:10 5    order and then you multiplied it by the volume of the

16:50:13 6    refined sugar product at issue; right?

16:50:16 7    A.      Yes.

16:50:16 8    Q.      That was the total calculation; correct, sir?

16:50:20 9    A.      Yes.

16:50:21 10   Q.      Okay.  And Mr. Hines, just as we did during your

16:50:25 11   deposition, I have sorted this data so that the customer

16:50:29 12   line item entries with the largest savings are listed first.

16:50:33 13   Do you recognize that now on the screen in front of you,

16:50:36 14   sir?

16:50:36 15   A.      Yes.  Yes, I do.

16:50:37 16   Q.      So Mr. Hines, the second entry here is for General

16:50:41 17   Mills' Covington, Georgia facility.  Do you see that?

16:50:45 18   A.      Yes.

16:50:45 19   Q.      And United currently delivers refined sugar to this

16:50:49 20   General Mills facility in Covington, Georgia, right?

16:50:52 21   A.      Yes.

16:50:52 22   Q.      And the product listed for this facility is bulk fine

16:50:57 23   granulated sugar; correct, sir?

16:50:59 24   A.      Yes.

16:51:00 25   Q.      And so the value in column AM, savings, the furthest

S. Hines - direct

16:51:05 1   to the right indicates the total distribution savings that

16:51:08 2   you estimated for bulk fine granulated sugar that United

16:51:13 3   delivers to this General Mills location, correct?

16:51:17 4   A.      Yes.

16:51:19 5   Q.      And Mr. Hines, in estimating the quote, savings

16:51:24 6   associated with this General Mills facility, you did not

16:51:27 7   give any consideration as to whether General Mills was

16:51:30 8   currently benefitting from competition between Imperial and

16:51:34 9   United, right?

16:51:35 10  A.      That's correct.

16:51:37 11  Q.      And that is true even though Covington, Georgia is

16:51:41 12  located less than 230 miles from Port Wentworth and the

16:51:46 13  proposed transaction would eliminate Imperial as a proposed

16:51:50 14  competitor, correct, Mr. Hines?

16:51:52 15  A.      I don't know that the distance, but yes, it -- yes, I

16:51:58 16  agree in general with that statement.

16:52:00 17  Q.      Now, Mr. Hines, the savings associated with General

16:52:04 18  Mills as shown in this table is not money that you

16:52:07 19  contemplated returning to General Mills in the form of lower

16:52:11 20  prices as part of your synergies analysis, correct?

16:52:15 21  A.      I did not contemplate what would happen with that

16:52:18 22  money.  That was not part of my charge.

16:52:21 23  Q.      And, in fact, Mr. Hines, your synergies analysis

16:52:26 24  assumed that this money would result in quote more NSP

16:52:30 25  dollars available to United's members, right?

S. Hines - direct

A.      I did not contemplate what would happen with those dollars.

Q.      But the savings would, in fact, increase the NSP dollars available to United's membership, that's what you were modeling, correct, sir?

A.      Yes.

Q.      We go one row down the next entry is for Hershey, Stuarts Draft facility.  Do you see that?

A.      Yes, I do.

Q.      And that Stuarts Draft facility is in Virginia, right?

A.      Yes.

Q.      As part of your synergies analysis you did not contemplate returning any of the savings found in column AM to Hershey as part of your synergies analysis, correct?

A.      I don't agree with that.  My exercise did not contemplate what would occur with those funds.

Q.      Understood.

        So Mr. Hines, you did not contemplate returning the money that's indicated in the savings column to Hershey in the form of lower prices in the result of a synergies analysis?

A.      That is correct.

Q.      Lastly, I want to draw your attention to Row 19.  You will see Piedmont Candy there.  Do you see that?

S. Hines - cross

16:53:38 1    A.        Yes.

16:53:39 2    Q.        And their location is in Lexington, North Carolina.

16:53:43 3    Do you see that?

16:53:44 4    A.        Yes.

16:53:44 5    Q.        And similarly, Mr. Hines, you did not contemplate

16:53:48 6    returning any of these savings to Piedmont Candy as a result

16:53:52 7    of the proposed transaction, right?

16:53:53 8    A.        My exercise didn't contemplate what would happen with

16:53:57 9    those funds.

16:53:58 10   Q.        Mr. Hines, in all the financial modeling that you did

16:54:02 11   for the transaction, going back to March 2019, despite

16:54:06 12   estimating millions of dollars of purported synergies, you

16:54:11 13   did not model or consider giving these customers lower

16:54:14 14   prices as a result of these savings, correct?

16:54:17 15   A.        That's correct.

16:54:19 16            MR. THORNBURGH:  Mr. Hines, I have no further

16:54:20 17   questions for you at this time.

16:54:22 18            THE COURT:  Thank you.

16:54:23 19            Cross-exam.

16:54:30 20            MS. REEVES:  Good afternoon, Your Honor.  Amanda

16:54:32 21   Reeves for US Sugar.  May I proceed?

16:54:34 22            THE COURT:  Please.

16:54:37 23                CROSS-EXAMINATION

16:54:37 24   BY MS. REEVES:

16:54:38 25   Q.        Good afternoon, Mr. Hines.  Did you have any role

S. Hines - cross

16:54:40  1    associated with the transaction between US Sugar and

16:54:42  2    Imperial Sugar?

16:54:45  3    A.      Yes, I provided input on synergies.

16:54:48  4    Q.      And what synergies did you identify?

16:54:51  5    A.      Among the synergies the most significant were

16:54:56  6    distribution cost savings and the effect of product

16:55:00  7    switching.

16:55:00  8    Q.      Let's walk through both of those synergies.  What are

16:55:04  9    distribution costs synergies?

16:55:06  10   A.      Distribution cost synergies are the difference in

16:55:11  11   distribution costs by moving a customer from its current

16:55:18  12   origin to a potential new origin, as a result of the

16:55:25  13   additional company, additional origin.

16:55:28  14   Q.      And why did the addition of Imperial's facility lower

16:55:32  15   United's distribution costs?

16:55:36  16   A.      We anticipated that for certain customers that United

16:55:41  17   was currently serving, the distribution costs would likely

16:55:45  18   be lower from Imperial.

16:55:48  19   Q.      Another synergy you identified was product switching,

16:55:55  20   can you explain that synergy?

16:55:57  21   A.      Yes, that involves selling higher margin products at

16:56:02  22   the expense of lower margin products.

16:56:05  23   Q.      Did your analysis consider any changes to your post-

16:56:10  24   acquisition prices?

16:56:11  25   A.      No.

S. Hines - cross

16:56:12 1    Q.      Why not?

16:56:13 2    A.      The scope of my exercise was to look strictly at the

16:56:18 3    costs associated with the synergies.

16:56:22 4    Q.      Now, plaintiff just now asked you a series of

16:56:26 5    questions about what factor the transaction would have in

16:56:29 6    terms of additional products, and whether additional output

16:56:34 7    would result, tell me how you factored output into your

16:56:38 8    analysis?

16:56:39 9    A.      In order to isolate the effect of the synergies I

16:56:44 10   assumed there was no change in output.

16:56:46 11   Q.      Why did you assume that?

16:56:47 12   A.      In order to clearly identify the effect solely of the

16:56:51 13   distribution cost synergies of this case.

16:56:56 14   Q.      If US Sugar acquires Imperial, do you know whether

16:56:59 15   production output will remain the same?

16:57:01 16   A.      My understanding is they expect to produce more.

16:57:05 17   Q.      And how would increased production affect your

16:57:09 18   synergies analysis?

16:57:11 19   A.      Well, in the case of product switching, we could sell

16:57:14 20   the additional higher margined products without giving up

16:57:17 21   the lower margin products.

16:57:21 22   Q.      Let's switch gears a bit.  You were also asked some

16:57:25 23   questions about implementing the Chicago strategy in the

16:57:30 24   southeast?

16:57:31 25   A.      Yes.

S. Hines - cross

Q.      What steps did you take with regard to analyzing
whether to build a packaging facility in the southeast?

A.      We did a very cursory evaluation, preliminary
evaluation which was never completed.

Q.      And do you know why the plan to implement the Chicago
strategy was abandoned?

A.      No.

Q.      Are you aware of whether United has any plans to
implement the Chicago strategy in the southeast post
closing?

A.      No.

Q.      Plaintiff also asked you a series of questions just
now about the spreadsheet, PTX 486.  You were asked about a
series of customers listed there.  Do you recall that a few
minutes ago?

A.      Yes, I do.

Q.      Can you tell us how those customers were selected?

A.      The -- we don't know Imperial's customers, nor do we
know their costs.  We know United's customers and costs so
in order to calculate the distribution synergies, we created
a pro forma customer mix of customers that would likely be
Imperial's and we used estimated rates.

Q.      Was that list based on your knowledge of head-to-head
competition with Imperial?

A.      No.

S. Hines - redirect

16:58:50  1          MS. REEVES:  Thank you.  I have no further

16:58:55  2    questions.

16:58:59  3                    REDIRECT EXAMINATION

16:58:59  4    BY MR. THORNBURGH:

16:58:59  5    Q.      Mr. Hines, just a few more questions.  I would ask

16:59:02  6    that you turn to tab PTX 547 in your binder, please.

16:59:18  7               Mr. Hines, you recognize this e-mail, correct?

16:59:20  8    A.      Yes, I do.

16:59:21  9    Q.      This is an e-mail that you wrote on April 12, 2019?

16:59:25 10    A.      Yes.

16:59:26 11          MR. THORNBURGH:  Your Honor, there are no

16:59:28 12    outstanding objections to this exhibit.  We ask that it be

16:59:31 13    admitted into evidence.

16:59:32 14          MS. REEVES:  No objection.

16:59:32 15          THE COURT:  Thank you.  It's admitted.

16:59:34 16               (PTX Exhibit No. 547 was admitted into

16:59:35 17    evidence.)

16:59:35 18    BY MR. THORNBURGH:

16:59:36 19    Q.      Mr. Hines, this is an e-mail that you wrote to

16:59:40 20    individuals who worked at United's member owners, correct?

16:59:42 21    A.      Yes.

16:59:42 22    Q.      Okay.  And if we could zoom in on the top e-mail.

17:00:01 23    Mr. Hines, in this e-mail, you were analyzing or looking at

17:00:10 24    potential financials associated with an acquisition of

17:00:15 25    Imperial, correct?

A.      Yes.

Q.      And I want to draw your attention to the numbers listed in the middle of this e-mail, and specifically number 3 where you write, "Better yet, I propose 1.5 percent inflation on costs, 1.5 percent on freight, and a more realistic 1.15 increase in prices."

        Do you see that?

A.      Yes.

Q.      In this analysis you were considering prices as part of your financial modeling, correct?

A.      I was attempting to forecast margins but because of the way the model was set up it included both prices and costs.

Q.      So prices was part of the analysis that you looked at, correct, sir?

A.      Correct.

        MR. THORNBURGH:  No further questions, Your Honor.

        THE COURT:  All right.  Thank you.  Sir, you are excused.  Let me just ask, PDX 486, that's a demonstrative, but you offered it into evidence.

        MR. THORNBURGH:  Yes, Your Honor, if that's something that would aid the Court, it's a summary of information --

        THE COURT:  Usually someone would mark a summary

17:01:17 1    exhibit as a DX, it's weird that it's a demonstrative.  We

17:01:21 2    don't usually consider those evidence and they don't come

17:01:23 3    into evidence, that's why I'm confused.

17:01:26 4              MR. THORNBURGH:  Your Honor, we wanted to admit

17:01:27 5    the underlying exhibit.  If it's the Court's preference, we

17:01:35 6    will not offer the demonstrative into evidence.

17:01:37 7              THE COURT:  Okay.  Now I'm confused.  Because

17:01:42 8    defendants didn't object.  So you guys are all cool with

17:01:45 9    this demonstrative coming into evidence?

17:01:48 10             MS. REEVES:  Your Honor, it's up to the

17:01:51 11   government whether they want to admit it.  We don't object

17:01:54 12   to it.

17:01:55 13             MR. THORNBURGH:  If there is no objection, we

17:01:56 14   would like it to be admitted.

17:01:58 15             THE COURT:  For the most part if we're going to

17:02:01 16   do summaries I would mark them as trial exhibits, because it

17:02:05 17   gets confusing go when they're demonstratives, I know what

17:02:09 18   you were doing with that, so we'll take that.  Thank you,

17:02:13 19   sir.

17:02:13 20             What's next?

17:02:14 21             MR. HANNA:  Your Honor, we're going to play two

17:02:17 22   videos.  I think they're two 25-minute or about 20 -- the

17:02:24 23   first one is 27 minutes.  We'll give Mr. Buckson the actual

17:02:30 24   time, about 17 minutes for plaintiffs and about ten minutes

17:02:34 25   for the defendants.

17:02:36  1             And we're going to call Matthew Kling.  He's the

17:02:40  2     chief operating officers of Batory Foods.  Batory Foods will

17:02:47  3     discuss purchasing and sale of sugar and other products.

17:03:07  4             (Videotape deposition of Matthew Kling:)

17:03:14  5     Q.      Mr. Kling, would you please state your name for the

17:03:16  6     record?

17:03:16  7     A.      Matthew George Kling.

17:03:18  8     Q.      Where do you work?

17:03:20  9     A.      I work for Batory Foods.

17:03:25 10     Q.      And at a very high level, what is Batory's business?

17:03:29 11     A.      Batory is one of the largest food ingredient

17:03:34 12     distributors in the United States.

17:03:36 13     Q.      What is your current role at Batory?

17:03:38 14     A.      Chief operating officer.

17:03:39 15     Q.      Can you describe briefly how Batory's business has

17:03:43 16     expanded, if at all, since you came on board?

17:03:46 17     A.      We -- we have acquired other distributors in the --

17:03:51 18     in the national marketplace.  That's been primarily the --

17:03:55 19     the acquisitional growth we've had.  Organically, we earn

17:04:02 20     new customers every day.  Organically, that's -- that's our

17:04:07 21     primary route to -- to growth.

17:04:13 22             But there have been some acquisitions since I've

17:04:18 23     joined.

17:04:20 24             MR. HANNA:  Your Honor, I apologize.  I forgot

17:04:22 25     to request permission to close the courtroom.  As we talked

17:04:25 1    earlier this morning, there is some confidential

17:04:28 2    information.

17:04:29 3           THE COURT:  The depositions are largely

17:04:30 4    confidential.  And I think good cause has been shown in the

17:04:35 5    written submissions which we received, so we will do that

17:04:38 6    with the proviso that public redactions need to be made for

17:04:42 7    the nonpublic information.  But for now we will close the

17:04:45 8    courtroom.

17:04:46 9           MR. HANNA:  I apologize for that, Your Honor.

17:04:49 10          (Courtroom sealed.)

17:05:17 11   A.     But there have been some acquisitions since I joined.

17:05:21 12   Q.     Can you give us a sense of how much the customer base

17:05:23 13   has grown since you joined Batory?

17:05:26 14   A.     It would be -- it would be approximately a double

17:05:31 15   digit percentage increase.

17:05:35 16   Q.     Batory does not refine sugar, does it?

17:05:38 17   A.     We do not refine sugar.

17:05:40 18   Q.     Is it fair to say that, in part, your strategy is to

17:05:45 19   buy sugar where it's less expensive in certain parts of the

17:05:47 20   United States or abroad and then resell it in places where

17:05:51 21   it can command a higher price?

17:05:52 22   A.     Yes.

17:05:52 23   Q.     And when Batory purchases sugar at a low price, is it

17:06:01 24   able to beat out competitors by offering that sugar to

17:06:05 25   customers at a lower price?  Correct?

17:06:09 1   A.      Incorrect.

17:06:09 2   Q.      Incorrect?  Why is that incorrect?

17:06:11 3   A.      We try to extract value for what we do.  A lot of our

17:06:16 4   customers are customers that come to us and want to purchase

17:06:20 5   other ingredients for delivery at the same time.  There are

17:06:24 6   costs incurred with buying and warehousing sugar that are

17:06:35 7   indignant to how we -- we cost our -- our products.

17:06:39 8   Q.      Is it fair to say that Batory is able to leverage its

17:06:43 9   facilities and distribution network to move sugar from areas

17:06:47 10  of supply to area of demand?

17:06:49 11  A.      It's fair to say that.

17:06:51 12  Q.      At this point, I'm going to mark an exhibit.  It's

17:06:56 13  BAT 0210.  It's an Excel spreadsheet.



17:07:38  1

17:07:41  2

17:07:45  3

17:07:52  4

17:07:56  5

17:07:57  6

17:07:59  7

17:08:00  8

17:08:05  9

17:08:13  10

17:08:15  11    Q.      So let's now mark as Exhibit 2, BAT 0208, another

17:08:21  12    Excel spreadsheet.  And I guess we should put this in the

17:08:24  13    chat as well, so everyone can see it in native form.

17:08:28  14            Are you familiar with this document?

17:08:32  15    A.      I am.

17:08:32  16    Q.      What does it show?

17:08:33  17

17:08:37  18

17:08:42  19

17:08:49  20

17:08:52  21

17:08:54  22

17:08:55  23

17:09:01  24

17:09:08  25

17:09:16  1  █████████

17:09:16  2  █  ███████████████████████

17:09:21  3  ██████████████████████████████████

17:09:27  4  █████████████████████████████████

17:09:32  5  ██████████████████████████████████

17:09:42  6  ██████████

17:09:45  7  █  ███████████████████████████

17:09:49  8  ██████████████████████████

17:09:52  9  █████████████████

17:09:54 10  █  ████

17:09:55 11  █  ████████████████████

17:09:59 12  ██████████████████████████

17:10:02 13  █  ██████████████████████████

17:10:09 14  ████████████████████████

17:10:13 15  █  █████████████████████████████

17:10:30 16  ████████████████████████████

17:10:33 17  ███████████████

17:10:45 18  █  ██

17:10:46 19  █  █████████████████████████████

17:10:52 20  ██████████████████████████████

17:10:55 21  █████████████████████

17:10:58 22  █  ██████████████████████

17:11:02 23  ██████████████████████████████

17:11:07 24  █████████████

17:11:10 25  Q.        **Let's move to the third and last exhibit I'm going to**

17:11:16  1    show you.  It's another Excel spreadsheet with production

17:11:20  2    number BAT 0209.  If we could put that in the chat, that

17:11:27  3    would be great.

17:11:27  4                 And are you familiar with this document?

17:11:31  5    A.     I am.

17:11:32  6    Q.     And what does it show?

17:11:34  7    ██    ████████████████████████████████████

17:11:39  8    ████████████████████████████████████████████

17:11:47  9    ██    ███████████████████████████████████

17:11:51  10   ██████

17:11:51  11   ██    ████

17:11:52  12   Q.     And focusing in on what the DOJ calls the southeast,

17:12:00  13   how would you describe the competitive environment for

17:12:03  14   refined sugar in that region?

17:12:05  15   A.     How would I describe the competitive environment?

17:12:09  16   Q.     Is it very competitive?  Is it not competitive?  You

17:12:14  17   know, however you want to describe it.

17:12:17  18   A.     I would describe it as not very competitive.

17:12:19  19   Q.     Why do you say that?

17:12:20  20   A.     You have -- you have one refiner that is not

17:12:24  21   vertically integrated, which is the Savannah refinery, so

17:12:31  22   they cannot compete in the market month in and month out.

17:12:36  23                 You have two refiners in Florida.  One is more

17:12:41  24   focused on retail than they are on the formats that we need

17:12:51  25   for our products.

17:12:53  1            And the freight lanes going from the Gulf to the

17:12:58  2    east are not necessarily competitive.   They're generally not

17:13:02  3    freight lanes that carries -- carriers aspire to transport

17:13:10  4    product in.





17:16:15  1
17:16:20  2
17:16:25  3
17:16:30  4
17:16:36  5
17:16:40  6
17:16:45  7
17:16:46  8
17:16:50  9
17:16:55 10
17:17:01 11
17:17:04 12
17:17:07 13
17:17:13 14
17:17:16 15
17:17:20 16
17:17:25 17
17:17:29 18
17:17:34 19
17:17:38 20
17:17:45 21
17:17:51 22
17:17:52 23
17:17:59 24
17:18:05 25





17:21:41 1 ███████████████████████████████

17:21:52 2 █████████████████████████████████

17:21:56 3 ████████████████████████████

17:22:01 4 ████████████████████████████████

17:22:07 5 ████████████████

17:22:09 6 ████████████████████████████

17:22:14 7 ████████████████████████████████

17:22:22 8 ██

17:22:22 9 █    █████████████████████████████████

17:22:28 10 ██████████████████████████████

17:22:32 11 ██████████████████████████████

17:22:37 12 ████████████████████████████████

17:22:42 13 █████████████████████████████

17:22:48 14 █████████████████████

17:22:52 15 ████████████████████████████████████

17:22:58 16 ███████████████████████████████

17:23:03 17 ████████████████

17:23:05 18 █    ███████████████████████

17:23:10 19 █    ██████████████████████

17:23:14 20 █    ████████████████████████

17:23:21 21 ███████████████████

17:23:28 22 █      ██

17:23:31 23 █    ████████████████████████

17:23:38 24 ██████████████████████████████

17:23:42 25 █████

17:23:43 1

17:23:44 2

17:23:44 3   Q.      Is there a reason why Batory's purchases from United

17:23:50 4   have declined?

17:23:51 5   A.      Yes.  They -- they have chosen to de-emphasize their

17:23:57 6   sales to distributors.

17:24:01 7   Q.      And what do you mean by they've chosen to

17:24:05 8   de-emphasize sales to distributors?

17:24:07 9   A.      They would prefer that distributors focus solely on

17:24:11 10  LTL business, and they do not want to supply distributors

17:24:17 11  who supply full truckloads to customers.

17:24:21 12  Q.      When did you first become aware that United was

17:24:27 13  adopting this new strategy?

17:24:30 14  A.      Approximately at the time I joined Batory, they were

17:24:34 15  transitioning into a new mindset about working with

17:24:41 16  distributors.

17:24:42 17          At one time, United supplied Batory with close

17:24:46 18  to 80, 85 percent of all of its sugar.

17:24:50 19  Q.      And when did that change?

17:24:51 20  A.      I -- we started to see the change in 2017.  There

17:24:55 21  were moves beginning to become apparent to us.  They decided

17:25:02 22  to supply us with less.  And, you know, they made a decision

17:25:12 23  to build a -- a pretty significant facility in Chicago to

17:25:17 24  compete with us.  So in that 2017 time range line was when

17:25:22 25  we saw this -- this strategy change begin.

17:25:36 1   Q.      And what facility did they build in Chicago?

17:25:44 2   A.      They built a sugar distribution facility in

17:25:48 3 Montgomery, Illinois.

17:25:50 4   Q.      And how did -- sorry, go ahead.

17:25:52 5   A.      And it's a significant capital investment, and it --

17:25:56 6 it gives them a platform to focus on business segments that

17:26:00 7 historically were not in their portfolio.

17:26:04 8   Q.      And what are those business segments?

17:26:08 9   A.      It's the local truckload Chicago market for vans --

17:26:13 10 package vans, as well as bulk sugar delivery.  Prior to

17:26:20 11 that, we were providing those handling services for them in

17:26:25 12 Chicago.

17:26:27 13   Q.      And how did United new strategy impact Batory?

17:26:38 14   A.      Well, it caused us to find other suppliers that could

17:26:42 15 be our supply partners in the markets we play or we

17:26:46 16 participate in.

17:26:48 17

17:26:53 18

17:26:54 19

17:26:59 20

17:27:01 21

17:27:09 22

17:27:12 23

17:27:14 24

17:27:15 25



17:27:19  1
17:27:25  2
17:27:33  3
17:27:37  4
17:27:44  5
17:27:46  6
17:27:47  7
17:27:48  8
17:27:52  9
17:27:5d 10
17:28:04 11
17:28:07 12
17:28:08 13
17:28:13 14

17:28:14 15   Q.      I want to go back to the discussion about United's

17:28:18 16   new facility in Chicago.

17:28:22 17              Where did they build that facility?

17:28:25 18   A.      It's in Montgomery, Illinois, which is about

17:28:30 19   thirty-five miles west of Chicago.

17:28:31 20   Q.      And how would you describe the facility that they

17:28:35 21   built?

17:28:35 22   A.      It's a significant capital investment.  They've --

17:28:42 23   they built it initially as a storage facility for sugar

17:28:42 24   coming from their member partners.  They do a lot of bulk

17:28:51 25   sugar through there in truckload quantities.  They are

17:29:01 1   moving in the direction of expanding the offerings from that

17:29:05 2   site.   The date is still a TBD.

17:29:12 3   ███ ████████████████████████████

17:29:17 4   ███████████████████████████

17:29:22 5   ███ ███████████████

17:29:23 6   ███ ████████████

17:29:25 7   ███ ████████████████████████████

17:29:32 8   ████████████████████████████████

17:29:36 9   █████████████████████████████████

17:29:40 10  ██████████████████████████████

17:29:43 11  ████████████

17:29:45 12  Q.       I want to go back to liquid sugar for a second.

17:29:49 13           What is the radius -- the typical radius for

17:29:52 14  shipping liquid sugar?

17:29:55 15  A.       It's -- the -- the effective radius is 200 miles or

17:30:00 16  less.

17:30:01 17           And the reason why, in a trailer of liquid

17:30:05 18  sugar, two-thirds of it is sugar, one-third of it is water.

17:30:11 19  So the cost to ship that percentage of water is very -- you

17:30:15 20  know, there's a cost-effective scenario that comes into

17:30:22 21  play.

17:30:25 22  ███ █████████████████████████

17:30:28 23  █████████████████████████████████

17:30:32 24  ██████████████████████████████

17:30:36 25  ████████████



17:32:12 1                    (End of videotape.)

17:32:15 2                    MR. HANNA:  Your Honor, at this time United

17:32:18 3     States moves into evidence, JTX 046 that was identified in

17:32:23 4     the deposition as BAT 0209.

17:32:32 5                    MS. DWYER:  Your Honor, we have no objection.

17:32:33 6     I'm Hannah Dwyer on behalf of Imperial Sugar and LDC.  The

17:32:35 7     defendants would also like to move into evidence JTX 047

17:32:39 8     which was exhibit 1 in the video, or BAT 0210, as well as

17:32:46 9     JTX 045, which was Exhibit 2 in the video or BAT 0208.  And

17:32:55 10    plaintiff already moved in the JTX046.

17:32:57 11                    THE COURT:  Any objection?

17:32:59 12                    MR. HANNA:  No objections, Your Honor.

17:33:00 13                    THE COURT:  All of those will be admitted.

17:33:00 14                    (The above listed exhibits were admitted into

17:33:00 15    evidence.)

17:33:02 16                    THE COURT:  What's next?

17:33:03 17                    MR. HANNA:  Your Honor, the United States calls

17:33:05 18    Chris Simons, the CEO and president of National Sugar

17:33:10 19    Marketing, by video.  NSM markets sugar on behalf of two

17:33:12 20    companies.

17:33:17 21                    (Videotape deposition of Chris Simons:)

17:33:28 22    Q.    Okay.  If you could just to begin with, tell me where

17:33:31 23    you're currently employed?

17:33:32 24    A.    I'm employed at National Sugar Marketing based in

17:33:35 25    Atlanta, Georgia.

17:33:36  1    Q.      And was your position there?

17:33:38  2    A.      CEO and president.

17:33:40  3    Q.      What is National Sugar Marketing Cooperative?

17:33:44  4    A.      So we are a marketing company.  We have two members,

17:33:48  5    Amalgamated Sugar Company and Southern Minn Sugar Company.

17:33:56  6    And we also have a marketing agreement with a company called

17:34:00  7    Sucden based out of Paris, France and located here in the

17:34:04  8    United States in Miami, Florida.  So the five individuals

17:34:10  9    that I have talked about that are functional leads we

17:34:14 10    provide those services for those two members and one

17:34:16 11    marketing company.

17:34:18 12    Q.      All right.  And Southern Minnesota, is that --

17:34:21 13    Southern Minnesota Beet and Sugar Cooperative?

17:34:24 14    A.      Beet sugar, yes.

17:34:25 15    Q.      We will call them Southern Minn.

17:34:29 16    A.      Yes.

17:34:30 17    Q.      And Amalgamated Sugar Company was the other member?

17:34:35 18    A.      Yes, ma'am.

17:34:36 19    Q.      And they are a farming cooperative?

17:34:38 20    A.      Yes, ma'am.

17:34:41 21    Q.      Looking first at Southern Minn where it's kind of the

17:34:50 22    same question, but where are they located?

17:34:52 23    A.      It actually is a more difficult question than you

17:34:55 24    probably think.  They have a facility in Renville,

17:35:00 25    Minnesota, but they also own a facility in Brawley,

17:35:04 1  California.

17:35:06 2  █ ███████████████████████████████

17:35:10 3  ████████████████████

17:35:12 4  █ ████████████

17:35:13 5  Q.     Do any of the facilities operated by Southern Minn

17:35:19 6  produce cane sugar?

17:35:23 7  A.     No.

17:35:24 8  Q.     How about any of the facilities operated by

17:35:28 9  Amalgamated, do they produce cane sugar?

17:35:30 10  A.     No.

17:35:31 11  Q.     Does NSM market all of the refined sugar produced by

17:35:36 12  its members?

17:35:36 13  A.     Yes.

17:35:37 14  Q.     Is NSM the exclusive marketer of products for -- or

17:35:42 15  excuse me, refined sugar products for its members?

17:35:45 16  A.     Yes.

17:35:46 17  Q.     Does NSM have any responsibility in setting or

17:35:50 18  directing the members in how much refined sugar they will

17:35:56 19  produce?

17:35:58 20  A.     I said no.

17:36:02 21  Q.     Did the members have responsibility or any input into

17:36:04 22  determining the actual price that NSM enters into with

17:36:08 23  respect to a particular customer?

17:36:12 24  A.     Not that I've seen in the two years I've been here,

17:36:12 25  no.  Not down to that level.

17:36:23 1   Q.      Does Southern -- NSM have a marketing relationship

17:36:27 2   with Sucden?

17:36:30 3   A.      Yes.

17:36:30 4   Q.      Do you set up a marketing plan with Sucden annually

17:36:36 5   similar to what you do with the other two members?

17:36:40 6   A.      No.  We have no idea when or where they are going to

17:36:45 7   bring product in.  I mean, they're a trader.

17:36:49 8   Q.      And what sorts of sugar do you market on their

17:36:53 9   behalf?

17:36:55 10   A.      Right now, the last year or two, it's been

17:36:57 11   100 percent cane sugar.

17:36:58 12   Q.      They import the sugar?

17:37:00 13   A.      Nearly all of it would be imported.

17:37:04 14   Q.      What are some of the quality issues that come up with

17:37:09 15   sourcing sugar from a foreign refinery?

17:37:15 16   A.      Documentation is probably the biggest.  Audits.

17:37:18 17   Granulation size.  Product coming into the United States

17:37:23 18   hard and lumpy.  So, you have a bag of sugar in your house

17:37:33 19   for four or five years, it becomes hard and lumpy, and that

17:37:38 20   often can be what comes into the United States.  Color can

17:37:41 21   be an issue.

17:37:42 22   Q.      What are the granulation concerns that you have with

17:37:47 23   the imported product?

17:37:50 24   A.      It can vary.  If you are trying to granulate sugar

17:37:57 25   faster, often the granulation size will become bigger, which

17:38:01 1   is -- can be a challenge to certain customers.  They want

17:38:11 2   certain, what they call screen size, you know, the ability

17:38:17 3   to get sugar in a certain granulation size versus a

17:38:21 4   different size.

17:38:22 5   Q.     What are the color issues that are -- you might

17:38:26 6   confront with an imported product?

17:38:29 7   A.     Some customers have color -- are very specific on

17:38:33 8   color.  You can have somebody that's putting sugar into

17:38:40 9   chocolate may not care.  Somebody that's putting sugar into

17:38:44 10  something that's clear or white will care on color.  So

17:38:49 11  that's -- it just depends on what that product is used for.

17:38:57 12  ███      █████████████████████████████

17:39:00 13  █████████████████████

17:39:03 14  █      ████████████████████████████

17:39:07 15  ████████████████████████████████████

17:39:11 16  ██████████████████████████████████████

17:39:15 17  ██████████████████████████████

17:39:19 18  ██████████████████████████████████

17:39:26 19  ███████████████████

17:39:28 20  Q.     Can you give me some examples of who falls under the

17:39:36 21  distribution business in your mind?

17:39:38 22  A.     Sweetener Products.  Sweeteners Plus.  Sweetener

17:39:42 23  Supply.  Indiana Sugars.  Batory.  Evergreen Sweeteners.

17:39:50 24  Those would be some of the bigger ones.

17:39:56 25  Q.     And how are distributors different at all from

17:40:01 1   customers that NSM would be selling to?

17:40:04 2   A.      Most distributors do something different with the

17:40:10 3   product and we would ship it in bulk rail to a distributor

17:40:19 4   and they would liquify it.  They would put it in a

17:40:29 5   customer's bag for them.  They will maybe provide only a

17:40:33 6   pallet's worth of product, versus we are looking to be

17:40:38 7   Tons-R-Us, you know, we want things mostly moving in bulk.

17:40:41 8   So they provide different types of products and packaging

17:40:44 9   that we wouldn't provide.

17:40:46 10  ███ ████████████████████████████████████████████

17:40:49 11  ████████████████████████████████████████████████

17:40:54 12  ███████████████████████████████████████

17:40:57 13  ███ ████████████████████████████████████

17:41:05 14  ███████████

17:41:05 15  ███ ██████████████████████████████████████████

17:41:09 16  ██████████████

17:41:10 17  ███ ███████████████████████████████████████

17:41:15 18  █████████████████████████████████████████

17:41:23 19  ███████████

17:41:23 20  ███ ████████████████████████████

17:41:27 21  █████████████████

17:41:30 22  ███ ██████████████████████████████████████

17:41:36 23  ██████████████████████████████████████████████████

17:41:40 24  ████████████████████████████████████████

17:41:50 25  ████████████████████████████████████████

17:41:54 1 ███████████████████████████████████████████████

17:42:00 2 █████████████████████

17:42:01 3   Q.      And that would be because --

17:42:03 4   A.      Crop gets frozen.   Crop melts.

17:42:08 5   Q.      Has that happened during your tenure?

17:42:11 6   A.      Yes.

17:42:12 7 ██    ████████████████████

17:42:14 8 ██     ████████████████████████████████

17:42:18 9 ███████████████████████████████████

17:42:24 10  Q.      And most of your customers -- would you say most of

17:42:27 11  your customers typically have annual contracts of one form

17:42:31 12  or another?

17:42:32 13  A.      Almost all of them, yes.

17:42:34 14  Q.      Over 90 percent?

17:42:35 15  A.      Easily by volume.   Easily.

17:42:37 16  Q.      How does the -- how does the storage capacity affect

17:42:42 17  your pricing decisions?

17:42:44 18  A.      Could dramatically.

17:42:54 19  Q.      And in what way, how does that manifest?

17:42:57 20  A.      So a silo, again, can either be too low or too high.

17:43:02 21  If you have it too low it causes operational challenges, you

17:43:08 22  can't get the sugar out of the silo, so you have to manage

17:43:11 23  that silo to a certain level, high and low, and you may have

17:43:15 24  to take different pricing decisions to try to move product

17:43:19 25  to keep those silos within that range.

17:43:24 1    Q.      NSM's headquarters are in Atlanta?

17:43:28 2    A.      Correct.

17:43:28 3    Q.      And do -- does the company have any warehousing

17:43:32 4    capability or terminal capability of its own in Atlanta?

17:43:38 5    A.      No.

17:43:38 6    

17:43:43 7

17:43:47 8

17:43:50 9

17:43:56 10

17:43:56 11

17:44:03 12

17:44:04 13

17:44:07 14   Q.      And you said most of your customers are getting a

17:44:16 15   delivered price not an FOB?

17:44:18 16   A.      At least ninety percent, yes.

17:44:20 17

17:44:24 18

17:44:25 19

17:44:30 20

17:44:30 21   Q.      How is -- why is the customer location an important

17:44:34 22   element of the plan?

17:44:35 23   A.      Just from a freight standpoint of where we expect to

17:44:35 24   be competitive.

17:44:35 25   Q.      Is there a particular geographic area where you would

17:44:44  1    -- where you expect NSM will be competitive?

17:44:48  2    A.      It can depend on a rail line that a customer's

17:44:56  3    location is on and our facility's location -- rail line.  So

17:45:04  4    you have a direct -- like, you are on the BN and you ship to

17:45:08  5    a BN customer.  There can be some reduced freight costs

17:45:14  6    because of that.  But for the most part, we are looking at

17:45:17  7    two-thirds of the United States.  We have shipped

17:45:21  8    everywhere, but yes.

17:45:29  9    Q.      If you are shipping the product by truck, does that

17:45:33  10   narrow the geographic area where you are likely to be

17:45:37  11   competitive for a customer?

17:45:41  12   A.      We believe about 250 miles outside of either a

17:45:46  13   facility or a warehouse or a terminal is more than likely

17:45:52  14   going to limit, due to governmental regulations, on driver

17:45:56  15   hours.

17:46:00  16   Q.      In terms of -- we talked about, you know, freight

17:46:03  17   being a, you know, a significant factor that you consider.

17:46:07  18   What role does freight play in determining, you know, which

17:46:11  19   geographic areas you might be interested in marketing to?

17:46:12  20   A.      Most part, freight rates are linear.  Further mile --

17:46:30  21   more miles you go, the more cost there is, whether it be

17:46:32  22   truck or rail.  Another key component is the facility's

17:46:37  23   ability to turn our railcars, and the amount of time a

17:46:41  24   railcar is away from our facility.  Just simple math, if my

17:46:46  25   railcar leaves Renville, Minnesota, and it takes forty days

17:46:51  1    to come back, versus my ability to ship a customer and I get

17:46:55  2    it back in twenty, I can turn it twice to the same railcar

17:47:00  3    that would be for one railcar going forty days.  That's a

17:47:05  4    major decision point for us when we are looking at freight.

17:47:10  5    Q.    I don't know if you've had a chance, or wanted to or

17:47:14  6    had any desire too, but if you had a chance to look at the

17:47:19  7    complaint that we filed in this matter.  Are you familiar

17:47:22  8    with the states that we -- the geographic market that's

17:47:27  9    covered by our complaint?

17:47:28 10    A.    Yes.  We had to provide information around this --

17:47:35 11    this CID around that, those states, yes.

17:47:40 12    Q.    And, at least for purposes of our complaint, we have

17:47:43 13    defined that area as, you know, the southeast.  Do you have

17:47:47 14    a particular area in -- you know, internally at NSM that you

17:47:52 15    think of as the southeast?

17:47:54 16    A.    No.

17:47:55 17    ███              ████████████████████████████████████████████

17:47:59 18    ████████████████████████████████████████████████████████████

17:48:04 19    ██████████████████████████████████████████████████

17:48:08 20    ███       ██████████████████████████████████

17:48:12 21    Q.    Why don't you make a greater percentage of sales in

17:48:16 22    the twelve state area plus DC that we have alleged?

17:48:20 23    A.    Typically it's freight costs and railcar turn.

17:48:32 24    Q.    With respect to, again, the southeast region, can you

17:48:37 25    tell me who some of your larger customers are in the

17:48:43 1  southeast, again, our -- United States Department of

17:48:48 2  Justice's southeast?

17:48:50 3  A.      Defined as southeast.  Again, you know, we sell 1

17:48:53 4  million of our 30 and change million into that region.  Most

17:48:58 5  -- nearly all of those customers are national customers that

17:49:01 6  we do business with elsewhere in the United States.



17:49:39 16 Q.      Do you know if you are the sole provider for those

17:49:44 17 facilities?

17:49:44 18 A.      No.  The answer is we are not the sole supplier of

17:49:48 19 that facility.



17:50:05  1

17:50:11  2

17:50:11  3

17:50:12  4

17:50:18  5

17:50:19  6

17:50:24  7

17:50:27  8

17:50:30  9

17:50:30 10   Q.    Do you know where that sugar is being sourced from?

17:50:33 11   A.    No.   It's either Renville, Minnesota, or Idaho

17:50:39 12   facilities.

17:50:40 13

17:50:43 14

17:50:50 15

17:50:50 16

17:50:54 17

17:50:58 18

17:51:00 19   Q.    What does it mean to be a strategic customer?

17:51:02 20   A.    We service them at multiple facilities and they have

17:51:07 21   facilities that they would view us as strategic and we would

17:51:11 22   view them as strategic.   And that's typically defined by

17:51:15 23   close vicinity to our facility -- our slicing facilities.

17:51:21 24

17:51:26 25



17:53:01  1  

17:53:08  2

17:53:13  3

17:53:16  4

17:53:19  5

17:53:28  6

17:53:28  7

17:53:32  8

17:53:32  9

17:53:39 10

17:53:45 11

17:53:48 12

17:53:55 13

17:54:00 14

17:54:03 15

17:54:09 16

17:54:15 17

17:54:19 18

17:54:25 19   Q.      And how -- you said that the Idaho facilities, the

17:54:29 20   amalgamated facilities are operating at a higher right of

17:54:33 21   utilization, correct?

17:54:34 22   A.      Correct.

17:54:34 23

17:54:37 24

17:54:42 25

17:54:44 1   ███   ████████████████████████

17:54:48 2   ███   ██████████████████████

17:54:51 3   Q.       During the break, we marked as Exhibit 1 to this

17:54:54 4   deposition an Excel spreadsheet that is entitled, "NSM

17:54:58 5   response to DOJ-US Sugar subpoenas.XLSX.  Do you have

17:55:06 6   Exhibit 1 in front of you?

17:55:06 7   A.       I do.

17:55:07 8   Q.       And are you familiar with this spreadsheet?

17:55:09 9   A.       I am.

17:55:10 10  Q.       And does this spreadsheet reflect NSM's sales data

17:55:15 11  that was produced in response to a subpoena by the

17:55:18 12  Department of Justice and the defendants in this litigation,

17:55:21 13  as far as you know?

17:55:22 14  A.       Yes.  Yes.

17:55:23 15  Q.       Does this Exhibit 1 summarize actual sales data that

17:55:27 16  NSM maintains in the ordinary course of its business?

17:55:31 17  A.       Yes.

17:55:31 18  Q.       Do you have in front of you also what we have marked

17:55:36 19  as Exhibit 2.  For the record, it is a spreadsheet that is

17:55:39 20  entitled "DOJ-US Sugar data glossary-highly confidential."

17:55:48 21  A.       Yes.

17:55:51 22  Q.       Okay.  And this is a list of the customers that NSM

17:55:55 23  sells to in DOJ's 13 states; is that right?

17:56:00 24  A.       Correct.

17:56:02 25  ███   ██████████████████████████████████████████████



```
17:56:07  1  ████████████████████████████████████████████
17:56:13  2  ████████████████████████████████████████████
17:56:18  3  ██████████
17:56:18  4  █    ████████
17:56:20  5  █    ████████████████████████████
17:56:25  6  ███████████████████
17:56:27  7  █    ███████████████████████████████████████
17:56:34  8  ████
```

17:56:34  9   Q.      Okay.  And some of the sugar you sold into those

17:56:38  10  states was beet sugar; right?

17:56:39  11  A.      Yes.

17:56:40  12  Q.      So, therefore, that sugar would have come from either

17:56:44  13  Idaho or Minnesota; is that right?

17:56:47  14  A.      And I know of a certain circumstance where it came

17:56:52  15  from, I believe, Brawley, California, as well.

```
17:56:55  16  █    ██████████████████████████
17:56:59  17  █████████████████
17:57:01  18  █    ████████
```

17:57:02  19  Q.      And that's beet sugar that is coming either out of

17:57:02  20  Idaho or Minnesota?

17:57:02  21  A.      Correct.

```
17:57:08  22  █    ██████████████████████████
17:57:11  23  ████████████████
17:57:14  24  █    ██
17:57:14  25  █    ██████████████████████████
```



17:57:20  1

17:57:23  2

17:57:24  3    Q.      And again, that is beet sugar that is originating

17:57:28  4    either out of Idaho or Minnesota, correct?

17:57:31  5    A.      Correct.

17:57:32  6

17:57:36  7

17:57:37  8

17:57:38  9

17:57:45 10

17:57:49 11

17:57:50 12

17:57:53 13

17:57:55 14

17:57:58 15

17:58:01 16

17:58:02 17

17:58:07 18

17:58:11 19

17:58:14 20

17:58:14 21

17:58:18 22

17:58:22 23

17:58:23 24

17:58:30 25

17:58:32   1   

17:58:34   2

17:58:38   3

17:58:43   4

17:58:44   5

17:58:44   6   Q.      The imported cane sugar that NSM sells from Sucden

17:58:49   7   meets NSM's quality requirements, correct?

17:58:51   8   A.      The assumption is yes.

17:58:53   9   Q.      You testified earlier that NSM is looking for

17:58:56  10   opportunities anywhere in the U.S. that makes business sense

17:58:59  11   to sell its sugar; is that right?

17:59:01  12   A.      Correct.

17:59:01  13   Q.      And that would, of course, include DOJ's 13 states,

17:59:06  14   true?

17:59:06  15   A.      Correct.

17:59:11  16

17:59:16  17

17:59:17  18

17:59:18  19

17:59:21  20

17:59:21  21

17:59:24  22

17:59:30  23

17:59:33  24

17:59:33  25   Q.      And are you -- that sugar was beet sugar out of

17:59:45  1    Idaho, correct?

17:59:46  2    A.    It was beet sugar.  I'm not certain where it came

17:59:49  3    from.

17:59:49  4    Q.    So Idaho or Minnesota?

17:59:51  5    A.    Yes.

17:59:52  6    

17:59:56  7

17:59:59  8

18:00:03  9

18:00:03  10

18:00:09  11

18:00:12  12

18:00:17  13

18:00:20  14

18:00:21  15

18:00:21  16    Q.    Have there been occasions where you have lowered your

18:00:31  17    price in response to customer feedback?

18:00:33  18    A.    Yes.

18:00:36  19              (End of videotape. )

18:00:45  20              THE COURT:  Okay.  Any exhibits you want to put

18:00:47  21    in?

18:00:47  22              MR. HANNA:  The government didn't have any

18:00:49  23    exhibits.

18:00:49  24              MS. DWYER:  The defendants have two exhibits,

18:00:52  25    Joint Trial Exhibit 049, which was Exhibit 1 in the video

| | |
|---|---|
| 18:00:55 | 1 |

and JTX 042, which was Exhibit 2.

18:01:01  2              THE COURT:  Any objection?

18:01:01  3              MR. HANNA:  No, Your Honor.

18:01:02  4              THE COURT:  Those are admitted.

18:01:02  5              (JTX Exhibit Nos. 042 and 049 were admitted into

18:01:02  6  evidence.)

18:01:03  7              THE COURT:  Okay.  So let's take our break for

18:01:07  8  the evening.  Let me ask on the streaming, who is watching

18:01:12  9  the streaming?  Do we have to cut that off is my question

18:01:17 10  when we seal the courtroom?

18:01:19 11              MR. HANNA:  I don't believe, Your Honor, we do.

18:01:22 12  We have spoken with the counsel that dialed in and made him

18:01:27 13  aware of corporate representatives are not -- they said they

18:01:32 14  wouldn't do that.

18:01:33 15              THE COURT:  Those that leave.

18:01:36 16              MR. HANNA:  Those that leave will not be

18:01:38 17  watching.

18:01:39 18              THE COURT:  And you guys agreed with that?

18:01:40 19              MR. BUTERMAN:  Yes, Your Honor.

18:01:41 20              THE COURT:  So if we do that, then we don't have

18:01:42 21  to cut it off when we seal the courtroom because it's not

18:01:47 22  open to the public.  Right?

18:01:48 23              MR. HANNA:  Right.

18:01:49 24              THE COURT:  Anything that we need to discuss

18:01:51 25  before we leave for the day?

18:01:54  1                    MR. HANNA:  Not from the government, Your Honor.

18:01:56  2                    MR. BUTERMAN:  Nothing for the defendants, Your

18:01:57  3     Honor.

18:01:57  4                    THE COURT:  Thanks everyone.  See you tomorrow

18:01:59  5     morning.

          6                         (Court adjourned at 6:01 p.m.)

          7

          8          I hereby certify the foregoing is a true and
                accurate transcript from my stenographic notes in the proceeding.
          9

         10                              /s/ Dale C. Hawkins
                                       Official Court Reporter
         11                             U.S. District Court

         12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25