08:06:19

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA,        )
                                 )  VOLUME 2
            Plaintiff,           )
                                 )  C.A. No. 21-1644(MN)
    v.                           )
                                 )
UNITED STATES SUGAR              )
CORPORATION, et al.,             )
                                 )
            Defendants.          )

                    Tuesday, April 19, 2022
                    8:30 a.m.
                    Bench Trial

                    844 King Street
                    Wilmington, Delaware

BEFORE:   THE HONORABLE MARYELLEN NOREIKA
          United States District Court Judge

APPEARANCES:

                UNITED STATES ATTORNEY'S OFFICE
                BY:  SHAMOOR ANIS, ESQ.

                -and-

                U.S. DEPARTMENT OF JUSTICE
                BY:  BRIAN E. HANNA, ESQ.
                BY:  CHINITA M. SINKLER, ESQ.
                BY:  JONATHAN MINCER, ESQ.
                BY:  CURTIS STRONG, ESQ.
                BY:  JENIGH GARRETT, ESQ.
                BY:  JOHN THORNBURGH, ESQ.
                BY:  RYAN SANDROCK, ESQ.

                        Counsel for the Plaintiff

1    APPEARANCES CONTINUED:

2              MORRIS NICHOLS ARSHT & TUNNELL LLP
               BY:  JACK BLUMENFELD, ESQ.
3              BY:  BRIAN P. EGAN, ESQ.

4              -and-

5              LATHAM & WATKINS LLP
               BY:  JENNIFER GIORDANO, ESQ.
6              BY:  LAWRENCE E. BUTERMAN, ESQ.
               BY:  CHRISTOPHER YATES, ESQ.
7              BY:  AMANDA REEVES, ESQ.
               BY:  MOLLY M. BARRON, ESQ.
8              BY:  ELYSE GREENWALD, ESQ.
               BY:  CHRISTOPHER BROWN, ESQ.

9
                        Counsel for the Defendant
10                      United States Sugar Corporation

11

12             RICHARDS LAYTON & FINGER
               BY:  KELLY FARNAN, ESQ.
13
               -and-
14
               CRAVATH SWAINE & MOORE LLP
15             BY:  TIMOTHY G. CAMERON, ESQ.
               BY:  DAVID R. MARRIOTT, ESQ.
16             BY:  DANIEL K. ZACH, ESQ.
               BY:  PETER BARBUR, ESQ.
17             BY:  HANNAH DWYER, ESQ.

18                      Counsel for Defendants
                        Imperial Sugar Company and
19                      Louis Dreyfus Holding

20

21             HOGAN McDANIEL
               BY:  DANIEL KERRICK, ESQ.
22
               -and-
23
               STINSON, LLP
24             BY:  PETER J. SCHWINGLER, ESQ.

25                      Counsel for the Defendant
                        United Sugars Corporation

1

2                                    — — — — — — — — — —

08:29:44  3          THE COURT:  Good morning.  Please be seated.  I

08:29:50  4    have reviewed the requests to seal and if the parties are

08:29:57  5    going to make it a minimal amount and the information to be

08:30:04  6    elicited or the testimony to be elicited in that time is

08:30:08  7    highly sensitive competitive information, third-party, so I

08:30:13  8    will grant the motion to seal, just do it at the very end of

08:30:16  9    the direct and the beginnings of the cross.

08:30:21 10          Thank you.

08:30:22 11          MR. BLUMENFELD:  Thank you.  With respect to the

08:30:25 12    request that we sent on behalf of ASR for Mr. Sproull,

08:30:30 13    Mr. Sproull can only be here today.  We're calling him as a

08:30:33 14    witness.  So we're planning on calling him out of order.

08:30:36 15    The government has agreed that we can do that.  And so if

08:30:40 16    it's acceptable to Your Honor, we will call him at some time

08:30:44 17    today.  I don't think he's arrived in Delaware yet, but when

08:30:47 18    he gets here.

08:30:47 19          THE COURT:  That's fine.  I think that was in

08:30:49 20    the e-mail, too.  That's fine.  Thank you.

08:30:51 21          MR. BLUMENFELD:  Thank you.

08:30:52 22          THE COURT:  What's next?

08:30:52 23          MR. WOLIN:  Now we're going to call our next

08:30:52 24    witness.

08:30:52 25          THE COURT:  Who?  Great.  That's okay.  Who is

Cagle - direct

08:31:03 1    it?

08:31:04 2                    MR. WOLIN:  We're going to call Heath Cagle, the

08:31:08 3    chief financial officer of Piedmont Candy.

08:31:11 4                    THE COURT:  All right.  Thank you.

08:31:43 5                    COURT CLERK:  Please raise your right hand.

08:31:48 6    Please state and spell your full name for the record.

08:31:51 7                    THE WITNESS:  Michael Heath Cagle,

08:31:56 8    M-I-C-H-A-E-L, H-E-A-T-H, C-A-G-L-E.

08:32:01 9                    MICHAEL HEATH CAGLE, having been duly sworn was

08:32:06 10   examined and testified as follows:

08:32:07 11                   THE COURT:  Good morning.

08:32:09 12                   THE WITNESS:  Good morning.

08:32:11 13                   MS. SINKLER:  Good morning, Your Honor.  Chinita

08:32:14 14   Sinkler representing the United States.

08:32:15 15                   THE COURT:  Please, go ahead.

08:32:16 16                   MS. SINKLER:  Thank you.

08:32:17 17                        DIRECT EXAMINATION

08:32:18 18   BY MS. SINKLER:

08:32:19 19   Q.      Good morning, Mr. Cagle.

08:32:20 20   A.      Good morning.

08:32:21 21   Q.      You have a binder of exhibits from both the United

08:32:22 22   States and the defendant.  You can just leave those there

08:32:23 23   for now and once we get to those, I'll let you know.  Okay?

08:32:24 24   A.      Okay.

08:32:30 25   Q.      Would you state your full name please?

Cagle - direct

08:32:32 1     A.      Michael Heath Cagle.

08:32:34 2     Q.      Where do you work?

08:32:35 3     A.      Piedmont Candy Company.

08:32:38 4     Q.      If I say Piedmont or Piedmont Candy, will you know

08:32:42 5     I'm referring to your company?

08:32:43 6     A.      Yes, ma'am.

08:32:43 7     Q.      Where is Piedmont Candy located in North Carolina?

08:32:46 8     A.      About sixty miles north of Charlotte.

08:32:50 9     Q.      How many manufacturing plants does the Piedmont Candy

08:32:53 10    have in North Carolina?

08:32:55 11    A.      Two.

08:32:55 12    Q.      How many employees does Piedmont Candy have?

08:32:59 13    A.      Today around eighty-five.

08:33:01 14    Q.      What type of business is Piedmont?

08:33:03 15    A.      Manufacturer of candy and then mix of like trail mix.

08:33:16 16    Q.      Would you describe more so the products that Piedmont

08:33:21 17    Candy makes?

08:33:21 18    A.      On the candy side, it's a -- the majority of what we

08:33:26 19    make is a soft peppermint puff, so it's like a star light,

08:33:31 20    it's not hard, it melts in your mouth.  On the mix side we

08:33:34 21    make the sweet mix, it's a low calorie mix, a low sugar mix

08:33:39 22    where it has pretzels, Chex mix and then it's got a low

08:33:42 23    calorie or low sugar chocolate coating.

08:33:42 24    Q.      What is the name of the low sugar mix you referred

08:33:52 25    to?

Cagle - direct

08:33:52  1  A.        Thinful.

08:33:53  2  Q.        Approximately what percent of Piedmont Candy's yearly

08:33:58  3  sale are from the soft puff candy versus the snack mix?

08:34:03  4  A.        Currently about 98 percent.

08:34:04  5  Q.        Are the peppermint puffs sold under a brand name?

08:34:08  6  A.        Yes.

08:34:08  7  Q.        What is that?

08:34:09  8  A.        It's Red Bird Candy.

08:34:11  9  Q.        Where is Red Bird Candy sold?

08:34:14  10  A.        National retailers throughout the Continental United

08:34:19  11  States.   For example, Wal-Mart, Walgreen's, CVS, Family

08:34:25  12  Dollar, Dollar Tree, Dollar General.

08:34:27  13  Q.        What are the ingredient that go into making the Red

08:34:33  14  Bird puffs?

08:34:33  15  A.        It's going to be pure cane sugar, invert sugar,

08:34:36  16  peppermint oil and a red flavoring.

08:34:40  17  Q.        Is the pure cane sugar that's used to make the Red

08:34:44  18  Bird Candy extra fine granulated sugar?

08:34:46  19  A.        Yes, EFG.

08:34:48  20  Q.        What percentage of the Red Bird Candy is made of EFG

08:34:52  21  sugar?

08:34:52  22  A.        All of it.

08:34:56  23  Q.        And approximately how many pounds of EFG does

08:35:01  24  Piedmont buy on a yearly basis?

08:35:02  25  A.        This year we're contracted for 12 million pounds.

Cagle - direct

08:35:07 1  Q.      Approximately how much money does Piedmont spend on

08:35:11 2  EFG on a yearly basis?

08:35:13 3  A.      So it's around this year we're contracted around

08:35:18 4  $0.44, so 12 million pounds times $0.44, 5 million, 5 or 6

08:35:26 5  million.

08:35:27 6  Q.      What is Piedmont's total yearly spend for the

08:35:31 7  ingredients to make its product?

08:35:34 8  A.      For the raw material ingredients?

08:35:38 9  Q.      Yes.

08:35:39 10  A.      6.5, 7 million.

08:35:42 11  Q.      Does it matter if Piedmont pays the lowest price for

08:35:46 12  sugar?

08:35:46 13  A.      Absolutely.

08:35:47 14  Q.      How so?

08:35:49 15  A.      It's our biggest ingredient, it's our biggest spend

08:35:54 16  by far, so if we pay more for sugar, we are either have to

08:35:58 17  make less profit or we have to pass that on to the customer.

08:36:02 18  Q.      Could you quantify for us, if you pay a penny more a

08:36:07 19  pound, what does that mean for the company?

08:36:09 20  A.      So a penny more a pound if we purchase 12 million

08:36:12 21  pounds, that's around $120,000 worth of profit, so for every

08:36:18 22  penny you can think of, it around $120,000 worth of profit,

08:36:22 23  unless we're able to take a price increase to the customer.

08:36:26 24  Q.      What else if you had to pay more for sugar, would the

08:36:30 25  company need to take any other steps to offset that price?

Cagle - direct

A.      Yes.  We would potentially look at cutting the labor

force or right sizing the labor force, or since we're in

manufacturing, that's kind of challenging to do, we would

have to look at reducing wages, things of that sort.

Q.      Why does Piedmont Candy use cane sugar?

A.      Historically that's -- that's what our candy has

always been made of.  We want to use the best of ingredients

so we use pure cane sugar.  And that's what we have been

able to use to manufacture so it would actually turn into a

soft peppermint puff.

Q.      Does Piedmont use any high fructose corn syrup to

make its candy?

A.      No, ma'am.

Q.      Why not?

A.      It not a natural ingredient first, plus it would

taste different than your current product if we used that.

Q.      Does Piedmont use any liquid sugar in its candy?

A.      Not currently.

Q.      Why not?

A.      We've used liquid sugar in the past, but liquid sugar

versus dry sugar there is a production process, production

part of it that makes it more difficult to produce, and then

part of that is liquid sugar is more unstable versus dry

sugar and you don't really know what you're getting until

you start the cooking process.  Plus it's more expensive

Cagle - direct

08:38:04 1    than dry sugar, I mean -- yes.

08:38:06 2    Q.    First you said there is a production issue with

08:38:10 3    liquid sugar.  Could you explain?

08:38:13 4    A.    Right.  So liquid sugar obviously comes in a liquid

08:38:19 5    form, so you have to cook it and cook all the liquid or the

08:38:23 6    water out of it.  Plus when it arrives to you versus dry

08:38:26 7    sugar it's not a stable, so for example, when we got liquid

08:38:32 8    sugar in the past, it would be transported from Florida and

08:38:37 9    it's transported in steel tanks so especially in the

08:38:41 10   summertime it can actually start to cook a little bit before

08:38:44 11   it arrives if it's really hot outside.  So the manner in

08:38:49 12   which you get the product is not always the same.  So then

08:38:51 13   the starting point of the cooking process can be different.

08:38:56 14   Q.    You also said it was more expensive.  What do you

08:39:00 15   mean?

08:39:01 16   A.    Well, there is water in it first of all, so I mean

08:39:04 17   it's not all liquid sugar when it arrives to you, there is a

08:39:08 18   certain part of water in the mix, otherwise it would just

08:39:11 19   turn into a congealed gel before it arrives.  So you're

08:39:12 20   actually paying the transportation costs of transporting

08:39:12 21   water from wherever it's coming from in the freight and then

08:39:22 22   secondly, you're paying whoever the manufacturer is to turn

08:39:27 23   it from a dry sugar to a liquid sugar, so there is

08:39:31 24   additional labor costs on their part.

08:39:33 25   Q.    Do you use beet sugar to make your candy?

Cagle - direct

A.      No.

Q.      Why not?

A.      It's not the same as pure cane sugar.  We have tried to use it, the company has tried to use it in the past many, many, many years ago and we could never get it to turn into a soft peppermint puff, and then, whatever it was left of it wouldn't taste the same as a pure cane sugar anyway.

Q.      Why did Piedmont take the step to try both beet sugar and liquid sugar to make its candy?

A.      Beet sugar is cheaper generally so it would have been to save cost.

Q.      I want to focus a little bit on your job history.  About how long have you worked at Piedmont?

A.      Since 2006, so sixteen years.

Q.      What is your current job title?

A.      Chief financial officer.

Q.      Who do you report to as the CFO?

A.      The CEO.

Q.      Would you tell us your responsibilities as CFO?

A.      Well, we're a small company so as with any small company there is every employee has a vast array of responsibilities but my main responsibilities are to report the financials on a monthly basis to the team, to the board, and to Plexus, the majority of the company, and then budgeting responsibilities, controllership responsibilities,

Cagle - direct

08:41:05 1   looking backward to report the financials, as far as

08:41:09 2   budgeting the forecasting of the cash flow and then for the

08:41:13 3   next fiscal year the budget.  And then also handle the

08:41:20 4   audits on an annual basis, fiscal year end audits.

08:41:25 5   Q.      Do you have a team of people to help you?

08:41:27 6   A.      One person.

08:41:28 7   Q.      Do you have any responsibilities related to buying

08:41:31 8   sugar?

08:41:32 9   A.      Currently, yes, my -- that's one of my

08:41:37 10  responsibilities.  I'm the main point of contact for the

08:41:40 11  negotiation of the sugar contracts.

08:41:42 12  Q.      What does that mean to be the main point of contact?

08:41:45 13  A.      So I'm the one who either reaches out to the vendors

08:41:49 14  or they reach out to me to start the negotiation practices

08:41:53 15  to try to get bids for the sugar for the next year.  And

08:41:57 16  then, throughout that process I would work with the vendors

08:42:00 17  to negotiate for the best price, make a recommendation to

08:42:05 18  the CEO and the board and then follow through on the -- for

08:42:10 19  the contract.

08:42:11 20  Q.      Before you became the main point of contact for

08:42:14 21  buying sugar, did you have any responsibilities related to

08:42:17 22  buying sugar for the company?

08:42:20 23  A.      My responsibilities were to just basically discuss it

08:42:25 24  with the CEO, the CEO was the one who handled what I would

08:42:32 25  do now, we would talk about it.  Once the recommendation was

Cagle - direct

08:42:35 1    approved by the board, then my part was to make sure that

08:42:37 2    the contract was what we needed it to be from the vendor.

08:42:42 3    Q.      Are there any criteria Piedmont Candy considers in

08:42:47 4    general terms when deciding who to buy your sugar from?

08:42:52 5    A.      Well, first we -- we want to make sure that we have

08:42:59 6    familiarity with the vendors that we're getting quotes from,

08:43:03 7    at least from historical where we've used them before

08:43:07 8    historically, or we've gotten quotes from them in the past

08:43:14 9    so the other criteria we're going to look at is hopefully

08:43:19 10   they're reasonably close to Piedmont Candy.  In order for

08:43:22 11   them to be competitively priced and be able to service us,

08:43:26 12   it would be obvious the closer they are to our facility the

08:43:30 13   better it would be from a freight perspective.  And then

08:43:33 14   also criteria would be that we feel comfortable with and

08:43:40 15   confident that they can service our needs.  Obviously as we

08:43:45 16   talked about before, sugar is very important to our company

08:43:50 17   so if we -- you know, we get probably three loads of sugar

08:43:54 18   each week, if they can't service us or provide the sugar on

08:43:58 19   time, we can't run the facility.  There is a service aspect

08:44:02 20   of it or reliability aspect of it as well.

08:44:07 21   Q.      How often does Piedmont Candy contract to buy sugar?

08:44:11 22   A.      Once a year.

08:44:13 23   Q.      Could you tell us how you start the process?

08:44:17 24   A.      We have some ongoing conversation through the vendors

08:44:21 25   throughout the year just to see where things stand and what

Cagle - direct

08:44:25 1    we think the price is going to be, but around this time of

08:44:28 2    year ---around this time of year we would start to look to

08:44:32 3    buy contract for 2023.  I would reach out to vendors and ask

08:44:36 4    them for pricing or they may have already reached out to me

08:44:40 5    and asked me if we were going to be -- how much sugar we

08:44:43 6    were looking for for the next year and provide pricing.

08:44:46 7    Q.      And what happens next?

08:44:48 8    A.      I receive pricing from the vendors.  I gather all the

08:44:52 9    information.  Then I start depending on how the prices fall

08:44:59 10   out, you can kind of see where the market is, and I start

08:45:04 11   having conversations with those vendors about how much of

08:45:09 12   their capacity they have contracted so far.

08:45:13 13           So for us, we don't want to be the first to

08:45:19 14   contract and we don't want to be the last to contract, we

08:45:22 15   want to kind of be in the middle.  If you're the first you

08:45:24 16   may pay a price that's way too high.  And then if you're

08:45:28 17   last when they've contracted most of their volumes, they

08:45:33 18   don't really have an incentive to offer a low price so we

08:45:37 19   want to be right in the middle.

08:45:38 20   Q.      When thinking about which vendors to contact or

08:45:42 21   invite to bid for you, how do you decide who you should

08:45:42 22   reach out to?

08:45:47 23   A.      Well, first we look at who has been able to supply us

08:45:50 24   in the past and provide us the needs that we need.  So it

08:45:55 25   would be historical performance.  And then on occasion we

Cagle - direct

08:46:01 1   bring in new vendors to quote us as well to see if -- and

08:46:08 2   really, there has been, only been a couple historically that

08:46:13 3   we've used over the last ten years or so, so we're trying to

08:46:17 4   get other pricing to make sure the prices they're giving us

08:46:22 5   we're certain can service us are in line with the prices

08:46:25 6   those current vendors give us.

08:46:27 7   Q.      When you're in the process of negotiating your prices

08:46:30 8   for sugar, do you say anything to the vendor about who they

08:46:36 9   may be competing against for your business?

08:46:39 10   A.      Not by me.

08:46:40 11   Q.      Could you give us what you may say?

08:46:47 12   A.      They all know or most of them know who we have

08:46:50 13   contracted with in the past are and who they're competing

08:46:53 14   against for the business.  So if they provide a price, let's

08:46:57 15   say it's 20 percent higher than another vendor, and they

08:47:02 16   asked me where they stand from a pricing perspective and how

08:47:06 17   they could get the business, I would say well, you're

08:47:08 18   higher, you're higher than the other vendors that have been

08:47:11 19   quoting us.

08:47:12 20   Q.      Does Piedmont pay a delivered price for the sugar

08:47:17 21   it's buying?

08:47:18 22   A.      Yes, we prepay.

08:47:20 23   Q.      How is the sugar delivered to Piedmont's

08:47:23 24   manufacturing facility?

08:47:26 25   A.      It's a full tractor trailer loads that are delivered.

Cagle - direct

08:47:29 1    Q.      Do you receive any deliveries on railcars?

08:47:33 2    A.      No.

08:47:34 3    Q.      Why not?

08:47:37 4    A.      There is a rail in Lexington, we don't have an

08:47:41 5    ability at Piedmont Candy to unload the -- if we did receive

08:47:46 6    it on the rail, unload it from the rail to get it to our

08:47:50 7    facility.

08:47:50 8    Q.      Why do you buy sugar paying a delivered price?

08:47:54 9    A.      An FOB price which means that we would be responsible

08:48:00 10   for setting up the trucks to pick up the sugar and deliver

08:48:04 11   it to our facility, there is two reasons why we wouldn't do

08:48:08 12   that.  First of all administrative burden of assigning the

08:48:12 13   trucks to pick up from whoever we're getting it from.  And

08:48:17 14   then secondly, when we get a prepaid price like for next

08:48:20 15   year, we know what our sugar price is going to be including

08:48:25 16   freight, so if freight goes up or even down, but more

08:48:29 17   specifically up, we would have to absorb that additional

08:48:32 18   freight costs to get it to our facility.  So that would be

08:48:38 19   very hard to budget for if we don't know actually what the

08:48:41 20   transportation industry is going to do, because those costs

08:48:44 21   are going to go up and down depending on what's happening

08:48:47 22   with the transportation industry.

08:48:49 23   Q.      Let's look at some Piedmont Candy's specific bids

08:48:54 24   received for sugar.  I would like you to take a look at JTX

08:48:58 25   027.  I'm going to ask Ms. Martinez to put up the native.  I

Cagle - direct

08:49:02 1    ask the Court to please not publish it to the gallery

08:49:06 2    because it contains confidential information.  It should be

08:49:09 3    on your screen.

08:49:12 4    A.      Okay.

08:49:13 5    Q.      Do you recognize JTX 027?  It should be on the screen

08:49:20 6    in front of you or is it in the binder.  It won't be on the

08:49:23 7    public screen.

08:49:25 8    A.      Okay.  Yes, I do.

08:49:27 9    Q.      What is it?

08:49:30 10   A.      This is the Excel file that I use to record and kind

08:49:37 11   of look at the quotes for sugar that I'm getting each year.

08:49:43 12   Q.      Did you create JTX 027?

08:49:47 13   A.      Yes, this is an Excel file that I created and I

08:49:51 14   maintain.

08:49:51 15   Q.      Does anyone else review JTX 027?

08:49:56 16   A.      The CEO would review it, yes.

08:50:00 17   Q.      Do you maintain this in the ordinary course of your

08:50:02 18   duties at Piedmont?

08:50:04 19   A.      Yes.

08:50:06 20          MS. SINKLER:  Your Honor, I would like to offer

08:50:07 21   JTX 027 into evidence.

08:50:09 22          MR. BUTERMAN:  No objection.

08:50:10 23          THE COURT:  Thank you.  It's so admitted.

08:50:12 24          MS. SINKLER:  Thank you, Your Honor.

08:50:14 25          (JTX Exhibit No. 27 was admitted into evidence.)

Cagle - direct

08:50:15 1   **BY MS. SINKLER:**

08:50:16 2   **Q.     Mr. Cagle, if you look at column A, the column headed**

08:50:20 3   **A starting with the word Product all the way to your left.**

08:50:25 4   **Do you see that?**

08:50:25 5   **A.     Yes.**

08:50:25 6   **Q.     Could you describe just sort of generally for the**

08:50:28 7   **Court what information is contained on this spreadsheet?**

08:50:32 8   **A.     So it list the product, and in this case which EFG**

08:50:36 9   **cane sugar for this product.  And the volume would be the**

08:50:41 10  **amount that we're looking to contract, in this case it's 10**

08:50:44 11  **million pounds.  The package that we're looking for it to be**

08:50:48 12  **in, which is 2,000 pound totes and then the period which is**

08:50:51 13  **in this case, January 21st through December 21st.  And then**

08:50:58 14  **below it starts to list out the quotes that we received from**

08:51:01 15  **each vendor and the details behind that.**

08:51:04 16  **Q.     Thank you.**

08:51:05 17          **And if you look all the way to the right, there**

08:51:09 18  **is a column headed Current Pricing.  Do you see that?**

08:51:12 19  **A.     Yes.**

08:51:12 20  **Q.     Would you just describe generally what that**

08:51:15 21  **information is showing?**

08:51:16 22  **A.     That would show what our current pricing is.  So this**

08:51:21 23  **example, this is pricing for 2020, the current pricing for**

08:51:25 24  **2020, and I'm trying to get quotes for pricing for 2021.**

08:51:32 25  **Q.**

Cagle - direct

08:51:34  1          MS. SINKLER:  Your Honor, at this time I would

08:51:36  2  request to close the courtroom for the rest of the witness's

08:51:39  3  testimony.

08:51:39  4          THE COURT:  All right.  For the reasons that

08:51:40  5  I've already stated, we will close the courtroom as this is

08:51:45  6  sensitive information for a third party, so anybody who is

08:51:51  7  not under a protective order, I would ask you to leave for a

08:51:54  8  few minutes.

08:51:56  9          MS. SINKLER:  Thank you, Your Honor.

08:51:58 10          (Courtroom sealed.)

08:52:04 11          MS. SINKLER:  We can publish this for the

08:52:07 12  gallery.  Thank you.

08:52:07 13  ████████████

08:52:10 14  █   ████████████████████████

08:52:14 15  ████████████████████████████████

08:52:19 16  █   ██████████

08:52:19 17  █   ██████████

08:52:21 18  █   ████████████████████████

08:52:26 19  ████████████████████████████████

08:52:30 20  ████████████████████

08:52:35 21  ██████████████████████████

08:52:41 22  ███████████████████████

08:52:45 23  ██████████████████████████

08:52:50 24  ███████████████████████

08:52:55 25  █   ████████████████████████

Cagle - direct



Cagle - direct



08:54:33  1
08:54:34  2
08:54:37  3
08:54:41  4
08:54:43  5
08:54:46  6
08:54:50  7
08:54:53  8
08:54:53  9
08:54:55  10
08:54:59  11
08:55:06  12
08:55:09  13
08:55:10  14
08:55:18  15
08:55:20  16
08:55:20  17
08:55:22  18
08:55:26  19
08:55:28  20
08:55:33  21
08:55:34  22
08:55:37  23
08:55:42  24
08:55:43  25

Cagle - direct



Cagle - direct



Cagle - direct



Cagle - direct



Cagle - cross



Cagle - cross



Cagle - cross



Cagle - cross



Cagle - cross



Cagle - cross



09:07:45 1
09:07:49 2
09:07:52 3
09:07:53 4
09:07:55 5
09:07:57 6
09:07:59 7
09:08:00 8
09:08:01 9
09:08:02 10
09:08:03 11
09:08:03 12
09:08:03 13
09:08:07 14
09:08:08 15
09:08:10 16
09:08:14 17
09:08:18 18
09:08:19 19
09:08:20 20
09:08:28 21
09:08:30 22
09:08:42 23
09:08:45 24
09:08:45 25

Cagle - cross



Cagle - cross



09:09:56  1

09:09:56  2

09:09:57  3

09:10:00  4

09:10:03  5

09:10:03  6

09:10:07  7

09:10:09  8

09:10:10  9

09:10:14 10

09:10:15 11

09:10:16 12

09:10:18 13

09:10:19 14

09:10:19 15

09:10:30 16

09:10:33 17

09:10:38 18

09:10:43 19

09:10:50 20

09:11:02 21

09:11:06 22

09:11:12 23

09:11:20 24

09:11:21 25

Cagle - cross



09:11:29  1
09:11:36  2
09:11:41  3
09:11:41  4
09:11:48  5
09:11:52  6
09:11:54  7
09:11:55  8
09:11:56  9
09:11:57 10
09:12:01 11
09:12:04 12
09:12:07 13
09:12:07 14
09:12:11 15
09:12:12 16
09:12:23 17
09:12:29 18
09:12:30 19
09:12:33 20
09:12:38 21
09:12:42 22
09:12:43 23
09:12:48 24
09:12:51 25

09:13:01  1  █  ███████████████████████████

09:13:04  2  ████████████████████████████████████

09:13:08  3  █████████████████████████████████

09:13:13  4  █  ████

09:13:13  5  █  ███████████████████████████

09:13:23  6  ████████████████████

09:13:29  7  █  █████████████████████

09:13:35  8  █  ██████████████

09:13:36  9  █  ███████

09:13:37 10  █  ██████████████████████████

09:13:41 11  ████████████████████

09:13:44 12  █  ███████

09:13:44 13  █  ████████████████████████████

09:13:51 14  ███

09:13:51 15  █  ████████████

09:13:54 16         MR. BUTERMAN:  Your Honor, I think at this point

09:13:56 17 I can do -- if I have to do anything else, I'll do it

09:13:59 18 without reference to numbers so I think we can unseal the

09:14:02 19 courtroom.

09:14:02 20         THE COURT:  Let's take that off the screen and

09:14:07 21 open the courtroom.  Thank you.

09:14:07 22        (Courtroom unsealed.)

09:14:30 23         THE COURT:  All right.

09:14:37 24 BY MR. BUTERMAN:

09:14:37 25 Q.    Now, Mr. Cagle, you mentioned that Piedmont only uses

Cagle - cross

09:14:47 1   cane sugar to make its peppermint puffs, correct, sir?

09:14:50 2   A.      Yes.

09:14:51 3   Q.      And the reason that it uses cane sugar has nothing to

09:14:56 4   do with any issues with respect to GMO; correct?

09:15:00 5   A.      Correct.

09:15:01 6   Q.      Piedmont believes that it can't use beet sugar

09:15:05 7   because it doesn't form into the product and hold to where

09:15:10 8   you can turn it into a soft peppermint puff, is that

09:15:14 9   correct, sir?

09:15:14 10  A.      We have not been able to, yes.

09:15:16 11  Q.      But to your knowledge, Piedmont hasn't attempted to

09:15:19 12  make its peppermint puffs using beet sugar in over a decade,

09:15:24 13  isn't that correct?

09:15:24 14  A.      That is correct.

09:15:25 15  Q.      And you don't know if Piedmont has any studies that

09:15:28 16  support the notion that it can't use beet sugar to

09:15:33 17  manufacture its peppermint puffs; correct?

09:15:36 18  A.      Correct.

09:15:36 19  Q.      Now you are aware that beet sugar and cane sugar are

09:15:39 20  chemically identical, correct?

09:15:42 21  A.      Yes.

09:15:42 22  Q.      But nonetheless, it's Piedmont's position that for

09:15:50 23  its peppermint puffs, beet sugar cannot be used to make the

09:15:54 24  product; correct, sir?

09:15:57 25  A.      Yes, and the same product that we end up with now.

Cagle - cross

09:16:01 1    Q.       And you are not aware of any product manufactured by

09:16:08 2    any company in the entire world that faces a similar issue

09:16:14 3    where it cannot be manufactured by beet sugar but can be

09:16:18 4    manufactured by cane sugar, correct, sir?

09:16:20 5    A.       I'm not aware of any.

09:16:22 6    Q.       Now, we also talked about liquid sugar and Piedmont

09:16:26 7    doesn't make its peppermint puffs with liquid sugar anymore,

09:16:30 8    correct, sir?

09:16:31 9    A.       Correct.

09:16:33 10   Q.       And that's because Piedmont believes that using

09:16:34 11   liquid sugar will make the manufacturing process more

09:16:38 12   difficult; correct?

09:16:39 13   A.       It's more than believe, we know that to be true for

09:16:44 14   our manufacturing process.

09:16:45 15   Q.       But, Piedmont hasn't done any studies to back up it's

09:16:50 16   statement that the consistency is not as good when it uses

09:16:53 17   liquid sugar, correct, sir?

09:16:55 18   A.       Formal studies, no, but we ran the product and it's

09:16:59 19   different.

09:16:59 20   Q.       And, in fact, Piedmont used liquid sugar for almost a

09:17:04 21   decade to make its product, correct?

09:17:06 22   A.       That's correct.

09:17:06 23   Q.       In fact, it was using liquid sugar as late as 2018 at

09:17:11 24   least to make its product, correct?

09:17:14 25   A.       That's correct.

Cagle - cross

Q.      Piedmont also buys -- only buys sugar in 2,000 pound
totes, correct?

A.      Currently.

Q.      And Piedmont only buys sugar in 2,000 pound totes
that are delivered by trucks; correct?

A.      Currently, yes.

Q.      Piedmont doesn't purchase any bulk sugar that does
not come in bags, correct?

A.      No.

Q.      I want to make sure that we have the answer.  Does
Piedmont purchase any bulk sugar that does not come in bags?

A.      No.

Q.      And Piedmont doesn't purchase any bulk sugar that
comes in rails, correct?

A.      We do not.

Q.      Piedmont doesn't buy sugar in bags of other sizes
than 2,000 pound totes, correct?

A.      Currently no, we do not.

Q.      But in the past it has bought in other sizes?

A.      Yes.

Q.      And as you testified a moment ago, Piedmont also
decided that it prefers to only buy from one company at a
time, correct, sir?

A.      That's correct.

Q.      And that's because Piedmont believes that even if

Cagle - cross

09:18:26 1   it's using cane sugar, if it switches from say Imperial cane

09:18:31 2   sugar to United's cane sugar, that that could mess up its

09:18:36 3   production process; correct, sir?

09:18:39 4   A.      It has messed up, yes.

09:18:42 5   Q.      And again, Piedmont is not aware of any other company

09:18:47 6   that has indicated that they have a problem using cane sugar

09:18:54 7   from two cane producers, correct?

09:18:56 8   A.      I'm not aware of any.

09:18:59 9   Q.      In fact, you are aware that there are numerous

09:19:02 10  companies that buy sugar, cane sugar from multiple vendors

09:19:07 11  each year, correct?

09:19:08 12  A.      Yes.

09:19:09 13  Q.      So to be clear, if there is a company that only sells

09:19:12 14  liquid sugar, Piedmont is not going to contract with them to

09:19:17 15  buy sugar to make the peppermint puffs, correct?

09:19:20 16  A.      Currently no.

09:19:21 17  Q.      And if there is a company that only sells beet sugar,

09:19:25 18  Piedmont is not going to contract with them to buy that

09:19:28 19  sugar to make their peppermint puffs, correct, sir?

09:19:31 20  A.      Currently no.

09:19:33 21  Q.      And if there is a company that's going to transport

09:19:34 22  their sugar by rail, Piedmont is not going to contract with

09:19:38 23  then to make their peppermint puffs, correct, sir?

09:19:41 24  A.      Correct.

09:19:42 25  Q.      If there is a company that doesn't offer 2,000 pound

09:19:44 1  totes, Piedmont won't contract with them to buy the sugar to

09:19:48 2  make the peppermint puffs, correct?

09:19:50 3  A.    Unless it's more than 2,000 pounds, correct.

09:19:53 4  Q.    And so to sum up, and when you say more than

09:19:56 5  2,000 pounds, you mean that sometimes totes are 2,200 pounds

09:19:59 6  as opposed to 2,000?

09:20:01 7  A.    That's correct, yes.

09:20:02 8  Q.    Okay.  But to sum up, Piedmont will only purchase dry

09:20:07 9  refined cane sugar that comes in 2,000 pound totes that is

09:20:12 10 transported to Lexington, North Carolina via truck; correct,

09:20:19 11 sir?

09:20:19 12 A.    In the current state, yes, that's correct.

09:20:21 13 Q.    Sir, are you aware of any other company in the entire

09:20:25 14 United States that has those kinds of particular unique

09:20:29 15 purchasing limitations?

09:20:32 16 A.    I am not aware of any.  There is only three people

09:20:36 17 that make the soft peppermint puffs, though.

09:20:40 18 Q.    But my question is, are you aware of any -- I'm not

09:20:43 19 asking about peppermint puffs, I'm asking about any

09:20:47 20 industrial product in the United States, are you aware of

09:20:51 21 any company in the country that has unique purchasing

09:20:55 22 limitations like those?

09:20:56 23 A.    No.

09:20:56 24 Q.    And so it's fair to say, sir, that the competitive

09:21:00 25 dynamic that Piedmont faces, they're probably not

09:21:04 1    representative of what other companies in the United States

09:21:07 2    face, is that fair?

09:21:08 3    A.      I guess that could be fair.

09:21:10 4    Q.      And that would go for the government's alleged

09:21:13 5    southeast market as well?

09:21:19 6    A.      What do you mean by that?

09:21:21 7    Q.      That's okay.  Nevermind.  I'll withdraw that

09:21:24 8    question.

09:21:24 9            Now, Piedmont believes nonetheless, despite

09:21:28 10   everything that we just said, that it's able to receive a

09:21:32 11   competitive price for sugar utilizing the four to five

09:21:36 12   quotes it currently gets on a yearly basis, correct?

09:21:39 13   A.      Correct.

09:21:40 14   Q.      And Piedmont believes and feels that if it needed to

09:21:44 15   get an additional quote or two in order to receive a

09:21:47 16   competitive price for its sugar, that it could do that,

09:21:52 17   right, sir?

09:21:52 18   A.      Yes.

09:21:53 19   Q.      Now, you talked about this a little bit earlier, but

09:21:58 20   during your deposition, you mentioned that before Piedmont

09:22:02 21   would sign a contract with a supplier, it needed to feel

09:22:02 22   comfortable with that supplier.  Do you remember talking

09:22:02 23   about that?

09:22:02 24   A.      Yes.

09:22:10 25   Q.      And currently the only companies that you say that

Cagle - cross

09:22:12  1   you're comfortable with are United and Imperial, correct,

09:22:16  2   sir?

09:22:17  3   A.      Correct.

09:22:17  4   Q.      And for instance, you said that Piedmont isn't

09:22:22  5   comfortable with Cargill; right?

09:22:26  6   A.      We haven't fully vetted Cargill, so we obviously

09:22:29  7   wouldn't be comfortable with them.

09:22:31  8   Q.      And the reason that you said that you weren't

09:22:33  9   comfortable with Cargill was because you thought they were

09:22:37 10   too big, right?

09:22:38 11   A.      I think I did use the word big, but, yes, their main

09:22:45 12   source of business is not just selling sugar like United and

09:22:49 13   Imperial is.

09:22:53 14   Q.      So what you said in your deposition, though, is you

09:22:55 15   feared because you weren't purchasing enough for them, you

09:22:58 16   weren't going to be as high on the totem pole, do you recall

09:23:01 17   that?

09:23:01 18   A.      Yes.

09:23:02 19   Q.      So you're most comfortable with them.

09:23:04 20          Now, sir, when counsel was questioning you

09:23:08 21   earlier?

09:23:12 22          THE COURT:  Do you have water?  Do you need any

09:23:17 23   water?

09:23:17 24          THE WITNESS:  I have some.  Thank you.

09:23:19 25          THE COURT:  Okay.

Cagle - cross

09:23:22 1    BY MR. BUTERMAN:

09:23:24 2    Q.      When counsel was questioning you earlier, you

09:23:26 3    mentioned that if you had to pay more for your sugar, that

09:23:29 4    it would be bad for your company, correct, sir?

09:23:32 5    A.      Correct.

09:23:33 6    Q.      In fact, you said that you might have to cut labor

09:23:37 7    and reduce wages?

09:23:40 8    A.      That could be one extreme that we would have to do.

09:23:43 9    Q.      So you would say that you do everything possible to

09:23:49 10   ensure that you get the lowest price for the sugar that

09:23:51 11   you're purchasing, correct?

09:23:53 12   A.      We try to.

09:23:56 13   Q.      And you also said that in order for companies to be

09:24:03 14   competitively priced and able to service you, it would

09:24:06 15   obviously be better if they were closer located to your

09:24:12 16   plant in North Carolina from a freight perspective; right?

09:24:16 17   A.      I would think that would be a way that we could get a

09:24:20 18   lower price from a vendor if their facility was closer to

09:24:23 19   Lexington.

09:24:24 20   Q.      And you are currently contracted to be purchasing

09:24:26 21   your sugar from United; correct for 2022?

09:24:33 22   A.      Yes.

09:24:34 23   Q.      United only produces sugar from Clew -- excuse me, US

09:24:42 24   Sugars, United only sells sugar that is made by US Sugar in

09:24:46 25   Clewiston, Florida, correct?

Cagle - cross

09:24:51  1    A.        That's my understanding, yes.

09:24:52  2    Q.        And Clewiston, Florida is approximately 750 miles

09:24:56  3    away from your facility in North Carolina; correct, sir?

09:25:01  4    A.        That sounds right.

09:25:02  5    Q.        And since obviously as you said it's better that

09:25:07  6    companies -- that you know that the companies are closer

09:25:10  7    from a freight perspective because that would get you your

09:25:14  8    more competitive price, if you can tell me how many

09:25:17  9    companies are located closer to your facility than U.S.

09:25:24 10    Sugar's facility in Clewiston, correct, sir?

09:25:27 11    A.        I'm sure there are companies that are closer than

09:25:31 12    that.

09:25:31 13    Q.        We talked about this during your deposition, do you

09:25:34 14    remember?

09:25:34 15    A.        Yes.

09:25:35 16    Q.        And there are actually a dozen sugar suppliers that

09:25:42 17    sell sugar that are located closer to the -- to you than the

09:25:49 18    facility in Clewiston, Florida; correct, sir?

09:25:53 19    A.        I don't know if twelve is the number, but it sounds

09:25:56 20    about right.

09:25:56 21    Q.        And it's true, sir, that of those dozen, there are

09:26:02 22    companies, most of those companies you have never spoken to?

09:26:02 23    A.        Me personally?

09:26:10 24    Q.        Yes.

09:26:11 25    A.        Correct.

Cagle - cross

09:26:11 1   Q.      And you have no idea what prices they would have

09:26:16 2   charged you or offered to sell sugar to you for, correct,

09:26:19 3   sir?

09:26:20 4   A.      That's correct.

09:26:20 5   Q.      And the reason you don't know is because you didn't

09:26:24 6   reach out to them because it's your view that if they had

09:26:28 7   the sugar to sell you, well, they should reach out to you

09:26:33 8   and try to solicit your business, correct, sir?

09:26:40 9   A.      Correct.

09:26:44 10  Q.      You're aware that there is a company called Atlantic

09:26:49 11  Ingredients that's located 76 miles from your facility in

09:26:52 12  Lexington, North Carolina, correct?

09:26:55 13  A.      That sounds correct.

09:26:57 14  Q.      You're only aware of it because I told you about it

09:27:02 15  during your deposition?

09:27:02 16  A.      Yes.

09:27:03 17  Q.      And you never have reached out to them?

09:27:05 18  A.      No.

09:27:05 19  Q.      You're familiar with a company called Archer Daniels

09:27:10 20  Midland, correct?

09:27:10 21  A.      Yes.

09:27:10 22  Q.      ADM?

09:27:11 23  A.      Yes.

09:27:12 24  Q.      And you know that they sell refined sugar; right?

09:27:14 25  A.      Yes.

Cagle - cross

09:27:15  1    Q.      You know that they have a facility in Chattanooga,

09:27:20  2    correct?

09:27:20  3    A.      Yes.

09:27:20  4    Q.      And they also have a facility in Lakewood, New York?

09:27:23  5    A.      I don't know about New York.

09:27:24  6    Q.      But the Chattanooga, Tennessee facility is only

09:27:29  7    340 miles from Lexington, correct?

09:27:31  8    A.      It sounds about right.

09:27:33  9    Q.      You never reached out to them to find out if they

09:27:35 10    could sell you sugar?

09:27:36 11    A.      Me personally, no.

09:27:40 12    Q.      You're familiar with a company called Batory?

09:27:45 13    A.      Batory Foods.

09:27:47 14    Q.      And they sell refined sugar, don't they?

09:27:49 15    A.      I'm not aware that they sell refined sugar, but they

09:27:52 16    may.

09:27:53 17    Q.      You're not even aware that Batory Foods sells refined

09:27:57 18    sugar, that's your testimony?

09:27:58 19    A.      Correct.

09:27:59 20    Q.      Okay.  Are you familiar with a company called Sucden?

09:28:07 21    A.      No.

09:28:08 22    Q.      You don't know whether they sell refined sugar?

09:28:10 23    A.      I'm not aware of the company.

09:28:15 24    Q.      Now, despite what you know and don't know about your

09:28:20 25    competitive options, you aren't aware of any impediments

Cagle - cross

09:28:26 1    that would prevent Piedmont from obtaining bids from any of

09:28:30 2    the companies that I mentioned in the event that US Sugar's

09:28:33 3    acquisition of Imperial went through, correct, sir?

09:28:36 4    A.      I am not aware of any.

09:28:38 5    Q.      In fact, you testified that if Piedmont wanted to

09:28:42 6    swap out some of the companies that it currently requests

09:28:44 7    bids from for some of those other companies at a later date,

09:28:48 8    that Piedmont could do that?

09:28:51 9    A.      Correct.

09:28:51 10   Q.      So now, I would like to talk about something else.

09:28:57 11   Let's put JTX 26 on the screen.  And let's put the redacted

09:29:03 12   -- perfect.

09:29:04 13           And sir, JTX 26, this is a document that

09:29:11 14   reflects the set of communications that you had with

09:29:16 15   representatives of various competitors that you were

09:29:19 16   soliciting sugar bids from, correct, sir?

09:29:22 17   A.      Yes.

09:29:23 18   Q.      And if we look at this document, we see that you were

09:29:27 19   speaking with representatives of ██████████████████████

09:29:31 20   ████████ and ██████████, correct, sir?

09:29:35 21   A.      That's correct.

09:29:36 22   Q.      And we haven't mentioned Evergreen yet, but it's

09:29:41 23   another distributor, correct?

09:29:42 24   A.      Yes.

09:29:42 25   Q.      And Evergreen was seeking to supply Piedmont with

Cagle - cross

09:29:45 1    invert sugar, correct?

09:29:47 2    A.      That's correct.

09:29:49 3    Q.      And invert sugar is part of the government's alleged

09:29:52 4    market in this case, but actually -- sorry, I should take

09:29:55 5    that back, it's not, because Evergreen is a distributor so

09:29:58 6    it's out.  But let me ask you this, sir.

09:30:01 7            It looks like you were speaking with ███████

09:30:04 8    ██████ and ██████ all around June 16th, do you see that?

09:30:10 9    A.      Yes.

09:30:11 10   Q.      And these reflect the notes of your conversations,

09:30:14 11   correct?

09:30:14 12   A.      Yes.

09:30:15 13   Q.      You made these notes in the ordinary course of your

09:30:18 14   business?

09:30:18 15   A.      Yes.

09:30:19 16   Q.      And it was your regular practice to make notes of

09:30:23 17   these conversations, correct?

09:30:25 18   A.      This year -- this particular year, I took, I think

09:30:29 19   this was one of the first years I did it, so I took copious

09:30:33 20   notes.  I think from that point forward, my notes weren't

09:30:37 21   nearly as detailed.

09:30:37 22   Q.      When you were doing this, you were trying to take

09:30:41 23   copious notes, correct?

09:30:41 24   A.      Trying to.

09:30:42 25   Q.      And these were made around the time of these

09:30:47 1    conversations, correct?

09:30:48 2    A.      Yes.

09:30:48 3    Q.      And they constitute your recorded recollections of

09:30:54 4    those conversations, correct?

09:30:55 5    A.      Correct.

09:30:57 6            MR. BUTERMAN:  Your Honor, I would like to move

09:30:58 7    for the admission of JTX 26.

09:31:02 8            THE COURT:  Any objection?

09:31:03 9            MS. SINKLER:  No, Your Honor.

09:31:04 10           THE COURT:  Thank you.  It's admitted.

09:31:06 11           (JTX Exhibit No. 26 was admitted into evidence.)

09:31:08 12   BY MR. BUTERMAN:

09:31:10 13   Q.      Now, sir, let's start with Imperial Sugars.  Do you

09:31:19 14   see that?

09:31:20 15   A.      Yes, sir.

09:31:20 16   Q.      And what Imperial Sugars tells you on June 16th is

09:31:26 17   that they don't have a percentage book to give you at this

09:31:30 18   point.  Do you see that, sir?

09:31:32 19   A.      Yes.

09:31:32 20   Q.      But they say that they have seen a lot of inquiries,

09:31:38 21   correct?

09:31:38 22   A.      Yes.

09:31:40 23   Q.      And when they say they don't have a percentage

09:31:44 24   booked, you understand that to be their sold position that

09:31:52 25   they're referring to; correct, sir?

Cagle - cross

09:31:54  1    A.      Correct.

09:31:55  2    Q.      And that's something that you had asked them about?

09:31:59  3    A.      Right, I would ask them how much of their business

09:32:02  4    had they booked so far this year.

09:32:04  5    Q.      And they gave that information to you?

09:32:07  6    A.      They said things like this.  We have not booked much

09:32:13  7    to this point.

09:32:14  8    Q.      And if we look at the next line, you also talked to

09:32:18  9    them about the hurricane season starting?

09:32:23 10    A.      These were some comments as far as I could recollect

09:32:27 11    that they stated during our conversation to me.

09:32:29 12    Q.      Right.

09:32:30 13            Now, this is from June 16th, 2020.  Who was

09:32:35 14    supplying you with sugar at this point in time?

09:32:38 15    A.      I think it was ████████████

09:32:40 16    Q.      Okay.  And ██████████ they don't sell beet sugar, do

09:32:49 17    they?

09:32:51 18    A.      As far as I know, correct.

09:32:53 19    Q.      And you don't even take beet sugar?

09:32:56 20    A.      Correct.

09:32:57 21    Q.      Okay.  But you're having the conversation with them

09:33:01 22    where they're talking about beet plant growth, correct, sir?

09:33:06 23    A.      They are talking about it, yes.

09:33:08 24    Q.      In connection with a conversation about pricing for

09:33:12 25    2021?

Cagle - cross

09:33:16  1    A.        Correct.

09:33:17  2    Q.        This cane refiner is talking to you about beet

09:33:21  3    pricing; correct?

09:33:23  4    A.        That's correct.

09:33:23  5    Q.        And that's because those prices for beet sugar, that

09:33:28  6    affects the cane prices, correct, sir?

09:33:33  7    A.        I don't know if I would phrase it that the pricing of

09:33:38  8    the beet affects the cane.  My understanding is more that if

09:33:41  9    they have trouble with the beet plantings, that could cause

09:33:45 10    a problem with the cane plantings.  If the beets, I hear

09:33:50 11    them say things like if the beet crop comes in late, maybe

09:33:55 12    that means it's going to affect the cane crop which could

09:34:00 13    cause the price to go up.

09:34:01 14    Q.        To be clear, that beet sugar, that's sugar that you

09:34:04 15    know is produced in the Red River Valley, states like

09:34:08 16    Michigan, Montana, Wyoming, North Dakota, and Minnesota,

09:34:13 17    correct, sir?

09:34:14 18    A.        Correct.

09:34:14 19    Q.        About a thousand miles or so away from Lexington,

09:34:18 20    North Carolina where Piedmont is?

09:34:20 21    A.        Sounds about right.

09:34:24 22    Q.        But you would agree that the reality of what happens

09:34:28 23    up there in beet country, that can have an effect on the

09:34:31 24    prices that you are going to be receiving down in Lexington

09:34:36 25    North Carolina, correct?

Cagle - cross

09:34:38  1   A.       Correct.

09:34:38  2   Q.       Now we also see that you spoke with -- you also spoke

09:34:45  3   with Julie Campbell, correct, from United?

09:34:48  4   A.       Correct.

09:34:48  5   Q.       And when you spoke with Ms. Campbell, she was also

09:34:56  6   talking to you about what was going on in the market with

09:35:02  7   respect to beets; correct?

09:35:05  8   A.       Correct.

09:35:05  9   Q.       She was talking to you about the beet freeze?

09:35:07 10   A.       Correct.

09:35:08 11   Q.       And the force majeure that companies like United had

09:35:11 12   to declare as a result?

09:35:13 13   A.       Correct.

09:35:13 14   Q.       She also talked about other issues like how the beet

09:35:17 15   crops and cane crops of United's other members were coming

09:35:20 16   in, correct, sir?

09:35:21 17   A.       Correct.

09:35:21 18   Q.       And she told you where she saw prices coming in in

09:35:26 19   2021 as opposed to 2020, right?

09:35:29 20   A.       Yes.

09:35:29 21   Q.       She also discussed with you in connection with this

09:35:33 22   pricing discussion the role of the USDA and the fact that

09:35:36 23   they could bring in more volume if crops were down or demand

09:35:40 24   was higher, right?

09:35:41 25   A.       Correct.

09:35:41  1   Q.      And she also shared with you that United's sold

09:35:45  2   position was 60 percent for 2021, correct, sir?

09:35:48  3   A.      Correct.

09:35:49  4   Q.      And she explained that that's higher than usual, but

09:35:53  5   she said that there was no urgency to lock in a contract

09:35:57  6   price because she wasn't seeing anything that could cause

09:36:00  7   prices to go up?

09:36:01  8   A.      Correct.

09:36:02  9   Q.      You also spoke with somebody from Domino, correct?

09:36:04 10   A.      Yes.

09:36:05 11   Q.      And again, Domino doesn't make beet sugar, do they?

09:36:08 12   A.      Not that I'm aware of.

09:36:09 13   Q.      And you don't buy beet sugar?

09:36:12 14   A.      Correct.

09:36:12 15   Q.      But as part of your pricing discussions with them,

09:36:15 16   you're talking about the beet crop and the effects of the

09:36:18 17   beet crop, right?

09:36:19 18   A.      They are.

09:36:20 19   Q.      And you're writing it down as part of your attempt to

09:36:23 20   take copious notes of what's important about your pricing

09:36:27 21   conversations with them?

09:36:28 22   A.      Correct.

09:36:29 23   Q.      And what Domino tells you, in fact, is that in 2021,

09:36:42 24   there should be better prices than 2020 because the beet

09:36:46 25   crop is going to be better.  Correct, sir?

Cagle - cross

09:36:50 1    A.      Correct.

09:36:51 2    Q.      So what Domino told you was that the prices that you

09:36:55 3    were going to receive in 2021 for your cane sugar was going

09:37:01 4    to be better because of something that was happening up

09:37:06 5    north a thousand miles away with respect to the beet crop;

09:37:09 6    correct, sir?

09:37:10 7    A.      Correct.

09:37:13 8    Q.      Quickly, if we look at Indiana, you spoke to Indiana.

09:37:22 9    And Indiana mentioned to you that they believe that prices

09:37:26 10   would come down once the July report came out, do you see

09:37:33 11   that?

09:37:33 12   A.      Yes.

09:37:33 13   Q.      And the WASDE, that's the World Agriculture Supply

09:37:40 14   Demand Estimates for the USDA, right?

09:37:42 15   A.      Correct.

09:37:42 16   Q.      So what Indiana tells you is once the USDA puts out

09:37:48 17   those estimates, you're going to see initial pricing coming

09:37:52 18   in for imports, and those import prices were going to cause

09:37:55 19   the prices to come down.

09:37:55 20   A.      That's what they thought was going to happen.

09:37:57 21   Q.      If we look quickly at Evergreen, Evergreen also

09:38:02 22   talked to about the USDA and they said that the USDA was

09:38:08 23   keeping sugar supply tight because the last thing that they

09:38:11 24   wanted was sugar to be forfeited, correct, sir?

09:38:14 25   A.      Correct.

Cagle - cross

Q.      And so what Evergreen was telling you was that but for the USDA's action, the price of sugar would have been lower?

A.      Yes, that's what they were saying.

Q.      And sir, in none of these conversations with any of these entities did any of them mention competition in the southeast and the effect of that competition on prices, did they?

A.      Not in those conversations.

Q.      By the way, just looking back at Domino, there was one thing I neglected to mention.  Domino also told you, a potential customer, what their sold position was for 2021; correct, sir?

A.      A potential vendor, Domino, they were saying that they had a fifty percent booked for 2021.

Q.      And sir, unlike all those exhibits that we looked at earlier, we're doing this in the open court because you didn't believe that any of the companies' sold positions was competitively sensitive, correct, sir?

A.      Correct.

        MR. BUTERMAN:  No further questions, Your Honor.

        THE COURT:  All right.  Thank you.

        Ms. Sinkler, redirect.

        MS. SINKLER:  Thank you, Your Honor.

                REDIRECT EXAMINATION

**BY MS. SINKLER:**

Q.      Mr. Cagle, I want to ask you first about PTX 220, which can't be displayed on the public screen.  I'm going to try to ask you in such a way not to close the courtroom again, but you were asked about PTX 220.  Do you see that in your binder?

A.      Your binder --

Q.      It's in the defendant's binder.

A.      Yes.

Q.      And page 961, the page ending in 961.  Do you see that?

A.      Yes.

Q.      And opposing counsel asked you about when you were speaking with Ms. Campbell and mentioning other vendors.  Do you recall that?

A.      Yes.

Q.      Did you mention any distributors by name when you were speaking with Ms. Campbell about other vendors in PTX 220?

A.      No.

Q.      Mr. Cagle, is your company pretty knowledgeable about how to make the candy that you make?

A.      Yes.

Q.      Do you know the ingredient your competitors use to make their products?

416

Cagle - redirect

09:41:01 1    A.      I can read the back of package of what the

09:41:05 2    ingredients are, but as far as firsthand knowledge, no.

09:41:10 3    Q.      How is sugar delivered to Piedmont Candy?

09:41:13 4    A.      Tractor trailer.

09:41:14 5    Q.      Is it possible that some of that sugar comes in via a

09:41:19 6    railcar and then is put on a tractor trailer to bring to

09:41:23 7    you?

09:41:23 8    A.      Yes, it's possible.

09:41:27 9    Q.      Do you spend your time as CEO researching every

09:41:33 10   possible company that could supply you with sugar?

09:41:36 11   A.      CFO.

09:41:37 12   Q.      I'm sorry.  CFO.

09:41:40 13           THE COURT:  She gave you a promotion.

09:41:44 14   A.      Could you repeat the question?

09:41:46 15   Q.      Yes.

09:41:46 16           Do you spend your time as CFO researching every

09:41:50 17   possible company that could supply you with sugar?

09:41:52 18   A.      No.

09:41:53 19   Q.      Why not?

09:41:52 20   A.      I don't have the time to do that.  I have other

09:41:57 21   responsibilities.

09:41:58 22   Q.      I'm sorry, Mr. Cagle?

09:41:59 23   A.      I have other responsibilities.

09:42:02 24   Q.      Do you try your best to get the lowest price of sugar

09:42:05 25   for your company?

Cagle - redirect

09:42:08  1    A.        Yes.

09:42:09  2    Q.        And finally, Mr. Cagle, who are the cane refiners in

09:42:13  3    the southeast located near you?

09:42:18  4    A.        It would be refineries, United and Imperial are the

09:42:23  5    main ones that I am aware of.

09:42:26  6              MS. SINKLER:  Thank you, Mr. Cagle.  No further

09:42:28  7    questions, Your Honor.

09:42:29  8              THE COURT:  All right.  Thank you.  All right.

09:42:31  9    Thank you, sir.  You are excused.

09:42:33 10              What's next?

09:42:37 11              MR. WOLIN:  Your Honor, I think we're --

09:42:41 12    Mr. Blumenfeld mentioned --

09:42:44 13              THE COURT:  Mr. Sproull.

09:42:46 14              MR. WOLIN:  I think we're going to let the

09:42:48 15    defendants call Mr. Sproull out of order.

09:42:51 16              THE COURT:  Okay.  Are you calling Mr. Sproull,

09:42:58 17    Mr. Buterman?

09:43:01 18              MR. BUTERMAN:  Yes, Your Honor.  Mr. Yates.

09:43:03 19              THE COURT:  You're on the clock.

09:43:04 20              MR. BUTERMAN:  We understand.

09:43:40 21              COURT CLERK:  Please raise your right hand.

09:43:42 22    Please state and spell your full name for the record.

09:43:50 23              THE WITNESS:  Robert Thomas Sproull,

09:43:52 24    R-O-B-E-R-T, T-H-O-M-A-S, S-P-R-O-U-L-L.

09:43:52 25              ROBERT THOMAS SPROULL, having been duly sworn,

Sproull - direct

09:44:07 1    was examined and testified as follows:

09:44:07 2                    THE WITNESS:  Good morning.

09:44:09 3                         DIRECT EXAMINATION

09:44:09 4    BY MR. YATES:

09:44:09 5    Q.       Good morning, Mr. Sproull.

09:44:11 6    A.       Good morning.

09:44:11 7    Q.       Mr. Sproull, who is your current employer?

09:44:13 8    A.       American Sugar Refining, Inc.

09:44:15 9    Q.       Also known as Domino?

09:44:17 10   A.       ASR Group is probably the also known as, Domino Foods

09:44:21 11   is the organization that I manage.

09:44:23 12   Q.       Mr. Sproull, what's Domino's business?

09:44:26 13   A.       We are in the sugar refining business, primarily.

09:44:29 14   Q.       What's your title, sir?

09:44:30 15   A.       Senior vice-president of sales, marketing and product

09:44:33 16   development.

09:44:33 17   Q.       Who do you report to?

09:44:35 18   A.       Luis Fernandez and Antonio Contreras.

09:44:39 19   Q.       What are their titles?

09:44:41 20   A.       They are co-presidents of the ASR Group.

09:44:44 21   Q.       Sir, other than the co-presidents, do you have

09:44:46 22   ultimate responsibility for refined sugar sales at Domino?

09:44:50 23   A.       For the geographies of the United States and Canada,

09:44:52 24   I do, yes.

09:44:54 25   Q.       Where are Domino Sugar refineries in the United

Sproull - direct

09:44:59 1    States located?

09:44:59 2    A.      We have, ASR has refineries in Crockett, California;

09:45:05 3    Chalmette, Louisiana; Baltimore, Maryland; and Yonkers, New

09:45:10 4    York; and then we produce Domino's sugar from the facility

09:45:15 5    in Okeelanta, Florida.

09:45:15 6    Q.      For each of those refineries that you mentioned does

09:45:18 7    Domino only sell the sugar in a state in which the refinery

09:45:23 8    is located?

09:45:24 9    A.      No, it does not.

09:45:25 10   Q.      For each of those refineries, does Domino only sell

09:45:30 11   the sugar in the states that border the state that contains

09:45:33 12   the refinery?

09:45:34 13   A.      No, that's not the case.

09:45:37 14   Q.      Are you aware, sir, that Domino produced its sales

09:45:40 15   data in response to a subpoena from the government in the

09:45:45 16   case?

09:45:45 17   A.      I am, I was part of that.

09:45:47 18   Q.      Let's take a look at DTX 517.  It's in your binder.

09:45:52 19   It's in the defendant's binder, the one with the US Sugar

09:45:55 20   logo on it, sir.

09:45:58 21   A.      Give me the number again, please.

09:46:00 22   Q.      Sure.  DTX 517.

09:46:03 23   A.      517.  Okay.

09:46:04 24   Q.      And this has been redacted.  I'm not going to display

09:46:08 25   it on the public record, sir.

Sproull - direct

09:46:11 1        To the best of your knowledge, sir, does this

09:46:15 2   appear to be an accurate summary of the volumes of refined

09:46:18 3   sugar that Domino sold in each state in the United States in

09:46:22 4   2021?

09:46:28 5   A.      Yeah, I don't -- I don't manage the business on a

09:46:33 6   state by state basis, but yeah, it looks reasonable.

09:46:37 7        MR. YATES:  Your Honor, I would like to move DTX

09:46:40 8   517 into evidence.

09:46:40 9        THE COURT:  Any objection?

09:46:43 10        MR. WOLIN:  No, Your Honor.

09:46:44 11        THE COURT:  It's admitted.

09:46:44 12        (DTX Exhibit No. 517 was admitted into

09:46:44 13   evidence.)

09:46:44 14   BY MR. YATES:

09:46:45 15   Q.      Mr. Sproull, how many states did Domino sell refined

09:46:51 16   sugar into in 2021?

09:46:52 17   A.      I would assume all fifty.

09:46:53 18   Q.      Let's take a look at a demonstrative, DDX 002.  All

09:47:04 19   right.  This shows the Continental United States.  Is it

09:47:07 20   true that Domino sold refined sugar in each of the

09:47:11 21   forty-eight states in the Continental United States over the

09:47:14 22   past four years?

09:47:17 23   A.      I'm sure.

09:47:18 24   Q.      You're sure it is?

09:47:19 25   A.      Yes.

Sproull - direct

09:47:20  1   Q.      Okay.  And that's from the five refineries that

09:47:24  2   Domino operates in the states that you mentioned earlier,

09:47:27  3   sir?

09:47:28  4   A.      That's correct.

09:47:33  5   Q.      Let's take a look at where those refineries are

09:47:37  6   located so we can see it on the map.  There is one in

09:47:40  7   Crockett, California, there is one in Chalmette, Louisiana,

09:47:43  8   there is one in Okeelanta, Florida, there is one in

09:47:47  9   Baltimore, Maryland, and one in Yonkers, New York?

09:47:50 10   A.      Correct.

09:47:50 11   Q.      And Domino ships throughout the United States from

09:47:51 12   these five refineries and sells to customers in all

09:47:58 13   forty-eight Continental United States from those five

09:48:00 14   refineries, correct?

09:48:01 15   A.      Yes, that's correct.

09:48:02 16   Q.      Does Domino -- let's take a look at DTX -- take a

09:48:06 17   look back at DTX 517, sir.

09:48:12 18   A.      Okay.

09:48:18 19   Q.      Do you see that there is a certain volume of sugar

09:48:21 20   that is being shipped and sold by Domino into the state of

09:48:26 21   Illinois?

09:48:27 22   A.      Yes.

09:48:28 23   Q.      Okay.  And that's one of the top ten largest states

09:48:33 24   by volume for Domino, correct?

09:48:35 25   A.      That's correct, yes.

Sproull - direct

09:48:36 1   Q.      Okay, Domino doesn't operate a refinery in Illinois,

09:48:41 2   does it?

09:48:41 3   A.      No, not a refinery.

09:48:43 4   Q.      And in DTX 517, take a look at page 3, sir.

09:48:50 5   A.      Okay.

09:48:50 6   Q.      Do you see that it says ASR Domino sales by state,

09:48:56 7   sugar produced at Chalmette, Louisiana?

09:48:59 8   A.      Yes.

09:49:00 9   Q.      What do you understand the table on page 3 of DTX 517

09:49:05 10  to show?

09:49:05 11  A.      These would be amounts of sugar sold by state from

09:49:09 12  the refinery in New Orleans.

09:49:12 13  Q.      And let's take a look at slide 3 on our

09:49:16 14  demonstrative.  Does slide 3 of our demonstrative show the

09:49:23 15  top ten states for sales of refined sugar from that refinery

09:49:29 16  in Chalmette, Louisiana?

09:49:32 17  A.      Yeah, it looks accurate.

09:49:36 18  Q.      And Chalmette is near New Orleans?

09:49:39 19  A.      Yes.

09:49:40 20  Q.      As depicted on the map, correct?

09:49:42 21  A.      Correct.

09:49:42 22  Q.      So the top ten states from Chalmette range from Texas

09:49:47 23  to Pennsylvania to New Jersey to Virginia to Illinois,

09:49:52 24  correct?

09:49:52 25  A.      That's right.

Sproull - direct

09:49:55 1   Q.       Now, Domino also has a refinery in Baltimore,

09:49:59 2   Maryland, correct?

09:50:00 3   A.       Correct.

09:50:00 4   Q.       Let's take a look at the next slide.  That shows you

09:50:04 5   where that refinery is, sir?

09:50:06 6   A.       Yes.

09:50:06 7   Q.       And even though Domino has got a refinery in

09:50:10 8   Baltimore, Maryland, Pennsylvania and New Jersey are among

09:50:14 9   the top ten states for sales by volume from the Chalmette,

09:50:19 10  Louisiana refinery, correct?

09:50:22 11  A.       That's right.

09:50:25 12  Q.       Is shipping refined sugar a shorter distance always

09:50:32 13  cheaper than shipping sugar a longer distance?

09:50:35 14  A.       I think as general a rule shipping further costs

09:50:38 15  more, but not always the case, different shipping lanes,

09:50:43 16  railways, they have different costs and sometimes it can be

09:50:46 17  less expensive to go further in terms of miles.

09:50:48 18  Q.       And ASR Domino chooses to ship sugar from all the way

09:50:52 19  from Chalmette, Louisiana up to customers in Pennsylvania

09:50:56 20  and New Jersey, correct?

09:50:58 21  A.       Yes, we do.

09:50:59 22  Q.       Let's take a look at page 5 of DTX 517, sir.  Do you

09:51:07 23  see that?

09:51:07 24  A.       I do.

09:51:08 25  Q.       That's a table with Domino sales by state from

Sproull - direct

09:51:12  1  Okeelanta, Florida refinery?

09:51:16  2  A.      That's correct.

09:51:17  3  Q.      Let's take a look at slide 5 on the demonstratives.

09:51:20  4  Does slide 5 represent the top ten states by volume for

09:51:27  5  sales from the Okeelanta, Florida refinery?

09:51:31  6  A.      It looks like a match to me, yes.

09:51:33  7  Q.      And among the top ten states for sales by volume from

09:51:37  8  Okeelanta, Texas, Illinois, Ohio, Pennsylvania, and even New

09:51:44  9  York, correct?

09:51:45 10  A.      Correct.

09:51:48 11  Q.      And does ASR sell more refined sugar into New York or

09:52:02 12  Alabama from its Okeelanta, Florida refinery, sir?

09:52:08 13  A.      Well, it appears New York.  And that would be

09:52:11 14  consistent with my understanding.

09:52:12 15  Q.      And, in fact, ASR sells three times as much sugar

09:52:16 16  into New York as it does into Alabama which is a state that

09:52:20 17  touches Florida, correct?

09:52:21 18  A.      Yes.

09:52:25 19  Q.      Mr. Sproull, can you take a look at DTX 043.  And

09:52:33 20  we're not going to display this on the public screen.  This

09:52:37 21  is another confidential document.

09:52:40 22  A.      Okay.  I'm there.

09:52:42 23  Q.      Would you please tell me what the attachment to this

09:52:45 24  e-mail is?

09:52:47 25  A.      This is a document that was a strategic review of our

Sproull - direct

09:52:58 1    business in the northeast, northeast United States.

09:53:02 2    Q.     And was DTX 043 prepared in the ordinary course of

09:53:07 3    ASR's business, sir?

09:53:09 4    A.     Yes.

09:53:10 5    Q.     And you received and reviewed DTX 043 in the ordinary

09:53:14 6    course of your job duties?

09:53:15 7    A.     Yes.

09:53:17 8            MR. YATES:  Your Honor, I move DTX 043 into

09:53:20 9    evidence.

09:53:20 10           MR. WOLIN:  No objection.

09:53:21 11           THE COURT:  Thank you, it's admitted.

09:53:23 12           (DTX Exhibit No. 043 was admitted into

09:53:25 13   evidence.)

09:53:25 14   BY MR. YATES:

09:53:25 15   Q.     I would ask you to turn to slide 6.  It's got the

09:53:29 16   Bates number 463 on it, sir.

09:53:32 17   A.     Okay.

09:53:33 18   Q.     Actually let's look at slide 5.  They're the same, I

09:53:37 19   think.  Is this a map that Domino's executive committee

09:53:40 20   relied on in the normal course of its business?

09:53:47 21   A.     Yes, it would be something we would look at.

09:53:49 22   Q.     And you're on Domino's executive committee, correct?

09:53:52 23   A.     I am.

09:53:54 24   Q.     And do you see the states that are encompassed by the

09:53:56 25   dotted line that is labeled in this Domino presentation as

09:54:01 1  the south?

09:54:02 2  A.    Yes.

09:54:03 3  Q.    And the south encompasses states ranging from Florida

09:54:07 4  to Texas to Tennessee to Arkansas in this ASR ordinary

09:54:13 5  course document, correct?

09:54:14 6  A.    That's correct.

09:54:15 7  Q.    And what states are the Midatlantic states in this

09:54:21 8  ASR ordinary course document, sir?

09:54:23 9  A.    Looks like the Carolinas.

09:54:26 10  Q.    So North and South Carolina, correct?

09:54:28 11  A.    Correct.

09:54:29 12  Q.    And then it looks like Virginia up through Maine is

09:54:34 13  labeled northeast in this document; is that right?

09:54:36 14  A.    That's right.

09:54:37 15  Q.    So ASR places Virginia and Maryland and Delaware in

09:54:42 16  the northeast in its ordinary course of business documents,

09:54:45 17  correct?

09:54:46 18  A.    Yes.

09:54:47 19  Q.    Mr. Sproull, do you have a graduate degree?

09:54:51 20  A.    I do.

09:54:51 21  Q.    What's your graduate degree in, sir?

09:54:55 22  A.    I have a masters in business administration.

09:54:57 23  Q.    From what institution?

09:54:59 24  A.    From MIT.

09:55:02 25  Q.    Okay.  And before you joined Domino, were you a

Sproull - direct

09:55:05 1   business consultant?

09:55:06 2   A.      I was.

09:55:06 3   Q.      At Deloitte?

09:55:07 4   A.      That is correct.

09:55:07 5   Q.      And was part of your job at Deloitte trying to make

09:55:11 6   other businesses more competitive?

09:55:12 7   A.      It was.

09:55:14 8   Q.      Does any part of your job at Domino involve helping

09:55:18 9   Domino increase its competitiveness in the sale of refined

09:55:22 10  sugar?

09:55:22 11  A.      Yes, absolutely.

09:55:24 12  Q.      If U.S. Sugars acquires Imperial Sugar, do you intend

09:55:29 13  to stop working every day to make Domino competitive in its

09:55:33 14  efforts to sell refined sugar?

09:55:35 15  A.      No, of course not.

09:55:37 16  Q.      If US Sugar acquires Imperial Sugar, do you expect

09:55:41 17  that you'll continue trying to win as much business as

09:55:45 18  possible for Domino?

09:55:46 19  A.      Well, I can only say my job is not to win as much

09:55:50 20  business but as to make the highest return to my shareholder

09:55:55 21  base.

09:55:55 22  Q.      Fair enough.  How would you characterize the degree

09:55:55 23  of competition for the sale of refined sugar in the United

09:56:02 24  States?

09:56:02 25  A.      It's based on my experience in other industries, it's

Sproull - direct

09:56:07 1  intense.

09:56:07 2  Q.    Who are the companies that you can recall sitting

09:56:10 3  here today that Domino competes with for the sale of refined

09:56:14 4  sugar in the United States?

09:56:15 5  A.    Well, it would be US Sugar, it would be Imperial, it

09:56:18 6  would be LSR Cargill, United with the Red River Valley beets

09:56:24 7  production, Michigan Sugar, National Sugar Marketing,

09:56:28 8  Mexican sugar coming in, imported Tier II sugar coming in.

09:56:35 9  Melt houses.

09:56:36 10  Q.    You mention melt houses.  What are they?

09:56:39 11  A.    They're not core sugar refiners.  They buy some type

09:56:43 12  of sucrose, some of it is refined, some of it is raw, some

09:56:47 13  of it is something in between and they produced the liquid

09:56:51 14  sugar from that.

09:56:51 15  Q.    Have you heard of a company called Indiana Sugar?

09:56:56 16  A.    Yes.

09:56:56 17  Q.    Did you compete against them?

09:56:58 18  A.    We both sell to them and compete against them.

09:57:00 19  Q.    To your knowledge has Domino lost sales to industrial

09:57:02 20  customers to Indiana Sugar?

09:57:02 21  A.    Sure.

09:57:10 22  Q.    Sir, over the past five years, have you observed any

09:57:12 23  changes in the amount of competition of the sale of refined

09:57:12 24  sugar in the United States?

09:57:12 25  A.    Yeah, easily, it's a year to year, it's a month to

09:57:22  1    month, it absolutely changes.

09:57:24  2    Q.       What have you observed over the last five years, have

09:57:27  3    you observed any new entrants?

09:57:30  4    A.       There are always people growing capacity, there are

09:57:33  5    people, it's an agricultural business so you have different

09:57:37  6    regions increasing their crop sizes.  As we've talked about,

09:57:41  7    the melt houses and CSC is one of those, they have added new

09:57:46  8    facilities in the last few years.

09:57:53  9             MR. YATES:  At this point, Your Honor, I think

09:57:54  10   we're going to have to seal the courtroom for the remainder

09:57:57  11   of the testimony.

09:57:58  12             THE COURT:  Okay.  Given that it's sensitive

09:58:02  13   business information for a third party, here, ASR, we'll

09:58:08  14   close the courtroom.

09:58:09  15             (Courtroom sealed.)

09:58:17  16             MR. YATES:  While we're waiting, Mr. Sproull,

09:58:20  17   could you pull up DTX 094.

09:58:24  18             THE WITNESS:  Sure.

09:58:29  19             THE COURT:  I think everyone is gone.

09:58:31  20             MR. YATES:  Thank you, Your Honor.

09:58:33  21   BY MR. YATES:

09:58:34  22   ███        █████████████████████

09:58:37  23   ███        ██████████████████████████████████████

09:58:46  24   █████████████████████

09:58:47  25   ███        ██████████████████████████████

Sproull - direct



Sproull - direct



Sproull - direct



Sproull - direct



Sproull - direct



Sproull - direct



10:04:42  1
10:04:44  2
10:04:48  3
10:04:52  4
10:04:52  5
10:04:57  6
10:04:57  7
10:04:57  8
10:05:01  9
10:05:01  10
10:05:02  11
10:05:06  12
10:05:08  13
10:05:08  14
10:05:09  15
10:05:12  16
10:05:16  17
10:05:20  18
10:05:25  19
10:05:30  20
10:05:32  21
10:05:36  22
10:05:41  23
10:05:42  24
10:05:43  25

Sproull - direct



Sproull - direct



Sproull - direct



Sproull - direct



10:09:53 1
10:09:59 2
10:10:03 3
10:10:08 4
10:10:11 5
10:10:14 6
10:10:18 7
10:10:19 8
10:10:22 9
10:10:26 10
10:10:33 11
10:10:36 12
10:10:38 13

10:10:39 14          MR. YATES:  Thank you.  No further questions,

10:10:42 15   Your Honor.

10:10:43 16          THE COURT:  Thank you.

10:10:44 17          Mr. Wolin, cross-exam.  And are you going to

10:10:49 18   need to keep the courtroom still sealed for the beginning of

10:10:53 19   this?

10:10:52 20          MR. WOLIN:  No, Your Honor.  We can open the

10:10:55 21   courtroom up.

10:10:58 22          THE COURT:  All right.  We can open the

10:11:00 23   courtroom.

10:11:01 24          (Courtroom unsealed.)

10:11:20 25          MR. WOLIN:  Your Honor, Michael Wolin on behalf

10:11:22 1    of the plaintiff, United States.   May I proceed?

10:11:25 2                THE COURT:   Yes.

10:11:25 3                       CROSS-EXAMINATION

10:11:25 4    BY MR. WOLIN:

10:11:27 5    Q.       Good morning, Mr. Sproull.   It's nice to talk to you.

10:11:30 6    A.       Good to see you.

10:11:31 7    Q.       We spoke a few minutes ago about U.S. sales of sugar

10:11:37 8    to industrial customers.   Do you recall that?

10:11:38 9    A.       Yes.

10:11:38 10   Q.       ASR markets sugar under the brand name Domino,

10:11:42 11   correct?

10:11:42 12   A.       That's one of our major brands.

10:11:44 13   Q.       ASR industrial customers will often solicit bids from

10:11:50 14   multiple sugar suppliers; is that correct?

10:11:52 15   A.       Yes.

10:11:53 16   Q.       And ASR in return responds with a bid price, right?

10:11:56 17   A.       Yes.

10:11:56 18   Q.       And ASR considers transportation costs when deciding

10:12:00 19   what bid to submit, correct?

10:12:02 20   A.       We do.

10:12:02 21   Q.       And ASR also sometimes considers transportation costs

10:12:07 22   when deciding whether to submit a bid at all, correct?

10:12:10 23   A.       I think so, yes.

10:12:12 24   Q.       And when submitting a bid, ASR sometimes does an

10:12:16 25   assessment of who the likely competitors are for that

441

Sproull - cross

10:12:18 1    customer, correct?

10:12:19 2    A.      Yes, we do.

10:12:20 3    Q.      And the location of the customer is one factor that

10:12:24 4    impacts the assessment of who the likely competitors would

10:12:27 5    be, correct?

10:12:27 6    A.      It is.

10:12:28 7    Q.      Now, you mentioned that ASR sells cane sugar,

10:12:33 8    correct?

10:12:33 9    A.      Yes.

10:12:34 10   Q.      Some of ASR's customers express a preference for cane

10:12:38 11   sugar over beet sugar, correct?

10:12:40 12   A.      Some.

10:12:41 13   Q.      And for those customers that express that preference,

10:12:45 14   they're willing to pay a small premium for cane sugar over

10:12:49 15   beet sugar, right?

10:12:50 16   A.      That's usually the case, yes.

10:12:52 17   Q.      And paying a small premium means paying a little bit

10:12:56 18   higher price, correct?

10:12:58 19   A.      Yes.

10:13:00 20   Q.      You also mentioned LSR's expansion while Mr. Yates

10:13:02 21   was questioning you, right?

10:13:02 22   A.      Correct.

10:13:02 23   Q.      Do you have any personal knowledge as to the status

10:13:11 24   of the LSR expansion?

10:13:12 25   A.      No, I don't.

Sproull - cross

10:13:15 1   Q.      Mr. Sproull, I would like you to turn then in the

10:13:19 2   binder, the white binder that I gave you when you came in?

10:13:23 3   A.      Okay.

10:13:23 4   Q.      And please turn to PTX 29 in that binder.

10:13:28 5   A.      Okay.

10:13:29 6   Q.      The document that you're looking at PTX 29 is an

10:13:33 7   e-mail that up sent to Alan Henderson, correct?

10:13:36 8   A.      Yes.

10:13:36 9   Q.      Mr. Henderson is the head of industrial sales for

10:13:41 10  ASR?

10:13:41 11  A.      That's correct.

10:13:41 12  Q.      And he reports to you, correct?

10:13:43 13  A.      He does.

10:13:45 14          MR. WOLIN:  Your Honor, plaintiff offers PTX 29.

10:13:49 15          MR. YATES:  No objection.

10:13:50 16          THE COURT:  It's admitted.

10:13:50 17          (PTX Exhibit No. 29 was admitted into evidence.)

10:13:50 18  BY MR. WOLIN:

10:13:53 19  Q.      Mr. Sproull, the version of the document you're

10:13:55 20  seeing on the screen has redactions that ASR's attorneys

10:14:00 21  have requested, so you have the full version without

10:14:02 22  redactions in your binder.  I'm going to ask you not to

10:14:02 23  reveal anything under the redactions that are shown.  Okay.

10:14:02 24  A.      Okay.  Sounds good.

10:14:02 25  Q.      If we look at the second e-mail in the chain, that's

Sproull - cross

10:14:12  1  an e-mail from Mr. Henderson, correct?

10:14:15  2  A.    It is.

10:14:15  3  Q.    And the subject line of the e-mail which is redacted

10:14:18  4  on the public screen but shown to you, refers to a specific

10:14:22  5  potential customer; correct?

10:14:24  6  A.    It does.

10:14:25  7  Q.    Mr. Henderson writes to you in the second paragraph

10:14:28  8  of the e-mail, that that customer is requesting a quote for

10:14:35  9  the October through December period only, do you see that?

10:14:39 10  A.    I see it, yes.

10:14:40 11  Q.    And then below that, Mr. Henderson says below and

10:14:45 12  attached is the competitive analysis for this quote.  Is

10:14:48 13  that right?

10:14:48 14  A.    I see that, yes.

10:14:49 15  Q.    And then below that in the bottom of the first page

10:14:52 16  of the document, Mr. Henderson includes a chart that lists a

10:14:57 17  North Carolina location and a Texas location; right?

10:15:00 18  A.    Yes.

10:15:02 19  Q.    And these are locations that ASR would be shipping

10:15:02 20  to, correct?

10:15:02 21  A.    Yes.

10:15:02 22  Q.    So let's look at the section of the chart for the

10:15:11 23  North Carolina location.  I'm going to ask you what's in the

10:15:14 24  chart but please don't reveal the specific numbers.  Okay?

10:15:17 25  A.    Will do.

Sproull - cross

Q.      The chart provides the amount of sugar expressed as a hundred weight; correct?

A.      Yes, it does.

Q.      And the chart provides ASR's proposed pricing?

A.      Yes, it does.

Q.      And the chart includes a line with an FOB price, correct?

A.      Yes.

Q.      And the chart also includes a line with a delivered price, correct?

A.      That's correct.

Q.      And Mr. Henderson's e-mail and this chart compares ASR's price to prices attributed to United and to Imperial, correct?

A.      Yes.

Q.      And United and Imperial are the only competitors listed in this competitive analysis for the North Carolina location, is that correct?

A.      That's correct.

Q.      So for this North Carolina business that we're seeing up on the screen, ASR assessed that it was competing head to head with United and with Imperial, correct?

A.      From New Orleans, yes, that's correct.

Q.      But if we look at the Texas section of the chart, the analysis list different companies; correct?

Sproull - cross

10:16:18 1    A.       Yes, it does.

10:16:19 2    Q.       Not United and Imperial, correct?

10:16:22 3    A.       That's correct.

10:16:23 4    Q.       Turning back to the section of the chart on the North

10:16:28 5    Carolina location, ASR assessed that United's delivered

10:16:33 6    price is the same as ASR's price; correct?

10:16:36 7    A.       Yes.

10:16:38 8    Q.       And ASR's assessed that Imperial's delivered price is

10:16:41 9    lower than both United's and ASR's correct?

10:16:44 10   A.       That's the estimate here, yeah.

10:16:47 11   Q.       Let's go to the top level e-mail in this document.

10:16:51 12   You wrote back to Mr. Henderson in this e-mail, correct?

10:16:57 13   A.       I did.

10:16:57 14   Q.       And you said to him, "I think it's really important

10:17:01 15   we signal to the market that there's still going to be

10:17:05 16   tightness."

10:17:08 17            Is that right?

10:17:08 18   A.       That's right.

10:17:08 19   Q.       And then you wrote, "We need to signal to the market

10:17:12 20   that we're going to maintain price, especially for the

10:17:12 21   October-December quarter."

10:17:12 22            Is that what you wrote?

10:17:20 23   A.       That's correct.

10:17:22 24   Q.       You can put that document to the side.

10:17:25 25            I would like to have you turn next to PTX 28 in

Sproull - cross

10:17:30 1    your binder, please.  And PTX 28 is an e-mail and attachment

10:17:41 2    that you sent to Luis Fernandez, is that right?

10:17:45 3    A.     Yes.

10:17:46 4             MR. WOLIN:  Your Honor, plaintiff offers PTX 28.

10:17:49 5             THE COURT:  Any objection?

10:17:50 6             MR. YATES:  No objection, Your Honor.

10:17:51 7             THE COURT:  All right.  Thank you.  It's

10:17:53 8    admitted.

10:17:54 9             (PTX Exhibit No. 28 was admitted into evidence.)

10:17:55 10   BY MR. WOLIN:

10:17:56 11   Q.     Let's show the redacted version on the screen.  In

10:18:00 12   the exhibit you're forwarding to Mr. Fernandez an e-mail

10:18:04 13   from Mr. Henderson, correct?

10:18:05 14   A.     That's correct.

10:18:06 15   Q.     And again, Mr. Fernandez is the co-president of ASR?

10:18:10 16   A.     Yes.

10:18:11 17   Q.     And he's your boss?

10:18:12 18   A.     That's correct.

10:18:12 19   Q.     The subject line in the e-mail was colloquium recap,

10:18:17 20   right?

10:18:17 21   A.     That's right.

10:18:18 22   Q.     And that refers to the sugar users' association

10:18:21 23   colloquium event that happens every year?

10:18:24 24   A.     That's right.

10:18:25 25   Q.     And let's turn to the text of the e-mail from

Sproull - cross

10:18:30 1   Mr. Henderson.  The first sentence that Mr. Henderson writes

10:18:35 2   is "below please find a summary of points from the

10:18:41 3   International Sweetener Colloquium that took place last week

10:18:44 4   in Palm Springs, California."

10:18:48 5           Is that right?

10:18:48 6   A.    Yes.

10:18:48 7   Q.    Let's turn then to the second page of PTX 28, please.

10:18:53 8   There is a section on this page that's labeled Competitive

10:18:58 9   Numbers FY 2021 and Notes.  Is that correct?

10:19:02 10  A.    Yes.

10:19:03 11  Q.    And in this section, Mr. Henderson list several

10:19:07 12  competitors to ASR; correct?

10:19:11 13  A.    That's right.

10:19:12 14  Q.    Mr. Henderson list estimates of the pricing for each

10:19:16 15  competitor, correct?

10:19:17 16  A.    Yes, he does.

10:19:18 17  Q.    And that list includes United?

10:19:20 18  A.    Yes.

10:19:21 19  Q.    And the list includes both -- refers to United RRV,

10:19:26 20  or Red River Valley, and Clewiston, Florida, correct?

10:19:30 21  A.    Yes.

10:19:31 22  Q.    And the pricing listed for Red River Valley for

10:19:35 23  United is different than the pricing for Clewiston, correct?

10:19:39 24  A.    Yes, it is.

10:19:39 25  Q.    The list also includes Imperial, correct?

Sproull - cross

10:19:42 1      A.      I see that, yes.

10:19:46 2      Q.      Can you put that document aside, Mr. Sproull.   I

10:19:49 3      would like to ask you about one additional document.

10:19:52 4              If you turn, please, to PTX 30 in your binder.

10:19:58 5      And this document is an e-mail that you sent to

10:20:01 6      Mr. Fernandez on May 26, 2021, correct?

10:20:04 7      A.      Yes.

10:20:06 8              MR. WOLIN:  Your Honor, plaintiff offers PTX 30.

10:20:09 9              MR. YATES:  No objection.

10:20:10 10             THE COURT:  Thank you.  It's admitted.

10:20:12 11             (PTX Exhibit No. 30 was admitted into evidence.)

10:20:13 12     BY MR. WOLIN:

10:20:14 13     Q.      So if you look at the bottom e-mail in the chain,

10:20:18 14     that's an e-mail from Mr. Henderson, correct?

10:20:21 15     A.      Yes.

10:20:22 16     Q.      And the subject line of the e-mail refers to a

10:20:25 17     specific distributor, correct?

10:20:28 18     A.      It does.

10:20:28 19     Q.      And in Mr. Henderson's e-mail he writes in talking

10:20:33 20     with Jenkins and Rich Wistisen, they believe, and then

10:20:38 21     provides some information about Cargill pricing; correct?

10:20:42 22     A.      Yes.

10:20:42 23     Q.      Rich Wistisen is the sugar industry analyst?

10:20:46 24     A.      Yes.

10:20:48 25     Q.      Let's go to the e-mail directly above that one.   In

449

Sproull - cross

| | |
|---|---|
| 10:20:52 | 1 |
that e-mail Mr. Henderson forwards his e-mail below to you,

10:20:56  2  correct?

10:20:56  3  A.     That's correct.

10:20:57  4  Q.     And at the end of the e-mail Mr. Henderson writes,

10:21:02  5  more below, right?

10:21:03  6  A.     Yes.

10:21:04  7  Q.     And more below refers to Mr. Henderson's e-mail below

10:21:10  8  that includes information from Mr. Wistisen, correct?

10:21:16  9  A.     Yes.

10:21:17 10  Q.     And then you forwarded the e-mail from Mr. Wistisen

10:21:22 11  to Mr. Fernandez?

10:21:23 12  A.     Correct.

10:21:24 13  Q.     And Mr. Fernandez is the co-president of ASR?

10:21:28 14  A.     He is.

10:21:28 15  Q.     You wrote to Mr. Fernandez, "Below gives us an idea

10:21:32 16  of what we'd have to do to buy share."

10:21:36 17        Is that right?

10:21:36 18  A.     That's right.

10:21:36 19  Q.     And then you suggest to Mr. Fernandez what price ASR

10:21:40 20  would have to offer to win this business, correct?

10:21:44 21  A.     That's correct.

10:21:44 22  Q.     And if we put that aside, Mr. Sproull.  I want to ask

10:21:50 23  you just a few more questions.

10:21:52 24        ASR has a code of conduct, is that correct?

10:21:55 25  A.     Yes, we do.

Sproull - redirect

10:21:56  1    Q.      And it has a ethics policy?

10:21:59  2    A.      Yes, we do.

10:21:59  3    Q.      And it's a written policy, correct?

10:22:01  4    A.      Yes.

10:22:02  5    Q.      And ASR employees periodically have to review the

10:22:06  6    policy and reaffirm it?

10:22:07  7    A.      Yes, sir.

10:22:07  8    Q.      And that ethics policy would prevent an ASR employee

10:22:13  9    from directly talking about ASR's pricing with a

10:22:15 10    representative of one of ASR's competitors; is that right?

10:22:19 11    A.      I think that's right, yes.

10:22:21 12            MR. WOLIN:  No further questions, Your Honor.

10:22:22 13            THE COURT:  All right.  Thank you.

10:22:23 14            Redirect.

10:22:25 15            MR. YATES:  Just a couple of questions, Your

10:22:27 16    Honor.

10:22:27 17                    REDIRECT EXAMINATION

10:22:28 18    BY MR. YATES:

10:22:29 19    Q.      Mr. Sproull, DTX 030, the last document that the

10:22:37 20    government's counsel was going through with you, sir.

10:22:40 21    A.      Yes.

10:22:41 22    Q.      You focused on Rich Wistisen in this document.  Do

10:22:45 23    you see there is also a reference to Jenkins?

10:22:48 24    A.      I do.

10:22:48 25    Q.      And is that Frank Jenkins of Jenkins Sugar Group?

Sproull - redirect

10:22:52  1    A.      That would be my understanding.

10:22:53  2    Q.      Is it your understanding that Jenkins Sugar Group

10:22:56  3    works with large industrial customers like Kraft and General

10:23:00  4    Mills and provides consulting services to them?

10:23:02  5    A.      Absolutely.

10:23:04  6    Q.      Let's go back to PTX 029, sir.

10:23:13  7    A.      Okay.

10:23:14  8    Q.      And first of all, the quote that's being discussed

10:23:18  9    here, this is a quote for a short-term period; correct,

10:23:22 10    three months?

10:23:23 11    A.      Yes.

10:23:24 12            MR. WOLIN:   Your Honor, I was going to say that

10:23:27 13    the confidential information is being displayed on the

10:23:31 14    screen, but it looks like they took it down.

10:23:34 15            MR. YATES:   Thank you.

10:23:35 16    BY MR. YATES:

10:23:37 17    Q.      ASR typically enters into contracts with industrial

10:23:40 18    customers that are for more than a year, correct?

10:23:43 19    A.      It really is customer by customer, some need supply

10:23:47 20    for one quarter, some need for a year, some want to book for

10:23:52 21    further out than that.

10:23:54 22    Q.      Fair enough.

10:23:55 23            In 2020, sir, there was a force majeure declared

10:24:00 24    by some beet suppliers, correct?

10:24:02 25    A.      Absolutely.

Sproull - redirect

10:24:03 1    Q.      At around this time?

10:24:04 2    A.      In November of '19, so about two months before this

10:24:07 3    time.

10:24:08 4    Q.      When you were referring to sending a signal to the

10:24:11 5    market, who are you referring to?

10:24:13 6    A.      I only signal to customers, so my customers ask me

10:24:16 7    for indications, they don't often -- this is not a quote,

10:24:20 8    this is tell me what your price would be if I wanted help in

10:24:24 9    this period in this time.  For me I'm telling Alan who works

10:24:28 10   for me, I don't want customers to think that the situation

10:24:30 11   was changed because the market was going to remain very

10:24:34 12   tight going in the October-December quarter.

10:24:36 13   Q.      Milling and Baking is referred to, what is that, sir?

10:24:40 14   A.      It's a magazine.  You can call it a piece of trade

10:24:44 15   collateral that's published digitally and.

10:24:48 16   Q.      Do you understand that the USDA includes information

10:24:52 17   from Milling and Baking in its publication that it puts out?

10:24:55 18   A.      Yes, they do.

10:24:57 19                MR. YATES:  Thank you.  No further questions.

10:24:58 20                THE COURT:  Thank you very much.  Thank you, sir

10:25:00 21   for coming up here.  And you are excused.

10:25:02 22                What's next?

10:25:02 23                MR. WOLIN:  Your Honor, we call Eric Speece.  My

10:25:17 24   colleague, Ryan Sandrock, will be handling it.

10:26:00 25                COURT CLERK:  Please raise your right hand.

Speece - direct

10:26:06 1    Please state and spell your full name for the record.

10:26:10 2              THE WITNESS:  Eric Speece, E-R-I-C, S-P-E-E-C-E.

10:26:17 3              ERIC SPEECE, having been duly sworn, was

10:26:21 4    examined and testified as follows:

10:26:25 5                   DIRECT EXAMINATION

10:26:29 6    BY MR. THORNBURGH:

10:26:30 7    Q.     Good morning, Mr. Speece.

10:26:31 8    A.     Good morning.

10:26:31 9    Q.     Mr. Speece, you are the director of strategic

10:26:34 10   accounts at United, correct?

10:26:36 11   A.     Correct.

10:26:36 12   Q.     And you have worked in the sugar industry since 2008,

10:26:40 13   correct?

10:26:40 14   A.     Correct.

10:26:41 15   Q.     And you joined United in 2017, correct?

10:26:44 16   A.     Correct.

10:26:45 17   Q.     And you held your current position as director of

10:26:48 18   strategic accounts since 2020, right?

10:26:51 19   A.     Correct.

10:26:51 20   Q.     And in your current position, you report to Dirk

10:26:55 21   Swart, right?

10:26:55 22   A.     Yes.

10:26:57 23   Q.     And Mr. Speece, strategic account at United refers to

10:27:00 24   a large customer that buys consistent refined sugar volume

10:27:04 25   year over year and tends to have a national footprint, is

Speece - direct

10:27:09 1    that right?

10:27:09 2    A.       That's correct.

10:27:10 3    Q.       And as director of strategic accounts you have

10:27:13 4    responsibility for United relationships with several

10:27:16 5    strategic account customers correct?

10:27:19 6    A.       That's correct.

10:27:19 7    Q.       You have responsible for Hershey, correct, sir?

10:27:21 8    A.       Correct.

10:27:22 9    Q.       And Kellogg's?

10:27:23 10   A.       Correct.

10:27:24 11   Q.       And Ocean Spray?

10:27:25 12   A.       Correct.

10:27:26 13   Q.       And Campbell soup?

10:27:28 14   A.       Correct.

10:27:29 15   Q.       And Mondola?

10:27:30 16   A.       Correct.

10:27:31 17   Q.       And Danone?

10:27:31 18   A.       Correct.

10:27:32 19   Q.       Danone makes Dannon Yogurt, right, sir?

10:27:36 20   A.       Yes.

10:27:37 21   Q.       And Unilever?

10:27:38 22   A.       Yes.

10:27:38 23   Q.       And Mars?

10:27:39 24   A.       Correct.

10:27:39 25   Q.       And Pepsi, correct?

10:27:41 1    A.      Correct.

10:27:43 2    Q.      Mr. Speece, the price that customers pay United for

10:27:46 3    refined sugar is known as the delivered price; is that

10:27:49 4    right?

10:27:49 5    A.      That's correct.

10:27:49 6    Q.      And the starting point for determining the delivered

10:27:52 7    price is the free on board, or FOB price, sir?

10:27:57 8    A.      That is.

10:27:58 9    Q.      And another component of the delivered price that

10:28:01 10   customers pay is freight, right?

10:28:03 11   A.      Correct.

10:28:04 12   Q.      And freight costs typically account for between five

10:28:07 13   and twelve percent of the delivered price that United's

10:28:11 14   customers pay, is that right?

10:28:12 15   A.      Right.

10:28:13 16   Q.      And in your experience, Mr. Speece, freight costs

10:28:16 17   have impacted United's ability to be competitive to serve

10:28:21 18   customers in some locations, is that right?

10:28:23 19   A.      That's correct.

10:28:24 20   Q.      And, for example, freight costs restrict United's

10:28:27 21   ability to be competitive in places like California and

10:28:31 22   Arizona, correct, sir?

10:28:33 23   A.      It can, yes.

10:28:34 24   Q.      And Mr. Speece, you have conversations with your

10:28:37 25   boss, Mr. Swart, about pricing for your customers, correct,

Speece - direct

10:28:40 1   sir?

10:28:40 2   A.      Correct.

10:28:41 3   Q.      Okay.  And many of your customers, Mr. Speece,

10:28:44 4   utilize what is called an RFQ or RFP process for purchasing

10:28:48 5   the refined sugar, correct?

10:28:51 6   A.      Correct.

10:28:51 7   Q.      And RFP and RFG process is when a customer ask United

10:28:58 8   to provide pricing for their refine sugar business covering

10:29:00 9   one or more of that customers locations, correct, sir?

10:29:04 10   A.      Correct.

10:29:04 11   Q.      And sometimes customers will purchase from United

10:29:06 12   outside this RFP process and will do so instead of what is

10:29:11 13   called a spot basis, is that right, sir?

10:29:14 14   A.      That happens, yes.

10:29:15 15   Q.      And a spot purchase usually refers to a purchase of

10:29:18 16   sugar for the immediate future or the next quarter; correct,

10:29:22 17   sir?

10:29:22 18   A.      That's how I would define it.

10:29:24 19   Q.      Mr. Speece, some United customers will only accept

10:29:27 20   cane sugar at one or more of their facilities, is that

10:29:31 21   right?

10:29:31 22   A.      Yes.  Some, yes.

10:29:32 23   Q.      And Domino, for example, has a cane only requirement

10:29:36 24   at their facility in Jacksonville, Florida, right?

10:29:40 25   A.      That's correct.

Speece - direct

10:29:40 1   Q.      Mr. Speece, M&A International is also one of your

10:29:45 2   customers; correct.

10:29:45 3   A.      Yes.

10:29:46 4   Q.      And M&A International is a distributor, correct?

10:29:50 5   A.      Correct.

10:29:51 6   Q.      And distributors in your experience at United tend to

10:29:54 7   serve smaller end customers than United, correct?

10:29:57 8   A.      They handle bulk trucks and down to small bags.

10:30:01 9   Q.      But Mr. Speece, in your experience distributors tend

10:30:04 10  to serve smaller end customers than United, correct, sir?

10:30:08 11  A.      They tend to smaller customers.

10:30:11 12  Q.      And Mr. Speece, you do not recall an instance in

10:30:14 13  which United provided a bid to a customer in response to an

10:30:18 14  RFP or RFQ but United ended up losing all of that customer's

10:30:24 15  business to a distributor instead, isn't that right?

10:30:27 16  A.      Can you repeat that?

10:30:28 17  Q.      Sure.

10:30:29 18          You do not recall an instance in which United

10:30:32 19  bid for a customer's business through an RFP or RFQ but

10:30:38 20  actually ended up losing all that business to a distributor,

10:30:41 21  is that correct?

10:30:42 22  A.      All of the business, no.

10:30:42 23  Q.      Thank you.

10:30:42 24          Mr. Speece, next please turn to tab PTX in the

10:30:45 25  binder in front of you, PTX 395.  That wasn't very helpful.

Speece - direct

10:30:52 1    Plaintiffs Exhibit 395 appears there.  And Mr. Speece, you

10:31:00 2    recognize the calendar invite --

10:31:02 3    A.    I'm sorry, 395?

10:31:04 4    Q.    395, yes, sir.

10:31:14 5    A.    I'm there.

10:31:21 6    Q.    Mr. Speece, you do recognize this calendar invite and

10:31:24 7    e-mail stream, correct, sir?

10:31:26 8    A.    I do.

10:31:33 9              MR. THORNBURGH:  Your Honor, there is no

10:31:34 10   outstanding objections.  Plaintiffs move to admit

10:31:37 11   Exhibit 395.

10:31:39 12   Q.    Mr. Speece, this is an e-mail conversation between

10:31:41 13   you and Gwendolyn Kernan, correct, sir?

10:31:45 14   A.    Yes.

10:31:45 15   Q.    And Ms. Kernan works for Danone, correct?

10:31:49 16   A.    Correct.

10:31:49 17   Q.    In this e-mail stream you are discussing terms for

10:31:52 18   providing liquid sugar to Danone facility in Jacksonville,

10:31:57 19   Florida, correct, sir?

10:31:59 20   A.    Delivered prices, correct.

10:32:02 21   Q.    And so looking at this e-mail at the bottom of

10:32:02 22   page 1, you reply to Ms. Kernan on Wednesday, May 15th,

10:32:02 23   2019, and you wrote in part, "Thanks for your feedback and

10:32:12 24   discussion on our quote for 2020.  I also like to lead with

10:32:12 25   my best price taking into consideration the market and our

Speece - direct

10:32:22 1    competition."

10:32:24 2                    That's what you wrote, correct, sir?

10:32:29 3    A.        That's what I wrote, yes.

10:32:30 4    Q.        And Mr. Speece, that's what you consistently try to

10:32:34 5    do in your job, you lead with your best price, taking into

10:32:38 6    consideration the competition, correct sir?

10:32:40 7    A.        I take into consideration the competition.

10:32:42 8    Q.        And then in the next paragraph you wrote, "We do have

10:32:45 9    a significant freight disadvantage over one competitor in

10:32:50 10   Savannah, Georgia, which is why I went with a much lower FOB

10:32:55 11   bulk basis number."

10:32:57 12                   And Mr. Speece, the competition that you were

10:32:59 13   you referring to in that sentence was Imperial Sugar,

10:33:02 14   correct?

10:33:02 15   A.        Correct.

10:33:03 16   Q.        So Mr. Speece, you were indicating here that you led

10:33:06 17   with a lower price for this business because you knew

10:33:12 18   starting that Imperial had a freight advantage over United

10:33:16 19   for this customer location, correct, sir?

10:33:18 20   A.        I knew they had a freight advantage, yeah.

10:33:21 21   Q.        And then in the next sentence you wrote, "Given your

10:33:24 22   recent feedback, we have lowered our FOB bulk basis down to

10:33:30 23   $35 per hundred weight."

10:33:32 24                   So Mr. Speece, you then lowered United's offer

10:33:36 25   even more in response to the feedback that you received from

Speece - direct

10:33:39 1    Ms. Kernan, correct, sir?

10:33:41 2    A.        They had indicated that they were high, yes.

10:33:45 3    Q.        And Mr. Speece, the only competitor that you mention

10:33:47 4    in this e-mail is Imperial Sugar; correct, sir?

10:33:50 5    A.        The only one I mention, yes.

10:33:52 6    Q.        You can put that document aside.  And ask that you

10:33:55 7    now please turn to tab PTX 370.  And Mr. Speece, an

10:34:05 8    unredacted version of plaintiff's Exhibit 370 appears there.

10:34:09 9    In a moment a redacted version will be shown on the screen.

10:34:17 10             So Mr. Speece, you recognize this e-mail from

10:34:20 11   May 2021, correct?

10:34:21 12   A.        I do.

10:34:21 13             MR. THORNBURGH:  Your Honor, plaintiff moves to

10:34:24 14   admit plaintiff's Exhibit 370.

10:34:28 15             MS. GIORDANO:  No objection, Your Honor.

10:34:29 16             THE COURT:  All right.  It's admitted.

10:34:29 17             (PTX Exhibit No. 370 was admitted into

10:34:32 18   evidence.)

10:34:32 19   BY MR. THORNBURGH:

10:34:32 20   Q.        So Mr. Speece, in this e-mail, you are giving your

10:34:36 21   boss, Mr. Swart, an update on contract negotiations that you

10:34:39 22   were having with Kellogg's and Campbell Soup, right, sir?

10:34:43 23   A.        Correct.

10:34:44 24   Q.        And I want to focus first on the second paragraph.

10:34:46 25   For Campbell Soup you were bidding on new business in

Speece - direct

10:34:52 1   Charlotte, North Carolina, correct?

10:34:54 2   A.      Correct.

10:34:54 3   Q.      And you understood this to be Imperial's business at

10:34:58 4   the time, correct, sir?

10:34:58 5   A.      Correct.

10:34:59 6   Q.      And then you estimated in this e-mail what you

10:35:03 7   thought Imperial's FOB price would be for a delivered price

10:35:07 8   of $42; correct, sir?

10:35:09 9   A.      Given a reference to Dirk Swart, yes.

10:35:12 10  Q.      Mr. Speece, why don't you provide pricing estimates

10:35:15 11  for any or competitors in this e-mail, sir?

10:35:18 12  A.      I was just simply giving Dirk a reference of what a

10:35:22 13  42 delivered price would back into Savannah, Georgia.

10:35:25 14  Q.      If you go up to the first paragraph, sir, you are

10:35:28 15  giving Mr. Swart an update on your negotiation with

10:35:32 16  Kellogg's, right?

10:35:33 17  A.      Right.

10:35:34 18  Q.      In the second sentence you wrote, "It looks like we

10:35:37 19  may get all of Memphis because of issues with supply and

10:35:40 20  color with Sucro Can."

10:35:41 21          Mr. Speece, what were you referring to here when

10:35:46 22  you wrote of Kellogg's issue with supply and with Sucro Can?

10:35:51 23  A.      Kellogg's had indicated to me that they were having

10:35:54 24  some issues with their current supplier which at that time

10:35:56 25  was Sucro Can.

Speece - direct

10:35:58 1    Q.      Mr. Speece, you can set plaintiff's Exhibit 370

10:36:03 2    aside.  I ask you that you turn to PTX 414 in your binder,

10:36:08 3    sir.  And Mr. Speece, you recognize this e-mail stream,

10:36:15 4    correct?

10:36:15 5    A.      I do.

10:36:16 6            MR. THORNBURGH:  Your Honor, the plaintiff moves

10:36:18 7    to admit plaintiff's Exhibit 414.

10:36:21 8            MS. GIORDANO:  No objection, Your Honor.

10:36:22 9            THE COURT:  Thank you.  It's admitted.

10:36:22 10           (PTX Exhibit No. 414 was admitted into

10:36:22 11   evidence.)

10:36:22 12   BY MR. THORNBURGH:

10:36:24 13   Q.      So, Mr. Speece, this is an e-mail stream involving

10:36:29 14   you and Steve Kline from Pepsi, is that correct, sir?

10:36:32 15   A.      And several others, but yes, it's correct.

10:36:35 16   Q.      And so Steve Kline from Pepsi reached out to you and

10:36:39 17   others at United to ask if United could provide refined

10:36:42 18   sugar to the Pepsi facility in Wytheville, Virginia,

10:36:47 19   correct, sir?

10:36:48 20   A.      Correct.

10:36:48 21   Q.      At the time this e-mail that is on the screen was

10:36:51 22   sent, April 21st, 2021, United was not supplying refined

10:36:55 23   sugar to this particular Pepsi facility, correct, sir?

10:36:59 24   A.      Correct.

10:37:00 25   Q.      And this request as you understood it at the time was

Speece - direct

10:37:04 1    a one off request from Pepsi, right, sir?

10:37:07 2    A.      Yeah, they were having some issues with another

10:37:09 3    supplier and they're asking for help.

10:37:11 4    Q.      So this would be what is commonly known as a spot

10:37:14 5    purchase then, correct, sir?

10:37:15 6    A.      In this case, no.

10:37:16 7    Q.      It's not a spot purchase?

10:37:18 8    A.      No.

10:37:18 9    Q.      It's a purchase for sugar in the immediate future,

10:37:20 10   correct, sir?

10:37:21 11   A.      No.

10:37:21 12   Q.      How far in the future was this purchase for, sir?

10:37:24 13   A.      It's not a purchase, we would just add it to their

10:37:29 14   current contract, we would add a new line imported, it's a

10:37:32 15   new purchase.

10:37:33 16   Q.      But it was a facility that you were not otherwise

10:37:35 17   serving at the time, correct, sir?

10:37:37 18   A.      That's right.

10:37:37 19   Q.      I want to direct your attention to page 2 of the

10:37:40 20   e-mail which Mr. Cline wrote, "Can United cover any of these

10:37:45 21   out of Tyner, we also asked Imperial, so first in wins.  We

10:37:50 22   will take what we can get due to Domino fire."

10:37:55 23                Did I read that correctly, sir?

10:37:54 24   A.      You did.

10:37:55 25   Q.      You understood United -- you understood Imperial to

Speece - direct

10:37:58 1    be United's only competition for this business, right, sir?

10:38:01 2    A.    No, that's not what I understood.

10:38:04 3    Q.    He said first in wins between you and Imperial,

10:38:08 4    right, sir?

10:38:08 5    A.    Yes.

10:38:09 6    Q.    Put that document aside.

10:38:11 7          Mr. Speece, you regularly receive industry

10:38:16 8    reports with information on the sugar industry, right?

10:38:19 9    A.    I do receive reports, yes.

10:38:21 10   Q.    And one industry report that you receive is from a

10:38:23 11   company called Commodity Info, is that right, sir?

10:38:26 12   A.    That's correct.

10:38:27 13   Q.    And the lead analyst and president of Commodity Info

10:38:32 14   is a man named Rich Wistisen, is that correct?

10:38:35 15   A.    That's correct.

10:38:36 16   Q.    And you have known Mr. Wistisen since you worked at

10:38:39 17   Cargill prior to your job at United, correct?

10:38:42 18   A.    That's correct.

10:38:42 19   Q.    And you regularly communicate with Mr. Wistisen every

10:38:46 20   month or two, correct, sir?

10:38:47 21   A.    Every month or two, correct.

10:38:48 22   Q.    Do you recall when the last time was you spoke to

10:38:52 23   Mr. Wistisen?

10:38:55 24   A.    It was sometime in early March.

10:38:55 25   Q.    Mr. Speece, next please turn to tab PTX 393 in your

Speece - direct

10:39:03  1    binder, please.  And Mr. Speece, you recognize the e-mail

10:39:13  2    stream there?

10:39:15  3    A.      I see it's from me and Rich Wistisen, yes.

10:39:19  4            MR. THORNBURGH:  Your Honor, plaintiff moves to

10:39:21  5    admit plaintiff's Exhibit 393.

10:39:23  6            MS. GIORDANO:  No objection.

10:39:24  7            THE COURT:  Thank you.  It's admitted.

10:39:24  8            (PTX Exhibit No. 393 was admitted into

10:39:26  9    evidence.)

10:39:26 10    BY MR. THORNBURGH:

10:39:26 11    Q.      Mr. Speece, this is a fairly long e-mail exchange, so

10:39:29 12    I'm going to ask that you go to page 4 to start.  That's the

10:39:33 13    page on the screen in front of you.  There is an e-mail

10:39:37 14    there from Mr. Wistisen to you on September 21, 2020, at

10:39:43 15    1:52 p.m.  Do you see that, sir?

10:39:44 16    A.      I do.

10:39:44 17    Q.      And I want to go to the bottom of that e-mail.  And

10:39:49 18    Mr. Wistisen asked you if there is, "anything new on the

10:39:53 19    pricing front."  Do you see -- excuse me, he asked you if

10:39:57 20    there is, "anything new of interest on the pricing front."

10:40:00 21            Do you see that?

10:40:02 22    A.      I do.

10:40:02 23    Q.      Okay.  And then Mr. Wistisen writes, "hearing beets

10:40:07 24    well sold, except possibly NSM 80 to 85 percent and prices

10:40:12 25    firm to higher.  Michigan $38.50 plus selective selling, 90

Speece - direct

10:40:22 1    plus percent, Western $36.75, mostly out of the market, 90

10:40:27 2    plus percent."

10:40:28 3             Do you see that?

10:40:29 4    A.     I do.

10:40:29 5    Q.     So I want to break down that sentence, Mr. Speece.

10:40:33 6    First, Mr. Wistisen here is providing you information about

10:40:38 7    the current prices of United's competitors, correct, sir?

10:40:42 8    A.     Providing spot prices for some of our competitors,

10:40:46 9    yes.

10:40:46 10   Q.     And second, Mr. Wistisen is providing information

10:40:49 11   about how much of each of these competitors have sold of

10:40:52 12   their annual crop for the current year, is that right?

10:40:56 13   A.     That's correct.

10:40:56 14   Q.     That's what the percentage figures in this e-mail

10:40:59 15   refer to, right, sir?

10:41:00 16   A.     Yes.

10:41:02 17   Q.     And Mr. Speece, information about how much crop a

10:41:06 18   sugar processor has sold in the current fiscal year is

10:41:10 19   information that your customers tend to care about, isn't

10:41:12 20   that right, sir?

10:41:14 21   A.     Our customers do tend to track it, yes.

10:41:16 22   Q.     And part of the reason United's customers care about

10:41:20 23   that information is because it can impact prices, right,

10:41:22 24   sir?

10:41:22 25   A.     I wouldn't say that.

Speece - direct

10:41:25 1    Q.      You wouldn't say that, sir?

10:41:27 2    A.      No.

10:41:29 3    Q.      I would like to ask you, Mr. Speece, to turn to the

10:41:32 4    tab with your litigation deposition transcript and turn to

10:41:36 5    page 249, please.

10:41:48 6    A.      You said 249?

10:41:50 7    Q.      Yes, sir.  And I would like to direct your attention

10:41:52 8    to line 22.  It should be the last tab in your notebook,

10:42:13 9    sir.

10:42:27 10   A.      I don't think I have -- 249?

10:42:30 11   Q.      Sorry, page 249, sir, in a table marked Deposition

10:42:34 12   Transcript, it's the last tab in your notebook.  It's

10:42:39 13   page 249 of that document.

10:42:41 14   A.      Oh, that one.

10:42:56 15   Q.      Are you there, sir?

10:42:59 16   A.      I'm there, yep.

10:43:01 17   Q.      And so at your deposition, I asked you, Mr. Speece,

10:43:04 18   "In your experience at United, the higher the percentage

10:43:07 19   booked that United has of its refined sugar, did that lead

10:43:11 20   often to increased prices?"

10:43:13 21          And your answer was, "No, I don't -- I don't

10:43:16 22   think it leads to -- it's just, if your higher percentage

10:43:20 23   showed you may have a lesser discount to your ask price."

10:43:25 24          MS. GIORDANO:  Your Honor, I don't believe this

10:43:27 25   is at all inconsistent with the question he asked

Speece - direct

10:43:29 1    Mr. Speece.

10:43:31 2                    MR. THORNBURGH:  I asked Mr. Speece if the

10:43:32 3    percentage sold of the book could affect pricing.

10:43:36 4                    MS. GIORDANO:  That's what customers care about.

10:43:37 5                    THE COURT:  You don't need to fight about it.  I

10:43:40 6    am reading the question asked and I have the transcript in

10:43:42 7    front of me.  I can determine whether it's proper

10:43:45 8    impeachment.  Got it.  Go ahead.

10:43:47 9                    THE WITNESS:  Can you restate the question?

10:43:50 10   Q.      Mr. Speece, part of the reason customers care about

10:43:53 11   how much of a crop a sugar processor has sold is because it

10:43:56 12   impacts sugar prices, right?

10:43:59 13   A.      It can.

10:44:00 14   Q.      Okay.  Thank you.

10:44:02 15                    Mr. Speece, this information in this e-mail

10:44:07 16   about your competitor's pricing and the percentage of their

10:44:10 17   book sold, this is information that you would not have

10:44:13 18   otherwise known at this time; correct, sir?

10:44:15 19   A.      No, there are other information.  We can get this

10:44:18 20   information from other venues.

10:44:21 21   Q.      Mr. Speece, do you recall getting this information,

10:44:24 22   this specific information from someone else at this time

10:44:27 23   other than Mr. Wistisen, sir?

10:44:29 24   A.      This specific, no, percentage sold, yes.

10:44:32 25   Q.      You don't -- you recall getting the specific

Speece - direct

10:44:36 1    information from someone else at this time, sir?

10:44:38 2    A.    I just said I do not recall getting this specific

10:44:41 3    information, but you can get this information from other

10:44:44 4    reports.

10:44:44 5    Q.    In the next sentence of the e-mail Mr. Wistisen

10:44:47 6    writes, "I hear you folks are also 90 plus percent and I

10:44:51 7    guess still mostly firm at $36.50 and $38, correct?"

10:44:58 8          That's what you wrote, right, sir?

10:45:00 9    A.    That's what he wrote.

10:45:01 10   Q.    In this sentence you understood Mr. Wistisen to be

10:45:05 11   asking how much of United's crop was booked or sold for the

10:45:09 12   current fiscal year, right?

10:45:11 13   A.    I was trying to confirm, yes.

10:45:14 14   Q.    And the $36.50 in his sentence here, that refers to

10:45:17 15   United's price for beet sugar at the time, correct?

10:45:20 16   A.    That's correct.

10:45:21 17   Q.    And the $38, that refers to United's cane price at

10:45:24 18   the time, correct, sir?

10:45:26 19   A.    Correct.

10:45:27 20   Q.    Now, I want to go down a few lines in this e-mail,

10:45:30 21   Mr. Wistisen wrote, "Hearing ASR despite Chalmette situation

10:45:33 22   showing a little more willingness to discount on both

10:45:33 23   coasts.  They have been lagging on coverage."

10:45:41 24         Did I read that correctly, sir?

10:45:42 25   A.    You did.

470

Speece - direct

10:45:43  1    Q.      And ASR here is referring to Domino, a competitor to

10:45:46  2    United, correct?

10:45:47  3    A.      Correct.

10:45:48  4    Q.      And then Mr. Wistisen in the next few lines passing

10:45:54  5    along information about how much business Cargill has booked

10:45:57  6    for the 2021 fiscal year, correct, sir?

10:46:00  7    A.      Correct.

10:46:00  8    Q.      And Cargill is also a competitor to United, right?

10:46:04  9    A.      Correct.

10:46:06 10    Q.      Mr. Speece, you wouldn't call Cargill and ask them

10:46:10 11    how much of their book is currently booked for the current

10:46:13 12    fiscal year, correct, sir?

10:46:15 13    A.      I would not.

10:46:16 14    Q.      Why not?

10:46:17 15    A.      I just wouldn't do it.

10:46:19 16    Q.      Is there any company policy that prevents you from

10:46:22 17    doing so, sir?

10:46:23 18    A.      No, it's only my policy, I don't call up competitors

10:46:28 19    and talk about percent booked or prices.

10:46:30 20    Q.      Mr. Speece, I'm now going to direct your attention

10:46:33 21    back up to the top of page 4 of the e-mail stream.  This is

10:46:37 22    an e-mail from you to Mr. Wistisen, correct, sir?

10:46:40 23    A.      That's correct.

10:46:41 24    Q.      And you wrote, "We are firm at 36.50, no change and

10:46:45 25    now 38.50 on cane.  An increase of $0.50 per hundred weight.

Speece - direct

10:46:50  1   And yes, you heard correctly, we are 90 percent sold."

10:46:54  2              That's what you wrote, right, sir?

10:46:55  3   A.      Yes.

10:46:56  4   Q.      The 36.50 here, that refers to United's then current

10:47:00  5   prices for beet, right, sir?

10:47:02  6   A.      Correct.

10:47:02  7   Q.      And the 38.50, that refers to United's then current

10:47:06  8   prices for cane sugar, right?

10:47:09  9   A.      Yes.

10:47:10 10   Q.      And Mr. Speece, United does not publish these prices

10:47:14 11   on its public website, correct, sir?

10:47:17 12   A.      We do not.

10:47:18 13   Q.      Okay.  And the 90 plus percent in this e-mail, that

10:47:22 14   refers to how much of United's crop it has sold for the 2021

10:47:28 15   fiscal year, correct, sir?

10:47:29 16   A.      Correct.

10:47:29 17   Q.      So Mr. Wistisen had heard from someone else that

10:47:34 18   United was 90 percent sold and you went ahead and confirmed

10:47:38 19   for him that that information was correct, right?

10:47:40 20   A.      I did, yes.

10:47:41 21   Q.      Mr. Speece, does United publish the percentage of its

10:47:45 22   crop that is booked for the current fiscal year?

10:47:48 23   A.      Do we publish, no.

10:47:50 24   Q.      Is that information that is available on United's

10:47:52 25   customer portal, sir?

472

Speece - direct

10:47:54  1    A.      No.

10:47:55  2    Q.      I would like to go to the bottom of page 3, now,

10:48:00  3    please.   So Mr. Wistison here responds to your e-mail on

10:48:06  4    September 22nd at 2:29 p.m., do you see that?

10:48:08  5    A.      I do.

10:48:09  6    Q.      And he wrote, "Was soft for a minute on the coasts,

10:48:13  7    but ASR saying back up to $40.50 to $41."

10:48:20  8            Do you see that?

10:48:21  9    A.      I do.

10:48:23 10    Q.      Mr. Speece, you understood that to mean that

10:48:25 11    Mr. Wistisen had received updated pricing information from

10:48:30 12    ASR, correct, sir?

10:48:31 13    A.      I don't know exactly who he was getting it from.

10:48:35 14    Q.      So you weren't sure what he meant by ASR saying, sir?

10:48:39 15    A.      I assume it's from ASR, but I don't know exactly who.

10:48:44 16    Q.      And you would never call ASR directly to get this

10:48:48 17    information, correct, sir?

10:48:49 18    A.      Correct.

10:48:50 19    Q.      And then if you look a few lines down in this e-mail,

10:48:52 20    Mr. Wistisen writes, "Waiting for confirm from Michigan."

10:48:55 21            Do you see that?

10:48:55 22    A.      I do.

10:49:00 23    Q.      And what did you understand Mr. Speece to be

10:49:02 24    indicating there, sir?

10:49:02 25    A.      It looks like he's waiting to confirm how sold they

Speece - direct

10:49:13 1   are.

10:49:13 2   Q.      You can put that document aside, sir.  I would next

10:49:16 3   ask you to please turn to tab PTX 389 in your binder.

10:49:30 4   A.      Okay.

10:49:30 5   Q.      Mr. Speece, you recognize this e-mail stream with

10:49:32 6   Mr. Wistisen from March 2021, correct, sir?

10:49:37 7   A.      I see it in front of me.

10:49:39 8              MR. THORNBURGH:  Your Honor, plaintiff moves to

10:49:41 9   admit plaintiff's Exhibit 389, please.

10:49:44 10             MS. GIORDANO:  No objection.

10:49:45 11             THE COURT:  It's admitted.

10:49:46 12             (PTX Exhibit No. 389 was admitted into

10:49:47 13  evidence.)

10:49:47 14  BY MR. THORNBURGH:

10:49:47 15  Q.      Mr. Speece, you can set that document aside, we can

10:49:50 16  come back to it if we have time.  I next can you to turn to

10:49:53 17  PTX 430.  And Mr. Speece, do you recognize this e-mail

10:50:05 18  stream, correct, sir?

10:50:06 19  A.      I do.

10:50:07 20             MR. THORNBURGH:  Your Honor, plaintiff moves to

10:50:09 21  admit plaintiffs Exhibit 430 into evidence.

10:50:12 22             MS. GIORDANO:  No objection.

10:50:13 23             THE COURT:  All right.  Thank you.

10:50:14 24             (PTX Exhibit No. 430 was admitted into

10:50:15 25  evidence.)

Speece - direct

BY MR. THORNBURGH:

Q.     Mr. Speece, this is another e-mail conversation between you and Mr. Wistisen, correct, sir?

A.     Correct.

Q.     I want to start on the page -- excuse me, the bottom of page 1, and there is an e-mail, Mr. Wistisen wrote you on February 15th at 3:26 p.m., do you see that?

A.     I do.

Q.     And Mr. Wistisen wrote, "any action in FY 22?  Has United put a number on it yet?  No word back from other processor/refiners.  I'll send along indications."

       Did I read that correctly, sir?

A.     You did.

Q.     And when Mr. Wistisen wrote "no word back from other processors/refiners," "I'll send along indications," you understood him to be telling you that he would be in touch if he heard from any of these other processors or refiners, correct, sir?

A.     Correct.

Q.     And then you forwarded this e-mail exchange to your boss, Mr. Swart, on February 15th at 3:50 p.m., correct, sir?

A.     Correct.

Q.     And then the first thing you write is "I indicate that you were surprised by both the beet and the Florida

Speece - direct

10:51:29 1    cane increases."

10:51:30 2              Do you see that?

10:51:30 3    A.       I do.

10:51:32 4    Q.       Now, Mr. Speece, if this is just a pricing survey

10:51:38 5    that you provide to Mr. Wistisen, an industry analyst, why

10:51:43 6    would it be important for you to indicate whether you were

10:51:46 7    surprised about price increases?

10:51:48 8    A.       This is not referencing price increases.

10:51:52 9    Q.       What is this referencing, sir?

10:51:53 10   A.       This is referencing the size of the crops.

10:51:55 11   Q.       Why would it be important for you to indicate that

10:51:58 12   you were surprised by that, sir?

10:51:59 13   A.       I don't recall at this time.

10:52:01 14   Q.       Okay.  Mr. Speece, you then ask Mr. Swart if you

10:52:05 15   should indicate where United is at or, "just say our current

10:52:10 16   prices remain at 36.50 and 38.50 and we have had zero

10:52:15 17   problems selling at these values."

10:52:18 18              So you wanted your boss's opinion on what

10:52:21 19   information to relay to Mr. Wistisen; correct, sir?

10:52:24 20   A.       Correct, around 2022.

10:52:28 21   Q.       And then you say, "I will call him rather than put in

10:52:32 22   writing."

10:52:35 23              Mr. Speece, you communicate frequently with your

10:52:39 24   customers via e-mail in the ordinary course of business;

10:52:42 25   right, sir?

10:52:43 1   A.      I communicate with them on e-mail and on the phone.

10:52:46 2   Q.      But you communicate with them frequently via e-mail,

10:52:50 3   correct, sir?

10:52:51 4   A.      I communicate with them via e-mail.

10:52:53 5   Q.      If you go back up to the main e-mail, Mr. Swart

10:52:57 6   responds to your e-mail the same day at 3:53 p.m., do you

10:53:01 7   see that?

10:53:01 8   A.      Yes.

10:53:02 9   Q.      And Mr. Swart also asked you to talk on the phone,

10:53:06 10  correct, sir?

10:53:06 11  A.      Correct.

10:53:06 12  Q.      And then a few minutes later, your boss, Mr. Swart,

10:53:10 13  calls up again and ask you again to give him a call,

10:53:13 14  correct?

10:53:14 15  A.      Correct.

10:53:15 16  Q.      Do you recall talking to Mr. Swart on the phone that

10:53:18 17  day, sir?

10:53:19 18  A.      I do not recall.

10:53:20 19  Q.      You don't recall what, if anything, Mr. Swart told

10:53:23 20  you to communicate to Mr. Wistisen, is that right?

10:53:25 21  A.      On that particular call, no.

10:53:27 22  Q.      Put that document aside.

10:53:28 23          Can you next please turn to tab PTX 406 in your

10:53:34 24  binder, sir.

10:54:00 25          Mr. Speece do you recognize this e-mail from

Speece - direct

10:54:03 1    February 2021, correct?

10:54:04 2    A.     I see it's between me and Rich.

10:54:08 3              MR. THORNBURGH:  Your Honor, plaintiffs move to

10:54:10 4    admit plaintiffs Exhibit 406 into evidence, please.

10:54:13 5              MS. GIORDANO:  No objection.

10:54:14 6              THE COURT:  Thank you.  It's admitted.

10:54:15 7              (PTX Exhibit No. 406 was admitted into

10:54:16 8    evidence.)

10:54:16 9    BY MR. THORNBURGH:

10:54:17 10   Q.     So I want to go to page 3 of this e-mail if we could,

10:54:20 11   Mr. Speece.  And I want to look at the bottom, the e-mail at

10:54:25 12   the bottom of page 3 that carries over to page 4.  And if

10:54:29 13   you look, here, Mr. Speece, this is in fact a continuation

10:54:33 14   of the e-mail conversation from the prior exhibit we were

10:54:36 15   just discussing.  Is that right, sir?

10:54:40 16   A.     Yes.

10:54:41 17   Q.     And then I want to look at the e-mail in the middle

10:54:43 18   of the page on February 15th where you e-mail Mr. Wistisen.

10:54:51 19   Do you see that?

10:54:51 20   A.     I do.

10:54:52 21   Q.     And you wrote, in part, "we are until at the 36.50

10:54:55 22   and 38.50 with zero problems selling at those values.  I do

10:55:02 23   not anticipate any changes to our prices, but we have not

10:55:04 24   formally decided."

10:55:05 25              That's what you wrote, correct, sir?

Speece - direct

10:55:07 1    A.      Correct.

10:55:08 2    Q.      And when you wrote "I do not anticipate any changes

10:55:11 3    to our prices," you were referencing what United might do to

10:55:17 4    its prices in the future, correct, sir?

10:55:18 5    A.      I was stating my opinion there, yes.

10:55:20 6    Q.      You were stating your opinion about what United might

10:55:23 7    do with its prices in the future, correct, sir?

10:55:26 8    A.      Yes, that's my opinion.

10:55:29 9    Q.      And Mr. Speece, this is the same proposed message

10:55:33 10   that you provided your boss, Mr. Swart, in the prior exhibit

10:55:36 11   that we just looked at, correct, sir?

10:55:38 12   A.      Yes.

10:55:40 13   Q.      Now, I want to go to page 2 of this exhibit, please,

10:55:45 14   Mr. Speece.  And here Mr. Wistisen e-mails you on

10:55:49 15   February 17th, at 8:44 a.m.  Do you see that?

10:55:53 16   A.      I do.

10:55:54 17   Q.      In the first couple sentences of this e-mail he

10:55:57 18   provides you pricing for NSM and Western, do you see that?

10:56:04 19   A.      I do.

10:56:05 20   Q.      And then Mr. Wistisen went on and he wrote "but

10:56:08 21   that's not how Cargill plays the game.  And that's the

10:56:12 22   concerning part heading into the FY 22 booking season:

10:56:16 23   Improved and/or abundant supplies in the hands of the most

10:56:22 24   aggressive sellers."

10:56:25 25           Do you see that?

Speece - direct

10:56:26 1   A.      I do.

10:56:26 2   Q.      So when Mr. Wistisen referred to the "most concerning

10:56:32 3   part being approved and/or abundant supplies in the hands of

10:56:36 4   the market's most aggressive sellers," you understood him to

10:56:41 5   be expressing a concern about lower prices, correct, sir?

10:56:44 6   A.      That appears to be Rich's opinion.

10:56:46 7   Q.      And then if you go back out to the main e-mail, you

10:56:50 8   reply, and you wrote, "Thanks Rich.  Call anytime."

10:56:56 9           Is that right?

10:56:57 10  A.      Yes.

10:56:58 11  Q.      If we can put that document aside, sir.  I next ask

10:57:03 12  that you turn to PTX 426 in your binder.  And you recognize

10:57:13 13  this e-mail stream, correct, sir?

10:57:15 14  A.      I do.

10:57:17 15          MR. THORNBURGH:  Your Honor, plaintiff moves to

10:57:19 16  admit plaintiff's Exhibit 426 into evidence, please.

10:57:23 17          MS. GIORDANO:  No objection.

10:57:24 18          THE COURT:  Thank you.  It's admitted.

10:57:26 19          (PTX Exhibit No. 426 was admitted into

10:57:26 20  evidence.)

10:57:26 21  BY MR. THORNBURGH:

10:57:27 22  Q.      Mr. Speece, this is another e-mail conversation

10:57:29 23  between you and Mr. Wistisen, this one from January 2021.

10:57:34 24  Correct, sir?

10:57:36 25  A.      And between Dirk and Steve and I, yes.

Speece - direct

10:57:39 1   Q.      I want to direct you to the bottom of page 2 of this

10:57:42 2   exhibit and there Mr. Wistisen ask you, has United put out a

10:57:48 3   price range on FY 22.  Do you see that?

10:57:51 4   A.      I do.

10:57:52 5   Q.      Okay.  And then you respond to this question from

10:57:55 6   Mr. Wistisen just a little bit further up the e-mail chain.

10:58:01 7   And you indicate here that United has very little sales for

10:58:05 8   the 2022 fiscal year and that the company has not yet set

10:58:11 9   pricing for 2022.  Is that right, sir?

10:58:16 10  A.      That's correct.

10:58:17 11  Q.      In this e-mail, Mr. Speece, you were referring to

10:58:20 12  United sales for the 2022 fiscal year, correct, sir?

10:58:26 13  A.      Referring to the price for the sales for 2022, yes.

10:58:31 14  Q.      Thank you, sir.

10:58:33 15          And then I want to move up to the first page of

10:58:36 16  the document if we could.  There is an e-mail from

10:58:38 17  Mr. Wistisen to you on Wednesday, January 20, 2021.  Do you

10:58:44 18  see that?

10:58:45 19  A.      I do.

10:58:46 20  Q.      And Mr. Wistisen replies to your e-mail about 2022

10:58:52 21  pricing, correct, sir?

10:58:52 22  A.      Correct.

10:58:53 23  Q.      And he writes, "Very little so far on FY 22.  One

10:58:56 24  processor saying they might start around $35 net Midwest,

10:59:02 25  but fully expect it to go lower by couple dollars."

Speece - direct

10:59:08 1          Did I read that right?

10:59:10 2     A.     You did.

10:59:12 3     Q.     Now I want to go to the top e-mail here, please, sir.

10:59:18 4     In this e-mail you forwarded your prior conversation with

10:59:21 5     Mr. Wistisen to your boss, Mr. Swart, as well as Mr. Hanson,

10:59:28 6     your colleague at United, correct, sir?

10:59:31 7     A.     Correct.

10:59:33 8     Q.     You wrote, "My real concern is the one beet supplier

10:59:38 9     starting at $35 net, likely NSM, and in my opinion it is not

10:59:45 10    necessary given they have the freight advantage into the

10:59:49 11    Midwest."

10:59:52 12            Mr. Speece, you were expressing a concern that

10:59:55 13    there was a competitor to United in the Midwest that had

10:59:59 14    pricing that was too low, correct, sir?

11:00:02 15    A.     That's what I'm indicating.

11:00:05 16    Q.     What did you mean by it is not necessary?

11:00:08 17    A.     At that point in time I didn't have the supply and

11:00:12 18    demand warranted the 35.

11:00:17 19    Q.     Then you wrote, "May want to communicate pricing

11:00:19 20    earlier than the colloquium to send a message."

11:00:25 21            That's what you wrote, right, sir?

11:00:26 22    A.     That's what I wrote.

11:00:27 23    Q.     Mr. Speece, did you consider calling NSM to let them

11:00:32 24    know that you were concerned about their pricing at the

11:00:36 25    time?

Speece - direct

11:00:35 1   A.        Absolutely not.

11:00:37 2   Q.        And in the colloquium that you referenced in your

11:00:40 3   e-mail here, sir, this is the annual sweeteners colloquium,

11:00:45 4   correct?

11:00:46 5   A.        That's right.

11:00:46 6   Q.        And this years sweeteners colloquium just took place

11:00:51 7   a month or two ago in Tucson, Arizona?

11:00:55 8   A.        Correct.

11:00:56 9   Q.        United attended the colloquium?

11:00:59 10  A.        That's right.

11:01:00 11  Q.        Did you attend this year, sir?

11:01:02 12  A.        We did.

11:01:02 13  Q.        And other beet processors attend the colloquium?

11:01:06 14  A.        Yes.

11:01:07 15  Q.        Other cane refiners?

11:01:08 16  A.        Yes.

11:01:08 17  Q.        Did you see ASR at the colloquium this year,

11:01:11 18  Mr. Speece?

11:01:13 19  A.        I saw them, yes.

11:01:14 20  Q.        Then you went on in your e-mail, "I will plan on

11:01:18 21  calling him tomorrow as it is always easier than black and

11:01:22 22  white.  Let me know if there are any key messages you would

11:01:26 23  like me to relay on."

11:01:29 24           Mr. Speece, what kind of key messages would you

11:01:32 25  need to convey to someone doing a pricing survey?

Speece - direct

11:01:35 1   A.      Simply asking a question, I don't know.

11:01:39 2             THE COURT:  Why don't we take our morning break.

11:01:41 3   It's getting a little late.

11:01:43 4             (A brief recess was taken.)

11:19:40 5             THE COURT:  All right.  Please be seated.  Let's

11:19:45 6   continue.

11:19:46 7             MR. THORNBURGH:  May I proceed, Your Honor?

11:19:47 8             THE COURT:  Yes, please.

11:19:48 9   BY MR. THORNBURGH:

11:19:49 10  Q.      Can you please, Mr. Snow, pull up PTX 426 that we

11:19:54 11  were discussing previously.  And Mr. Speece, if you could

11:19:57 12  please turn to that document in your binder.

11:20:09 13            Mr. Speece, you recall we were discussing this

11:20:12 14  document right before we went on the break, correct, sir?

11:20:15 15  A.      I do.

11:20:15 16  Q.      And I want to direct your attention back to the top

11:20:19 17  e-mail if we could.  And then, the sentence where you wrote

11:20:22 18  the second paragraph, I'll plan on calling him tomorrow as

11:20:25 19  it is always easier than black and white.  Mr. Speece, is

11:20:29 20  the reason that you indicated you would call Mr. Wistisen as

11:20:33 21  opposed to writing him an e-mail is because you didn't want

11:20:36 22  a written record of your communication with him?

11:20:38 23  A.      No, I tend to prefer to communicate on the phone.

11:20:42 24            MR. STONEROCK:  Mr. Speece, you can put that

11:20:45 25  document aside.  I have no further questions for you at this

Speece - cross

11:20:45  1   time.   Thank you.

11:20:46  2                    THE COURT:  All right.   Thank you.

11:20:48  3                    Cross-exam.

11:20:52  4                    MS. GIORDANO:   Good morning, Your Honor.

11:20:56  5   Jennifer Giordano from Latham & Watkins on behalf of the

11:21:01  6   defendants.

11:21:02  7                       CROSS-EXAMINATION

11:21:02  8   BY MS. GIORDANO:

11:21:02  9   Q.      Mr. Speece, you testified on the government's

11:21:04 10   question that you're responsible for some large industrial

11:21:07 11   customers like Hershey and Pepsi, is that right?

11:21:10 12   A.      That's correct.

11:21:10 13   Q.      How many customer accounts in total are you

11:21:12 14   responsible for at United?

11:21:14 15   A.      Fourteen.

11:21:15 16   Q.      And are those all large industrial, very large

11:21:19 17   industrial companies like Pepsi and Hershey?

11:21:21 18   A.      Not all, but the majority.

11:21:23 19   Q.      To whom do you report?

11:21:25 20   A.      Dirk Swart.

11:21:27 21   Q.      And who ultimately determines the price at which

11:21:31 22   United sells sugar to the customer accounts that you're

11:21:34 23   responsible for?

11:21:34 24   A.      Dirk Swart.

11:21:35 25   Q.      The government asked you about an e-mail that you had

Speece - cross

11:21:38 1    with Danone in 2019, it was PTX 395.  Do you recall that

11:21:43 2    e-mail?

11:21:43 3    A.    I do.

11:21:45 4    Q.    For that particular bid to Danone, did you

11:21:49 5    subsequently find out whether you were actually competing

11:21:53 6    with Imperial for that business?

11:21:55 7    A.    I did.

11:21:55 8    Q.    What did you find out?

11:21:56 9    A.    That they were not an approved supplier.

11:21:59 10   Q.    How did you find that out?

11:22:00 11   A.    Through the buyer at the time.

11:22:02 12   Q.    Danone told you that?

11:22:03 13   A.    Yes.

11:22:04 14   Q.    Now, sir, with respect to these e-mails the

11:22:09 15   government showed you with Mr. Wistisen, let me just ask you

11:22:12 16   a couple of questions.  Did you ever share any information

11:22:15 17   with Mr. Wistisen, that United was not freely sharing with

11:22:19 18   its customers at that same time?

11:22:22 19   A.    No.

11:22:22 20   Q.    All the prices in those e-mails that the government

11:22:26 21   showed you, were those all spot prices?

11:22:29 22   A.    Yes.

11:22:30 23   Q.    And those are sometimes called list prices?

11:22:32 24   A.    Correct.

11:22:35 25   Q.    Mr. Speece, did you ever share any information with

11:22:39 1    Mr. Wistisen about a specific customer negotiation that

11:22:43 2    United was involved in?

11:22:45 3    A.      No.

11:22:45 4    Q.      Did you ever receive from Mr. Wistisen, any

11:22:49 5    information about a competitor, related to a specific

11:22:54 6    customer negotiation United was involved in?

11:22:56 7    A.      No.

11:22:56 8    Q.      To the best of your knowledge, sir, what role did the

11:23:03 9    information that you received from Mr. Wistisen play in the

11:23:08 10   price that any United customer paid for a shipper?

11:23:09 11   A.      None.

11:23:10 12           MS. GIORDANO:  Thank you, sir.  I have no

11:23:11 13   further questions.

11:23:12 14           THE COURT:  All right.  Any redirect?

11:23:13 15           MR. THORNBURGH:  No, Your Honor.  Thank you.

11:23:14 16           THE COURT:  Thank you, sir.  You're excused.

11:23:17 17           What's next?

11:23:18 18           MR. GEIGER:  Your Honor, at this time, United

11:23:20 19   States calls Alan Henderson.

11:23:25 20           THE COURT:  All right.  Thank you.

11:23:57 21           COURT CLERK:  Please raise your right hand.

11:24:01 22   Please state and spell your full name for the record.

11:24:07 23           THE WITNESS:  Alan Henderson, A-L-A-N,

11:24:14 24   H-E-N-D-E-R-S-O-N.

11:24:16 25           ALAN HENDERSON, having been duly sworn was

Henderson - direct

11:24:20 1    examined and testified as follows:

11:24:23 2                MR. GEIGER:  Your Honor, David Geiger from the

11:24:27 3    United States.  May I proceed?

11:24:28 4                THE COURT:  Please.

11:24:29 5                    DIRECT EXAMINATION

11:24:29 6    BY MR. GEIGER:

11:24:30 7    Q.      Good morning, Mr. Henderson.

11:24:31 8    A.      Good morning.

11:24:32 9    Q.      Mr. Henderson, where do you currently work?

11:24:34 10   A.      I work for Domino Foods in Iselin, New Jersey.

11:24:38 11   Q.      What does Domino Foods broadly do?

11:24:41 12   A.      Domino food is a marketing arm of American Sugar

11:24:44 13   Refining.

11:24:45 14   Q.      And if I refer to American Sugar Refining as ASR,

11:24:50 15   will you understand that?

11:24:50 16   A.      Yes.

11:24:51 17   Q.      What is your current position at Domino Foods?

11:24:54 18   A.      I am the vice-president of industrial sales.

11:24:56 19   Q.      How long have you been in that position?

11:24:58 20   A.      Approximately five years.

11:25:01 21   Q.      What does industrial sales refer to?

11:25:04 22   A.      Industrial sales is -- sells to manufacturers, like

11:25:10 23   railcars, bags, totes, liquid, things like that, mainly the

11:25:14 24   manufacturers throughout the country.

11:25:17 25   Q.      And as vice-president of industrial sales, what are

Henderson - direct

11:25:20 1  your responsibilities?

11:25:21 2  A.      I manage a team of eleven in our group throughout the

11:25:27 3  country.   I have three direct reports, and I am basically

11:25:31 4  responsible for anything that has to do with industrial

11:25:33 5  sales whether it's selling, logistics, forecasting, things

11:25:38 6  like that.

11:25:38 7  Q.      Are you familiar with Domino Foods's competitors for

11:25:43 8  refined sugar within the United States?

11:25:44 9  A.      Yes.

11:25:45 10  Q.      Do you have any responsibility with respect to

11:25:47 11  refined sugar prices for Domino foods?

11:25:50 12  A.      I have responsibility for some of the industrial

11:25:53 13  pricing, yes.

11:25:54 14  Q.      Do you have responsibility for approving certain

11:25:56 15  refined sugar prices?

11:25:58 16  A.      Yes.

11:25:59 17  Q.      Mr. Henderson, when setting Domino Food's prices, do

11:26:05 18  you consider feedback from customers?

11:26:07 19  A.      Very much so.

11:26:08 20  Q.      Do customers tell you about how your prices compare

11:26:11 21  to your competitor's prices?

11:26:12 22  A.      I would say in most cases, yes.

11:26:13 23  Q.      Mr. Henderson, in what ways can you use prices to

11:26:20 24  send a signal to competitors?

11:26:22 25  A.      We really don't use pricing to send a signal to

Henderson - direct

11:26:27 1    competitors.  We will give a quote to a customer, what they

11:26:31 2    do with that quote, a lot of them probably do what they do

11:26:34 3    with us, is pass it on to their supplier, and the customer

11:26:38 4    is signaling to us that you're not competitive or you're to

11:26:43 5    high in your price.

11:26:44 6    Q.    Let's look at a document where signaling is

11:26:48 7    discussed.  Please turn to tab PTX 055 in your white binder.

11:27:03 8    A.    055?

11:27:04 9    Q.    Correct.

11:27:11 10   A.    I have it, yes.

11:27:12 11   Q.    Mr. Henderson, is this an e-mail chain you sent and

11:27:15 12   received in June 2020?

11:27:18 13   A.    Correct.

11:27:19 14          MR. GEIGER:  Your Honor, I move for admission of

11:27:21 15   PTX 055.

11:27:23 16          MR. YATES:  No objection, Your Honor.

11:27:24 17          THE COURT:  All right.  Thank you.

11:27:25 18          (PTX Exhibit No. 055 was admitted into

11:27:26 19   evidence.)

11:27:26 20   BY MR. GEIGER:

11:27:27 21   Q.    Mr. Henderson, parts of this document have been

11:27:28 22   redacted so, please don't identify the potential customer

11:27:32 23   discussed here.  But without doing that, what broadly is the

11:27:34 24   topic of this e-mail?

11:27:37 25   A.    It looks like a customer of ours requesting a quote.

11:27:41 1    Q.      The third e-mail down is from Mr. Whittaker to you,

11:27:46 2    is that right?

11:27:47 3    A.      Yes.

11:27:47 4    Q.      Does Mr. Whittaker report to you?

11:27:49 5    A.      Yes, he does.

11:27:50 6    Q.      Do you see that Mr. Whittaker wrote, "Rob is

11:27:53 7    suggesting at," and then a price?

11:27:58 8    A.      I do.

11:27:59 9    Q.      Let's look at your response higher up the page.  You

11:28:04 10   responded and you wrote, "I would love to get aggressive

11:28:07 11   here, but Rob S does not want to lower the bar."

11:28:10 12           Do you see that?

11:28:10 13   A.      Yes.

11:28:11 14   Q.      Who was Rob S?

11:28:13 15   A.      That would be Rob Sproull.

11:28:15 16   Q.      Do you know that he testified before you today?

11:28:18 17   A.      That was my understanding.

11:28:21 18   Q.      In your e-mail you continued, "we would like to avoid

11:28:25 19   sending a signal out to competitors that we are chasing

11:28:28 20   business and lowering pricing off the standard $41 bulk

11:28:32 21   basis."

11:28:33 22           Do you see that?

11:28:34 23   A.      Yes.

11:28:35 24   Q.      What competitors were you referring to when you

11:28:38 25   wrote, we would like to avoid sending a signal out to

Henderson - direct

11:28:41 1    competitors?

11:28:42 2    A.      In this particular incident with this customer, we

11:28:47 3    really don't sell them, so they have a history of asking us

11:28:51 4    for pricing and it's usually very low pricing.  So our

11:28:55 5    thought process is, we go down and match that price that

11:28:58 6    they're not going to give us the business, they're just

11:29:01 7    going to go back and tell their supplier where our pricing

11:29:04 8    is, so it's really like a customer sending a signal to

11:29:07 9    someone else, I would assume.

11:29:09 10   Q.      Let's look at the second page.  There is a table on

11:29:12 11   the second page, Mr. Henderson?

11:29:14 12   A.      Yes.

11:29:15 13   Q.      Which competitors are listed in this table?

11:29:18 14   A.      That is Imperial and United.

11:29:21 15   Q.      Are these the competitors you were referencing in

11:29:24 16   your e-mail on two first page?

11:29:25 17   A.      That's what we're assuming in this particular case,

11:29:28 18   whether the customer told Rob Weston that or not, it's

11:29:35 19   possibly.

11:29:35 20   Q.      Sir, let's talk about some other ways information

11:29:38 21   flows to and from competitors.  Do you know a Richard

11:29:41 22   Wistisen?

11:29:42 23   A.      I know Richard Wistisen from his magazine, yes.

11:29:46 24   Q.      Who is he?

11:29:47 25   A.      He is an analyst that's involved with commodity

11:29:51 1  specialist, commodity information is the publication he puts

11:29:54 2  out.

11:29:54 3  Q.      How do you know him?

11:29:56 4  A.      When I first started in this position, our

11:29:59 5  vice-president that was in the position said that he would

11:30:02 6  get an e-mail approximately once a month from Mr. Wistisen

11:30:05 7  about general market information and he would just, our

11:30:09 8  ex-vice-president would supply him with our general pricing

11:30:12 9  and basically, you know, general coverage throughout the

11:30:15 10 country.

11:30:16 11 Q.      Do you communicate with Mr. Wistisen?

11:30:18 12 A.      I communicate by e-mail with Mr. Wistisen about once

11:30:21 13 a month.

11:30:22 14 Q.      Is he a Domino Foods customer?

11:30:26 15 A.      No, he's not.

11:30:27 16 Q.      Is he a Domino Foods broker?

11:30:30 17 A.      No.

11:30:30 18 Q.      Do you communicate with Mr. Wistisen by any way

11:30:34 19 besides e-mail?

11:30:35 20 A.      Just e-mail.

11:30:36 21 Q.      Who, if anyone, at Domino is aware that you

11:30:39 22 communicate with Mr. Wistisen?

11:30:41 23 A.      I would say that most of the people involved with

11:30:45 24 industrial sales, you know, there is four or five analyst

11:30:49 25 publications out there that we communicate and it's just the

11:30:52 1  general information, you know, their publication comes out

11:30:57 2  and I would say so myself, Adam, some other folks in

11:31:01 3  industrial sales, Mr. Sproull.

11:31:03 4  Q.     Is Mr. Sproull aware that you communicate with

11:31:06 5  Mr. Wistisen?

11:31:06 6  A.     Yes.

11:31:08 7  Q.     What is your understanding as to how Mr. Wistisen

11:31:11 8  gets the information that he puts into his report?

11:31:14 9  A.     I think he does a general survey of the industry,

11:31:19 10  including suppliers, brokers, customers, trade people, raw

11:31:24 11  sugar people, maybe even weather people, analyst, he does a

11:31:31 12  lot of crop reports things like that.

11:31:33 13  Q.     By suppliers are you referring to your competitors?

11:31:36 14  A.     I would assume so, I think most people in the

11:31:39 15  industry supply that information.

11:31:41 16  Q.     Have you ever provided Mr. Wistisen with Domino's

11:31:45 17  prices for refined sugar?

11:31:47 18  A.     I provided him with our general price guideline, yes.

11:31:50 19  Q.     Are those spot prices?

11:31:52 20  A.     They could be two things, sometimes these analysts

11:31:55 21  ask for spot pricing which is the current pricing today,

11:31:58 22  sometimes they ask for a price say in calendar '23, so that

11:32:02 23  price in calendar '23 is based off of 16 boards that can

11:32:04 24  change on a daily basis.

11:32:05 25  Q.     And that example price for '23, is that a forward

Henderson - direct

price?

A.      We kind of refer to it as a contract price or a request for quote, so the customer say today was asking for pricing for June of '23, we could provide a quote based off of 16, but everything is subject to confirmation because it changes daily.

Q.      So you would provide a contract price and a spot price to Mr. Wistisen, is that correct?

A.      Well, I would call it general price guidelines, right.  The period say being today, being spot, a period next year is just 16 pricing and just where our what our general guidelines are.

Q.      Do you consider United to be a competitor?

A.      Yes.

Q.      How honest do you believe United is with the information they provide Mr. Wistisen?

A.      You know, I'm skeptical on a lot of reports I receive from the trade analysts, brokers, sometimes even customers. Most of our customers are repetitive customers so there are very good relationships, so we put a lot more merit in customer feedback than we do in the analysts.

Q.      Mr. Henderson, my question is how honest do you believe United is with the information they provide Mr. Wistisen?

A.      I couldn't answer that.  I have no idea.

Henderson - direct

11:33:31 1   Q.      Let's look at another document.  Please turn to PTX

11:33:35 2   048 in your binder.  Are you there?

11:33:46 3   A.      I want to make sure it's 048.

11:33:48 4   Q.      048.

11:33:52 5   A.      Yes.

11:33:53 6   Q.      Is this an e-mail chain you sent and received in

11:33:57 7   February 2021?

11:33:59 8   A.      Sorry, I was -- yes, 048 is, yes.

11:34:06 9           MR. GEIGER:  Your Honor, I move for admission of

11:34:07 10  PTX 048.

11:34:09 11          MR. YATES:  No objection, Your Honor.

11:34:10 12          THE COURT:  Thank you.  It's admitted.

11:34:12 13          (PTX Exhibit No. 048 was admitted into

11:34:13 14  evidence.)

11:34:13 15  BY MR. GEIGER:

11:34:14 16  Q.      At the bottom of the first page, Mr. Wistisen wrote

11:34:17 17  you an e-mail.  Do you see that?

11:34:27 18  A.      Yes, February 17th.

11:34:29 19  Q.      And you forwarded Mr. Wistisen's e-mail to Adam

11:34:35 20  Whittaker?

11:34:42 21  A.      Yes.

11:34:42 22  Q.      When you wrote, "United is usually pretty upfront

11:34:48 23  with Rich."

11:34:49 24          What did you mean by upfront?

11:34:51 25  A.      Well, I think all the suppliers want to give somewhat

Henderson - direct

11:34:55 1    accurate information to these publications because they're

11:34:58 2    used for the whole trade and even the USDA references them,

11:35:02 3    so I would think they would have to be somewhat accurate.

11:35:05 4    Q.    Let's take a closer look at the e-mail Mr. Wistisen

11:35:10 5    sent to you on the second page.  And you see that

11:35:13 6    Mr. Wistisen wrote in part, "long conversation with United.

11:35:18 7    Won't set FY 22 price list until March, but the plan remains

11:35:22 8    to hold steady at 36.50 and 38.50 based on demand,

11:35:27 9    inventories, number 16."

11:35:29 10           Do you see that?

11:35:30 11   A.    I do.

11:35:30 12   Q.    Now, when Mr. Wistisen wrote to you, the plan remains

11:35:35 13   to hold steady at 36.50 and 38.50, whose plans do you

11:35:42 14   understand that to refer?

11:35:44 15   A.    I didn't give a lot of thought but looking at it I

11:35:48 16   would assume he is speaking about United.

11:35:51 17   Q.    Let's look at another communication with

11:35:55 18   Mr. Wistisen.  Please turn to Tab 064 in your binder.

11:36:03 19   A.    Yes, I have it.

11:36:06 20   Q.    Sir, is this an e-mail chain between you and

11:36:08 21   Mr. Wistisen in June and July of 2021?

11:36:12 22   A.    Yes, it is.

11:36:12 23           MR. GEIGER:  Your Honor, I move for admission of

11:36:14 24   PTX 064.

11:36:17 25           MR. YATES:  No objection, Your Honor.

Henderson - direct

11:36:19 1          THE COURT:  Thank you.  It's admitted.

11:36:20 2          (PTX Exhibit No. 064 was admitted into

11:36:21 3   evidence.)

11:36:21 4   BY MR. GEIGER:

11:36:22 5   Q.     Let's go to the fifth page ending 241 in the bottom

11:36:27 6   corner.  At the bottom of this page is an e-mail from

11:36:30 7   Mr. Wistisen to you dated June 17th.  Do you see that?

11:36:34 8   A.     Yes.

11:36:36 9   Q.     Turn to the next page toward the bottom, Mr. Wistisen

11:36:40 10  wrote, "what are you seeing on the price and demand side of

11:36:44 11  things?"

11:36:45 12          Do you see that?

11:36:46 13  A.     Yes, I do.

11:36:48 14  Q.     For what product do you understand Mr. Wistisen is

11:36:50 15  asking you about price and demand?

11:36:52 16  A.     I think he's asking about a general pricing, or price

11:36:54 17  guidelines that we have, and just basically how the market

11:36:58 18  is out there.

11:37:00 19  Q.     For refined sugar, correct?

11:37:02 20  A.     Yes.

11:37:02 21  Q.     Mr. Wistisen then wrote, "I'm just getting going on

11:37:02 22  pricing but have heard a bit NSM 35-36 net RRV, 37 net west,

11:37:18 23  claiming to be close to sold out at Brawley, 70 percent

11:37:22 24  Renville, but only 40 percent booked amalgamated."

11:37:27 25          Do you see that?

Henderson - direct

11:37:27 1   A.      Yes, I do?

11:37:28 2   Q.      What do you understand RRV to mean?

11:37:30 3   A.      Red River Valley.

11:37:32 4   Q.      What do you understand the phrase sold out to mean?

11:37:35 5   A.      Sold out is an interesting term for beets because

11:37:38 6   it's really based on the crop size, so they have a limited

11:37:42 7   amount of crop, so when their crop is done, they can't

11:37:47 8   import beet sugar, so that's basically their crop is their

11:37:51 9   process.  And that report comes out in numerous

11:37:56 10  publications.

11:37:56 11  Q.      Do you understand that Mr. Wistisen is telling you

11:37:58 12  that NSM is sold out of beets at their Brawley facility, is

11:38:05 13  that right?

11:38:05 14  A.      I think he wrote they're claiming to be.

11:38:10 15  Q.      Mr. Wistisen then wrote, "United reportedly, I'll

11:38:14 16  talk with them tomorrow, holding 36.50 gross."

11:38:19 17          Do you see that?

11:38:19 18  A.      Yes.

11:38:20 19  Q.      What do you understand the phrase 36.50 gross to

11:38:24 20  refer to?

11:38:24 21  A.      That's general pricing I guess that they put out as

11:38:29 22  their price guidance to various people and publications and

11:38:34 23  Milling and Baking, things like that.

11:38:34 24  Q.      For United?

11:38:36 25  A.      I think most processors and refiners do that, yes.

Henderson - direct

11:38:42 1   Q.      Is this price here a reference for United?

11:38:47 2   A.      Yes, Rich noted that, yes.

11:38:50 3   Q.      What do you understand the phrase, "I'll talk with

11:38:53 4   them tomorrow" to mean?

11:38:56 5   A.      You know, I never asked or cared how Rich

11:39:00 6   communicated with the trade or brokers and suppliers.  I

11:39:04 7   know I just did it by e-mail.  To me that was very

11:39:07 8   transparent.

11:39:08 9   Q.      You understood that Mr. Wistisen intended to talk

11:39:11 10  with United the following day, is that right?

11:39:13 11  A.      Yeah, I think he talks to almost everybody in the

11:39:16 12  trade.

11:39:16 13  Q.      Mr. Wistisen then wrote, "and that southeast has

11:39:21 14  slipped below $38."

11:39:24 15           Do you see that?

11:39:24 16  A.      Yes.

11:39:25 17  Q.      What do you understand the southeast to mean here?

11:39:27 18  A.      Southeast in these publications usually refers to

11:39:31 19  Florida.

11:39:34 20  Q.      Let's go back to the forth page, and in 241.  In the

11:39:40 21  middle of that page you wrote back to Mr. Wistisen on

11:39:42 22  June 18th, is that correct?

11:39:42 23  A.      Correct.

11:39:42 24  Q.      You wrote "October to December 21st, East/West Coast,

11:39:52 25  $44 gross, FOB bulk basis, Gulf $42 gross FOB bulk basis."

Henderson - direct

11:40:00 1                    Do you see that?

11:40:00 2    A.      I do.

11:40:00 3    Q.      Are those Domino general list pricing numbers?

11:40:05 4    A.      Yes.

11:40:05 5    Q.      For refined sugar?

11:40:06 6    A.      Yes, sir.

11:40:08 7    Q.      And with respect to contract prices, Mr. Henderson,

11:40:10 8    is a Domino customer able to take a spot price and convert

11:40:14 9    it to a contract price?

11:40:16 10   A.      It really depends on the period, so a spot price is

11:40:19 11   basically that week, it could be converted to thirty-day

11:40:23 12   contract because it's usually the same trading period.  So

11:40:27 13   if you're in a July period, you're trading against the July

11:40:31 14   futures, so it's the same number for that month.  In most

11:40:35 15   cases, when you go out a different quarter it's different

11:40:39 16   pricing because of the 16 market.

11:40:41 17   Q.      Mr. Henderson, a customer can take a spot price and

11:40:46 18   turn it into a contract price, correct?

11:40:47 19   A.      Yes, but not necessarily at the same price.

11:40:50 20   Q.      Sometimes at the same price?

11:40:52 21   A.      Depending on the period and the product.  There is

11:40:55 22   many variables that go into that decision.

11:40:58 23   Q.      Sir, did you ever ask Mr. Wistisen what he would do

11:41:02 24   with the information you provided?

11:41:05 25   A.      No, I just assumed when I took over the position that

501

Henderson - direct

11:41:07 1    he for the thirty past years before this one, if there was

11:41:10 2    ever information, they were supplying the information out to

11:41:13 3    the trade, he would gather his monthly information and put

11:41:16 4    it together in a report.

11:41:17 5    Q.     Did you ever tell Mr. Wistisen that he should not

11:41:20 6    share Domino Foods' pricing information with your

11:41:23 7    competitors?

11:41:24 8    A.     Everything I told him was for public knowledge to put

11:41:27 9    in his publication.  Now who he shared that with, that was

11:41:31 10   his prerogative, but for me, I never told him not to share,

11:41:35 11   not to put anything in his report that I told him.

11:41:38 12   Q.     You're aware that he shared your information with

11:41:41 13   competitors, correct?

11:41:42 14   A.     I have never seen it myself.  I am assuming that, you

11:41:47 15   know, he surveys the market and talks about the market in

11:41:50 16   general and then he informs everyone in the trade through

11:41:53 17   his report, usually out the next day.

11:41:59 18   Q.     He has a monthly report, sir?

11:42:01 19   A.     Yes.

11:42:01 20   Q.     You communicate with him more than once a month,

11:42:05 21   don't you?

11:42:05 22   A.     I would say in most cases, maybe ten months out of

11:42:09 23   the year it's once a month.  Sometimes there are certain

11:42:12 24   incidents that happen in the industry and weather, things

11:42:15 25   like that.

Henderson - direct

11:42:16 1   Q.      Do you provide accurate prices to Mr. Wistisen?

11:42:20 2   A.      I would call them price guidelines.  Every bid we

11:42:24 3   look at, every contract we do has unique circumstances and

11:42:29 4   different pricing.

11:42:30 5   Q.      Those are prices, are they not, sir?

11:42:34 6   A.      Those are general price guidelines, yes.

11:42:39 7   Q.      Let's go to the middle of page 240, the third page.

11:42:46 8   A.      Yes.

11:42:47 9   Q.      And middle, Mr. Wistisen asked you where would you

11:42:50 10  put forward pricing and coverage.  Do you see that?

11:42:54 11  A.      I do.

11:42:56 12  Q.      Let's go to the third page ending in 239 where you

11:42:59 13  responded to Mr. Wistisen on July 12th.  Do you see that?

11:43:03 14  A.      Yes.

11:43:04 15  Q.      And you wrote in the third paragraph, "For fiscal

11:43:09 16  year '22, close to 65 percent booked and moving prices up."

11:43:13 17          Do you see that?

11:43:14 18  A.      I do.

11:43:14 19  Q.      What does close to 65 percent booked refer to?

11:43:18 20  A.      When we do our forecasting we come up with a number

11:43:22 21  for the year, so it's really 65 is basically our estimated

11:43:22 22  forecast for industrial sales.

11:43:23 23  Q.      That is your sold position, isn't it?

11:43:31 24  A.      That is our sold position against our forecasts, yes.

11:43:35 25  Q.      Let's go to the first page.  At the bottom

Henderson - direct

11:43:39 1    Mr. Wistisen wrote to you on July 16th.  Do you see that?

11:43:43 2    A.      Yes.

11:43:43 3    Q.      And he wrote, "I don't understand it, but this is the

11:43:46 4    word from United, 80 to 85 percent sold, will be over 90

11:43:51 5    very soon."  Do you see that?

11:43:53 6    A.      I do.

11:43:54 7    Q.      That is United's sold position, isn't it?

11:43:58 8    A.      I would assume that's what he was referring to.

11:44:01 9    Q.      And then he asked you, any changes in ASR forward

11:44:07 10   prices.  Right?

11:44:08 11   A.      Yes.

11:44:08 12   Q.      So the first page, and you responded to Mr. Wistisen,

11:44:17 13   and you said we are now 40.50 Gulf, 43 FOB East and West

11:44:24 14   Coast.  Do you see that?

11:44:25 15   A.      I do.

11:44:25 16   Q.      Those are ASR forward prices, correct?

11:44:27 17   A.      Yes.

11:44:28 18   Q.      Now moving up one e-mail, Mr. Wistisen then wrote to

11:44:32 19   you on July 16th at 10:37 a.m., do you see that?

11:44:36 20   A.      Yes, sir.

11:44:37 21   Q.      That's the same day as this e-mail at the bottom of

11:44:39 22   the page, correct?

11:44:43 23   A.      Yes, July 16th.

11:44:45 24   Q.      And he wrote to you and said, "the United info I

11:44:50 25   provided was direct from them this morning.  They held a big

Henderson - direct

11:44:54 1   huddle yesterday (sounded like all sales reps/VP were

11:44:59 2   present) and those numbers were the result."

11:45:01 3            Do you see that?

11:45:02 4   A.     Yes, sir.

11:45:03 5   Q.     Now, you understand that the information that

11:45:05 6   Mr. Wistisen provided to you came directly from United that

11:45:11 7   morning, correct?

11:45:12 8   A.     What he wrote is it seemed like he spoke to them.  I

11:45:16 9   have no idea of what manner of communication he spoke to

11:45:19 10  them.

11:45:19 11  Q.     But you understand that the information he provided

11:45:22 12  came directly from United that morning, correct?

11:45:27 13  A.     Yes, reading that, I would say yes.

11:45:28 14  Q.     Mr. Henderson, would you call United to ask them

11:45:31 15  their pricing information?

11:45:32 16  A.     No, I would not.

11:45:33 17  Q.     Would you call United to ask them their sold

11:45:36 18  position?

11:45:36 19  A.     No, sir.

11:45:37 20  Q.     Why not?

11:45:37 21  A.     Because we've always been trained in your company not

11:45:41 22  to speak to competitors, not to have even a simple

11:45:45 23  discussion.

11:45:46 24  Q.     But you received United pricing information through

11:45:50 25  Mr. Wistisen, didn't you?

Henderson - direct

A.      I receive pricing information from many, many sources
all day long, all month long, did I receive that from Rich,
I take that just as another bit of information, whether it's
accurate or not, I have no idea.

Q.      You believe that United is upfront with Mr. Wistisen,
don't you?

A.      I think they're upfront as far as like their general
pricing, like we do, this is information that's gathered by
many sources including the United States Department of
Agriculture, so we want to be somewhat accurate, yes.

Q.      Let's take a step back, Mr. Henderson.  You have
communicated with Mr. Wistisen on other occasions than what
is in Exhibit 64 that we just looked at, correct?

A.      Yes.

Q.      And on those other occasions, you have provided
Domino's pricing for refined sugar, correct?

A.      I'm sorry, repeat the question.

Q.      You have provided Domino's pricing for refined sugar
on other occasions?

A.      Our current pricing guidelines.

Q.      And you have also provided Domino Foods' forward
pricing for refined sugar, correct?

A.      What we would assume to be a different trade period,
yes.

Q.      And you have provided Domino Foods' sold position of

Henderson - direct

11:46:56  1   refined sugar to Mr. Wistisen, correct?

11:46:59  2   A.      Yes, our general number.

11:47:01  3   Q.      You also received your competitor pricing for refined

11:47:04  4   sugar from Mr. Wistisen, correct?

11:47:06  5   A.      Yes, either through him or through his publication at

11:47:09  6   the same time.

11:47:09  7   Q.      And their booked position of refined sugar, correct?

11:47:12  8   A.      I think what Mr. Wistisen does, he takes everybody's

11:47:16  9   general position of bookings and he puts it in his report

11:47:19 10   about where capacity is in the United States.

11:47:22 11   Q.      Let's explore these other communications for a few

11:47:25 12   minutes.  Please turn to tab PTX 051 in your binder.  Is

11:47:38 13   this an e-mail chain between you and Mr. Wistisen in

11:47:42 14   September 2020?

11:47:42 15   A.      Yes.

11:47:43 16           MR. GEIGER:  Your Honor, I move for admission of

11:47:44 17   PTX 051.

11:47:46 18           MR. YATES:  No objection, Your Honor.

11:47:47 19           THE COURT:  All right.  Thank you.  It's

11:47:48 20   admitted.

11:47:49 21           (PTX Exhibit No. 051 was admitted into

11:47:50 22   evidence.)

11:47:50 23   BY MR. GEIGER:

11:47:50 24   Q.      Let's go to the third page.  Mr. Wistisen e-mailed

11:47:54 25   you there, do you see that?

11:47:55  1    A.      That's page 150, sir.

11:48:01  2    Q.      Yes.

11:48:02  3    A.      Yes.

11:48:02  4    Q.      At the very bottom he asked you where would you put

11:48:06  5    ASR prices in FY 21 or 2021 coverage.  Do you see that?

11:48:11  6    A.      I do.

11:48:11  7    Q.      Go back to the middle of the second page.  And there

11:48:16  8    you provided Mr. Wistisen with Domino Foods' prices,

11:48:21  9    correct?

11:48:22 10    A.      Those are our general price guidelines, yes.

11:48:25 11    Q.      You also wrote higher levels for the

11:48:30 12    October/December 20 period as most cane and beet companies

11:48:32 13    are well sold and/or filling past force majeure volume.  Do

11:48:37 14    you see that?

11:48:37 15    A.      Yes.

11:48:38 16    Q.      Higher levels means higher prices, correct?

11:48:43 17    A.      I would assume so.  I mean, it could also refer to

11:48:47 18    number 16 values, but that could also tie into higher

11:48:54 19    refined prices.

11:48:55 20    Q.      There are higher prices because the sugar refiners

11:48:58 21    were quote "well sold", correct?

11:49:02 22    A.      Well, what happened in 2020 there was a terrible

11:49:04 23    weather incident and United Sugar and Western declared force

11:49:09 24    majeure.  They didn't have any crop left because of the

11:49:12 25    weather.

Henderson - direct

11:49:12 1    Q.      But you also said because they were well sold,

11:49:16 2    correct?

11:49:16 3    A.      I don't know if it was well sold or they ran out of

11:49:19 4    stock.

11:49:20 5    Q.      Let's look at another e-mail.  Please turn to tab PTX

11:49:25 6    049.

11:49:28 7    A.      Yes.

11:49:28 8    Q.      This is an e-mail chain between you and Mr. Wistisen

11:49:32 9    this time in November 2020, correct?

11:49:34 10   A.      Correct.

11:49:35 11           MR. GEIGER:  Your Honor, I move for admission of

11:49:37 12   PTX 049.

11:49:38 13           MR. YATES:  No objection, Your Honor.

11:49:40 14           THE COURT:  Thank you.  It's admitted.

11:49:41 15           (PTX Exhibit No. 049 was admitted into

11:49:42 16   evidence.)

11:49:42 17   BY MR. GEIGER:

11:49:42 18   Q.      Let's look at the bottom of the first page, you wrote

11:49:45 19   to Mr. Wistisen, correct?

11:49:46 20   A.      Yes.

11:49:47 21   Q.      And you wrote for calendar 20 with 21, east/west, $42

11:49:52 22   FOB.  Right?

11:49:55 23   A.      Yes.

11:49:56 24   Q.      And that referred to Domino's price for refined sugar

11:49:59 25   in the following year, correct?

Henderson - direct

11:50:02 1     A.       That is for calendar '21, that is correct.

11:50:05 2     Q.       And you wrote this in 2020?

11:50:07 3     A.       I wrote that in November of 2020, a month-and-a-half

11:50:10 4     away.

11:50:11 5     Q.       Now, in the next page, you also told Mr. Wistisen

11:50:15 6     that Domino's sold position of refined cane sugar was 85 to

11:50:24 7     90 percent, right?

11:50:25 8     A.       I wrote cane coverage so that's an assumption that

11:50:27 9     you made from reading other publications, listening to

11:50:31 10    customers what everything in the cane industry did.

11:50:34 11    Q.       Is it your testimony that is not Dominos Foods' sold

11:50:38 12    position?

11:50:39 13    A.       It's my testimony looking at this that it looks like

11:50:42 14    when I put cane coverage I'm talking about in totality in

11:50:46 15    the industry.

11:50:47 16    Q.       Let's go to tab PTX 059.

11:50:58 17             Sir, here we have another e-mail chain primarily

11:51:01 18    between you and Mr. Wistisen, this time in April/May 2021,

11:51:06 19    is that correct?

11:51:08 20    A.       Correct.

11:51:09 21             MR. GEIGER:  Your Honor, I move for admission of

11:51:11 22    PTX 059.

11:51:13 23             MR. YATES:  No objection, Your Honor.

11:51:13 24             THE COURT:  Thank you.  It's admitted.

11:51:15 25             (PTX Exhibit No. 059 was admitted into

Henderson - direct

11:51:16 1    evidence.)

11:51:16 2    BY MR. GEIGER:

11:51:18 3    Q.    Now, sir, you forwarded this e-mail chain to

11:51:22 4    Mr. Whittaker, Mr. Dahlman, and Mr. Williams at the top.  Do

11:51:36 5    you see that?

11:51:37 6    A.    I'm sorry, I'm looking for that.  What is the date?

11:51:41 7    Q.    059, top of the first page.

11:51:51 8    A.    I'm sorry, what was the tab number, was it 059?

11:51:55 9    Q.    059.

11:51:57 10   A.    Yes.  I got it.  I got it.

11:51:59 11   Q.    And you forwarded this to Mr. Whittaker, Mr. Dahlman

11:52:04 12   and Mr. Williams?

11:52:05 13   A.    Yes, I did.

11:52:05 14   Q.    Now the e-mail you forwarded from Mr. Wistisen

11:52:08 15   included this statement "only about 40 percent covered.  But

11:52:12 16   expect big action over the next month.  20 plus percent add

11:52:16 17   to bookings and at that time, expect to raise prices and not

11:52:20 18   by just a dollar."

11:52:22 19           Correct?

11:52:22 20   A.    Correct.

11:52:24 21   Q.    And you understood that statement to be about United,

11:52:27 22   correct?

11:52:28 23   A.    When you read the paragraph in total, yes, I would

11:52:32 24   assume that it is United.

11:52:35 25   Q.    We have a few more examples, Mr. Henderson, please

Henderson - direct

11:52:38 1    turn to tab PTX 039.

11:52:55 2    A.      I have it.

11:52:55 3    Q.      This is another e-mail chain relating to Mr. Wistisen

11:52:59 4    that you sent and received in March 2021; is that correct?

11:53:03 5    A.      Correct.

11:53:04 6            MR. GEIGER:   Your Honor, I move for admission of

11:53:05 7    PTX 039.

11:53:07 8            MR. YATES:   No objection.

11:53:08 9            THE COURT:   Thank you.   It's admitted.

11:53:09 10           (PTX Exhibit No. 039 was admitted into

11:53:10 11   evidence.)

11:53:10 12   BY MR. GEIGER:

11:53:11 13   Q.      Now, here Mr. Henderson, you forwarded an e-mail from

11:53:14 14   Mr. Wistisen to your boss, Mr. Sproull, is that right?

11:53:18 15   A.      Correct.

11:53:18 16   Q.      You told him this was market intelligence, correct?

11:53:22 17   A.      Yes.

11:53:22 18   Q.      And that market intelligence included information on

11:53:25 19   your competitors inventory of refined sugar, correct?

11:53:38 20   A.      I'm not seeing where it says inventory, but I can

11:53:42 21   look again.

11:53:42 22   Q.      It says NSM and Western have inventory to move?

11:53:47 23   A.      Yes.

11:53:47 24   Q.      And United tight at 36.50?

11:53:51 25   A.      Yes.   I probably sent Rob Sproull various information

Henderson - direct

11:53:58 1   throughout the week from customers, analyst, publications,

11:54:01 2   things like that, just one of many.

11:54:03 3   Q.      You sent him this information which you considered

11:54:07 4   market intelligence from Mr. Wistisen, isn't that right?

11:54:11 5   A.      Yes.

11:54:11 6   Q.      Please turn to Tab 065.  Sir, this is another e-mail

11:54:24 7   chain between you and Mr. Wistisen, this time August 2020,

11:54:28 8   is that right?

11:54:28 9   A.      Correct.

11:54:29 10              MR. GEIGER:  Your Honor, I move for admission of

11:54:30 11  PTX 065.

11:54:32 12              MR. YATES:  No objection, Your Honor.

11:54:33 13              THE COURT:  Thank you.  It's admitted.

11:54:35 14              (PTX Exhibit No. 065 was admitted into

11:54:36 15  evidence.)

11:54:36 16  BY MR. GEIGER:

11:54:36 17  Q.      Let's go to another one, Mr. Henderson, please turn

11:54:40 18  to PTX 043.  Now this is another e-mail chain between you

11:54:46 19  and Mr. Wistisen, this time in September of 2019, is that

11:54:50 20  correct?

11:54:50 21  A.      That is correct.

11:54:51 22              MR. GEIGER:  Your Honor, I move for admission of

11:54:53 23  PTX 043.

11:54:54 24              MR. YATES:  No objection.

11:54:55 25              THE COURT:  All right.  It's admitted.

Henderson - direct

11:54:56  1              (PTX Exhibit No. 043 was admitted into

11:54:59  2  evidence.)

11:54:59  3  BY MR. GEIGER:

11:54:59  4  Q.      Let's do one more.  Please turn to tab PTX 063, sir.

11:55:11  5  A.      I have it.

11:55:12  6  Q.      This is another e-mail chain between you and

11:55:15  7  Mr. Wistisen in June and July 2021, isn't it?

11:55:18  8  A.      That's correct.

11:55:19  9              MR. GEIGER:  Your Honor, I move for admission of

11:55:21 10  PTX 063.

11:55:22 11              MR. YATES:  No objection.

11:55:23 12              THE COURT:  All right.  It's admitted.

11:55:25 13              (PTX Exhibit No. 063 was admitted into

11:55:25 14  evidence.)

11:55:25 15  BY MR. GEIGER:

11:55:27 16  Q.      On the top of the first page you forwarded the e-mail

11:55:30 17  chain to Mr. Whittaker, Mr. Duhlman and Mr. Williams, do you

11:55:35 18  see that?

11:55:35 19  A.      Yes.

11:55:36 20  Q.      You told them FYI below, United had price increase,

11:55:40 21  is that correct?

11:55:40 22  A.      Yes.

11:55:41 23  Q.      And you told them let's see if we can hunt something

11:55:42 24  down, correct?

11:55:45 25  A.      That is correct.

Henderson - direct

11:55:46 1   Q.      Let's talk about Domino Foods pricing for a minute,

11:55:51 2   Mr. Henderson.  Would you please turn to tab PTX 041.

11:56:05 3   A.      041, yes.

11:56:06 4   Q.      Now, Mr. Henderson this document that's marked

11:56:09 5   confidential by ASR so don't tell me any details of the

11:56:13 6   statements made in these e-mails.  Is that okay?

11:56:16 7   A.      Yes, sir.

11:56:17 8   Q.      Is this an e-mail chain that you sent or received in

11:56:21 9   July 2020?

11:56:22 10  A.      Yes.

11:56:23 11  Q.      And this document relates to potential bids for a

11:56:26 12  prospective customer, correct?

11:56:28 13  A.      That is correct.

11:56:29 14          MR. GEIGER:  Your Honor, I move for admission of

11:56:31 15  PTX 041.

11:56:32 16          MR. YATES:  No objection.

11:56:33 17          THE COURT:  Okay.

11:56:34 18          (PTX Exhibit No. 041 was admitted into

11:56:35 19  evidence.)

11:56:35 20  BY MR. GEIGER:

11:56:35 21  Q.      Please turn to tab PTX 053.  Before I do that.

11:56:42 22          MR. GEIGER:  Your Honor, I believe I moved PTX

11:56:50 23  055 into evidence, but I just want to confirm that I made

11:56:52 24  that request.

11:56:54 25          THE COURT:  Say that again.

Henderson - direct

11:56:55 1          MR. GEIGER:  I believe I moved to admit PTX 055

11:56:58 2   into evidence earlier, but I want to confirm that request.

11:57:01 3          THE COURT:  I don't know if you did or not, but

11:57:03 4   assuming you didn't.

11:57:04 5          MR. YATES:  There is no objection.

11:57:05 6          THE COURT:  So if it's not in, it's in, if it

11:57:10 7   wasn't already.

11:57:11 8          MR. GEIGER:  Thank you, Your Honor.  I

11:57:12 9   appreciate that.

11:57:13 10  BY MR. GEIGER:

11:57:14 11  Q.     Let's go to tab PTX 053, Mr. Henderson.  This is an

11:57:18 12  e-mail chain you sent and received in August 2020, is that

11:57:22 13  correct?

11:57:22 14  A.     Yes, sir.

11:57:23 15         MR. GEIGER:  Your Honor, I move for admission of

11:57:25 16  PTX 053.

11:57:27 17         MR. YATES:  No objection to this one either,

11:57:29 18  Your Honor.

11:57:29 19         THE COURT:  All right.  Thank you.

11:57:30 20         (PTX Exhibit No. 053 was admitted into

11:57:31 21  evidence.)

11:57:31 22  BY MR. GEIGER:

11:57:32 23  Q.     Now, Mr. Henderson at the bottom of the first page is

11:57:34 24  an e-mail from Mr. Whittaker to you.  Do you see that?

11:57:38 25  A.     Yes, sir.

Henderson - direct

Q.      And Mr. Whittaker is a director of national accounts?

A.      He is.

Q.      And the third line of this e-mail he wrote to you, Imperial is sold out through December 20.  Correct?

A.      Yes, that's what I have.

Q.      Now, going out to the middle of the page, you responded to Mr. Whittaker's e-mail, correct?

A.      I did.

Q.      And you expressed your belief at the beginning that this was good competitive intelligence, correct?

A.      Yes.

Q.      And the second paragraph you then wrote, "Imperial being sold out gives us justification for a premium in October/December versus calendar year 2021 business." Correct?

A.      I wrote that to Adam, yes.

Q.      Mr. Henderson, you received good competitive intelligence on Imperial, a competitor being sold out of refined sugar and that gave you justification for a premium, correct?

A.      Well, I probably had some of that information already and that information is also put in the Milling and Baking, it's disclosed weekly, we had an idea that may be the case. The premium is really every customer is unique, so there is always somebody there that fills the void, another supplier,

Henderson - cross

11:58:57 1    somebody else coming in, so when you think you may get a

11:59:01 2    premium you probably won't.

11:59:03 3    Q.      Mr. Henderson, you received what you called good

11:59:05 4    competitive intelligence, correct?

11:59:07 5    A.      Yes.

11:59:07 6    Q.      And then you wrote, "Imperial being sold out gives us

11:59:12 7    justification for a premium."  Correct?

11:59:14 8    A.      Yes.

11:59:14 9    Q.      And premium means a higher price, doesn't it?

11:59:17 10   A.      In most cases it could be, and that's just

11:59:21 11   information we're gathering from many sources, whether that

11:59:25 12   was accurate or not, I couldn't tell you.

11:59:28 13             MR. GEIGER:  I have no further questions at this

11:59:29 14   time, Your Honor.

11:59:30 15             THE COURT:  All right.  Thank you.

11:59:33 16             Cross-exam.

11:59:35 17             MR. YATES:  Thank you, Your Honor.

11:59:38 18                  CROSS-EXAMINATION

11:59:38 19   BY MR. YATES:

11:59:39 20   Q.      Good morning, barely, Mr. Henderson.  How are you?

11:59:41 21   A.      Very good.  Thank you.

11:59:42 22   Q.      All right.  Mr. Henderson, let's try to clear a

11:59:47 23   couple of things up for the Court.  First of all, there are

11:59:51 24   a lot of questions about number 16.  What is that, sir?

11:59:55 25   A.      The 16 is the commodity trading position for United

12:00:02 1   States sugar, raw sugar.

12:00:03 2   Q.      So as I understand it, the number 16 is a published

12:00:08 3   market index; is that right?

12:00:10 4   A.      Yes, it is.

12:00:11 5   Q.      Okay.  And people can buy and sell futures in that

12:00:15 6   commodity index, correct?

12:00:17 7   A.      Yes, they do that every day.

12:00:18 8   Q.      And that's something that is important to ASR's

12:00:24 9   business, is that right?

12:00:25 10  A.      Yes.

12:00:25 11  Q.      Why?

12:00:26 12  A.      Because we're a cane refiner, so all our purchases

12:00:31 13  start with the 16 market.

12:00:33 14  Q.      That's because the 16 market is the price for raw

12:00:37 15  sugar if you're buying and selling raw sugar, correct?

12:00:40 16  A.      That is correct.

12:00:41 17  Q.      And raw sugar is a major component part of the

12:00:45 18  ultimate cost of refined sugar for ASR, correct?

12:00:49 19  A.      Yes, it is.

12:00:50 20  Q.      And ASR needs to purchase raw sugar in order to make

12:00:55 21  refined sugar because it doesn't have enough sugar fields;

12:01:02 22  correct?

12:01:03 23  A.      Yeah, all our purchases are based off of 16 in

12:01:06 24  industrial.

12:01:06 25  Q.      ASR buys imported sugar; is that right?

519

Henderson - cross

A.      Yes.

Q.      And that's imported raw sugar, correct?

A.      Correct.

Q.      Is there also something called a number 11 price?

A.      Yes, there is.

Q.      What is that?

A.      That is the -- that's the world market for raw sugar.
So that's traded throughout the globe.

Q.      And take a quick look at what is -- what was marked
by the government and admitted as PTX 048, if you would.

A.      048.  Got it.

Q.      You see in the e-mail in the middle of the page that
says buyers telling Ron they're looking for 34.50.  It's
highlighted on the screen if you want to see it?

A.      Yes, I got it.  Thank you.

Q.      Is it your understanding that Mr. Wistisen speaks
with buyers of refined sugar in addition to suppliers?

A.      Yes, I believe he speaks to many different actors in
the industry.

Q.      Let's take a quick look at one of Mr. Wistisen's
reports.  The government has asked you a lot of questions
about e-mails, but please take a look at PTX 042 in the
government's binder.

A.      Yes, I have it.

Q.      Is PT -- does PTX 042 have Mr. Wistisen's domestic

Henderson - cross

12:02:52 1    sugar report for June 21st of 2021?

12:02:55 2    A.      Yes, it does.

12:02:57 3                MR. YATES:  Your Honor, I move PTX 042 into

12:03:01 4    evidence.

12:03:02 5                MR. GEIGER:  No objection.

12:03:02 6                THE COURT:  All right.  Thank you.  It's

12:03:04 7    admitted.

12:03:05 8                (PTX Exhibit No. 042 was admitted into

12:03:05 9    evidence.)

12:03:05 10   BY MR. YATES:

12:03:06 11   Q.      Do you see that Mr. Wistisen's report has, if you go

12:03:09 12   to I believe it's the fourth page with the Bates number

12:03:12 13   ending in 585, it's got a section on US Sugar production,

12:03:17 14   correct?

12:03:18 15   A.      Yes, sir.

12:03:19 16   Q.      And does the United States Department of Agriculture

12:03:22 17   also publish information on US Sugar production?

12:03:26 18   A.      Yes, they do.

12:03:26 19   Q.      Does the United States Department of Agriculture also

12:03:29 20   publish information in a report called the WASDE on supply

12:03:33 21   and demand?

12:03:33 22   A.      Yes, they do.

12:03:40 23   Q.      If you go two pages further in Mr. Wistisen's report,

12:03:44 24   do you see he has a section on Mexico's supply and demand?

12:03:50 25   A.      Yes.

Henderson - cross

12:03:50 1    Q.      If you go to the next pages he's got a page on US

12:03:55 2    Sugar imports, correct?

12:03:55 3    A.      Correct.

12:03:56 4    Q.      And then he's got some data on the following page and

12:04:00 5    some charts over time, correct?

12:04:01 6    A.      Yes.

12:04:02 7    Q.      And then on the same page, a page ending 590 of this

12:04:08 8    exhibit, he's got information on US Sugar deliveries,

12:04:12 9    correct?

12:04:12 10   A.      Yes, he does.

12:04:14 11   Q.      And then if you go to page 593, you see there is

12:04:19 12   information on sugar prices?

12:04:24 13   A.      Yes, sir.

12:04:25 14   Q.      If you go to the following page, you see that there

12:04:29 15   appear to be the number 16 and the number 11 raw prices over

12:04:35 16   time?

12:04:35 17   A.      Correct.

12:04:44 18   Q.      Please take a quick look at what was marked as PTX

12:04:50 19   053, sir.  And Mr. Geiger read you the portion on good

12:04:59 20   competitive intelligence.  And then immediately following

12:05:05 21   this, you wrote Cargill moving up to $37.75 cent is

12:05:11 22   suspicious and that the Court can see there are two

12:05:14 23   customers, large industrial customers mentioned.  Those

12:05:17 24   customers had noted Cargill being lower.  Do you see that?

12:05:22 25   A.      Yes, sir.

Henderson - cross

12:05:22 1    Q.      In your experience, is it common for industrial

12:05:26 2    customers to provide you with information on competitor

12:05:32 3    pricing?

12:05:33 4    A.      I would say almost happens on a daily basis.

12:05:40 5    Q.      There were some questions about prices in the future.

12:05:47 6    Do you recall that?

12:05:47 7    A.      Yes, sir.

12:05:48 8    Q.      And are those price estimates based upon the number

12:05:53 9    16 market and the price futures from the number 16 market?

12:05:58 10   A.      They are, so we reference those trading periods.

12:06:02 11   Q.      The number 16 price, how often can that change?

12:06:06 12   A.      By minute, I get updates every thirty minutes.

12:06:10 13   Q.      And you get updates every thirty minutes because the

12:06:13 14   number 16 raw price is important to ASR's business, correct?

12:06:23 15   A.      Very important.

12:06:24 16   Q.      Mr. Henderson, let's switch gears and just talk very

12:06:31 17   briefly about a different topic.  You're in the industrial

12:06:36 18   sales channel at ASR; correct?

12:06:39 19   A.      Yes, I am.

12:06:40 20   Q.      Does Domino have other sales channels?

12:06:42 21   A.      We do.

12:06:42 22   Q.      What are they?

12:06:44 23   A.      We have a grocery sales channel, we have a food

12:06:47 24   service sales channel, we have a specialty sales channel and

12:06:51 25   we have an export sales channel.

Henderson - cross

| | | |
|---|---|---|
| 12:06:53 | 1 | Q.      What percentage of Domino's refined sugar sales are |
| 12:06:57 | 2 | made to customers in the industrial sales channel? |
| 12:07:01 | 3 | A.      Industrial is approximately fifty percent. |
| 12:07:04 | 4 | Q.      So the other fifty percent of Domino's sales are to |
| 12:07:08 | 5 | customers in different channels such as food service and |
| 12:07:12 | 6 | grocery, is that right? |
| 12:07:13 | 7 | A.      That is correct. |
| 12:07:14 | 8 | Q.      And within industrial, do sales to distributors such |
| 12:07:19 | 9 | as Indiana Sugar count as industrial sales? |
| 12:07:22 | 10 | A.      Yes, they do. |
| 12:07:23 | 11 | Q.      And what percentage of industrial sales are sales to |
| 12:07:27 | 12 | distributors? |
| 12:07:28 | 13 | A.      It could make up as much as 15 to 25 percent |
| 12:07:33 | 14 | depending on the year. |
| 12:07:34 | 15 | Q.      Now, go -- let's go back and talk about the number 16 |
| 12:07:40 | 16 | price for just a moment.  Do some large customers enter into |
| 12:07:46 | 17 | contacts with ASR based on the number 16 price? |
| 12:07:49 | 18 | A.      Yes, they do. |
| 12:07:50 | 19 | Q.      Are those called toll or FOB contracts? |
| 12:07:56 | 20 | A.      We have two sets of contracts like that's toll |
| 12:07:59 | 21 | contracts where the customer executes the 16 and EO |
| 12:08:02 | 22 | contracts. |
| 12:08:03 | 23 | Q.      Would you explain to the Court how a contract with a |
| 12:08:06 | 24 | large industrial customer that's a toll or EO contract |
| 12:08:12 | 25 | works? |

Henderson - cross

12:08:13 1     A.      These are large industrial customers that we have

12:08:16 2     dealt with historically for many, many years, they have

12:08:19 3     commodity departments usually in their companies where they

12:08:24 4     can monitor not only sugar but all sorts of ingredients,

12:08:28 5     they say to us just please provide a margin or a toll rate

12:08:32 6     and we'll execute our futures when the time comes.  A couple

12:08:37 7     of them get toll rate on the invoice, there is no pricing,

12:08:43 8     and others execute a price in the future when they feel the

12:08:46 9     time is right.

12:08:47 10    Q.      Let's see if we can break that down and make sure I

12:08:50 11    understand it, at least.  As I understand it, these large

12:08:53 12    industrial customers have commodity departments that track

12:08:57 13    the number 16 price; is that right?

12:08:58 14    A.      Correct.

12:08:59 15    Q.      As I understand it, the contract that ASR would enter

12:09:04 16    into with one of these large industrial customers would

12:09:07 17    provide ASR with their refining margin, is that right?

12:09:12 18    A.      Yes, sir.

12:09:13 19    Q.      And that refining margin that's negotiated between

12:09:16 20    ASR and the large industrial customer, correct?

12:09:18 21    A.      Correct.

12:09:18 22    Q.      Okay.  And then the customer can choose at which

12:09:23 23    point they want to cover the number 16 raw sugar contract.

12:09:28 24    Correct?

12:09:29 25    A.      Correct.

Henderson - cross

12:09:30 1   Q.      So the customer can choose the price at which it

12:09:35 2   wants to cover the number 16 raw sugar contract; is that

12:09:39 3   right?

12:09:39 4   A.      Correct.

12:09:40 5   Q.      Okay.  And so the customer in essence has control

12:09:43 6   over the price of the largest input costs into refined

12:09:49 7   sugar, correct?

12:09:49 8   A.      That is correct.

12:10:05 9   Q.      Would you please take a look at DTX 066 in your

12:10:09 10  binder.  It's in the defendants' binder, not in the binder

12:10:16 11  provided by the Department of Justice.  And this document

12:10:24 12  has been marked as confidential so we won't display it on

12:10:27 13  the big screen, but you and the Judge can follow along.

12:10:32 14  Okay?

12:10:32 15  A.      066, correct?

12:10:34 16  Q.      Yes.  Do you have that in front of you, sir.  DTX

12:10:39 17  066.

12:10:39 18  A.      Yes.

12:10:41 19  Q.      Marked as Exhibit 23 to your deposition?

12:10:42 20  A.      Correct.

12:10:45 21  Q.      Okay.  DTX 066 is an e-mail from Adam Whittaker to

12:10:51 22  you on May 4th of last year, 2021; correct?

12:10:52 23  A.      Yes, sir.

12:10:52 24  Q.      And Mr. Whittaker reports to you in the industrial

12:10:56 25  sales channel of ASR; correct?

Henderson - cross

12:11:01 1    A.      He does.

12:11:03 2    Q.      And the title of the e-mail is strategic

12:11:08 3    opportunities fiscal year 2022, correct?

12:11:11 4    A.      Correct.

12:11:13 5            MR. YATES:  Your Honor, I move DTX 066 into

12:11:15 6    evidence.

12:11:15 7            MR. GEIGER:  No objection.

12:11:16 8            THE COURT:  All right.  Thank you.  It's

12:11:19 9    admitted.

12:11:21 10           (DTX Exhibit No. 066 was admitted into

12:11:22 11   evidence.)

12:11:22 12   BY MR. YATES:

12:11:23 13   Q.      Let's take a look at the attachment to this exhibit,

12:11:26 14   sir.  Do you see it's a printout of a spreadsheet?

12:11:28 15   A.      Yes, sir.

12:11:29 16   Q.      Okay.  And does this spreadsheet reflect incremental

12:11:38 17   sales opportunities to industrial customers that

12:11:42 18   Mr. Whittaker had identified for you?

12:11:44 19   A.      Yes, it does.

12:11:45 20   Q.      And that's for fiscal year 2022, correct?

12:11:50 21   A.      That is correct.

12:11:51 22   Q.      Okay.  And just so the Court can follow along, column

12:11:51 23   B, does that list the potential incremental sales

12:12:02 24   opportunities at industrial customers?

12:12:02 25   A.      Column B does that.

Henderson - cross

12:12:07 1    Q.      When we're talking about incremental sales

12:12:10 2    opportunities, these are sales opportunities above and

12:12:13 3    beyond what ASR may have already contracted, correct?

12:12:16 4    A.      That's correct.

12:12:17 5    Q.      Okay.  So column B has the customer, and column C,

12:12:22 6    does that have the shipped to location for the customer,

12:12:26 7    sir?

12:12:26 8    A.      Yes, that's for the customer.

12:12:28 9    Q.      And column G, does that have the -- does that contain

12:12:35 10   who ASR believes the competition is for a particular sale?

12:12:38 11   A.      Yes.

12:12:40 12   Q.      And column N all the way over on the third page, sir,

12:12:46 13   just in the way that Excel's print out, do you see that's a

12:12:51 14   notes column?

12:12:51 15   A.      I do.

12:12:52 16   Q.      I'm sorry, column R.  Do you see that?

12:12:55 17   A.      Column R, yes.

12:12:58 18   Q.      The notes column also sometimes has information on

12:13:02 19   who ASR believed it's competing with for that particular

12:13:02 20   incremental opportunity, correct?

12:13:02 21   A.      Yes.

12:13:02 22   Q.      And just so the Court can follow along, let's take a

12:13:12 23   look at an example.  If you look at I believe it's row --

12:13:20 24   let's take a look at Row 34, sir?

12:13:24 25              MR. GEIGER:  Your Honor, I object to this line

Henderson - cross

12:13:26 1    of questioning as beyond the scope of direct examination.

12:13:31 2                THE COURT:  All right.

12:13:34 3                MR. YATES:  Your Honor, I think it's fairly

12:13:36 4    within the scope of the direct.

12:13:38 5                THE COURT:  You got to repeat the question for

12:13:42 6    me.

12:13:43 7                MR. YATES:  Sure.  My question is relatively

12:13:46 8    simple.  I just wanted to illustrate what the spreadsheet is

12:13:49 9    for Your Honor so Your Honor can see and understand a

12:13:53 10   document that's already been admitted into evidence.

12:13:56 11               THE COURT:  The document has already been

12:13:57 12   admitted into evidence.  I'm going to overrule the

12:14:01 13   objection.

12:14:01 14   BY MR. YATES:

12:14:03 15   Q.    So 34, sir, column 34 -- Row 34?

12:14:07 16   A.    Row 34.

12:14:08 17   Q.    Do you see there is a customer listed in Georgia?

12:14:11 18   A.    Yes, sir.

12:14:12 19   Q.    And then the competitors in column G are Cargill,

12:14:21 20   NSM, that's the sugar marketing cooperative from up in the

12:14:24 21   Red River Valley, sir?

12:14:25 22   A.    That's National Sugar Marketing.

12:14:28 23   Q.    And then United and Imperial, correct?

12:14:30 24   A.    Yes.

12:14:32 25   Q.    And if we were to look at the other potential

Henderson - redirect

12:14:35 1  incremental opportunities it lists who ASR at least at the

12:14:40 2  time believed it was competing against, correct?

12:14:43 3  A.      Correct.

12:14:44 4          MR. YATES:  No further questions, Your Honor.

12:14:46 5  Thank you.

12:14:47 6          THE COURT:  Thank you.

12:14:47 7          Redirect.

12:14:49 8          MR. GEIGER:  Yes, Your Honor.

12:14:49 9          May I proceed?

12:14:52 10         THE COURT:  Yes.  Please.

12:14:52 11                  REDIRECT EXAMINATION

12:14:53 12 BY MR. GEIGER:

12:15:00 13 Q.      Mr. Henderson, just a couple of questions.

12:15:02 14         To your knowledge USDA does not provide supply

12:15:07 15 information for specific processors, does it?

12:15:11 16 A.      I'm not sure, in their sweetener report they have

12:15:16 17 crop conditions by regions, I believe, so I don't know how

12:15:19 18 they identify it.

12:15:20 19 Q.      Those are regions and not specific processors,

12:15:22 20 correct?

12:15:24 21 A.      Yes.

12:15:26 22 Q.      To your knowledge, USDA does not provide prices for

12:15:30 23 its specific processors, does it?

12:15:36 24 A.      No, they put a monthly table out on pricing.

12:15:40 25 Q.      And those pricing figures are aggregated?

Wineinger - direct

12:15:43 1    A.        Yes.

12:15:44 2              MR. GEIGER:   No further questions Your Honor.

12:15:45 3              THE COURT:   Thank you.

12:15:46 4              Thank you, sir.   You are excused.

12:15:48 5              What's next?

12:15:49 6              MR. HANNA:   Your Honor, at this time the United

12:15:52 7    States calls United's CEO Matthew Wineinger to the stand as

12:16:00 8    an adverse.

12:16:01 9              THE COURT:   All right.   Thank you.

12:16:15 10             COURT CLERK:   Please raise your right hand.

12:16:19 11   Please state and spell your full name for the record.

12:17:06 12             THE WITNESS:   Matthew David Wineinger,

12:17:12 13   M-A-T-T-H-E-W, D-A-V-I-D, W-I-N-E-I-N-G-E-R.

12:17:21 14             MATTHEW DAVID WINEINGER, having been duly sworn

12:17:25 15   was examined and testified as follows:

12:17:36 16             MR. HANNA:   May I proceed, Your Honor?

12:17:39 17             THE COURT:   Yes, please.

12:17:41 18                     DIRECT EXAMINATION

12:17:41 19   BY MR. HANNA:

12:17:42 20   Q.    Good afternoon, Mr. Wineinger.   Good to see you.   I

12:17:44 21   handed you a binder for the depositions and documents and

12:17:42 22   I'll refer to you and I'll let you know.

12:17:52 23             Mr. Wineinger, you're the president and CEO of

12:17:56 24   United Sugars?

12:17:57 25   A.    I am.

Wineinger - direct

12:17:57 1   Q.      You have been CEO of United for the past seven years?

12:18:01 2   A.      That's correct.

12:18:01 3   Q.      And you report to the United executive committee that

12:18:05 4   is comprised of the four CEOs of United owners, right?

12:18:10 5   A.      That's correct.

12:18:10 6   Q.      Now, as the United CEO, you're paid a base salary as

12:18:15 7   well as an incentive based bonus, is that correct?

12:18:18 8   A.      That's correct.

12:18:19 9   Q.      There are two components of your bonus, correct?

12:18:21 10  A.      Yes.

12:18:21 11  Q.      And part of your bonus is based on achieving or

12:18:25 12  exceeding the net selling price that is set by the executive

12:18:28 13  committee on a yearly basis, right?

12:18:31 14  A.      Yes.

12:18:31 15  Q.      The higher the net selling price that United can

12:18:34 16  achieve, that's better for your bonus, right?

12:18:36 17  A.      That's correct.

12:18:37 18  Q.      Now, the net selling price component of your bonus is

12:18:42 19  weighted at 75 percent, right?

12:18:42 20  A.      Yes.

12:18:44 21  Q.      So if United gets higher prices, that means the

12:18:48 22  bigger bonus for you, right?

12:18:49 23  A.      Higher net selling prices.

12:18:52 24  Q.      Higher net selling price means bigger bonus for you,

12:18:55 25  right?

Wineinger - direct

12:18:56  1    A.      That's correct.

12:19:10  2    Q.      Now, on a weekly basis, United tells the owners the

12:19:14  3    type of redefined sugar United wants their plant to either

12:19:18  4    load out or produce for United to sell, right?

12:19:22  5    A.      We direct our plants in terms of what form of product

12:19:25  6    to produce, and so you're right in terms of what package

12:19:29  7    form, et cetera.

12:19:30  8    Q.      Do you tell US Sugar how much 50-pound bags to

12:19:33  9    produce for that week?

12:19:35  10   A.      That's correct.

12:19:36  11   Q.      And you do that based on long-term and short-term

12:19:39  12   needs that United sees, right?

12:19:41  13   A.      That's correct.

12:19:42  14   Q.      And United member has no ability to override that

12:19:47  15   directive, right?

12:19:48  16   A.      They try to achieve what we ask them to do, but they

12:19:53  17   will have breakdowns from time to time.

12:19:54  18   Q.      But generally speaking, US Sugar couldn't say

12:19:59  19   Mr. Wineinger, I really like to make smaller retail products

12:20:02  20   this week, right?

12:20:02  21   A.      Ask the question again.

12:20:02  22   Q.      One of United members like US Sugar couldn't say I

12:20:02  23   prefer to make retail size packages because it makes more

12:20:12  24   money for me, right?

12:20:12  25   A.      They have lines that they try to maximize every day

Wineinger - direct

12:20:19 1    and they run those lines every day of the week.

12:20:21 2    Q.    But what United tells them how many 50-pound bags or

12:20:25 3    what to produce on a weekly basis, they can't override that

12:20:30 4    unless one of the systems is broken down, right?

12:20:32 5    A.    They try to achieve what we put out in a plan, yes.

12:20:35 6    Q.    If improvements are needed for any of the asset at

12:20:39 7    one of the United owner plants with respect to packaging or

12:20:43 8    transportation, anything outside bulk sugar production,

12:20:48 9    that's on a capital plan approved by United right?

12:20:51 10   A.    United as well as the member who will be making the

12:20:54 11   investment.

12:20:55 12   Q.    Could you please turn to PTX 330 in your notebook,

12:20:59 13   sir.  PTX 330 is a United PowerPoint presentation prepared

12:21:12 14   for the purpose of a potential acquisition of Imperial,

12:21:16 15   right?

12:21:16 16   A.    That's correct.

12:21:18 17            MR. HANNA:  Your Honor, at this time the United

12:21:21 18   States moves to admit PTX 330 into evidence.

12:21:21 19            MR. BUTERMAN:  No objection.

12:21:22 20            THE COURT:  It's admitted.

12:21:22 21            (PTX Exhibit No. 330 was admitted into

12:21:24 22   evidence.)

12:21:24 23   BY MR. HANNA:

12:21:25 24   Q.    Now, now Seine referenced in this document is a

12:21:31 25   reference to Imperial?

Wineinger - direct

12:21:32 1    A.      That's right.

12:21:32 2    Q.      This is dated February 2020, right?

12:21:36 3    A.      Yes.

12:21:36 4    Q.      At this point US Sugar was pursuing an acquisition of

12:21:40 5    Imperial, right?

12:21:40 6    A.      Yes.

12:21:41 7    Q.      A few months prior to this, United had stop pursuing

12:21:45 8    its own acquisition of Imperial, right?

12:21:47 9    A.      That's right.

12:21:48 10   Q.      This is a presentation United gave its owner, US

12:21:52 11   Sugar, on the sugar market in the U.S., right?

12:21:55 12   A.      That's right.

12:21:55 13   Q.      If you could turn to page 5.  PTX 330.  Do you see at

12:22:02 14   the top it says Supply Industry Structure Processors?

12:22:06 15   A.      Yes.

12:22:06 16   Q.      Now, the refining step in the supply chain on this

12:22:11 17   slide identifies the companies that were supplying sugar

12:22:14 18   from either sugar beets or raw sugarcane, right?

12:22:17 19   A.      That's correct.

12:22:18 20   Q.      All right.  Now if we move to the left on this supply

12:22:21 21   chain slide, the marketers of the companies out in the

12:22:24 22   market selling the sugar, produced by the cane refiners or

12:22:28 23   the beet sugar processors, right?

12:22:30 24   A.      That's a portion of the industry's marketers.

12:22:32 25   Q.      Now, if we move to the left down the supply chain we

Wineinger - direct

12:22:38 1    get to the sugar buyers/channel, do you see that?

12:22:42 2    A.      I do.

12:22:43 3    Q.      Now the sugar buyer/channel step includes food

12:22:47 4    processors, retail and distributors, right?

12:22:50 5    A.      Correct.

12:22:51 6    Q.      Now, the food processors, retail and distributors are

12:22:54 7    the direct customers that marketers are like United used as

12:22:58 8    an outlet to sell sugar, right?

12:23:00 9    A.      That's correct.

12:23:01 10   Q.      If you could turn to the next page, sir, please.  You

12:23:07 11   see all the way at the bottom of this, do you see it says

12:23:11 12   distributors are assigned a market share of zero percent of

12:23:14 13   the supply.  Do you see that?

12:23:16 14   A.      I do.

12:23:16 15   Q.      That's what you have told US Sugar, right?

12:23:19 16   A.      That's what the slide says.

12:23:22 17   Q.      You can put that aside.

12:23:24 18           Now earlier you mentioned we talked a little bit

12:23:28 19   about, you mentioned United pursues its own acquisition of

12:23:32 20   Imperial, right?

12:23:33 21   A.      That's correct.

12:23:34 22   Q.      In late 2018 you learned that Louis Dreyfus, the

12:23:37 23   owner of Imperial, was looking at a possible joint venture,

12:23:40 24   right?

12:23:40 25   A.      Roughly about that time, yes.

536

Wineinger - direct

12:23:42 1    Q.       You learned in late 2018 that rumor?

12:23:45 2    A.       Yes.

12:23:45 3    Q.       And then you contacted Imperial's CEO Mike Gorrell if

12:23:51 4    they could consider a strategic buyer, correct?

12:23:53 5    A.       That is correct.

12:23:54 6    Q.       This was a potential acquisition of Imperial by

12:23:57 7    United itself, right?

12:23:58 8    A.       At that point in time, that's correct.

12:24:00 9    Q.       And so then in February of 2019, United signed a

12:24:04 10   nondisclosure agreement with Imperial for the purpose of a

12:24:06 11   potential acquisition of Imperial?

12:24:08 12   A.       That's correct.

12:24:09 13   Q.       And then in the summer of 2019, United made two

12:24:12 14   separate offers to acquire Imperial, right?

12:24:16 15   A.       Yes.

12:24:16 16   Q.       And both of those offers from United to acquire

12:24:19 17   Imperial were rejected by Louis Dreyfus, right?

12:24:23 18   A.       Yes.

12:24:23 19   Q.       Louis Dreyfus thought United's offer price was too

12:24:27 20   low, right?

12:24:28 21   A.       That's correct.

12:24:28 22   Q.       If you could please turn to PTX 490 in your notebook,

12:24:32 23   sir.  PTX 490 is a presentation prepared for American

12:24:47 24   Crystal Strategic Planning Meeting in 2019, is that right?

12:24:51 25   A.       It doesn't have the date on it, but I believe that's

Wineinger - direct

12:24:54  1      what it would have been.

12:24:58  2                  MR. HANNA:  Your Honor, United States moves to

12:25:01  3      admit PTX 490 at this time.

12:25:04  4                  MR. BUTERMAN:  No objection, Your Honor.

12:25:05  5                  THE COURT:  It's admitted.

12:25:06  6                  (PTX Exhibit No. 490 was admitted into

12:25:07  7      evidence.)

12:25:07  8      BY MR. HANNA:

12:25:09  9      Q.      Sir, I would like to -- if I could please turn to

12:25:12 10      page 4 of PTX 490 ending in the Bates number 1112.  Do you

12:25:25 11      see this title of the slide is the Power of One, do you see

12:25:28 12      that?

12:25:28 13      A.      I do.

12:25:29 14      Q.      And I notice some notes at the bottom, do you see

12:25:33 15      those notes at the bottom of the statement.  Do you see

12:25:37 16      those?

12:25:37 17      A.      I do see those.

12:25:39 18      Q.      So do you see where it says, "By pooling your sugar

12:25:43 19      with the sugar produced by three other sugar processors, we

12:25:46 20      have a much larger presence in the market."

12:25:50 21                  Do you see that?

12:25:50 22      A.      I do.

12:25:51 23      Q.      And that's what the United document says, right?

12:25:55 24      A.      That's what the notes say, yes.

12:25:57 25      Q.      So by combining this volume to sell, that creates

Wineinger - direct

12:26:00 1  this larger presence for United, right?

12:26:03 2  A.      That's correct.

12:26:04 3  Q.      Combining the production from the four United owners

12:26:08 4  makes this larger presence in the market?

12:26:11 5  A.      That's correct.

12:26:11 6  Q.      And then United calls this the Power of One, right?

12:26:15 7  A.      That's what this slide is communicating, yes.

12:26:18 8  Q.      So United owners are competing as one large presence

12:26:22 9  in the market, right?

12:26:22 10 A.      We market and distribute together, yes.

12:26:26 11 Q.      Competing in the market as one?

12:26:29 12 A.      Yes.

12:26:30 13 Q.      If we could turn to the next page, page 5 ending in

12:26:35 14 Bates number 1113.  Are you there?

12:26:38 15 A.      Yes.

12:26:38 16 Q.      On the screen here, this is a huge map that shows the

12:26:43 17 intensity of delivery of sugar by United to the customer

12:26:46 18 locations on this map, right?

12:26:47 19 A.      That's correct.

12:26:48 20 Q.      And the fiery red color means higher volumes of sales

12:26:55 21 by United delivered to these customers in those locations?

12:26:57 22 A.      Higher volume in those regions, yes.

12:26:59 23 Q.      Now, there is a question in the box on the bottom

12:27:02 24 left-hand side that says, question is why sell here, and

12:27:05 25 then the answer is, most attractive opportunities given our

Wineinger - direct

12:27:09 1    supply and distribution costs relative to competition.

12:27:15 2    That's what it says?

12:27:16 3    A.      It is.

12:27:17 4    Q.      When it says our, that's referring to United, right?

12:27:20 5    A.      That's correct.

12:27:22 6    Q.      You can put that document aside.

12:27:24 7            Please turn to PTX 348 in your notebook.

12:27:31 8            MR. HANNA:  Your Honor, I believe PTX 348 has

12:27:33 9    already been admitted into evidence.

12:27:35 10           THE COURT:  Okay.

12:27:40 11           MR. HANNA:  I ask that we can publish it.

12:27:41 12           THE COURT:  Sure.

12:27:42 13           MR. HANNA:  Thank you, Your Honor.

12:27:43 14   BY MR. HANNA:

12:27:44 15   Q.      Mr. Wineinger, PTX 348 is a summary of possible

12:27:50 16   synergies that United believed would be realized from

12:27:55 17   United's acquisition of Imperial?

12:27:57 18   A.      Possibly, yes.

12:27:59 19   Q.      And this is dated June 10, 2019?

12:28:00 20   A.      That's correct.

12:28:02 21   Q.      This is a presentation that was shared with United's

12:28:05 22   executive committee, right?

12:28:06 23   A.      I believe that to be correct.

12:28:08 24   Q.      And that would include the CEO.  US Sugar, Bob Buker?

12:28:12 25   A.      That's correct.

Wineinger - direct

12:28:13 1   Q.      As of June 10th, 2019, United was still considering a

12:28:17 2   possible acquisition of Imperial, right?

12:28:19 3   A.      Yes.

12:28:20 4   Q.      I think you had recently made at least one of the

12:28:23 5   offers to acquire, right?

12:28:24 6   A.      I think that's right.

12:28:26 7   Q.      Now, can you please turn to page 31 of the

12:28:29 8   presentation.  Do you see page 31 that says product mix

12:28:43 9   upgrade and there is a map with blue dots?

12:28:45 10  A.      I do.

12:28:46 11  Q.      The first bullet point here says 2.5 million

12:28:50 12  hundredweight targeted for Clewiston 50-pound bag expansion.

12:28:55 13  Do you see that?

12:28:55 14  A.      I see that.

12:28:56 15  Q.      And that was -- well, so the 2.5 million

12:29:01 16  hundredweight referenced here on the slide is what a new

12:29:04 17  high speed 50-pound bag packaging line is capable of

12:29:08 18  producing, right?

12:29:09 19  A.      That's my understanding.

12:29:10 20  Q.      And then there is a map of the United States with

12:29:12 21  some blue dots.  Do you see that?

12:29:12 22  A.      I do.

12:29:12 23  Q.      Well, I should say part of the United States,

12:29:12 24  correct?

12:29:12 25  A.      Correct.

541

Wineinger - direct

12:29:20 1    Q.      Now this map shows United's game plan for targeting

12:29:24 2    the expanding sales of 50-pound bags, right?

12:29:27 3    A.      I believe this is actually where 50-pound bags exist.

12:29:31 4    Q.      Opportunities for United, right?

12:29:33 5    A.      For any competitor.

12:29:34 6    Q.      But this is your slide, right?

12:29:36 7    A.      It is.

12:29:37 8    Q.      And the slide, the bullet point says 2.5 million

12:29:44 9    hundredweight targeted for Clewiston 50-pound bag expansion?

12:29:47 10    A.      That's what the slide says.

12:29:49 11    Q.      Clewiston is a refinery owned by US Sugar, right?

12:29:52 12    A.      That's right.

12:29:53 13    Q.      And US Sugar is United's owner, right?

12:30:02 14    A.      Yes.

12:30:03 15    Q.      The blue dots in this map indicate the locations that

12:30:07 16    United would likely target first for the increased 50-pound

12:30:12 17    bag sales if Clewiston expanded its 50-pound bag packaging

12:30:17 18    capacity, right?

12:30:18 19    A.      These are opportunities we would take a look at.

12:30:21 20    Q.      These are opportunities you would first target if you

12:30:23 21    expanded, right?

12:30:25 22    A.      I'm not sure if they were meant to be first targets,

12:30:28 23    I don't know how many pounds that represents, but yes,

12:30:31 24    they're targets.

12:30:34 25    Q.      Now, if we could, Mr. Snow, zoom out again.  Sorry.

Wineinger - direct

12:30:41 1          Mr. Wineinger, at the top of the slide this says

12:30:44 2     3,000,000 one-time capital avoidance or delay, do you see

12:30:48 3     that?

12:30:48 4     A.     I do.

12:30:48 5     Q.     So the Imperial acquisition would enable United or

12:30:53 6     forgo altogether or delay this expansion at Clewiston for

12:30:56 7     the 50-pound bag?

12:31:01 8     A.     That was our assumption.

12:31:03 9     Q.     You can set that document aside.

12:31:06 10          United and its member owners benefit when its

12:31:09 11    competitors don't lower their prices, right?

12:31:11 12    A.     That's correct.

12:31:12 13    Q.     And United sends messages to competitors when United

12:31:17 14    doesn't want prices to go lower, right?

12:31:19 15    A.     We do not.

12:31:20 16    Q.     Please turn to PTX 450 in your notebook?

12:31:25 17    A.     Four what?

12:31:26 18    Q.     450, sir.  PTX 450 is a periodic report that you sent

12:31:39 19    to the United executives, is that right?

12:31:41 20    A.     That's right.

12:31:42 21    Q.     You put the content together for these reports,

12:31:44 22    right?

12:31:45 23    A.     I do.

12:31:45 24          MR. HANNA:  Your Honor, at this time the United

12:31:47 25    States moves to admit PTX 450 into evidence.

12:31:51  1          MR. BUTERMAN:  No objection.

12:31:52  2          THE COURT:  Thank you.  It's admitted.

12:31:53  3          (PTX Exhibit No. 450 was admitted into

12:31:55  4     evidence.)

12:31:55  5     BY MR. HANNA:

12:31:55  6     Q.     Now you testified about this earlier, but United

12:31:57  7     executive committee that is included on this e-mail are the

12:32:00  8     four CEOs of United owners, right?

12:32:03  9     A.     That's correct.

12:32:03 10     Q.     I want to focus on your report to them on the sales

12:32:07 11     the very bottom first page, do you see that?

12:32:08 12     A.     I do.

12:32:09 13     Q.     You see the first sentence you write, that at this

12:32:14 14     point in time United is trying to push prices higher, right?

12:32:17 15     A.     That's right.

12:32:18 16     Q.     And you say United put in an expiration date on the

12:32:22 17     offers, that United had out in front of customers, right?

12:32:26 18     A.     That's correct.

12:32:27 19     Q.     So by putting an expiration date on the offers, you

12:32:30 20     write that United was as you quote here, sending a message

12:32:33 21     to NSM and other competitors that we are not interested in

12:32:38 22     allowing the market to slip lower, right?

12:32:40 23     A.     We were actually trying to book some business by

12:32:44 24     putting that close out sale on.

12:32:45 25     Q.     So it allows you to spur some business, but it also

Wineinger - direct

12:32:49 1   allowed United to send a message to NSM and other

12:32:52 2   competitors that you were not interested in the prices in

12:32:55 3   the market to go lower, right?

12:32:56 4   A.      I don't know if it did that or not, but that is what

12:32:59 5   I wrote.

12:32:59 6   Q.      That was your intended message to competitors, right?

12:33:03 7   A.      I don't have an intended message to competitors.   I

12:33:08 8   was communicating to customers that we were giving them an

12:33:10 9   opportunity to buy before we raise prices.

12:33:12 10  Q.      The message United was sending to its competitors,

12:33:15 11  was United was not interested in prices going lower, right?

12:33:18 12  A.      I don't send competitors a message.

12:33:21 13  Q.      You wanted to avoid a price fight, right?

12:33:23 14  A.      Once again, we negotiate deals with customers, not

12:33:28 15  with competitors.

12:33:29 16  Q.      Now, sir, do you know if United has other ways to

12:33:32 17  send messages to competitors, other than what you described

12:33:35 18  in your e-mail?

12:33:37 19  A.      No, I don't.

12:33:39 20  Q.      You have been in the courtroom, the court

12:33:42 21  representing of United throughout the testimony?

12:33:45 22  A.      For a portion of the proceedings, yes.

12:33:47 23  Q.      And were you here today, sir?

12:33:50 24  A.      I was not here today.

12:33:51 25  Q.      You weren't listening to the testimony --

Wineinger - direct

12:33:53  1    A.    I was listening on the feed or whatever you want to

12:33:55  2    call it, yes.

12:33:56  3    Q.    So you heard the testimony of United's director of

12:34:04  4    strategic accounts, Eric Speece?

12:34:06  5    A.    I did hear a portion of that.

12:34:08  6    Q.    Did you hear a portion of Mr. Henderson's, who is at

12:34:11  7    Domino, did you hear his testimony?

12:34:13  8    A.    I did not.

12:34:14  9    Q.    Now, did you see the e-mail exchanges that were put

12:34:17 10    up on the screen in front of Mr. Speece, with respect to his

12:34:22 11    communications with Richard Wistisen?

12:34:24 12    A.    I did not.

12:34:25 13    Q.    You didn't see that?

12:34:25 14    A.    The feed was too small upstairs, it's literally on an

12:34:30 15    iPad.

12:34:30 16    Q.    The corporate representatives of Imperial was here,

12:34:34 17    wasn't he?  Was he the courtroom?

12:34:36 18    A.    The who?

12:34:37 19    Q.    Mr. Gorrell was in the courtroom, did you see him in

12:34:41 20    the courtroom?

12:34:41 21    A.    I did not.

12:34:42 22    Q.    You were here in the courtroom yesterday, right?

12:34:45 23    A.    I was.

12:34:46 24    Q.    Now, Rich Wistisen, you're the person in charge of

12:34:51 25    approving payment for invoices that he sends to United for

Wineinger - direct

12:34:57  1   services, right?

12:34:59  2   A.      That's right.

12:35:01  3   Q.      Let me ask you this again.  Did you hear any of

12:35:04  4   Mr. Speece's testimony today?

12:35:05  5   A.      I did overhear some of his testimony, yes.

12:35:08  6   Q.      And you didn't see any of the e-mail exchanges he had

12:35:11  7   with Mr. Wistisen?

12:35:12  8   A.      I did not, they were too small on the screen.

12:35:14  9   Q.      Are you aware that he communicated with Mr. Wistisen?

12:35:18 10   A.      I was not, until these proceedings, over the last

12:35:20 11   couple of months.

12:35:21 12   Q.      You were not aware until they, Department of Justice,

12:35:24 13   uncovered the e-mails, right?

12:35:25 14   A.      I was not aware that they were having those

12:35:28 15   conversations.

12:35:28 16   Q.      Did you hear Mr. Speece testify that there is no

12:35:31 17   company policy against calling competitors?

12:35:35 18   A.      I did not hear him say that, no.

12:35:38 19   Q.      Now, have you heard any of the testimony this week

12:35:40 20   about the concept or about sold position?

12:35:48 21   A.      I understand what sold position is, yes.

12:35:50 22   Q.      You know what sold position is, right?

12:35:52 23   A.      Yes.

12:35:52 24   Q.      It's your expectation that your people at United

12:35:56 25   would treat United's sold position as confidential, and that

12:35:59 1    they would hold that information close to the vest; right?

12:36:02 2    A.      There would be times when we would he hold that

12:36:05 3    information close to the vest, yes.

12:36:06 4              MR. HANNA:  No further questions, Your Honor.

12:36:08 5              THE COURT:  Thank you.

12:36:09 6              Cross-exam.

12:36:17 7              MR. BUTERMAN:  Your Honor, just for timing

12:36:18 8    purposes, because I know we're getting later, I think I'm

12:36:22 9    about fifteen, twenty minutes.

12:36:23 10             THE COURT:  That's fine.  I wanted to break at

12:36:26 11   1:00 because I have a call I have to take at 1:00.

12:36:30 12             MR. BUTERMAN:  I will make sure we are a done

12:36:32 13   well before that.

12:36:33 14                    CROSS-EXAMINATION

12:36:33 15   BY MR. BUTERMAN:

12:36:34 16   Q.      Good afternoon, Mr. Wineinger.

12:36:35 17   A.      Good afternoon.

12:36:36 18   Q.      I want to clear something up.  Counsel asked you some

12:36:39 19   questions and I know he didn't mean to say this, but US

12:36:42 20   Sugar doesn't own United Sugars, correct?

12:36:47 21   A.      Correct, there are four owner members of United

12:36:50 22   Sugars.

12:36:52 23   Q.      Okay.  And lets just look quickly at a couple of the

12:36:55 24   documents that counsel showed you.  First, can we pull

12:37:02 25   Exhibit 490, the slide ending in 113.

Wineinger - cross

12:37:15  1          Mr. Wineinger, you are aware that the

12:37:19  2   government's proposed market definitions in this case are

12:37:23  3   the southeast market and the Georgia plus the surrounding

12:37:29  4   states market?

12:37:30  5   A.     I am aware of that, yes.

12:37:32  6   Q.     Counsel asked you some questions about the market.

12:37:34  7   Is this market consistent with either of those markets?

12:37:37  8   A.     No.

12:37:38  9   Q.     Can we look at PTX 348.   Slide 31.   Same question.

12:37:51 10   Mr. Wineinger, is this map consistent with either the

12:37:57 11   government's proposed southeast market or their proposed

12:38:00 12   Georgia plus the surrounding states market?

12:38:03 13   A.     I believe those dots go well outside of that region.

12:38:06 14   Q.     Counsel asked you some questions about net selling

12:38:10 15   price.  Is net selling price the same thing as the delivered

12:38:13 16   price?

12:38:14 17   A.     It is not.

12:38:16 18   Q.     So prior to working for United, did you ever work

12:38:23 19   with any other agricultural products?

12:38:25 20   A.     I have.  I worked in the meat industry as well as

12:38:28 21   food ingredients.

12:38:29 22   Q.     What's a cooperative?

12:38:31 23   A.     A cooperative is a group that allows for a grower

12:38:34 24   producer of product, of agricultural products to market and

12:38:35 25   distribute their products together.

Wineinger - cross

12:38:41 1    Q.      You testified about the four members of United.

12:38:46 2    Could a member leave United?

12:38:48 3    A.      They could.

12:38:50 4    Q.      Has a member ever left United?

12:38:52 5    A.      There has been a member leave United.

12:38:54 6    Q.      Who was that?

12:38:55 7    A.      That would have been Southern Minnesota Beet Sugar

12:38:59 8    Cooperative.

12:38:59 9    Q.      How much notice does a member have to give to leave?

12:39:03 10   A.      One year.

12:39:04 11   Q.      You mentioned Southern Minnesota Beet Cooperative,

12:39:07 12   that's also sometimes referred to as Southern Minn's?

12:39:13 13   A.      That's correct.

12:39:14 14   Q.      How is Southern Minn sugar sold?

12:39:17 15   A.      National Sugar Marketing markets their sugar for

12:39:20 16   them.

12:39:21 17   Q.      That's also the company that's referred to as NSM?

12:39:25 18   A.      Yes.

12:39:26 19   Q.      Do you compete with NSM?

12:39:28 20   A.      We do.

12:39:29 21   Q.      Do all four of United's members produce refined

12:39:33 22   sugar?

12:39:33 23   A.      They do.

12:39:35 24   Q.      Does United produce refined sugar?

12:39:37 25   A.      We do not.

12:39:38 1   Q.      What role does United play with respect to its?

12:39:42 2   A.      Can you ask the question.

12:39:44 3   Q.      What role does United serve with respect to its

12:39:47 4   members' refined sugar?

12:39:48 5   A.      Thank you.

12:39:48 6           We are charged with marketing, selling,

12:39:51 7   distributing and providing the logistics for all of our

12:39:54 8   members refining sugar.

12:39:55 9   Q.      Does United tell members how much refined sugar to

12:39:59 10  produce?

12:39:59 11  A.      We do not.

12:40:01 12  Q.      Do United's members inform United about the overall

12:40:04 13  volume of sugar that each expects to produce in a given

12:40:07 14  year?

12:40:08 15  A.      They do.  Starting May 1st, they provide us

12:40:10 16  information as to what they think their crop that year is

12:40:15 17  going to produce.

12:40:16 18  Q.      Why does each member do that?

12:40:17 19  A.      It's important because it tells us roughly how much

12:40:20 20  volume we have to go sell into the marketplace.

12:40:23 21  Q.      What is United Sugars's mission?

12:40:26 22  A.      Our mission is to sell all of the sugar that our

12:40:30 23  members produce on an annual basis, and to sell it at the

12:40:33 24  highest net selling price.

12:40:34 25  Q.      Why does United need to sell out its pool of sugar

Wineinger - cross

12:40:39 1  that your members produce each year?

12:40:42 2  A.      Yeah, if we have to carry over sugar from one year to

12:40:45 3  the next, it's very expensive.  We have to put it in one ton

12:40:50 4  tote boxes, cardboard boxes, and store them in a traditional

12:40:54 5  warehouse.  And then we'll go and dump those the following

12:40:57 6  summer after we have completed the beet campaign, and then

12:41:00 7  still get that sugar shipped before the next crop starts to

12:41:03 8  come in.  So that's about $4 a hundredweight every time we

12:41:07 9  have to carry that product over.

12:41:09 10 Q.      Has there ever been a time where United has not sold

12:41:13 11 all of its sugar in a given year?

12:41:15 12 A.      Yeah.  Unfortunately the first year that I was on the

12:41:19 13 job, I'll call it a rookie mistake, but I tried to wait out

12:41:25 14 the market to get a better price and we ended up not getting

12:41:31 15 $4 a hundredweight sold that year.  It cost us the $4 a

12:41:35 16 hundredweight on four million hundredweight or $16 million

12:41:38 17 that year plus we had to drop the price the following year,

12:41:42 18 not only on the 4 million but on the conditional new crop

12:41:45 19 that we sold into the marketplace.  It was hugely expensive.

12:41:48 20 I was told by my bosses if I ever tried that again, I would

12:41:51 21 not be the CEO and president of United going forward.

12:41:54 22 Q.      When would that have happened?

12:41:56 23 A.      That would have happened my first year.  The summer

12:41:58 24 of '15, is when we were trying to hold the market and we

12:42:01 25 carried that over into '16.

Wineinger - cross

12:42:02 1    Q.      And aside from what you were told by the member

12:42:08 2    owners, what did that experience teach you?

12:42:10 3    A.      It told me that we're not going to try to wait out

12:42:13 4    the market, we're going to be an aggressive seller, we have

12:42:17 5    been an aggressive seller into the marketplace ever since.

12:42:19 6    Q.      As the CEO of United Sugars, what's your directive to

12:42:23 7    your sales team when they're faced with the choice of

12:42:26 8    holding out for a higher price or securing a long-term

12:42:30 9    contract at a lower price?

12:42:31 10   A.      We'll take the long-term contract every time because

12:42:33 11   we can we cannot afford to hold the market.

12:42:37 12   Q.      Now, where does United Sugars ship its sugar?

12:42:44 13   A.      We ship sugar across the entire United States, in

12:42:47 14   fact over the last three years we have consistently shipped

12:42:50 15   to forty-five different states.

12:42:52 16   Q.      How many states do United members have processing

12:42:57 17   facilities in?

12:42:57 18   A.      Five.

12:42:58 19   Q.      Which states are those?

12:43:00 20   A.      We have several processing facilities in both

12:43:02 21   Minnesota and North Dakota, we have one Montana, we have one

12:43:07 22   in northern Wyoming and of course we have the U.S. Sugar

12:43:10 23   facility in Florida.

12:43:12 24   Q.      How does United move, if United only has facilities

12:43:16 25   in five states, how does it sell to forty-five states?

12:43:19  1    A.      Sure.  Sugar flows extremely easily in this country.

12:43:22  2    There are four main modes by which we ship sugar.  One is in

12:43:26  3    a bulk railcar, one is in a bulk truck, we can also put

12:43:31  4    product in a package and ship it in a boxcar or we can ship

12:43:35  5    product in a van/truck, what you may know as a semi truck.

12:43:39  6    I guess we can also ship liquid sugar as well.

12:43:42  7    Q.      You mentioned earlier that you had worked previously

12:43:45  8    in the meat industry.  When you worked in that industry, did

12:43:47  9    you have to ship meat to customers?

12:43:49 10    A.      We did on a daily basis.

12:43:51 11    Q.      And how does the cost to ship meat compare to the

12:43:55 12    cost to ship sugar?

12:43:57 13    A.      Sure.  So in the meat industry, obviously it's a

12:44:00 14    perishable product, you got to keep it refrigerated and

12:44:05 15    getting it to the marketplace as quickly as possible is

12:44:08 16    important, so most of that is done via semi truck.  Sugar is

12:44:12 17    much more easily shipped and more economically shipped

12:44:16 18    because we have modes to do that that are cheaper modes than

12:44:20 19    just semi trucks.

12:44:21 20    Q.      Does United ship sugar into the geographic market

12:44:23 21    that the plaintiff defines as the southeast?

12:44:25 22    A.      We do.

12:44:26 23    Q.      Where does United ship that sugar from?

12:44:28 24    A.      We can ship that sugar from any of our nine different

12:44:31 25    locations and we do.

Wineinger - cross

12:44:32 1    Q.      Can you give me an example of -- and sorry, does that

12:44:37 2    include your facilities in the Red River Valley?

12:44:40 3    A.      That does.

12:44:41 4    Q.      And can you give me an example of the United

12:44:45 5    customers in Florida that would be getting sugar from the

12:44:48 6    Red River Valley?

12:44:49 7    A.      Sure.  Wal-Mart is a great example that we ship a

12:44:52 8    significant amount of sugar down to Florida for.

12:44:56 9    Q.      Why does United ship sugar from Wyoming, Montana,

12:45:00 10   North Dakota and Minnesota, into what the government calls

12:45:04 11   the southeast?

12:45:05 12   A.      Once again, we can ship sugar quite freely because

12:45:09 13   sugar does flow easily across, so we're always trying to

12:45:14 14   optimize all the opportunities that we have at the beginning

12:45:16 15   of any month, we look at what we project our sales to be

12:45:20 16   based on what product form that customer, or that set of

12:45:23 17   customers may need that month.  We're always trying to

12:45:26 18   optimize that total freight picture.

12:45:28 19   Q.      How does United get the sugar from Wyoming, Montana,

12:45:30 20   North Dakota, Minnesota down to what the government calls

12:45:37 21   the southeast?

12:45:38 22   A.      Once again, it would be any of those four modes I

12:45:42 23   mentioned before, it would be bulk rail, bulk trucks,

12:45:42 24   boxcars or semi vans.

12:45:47 25   Q.      Are you aware of something called the beet freeze?

12:45:50 1    A.      I am painfully aware of the beet freeze.

12:45:53 2    Q.      When was the beet freeze?

12:45:54 3    A.      So back in the fall of 2019 up in the Red River

12:45:58 4    Valley they were having a very wet fall that year and we

12:46:00 5    couldn't get the beets out of the ground.  In fact, about

12:46:03 6    November 20th we had only harvested about 20 percent of the

12:46:07 7    beets, and Mother Nature then froze the rest of the beets,

12:46:11 8    the last twenty percent in the ground.  We were never able

12:46:14 9    to harvest those.  I should say our members were never able

12:46:18 10   to harvest those.  Unfortunately, we had to declare force

12:46:22 11   majeure across our enterprises to the tune of about twenty

12:46:28 12   percent.

12:46:28 13   Q.      Where in the country were the sugar beets affected by

12:46:29 14   the beet freeze?

12:46:29 15   A.      In the Red River Valley.

12:46:32 16   Q.      Did the refined sugar prices increase as a result of

12:46:34 17   the beet freeze?

12:46:34 18   A.      They did across the country.

12:46:36 19   Q.      Why did they increase across the country if the beet

12:46:39 20   freeze was in the upper midwest around North Dakota?

12:46:42 21   A.      Because sugar flows and it's a national market.

12:46:46 22   Q.      If the transaction between US Sugar and Imperial is

12:46:50 23   completed, what effect would that have on United's abilities

12:46:54 24   to serve customers in the event that something like the beet

12:46:57 25   freeze happens again?

12:46:58  1    A.      Sure.  Because Imperial is a port refiner and uses

12:47:02  2    raws from Florida, or other places around the world, we

12:47:05  3    would have been able to ship those raws in and produce that

12:47:08  4    product at Imperial, and therefore decrease the amount of

12:47:12  5    force majeure we would have to serve on customers.

12:47:16  6    Q.      Who does United compete with for the sale of refined

12:47:20  7    sugars?

12:47:20  8    A.      American Sugar Refining, Indiana Sugar, Louisiana

12:47:24  9    Sugar, CSC, Sucro Can, National Sugar Marketing, Michigan,

12:47:30 10    Western.

12:47:30 11    Q.      Are there others?

12:47:32 12    A.      There is a whole bunch of distributors if you want me

12:47:35 13    to go on.

12:47:35 14    Q.      No, that's okay.  We get the point.  If we were to

12:47:38 15    talk about who United competes with in the area that the

12:47:42 16    government has defined as the southeast, would the names of

12:47:45 17    United's competitors be any different?

12:47:48 18    A.      They would not.  The frequency by which we run up

12:47:52 19    against them may be different.

12:47:52 20    Q.      I apologize.  Because of the transcript in front of

12:47:57 21    me, did you mention Imperial in that list of competitors?

12:48:00 22    A.      You know, I did not.

12:48:01 23    Q.      Okay.  Would you also include Imperial as one of your

12:48:04 24    competitors?

12:48:05 25    A.      I would, but we don't run up against them that much

Wineinger - cross

because they are a residual seller for the most part in the marketplace.

Q.      Can you explain what a residual seller is?

A.      Yeah, a residual seller is somebody who comes into the marketplace later than we do, when we do run up against them sometimes earlier, because we're an aggressive seller and we don't have a buy/sell economic like they do, where they have to pay for raws and then sell it, sell the refined, they're much more of a residual seller.

Q.      And do you consider residual sellers to be particularly close competitors to United?

A.      We do not.

Q.      Which suppliers do you tend to see more often than Imperial?

A.      Yeah, the suppliers we see more often are those ones again who are growing their own raw materials so, National Sugar Marketing, Louisiana Sugar, Western, Michigan, ASR, all of those grow a portion of their raw materials.

Q.      If this transaction goes through and US Sugar owns Imperial, is the Imperial facility going to remain a residual seller?

A.      No, it will not.

Q.      Why not?

A.      Because they're going to be part of our pool and we're going to have to go out and aggressively sell their

Wineinger - cross

12:49:30 1   additional pile of sugar along with our big pile of sugar

12:49:33 2   and we're going to have to aggressively sell even a slightly

12:49:37 3   larger amount of sugar.

12:49:38 4   Q.      What's your sense on how that's going to impact

12:49:41 5   things?

12:49:41 6   A.      It's going to actually decrease prices.

12:49:45 7   Q.      You're familiar with the Federal Sugar Program?

12:49:47 8   A.      I am.

12:49:48 9   Q.      Who oversees the Federal Sugar Program?

12:49:51 10  A.      The United States Department of Agriculture.

12:49:52 11  Q.      Does the United States Department of Agriculture take

12:49:55 12  action to affect the supply of sugar in the United States?

12:49:59 13  A.      They can.

12:49:59 14  Q.      What kind of actions can they take?

12:50:02 15  A.      Normally what they're looking at is they're looking

12:50:04 16  at what the total needs of the US marketplace are and

12:50:08 17  they're assessing whether based upon domestic production

12:50:12 18  plus what has been imported under the TRQ and the Mexico

12:50:16 19  suspension agreements if there is enough sugar, and if there

12:50:19 20  isn't, they are more than willing to open those doors and

12:50:22 21  bring in more sugar.

12:50:22 22  Q.      Do those actions have effects on prices in the United

12:50:26 23  States in your opinion?

12:50:29 24  A.      They do.

12:50:30 25  Q.      How so?

Wineinger - cross

12:50:31 1   A.      Once again, any time you increase supply, obviously

12:50:35 2   that is going to decrease the price of sugar.

12:50:38 3   Q.      Can you give us an example of a USDA action that has

12:50:43 4   affected the price of sugar?

12:50:45 5   A.      Yeah.  Last November, USDA took action to actually

12:50:50 6   increase the speed with which Mexico was allowed to import

12:50:54 7   product into the U.S.

12:50:56 8   Q.      Do you believe that the USDA would take action if

12:51:00 9   United tried to raise its refined prices above competitive

12:51:03 10  levels after a transaction?

12:51:04 11  A.      I very strongly believe they would do that.

12:51:07 12  Q.      How does that affect you in your every day business?

12:51:11 13  A.      Essentially we're not even going to try that, for

12:51:14 14  would we, it simply wouldn't make sense because we know that

12:51:17 15  USDA would take the action that would squelch any attempt we

12:51:23 16  would try.

12:51:23 17  Q.      Are you familiar with the term Tier II sugar?

12:51:26 18  A.      I am.

12:51:26 19  Q.      What is Tier II sugar?

12:51:28 20  A.      Tier II sugar is when you can actually bring sugar in

12:51:31 21  and pay the quota or the duty on that sugar.  And so it

12:51:36 22  comes in at a higher price than non-tariff rate quota sugar

12:51:42 23  does which then essentially sets the ceiling of the U.S.

12:51:47 24  marketplace.

12:51:47 25  Q.      Does Tier II sugar refer to raw or refined sugar?

Wineinger - cross

12:51:51 1   A.      It's both and there is no limit on the amount of Tier

12:51:55 2   II sugar that can come into the country.

12:51:57 3   Q.      Does the price of Tier II refined sugar affect the

12:52:01 4   prices that United is willing to accept for its sugar?

12:52:04 5   A.      It does.  We always know where Tier II sugar is

12:52:08 6   priced because it sets the ceiling for us.

12:52:09 7   Q.      Could United Sugars exceed the price of Tier II

12:52:14 8   refined sugar?

12:52:14 9   A.      We could try, but it would never work because

12:52:18 10  customers would bring in or distributors would bring in Tier

12:52:21 11  II sugar over the top and there would be excess supply of

12:52:24 12  sugar at that point in time.

12:52:25 13  Q.      When you're evaluating whether to make a price offer

12:52:28 14  to a customer, do you consider the price of Tier II sugar?

12:52:31 15  A.      We always know where it is.

12:52:33 16  Q.      Why is that?

12:52:33 17  A.      Once again, we don't try to go above the price of

12:52:37 18  Tier II sugar in pricing our product.

12:52:39 19  Q.      Now, Mr. Wineinger, did United's estimate any

12:52:42 20  potential synergies from the Imperial transaction related to

12:52:46 21  United distribution network?

12:52:50 22  A.      We did, we estimated roughly eight to $12 million.

12:52:53 23  Q.      And if this transaction does not -- well, what were

12:52:57 24  those distribution network savings, specifically?

12:52:57 25  A.      So once again, we believe that we've got railcars,

Wineinger - cross

12:53:03 1   what I'll call passing in the night, maybe one going north

12:53:06 2   and one going south and we believe that we could get rid of

12:53:09 3   that and save roughly eight to $12 million by being more

12:53:15 4   optimized on our freight economics.

12:53:17 5   Q.      If this transaction does not close, will United be

12:53:20 6   able to achieve those distribution network savings?

12:53:23 7   A.      No, because we don't have that additional

12:53:25 8   distribution point that would allow us to share back with

12:53:28 9   customers.

12:53:28 10  Q.      Does United expect to achieve any synergies through

12:53:32 11  Imperial's packaging facility?

12:53:34 12  A.      We do, we believe there are some opportunities there.

12:53:38 13  Q.      Counsel asked you some questions about some of the

12:53:41 14  testimony that you may have heard over the course of these

12:53:43 15  proceedings.  Have you heard the government asking some

12:53:47 16  questions about a potential packaging line expansion in

12:53:52 17  Clewiston?

12:53:52 18  A.      I have heard that, yes.

12:53:53 19  Q.      Do you recall that -- do you recall the United

12:54:01 20  discussions around a potential packaging line expansion at

12:54:06 21  Clewiston?

12:54:07 22  A.      I recall that initial discussion very clearly and

12:54:09 23  that's all it was an initial discussion.  We thought it

12:54:12 24  would be as simple as adding a line in the Clewiston

12:54:16 25  facility, but what we were quickly made aware of is, that

12:54:20 1   their warehouse is completely full and any expansion of an

12:54:23 2   additional line would take additional warehouse space

12:54:26 3   because you have to have a place to put that before you can

12:54:29 4   ship it, and it's very expensive to build warehouses on the

12:54:33 5   sands of Florida, let's call it, because you have to go so

12:54:36 6   deep with the footings, so it was untenable in terms of the

12:54:41 7   return on that project so it was killed after an initial

12:54:44 8   discussion.

12:54:44 9   Q.       Let's put this issue to bed.  Did United abandon its

12:54:48 10  plans to engage in a packaging expansion in Clewiston

12:54:54 11  because US Sugar started considering the acquisition of

12:54:59 12  Imperial?

12:54:59 13  A.       We did not do it for that reason.

12:55:03 14  Q.       Let me just ask you a few final questions.

12:55:07 15           Based on your experience in the sugar industry,

12:55:09 16  what effect do you think this transaction will have on sugar

12:55:12 17  users in the United States?

12:55:13 18  A.       Once again, I believe it will actually lower prices

12:55:16 19  because we're going to be an aggressive seller of all of

12:55:19 20  that sugar, not just the sugar that we currently sell today.

12:55:22 21  Q.       How do you think the proposed transaction is going to

12:55:27 22  benefit the American farmers that are United members?

12:55:30 23  A.       Sure.  There are several ways and we have identified

12:55:33 24  these through some strategic work, but first is we think we

12:55:37 25  can decrease our cost per hundredweight for overhead.  The

Wineinger - cross

12:55:41 1    distribution savings we talked about, once again, we believe

12:55:44 2    we can share in those which will benefit the American

12:55:48 3    farmer.  And lastly, we think we can upgrade our product mix

12:55:50 4    a little bit by improving our product mix that we offer to

12:55:54 5    customers.

12:55:54 6    Q.     If US Sugar is permitted to acquire Imperial, will

12:55:57 7    the fact that United is marketing Imperial Sugar enable

12:56:02 8    United to raise prices in any area of the United States?

12:56:05 9    A.     Absolutely not.

12:56:06 10   Q.     Why not?

12:56:06 11   A.     We just wouldn't have that ability to do that.

12:56:09 12   Competitors would quickly flow sugar into that same

12:56:13 13   marketplace, where we were trying to raise prices and would

12:56:16 14   squelch much of any type of a price increase we try to take.

12:56:19 15   Q.     Is it United's intention to try to raise prices

12:56:22 16   anywhere in the United States based on the fact that US

12:56:26 17   Sugar will own Imperial?

12:56:27 18   A.     It is not.

12:56:28 19   Q.     The government's theory in this case is that if this

12:56:31 20   transaction closes, United is going to be able to raise

12:56:36 21   prices in that thirteen state area that they call the

12:56:39 22   southeast, and the other area that they call Georgia and the

12:56:42 23   surrounding states.  What's your reaction to that?

12:56:44 24   A.     We would not be able to do that.  Sugar flows too

12:56:46 25   freely in this country, both from internal sources as well

564

Wineinger - cross

12:56:51 1   as from imports that come in.

12:56:53 2   Q.    And what's the significance of that?

12:56:56 3   A.    Once again, any time we would try to raise prices in

12:57:00 4   that area, competitors would flow that sugar in and squelch

12:57:03 5   any type of an increase we would try to take.

12:57:06 6   Q.    What about the USDA?

12:57:08 7   A.    USDA would have that same power, if they thought we

12:57:13 8   were trying to take advantage of the market they would

12:57:15 9   increase imports as well.

12:57:17 10          MR. BUTERMAN:  Thank you.  I have no further

12:57:19 11   questions.  I apologize, Your Honor, I took a little bit

12:57:22 12   longer than I said I would take.

12:57:24 13          THE COURT:  Redirect.

12:57:27 14          MR. HANNA:  I may have five minutes.

12:57:30 15          THE COURT:  Is it okay, do you mind if we take a

12:57:32 16   break now?

12:57:33 17          MR. HANNA:  Your preference.

12:57:34 18          THE COURT:  Let's take our break since I have

12:57:36 19   this 1 o'clock call and let's take a little bit longer.  I'm

12:57:39 20   not sure how long it will go, so let's say 1:45 we'll come

12:57:42 21   back.

12:57:42 22          (A luncheon recess was taken.)

13:38:58 23          THE COURT:  All right.  Please be seated.

13:49:02 24          Redirect.

13:49:06 25          MR. HANNA:  May I proceed, Your Honor?

Wineinger - redirect

13:49:08  1              THE COURT:  Please.

13:49:09  2                    REDIRECT EXAMINATION

13:49:09  3  BY MR. HANNA:

13:49:11  4  Q.     Mr. Wineinger, just a few more questions.

13:49:13  5              Your counsel asked you some questions about PTX

13:49:17  6  348 in that map where Your Honor targeting your sales.  Can

13:49:20  7  we go to that map, please, on slide 31.  Your counsel asked

13:49:25  8  you some questions on friendly cross with respect to whether

13:49:31  9  or not you thought this showed where United was going to

13:49:34 10  target sales, whether or not that was in the region that the

13:49:38 11  United States generally alleged in the complaint.  Do you

13:49:41 12  recall that testimony?

13:49:43 13  A.     I do.

13:49:44 14  Q.     And it looked like there were a lot of blue dots in

13:49:48 15  North Carolina, South Carolina, and Georgia.  Do you see

13:49:51 16  that?

13:49:51 17  A.     There are a lot there, yes.

13:49:53 18  Q.     There are lots of dots?

13:49:55 19  A.     Depend on your definition of a lot, but yes.

13:49:58 20  Q.     Lots of blue dots in Florida, too, right?

13:50:01 21  A.     There is dots there, too.

13:50:03 22  Q.     I would like you to turn to slide 28 of PTX 348.  Do

13:50:20 23  you see the first bullet point that says Siene would likely

13:50:24 24  provided access to attractive southeast demand for key

13:50:28 25  products, do you see that?

Wineinger - redirect

13:50:30 1    A.      I see that.

13:50:31 2    Q.      Southeast is referring to an area of the country,

13:50:33 3    right?

13:50:33 4    A.      It is.

13:50:34 5    Q.      And there are presentations that created by United

13:50:39 6    that talks about a southeast market, you're familiar with

13:50:41 7    those, right?

13:50:44 8    A.      I am.

13:50:45 9    Q.      You understand that there are documents that United

13:50:47 10   created where they talk about a southeast market, right?

13:50:50 11   A.      I know what documents you're talking about, yes.

13:50:52 12   Q.      And the key products that are being discussed on

13:50:57 13   slide 28 are 50-pound bags and super sacks, right?

13:51:01 14   A.      And the rest of that list as well.

13:51:03 15   Q.      And the 50-pound bags is the product that on slide 31

13:51:08 16   United was bulk talking about targeting in that area, right?

13:51:12 17   A.      Yes, that's what that slide referred to.

13:51:15 18   Q.      You can set that document aside.

13:51:17 19           Now, United doesn't offer customers -- doesn't

13:51:27 20   offer customers to buy sugar on tolling arrangements, right?

13:51:30 21   A.      That's correct.

13:51:33 22   Q.      On your friendly cross, you discussed some synergies

13:51:42 23   that United calculated as a result of an acquisition of

13:51:47 24   United or acquisition of Imperial, right?

13:51:50 25   A.      Correct.

Wineinger - redirect

13:51:51 1    Q.       And United calculated this synergy at the United

13:51:58 2    level, right?

13:51:58 3    A.       That's correct.

13:51:59 4    Q.       I think on your friendly cross the only synergy that

13:52:02 5    I think your testimony, the only synergy that was quantified

13:52:07 6    was freight cost savings, right?

13:52:10 7    A.       I mentioned overhead costs as well, and the margin of

13:52:14 8    opportunity for opportunity.

13:52:15 9    Q.       Margin of opportunity was to sell more 50-pound bags,

13:52:19 10   right?

13:52:20 11   A.       More of all of our value added products.

13:52:26 12   Q.       Now, you also testified on friendly cross that you

13:52:29 13   have a bigger pool of sugar if US Sugar acquires Imperial,

13:52:35 14   right?

13:52:36 15   A.       That's correct.

13:52:36 16   Q.       Acquires Imperial, right?

13:52:39 17   A.       That's correct.

13:52:39 18   Q.       After the merger United would control the sales of

13:52:42 19   two of the four only cane sugar refiners in the United

13:52:48 20   States; right?

13:52:52 21   A.       United Sugars will own two of those.

13:52:56 22   Q.       There are four cane sugar refiners in the United

13:53:00 23   States, Domino, LSR, US Sugar and Imperial, right?

13:53:02 24   A.       That's if you're choosing to exclude supermarkets,

13:53:05 25   CSC and Sucro Can.

Wineinger - redirect

13:53:11 1    Q.    And they produce liquid sugar, right?

13:53:13 2    A.    Liquid sugar.

13:53:14 3    Q.    Now, you also testified, I believe that you think as

13:53:20 4    a result of having this bigger pool of sugar, that United

13:53:23 5    will lower its prices, right?

13:53:25 6    A.    I believe that to be true on the portion that

13:53:28 7    Imperial produces, yes.

13:53:29 8    Q.    But United never modeled lowering prices when it was

13:53:34 9    running models for synergies, right?

13:53:36 10   A.    We did not.

13:53:38 11   Q.    Now, you also testified on friendly cross I think

13:53:41 12   that you believe that if you tried to raise prices, the USDA

13:53:48 13   would step in and squelch it, right?

13:53:51 14   A.    That's right.

13:53:51 15   Q.    Squelch it I think was your word, right?

13:53:54 16   A.    Right.

13:53:55 17   Q.    Isn't it true that you spend the time and energy to

13:53:58 18   try to influence what USDA does on sugar policies, right?

13:54:03 19   A.    Our members participate in that.

13:54:02 20   Q.    Your members try to lobby against the USDA bringing

13:54:02 21   in more imports, right?

13:54:11 22   A.    Our members take a different view from time to time

13:54:14 23   on that topic.

13:54:14 24   Q.    From time to time your members have encouraged USDA

13:54:12 25   to restrict imports, haven't they?

13:54:22 1   A.       They have done that.

13:54:23 2   Q.       In fact, United is a member of the American Sugar

13:54:28 3   Alliance, right?

13:54:28 4   A.       United is not.

13:54:29 5   Q.       United's members are a member of the American Sugar

13:54:33 6   Alliance?

13:54:33 7   A.       They are, I believe.

13:54:35 8   Q.       The very purpose of that alliance is to influence

13:54:38 9   USDA sugar policy in favor of sugar producers in the U.S.?

13:54:42 10  A.       I'm unaware.  I don't know.  I'm not a member.

13:54:46 11            MR. HANNA:  No further questions, Your Honor.

13:54:47 12            THE COURT:  All right.  Thank you.

13:54:49 13            Thank you, sir.  You're excused.

13:54:51 14            What's next?

13:54:53 15            MR. HANNA:  Your Honor, at this time United

13:54:54 16  States is going to call Julie Campbell, a national account

13:54:58 17  sales manager for Industrial Products.  We're calling her by

13:55:01 18  video.  I don't believe we need to close the courtroom,

13:55:04 19  though.

13:55:05 20            THE COURT:  Okay.  Thank you.

13:55:12 21            (Videotape deposition of Julie Campbell:)

13:55:33 22  Q.       Can you state your name for the record, please?

13:55:41 23  A.       Julie Campbell.

13:55:47 24  Q.       And who is your employer?

13:55:48 25  A.       United Sugars Corporation.

13:55:50 1   Q.      What is your current title?

13:55:52 2   A.      National accounts sales manager for industrial

13:55:55 3   products.

13:55:56 4   Q.      Can you describe your responsibilities as national

13:56:01 5   accounts sales manager for industrial products?

13:56:03 6   A.      Yes.  So I am responsible for what we call southeast,

13:56:07 7   which is anywhere from Louisiana to North Carolina from

13:56:11 8   Florida up to Kentucky.

13:56:13 9           I have current responsibility for 60 customers

13:56:18 10  and a prospect list of about 200 customers that I work to

13:56:22 11  try and gain additional business.

13:56:26 12  Q.      All right.  So you had mentioned that you focus on

13:56:29 13  customers in the southeast region; is that right?

13:56:31 14  A.      Yeah.  Within the -- my region I described, yes.

13:56:37 15  Q.      Right, the specific states that you mentioned, which

13:56:40 16  I think was Louisiana, to North Carolina, Florida to

13:56:45 17  Kentucky; right?

13:56:46 18  A.      Correct.

13:56:48 19  Q.      As a sales manager in the southeast, as defined by

13:56:51 20  the states you have mentioned, do you have an opinion of who

13:56:55 21  your primary competitors are in the southeast?

13:57:00 22  A.      Really, the -- my competition is anyone who sells

13:57:03 23  sugar.

13:57:04 24  Q.      What suppliers do you believe that you're most

13:57:08 25  frequently quoting against for business?

A.       I typically don't always know who I am competing

against.   But my competitors are going to be Cargill,

Domino, Imperial, that -- Western, Michigan; you've got

distributors such as Evergreen, Batory, Indiana Sugars, the

old Marigold facility, and then imports.

Q.       So when I asked you what suppliers you believe you're

most frequently quoting against for business, you are most

frequently quoting for business in the southeast; is that

right?

A.       I am, yeah.   I mainly quote for business in the

southeast.

Q.       And you listed Cargill, Domino, Imperial, Western,

Michigan, distributors -- you named some specific

distributors, and then imports.

         That is everybody who sells sugar in the

country; is that right?

A.       Almost, yeah.

Q.       Are there any of these companies that sell sugar that

you compete most frequently with in the southeast?

A.       I am not sure.   Majority of time I don't know who I

am competing against.

Q.       And this is going to be document Bates number United

DOJ00244181, and let's just take a second to make sure that

you can get the document, Julie.

         What is this document?

A.      This document is the Bud's Best contract and all the
backup for that negotiation.

Q.      Are you responsible for the customer account of Bud's
Best?

A.      I am.

Q.      Did you put this file together?

A.      I did.

Q.      And why did you keep this file on Bud's Best?

A.      I always keep pricing documents and documentation of
negotiations in case I ever have to refer back to it during
the course of the contract.

Q.      And so do you regularly keep files like this for your
customers?

A.      I try to.

Q.      Bud's Best makes cookies, is that right?

A.      Yes.

Q.      And they are based in Birmingham, Alabama, is that
right?

A.      That is correct.

Q.      So then if we move up to the page ending in 4187, it
should be the bottom of page 7 of the PDF?

A.      Okay.

Q.      Here you're e-mailing Robert Schreck on August 4,
2020, with the subject line, Bud's Best buyer's bid, 2021.
And in this e-mail you're telling him about a buyer's bid

14:00:26 1  that you received from Bud's Best Cookies, is that right?

14:00:30 2  A.    That is correct.

14:00:31 3  Q.    What is a buyer's bid?

14:00:33 4  A.    The buyer's bid is when a customer comes to us and

14:00:37 5  asks if we can meet this price, so they want -- they are

14:00:41 6  looking for us to get to a certain price, so they are asking

14:00:44 7  if we would be willing to book volume at that price.

14:00:48 8  Q.    So Bud's Best is asking in his buyer's bid for

14:00:54 9  pricing that is over $2 less than your July 30th quote; is

14:00:55 10 that right?

14:00:59 11 A.    That's right.

14:01:00 12 Q.    So now we're kind of going back up, now that we got

14:01:04 13 to the bottom of that e-mail, and a little higher on page 7.

14:01:07 14 There is an e-mail from Dirk Swart to Robert Schreck with

14:01:12 15 you cc'd.   Subject line is Bud's Best-buyer's bid 2021.

14:01:19 16        Do you see that?

14:01:20 17 A.    I see that.

14:01:21 18 Q.    And this is dated August 4, 2020; right?

14:01:25 19 A.    Yes.

14:01:26 20 Q.    And then he writes, sort of his last sentence there,

14:01:34 21 "meet the price and get the business."   Correct?

14:01:37 22 A.    That is -- I see that.

14:01:39 23 Q.    What did you understand him to mean by "meet the

14:01:44 24 price and get the business"?

14:01:46 25 A.    I believe, based on kind of the e-mail that it was,

14:01:51 1    to go ahead and agree to the buyer's bid.

14:01:55 2    Q.     So then top of the page, so we are still on page

14:01:59 3    ending in 4187.  And this is an e-mail from you to Dirk and

14:02:11 4    to Robert.

14:02:13 5           And you write in the first line, "I have

14:02:19 6    confirmed that we are matching Imperial's quote."  Correct?

14:02:24 7    A.     I see that.

14:02:25 8    Q.     So here you are saying that you have confirmed that

14:02:29 9    Bud's Best is asking for lower pricing from United in order

14:02:33 10   to match a quote that Bud's Best had from Imperial; is that

14:02:38 11   right?

14:02:38 12   A.     That's what it says.

14:02:40 13   Q.     Did you, in fact, win the business back?

14:02:44 14   A.     We did.

14:02:45 15   Q.     Of course.  While you do that, I will say for the

14:02:49 16   record that Campbell Exhibit 2 has Bates number United

14:02:59 17   DOJ-00231322.

14:03:02 18          So this is an e-mail from you to Jessica Ames,

14:03:06 19   with Cody Bendickson cc'd, dated October 28, 2020.  Subject

14:03:12 20   line, United Sugars:  Myers WHSE.  Does that look right?

14:03:22 21   A.     Yep.  I see it.

14:03:23 22   Q.     So you write in this e-mail, I guess the second line,

14:03:27 23   we had lost Bud's business to Imperial for 2019 -- sorry.

14:03:32 24   That's not -- let me start again.

14:03:34 25          "We had lost Bud's business to Imperial for

14:03:38  1   2020..."

14:03:41  2                    Is that right?

14:03:41  3   A.      That's what it says, yes.

14:03:43  4   Q.      So based on that, do you understand that United had

14:03:46  5   Bud's Best business in 2019?

14:03:48  6   A.      I believe so.

14:03:49  7   Q.      And then you lost the business to Imperial for 2020,

14:03:54  8   right?

14:03:55  9   A.      That's correct.

14:03:57 10   Q.      But then you met the buyer's bid and you got the

14:04:01 11   business back for 2021; is that right?

14:04:04 12   A.      That is correct.

14:04:07 13   Q.      While you do that, I will say for the record that

14:04:11 14   this exhibit, Campbell Exhibit 3, is Bates stamped United

14:04:15 15   DOJ 00245118.

14:04:20 16               And this is an e-mail from Julie Campbell to

14:04:24 17   Robert Schreck, dated June 6th -- sorry, June 12th, 2019.

14:04:34 18   Subject line, Great American Cookie 2020.

14:04:39 19               Is this a customer file that you keep similar to

14:04:42 20   the file you had on Bud's Best?

14:04:44 21   A.      Yes.

14:04:45 22   Q.      And Great American Cookie is another cookie company,

14:04:51 23   is that fair?

14:04:51 24   A.      It is.

14:04:52 25   Q.      And they are in Atlanta, Georgia, right?

14:04:54 1    A.      That's correct.

14:04:55 2    Q.      The first page is an e-mail from you to Robert, your

14:05:04 3    manager, dated June 12th, 2019, correct?

14:05:09 4    A.      That is correct.

14:05:10 5    Q.      And why were you sending him this e-mail?

14:05:14 6    A.      Because Great American Cookie had asked me to

14:05:22 7    re-quote, as they felt my quote was too high.

14:05:28 8    Q.      So you write, "GAC has asked for me to re-quote on

14:05:33 9    2020 business.   They let me know that my original quote was

14:05:37 10   too high compared to the competition."   Right?

14:05:40 11   A.      I see that.

14:05:41 12   Q.      GAC, does that stand for Great American Cookie?

14:05:46 13   A.      It does.

14:05:47 14   Q.      What -- what did you consider when you were coming up

14:05:50 15   with this quote suggestion?

14:05:52 16   A.      I just consider what my parameters were and since I

14:05:57 17   did not know any information from the customer, as far as

14:06:03 18   how off I was, and knowing that there's a number of

14:06:08 19   competitors that could be in the mix, I wanted to come down

14:06:12 20   enough that they would recognize that, you know, we were

14:06:16 21   trying our best.

14:06:18 22   Q.      So here you're confirming for your boss, that in the

14:06:22 23   past Imperial used to sell to Great American Cookie, but

14:06:27 24   Imperial lost the business to United, right?

14:06:32 25   A.      That is correct.

14:06:34  1    Q.      So, I think you had said earlier that customer

14:06:39  2    service, quality, on time delivery, were examples of things

14:06:44  3    that United can use to try to win business; is that right?

14:06:48  4    A.      That is correct.

14:06:50  5    Q.      This is Bates number United DOJ 00245121.  Just let

14:06:58  6    me know when you have had a chance to open that and review

14:07:02  7    it.

14:07:02  8             It's an e-mail chain between you and Rob.  All

14:07:10  9    the e-mails looks like they are dated August 20, 2019,

14:07:14 10    right?

14:07:14 11    A.      Correct.

14:07:14 12    Q.      And in the bottom e-mail, the first e-mail you sent,

14:07:18 13    you're telling your manager that United did not secure Great

14:07:21 14    American Cookies' business in 2020, is that right?

14:07:25 15    A.      That's right.

14:07:25 16    Q.      And then in the last sentence of that paragraph to

14:07:29 17    Rob, so kind of your main paragraph in this e-mail, you say,

14:07:34 18    "I believe Imperial might have gotten back in."  Do you see

14:07:37 19    that?

14:07:37 20    A.      I see that.

14:07:38 21    Q.      Why did you believe that?

14:07:40 22    A.      It was just an assumption based on them having the

14:07:45 23    business prior.  But really, any of our competition could

14:07:49 24    have been in there, and I did not receive any feedback to

14:07:52 25    really know who got the business.

14:07:56 1   Q.       And this is Bates number United DOJ 00227037.

14:08:07 2           This document is a number of messages you

14:08:12 3   exchanged with Jonathan Lloyd on April 26, 2019; is that

14:08:17 4   right?

14:08:17 5   A.       Yes, that's correct.

14:08:19 6   Q.       And Jonathan Lloyd is the sales manager you mentioned

14:08:24 7   who still had some grandfathered accounts in the southeast,

14:08:30 8   is that right?

14:08:30 9   A.       That is correct.

14:08:31 10  Q.       And he writes at 11:35 a.m., "tell me again the cane

14:08:37 11  basis used for the business you lost."

14:08:40 12          Do you see that?

14:08:41 13  A.       I see that.

14:08:42 14  Q.       And what did you understand him to be asking for?

14:08:45 15  A.       For the Piedmont business.

14:08:48 16  Q.       Is that because you had lost the Piedmont business?

14:08:53 17  A.       Yes, that is correct.

14:08:57 18  Q.       And Jonathan writes at 11:35 that he is looking for

14:09:05 19  insight on Imperial pricing.  Do you see that?

14:09:08 20  A.       I see that.

14:09:09 21  Q.       Do you have an understanding of why the business you

14:09:12 22  lost would have given him insight into Imperial pricing?

14:09:15 23  A.       Because I had lost the Piedmont business to Imperial.

14:09:17 24  Q.       How did you know that you had lost the business to

14:09:21 25  Imperial?

14:09:22  1    A.      They told me.  Piedmont told me.

14:09:24  2    Q.      And then I am going to ask Sophia to put into the tab

14:09:34  3    G, and this document is Bates number United DOJ 00244734.

14:09:46  4             Is this your file on Piedmont for the 2021

14:09:53  5    contract year?

14:09:54  6    A.      Yes, it is.  For 2021 business quote, not contract.

14:10:00  7    Q.      If we go back to page 7, at the very bottom, so kind

14:10:08  8    of from page 7 going on to page 8, this is a June 16, 2020,

14:10:23  9    e-mail from you to Heath Cagle.

14:10:31 10             And you are providing a price quote; is that

14:10:34 11    right?

14:10:34 12    A.      That is correct.

14:10:36 13    Q.      And then you respond on July 7, 2020.  You write,

14:10:41 14    "could you further elaborate on significant?  I know we are

14:10:46 15    freight disadvantaged versus our competition, but it sounds

14:10:51 16    like it is potentially more than this."

14:10:57 17             Do you see that?

14:10:58 18    A.      I see that.

14:10:58 19    Q.      And what did you mean when you said that?

14:11:02 20    A.      Piedmont takes cane super sacks.  And for cane super

14:11:08 21    sacks, United Sugars has to use a third-party station to

14:11:12 22    package the super sacks which adds additional costs.

14:11:18 23    Q.      What did you mean by "freight disadvantaged"?

14:11:27 24    A.      Because we are having to ship bulk product up to our

14:11:30 25    third-party station to repackage and then ship back out to

14:11:35 1    the customer.

14:11:37 2    Q.      And when you said I know we are freight disadvantaged

14:11:41 3    versus our competition, what was the competition that you

14:11:44 4    were referring to?

14:11:46 5    A.      It would be any other supplier of cane super sacks.

14:11:51 6    So Cargill, Evergreen, Marigold, Imperial, those are the

14:11:58 7    ones that I know can do super sacks.

14:12:01 8    Q.      And do you see that August 13, 2020, e-mail from

14:12:09 9    Heath?

14:12:09 10   A.      Yes.

14:12:10 11   Q.      And so is this a buyer's bid that he's making?

14:12:14 12   A.      It looks like it, yes.

14:12:16 13   Q.      Is it most common when you get a buyer's bid that the

14:12:20 14   understanding is that there was -- that pricing was received

14:12:24 15   from a competitor?

14:12:25 16   A.      Not necessarily.

14:12:26 17   Q.      But is that most frequently the case?

14:12:29 18   A.      I don't always know.  Some buyers, they have a target

14:12:34 19   price that they want to meet or they would like to get and

14:12:39 20   tell, they will just offer that to us.

14:12:41 21           So I never know for sure if there is a

14:12:44 22   competitive offer behind it.

14:12:46 23   Q.      And then later on August 13th, you e-mail Heath back,

14:12:51 24   to let him know that you are going to pass on the buyer's

14:12:57 25   bid; right?

Rothman - direct

14:12:59  1    A.        Right.

14:12:59  2    Q.        And so ultimately, is it the case that Piedmont --

14:13:03  3    that United did not obtain Piedmont's business in 2021?

14:13:08  4    A.        That is correct.

14:13:11  5                   (End of videotape deposition.)

14:13:16  6                   MR. HANNA:  Your Honor, at this time the United

14:13:20  7    States moves for admission in the record or evidence PTX

14:13:24  8    459, PTX 461, PTX 464, PTX 465, PTX 469, and finally PTX

14:13:37  9    470, Your Honor.

14:13:38  10                   THE COURT:  All right.  Any objection?

14:13:46  11                   MS. DWYER:  No objection, Your Honor.

14:13:47  12                   THE COURT:  What's next?

14:13:49  13                   MR. MINCER:  Jonathan Mincer for the United

14:13:52  14   States of America.  May we proceed with our next witness?

14:13:56  15                   THE COURT:  Yes, please.

14:14:32  16                   COURT CLERK:  Please raise your right hand.

14:14:36  17   Please state and spell your full name for the record.

14:14:44  18                   THE WITNESS:  Dov Rothman, D-O-V, R-O-T-H-M-A-N.

14:14:50  19                   DOV ROTHMAN, having been duly sworn was examined

14:14:54  20   and testified as follows:

14:15:02  21                        DIRECT EXAMINATION

14:15:02  22   BY MR. MINCER:

14:15:11  23   Q.        Good afternoon, Dr. Rothman.

14:15:12  24   A.        Good afternoon.

14:15:15  25   Q.        Could you please describe your educational

582

Rothman - direct

14:15:18 1    background?

14:15:19 2    A.     I have a BS and a Ph.D. from Berkley and a degree

14:15:26 3    from Cambridge University in the United Kingdom.

14:15:29 4    Q.     What did you study in your Ph.D. program?

14:15:32 5    A.     I have a Ph.D. in business administration, which is

14:15:38 6    the degree you get when you do the Ph.D. in the business

14:15:41 7    school at Berkeley.  Just to avoid confusion, my training is

14:15:47 8    in economics, and in my program I took the core economics

14:15:54 9    class in the economics department.

14:16:00 10   Q.     What is your work experience after your Ph.D.?

14:16:02 11   A.     I was an assistant professor at the School of Public

14:16:06 12   Health at Columbia University in New York.  I am now a

14:16:10 13   managing principal at a firm called Analysis Group.  I have

14:16:15 14   been at Analysis Group for about sixteen years.  I have also

14:16:20 15   taught a course on economics of merger analysis at Harvard

14:16:24 16   University.

14:16:24 17   Q.     Do you have any other professional affiliations or

14:16:29 18   positions?

14:16:29 19   A.     I am a senior editor of Antitrust Law Journal.  I'm a

14:16:34 20   member of the American Economic Association.

14:16:36 21   Q.     Have you published in peer reviewed journals in the

14:16:40 22   field of economics?

14:16:41 23   A.     Yes.

14:16:41 24   Q.     Have you previously testified in Federal Court as an

14:16:45 25   economic expert in an antitrust merger case?

14:16:48 1   A.      Yes.

14:16:48 2   Q.      Has any court excluded you from testifying as an

14:16:52 3   expert?

14:16:52 4   A.      No.

14:16:53 5           MR. MINCER:  Your Honor, I would like to offer

14:16:54 6   Dr. Rothman as an expert in the field of economics.

14:16:58 7           MR. YATES:  Your Honor, we don't object to

14:16:59 8   Dr. Rothman testifying today.  There are some issues we will

14:17:03 9   explore on cross and then address in post-trial briefing

14:17:06 10  consistent with the pretrial order.

14:17:08 11          THE COURT:  Okay.  So are you objecting or not

14:17:10 12  objecting to him being an expert in the field of economics?

14:17:16 13          MR. YATES:  We do not believe he is an expert in

14:17:18 14  the field of economics, no, ma'am, but consistent with the

14:17:21 15  pretrial order, we will address that in the post-trial

14:17:25 16  briefing.

14:17:25 17          THE COURT:  Thank you.

14:17:26 18  BY MR. MINCER:

14:17:26 19  Q.      Dr. Rothman, have you prepared a slide presentation

14:17:29 20  to assist with your testimony?

14:17:30 21  A.      Yes, I have.

14:17:31 22  Q.      Did you submit expert reports in this case?

14:17:34 23  A.      Yes.  An initial report and a reply report responding

14:17:39 24  to defendants' expert, Dr. Hill's report.

14:17:42 25  Q.      And will you be referring to the Horizontal Merger

Rothman - direct

14:17:46 1    Guidelines during your testimony today?

14:17:47 2    A.      Yes, I will.

14:17:49 3    Q.      What are the Horizontal Merger Guidelines?

14:17:52 4    A.      The Horizontal Merger Guidelines are a document, they

14:17:57 5    were published in 2010 by the DOJ and FTC, they summarize

14:18:02 6    methods that antitrust economists use to evaluate mergers

14:18:08 7    and acquisitions of competitors.

14:18:09 8    Q.      Dr. Rothman, what was your assignment in this case?

14:18:12 9    A.      My assignment was to conduct an economic analysis of

14:18:19 10   the likely effects of the proposed acquisition, the likely

14:18:22 11   competitive effects of the proposed acquisition.

14:18:25 12   Q.      Did you reach opinions about the likely competitive

14:18:28 13   affects of the proposed acquisition?

14:18:30 14   A.      Yes, I did.

14:18:31 15   Q.      And what is your overall opinion?

14:18:33 16   A.      My overall opinion is that the proposed acquisition

14:18:39 17   would likely lead to a substantial lessening of competition.

14:18:44 18   Q.      At a high level in what ways would competition be

14:18:48 19   affected?

14:18:48 20   A.      At a high level United and Imperial are two of the

14:18:52 21   largest suppliers of refined sugar to customers in the

14:18:57 22   southeast and in states along the east coast.  They compete

14:19:03 23   to supply sugar to the customers, they benefit from this

14:19:08 24   competition, the proposed acquisition would eliminate that

14:19:12 25   competition.

Rothman - direct

Q.      Could you walk us through how you analyzed the proposed acquisition?

A.      So, I'll organize this in four steps.  Market definition, market participants, shares, and market concentration, competitive effects, and mitigating factors.

        With respect to market definition, the United States properly defined two relevant economic markets, for purposes of evaluating the competitive effects of the proposed acquisition.

        The first market is the production and sale of refined sugar to wholesale customers in Georgia and its bordering states.  The second market is the production and sale of refined sugar to customers in Georgia, and the bordering states and a few additional states.

        With respect to market concentration, the proposed transaction would result in highly concentrated markets and it would lead to a substantial increase in market concentration in the United States' relevant markets triggering what's called a presumption of harm under the Horizontal Merger Guidelines.

        Three, with respect to competitive effects, the proposed acquisition would eliminate head-to-head competition between United and Imperial, and it would further likely soften competition by increasing the extent of what I'll describe as coordinated interaction between

Rothman - direct

14:20:54 1  United and United's largest competitor.

14:20:59 2           Then fourth with respect to mitigating factors,

14:21:02 3  the mitigating factors defendants have put forward would not

14:21:08 4  prevent harm from the proposed acquisition.

14:21:11 5  Q.      If we turn to the next slide.  After conducting that

14:21:14 6  analysis, what did you find the result would be for

14:21:17 7  customers if the proposed transaction were to consummate?

14:21:21 8  A.      So higher prices, and just with respect to the loss

14:21:27 9  of head-to-head competition in the narrower market, higher

14:21:33 10 prices would result in harm of $30.5 million per year.  And

14:21:39 11 in the broader market -- I should say that I'll be sometimes

14:21:45 12 referring to the Georgia and its bordering states market as

14:21:49 13 the narrower market, and the Georgia bordering states plus a

14:21:53 14 few additional states as the broader market.

14:21:55 15          In the broader market, the proposed acquisition

14:21:59 16 would result in harm of $36.2 million per year.  This is

14:22:03 17 just from the elimination of head-to-head competition.

14:22:07 18          And then adding in the effects of increased

14:22:13 19 coordinated interaction, the harm in the narrower market

14:22:16 20 would be $58.1 million per year.  And the harm in the

14:22:22 21 broader market would be $72.6 million per year.

14:22:28 22 Q.      So conducting your analysis, did you learn about the

14:22:32 23 refined sugar industry?

14:22:32 24 A.      Yes.

14:22:34 25 Q.      How did you do that?

Rothman - direct

A.      I reviewed a lot of documents and testimony and a lot

of data.   I reviewed submissions that the parties submitted

during the DOJ's investigation of the proposed transaction.

Q.      And by the parties, you mean the merger parties?

A.      Yes.

Q.      What is your understanding of the proposed

acquisition?

A.      That US Sugar would acquire Imperial, and post

transaction that United Sugars, which is US Sugar's

marketing arm would sell the refined sugar produced at

Imperial's Port Wentworth refinery.

Q.      What is United's role in the refining sugar industry?

A.      United is a marketing cooperative.   It sells the

refined sugar produced by US Sugar and three other member

owners.   The member owners of United don't -- they act as

one economic entity with respect to pricing, and United is

that one economic entity.   And we see this when United

refers, for example, to the power of one.

Q.      What is your understanding of United's objective?

A.      My understanding of United's objective is to make the

most profit for its member owners by selling the most

refined -- the most refined sugar at the highest possible

prices.   I heard testimony earlier today that United's CEO's

bonus, for example, is heavily weighted toward net selling

price.

Rothman - direct

14:24:23 1    Q.       Have you also heard testimony from United that adding

14:24:28 2    Imperial's production of US Sugar would force United to

14:24:31 3    lower prices?

14:24:32 4    A.       Yes.

14:24:34 5    Q.       What do you think of that?

14:24:35 6    A.       Well, I disagree.  So post transaction, United would

14:24:42 7    be selling refined sugar that Imperial would have been

14:24:46 8    selling on its own, but Imperial would have been facing

14:24:49 9    competition from United.  United would be selling that

14:24:54 10   refined sugar, but it won't be facing competition from

14:24:58 11   Imperial.

14:24:58 12           A logical implication of this argument is that

14:25:01 13   if all of the producers were to join United, United would

14:25:06 14   have more refined sugar to sell, its prices wouldn't go

14:25:14 15   down, it wouldn't be facing any more competition.

14:25:17 16   Q.       Turning briefly to customers before diving into your

14:25:20 17   analysis, what kind of customers do sugar refiners sell to?

14:25:25 18   A.       Wholesale customers, food and beverage manufacturers,

14:25:30 19   retailers like grocery stores, as well as distributors that

14:25:33 20   buy refined sugar and then resell to other wholesale

14:25:33 21   customers.

14:25:40 22   Q.       Does your analysis apply to all of these kinds of

14:25:42 23   customers?

14:25:42 24   A.       Yes, it does.

14:25:42 25   Q.       What is the role of distributors in the refined sugar

Rothman - direct

industry?

A.      Distributors are, they're purchasers and they serve as a distribution channel for refiners to reach additional customers.

Q.      So let's turn to the first step in your analysis that you mentioned earlier.  You said the first step is market definition.  What is an antitrust market?

A.      So an antitrust market has a product and a geographic dimension.  I think of it as a set of competing products sold to customers in a given geographic area.

Q.      You also referred to a relevant antitrust market. What is a relevant antitrust market in the context of a merger or acquisition?

A.      A relevant antitrust market is an antitrust market in which there is the potential for a -- a proposed transaction to effect competition, an antitrust market in which the merging firms, the relevant parties compete.

Q.      What is the purpose of defining relevant antitrust markets when evaluating mergers for acquisition?

A.      Market definition is meant to assist in the evaluation of competitive effects, it helps to focus and identify the areas where there is the potential for harm from a proposed merger or acquisition.

Q.      Under the Horizontal Merger Guidelines, how do you determine if a market is properly defined?

Rothman - direct

14:27:32 1    A.      A market is properly defined if it's worth

14:27:37 2    monopolizing.   And whether a market is worth monopolizing is

14:27:44 3    tested using a tool called the hypothetical monopolist test.

14:27:50 4    Q.      What is the hypothetical monopolist test?

14:27:54 5    A.      The hypothetical monopolist test ask whether the

14:28:00 6    complete elimination of competition within a market would

14:28:06 7    likely result in higher prices.   Higher prices often are

14:28:12 8    referred to as a small but significant nontransitory

14:28:18 9    increase in price which gets abbreviated to SSNIP.   If a

14:28:22 10   market leaves out or excludes enough competitively important

14:28:26 11   products, eliminating all of the competition in that market

14:28:30 12   would not necessarily result in higher prices, in which case

14:28:34 13   the market would not pass the hypothetical monopolist test,

14:28:39 14   the market would need to be broadened to include additional

14:28:42 15   competitively important products.

14:28:45 16        If a market includes enough competitively

14:28:49 17   important products, the complete elimination of competition

14:28:52 18   within that market will likely result in higher prices, in

14:28:56 19   which case the market is said to pass the hypothetical

14:29:02 20   monopolist test, it is a market that would be worth

14:29:02 21   monopolizing.

14:29:02 22   Q.      To clarify one thing, you referred to the complete

14:29:02 23   elimination of competition in a market.   Why is this called

14:29:12 24   a hypothetical monopolist test?

14:29:17 25   A.      So one way to think about this is that if you took a

Rothman - direct

market and you had a set of competing firms and you gave one
of the firms essentially a license to be the only seller to
customers in that market, that would eliminate all the
competition in the market and that one seller that is given
the license to be the only seller would be a monopolist of
that market.  So the -- eliminating all the competition in
the market is effectively creating what gets referred to as
a hypothetical monopolist.

Q.     And if all competition in a candidate market is
eliminated, why might prices not go up?

A.     So if all competition in a market is eliminated, if
that market doesn't include enough of the competitively
important products, then the elimination of competition in
that market would not necessarily result in higher prices.
The idea to this, all the competition in the market is
eliminated and prices start to go up, but the market doesn't
include enough competitively significant products, consumers
could substitute to something not included in the market,
and that would in some sense defeat the price increase.

Q.     Turning to the facts of this case, how did you apply
the hypothetical monopolist test here?

A.     I applied the hypothetical monopolist test to the two
markets that the United States has alleged.  I evaluated
whether the complete elimination of competition among
producers of refined sugar to sell refined sugar to

Rothman - direct

14:31:04 1    customers that are located in the geographic markets that

14:31:07 2    the United States has defined would likely result in higher

14:31:10 3    prices.

14:31:10 4    Q.      And what conclusion did you reach when running that

14:31:13 5    hypothetical monopolist test?

14:31:16 6    A.      That the markets the United States has defined are

14:31:20 7    markets that would be worth monopolizing.

14:31:23 8                    THE COURT:  Did you define the market or were

14:31:26 9    you just using what they did?

14:31:28 10                   THE WITNESS:  I would say that the United States

14:31:31 11   defined two markets, and I evaluated whether those markets

14:31:37 12   are well-defined antitrust markets for the purposes of

14:31:42 13   evaluating the competitive effects of the proposed

14:31:46 14   transaction.

14:31:46 15                   THE COURT:  Sorry.  Go ahead.

14:31:49 16                   MR. MINCER:  No problem.

14:31:50 17   BY MR. MINCER:

14:31:50 18   Q.      You mentioned earlier that there is a product

14:31:52 19   dimension, a geographic dimension to the market definition.

14:31:56 20   What did you find with respect to the product dimension of

14:32:00 21   market definition?

14:32:02 22   A.      The production and sale of refined sugar to customers

14:32:08 23   is a well-defined product market for the purposes of

14:32:11 24   evaluating the competitive effects of the proposed

14:32:14 25   acquisition.

Rothman - direct

14:32:15 1    Q.      Why is it a relevant product market?

14:32:19 2    A.      It's a market that would be worth monopolizing.   If

14:32:25 3    competition among all the producers of refined sugar were

14:32:28 4    eliminated, that would likely result in higher prices

14:32:33 5    because for most end uses, refined sugar, there aren't good

14:32:38 6    substitutes for refined sugar.

14:32:40 7    Q.      Should the relevant product market be broadened to

14:32:44 8    include resales by distributors?

14:32:47 9    A.      No, distributors are purchasers in the product

14:32:51 10   market.   And so one way to think about this is that if all

14:32:59 11   of the competition among producers of refined sugar were

14:33:03 12   eliminated, distributors wouldn't be able to prevent prices

14:33:09 13   from going up because the distributors as purchasers that

14:33:13 14   that market would be with hit with the higher prices

14:33:16 15   themselves.

14:33:17 16   Q.      Let's turn to the geographic definition of market.

14:33:22 17   What did you find with respect to the geographic dimension.

14:33:27 18   A.      That the geographic markets that United States has

14:33:30 19   defined are well-defined geographic markets for the purposes

14:33:35 20   of evaluating the competitive effects of the proposed

14:33:40 21   acquisition.

14:33:40 22   Q.      Why are they relevant geographic markets?

14:33:47 23   A.      Three related -- I'll describe this in terms of three

14:33:52 24   related reasons.   One, competition in the refined sugar

14:33:52 25   industry is regional.   Two, United and Imperial are two of

Rothman - direct

14:34:02 1    three suppliers that are relatively well situated to supply

14:34:08 2    refined sugar to customers in the United States's geographic

14:34:11 3    markets, so the United States geographic markets are areas

14:34:14 4    of the country in which proposed transaction potentially

14:34:20 5    affects competition.   And three, the United States'

14:34:24 6    geographic markets are -- they're markets that would be

14:34:29 7    worth monopolizing.   They pass the hypothetical monopolist

14:34:35 8    test.

14:34:35 9          THE COURT:   What market wouldn't be worth

14:34:37 10   monopolizing?   If you say hypothetically get rid of all the

14:34:41 11   competition, it sounds like anybody could pass the

14:34:44 12   hypothetical monopolist test?

14:34:47 13          THE WITNESS:   So a market that doesn't include

14:34:50 14   enough competitively significant products, meaning products

14:34:55 15   that customers in response to higher prices in the market

14:34:59 16   could turn to, that market would not necessarily pass the

14:35:07 17   hypothetical monopolist test.

14:35:08 18          So, for example, this will be a very -- if we

14:35:13 19   thought of the market, a market to purchase milk on a given

14:35:17 20   block, and we -- there were three suppliers of milk on a

14:35:21 21   given block and those three suppliers said we're going to

14:35:24 22   stop competing and we're going to try to raise prices.   What

14:35:28 23   would decide that price increase is if the customers could

14:35:34 24   go purchase milk on some other block or across the street or

14:35:38 25   some block that is not included in the market.

595

Rothman - direct

14:35:40 1              And so those three suppliers, if they got --

14:35:45 2     they're on the same block, they try to raise price.  What

14:35:48 3     customers would do in response to higher prices is they

14:35:52 4     would buy milk somewhere else.  So trying to raise prices,

14:35:56 5     they would lose too many sales which would discourage that

14:35:59 6     price increase.  So that market for milk on a given block

14:36:03 7     would be too narrow.  And the idea that the market would

14:36:06 8     need to be broadened, because buying milk somewhere else on

14:36:10 9     another street is a good enough alternative to consumers,

14:36:14 10    that in response to higher prices in the market, consumers

14:36:19 11    could go over here to buy milk.  And then -- so then the

14:36:23 12    market would get broaden to include that other block.

14:36:26 13             So then the same question would -- we would ask

14:36:29 14    the same question, so now we have a market with two blocks

14:36:33 15    and let's say maybe we have four suppliers, sellers of milk

14:36:39 16    on these two blocks, the question would be if all four of

14:36:42 17    these suppliers were to stop competing with one another, the

14:36:46 18    creation of the hypothetical monopolist, would they be able

14:36:50 19    to increase price.  So then the question would be well, if

14:36:52 20    they tried to increase price, how would consumers respond?

14:36:58 21    Would they go three blocks away to purchase milk.  And the

14:37:02 22    exercise is to broaden the market out to the point at which

14:37:08 23    the market includes enough of the important options to

14:37:11 24    consumers in the area that if we eliminated all the

14:37:17 25    competition among the suppliers that can sell to that area.

Rothman - direct

14:37:20 1          THE COURT:  They rather would pay for it than go

14:37:23 2 someplace else?

14:37:24 3          THE WITNESS:  Exactly.  Exactly.

14:37:27 4 Q.     You mentioned earlier, Dr. Rothman that competition

14:37:29 5 in the refined sugar industry is regional.  Why do you say

14:37:32 6 that it's regional?

14:37:34 7 A.     It's regional because refined sugar is costly to

14:37:40 8 transport long distances.  And I think Imperial and NSM

14:37:48 9 illustrate this point well.  So this is a map, we have seen

14:37:53 10 this map before.  Imperial's refinery is in Georgia.  The

14:38:01 11 states that are colored in red here are, this is the Georgia

14:38:06 12 and bordering states region, this is the set of states that

14:38:11 13 United has referred to as the US Sugar Imperial ASR Florida

14:38:18 14 refinery backyard.  Among customers that are located in

14:38:23 15 these states, and Georgia and bordering states region,

14:38:28 16 Imperial share is 20 percent.

14:38:30 17          Now if we look, if we go to the far west, the

14:38:35 18 states shaded in gray is labeled, United has referred to

14:38:41 19 this as Amalgamated Crockett and Brawley backyard, is this

14:38:46 20 the backyard for NSM and ASR, Imperial share of customers

14:38:51 21 out in the west is basically zero percent.

14:38:57 22          This isn't an accident.  Imperial is well

14:39:02 23 positioned to supply customers in the southeast in the

14:39:02 24 Georgia and bordering states market and then states around

14:39:05 25 there, it's not well positioned to compete with the supply

14:39:09 1    of refined sugar to customers in the far west.

14:39:11 2              Now, if we take NSM, NSM has processing

14:39:18 3    facilities in Minnesota, it has three in Idaho, it has one

14:39:22 4    in California.  For customers that are located in the

14:39:29 5    amalgamated Crockett and Brawley backyard, this is an ASR

14:39:35 6    NSM far west backyard, NSM's share to those customers is

14:39:41 7    47 percent.  Among customers that are in the Georgia and

14:39:44 8    bordering states region, that is the US Sugar, Imperial, ASR

14:39:51 9    boarder refinery backyard its share is two percent, this

14:39:56 10   isn't an accident, either, NSM was well positioned to supply

14:40:00 11   customers in the far west, it's not well positioned to

14:40:03 12   supply customers in the southeast and along the east coast.

14:40:09 13   Q.    Why is it relevant that United and Imperial are well

14:40:13 14   positioned to supply customers in the geographic regions

14:40:18 15   alleged in the complaint?

14:40:21 16   A.    This goes back to the purpose of market definition,

14:40:26 17   market definition is consist of the evaluation of

14:40:31 18   competitive effects, it helped us focus on the area in which

14:40:35 19   a merger or acquisition could potentially lessen

14:40:39 20   competition.  This is the area in which the elimination of

14:40:42 21   competition between United and Imperial is most likely to

14:40:46 22   matter.

14:40:48 23             THE COURT:  Just to make sure I understand your

14:40:50 24   testimony, you're saying that, so NSM has two percent of

14:40:52 25   this orange market, right, the Clewiston, South Bay and

Rothman - direct

14:40:58  1    Imperial.

14:41:00  2              THE WITNESS:  Yes.

14:41:01  3              THE COURT:  And so your testimony is that if the

14:41:08  4    merged companies raised prices, that the people, that that

14:41:12  5    orange area would just say okay, we're going to pay higher

14:41:15  6    prices, we're not going to try and take NSM's cheaper sugar

14:41:20  7    that they would have to bring us from Minnesota, that's what

14:41:23  8    you're saying?

14:41:25  9              THE WITNESS:  I would try to maybe put it a

14:41:28 10    little bit differently, which is that currently customers in

14:41:32 11    this area have NSM as a potential supplier, they have ASR,

14:41:38 12    they have other suppliers.  And the question in terms of the

14:41:41 13    evaluation of competitive effects is what the proposed

14:41:45 14    transaction changes.  And what its choices are is that we

14:41:50 15    lose the competition to supply customers in this area, the

14:41:53 16    competition between United and Imperial.

14:41:57 17              Now, there is a question about whether in

14:42:02 18    response to prices going up in the geographic markets here,

14:42:08 19    whether a supplier like NSM might in principle choose to try

14:42:12 20    to win more business.  And this is where I -- I think this

14:42:12 21    map, though, is helpful, which is a supplier like NSM has a

14:42:22 22    certain amount of sugar that it can sell over a given period

14:42:26 23    of time, and it has an economic incentive to focus on

14:42:31 24    competing in the areas where it's best positioned to

14:42:34 25    compete.

Rothman - direct

14:42:35 1          These are -- so NSM's share of sales to

14:42:39 2    customers in the far west is 47 percent, and that's not an

14:42:42 3    accident, it's because it has four processing facilities in

14:42:47 4    that area.  NSM is well positioned to compete for customers

14:42:52 5    out there.  It's not well positioned to compete for

14:42:55 6    customers in the southeast.  And the proposed acquisition

14:42:59 7    wouldn't change that.

14:43:03 8          THE COURT:  Okay.

14:43:08 9    Q.     Turning to the hypothetical monopolist test which you

14:43:12 10   mentioned that you ran on this candidate market, could you

14:43:16 11   explain how you ran the test here?

14:43:20 12   A.     So I evaluated whether the government's geographic

14:43:28 13   markets are markets that would be worth monopolizing.  I

14:43:32 14   evaluated whether a complete elimination of competition

14:43:36 15   between producers of refined sugar to sell refined sugar to

14:43:41 16   customers in the government's geographic area markets would

14:43:45 17   likely result in higher prices.

14:43:46 18   Q.     What did you find when running the hypothetical

14:43:52 19   monopolist test here?

14:43:52 20   A.     That the geographic markets the United States has

14:43:58 21   identified are markets that would be -- that are worth

14:44:02 22   monopolizing, that the complete elimination of competition

14:44:02 23   between producers of refined sugar who sell refined sugar to

14:44:11 24   customers in geographic markets would likely result in

14:44:14 25   higher prices.

Rothman - direct

Q.      Could you please walk us through how your
hypothetical monopolist test reached that result?

A.      So, in response to higher prices from the elimination
of competition to supply customers in the government's
geographic market, the customers in principle could try to
purchase refined sugar outside of the geographic market
through what's called arbitrage the purchasing from other
customers like distributors that are located outside of the
geographic market.   I found that arbitrage would not be
sufficient to prevent the complete elimination of
competition among producers to sell refined sugar to
customers in the market to prevent that from increasing
prices.

Q.      And why would turning to distributors be
insufficient?

A.      Turning to distributors that are outside of the
market is a high cost option, the distributors would be
attaching their own markup to the refined sugar,
distributors also generally ship by truck and shipping
refined sugar long distance by truck is costly.

Q.      Throughout your discussion of geographic market
definition, you have been referring to competition to supply
customers in a given area such as the geographic markets
alleged in the complaint.   Can you clarify what you mean by
that?

Rothman - direct

14:46:01 1   A.      Yes.   See the Horizontal Merger Guidelines explain

14:46:04 2   that geographic markets can be defined around the locations

14:46:09 3   of suppliers or the location of buyers.   And when products

14:46:13 4   are delivered to customer locations and pricing is customer

14:46:19 5   specific, and arbitrage is limited, geographic markets are

14:46:23 6   typically defined around the locations of buyers.   And in

14:46:28 7   those markets, any supplier that makes sales to customers in

14:46:33 8   the market is a market participant, it's part of the market.

14:46:38 9   So, for example, LSR has -- LSR is what -- LSR is located

14:46:47 10  outside of the geographic market, but it makes sales to

14:46:51 11  customers in the geographic market so it's included in the

14:46:54 12  geographic market.   I'll explain in the next few slides that

14:46:58 13  it share is about seven percent.   Same with NSM, NSM makes

14:47:04 14  some sales to customers in this geographic market, it's part

14:47:07 15  of the market.

14:47:08 16  Q.      And what would the affect be of broadening the

14:47:12 17  market, broadening the geographic market?

14:47:15 18  A.      The affect of broadening the geographic market would

14:47:20 19  be to bring in additional customers.   They would bring in

14:47:24 20  different additional geographies where there are additional

14:47:28 21  customers.   Broadening the geographic markets here wouldn't

14:47:33 22  change anything about the potential effect of the proposed

14:47:37 23  acquisition on the customers that are in, for example, the

14:47:41 24  Georgia and bordering states market, it would just bring in

14:47:45 25  additional customers.

Rothman - direct

Q.      Could you explain a little bit more why it's proper

here in this case to define markets around the customers as

opposed to around the locations of the suppliers?

A.      When products are delivered to customer location and

pricing is customer specific and arbitrage is limited,

geographic markets are appropriately defined around the

locations of customers, and then again any seller that makes

a sale to customers in the market is part of the market.

Q.      Besides the geographic markets alleged in the United

States's complaint, did you evaluate any other potential

geographic markets?

A.      Yes.  Defendants' expert, Dr. Hill, suggested two

other geographic markets.  A national market and a regional

market that includes many of the states in the eastern half

of the United States.

Q.      What is your view -- starting with the national

market, what is your view of Dr. Hill's proposed national

market?

A.      The national market doesn't make sense to me.  United

and Imperial compete in the southeast and in states along

the east coast, they don't compete on the west coast of the

United States.  So a national market would combine areas of

the country in which customers have meaningfully different

competitive options, it would -- combining areas of the

country in which the potential effect of the proposed

Rothman - direct

14:49:40 1    acquisition are very different.

14:49:41 2              The purpose of market definition is to assist in

14:49:45 3    evaluation of competitive effects that help to focus in on

14:49:50 4    areas in which there is the potential for harm is highest.

14:49:56 5    Q.     What is the result of combining together regions

14:49:59 6    where there are different competitive options?

14:50:03 7    A.     The result is that it ends up confusing rather than

14:50:08 8    clarifying the evaluation of competitive effect by combining

14:50:13 9    areas in which the potential effects of the proposed

14:50:17 10   transaction are meaningfully different.

14:50:19 11   Q.     Let's turn to Dr. Hill's proposed regional market.

14:50:23 12   What is your view of that proposed market?

14:50:28 13   A.     The proceed -- Dr. Hill's proposed regional market is

14:50:35 14   like the United States' geographic market in that it

14:50:39 15   recognizes that the competition is regional.  Dr. Hill's

14:50:44 16   regional market is in my opinion too broad.  It brings in

14:50:50 17   areas of the country in which customers have meaningfully

14:50:55 18   different competitive options in comparison to customers in

14:50:59 19   the United States's geographic market.

14:51:01 20             So, for example, Dr. Hill's regional market

14:51:06 21   includes Michigan and Ohio which United refers to as the

14:51:10 22   backyard of Michigan Sugar.  Customers in Michigan and Ohio,

14:51:16 23   the potential effects of the proposed acquisition for

14:51:20 24   customers in Michigan and Ohio are meaningfully different in

14:51:24 25   comparison to the potential affects of the proposed

Rothman - direct

14:51:27 1    acquisition for customers that are in the Georgia -- the

14:51:30 2    United States's geographic market.

14:51:33 3              Dr. Hill's regional market also includes states

14:51:37 4    in the yellow here that are, these are, United has referred

14:51:45 5    to these states as the backyard of ASR and Louisiana

14:51:51 6    refineries R customers in these states have meaningfully

14:51:55 7    different competitive options in comparison to customers in

14:51:58 8    the United States market.

14:52:01 9              By broadening the market, Dr. Hill's regional

14:52:07 10   market combines areas of the country and customers where the

14:52:12 11   potential effect of the proposed acquisition are likely to

14:52:17 12   be meaningfully different, and that doesn't help clarify the

14:52:21 13   analysis of competitive effects, it ends up confusing it.

14:52:28 14   Q.    Are is Dr. Hill's proposed regional market defined

14:52:32 15   around the locations of the customers or locations of

14:52:35 16   suppliers?

14:52:37 17   A.    It's also defined around the locations of customers.

14:52:44 18   It's defined in terms of where United and Imperial, where

14:52:49 19   there is a potential for harm from the proposed transaction,

14:52:52 20   takes that's like the United States' geographic market.  It

14:52:58 21   includes geographic areas in which the potential effects of

14:53:01 22   the proposed acquisition are meaningfully different from the

14:53:04 23   potential effects of the proposed acquisition in the markets

14:53:09 24   that the United States has defined.

14:53:11 25              I know I'm repeating myself.  It just goes back

Rothman - direct

14:53:14 1  to purpose of market definition serving to help identify

14:53:17 2  where we should really be focusing in terms of where the

14:53:21 3  potential for harm from a proposed acquisition is likely to

14:53:26 4  be the greatest.

14:53:29 5  Q.      We have discussed market definition.   After analyzing

14:53:33 6  market definition, what was the next step in your analysis

14:53:35 7  of the proposed acquisition?

14:53:38 8  A.      The next step is to identify market participants,

14:53:44 9  calculate market shares, and calculate market concentration.

14:53:55 10  Q.      What opinion did you reach based on your analysis of

14:53:59 11  market participants, market shares, and market

14:54:02 12  concentration?

14:54:03 13  A.      That for both of the government's relevant markets,

14:54:10 14  the post transaction level of market concentration and would

14:54:19 15  be above a threshold outlined in the Horizontal Merger

14:54:23 16  Guidelines and that the change in market competition would

14:54:25 17  also be above the threshold outlined in the Horizontal

14:54:31 18  Merger Guidelines such that the proposed acquisition is

14:54:34 19  presumptively likely to enhance market power.

14:54:38 20  Q.      So starting with market participants, what companies

14:54:41 21  did you include as market participants when evaluating the

14:54:42 22  proposed transaction?

14:54:48 23  A.      All producers of refined sugar that make sales of

14:54:51 24  refined sugar to customers in the relevant market regardless

14:54:52 25  of where the producers themselves are located.

Rothman - direct

14:55:05 1   Q.       Does it include sales from outside the country?

14:55:12 2   A.       Any producer that makes sales to customers in the

14:55:17 3   relevant markets are included.

14:55:22 4   Q.       Do you include distributors as market participants?

14:55:26 5   A.       No.  Distributors are not included -- I do not

14:55:30 6   include distributors as market participants.  Including

14:55:34 7   distributors as market participants would dramatically

14:55:38 8   overstate their competitive significance, vis-a-vis the

14:55:43 9   competitive effects of the proposed acquisition.  And I

14:55:48 10  think an analogy I find helpful, Nike sells its shoes

14:55:55 11  through its own Nike stores and it sells its shoes in Foot

14:55:59 12  Lockers.  And Adidas sells its shoes in Adidas stores and it

14:56:04 13  sells its shoes in Foot Lockers.  If Nike and Adidas were to

14:56:11 14  merge, Foot Locker would not be treated as a market

14:56:14 15  participant in the market in which Nike and Adidas are

14:56:19 16  competing.  Foot Locker would not be able to prevent a

14:56:23 17  merger of Nike and Adidas from increasing prices.

14:56:28 18          THE COURT:  That's assuming somebody wants a

14:56:31 19  Nike or Adidas shoe rather than a tennis shoe.  Right?  This

14:56:35 20  is sugar, it's not Nike sugar and Adidas sugar, it's just

14:56:40 21  sugar.  Right?  Like I can see somebody would want a Nike

14:56:42 22  shoe, but sugar just seems -- do you have an analogy that is

14:56:51 23  more apt to sugar?

14:56:55 24          THE WITNESS:  So, I mean I think that one way of

14:56:58 25  thinking about this is that refiners, they sell their

Rothman - direct

refined sugar directly themselves, you can think of this as the refiners providing the refining and the delivery, and they also make sales to wholesale customers through distributors where distributors are the essentially the distribution partner of the refiner, they're helping the refiners reach other customers.  So even though I agree with you that shoes are differentiated products more than refined sugar, the refiners are using distributors to reach other customers.

THE COURT:  But why aren't the refiners in other areas, before when you were asked, you said well, distributors wouldn't matter because the distributors are still stuck with these refiners, but if the market was such that the prices were going up, and other refiners saw an opportunity to get into that market, why wouldn't those other refiners outside use distributors in that market?  Sort of distribute their product there.

THE WITNESS:  They certainly could.  And I think the only distinction that I'm making here is that it's the refiner, that is in this example outside of the market that is imposing a competitive constraint on the merged firm.  And whether -- you know, if you have a customer that is purchasing from a distributor, that the distributor bought the refined sugar from a refiner that is outside the market.

THE COURT:  Let's say ASR.

THE WITNESS:  Or NSM.  NSM.  The distributor
isn't bringing additional competition on top of the
competition that the NSM is bringing to the merged firm.
You can almost think of if you have a distributor making a
sale in the market, and it purchased refined sugar from NSM,
think of the NSM distributor as a value chain that imposing
a competitive constraint on United or Imperial in the
relevant market.  But NSM and the distributor aren't
separately imposing competitive constraints for the sale of
refined sugar.

THE COURT:  Why not?

THE WITNESS:  Because it's -- the distributor
isn't bringing more competition than NSM is.

THE COURT:  But why not?  It's an extra body in
there, that's why I'm not understanding why it's not
bringing in more competition.  If you say I'm going to get a
bid from all these people, why isn't the distributor
bringing in additional competition?

THE WITNESS:  So in terms of -- here let me try
to go to my analogy, then we can go back to refined sugar.
A customer when it's looking to buy Nike shoes could buy
Nike shoes in a Nike store or buy Nike shoes from a Foot
Locker store.  If the customer chooses to buy Nike shoes
from the Foot Locker, that's not a bad outcome for Nike --
I'm sorry, if the customer chooses to purchase the Nike

Rothman - direct

shoes from the Foot Locker, that's not a bad outcome for Nike because Foot Locker would then buy more shoes from Nike.

I want to distinguish between observing that at a given point in time a customer can choose to purchase a product from a distributor and from the producer of the product from the distributor being an independent competitive constraint on the producer of the product. They're just different. When at a given point in time a customer could purchase refined sugar from a distributor that purchase from United or it could choose to purchase refined sugar from United, either way, United wins because the customer purchases the refined sugar from the distributor that purchased from United, the distributor will purchase more refined sugar from United. United is making a sale to that customer through the distributor.

So that in this -- the distributors are more distribution partners for the refiners, even though at a given point in time we could see a customer choosing to purchase the product from a distributor or from a refiner.

THE COURT:  Okay.

Q.    Just on this topic that the Court was asking about, I think it may help to ask about a couple of things.  So first, could you describe the focus of refiners compared to distributors in terms of the customers they focus on?

Rothman - direct

A.      Well, in general they don't necessarily tend to focus
on the same customers.  Distributors will often sell to
customers where they are relative -- they're better
positioned to provide the distribution to the customer than
a refiner.  This is part of what I mean when I describe the
distributors as distribution partners for refiners, they
help refiners sell to customers that refiners are relatively
less well positioned to supply.

Q.      What are examples, or what is -- what type of
customer might a refiner be less well positioned to supply
than a distributor is?

A.      It could be a customer that's looking to purchase
relatively smaller volumes of refined sugar.

Q.      Earlier in the context of geographic market
discussion, we discussed the possibility of arbitrage from
distributors.  It may assist the Court to describe a little
bit more why turning to distributors outside the relevant
markets wouldn't be a good option for customers in the
relevant market?

A.      So the arbitrage, like it wouldn't be sufficient to
prevent prices from going up if all the competition in
geographic markets went away and this comes back to
purchasing from a distributor that's outside the geographic
market, the distributor will attach its own markup to the
refined sugar, and again, distributors often ship by, tend

Rothman - direct

15:04:08 1    to ship by truck, and shipping refined sugar long distances

15:04:13 2    by a truck is relatively costly.

15:04:17 3    Q.      Once you determine the market participants, what was

15:04:20 4    the next step in your analysis?

15:04:23 5    A.      To calculate market shares.

15:04:25 6    Q.      How did you calculate market shares?

15:04:28 7    A.      For each market participant I divided the sales of

15:04:35 8    the define customers in the market and defined that by the

15:04:41 9    total sales of refined sugar to customers in the market.

15:04:45 10   Q.      If we could turn to the next slide.  What were the

15:04:47 11   results of your market share calculations?

15:04:51 12   A.      So in the narrower market, United share is

15:04:57 13   34 percent, Imperial share is 20 percent, ASR share is

15:05:03 14   25 percent, LSR share is 7 percent, CSC share is 3 percent,

15:05:08 15   NSM share is 2 percent, Michigan share is zero percent,

15:05:14 16   Western Sugar share is zero percent, Zucramex zero percent,

15:05:21 17   Sucro Sourcing Sale zero percent, L&S zero percent, imports

15:05:27 18   account for 7 percent.

15:05:29 19           In the broader market, United share is

15:05:33 20   29 percent, Imperial share is 17 percent, ASR share is

15:05:38 21   28 percent, LSR share is 7 percent, CSC share is 6 percent,

15:05:44 22   NSM share is 3 percent, Michigan Sugar share is 1 percent,

15:05:52 23   Western Sugar share is 1 percent, Zucramex share is

15:05:56 24   zero percent, Sucro Sourcing share is zero percent, L&S

15:06:04 25   Sweetener share is zero percent, imports account for 7

1    percent.

2    Q.    Does NSM have sales to some customers in the relevant

3    markets?

4    A.    Yes, it does.  Its share of sales to customers in the

5    narrower market, is two percent.  And its share of sales to

6    customers in the broader market is three percent.

7    Q.    After calculating market shares, what was the next

8    step in your analysis?

9    A.    To calculate market concentration.

10   Q.    How did you calculate market concentration?

11   A.    The standard measure of market concentration is a

12   statistic called the Herfindahl Hirschman index, abbreviated

13   HHI.  It's calculated by summing shares of all firms in the

14   market, it ranges from 0 to 10,000, a market that has many,

15   many, many suppliers with very, very, very small shares, the

16   HHI would be close to 0.  In a market with one, one firm

17   that has a share of a hundred percent, the HHI would be

18   10,000.

19   Q.    Are there certain levels of concentration that

20   typically are thought to raise concerns about harm to

21   competition?

22   A.    Under the Horizontal Merger Guidelines, a merger or

23   an acquisition that results in a post transaction HHI of

24   greater than 2,500, and a change in HHI of 200 or more is

25   presumed likely to enhance market power.

Rothman - direct

15:07:51 1    Q.      What market concentration did you find in the two

15:07:54 2    relevant markets here?

15:07:56 3    A.      So in the narrower market the post acquisition HHI

15:08:04 4    would be 3,658, the change in HHI would be 1,393.  In the

15:08:13 5    broader market, the post acquisition HHI would be 3,035.

15:08:19 6    And the change in HHI would be 1,011.

15:08:23 7    Q.      And again, just with these numbers up, what are the

15:08:31 8    thresholds under the Horizontal Merger Guidelines?

15:08:31 9    A.      The post acquisition HHI post acquisition HHI is

15:08:37 10   2,500 or more and a change of HHI of 200 or more merger

15:08:43 11   acquisition it would be presumed likely to enhance market

15:08:48 12   power.

15:08:48 13   Q.      What are your conclusion based on the market

15:08:52 14   concentration results here?

15:08:53 15   A.      Based on the results here the proposed acquisition

15:08:56 16   would be presumed likely to enhance market power in both of

15:09:00 17   the relevant markets.

15:09:09 18   Q.      Yesterday did you hear testimony that Imperial sells

15:09:12 19   eleven percent of its refined sugar in Texas?

15:09:16 20   A.      Yes.

15:09:17 21   Q.      Is that relevant to you?

15:09:22 22   A.      I think the point that's relevant here is that a

15:09:28 23   relevant market need not include all of the areas in which

15:09:32 24   there is the potential for harm.  Again, the market

15:09:36 25   definition is used just as an evaluation of competitive

Rothman - direct

15:09:42 1   factors to identify where to focus, where the potential for

15:09:46 2   harm is the greatest, I would note that in a market that

15:09:51 3   includes Georgia and its bordering state and the additional

15:09:55 4   states in the government's market plus Texas, Oklahoma,

15:10:00 5   Arkansas and Louisiana, the post transaction HHI would be

15:10:05 6   greater than 2,500 and the change in HHI would be greater

15:10:09 7   than 200.

15:10:11 8   Q.    What's the relevance of the set of states that you

15:10:14 9   just mentioned?

15:10:15 10  A.    So these set of states, Georgia, its bordering

15:10:18 11  states, the broader market plus Texas, Arkansas, Oklahoma

15:10:23 12  and Louisiana, those are the set of states that USDA calls

15:10:28 13  USDA south region.

15:10:34 14  Q.    We have discussed market definition and market

15:10:36 15  concentration.  What was the next step in your analysis?

15:10:40 16  A.    Competitive effects.

15:10:42 17  Q.    What are your opinions with respect to competitive

15:10:46 18  effects?

15:10:46 19  A.    That the proposed acquisition would eliminate

15:10:52 20  head-to-head competition between United and Imperial.  And

15:10:55 21  that it would further soften competition by increasing the

15:11:01 22  extent of coordinated interaction between United and ASR.

15:11:02 23  Q.    What would the result be of the two kinds of

15:11:02 24  competitive effects that you just mentioned?

15:11:12 25  A.    Higher prices.

Rothman - direct

Q.      Let's start with head-to-head competition.  What does
the term head-to-head competition mean?

A.      The term head-to-head competition gets at that United
and Imperial compete to supply the same customers, they put
competitive pressure on each other.  Examples of customers
that have switched between United and Imperial are shown
here.  King Hawaiian, Krispy Kreme, Miller, Coors.

        One thing I would note that customers benefit
from head-to-head competition even when they don't switch
between suppliers.  So these are switches where a customer
was purchasing from United, Imperial, made them a better
offer, and the customer switched to Imperial.  Customers
also benefits from competition where the customer is
purchasing from a different supplier, another supplier makes
a competitive offer, forces the first supplier to improve
its offer and the customer doesn't switch, but the customer
still benefits from head-to-head competition.

Q.      What effect did you find that the proposed
acquisition window have on this head to head competition?

A.      Well the proposed acquisition would eliminate
head-to-head competition between United and Imperial because
Imperial will no longer be an independent competitor.

Q.      Let's turn to the second kind of competitive effects
that you mentioned, increased coordinated interaction.  What
does the term coordinated interaction mean?

Rothman - direct

A.      Coordinated interaction arises from strategic behavior where firms, when thinking about what price to set, anticipate how the competitors will respond to the prices they set and they take that into account.  And this type of behavior can soften competition.  If one firm is thinking about increasing price and it anticipates that its competitors would respond to its higher price by increasing their prices, that threatens everybody's incentive to increase price.

Q.      Is it necessary for coordinated interaction to be independent antitrust violation?

A.      No.  Coordinated interaction can involve what Horizontal Merger Guidelines refer to as parallel accommodating conduct.  This would be -- this could be conduct that's not pursuant to any type of agreement that a lawyer would call unlawful.  It's -- but it is -- to the extent that a merger increases that type of market behavior, that can be a way in which a merger can result in harm.  Basically by changing the nature of competition by softening competition.

Q.      Have you seen evidence of coordinated interaction in this case?

A.      Yes, I have seen direct evidence of coordinated interaction.

Q.      What kind of direct evidence are you referring to?

Rothman - direct

15:14:53 1    A.      It's the evidence relating to sending messages to

15:14:58 2    competitors when thinking about what to bid, pulling

15:15:06 3    punches, the sharing of information.

15:15:10 4    Q.      Could you provide the Court with just some examples

15:15:14 5    of sending messages and pulling punches?

15:15:20 6    A.      So that the relevance to me of the references to

15:15:23 7    things like signal to the market is that it reflects the

15:15:27 8    type of strategic behavior that can soften competition.  The

15:15:33 9    idea of signaling to the market is an example of a firm

15:15:38 10   thinking about how would what it chooses to do at a

15:15:43 11   particular point in time, how its competitors would respond

15:15:45 12   to that and taking that into account.  Again, this is the

15:15:48 13   type of behavior that can tend to soften competition.

15:15:53 14           Here, this is an e-mail where there -- you know,

15:16:00 15   there is a reference you need to signal to the market that

15:16:04 16   we're going to maintain prices.  Recognizing that, what ASR

15:16:12 17   here chooses to do, the market will respond to that and they

15:16:17 18   are taking that into account.

15:16:18 19   Q.      Could you provide us with one more example?

15:16:21 20   A.      This is an example, what's relevant to me is the

15:16:33 21   reference to sending a message, relaying key messages on, it

15:16:42 22   reflects the strategic behavior from which coordinated

15:16:47 23   interaction arises.  Recognizing that what United does here,

15:16:55 24   competitors will see that, will respond to that, and United

15:16:58 25   is thinking through how that affects what it wants to do.

Rothman - direct

15:17:05  1    Q.      So Dr. Rothman, has the coordinated interaction that

15:17:09  2    you have been discussing affected pricing bids to customers,

15:17:14  3    and without mentioning confidential information that's been

15:17:17  4    redacted here, so without naming specific customer names or

15:17:22  5    prices, could you discuss that?

15:17:25  6    A.      Yeah.  So this is an example for an unnamed customer.

15:17:32  7    And this is a -- this is behind the scenes at ASR, Adam

15:17:42  8    Whittaker is running, I would like to get aggressive, but

15:17:45  9    Rob asked, Rob Speece does not want to lower the bar at this

15:17:50 10    time.  We would like to avoid sending a signal out to

15:17:54 11    competitor.

15:17:57 12            What's relevant to me here is thinking through

15:18:00 13    how are the competitors going to respond to what we do and

15:18:04 14    take that into account.

15:18:09 15    Q.      For the next slide I would like to ask the Court to

15:18:12 16    please turn off the public screen.  Thank you.

15:18:19 17            Dr. Rothman, what was the result of this

15:18:23 18    coordinated interaction that you discussed in the prior

15:18:28 19    slide, again without naming specific customer names or

15:18:31 20    prices because of confidentiality?

15:18:34 21    A.      So again what ended up happening in this instance

15:18:40 22    with this customer is that over the course of --

15:18:42 23            THE COURT:  I'm sorry, what document are you

15:18:45 24    looking at again?

15:18:46 25            MR. MINCER:  Do you have it on your screen?

Rothman - direct

15:18:50  1        THE COURT:  No, I have Dr. Rothman's direct file

15:18:53  2  open.  And I don't know which of these five things you're

15:18:56  3  looking at.

15:18:58  4        MR. MINCER:  I'm sorry, what are you --

15:19:01  5        THE COURT:  There are were only five documents

15:19:03  6  in the Rothman direct file that was sent to us.

15:19:11  7        MR. STRONG:  What we're looking at now, Your

15:19:12  8  Honor, is JTX 027.

15:19:15  9        THE COURT:  That's not in the file, all I have

15:19:18 10  is the report, the reply report, the guidelines and the

15:19:23 11  deposition report.

15:19:26 12        MR. MINCER:  Did you receive the presentation.

15:19:28 13  It's JTX 027.  It's one of the joint exhibits in this case.

15:19:38 14  So it's both on the slide 21 of the presentation and it's

15:19:44 15  also one of the joint exhibits.

15:19:47 16        THE COURT:  Mark, do we have it?  It looks like

15:19:51 17  both things we have direct and cross are exactly the same.

15:20:10 18        MR. MINCER:  Do you have it now, Your Honor?

15:20:14 19  BY MR. MINCER:

15:20:15 20  Q.    Dr. Rothman, what was the result of the coordinated

15:20:18 21  interaction that we saw on the prior slide?

15:20:23 22  A.    Well, what ended up happening over the course of this

15:20:28 23  bidding process is that the customer was able to get

15:20:32 24  Imperial and United to bring down their bids.  On the

15:20:36 25  previous slide we were looking at it is an e-mail in which

Rothman - direct

15:20:44 1    the reference was likely get more aggressive, but Rob

15:20:50 2    Sproull doesn't want to signal to the market getting

15:20:53 3    aggressive on price.  And then you can see in the quotes,

15:20:56 4    the Domino quote was quite a bit higher.

15:21:05 5    Q.    So if we could turn to the next slide in the

15:21:07 6    presentation, and once that happens, we can turn the public

15:21:12 7    screen back on.

15:21:16 8            Dr. Rothman, you also mentioned that sugar

15:21:19 9    refiners use third parties to share competitively sensitive

15:21:24 10   information.  What kind of information are refiners sharing?

15:21:27 11   A.    I have seen evidence showing sharing of information

15:21:31 12   about current and future prices, crop yields, sold

15:21:38 13   positions.

15:21:38 14   Q.    What's the relevance of the information on crop

15:21:42 15   yields and sold positions?

15:21:46 16   A.    It provides information about the extent to which a

15:21:51 17   supplier will or will not be aggressive on price going

15:21:55 18   forward.

15:21:56 19   Q.    How do sugar refiners share this information with

15:21:59 20   each other?

15:22:02 21   A.    The evidence I have seen they are sharing information

15:22:02 22   through third-party analyst, Mr. Wistisen.

15:22:12 23   Q.    In way what ways do sugar refiners share information

15:22:12 24   through Richard Wistisen?

15:22:22 25   A.    The instances -- I have seen instances in which

15:22:25 1    Mr. Wistisen will send an e-mail to United and ASR and

15:22:32 2    asking for information about prices and sold positions and

15:22:39 3    they'll respond and then Mr. Wistisen will take the

15:22:43 4    information that he received from United and share it with

15:22:47 5    ASR's and take the information he received from ASR and

15:22:51 6    share it with United.

15:22:52 7    Q.      Could you discuss just a couple of examples of this

15:22:55 8    kind of information sharing?  Let's start with the one on

15:22:58 9    the slide now.

15:23:00 10   A.      So this is an example from September of 2020.

15:23:06 11   Mr. Wistisen wrote to United's Eric Speece and ASR Alan

15:23:14 12   Henderson on the same day asking for price and sold position

15:23:19 13   information.  They both responded pretty quickly.  The next

15:23:24 14   day Mr. Wistisen took the information he received from ASR's

15:23:30 15   Henderson and shared it with United Speece and the

15:23:32 16   information he received from United's Speece, shared it with

15:23:36 17   ASR's Henderson.

15:23:39 18   Q.      And could you give us one more example?

15:23:43 19   A.      This is an example of United Eric Speece sharing

15:23:50 20   information with Mr. Wistisen about likely future pricing.

15:24:02 21   And then Mr. Wistisen sharing what he received from United's

15:24:08 22   Eric Speece with ASR's Alan Henderson.

15:24:14 23   Q.      Besides direct evidence of coordinated interaction,

15:24:18 24   have you seen other evidence related to coordination in this

15:24:22 25   case?

Rothman - direct

A.      Yes, there is evidence that that indicates the industry is vulnerable to coordinated interaction.  Among the very significant suppliers in the relevant market, there is evidence of strategic interdependence.  Again, that's the evidence of recognizing that what one does at one point in time, the competitors will respond to it and take that into account.  There is evidence of close monitoring of competitors.

Q.      Looking at the evidence of coordinated interaction as a whole, what effect do you expect the proposed acquisition to have on this coordinated interaction?

A.      The proposed acquisition would likely increase the extent of the coordinated interaction by making United larger.  That would increase the strategic interdependence for United and ASR, which would increase incentives, increase the incentives to behave strategically and anticipate how each other will respond to each other.

        In addition, by eliminating Imperial as an independent competitive constraint, the proposed acquisition increases the benefits from coordinated interaction between United and ASR.

Q.      So we've discussed the elimination of head-to-head competition and increased coordinated interaction.  What do you respect to result from these competitive facts?

A.      Higher prices.

Rothman - direct

Q.      Did you measure the likely increase in prices?

A.      Yes.  I measured the likely price effects.  I used a tool called a GUPPI model, Gross Upper Pricing Pressure Index, as well as a second score bidding merger simulation model.  The GUPPI is a screening tool.

        I'm focusing more today on the second score bidding model, the results are similar, the bidding model is the more sophisticated model, better matches the way in which most refined sugar is sold.  And also incorporate, use the bidding model to incorporate the increase in the effect of coordinated interaction.

Q.      Could you walk the Court through at a high level how a second score bidding model works?

A.      So, in a second score bidding model, a customer wants to purchase refined sugar and issues an RFP or an RFQ.  And suppliers submit the -- the supplier that submits the best bid, wins the contract.  And the prices are determined by the second best bid.

        So in this framework, customers for which United and Imperial are the two best bidders are harmed by the proposed -- would be harmed by the transaction because post acquisition United and Imperial wouldn't bid against each other.  And so the harm for these customers would depend, would be determined by how much worse or best it is relative to the second best bid.

624

Rothman - direct

Q.      **What are the key inputs of your second score bidding model?**

A.      **Actual state level shares, and United and Imperial margins.**

Q.      **How does the model use actually supplier state level shares?**

A.      **So one of the key things that the model is used to estimate is the likelihood that customers, that United and Imperial are the two best bidders for a given customer.  The model uses actual state-level shares to estimate the likelihood that United and Imperial are the two best bidders for a given customer.**

Q.      **And how does the model use actual margins?**

A.      **The margins have information about the intensity of competition, about competitive dynamics.  The model uses margins so that the model is calibrated to that it reflects the nature of competition to supply given customers.**

Q.      **And how does your model compare to market realities?**

A.      **Well, it's grounded in market realities because the two key things that the model needs to have are the likelihood that for a customer and United, Imperial, are the two best bidders, it uses actual state-level shares to do that.  Then for those customers it needs to estimate how much worse is the third best bid relative to the second best bid and the model uses observed margins to do that.**

Rothman - direct

Q.      You mentioned that your model uses both United and Imperial profit margin.  Why does your model use both?

A.      Because they both provide relevant information about competitive dynamics of the nature of competition.

Q.      Let's discuss the results of your second score bidding model.  Looking only at the elimination of head-to-head competition between United and Imperial, what did your second score bidding model find?

A.      So with respect to the elimination of head-to-head competition in the narrower market, the predicted prices for United is three percent on average, for Imperial 4.4 percent, and the weighted average is 3.6 percent.  In the broader market, the predicted price effect for United is 2.8 percent, for Imperial 4.2 percent, and the weighted 3.3 percent.  These Predicted Price Effects translate to harm in the narrower market of $30.5 million per year and harm in the broader market of $36.2 million per year.

Q.      Could you put those numbers and prices in the context of this proposed transaction?

A.      So these are significant price effects in low margin industries, a four percent price effect can be quite significant.

Q.      And why is the harm higher in the broader market, even though the percentage increase in price effects is lower there?

Rothman - direct

A.      The harm is higher in the broader market, because the broader market includes additional customers, there are more sales in the broader market, so the average harm in the broader market is lower but the total harm is greater because there are more sales in the broader market.

Q.      And if you were to broaden the market further as Dr. Hill proposes, what would the effect be on the harm, total harm?

A.      So the effect on the broadening market brings in areas in which the potential effects of the transaction are different from, in the market that is defined, that effects the harm for customer, but in a broader market there are more sales, so the total mark would be greater.

Q.      Did you also measure the prior effects that are likely to happen with increased coordinated interaction?

A.      Yes.

Q.      How do you use that?

A.      I used the bidding market and I estimated the price effect of the transaction under scenarios in which pre-transaction, United and ASR refrain from bidding against each other on a certain percentage of opportunities and post transaction they refrain from bidding against each other on a certain percentage of opportunities.  I considered all possible scenarios in increments of at least ten percent, so a scenario in which pre-transaction United and ASR forgo

Rothman - direct

15:33:47 1    bidding against each other for ten percent of opportunities

15:33:50 2    and post transaction it increases to 20 percent or to

15:33:55 3    30 percent or to 40 percent.  Across the ranges, these

15:34:00 4    scenarios of Predicted Price Effects range from four percent

15:34:05 5    to twelve percent.

15:34:07 6    Q.    And what scenario did you use to report price effects

15:34:11 7    here?

15:34:12 8    A.    I reported price effects and harm estimate for one of

15:34:17 9    the scenarios, the scenario in which pre-transaction, United

15:34:22 10   and ASR refrain from bidding against each other on ten

15:34:27 11   percent of opportunities, post transaction it goes to

15:34:31 12   thirty percent.

15:34:33 13   Q.    Is that the scenario that showed the highest price

15:34:37 14   effects?

15:34:39 15   A.    No.  That's the price effects for that scenario are

15:34:44 16   closer to the lower end of the range I just described.

15:34:49 17   Q.    If we could turn to the next slide.  What were the

15:34:52 18   results in your bidding model when you added in the effects

15:34:56 19   of increased coordinated interaction using the scenario that

15:35:01 20   you just mentioned?

15:35:02 21   A.    So for this scenario in the narrow market the

15:35:02 22   predicted price effect for United is 5 percent.  For

15:35:02 23   Imperial it's 6.6 percent.  For ASR it's 2.1 percent.  And

15:35:12 24   the weighted average for United and Imperial is 5.7 percent.

15:35:12 25   In the broader market, the price effect for United is

15:35:23 1    4.8 percent.   For Imperial it's 6.4 percent.   For ASR it's

15:35:31 2    1.9 percent.   And the weighted average for United and

15:35:35 3    Imperial is 5.4 percent.   These higher price is translate to

15:35:42 4    harm of $58.1 million per year in the narrower market and

15:35:47 5    $72.6 million per year in the broader market.

15:35:52 6    Q.    So before turning to the last step in your analysis,

15:35:55 7    I just would like to ask you one question about your GUPPI

15:36:00 8    analysis because defendants' counsel put in their opening

15:36:04 9    slides that there was a difference between the price effects

15:36:06 10   shown in your initial report and your reply report.   Could

15:36:10 11   you explain why there was a difference?

15:36:14 12   A.    Sure.   So in the GUPPI model, one of the inputs the

15:36:23 13   to the GUPPI model is price ratio.   In my initial report I

15:36:28 14   flipped one of the price ratios, which had the effect of

15:36:33 15   increasing the predicted price effect for United a little

15:36:37 16   bit and decreasing the predicted price effect for Imperial.

15:36:44 17   That is, the weighted average, the effect on that on the

15:36:47 18   weighted average price is very small.   The other change that

15:36:51 19   I made between the initial report and the reply report is I

15:36:58 20   updated the analysis to use 2021 data.   And the predicted

15:37:04 21   GUPPI between the initial report and the reply report

15:37:08 22   changed almost entirely because of updating the analysis to

15:37:11 23   2021 data.

15:37:16 24         The flipping of the price ratio, when I

15:37:21 25   corrected that and the reply report, that's a very, very

15:37:26 1  small effect on the GUPPI.  I think the point is just what I

15:37:30 2  heard referenced in the opening in terms of how the

15:37:32 3  Predicted Price Effects from the GUPPI's changed is that

15:37:36 4  this was really driven by using 2021 data which I think has

15:37:43 5  when I prepared my initial report and subsequent to

15:37:46 6  preparing the initial report and the reply report I updated

15:37:52 7  everything to 2021 data.

15:37:53 8  Q.     Let's turn to the last step in your analysis,

15:37:56 9  mitigating factors.  Which purported mitigating factors put

15:38:00 10 forward by defendants did you consider here?

15:38:08 11 A.     The US Sugar Program.  An argument about Imperial's

15:38:16 12 competitive significance going forward in the absence of a

15:38:20 13 transaction.  Entry and expansion.  And claimed

15:38:24 14 efficiencies.

15:38:26 15 Q.     What overall opinion did you reach regarding the

15:38:29 16 mitigating factors put forward by the Defendants?

15:38:32 17 A.     That they wouldn't be sufficient to prevent harm from

15:38:35 18 the proposed acquisition.

15:38:37 19 Q.     So let's start with the first reported mitigating

15:38:41 20 factors, the US Sugar Program.  What is your understanding

15:38:44 21 of the US Sugar Program?

15:38:47 22 A.     That the USDA has a dual mandate to one, manage the

15:38:52 23 supply of sugar to keep sugar prices above loan forfeiture

15:38:57 24 level, and two, to manage the supply sugar of and to ensure

15:39:02 25 adequate supplies of raw and refined sugar.

Rothman - direct

Q.     Starting with the first mandate, did you find that keeping sugar prices above forfeiture levels would help address the competitive effects of the proposed acquisition?

A.     No.  The first mandate is to keep prices elevated, so that would not prevent, the proposed acquisition from increasing prices.

Q.     What about the second mandate of managing the supply of sugar to ensure adequate supplies of raw and refined sugar.  Would that address the competitive effects of  the proposed acquisition?

A.     Higher prices from the lessening of competition from the proposed acquisition wouldn't threaten the adequacy of the supply of sugar, no.

Q.     Let's turn to the second purported mitigating factor, Imperial's competitive significance going forward in the absence of the proposed transaction.  What is your understanding of that argument by defendants?

A.     My understanding of the argument is that Imperial's current level of competitive significance overstates its level of competitive significance going forward in the absence of the transaction.

Q.     What is your opinion about this purported mitigating factor?

A.     I don't think that argument is supported.  Imperial's share has been stable.  I evaluated for both the narrower

Rothman - direct

and the broader market Imperial's share over the 2018 to
2021 period.  In the narrower market Imperial's share was
19 percent in 2018, 20 percent 2021, in the broader market
Imperial's share in 2018 was 14 percent, 17 percent in 2021.

Q.      Let turn to the third purported mitigating factor.
Entry and expansion.  What are the principles that guide
your analysis of potential entry and expansion?

A.      So the principal of the concept is that in response
to a lessening of competition, that potentially could make a
market more attractive to other supplies because prices and
profits are higher.  Which would attract entry or expansion
and potentially offset a lessening of competition under the
guidelines for that to happen the entry or the expansion
would need to be timely, likely and sufficient.

Q.      What opinion did you reach regarding potential entry
and expansion in this case?

A.      That entry and expanding would not offset, would not
prevent the harm from the proposed acquisition.

Q.      And what's the basis for that opinion?

A.      So one of two arguments that has been made is that
suppliers that have small shares of sales to customers in
the relevant markets in response to a lessening of
competition in the relevant markets would shift focus and
try to compete more in the relevant markets in response to
higher prices.  And I think what this misses is the

Rothman - direct

15:42:41  1    suppliers have an economic incentive to compete, focus where

15:42:46  2    they compete, where they're relatively well situated to

15:42:50  3    compete.  So we talked about this earlier.

15:42:54  4              NSM is well situated to compete for customers in

15:42:58  5    the far west by virtue of it has four processing facilities

15:43:03  6    out there.  It's not well situated to compete for customers

15:43:08  7    in the government's geographic markets.  The proposed

15:43:12  8    acquisition wouldn't change that.

15:43:17  9    Q.    Defendants also point to recent examples of entry and

15:43:20 10    expansion by melters.  What are melters?

15:43:23 11    A.    Melters are -- melters produce liquid sugar.

15:43:29 12    Q.    What kind of liquid sugar do they produce?

15:43:33 13    A.    High color liquid sugar.

15:43:40 14    Q.    Do they produce dry sugar?

15:43:42 15    A.    No.

15:43:42 16    Q.    What is your opinion of the examples put forward by

15:43:46 17    defendants?

15:43:46 18    A.    That expansion by melters would not present harm from

15:43:51 19    the proposed acquisition.  Around 80 percent of the refined

15:43:55 20    sugar sold in the relevant market is dry granulated sugar.

15:44:00 21    Melters don't produce that.  We have here on the screen from

15:44:05 22    CSC which is a melter, its founding CEO's testimony that it

15:44:11 23    doesn't compete with the merging parties.

15:44:21 24    Q.    Let's turn to the last purported mitigating factor.

15:44:28 25    Efficiencies.  What are your principles that guide your

15:44:31 1   analysis of the claimed efficiencies?

15:44:35 2   A.      Under the Horizontal Merger Guidelines efficiency are

15:44:39 3   credited if they are supported, they're verifiable, they're

15:44:44 4   not speculative.  If they are merger specific, they likely

15:44:48 5   happen with the proposed transaction and unlikely to happen

15:44:52 6   in the absence of the proposed transaction.  And to offset

15:44:57 7   harm, efficiencies also need to be passed through to

15:45:03 8   customers that efficiency can't just serve to increase the

15:45:08 9   profits of the merger firms.

15:45:09 10  Q.      What opinions did you reach regarding Defendants'

15:45:15 11  claimed efficiencies here?

15:45:17 12  A.      That the efficiencies defendants have put forward

15:45:21 13  either aren't efficiencies or wouldn't come close to

15:45:24 14  offsetting the harm from the proposed acquisition.

15:45:27 15  Q.      Let's discuss each of the three claimed efficiencies

15:45:31 16  that Defendants' have put forward.  What did you find with

15:45:34 17  respect to the defendant claim that they will increase the

15:45:37 18  amount of domestic raw sugar that the Imperial plant

15:45:43 19  obtains?

15:45:44 20  A.      So just increasing the amount of domestic raw sugar

15:45:42 21  purchased is not in and of itself an efficiency.  The

15:45:52 22  purchasing is more of a given input.  Defendants also have

15:46:01 23  not claimed that this would result in cost savings that

15:46:05 24  would translate into -- that would serve to offset harm.

15:46:16 25  Q.      Turning to the second claimed efficiency, what did

Rothman - direct

15:46:15 1    you find with respect to Defendants' claim that they will

15:46:18 2    increase production at Port Wentworth?

15:46:22 3    A.      Again, this is not in and of itself an efficiency, it

15:46:28 4    is an operational aspiration, desire to run a facility with

15:46:33 5    more shifts, that by itself is not efficiency, it's a

15:46:40 6    different operational choice.

15:46:46 7    Q.      Is it a choice that's related to the proposed

15:46:49 8    transaction?

15:46:55 9    A.      Well, it's a choice that US Sugar is saying we would

15:46:58 10   like to do.  With respect to mergers specificity, there is a

15:47:04 11   question of US Sugar wants to make this choice, is this a

15:47:10 12   choice that Imperial is going to make on its own.

15:47:12 13   Q.      Finally turning to the third claimed efficiency, what

15:47:15 14   did you find with respect to the defendants' claimed they

15:47:18 15   will reroute certain shipments based to the relative

15:47:31 16   transportation cost?

15:47:31 17   A.      So to begin with, defendants' expert, Dr. Hill

15:47:36 18   assumes costs savings of 12 to $13 million.  I think we

15:47:42 19   heard a lower number today.  Even the costs savings,

15:47:46 20   distribution cost savings for 12 to $13 million, those

15:47:50 21   savings wouldn't be close to offsetting the harm from the

15:47:52 22   proposed acquisition.

15:47:55 23            We also heard this week that in modeling the

15:48:00 24   potential cost savings, distribution cost savings, there is

15:48:02 25   no clear -- there was not any contemplation of to what

Rothman - cross

15:48:08 1    extent these would get passed through to consumers.  The

15:48:12 2    working assumption is that any savings would go back to the

15:48:15 3    member owners.

15:48:18 4              MR. MINCER:  Thank you, Dr. Rothman.  No further

15:48:20 5    questions on direct, Your Honor.

15:48:21 6              THE COURT:  Let's take our afternoon break and

15:48:23 7    then we'll come back for cross.

15:48:25 8              (A brief recess was taken.)

16:05:40 9              THE COURT:  All right.  Please be seated.

16:05:46 10             MR. YATES:  May I proceed, Your Honor?

16:05:48 11             THE COURT:  Please.

16:05:49 12                  CROSS-EXAMINATION

16:05:49 13   BY MR. YATES:

16:05:50 14   Q.      Good afternoon, Dr. Rothman.  Nice to see you again.

16:05:52 15   A.      Good afternoon.  Likewise.

16:05:54 16   Q.      Dr. Rothman, do you recall that in your direct

16:05:56 17   presentation, you had a slide on head-to-head competition

16:06:01 18   examples?

16:06:03 19   A.      Yes.

16:06:03 20   Q.      Okay.  And you wrote in your reply report in this

16:06:08 21   case that it is necessary to look across many customers to

16:06:11 22   evaluate the extent of head-to-head competition; correct?

16:06:17 23   A.      The specific words we can look at them, the general

16:06:24 24   principles sound reasonable.

16:06:27 25   Q.      Okay.  But you can't tell me for how many customers

Rothman - cross

16:06:30 1  in the alleged relevant markets Imperial and United compete

16:06:34 2  head to head on price, can you?

16:06:39 3  A.      The total number, I have not done that calculation.

16:06:42 4  Q.      You haven't done that calculation, correct, that's

16:06:44 5  what you told me in deposition?

16:06:46 6  A.      That's correct.

16:06:48 7  Q.      Okay.  In fact in your deposition less than three

16:06:52 8  weeks ago, you testified that you had not done a calculation

16:06:54 9  to determine whether Imperial and United competed for the

16:06:59 10  business of more than five percent of the customers in the

16:07:05 11  alleged markets from a head-to-head price standpoint,

16:07:08 12  correct?

16:07:09 13  A.      Again, I believe I said that I hadn't done an

16:07:12 14  analysis that quantifies the total number of -- total amount

16:07:16 15  of head-to-head competition.

16:07:18 16  Q.      And during your deposition, you testified that you

16:07:21 17  didn't know how many instances United had actually lowered

16:07:25 18  its price in response to an Imperial price; correct?

16:07:29 19  A.      Correct.  I think I said I hadn't done an analysis

16:07:33 20  that quantifies that specific number.

16:07:35 21  Q.      And I also asked you in deposition if you could tell

16:07:38 22  me on how many occasions Imperial had lowered a price in

16:07:42 23  response to a United price and you told me you hadn't done

16:07:47 24  that calculation either, right?

16:07:48 25  A.      Yes, that's correct.

637

Rothman - cross

16:07:51 1    Q.      And you haven't attempted to quantify how often

16:07:57 2    United competes with Imperial as opposed to other suppliers

16:08:01 3    of sugar in the marketplace; correct?

16:08:09 4    A.      In terms of the analysis that I think you were asking

16:08:13 5    me about, I think what I told you is that I hadn't done that

16:08:17 6    specific analysis.

16:08:20 7    Q.      Let's take a look at some demonstratives, including

16:08:25 8    one of your slides.  This is a slide that you went through

16:08:30 9    in your opening -- strike that.

16:08:32 10           This is a slide you went through in your direct

16:08:35 11   testimony; correct?

16:08:36 12   A.      That is correct.

16:08:37 13   Q.      Okay.  And this has examples of head-to-head

16:08:43 14   competition, and this is drawn from paragraphs 132 to 153 of

16:08:49 15   your opening expert report in this case, correct?

16:08:51 16   A.      That sounds right.  I haven't memorized the

16:08:56 17   paragraphs.

16:08:59 18   Q.      And you told me in deposition that beyond the

16:09:02 19   examples in those paragraphs of your opening expert report,

16:09:06 20   you were not aware of any other specific instances of

16:09:10 21   head-to-head competition; correct?

16:09:14 22   A.      I think I said that I didn't have other examples

16:09:17 23   sitting there, correct.

16:09:19 24   Q.      And during questioning by the government today, you

16:09:27 25   said that these were examples of head-to-head competition

638

Rothman - cross

16:09:31 1 between Imperial and United; correct?

16:09:35 2 A.    That sounds right.

16:09:36 3 Q.    And I think you said that these are even examples of

16:09:39 4 switching between Imperial and United, correct?

16:09:47 5 A.    That sounds right.

16:09:48 6 Q.    That was your testimony just a little while ago on

16:09:51 7 direct; correct?

16:10:00 8 A.    I believe so, yeah.  Whether -- I was probably

16:10:05 9 talking about switching as well, head-to-head competition

16:10:10 10 also plays out when there isn't actually a switch from one

16:10:15 11 to the other.

16:10:15 12 Q.    You did say that, but you said these were examples of

16:10:18 13 switches, too; correct?

16:10:22 14 A.    I may have said, yeah, the specific words, I remember

16:10:28 15 discussing switching and then head-to-head competition when

16:10:32 16 there wasn't a switch.

16:10:33 17 Q.    So there are seventeen customer logos on this slide

16:10:37 18 from your direct; correct?

16:10:40 19 A.    I believe that's right.

16:10:42 20 Q.    And I think the Court is going to hear testimony from

16:10:48 21 four of them, Brill, the Piedmont Candy Company, the person

16:10:52 22 who testified this morning, Danone and General Mills who

16:10:57 23 testified on the first day of trial; is that right?

16:11:01 24 A.    That sounds right.  I don't have the witness order.

16:11:05 25 Q.    And you're not aware of any evidence that's to be

Rothman - cross

16:11:08  1    presented at this trial from any of the other supposed

16:11:12  2    examples of head-to-head competition and switching, are you?

16:11:20  3    A.      Sitting here right now, I don't have examples.

16:11:24  4    Q.      One of the companies whose testimony will be

16:11:29  5    presented at this trial is Danone.  You know that, right?

16:11:34  6    A.      In terms of the list of witnesses, I have watched the

16:11:41  7    proceedings to this point.  I don't have a list in front of

16:11:44  8    me in terms of what's happening going forward.

16:11:46  9    Q.      Fair enough.  You're aware that Danone provided a

16:11:50  10   deposition as part of the discovery process and you cited

16:11:54  11   that in your reports, correct?

16:11:56  12   A.      Yes, I believe so.

16:11:57  13   Q.      Did you read that deposition, sir?

16:12:01  14   A.      Yes.

16:12:02  15   Q.      Okay.  Let's see what Danone's vice-president

16:12:09  16   actually said.  This is from Mr. Buterman's opening.

16:12:15  17           "At any time in the last four years has Danone

16:12:17  18   purchased sugar from Imperial?"

16:12:20  19           "Not that I'm aware of."

16:12:22  20           Were you aware of that testimony, sir, before

16:12:24  21   today?

16:12:25  22   A.      I read the deposition transcript.

16:12:27  23   Q.      Do you recall that that was Danone's testimony that

16:12:30  24   they had purchased no refined sugar from Imperial in the

16:12:34  25   past four years?

Rothman - cross

16:12:37 1    A.       I don't recall that specific testimony.

16:12:40 2    Q.       And the Danone representative was also asked, "Does

16:12:45 3    Imperial compete for Danone's business?"

16:12:48 4             And the response was, "I would say they do not

16:12:50 5    necessarily compete for Danone's business because they have

16:12:54 6    not provided any bids for our business."

16:12:57 7             Do you see that?

16:13:01 8    A.       Yes.

16:13:02 9    Q.       But Danone is one of your examples of alleged

16:13:06 10   head-to-head competition and switching, correct?

16:13:10 11   A.       It is one of the examples of head-to-head

16:13:13 12   competition.

16:13:13 13   Q.       And General Mills is another example that you claimed

16:13:17 14   of head-to-head competition between United and Imperial,

16:13:21 15   correct?

16:13:22 16   A.       Yes.

16:13:24 17   Q.       Are you aware that Mr. Riippa testified yesterday,

16:13:28 18   that General Mills has not contracted with Imperial to

16:13:32 19   provide any bulk refined sugar to any of its, I think you

16:13:38 20   said dozen plus, fifteen co-packing plants in the United

16:13:42 21   States.  Were you aware of that testimony, sir?

16:13:45 22   A.       I saw portions of that testimony.  I'm not -- I don't

16:13:49 23   dispute it.  I don't specifically recall it.

16:13:52 24   Q.       Let's switch gears.  You have never offered an

16:13:57 25   opinion in a case involving an agricultural cooperative

Rothman - cross

16:14:01 1    before this one, have you?

16:14:05 2    A.      That's correct.

16:14:06 3    Q.      And you have never offered an expert opinion in a

16:14:10 4    case where the United States Department of Agriculture's

16:14:14 5    actions were relevant to the supply of the product at issue,

16:14:18 6    correct?

16:14:20 7    A.      That's correct.

16:14:21 8    Q.      You're not claiming to be an expert on the USDA's

16:14:25 9    management of the US Sugar program, are you?

16:14:29 10   A.      No.

16:14:31 11   Q.      And you're not claiming to be an expert in the laws

16:14:34 12   and regulations that the USDA administers as part of the US

16:14:39 13   Sugar program, are you?

16:14:41 14   A.      No.

16:14:42 15   Q.      You're testifying here on behalf of the plaintiff,

16:14:45 16   the United States of America; correct?

16:14:52 17   A.      That's my understanding, I think on behalf of the

16:14:54 18   Department of Justice.

16:14:55 19   Q.      Fair enough.

16:14:57 20           Did you speak with any employees of the United

16:15:01 21   States Department of Agriculture in connection with forming

16:15:04 22   your opinions in this case?

16:15:07 23   A.      I don't believe so.

16:15:09 24   Q.      Did you ask a single question to the Department of

16:15:12 25   Agriculture about its role in the refined sugar industry in

Rothman - cross

16:15:16 1 the United States?

16:15:21 2 A.    I certainly reviewed materials from the Department of

16:15:25 3 Agriculture, but I don't recall asking a question of the

16:15:28 4 Department of Agriculture.

16:15:30 5 Q.    Even though the plaintiff in this case is the United

16:15:33 6 States of America, you didn't interview anyone from the

16:15:37 7 Department of Agriculture and ask them any questions about

16:15:39 8 the USDA's role in the refined sugar industry, did you?

16:15:45 9 A.    No, as I said, I reviewed materials from the

16:15:49 10 Department of Agriculture, USDA but I did not conduct an

16:15:54 11 interview.

16:15:55 12 Q.    And you didn't speak to anyone at the Department of

16:15:57 13 Agriculture about the Department of Agriculture's views

16:15:59 14 about this transaction, did you?

16:16:02 15 A.    Me personally, no.

16:16:07 16 Q.    You didn't ask a single question to any employee of

16:16:10 17 the Department of Agriculture, about whether your opinions

16:16:14 18 are consistent with their view of the economic realities of

16:16:18 19 the refined sugar marketplace of the United States, did you?

16:16:22 20 A.    I did not have that conversation with anyone from the

16:16:27 21 Department of Agriculture.

16:16:28 22 Q.    Dr. Rothman, you don't have a Ph.D. in economics, do

16:16:33 23 you?

16:16:33 24 A.    No.

16:16:35 25 Q.    And you don't hold an advanced degree in agricultural

16:16:40 1   economics either, do you?

16:16:42 2   A.      No.

16:16:48 3   Q.      Now, let's take a look at what you said about the

16:16:51 4   USDA in your direct testimony here today.  I think in your

16:16:57 5   direct testimony, you talked about the US Sugar Program and

16:17:01 6   you talked about the USDA having a dual mandate.  Do you

16:17:06 7   recall that?

16:17:08 8   A.      Yes.

16:17:10 9   Q.      Now, you didn't include anything in this slide that

16:17:14 10  you presented to the Court to summarize your opinions about

16:17:22 11  whether part of the USDA's role is to ensure supply of raw

16:17:27 12  and refined sugar at reasonable prices, did you?

16:17:35 13  A.      No.  But including those words wouldn't change the

16:17:41 14  dual mandate.

16:17:42 15  Q.      You don't think including the words "manage the

16:17:46 16  supply of sugar to ensure adequate supplies of raw and

16:17:49 17  refined sugar at reasonable prices" would change your views

16:17:53 18  of the USDA's mandate?

16:17:55 19  A.      So with respect to the second mandate, my

16:17:58 20  understanding is it's to manage the supply of sugar to

16:18:02 21  ensure adequate supplies of raw and refined sugar and it

16:18:07 22  uses something called the stocks-to-use ratio, if the

16:18:12 23  stocks-to-use ratio is between 13.5 percent and

16:18:17 24  15.5 percent, it lets the market work.  So with respect to

16:18:21 25  the second mandate, the USDA, the stocks-to-use ratio speaks

16:18:26 1    to the adequacy of the supply of sugar.  If the

16:18:31 2    stocks-to-use ratio falls below 13.5 percent, that's an

16:18:35 3    indicator that the supply of sugar may not be adequate.

16:18:41 4    Q.    Well, you didn't include the words "at reasonable

16:18:47 5    prices" in this slide that you presented just a couple of --

16:18:51 6    an hour ago, did you?

16:18:54 7    A.    No, those word were not there.

16:18:57 8    Q.    Let's take a look at the next slide.  This is also

16:19:01 9    from Mr. Buterman's opening.  This is the secretary of

16:19:06 10   the -- the acting secretary of the U.S. Department of

16:19:09 11   Agriculture, and you see that he writes, "please be assured

16:19:13 12   that the U.S. Department of Agriculture will work diligently

16:19:16 13   to represent the interests of all our stakeholders and

16:19:19 14   manage the program to provide adequate supplies of both raw

16:19:23 15   and refined sugar at reasonable prices."  That's what he

16:19:27 16   wrote, correct?

16:19:29 17   A.    I see that there.

16:19:31 18   Q.    Now, during the government's questioning, you

16:19:34 19   testified that a company called CSC said it does not compete

16:19:39 20   with the merging parties, correct?

16:19:42 21   A.    I referenced testimony from the founder and CEO of

16:19:47 22   CSC.

16:19:48 23   Q.    And you presented a slide to the Court with an

16:19:51 24   excerpt from some testimony, correct, there it is?

16:19:56 25   A.    Yes.

Rothman - cross

16:19:57 1  Q.      Okay.  Did you read Mr. Farmer's entire deposition,

16:20:00 2  sir?

16:20:02 3  A.      Yes, I believe so.

16:20:07 4  Q.      So are you aware that Mr. Farmer testified "when we

16:20:10 5  offer sugar, we are not told by the buyer who the

16:20:14 6  competitors are, but to my knowledge, we have" -- and then

16:20:17 7  goes on, do you see that?

16:20:20 8  A.      Yes.

16:20:21 9  Q.      Okay.  And so Mr. Farmer's testimony is we are not

16:20:24 10 told by the buyer who the competitors are, correct?

16:20:30 11 A.      I see that.

16:20:31 12 Q.      And US Sugar, US Sugar is not -- they actually don't

16:20:37 13 sell refined sugar, do they, you testified earlier that

16:20:40 14 United does?

16:20:40 15 A.      I agree with that.

16:20:44 16 Q.      Now, are you aware that Mr. Farmer testified that he

16:20:50 17 would rely on sales, his sales data to determine where CSC

16:20:57 18 had made sales of refined sugar in the United States?

16:21:01 19 A.      Specifically I don't.

16:21:04 20 Q.      You see it displayed on the screen sir, Mr. Farmer's

16:21:08 21 testimony?

16:21:08 22 A.      Yes.

16:21:10 23 Q.      All right.  Let's take a look at what the sales data

16:21:14 24 shows.  Were you aware that CSC makes sales of refined sugar

16:21:18 25 in 35 different states in the Continental United States,

Rothman - cross

16:21:23 1    sir?

16:21:26 2    A.      It doesn't surprise me.  I wouldn't have said I was

16:21:30 3    aware of this specific map.

16:21:32 4    Q.      And CSC makes sales in Tennessee and Virginia and

16:21:37 5    other states within both of the Department of Justice's

16:21:42 6    claimed markets, correct?

16:21:44 7    A.      Yes, CSC has a market share in the markets that I

16:21:49 8    discussed earlier today.

16:21:50 9    Q.      And I think the CSC market share, that I recall

16:21:54 10   seeing in the broader or what the DOJ called the southeast

16:21:59 11   market was six percent.  Is that right?

16:22:02 12   A.      That sounds right.

16:22:03 13   Q.      Okay.  Now CSC has a refinery in Virginia, correct?

16:22:10 14   A.      Yeah.  I want to be careful about using the word

16:22:18 15   refinery.  CSC produces liquid sugar, and I don't recall all

16:22:23 16   the locations for CSC refineries.  I don't have a reason to

16:22:29 17   dispute that.

16:22:30 18   Q.      Why do you want to be careful about calling CSC a

16:22:34 19   refiner, sir?

16:22:35 20   A.      The distinction between producing dry granulated

16:22:39 21   sugar and liquid sugar.

16:22:40 22   Q.      Are you aware that the United States Department of

16:22:42 23   Agriculture calls CSC a refiner?

16:22:46 24   A.      Well, this is where I just want to know how different

16:22:52 25   terms are being used, I want to be careful with these terms.

Rothman - cross

16:22:56  1    Q.      I appreciate that response, you didn't answer my

16:22:59  2    question.  Are you aware that the United States Department

16:23:03  3    of Agriculture characterizes CSC as a refinery?

16:23:07  4    A.      I don't recall how the USDA characterizes CSC.

16:23:12  5    Q.      Are you aware that CSC has to report data on its

16:23:18  6    supplies and sales to the USDA in the same way that say

16:23:25  7    Imperial does?

16:23:28  8    A.      That wouldn't -- I'm not disputing that.

16:23:32  9    Q.      Are you aware that CSC also has a refinery in

16:23:36 10    Tennessee?

16:23:41 11    A.      I don't recall where CSC's locations are.

16:23:45 12    Q.      Let's take a look at the next slide.

16:23:48 13            So I think this slide is supposed to show the

16:23:53 14    southeast market and also the so-called narrower market;

16:23:59 15    correct?

16:23:59 16    A.      The terms we have been using are the narrower market

16:24:03 17    and the broader market.

16:24:05 18    Q.      Well, I think I asked you in deposition, have you

16:24:07 19    ever used the terms narrower market and broader market in

16:24:11 20    defining a relevant market before, and you told me you had

16:24:15 21    not; correct?

16:24:16 22    A.      I don't specifically recall that.

16:24:20 23    Q.      And within this slide that you presented to the Court

16:24:22 24    a short while ago, you purported to list the locations of

16:24:26 25    refineries; correct?

Rothman - cross

16:24:34 1    A.       This slide shows locations of refineries.

16:24:37 2    Q.       But you didn't include the locations of any CSC

16:24:40 3    refineries, did you?

16:24:45 4    A.       That's correct.

16:24:51 5    Q.       Let's switch gears a little bit and talk about market

16:24:56 6    definition for a moment.   Okay.   In this case you're

16:25:02 7    offering the opinion that the two regions identified in the

16:25:05 8    government's complaint, are relevant geographic markets for

16:25:09 9    antitrust purposes; isn't that right?

16:25:12 10   A.       Yes.

16:25:14 11   Q.       But you didn't personally select the states to be

16:25:18 12   included within the claimed relevant geographic markets, did

16:25:23 13   you?

16:25:24 14   A.       That's correct.

16:25:25 15   Q.       You took what the Department of Justice had alleged

16:25:29 16   and then you analyzed that, correct?

16:25:34 17   A.       Yes, I analyzed the markets that the United States

16:25:38 18   alleged.

16:25:39 19   Q.       So you didn't identify the candidate markets

16:25:42 20   yourself, did you?

16:25:47 21   A.       I evaluated the markets the United States alleged,

16:25:51 22   whether they were relevant antitrust markets for the

16:25:54 23   purposes of evaluating the competitive effects of the

16:25:57 24   proposed acquisition.

16:25:58 25   Q.       I appreciate that, I think we already understand that

Rothman - cross

16:26:02 1   you analyzed what the Department of Justice alleged.  My

16:26:06 2   question was different.  You went through an example in

16:26:11 3   response to a question that Her Honor asked, do you recall

16:26:15 4   that?

16:26:16 5   A.     Yes.

16:26:17 6   Q.     And in that example, you said well, let's talk about

16:26:21 7   the sale of milk, and we'll identify a candidate market of

16:26:26 8   one block.  Do you recall that?

16:26:27 9   A.     Yes, I do.

16:26:28 10   Q.     And then you said well we got to test it and then we

16:26:31 11   got to see if we need to go to two blocks or three blocks or

16:26:35 12   a larger geographic market.  Do you recall that?

16:26:37 13   A.     I do.

16:26:38 14   Q.     Okay.  In this case, you didn't identify the narrower

16:26:44 15   market, you didn't identify the candidate market, did you?

16:26:48 16   A.     I didn't identify the narrower market, I would say as

16:26:52 17   part of evaluating whether the markets the United States has

16:26:57 18   alleged are relevant markets for the purpose of evaluating

16:27:00 19   the competitive effect, but part of that is evaluating

16:27:04 20   whether the candidate market that's implicit in the United

16:27:08 21   States's market is -- makes sense from a market definition

16:27:11 22   perspective.

16:27:11 23   Q.     But you didn't identify the candidate market;

16:27:14 24   correct?

16:27:15 25   A.     I evaluated the markets the United States has

Rothman - cross

16:27:24 1    alleged, and what's implicit in that is a candidate market,

16:27:28 2    it's included in my analysis.

16:27:30 3    Q.    Well, you didn't identify it, you just accepted it,

16:27:33 4    correct?

16:27:35 5    A.    I would say I evaluated it.

16:27:37 6    Q.    And in your example, you said well, if you identify a

16:27:43 7    candidate market for milk and it's one block and then it

16:27:50 8    doesn't pass the hypothetical monopolist test, you got to go

16:27:54 9    broader, do you recall that?

16:27:56 10   A.    Yes.

16:27:56 11   Q.    And here your narrower market passes your

16:28:00 12   hypothetical monopolist test; correct?

16:28:04 13   A.    It does.

16:28:04 14   Q.    And your broader market passes your hypothetical

16:28:11 15   monopolist test correct?

16:28:12 16   A.    It does pass the hypothetical monopolist test.

16:28:14 17   Q.    And the merger guidelines say you're supposed to

16:28:17 18   focus on the smallest relevant market, is that true?

16:28:20 19   A.    I don't think the merger guidelines say precisely

16:28:22 20   that.

16:28:22 21   Q.    You didn't perform a hypothetical monopolist test on

16:28:29 22   any region that is smaller than the government's alleged

16:28:35 23   Georgia and surrounding states market, did you?

16:28:39 24   A.    I did not.

16:28:40 25   Q.    And you didn't perform a hypothetical monopolist test

16:28:43 1  on any region broader than the southeast market as alleged

16:28:47 2  by the United States, correct?

16:28:51 3  A.      I evaluated the markets the United States has

16:28:56 4  alleged.  Now a broader market, because the narrower and

16:29:00 5  broader market pass the hypothetical monopolist test, a

16:29:03 6  broader will also pass the hypothetical monopolist test.

16:29:06 7  Q.      Right.  You told me at deposition the entire United

16:29:09 8  States would pass your hypothetical monopolist test;

16:29:12 9  correct?

16:29:14 10 A.      I think the same principle is the narrower, the

16:29:19 11 broader market pass hypothetical monopolist, broader markets

16:29:22 12 will also pass the hypothetical monopolist test.

16:29:26 13 Q.      Sorry.

16:29:27 14 A.      Sorry.  I just want to be clear here that the

16:29:30 15 hypothetical monopolist test is one aspect, one part of

16:29:35 16 evaluating the relevant market.  There is also the -- just

16:29:40 17 going back to the principles of market definition where, the

16:29:45 18 market definition is to help with the evaluation of

16:29:48 19 competitive effects.  It's to help identify an area to focus

16:29:52 20 on in which there is potential for harm.  Markets that pass

16:30:00 21 the hypothetical monopolist test aren't -- multiple markets

16:30:05 22 can pass the hypothetical monopolist test.  That doesn't

16:30:08 23 mean that a national market is the relevant market for

16:30:12 24 evaluating competitive effects for the proposed transaction.

16:30:18 25 Q.      We'll get to some more questions about that, sir, but

Rothman - cross

16:30:21 1   I want to focus for a moment on the hypothetical monopolist

16:30:24 2   test, because you have talked about it and explained the

16:30:27 3   concept to the Court.  Let's be clear, the entire United

16:30:32 4   States would pass your hypothetical monopolist test;

16:30:36 5   correct?

16:30:36 6   A.     Well --

16:30:38 7   Q.     Can you answer that question, please, sir?

16:30:40 8   A.     I think the entire United States would pass the

16:30:43 9   hypothetical monopolist test.

16:30:43 10  Q.     The broader market plus Texas plus Illinois would

16:30:47 11  pass your hypothetical monopolist test; correct?

16:30:50 12  A.     I think that's likely.

16:30:53 13  Q.     A single plant within the narrower market where both

16:30:58 14  United and Imperial sell sugar would pass the hypothetical

16:31:03 15  monopolist test; correct?

16:31:07 16  A.     Not necessarily.  I'm not sure you're referring to a

16:31:10 17  single plant.  I just want to be clear here.  The markets

16:31:15 18  are defined around location of customers here, but not

16:31:20 19  necessarily.

16:31:20 20  Q.     I'm talking about a customer's plant.  I'm sorry if I

16:31:24 21  wasn't clear.

16:31:25 22  A.     I'm sorry.

16:31:26 23  Q.     You heard testimony -- you didn't hear testimony yet,

16:31:29 24  you heard in opening about Kraft's plant here in the State

16:31:34 25  of Delaware, correct?

Rothman - cross

A.      Yes.

Q.      Okay.  Did you look, did you analyze in any way whether that single Kraft plant in Dover, Delaware would pass your hypothetical monopolist test?

A.      Well, so I think that the question here is, I think you're suggesting identifying a candidate market defined around the location of where that plant is.  And the hypothetical monopolist test would ask whether the complete elimination of competition to supply to that specific geographic location would result in higher prices, and what would potentially constrain that would be arbitrage, purchasing the refined sugar outside of this market.  And that market may well be too narrow.  It doesn't necessarily pass the hypothetical monopolist test.

Q.      I appreciate the answer, I don't think you answered my question.  Which is, did you test whether or not a single plant within, a single customer plant within the broader market, for instance, would pass your hypothetical monopolist test?

A.      So I didn't evaluate the hypothetical monopolist test on any possible single location in the government's geographic markets.  I evaluated whether the government's geographic markets were well-defined geographic markets.

Q.      And you mentioned arbitrage a moment ago.  Let's explore that for a second.  Okay.  All right.  One way that

Rothman - cross

16:33:14 1    a customer might engage in arbitrage is if the customer has

16:33:19 2    a facility outside of these alleged relevant markets;

16:33:24 3    correct?

16:33:26 4    A.      In principle, yes.

16:33:30 5    Q.      I think you concluded in your report that arbitrage

16:33:34 6    was unlikely for a variety of reasons including "most

16:33:40 7    customers do not have facilities in multiple regions."

16:33:44 8    That's in paragraph 95 of your opening report, if you want

16:33:46 9    to take a look.  Do you recall that, sir?

16:33:48 10   A.      Yes, this was part of the analysis.

16:33:50 11   Q.      And are you aware of the testimony that's already

16:33:53 12   been elicited in this trial from, for example, General Mills

16:33:57 13   about the fact that it's got plants inside and outside of

16:34:01 14   the DOJ's claimed markets?

16:34:06 15   A.      Yes, I am aware of that testimony.

16:34:08 16   Q.      And you're aware that Mr. Riippa of General Mills

16:34:12 17   testified that because General Mills engages in bulk volume

16:34:18 18   contracts, General Mills has the ability to redirect supply

16:34:22 19   from say Iowa to Tennessee, do you recall that testimony,

16:34:27 20   sir?

16:34:28 21   A.      Yes.

16:34:30 22   Q.      Did you conduct any economic analysis to determine

16:34:35 23   whether purchasers like General Mills which have -- strike

16:34:42 24   that.

16:34:42 25           Did you conduct any economic analysis to analyze

16:34:47 1   how many purchasers are like General Mills and have

16:34:52 2   facilities inside and outside of the alleged relevant

16:34:56 3   markets?

16:34:59 4   A.      So this was part of the analysis of my evaluation,

16:35:06 5   the hypothetical monopolist test, one possible form of

16:35:09 6   arbitrage would be for the customers that have facilities

16:35:14 7   outside the geographic market in principle, they could

16:35:18 8   purchase the refined sugars at their locations outside the

16:35:22 9   market and then reship the sugars to their locations in the

16:35:26 10  market, and I explained that most customers don't have

16:35:30 11  locations outside of the market, and even for the customers

16:35:34 12  that do have locations outside of the market this type of

16:35:37 13  arbitrage would be costly and inefficient.  It would require

16:35:43 14  first, having the sugar shipped to their location outside of

16:35:45 15  the market, and then they would need to incur the cost of

16:35:49 16  receiving the sugar and then reshipping it back to their

16:35:53 17  location in the relevant market.

16:35:56 18       And what I explained is that this type of

16:35:59 19  arbitrage would not be sufficient to prevent prices from

16:36:04 20  going up as a consequence of the complete elimination of

16:36:05 21  competition to supply customers in the government's markets.

16:36:11 22  Q.      So it's your testimony that most wholesale customers

16:36:14 23  of refined sugar in the alleged broader market do not have

16:36:22 24  locations both inside and outside the market, is that your

16:36:27 25  testimony?

Rothman - cross

16:36:29 1    A.        Most --

16:36:30 2    Q.        Yes or no, sir?

16:36:32 3    A.        Yes.

16:36:33 4    Q.        And do you disclose in your reports any analysis that

16:36:40 5    supports your contention that most customers do not have

16:36:45 6    plants inside and outside of the alleged relevant markets?

16:37:05 7              Instead of having you paw through your report,

16:37:08 8    sir, do you recall disclosing that here today?

16:37:10 9    A.        I recall discussing it in my reports.  I was looking

16:37:13 10   back to where it was discussed.

16:37:15 11   Q.        You don't account for any arbitrage in your

16:37:27 12   hypothetical monopolist test, do you?

16:37:33 13   A.        I wouldn't agree with that, I'm not sure I

16:37:36 14   understand.

16:37:36 15   Q.        Your calculations factor in zero arbitrage, correct?

16:37:42 16   A.        I wouldn't -- no, I don't agree that factors in zero

16:37:47 17   arbitrage, my analysis is that arbitrage would not be

16:37:51 18   sufficient to prevent price increases.

16:37:54 19   Q.        Now, you are aware that defendant's expert,

16:38:00 20   Dr. Nicholas Hill has criticized the relevant markets that

16:38:02 21   the DOJ alleged and which you evaluated, correct?

16:38:10 22   A.        Yes.

16:38:11 23   Q.        And you're aware that Dr. Hill criticizes the

16:38:14 24   relevant markets for being too narrow, correct?

16:38:21 25   A.        Yes.

657

Rothman - cross

16:38:22 1    Q.      Dr. Hill's opinion is here on the screen, the

16:38:27 2    geographic markets are "arbitrarily selected and too

16:38:34 3    narrow", correct?

16:38:34 4    A.      Yes, he makes that claim and I disagree with

16:38:37 5    Dr. Hill.

16:38:38 6    Q.      And Dr. Hill proposes two potential alternative

16:38:48 7    markets correct?

16:38:49 8    A.      He proposed two alternative markets, yes.

16:38:51 9    Q.      And one is the competitive overlap region, correct?

16:38:56 10   A.      Yes.  Correct.

16:38:57 11   Q.      You don't dispute that Dr. Hill's competitive overlap

16:39:01 12   region would pass your hypothetical monopolist test, do you?

16:39:05 13   A.      No.  And I think this goes back to what I was trying

16:39:09 14   to emphasize before, which is that the hypothetical

16:39:12 15   monopolist test evaluates whether a market is well defined,

16:39:15 16   whether it would be worth monopolizing as a part of the

16:39:19 17   market definition analysis, but it's not the only criteria.

16:39:22 18   Q.      We'll come back to that in a moment.

16:39:26 19           The broader market that's alleged in the

16:39:28 20   complaint in which you took and evaluated, that completely

16:39:34 21   encompasses the so-called narrower market, correct?

16:39:41 22   A.      If I understand your question correctly, the narrower

16:39:45 23   market is within the broader market?

16:39:47 24   Q.      Correct.

16:39:48 25   A.      Yes.

Rothman - cross

Q.      And you don't contend and you're not offering an
opinion that the narrower market alleged in the complaint is
a superior geographic region for assessing the alleged
competitive effects of this merger than the broader area,
are you?

A.      No, my opinion is that both of these markets are
properly defined and they're useful for the evaluation of
the competitive effects of the proposed acquisition.

Q.      I asked you in deposition if the Court asked you to
choose between your two claimed relevant geographic markets
and you could choose only one, I asked you which one would
you choose, correct, do you recall that?  And your answer in
deposition sir, was I haven't done that specific analysis;
correct?

A.      That's correct.  That's not -- it's an analysis I
didn't need to do, both of the markets the government has
defined are properly defined, well defined antitrust markets
for the purpose of evaluating the competitive effects of the
merger.

Q.      You're not evaluating the opinion that Dr. Hill's
competitive overlap region is unhelpful for assessing the
potential anticompetitive effects of this merger, are you?

A.      Well, my opinion is that it's too broad, that it --
it is too broad and it includes areas of, bringing in areas
in which the customers have meaningfully different choices,

Rothman - cross

1 and the consequence of that is that it can confuse rather

2 than help clarify the analysis of competitive effect.

3 Q.    I heard your explanation of that on direct.  I

4 appreciate that.  You would agree that Dr. Hill's

5 competitive overlap region is based on the principle of

6 identifying states where United and Imperial compete today?

7 A.    I'm not disputing that.  I talked about this on

8 direct, that it is not inconsistent with my criticism of

9 this market, the relevant market does not need to include

10 all of the areas in which the merging firms compete.  Again,

11 the purpose of market definition, using market definition to

12 assist with the evaluation of competitive effects to help us

13 identify where the focus where the potential for harm is

14 likely to be the greatest.

15 Q.    I think you said that Dr. Hill's competitive overlap

16 region confuses things, because it brings in states where

17 customers might have different competitive alternatives; is

18 that right?

19 A.    Right.  For example I talked about how Dr. Hill's

20 competitive overlap market includes Michigan and Ohio, which

21 is what United refers to as the Michigan Sugar backyard.

22 Michigan Sugar has three or four processing facilities

23 there, it has a significant share of sales to customers in

24 those states.  The potential effect of the proposed

25 acquisition for customers in those states is meaningfully

Rothman - cross

16:43:02 1    different from the potential effects of the proposed

16:43:04 2    transaction on customers in the United States geographic

16:43:07 3    markets.   And combining these areas into the same market

16:43:12 4    serves to confuse rather than help clarify the potential

16:43:17 5    effects of the proposed acquisition.

16:43:19 6    Q.    So it would be wrong in your view to include in the

16:43:22 7    relevant market customers that have different sets of

16:43:27 8    competitive alternatives, is that right?  Yes or no?

16:43:34 9    A.    Well --

16:43:35 10   Q.    Yes or no?

16:43:36 11   A.    I don't think this is a yes or no question.

16:43:38 12   Q.    Well, please answer yes or no and then if you want to

16:43:41 13   explain, I'm sure Mr. Mincer will elicit some testimony on

16:43:46 14   the government's time.  Can you answer my question yes or

16:43:48 15   no, please, sir?

16:43:51 16   A.    Can you repeat the question?

16:43:52 17   Q.    Sure.

16:43:53 18         Would it be wrong in your view to include in the

16:43:55 19   relevant market customers that have different sets of

16:43:58 20   competitive alternatives?  Yes or no?

16:44:04 21   A.    It's not a yes or no answer, it depends, more

16:44:08 22   information would be needed.

16:44:14 23   Q.    One of the states that Dr. Hill includes in his

16:44:17 24   competitive overlap region is Pennsylvania; correct?

16:44:22 25   A.    Yes.

Rothman - cross

16:44:23 1   Q.     And Delaware is a state that is included in the

16:44:29 2   complaint's broader region; correct?

16:44:32 3   A.     Yes, correct.

16:44:34 4   Q.     You did do a analysis to determine whether the

16:44:38 5   competitive conditions for the sale of refined sugar are

16:44:41 6   different in Pennsylvania than they are in Delaware, didn't

16:44:43 7   you?

16:44:46 8   A.     No, this was not an analysis I needed to do for

16:44:49 9   evaluating the government's market.

16:44:51 10   Q.     And you don't dispute that both Imperial and United

16:44:55 11   compete for sales in Pennsylvania, do you?

16:44:59 12   A.     No, I'm not disputing that.

16:45:08 13   Q.     Dr. Rothman, let's take a look at another slide that

16:45:12 14   you used in your direct testimony.  The geographic market

16:45:17 15   definition slide.  Thank you.

16:45:18 16        Now, I think you focused much of your testimony

16:45:27 17   on the market shares that are listed on the right side of

16:45:34 18   this slide.  Do you recall that?

16:45:36 19   A.     I recall talking about the market shares on the right

16:45:39 20   and the left side.

16:45:40 21   Q.     Now, LSR is not listed on the right side of this

16:45:44 22   slide, is it?

16:45:47 23   A.     It's not.  LSR shares are about seven percent of the

16:45:52 24   states shaded in red.

16:45:55 25   Q.     LSR today is selling refined sugar into both the

Rothman - cross

16:46:00 1    narrower and by definition broader markets alleged by the

16:46:04 2    Department of Justice; correct?

16:46:06 3    A.      Yes, that's correct.

16:46:08 4    Q.      And is it your opinion that LSR would not try to take

16:46:13 5    advantage of a price increase that was limited to these two

16:46:19 6    claimed regions and try to sell more sugar into those

16:46:24 7    regions than it currently is today if there was indeed a

16:46:28 8    price increase, is that really your opinion, sir?

16:46:30 9    A.      It's not my opinion that LSR won't do it at all.  My

16:46:34 10   opinion is that this type of expansion that you're

16:46:38 11   describing would not be sufficient to prevent the harm from

16:46:41 12   the proposed acquisition.

16:46:45 13   Q.      Now, the red shaded area or orange I can't really

16:47:00 14   tell which it is, but the so-called Clewiston, South Bay and

16:47:04 15   Imperial backyard, I think is the way it's been referred to,

16:47:09 16   that doesn't match the Department of Justice's alleged

16:47:12 17   southeast market, does it?

16:47:15 18   A.      That's the -- what I have been referring to as the

16:47:18 19   narrower market.  The broader market includes Mississippi,

16:47:22 20   Kentucky, West Virginia, Virginia, Maryland, Delaware, the

16:47:27 21   District of Columbia.

16:47:29 22   Q.      You don't cite one ordinary course document from any

16:47:32 23   supplier or customer or from the USDA that matches the

16:47:36 24   southeast region alleged in the complaint, do you?

16:47:41 25   A.      That matches the exact set of states in the broader

16:47:45 1  market.

16:47:45 2  Q.      Correct?

16:47:46 3  A.      I don't believe I cite a document that matches the

16:47:50 4  exact set of states.  With respect to the narrower market,

16:47:56 5  this does come -- this is the same set of states as what

16:48:00 6  United refers to as the US Sugar, Imperial, and ASR

16:48:05 7  refineries' backyard.

16:48:07 8  Q.      That's the one document in this case that matches

16:48:10 9  that claimed market, I agree with that.

16:48:12 10             Do you recall the testimony -- strike that.

16:48:16 11             Were you present for the testimony of

16:48:17 12  Mr. Sproull this morning?

16:48:23 13  A.      Yes.

16:48:23 14  Q.      Were you here for the sealed portion of that

16:48:26 15  testimony, sir?

16:48:29 16  A.      I'm not -- we were-I was watching and sometimes when

16:48:33 17  the courtroom was sealed, I think we lost --

16:48:37 18  Q.      Fair enough.  But you reviewed Mr. Sproull's

16:48:43 19  deposition that I took?

16:48:44 20  A.      Yes.

16:48:45 21  Q.      And you recall that there is an ordinary course ASR

16:48:49 22  document that looks at the geographic regions very

16:48:52 23  differently than this document; correct?

16:48:55 24  A.      The specifics of Mr. Sproull's deposition, I don't

16:49:01 25  recall, I mean I'm not disputing that there are documents

Rothman - cross

16:49:03 1    that refer to different combinations of states.

16:49:08 2    Q.     You list purported market shares on the right side of

16:49:12 3    this slide from your direct testimony; correct?

16:49:15 4    A.     Yes.   Those are shares of sales of refined sugar to

16:49:20 5    customers in the Georgia and bordering states market.

16:49:27 6    Q.     Okay.   Those shares, just so we're clear, those are

16:49:30 7    based on an assumption that distributors and their sales

16:49:34 8    don't count; correct?

16:49:37 9    A.     Well, I respectfully couldn't call it an assumption.

16:49:42 10   Distributors are not treated as market participants.

16:49:46 11   Q.     Fair enough.   You don't treat distributors as market

16:49:49 12   participants in this case, correct?

16:49:51 13   A.     That's correct.

16:49:52 14   Q.     Even though we saw the document in your direct

16:49:56 15   testimony in which a distributor is making -- is bidding for

16:50:01 16   the customer who testified this morning's business, correct?

16:50:05 17   A.     That's correct.   And I talked in my direct about the

16:50:10 18   distinction between at any given point in time being an

16:50:17 19   option, and whether the entity would be treated as a market

16:50:22 20   participant for the purposes of calculating market shares

16:50:25 21   for the purposes of evaluating competitive effects.

16:50:29 22   Q.     So for all of your analysis in this case, you do not

16:50:32 23   treat distributors as market participants; is that right?

16:50:35 24   A.     That's correct.

16:50:36 25   Q.     Okay.   Looking at the shares, for ASR as an example,

Rothman - cross

16:50:44 1    you attribute 25 percent of the sales in that region to ASR.

16:50:50 2    Do you know which ASR plants those sales come from?

16:50:55 3    A.      In these -- I didn't break that down in these

16:50:59 4    calculations.

16:50:59 5    Q.      You don't know that, you didn't analyze that, did

16:51:01 6    you?

16:51:02 7    A.      Sitting here right now, I don't recall.

16:51:04 8    Q.      You don't know how much of that claimed 25 percent

16:51:07 9    comes over from Louisiana, do you?

16:51:12 10   A.      No, not sitting here.

16:51:13 11   Q.      And you don't know how much of that claimed

16:51:16 12   25 percent comes down from Baltimore or down from Yonkers,

16:51:21 13   do you?

16:51:21 14   A.      Not sitting here.  Again, the numbers that -- the

16:51:25 15   point I was making with these calculations is different from

16:51:30 16   the specific issue, so I don't have those numbers in front

16:51:33 17   of me.

16:51:33 18   Q.      For United, you don't know how much of the claimed

16:51:37 19   34 percent in market shares actually is beet sugar that's

16:51:42 20   coming all the way down from the Red River Valley, do you?

16:51:46 21   A.      Same answer.

16:51:52 22   Q.      Now, as I understand it, sir, the only relevant

16:52:00 23   product market that you're testifying in support of here

16:52:02 24   today is the production and sale of refined sugar to

16:52:06 25   wholesale customers; is that right?

Rothman - cross

A.      Yes, that's correct.

Q.      And I think you confirmed, but let me just do it
again.  You don't believe that the sale of refined sugar by
someone that didn't produce it, that that sugar should count
in your relevant market calculations, correct?

A.      I think I explained that including a purchaser in the
product market, the market, the production and sale of
refined sugar is a well-defined market but the markets not
the production and sale and resale of refined sugar.

        As I explained, we talked about the hypothetical
monopolist test, that a market is well defined if it's a
market worth monopolizing, and that eliminating the
competition between all of the producers of refined sugar, a
purchaser in the product market wouldn't prevent that from
increasing prices.

Q.      I'm glad you brought that up.  You came up with an
example which was Nike and Adidas and Foot Locker, do you
recall that?

A.      I used an analogy.

Q.      It's the same one you used with me in deposition,
correct?

A.      That sounds right.

Q.      Okay.  And what I asked you in deposition was, I
think exactly what the Judge asked you, that it involves a
differentiated product, doesn't it?

Rothman - cross

16:53:42  1    A.       I don't recall you asking me that in deposition.

16:53:45  2    Q.       But your analogy involves a differentiated product,

16:53:51  3    doesn't it?

16:53:51  4    A.       I think it's fair to call Nike and Adidas a

16:53:57  5    differentiated product.  Without going to the analogy, I

16:54:01  6    think the point that I'm making here is that if you

16:54:03  7    eliminate all competition between producers of refined

16:54:09  8    sugar, the question is whether that would result in an

16:54:11  9    increase in price, and an entity that is a purchaser in that

16:54:16 10    market wouldn't constrain that from increasing prices

16:54:20 11    because their prices would be going up as well.

16:54:23 12    Q.       Now, sir, you agree with me that sugar is largely a

16:54:31 13    commodity product; correct?

16:54:34 14    A.       The product itself?

16:54:37 15    Q.       Yes.

16:54:38 16    A.       Can be characterized as largely a commodity product.

16:54:41 17    That doesn't mean that competition to supply refined sugar

16:54:45 18    is what an economist could call homogeneous product

16:54:50 19    competition.

16:54:50 20    Q.       You offered almost the same opinion in the Evonik

16:54:54 21    case, correct, you argued that hydrogen peroxide, even

16:54:56 22    though it's a commodity product, competition is

16:55:02 23    differentiated because suppliers are in different parts of

16:55:02 24    the country, that was your testimony in Evonik correct?

16:55:02 25    A.       The principle you're identifying is similar in the

Rothman - cross

16:55:12 1    sense that the product itself is not highly differentiated,

16:55:15 2    but the competition is differentiated.

16:55:17 3    Q.      And the court in Evonik rejected that opinion of

16:55:22 4    yours, correct?

16:55:22 5    A.      The court disagreed with the FTC.  I testified on

16:55:28 6    behalf of the FTC.

16:55:30 7    Q.      Now, the product market that you proposed is also

16:55:35 8    based on sales to wholesale customers, correct?

16:55:40 9    A.      The product market is defined as the production and

16:55:43 10   sale of refined sugar to wholesale customers.

16:55:46 11   Q.      And your definition of wholesale customers ranges

16:55:50 12   from retailers to food service companies that might supply a

16:55:55 13   Dunkin Donuts to industrial companies like General Mills;

16:55:59 14   correct?

16:55:59 15   A.      Those are wholesale customers.

16:56:08 16   Q.      For purposes of your work in this case, did you

16:56:11 17   conduct any analysis to determine whether or not the

16:56:17 18   competitive conditions for sale to industrial customers are

16:56:23 19   the same as the competitive conditions for sale of refined

16:56:27 20   sugar to retail customers?

16:56:31 21   A.      So my analysis considered all wholesale customers

16:56:37 22   together and I did not specifically differentiate between

16:56:40 23   sales to different types of whole sale customers in my

16:56:44 24   analysis.

16:56:44 25   Q.      In your analysis, did you consider whether customers

Rothman - cross

1   that can receive refined sugar by bulk rail such as General

2   Mills have the same competitive alternatives as customers

3   that can only receive sugar by truck like Piedmont Candy

4   that we heard about earlier today?

5   A.      My analysis was not that granular.

6   Q.      Do you know how many wholesale customers there are

7   within the alleged southeast market?

8   A.      The specific number, I don't know the exact number.

9   Q.      Did you attempt to quantify all of that in your work

10   in this case?

11   A.      You know, it would probably be in the data that I

12   worked with.  I don't recall the specific number.

13   Q.      Now, in your opening report, I think you wrote that

14   the Department of Justice's markets that you were evaluating

15   were logical because "refined sugar is costly to transport,

16   which means the geographic proximity to wholesale customers

17   matters," isn't that what you said in your opening report?

18   A.      Yes, that's consistent with the math we were looking

19   at with the shares showing the shares of sales to customers

20   and the different geographic regions.

21   Q.      I appreciate that answer.  I think you really didn't

22   answer my question, which is, did you say in your opening

23   report, "refined sugar is costly to transport which means

24   that geographic proximity to wholesale customers matters"?

25   A.      Yes.

Rothman - cross

Q.      And you said a consequence of where United and
Imperial operate refineries is that they're both relatively
well situated to supply wholesale customers in the
Department of Justice's alleged markets; correct?

A.      You didn't read exactly what that said, but it's
consistent with what I wrote.

Q.      That was in paragraph 9 of your opening report,
correct?

A.      I believe so.

Q.      And you said all else -- this is in your opening
report, "all else equal, customers will tend to purchase
from suppliers that are closer to them that can supply at a
lower overall cost, and so competition can differ
geographically."  Correct?

A.      Yes.

Q.      And that was the base -- one of the bases for your
contention that the Department of Justice's markets that
were alleged and that you were evaluating were logical,
correct?

A.      This is part of the analysis.

Q.      Then you submitted a reply report in this case on
March 24th; correct?

A.      Yes.

Q.      And the reply report, in the reply report -- strike
that.

671

Rothman - cross

16:59:57 1          Dr. Hill had submitted a report in between your

17:00:00 2  opening report and your reply report, correct?

17:00:03 3  A.      Yes, that's correct.

17:00:04 4  Q.      And Dr. Hill had taken your comments about how

17:00:08 5  geography matters and freight cost matters and he built an

17:00:12 6  economic model to test that, correct?

17:00:15 7  A.      I wouldn't say that he had an economic model to test

17:00:19 8  anything.

17:00:19 9  Q.      That's what Dr. Hill claims he did, correct?

17:00:22 10 A.      He may claim that.  I think Dr. Hill really

17:00:26 11 misinterpreted what I was saying about the importance of

17:00:33 12 geography and transportation cost.

17:00:37 13 Q.      Let's see, in the opening report, geography and

17:00:41 14 transportation costs are everything, that's what makes the

17:00:44 15 Department of Justice's alleged markets logical.

17:00:47 16          Let's see what you said in your reply report.

17:00:49 17 A.      I think you mischaracterized what I was saying in my

17:00:54 18 initial report.

17:00:54 19 Q.      Sir, in your reply report you said a supplier with a

17:00:57 20 transportation cost disadvantage can exert competitive

17:01:02 21 pressure by offering a competitive price and earning a lower

17:01:05 22 margin.  That's one of the things you said, correct?

17:01:07 23 A.      I did, and that's not inconsistent with what we were

17:01:12 24 looking at from my initial report.  I think you

17:01:15 25 mischaracterized what I said.

Rothman - cross

17:01:16 1   Q.      You also said suppliers can exert competitive

17:01:20 2   pressure even if they do not have the lowest transportation

17:01:24 3   costs, that's what you said in the reply report?

17:01:26 4   A.      Correct.

17:01:27 5   Q.      You said there are many potential reasons why a

17:01:30 6   supplier might be willing and able to offer a competitive

17:01:33 7   bid that is unrelated to freight cost.  Correct?

17:01:36 8   A.      Yes, this is correct.  I think what's relevant here

17:01:41 9   is that transportation costs matter, and that means

17:01:46 10  geography matters.  And that's why competition is regional.

17:01:53 11  Now, within a region when you have suppliers that are well

17:01:58 12  situated to supply customers, that's not to say that the

17:02:02 13  only thing that matters is transportation costs, suppliers

17:02:06 14  find other ways to impose competitive pressure on each

17:02:11 15  other.  This is what I was -- what I meant when I said

17:02:19 16  Dr. Hill misinterpreted what I was saying, and his models

17:02:23 17  are just, they're not addressing what I was saying.

17:02:29 18  Q.      In fact, I think you calculated that for 89 percent

17:02:33 19  of the customers that United supplied, United does not have

17:02:38 20  the lowest transportation cost.

17:02:41 21  A.      Correct.  In Dr. Hill's analysis that's correct.

17:02:47 22  There is nothing inconsistent here with on the one hand

17:02:51 23  geography being an important component of competition and

17:02:55 24  suppliers finding ways to impose competitive pressure on

17:02:59 25  each other and to win business even when they are not the

Rothman - cross

17:03:02 1    closest in terms of transportation.

17:03:05 2    Q.      Let's switch gears and talk for a moment about the

17:03:08 3    market concentration calculations you performed.  When you

17:03:12 4    testified earlier about a presumption of harm to

17:03:16 5    competition, that presumption was based on your calculation

17:03:18 6    of market concentration, correct?

17:03:25 7    A.      Yes.  The testimony on the presumption of harm was

17:03:28 8    based on the calculation of -- I also referred to

17:03:36 9    concentration calculations and exchanges of concentration to

17:03:38 10   markets and included additional states.

17:03:41 11   Q.      The geographic regions were to be -- that were being

17:03:45 12   studied were adjusted so the market share and concentration

17:03:49 13   calculations would change, correct?

17:03:52 14   A.      That's likely, yeah.

17:04:00 15   Q.      And just to confirm, the market share and

17:04:05 16   concentration calculations don't include suppliers, correct,

17:04:11 17   distributors, correct?

17:04:13 18   A.      The measures of market concentration are based on

17:04:17 19   shares.  Shares are based on sales of market participants as

17:04:22 20   I've explained, distributors should not be treated as market

17:04:26 21   participants for competitive effects analysis.

17:04:28 22   Q.      Are you aware that Section 5.1 of the Department of

17:04:32 23   Justice's own Horizontal Merger Guidelines say that all

17:04:36 24   firms that currently own revenues in the relevant market are

17:04:40 25   considered market participants?

Rothman - cross

A.      There is -- that's the opening statement, I think
that that's taking it out of context with the guidelines are
saying with respect to the identification of market
participants, the guidelines don't just say that.

Q.      Now, the market shares and the concentrations that
you relied on to support your opinion that the merger will
lead to a presumption of harm to competition are based on
2021 sales, correct?

A.      In my reply report, I updated everything to 2021 data
because the data had become available.

Q.      So your concentration calculations, your market
shares, they're all based upon 2021 data, correct?

A.      In the reply report, they are.  In the first report
they were based on 2020 data.

Q.      Fair enough.  But the reply report, those are the
concentration calculations that you're presenting in your
opinions here today; correct?

A.      Yes, that's correct.

Q.      Okay.  As I understand it, that testimony is based on
a snapshot in time, 2021, correct?

A.      It's based on 2021 data, yeah, that's correct.

Q.      So you're not making any kind of predictions or
assumptions about what will happen in later years with
respect to, for example, NSM's share; correct?

A.      The market shares and the market concentration

Rothman - cross

17:06:09 1   numbers are based on 2021 data, that's the most recent data

17:06:12 2   available.

17:06:12 3   Q.      And you see that NSM has grown its sales within the

17:06:17 4   broader market from one percent to three percent from 2019

17:06:20 5   to 2021, sir, correct.  Do you see that?

17:06:29 6   A.      Yes.  Imperial's sales went from 14 percent to

17:06:35 7   17 percent.

17:06:35 8   Q.      Well, Imperial's sales went up from 14 to 17 percent

17:06:39 9   because there was a force majeure, there was a beet freeze,

17:06:43 10  correct?

17:06:43 11  A.      There was a beet freeze.  Imperial's share went up

17:06:46 12  from 14 percent to 17 percent.

17:06:48 13  Q.      Let's get back to my question which you didn't

17:06:52 14  answer, sir.

17:06:52 15          From 2019 to 2021, NSM's share increased three

17:06:57 16  fold from one percent to three percent; correct?  Actually

17:07:00 17  it's more than that.

17:07:02 18  A.      It went from one percent to three percent between

17:07:06 19  2018 and 2021.

17:07:07 20  Q.      And in your market share calculations, you're

17:07:10 21  assuming that NSM stays at three percent, correct?

17:07:14 22  A.      The market share calculations are using 2021 data for

17:07:18 23  everybody.

17:07:18 24  Q.      And so the answer to my question is you're right, the

17:07:22 25  market share calculations assume no further growth by NSM,

Rothman - cross

correct?

A.      That's correct, the market share calculations don't

invent assumptions about what everybody's shares are going

to do over time.

Q.      And CSC shares are static even though its shares have

grown from three percent to six percent from 2018 to 2021,

correct?

A.      The market shares and market concentration numbers

use the numbers from 2021.

Q.      Now, when calculating market shares in this case, you

grouped together sales of sugar produced by each of United's

four members; correct?

A.      I calculated United's share.

Q.      And in all of your work in this case, you never

separately analyzed sales of sugar, that US Sugar had

produced, correct?

A.      No, that wouldn't have been -- that wouldn't have

made sense.

Q.      Now, you agree that US Sugar is the company that's

attempting to acquire Imperial; correct?

A.      Yes, correct.

Q.      Your analysis in this case assumes that post

transaction, United will market all of the sugar that

Imperial produces; correct?

A.      Yes, my understanding is that post transaction,

Rothman - cross

17:08:53  1    United would sell the sugar that's produced at Imperial's

17:08:57  2    Port Wentworth refinery.

17:08:58  3    Q.      And you understand that for the sugar that United

17:09:02  4    markets, United is the company that negotiates and

17:09:05  5    determines the prices it will charge for refined sugar,

17:09:08  6    right?

17:09:10  7    A.      Yes.

17:09:17  8    Q.      You agree that US Sugar has no control over the

17:09:20  9    prices that are charged for its sugar, correct?

17:09:25 10    A.      Yes, that's my -- United is the marketing entity of

17:09:31 11    its four member owners, its four member owners don't set

17:09:35 12    prices, they don't compete on price, they operate as one

17:09:38 13    economic unit and that's United.

17:09:40 14    Q.      And you told me at deposition that you're not aware

17:09:43 15    of a single document in this case indicating that the

17:09:45 16    purpose of this transaction in US Sugar's acquisition of

17:09:51 17    Imperial is to raise prices, isn't that right?

17:09:55 18    A.      I recall that.

17:09:56 19    Q.      And you would agree with me, don't you, that United

17:10:00 20    does not produce any refined sugar itself?

17:10:03 21    A.      I agree with that.

17:10:03 22    Q.      And you're not offering an opinion, are you, that

17:10:10 23    United has control over the amount of sugar produced by US

17:10:14 24    Sugar or any other member -- any of its other members;

17:10:16 25    correct?

Rothman - cross

A.      I'm not offering that opinion.

Q.      And you're not offering an opinion that United has

the ability to tell US Sugar to stop producing refined sugar

or to produce less refined sugar, right?

A.      I'm not offering that specific opinion.

Q.      And you're not offering an opinion that each of

United's member owners can independently choose their own

output, correct?

A.      I'm sorry, can you repeat that question?

Q.      Sure.  You're not offering an opinion that United's

owner members can each choose their own output

independently, are you?

A.      I'm not offering an opinion that they can't.

Q.      Because they each can -- let's clarify that.

        You're not offering an opinion in this case that

United's member owners have any limitations imposed by

United on their ability to choose their own output, are you?

A.      I haven't offered that opinion, no.

Q.      You're aware, aren't you, that US Sugar stated that

one of the reasons it wants to complete this transaction is

to increase the output of refined sugar at Imperial 's

refinery in Savannah?

A.      Yes, I am aware of that aspiration.

Q.      And did you hear Mr. Wineinger's testimony earlier

today, that he views this mandate to be able to sell all of

Rothman - cross

17:11:52 1   the refined sugar that its members produce?

17:11:55 2   A.      What I heard was that his mandate is to sell the

17:11:59 3   refined sugar, as much refined sugar at the highest possible

17:12:05 4   net selling price.

17:12:06 5   Q.      That's fair?

17:12:06 6   A.      Which to me is consistent with trying to make the

17:12:10 7   most profit for United's member owners, which is both trying

17:12:15 8   to sell as much sugar at the highest possible net selling

17:12:19 9   price.

17:12:19 10  Q.      But you heard his testimony where he was recounting

17:12:22 11  an example where he hadn't been able to sell it all.  The

17:12:26 12  cost of carrying the sugar to next year both in terms of the

17:12:30 13  cost of storage and also the cost in terms of the reduced

17:12:33 14  sales in the following year, correct?

17:12:35 15  A.      Yes, correct.  That example was consistent with an

17:12:38 16  objective of trying to sell the most refined sugar at the

17:12:42 17  highest possible net selling price to try to maximize profit

17:12:46 18  for the member owners.

17:12:48 19  Q.      You wrote in your reply report, didn't you, that

17:12:51 20  higher prices from the proposed transaction would result in

17:12:54 21  a decrease in the quantity sold in the relevant markets.

17:12:58 22  That's entered in your reply report, correct?

17:13:02 23  A.      Higher prices in general could result in a reduction

17:13:02 24  in quantities sold.  Here the quantities sold of refined

17:13:11 25  sugar are not that sensitive to price, but quantities and

Rothman - cross

17:13:18 1    prices are related.

17:13:20 2    Q.      What you wrote in your report was higher prices from

17:13:23 3    the proposed transaction would result in a decrease in the

17:13:26 4    quantity sold in the relevant markets.  That's what you

17:13:29 5    wrote in your reply report, correct?

17:13:31 6    A.      Yes, I wrote that, we're taking this out of context.

17:13:36 7    I wrote that, yes.

17:13:37 8    Q.      And you also wrote, United and Imperial increasing

17:13:41 9    prices would decrease the quantity that they sell and would

17:13:44 10   increase the residual demands of other sellers, correct?

17:13:49 11   A.      Yes.

17:13:51 12   Q.      You're not aware -- strike that.

17:13:53 13           You told me in deposition that you're not aware

17:13:56 14   of any evidence in this case stating that the purpose of

17:13:59 15   this transaction is to decrease output in any way, correct?

17:14:05 16   A.      Correct.

17:14:06 17   Q.      In fact, you have seen evidence that the purpose of

17:14:09 18   the transaction, as at least you called it, an aspiration in

17:14:13 19   your deposition, was for US Sugar to increase output at Port

17:14:18 20   Wentworth, correct?

17:14:19 21   A.      I am aware of that aspiration.

17:14:24 22   Q.      Now, you recognize, sir, that several of the sellers

17:14:30 23   of refined sugar in the United States are organized as

17:14:34 24   agricultural cooperatives, correct?

17:14:40 25   A.      Yes.

Rothman - cross

17:14:41 1   Q.      And that means that many of the sellers of refined

17:14:43 2   sugar in this country are actually owned by the farmers of

17:14:47 3   sugarcane and sugar beets.  You don't dispute that, do you?

17:14:51 4   A.      No, I don't dispute that.

17:14:53 5   Q.      And you're familiar with not just the testimony from

17:14:56 6   Mr. Wineinger, but also, for example, from the CEO of

17:15:00 7   Michigan and NSM that agricultural cooperatives view their

17:15:04 8   mandate as selling all of the products supplied by the

17:15:09 9   members of the cooperative, you're aware of that, correct?

17:15:13 10  A.      I don't recall the specific testimony.  I think that

17:15:19 11  -- understand that those words are used, for example, with

17:15:21 12  United, sell it all, but it's also sell it high and I think

17:15:26 13  that the real objective is to make the most profit for the

17:15:29 14  member owners, which involves both selling as much as

17:15:33 15  possible at the highest possible prices.

17:15:35 16  Q.      Now, just to confirm, you never offered an expert

17:15:39 17  opinion before in a case involving an agricultural

17:15:41 18  cooperative, correct?

17:15:42 19  A.      That's correct.

17:15:42 20  Q.      I think in your testimony earlier today, you went

17:15:46 21  through some, I believe what you called market conditions,

17:15:51 22  that you believe make the refined sugar industry in the

17:15:56 23  United States more conducive to coordinated interaction, do

17:16:00 24  you recall that?

17:16:01 25  A.      Yes, vulnerable to coordinated interaction.

Rothman - cross

17:16:04 1    Q.      I think you put up a slide which had an e-mail from

17:16:07 2    Mr. Speece who testified earlier today, do you recall that?

17:16:11 3    A.      Yes.

17:16:12 4    Q.      And I think that -- did you hear Mr. Speece's

17:16:18 5    testimony that what he meant by "signal the market" meant

17:16:23 6    signaling customers?

17:16:24 7    A.      I did hear him say that.

17:16:27 8    Q.      And you testified in the Evonik case on behalf of the

17:16:38 9    Federal Trade Commission, correct?

17:16:39 10   A.      Yes, that's correct.

17:16:40 11   Q.      And you offered the opinion in that case that the

17:16:43 12   market for hydrogen peroxide was vulnerable to coordination,

17:16:49 13   correct?

17:16:49 14   A.      Yes, that's correct.

17:16:50 15   Q.      And in Evonik, the court rejected the Federal Trade

17:16:57 16   Commission's request for injunction, correct?

17:16:59 17   A.      The court disagreed with the FTC, yes.

17:17:04 18   Q.      And the court disagreed with your opinion that the

17:17:08 19   market was vulnerable to coordination, correct?

17:17:12 20   A.      I believe that's correct.

17:17:14 21   Q.      And the Evonik court walked through a bunch of

17:17:12 22   factors that it relied on to ultimately find that the market

17:17:22 23   was not vulnerable to coordination, isn't that true?

17:17:27 24   A.      The Evonik court disagreed about whether the market

17:17:30 25   was vulnerable to coordination.

683

Rothman - cross

17:17:32 1   Q.     One of the factors the Evonik court pointed to was
17:17:37 2   the presence of sophisticated and powerful customers, right?
17:17:40 3   A.     That sounds right.
17:17:42 4   Q.     And you heard testimony from General Mills and other
17:17:46 5   companies in this case, correct?
17:17:49 6   A.     Yes.
17:17:50 7   Q.     And another factor that the Evonik court pointed to
17:17:57 8   that indicated that a market, the market in that case was
17:18:01 9   not vulnerable to the coordination was the presence and use
17:18:05 10   of large and long-term contracts; correct?
17:18:08 11   A.     That sounds right.
17:18:09 12   Q.     And you don't dispute that the majority of refined
17:18:13 13   sugar sold in the United States is sold pursuant to
17:18:17 14   long-term contracts, do you?
17:18:21 15   A.     It depends what you mean by long-term, but most
17:18:24 16   refined sugar is sold pursuant to contracts.
17:18:27 17   Q.     Well, we heard testimony from General Mills that it
17:18:31 18   contracts a year at a time, it does so in advance of the
17:18:35 19   year; correct?
17:18:36 20   A.     Yes.
17:18:37 21   Q.     Okay.  And another factor that the Evonik court
17:18:41 22   pointed to indicating that the market there was not
17:18:45 23   vulnerable to coordinated interaction, was the use of blind
17:18:49 24   bidding.  Do you recall that?
17:18:50 25   A.     Yes.

Rothman - cross

17:18:51 1   Q.      And you agree with me, don't you, that customers like

17:18:55 2   General Mills and Kraft and others use blind bidding, RFP

17:19:00 3   processes?

17:19:01 4   A.      I agree that RFP processes are used in the refined

17:19:07 5   sugar industry.

17:19:08 6   Q.      In your demonstratives I think you also pointed to

17:19:12 7   some e-mails involving Mr. Wistisen.  Do you recall that?

17:19:17 8   A.      Yes.

17:19:18 9   Q.      And I think in your demonstratives you had two sets

17:19:21 10  of e-mails, one on September 21st of 2020, do you recall

17:19:26 11  that?

17:19:27 12  A.      Yes, I -- September 2020, yes.

17:19:30 13  Q.      And you didn't conduct any Imperial analysis of

17:19:34 14  prices before or after those e-mails of September 21st of

17:19:40 15  2020, did you?

17:19:40 16  A.      No, I'm not sure what that analysis would be, but I

17:19:44 17  -- no, the interaction that I talked about was as an example

17:19:53 18  of the information sharing.

17:19:55 19  Q.      Well, you didn't conduct any empirical analysis to

17:19:58 20  see if prices rose after September 21st ever 2020, did you?

17:20:06 21  A.      No, I didn't conduct a specific analysis of that.

17:20:09 22  Q.      And the same is true for the e-mail you pointed to on

17:20:14 23  November 21, 2020, you didn't conduct any empirical analysis

17:20:18 24  of prices before and after that e-mail, did you?

17:20:22 25  A.      No.  These examples are making a different point.

Rothman - cross

17:20:35 1    Q.      Now, I think you testified in your calculation of

17:20:37 2    whether the coordinations would be profitable, you assumed

17:20:41 3    that United and ASR would coordinate on 10, 20, 30, or

17:20:46 4    40 percent of opportunity, is that right?

17:20:48 5    A.      I considered scenarios in which the extent of

17:20:52 6    coordinated interaction would be increased by different

17:20:57 7    increments and I reported the price effects across all of

17:21:01 8    the scenarios.

17:21:02 9    Q.      So those are just assumptions that you were using in

17:21:07 10   your analysis, correct?

17:21:08 11   A.      I would call them scenarios.  They provide

17:21:11 12   information about the range of potential price effect.

17:21:15 13   Q.      Now, let's take a look at a slide you presented in

17:21:21 14   your summary of opinions.  Sir, you presented a slide and

17:21:33 15   went through it with the Court, correct?

17:21:36 16   A.      Yes, that's correct.

17:21:37 17   Q.      And you're expressing things, expressing alleged harm

17:21:43 18   in dollars here; correct?

17:21:45 19   A.      Yes, that's correct.

17:21:47 20   Q.      And on a percentage basis, the claimed price effect

17:21:51 21   in the narrower market is 3.6 percent, correct?

17:21:57 22   A.      So are you talking about the weighted average.

17:22:00 23   Q.      The weighted average, correct?

17:22:02 24   A.      The exact number is three point something percent.

17:22:05 25   Q.      Figure 9 on page 44 of your reply report.  And you

Rothman - cross

17:22:12 1   presented it in court just a short while ago, sir?

17:22:14 2   A.      Yeah, I haven't memorized all the numbers and all of

17:22:18 3   the slides.

17:22:19 4   Q.      The weighted average in the narrower market was

17:22:27 5   around 3.6 percent, correct?  Is that right, sir?

17:22:34 6   A.      I'm looking.  Figure 9.  That's correct.

17:22:39 7   Q.      Okay.  And in your -- in the broader market, the

17:22:43 8   predicted price effect according to your model is

17:22:47 9   3.3 percent; correct?

17:22:49 10  A.      So these are both the Predicted Price Effects or just

17:22:53 11  the elimination of head-to-head competition, 3.6 in the

17:22:57 12  narrower market and 3.3 percent in the broader market.

17:23:02 13  Q.      And those estimates are based upon the Department of

17:23:07 14  Justice's claimed product market; correct?

17:23:11 15  A.      Those are the estimates of price effects on harm in

17:23:16 16  the United States's markets.

17:23:18 17  Q.      So the estimates are dependent upon the court

17:23:22 18  accepting the United States' product and geographic markets,

17:23:26 19  correct.

17:23:28 20  A.      The estimates are to customers in the United States's

17:23:31 21  markets.

17:23:31 22  Q.      And these estimates are based upon your so-called

17:23:35 23  second-score bidding model, right?

17:23:38 24  A.      These are based on a model that's called a second

17:23:42 25  score.

Rothman - cross

17:23:45 1   Q.      In your reply report you also presented evidence

17:23:49 2   using what you call a GUPPI model, correct?

17:23:52 3   A.      Yes, that's correct.

17:23:54 4   Q.      And you admitted in deposition that if companies are

17:23:59 5   competing at all and making any profits a GUPPI will also

17:24:03 6   predict some upward pricing pressure; correct?

17:24:07 7   A.      Yes, that's correct.

17:24:09 8   Q.      And in the GUPPI models in your reply report, the

17:24:13 9   highest predicted price effect was 3.2 percent, correct on

17:24:25 10  the weighted average basis, sir.   Table 8, sir.

17:24:47 11  A.      Yes, that's correct.

17:24:49 12  Q.      And the lowest predicted price effect there is

17:24:53 13  1.4 percent, correct?

17:25:01 14  A.      Yes, in Table 8, yes.

17:25:03 15  Q.      Let's talk about your GUPPI a bit more for a moment.

17:25:08 16  Your GUPPI went down by fifty percent from your opening

17:25:12 17  report to your reply report; correct, the predicted price

17:25:16 18  effect?

17:25:16 19  A.      The predicted price, I talked about this in direct.

17:25:19 20  Q.      You submitted an opening report in this case on

17:25:22 21  February 28th, isn't that true?

17:25:24 22  A.      Yes, that's correct.

17:25:25 23  Q.      Four days later you submitted a corrected report?

17:25:29 24  A.      Yes, that's correct.

17:25:30 25  Q.      Among the corrections was a correction to

Rothman - cross

17:25:33 1    paragraph 12 of your February 28th report where you called

17:25:36 2    the DOJ's markets highly concentrated today; correct?

17:25:42 3    A.      Yes.  This was the text where I had intended to write

17:25:48 4    that post transaction the DOJ's markets would be highly

17:25:52 5    concentrated.

17:25:53 6    Q.      What you wrote and what you had to correct is that

17:25:56 7    the markets are highly concentrated today, correct?

17:25:59 8    A.      Yes, that's correct.

17:26:00 9    Q.      So you corrected it in a corrected report submitted

17:26:03 10   on March 4th, correct?

17:26:04 11   A.      Yes, that's correct.

17:26:05 12   Q.      And then in your March 4th report, you had predicted

17:26:10 13   price effects using a GUPPI model, correct?

17:26:12 14   A.      Yes, that's correct.

17:26:13 15   Q.      And you got the GUPPI formula wrong in that report,

17:26:17 16   correct?

17:26:18 17   A.      Yes, I referred to this earlier, I flipped the price

17:26:23 18   ratio and that increased one predicted price effect and

17:26:27 19   decreased another.

17:26:29 20   Q.      And the court in Evonik found your GUPPI analysis was

17:26:33 21   unreliable, correct?

17:26:33 22   A.      The court disagreed with the GUPPI analysis.

17:26:40 23   Q.      And the Evonik court is not the only court to

17:26:42 24   disagree with your attempt to provide economic testimony;

17:26:42 25   correct?

Rothman - cross

A.      Other courts have disagreed with analysis I have done.

Q.      Your opinions were -- your HHI calculations were called or criticized in Altria and JUUL Labs by the judge there, correct?

A.      Yes, the judge disagreed with the calculation I did.

Q.      And you provided testimony in the Aya Healthcare case as well, correct?

A.      Yes, correct.

Q.      And your opinions were found unreliable by the Aya Healthcare case court, correct?

A.      I think there is some context there, but there is a statement by the judge to that effect.

MR. YATES:  Your Honor, Mr. Marriott on behalf of Imperial would like to ask just a few minutes of questions.

MR. MARRIOTT:  Good afternoon, Your Honor. David Marriott for LDC and Imperial.  May I proceed?

THE COURT:  Please.

BY MR. MARRIOTT:

Q.      Good afternoon, Dr. Rothman.

A.      Good afternoon.

Q.      I would like to ask you some questions about the government's proposed markets as they relate to Imperial's business.  Why don't we look together if we could at a map,

Rothman - cross

17:28:12 1    a demonstrative, DDX 4.  Do you see that, sir?

17:28:18 2    A.      Yes.

17:28:20 3    Q.      And the government's narrower alleged market is

17:28:24 4    depicted in blue and it's broader alleged market is depicted

17:28:30 5    in red.  Do you see that, sir?

17:28:33 6    A.      Yes.

17:28:34 7    Q.      And the government's alleged markets exclude states

17:28:38 8    in which Imperial markets refined sugar; correct?

17:28:44 9    A.      Yes, that's correct.

17:28:45 10   Q.      And so, for example, Imperial markets refined sugar

17:28:48 11   in Illinois, Indiana, Ohio and Pennsylvania, correct?

17:28:55 12   A.      Yes, I discussed this on direct.

17:28:58 13   Q.      And Imperial not only markets outside the

17:29:01 14   government's alleged markets but it also sells significant

17:29:04 15   quantities of sugar outside the government's alleged

17:29:09 16   markets; true?

17:29:09 17   A.      It sells refined sugar outside of the markets.

17:29:13 18   Q.      In fact in 2021, 47 percent of Imperial's sales were

17:29:18 19   outside of the government's narrower market, and 33 percent

17:29:22 20   of Imperial's sales were outside of the government's broader

17:29:27 21   market, correct?

17:29:28 22   A.      I haven't -- I don't recall that.  I haven't done

17:29:30 23   that calculation.

17:29:31 24   Q.      That's not a calculation that you did in connection

17:29:33 25   with submitting your opinions in this case, correct?

Rothman - cross

17:29:36 1    A.      Well, I'm not disputing the number.  I explained

17:29:41 2    earlier that the relevant market need not include all of the

17:29:45 3    areas in which there is a potential for harm from a

17:29:48 4    transaction.

17:29:49 5    Q.      But you don't dispute that in 2021, 47 percent of

17:29:52 6    Imperial's sales were outside of the government's narrower

17:29:56 7    market; true?

17:29:57 8    A.      I'm not disputing that.

17:29:59 9    Q.      I want to add if I could, Dr. Rothman, to our slides

17:30:05 10   figures and these come from DTX 516 which is in evidence

17:30:08 11   representing Imperial's 2021 sales by state.  Do you see

17:30:12 12   that, sir?

17:30:17 13   A.      I see what's on the screen.

17:30:20 14   Q.      That is what I am referring to.

17:30:22 15   A.      Okay.

17:30:22 16   Q.      And Imperial had more sales in some of the states

17:30:25 17   that are outside of the government's alleged markets than it

17:30:29 18   did in some of the states that are inside the government's

17:30:32 19   alleged markets; correct?

17:30:35 20   A.      Correct.  So, for example, Texas is a much, much

17:30:40 21   bigger state than West Virginia, it's not surprising that it

17:30:44 22   would have more sales in Texas than in West Virginia.

17:30:48 23   Q.      I'm glad you raised Texas, Dr. Rothman.  In fact,

17:30:52 24   Imperial had more sales in Texas than it did in all but two

17:30:56 25   of the thirteen states which are included in the

17:30:59 1  government's alleged markets, isn't that right?

17:31:01 2  A.    Yeah, Texas is a big state.  I think the distinction

17:31:06 3  here that's relevant is when we're thinking about potential

17:31:11 4  effects of a transaction, in Texas we're thinking about what

17:31:14 5  are the options that they have, and that's in terms of the

17:31:17 6  more relevant metric there would be Imperial's share of

17:31:21 7  sales to customers in Texas.  The eleven percent number is a

17:31:25 8  big number because there are a lot of people in Texas.

17:31:28 9  Q.    And the government's broader market, Dr. Rothman, it

17:31:32 10  excludes three of Imperial's ten largest states by volume,

17:31:37 11  isn't that right, Indiana, Ohio and Pennsylvania, do you see

17:31:42 12  those there in blue?

17:31:43 13  A.    I agree that those states are not included in the

17:31:45 14  government's market.

17:31:47 15  Q.    And Imperial had more sales, in fact, sir, in each of

17:31:51 16  Indiana, Ohio and Pennsylvania than it did in Mississippi,

17:31:57 17  Maryland, Delaware, and DC combined, isn't that right, sir?

17:32:03 18  A.    I haven't done the math.  I'm not disputing that.

17:32:09 19  It's not relevant to the analysis of geographic market.

17:32:12 20  Q.    Imperial competes with producers located both outside

17:32:16 21  the -- withdrawn.

17:32:20 22        Imperial competes with producers located outside

17:32:23 23  of the government's proposed market, you agree with that, do

17:32:27 24  you not?

17:32:27 25  A.    Yes.  For example, I talked about how in the

Rothman - cross

17:32:30 1    government's markets, LSR shares seven percent, LSR is

17:32:36 2    located outside of the geographic markets.  NSM shares two

17:32:41 3    percent, NSM's facilities are located outside of the

17:32:44 4    geographic market.  The markets are defined around the

17:32:48 5    locations of customers and any supplier that makes sales to

17:32:51 6    customers in the markets is included in the market.

17:32:54 7    Q.       So, for example, Imperial has competed with Michigan

17:32:58 8    Sugar for Kroger's business in Idaho, NSM for Hershey's

17:33:03 9    business in Pennsylvania, and LSR for Mar's business in New

17:33:07 10   Jersey, true?

17:33:09 11   A.       I'm not disputing that.

17:33:10 12   Q.       And you don't dispute, do you, that Imperial also

17:33:14 13   competes with distributors for business both in and outside

17:33:17 14   of the government's alleged market?

17:33:20 15   A.       There are instances where Imperial and a distributor

17:33:26 16   will be submitting bids for the same customer, and to some

17:33:33 17   extent there is some competition there.

17:33:34 18   Q.       In fact, sir, Imperial has lost business, has it not,

17:33:37 19   to Indiana Sugars, Batory and Sugar Services, correct?

17:33:42 20   A.       Yes, there are customers that have chosen to purchase

17:33:46 21   from distributors rather than from Imperial in given bidding

17:33:52 22   opportunities.

17:33:52 23   Q.       And Imperial has lost business to ADM, Archer Daniels

17:34:02 24   Midland?

17:34:03 25   A.       That wouldn't surprise me.

Rothman - cross

17:34:05  1    Q.      Regarding transportation costs, Dr. Rothman, Imperial

17:34:08  2    has only one refinery from which it services customers, is

17:34:12  3    that right?

17:34:12  4    A.      Yes, that's correct.

17:34:14  5    Q.      And the sugar that Imperial sells here in Delaware

17:34:17  6    comes from the same plant as the sugar that it sells in

17:34:20  7    California, correct?

17:34:22  8    A.      Well, my shares -- to the extent Imperial is making

17:34:28  9    sales to customers in California, it would -- it has one

17:34:32 10    refinery.

17:34:33 11    Q.      And we can agree, can we not, that Imperial's

17:34:36 12    refinery in Georgia is more than a thousand miles from parts

17:34:39 13    of Texas?

17:34:43 14    A.      I'm not disputing that.

17:34:46 15    Q.      And yet Texas is Imperial's third largest state by

17:34:50 16    volume sold, true?

17:34:52 17    A.      The specific ranges, I don't recall, I'm not

17:34:55 18    disputing that.

17:34:56 19    Q.      Let's see if we can add some more figures to our map,

17:35:02 20    Dr. Rothman.   These come from DTX 516 in evidence,

17:35:02 21    representing Imperial customers by state.   Do you see that,

17:35:02 22    sir?

17:35:12 23    A.      Yes.

17:35:12 24    Q.      And Imperial has more customers in some of the states

17:35:16 25    that are outside of the government's alleged markets than it

Rothman - cross

17:35:21 1  does in states in the government's alleged markets, true?

17:35:25 2  A.      Yes.

17:35:26 3  Q.      So look again at Texas.  Imperial has more customers

17:35:30 4  in fact in Texas than it has in any other state.  Isn't that

17:35:35 5  true?

17:35:37 6  A.      That's what these numbers indicate, Texas is a big

17:35:41 7  state.

17:35:41 8  Q.      And Imperial has more customers in each, in each of

17:35:45 9  Louisiana, Indiana, Michigan, Ohio, Pennsylvania and New

17:35:51 10  Jersey, than it does in Delaware, DC and West Virginia

17:35:56 11  combined, correct?

17:35:57 12  A.      According to these numbers, that's correct.  Imperial

17:36:04 13  makes sales outside of the market.

17:36:07 14  Q.      And similarly Imperial has more customers in each of

17:36:13 15  Nebraska, Missouri and Louisiana than it does here in

17:36:18 16  Delaware, true?

17:36:22 17  A.      According to these numbers, yeah.

17:36:24 18  Q.      When Imperial bids on new business, Dr. Rothman, it

17:36:28 19  competes against more than ten suppliers in some instances,

17:36:33 20  isn't that fair to say?

17:36:36 21  A.      It could.

17:36:37 22  Q.      So, for example, the most recent Kraft Heinz, RFP

17:36:42 23  invites bids from fourteen different suppliers, true?

17:36:47 24  A.      I am not disputing that.  I don't recall the

17:36:50 25  specifics of the most recent Kraft Heinz RFP.

Rothman - redirect

17:36:54  1    Q.      But you do recall, do you not, sir, that a number of

17:36:58  2    those companies, including LSR, are located outside the

17:37:02  3    government's proposed markets, correct?

17:37:06  4    A.      I'm not disputing that.

17:37:08  5    Q.      So in sum, Dr. Rothman, the government's alleged

17:37:13  6    markets exclude 33 to 47 percent of Imperial's 2021 sales,

17:37:18  7    four of Imperial's top ten states by sales, and states in

17:37:23  8    which Imperial has numerous customers, correct?

17:37:27  9    A.      I didn't calculate these numbers.  This is -- I'm not

17:37:32 10    disputing them.  Again, with market definition, the purpose

17:37:36 11    of market definition is not to identify the states where

17:37:40 12    Imperial has made sales, it's to identify the focus on the

17:37:44 13    areas where there is -- the potential for harm from the

17:37:47 14    proposed acquisition is likely to be the greatest.  And this

17:37:51 15    is conflating two different things.

17:37:55 16            MR. MARRIOTT:  I have no further questions, Your

17:37:56 17    Honor.  Thank you, Dr. Rothman.

17:37:58 18            THE COURT:  Thank you.  Redirect.

17:38:01 19            MR. MINCER:  Your Honor, I'll be very quick.

17:38:02 20                    REDIRECT EXAMINATION

17:38:02 21    BY MR. MINCER:

17:38:12 22    Q.      Dr. Rothman, could you provide a few examples of

17:38:17 23    industries in which you testified as an expert, just a

17:38:21 24    couple?

17:38:22 25    A.      Chemical products, consumer products.  Health care

Rothman - redirect

17:38:30 1   products.  Auto parts.

17:38:37 2   Q.    Do the principles of antitrust economics and the

17:38:42 3   Horizontal Merger Guidelines apply to all those industries?

17:38:46 4   A.    Yes, the principles are generally the same.  But

17:38:50 5   specific facts of cases and industries can be different, but

17:38:53 6   the principles are fairly general.

17:38:57 7   Q.    And do you recall, Dr. Rothman, defendants' counsel

17:39:01 8   asked you about the narrowest market principle.  Could you

17:39:07 9   explain what the Horizontal Merger Guidelines say about

17:39:11 10  that?

17:39:13 11  A.    I believe counsel asked me if the Horizontal Merger

17:39:17 12  Guidelines say that you should always define the narrowest

17:39:22 13  market, I don't think the guidelines say that.  The

17:39:25 14  guidelines discuss risks associated with defining markets

17:39:29 15  that are overly broad and the risks that by defining a

17:39:35 16  market that's overly broad the analysis of -- the suppliers

17:39:43 17  that are not close substitutes for customers in one part of

17:39:47 18  the market could be broad and that could result in

17:39:50 19  essentially confusing rather than clarifying the analysis of

17:39:54 20  competitive effect.

17:39:55 21  Q.    And finally, did Defendants' provide you with the

17:39:59 22  data to look at all instances of head-to-head competition

17:40:02 23  between United and Imperial?

17:40:05 24  A.    I don't think those data exist.  I am not aware of

17:40:10 25  those data -- those data are not available and I'm not sure

17:40:13 1    if those data even exist.

17:40:16 2                MR. MINCER:  Thank you.  No further questions.

17:40:19 3                THE COURT:  All right.  Thank you very much.

17:40:21 4    You are excused.

17:40:22 5                Okay.  It's 5:40.  Why don't we just take a

17:40:31 6    break, or break for the evening right now.

17:40:34 7                Tell me what's coming up so I know what to

17:40:38 8    expect.

17:40:39 9                MR. HANNA:  Your Honor --

17:40:43 10               THE COURT:  I don't recognize you over there, so

17:40:46 11   used to you being there.  I thought you were hiding.

17:40:49 12               MR. HANNA:  Your Honor, we expect to call three

17:40:51 13   more witnesses and play a video in the morning.  I think

17:40:55 14   it -- we'll have to use the confidentiality, I'll check

17:40:59 15   that, I'm pretty you sure all three of them have

17:41:03 16   confidentiality from third parties.

17:41:04 17               THE COURT:  Okay.

17:41:05 18               MR. HANNA:  That will be it and we will rest.

17:41:07 19               THE COURT:  All right.  And you guys are

17:41:09 20   watching your time because your time is kind of --

17:41:12 21               MR. HANNA:  We are.

17:41:12 22               MR. BUTERMAN:  Your Honor, since, if we have a

17:41:15 23   minute, one thing I did want to raise, we are moving very

17:41:17 24   efficiently.  There is one witness, the Hostess witness who

17:41:22 25   we understand is not available until Friday morning to get

17:41:27 1    here.  So I don't know if we're going to be done by Thursday

17:41:34 2    afternoon.  I don't know what Your Honor's plan was.

17:41:36 3                THE COURT:  Right now we are about fifteen hours

17:41:39 4    and forty-seven minutes into a twenty-eight-hour trial.  So

17:41:45 5    I would expect closing arguments would be Thursday afternoon

17:41:49 6    or Friday morning.

17:41:50 7                MR. BUTERMAN:  So Your Honor, we will go back

17:41:52 8    and if we can, report in the morning on this.  We

17:41:57 9    understand.

17:41:58 10               THE COURT:  And I know it's someone who is not

17:42:00 11   in your control.  So let me know what you get.  Tell them

17:42:04 12   what I said, and then see if that is at all helpful.

17:42:08 13               MR. BUTERMAN:  I believe it might be, Your

17:42:09 14   Honor.

17:42:09 15               THE COURT:  Okay.  All right.  Anything else?

17:42:13 16               MR. HANNA:  No, Your Honor.

17:42:13 17               MR. BUTERMAN:  No Your Honor.

17:42:14 18               THE COURT:  Thanks very much.

19                   (Court adjourned at 5:42 p.m.)

20

21                   I hereby certify the foregoing is a true and
      accurate transcript from my stenographic notes in the proceeding.
22

23                          /s/ Dale C. Hawkins
                          Official Court Reporter
24                          U.S. District Court

25