08:14:55

                    IN THE UNITED STATES DISTRICT COURT

                      FOR THE DISTRICT OF DELAWARE


        UNITED STATES OF AMERICA,       )
                                        ) VOLUME 4
                      Plaintiff,        )
                                        ) C.A. No. 21-1644(MN)
        v.                              )
                                        )
        UNITED STATES SUGAR             )
        CORPORATION, et al.,            )
                                        )
                      Defendants.       )


                         Thursday, April 21, 2022
                         8:30 a.m.
                         Bench Trial

                         844 King Street
                         Wilmington, Delaware


        BEFORE:   THE HONORABLE MARYELLEN NOREIKA
                  United States District Court Judge


        APPEARANCES:


                    UNITED STATES ATTORNEY'S OFFICE
                    BY:  SHAMOOR ANIS, ESQ.

                    -and

                    U.S. DEPARTMENT OF JUSTICE
                    BY:  BRIAN E. HANNA, ESQ.
                    BY:  CHINITA M. SINKLER, ESQ.
                    BY:  ROBERT LEPORE, ESQ.
                    BY:  CURTIS STRONG, ESQ.


                         Counsel for the Plaintiff

1   APPEARANCES CONTINUED:

2                 MORRIS NICHOLS ARSHT & TUNNELL LLP
                  BY:   JACK BLUMENFELD, ESQ.
3                 BY:   BRIAN P. EGAN, ESQ.

4                 -and-

5                 LATHAM & WATKINS LLP
                  BY:   JENNIFER GIORDANO, ESQ.
6                 BY:   LAWRENCE E. BUTERMAN, ESQ.
                  BY:   CHRISTOPHER YATES, ESQ.
7                 BY:   AMANDA REEVES, ESQ.
                  BY:   MOLLY M. BARRON, ESQ.

8
                          Counsel for the Defendant
9                         United States Sugar Corporation

10

11                RICHARDS LAYTON & FINGER
                  BY:   KELLY FARNAN, ESQ.
12
                  -and-
13
                  CRAVATH SWAINE & MOORE LLP
14                BY:   TIMOTHY G. CAMERON, ESQ.
                  BY:   DAVID R. MARRIOTT, ESQ.
15                BY:   DANIEL K. ZACH, ESQ.
                  BY:   LINDSAY J. TIMLIN, ESQ.
16                BY:   HANNAH DWYER, ESQ.

17                        Counsel for Defendants
                          Imperial Sugar Company and
18                        Louis Dreyfus Holding

19

20                HOGAN McDANIEL
                  BY:   DANIEL KERRICK, ESQ.
21
                  -and-
22
                  STINSON, LLP
23                BY:   PETER J. SCHWINGLER, ESQ.

24                        Counsel for the Defendant
                          United Sugars Corporation
25
                        — — — — — — — — — —

08:22:35 1                  THE COURT:  Good morning.   Please be seated.

08:29:17 2     All right.   Where are we?

08:29:23 3                  MS. DWYER:  Good morning, Your Honor.   At this

08:29:24 4     time defendants' would like to play the video deposition of

08:29:27 5     Mr. John Yonover of Indiana Sugars.  He's requested that his

08:29:31 6     deposition be played under seal because his testimony

08:29:35 7     contains competitively sensitive information.

08:29:37 8                  THE COURT:  So my ruling from yesterday on the

08:29:39 9     depositions will apply.   I think good cause has been

08:29:44 10    established in the submissions that we have had before us,

08:29:47 11    but I will ask that you ensure that the court reporter knows

08:29:50 12    what is confidential so we can do a line-by-line redaction

08:29:53 13    of the transcript.

08:29:55 14                 MS. DWYER:  His counsel, Robert Cecil, is here

08:29:58 15    today and would like to make an additional request.

08:30:01 16                 MR.CECIL:  Good morning.   Robert Cecil on behalf

08:30:04 17    of Indiana Sugars.

08:30:05 18                 Your Honor, I just want to address something

08:30:07 19    that came up yesterday in Dr. Hill's direct examination.   At

08:30:11 20    one point he offered two numbers that we seek to have sealed

08:30:13 21    in the record.   He have offered testimony regarding Indiana

08:30:17 22    Sugar's quantity of hundredweight sold and so just that

08:30:21 23    specific number we would like to have sealed.   He also

08:30:24 24    testified directly after that to the percentage that that

08:30:28 25    represented of the market share.   And so just the number of

08:30:32 1   the percentage we would also ask to have sealed.  I have

08:30:35 2   spoken to counsel for both plaintiff and defendants and they

08:30:38 3   don't oppose that request.

08:30:39 4              THE COURT:  That's fine.  You want to put on the

08:30:42 5   record something to establish that that is competitively

08:30:44 6   sensitive so I can rule on it.

08:30:47 7              MR. STEEPLE:  Yes, Your Honor.  It goes back to

08:30:48 8   our motion at Docket No. 182, but this is information that's

08:30:55 9   closely held by the company.  It's competitively sensitive

08:30:58 10  in terms of the amount of the quantity of sugar they need to

08:31:01 11  put into the market, their percentage of market share and so

08:31:05 12  for those reasons, Your Honor, for that to be divulged to

08:31:09 13  the public would be harmful to the business.  For that

08:31:13 14  reason, Your Honor, we ask for those two numbers to be

08:31:15 15  sealed from the public record.

08:31:17 16             THE COURT:  We will do that for the reasons you

08:31:18 17  just stated, as well as in the written submission.

08:31:23 18             MR. STEEPLE:  Thank you, Your Honor.

08:31:27 19             (Courtroom sealed.)

08:31:27 20             THE COURT:  Okay.  Play the deposition.

08:31:32 21             (Videotape deposition of John Yonover:)

08:31:35 22  Q.     How long have you worked at Indiana Sugars?

08:31:37 23  A.     I have been a full-time employee here for about

08:31:41 24  thirty-five years.  It's my family's business.  I'm third

08:31:45 25  generation.  And so as soon as I was old enough to hold a

08:31:48 1  broom, I've been involved in this company.

08:31:51 2  Q.      Okay.  And what's your current job?

08:31:52 3  A.      President and chief operating officer.

08:31:56 4  Q.      And Mr. Yonover, what kind of business is Indiana

08:32:00 5  Sugars?

08:32:00 6  A.      We would classify ourselves as a value-added

08:32:05 7  distributor.

08:32:05 8  Q.      What is a value-added distributor?

08:32:07 9  A.      We buy sugar and do stuff to it.  We take it and we

08:32:12 10 package it; we liquefy it; we grind it; we warehouse it; and

08:32:18 11 we distribute it.

08:32:22 12 Q.      And for your manufacturing processes themselves, how

08:32:27 13 many manufacturing facilities do you have?

08:32:30 14 A.      Well, manufacturing -- we don't make sugar.

08:32:35 15 Q.      Right.

08:32:37 16 A.      We buy sugar.  So, our manufacturing is more

08:32:41 17 packaging, grinding, and liquification.  And we have five

08:32:46 18 facilities.

08:32:48 19 Q.      Can you give a range in pounds of how much sugar

08:32:52 20 Indiana Sugars buys on a yearly basis?

08:32:57 21 A.      I would say that we're probably one of the top ten to

08:33:01 22 fifteen buyers of sugar in America.

08:33:03 23 Q.      And for the domestic sugar that you're buying --

08:33:06 24 refined sugar, who does Indiana Sugars buy its domestic

08:33:14 25 refined cane sugar from?

08:33:16 1   A.      We buy from every single U.S. producer of sugar.

08:33:20 2   Q.      Of cane sugar?

08:33:22 3   A.      As well.  Beet and cane.  We buy from all of them.

08:33:26 4   Q.      Now, I want to ask you about refined imported sugar.

08:33:30 5   Does Indiana Sugars buy imported refined sugar?

08:33:34 6   A.      We do.

08:33:35 7   Q.      Who does Indiana Sugars buy its imported refined

08:33:40 8   sugar from?

08:33:40 9   A.      It's a pretty lengthy list of different people we

08:33:46 10  trade with.  And, I would call it extremely proprietary.

08:33:49 11  Q.      Who are Indiana Sugars' typical type customers for

08:33:51 12  refined sugar?

08:33:54 13  A.      All the way from little mom and pop food companies,

08:33:58 14  all the way up to top five consumer packaged goods

08:34:03 15  companies.

08:34:04 16  Q.      And when you say "food companies," could you give me

08:34:10 17  an example?

08:34:13 18  A.      Kraft would be an example.

08:34:20 19  Q.      Can you tell me where the majority of Indiana Sugars

08:34:24 20  customers are located?

08:34:24 21  A.      So, I would say the majority of our customers are

08:34:28 22  within 250 miles of our five plants.

08:34:30 23  Q.      Does Indiana Sugars currently have any plans to

08:34:34 24  expand its sales in the southeastern United States?

08:34:37 25  A.      We are always looking to increase our business.  And,

08:34:41 1  we are always looking to prospect and grow.  So, the basic

08:34:46 2  answer to your question is, yes, we're always looking in all

08:34:50 3  markets that we can potentially trade in.

08:34:53 4  Q.     That's okay.  Does Indiana Sugars have any current

08:34:58 5  plans on the books, to expand its sales in the southeastern

08:35:02 6  United States?

08:35:02 7  A.     Yes.

08:35:03 8  Q.     What are those plans?

08:35:06 9  A.     We're considering building a new facility in the

08:35:12 10 area.

08:35:16 11 Q.     And what's your estimate of how long it would take to

08:35:20 12 get such a facility open?

08:35:21 13 A.     Twelve to eighteen months.

08:35:24 14 Q.     Who are Indiana Sugars' main competitors in the sale

08:35:28 15 of refined granulated sugar?

08:35:30 16 A.     It's a very unusual business.  Because, we have

08:35:33 17 competitors who do what we do.  And then the people that we

08:35:37 18 buy from are also our competitors sometimes, too.

08:35:41 19 Q.     Has Indiana Sugars ever bid to supply refined sugar

08:35:42 20 to a customer that it was aware was one of United's top

08:35:52 21 customers?

08:36:00 22 A.     Certainly.

08:36:01 23 Q.     How often?

08:36:02 24 A.     Frequently.

08:36:05 25 Q.     Could you expand?  How frequent?

08:36:10 1   A.      Well, United Sugars is one of the largest producers

08:36:15 2   of sugar in America.  They pretty much sell everybody.  So,

08:36:23 3   we would often quote it to the same customers.

08:36:25 4   Q.      How often do you win those?

08:36:28 5   A.      How often do we win them?  We have no tracking

08:36:33 6   mechanism for that.  I -- we've been in business a hundred

08:36:38 7   years next year.  So I guess we're winning some.

08:36:41 8   Q.      I wanted to ask you about the USDA sugar program.

08:36:47 9   Are you familiar with it?

08:36:48 10  A.      I would say I'm very familiar with it.  Yes.

08:36:54 11  Q.      And what's your familiarity with it?

08:36:57 12  A.      Well, since it pretty much dictates the entire

08:37:01 13  business, I -- I would say I know it pretty well.

08:37:05 14  Q.      You testified earlier today that Indiana Sugars

08:37:09 15  purchases sugar from pretty much every supplier that's out

08:37:13 16  there.  Is that right?

08:37:14 17  A.      Well, in the United States, every supplier that's out

08:37:17 18  there.  Yes.

08:37:19 19  Q.      Okay.  Every supplier in the United States that's out

08:37:21 20  there, you buy from is that right?

08:37:24 21  A.      Yes.

08:37:24 22  Q.      And then Indiana Sugars also buys from a number of

08:37:27 23  importers?

08:37:29 24  A.      Right.

08:37:30 25  Q.      Correct?

08:37:31 1    A.      Yes, that's correct.

08:37:31 2    Q.      I'm going to mark as Exhibit 1, a document Bates

08:37:34 3    stamped INDSUG-00002.  And I believe you have access to

08:37:42 4    that.  Let me know when you have it handy?

08:37:46 5    A.      Okay.  I have it.

08:37:47 6    Q.      Okay.  Great.  I'm going to represent to you that

08:37:51 7    this is a chart that your counsel produced to us in this

08:37:54 8    case.  Have you seen it before?

08:37:55 9    A.      I have.

08:37:56 10   Q.      And did you help prepare it?

08:37:57 11   A.      I did.

08:37:58 12   Q.      Okay.  Does it accurately reflect the suppliers from

08:38:02 13   whom Indiana Sugars purchased sugar from 2016 to 2021?

08:38:08 14   A.      Yes, it does.

08:38:09 15   Q.      Is it specifically the top ten suppliers?

08:38:11 16   A.      It is our sugar suppliers.

08:38:15 17   Q.      Okay.  Looking at Exhibit 1, we see that Indiana

08:38:21 18   Sugars's top supplier for the ███████████████████.  Is

08:38:26 19   that right?

08:38:26 20   A.      Yes.  That's correct.

08:38:27 21   Q.      And who is Indiana Sugars's number two supplier in

08:38:33 22   two of the last three years?

08:38:35 23   A.      ██████

08:38:37 24   Q.      ███████████ was number three in 2020.  Is that right?

08:38:41 25   A.      Yep.

08:38:42 1   Q.     It flipped to third place when imports took over

08:38:46 2   number two?

08:38:46 3   A.     Yeah.   That's exactly right.

08:38:49 4   Q.     Okay.   And by the way, I should be very clear that

08:38:52 5   the category called "offshore supply chain," that's the

08:38:58 6   import category, right?

08:38:59 7   A.     That's correct.

08:38:59 8   Q.     And that can be many numbers of importers?

08:39:03 9   A.     Yes.   Many different origins.

08:39:06 10   Q.     Okay.   Are you aware that Cargill has announced an

08:39:11 11   expansion plan at its facility in Gramercy, Louisiana?

08:39:17 12   A.     I am aware.

08:39:18 13   Q.     And are you aware that that expansion plan could

08:39:21 14   increase the capacity at that Louisiana facility by as much

08:39:26 15   as 50 percent?

08:39:27 16   A.     Yes, I am aware of that.

08:39:30 17   Q.     Would you consider that to be a pretty significant

08:39:33 18   expansion for a refiner like LSR in Gramercy?

08:39:37 19   A.     Yes, I think that's a large expansion.   Yes.

08:39:40 20   Q.     For Indiana Sugars, what do you expect that expansion

08:39:45 21   to mean for you?

08:39:46 22   A.     Potentially, additional supply.

08:39:48 23   Q.     How do you think the price of that supply might be

08:39:51 24   available to you, based on the expansion?

08:39:54 25   A.     There's many factors there.   I don't have an answer

08:39:59 1   for you on that.   I believe we would be able to do more

08:40:03 2   business with them.   That's my belief.

08:40:05 3   Q.       Okay.  Do you find -- do you regard that as a good

08:40:10 4   thing for Indiana Sugars?

08:40:11 5   A.       I do.

08:40:12 6   Q.       In the last five years, ██████ doesn't appear to

08:40:16 7   have been higher than number five on your list.  Is that

08:40:21 8   correct?

08:40:21 9   A.       That's correct.

08:40:22 10  Q.       And in 2021, ██████ was number six?

08:40:25 11  A.       Yes.

08:40:28 12  Q.       In 2020, it was seventh?

08:40:32 13  A.       Yes.

08:40:33 14  Q.       And in -- from 2016 to 2018, they dropped down to

08:40:38 15  eighth or ninth place.  Is that right?

08:40:41 16  A.       That's correct.

08:40:43 17  Q.       Okay.  And fair to say that Indiana Sugars has a

08:40:47 18  number of supplier options that it chooses to buy from

08:40:51 19  before ██████?

08:40:52 20  A.       As evidenced by their ranking.

08:40:52 21  Q.       Is it fair to say that Indiana Sugars will sell any

08:41:02 22  suppliers sugar in the United States wherever Indiana Sugars

08:41:02 23  thinks it makes sense to do that?

08:41:02 24  A.       Yes.

08:41:02 25  Q.       Do you -- does Indiana Sugars always know who it's

competing against when it's competing for a customer's

business?

A.      Very rarely do we know exactly who we are competing

with.

Q.      Does it matter to Indiana Sugars who you are

competing against?  Do you need to know that?

A.      Not generally.

Q.      Okay.  Does Indiana Sugars compete as aggressively

for any customer it's competing for regardless of whether

its suppliers may also be competing?

A.      Yes.

Q.      You testified earlier, I think, that Indiana Sugars

has competed against some of its suppliers for customers in

the past, and won that business; is that right?

A.      Yes.

Q.      How is it that you're able to beat some of your

suppliers when you're reselling their sugar?

A.      I only have three things:  Service, quality and

price.  And often, our service is exceptional to our supply

chain -- suppliers, we -- especially for small accounts we

tend -- they are more important to us.

Q.      Is it also the case that you're able to -- because

you buy from so many different suppliers, you're able to

keep your cost at a level that enables you to compete on

price for some of your suppliers?

08:42:31 1    A.      Certainly so.

08:42:32 2    Q.      Can you describe to me an example of how that might

08:42:39 3    work?

08:42:39 4    A.      Well, commodities.  The more you buy of a commodity,

08:42:43 5    generally, the better your price is.  So by the size of our

08:42:47 6    buys, we generally have opportunities that they create

08:42:51 7    themselves because we're buying better, because we buy more.

08:42:55 8    Q.      We talked a little bit earlier when the Department of

08:42:59 9    Justice was questioning you about how some of your purchases

08:43:02 10   from your suppliers, you do on an FOB basis.  Is that right?

08:43:06 11   A.      Yes.

08:43:06 12   Q.      Is one of the reasons that you might buy -- that

08:43:09 13   Indiana Sugars might buy on an FOB basis, because you don't

08:43:16 14   necessarily want your supplier to know where you're

08:43:19 15   reselling that sugar?

08:43:21 16   A.      Yes.

08:43:23 17   Q.      Okay.  And can you explain to me a little bit why

08:43:26 18   that might matter?

08:43:28 19   A.      There are -- there are customers that are not

08:43:31 20   well-known in the market and they are proprietary to us, or

08:43:35 21   other competitors.  So we would prefer not to have anybody

08:43:39 22   know who our customers are.

08:43:41 23   Q.      And is that because -- again, you consider your

08:43:44 24   suppliers also to be your competitors?

08:43:47 25   A.      Certainly.

08:43:49 1   Q.      And there's twelve very specific states that the

08:43:54 2   Department of Justice has alleged are within the southeast.

08:43:57 3   Okay?  It's Alabama, Delaware, Florida, Georgia, Kentucky,

08:44:03 4   Maryland, Mississippi, North Carolina, South Carolina,

08:44:10 5   Tennessee, Virginia, and West Virginia.

08:44:15 6          Did you catch all that?

08:44:17 7   A.      Oh, yeah.  No, I'm aware of how they define the

08:44:21 8   southeast.

08:44:22 9   Q.      Perfect.  You were asked some questions about a new

08:44:25 10  facility that Indiana Sugars has contemplated building in

08:44:31 11  the southeast.  Is that right?

08:44:32 12  A.      Yes.

08:44:32 13  Q.      And I know you don't want to specify where, but could

08:44:35 14  I just ask you, is the new facility you're considering

08:44:40 15  building in one of those twelve states?

08:44:42 16  A.      It is.

08:44:43 17  Q.      Is it the case that you are considering building a

08:44:47 18  facility in the southeast in one of those twelve states,

08:44:50 19  because Indiana Sugars believes that it has enough customers

08:44:54 20  in that area in order to justify the new facility?

08:44:58 21  A.      Yes.

08:44:58 22  Q.      Is it the case that you're -- Indiana Sugars is

08:45:02 23  considering building that facility within one of those

08:45:02 24  twelve states because you also see an opportunity to expand

08:45:03 25  your business in that area?

08:45:11 1   A.      Yes.

08:45:11 2   Q.      I'm going to ask you -- we've marked as Exhibit 2, an

08:45:19 3   Excel file that's Bates stamped INDSUG-00001.  It's an Excel

08:45:28 4   file.  And I'm going to represent to you that this is a data

08:45:32 5   file that your attorney produced to us in response to a

08:45:37 6   subpoena, indicating to us that these reflect Indiana

08:45:44 7   Sugars' sales into those twelve states in the southeast from

08:45:48 8   2016 to 2021.  Does that -- does Exhibit 2 appear to be that

08:45:56 9   data to you?

08:45:57 10  A.      It does.

08:45:58 11  Q.      Okay.  Do you believe that data to accurately reflect

08:46:03 12  Indiana Sugars' sales into the southeast between 2016 and

08:46:08 13  2021?

08:46:09 14  A.      Yes, I do.

08:46:10 15  Q.      Based on that data that you're -- that Indiana Sugars

08:46:15 16  has produced in Exhibit 2, it appears that Indiana Sugars

08:46:18 17  has increased its sales pretty significantly in the

08:46:23 18  twelve-state region between 2016 and 2021.  Does that sound

08:46:27 19  right to you?

08:46:28 20  A.      I notice that from the reports -- the other exhibit

08:46:32 21  that you had.  But, yes.  The answer is, yes.

08:46:35 22  Q.      Okay.  What, in your view, has allowed Indiana Sugars

08:46:39 23  to increase its sales volume so significantly in those

08:46:44 24  twelve states between 2016 and 2021?

08:46:47 25  A.      Better service.  Better customer response.

08:46:51 1   Q.     And is that increase in sales that you witnessed in

08:46:56 2   those twelve states part of the reason you're considering

08:47:00 3   building a new facility in those twelve states?

08:47:04 4   A.     It is part of the reason, yes.

08:47:07 5   Q.     Okay.  I am going to introduce as Exhibit 3, a

08:47:11 6   document that's Bates stamped INDSUG-00003, and ask you if

08:47:25 7   you've seen this document before?

08:47:28 8   A.     I have.

08:47:32 9   Q.     I'll still tell you what it appears to be, my

08:47:37 10  understanding is, is Exhibit 3 -- does it reflect Indiana

08:47:42 11  Sugars' top five customers by year in those twelve southeast

08:47:46 12  states from 2016 to 2021?

08:47:49 13  A.     Yes, it does.

08:47:52 14  Q.     You mentioned earlier that you typically, for

08:47:56 15  example, don't sell beyond 250 miles from a plant that you

08:48:02 16  have -- one of your five plants.  Is that right?

08:48:05 17  A.     In general, yes.

08:48:06 18  Q.     Okay.  But when it makes economic sense to do so,

08:48:12 19  does Indiana Sugars sell beyond that radius?

08:48:14 20  A.     Of course.

08:48:15 21  Q.     And do you look for opportunities to do that wherever

08:48:20 22  you can?

08:48:20 23  A.     Absolutely.

08:48:21 24  Q.     And will you continue to do that, as far as you can

08:48:24 25  tell, for the foreseeable future?

08:48:26 1  A.        Absolutely.

08:48:27 2  Q.        Would you say that only a small portion of Indiana

08:48:32 3  Sugars' sales are into the southeast?

08:48:35 4  A.        I wouldn't know that specific number, but it is not a

08:48:39 5  large market for us.

08:48:41 6  Q.        So in 2021, how much refined sugar did you sell on an

08:48:45 7  annual basis nationwide?

08:48:47 8  A.        ████████████████████████████████████████████

08:48:51 9  Q.        And in which state have you considered building a new

08:48:56 10  facility?

08:48:56 11  A.        ████████████████████████████████████

08:49:02 12              (End of videotape deposition.)

08:49:06 13              (Courtroom unsealed.)

08:49:06 14              MS. DWYER:  Thank you, Your Honor.  At this time

08:49:09 15  we would like to move DTX 115, which was Yonover Exhibit 1,

08:49:15 16  DTX Exhibit 116, which is Yonover Exhibit 3, and JTX 010

08:49:28 17  which was Yonover Exhibit 2 into evidence.

08:49:31 18              THE COURT:  Any objection?

08:49:35 19              MS. SINKLER:  No objection, Your Honor.

08:49:36 20              THE COURT:  These are admitted.

08:49:36 21              MS. DWYER:  We have three videos remaining,

08:49:42 22  these are all third party and none have requested

08:49:45 23  confidential treatment so we can open the court.

08:49:47 24              THE COURT:  We can open the courtroom.

08:49:50 25              MS. DWYER:  At this time defendant calls Chad

08:49:53 1   Bechard.  He's the Director of Commodities and Procurement

08:49:53 2   for Hostess.  And he is going to talk about purchasing

08:49:53 3   refined sugar.

08:49:53 4                    (Videotape deposition of Chad Bechard:)

08:49:58 5   Q.      Mr. Bechard, who do you currently work for?

08:50:01 6   A.      Hostess Brands.

08:50:02 7   Q.      And what is your job title?

08:50:04 8   A.      Director of Commodity and Procurement.

08:50:07 9   Q.      And Mr. Bechard, how long have you worked at Hostess?

08:50:11 10  A.      The new company?  It's been almost nine years.  If

08:50:15 11  you combine both, Hostess Brands and Interstate Brands

08:50:19 12  before, it's been nineteen.

08:50:21 13  Q.      And so what products does Hostess Brands make?

08:50:24 14  A.      Your standard is your Twinkies, your cupcakes, Debbie

08:50:29 15  snack cakes.  We do have co-packers that make our -- make

08:50:33 16  bread for us and pies.  But yeah, your standard, your

08:50:37 17  Twinkies, cupcakes, doughnuts, snowballs.  All the Hostess

08:50:41 18  products.

08:50:42 19  Q.      And that actually was just my next question.  So

08:50:42 20  where -- where are your Hostess bakeries located?

08:50:42 21  A.      We have a bakery in Emporia, Kansas; Columbus,

08:50:55 22  Georgia; Indianapolis, Indiana; Chicago, Illinois.  And then

08:50:58 23  we have one in Canada in Burlington, Ontario.

08:51:02 24  Q.      And how many of those bakeries use sugar?

08:51:05 25  A.      All of them use sugar.

08:51:10 1    Q.      And as part of your job, are you the person or one of

08:51:14 2    the people who makes the decisions about which suppliers

08:51:17 3    you're going to give Hostess's business to?

08:51:20 4    A.      Yes.  I -- I will -- I'm the chief buyer.  I buy all

08:51:25 5    the ingredients.  So I will make the final decision.

08:51:29 6    ███ ████████████████████████████████████████████████████

08:51:33 7    ██████████████████

08:51:35 8    ███ ██████████████████████████████████████████

08:51:39 9    ███ ███████████████████████████████████████████████

08:51:42 10   ████████████████████████████████████████

08:51:45 11   ███ ██████████████████████████████████████████

08:51:49 12   █████████████████████████████████████████████████

08:51:53 13   ████████████████████████████████████████████████████

08:52:04 14   ███████████████████████████████████████████

08:52:08 15   ███ ██████████████████████████████████████████████

08:52:11 16   ██████████████████████████████████████████████

08:52:15 17   ███████████████████████████████

08:52:18 18   ███ ████████████████████████████████████████████████

08:52:22 19   Q.      And so, how many prospective suppliers do you reach

08:52:27 20   out to, to get quotes from?

08:52:29 21   A.      Traditionally, there's four or five.  Not every year

08:52:34 22   do I bid it out.  Like, we'll have a standard -- like we had

08:52:39 23   -- there's some years where United, we have a standard

08:52:44 24   price.  And "here's what our FOB price.  Here's what our

08:52:50 25   delivered price.  And here's what the fuel surcharges are."

08:52:54 1  And we take those and if we feel like it's good and we're

08:52:58 2  getting a good price on an FOB price of sugar, we will just

08:53:02 3  go ahead and book it and not bid it out for that year,

08:53:05 4  because it's a good price for us.

08:53:06 5  Q.      And do you find that you are then sometimes able to

08:53:09 6  get a good price for you from United without getting quotes

08:53:12 7  from other suppliers?

08:53:13 8  A.      Yes.   I think some vendors want to make sure they

08:53:18 9  keep all of the business, and are willing to press to keep

08:53:21 10  that full business.

08:53:22 11  Q.      And is United one of those vendors?

08:53:24 12  A.      Yes.

08:53:24 13  Q.      And I think you mentioned that in some years, though,

08:53:28 14  that you will send out quotes to four or five other --

08:53:33 15  A.      Yes.   And I send them out to our major -- I send them

08:53:38 16  out to the big dogs.   Sorry.   The national -- the national

08:53:41 17  marketing.   The old Amalgamated Sugar.   Domino Sugar.

08:53:46 18  Michigan Sugar.   Indiana Sugar.   Even local guys.

08:53:49 19          When sugar got tight, I was even talking --

08:53:52 20  that's when we came with Pullman Sugar to buy some.   We just

08:53:55 21  -- we were using some from Marigold Sugar that had a

08:54:02 22  location for powdered sugar that was very close.   And then

08:54:05 23  they went belly up.   So...

08:54:10 24  Q.      And do you also ask for quotes from -- from a company

08:54:14 25  called Cargill?

08:54:15  1   A.      We have before.

08:54:17  2   Q.      And in terms of sourcing sugar, specifically, are

08:54:20  3   there certain common things that you've seen as your -- you

08:54:26  4   know, in your years of procurement that can disrupt the

08:54:32  5   continuity of supply of sugar?

08:54:35  6   A.      A hurricane.  A hurricane does a lot of damage to it.

08:54:39  7   We've had delays in rail truck transfers.  So there's always

08:54:44  8   options that any multiple things can cause delays.  My wife

08:54:51  9   makes fun of me for looking at the weather all the time,

08:54:54  10  because you are always looking at where -- where there is an

08:54:58  11  ice storm; where there is, you know, tornados, hurricanes,

08:55:03  12  all that stuff.

08:55:03  13  Q.      Let me ask you this.  Have you -- in your experience,

08:55:06  14  does the number of refining or processing plants that a

08:55:09  15  supplier has in its system something that can affect how

08:55:13  16  well they deal with disruptions, like weather, or -- or

08:55:17  17  transportation breakdowns?

08:55:19  18  A.      Yes.  I think that's huge.  Because it allows you to

08:55:22  19  have more places to -- so if it hits one portion of the

08:55:25  20  country, the other portion can still make up for it.

08:55:28  21  Q.      And does that make suppliers that have multiple

08:55:31  22  refining or production facilities within their system more

08:55:36  23  attractive to you when you're deciding where you're going to

08:55:41  24  award out Hostess's business?

08:55:45  25  A.      It is a part of my comfort level of, do I feel like

08:55:47 1    they can supply me.

08:55:48 2    Q.      I asked earlier about this.  I just want to make

08:55:52 3    sure.  Are there any circumstances that Hostess purchases

08:55:58 4    sugar on a spot to any of its bakeries?

08:56:01 5    A.      No.

08:56:07 6    Q.      You have worked with United, as a customer of United,

08:56:11 7    for about ten years or more?

08:56:13 8    A.      Yes.



08:57:32  1 ████████████████████████████████████████

08:57:38  2 ████████████████████████████████████████████

08:57:42  3 ████

08:57:42  4  Q.     And does the -- you mentioned pricing.  You know, to

08:57:48  5  what extent does the fact that Hostess is buying so much of

08:57:53  6  its volume from United help you negotiate a -- you know, a

08:57:59  7  good price from United?

08:58:00  8  A.     The more you buy traditionally, the more -- the

08:58:06  9  better price you're going to get.  And also, I've learned

08:58:11 10  from all this other time going out there is if somebody is

08:58:16 11  one of your major suppliers, they're more willing to get you

08:58:20 12  product on a timely manner, and they work with you to make

08:58:23 13  sure that they have you covered.  Because they know that's

08:58:26 14  their job as the primary supplier.

08:58:29 15  Q.     I think a minute ago, you were talking about how you

08:58:31 16  -- you know, you trust United to give you a good price

08:58:35 17  upfront.  Is that right?

08:58:36 18  A.     Yes.

08:58:37 19  Q.     Have there been times in your relationship with them

08:58:40 20  that you have kind of counter -- counter-offered and been

08:58:45 21  able to negotiate them down to a lower price?

08:58:48 22  A.     Yes.

08:58:48 23  Q.     And, again, is that something that you are able to do

08:58:55 24  by virtue of your kind of long, you know, relationship with

08:58:58 25  them?

A.      Yes.  But it also has to do with when I have a --
when somebody comes in on a bid with a lower price, I always
give my current supplier a chance to rebid it, so that we do
-- it saves, like I said, us time and money to not change
suppliers.

Q.      Do you feel like if you are getting kind of one or
two quotes from other suppliers that -- that's going to give
you what you need to be able to effectively negotiate
against United?

A.      Yeah.  And also, you know, you keep track of what the
market is doing, also.  I mean, I'm watching the market at
all times, like, where are the current bids out there and
what's going on.

Q.      All right.  Mr. Bechard, are you also familiar with
the company Imperial Sugar?

A.      Yes.

Q.      And so is the Imperial Port Wentworth refinery the
closest geographic refinery to Hostess's bakery in Columbus,
Georgia?

A.      I'm not a hundred percent confident, but yes, I think
so.

Q.      And in your years of buying for Hostess, including
that -- that Georgia location, have you found that Imperial
is also the -- the cheapest refinery for Hostess to buy from
for the Columbus location?

09:00:35  1   A.      Ironically.

09:00:38  2   Q.      Okay.

09:00:39  3   A.      In the past, it had not been.

09:00:43  4   Q.      And in -- in the nine years that you have overseen

09:00:49  5   procurement for Hostess, have you ever sought quotes from

09:00:56  6   that Imperial location?

09:00:57  7   A.      I have requested in the past.  And we had used them

09:01:02  8   in the past.

09:01:03  9   Q.      And when you say "in the past," was that more than

09:01:07 10   five years ago?

09:01:09 11   A.      Yes.

09:01:09 12   Q.      And how would you describe the prices that Imperial

09:01:14 13   has typically quoted you for the Columbus, Georgia location,

09:01:19 14   compared to other potential suppliers?

09:01:21 15   A.      In the past, when I bid them out, they were higher

09:01:26 16   than the bids I was getting from United Sugar.

09:01:33 17   Q.      And do you send quotes to Imperial to -- today, when

09:01:37 18   you're looking to bid out the main bulk EFG business?

09:01:44 19   A.      I had not sent it out to them in the past, because

09:01:48 20   they were surprisingly outside of the market, when I did bid

09:01:52 21   it out.

09:01:52 22   Q.      And when you say they were surprisingly outside of

09:01:57 23   the market, are you talking about in terms of the price that

09:02:00 24   they were quoting?

09:02:02 25   A.      Yes.

09:02:02 1    Q.      And so is it fair to say that Hostess has not

09:02:06 2    purchased any substantial amount of supply from Imperial in

09:02:17 3    the last five years?

09:02:23 4    A.      Correct.

09:02:25 5    Q.      Okay.  So as in terms of -- in terms of your

09:02:29 6    experience as a buyer, I think earlier today you told me

09:02:32 7    that suppliers that have more than one plant in their system

09:02:36 8    are more attractive to you.  Is that -- is that generally

09:02:46 9    right?

09:02:48 10   A.      I like when people have it.  Because in the past, if

09:02:53 11   there's been a problem, they have been able to fix it

09:02:57 12   quicker when you have multiple facilities.

09:03:00 13   Q.      And in terms of, you know, talking about that issue,

09:03:04 14   do you see any benefit to you, as a buyer at Hostess, from

09:03:07 15   US Sugar acquiring the Port Wentworth refinery from a

09:03:13 16   continuity of supply perspective?

09:03:15 17   A.      It would add an extra facility.

09:03:21 18   Q.      And is that a benefit to you at Hostess?

09:03:24 19   A.      Yes.  In the past it has been a benefit to having

09:03:28 20   multiple.

09:03:28 21   Q.      And, you know, do you specifically have any concerns

09:03:33 22   about the -- the transaction for Hostess in Georgia today?

09:03:38 23   A.      If they would match our specs -- if it matches our

09:03:42 24   specs and our requirement for quality, yes, I would have no

09:03:45 25   problem.

Q.      Yeah.   What have you -- what have you seen.   Have you
noticed a relationship between how long the sugar has to
travel to get to Hostess and the price for which you have to
pay for it?

A.      I mean, if -- I don't know how to properly answer
that.   In the past, though, the farther the distance, the
more expensive the product is.

Q.      And do you know --

A.      If you're looking at -- if you're on an even FOB
price.

Q.      I mean, would it be fair to say that a vendor who is
located geographically close to your Columbus, Georgia
facility has a price advantage over a competing vendor who
is located on the other side of the country?

A.      Yes.   That is correct.

Q.      Do you have any visibility into how a company -- do
you have any visibility into how United comes up with their
pricing?

A.      I have -- I have always requested delivered prices.
It gives a person that has -- in the past, it gives them a
chance that if they have a larger freight, they can reduce
their FOB price.   But that's why your question -- delivered
pricing, because that's what's going to impact me.

Q.      Do you ever use distributors to buy granulated sugar?

A.      No.

09:05:03 1    Q.       Why not?

09:05:04 2    A.       Because traditionally the prices are more expensive.

09:05:10 3    Because you are paying a third party to process the -- you

09:05:13 4    have -- somebody -- the distributor has to make money.

09:05:17 5    Q.       Are you aware of any instances in which a distributor

09:05:21 6    has competed against -- has competed for Hostess's business

09:05:25 7    for sales of granulated sugar?

09:05:28 8    A.        I honestly cannot remember, but I wouldn't be a

09:05:31 9    hundred percent confident with that answer.

09:05:33 10   Q.        All things being equal, wouldn't Hostess prefer to

09:05:37 11   have Imperial active in the market and competing against US

09:05:47 12   Sugar?

09:05:47 13   A.       Based on the history, I don't know if I can say that

09:05:52 14   because they were the higher priced person.

09:05:58 15              (End of videotape.)

09:06:00 16              MS. DWYER:  We have no exhibits for this

09:06:03 17   witness.

09:06:04 18              THE COURT:  No HoHo's to put in evidence for me?

09:06:09 19              MS. SINKLER:  No, Your Honor.

09:06:09 20              THE COURT:  All right.  What's next?

09:06:12 21              MS. DWYER:  So defendants would now like to call

09:06:12 22   Keith Krause.  He's the vice-president of purchasing at

09:06:17 23   McKee Foods and he'll also testify about purchasing refined

09:06:22 24   sugar.

09:06:22 25              (Video deposition of Keith Krause:)

09:06:23 1    Q.      What is your title at McKee?

09:06:25 2    A.      Vice-president of purchasing.

09:06:29 3    Q.      McKee has three facilities at which it makes

09:06:35 4    products; is that correct?

09:06:36 5    A.      Three locations.  Here in Collegedale, there's

09:06:42 6    currently two facilities that make product.  But three main

09:06:45 7    cities.

09:06:45 8    Q.      And could you tell me what those are?

09:06:48 9    A.      Yes.  Collegedale, Tennessee, our corporate

09:06:52 10   headquarters has two plants.  Then we have a Gentry,

09:06:56 11   Arkansas plant and a Stuarts Draft Virginia plant.  And on

09:07:00 12   top of that, we have a Kingman, Arizona warehouse, it's a

09:07:04 13   distribution center, but it does not make product there.

09:07:07 14   Q.      As part of your responsibilities, do you obtain

09:07:10 15   quotes from sugar suppliers?

09:07:11 16   A.      Yes.

09:07:16 17   Q.      Okay.  And do you negotiate pricing with sugar

09:07:21 18   suppliers?

09:07:21 19   A.      Yes.

09:07:22 20   Q.      So you've touched on this a little bit, but what does

09:07:25 21   McKee do?

09:07:28 22   A.      So we are the manufacturer of little Debbie Snack

09:07:32 23   Cakes.  And we also have Sunbelt brands, and Heartland

09:07:38 24   brands and we also own Drake cake brands that make Drake

09:07:42 25   cakes.

09:07:43 1    Q.      Does McKee purchase both beet sugar and cane sugar?

09:07:47 2    A.      Yes.

09:07:48 3    Q.      Do you know on an annual basis how much refined sugar

09:07:54 4    McKee purchases, on average?

09:07:57 5    A.      Of all my sugar contracts, between ███████████████

09:08:05 6    ███████, somewhere around that range, typically.

09:08:08 7    Q.      ███████████████████████

09:08:11 8    A.      Correct.

09:08:12 9    Q.      Turning to Stuarts Draft, Virginia, can you tell me

09:08:18 10   what companies ship bulk EFG by rail into Stuarts Draft?

09:08:26 11   A.      I know ██████████████████████████.   And we

09:08:36 12   might get some ██████ bulk up there, too, but I'm not sure,

09:08:48 13   I know they can ship up there, but I'm not sure if we're

09:08:51 14   receiving them right now.

09:08:53 15   Q.      Okay.  And again --

09:08:56 16   A.      Or have.

09:08:57 17   Q.      And again ██████, the sugar that's being delivered

09:09:00 18   to Stuarts Draft ██████, do you know where it's

09:09:04 19   originating from?

09:09:06 20   A.      From the -- from the northwest, you know, the Idaho

09:09:12 21   area where they produce.  I don't know which of their

09:09:14 22   approved places they ship from.  They get to choose that.

09:09:18 23   Q.      What is Indiana Sugar?

09:09:23 24   A.      I consider them what I call a reseller of sugar.  So

09:09:26 25   they buy sugar from the same vendors or more than I do --

09:09:31 1    more vendors than I do and then redistribute it through

09:09:35 2    different means, through bulk truck, bagged EFG and powdered

09:09:39 3    sugar bagged.

09:09:40 4    Q.    If Indiana is purchasing sugar through some of the

09:09:47 5    same sources that you are, what is the reason why you would

09:09:51 6    contract with them, as opposed to contracting with the other

09:09:55 7    entities?

09:09:58 8    A.    So I would do it in an emergency situation where I

09:10:02 9    needed to -- I could not get supply from my normal

09:10:07 10   suppliers, I would do it in that.  And also, I would do it

09:10:11 11   in a time when we've got planned mills, the powdered sugar

09:10:16 12   mills are being replaced and I needed powdered sugar, and

09:10:20 13   they had the volume for me.

09:10:22 14   Q.    Could you tell me, who are McKee's approved vendors

09:10:27 15   for EFG sugar?

09:10:30 16   A.    Okay.  ████████████████████████████████████████

09:10:35 17   ████████████████████████████████████████████████████████

09:10:44 18   ████████████████████████████████████████████████████████

09:10:50 19   ████████

09:10:51 20   Q.    Does McKee believe that with the set of companies

09:10:54 21   that are currently approved vendors for refined sugar, that

09:11:01 22   it's able to obtain sufficient competition and information

09:11:08 23   in making its buying decisions?

09:11:25 24   A.    Yes, I do.

09:11:25 25   Q.    In a given year, how many different suppliers do you

09:11:32 1    typically contract with for the three plants -- or the three

09:11:38 2    locations, I should say?

09:11:40 3    A.        Typically I think it would be four.

09:11:43 4    Q.        So to clarify, Exhibit 3 is a PDF of the spreadsheet

09:11:48 5    that Mr. Krause testified he uses for purposes of collecting

09:11:59 6    and documenting the bids and counters and -- related to

09:12:06 7    sugar purchases.  And Exhibit 4 is the actual Excel

09:12:16 8    spreadsheet that is reflected in the printout for Exhibit 3.

09:12:30 9    Is that correct, Mr. Krause?

09:12:38 10   A.        Okay.  So I see Exhibit 3.  Let me look at the

09:12:42 11   spreadsheet.  I mean, you know, without looking at every

09:12:47 12   cell, it appears to be a PDF of my spreadsheet, so...

09:12:56 13   Q.        But, for the record, we will mark as Exhibit 4 the

09:13:01 14   Excel spreadsheet.

09:13:03 15   A.        Okay.

09:13:04 16   Q.        Okay.  So just so we're clear, since 2016 at least,

09:13:09 17   McKee █████████████████████████████████████████

09:13:15 18   correct?

09:13:16 19   A.        I believe that's right, yes.

09:13:18 20   █ █████████████████████████████████████████████

09:13:24 21   █████████████████████

09:13:26 22   █ ███████████████████████████████████████

09:13:32 23   █████████

09:13:35 24   █ ███████████████████████████████████

09:13:41 25   █████████████████████████████████████████████

09:13:48 1 ███████████████████████████████████████████████

09:13:58 2 ████████████████████████████████████

09:14:01 3 ██    ███

09:14:05 4 Q.     Okay.  Given that you testified a few moments ago

09:14:10 5 that you ██████████████████████████████████████, would

09:14:14 6 you agree that when you have gone to suppliers since 2016

09:14:21 7 and asked them to lower their prices, you were never asking

09:14:28 8 them to ████████████████████████████████████████████?

09:14:36 9 A.     That's correct.  To my knowledge.

09:14:40 10 Q.     ██████████████████████████████████████████

09:14:45 11 ██████████████████████████████████████████

09:14:53 12 ██████████████████████████

09:14:57 13 ██     ████████████████████████████████████

09:15:03 14 ██████████████████████████████████████████

09:15:07 15 ██████████████████████████████████████████

09:15:10 16 ██████████████████████████████████████

09:15:13 17 ██     ████████████████████████████████████████

09:15:17 18 ████████████████████████████████████, McKee

09:15:21 19 still believes it's been able to obtain a competitive price

09:15:24 20 for its refined sugar; is that fair, in each of those years?

09:15:30 21 A.     To the best of my knowledge, yes.  You know, we've

09:15:35 22 been able to find the best price coming into the plant.

09:15:40 23 Q.     Mr. Krause, since 2016, has any offer to purchase

09:15:44 24 refined sugar that McKee has made to any supplier ████

09:15:52 25 ██████████████████████████████████████████████?

09:16:04  1    A.      To my recollection, no.

09:16:07  2    Q.      Since 2016, to your knowledge, has the price that

09:16:11  3    McKee received for any of its refined sugar ███████████████

09:16:22  4    ██████?

09:16:23  5    A.      Not to my knowledge.

09:16:25  6    Q.      Not to your knowledge?

09:16:27  7    A.      No.

09:16:28  8    Q.      Does McKee use raw sugar?

09:16:30  9    A.      No.

09:16:31 10    Q.      Does McKee import refined sugar?

09:16:36 11    A.      ████████████████████

09:16:38 12    Q.      Why not?

09:16:41 13    A.      It's cost prohibitive and we ███████████████████

09:16:46 14    ████████████████████████████████████████████████████

09:16:50 15    ████████

09:16:53 16    Q.      Is the price of refined sugar an important factor to

09:16:57 17    McKee?

09:16:57 18    A.      Yes.

09:16:59 19    Q.      Why?

09:17:01 20    A.      It's one of our biggest spends and we buy so much

09:17:07 21    that a penny a pound represents ████████████████████████

09:17:11 22    ██████.

09:17:11 23    Q.      McKee uses multiple suppliers for its refined sugar

09:17:15 24    needs?

09:17:15 25    A.      Yes.

09:17:16 1    Q.      Why is that?

09:17:18 2    A.      Well, I need a good supply and multiple suppliers and

09:17:21 3    also with the multiple suppliers you get better pricing,

09:17:25 4    because they have to meet competition.

09:17:27 5    Q.      Do you see a benefit from Imperial's presence in the

09:17:31 6    market?

09:17:31 7    A.      Yes. Yes.

09:17:35 8    Q.      What would the impact be to your business if Imperial

09:17:38 9    is no longer in the market as an independent supplier?

09:17:41 10    A.      It takes away another potential source, so in an

09:17:45 11    emergency it takes away that source.

09:17:49 12

09:17:53 13

09:17:58 14

09:17:58 15    Q.      Is the price of refined sugar increased to McKee,

09:18:04 16    what would you do in response to the price increases?

09:18:07 17    A.      We would have to pass on the price to the consumer,

09:18:10 18    eventually.

09:18:14 19             (End of video deposition.)

09:18:18 20             MS. DWYER:  Your Honor, we would now like to

09:18:21 21    move into evidence DTX 238 which was Krause Exhibit 3, DTX

09:18:22 22    239, which was Krause Exhibit 4.

09:18:31 23             THE COURT:  Any objection?

09:18:33 24             MS. SINKLER:  No objection, Your Honor.

09:18:34 25             THE COURT:  Thank you.  It's admitted.

09:18:37 1          MS. DWYER:   And defendants would like to play

09:18:39 2   their last video.   Defendant now call Jennifer Petibon by

09:18:43 3   video deposition.   And she is the Vice-President of

09:18:47 4   Procurement for Directs and Material Planning at Danone.

09:18:49 5   Ms. Petibon will also testify about purchasing refined

09:18:53 6   sugar.

09:18:53 7          THE COURT:   All right.   Thank you.

09:18:53 8          (Video deposition of Jennifer Petibon:)

09:18:54 9   Q.     Ms. Petibon, where do you work?

09:18:56 10  A.     I work at Danone in North America.

09:18:59 11  Q.     And what is your current role at Danone?

09:19:01 12  A.     I'm the Vice-president of Procurement for Directs and

09:19:06 13  Material Planning.

09:19:06 14  Q.     So in your current role, are you responsible for

09:19:09 15  Danone's purchases of refined sugar in the United States?

09:19:13 16  A.     Yes, I am.   In conjunction -- working, again, with

09:19:17 17  the global -- with the global team.

09:19:20 18  Q.     You testified earlier that Danone is a food and

09:19:23 19  beverage company.   Could you explain a little more for us

09:19:25 20  the types of food and beverage products that Danone makes?

09:19:28 21  A.     Yes.   Danone makes yogurt products.   Danone makes

09:19:32 22  coffee creamers.   Coffee -- ready to drink cold coffee.

09:19:38 23  Those would be some of the primary products.

09:19:44 24  Q.     Well, does Danone have production facilities in

09:19:48 25  Virginia?

1093

09:19:48 1    A.      Yes, we do.

09:19:49 2    Q.      And does it have production facilities in Florida?

09:19:53 3    A.      Yes, we do.

09:19:54 4    Q.      Well, let's start with Florida.  Does Danone have a

09:19:57 5    facility located in Florida?

09:19:58 6    A.      Yes, it does.

09:19:59 7    Q.      And is that located in Jacksonville?

09:20:02 8    A.      It is.

09:20:03 9    Q.      And is Danone's facility in Virginia located in

09:20:08 10   Mt. Crawford?

09:20:09 11   A.      Yes, that's correct.

09:20:10 12   Q.      Let's mark our first exhibit, which is going to be

09:20:13 13   Petibon Exhibit 1.  Okay, ma'am.  This is an Excel document

09:20:19 14   bearing Bates stamp Danone 000007.  And it's a spreadsheet

09:20:24 15   that was produced in this litigation.  Would you describe

09:20:28 16   Danone as a significant purchaser of refined sugar in

09:20:32 17   Florida and Virginia?

09:20:34 18   A.      Yes.

09:20:35 19   Q.      And is it also correct that Danone, between 2018 and

09:20:40 20   2021, purchased all of its organic sugar for the

09:20:42 21   Jacksonville facility in Florida, from two suppliers as

09:20:42 22   well?

09:20:49 23   A.      Yes.  That's correct.

09:20:50 24   Q.      And who are those two suppliers?

09:20:52 25   A.      It's BSYD and Domino.

09:20:56 1  Q.      And can you tell me what is BSYD, ma'am?

09:21:01 2  A.      They are a Brazilian supplier.

09:21:04 3  Q.      And are they an importer of Brazilian sugar?

09:21:10 4  A.      Yes.

09:21:11 5  Q.      So, in Florida, according to Exhibit 1, is it correct

09:21:15 6  that Danone has purchased about 45 million pounds of refined

09:21:21 7  sugar, and all of it has come from Domino, United, and BSYD?

09:21:29 8  A.      Yes.  That's correct.

09:21:30 9  Q.      If we look at Danone's facility in Virginia, is it

09:21:35 10 correct that from 2018 to 2021, Danone purchased all of its

09:21:46 11 liquid cane sugar from two suppliers?

09:21:50 12 A.      For the Virginia facility?

09:21:54 13 Q.      Yes.

09:21:55 14 A.      Yes.

09:21:57 15 Q.      And who are those two suppliers for liquid cane

09:22:02 16 sugar?

09:22:02 17 A.      For liquid cane sugar it's Domino and Sugaright --

09:22:08 18 Sugaright also goes by CSC.

09:22:10 19 Q.      From 2018 to 2021, again, in the Virginia facility,

09:22:12 20 Danone purchased all of its organic sugar from two

09:22:12 21 suppliers.  Is that correct?

09:22:20 22 A.      Yes.  That's correct.

09:22:22 23 Q.      And who were those suppliers?

09:22:24 24 A.      BSYD and Domino.

09:22:28 25 Q.      And, all of that volume of refined sugar purchased by

09:22:32 1    Danone in its Mt. Crawford, Virginia factory, has come from

09:22:39 2    Domino, CSC and BSYD; is that correct?

09:22:44 3    A.      All of the liquid cane sugar and the organic sugar.

09:22:48 4    Yes.

09:22:51 5    Q.      Ms. Petibon, we've just loaded Petibon Exhibit 2.

09:22:56 6    This is another Excel spreadsheet bearing Bates stamp Danone

09:23:00 7    000059.  According to Exhibit 2, which suppliers supply

09:23:05 8    Danone with dry natural sugar at its Virginia facility, from

09:23:11 9    2018 through 2020?

09:23:12 10   A.      Domino and Zucramex.

09:23:18 11   Q.      And are they the only suppliers that supplied the

09:23:21 12   Virginia facility with dry natural sugar during that time

09:23:26 13   period?

09:23:26 14   A.      Yes.

09:23:26 15   Q.      And can you tell me the supplier or suppliers that

09:23:32 16   provided Danone's Virginia facility with liquid organic

09:23:38 17   sugar, between 2018 and 2020?

09:23:41 18   A.      Domino.

09:23:42 19   Q.      And is that the only supplier that supplied Danone's

09:23:46 20   Virginia facility with liquid organic sugar during that time

09:23:52 21   period?

09:23:52 22   A.      Yes, it is.

09:23:54 23   Q.      At any time in the last four years, has Danone

09:23:58 24   purchased sugar from Imperial?

09:24:00 25   A.      Not that I'm aware of.

09:24:02 1    Q.      In the course of the last four years, are you aware

09:24:05 2    of Danone purchasing any refined sugar products from

09:24:09 3    Imperial?

09:24:09 4    A.      No, I'm not.

09:24:11 5    Q.      Let's mark as Exhibit 3, a document that was produced

09:24:15 6    this morning.  It doesn't bear a Bates stamp, but it's a

09:24:21 7    document entitled "list of suppliers who submitted bids."

09:24:31 8    Do you know what this is?

09:24:32 9    A.      Yes.  It's a list of suppliers who submitted bids to

09:24:36 10   Danone.

09:24:40 11   Q.      And now, would the suppliers listed here have

09:24:43 12   submitted bids in response to an RFP or an invitation by

09:24:48 13   Danone for them to do so?

09:24:51 14   A.      Yes, they would have.

09:24:52 15   Q.      And so, if we look at Jacksonville first, it list dry

09:24:57 16   sugar; liquid cane sugar, dry organic; organic liquid sugar.

09:25:03 17   Do you see that down at the left-hand side?

09:25:06 18   A.      Yes, I do.

09:25:06 19   Q.      Is Imperial listed for any of those refined sugar

09:25:10 20   products in any of the years between 2018 and 2022?

09:25:15 21   A.      No, they are not.

09:25:16 22   Q.      So does that mean that Imperial did not submit a bid

09:25:20 23   for any of those refined sugar products during any of those

09:25:22 24   years?

09:25:22 25   A.      Yes.  That's correct.

09:25:27 1    Q.      Okay.  So let's look at the page 2; Mt. Crawford.

09:25:32 2    That's the Virginia facility, that is correct?

09:25:34 3    A.      Yes, that's correct.

09:25:35 4    Q.      And does this list the names of suppliers who

09:25:37 5    submitted bids for those particular refined sugar products

09:25:40 6    between 2018 and 2022?

09:25:44 7    A.      Yes, it does.

09:25:45 8    Q.      And is Imperial listed anywhere on this page?

09:25:47 9    A.      No, it is not.

09:25:48 10   Q.      So did Imperial submit a bid for any of those refined

09:25:52 11   sugar products between 2018 and 2022 to Danone?

09:25:56 12   A.      No, they did not.

09:25:57 13   Q.      In light of what we've been discussing this morning,

09:26:00 14   is it fair to say -- how would you describe the question of

09:26:13 15   whether Imperial competes for Danone's business?

09:26:19 16   A.      The -- I would say that they do not necessarily

09:26:27 17   compete for Danone's business.  Because they have not

09:26:30 18   produced -- provided any bids for our business.

09:26:38 19   Q.      Can you tell me who is Danone's biggest supplier of

09:26:42 20   sugar, by volume?

09:26:44 21   A.      That would be Sugaright.

09:26:47 22   Q.      And I think you --

09:26:49 23   A.      Or CSC.

09:26:51 24   Q.      And you testified before that's also referred to as

09:26:54 25   CSC.  Is that correct?

09:26:55 1  A.      Yes.  That's right.

09:26:56 2  Q.      And so, according to Exhibit 1, CSC has delivered

09:27:00 3  over 435 million pounds of sugar to Danone's facility in

09:27:06 4  Virginia over the last four years.  Is that right?

09:27:09 5  A.      Yes.  That's correct.

09:27:11 6  Q.      Would you have any reason to disagree with me if I

09:27:16 7  told you that over the last four years, based on the figures

09:27:20 8  in Exhibit 1, CSC has supplied nearly 69 percent of Danone's

09:27:26 9  refined sugar requirements in Jacksonville and Mt. Crawford?

09:27:30 10 A.      Yes.  That's how I -- that sounds about right.

09:27:33 11 Q.      And solely to the Virginia facility, CSC has supplied

09:27:41 12 nearly 74 percent of sugar during that same time period?

09:27:46 13 A.      That could be possible, yes.

09:27:48 14 Q.      And according to Exhibit 1, the volume supplied by

09:27:51 15 CSC has gone from 37 million pounds in 2018, to 109 million

09:27:58 16 pounds in 2019, to 120 -- excuse me -- million pounds in

09:28:06 17 2020.  And then, 166 million pounds in 2021.  Is that

09:28:12 18 correct?

09:28:12 19 A.      Yes, that's correct.

09:28:14 20 Q.      Would it be fair to say that CSC is Danone's most

09:28:18 21 significant sugar supplier?

09:28:19 22 A.      Yes, that's correct.

09:28:20 23 Q.      And I think if we look at Exhibit 1, it indicated

09:28:23 24 that at least two years, between 2018 and 2021, Danone

09:28:31 25 purchased organic sugar for its Jacksonville, Florida

09:28:36 1    facility from BSYD.  Is that right?

09:28:40 2    A.     Yes.  That's correct.

09:28:42 3    Q.     And as we discussed, is BSYD an importer of Brazilian

09:28:49 4    sugar?

09:28:49 5    A.     Yes, that's my understanding.

09:28:51 6    Q.     As opposed to sugar that needs to be refined, you

09:28:54 7    know, or raw sugar, is it correct that Danone buys refined

09:28:58 8    sugar from BSYD?

09:29:00 9    A.     That's my understanding.  Yes.

09:29:02 10   Q.     Now, you mentioned earlier that Danone has purchased

09:29:05 11   in the past from a company called Zucarmex.  Is that right?

09:29:17 12   A.     Yes.  That's correct.

09:29:18 13   Q.     And, in fact, if we look at Exhibit 2, Zucarmex is

09:29:28 14   referenced there as a supplier of dry natural sugar to

09:29:33 15   Danone's Mt. Crawford facility.  Is that right?

09:29:38 16   A.     Yes.  That's correct.

09:29:40 17   Q.     I'm sorry.  Could you look at Exhibit 3 for me?

09:29:43 18   A.     Yes.

09:29:44 19   Q.     And based on that exhibit, can you tell me whether

09:29:47 20   Zucarmex has submitted bids overtime.  And if so, for which

09:29:54 21   products for which facility?

09:29:55 22   A.     Okay.  So Zucarmex submitted bids in 2020 for

09:29:59 23   Jacksonville.

09:30:00 24   Q.     And for which product?

09:30:01 25   A.     For liquid cane sugar.  And Zucarmex provided bids in

09:30:08 1  Mt. Crawford for dry sugar in 2020; 2021.  And that is all,

09:30:14 2  to my understanding -- to my knowledge.

09:30:19 3  Q.      If we look again at Exhibit 3, there is a reference

09:30:27 4  with regard to dry organic sugar for 2022, that a company

09:30:32 5  called Sucro submitted a bid for the Jacksonville facility.

09:30:39 6  Do you see that?

09:30:39 7  A.      Yes.  I do.

09:30:40 8  Q.      Has Danone ever considered buying sugar from Sucro?

09:30:45 9  A.      Yes, we have.

09:30:48 10 Q.      So something you said while Mr. Cameron was talking

09:30:51 11 to you.  You asserted that Imperial -- it's your

09:30:56 12 understanding that Imperial does not currently meet, or has

09:30:59 13 not historically met Danone's specifications.  Do you recall

09:31:03 14 saying that?

09:31:03 15 A.      Yes.  That's correct.

09:31:04 16 Q.      What did you mean by that?

09:31:06 17 A.      So, my -- my understanding is that the specifications

09:31:11 18 that Danone has for sugar are not met by -- by Imperial.  We

09:31:16 19 require dry bone-free sugar.  And my understanding is that

09:31:22 20 that had not been available through -- through Imperial.

09:31:22 21 Q.      So, if Imperial's sugar -- if Imperial -- sorry, let

09:31:31 22 me restate the question.  If Imperial were to stop using

09:31:35 23 bone char in their sugar, would Danone consider them for

09:31:39 24 their sugar needs?

09:31:40 25 A.      So, Danone could invite Imperial to bid on -- on our

business, on the business for these facilities.  They would

need -- all suppliers need to meet the qualification --

excuse me, the specifications.  And they also need to be

cost effective and meet the quality requirements.

Q.      Does Danone solicit one bid for all of its

facilities?  One bid for sugar for all of its facilities?

A.      Danone issues bids for each of its facilities.

Often, we issue the bids at a similar time frame; or

sometimes altogether.  But -- but the bids are

facility-specific as part of an overall process.

Q.      Do you know why the bids are facility-specific, as

opposed to nationally contracted?

A.      Transportation is a key cost driver in -- in sugar.

And so, geographic location place a big role in -- in the

cost effectiveness.  So, that's why we split it out.

Q.      Do you know who Ms. Kernan is?

A.      Yes.  Ms. Kernan used to manage a sugar desk at

Danone, several years ago.

Q.      Was she a member of one of your teams?

A.      At the time that she was managing sugar, I was not at

Danone.

Q.      Okay.

A.      She did move into a different role, and was part of

my team in a different role.

Q.      So, at some point, were you Ms. Danone --

09:33:24 1    **Ms. Kernan's supervisor?**

09:33:27 2    **A.     Yes.**

09:33:28 3    **Q.     Is that -- okay.  Do you know who Mr. Speece is?**

09:33:33 4    **A.     I do not.**

09:33:39 5              **(End of videotape deposition.)**

09:33:42 6              **MS. DWYER:  Your Honor, defendants would now**

09:33:45 7    **like to move into evidence DTX 037 which was Petibon Exhibit**

09:33:52 8    **1, DTX 038 which was Petibon Exhibit 2, and DTX 039 which is**

09:33:59 9    **Petibon Exhibit 3.**

09:34:00 10             **MS. SINKLER:  No objections, Your Honor.**

09:34:01 11             **THE COURT:  All right.  Thank you very much.**

09:34:03 12   **Those are admitted.  Tell me what bone free sugar is.  I**

09:34:11 13   **mean, bone full sugar sounds disgusting.**

09:34:16 14             **MR. BUTERMAN:  Your Honor, at one point in time,**

09:34:18 15   **bone char was actually used in some, by some companies in**

09:34:24 16   **order to make sugar whiter.  To get that really white color.**

09:34:31 17   **It's not done anymore.**

09:34:33 18             **MS. SINKLER:  Yeah, no.**

09:34:34 19             **MR. BUTERMAN:  But it was many years ago I think**

09:34:37 20   **counsel will agree.**

09:34:38 21             **MS. SINKLER:  Not anymore.**

09:34:40 22             **THE COURT:  Get on that regulation if it is.**

09:34:42 23   **Yes.  All right.**

09:34:45 24             **MR. MARRIOTT:  Good morning, Your Honor.**

09:34:46 25             **THE COURT:  Good morning.**

09:34:50 1          MR. MARRIOTT:  Defendants call Andrew Carter of

09:34:56 2   Cargill as a live witness.

09:34:59 3          THE COURT:  Okay.

09:35:27 4          COURT CLERK:  Please raise your right hand.

09:35:33 5   Please state and spell your full name for the record.

09:35:41 6          THE WITNESS:  Andrew Carter.  A-N-D-R-E-W.

09:35:45 7   C-A-R-T-E-R.

09:35:47 8          ANDREW CARTER, having been duly sworn, was

09:35:52 9   examined and testified as follows:

09:35:56 10          MR. MARRIOTT:  May I proceed Your Honor?

09:36:01 11          THE COURT:  Please.

09:36:01 12                  DIRECT EXAMINATION

09:36:01 13   BY MR. MARRIOTT:

09:36:02 14   Q.     Good morning, Mr. Carter.  My name is Dave Marriott.

09:36:05 15   We met briefly here this morning.  Would you please

09:36:08 16   introduce yourself to the Court.

09:36:10 17   A.     Andrew Carter, interim Line Sugar Product Manager for

09:36:14 18   Cargill.

09:36:14 19   Q.     Where are you currently employed?

09:36:16 20   A.     Cargill, Inc.

09:36:17 21   Q.     And how long have you been employed with Cargill?

09:36:19 22   A.     Sixteen-and-a-half years, roughly.

09:36:21 23   Q.     And tell us what your current role in Cargill is?

09:36:24 24   A.     Interim Sugar Product Line Manager.

09:36:27 25   Q.     And how would you describe that role for the Court,

Carter - direct

09:36:30 1    **Mr. Carter?**

09:36:31 2    **A.      I would describe that as I'm responsible for the**

09:36:34 3    **strategy and direction of marketing the refined sugar that**

09:36:39 4    **comes out of Louisiana Sugar Refinery, or LSR.**

09:36:42 5    **Q.      When did you become interim product line manager at**

09:36:46 6    **Cargill?**

09:36:47 7    **A.      Roughly three months ago.**

09:36:48 8    **Q.      Prior to becoming interim product line manager, what**

09:36:51 9    **did you do at Cargill?**

09:36:52 10   **A.      I was the Sugar Product Line Advisor.**

09:36:55 11   **Q.      Would you please describe for Her Honor in general**

09:37:00 12   **terms Cargill's sugar business?**

09:37:02 13   **A.      General.   So Cargill is responsible for the marketing**

09:37:06 14   **of the refined sugar that comes out of LSR, that's Louisiana**

09:37:10 15   **Sugar Refinery.   That a 50/50 joint venture between US Sugar**

09:37:14 16   **which is a growers co-op and Cargill.**

09:37:17 17   **Q.      Is Cargill one of the fastest growing marketers in**

09:37:20 18   **the country?**

09:37:22 19   **A.      I think fastest is relative but we are on a growth**

09:37:24 20   **projection, yes.**

09:37:24 21   **Q.      Can you tell us what extent Cargill is capable of**

09:37:30 22   **delivering sugar to customers throughout the United States?**

09:37:34 23   **A.      LSR produces refined sugar in multiple I guess**

09:37:42 24   **avenues, so delivery of bulk rail to customers in our**

09:37:47 25   **terminal network as well as packaged sugar in the U.S.**

Carter - direct

Q.      What can you tell Her Honor about whether Cargill has
a strategic network of business partners that supply
customers with all of those sugars?

A.      Yeah, I think we have a strategy, we have customers
that we sell to that demand our sugar and we have a supplier
of that raw sugar that we refine, that is our grower's co-op
of sugar.

Q.      Does Cargill partner with co-ops to provide sugar
across North America including LSR?

A.      I don't understand the question.

Q.      Does Cargill partner with LSR to provide sugar
throughout North America?

A.      Yes, we're responsible for the marketing of the
refined sugar.

Q.      Lets talk a little bit more about LSR.  I think you
said LSR is a joint venture with Cargill and the sugar
growers and the refiners company?

A.      That's correct.

Q.      What is the ownership structure of LSR?

A.      It's a 50/50 joint venture between Cargill and
Louisiana Sugar Growers and Refiners.

Q.      Where is that?

A.      Gramercy, Louisiana.

Q.      Where does Cargill get the refined sugar that it
sells?

Carter - direct

09:39:01 1   A.      From Louisiana Sugar Refinery, LSR.

09:39:06 2   Q.      Where does LSR get the sugar that it refines from?

09:39:10 3   A.      The Sugar Growers Co-op.

09:39:12 4   Q.      To what extent is Cargill obligated to sell the sugar

09:39:15 5   refined at LSR's Louisiana facility?

09:39:19 6   A.      Per the marketing agreement that we're responsible

09:39:21 7   for marketing the sugar.

09:39:22 8   Q.      Look, if you would, please, sir, at JTX 24 which is

09:39:27 9   in the black binder which is before you there.  This is the

09:39:31 10  marketing agreement between Cargill and LSR.  Do you see

09:39:34 11  that, sir?

09:39:35 12  A.      I do.

09:39:37 13          MR. MARRIOTT:  Your Honor, I would move the

09:39:39 14  admission, please, of JTX 24 into evidence.

09:39:41 15          MS. TATICCHI:  No objection.

09:39:41 16          THE COURT:  All right.  Thank you.  It's

09:39:43 17  admitted.

09:39:43 18          (JTX Exhibit No. 24 was admitted into evidence.)

09:39:44 19  BY MR. MARRIOTT:

09:39:45 20  Q.      Does LSR provide refined sugar to any entities other

09:39:45 21  than Cargill, Mr. Carter?

09:39:50 22  A.      Not to my knowledge, no.

09:39:52 23  Q.      Let's talk about Cargill's sugar portfolio and

09:39:52 24  footprint.  Look, if you would, at JTX 1 in the binder

09:39:55 25  before you.

09:40:00 1          MR. MARRIOTT:  Your Honor, here I would ask the

09:40:02 2   Court if I could to please turn off the main screen so that

09:40:05 3   we can display this document just to the witness and to the

09:40:08 4   Court.  Thank you.

09:40:09 5          THE COURT:  All right.  Would you repeat the

09:40:11 6   numbers for me so I can pull it up.

09:40:14 7          MR. MARRIOTT:  Yes, JTX 1.

09:40:17 8   BY MR. MARRIOTT:

09:40:17 9   Q.     What is JTX 1, Mr. Carter?

09:40:20 10  A.     It looks to be titled Cargill sugar overview and

09:40:24 11  outlook.

09:40:24 12         MR. MARRIOTT:  Your Honor, I would move the

09:40:26 13  admission of JTX 1.

09:40:27 14         MS. Taticchi:  No objection, Your Honor.

09:40:28 15         THE COURT:  All right.  Thank you.

09:40:30 16         (JTX Exhibit No. 1 was admitted into evidence.)

09:40:30 17  BY MR. MARRIOTT:

09:40:31 18  Q.     Referring to Bates page 38, Mr. Carter, particularly

09:40:35 19  the left side, how would you describe Cargill's sugar

09:40:39 20  portfolio for Her Honor?

09:40:42 21  A.     Like I said before, the Gramercy, Louisiana refinery

09:40:46 22  produces refined sugar and we market that sugar to customers

09:40:51 23  that demand it.  That goes out in multiple avenues, bulk

09:40:56 24  railcars, bulk trucks which come from our terminal network,

09:41:00 25  as well as the liquid trucks.  We also produce packaged

09:41:05 1  products at LSR, totes, 50-pound bags, 25-pound bags,

09:41:11 2  smaller retail size bags that go out via truck from LSR to

09:41:15 3  our customers.

09:41:16 4  Q.     Pointing to the right side of the diagram, how would

09:41:19 5  you describe Cargill's sugar footprint for Her Honor?

09:41:23 6  A.     The red square is where the refinery is located

09:41:27 7  that's where all the refined sugar comes out of.  The stars

09:41:32 8  both looks gray and blue, represent our terminal network,

09:41:36 9  Cargill owns two terminals, the Chattanooga terminal and the

09:41:41 10 Barksdale terminal.  We also utilize three third-party

09:41:44 11 terminals in Arlington, Chicago and Worcester.  We have two

09:41:50 12 outside warehouses that have actually been changed since

09:41:53 13 this document was written.  They're no longer in LA and

09:41:58 14 Grand Prairie, they are in Kenner, Louisiana, and Indianola,

09:42:03 15 Mississippi.

09:42:04 16 Q.     How does Cargill distribute sugar from LSR to its

09:42:10 17 customers?

09:42:10 18 A.     Multiple ways.  The first way would be via bulk rail

09:42:14 19 to customers that can offload railcars.  The second way

09:42:17 20 would be via bulk rail to one of our five terminals that are

09:42:22 21 the stars on this map.  From those terminals those railcars

09:42:27 22 get unloaded, reloaded in bulk truck or melted into liquid

09:42:32 23 sucrose into another tanker truck and then transported to

09:42:35 24 customers.  And I guess I would generalize the third way of

09:42:38 25 packing that refined sugar into multiple package sizes in

09:42:43 1    LSR which then exit the refinery via the van driving a

09:42:47 2    truck.

09:42:47 3    Q.      What rail networks does Cargill use?

09:42:50 4    A.      Gramercy is directly on both the CN and the KCS,

09:42:56 5    that's Canadian National and Kansas City Southern.  From

09:43:01 6    those two railroads, generally speaking I would say most

09:43:04 7    other railroad lines in the U.S. can be accessed.

09:43:06 8    Q.      So Cargill's rail and truck network allow it to

09:43:10 9    distribute sugar throughout the United States?

09:43:12 10   A.      Generally speaking, yes.

09:43:14 11   Q.      Let's talk a little bit about the competitive

09:43:16 12   landscape for refined sugar.  Would you turn please to DTX

09:43:21 13   28.  What is DTX 28?

09:43:26 14   A.      This is our 2021 LSR Vision Meeting document.

09:43:31 15           MR. MARRIOTT:  Your Honor, I might have the

09:43:32 16   admission of DTX 28.

09:43:34 17           MS. TATICCHI:  No objection, Your Honor.

09:43:35 18           THE COURT:  Thank you.  Admitted.

09:43:37 19           (DTX Exhibit No. 28 was admitted into evidence.)

09:43:37 20   BY MR. MARRIOTT:

09:43:38 21   Q.      Turn if you would please to page 22 of DTX 28,

09:43:41 22   Mr. Carter.  It's on the screen, I believe, too, if that

09:43:45 23   helps you.

09:43:46 24   A.      Yes, sir.

09:43:46 25   Q.      This slide identifies some of the sugar refineries

Carter - direct

09:43:49 1    with which Cargill competes and its understanding of

09:43:53 2    relative nameplate capacities, is that correct?

09:43:56 3    A.      Yes.

09:43:57 4    Q.      Where does Cargill sell the sugar produced at

09:44:02 5    Gramercy?

09:44:02 6    A.      Generally speaking in multiple states across the U.S.

09:44:06 7    Q.      Is there any state in which Cargill does not sell

09:44:09 8    refined sugar from Gramercy?

09:44:12 9    A.      I don't have the details in front of me to answer

09:44:14 10   that confidently.

09:44:15 11   Q.      Take a look if you would, sir, at DTX 26 and 25, 25

09:44:20 12   and 26, which are sales data provided by Cargill in this

09:44:25 13   matter, and in your binder, sir, just excerpts since this is

09:44:29 14   a native document.

09:44:30 15   A.      Okay.

09:44:31 16            MR. MARRIOTT:  Your Honor, I move the admission

09:44:32 17   please of DTX 25 and 26.

09:44:34 18            MS. TATICCHI:  No objection.

09:44:43 19            MR. MARRIOTT:  I move the admission of 28 as

09:44:51 20   well.

09:44:51 21            MS. TATICCHI:  No objection.

09:44:52 22            THE COURT:  Thank you.

09:44:52 23            (DTX Exhibit Nos. 25, 26 and 28 were admitted

09:44:52 24   into evidence.)

09:44:52 25   BY MR. MARRIOTT:

Carter - direct

09:44:52  1  Q.      Where does Cargill sell the sugar produced in

09:44:55  2  Gramercy?

09:44:56  3  A.      In the United States.

09:44:57  4  Q.      And from Gramercy, Cargill sells sugar to the West

09:45:01  5  Coast, right?

09:45:01  6  A.      We do have customers on the West Coast.

09:45:03  7  Q.      And that includes locations that are in excess of

09:45:05  8  2,000 miles from Gramercy?

09:45:08  9  A.      If California is roughly that many miles, yes.

09:45:11 10  Q.      And Cargill sells sugar to the East Coast from

09:45:15 11  Gramercy, too?

09:45:15 12  A.      That's correct.

09:45:16 13  Q.      And that includes locations that are more than 1,500

09:45:20 14  miles from Gramercy?

09:45:20 15  A.      That is the math, yes.

09:45:21 16  Q.      Let's look at DTX 28 again.  I want to point you to

09:45:26 17  page 24, if I could, please, where you're going to see some

09:45:31 18  tables color coded according to the USDA regions.  Do you

09:45:35 19  see that, sir?

09:45:36 20  A.      I do.

09:45:37 21  Q.      There are five USDA regions, is that right?

09:45:41 22  A.      That looks to be correct.

09:45:42 23  Q.      And Cargill sells sugar in all five USDA regions?

09:45:46 24  A.      That's correct.

09:45:46 25  Q.      In the course of your job, Mr. Carter, do you provide

Carter - direct

09:45:52  1    specific pricing information to brokers or industry

09:45:58  2    commentators?

09:45:58  3    A.      I do not.

09:46:00  4    Q.      Have you ever provided information about Cargill's

09:46:02  5    sugar sales to an individual by the name of Richard Wistisen

09:46:05  6    of Rich Commodities?

09:46:07  7    A.      I don't know that name.

09:46:08  8    Q.      Let's talk a little bit more about LSR if we can,

09:46:12  9    sir.  We'll go into more detail in the confidential session,

09:46:16 10    but for now a couple of questions for the open session.

09:46:18 11            What, if any, plans does LSR have to expand it's

09:46:22 12    Louisiana Sugar Refining operations?

09:46:25 13    A.      We have intentions of expanding the output of LSR by

09:46:30 14    roughly 20 to 25 percent.

09:46:33 15            MR. MARRIOTT:  Your Honor, at Cargill's request

09:46:35 16    now, I would ask that we close the courtroom as the next set

09:46:38 17    of questions concern Cargill confidential information or

09:46:42 18    documents and by the same token, we can turn it back on when

09:46:44 19    the courtroom has closed the main screen.

09:46:49 20            THE COURT:  Okay.  For the reasons that have

09:46:50 21    been set forth in open court and the papers I'm going to

09:46:52 22    grant the request for this limited period of time.  Anyone

09:46:58 23    that is not in the protective order, I would ask you to

09:47:02 24    leave for a few minutes while we address some competitively

09:47:06 25    sensitive information.

09:47:10  1          MR. MARRIOTT:  Thank you, Your Honor.

09:47:14  2          THE COURT:  Okay.  The courtroom is closed.

Carter - direct

09:48:41  1

09:48:45  2

09:48:49  3

09:48:51  4

09:48:53  5

09:48:56  6

09:49:00  7

09:49:02  8

09:49:03  9

09:49:07 10

09:49:13 11

09:49:15 12

09:49:22 13

09:49:28 14

09:49:29 15

09:49:35 16

09:49:39 17

09:49:39 18

09:49:44 19

09:49:45 20

09:49:47 21

09:49:50 22

09:49:52 23

09:49:58 24

09:50:07 25

Carter - direct



Carter - direct

Carter - direct



1118

Carter - direct

| | |
|---|---|
| 09:54:05 1 | |
| 09:54:06 2 | |
| 09:54:10 3 | |
| 09:54:11 4 | |
| 09:54:12 5 | |
| 09:54:16 6 | |
| 09:54:17 7 | |
| 09:54:20 8 | |
| 09:54:23 9 | |
| 09:54:27 10 | |
| 09:54:29 11 | |
| 09:54:29 12 | |
| 09:54:35 13 | |
| 09:54:35 14 | |
| 09:54:38 15 | |
| 09:54:38 16 | |
| 09:54:42 17 | |
| 09:54:44 18 | |
| 09:54:48 19 | |
| 09:54:52 20 | |
| 09:54:54 21 | |
| 09:54:58 22 | |
| 09:55:00 23 | |
| 09:55:04 24 | |
| 09:55:07 25 | |

Carter - direct



Carter - direct



Carter - direct

09:57:31 1

09:57:34 2

09:57:35 3

09:57:40 4

09:57:42 5

09:57:49 6

09:57:53 7

09:57:57 8

09:58:01 9

09:58:05 10

09:58:08 11

09:58:09 12

09:58:12 13

09:58:20 14

09:58:23 15

09:58:23 16

09:58:23 17

09:58:29 18

09:58:41 19

09:58:42 20

09:58:42 21          MR. MARRIOTT:  Thank you, sir.

09:58:42 22          Your Honor, I have no further questions at this

09:58:42 23     time.

09:58:42 24          THE COURT:  Thank you.  Cross-exam.

09:58:55 25          MS. TATICCHI:  Good morning, Your Honor.

Carter - cross

09:59:12  1    Jessica Taticchi for the United States.

09:59:18  2                    May I proceed?

09:59:18  3                    THE COURT:  Yes.

09:59:18  4                    CROSS-EXAMINATION

09:59:18  5    BY MS. TATICCHI:

09:59:20  6    Q.      Good morning, Mr. Carter.

09:59:21  7    A.      Good morning.

09:59:23  8    Q.      Do you recall being asked about DTX 028.

09:59:36  9    A.      Yes.

09:59:37 10    Q.      If we turn to page 4, I believe you were asked about

09:59:44 11    page 4.  And this is the Cargill presentation that's using a

09:59:57 12    map that shows the sugar market by region; is that correct?

10:00:00 13    A.      USDA defined regions, yes.

10:00:02 14    Q.      And, in fact, Cargill has identified different

10:00:08 15    long-term optimal market shares for the different regions;

10:00:12 16    is that right?

10:00:14 17    A.      Long-term, yes.

10:00:17 18    Q.      Let me ask you, since this document was created, have

10:00:22 19    any of those optimal market shares changed?

10:00:26 20    A.      I have not yet started the 2022 vision meeting

10:00:31 21    document, so not yet.

10:00:34 22    Q.      You expect that they may change?

10:00:36 23    A.      Potentially, I don't know for sure.

10:00:42 24    Q.      And if you turn to page 9, I believe you were also

10:00:50 25    asked about page 9.  Now this is a list of customers, this

Carter - cross

10:01:04 1   is a list of customers that Cargill may target for

10:01:08 2   additional business; is that correct?

10:01:12 3   A.      That looks like liquid.

10:01:14 4   Q.      For liquid.  And there is a focus here on a customer

10:01:19 5   based within one day transit from LSR.  Do you see that in

10:01:23 6   the bullet point towards the top?

10:01:25 7   A.      I do.

10:01:25 8   Q.      Do you have an understanding of why the focus would

10:01:28 9   be on a customer based within one day transit from LSR?

10:01:32 10  A.      Sure.  So high-colored liquid or any liquid sugar has

10:01:37 11  a very short shelf life before it starts to re-thicken or

10:01:42 12  crystalize.  We try to sell to customers within a one day

10:01:46 13  driving window so the quality of the product is still

10:01:50 14  intact.

10:01:50 15  Q.      So if we look at this chart, I won't ask you to

10:01:53 16  specifically count, but by my count there is over a dozen

10:01:58 17  locations in Texas, here, does that seem about right?

10:02:04 18  A.      Seems about right.

10:02:07 19  Q.      And I don't see any into Delaware, does that seem

10:02:12 20  right?

10:02:12 21  A.      That seems correct.

10:02:15 22  Q.      And that's consistent with the need for a one-day

10:02:20 23  transit from LSR?

10:02:22 24  A.      Correct.

10:02:24 25  Q.      And just to confirm, these customers, Cargill still

Carter - cross

10:02:30  1   needs to validate the demand numbers, is that still true?

10:02:34  2   A.     I believe that this -- these demand numbers were

10:02:37  3   pulled from customer RFP's or request for pricing, so

10:02:43  4   possibly we need to revise these on maybe a 2024, 2023

10:02:50  5   RFP's.

10:02:52  6   Q.     Let me ask you this.  Are any of these customers

10:02:55  7   committed to any of these estimated volumes at this point?

10:03:00  8   A.     No.  This is potential volume.

10:03:04  9   Q.     Now, you were asked today specifically about LSR's

10:03:07 10   possible expansion of the Gramercy refinery.  Do you recall

10:03:11 11   that?

10:03:11 12   A.     I do.

10:03:11 13   ████  ████████████████████████████████████████████

10:03:18 14   ██████████████████████████████████████████████████████

10:03:23 15   ██████████████████████████████████

10:03:24 16   ████  ██████████████████████

10:03:24 17   ████  ████████████████████████████████████████████████

10:03:28 18   ██████████████████████████████████████

10:03:32 19   ████  ████████████████████████████████████████████████

10:03:35 20   ██████████████████████████████████████████████████████

10:03:41 21   ██████████████████████████████████████████████████

10:03:45 22   ████████████████████████████████████████

10:03:50 23   Q.     Now, do you recall being asked about DDX 6 which was

10:04:06 24   a map that had the shares based on states?

10:04:11 25   A.     I do.

Carter - cross

10:04:13 1    Q.     And it looks like there is a significant percentage

10:04:17 2  of total sales in Illinois; is that right?

10:04:21 3    A.     That's correct.

10:04:23 4    Q.     Now, LSR has rail access directly to Chicago; is that

10:04:28 5  right?

10:04:28 6    A.     That's correct.

10:04:30 7    Q.     But a substantial amount of LSR sugar is transported

10:04:41 8  via truck, is that true?

10:04:43 9    A.     The product mix that exits LSR is 70 percent rail,

10:04:48 10  30 percent truck.

10:04:49 11    Q.     And all of the -- all of the package sugar is

10:04:53 12  transported via truck, is that correct?

10:04:56 13    A.     That's correct.

10:04:56 14    Q.     And just a couple more questions.  Back to Illinois.

10:05:00 15  One of your customers in Illinois is Batory, is that right?

10:05:04 16    A.     That's correct.

10:05:04 17    Q.     And they're a distributor outside of Chicago?

10:05:07 18    A.     They are a distributor, yes.

10:05:09 19    Q.     And do they have two locations in the Chicago area?

10:05:12 20    A.     Yes.

10:05:12 21    Q.     Would you agree that distributors are among your

10:05:12 22  largest customers?

10:05:18 23    A.     I would.

10:05:19 24    Q.     And but you don't consider distributors like Batory

10:05:22 25  to be competitors, right?

10:05:25  1    A.       A direct competitor, I think we need to define the

10:05:31  2    word competitor for me to give a competent answer, I don't

10:05:35  3    believe Batory refines sugar.  They don't have an integrated

10:05:39  4    supply chain like our structure is.  I think they have a

10:05:43  5    different business model in terms of customer charges and

10:05:46  6    selling than we do.

10:05:47  7            MS. TATICCHI:  No further questions.  Thank you.

10:05:49  8            THE COURT:  All right.  Thank you.

10:05:51  9            MR. MARRIOTT:  Just one question, Your Honor.

10:05:54 10                      REDIRECT EXAMINATION

10:05:54 11    BY MR. MARRIOTT:

10:05:55 12    Q.       Mr. Carter, customers that Cargill RFPs also receive

10:05:59 13    quotes for distributors for the same business, true?

10:06:03 14    A.       I believe that to be true.

10:06:05 15            MR. MARRIOTT:  Thank you, sir.

10:06:06 16            Nothing further, Your Honor.

10:06:07 17            THE COURT:  All right.  Thank you.

10:06:09 18            MR. BUTERMAN:  Your Honor, with that defense

10:06:12 19    rests.

10:06:12 20            THE COURT:  All right.  Thank you.

10:06:15 21            MS. SINKLER:  Your Honor, we have one rebuttal

10:06:18 22    video that we want to play and we ask Your Honor if we can

10:06:21 23    do it while the courtroom is closed.  It's confidential

10:06:23 24    information.

10:06:24 25            THE COURT:  Yes.  I realize, did we not open the

10:06:27  1   courtroom for the cross?

10:06:32  2              MS. TATICCHI:  We didn't, Your Honor, but we

10:06:34  3   were continuing to display confidential documents.

10:06:36  4              THE COURT:  So I'll just ask you, though, since

10:06:38  5   we didn't, if you guys could look through it and check with

10:06:41  6   the third party and if there is stuff that's not

10:06:44  7   commercially sensitive, we let the court reporter know so

10:06:49  8   that can be on the open docks.

10:06:52  9              MS. TATICCHI:  Yes.

10:06:52 10              THE COURT:  Thank you.

10:06:53 11              MS. SINKLER:  Your Honor, at this time --

10:06:56 12              THE COURT:  You can step down.  Sorry again.

10:06:57 13              MS. SINKLER:  Sorry.

10:06:58 14              THE COURT:  He's going to sit up there and watch

10:07:00 15   the video.

10:07:03 16              MS. SINKLER:  So at this time, Your Honor, the

10:07:06 17   United States would like to play the testimony of

10:07:10 18   Mr. Lawrence Faucheux.  Mr. Faucheux is the CEO and General

10:07:13 19   Manager of Louisiana Sugar Refining, also known as LSR.  And

10:07:17 20   he will testify about the current refined sugar production

10:07:20 21   capabilities as well as expansion plans.  And our portion of

10:07:23 22   the video is like seven minutes.  It's the last video.

10:07:28 23              THE COURT:  Great.  So keep the courtroom

10:07:34 24   closed.

10:07:37 25                   (Videotape deposition of Lawrence Faucheux:)

10:07:40 1    Q.      Where are you currently employed, sir?

10:07:42 2    A.      I am employed by Louisiana Sugar Refining.

10:07:53 3    Q.      What is LSR?

10:07:54 4    A.      LSR is a sugar refining facility which -- its entity

10:07:59 5    is a business which is jointly owned by Cargill and the

10:08:03 6    SUGAR co-op.

10:08:04 7    Q.      Where are LSR's facilities located?

10:08:07 8    A.      LSR has one facility.  It's in Gramercy, Louisiana.

10:08:13 9    Q.      What is your job at LSR?

10:08:16 10   A.      I'm the General Manager/CEO of the facility.

10:08:19 11   ████   ██████████████████████████████████████████

10:08:22 12   ████████████████████████████████████████████

10:08:28 13   ████   ████████████████████████████████████████

10:08:36 14   ████   ██████████████████████████████████████████

10:08:42 15   ██████

10:08:42 16   ████   ████████

10:08:44 17   ████   ██████████████████████████████████████

10:08:51 18   ██████████████████████████████████████████████

10:08:54 19   ████████████████████████████████████████

10:08:57 20           ████████████████

10:08:57 21   ████   ██████████

10:08:58 22   Q.      Now, if you look down at the third paragraph of the

10:09:00 23   news release, there's a statement there that's attributed to

10:09:02 24   you, and I will just read it for the record.

10:09:14 25                "We've been able to creatively engineer our

10:09:20  1     available space to increase efficiencies and reliability of

10:09:24  2     most, if not all, of the plant's components.  With

10:09:27  3     investments in people and new equipment, new integrated

10:09:31  4     control systems and now the infrastructure, LSR has the

10:09:35  5     potential to be the first U.S. refinery to process

10:09:40  6     1.5 million tons of high quality raw sugar."

10:09:45  7              Do you see that, sir?

10:09:46  8     A.     I do.

10:09:46  9     Q.     And that's an accurate reflection of the statement

10:09:50 10     that you made, is it not?

10:09:51 11     A.     That is our goal to have that potential one day, that

10:09:56 12     is correct.

10:09:56 13     Q.     If LSR at some point is successful in expanding its

10:10:02 14     capacity to 1.5 million raw tons per year, what would that

10:10:07 15     translate into in terms of the volume of refined sugar that

10:10:12 16     the facility would be able to generate on a yearly basis?

10:10:24 17     A.     That potentially could be 97 percent of whatever that

10:10:28 18     1.5 million tons equates to.  So that's correct.  That's is

10:10:33 19     a lofty aspiration of LSR, and that's something we have to

10:10:38 20     continue to look at if that's what we need to do.

10:10:44 21     ████  ███████████████████████████████████████████████████

10:10:48 22     ████████████████████████████████████████████████████████

10:10:52 23     ██████████████████████████████████████████

10:11:00 24     ███████████████████████████████████████████████

10:11:06 25     ██████████████████████████████████████████████



10:11:11  1

10:11:16  2

10:11:18  3

10:11:22  4

10:11:26  5

10:11:32  6

10:11:39  7

10:11:42  8

10:11:46  9

10:11:52  10

10:11:53  11

10:11:54  12

10:11:56  13

10:12:00  14

10:12:06  15

10:12:11  16

10:12:17  17

10:12:21  18

10:12:25  19

10:12:31  20

10:12:34  21    Q.      Has LSR abandoned any of its expansion efforts that

10:12:44  22    are set forth in Exhibit 2?

10:12:45  23    A.      Abandoned is a harsh word, so no.

10:12:50  24

10:12:55  25

| | |
|---|---|
| 10:13:02 | 1 |
| 10:13:06 | 2 |
| 10:13:15 | 3 |
| 10:13:21 | 4 |
| 10:13:30 | 5 |
| 10:13:34 | 6 |
| 10:13:39 | 7 |
| 10:13:46 | 8 |
| 10:13:47 | 9 |
| 10:13:51 | 10 |
| 10:13:51 | 11 |
| 10:13:52 | 12 |
| 10:13:57 | 13 |
| 10:14:04 | 14 |
| 10:14:15 | 15 |
| 10:14:26 | 16 |
| 10:14:27 | 17 |
| 10:14:28 | 18 |
| 10:14:32 | 19 |
| 10:14:34 | 20 |
| 10:14:38 | 21 |
| 10:14:42 | 22 |
| 10:14:52 | 23 |
| 10:14:58 | 24 |
| 10:15:01 | 25 |

10:15:06  1

10:15:12  2

10:15:13  3

10:15:16  4

10:15:17  5

10:15:18  6

10:15:24  7

10:15:32  8

10:15:36  9

10:15:41 10

10:15:47 11

10:15:54 12

10:15:58 13

10:16:00 14

10:16:02 15

10:16:06 16

10:16:10 17

10:16:13 18

10:16:16 19

10:16:18 20

10:16:23 21

10:16:26 22

10:16:31 23

10:16:34 24

10:16:42 25

10:16:47  1
10:16:49  2
10:16:53  3
10:16:57  4
10:17:01  5
10:17:06  6
10:17:11  7
10:17:19  8
10:17:26  9
10:17:29  10
10:17:32  11
10:17:35  12
10:17:39  13
10:17:43  14
10:17:45  15
10:17:50  16
10:17:52  17
10:17:56  18
10:18:06  19
10:18:10  20
10:18:14  21
10:18:18  22
10:18:21  23
10:18:22  24
10:18:27  25

10:18:33  1

10:18:36  2

10:18:43  3

10:18:44  4

10:18:49  5

10:18:53  6

10:18:57  7

10:18:59  8

10:19:03  9

10:19:04  10

10:19:15  11

10:19:18  12

10:19:21  13

10:19:24  14

10:19:27  15

10:19:33  16

10:19:39  17

10:19:43  18

10:19:45  19

10:19:49  20

10:20:02  21

10:20:08  22

10:20:09  23

10:20:12  24

10:20:20  25

10:20:28 1   

10:20:39 2

10:20:39 3   Q.      What other rail access does Gramercy have besides the

10:20:45 4   CN?

10:20:45 5   A.      The KCS.

10:20:48 6   Q.      Anything else?

10:20:49 7   A.      That's it.

10:20:52 8   Q.      The Woodside refinery, would you be able to load

10:20:58 9   sugar for transport on both CN and the KCS?

10:21:08 10  A.      Yes.   So every cane refinery can get to multiple

10:21:16 11  railroads, it just so happens the two we can get to are KCS

10:21:25 12  and CN.

10:21:26 13

10:21:29 14

10:21:34 15

10:21:34 16

10:21:38 17

10:21:43 18

10:21:47 19

10:21:48 20

10:21:54 21

10:21:55 22

10:21:59 23

10:22:02 24

10:22:02 25



```
10:22:10  1
10:22:13  2
10:22:16  3
10:22:21  4
10:22:24  5
10:22:25  6
10:22:29  7
10:22:35  8
10:22:39  9
10:22:41 10
10:22:45 11
10:22:49 12
10:22:53 13
10:22:56 14
10:23:00 15
10:23:05 16
10:23:09 17
10:23:15 18
10:23:17 19
```

10:23:27 20              **(End of video.)**

10:23:30 21              **MS. SINKLER:  Your Honor, the plaintiff seeks to**

10:23:32 22    **move JTX 050 and PTX 293 into evidence.**

10:23:37 23              **MR. BUTERMAN:  No objections, Your Honor.**

10:23:38 24              **THE COURT:  All right.  Thank you.  Those are**

10:23:40 25    **admitted.**

10:23:40 1                    (JTX Exhibit No. 50 and PTX Exhibit No. 293 were

10:23:41 2    admitted into evidence.)

10:23:41 3                    MS. SINKLER:  Plaintiff rest, Your Honor.

10:23:42 4                    THE COURT:  All right.  Okay.  So I guess that

10:23:44 5    is the end of evidence.  And we'll have closing arguments.

10:23:51 6    How about we take a break.  I want to go back and look at

10:23:57 7    some things before closings, too.  So would it be okay, what

10:24:01 8    if we come back around 1:30.

10:24:05 9                    Thanks very much.

10:24:06 10                   (A brief recess was taken.)

13:10:42 11                   THE COURT:  Good afternoon.  Please be seated.

13:33:03 12   Okay.

13:33:05 13                   MR. BUTERMAN:  I apologize, Your Honor.  There

13:33:11 14   is one minor housekeeping matter.  There was one exhibit

13:33:14 15   that didn't go in in the last deposition.  I spoke to

13:33:18 16   counsel about it and they gracefully said that we could --

13:33:22 17   they wouldn't object, JTX 022.

13:33:30 18                   THE COURT:  Okay.  All right.  Thank you for

13:33:34 19   agreeing to that.

13:33:34 20                   (JTX Exhibit No. 22 was admitted into evidence.)

13:33:35 21                   THE COURT:  Okay.  Mr. Hanna.

13:33:42 22                   MR. HANNA:  Good afternoon, Your Honor.  May I

13:33:42 23   proceed?

13:33:50 24                   THE COURT:  Let me just ask one question.  I

13:33:52 25   want to hear from both of you on this because I know that

13:33:55 1    there is a big issue on the geographic market.  Is there a

13:34:01 2    dispute on the product market?  Is the product refined

13:34:05 3    sugar, everyone agree on that?

13:34:07 4              MR. HANNA:  Your Honor, we contend that the

13:34:09 5    product at issue is refined sugar.  I think the defendants

13:34:14 6    would say that -- I think really they would argue that the

13:34:17 7    refined sugar, but distributors should be have included.

13:34:21 8              THE COURT:  Is that the issue, not just who

13:34:24 9    sells refined sugar, but that they're saying it has to be

13:34:28 10   the producers and sellers, that's the issue for the product

13:34:31 11   market?

13:34:32 12             MR. BUTERMAN:  The object itself, Your Honor, if

13:34:34 13   I may is refined sugar, both sides agree.

13:34:36 14             THE COURT:  And that's true whether it's

13:34:39 15   powdered, brown, granulated or liquid?

13:34:42 16             MR. BUTERMAN:  And/or beet or cane.

13:34:44 17             THE COURT:  And beet or cane.  Because I know

13:34:46 18   there was at least one witness who said they only wanted

13:34:50 19   granulated cane, so I didn't know if that was an issue.

13:34:52 20   Sorry.

13:34:52 21             MR. HANNA:  May I proceed?

13:34:52 22             THE COURT:  Yes, please.

13:34:52 23             MR. HANNA:  On behalf of the United States and

13:34:52 24   Department of Justice, I want to begin by thanking the Court

13:35:02 25   and Your Honor's colleagues for your time and attention this

13:35:06 1    week.  It's been a pleasure being in front of you.

13:35:10 2             Your Honor, the evidence at trial has shown that

13:35:13 3    United and Imperial compete for the same business.  And they

13:35:16 4    mostly compete in the southeast and up through the

13:35:20 5    Mid-Atlantic region.  The merger would end this competition.

13:35:23 6    The merger is presumptively illegal and we have shown in

13:35:27 7    market shares.  The defendants have not put forth evidence

13:35:29 8    to rebut that.

13:35:31 9             Now, Your Honor, there are four fundamental

13:35:35 10   issues that need to be decided in this case.  First, where

13:35:40 11   does competition between United and Imperial matter the

13:35:43 12   most?  In other words, what is the relevant geographic

13:35:46 13   market?

13:35:46 14            And number two, and we just discussed, how

13:35:49 15   should we treat distributors?

13:35:50 16            And number three, does USDA regulation make

13:35:55 17   competition not relevant?

13:35:58 18            And fourth, Your Honor, fundamental issues to

13:36:01 19   decide, can coordination occur and therefore soften the

13:36:02 20   competition in this market?

13:36:02 21            Now, today I want to spend some time talking

13:36:10 22   about the relevant case law and how I want to apply the

13:36:12 23   facts to the case law.  That's important not just because it

13:36:12 24   gives us the guidance to follow, but it's also important

13:36:21 25   because the defendants spent a considerable amount of time

13:36:24  1   confusing the issues.  And so let's talk about geographic

13:36:28  2   market first.

13:36:28  3           For geographic market we have to draw a line

13:36:32  4   somewhere.  So where do we draw it?  The question is it

13:36:37  5   national or is it a regional market?  You asked counsel for

13:36:41  6   Imperial in openings, if they were claiming a national

13:36:45  7   market, and the answer was in essence national.  We know

13:36:50  8   that the commercial --

13:36:52  9           THE COURT:  But everybody has two markets,

13:36:55 10   though, you have the narrow market and the broader market,

13:36:58 11   and I don't remember what they called it, they have the

13:37:00 12   national market and then the narrower market is broader than

13:37:04 13   your broad market, which I think is defined on where

13:37:08 14   Dr. Hill says the two compete.

13:37:12 15           MR. HANNA:  Correct.  It's not a searching

13:37:14 16   exercise, the purpose of market definition is to illuminate

13:37:20 17   where the effects are going to be greater.  And as the

13:37:24 18   Supreme Court in *Philadelphia National Bank* said, the

13:37:28 19   perfect -- you don't look where they compete or even where

13:37:31 20   they do business, you look at where the effect on the merger

13:37:34 21   is going to be the greatest.  And that's what we have done

13:37:37 22   in this case.  We've defined the market in the parties'

13:37:41 23   backyard.  We have seen that map several times.  So that's

13:37:44 24   where we started.

13:37:47 25           There is no -- all the evidence in this case

13:37:49 1    shows that the parties' documents analyze competition

13:37:54 2    regionally.  We seen third-parties that analyze competition

13:37:59 3    regionally as well.  You can see here, Mr. Swart testified

13:38:03 4    that this map here, they identified where producers in those

13:38:08 5    regions have freight cost advantages.  We have seen lots of

13:38:12 6    testimony and lots of documents talk about locational

13:38:15 7    advantages, freight cost advantages, we have third-party

13:38:20 8    documents and third-party testimony, this document based on

13:38:26 9    competition based on regions, there is not one, not

13:38:28 10   everybody agrees on where to draw those boundaries.

13:38:31 11          THE COURT:  I have seen southeast mentioned a

13:38:33 12   lot but it's not entirely clear to me that southeast always

13:38:38 13   means the states that are in your narrower region.

13:38:42 14          MR. HANNA:  And that makes sense, Your Honor.

13:38:44 15   The parties, people in the industry are not doing what we

13:38:47 16   all do as a living here as lawyers in the antitrust world,

13:38:51 17   they're not defining antitrust markets, they're not running

13:38:55 18   a hypothetical monopolist test.

13:38:56 19          THE COURT:  They would make that too easy for

13:38:59 20   you.

13:38:59 21          MR. HANNA:  It would be very nice if they did

13:39:01 22   that.  In a lot of cases, Your Honor, we don't have

13:39:04 23   documents like the supplier backyard map.  There is a lot of

13:39:08 24   cases where *Philadelphia National Bank* was a seminal Supreme

13:39:14 25   Court case that defined the market based on regional --

13:39:17 1    commercial banking was the product at issue and they found

13:39:20 2    three or four states or counties market there.  There is no

13:39:23 3    documents in that case that said well, the market there is,

13:39:27 4    you know, the commercial bank's backyard.  They didn't have

13:39:31 5    that.  We have that in this case now.

13:39:33 6            ASR defines it slightly differently.  United,

13:39:37 7    Imperial, they all define it slightly differently.  But it

13:39:41 8    doesn't change the outcome of this case.  Dr. Rothman, the

13:39:45 9    United States' expert testified, and we heard him testify,

13:39:47 10   that he calculated the HHI concentration analysis looking at

13:39:52 11   the USDA guide.  We heard that United executives tried to

13:39:57 12   walk away from supplier backyard and say well, we actually

13:40:01 13   look at USDA south.  The testimony from Dr. Rothman was that

13:40:05 14   the HHI concentration analysis for that, if you took those

13:40:10 15   states, would be well above the presumption.

13:40:13 16           THE COURT:  But is that if you don't include the

13:40:18 17   distributors?

13:40:21 18           MR. HANNA:  Well, if I can address distributors

13:40:25 19   just for a minute.

13:40:25 20           THE COURT:  I'm just trying to figure out where

13:40:28 21   those numbers come from and is there a difference in those

13:40:31 22   numbers if you include other folks.

13:40:33 23           MR. HANNA:  The United States does not believe

13:40:35 24   distributors --

13:40:36 25           THE COURT:  No, I get that's correct, I'm just

13:40:40 1    trying to understand where things stand if I come out in a

13:40:44 2    different way on that one.

13:40:46 3              MR. HANNA:  I don't have a calculation for what

13:40:48 4    distributors, you know --

13:40:51 5              THE COURT:  So what I'm trying to figure out is,

13:40:54 6    if I were to say look, I think distributors should be

13:40:58 7    included, do you have numbers for me that would say the

13:41:05 8    presumption still applies?

13:41:08 9              MR. HANNA:  I would say this, Your Honor.  I

13:41:11 10   don't believe we have the numbers in there with the

13:41:14 11   calculations with distributors in there.  Neither do

13:41:18 12   defendants.  Defendants' own expert did not put -- when he

13:41:23 13   calculated his, did his modeling, he didn't include

13:41:28 14   distributors as well.

13:41:29 15              Since you asked about distributors, I'll

13:41:32 16   specifically address that.  The law is clear that resellers

13:41:35 17   of a product like distributors in this case should not be

13:41:39 18   considered as part of -- they're not a competitive restraint

13:41:43 19   on the manufacturers of the product.  We can consider

13:41:48 20   examples and we'll apply it to this case, Your Honor.  We

13:41:51 21   had one refiner and nine distributors in the market.  And

13:41:52 22   the refiner sells direct to customers as well as to

13:41:55 23   distributors.  And then the distributors sell to the

13:42:02 24   customers.  Is this a monopoly market or is it a market with

13:42:05 25   ten competitors?  It's monopoly marker.  The single refiner

13:42:13 1    in the case, in the market can raise price to all the

13:42:17 2    distributors and the customers couldn't turn to the

13:42:20 3    distributors to avoid that price increase.  So there is one

13:42:23 4    monopolist in the market.

13:42:24 5              We take -- expand that out a little bit.  If we

13:42:29 6    had two refiners in the market and then eight distributors,

13:42:32 7    but those two refiners merged, the sugar refiners, the

13:42:37 8    question would be is this a 2 to 1 merger or is it a 10 to 9

13:42:41 9    merger?

13:42:42 10             THE COURT:  What about, I thought there was some

13:42:44 11   testimony that distributors can also get imports, right?

13:42:48 12             MR. HANNA:  Your Honor, we in fact include

13:42:50 13   imports in our market.

13:42:52 14             THE COURT:  Whether they come from a -- whether

13:42:56 15   they're sold from -- where are those imports from, because I

13:43:03 16   know Imperial gets imports.  Do Imperial's imports get

13:43:07 17   included in your import number or are those just

13:43:11 18   distributors that have imported numbers?

13:43:13 19             MR. HANNA:  Your Honor, that's a good question.

13:43:15 20             THE COURT:  Probably wasn't, but kind of you to

13:43:17 21   say.

13:43:18 22             MR. HANNA:  No, it was.

13:43:18 23             Imperial imports raw sugar and then what they do

13:43:21 24   with that sugar is they refine it into refined sugar and

13:43:25 25   then sell that.

13:43:26  1                    THE COURT:  Right.

13:43:27  2                    MR. HANNA:  So that's in their market share.  We

13:43:31  3      say twenty percent in their market.  We look at imports,

13:43:34  4      that's seven percent number at the end.  That is refined

13:43:37  5      imports that are coming from refiners that are located in

13:43:41  6      Mexico or --

13:43:42  7                    THE COURT:  But wasn't there someone today who

13:43:45  8      testified that they import sugar, but it's not refined

13:43:49  9      because he said he wouldn't want to get the refined sugar

13:43:52 10      imported because I can't see their factory and I dont know

13:43:55 11      if it has a safety issue.  Someone said that, I thought.  So

13:43:59 12      is that -- so that sounded like import of not refined sugar.

13:44:09 13      Maybe I am misremembering that, but I remember him saying we

13:44:11 14      couldn't see their factory.

13:44:15 15                    MR. HANNA:  I apologize on not answering your

13:44:18 16      question.  I would say there is really two forms of sugar

13:44:21 17      that gets imported for all intents and purposes, it's

13:44:25 18      refined sugar or raw sugar.  Now, if raw sugar gets imported

13:44:29 19      in and refined and then sold by somebody, that's in one of

13:44:33 20      these market shares here.  And what the imports here is

13:44:37 21      showing is, it's many different people actually selling

13:44:42 22      that.  We don't obviously have the data to show who is

13:44:46 23      selling that seven percent, but we count that in there.  We

13:44:50 24      count the imports in our market share and you can see we

13:44:52 25      still get the presumption.

13:44:55  1          Another thing the defendants in opening

13:44:58  2     statements said, right out of the gate defendants pretended

13:45:01  3     that we didn't count some of these suppliers like LSR.  We

13:45:06  4     can see on the opening slide why isn't LSR in the market.

13:45:10  5     What we saw on the market shares, we count LSR.  They're not

13:45:13  6     located in what we call the broader market or the northeast

13:45:17  7     -- the narrow market, they are in Louisiana, but they are

13:45:21  8     selling refined sugar into that market so we give them

13:45:24  9     market share.  They have I think seven or eight percent

13:45:28 10     market share.

13:45:29 11          And the reason we give them market shares is

13:45:36 12     we're defining the market around the location of the

13:45:39 13     customers.  And Dr. Hill confirmed that that is, you know,

13:45:43 14     perfectly correct and a way to define a market.  We look at

13:45:49 15     where the customers are located.  We're drawing a circle in

13:45:52 16     the southeast and the broader north and the narrower market

13:45:57 17     where the customers are located.  And so any sugar producer

13:46:01 18     that sells into that market regardless of where they're

13:46:04 19     located, it could be a foreign supplier that's using, maybe

13:46:09 20     a distributor that's selling it to a distributor who is then

13:46:12 21     selling into a market.  That foreign supplier is in our

13:46:17 22     market with the market shares with the -- I think it was

13:46:20 23     seven percent for the imports.

13:46:21 24          So LSR has sales in our market.  They're in our

13:46:26 25     market.  It turns out they don't have very much and that's

13:46:29 1  because, you know, as the evidence showed, you know,

13:46:33 2  transportation cost, it has an impact on how far a supplier

13:46:38 3  can cost effectively ship sugar to the customer.

13:46:41 4         We heard, you know, one thing in opening

13:46:47 5  statements I think we heard is that they insisted that we --

13:46:53 6  that to win this case, we had to show that the suppliers

13:46:58 7  can't ship an ounce more sugar into the market.  And of

13:47:02 8  course that's not the law, Your Honor.  The real question

13:47:05 9  is, if the companies raise prices, would enough sugar flow

13:47:09 10  into the market to offset any anticompetitive harm.  And the

13:47:13 11  evidence shows that, the countless evidence, locational

13:47:16 12  advantage, freight cost advantage, supplier backyard, it is

13:47:22 13  expensive and costly to ship.  LSR and NSM are well situated

13:47:27 14  where they are selling today and we can see that the market

13:47:30 15  shares, two percent in this market, you heard the CEO of NSM

13:47:35 16  testify they're very small in the narrower and broader

13:47:38 17  market and that's because of freight costs.  He talked also

13:47:41 18  about the railcar charge, they can ship pretty easily by

13:47:46 19  rail to some of those markets, but there is an opportunity

13:47:49 20  cost for him because it might take him forty days to get to,

13:47:54 21  you know, to Florida or Georgia to get a railcar down there,

13:47:58 22  but he can, you know, ship closer to him and have, you know,

13:48:02 23  two or three turns of that railcar and get more volume out

13:48:06 24  to -- closer to where NSM is in the upper Midwest or further

13:48:11 25  west out in Idaho.

13:48:13 1          THE COURT:  Didn't someone testify that it's not

13:48:15 2    just distance, right, there was someone who testified, I

13:48:19 3    remember Baltimore was involved because I always have a

13:48:22 4    problem when I go to Baltimore on a train, and they said

13:48:26 5    something like it's faster to ship it from somewhere than it

13:48:29 6    is to ship it by train from Baltimore.  So like it's not

13:48:33 7    just as the crow flies locations, right?

13:48:36 8          MR. HANNA:  Yes, Your Honor, I believe that was

13:48:38 9    Kraft that testified that there is some rail congestion in

13:48:41 10   Baltimore and they get some from LSR, or some from

13:48:46 11   Louisiana, I believe, from ASR.  And it's not just --

13:48:51 12   another thing a lot of evidence will show and we'll put this

13:48:54 13   in our findings of fact and briefing is it's a reliability

13:48:58 14   issue.  Competition is not just about price, it's also about

13:49:02 15   giving -- getting the sugar to the customer's location on

13:49:05 16   time.  You know, they're running, they're making products

13:49:08 17   and they need to have the sugar at their bay and so they

13:49:13 18   don't have to close down the factory.

13:49:15 19          And so that's another, you know, reason why

13:49:19 20   generally speaking the proximity to, a customer is going to

13:49:23 21   look to the proximity to where, you know, more products from

13:49:27 22   a refiner that is closer to them.  That doesn't mean that

13:49:34 23   they can't and don't get alternative supply in some

13:49:37 24   instances, but we can look at the market shares and we can

13:49:41 25   see if you look in the narrower and broader markets that the

13:49:46 1   overwhelming amount of sugar is being supplied by United,

13:49:50 2   Imperial and Domino.

13:49:53 3          And the evidence, United's executive

13:49:55 4   vice-president of sales, Dirk Swart testified the

13:49:59 5   predominant -- for customers in the southeast of United,

13:50:03 6   predominantly that sugar is coming from Clewiston, Florida.

13:50:08 7   United has the luxury because it has ten production -- nine

13:50:11 8   production plants, it will have ten if it acquires Imperial.

13:50:15 9   It has the luxury of being able to optimize its freight,

13:50:19 10  optimize its network, and it can ship sugar down from the

13:50:23 11  Midwest or from the Midwest.

13:50:25 12         But the testimony also showed from Mr. Swart

13:50:28 13  that it's a pricing condition.  I think I -- I walked

13:50:35 14  Mr. Swart through the Pepsi Wytheville, Virginia facility.

13:50:39 15  There was intense competition between Imperial and United

13:50:42 16  for that, over four or five-year span, you know, Imperial

13:50:46 17  won that business and then I showed you some evidence and

13:50:50 18  Your Honor some evidence in 2021, United had its eye on

13:50:54 19  Wytheville, Virginia I think was the language and it dropped

13:50:57 20  its price.  You saw how much it dropped the discount for

13:51:00 21  that.  It was pricing that product out of Clewiston's -- out

13:51:04 22  of Clewiston, but I think the testimony was some of that

13:51:08 23  because they are producing more sugar out of the midwest

13:51:12 24  they're going to actually rail it down from the midwest.

13:51:15 25  But the customer is paying as if it's from Clewiston because

it's a lower cost.

There were some questions about, you know, well, sugar flows so that means, you know, the market, you know, should be broader.  You know, of course if you raise prices enough it will eventually be economical for LSR or NSM to bring more sugar down here.  But, you know, there is a, you know, that sugar is not flowing, you know, freely.  We heard sugar flows freely.  It's not flowing freely, it's going to flow at a cost because there can be tens of millions of price increases for customers in this market.

Dr. Rothman's economic model shows that will not attract enough sugar from outside to bring the prices back down.  This will mean real costs for real people.  That's exactly the kind of harm Section 7 was meant to prevent.

Defendants have put forth no ordinary course of business documents supporting the contention of a national market.  We have seen no documents of the defendant indicating that companies meaningfully compete with the likes of NSM or Western in these markets that we have put forth.

Now, there is nothing particularly novel about how we defined the markets here, textbook tried and true antitrust analysis.  In our brief and in my opening, we highlighted the *American Crystal Sugar* case and we have it up here on the slide.  The details of that decision read

13:52:56 1   like a recap of the trial record here.  You know, there was

13:53:00 2   two merging refining companies.  And the Court there cited

13:53:05 3   transportation costs for defining a market based on customer

13:53:08 4   location.

13:53:09 5           THE COURT:  Does it matter -- that case got my

13:53:13 6   attention, too, and I have reviewed that case.  I'll ask

13:53:17 7   defendants about it.  But does it matter at all that it's

13:53:20 8   1958?  Are there differences in the world now that might

13:53:25 9   impact -- I mean, there is lots of things that might have

13:53:28 10  been different local wise, but, you know, improvements in

13:53:34 11  transportation make them less relevant.

13:53:36 12          MR. HANNA:  Your Honor, that's a fair question

13:53:38 13  and certainly --

13:53:39 14          THE COURT:  It wasn't a good one, though.  It

13:53:42 15  was not a good question, it was fair?

13:53:44 16          MR. HANNA:  I apologize.

13:53:45 17          THE COURT:  Fair to middling?

13:53:47 18          MR. HANNA:  Defendants in opening said the same

13:53:51 19  thing.  You know, if this was television markets or airline

13:53:52 20  or something like that, that might be, the answer might be

13:53:52 21  different.  But we're talking about, you know, sugar.

13:54:02 22  Sugarcane, sugar is made from cane and beets for a long

13:54:05 23  time, and we're talking about rail and truck and we've had a

13:54:11 24  railroad for a very long time.  Sugar is not getting shipped

13:54:14 25  any other way.  Some of the refineries I would gather that

13:54:18  1    were in that case are still in existence today.  So the

13:54:22  2    technology hasn't really changed all that much.  It is

13:54:27  3    highly relevant.  And it's -- you know, it is a Second

13:54:30  4    Circuit case, but the Supreme Court in *Philadelphia National*

13:54:34  5    *Bank* relied on that case, and relied on it for the very

13:54:38  6    reason to say that the transportation -- high transportation

13:54:42  7    costs can localize competition.

13:54:44  8            And in that case, and the *Philadelphia National*

13:54:47  9    *Bank*, I cite it, that's an old case, too.  It's a seminal

13:54:51  10   antitrust merger case.  The Supreme Court many years ago

13:54:57  11   heard a lot of cases.  They don't hear many today, but in

13:55:01  12   the *Energy Solutions* case, Judge Robinson cited that case in

13:55:05  13   her opinion, so it's a seminal antitrust case, Supreme Court

13:55:09  14   case that's still good case law.

13:55:12  15           And that's why *American Crystal Sugar v.*

13:55:19  16   *American Sugar* is still good case law.

13:55:21  17           I want to switch briefly, I mentioned

13:55:24  18   distributors and I gave sort of a -- I tried to give a

13:55:30  19   hypothetical.  I just want to say, you know, our treatment

13:55:33  20   of distributors in this case is fully consistent with

13:55:37  21   seventy years of precedent.  There is a -- I'll cite another

13:55:42  22   similar case, *United States v. Alcoa*, and that involved the

13:55:48  23   sale of aluminum.  The Third Circuit also adopted that case

13:55:51  24   in *Allen-Myland v. IBM*.  I'll talk about both of these

13:55:57  25   cases.

13:55:57  1          Let me take the Alcoa Case first.  Alcoa, in

13:56:01  2  that case argued when calculating the market share the Court

13:56:05  3  should count companies that resold aluminum that had

13:56:09  4  previously been produced by manufacturers like Alcoa.  And

13:56:12  5  the court said at any given moment, Alcoa might compete with

13:56:18  6  one of the resellers and also all that aluminum came from

13:56:21  7  producers like Alcoa.  The court said we don't count the

13:56:26  8  sales from resellers.

13:56:27  9          Now, of course we have seen evidence in this

13:56:29 10  case, and there has been testimony that distributors compete

13:56:33 11  with, you know, refiners.  But that doesn't mean we should

13:56:37 12  count their market share.  We should count them for purposes

13:56:40 13  of evaluating this market.  And that's because really the

13:56:45 14  scarce resource in this industry is the refining capacity.

13:56:48 15  That's what's getting transferred as a result of this

13:56:51 16  merger.  The refining capacity of Imperial and that's

13:56:55 17  limited in this case.

13:56:55 18          The distributors don't have the refining

13:56:59 19  capacity, they don't have an independent access to sugar,

13:57:02 20  they have to buy it from a refiner, and that's why it's not

13:57:05 21  -- you know, they're more of a partner, and we have heard

13:57:08 22  some testimony about them being a partner to distributors --

13:57:11 23  or to refiners.  And that's why for purposes of assessing

13:57:17 24  evaluating the effects of the merger, we shouldn't look at

13:57:20 25  distributors as far as calculating market shares and that's

13:57:22 1    consistent with the Alcoa case, which by the way, it's kind

13:57:33 2    of treated as Supreme Court law because there was justices

13:57:37 3    who were recused, so it's the last -- the Second Circuit was

13:57:41 4    the final saying in that case.

13:57:43 5            But as I mentioned, *Allen-Myland v. IBM* case

13:57:47 6    also cites that.  In that case it was a question of, you

13:57:50 7    know, IBM was producing mainframes and then selling that to

13:57:54 8    resellers who were leasing it out.  And the question was,

13:57:58 9    well, do the companies that lease the IBM mainframes, are

13:58:03 10   they in the market competing with IBM?  And the court in

13:58:06 11   that case, the Third Circuit case said no, we don't count

13:58:10 12   them, that would be double counting.

13:58:12 13           So I'll point out one more case.  Dr. Hill was

13:58:16 14   on the stand, I believe it was yesterday.  He provided

13:58:20 15   another example, the *U.S. v. Dean Foods* case.  That case

13:58:26 16   involved fluid milk.  And the producers, he admitted this on

13:58:32 17   the stand, producers in that case sold milk to distributors

13:58:36 18   but in that case distributors didn't get market share.  That

13:58:40 19   made sense.  The producers of the milk were the ones

13:58:42 20   constraining the market.

13:58:47 21           Defendants also try to make this attack that

13:58:51 22   we've limited the market for, you know, quote, production in

13:58:55 23   sale as if that's, you know, a novel -- you know, something

13:59:00 24   that's novel.  We can look at on the slide here.  There are

13:59:02 25   many cases that have been brought, it's all highlighted,

13:59:07 1    production and sale of beer, production and sale of beer,

13:59:10 2    production and sale of coal, production and sale of florist

13:59:14 3    foil.  This is not something we're trying to trick the Court

13:59:17 4    into thinking that, you know, this is stuff that we do all

13:59:23 5    the time.  And it's also, by the way, this case law and what

13:59:27 6    we're doing here it's consistent with the ordinary course of

13:59:30 7    evidence.  I would submit that it's in the trial record.

13:59:33 8          We can look at PTX 330, it's a document that was

13:59:37 9    shown to the United CEO, Mr. Wineinger.  This was a

13:59:42 10   presentation that was given to US Sugar when it was seeking

13:59:48 11   to acquire Imperial, United had just stopped pursuing that

13:59:52 12   acquisition.  Now it was educating US Sugar on the sugar

13:59:55 13   market.  We can see it's walking down supply chain from the

13:59:59 14   growers all the way to the buyers.  We can see distributors

14:00:02 15   are in the buyers.  They're in the buyer channel.  They have

14:00:06 16   to buy their sugar from marketers like United or Imperial.

14:00:10 17   And we can see United, they give distributors zero of the

14:00:15 18   supply.

14:00:17 19         We also heard from the distributors in this

14:00:19 20   case.  We heard from the CEO of Batory Foods, you can see

14:00:22 21   some of the testimony on the slide here.  You know, they

14:00:22 22   can't compete with United.  They're a producer.  They

14:00:29 23   control the supply chain from the field, that's the grower,

14:00:32 24   all the way to the delivery point.  I believe we heard from

14:00:37 25   Mr. Brown, Clayton Brown, for IFP, who talked about well,

14:00:44 1    they adjusted my prices.   I have to pass that on.

14:00:47 2                We walked through an example of a gentleman's

14:00:51 3    agreement.   Imperial, the refiners benefit when they sell

14:00:55 4    their sugar to a distributor.   That distributor can then --

14:00:59 5    that distributor benefits, it makes a sale, but Imperial and

14:01:03 6    United also benefit from it.   We saw some evidence where I

14:01:07 7    think it was ASR was contemplating taking share through

14:01:12 8    distributors, that means they're getting their sugar out in

14:01:15 9    the market through distributors as a partner.

14:01:17 10               I want to take a minute also, I mentioned four,

14:01:22 11   issues that Your Honor will need to decide.   And the issue

14:01:25 12   is USDA or, you know, does USDA regulations, is that used

14:01:31 13   for competition?   I will submit the defendants ask this

14:01:36 14   Court to let this merger through because the USDA has tools

14:01:38 15   that can affect prices.   The law is clear, though, that

14:01:41 16   that's not enough to displace the antitrust laws.

14:01:44 17               As we saw, prices have fluctuated a lot, the

14:01:49 18   USDA may be taking action, discretionary, but they certainly

14:01:54 19   can bring in more imports so we have seen prices elevated.

14:01:58 20   You asked me in opening about price floors.   They do set a

14:02:02 21   price floor and they set that to ensure that farmers get

14:02:06 22   paid for the sugar they make.   And Dr. Fesco testified, I

14:02:10 23   think, I think prices have been two or three times higher

14:02:12 24   than that price floor, they have a dual mandate.   One

14:02:18 25   mandate is to make sure it doesn't go below that price floor

14:02:23 1    because if it goes below that floor the farmers are going to

14:02:27 2    forfeit their sugar to the United States.  The United

14:02:30 3    States, we're not good at selling sugar.  We want to avoid

14:02:33 4    that, so we want to keep prices elevated.  I think Dr. Fecso

14:02:38 5    testified that the U.S. has the highest prices in the world.

14:02:41 6             THE COURT:  Right.  And I know that this doesn't

14:02:44 7    really come into play, but it just seems funny to me that

14:02:48 8    the United States government is -- I mean, the prices are

14:02:52 9    not as low as they can be because the United States

14:02:54 10   government keeps them higher.  And now the United States

14:02:57 11   government is coming in and saying, oh, my God, this is

14:03:00 12   going to raise prices.  It seems a little inconsistent.

14:03:06 13            MR. HANNA:  Good, fair question.  You know, USDA

14:03:11 14   is a -- that's a policy that we as a society for a long time

14:03:19 15   we have had --

14:03:20 16            THE COURT:  I understand that's a legislative

14:03:22 17   policy, different branch.  Those people are elected to make

14:03:27 18   those decisions.  But it seems a little bit -- it seems a

14:03:30 19   little bit odd to me that, you know, especially when even

14:03:34 20   your expert when I look at what he's saying the possible

14:03:39 21   price differential would be, you know, it seems probably

14:03:42 22   less than what the government is already inflating it from.

14:03:49 23            MR. HANNA:  Your Honor, there is, you know, in

14:03:52 24   the Supreme Court I mentioned *Philadelphia National Bank* as

14:03:52 25   a seminal Supreme Court case.  We need to let competition

14:04:01 1    play within the regulations.   There is a zone of

14:04:06 2    competition.

14:04:06 3              THE COURT:  Right, banking has regulations.

14:04:08 4              MR. HANNA:  It did back in 1963, it was actually

14:04:11 5    more heavily regulated.  Actually in that case, Philadelphia

14:04:16 6    National Bank noted that there was a floor from the Federal

14:04:18 7    Reserve and a ceiling from the state fiduciary law.  And it

14:04:22 8    noted in that case, obviously you can have competition in

14:04:24 9    between that.

14:04:24 10             We see competition happen, we see competition

14:04:27 11   driving prices down, we see prices going up and down so we

14:04:32 12   know competition matters irrespective of, you know, the

14:04:38 13   USDA, you know, policy.

14:04:41 14             THE COURT:  Speaking of the USDA, I mean, what

14:04:43 15   do I make of Dr. Fecso, and I take it that she's not opining

14:04:48 16   here on -- she's not testifying as to USDA's policy and USDA

14:04:55 17   hasn't taken a position.  But, you know, I look at her and

14:04:59 18   she seems like a pretty straight shooter and a credible

14:05:04 19   witness and she seems like she would have better insight in

14:05:07 20   the industry than most people do.  So what do I make of her

14:05:12 21   testimony?

14:05:12 22             MR. HANNA:  Dr. Fesco, obviously she's very

14:05:16 23   knowledgeable.  She's been involved in the industry for many

14:05:19 24   decades.  You know, she candidly acknowledged that she was

14:05:22 25   expressing her own views and not that of the USDA.  She

14:05:30  1  acknowledged she's not an antitrust specialist.  She doesn't

14:05:37  2  evaluate mergers.

14:05:38  3          THE COURT:  No, but part of what you're trying

14:05:41  4  to show is there is a significant or substantial

14:05:44  5  anticompetitive effect and largely that the prices would

14:05:46  6  increase because you're losing a competitor.  And she says

14:05:50  7  look, Imperial is a high-priced alternative, their market

14:05:55  8  share has been going down, down, down, and they're not

14:05:58  9  really constraining the prices.  And I think, according to

14:06:02 10  her, again, not speaking for the USDA, but I think that when

14:06:07 11  I look at this, Imperial's problems can be mitigated by this

14:06:14 12  merger.  And that actually might make their costs go down

14:06:18 13  which would make them a more competitive alternative, even

14:06:25 14  though they'll be part of United.

14:06:28 15          MR. HANNA:  Dr. Fesco, obviously she didn't have

14:06:32 16  the internal documents of the parties.  You know, the

14:06:36 17  parties obviously respect her and garner a lot of respect

14:06:42 18  before the merger was announced to talk to her about the

14:06:47 19  sale.  We can look at -- to your question about declining,

14:06:51 20  you know, Imperial's struggles, we can look at their market

14:06:55 21  shares, and we can see that it's been relatively stable over

14:06:59 22  time.  We have the data from the parties and we can see that

14:07:02 23  it's relatively, you know, relatively stable.

14:07:06 24          You know, are they higher cost?  We're not

14:07:12 25  denying that they might have higher costs.  But it doesn't

14:07:15 1    mean that you can't have a competitive force.  We saw

14:07:19 2    evidence of United and Imperial competing, being a

14:07:24 3    competitive constraint on them.  Maybe they make less money

14:07:29 4    than United because they have higher costs, their profits

14:07:32 5    aren't as high, it doesn't make them a weaker competitor in

14:07:35 6    the market.

14:07:36 7                THE COURT:  But they are a weaker -- I take it,

14:07:39 8    you have the cookie place, I remember, and some other ones

14:07:46 9    where they compete head to head, but they are a weaker

14:07:52 10   competitor.  Right?  The CEO got on the stand and said yep,

14:07:57 11   we're sort of managing it to stick around for the next year.

14:08:02 12   It sort of makes me wonder, you're challenging this because

14:08:07 13   you want Imperial to be in the market, but it seems like

14:08:10 14   there is a good chance that Imperial won't be in the market

14:08:15 15   if they go under, and this is an opportunity to make them

14:08:18 16   more efficient and able to maybe have lower prices.

14:08:24 17                MR. HANNA:  The defense is certainly not making

14:08:28 18   a failing firm attempt because of that, they're clearly

14:08:31 19   making money.  Ms. Garrett, I don't know if it was closed

14:08:41 20   session or not, or confidential, but they're making money

14:08:44 21   and they're steady.  And the case law is clear, we have it

14:08:47 22   on the slide here, this type of argument is a Hail Mary

14:08:51 23   pass, this weakened competitor argument is a Hail Mary pass.

14:08:55 24   They're not -- I would submit they're actually not a weak

14:08:55 25   competitor.  They have ups and downs every year, but they're

in the market and we can look at their market share in our relevant market and we can see they're winning a lot of business.

THE COURT:  But them being a higher priced competitor for -- I understand the argument that I was just making was that they were a weak competitor, but the argument that they are a higher price and therefore not constraining prices, that's not a weakened competitor, that's just that they're not really a competitor, that's -- that is, you know, having some effect keeping prices down, right?

MR. HANNA:  Two responses to that.  First of all, we did put forth evidence that they're not always at the highest price.  There is no evidence of Imperial being -- I think it was General Mills said they were the lower price, then United came in after them.  Imperial and United competing first and foremost, clearly they're not at the highest price all the time, they have a freight advantage a lot of the times.  That can help them with price.

Price isn't the only thing, we heard testimony that price is not everything.  Imperial is very -- you know, partly to their credit, they recognize that they have to be even more, you know, more reliable.  And we saw an example when Pepsi informed Imperial that they were, you know, they are a supplier at times, United was bringing in lumpy sugar,

14:10:38 1   and you know, Imperial recognized that and, you know, tried

14:10:41 2   to make that better, make improvement.  So there is

14:10:44 3   competition not just on price.  Even if they're the highest

14:10:48 4   -- even if they are the highest price in some instances, you

14:10:52 5   know, United is sometimes the highest price as well.  It

14:10:58 6   doesn't mean they're not a competitive strength.

14:11:00 7           There was one example for Danone, they like, the

14:11:03 8   defendants try to, you know, I think the illusion was that

14:11:08 9   well, you know, United or Imperial actually didn't bid on

14:11:11 10  the Danone business in Jacksonville, Florida.  Well, you can

14:11:16 11  still have a competitive constraint on your competitor even

14:11:20 12  if you're not bidding on the business.  We can see in this

14:11:24 13  example that United recognized that Imperial was -- because

14:11:27 14  of freight, they were closer to this facility, they were

14:11:32 15  likely competing for that business and that, you know,

14:11:35 16  United would likely be at a freight cost disadvantage.

14:11:39 17          United is not saying, we don't have to worry

14:11:42 18  with Imperial because they're a higher cost, that's not what

14:11:45 19  he's saying, he's saying they have a freight disadvantage.

14:11:49 20  He's saying one competitor, he's not saying LSR or NSM, he's

14:11:52 21  saying one competitor in Savannah, Georgia, and that's

14:11:58 22  Imperial.  And you can see here, what did United do?  It

14:12:01 23  lowered their price.  Imperial just being in the market is

14:12:04 24  having an effect.

14:12:06 25          Now, I did want to reserve some time for

14:12:10 1    rebuttal.  I just want to touch on the last point briefly on

14:12:15 2    coordinated effects.  And part of this we will touch on this

14:12:22 3    point about, you know, Imperial.  One of the reasons why a

14:12:27 4    merger may be illegal under Section 7 is if it makes a

14:12:32 5    market more vulnerable.  The defendants and the expert

14:12:37 6    Dr. Hill have spent a lot of time confusing exactly what we

14:12:41 7    mean by coordination.  What is coordination?  Coordinated

14:12:46 8    interaction is merger guidelines, we agree merger guidelines

14:12:51 9    is pretty settled caselaw, courts in the Third Circuit

14:12:55 10   follow it, there is a range of conduct.  We have showed a

14:12:58 11   range of conduct in this case.  Actual agreements, of course

14:13:02 12   among competitors are covered.  We don't want to, you know,

14:13:05 13   implicit agreement, similar common understanding between

14:13:10 14   competitors, a wink and a nod, price signaling, those are

14:13:14 15   all types of ranges of conduct, information sharing, we have

14:13:18 16   shown plenty of that.

14:13:19 17           You know, this type of parallel conduct can you

14:13:26 18   know, short of an actual explicit agreement is coordination.

14:13:31 19   And, the case law makes it clear that mergers should be

14:13:34 20   allowed -- or should not be allowed to make this risk, you

14:13:38 21   know, these conditions, you know --

14:13:40 22           THE COURT:  So I know you have those couple of

14:13:43 23   e-mails with Mr. Wistisen.  What else do you have for

14:13:46 24   coordination?

14:13:47 25           MR. HANNA:  Well, we have a table here where

14:13:52 1    they're trying to send messages to competitors.  The

14:13:56 2    testimony is it didn't get to competitors, that's fine, but

14:13:58 3    the benefited recipient of these messages are the

14:14:01 4    competitors.  Right?  They're trying to elevate, elevate

14:14:06 5    prices, you know, United's CEO wrote an e-mail saying we

14:14:11 6    were trying to raise prices.  And we took these offers off

14:14:14 7    the table in order to push, you know, or to send a message

14:14:18 8    to our competitors saying we were not interested in prices

14:14:22 9    going lower.  We also saw an e-mail or testimony and an

14:14:26 10   e-mail from United's director of marketing.  United was

14:14:32 11   looking to -- was looking to take shape, we talked a little

14:14:38 12   bit about the, you know --

14:14:40 13          THE COURT:  I guess where I'm coming out on some

14:14:43 14   of this is it really -- I mean, I don't know, this just

14:14:46 15   doesn't strike me as the type of coordination that is

14:14:49 16   usually seen in an antitrust kind of way.  This is more like

14:14:54 17   we want to project strength to the market.  Which is

14:14:57 18   different to me than we want to, you know, we want to

14:15:01 19   coordinate with each other on our pricing.

14:15:06 20          MR. HANNA:  Coordination doesn't have to be,

14:15:06 21   like I said, it doesn't have to be they're actually in a

14:15:10 22   room, they have a formal agreement, of course that is

14:15:14 23   illegal.  These are pretty troubling, talking about these

14:15:17 24   exchanges, pretty troubling.  They're not just sharing spot

14:15:22 25   pricing.  I say it, you heard Imperial's CEO, they don't

14:15:29 1  share spot pricing, that company gets acquired and is out of

14:15:32 2  the market, it's going to be easier for United and Domino if

14:15:38 3  they share what their competitors sell package is or what

14:15:42 4  their future pricing strategy are, it's easier to avoid a

14:15:48 5  price hike.

14:15:49 6          They can get that information from the customer,

14:15:51 7  but are they going to trust that customer?  They might not

14:15:55 8  trust that customer.  Mr. Swart testified to that.  They

14:16:02 9  hope, he testified, you know, customers are trying to use

14:16:06 10 competitive pricing --

14:16:08 11         THE COURT:  You're going to say I got, even if

14:16:11 12 they offered you 41, they're going to say can you do better

14:16:14 13 than 39.

14:16:15 14         MR. HANNA:  Exactly.  And if you have a trusted

14:16:19 15 source like to go to to talk about, they know you're giving

14:16:24 16 back and forth.

14:16:25 17         THE COURT:  But those were spot prices for

14:16:27 18 Mr. Wistisen, is that right?

14:16:29 19         MR. HANNA:  Well, that's what the defendant --

14:16:31 20 that's what defendants have said and that's what certainly

14:16:34 21 the testimony was.  Surely spot price, I think Mr. Henderson

14:16:39 22 from Domino testified that spot prices are list prices and

14:16:43 23 they can turn into contract prices, you know, it's the

14:16:46 24 starting point of negotiation.  Right?  So I'm sure there is

14:16:51 25 no -- as I said in opening, it clearly goes beyond just

14:16:57 1  sharing the spot pricing, sharing of how much more sugar do

14:17:01 2  you have left to sell.  When you have less sugar to sell,

14:17:04 3  you can increase your prices.  If I have Domino has less

14:17:08 4  sugar to sell, I know I can probably get away with a price

14:17:12 5  increase, because they don't have that sugar to constrain

14:17:16 6  me.

14:17:16 7          I would say, you know, I want to -- I mentioned

14:17:23 8  earlier, Steve Hanson, the Vice President or Director, I

14:17:27 9  believe of United.  You know, taking it away from the

14:17:30 10 information exchanges, but he testified that when United was

14:17:35 11 looking to take shares, right, you would think that's where

14:17:39 12 we're trying to be as you put it, Your Honor, a stronger

14:17:43 13 competitor, you want them to take market share, right.  We

14:17:46 14 can see what he testifies to.  You know, his e-mail was, you

14:17:50 15 know, when they're making these sales plans to take share,

14:17:55 16 they needed to stay balanced, stay balanced so you didn't --

14:17:59 17 you caused competitors to take smaller reactions, and so the

14:18:04 18 prices would go lower.  And you see his testimony, you stay

14:18:08 19 balanced so the price doesn't drop much.

14:18:11 20         That's also -- you know, it means that this

14:18:14 21 market is vulnerable to this type of coordination.  It

14:18:18 22 doesn't mean that they're actually talking to competitors in

14:18:22 23 this example, but they all recognize that it benefits them

14:18:24 24 all to try to have prices elevated.

14:18:29 25         Time to get off.

14:18:47  1              THE COURT:  Why don't they just give you a hook.

14:18:52  2              MR. HANNA:  I just --

14:18:53  3              THE COURT:  Go ahead, I won't cut you off in

14:18:55  4    your rebuttal.

14:18:56  5              MR. HANNA:  I just want to end on one thing

14:18:59  6    about this.  You know, we have a market that's going to be

14:19:07  7    dominated by two competitors, really, Domino and United.

14:19:11  8    And we have them, stacks of e-mails of them communicating

14:19:15  9    with each other, communicating through a go between.  They,

14:19:21 10    you know, on their own, they're recognizing that they want

14:19:24 11    to soften competition.  We don't want to raise, you know,

14:19:28 12    prices with marginal accounts.  We don't want -- we want to

14:19:33 13    send messages to competitors, that's all evidence of

14:19:37 14    coordination.  We don't need to prove that there has been a

14:19:41 15    Section 1 violation, that's not what we're -- that's not

14:19:44 16    what we are proving.  We're offering this as evidence,

14:19:48 17    powerful evidence that this market is vulnerable to

14:19:51 18    coordinated conduct.  That's all we have to show.  All we

14:19:54 19    have to show is that the market is vulnerable and

14:19:56 20    susceptible to coordination.

14:19:59 21              It turns out, we actually have evidence that

14:20:01 22    they are coordinating in this type of way, and that's shows

14:20:03 23    that the market is vulnerable.

14:20:06 24              With that, Your Honor, I do want to save the

14:20:11 25    balance of my time for rebuttal.  Of course unless you have

14:20:16 1    more questions for me.

14:20:17 2              THE COURT:  No, that's fine.  And if I have

14:20:19 3    questions that come up during defendants, I'll ask you.

14:20:24 4              MR. HANNA:  I don't know if I mentioned I was

14:20:26 5    going to let my colleague, Ryan Sandrock do the rebuttal.

14:20:32 6    I'm happy to do the rebuttal as well, but I want to thank

14:20:36 7    you, Your Honor, for your time and the Court's personnel's

14:20:39 8    time this week.  It's been a pleasure being in front of you.

14:20:42 9              Thank you.

14:20:56 10             MR. BUTERMAN:  May I proceed, Your Honor?

14:20:58 11             THE COURT:  You may.

14:20:59 12             MR. BUTERMAN:  Thank you.

14:21:03 13             Your Honor, when I stood up here on Monday, I

14:21:07 14   said that this case had one question.  And that was about

14:21:12 15   whether Imperial was keeping prices significantly below

14:21:16 16   where they would be otherwise.  That was the issue that we

14:21:19 17   needed to decide in connection with understanding whether

14:21:23 18   this transaction, the removal of Imperial as an independent

14:21:27 19   company would substantially lessen competition.

14:21:29 20             THE COURT:  Tell me how that fits in to the

14:21:34 21   legal analysis that I need to set.  I get that as a, you

14:21:42 22   know, sort of in this big picture and I've got these

14:21:46 23   shifting burdens and different things.  Where does that

14:21:51 24   question fit in?

14:21:52 25             MR. BUTERMAN:  So it all starts with the Supreme

14:21:55 1   Court case of Brown Shoe.  And Brown Shoe says that we have

14:21:59 2   to take a practical pragmatic approach to market definition.

14:22:05 3   And I think that -- and product market, geographic market,

14:22:08 4   the whole shebang.  I think that Dr. Hill talked about this

14:22:13 5   yesterday in a better than, hopefully not better than I can,

14:22:19 6   but what he said is have you have to look at this

14:22:22 7   holistically.  You can't just look at this by focusing on

14:22:27 8   numbers on, you know, just hypothetical monopolist test or

14:22:30 9   HHI calculations, but you also have to look to industry

14:22:35 10  realities.

14:22:35 11          If we can put up the first slide.  This is what

14:22:38 12  Judge Stark said in *Sabre*, no party can gerrymander its way

14:22:45 13  to an antitrust victory without due regard for market

14:22:49 14  realities.  Market realities are very critical here.  They

14:22:53 15  are one of the legs of the stools.  And I think that the

14:22:55 16  overwhelming evidence and with respect to my colleague and

14:23:01 17  friend, this isn't even our burden.  Right?  That has to be

14:23:06 18  understood with respect to statements here.  They have the

14:23:09 19  burden on market definition, on effects, that's not our

14:23:12 20  burden.  But the overwhelming evidence of the way that the

14:23:17 21  market operates here simply leads to the conclusion that

14:23:21 22  this transaction will not harm competition.

14:23:25 23          And, you know, in preparing for this, we went

14:23:30 24  and we thought, okay, fine, what are those realities?  What

14:23:35 25  are the realities that we talk about?  If you could go to

14:23:39  1    the next slide.  What's economic reality based on?  It's

14:23:42  2    based on the defendants' course of business documents, the

14:23:45  3    testimony of defendant's executives and the testimony of

14:23:48  4    customers and, of course, the industry expert.

14:23:50  5          Now, I get it, the government here disagrees

14:23:54  6    with that.  But we believe that this is the way that we need

14:23:59  7    to be looking at this.

14:24:01  8          And it goes beyond that.  Another issue that we

14:24:05  9    believe frames this entire analysis when we think about this

14:24:07 10    is the role of the parties' intent.  Intent, it goes to the

14:24:12 11    probable future conduct and probable future effects.  It's

14:24:16 12    absolutely relevant as the Supreme Court explains in Brown

14:24:20 13    Shoe.  It's an aid in predicting go the probable future

14:24:23 14    conduct of the parties and thus the probable effects of the

14:24:26 15    merger.

14:24:27 16          And it's so important here, Your Honor, you know

14:24:31 17    I spent a lot of time working at the Antitrust Division

14:24:35 18    until I went over to this side of the bar, and this case is

14:24:39 19    so different from so many other cases in that there are no

14:24:44 20    documents, there is no evidence that this transaction is

14:24:44 21    motivated in any way by anyone thinking that they can raise

14:24:56 22    prices, decrease output.  We know this, right?  United is a

14:25:02 23    co-op.  We talked about that.  They don't even have the

14:25:02 24    ability to do what the government and their experts say that

14:25:07 25    they need to do in order to effect prices here.

14:25:10  1          THE COURT:  Right, because if they don't sell

14:25:12  2   all of it, then they have to keep it and there is a high

14:25:15  3   carrying cost and the one guy almost lost his job if he was

14:25:18  4   going to do it one more time.  Right?

14:25:21  5          MR. BUTERMAN:  Exactly.  Yes, Your Honor.  I

14:25:24  6   have two more that I want to hit on quickly.

14:25:26  7          Another idea here, the role of market

14:25:29  8   definition.  I think this is very important here.  Again, I

14:25:33  9   understand that the government disagrees with this.  The

14:25:36 10   government disagrees with this.  It's not an academic or

14:25:41 11   theoretical exercise, it's not an end in and of itself.  I

14:25:45 12   believe what we saw with Dr. Rothman is that they do believe

14:25:49 13   that it's an exercise, it's a theoretical exercise in and of

14:25:53 14   itself.  We believe that it's a framework for understanding

14:25:56 15   how competition works in a particular industry, in this

14:26:00 16   sugar industry.

14:26:01 17          And the last one, Your Honor, it goes back to

14:26:03 18   something that Your Honor mentioned in the beginning.  How

14:26:07 19   market definition needs to be conducted.  We begin by

14:26:10 20   applying the evidence of real world competition to define

14:26:14 21   relevant markets.  Section 7 requires a focus on the

14:26:18 22   competitive overlap between the merging firms.  In Brown

14:26:24 23   Shoe the Supreme Court tells us that the market should be

14:26:27 24   drawn to recognize competition where, in fact, competition

14:26:30 25   exists.  These are four critical themes that we believe lead

14:26:39 1    to only one conclusion.

14:26:41 2              THE COURT:  How does that fit in with the quotes

14:26:45 3    that I keep getting from the *Philadelphia National Bank*

14:26:49 4    case, the proper question to be asked is not where the

14:26:52 5    parties do business or even where they compete, but where

14:26:55 6    within the area of competitive overlap the effect of the

14:26:59 7    merger on competition will be direct and immediate.

14:27:03 8              MR. BUTERMAN:  So it's a two-part, it's a

14:27:07 9    two-part test, it's a sequential test.  We first have to

14:27:11 10   define the relevant market and then within that relevant

14:27:14 11   market that's where we do that analysis to see the harm.

14:27:17 12   And that's really one of the fundamental problems with what

14:27:21 13   Dr. Rothman did, because he didn't do that analysis.  And

14:27:24 14   what Dr. Rothman did is so troubling because he actually sat

14:27:29 15   here and he gave a great example I thought of how market

14:27:33 16   definition is supposed to be done, not the sneakers, but the

14:27:37 17   milk.  When he walked through and he said well, you start,

14:27:41 18   you look first at the block, and then you see what would

14:27:44 19   happen in response to that.  And then you expand it out a

14:27:48 20   little bit, and then you expand it out a little bit more.

14:27:51 21   He didn't do that in this case.  The exact -- he taught us

14:27:55 22   the way to do it, but he didn't do it here.

14:27:58 23             Your Honor, there is something else about this,

14:28:00 24   this point here, this isn't my point, this is actually if we

14:28:02 25   go through the next few slides, these are what the

government has said the last two times they have been in the District of Delaware, what I just played are all their statements from the closings that they gave.  That's from *Energy Solutions* about the reality being the defendants' course of business documents.  If we go to the next slide, that's from *Energy Solutions* about intent and how important it is.  If we can go to the next slide, that's about market definition not being academic or theoretical.  And the last one is from *Sabre*.

        The government here in this case is trying to say that what Dr. Hill did with his competitive overlaps is wrong.  That's what they said.  He was wrong.  Dr. Rothman said he was wrong, we don't look to competitive overlaps. February 6, 2020, in front of Judge Stark in this court, they said Section 7 requires a focus on competitive overlaps of the merging firms.

        So Your Honor, my colleague, Mr. Blumenfeld, said that I wouldn't be able to get through my opening without trying to go back and rebut a couple of things.  So I do want to do that now and I want to start with some of the law.  And I promised Your Honor that I would talk about a 1958 case, so I will address the 1958 case.

        THE COURT:  Well, Mr. Blumenfeld knows there is one former partner who used to say old law is good law.

        MR. BUTERMAN:  Well, Your Honor, I'm not so sure

14:29:43  1    that I disagree.   The 1958 case involved the distribution

14:29:51  2    and sale of refined sugar.   It wasn't the production and

14:29:55  3    sale of refined sugar, it was the distribution and sale.

14:29:58  4    The market definition in that case actually included people

14:30:01  5    who distributed and sold.   So if we're going to go by 1958.

14:30:08  6    But, I'm going to be consistent and say in 1958, it was a

14:30:13  7    long time ago.   We have done a little research.   I think

14:30:16  8    that the international -- the interstate system was really

14:30:24  9    developed in the 1950's and it was getting built up in the

14:30:29 10    Eisenhower administration.   I think we can all agree that

14:30:32 11    the world is very different.   Dr. Hill talked about the fact

14:30:36 12    that when you think about a world pre the suspension

14:30:45 13    agreements in the sugar industry, it was a very different

14:30:48 14    world.   I don't think it takes too much to know that the

14:30:52 15    world in 1958 doesn't exactly match up with what we have

14:30:58 16    today.   And obviously they aren't even the same markets that

14:31:03 17    were being discussed at that period of time.

14:31:06 18         While we're talking about case law, counsel

14:31:13 19    mentioned the Hackensack Meridian case.   That's a case that

14:31:20 20    was actually just decided I believe in the last month.   And

14:31:28 21    let's see what it says about geographic market.   It says the

14:31:33 22    relevant geographic market is the area where potential buyer

14:31:36 23    may rationally look for the goods or services he seeks.   The

14:31:41 24    relevant market's geographic scope must be determined within

14:31:45 25    the specific context of each case, correspond to the

14:31:50 1    commercial realities of the industry, and be economically

14:31:54 2    significant.

14:31:55 3            The court in that case also said that definition

14:32:02 4    of the relevant geographic market is a factual question

14:32:06 5    dependent upon the special characteristics of the industry

14:32:10 6    involved so we review for clear error.  However, where a

14:32:13 7    district court applies an incomplete economic analysis or an

14:32:18 8    erroneous economic analysis to the facts, it has committed

14:32:23 9    legal error subject to plenary review and we will reverse.

14:32:28 10            And I say that, Your Honor, because we all sat

14:32:31 11   here and we saw Dr. Rothman's testimony.  And with respect,

14:32:36 12   his analysis is not a complete economic analysis.  There

14:32:43 13   were, his economic analysis was riddled with errors and even

14:32:48 14   when Dr. Hill went about and accepted all these assumptions

14:32:53 15   that he had made, the price effects that we came up with

14:32:58 16   were not significant.  In fact, I believe that Dr. Hill

14:33:01 17   talked about them as being roughly de minimis.  These are

14:33:07 18   tests --

14:33:07 19            THE COURT:  Is there any evidence countering

14:33:10 20   that those are significant?  I know he said something like

14:33:14 21   the GUPPI analysis if it's under five percent it's probably

14:33:18 22   not relevant because of mitigating factors, but is there

14:33:23 23   anything on the other side or is it really just Dr. Hill

14:33:26 24   what he said look, here is mine, here is his, this is not?

14:33:33 25            MR. BUTERMAN:  I don't know that there is

14:33:34 1    anything more.  I think what happened was, and it was pretty

14:33:37 2    telling that Dr. Rothman never actually put the percentages

14:33:41 3    in front of us.  Right?  He just tried to show you well, if

14:33:45 4    you take all these assumptions I can make it into a big

14:33:48 5    absolute number to make everyone concerned about it, but

14:33:51 6    from a percentage point, we're looking at, you know, in some

14:33:55 7    instances a one percent price increase.

14:33:58 8         And the question that I have is do we really

14:34:02 9    believe after the testimony of Dr. Rothman when he got the

14:34:06 10   very formula that you use for GUPPI incorrect, do we really

14:34:11 11   believe that he is so precise that he can calculate that

14:34:14 12   price increase to one percent, two percent or three percent?

14:34:19 13   I mean -- so anyway, I'll move on to a couple of other

14:34:25 14   things I wanted to hit.

14:34:26 15        Your Honor had asked a question about the state

14:34:32 16   of Imperial, how that factored into the analysis, and

14:34:36 17   Mr. Hanna responded and had I believe a slide about a

14:34:42 18   failing firm defense.  Let's be clear about that.

14:34:45 19   Absolutely not, we have not made a failing firm defense.  We

14:34:49 20   haven't made what's called an antitrust flailing firm

14:34:52 21   defense which is a variation on that.

14:34:55 22        But in 1974, a little bit more recent, in the

14:34:59 23   Supreme Court case of General Dynamics, the Supreme Court

14:35:02 24   made an observation that you have to look, and it's not so

14:35:02 25   different from some of the ideas behind Brown Shoe, but you

14:35:12 1   have to look at what role the company that's being acquired

14:35:15 2   plays in the industry and what the future looks like for

14:35:17 3   them.  And it's for the reason that Your Honor mentioned,

14:35:20 4   because it's all about the effects of competition.  And if

14:35:23 5   the company that's being acquired isn't going to continue, I

14:35:27 6   mean, in that case it will not continue to be a competitive

14:35:32 7   constraint, but if the company is a competitive constraint

14:35:36 8   if it doesn't have that strong future that's a very relevant

14:35:40 9   point that the Supreme Court said in doing the analysis.  I

14:35:43 10  think it's really a critical factor here when we think about

14:35:47 11  it, because again, the evidence came in only one way.  In

14:35:54 12  fact, I don't think that, if I'm not mistaken, I'm not sure

14:35:59 13  how much counsel even talked about the role of Imperial in

14:36:03 14  keeping competition in the industry.

14:36:07 15       THE COURT:  You're saying as opposed to just a

14:36:09 16  few examples of head-to-head competition?

14:36:11 17       MR. BUTERMAN:  Yeah.  And, Your Honor, again, we

14:36:14 18  talked about the numbers in the opening.  I actually tried

14:36:19 19  to figure out how many were mentioned at trial and we had

14:36:22 20  too many debates so we couldn't even really come up with it.

14:36:27 21  It was one person who said there were three, there were

14:36:29 22  other people who said five.  We know that Dr. Rothman had

14:36:33 23  put seventeen logos on his screen, but as my colleague had

14:36:38 24  done with Dr. Rothman, I mean, one of those was I believe

14:36:41 25  Danone who hadn't bought in over four years which actually

14:36:47 1   is something I want to mention because I do want to talk

14:36:50 2   about distributors.

14:36:50 3              THE COURT:  But, you have to show that the

14:36:52 4   head-to-head competition is enough that if you remove

14:36:55 5   Imperial from the market you would have a substantial

14:36:58 6   anticompetitive.

14:37:00 7              MR. BUTERMAN:  Exactly, Your Honor.  And I think

14:37:02 8   all the evidence came in one way on that one.

14:37:05 9              I will say, you know, that I thought it was

14:37:08 10  interesting that the government took the position just

14:37:11 11  earlier that Imperial, I think it was specifically with

14:37:16 12  respect to Danone, could be a competitive constraint even

14:37:20 13  when it was not participating.  But at the same time,

14:37:24 14  counsel said in the beginning, and acknowledged that

14:37:28 15  distributors are competing, but yet they don't count in the

14:37:31 16  market.  I don't see how those two things can work.  That's

14:37:35 17  just not the way reality works here.

14:37:39 18             I want to be clear about distributors because

14:37:40 19  Dr. Hill said something yesterday on a different topic that

14:37:42 20  I thought was very informative.  So when -- you'll recall

14:37:48 21  when Dr. Hill was talking about United versus US Sugar and

14:37:51 22  how you should assign shares, he said you know on the one

14:37:52 23  hand, you can look at all the four members of United like

14:37:56 24  they're completely independent entities.

14:38:02 25             On the other hand, you can look at them like

14:38:05 1    they're one combined.  And he said the problem is that

14:38:09 2    Dr. Rothman took that super aggressive position and Dr. Hill

14:38:14 3    didn't say I'm taking the other one, he said no, I think it

14:38:18 4    needs to be in the middle.  I heard the evidence in this

14:38:21 5    case.  And the defendants admit there are certainly

14:38:25 6    instances where distributors are not acting as a competitive

14:38:29 7    constraint.  But I also saw the testimony and I questioned

14:38:33 8    the gentleman from Piedmont and we saw what his bid tracker

14:38:37 9    showed, there are times and counsel acknowledged it, there

14:38:41 10   are times when they are competing.  But the government says

14:38:47 11   no, zero.

14:38:49 12        And just to clarify the answer to the question

14:38:52 13   that Your Honor asked earlier.  Importers are included in

14:38:56 14   the market only when they directly sell into the United

14:39:01 15   States.  But if an importer like most of them do, sells

14:39:06 16   sugar to a distributor, no, no, the sales from that

14:39:11 17   distributor are not in the market.  I mean, it's -- this

14:39:14 18   market definition going back to what we said --

14:39:17 19        THE COURT:  You're saying not in the market as

14:39:19 20   defined by the government?

14:39:21 21        MR. BUTERMAN:  Absolutely, Your Honor, we don't

14:39:22 22   see that as making sense.  Imports as we know are a

14:39:26 23   significant portion of this market.  Distributors account

14:39:31 24   for more sales than either US Sugar through United or

14:39:38 25   Imperial.  But yet not one of them, not one of them counts

14:39:44 1     in the markets that Dr. Rothman has done.

14:39:49 2              And I want to talk a little bit about that

14:39:53 3     because the conversation began with some statements about a

14:39:56 4     lot of markets and a lot of market shares that aren't in the

14:40:01 5     record.  You know, there is a complaint that the government

14:40:07 6     filed in this case, they alleged two markets, and those are

14:40:11 7     the only markets that they did their analysis on.  Right?

14:40:17 8     Everything else was back of the hand.

14:40:20 9              You'll recall counsel during Dr. Hill's

14:40:27 10    testimony putting up one of his charts and saying if you add

14:40:30 11    up that number and that number, what do you get?  You get

14:40:34 12    31, and 31 was more than 30.  That was the question that was

14:40:37 13    asked.  And the reason they did that is because in

14:40:40 14    *Philadelphia National Bank* there is a statement about 30

14:40:43 15    being, you know, something that you look to.  But the point

14:40:49 16    is that Dr. Hill when he was doing that, well, he was

14:40:54 17    analyzing it as he said, he said I don't even need to make

14:40:58 18    any other assumptions to show why this is all wrong.  I'm

14:41:01 19    going to take all these bad assumptions and I can show you

14:41:05 20    why this transaction if you just look at it consistent with

14:41:08 21    the evidence, consistent with the fact that sugar is flowing

14:41:12 22    across the country, that this transaction just doesn't raise

14:41:17 23    an anticompetitive concern.

14:41:20 24             You know what else he said?  He said you know

14:41:22 25    what, I want to back it up because I don't want it to be

14:41:26  1   just about my numbers.  So he looked at the documents.  One

14:41:28  2   thing that I saw yesterday was Dr. Hill had a command of the

14:41:31  3   documents, he knew what he was talking about.  He had done

14:41:34  4   the work that was necessary.  We didn't give him a market

14:41:39  5   and then ask him to take -- and to tell us whether it passes

14:41:44  6   a hypothetical monopolist test.  He did the work himself.

14:41:47  7   And when you do the work yourself, that's what you come up

14:41:50  8   with.

14:41:51  9          I think it's pretty clear what Dr. Rothman did.

14:41:55 10   He didn't define the markets.  He couldn't have said it more

14:41:59 11   times during his testimony.  The government's markets, the

14:42:02 12   Department of Justice's markets.  It was almost as if he was

14:42:06 13   disavowing them.  He was moving away from them, they're not

14:42:10 14   mine, I didn't do what I told you I normally do which is

14:42:14 15   start with the candidate market.  They gave me them and I

14:42:19 16   just said do they pass the test.  As I said during my

14:42:22 17   opening, the test that he used could not be failed.

14:42:25 18          Now, there were -- I have a bunch of points to

14:42:39 19   make, but with respect to Imperial, I think we can't forget

14:42:44 20   the point that the years 2019, 2020, there was a beet

14:42:49 21   freeze, and so I think the testimony from Mr. Gorrell and

14:42:54 22   others, I think everyone that we heard from that we asked

14:42:57 23   about the beet freeze acknowledged what a significant event

14:43:01 24   it was and how it changed the dynamics in the industry.

14:43:05 25          I think it also highlights why what Mr. Buker

said about why he's doing this transaction makes so much
sense, because at the end of the day, having that extra
plant and the hedge it gives him against protection against
extreme weather events is very, very critical.  Obviously
the beet freeze is in my antitrust nerdom called a natural
experiment.  What did it show?  Well, it showed that sugar
flows across the country, not only that sugar flows across
the country, but that the prices react.  Which is what
Dr. Fecso, the industry expert said.

Dr. Fecso knows this market better than anyone
in the United States, probably anyone in the world.  And, I
think that that is probably one of the most critical things
about what Dr. Fecso said.  There was a lot of powerful
stuff that Dr. Fecso said.

She knows how the industry operates and she said
that sugar flows.  And she said that if there was a price
effect, that there would be two things that would happen.
One would be that there would be a supply response from
everyone else in the country trying to take advantage.  And
that would defeat the price increase.  And two, that the
USDA had the tools to let in the imports.

THE COURT:  But where does the -- where does the
freight come in, because there was a lot of testimony from
people that, you know, freight makes a difference, and that
that's a significant cost.  So that's my only sort of

14:45:01 1    concern with, when I saw Dr. Hill and he said we have the

14:45:05 2    national and we have the smaller than national.  But, I mean

14:45:08 3    there was a lot of testimony that freight matters.

14:45:11 4                MR. BUTERMAN:  Yes, there really was.  And

14:45:14 5    freight advantage was a term that we saw in the documents.

14:45:19 6    But here is the thing.  Despite the fact that freight

14:45:23 7    matters, we still saw what was in that first chart that I

14:45:29 8    put out, which was the government's market share -- sorry,

14:45:33 9    not that one, the government's market shares that they had

14:45:36 10   alleged in their complaint where 40 -- approximately 47,

14:45:44 11   48 percent of the sugar flowing into, or excuse me, the

14:45:50 12   sugar being sold in their relevant market in their southeast

14:45:55 13   market is coming from outside.  So if freight as I believe

14:46:00 14   Mr. Hanna said -- I like what he said it, sugar flows at a

14:46:06 15   cost.  Sugar flows at a cost.  But ain't a prohibitive cost,

14:46:11 16   because 48 percent of the sugar is coming in from other

14:46:14 17   parts of the country.  And that negates prices.

14:46:18 18                So what happens if prices were to go up the 5 to

14:46:21 19   10 percent which incidentally their expert doesn't even

14:46:24 20   suggest is possible, but that's the test that they use.  I

14:46:27 21   mean, isn't that the most ironic thing that their expert

14:46:31 22   uses a test, a hypothetical monopolist test that's based on

14:46:35 23   the idea of what happens if prices go up 5 to 10 percent and

14:46:38 24   yet their expert can't even get the prices to half, to

14:46:42 25   basically to half of that.  I mean, it's telling.

But I believe that the two of them go together,
freight matters.  Dr. Hill says it, he says it's a factor,
he doesn't deny it, but it's not the critical factor.  One
of the tests Dr. Hill did was he actually went to see how
often is -- are United and Imperial the cheapest -- have the
lowest freight when they win bids.  And what he found is in
the overwhelming majority of cases they aren't.

We did see that example from Kraft about a
significant amount of sugar coming up from -- coming up from
Louisiana by ASR instead of coming from a much closer locale
in Baltimore.

THE COURT:  Here is a question.  I was going to
ask Mr. Hanna and I forget, but I'll ask his colleague, but
I might as well ask you, too.  Dr. Hill put up some -- a
chart I think where it showed this is the average price in
the northeast, in the west, in the midwest, in the
southeast, and they were all very similar prices.  Where
does that fit in with the analysis?

MR. BUTERMAN:  Well, it goes to show that prices
equalize and they equalize pretty quickly.  Are there going
to be differences at times?  There absolutely could be for
short periods of time.

THE COURT:  I think one of those I think in the
blizzard or the beet freeze.

MR. BUTERMAN:  Exactly.  But what happens over

1185

14:48:27  1    time is they're going to regulate.  The word that we have

14:48:30  2    heard a lot about sugar is flowing, and when things flow

14:48:33  3    they start over here and end up here.  So yes there is

14:48:37  4    potentially a short lag time, but the key question is

14:48:41  5    whether at the end of the day the prices do come closer and

14:48:45  6    I think that that's what Dr. Hill's analysis showed.

14:48:48  7            I want to talk a little bit about the ordinary

14:48:51  8    course documents.  We heard a little bit about that, Your

14:48:54  9    Honor.

14:48:56 10            THE COURT:  Because there is not a lot of sugar

14:48:58 11    manufacturing going on in the northeast, but the prices

14:49:01 12    there aren't substantially different than anywhere else in

14:49:04 13    the country.

14:49:05 14            MR. BUTERMAN:  Yeah, a lot of the differences in

14:49:07 15    price also relate to who is purchasing the sugar.  I mean,

14:49:10 16    that's one of the key issues here which is the differences

14:49:14 17    amongst the customers.  So, for instance, in the midwest and

14:49:18 18    areas like Chicago, that's where you have a lot of the

14:49:23 19    manufacturing going on.  And so, you know, you have a lot of

14:49:27 20    sugar going into that area for those reasons.  As you said,

14:49:31 21    Your Honor, there isn't as much production going on in the

14:49:35 22    northeast.  But what this shows is that everyone in this

14:49:40 23    market is chasing a buck.  They're trying to figure out

14:49:44 24    where they can maximize the return and sell their sugar in

14:49:47 25    the most efficient way.

14:49:50  1          This chart which again is, you know, the page

14:49:55  2     after the one that the government focuses on and in its one

14:49:59  3     document.  I just, I just think that we have to take a step

14:50:04  4     back and think about that.  So two markets, the first is the

14:50:09  5     southeast, and as we see in the quote from Dr. Rothman, I

14:50:13  6     believe he acknowledges that there isn't a single ordinary

14:50:17  7     course document that matches up with his southeast market,

14:50:21  8     his larger market.  There you are.

14:50:25  9          And with respect to that smaller market, what

14:50:31 10     Dr. Rothman says is well, I got one, I got that one,

14:50:36 11     supplier backyard.  In fact counsel during the questioning

14:50:39 12     of Dr. Hill yesterday criticized Dr. Hill because he didn't

14:50:43 13     use the words backyard or supplier backyard in his expert

14:50:49 14     reports.  It's one document in a slide deck that the next,

14:50:55 15     very next page completely disproves the government's point

14:51:01 16     which shows that these markets are just not durable.  There

14:51:04 17     is sugar flowing in and out all the way.  If we had looked

14:51:08 18     -- if we look at those arrows, some of those arrows come

14:51:11 19     from Louisiana, from the yellow there and going up, they're

14:51:14 20     going through the southeast.  If prices go up, you don't

14:51:21 21     need to do anything other than stop the trains, let the

14:51:25 22     sugar out and make more money by doing so.  But for the

14:51:30 23     government's case to make sense, they have to say that that

14:51:33 24     can't happen.  And did we hear any evidence from a witness

14:51:37 25     to explain why that can't happen?  It's just not there.

14:51:41  1    It's one of the very, very many failures of proof here, Your

14:51:46  2    Honor.

14:51:47  3         Your Honor, I have a ton of stuff prepared, but

14:51:55  4    I -- I mean, I can keep going if there are issues.

14:51:59  5         THE COURT:  Go ahead.  If I see something and I

14:52:02  6    have a question, I'll let you know.

14:52:16  7         MR. BUTERMAN:  Your Honor, I wanted to make a

14:52:19  8    point.  If we could turn to slide 17.  I wanted to make a

14:52:27  9    point about customer complaints here because as we were

14:52:30 10    going through this and watching the videos over the last

14:52:34 11    couple of days.

14:52:34 12         THE COURT:  And the coordination.

14:52:36 13         MR. BUTERMAN:  I'll get to that.  As we were

14:52:40 14    talking about the customers, I wanted to make a point which

14:52:43 15    is -- well, first of all, how unusual it is that the

14:52:48 16    customers almost all come in on one side saying that they

14:52:54 17    have -- that they have options, they don't believe that the

14:52:57 18    transaction is going to substantially lessen competition.

14:53:01 19    In fact, I didn't think that I heard even the gentleman from

14:53:02 20    Piedmont say that he thought the transaction would

14:53:07 21    substantially lessen competition.  This is so unusual.  It

14:53:13 22    is unheard of in an antitrust case.

14:53:15 23         Your Honor, in a typical antitrust case, we were

14:53:18 24    taught at the division that there are three legs to the

14:53:21 25    stool.  It's the economics, it's the documents, and it's the

14:53:25 1    customer testimony.  That's what you need to build a good

14:53:30 2    strong merger challenge.  Here, they're sitting on the

14:53:34 3    floor.  They don't have any of those.

14:53:37 4            The one witness who they identify was this

14:53:41 5    gentleman from Piedmont -- by the way, I wanted to make a

14:53:45 6    point that General Mills, Kraft Heinz and McKee, those were

14:53:50 7    also government witnesses, those weren't ours.  We didn't

14:53:54 8    pick them and decide that, you know, they were going to be

14:53:56 9    good witnesses for us.  The government put them on their

14:53:59 10   witness list as their fourth witnesses, originally that

14:54:02 11   supported their case.  And we took their depositions and we

14:54:08 12   said "why are we here?"

14:54:10 13           So with respect to the gentleman from Piedmont,

14:54:14 14   I think that the key is that what he showed in addition to

14:54:20 15   stating that he disagrees with the government's position on

14:54:24 16   distributors, which was his testimony because he believes

14:54:28 17   that distributors do compete, is that there was nobody that

14:54:33 18   he knows that has those kind of unique unicorn

14:54:38 19   qualifications that he has.  He's not representative of

14:54:41 20   anything.

14:54:41 21           And again, we can't say that this merger is

14:54:45 22   going to substantially lessen competition just because we

14:54:50 23   have one individual who says that he likes Imperial.  That's

14:54:54 24   just not enough to keep these companies from merging.

14:54:55 25           By the way, I did want to make the point going

14:55:02 1    back to Dr. Rothman, the test, I don't want it to be lost,

14:55:07 2    that when we do these tests, and I think Dr. Hill mentioned

14:55:10 3    this and my colleague had questioned Dr. Rothman about this,

14:55:15 4    these tests automatically show some effect, no matter what.

14:55:20 5    As long as you're removing somebody, right, as long as there

14:55:25 6    is a horizontal element to the transaction where you're

14:55:28 7    taking one company out.  If there were a hundred producers

14:55:33 8    and you went down to 99, there would be an effect.  By the

14:55:36 9    way, it probably wouldn't be that different than the effect

14:55:39 10   that they see here.  But that's the way these test go.

14:55:43 11           So even that, you know, three percent that he

14:55:46 12   shows, it doesn't show anything.  And that's why the

14:55:51 13   economists who helped develop the tests said when you get

14:55:55 14   below five percent, you can't rely on this to show

14:55:59 15   substantial effects.  That's what they have.  I don't know

14:56:01 16   if they're still claiming that or not, it's unclear to me.

14:56:06 17   What I saw throughout this trial was really about a

14:56:11 18   gentlemen, Mr. Wistisen.  In fact, Your Honor, here is

14:56:15 19   something telling.  On the first two days of trial which is

14:56:17 20   when the government put their case together, they mentioned

14:56:20 21   the word Wistisen 140 times.  It's more times than they

14:56:25 22   mentioned the word competition.  In a merger case --

14:56:29 23           THE COURT:  What was the -- I did get a little

14:56:32 24   confused there on whether spot prices are confidential or

14:56:35 25   not because somebody said we don't share them, or our policy

14:56:42 1   is or our ethics agreement or something says don't share.

14:56:47 2   So I don't really know where those come out.

14:56:50 3               MR. BUTERMAN:  So, well, first the background, I

14:56:54 4   think that most of the testimony is that the overwhelming

14:57:02 5   majority of customers buy on annual contracts.  They're

14:57:05 6   typically one year contracts.  The numbers vary, I heard 95,

14:57:10 7   some people said 90.  We heard the witnesses, the customers

14:57:13 8   say that they rarely buy on spot because spot is a list

14:57:18 9   price, and when you're buying a little bit of sugar, when

14:57:24 10  you need it most, when the company has already allocated its

14:57:29 11  sugar to customers and to long-term contracts those prices

14:57:32 12  are going to be higher.  But what I can say is that those

14:57:37 13  prices are published.  They're published in Milling &

14:57:42 14  Baking, Sosland and Wistisen's report.  They're available

14:57:48 15  out to everybody.  There is nothing confidential about that.

14:57:51 16  Here are some of the statements about pricing.  But --

14:57:58 17              THE COURT:  What about the comment that was made

14:58:00 18  that it wasn't just pricing that they were sharing, it was

14:58:04 19  how much do you have left and that's important because it

14:58:07 20  tells you, you know, if he doesn't have a lot left so I can

14:58:12 21  charge higher prices.

14:58:15 22              MR. BUTERMAN:  So first of all, I think we saw

14:58:17 23  the testimony from the document I did at the end of the

14:58:20 24  examination of Mr. Cagle where he had his notes of his

14:58:24 25  conversations with all of the various suppliers.  And I

14:58:28 1     believe in at least three if not four of the supplier

14:58:32 2     conversations he said the suppliers told him, completely,

14:58:37 3     yeah, this is what my sold position is.

14:58:39 4              By the way, the sold position, it's not such a

14:58:43 5     -- it's not a state secret.  So first of all, you have

14:58:47 6     companies, Mr. Wineinger talked about this, he has to sell

14:58:51 7     everything and he can't get caught holding at the end of the

14:58:54 8     year for the reason that he said, so he's aggressive in the

14:58:58 9     marketplace.

14:58:59 10             Now, everyone knows, I believe the e-mails that

14:59:03 11    the government had shown with respect to some of these, they

14:59:08 12    were late in the year.  Everyone knew at that point, United

14:59:11 13    is typically almost out of sugar by the time you get to

14:59:19 14    October or November or December.

14:59:20 15             Let's think about it from this perspective.  If

14:59:24 16    it really is such a piece of confidential information, why

14:59:28 17    are they sharing it with Piedmont Candy willingly, all these

14:59:33 18    companies?  As he said, he's a very small purchaser, he

14:59:37 19    doesn't even want to do business with Cargill because he

14:59:39 20    thinks he's not high enough on the totem pole to get what he

14:59:42 21    needs from them.  But yet, they're just giving out this

14:59:47 22    information.  It's not confidential.  By the way, the rest

14:59:50 23    of it is all about like what's going on in the industry, you

14:59:55 24    know, how is the crop coming in, you know, are your beets

15:00:02 25    coming in, what's the weather, what's the effect of the

weather.  And the other thing when we talk about all this,
Your Honor, is we can't lose sight of the fact that this is
all taking place within the agricultural industry, and
specifically, the fact that United is a co-op.  Again, we
need to think about the theory that's been proposed here.
The theory that's been proposed by Dr. Rothman is that as a
result of this transaction, and I'm using that word
purposefully, if, United and ASR decided to stop bidding on
30 percent of options, there would be a lot of harm that
would come from that.

How do you get from e-mails and information
being given to industry analysts to the fact that two
companies get together and all of a sudden engage in conduct
which they can't even do, because, as we learned, because
its a co-op, United cannot withhold.  And my colleague,
Mr. Hanna, said all we have to show is that the market is
vulnerable to coordination.  With due respect, that's
actually not true.  What the government has to show is not
only that the market is vulnerable to coordination, but that
somehow this transaction is going to increase the likelihood
of coordination.

In the Evonik case what the court said when you
do that analysis consistent with the government's Horizontal
Merger Guidelines you can't rely on the fact that what you
have done is shrunk the industry from five players to four

15:02:01 1   players.  What the court there said is an interesting

15:02:05 2   comment, consistent with the merger guidelines, you already

15:02:09 3   used that one, right, that was your tool to get to the point

15:02:11 4   that you are now so you can't rely on it again and say

15:02:14 5   that's the reason.  That's why in Evonik the court went

15:02:19 6   through and identified these six factors and there are

15:02:22 7   others, but these factors and they said that when you look

15:02:26 8   at these factors, that's what will determine whether the

15:02:29 9   industry really is vulnerable to coordination.

15:02:33 10       And when we look at these factors, what we see

15:02:37 11  is things like power buyers.  I mean, we heard about some of

15:02:42 12  these witnesses, how big they were, how massive.  We all

15:02:46 13  know who they are.  Companies, some of the biggest companies

15:02:49 14  in the world.  And they are power buyers.  They dictate

15:02:54 15  where the sugar is sold and they can decide that they want

15:02:58 16  to move it at will, a point which incidentally goes to the

15:03:02 17  arbitrage.  It undercuts Dr. Rothman's market definition,

15:03:06 18  which is another reason that this case fails.

15:03:11 19       But there are other things here.  And again, I

15:03:14 20  want to point out the long-term contracts, the blind

15:03:19 21  bidding, and also this point again because it can't be

15:03:22 22  emphasized enough, the need to keep the plants running at

15:03:25 23  capacity.  That's what Mr. Buker testified to.  He said my

15:03:30 24  costs are such that no matter what I produce, I forget the

15:03:35 25  numbers he used, a hundred thousand or a million, I'm paying

15:03:43 1    so much of the same fixed costs.  And so they just don't

15:03:49 2    have the -- it just doesn't work, it just doesn't make any

15:03:54 3    sense.  I don't know how to say it any other way than the

15:03:57 4    theory that Dr. Rothman has posited, it's not even a theory.

15:04:02 5    He basically said look, if you assume something that there

15:04:07 6    is no evidence for, and I don't even think the government

15:04:10 7    would say that there is any evidence that United and ASR

15:04:16 8    have withheld or coordinated on bids and allocated the

15:04:23 9    market in any way, but what he says is assume that today

15:04:27 10   they're doing it ten percent of the time.  Post transaction,

15:04:30 11   they did it thirty percent of the time, there would be more

15:04:33 12   harm.  That's not worth the paper it was written on.

15:04:40 13              Your Honor, I also want to --

15:04:44 14              THE COURT:  What about the stacks of e-mails?

15:04:54 15              MR. BUTERMAN:  So I think that what the e-mails

15:04:57 16   show is something that we all -- first of all, the testimony

15:05:00 17   from a number of the individuals when they said that the

15:05:04 18   market, signaling the market, they were talking about

15:05:07 19   signaling to customers.  I mean, I don't think anyone is

15:05:12 20   naive about the fact that if you raise price that a result

15:05:12 21   of that is that other people are -- your customers are going

15:05:22 22   to look for alternatives.  There is nothing really shocking

15:05:27 23   about that.  Right?  It's the idea that there is competition

15:05:33 24   in the market place.

15:05:35 25              The example that one of the e-mails involved

15:05:38 1    Mr. Wineinger I thought was pretty interesting, because what

15:05:42 2    he said is, you know, we decided to pull some offers.  We

15:05:45 3    had in essence what had happened was United had offers out

15:05:51 4    to people, and they decided that they were going to raise

15:05:54 5    prices.  And so what they did is they went and they told the

15:05:59 6    customers, hey, look, your offer is going to expire.  Right?

15:06:03 7    It's like when you get that e-mail from, you know, like the

15:06:07 8    gap that says that the thirty percent off expires at

15:06:10 9    midnight and if you're a sucker like me, I probably go and

15:06:15 10   spend more money than you need to on T-shirts or something.

15:06:19 11   But that's what he said.  And what he said was the result of

15:06:22 12   that was that they went ahead and they booked some sales

15:06:28 13   because some customers, you know, some customers learned

15:06:32 14   that they only had a limited time before the prices went up.

15:06:36 15   And he said -- and we sent the message, right.  Was it his

15:06:42 16   intention?  What he's noting was an industry reality.  I

15:06:47 17   mean, all this information is getting around.  The customers

15:06:51 18   are talking.  It's just nothing -- it's no different than

15:06:55 19   any other industry.  There is nothing unique here.  This

15:07:00 20   isn't, Your Honor, price fixing.

15:07:02 21           When I was at the government, I did the Apple

15:07:02 22   eBooks case which was a price fixing case and there was a

15:07:10 23   smoke-filled room there.  This was information exchanged

15:07:12 24   with an analyst.  These are people taking completely

15:07:17 25   legitimate business moves and -- I don't want to use the

word crime, but their crime is that they know that like --
that customers talk.

THE COURT:  So part of it is you're saying if we
reduce the price for Kraft then Post is going to find out
about it and ask for a lower price?

MR. BUTERMAN:  So part of it is -- part of it is
that if they reduce the price -- sorry, if -- part of it is
if you go out there and you tell a customer look, we're
going to be strong here, we're not, you know, we're not
going to be lowering price or we're raising our prices, it's
a reality that you know that people are going to find out
about it.  It's not tacit coordination, it's not anything,
it's a market reality.

So if the customer then goes and talks to NSM,
you may understand that that's what happens in this
marketplace and the reason that you understand that it
happens in the marketplace is because you aren't the
dominant company that the government tries to portray you
as, you know that you have competition, and if you raise
price, you run the risk of losing the business.

So when they say that we're signaling, what
they're saying is, they're recognizing the reality of
competition here.  And Dr. Hill analyzed these and he said
in most instances what they actually showed was that United
was more aggressive on price, meaning more competitive on

15:09:02 1    price, that they didn't reflect anything that he thought

15:09:07 2    increased the -- excuse me, that shows that the market was

15:09:11 3    vulnerable to coordination.  And it's interesting because

15:09:17 4    the Evonik case was actually Dr. Rothman and Dr. Hill, they

15:09:21 5    were both in that case.  And the court sided with Dr. Hill

15:09:26 6    and said that Dr. Rothman's analysis of coordinated effects

15:09:31 7    was just off base.  That the market wasn't vulnerable to

15:09:36 8    coordination there.

15:09:37 9          And the same factors apply here, the results

15:09:41 10   shouldn't be any different.

15:09:43 11         The other thing I want to say, Your Honor, is we

15:09:47 12   talked a lot about, you know, and Your Honor had questions

15:09:51 13   about the framework, the burden shifting.  So I just think

15:09:57 14   that we have to put in context how this all works.  As I

15:10:01 15   said in my opening, if the government fails on product

15:10:04 16   market, the case is over.  If they fail on geographic

15:10:08 17   market, it's over.  They can't say that by coming up with

15:10:11 18   new markets and say hey, we think that maybe those would

15:10:14 19   work.  The time for that has long since passed.  And, you

15:10:20 20   know, as we said, I think it's pretty clear at this point

15:10:23 21   that the government has abandoned their unilateral effects

15:10:28 22   theory.

15:10:28 23         But if we get past that, we have so much that we

15:10:34 24   have to get past in order for any of this to matter.  So if

15:10:41 25   somehow we get to the point where we believe that the

15:10:45 1    government has established their prima facie case by

15:10:49 2    identifying the proper markets, showing the effects of it

15:10:51 3    are likely to be anticompetitive, make that presumption, we

15:10:56 4    can rebut that presumption by showing that their case

15:10:59 5    inaccurately predicts the merger's effect in the relevant

15:11:04 6    market.

15:11:04 7            That goes back to the point that I first said.

15:11:07 8    They can tell us that the market shares are double what they

15:11:11 9    are, is there any evidence that that accurately reflects

15:11:15 10   what competition is in the market today?  It's just not.

15:11:19 11   Imperial is a high priced -- a high price option.  They are

15:11:24 12   not acting as a competitive threat.  There is no coherent

15:11:29 13   theory that can explain how taking out an entity that

15:11:34 14   frankly is struggling to survive, that has input costs that

15:11:42 15   are 30 percent higher than its competitors, that that

15:11:47 16   company is acting as a competitive constraint in the market.

15:11:51 17   You have to change the meanings of lot of words.  And it's

15:11:55 18   worse than changing the meaning of southeast, which I don't

15:11:58 19   know what it means.  I have seen it and as I said, if we had

15:12:02 20   more time, we were going to put together a chart that

15:12:04 21   actually shows what all the witnesses testified that they

15:12:07 22   meant when they said the southeast.

15:12:09 23           But what I do know is that there was only one

15:12:12 24   document in the entire case that matched up with one of

15:12:16 25   their markets and it wasn't their southeast market, right,

15:12:19 1    it was the one where it said southeast, but it matched up

15:12:23 2    with those states in that one document.  And I know it, it's

15:12:28 3    engraved in my head.  It's PTX 452.  It's that document.  If

15:12:33 4    you look at every other page of that document, it proves the

15:12:38 5    point that -- it proves the point that sugar flows

15:12:45 6    throughout the country.

15:12:49 7           You know, since I am talking about numbers and I

15:12:52 8    have just a few more minutes, I will just throw some numbers

15:12:55 9    out here because I think that in a case where the government

15:12:58 10   is trying to make a case based on numbers there are some

15:13:00 11   that are actually pretty important.  The case by the numbers

15:13:04 12   here, Your Honor, 48, 48 percent of sugar sold in the

15:13:08 13   plaintiff's broader market is produced outside.  47, that's

15:13:13 14   the amount of sugar that Imperial sold outside of the

15:13:16 15   plaintiff's narrower market in 2021.  45, the states that

15:13:22 16   United ships into from its production facilities in five

15:13:27 17   states.  543, the number of customers in plaintiff's broader

15:13:34 18   market that cannot be understated when we're talking about a

15:13:38 19   substantial lessening of competition.

15:13:41 20          We heard somewhere in the neighborhood of three

15:13:42 21   examples or ten -- 5, 7, 10, depending on how much you want

15:13:55 22   to give credit to some of these.  Whatever it was they had

15:13:57 23   four years of data.  Let's be clear, they asked Dr. Rothman

15:14:00 24   whether he had the data or not.  He has the data, and they

15:14:05 25   asked for it.  They asked for it twice from us.  The

government gets to ask us during the investigation, we have

to provide data and then they do it again.  If they thought

that they didn't have it, that's not on us.  It's not our

burden to establish how substantial competition is between

Imperial and United, it's their burden.  And the evidence

when you look at 543, or 428, the numbers come out to

somewhere less than one-eighth of one percent of the

opportunities they have identified where there is

competition.  Dr. Rothman said again --

THE COURT:  You say competition between United

and Imperial.

MR. BUTERMAN:  Yeah.  And I mean, that's giving

a broad definition to competition.  I'm just saying we take

what they say and the ones they identify and then we, you

know, we do the math over 543 opportunities a year and you

come up with something over four years which is less than

like -- able to sell much less than one percent.  And the

last number there, you know, is two.  Two Ph.D. economists

who testified here in this trial that this transaction will

not lead to anticompetitive effects.  That is so critical.

And Your Honor, when we look at this, this is a

list of things that we need to accept.  And we need to

accept, Your Honor would need to accept every single one of

these.  And I guarantee you that if we had more time, we

would have put together two more pages of these things, of

15:15:46  1    things that need to be accepted completely in order for the

15:15:49  2    government to win this case.  And if they lose even one of

15:15:53  3    these, if even one of these is not true, we win.  The DOJ's

15:16:01  4    alleged markets are distinct and durable.  Sugar won't flow

15:16:05  5    into the plaintiff's markets because of the price increase.

15:16:09  6    Distributors are not in the market at all.  These are the

15:16:12  7    things they have to prove.  United was the supplier.  USDA

15:16:14  8    cannot and will not take actions to stop a price increase.

15:16:18  9    The USDA will not defer United from pursuing a price

15:16:22 10    increase.  United will not sell all of its members sugar

15:16:25 11    even though it has to.  Competitors will not use their

15:16:30 12    expansion, we heard about that today, competitors will not

15:16:34 13    use their expansion to chase higher prices.  And the fact

15:16:38 14    that Dr. Rothman is correct that the shares are static, that

15:16:42 15    nothing is going to change.  Your Honor, not one of those

15:16:45 16    has the government met its burden on.  And because of that,

15:16:51 17    we win.

15:16:53 18         THE COURT:  Does it matter at all that these

15:16:55 19    sales are not necessarily in an either or kind of thing.

15:17:00 20    Like both United and Imperial both win, they just might, one

15:17:02 21    might be the backup supplier or the alternative supplier.

15:17:02 22    Does that matter?

15:17:02 23         MR. BUTERMAN:  It actually matters a lot.  It

15:17:11 24    matters in the way that Dr. Hill testified to.  Because

15:17:14 25    those numbers that Dr. Rothman presented were based on the

15:17:19 1    idea that that didn't happen.  Remember, Dr. Hill showed

15:17:22 2    that example where in one year --

15:17:25 3              THE COURT:  That's right, a switch.

15:17:27 4              MR. BUTERMAN:  It was a switch, and a switch is

15:17:29 5    not competition which is part of the reason why my

15:17:31 6    colleagues and I when we were doing all this, we were like

15:17:35 7    what do we consider to be what they think is head-to-head

15:17:40 8    competition.  It's why when Dr. Rothman did his diversion

15:17:44 9    ratios from one year to the next, he had a diversion ratio

15:17:48 10   over a hundred, which again, it didn't make sense.  If you

15:17:53 11   lose a hundred sales, they can't result in 130 sales for the

15:17:58 12   other company, it's mathematically impossible or the

15:18:02 13   negative one where it was minus 29.

15:18:05 14             With that, Your Honor, thank you.

15:18:12 15             THE COURT:  All right.

15:18:15 16             MR. BUTERMAN:  Your Honor, I did want to say

15:18:17 17   thank you also to Your Honor, and everyone here who has

15:18:23 18   helped us this week.  And also to my colleagues at the

15:18:25 19   government, while we disagree about this case, I know having

15:18:27 20   been there how hard they all work on this, and they have

15:18:33 21   been professional throughout.  We appreciate that.

15:18:36 22             THE COURT:  You guys have worked very well

15:18:38 23   together.  We don't often see that, so I certainly

15:18:41 24   appreciate that.  All right.

15:18:44 25             MR. SANDROCK:  Good afternoon, Your Honor.  Ryan

15:18:46 1    Sandrock on behalf of United States.

15:18:48 2              THE COURT:  I like that I keep getting new

15:18:50 3    faces.  When will it end?

15:18:53 4              MR. SANDROCK:  You saw me once before, Your

15:18:55 5    Honor.

15:18:55 6              THE COURT:  During this trial?

15:18:57 7              MR. SANDROCK:  It was the first day.

15:18:59 8              THE COURT:  That was a long time ago.

15:19:01 9              MR. SANDROCK:  And I know that we're all ready

15:19:02 10   to wrap this up, so I'll be very brief.

15:19:06 11             THE COURT:  Okay.  So let's say that I were to

15:19:12 12   agree with the government that maybe not a national market,

15:19:16 13   but I am not sure that I agree with your proposal to think

15:19:23 14   that they might be too narrow in terms of commercial

15:19:27 15   reality.  What do I do?  What data do I have that I could

15:19:31 16   make an analysis?

15:19:33 17             MR. SANDROCK:  I'm sorry, I missed the second

15:19:35 18   part.

15:19:36 19             THE COURT:  I don't think it's national but I

15:19:38 20   don't know that your proposed narrow or broader market is

15:19:42 21   correct.  And I get it, you can try and convince me that

15:19:46 22   those are correct and maybe I will find that, but let's say

15:19:51 23   for purposes of this question, I'm not going to agree with

15:19:55 24   that, what am I supposed to do in terms of making the

15:19:58 25   analysis?

15:19:59  1            MR. SANDROCK:  You would look at the market

15:20:01  2   concentration and whatever you believe was --

15:20:03  3            THE COURT:  But what evidence do I have to use?

15:20:08  4   What's going on if I say, you know, I have market share

15:20:14  5   numbers that you have given me for your narrow and your

15:20:16  6   broader, what do I have if I think that the geographic

15:20:23  7   market is different?

15:20:26  8            MR. SANDROCK:  So I think there is a lot, but

15:20:28  9   I'm going to be frank, I don't have it right at my

15:20:31 10   fingertips.  So I think we do have numbers that for a

15:20:36 11   slightly different market, for instance the USDA south, I

15:20:39 12   think there is a lot of stuff in Dr. Rothman's numbers, not

15:20:44 13   stuff, a lot of numbers and evidence that we have that would

15:20:47 14   give you specific information in different markets.  And we

15:20:50 15   will do that in post-trial briefing.  And, Your Honor, I

15:20:54 16   just frankly don't want to try and answer that question

15:20:57 17   here.

15:20:58 18            THE COURT:  I don't want you to make stuff up on

15:21:01 19   the spot.

15:21:02 20            MR. SANDROCK:  But certainly we think as we --

15:21:05 21   that we would be entitled to the presumption there is a

15:21:08 22   national market we would be entitled to it in smaller

15:21:11 23   market, we think that there be -- we stand by our markets

15:21:14 24   but we think that if there was some variation in the markets

15:21:15 25   that our case would still stand.  And we certainly will

15:21:23 1    brief that and explain how sometimes there can be variation

15:21:27 2    between markets pled and markets proved and how even if you

15:21:31 3    disagree slightly with our markets that we should still

15:21:36 4    prevail.

15:21:37 5          THE COURT:  All right.  Now, I have to look to

15:21:40 6    see whether the effect of the acquisition would

15:21:43 7    substantially lessen competition, right?

15:21:45 8          MR. SANDROCK:  Yes.

15:21:46 9          THE COURT:  And you guys are relying on the

15:21:49 10   potential for increased prices to show me that, right?

15:21:55 11         MR. SANDROCK:  Yes.

15:21:56 12         THE COURT:  Let's say, what is substantial?

15:21:58 13   Let's say I were to look at the price increases that

15:22:03 14   Dr. Rothman put forward or Dr. Hill, how do I determine

15:22:07 15   what's substantial?

15:22:10 16         MR. SANDROCK:  So we were prepared for the

15:22:11 17   question, Your Honor, so I got the notes.  There is no exact

15:22:15 18   number, so there is no exact number in the case law.

15:22:20 19   Congressional intent was to prevent loss of competition

15:22:22 20   before it happens in its incipiency is the word in the cases

15:22:28 21   so there is no precise number.  And it can be what

15:22:30 22   defendants would say would be a relatively small number.

15:22:37 23   There can be some guidance in cases, the Cigna health

15:22:41 24   insurance merger, there was allegation of harm in one market

15:22:46 25   for big companies and 35 local markets.  The court blocked

the whole merger on the basis of just the market for big

companies plus the market for Richmond, did not look at the

rest of the markets, substantial harm in one area was

enough.

The answer is, it doesn't have to be -- there is

not a precise answer.  But importantly, the number doesn't

have to be that big because we've all recognized on the

sugar flows point that at some point the price increase will

be stopped.  That's true in every market.  So prices

couldn't go up 20 percent.  They probably couldn't go up

even much less than that because sugar would flow in from

other places.  So Section 7 is not concerned about

percentages that are that high, it's concerned about

percentages that could be much lower.  But there is a

recognition in the case law --

THE COURT:  But -- okay.  I mean, it seems like

you just made the argument that the defendants are making

which is that sugar flows and that other folks will come

into the market and take the business away if the combined

defendants, as they want to combine, exist.  Why isn't what

you just said kind of bad?

MR. SANDROCK:  I'm sorry, Your Honor, I didn't

mean to confuse the issue.  The point was that if the price

goes up enough, it will be stopped.  We talk about sugar

prices that were $0.40 a pound or around that measure.

15:24:25 1    Imagine sugar prices went up, they started, combined

15:24:29 2    United/Imperial started charging $2 a pound, obviously in

15:24:32 3    that instance sugar would flow in from other places, because

15:24:39 4    despite additional freight costs, the beet growers in the

15:24:43 5    northeast or sugar from anywhere else, they would say we can

15:24:47 6    beat that price easily, even if we -- even though we have

15:24:51 7    greater costs.  So there is always a limitation on the

15:24:55 8    ability to raise prices.

15:24:58 9         THE COURT:  I mean, the weird thing is you're

15:25:01 10   sort of suggesting the antitrust law only cares about tiny

15:25:06 11   little changes in price because a big price you're saying

15:25:10 12   the market will correct for and a little price change the

15:25:13 13   market won't correct for, but that's what's important here.

15:25:17 14   Maybe I'm misunderstanding your argument.

15:25:19 15        MR. SANDROCK:  A competitive market will correct

15:25:22 16   for a small price increases and you'll get a competitive

15:25:27 17   price, when you don't have enough participants in the market

15:25:31 18   it will not be a competitive price.  The price may only go

15:25:34 19   up a little bit, but that is real harm.  We go back to Heath

15:25:39 20   Cagle of Piedmont Candy who said a one cent price increase

15:25:42 21   is a hundred thousand dollars for him.  And I know

15:25:47 22   defendants think he's just a small town candy guy.

15:25:52 23        THE COURT:  I don't think they were saying that,

15:25:52 24   I think they were saying that that is one person.  There is

15:25:57 25   always going to be someone who is affected and that's not

necessarily substantial anticompetitive harm.

MR. SANDROCK:  I think the reason Heath Cagle at Piedmont is instructive is because a hundred thousand dollars means a couple of people might get fired because it's easy to see that in a small company.  The same thing is true for General Mills or anyone else where they compete and one cent isn't a hundred thousand dollars for those companies, it's a lot more.

THE COURT:  But those companies -- of all the companies, those companies have the ability to say we're going to get it from a different market.

MR. SANDROCK:  They'll get it, there still will be Pepsi and HoHo's and everything, but they might be more expensive.  We've heard from everybody that people are chasing pennies.  We heard chasing a buck, but I think the reality is everybody is chasing pennies on cost here.  This is a low price product.  So you're chasing pennies.  And if you have to buy sugar for one penny more or two pennies more, that is a big deal.  So if the price goes up just a little bit for sugar, a few pennies, that is going to have a substantial impact on customers.

And to take this USDA for a second, the USDA, their interests is not stopping a price increase of a couple of pennies, we heard from Dr. Fecso.

THE COURT:  Their interest is keeping the price

1    artificially high.

2              MR. SANDROCK:  Right.  I'm so tired, I don't

3    know what I just said right to, Your Honor.  I take that

4    back.

5              But, Your Honor, the USDA, we talked about

6    reasonable prices, that was the point defendants kept

7    making.  Well, you have the tools to keep prices reasonable.

8    There is no indication, there was no definition of

9    reasonable.  What's reasonable?  They're not monitoring

10   prices, it's pretty clear and there is no evidence that the

11   USDA would stop a three percent, a five percent price

12   increase to customers.  They're not going to protect

13   customers from this.  They have to protect farmers.  And

14   they're not going to look at a little price increase.  If

15   they saw a little price increase and then they let a wave of

16   imports in, we know what the letters to the USDA would be.

17   We know what the farmers would say.  They're not going to

18   stop it.  And there is no evidence that they would.

19             And, Your Honor, if I -- we have -- I think I

20   have very little time.  I would like to really quickly talk

21   about coordinated effect and then wrap up.

22             THE COURT:  Sure.

23             MR. SANDROCK:  And I'm glad that coordinated

24   effects came to the forefront in this case.  I'm glad we

25   said the name Wistisen over a hundred times.  I'm glad that

counsel spent so much time on Evonik and trying to argue

against our Coordinate effects case because this is an

exceptional coordinated effects case.  In most cases, it's

just about the theory of whether there could be coordination

in the future.  Here, we have actual coordination that was

revealed because of this litigation.

And a very important point is that coordinated

effect in the merger context is not the type of conduct that

sends you to jail for price fixing.  It can be, but it

doesn't have to be.

So what coordinated effects are, I think we have

a slide on this, coordinated effects in the merger context

is pulling punches, and what that means is will it make

sense to not compete hard?

THE COURT:  Right.  But address specifically the

issue that was raised where, you know, you're essentially

saying look, we're going to pull punches.  We are going to

sit out.  There is no evidence that United, for example, is

going to sit out a certain sale so that ASR gets them or

vice versa, because United has to sell all of their product.

What is the evidence you have of that kind of coordination?

Or are you saying I don't need that, I just need to say,

well, they're sending a signal.

MR. SANDROCK:  You don't need actual -- we don't

need any of these documents, all you need is to show when

15:30:46 1   you go down to two refiners, it's possible.

15:30:49 2           If I can answer your question, Your Honor.  This

15:30:51 3   document here, this is an ASR document.  What they're saying

15:30:58 4   is I love to compete for the business you have with this

15:31:01 5   customer.  I would love to get it.  But we want to avoid

15:31:05 6   sending a signal out to competitors.  Let's not be naive,

15:31:10 7   that's not a signal to customers.  That's a signal to

15:31:14 8   competitors.

15:31:14 9           And the signal they're worried about is that if

15:31:17 10  we lower the price to this customer, competitors will see

15:31:22 11  that and they'll go, oh, ASR is lowering prices, so we now

15:31:28 12  have to lower prices, too.  And it doesn't matter if they

15:31:32 13  don't talk.  They can have an absolute no talking policy,

15:31:39 14  not violating any company policy against talking with

15:31:42 15  competitors.  But the problem would be is they're signaling,

15:31:46 16  tacitly signaling don't cut prices.

15:31:49 17          Your Honor, this strategy doesn't make sense in

15:31:53 18  a competitive market.  In a competitive market, when you

15:31:57 19  decide not to cut prices, you don't get business.  In a

15:32:02 20  competitive market when Steve Hanson says stay balanced,

15:32:07 21  everybody -- the collective wisdom would be what do you

15:32:11 22  mean?  If we stay balanced, we don't get customers.  But

15:32:15 23  what he said is and what --

15:32:17 24          THE COURT:  I would feel better about this if I

15:32:20 25  didn't think the government was already inflating prices.

15:32:23 1   It's like you're saying we don't want to send it out and

15:32:26 2   lower the price down to the floor like the government says.

15:32:30 3        MR. SANDROCK:  Your Honor, we're way above that.

15:32:32 4   At issue in this case is, there is a policy issue about what

15:32:35 5   the price is now.  But what would happen as a result of this

15:32:39 6   merger is prices would go up even more.  So you think the

15:32:44 7   prices are already inflated, but they would go up even

15:32:48 8   higher.

15:32:48 9        On the coordinated effects point, the simple

15:32:52 10  reason is because when you have two refiners or if you want

15:32:55 11  to make it three, if the number is small, it's really easy

15:33:02 12  to coordinate.  I shouldn't say to coordinate.  Everybody is

15:33:05 13  going to make the same independent decisions that will have

15:33:10 14  harmful effects to consumers.  If you have AI making the

15:33:14 15  decision about pricing --

15:33:15 16       THE COURT:  The problem I'm having here, and I

15:33:20 17  take what you're saying, okay, but I mean, I was a litigator

15:33:25 18  for twenty years and this just doesn't seem like that much

15:33:29 19  of a difference from what everybody in every industry does

15:33:33 20  which is not price fixing, but just like we don't want to

15:33:36 21  send out that we're like desperate and chasing money.

15:33:41 22  Chasing customers.  I don't know.  I mean, I guess if this

15:33:46 23  is all it takes to have a coordinated effect, it seems like

15:33:51 24  you would have coordinated effect in just about every

15:33:54 25  industry.

15:33:55  1          MR. SANDROCK:  With respect, Your Honor, you

15:33:57  2     wouldn't, because if you have twenty refiners, if you have

15:34:02  3     ten refiners, people aren't doing --

15:34:05  4          THE COURT:  I guess this goes back to the other

15:34:07  5     issue that was raised by the defendants which is okay, let's

15:34:10  6     look at that other sugar case, the Second Circuit sugar

15:34:14  7     case.  Okay?  They were talking about distribution and sale,

15:34:19  8     not production and sale.  So when you talk about

15:34:22  9     distribution and sale and include in their distributors,

15:34:25 10     then we don't just have two folks in this market, right?

15:34:29 11          MR. SANDROCK:  We do, but the distributors have

15:34:31 12     to get the sugar --

15:34:33 13          THE COURT:  But distributors aren't going to be

15:34:35 14     just getting the sugar from ASR and United, those are your

15:34:40 15     two that you're now emphasizing, right, they get it from

15:34:44 16     imports, they get it from other LSR, whatever the other

15:34:48 17     refiners are, all the numbers of -- the names are starting

15:34:53 18     to confuse my head.

15:34:54 19          MR. SANDROCK:  They can get it, but it's not

15:34:57 20     clear they'll be able to get it at the better price.

15:35:01 21          And I'm probably down to two minutes here, but

15:35:03 22     let me point Your Honor to one more document that I think

15:35:06 23     wraps this all up, which is JTX 027.  This is a Piedmont

15:35:11 24     document.  And the bidding history in that case is really

15:35:15 25     important.  And I can't show it on the screen because the

15:35:18  1       information is not public.

15:35:19  2                THE COURT:  I'm sorry, tell me what it is and

15:35:22  3       I'll pull it up.

15:35:24  4                MR. SANDROCK:  JTX 027.  We saw this on the

15:35:41  5       second date, a spreadsheet with triangles.

15:35:45  6                THE COURT:  JTX 0 --

15:36:01  7                MR. SANDROCK:  027.

15:36:04  8                THE COURT:  Do I want the Excel file?

15:36:08  9                MR. SANDROCK:  The Excel will work.

15:36:13 10                THE COURT:  Okay.

15:36:14 11                MR. SANDROCK:  Okay.  So the story of that

15:36:16 12       document begins with this document.  ASR is talking about

15:36:20 13       what they should do in June 2020.  And they decide that

15:36:24 14       they're not going to be aggressive in trying to get

15:36:28 15       business.  And the result of that is that they try not --

15:36:33 16       they don't bid aggressively.

15:36:35 17                Now I'm trying to be careful here on

15:36:38 18       confidentiality so that's why I'm being a little bit vague.

15:36:41 19       The document you have in front of you have shows the type of

15:36:44 20       bid that ASR was giving to customers.  And it was -- they

15:36:51 21       were not giving competitive bids, so Piedmont was left with

15:36:58 22       limited competitive options.  It did not have ASR as an

15:37:02 23       option because of a desire not to signal out to competitors

15:37:07 24       --

15:37:07 25                THE COURT:  Yeah.  But I mean, okay, that one

15:37:10  1    just seems a little different to me.  This is a small

15:37:13  2    company.  It would be one thing if you were saying they were

15:37:15  3    doing that to General Mills or Kraft or something.

15:37:19  4              MR. SANDROCK:  They buy millions of dollars of

15:37:22  5    sugar a year.  But if you look at this e-mail, the reason

15:37:27  6    they're concerned about cutting prices to ███████  is

15:37:31  7    because of the impact it would have on bigger customers.  I

15:37:35  8    mean, they don't care if -- they love to sell to ███████,

15:37:39  9    that's what they're saying here.  But the reason they're

15:37:43 10    saying we --

15:37:44 11              THE COURT:  You just said the impact it would

15:37:47 12    have on other customers, but you said this is going out to

15:37:50 13    other competitors.

15:37:51 14              MR. SANDROCK:  The bottom e-mail there, the

15:37:53 15    reason they're not going to be aggressive is they don't want

15:37:57 16    to send a signal out because of the bigger customers, it

15:38:01 17    would impact the price that everybody gets.  They know if

15:38:04 18    they give a good deal to somebody, that others will hear

15:38:07 19    about that deal and that will lower the price.

15:38:09 20              THE COURT:  That right there you're saying

15:38:11 21    they're signaling customers when the whole point you were

15:38:14 22    making is they were signaling other competitors.

15:38:17 23              MR. SANDROCK:  They are worried -- well, here

15:38:20 24    it's two different things.  They're sending a signal out to

15:38:24 25    competitors here that they're not going to discount.  That's

15:38:28 1   what they're trying to do and they're trying to have tacit

15:38:32 2   coordination.  But the worry they have is that prices are

15:38:35 3   going to go down for everybody.

15:38:38 4           And I want to take one more point about

15:38:40 5   coordination -- well, let me finish this up.  Piedmont was

15:38:44 6   left with a limited number of suppliers.  The price they

15:38:47 7   paid was too high.  And that was because people were pulling

15:38:51 8   punches.  And counsel said that Mr. Cagle, in their opening

15:38:59 9   they said he didn't try hard enough.  They said he didn't

15:39:03 10  know how to make peppermint puff candy.  They also said that

15:39:07 11  he didn't say that this transaction would hurt him.  Yes, he

15:39:10 12  did.  He said that he would lose a competitive option.  And

15:39:15 13  this case is as simple as the fact that when customers lose

15:39:21 14  a competitive option, they lose leverage.  Prices will go

15:39:26 15  up.  That has nothing to do the intent of anybody.  United

15:39:30 16  will charge the highest price they can, because that's what

15:39:34 17  everybody does.  And the limit on their ability to charge

15:39:37 18  the highest price is competition.  And when you take away

15:39:43 19  one competitor, customers lose leverage and prices go up.

15:39:48 20          Just a final quick point on coordinated effect.

15:39:51 21  We'll brief it a lot more.  Defendants have made a lot about

15:39:55 22  the fact that customers might have this same information so

15:39:58 23  that somehow makes it okay.  That's not true.  If I go buy a

15:40:02 24  car and I go in and the salesperson says well, we'll offer

15:40:06 25  you this price and we have X number of vehicles left over,

15:40:10  1    and I go to the next car dealership and say hey, they gave

15:40:15  2    me this price, I have the information and I'm using it to

15:40:18  3    lower the price.  If one car dealership calls up the other

15:40:22  4    car dealership and they say here is what we just offered to

15:40:26  5    the guy who came in, they're doing it to keep prices up.

15:40:30  6    It's a totally different thing.  And that's a really basic

15:40:33  7    antitrust point.

15:40:34  8            THE COURT:  I get it.  My problem was you

15:40:36  9    actually when you gave me the example of what the problem

15:40:39 10    was here, it was the customer going to the other guy and

15:40:44 11    saying with the price, you said other customers would find

15:40:48 12    out and then prices would come down.  That's why I got

15:40:51 13    confused.

15:40:52 14            MR. SANDROCK:  Well, I think, and I'm probably

15:40:55 15    getting confused again, I apologize, Your Honor, and I'll

15:40:59 16    wrap up.  But what they're concerned about is, you can be

15:41:02 17    concerned about sending out a signal to competitors that

15:41:05 18    goes through a customer, so -- but the key point that

15:41:09 19    they're making here is let's keep prices up.  That's what

15:41:12 20    they're doing.  And as we love to brief in post-trial

15:41:16 21    briefing on Evonik and talk about this, this is truly

15:41:22 22    exceptional coordinated effects evidence.  And I'll stop

15:41:27 23    here because I'm getting some notes.

15:41:30 24            THE COURT:  You didn't stop before he read your

15:41:33 25    note.

15:41:34  1          MR. SANDROCK:  No, I'm reading the note.

15:41:36  2          MR. HANNA:  The time went off.

15:41:37  3          THE COURT:  Right.  He's the one that put the

15:41:39  4   timer on you.

15:41:41  5          MR. SANDROCK:  Your Honor, the number of post-it

15:41:43  6   notes that I have ignored is very high.

15:41:46  7          I want to say that there is a lot of things

15:41:48  8   obviously that we disagree with defendants and no doubt they

15:41:52  9   disagree with us.  We look forward to briefing those.

15:41:55 10          One of the things we want to brief is some of

15:41:58 11   the Dr. Hill/Dr. Rothman issues.  We believe Dr. Rothman's

15:42:04 12   opinions are clear, well supported, consistent with ordinary

15:42:07 13   course documents.  We disagree with Dr. Hill's analysis and

15:42:11 14   we think the cross yesterday showed a lot of problems with

15:42:14 15   his analysis.  But we look forward to briefing all of this

15:42:18 16   on the post-trial briefing and hopefully I can put together

15:42:22 17   a more coherent story in this document and the Piedmont

15:42:24 18   document.

15:42:27 19          And with that, should we wrap up.  I'll turn it

15:42:31 20   over to Mr. Hanna.  Thank you, Your Honor.

15:42:33 21          THE COURT:  You started the trial, you should

15:42:35 22   finish it.

15:42:36 23          MR. HANNA:  I'll try to finish it.  Thank you.

15:42:38 24          On behalf of the whole United States, and I just

15:42:41 25   want to say that defense side, it's been a pleasure working

15:42:45 1    with you.  You have been cordial.  And thank you, Your

15:42:47 2    Honor, for listening to us.  You gave us extra time.  I

15:42:51 3    appreciate it.  Thanks to your personnel here.  It's been a

15:42:55 4    pleasure.  And thank you for your time and consideration.

15:42:59 5            THE COURT:  You guys have been very professional

15:43:02 6    and I do appreciate that.  I want to talk a few minutes

15:43:05 7    about the post-trial submissions, but first I want to get

15:43:09 8    Mr. Buterman a chance to clear the record.  I don't think

15:43:13 9    you said Mr. Cagle does not know how to make peppermint

15:43:17 10   puffs.  And I have to say that I think he makes delicious

15:43:20 11   peppermint puffs.  You can go ahead and clarify that you did

15:43:24 12   not say that.

15:43:25 13           MR. BUTERMAN:  I did not say that and I do want

15:43:27 14   to be clear that we have nothing but respect for both

15:43:31 15   Mr. Cagle and Piedmont Candy.

15:43:33 16           THE COURT:  It's delicious.

15:43:35 17           MR. BUTERMAN:  We like those puffs as well, the

15:43:37 18   Red Birds.

15:43:38 19           THE COURT:  They're not too hard, they're not

15:43:41 20   too mushy.

15:43:42 21           MR. BUTERMAN:  They're a lot softer than what

15:43:45 22   we've had at the table.  Thank you, Your Honor.

15:43:47 23           THE COURT:  Okay.  So now let's talk about

15:43:51 24   post-trial submissions.  This is what I would like and then

15:43:55 25   we can talk about pages.  But I would like all of the

15:44:00 1    submissions by May 27th.  The briefing, I think this is an

15:44:07 2    issue where the plaintiff has the burden, so I was thinking

15:44:12 3    we would do opening, answering, reply in terms of briefing.

15:44:17 4              Now, I also, though, want findings of fact.  And

15:44:23 5    what I want -- I don't necessarily want responsive findings

15:44:27 6    of fact, though if there is something the other side says is

15:44:32 7    wrong.  What I usually do with findings of fact is with your

15:44:35 8    opening papers, you will submit your findings.  With your

15:44:39 9    responsive answering brief you will submit your findings,

15:44:42 10   but I don't want your findings just to be responding to

15:44:45 11   them, I want it to be you think you're going to win, you say

15:44:50 12   gosh, those look good and put it in my opinion.  I want you

15:44:54 13   to write it from the perspective of this is what we think

15:44:56 14   the evidence shows.

15:44:58 15             When you give me those findings, I would like to

15:45:02 16   make sure whatever you're citing to is the specific pages.

15:45:05 17   We have had instances where someone will just cite PTX 8 in

15:45:10 18   support of their position and then it's a hundred-page

15:45:12 19   document.  And we don't have time to go through and figure

15:45:15 20   out if it's really supporting what you say it's supporting.

15:45:19 21             Now, we do in more complex cases usually ask for

15:45:22 22   or appreciate at least hyperlinked briefs because then you

15:45:27 23   can go through.  Is that going to be an issue for you,

15:45:30 24   Mr. Hanna?

15:45:35 25             MR. HANNA:  No, Your Honor, we often do that.

15:45:36  1          THE COURT:  So we would appreciate both the

15:45:38  2   findings and the briefing being hyperlinked which you can do

15:45:44  3   at some point in the week or so after things are filed.

15:45:47  4          Now, what are we thinking in terms of pages?

15:45:53  5          MR. HANNA:  Your Honor, I believe we requested

15:45:56  6   for the briefing I think forty-five pages for the opening

15:46:00  7   briefing.  I don't remember if we had an agreement on that.

15:46:03  8   Maybe it was a little bit different.  And then we were

15:46:06  9   requesting a hundred pages for the findings of fact.  I

15:46:09 10   think that's pretty similar to what we had, that's what we

15:46:15 11   were proposing.  I think for reply brief, twenty-five pages,

15:46:20 12   something like that.

15:46:23 13          MR. BUTERMAN:  Your Honor, we're fine with

15:46:26 14   obviously whatever Your Honor would like.  Forty-five is

15:46:31 15   something that we find to be reasonable, but we'll do

15:46:36 16   whatever the Court --

15:46:37 17          THE COURT:  The briefing sounds good.  A hundred

15:46:40 18   pages of facts scares me a little bit just because there is

15:46:45 19   some time sensitivity here and I can't make my clerk quit.

15:46:50 20   Can you guys maybe go back and talk a little bit, look at

15:46:55 21   the record, think about what you might actually need and

15:46:59 22   then in the next week or so maybe submit something to us

15:47:02 23   with the proposal with hopefully something less than a

15:47:06 24   hundred pages of fact.  But if you really need it, you can

15:47:10 25   try and convince us.  But just keeping it a little bit more

15:47:15  1    streamlined might be helpful to us.

15:47:18  2              MR. HANNA:  Of course, Your Honor.  Counsel

15:47:21  3    we'll work out a joint proposal for Your Honor.

15:47:24  4              MR. BUTERMAN:  And Your Honor, just to clarify,

15:47:25  5    all briefing will be complete by the 27th.

15:47:29  6              THE COURT:  By the 26th.  I think the 27th is a

15:47:34  7    Sunday, whatever the Friday is before Memorial Day.

15:47:38  8              MR. BLUMENFELD:  Your Honor, there is five

15:47:40  9    weeks, so two weeks, two weeks, one week, but we'll work out

15:47:45 10    specific days.

15:47:45 11              THE COURT:  Yes.

15:47:46 12              MR. HANNA:  Your Honor, just to clarify, the

15:47:48 13    final answering brief for us would be due the 25th, so we'll

15:47:52 14    work with counsel to work out the schedule.

15:47:54 15              THE COURT:  Yes.  All right.  And once again,

15:47:56 16    thank you all for your excellent presentations and for your

15:48:03 17    getting along so well.  We often come in in the morning with

15:48:07 18    many disputes on exhibits and things like that, and the fact

15:48:11 19    that you didn't make us do that really helps.  So we do

15:48:16 20    appreciate that.  And I wish you all safe travels.

         21              (Court adjourned at 3:48 p.m.)

         22              I hereby certify the foregoing is a true and
               accurate transcript from my stenographic notes in the proceeding.

         23

         24              /s/ Dale C. Hawkins
                         Official Court Reporter
         25                 U.S. District Court