IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-1644 (MN) |
| | ) | |
| UNITED STATES SUGAR | ) | REDACTED - PUBLIC VERSION |
| CORPORATION, UNITED SUGARS | ) | Original filing date: May 20, 2022 |
| CORPORATION, IMPERIAL SUGAR | ) | Redacted filing date: May 26, 2022 |
| COMPANY, and LOUIS DREYFUS | ) | |
| COMPANY LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' POST-TRIAL BRIEF

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Brian P. Egan (#6227)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
began@morrisnichols.com

*Attorneys for Defendant United States Sugar
Corporation*

HOGAN MCDANIEL
Daniel K. Hogan (#2841)
Daniel C. Kerrick (#5027)
1311 Delaware Avenue, Suite 1
Wilmington, DE 19806
(302) 656-7540
dhogan@dkhogan.com
dckerrick@dkhogan.com

*Attorneys for Defendant United Sugars
Corporation*

RICHARDS, LAYTON & FINGER. P.A.
Kelly E. Farnan (#4395)
One Rodney Square
Wilmington, DE 19801
(302) 651-7700
farnan@rlf.com

*Attorneys for Defendants Imperial Sugar
Company and Louis Dreyfus Company LLC*

May 20, 2022

TABLE OF CONTENTS

Page

INTRODUCTION ....................................................................................................................1

ARGUMENT ..........................................................................................................................5

I.    PLAINTIFF'S FAILURE TO PROVE A RELEVANT MARKET IS
DISPOSITIVE ...............................................................................................................5

    A.    Plaintiff Failed To Establish A Relevant Product Market ......................................6

        1.    Plaintiff Fails To Show That "Production And Sale" Of Refined
Sugar To Wholesale Customers Is A Relevant Product Market................6

        2.    Plaintiff's Product Market Is Overbroad Because It Incorrectly
Assumes Customer Homogeneity.............................................................10

    B.    Plaintiff Failed To Establish A Relevant Geographic Market ..............................11

        1.    Plaintiff Did Not Engage In A Proper Process For Selecting Its
Markets .....................................................................................................12

        2.    The "Commercial Reality" Is That Sugar Flows Well Beyond
Plaintiff's Narrow and Arbitrary Geographic "Markets" .........................13

        3.    The Ordinary Course Documents Do Not Support Plaintiff's
Geographic Markets..................................................................................16

        4.    Plaintiff's Reliance On Transportation Costs Does Not Provide A
Basis To Arbitrarily Define Narrower Markets .......................................17

        5.    The Economic Evidence Confirms That Plaintiff Fails To Carry Its
Burden To Identify Proper Geographic Markets ......................................19

    C.    Plaintiff Is Not Entitled To A Presumption That The Transaction Will
Likely Substantially Lessen Competition Based On The Markets It
Alleged, Nor Based On New Markets It Now Offers To Try To Save Its
Case.........................................................................................................................20

II.    DEFENDANTS HAVE SHOWN THAT PLAINTIFF'S ATTEMPTED *PRIMA
FACIE* CASE INACCURATELY PREDICTS THE MERGER'S EFFECTS ................23

    A.    Plaintiff's Shares Overstate The Transaction's Likely Competitive Effects
Because Entry, Expansion and Repositioning Are Likely.....................................24

    B.    Consistent With *General Dynamics*, Imperial's Shares Today Overstate Its
Likely Competitive Significance Going Forward..................................................25

C. The Industry's Combination Of Blind Bidding Processes And Sophisticated Buyers Create Enhanced Competition, Even If Shares Are Concentrated ...................................................................27

D. U.S. Sugar's Acquisition Will Increase Output In An Industry Where Limiting Output Is Economically Irrational ......................................................27

III. PLAINTIFF FAILS TO CARRY ITS BURDEN TO SHOW THE TRANSACTION WILL HAVE SUBSTANTIAL ANTICOMPETITIVE EFFECTS ...................................................................28

A. Plaintiff Fails To Show That The Transaction Will Result In Substantial Harm As A Result Of Unilateral Effects ...........................................29

1. Market Conditions Do Not Support Plaintiff's Unilateral Effects Theory Because The Transaction Will Increase, Not Decrease, Output ...........................................30

2. Plaintiff Has Not Established That Any Loss Of Competition Between U.S. Sugar And Imperial Will Result In Higher Prices .............31

a) The Refined Sugar Industry Features Numerous Competitors Who Already Supply Customers In Plaintiff's Markets Today ...........................................32

b) Imperial Is Not A Maverick, But Is Instead a High-Cost, High-Priced Competitor...........................................34

3. The Economic Evidence Confirms The Transaction Will Not Result In Substantial Unilateral Effects...........................................36

B. Plaintiff Failed To Establish That The Transaction Is Likely To Result In Coordinated Effects ...........................................37

1. Plaintiff Failed To Prove That The Sugar Industry Is Vulnerable to Coordination ...........................................38

a) United Cannot Withhold Sugar In Coordination With Domino To Increase Price ...........................................38

b) Numerous Other Characteristics Of The Sugar Industry Alleviate Any Concern That It Is Vulnerable To Coordination ...........................................40

2. Plaintiff Is Wrong That United And Domino Are Coordinating Today ...........................................40

       3.     Even If The Market Were Vulnerable To Coordination, Plaintiff Failed To Prove That The Merger Would Enhance That Vulnerability ............................................................................................. 42

IV.     THE COURT SHOULD NOT CREDIT DR. ROTHMAN'S TESTIMONY ................... 43

V.      USDA'S INDUSTRY EXPERT CONFIRMED THAT THE TRANSACTION WILL NOT HARM COMPETITION AND IS LIKELY TO BENEFIT CONSUMERS ................................................................................................................ 44

<u>TABLE OF AUTHORITIES</u>

Page(s)

**CASES**

*Ajir v. Exxon Corp.*,
    185 F.3d 865, 1999 WL 393666 (9th Cir. 1999) ...................................................................9

*Allen-Myland, Inc. v. IBM Corp.*,
    33 F.3d 194 (3d Cir. 1994).................................................................................................8, 9

*In re Altria Group, Inc. & JUUL Labs, Inc.*,
    No. 9393 (F.T.C. Feb. 23, 2022)........................................................................................43

*American Crystal Sugar Co. v. Cuban-American Sugar Co.*,
    259 F.2d 524 (2d Cir. 1958)...............................................................................................10

*Apani Sw., Inc. v. Coca-Cola Enters., Inc.*,
    300 F.3d 620 (5th Cir. 2002) .............................................................................................13

*Aya Healthcare Sers., Inc. v. AMN Healthcare, Inc.*,
    No. 17-205, 2020 WL 2553181 (S.D. Cal. May 20, 2020) ...................................................44

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
    No. 17-205, 2020 WL 3414662 (S.D. Cal. June 22, 2020) ...................................................44

*Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*,
    784 F.2d 1325 (7th Cir. 1986) ...........................................................................................24

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962)...................................................................................................*passim*

*Cont'l Trend Res., Inc. v. OXY USA Inc.*,
    44 F.3d 1465 (10th Cir. 1995), *vacated on other grounds*, 517 U.S. 1216 (1996)..................21

*Dicar, Inc. v. Stafford Corrugated Prods., Inc.*,
    No. 05-5426, 2010 WL 988548 (D.N.J. Mar. 12, 2010) ........................................................16

*FTC v. Arch Coal*,
    329 F. Supp. 2d 109 (D.D.C. 2004) ...............................................................................*passim*

*FTC v. Consolidated Foods Corp.*,
    380 U.S. 592 (1965)..............................................................................................................1

*FTC v. Hackensack Meridian Health, Inc.*,
    30 F.4th 160 (3d Cir. 2022) ...............................................................................................12

*FTC v. Penn State Hershey Med. Ctr.*,
    838 F.3d 327 (3d Cir. 2016) .................................................................................5, 11, 12

*FTC v. RAG-Stiftung*,
    436 F. Supp. 3d 278 (D.D.C. 2020) ................................................................. *passim*

*FTC v. Staples, Inc.*,
    190 F. Supp. 3d 100 (D.D.C. 2016) .................................................................13, 35

*FTC v. Sysco Corp.*,
    113 F. Supp. 3d 1 (D.D.C. 2015) ...............................................................................35

*FTC v. Tenet Health Care Corp.*,
    186 F.3d 1045 (8th Cir. 1999) ....................................................................................12

*FTC v. Thomas Jefferson Univ.*,
    505 F. Supp. 3d 522 (E.D. Pa. 2020) ...........................................................................6

*FTC v. Tronox Limited*,
    332 F. Supp. 3d 187 (D.D.C. 2018) ...........................................................................39

*Int'l Shoe Co. v. FTC*,
    280 U.S. 291 (1930) .....................................................................................................29

*It's My Party, Inc. v. Live Nation, Inc.*,
    811 F.3d 676 (4th Cir. 2016) ......................................................................................13

*Kaufman v. Time Warner*,
    836 F.3d 137 (2d Cir. 2016) .......................................................................................45

*New York v. Deutsche Telekom AG*,
    439 F. Supp. 3d 179 (S.D.N.Y. 2020) ...........................................................35, 36, 42, 43

*Pastore v. Bell Tel. Co. of Penn.*,
    24 F.3d 508 (3d Cir. 1994) .........................................................................................21

*PepsiCo, Inc. v. Coca-Cola Co.*,
    114 F. Supp. 2d 243 (S.D.N.Y. 2000), *aff'd*, 315 F.3d 101 (2d Cir. 2002) ..............9

*ProMedica Health System, Inc. v. FTC*,
    749 F.3d 559 (6th Cir. 2014) ......................................................................................26

*PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*,
    615 F.3d 412 (5th Cir. 2010) ........................................................................................9

*RSR Corp. v. FTC*,
    602 F.2d 1317 (9th Cir. 1979) ....................................................................................18

*United States v. Aetna Inc.*,
    240 F. Supp. 3d 1 (D.D.C. 2017) ...................................................................35

*United States v. Aluminum Co. of America*,
    148 F.2d 416 (2d Cir. 1945) ....................................................................8, 9

*United States v. Anthem, Inc.*,
    236 F. Supp. 3d 171 (D.D.C. 2017) ......................................................23, 24

*United States v. Archer-Daniels-Midland Co.*,
    781 F. Supp. 1400 (S.D. Iowa 1991) ............................................................40

*United States v. AT&T Inc.*,
    310 F. Supp. 3d 161 (D.D.C. 2018), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019) ..........................23

*United States v. Baker Hughes*,
    908 F.2d 981 (D.C. Cir. 1990) ................................................................ *passim*

*United States v. Country Lake Foods, Inc.*,
    754 F. Supp. 669 (D. Minn. 1990) ......................................................16, 19

*United States v. E. I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956) ....................................................................................7

*United States v. Energy Solutions*,
    265 F. Supp. 3d 415 (D. Del. 2017) ............................................................24

*United States v. General Dynamics Corp.*,
    415 U.S. 486 (1974) ..................................................................................25

*United States v. H&R Block, Inc.*,
    833 F. Supp. 2d 36 (D.D.C. 2011) ..............................................................24

*United States v. Marine Bancorp.*,
    418 U.S. 602 (1974) ..................................................................................44

*United States v. National Ass'n of Broadcasters*,
    536 F. Supp. 149 (D.D.C. 1982) ................................................................44

*United States v. Oracle Corp.*,
    331 F. Supp. 2d 1098 (N.D. Cal. 2004) ............................................11, 29, 32, 36

*United States v. Phila. Nat'l Bank*,
    374 U.S. 321 (1963) ............................................................................5, 11, 22

*United States v. Sabre*,
    452 F. Supp. 3d 97 (D. Del. 2020) ........................................................ *passim*

*United States v. Sabre Corp.*,
　No. 19-1548 (D. Del. Feb. 6, 2020), D.I. 268 .........................................................................13

*United States v. U.S. Gypsum Co.*,
　438 U.S. 422 (1978).................................................................................................................41

*United States v. Waste Mgmt., Inc.*,
　743 F.2d 976 (2d Cir. 1984).....................................................................................................25

*Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*,
　540 U.S. 398 (2004).................................................................................................................44

## STATUTES

15 U.S.C. § 18..................................................................................................................................1

## OTHER AUTHORITIES

5B Phillip E. Areeda & Hebert Hovenkamp, Antitrust Law .........................................................18

## INTRODUCTION

Plaintiff's burden at trial was to prove by a preponderance of the evidence that U.S. Sugar's acquisition of Imperial is likely to substantially lessen competition in a relevant antitrust market. 15 U.S.C. § 18.  To meet that burden, it was "not enough" for Plaintiff to show "[t]he 'mere possibility'" that the transaction could lead to anticompetitive effects.  *FTC v. Consol. Foods Corp.*, 380 U.S. 592, 598 (1965) (citation omitted).  Rather, it had to establish "that the substantial lessening of competition would be 'sufficiently probable and imminent' to warrant relief."  *FTC v. Arch Coal*, 329 F. Supp. 2d 109, 115 (D.D.C. 2004) (citation omitted).  Plaintiff did not come close to meeting its burden: it failed to prove a relevant product market, it failed to prove a relevant geographic market, it failed to prove that it is entitled to a presumption, and it failed to prove that the transaction is likely to lead to substantial anticompetitive effects in the form of unilateral or coordinated effects.  These are all independent reasons why Plaintiff's case fails.

As trial made clear, three commercial realities explain why this transaction will not substantially lessen competition.   *First*, sugar flows easily throughout the country—a fact confirmed by every defense witness, every third party (including Plaintiff's own customer witnesses), the USDA's chief economist in charge of the Federal Sugar Program, and Plaintiff's counsel during closing argument.  Plaintiff's case is premised on the assertion that refined sugar is too expensive to transport, meaning customers largely can only purchase from nearby suppliers.  But that is incorrect.  Almost half of all sugar sold to wholesale customers in Plaintiff's alleged southeast region comes from outside that area.  Any attempt to raise prices in the alleged southeast would cause suppliers to ship more sugar into (and less sugar out of) the region and would fail.

*Second*, Imperial is not a critical competitor.  Imperial is a high-priced sugar supplier that unlike other refiners must *purchase* all the raw sugar it refines.  Primarily, Imperial imports that raw sugar from costly foreign sources.  Imperial's cost structure is so much higher than that of

other refiners that companies over a thousand miles away deliver refined sugar to customers in Imperial's hometown of Savannah for less than the price Imperial can purchase imported raw sugar for its refinery. As a result, Imperial typically is a residual or backup seller to wholesale customers: it sells sugar later in the year and often focuses on different types of customers than United. Indeed, virtually every third-party witness testified that Imperial did not influence the sugar prices they received from others, and that if those customers purchased from Imperial, it was a high-priced backup source. Imperial does not exert any unique competitive pressure on United or others.

*Third*, for United to raise refined sugar prices, it must withhold supply from the market. However, United is a cooperative that does not control its members' output and must sell all of its members' sugar. And this deal means United will have *more* sugar that it must sell. The evidence at trial confirmed that even short-term attempts by United to hold back sugar can lead to disastrous financial outcomes. Plaintiff has never explained how its theories of harm are plausible given these unrefuted commercial realities.

This context explains why Plaintiff cannot prevail. Under Section 7 analysis, Plaintiff must first establish a *prima facie* case that the transaction is likely to result in a substantial lessening of competition in a relevant market. It has not. As to product market, Plaintiff urges the Court to focus on a significantly narrower product market that excludes all sugar sold by distributors, under the theory they do not produce their own sugar. There is no factual basis for doing so. Customers do not limit their sugar purchases to producer-suppliers and distributors have sources of supply well beyond the merging parties, including imports. In fact, *distributors account for more sales each year to wholesale customers than either of the merging parties.*

Plaintiff's approach to geographic market likewise did not hold up under evidentiary scrutiny. The standard approach to geographic market definition, as articulated by the Supreme

Court and which Plaintiff follows in other cases, is to look at where the merging parties sell their products or compete.  Plaintiff did not do that here.  Ignoring the fact that sugar flows, Plaintiff limited the set of states in the relevant geographic market to those it believed would allow it to claim a legal presumption that the transaction was anticompetitive.  This amounts to an improper attempt to gerrymander its way to victory and, in any event, is incorrect based on the facts.

Plaintiff's failures to define a relevant market mean that it is not entitled to a presumption that the transaction is likely to substantially lessen competition, and the Court need not proceed further.  But even if the Court were to continue the doctrinal analysis, Plaintiff's case also collapses because it has not put forward a cogent theory supported by evidence of why prices will increase.

Any claim that this transaction unilaterally will allow United to substantially raise prices assumes that Imperial is a significant price constraint on United today.  That is incorrect.  Plaintiff's expert, Dr. Rothman, did not even analyze the extent to which United and Imperial compete head-to-head today and cannot opine on how significant any lost competition will be.  Regardless, the transaction cannot have unilateral price effects because of the extent of competition today and the fact that many competitors are expanding.  This context matters because if United somehow attempted to increase prices in Plaintiff's proposed geographic markets (again, it cannot withhold supply to limit output), that is logically where that excess sugar would flow.  These commercial realities explain why Dr. Rothman—even with all of his assumptions and errors—claims this transaction will result in only a minimal price effect that does not pass muster under Section 7.  It is telling that there is *not a single document in this case* even suggesting that United believes it has the ability to raise prices as a result of this transaction or that its intention is to do so.

Plaintiff also ignores critical issues that undermine the claim that the refined sugar industry is vulnerable to coordination and that the transaction will lead to coordinated effects, including

that: prices are not transparent, contracts are long-term, and buyers generally are sophisticated entities that can structure a process to protect themselves.  Instead, Plaintiff focuses on communications related to spot pricing and other non-sensitive information that is widely available in the market through numerous channels, including United's customer portal and the USDA. Moreover, Plaintiff failed to present any explanation of how the Imperial acquisition would increase coordination between United and Domino, or lead to the specific coordinated activity its theory presupposes.  Plaintiff cannot carry its burden to show substantial anticompetitive effects with its frail coordinated effects case.

Finally, there is the testimony of Dr. Fecso, the USDA's chief economist tasked with running the Federal Sugar Program.  Dr. Fecso knows more about the industry than anyone else in the country.  She confirmed at trial that Plaintiff's theories of anticompetitive price effects do not comport with market realities because of Imperial's high costs and diminishing competitive significance, because sugar flows throughout the country, and because USDA monitors and controls the amount of sugar that can be imported into this country at no or low tariffs and can increase imports if needed to counteract Plaintiff's effects.  Defendants are not claiming the sugar industry is thus immune from antitrust scrutiny or that the USDA supplants the Antitrust Division of the Department of Justice as an antitrust regulator.  Rather, the point is simply that suppliers are all aware of what the USDA can and may do, and irrespective of everything else, that prevents them from attempting to raise prices above a competitive level or decrease quality.  And imports can increase at any point if needed to offset price increases.

In sum, Plaintiff's "failure of proof in any respect will mean the transaction should not be enjoined."  *Arch Coal*, 329 F. Supp. 2d at 116.  Here, Plaintiff failed to carry its burden of proof in *every* respect.  Its case thus fails.

## ARGUMENT

A court's review of a merger under Section 7 proceeds under a well-established three-prong burden shifting standard. *First*, as detailed in Part I below, Plaintiff bears the burden to establish a *prima facie* case that the merger is likely to result in substantial harm to competition. To carry this burden, Plaintiff must prove both a legally cognizable relevant product market and geographic market. Plaintiff must then show that it has established that the transaction is likely to lead to substantial anticompetitive effects. *See United States v. Sabre*, 452 F. Supp. 3d 97, 135 (D. Del. 2020); *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 363 (1963). If Plaintiff fails to prove any part of its *prima facie* case, its whole case fails. Otherwise, if Plaintiff establishes a *prima facie* case, the case proceeds to the second prong of the analysis (Part II below) where Defendants must show that Plaintiff's *prima facie* case inaccurately predicts the merger's likely competitive effects in the relevant market. *Sabre*, 452 F. Supp. 3d at 135. Once Defendants successfully rebut the *prima facie* case, then, under the third prong (Part III below), the burden shifts back to Plaintiff to prove that the merger will substantially lessen competition as a result of unilateral or coordinated conduct. *Id.* The ultimate burden of persuasion by a preponderance of the evidence always rests with Plaintiff. *Id.*

## I.  PLAINTIFF'S FAILURE TO PROVE A RELEVANT MARKET IS DISPOSITIVE

Market definition is a "pragmatic" and "factual" exercise, "not a formal, legalistic one," *Brown Shoe Co. v. United States*, 370 U.S. 294, 336 (1962), and depends "upon the special characteristics of the industry involved." *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 335 (3d Cir. 2016). A properly identified relevant market must "correspond to the commercial realities of the industry." *Brown Shoe*, 370 U.S. at 336 (internal citation omitted). To determine if a market corresponds to "commercial realities," courts rely on the *Brown Shoe* factors: "industry or public recognition of the [relevant market] as a separate economic entity, the product's peculiar

5

characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity

to price changes, and specialized vendors." *Id.* at 325. Plaintiff failed to define both a relevant

product and geographic market, either of which is independently dispositive. *Sabre*, 452 F. Supp.

3d at 139-44; *see also FTC v. Thomas Jefferson Univ.*, 505 F. Supp. 3d 522, 557 (E.D. Pa. 2020).

### A.    Plaintiff Failed To Establish A Relevant Product Market

Plaintiff contends the "production and sale of refined sugar" to "wholesale customers" is

an appropriate relevant product market.[1]  Compl. ¶¶ 26-27, D.I. 1.  Plaintiff is wrong.  *First*,

reliance on a "production and sale" product market is too narrow because Plaintiff fails to show

that distributors are competitively disadvantaged from other suppliers and that post transaction

they will charge higher prices.  DFOF § III.A.1-6.  *Second*, including retailers and food service

companies in the "wholesale customer" definition renders the product market too broad because

Plaintiff fails to show these customers face the same competitive dynamics for purchasing sugar

as industrial customers and will be harmed as a result of the deal.  *Id*. § III.A.7.  As discussed in

Part I.C below, these failures matter because Plaintiff does not have evidence of market shares if

it is wrong on either of these elements, meaning it cannot obtain a presumption that the transaction

is anticompetitive and proceed to the second prong of the analysis.  DFOF ¶ 178.

### 1.    Plaintiff Fails To Show That "Production And Sale" Of Refined Sugar To Wholesale Customers Is A Relevant Product Market

Product markets are "almost always defined by demand substitution."  *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 292 (D.D.C. 2020) ("*Evonik*").  "Demand substitution describes

---

[1] Plaintiff claims that "the only dispute regarding product market is whether distributors are properly excluded from the market and from the market shares."  Pl. Post-Trial Br. at 15, D.I. 214 ("Pl. Br.").  That is incorrect.  While that is the only product market issue Plaintiff chooses to address, it is far from the only reason why its definition fails.

'customers' ability and willingness to substitute away from one product to another in response to a price increase or a corresponding non-price change such as a reduction in product quality or service.'" *Id.* (quoting U.S. Dep't of Just. & Fed. Trade Comm'n, Horizontal Merger Guidelines § 4 (2010) ("HMG")).  The competitive set for the purpose of determining the relevant product market is those suppliers who offer reasonably interchangeable products and to whom customers can practicably turn in the event of a price increase.  In the case of a commodity, this typically includes all sellers of the same product.  *See United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956) (noting that relevant market is determined by whether "commodities [are] reasonably interchangeable by consumers for the same purposes").  To prevail on its "production and sale" product market, Plaintiff must therefore establish that in the event of a price increase, customers would not substitute away to sugar sold by entities that do not produce it—even though it is the identical product.  Plaintiff cannot meet that burden.

Customers view companies that "produce and sell" refined sugar and companies that "sell" refined sugar as substitutes and source refined sugar from both.  DFOF ¶¶ 115-16, 120-24.  That is why distributors account for as much as 25 percent of all sugar sales in the United States,[2] *id.* ¶ 65, and belong in the competitive set.  Indeed, distributors routinely compete head-to-head with refiners such as Imperial, non-producing cooperatives such as United, and other suppliers, for the sale of refined sugar.  *Id.* ¶ 122.  For example, in 2021, distributor Indiana Sugars sold ███████ ███████ of refined sugar (or █████████), and its President confirmed that it routinely competes with its suppliers, including United.  *Id.* ¶¶ 65-67, 121-22.  United, Imperial, Domino, and Michigan Sugar, among others, similarly characterize distributors as competitors against

---

[2] Plaintiff's delineation of which entities "produce and sell" is also inaccurate in that it includes firms like United, NSM, and Cargill that sell refined sugar but do not produce it.  DFOF ¶ 127.

whom they compete aggressively today.  *Id.* ¶ 124.



. *Id.*; DTX-066, at Column G.

; DFOF ¶ 123.   Even Plaintiff's expert Dr. Rothman concedes that distributors and refiners bid for the same customers, and that "there is some competition" between distributors and refiners for sales to wholesale customers.   DFOF ¶ 113.   These facts make Plaintiff's decision to discount sales by distributors to wholesale customers *completely* from *all* its market share calculations indefensible.

Plaintiff remarkably introduced no evidence establishing that customers care whether the sugar they purchase is sold by the entity that produced it.  Nor did it propose a single finding of fact that customers view non-producers' sugar as different from sugar sold by producers.  Instead, Plaintiff offers three responses, none of which is persuasive.

*First*, Plaintiff claims that distributors primarily serve "smaller customers" or ship "less than truckloads" of sugar, and thus are not always a competitive constraint.  Pl. Br. at 18.  That is incorrect.  The record shows that Indiana Sugars' typical sugar shipment is ⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛, and ⬛⬛⬛⬛⬛ of its shipments were for ⬛⬛⬛⬛⬛⬛⬛.  DFOF ¶ 121. Distributors sell millions of pounds of sugar to customers like ⬛⬛⬛⬛, ⬛⬛⬛⬛⬛, ⬛⬛⬛ and ⬛⬛⬛⬛.  *Id.* ¶¶ 120-21, 152(c), 184.

*Second*, Plaintiff cites *Allen-Myland, Inc. v. IBM Corp.*, 33 F.3d 194 (3d Cir. 1994), and *United States v. Aluminum Co. of America*, 148 F.2d 416 (2d Cir. 1945) ("*Alcoa*"), for the proposition that distributors should not be part of the relevant market.  Contrary to Plaintiff's

assertion, these cases only stand for the uncontentious notion that in situations where distributors themselves cannot practically turn to other alternatives such as other sellers or imports due to a risk of input foreclosure—i.e., where there is a plausible risk that a single company can foreclose its competitors from accessing an essential input—distributors that resell the product are in a different market. *See, e.g.*, *Alcoa*, 148 F.2d at 424-25 (distributors were in a different market because Alcoa controlled 90% of the market for the critical input); *Allen-Myland*, 33 F.3d at 202 (product market excluded leased IBM computers because IBM controlled the supply of those products; market should *include* leased non-IBM computers which compete with IBM).

Plaintiff does not meet the onerous burden to show that there is any risk of input foreclosure to sugar distributors. To the contrary, distributors buy substantial quantities from many companies other than United, Imperial, and Domino, including foreign suppliers. *See* DFOF ¶¶ 67, 69, 118-19; 126. Indeed, Indiana Sugars and ███ purchase from virtually every domestic supplier, as well as from numerous importers. DFOF ¶ 118. This ability to purchase from multiple sources gives distributors independence from refiners and allows them to remain price competitive by strategically buying sugar at low prices, and then storing and leveraging their logistics networks, or selling after further processing. Tr. 918:12-919:1 (Hill); DFOF ¶¶ 117-19. Courts routinely conclude that distributors compete in the same relevant product market as their suppliers[3] and the

---

[3] *See, e.g.*, *PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 418 (5th Cir. 2010) (rejecting exclusion of distributors from product market because "market definition must focus on the product rather than the distribution level."); *see also PepsiCo, Inc. v. Coca-Cola Co.*, 114 F. Supp. 2d 243, 251 (S.D.N.Y. 2000) (rejecting product market distinguishing between means of distribution of the same product where "price reductions or other marketing strategies" could be used to lure customers from one type of supplier to another), *aff'd*, 315 F.3d 101 (2d Cir. 2002); *cf. Ajir v. Exxon Corp.*, 185 F.3d 865, 1999 WL 393666, at *3-4 (9th Cir. 1999) (distributors are "potential competitors" of producers that sell their own products).

facts here do not compel a different result. ███████████████████████████

████████████████████████████████████████████████████.

Finally, Plaintiff again attempts to draw parallels with *American Crystal Sugar Co. v. Cuban-American Sugar Co.*, 259 F.2d 524 (2d Cir. 1958).  Putting aside the utility of Plaintiff's outsized reliance on an out-of-circuit case analyzing the sugar industry 65 years ago, in *American Crystal*, the "line of commerce" was "*the distribution and the sale* of refined sugar," *id.* at 529 (emphasis added), and not the "*production and sale*" of refined sugar.  Although Plaintiff now brushes aside the Second Circuit's articulated market definition, the Second Circuit's opinion does not support gerrymandering the market for refined sugar in the way Plaintiff attempts to do here.

### 2.   Plaintiff's Product Market Is Overbroad Because It Incorrectly Assumes Customer Homogeneity

Plaintiff's product market suffers from an additional flaw: Plaintiff combines all wholesale refined sugar sales, including sales to retailers and food service companies (such as restaurants and hotels).  Plaintiff provides no data, and offers no testimony (expert or otherwise), to support aggregating all wholesale sales into a single market.  DFOF ¶ 131.  Sugar suppliers do not share Plaintiff's belief that all sugar buyers are similarly situated.  For example, United, Imperial, and Domino each maintain separate sales channels for industrial and retail customers.  DFOF ¶¶ 132-35.  Suppliers employ retail-specific sales strategies in response to different supply and demand conditions.  *See id.* ¶¶ 132-34.  Retail customers therefore experience different competitive options than industrial customers do, a point wholly unexplored by Plaintiff.  Merely assuming that all "wholesale" purchasers of refined sugar face similar competitive choices renders Plaintiff's product market overbroad because it is unsupported by the record evidence.  *See, e.g.*, *Evonik*, 436 F. Supp. 3d at 294 (finding FTC's product market overbroad because it failed to show why standard, specialty, and pre-electronics grade hydrogen peroxide were properly aggregated into a

single market). Plaintiff's failure to establish a relevant product market means its entire case fails. *Brown Shoe*, 370 U.S. at 324 ("[D]etermination of the relevant market is a necessary predicate to a finding of a violation of the Clayton Act."); *Sabre*, 452 F. Supp. 3d at 136, 144.

### B. Plaintiff Failed To Establish A Relevant Geographic Market

Plaintiff's case also fails because it has not proven a relevant geographic market, which is defined as "the area in which a potential buyer may rationally look for the goods or services he seeks." *Penn State Hershey*, 838 F.3d at 338.[4] If customers turn to suppliers outside a proposed geographic market, the claimed geographic market is too narrow. *See Sabre*, 452 F. Supp. 3d at 142-43 (rejecting market that failed to account for sales originating outside the relevant market); *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1161 (N.D. Cal. 2004) ("exports or imports greater than 10% suggest that the market examined is not a relevant market"). Plaintiff has the burden on this point, which means it must engage in a "pragmatic" and "factual" exercise to define a relevant geographic market that "'correspond[s] to the commercial realities' of the industry." *Brown Shoe*, 370 U.S. at 336 (citation omitted).

As explained below, Plaintiff did not examine any of the practical indicia that would reveal today's commercial realities. It did not look at how far suppliers typically ship sugar. It did not analyze where the parties actually compete today (which itself is indicative of how far they can and do ship refined sugar). And it did not test whether its candidate markets were too narrow, which is typically the case when shipments outside the region are flooding the market. Instead, it

---

[4] Despite Plaintiff's suggestions to the contrary in its Post-Trial Brief, this articulation of how to define a relevant geographic market is fully consistent with the Supreme Court's opinion in *Philadelphia National Bank*. There the Court stated that "the 'area of effective competition'" (on which Plaintiff is focused), "must be charted by careful selection of the market area in which the seller operates, and *to which the purchaser can practicably turn for supplies*." *Phila. Nat'l Bank*, 374 U.S. at 359 (emphasis added) (internal citation omitted).

chose geographic markets which it claims enable it to obtain a presumption that the transaction is anticompetitive.  Pl. Br. at 5.  But that assumes the conclusion and is not what the law requires for geographic market definition.  As trial established, potential buyers in Plaintiff's proposed geographic markets do not limit themselves to those areas when it comes to purchasing refined sugar.  Instead, consistent with the fact that sugar flows, potential buyers regularly look throughout the country for refined sugar.  As a result, Plaintiff's geographic markets do not reflect the commercial realities of the refined sugar industry as the law requires and are improper.[5]

### 1.     Plaintiff Did Not Engage In A Proper Process For Selecting Its Markets

In *Brown Shoe*, the Court held that "the proper definition of the market is a '*necessary predicate*' to an examination of the competition that may be affected by the horizontal aspects of the merger."  370 U.S. at 335 (emphasis added).  It is therefore incumbent on Plaintiff to *define* a relevant geographic market based on the proper analytical framework *before* it determines whether that market leads to a legal presumption that the transaction is anticompetitive.  *See id.* at 336 ("Congress prescribed a pragmatic, factual approach to the *definition* of the relevant market." (emphasis added)).  "Without a well-defined relevant market," an examination of the merger's competitive effects would be "without context or meaning."  *Penn State Hershey,* 838 F.3d at 338 (citation omitted).  For that reason, courts consistently reject attempts by plaintiffs to gerrymander a geographic market and exclude areas that undermine their preferred market share calculations.  *See, e.g.*, *Sabre*, 452 F. Supp. 3d at 143; *FTC v. Tenet Health Care Corp.*, 186 F.3d 1045, 1053-54 (8th Cir. 1999) (rejecting FTC market as "too narrow" where FTC improperly discounted the

---

[5] Plaintiff cites *FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160 (3d Cir. 2022) for the proposition that "[c]ourts and agencies often define geographic markets based on the location of customers."  Pl. Br. at 5 n.2.  Yet it ignores the *Hackensack* court's directive: "the fundamental antitrust principle [is] that courts must consider the commercial realities of the industry involved when defining the relevant market."  *Hackensack Meridian Health*, 30 F.4th at 169.

extent to which 22% of consumers already used hospitals outside of the FTC's market).[6]  Yet that is exactly what Plaintiff did here when it chose its geographic markets.  Pl. Br. at 5.

Even Dr. Rothman admitted that he did not engage in the traditional process to choose the relevant geographic markets.  Instead, he accepted the markets Plaintiff proposed and asserted that those markets passed the hypothetical monopolist test.   DFOF ¶ 166(a).   To Defendants' knowledge, that is unprecedented.  The only case Plaintiff presents in defense of the fact that its expert was "not required to have personally selected" the candidate markets, Plaintiff's Brief at 15 (citing *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 125-26 (D.D.C. 2016)), does not endorse Plaintiff's departure from accepted economic practice.  Rather, *Staples* stands for the proposition that it is permissible for an economist to engage in a "collaborative process" with government economists to determine the scope of a candidate market.  *Staples*, 190 F. Supp. 3d at 125-26.  Here, however, Dr. Rothman admitted there was no such collaborative process.  He took the markets Plaintiff gave him and blessed them based on a test that could not be failed.  DFOF ¶ 166(a).  He did not perform the inquiry necessary to determine whether the markets were appropriately chosen.  As discussed below, the evidence confirms they were not.

### 2.   The "Commercial Reality" Is That Sugar Flows Well Beyond Plaintiff's Narrow and Arbitrary Geographic "Markets"

As Plaintiff admitted when it previously litigated in this District, "markets should be drawn to recognize competition where, in fact, competition exists."   Closing Statement of the United States at 15, *United States v. Sabre Corp.*, No. 19-1548 (D. Del. Feb. 6, 2020), D.I. 268.  The evidence shows that the area of effective competition for U.S. Sugar and Imperial extends well

---

[6] *See also Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 627 (5th Cir. 2002) (geographic market too narrow because it did not contain an "appreciable segment of the product market"); *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 683 (4th Cir. 2016) (plaintiff's "cramped" market definition was an "exercise in precise line-drawing" that failed to reflect market realities).

13

beyond Plaintiff's proposed geographic markets, which do not reflect the fact that sugar flows. The USDA's own economist, Dr. Fecso, agrees that sugar flows beyond Plaintiff's geographic markets (DFOF ¶¶ 5-6, 140), as do Plaintiff's attorneys.  Tr. 1206:6-12 (Pl. Closing) ("[W]e've all recognized on the sugar flows point that at some point the price increase will be stopped.").

The fact that sugar flows is clear from the distances that Imperial ships its product—well beyond the narrow confines of Plaintiff's proposed markets.  As an example, even though Plaintiff includes Delaware in its geographic market, Imperial sells more sugar to customers in multiple other states Plaintiff excludes from its market, such as Texas, Indiana, and Pennsylvania.  DFOF ¶ 160.  Indeed, Texas is the third top state where Imperial ships sugar, far beyond Plaintiff's narrower markets.  DTX-516.  Likewise, Plaintiff's broader market excludes three of Imperial's ten largest states by sales volume, but includes states with much smaller sales volume like Alabama.  *See* DFOF ¶ 160.  In the Mid-Atlantic region, Plaintiff's similar hodge-podge approach yielded a market that excludes Pennsylvania and New Jersey, but includes Maryland and Delaware—in which the parties have significantly fewer sales and lower market shares.  *See id.* And despite claiming that its markets encompass the states where United and Imperial compete most directly, Plaintiff puts forward no evidence that United and Imperial's market shares in states in the relevant market are higher than nearby states that Plaintiff excluded, like Pennsylvania, Ohio, or New Jersey.[7]  The facts do not support that Imperial sells primarily in Plaintiff's markets, which is unsurprising given that Plaintiff never tried to *select the correct geographic market*.

Beyond the facts relating to Imperial, there is overwhelming evidence that sugar flows. DFOF ¶¶ 5-9, 139-43.  Both NSM and United ship sugar to customers in Plaintiff's geographic

---

[7] When these and other nearby states are included, the market concentrations do not support Plaintiff's claimed presumption of harm.  DFOF ¶¶ 171-73.

markets from the Upper Midwest (*id.* ¶¶ 40, 142(d)-(e), 152(d)); Domino primarily ships sugar to

███████████████████████████████████████████████████████████████

████████████████████████████████████ (*id.* ¶ 148); Domino ships ██████████████ of

sugar from Louisiana to customers in Pennsylvania annually (*id.* ¶ 142(b)); and last year Imperial

shipped ██████████████████ of sugar from Georgia to customers in Texas, over 1,000 miles

away (*id.* ¶ 142(c)).  Indeed, almost half the sugar sold to customers in Plaintiff's proposed

southeast market comes from outside that market, often from over 1,000 miles away.  *Id.* ¶ 8.

Evidence of repositioning and arbitrage confirms that customers in Plaintiff's markets have

a broader set of choices beyond Plaintiff's purported competitive set and can defeat any attempted

regional price increase.  *See* HMG § 4.2.2 ("A region forms a relevant geographic market if this

price increase would not be defeated by substitution away from the relevant product or by

arbitrage, e.g., customers in the region travelling outside it to purchase the relevant product.").  As

Dr. Hill testified, if prices were to rise within Plaintiff's geographic markets, customers can pick

up refined sugar at locations outside of those markets and move it in.

Even today, with prices "equalized across all [] regions," "30 to 35 percent of customers

pick up at their supplier" in Plaintiff's geographic markets, and "three percent of customers

purchase at a supplier location outside of [those markets] and move it in." *See* Tr. 936:12-22 (Hill).

Moreover, "more than 75 percent of purchases in [Plaintiff's geographic markets] are made by

customers who have a location outside of [those] market[s]," (Tr. 936:23-937:8 (Hill)), enabling

customers to shift sugar supply from among their various plants located both within and outside

of Plaintiff's geographic markets to defeat any hypothetical price increase, (*see* Tr. 107:7-108:5

(Riippa/General Mills)).  Additionally, many suppliers currently sell into the alleged geographic

markets from elsewhere, including Cargill, NSM, Michigan, Indiana Sugars, and importers, and

could easily make additional sales into the region if conditions warranted it.  *See* DFOF ¶ 153.
Several of these suppliers are also in the process of expanding.  *See id.* ¶¶ 68, 205-09.

Plaintiff thoroughly ignores these commercial realities in its post-trial submissions, instead
relying on the bald pronouncement that "[c]ustomers generally choose from refiners located
nearby," Pl. Br. at 6.  But that is simply wrong.  As other courts have held on the basis of similar
evidence, Plaintiff's proposed geographic markets are too narrow.  *See Sabre*, 452 F. Supp. 3d at
142-43 (finding DOJ failed by not accounting for sales originating from outside the United States
(citing *Dicar, Inc. v. Stafford Corrugated Prods., Inc.*, No. 05-5426, 2010 WL 988548, at *12
(D.N.J. Mar. 12, 2010) ("Where, as here, there is no indication that a consumer would be unable
to purchase a product abroad, the Court will not arbitrarily limit the geographical market to the
U.S."))); *United States v. Country Lake Foods, Inc.*, 754 F. Supp. 669, 676, 678 (D. Minn. 1990)
(rejecting Section 7 challenge because geographic market was too narrow).

### 3. The Ordinary Course Documents Do Not Support Plaintiff's Geographic Markets

Plaintiff argues that ordinary course documents support "the conclusion that the southeast
and adjacent states are distinct markets," *see* Plaintiff's Brief at 9, and goes so far as to state that
"the similarity between the southeast regions defined by United and U.S. Sugar, Imperial and
███████ and the United States is striking."  *Id.* at 10.  That statement is inexplicable, given that
Plaintiff's own expert admitted that there are no ordinary course documents in this case that match
Plaintiff's contention of a "southeast" market.  Tr. 662:22-663:7 (Rothman).  Although there are
instances in which market participants do refer to the "southeast," in none of those instances does
that southeast comport with the set of states Plaintiff proposes as the southeast.

Documentary support is likewise largely non-existent on Plaintiff's narrower alleged
market of Georgia and its surrounding states.  Pointing to ███████████, Plaintiff suggests

████ defines a "southeast" region as comprising the exact same states as the narrower market. Pl. Br. at 10.  This is incorrect.  The map on which Plaintiff relies was created by McKeany-Flavell, a third-party consultant and, as the trial record shows, ████ ordinary course documents do not match Plaintiff's alleged geographic markets in the slightest—████ puts Texas and Florida in one region and considers Delaware and Virginia in the same region as Maine.  DFOF ¶¶ 156-57, 157 n.9.  Plaintiff makes a similar error in pointing to a map it incorrectly states was used by Imperial.  Pl. Br. at 10.  This, too, was a map created by McKeany-Flavell that Imperial did not have input into creating,  DFOF ¶ 157 n.9; PTX-217, at -071, and never used in the ordinary course of business.  DFOF ¶ 157 n.9.[8]  In the ordinary course of its business, Imperial does not define a region as the "southeast."  Tr. 255:19-21 (Hines/Imperial).

In reality, the only document that supposedly supports Plaintiff's "Georgia Plus" market is the "Supplier Backyards" slide.  But this document actually undermines Plaintiff's argument.  The slide was part of a presentation prepared in March 2020 related to a potential expansion of Clewiston's bagging line.  DFOF ¶ 158.  Prior to this presentation, United had never grouped states in the way shown on the "Supplier Backyards" slide, and United has never grouped states in the same way again.  *Id.*  Critically, the slides that immediately follow the "Supplier Backyards" map use arrows to show that refined sugar flows across the country.  *Id.* ¶ 159.

### 4.    Plaintiff's Reliance On Transportation Costs Does Not Provide A Basis To Arbitrarily Define Narrower Markets

Despite conceding that sugar flows, Plaintiff now tries to argue that sugar flows, but *to a point*.  Plaintiff contends that high transportation costs are a sufficient deterrent to competitors such that customers will be unable to defeat a small but significant price increase by turning to

---

[8] In addition, the map did not include most of Florida in Imperial's primary marketing area.  *Id.*

alternative sources of supply outside of Plaintiff's geographic markets. Yet Plaintiff's expert, Dr. Rothman, testified otherwise. As Dr. Rothman noted in his reply report, and reaffirmed at trial, "a supplier with a transportation cost disadvantage can exert competitive pressure by offering a competitive price and earning a lower margin." Tr. 671:19-25; *see also* Tr. 672:1-4 (Rothman) ("suppliers can exert competitive pressure even if they do not have the lowest transportation costs"). Supporting this point, Dr. Rothman calculated that United does not have the lowest transportation cost for 89% of the customers that it supplies. Tr. 672:18-21 (Rothman). In essence, even according to Plaintiff's own expert, transportation costs are *not a sufficient deterrent* to competitors because "there are many potential reasons why a supplier might be willing and able to offer a competitive bid that is unrelated to freight costs." Tr. 672:5-8 (Rothman).

Dr. Rothman thus endorsed the simple, case dispositive point that transportation costs standing alone are not a reason to define a market narrowly. This is because if customers pay different prices *due to different costs*, the fact that some pay higher prices cannot be attributed to market power, but is instead due to the fact that the costs to serve each unique customer are different. 5B Phillip E. Areeda & Hebert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles & Their Application ¶ 517b (5th ed. 2020) (explaining that price discrimination cannot be used as a basis to infer market power "without reference to costs, for price differences on sales to different buyers are not discriminatory if costs differ in the same proportion"); *id.* ¶ 517c1 (explaining why cost differentials are not a basis for inferring market power). For this reason, courts have found that commodity markets are broad even where the product must travel long distances. *See RSR Corp. v. FTC*, 602 F.2d 1317, 1323 (9th Cir. 1979) (finding nationwide geographic market for secondary lead even though high transportation costs resulted in sales mostly "within a few hundred miles" because producers would ship farther depending on

"economic and market conditions"); *see also Country Lake Foods*, 754 F. Supp. at 676-77 (rejecting narrow market, even for a *perishable* commodity, because "distant dairies have substantially lower labor costs" which allows them to compete despite transportation costs).

What ultimately matters is not standalone transportation costs, but a supplier's total cost to serve a customer, of which transportation cost is a marginal portion.  DFOF ¶¶ 145-47.  The testimony from Plaintiff's customer witnesses only underscores the marginal significance of transportation costs in today's refined sugar market.  *Id.* ¶¶ 148, 152.  The marginal significance of transportation costs also explains why (1) almost half of the sugar in Plaintiff's southeast market comes from outside of that area, and (2) Imperial can make more than 47% of its sales outside of the supposed Georgia-Plus market and sell more sugar in states like Texas (over 1,000 miles away from Georgia) than in many states within that claimed market.  *Id.* ¶¶ 8, 160.  Plaintiff's reliance on transportation costs to dictate the breadth of its geographic markets is inconsistent with the real-world evidence on how transportation costs factor into suppliers' and customers' decision making.

### 5. The Economic Evidence Confirms That Plaintiff Fails To Carry Its Burden To Identify Proper Geographic Markets

Dr. Rothman's opinions cannot save Plaintiff's markets.  In addition to the markets being arbitrarily selected, the evidence rebuts any possibility of sustained higher prices in only one region of the country—which is the foundation of Plaintiff's regional market definitions.  Plaintiff's expert failed to present any economic evidence of meaningful price differences across regions. DFOF ¶¶ 161-62, 165.  Instead, the only economic analysis came from Defendants' expert Dr. Hill, who showed that "there is no meaningful differences in prices between the states in Dr. Rothman's regions and the states that border it," and no meaningful differences in prices between the states in Dr. Rothman's regions and "a broader comparison group of states."  Tr. 928:19-929:13 (Hill).  Unsurprisingly, prices equalize nationally, which undermines Plaintiff's speculation that a

price increase in an isolated part of the country could succeed—speculation that neither the USDA's industry expert nor any sugar supplier believes is realistic.  Tr. 929:14-930:3 (Hill); DFOF ¶¶ 5-9, 139-43,162-64, 174-76.  Dr. Hill's analysis instead showed that supply disruptions in one area during the 2019-2020 beet freeze caused prices "to adjust nationally rather than regionally."  Tr. 930:4-931:6 (Hill).[9]

Dr. Hill's findings are consistent with the examples of repositioning and arbitrage in the Plaintiff's geographic markets, discussed in Section I.B.2, *supra*.  Contrary to Dr. Rothman's finding that arbitrage was unlikely, (*see* Tr. 653:24-654:10 (Rothman)), which he used to support Plaintiff's geographic markets, customers are employing significant methods of arbitrage today, (Tr. 934:22-937:18 (Hill)).  Dr. Fecso agrees.  Tr. 896:24-897:10 (Fecso).

Plaintiff's failure to establish a relevant geographic market means its entire case fails as a matter of law.  *Sabre*, 452 F. Supp. 3d at 136, 143-44.

> **C.     Plaintiff Is Not Entitled To A Presumption That The Transaction Will Likely Substantially Lessen Competition Based On The Markets It Alleged, Nor Based On New Markets It Now Offers To Try To Save Its Case**

Perhaps because of the myriad of infirmities with the product and geographic markets that it actually alleged, Plaintiff argues that the Court should presume the transaction is likely to substantially lessen competition in *new markets* that it did not allege in its complaint.  These belated arguments fail for two independent reasons.

---

[9] Plaintiff argues, incorrectly, that pricing varies by region and "Defense counsel attempted to confuse the issue by referring to a . . . normalized graph."  Pl. Br. at 8-9.  But Dr. Hill addressed the differential price point in two ways.  First, in explaining the demonstrative slide immediately preceding the one Plaintiff attacks, Dr. Hill showed the correspondence of actual prices both inside and outside of Dr. Rothman's regions.  Tr. 928:19-929:19 (discussing DDX-008, at 14).  Only then did Dr. Hill discuss the normalized graph.  Tr. 930:4-931:15.  And, contrary to Plaintiff's claim, Dr. Hill did expressly state that "prices are equalized across all the regions."  Tr. 936:17-18.

*First*, Plaintiff's suggestion that this Court should save its case based on new markets it addresses in its post-trial brief is procedurally improper. Defendants have spent nearly six months defending against claims that the transaction is anticompetitive in the two markets that Plaintiff alleged and argued through trial (which itself followed eight months of investigation that presumably supplied the basis for Plaintiff's claimed markets). If, upon reflection, Plaintiff now concludes after the close of evidence and completion of trial it should have brought a different case and "invit[es] the Court to 'unilaterally change the defective market allegations if necessary to save its case,' it would be wrong for the Court to do so under the circumstances here." *Sabre*, 452 F. Supp. 3d at 142 n.20 (citation omitted) (declining to consider different markets from those Plaintiff pled in its case). As in *Sabre,* courts do not allow plaintiffs to retroactively fix fatal market definition errors. *See, e.g.*, *Cont'l Trend Res., Inc. v. OXY USA Inc.*, 44 F.3d 1465, 1481 n.19 (10th Cir. 1995) (affirming rejection of antitrust claims on market definition grounds and holding plaintiffs had to be "saddled with their Complaint as filed in this Court" when they "later attempted to redefine the relevant market"), *vacated on other grounds*, 517 U.S. 1216 (1996); *Pastore v. Bell Tel. Co. of Penn.*, 24 F.3d 508, 512-13 & n.5 (3d Cir. 1994) ("hold[ing] plaintiffs to their own contention" regarding relevant market).

*Second*, Plaintiff fails to support its new markets with evidence. As to the USDA South, Plaintiff now summarily asserts that even if the market is defined to include the USDA South, "the transaction would still be presumptively unlawful." Pl. Br. at 22. Plaintiff cites no economic analysis for this belated argument, instead offering only a cursory cite to one sentence in Dr. Rothman's trial testimony. DFOF ¶¶ 167-69. With regard to the USDA South, however, Dr. Rothman offered no evidence or analysis on any actual shares or market conditions—and, with good reason: whether the USDA South was a proper relevant market was not at issue in the

complaint and was not a focus of discovery, including expert discovery.[10]  *See Evonik*, 436 F. Supp. 3d at 300 & n.13 (refusing to consider if certain hydrogen products could make up an alternative product market where "[t]he record lacks evidence of market concentration statistics or other quantitative measures of anticompetitive effects").

Plaintiff's arguments as to "Dr. Hill's competitive overlap region" and "Defendants' National Market" are even more attenuated.  Plaintiff does not cite any evidence to support the suggestion that the transaction is presumptively likely to result in substantial harm to competition in these markets.  Instead, Plaintiff suggests, without any legal citation, that it is entitled to a presumption on the basis of the merging Parties' combined market shares alone.  *See* Pl. Br. at 22-23.  That is not the law, and Plaintiff cites no case that says it can obtain a presumption *solely* on the basis of market shares.  *Philadelphia National Bank* itself found that Plaintiff was entitled to an inference on the basis of market shares *and* market concentration statistics, among other factors, 374 U.S. at 363-64, which is the same position Plaintiff takes in its recitation of the legal standard. Pl. Br. at 4.  Plaintiff cites no basis to depart from this clearly articulated Supreme Court standard.

*Finally*, any claim that Plaintiff can obtain a presumption based on market shares in any of those three unpled markets ignores the fact that the shares presented all incorporate Plaintiff's faulty product market assumptions, including the exclusion of distributors.  Plaintiff conceded at trial that it does not have evidence reflecting distributors' market shares as downstream suppliers. *See* Tr. 1143:5-11 (Pl. Closing) ("I don't believe we have the numbers in there with the calculations with the distributors in there.").  Plaintiff adds nothing further on this point in its post-trial brief.

---

[10] Third-parties refused to produce documents relating to sugar sales in unalleged markets, further reducing the evidentiary record about those areas.  *See* DFOF ¶ 168.

Thus, if the Court concludes any sales by distributors should be in the market at all, Plaintiff, having failed to present any such evidence regarding distributors, is not entitled to a presumption.

## II.  DEFENDANTS HAVE SHOWN THAT PLAINTIFF'S ATTEMPTED *PRIMA FACIE* CASE INACCURATELY PREDICTS THE MERGER'S EFFECTS

Plaintiff's failure to establish it *prima facie* case should be the end of the analysis.  But even when a plaintiff does meet its burden under the first prong of the burden-shifting analysis, defendants can rebut that case "by demonstrating that the [Government's] *prima facie* case and market-share statistics inaccurately predict the merger's probable effects in the relevant market." *Evonik*, 436 F. Supp. 3d at 291; *see also United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 191 (D.D.C. 2018), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019).  "The standard for the quantum of evidence defendants must produce to shift the burden back is relatively low," *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 213 (D.D.C. 2017).  This is particularly true where a plaintiff's *prima facie* case is weak.  *Arch Coal*, 329 F. Supp. 2d at 129 ("Certainly less of a showing is required to rebut a less-than-compelling *prima facie* case."); *see also United States v. Baker Hughes*, 908 F.2d 981, 991-92 (D.C. Cir. 1990) (explaining why the defendant's burden on prong two is low because otherwise the government could virtually rest its case on market concentration statistics).  For a multitude of reasons, even assuming Plaintiff had made its *prima facie* case, Defendants have carried their burden here to rebut that presumption.[11]

---

[11] Rather than discussing this *second prong* of the Section 7 burden-shifting standard *second*, Plaintiff instead addresses this second prong *last*—after explaining why it has carried its burden on competitive effects—and suggests that Defendant has the burden on various points, including entry, expansion, and efficiencies.  *See, e.g.*, Pl. Br. at 41, 43.  This is wrong and misleading in so far as it suggests Plaintiff does not bear the burden of proof on all Section 7 elements.  *Sabre*, 452 F. Supp. 3d at 135 ("[I]f defendants do successfully rebut the government's *prima facie* case, 'the burden of production shifts back to the [g]overnment and merges with the ultimate burden of persuasion'").  Defendants' only burden is to rebut Plaintiff's *prima facie* case, as they do here.

### A.   Plaintiff's Shares Overstate The Transaction's Likely Competitive Effects Because Entry, Expansion and Repositioning Are Likely

Plaintiff's market share statistics overstate the transaction's potential competitive effects because the sugar industry is dynamic and because competitors can (and already do) quickly enter, expand and reposition.  *See* DFOF ¶¶ 57, 68, 153, 205-09.  These facts confirm that there is an "absence of significant barriers [to entry]" and Defendants "probably cannot maintain supracompetitive pricing for any length of time."  *Baker Hughes*, 908 F.2d at 987; *Sabre Corp.*, 452 F. Supp. 3d at 145; *see also Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1335-37 (7th Cir. 1986).

Plaintiff relies on three cases to try to undermine the overwhelming evidence that sugar flows—each of which emphasizes the comparative ease with which entry, expansion, and repositioning could occur here.  In *United States v. Energy Solutions*, (1) defendants had explicitly recognized high entry barriers; (2) the cost of entry was building an expensive radioactive waste disposal facility and obtaining regulatory permits; and (3) there was no history of repositioning. 265 F. Supp. 3d 415, 443-44 (D. Del. 2017).  In *United States v. H&R Block, Inc.*, (1) massive marketing expenditures of the two major firms created "high per customer acquisitions costs" and limited the "easy marketing channels that are open to small competitors"; (2) there were significant barriers to switching between products; and (3) the parties "essentially agree[d]" that new entrants could not meaningfully compete in the requisite time frame.  833 F. Supp. 2d 36, 73-76 & n.28 (D.D.C. 2011).  And in *Anthem*, the court walked through the arduous process of developing a provider network to demonstrate "that entry is not particularly easy."  236 F. Supp. 3d at 222-24.

This case is nothing like those.  Entry, expansion, and repositioning in the refined sugar industry is constant and ongoing.  Competitors to United and Imperial are hungry to gain market share, and are sophisticated and innovative.  LSR/Cargill, CSC, Indiana Sugars, Michigan, and

others are all expanding.  DFOF ¶¶ 29-33, 43, 57-59, 68, 205-09.  Given that nearly half of the refined sugar purchased in Plaintiff's alleged southeast already comes from outside of the area, more sugar could easily flow into that area if prices there were to rise differentially post-transaction.  *Id.* ¶¶ 8, 151, 153 240(c).  These facts demonstrate that static shares are inconsistent with the competitive realities and ongoing industry expansion in the sugar industry.  *See, e.g.*, HMG § 5.3 ("Market shares may not fully reflect the competitive significance of firms in the market or the impact of a merger."); *United States v. Waste Mgmt., Inc.*, 743 F.2d 976, 982 (2d Cir. 1984) ("Moreover, under *General Dynamics*, a substantial existing market share is insufficient to void a merger where that share is misleading as to actual future competitive effect.").

### B.   Consistent With *General Dynamics*, Imperial's Shares Today Overstate Its Likely Competitive Significance Going Forward

Trial showed that Imperial is not a strong competitor: customers admit that Imperial is consistently higher-priced, LDC is not making material capital improvements at Imperial going forward, and U.S. Sugar is the only buyer to make an acceptable offer in five years.  DFOF ¶¶ 111, 181-82.  For these reasons, Defendants consistently have cited *United States v. General Dynamics Corp.*, 415 U.S. 486 (1974), to explain why, as a matter of law, the fact that Imperial's shares overstate its competitive significance is critical for the second prong of the Section 7 analysis.

In *General Dynamics*, the Court upheld a merger between two leading coal producers, which would result in those firms controlling half of all sales in an industry that was already highly concentrated.  The Court found that even though plaintiff was entitled to a presumption that the transaction was anticompetitive, the facts suggested that the acquired company was unlikely to be a significant competitive constraint going forward.  *Id.* at 501-04.  This was true despite evidence that the acquired company was "highly profitable and efficient."  *Id.*  Here, Imperial is neither

"highly profitable" nor "efficient," and the evidence that Imperial has not been (and will not be) a competitive constraint is overwhelming.  That is one reason why the burden shifts back to Plaintiff.

Plaintiff does not even cite *General Dynamics* in its post-trial brief on this point.  Instead, it offers three disjointed responses.  *First*, in discussing the weakened competitor defense, it singularly relies on *ProMedica Health System, Inc. v. FTC*, 749 F.3d 559, 570-72 (6th Cir. 2014), where the merging parties' own testimony was that the merger would give them the ability to charge higher rates and where, for many customers, the transaction combined their only two options.  The fact that the plaintiff in *ProMedica* proved a far more robust *prima facie* case and the court found the countervailing evidence did not rebut it provides no reason for this Court not to reach a different outcome here on an entirely different set of facts.

*Second*, Plaintiff contends that Defendants failed to produce evidence that Imperial's shares are likely to decline and that Defendants' failure to do so is "fatal to its weakened competitor defense."  Pl. Br. at 35.  Not so.  The defendant in *General Dynamics* produced no such evidence.  Nor did the defendants in *Baker Hughes*, 908 F.2d at 984-86, 992.  This is because the point of the defense is that *shares are not indicative of commercial reality*, and that Section 7 requires a comprehensive examination of market characteristics and dynamics to inform whether market shares accurately portray the competitive dynamics.   Applying that principle, attributing presumptive anticompetitive weight to misrepresentative shares does not make sense: Imperial is not aggressive on price, is a high-cost competitor, and customer testimony confirms that Imperial is in no way uniquely competitively important.  DFOF ¶¶ 181-82.  That is precisely the point of *General Dynamics* and it is why, when the law is properly applied to the facts, Defendants have carried their burden to refute Plaintiff's *prima facie* case.

*Last*, Plaintiff argues that Defendants "make an even softer rebuttal" by pointing to Imperial's high cost structure and says there "is no basis in law" for this argument. The fact that Imperial has a high cost structure that limits its ability to be price competitive going forward is not a "softer" or different argument—it is one and the same. Imperial has to pay more for raw sugar than its numerous domestic competitors pay. *Id.* ¶¶ 49-51. That places Imperial at a competitive disadvantage forcing it to charge higher prices and to play a different role in the marketplace. Accordingly, Imperial's sales and share figures overstate its competitive importance.

### C.    The Industry's Combination Of Blind Bidding Processes And Sophisticated Buyers Create Enhanced Competition, Even If Shares Are Concentrated

Plaintiff cannot dispute that sales of refined sugar are done through blind RFP processes where each supplier does not know who else is bidding for the opportunity. *See* DFOF ¶ 79. Nor can Plaintiff dispute that the customers it cites in its Post-Trial Brief—including Pepsi, General Mills, Post, Hostess, and Danone—are sophisticated buyers who run processes to maximize competition for their own benefit. These facts are important because courts have held that defendants can rebut a *prima facie* case with exactly this type of showing. *Baker Hughes*, 908 F.2d at 986-87 ("sophisticat[ed]" customers which "closely examine available options and typically insist on receiving multiple, confidential bids for each order" are "likely to promote competition even in a highly concentrated market"); *Evonik*, 436 F. Supp. 3d at 314 (citing blind RFP bidding process as a basis for overcoming a *prima facie* case and noting that practice of "pitting of suppliers against each other lowers prices, even when there are only two competing suppliers, because suppliers generally do not know which other suppliers have placed bids").

### D.    U.S. Sugar's Acquisition Will Increase Output In An Industry Where Limiting Output Is Economically Irrational

The evidence shows that this deal will, among other things, improve the operational efficiency of *Imperial's refining plant*, decrease unit costs by relying in part on raw sugar produced

from U.S. Sugar's excess cane in lieu of pricier imports, and provide enhanced supply chain security for customers in the event of weather or other catastrophes that threaten supply disruption at the Imperial or U.S. Sugar plant.[12]  *See* DFOF § II.A.  U.S. Sugar will do this in an environment that compels United to sell all the sugar its members produce.

Plaintiff points to an erroneous legal strawman in response and argues that for the Court to give this evidence *any weight* it must determine that the evidence meets the formal elements of an efficiencies defense.  Pl. Br. at 43-44.  That is incorrect.  Defendants' point here is not that the Court should clear the transaction on the basis of an efficiencies argument, which is what the efficiencies defense is directed at.  The question under the second prong of the Section 7 burden-shifting inquiry is whether Defendants have met Plaintiff's *prima facie* case with evidence that suggests Plaintiff is overstating the transaction's likely anticompetitive effects.  Viewed through this lens, Defendants' position is simply that the evidence on the deal rationale combined with the other evidence discussed herein demonstrates just that.  *See Baker Hughes*, 908 F.2d at 990-92 (rejecting argument that defendant must make a "clear showing" that the transaction will not have anticompetitive effects because that standard is to stringent).

## III.    PLAINTIFF FAILS TO CARRY ITS BURDEN TO SHOW THE TRANSACTION WILL HAVE SUBSTANTIAL ANTICOMPETITIVE EFFECTS

To carry its ultimate burden, Plaintiff must prove that the transaction is likely to have "substantial[]" anticompetitive effects in a relevant market.  *Sabre*, 452 F. Supp. 3d at 135 (citation omitted).  Contrary to Plaintiff's statements at closing,[13] the fact that the transaction may eliminate

---

[12] Plaintiff focuses on the fact that Imperial has a "state-of-the-art" *packaging facility*.  Pl. Br. at 35.  Of course it does; Imperial had to rebuild that facility after a catastrophic explosion in 2008.  But Imperial cannot package what it has not refined.  Defendants intend to upgrade Imperial's *refining facility*, which in places still dates back to the 1940s.

[13] In response to the Court's question during Closings about "what is substantial" in the context of a post-transaction price increase, Plaintiff argued that "the number doesn't have to be that big" and

some head-to-head competition and "result in some lessening of competition" is not sufficient under the law. *Int'l Shoe Co. v. FTC*, 280 U.S. 291, 298 (1930) (noting that Section 7 only "deals only with such acquisitions as probably will result in lessening competition to a *substantial degree*" (emphasis added)). Plaintiff attempts to meet this standard by arguing that the transaction is likely to result in both unilateral and coordinated effects. It fails in both regards.

### A. Plaintiff Fails To Show That The Transaction Will Result In Substantial Harm As A Result Of Unilateral Effects

Plaintiff spends the bulk of its competitive effects discussion attempting to revive its "unilateral effects" argument. Pl. Br. at 23. To prevail on this theory, Plaintiff must show that post-closing Defendants will have market power such that it will be able to *unilaterally* raise prices[14] without losing customers. *See Oracle*, 331 F. Supp. 2d at 1113 (horizontal merger results in unilateral effects if it "lead[s] to higher prices simply by virtue of the fact that the merger will eliminate direct competition between the two merging firms"). Plaintiff must present "a forward-looking analysis" establishing that, post-merger, the acquirer will likely raise prices. *Sabre*, 452 F. Supp. 3d at 146-47. Evidence that rivals will remain and threaten to steal business refutes a finding of unilateral effects because it demonstrates that the merged firm will not have durable pricing power. *Id.* at 147 (anticompetitive effects unlikely where the sellers' "rivals will likely further constrain [the buyer's] ability to raise prices"); *Evonik*, 436 F. Supp. 3d at 320 (anticompetitive effects unlikely because "three competitors are well positioned to check [the merged firm] during the bidding process").

---

that, in fact, it would not be that big here because "sugar would flow in from other places." *See* Tr. 1206:6-12 (Pl. Closing) ("We've all recognized . . . sugar flows" and that were prices to increase in one area "sugar would flow in from other places.").

[14] Plaintiff speculates that the transaction may result in a decrease in quality. Pl. Br. 24-25, 37. No actual customer expressed any such concern.

Plaintiff failed to prove that post-transaction Defendants *likely* will be able to *unilaterally* force customers to pay *substantially* higher prices without losing customers to alternative suppliers. Market conditions in the refined sugar industry are inconsistent with a unilateral effects thesis in the context of a homogenous product because United cannot withhold output, and U.S. Sugar plans to increase output. Plaintiff also failed to establish that any purported lost head-to-head competition or economic analysis supports a theory of unilateral effects. For these reasons, it is not surprising that there simply is no evidence whatsoever that United intends to raise prices if the proposed transaction is allowed to close. DFOF ¶ 200.

### 1. Market Conditions Do Not Support Plaintiff's Unilateral Effects Theory Because The Transaction Will Increase, Not Decrease, Output

Plaintiff's case ignores two fundamental commercial realities: United cannot reduce output because it is obligated to sell all of the sugar produced by U.S. Sugar (and its other members) and U.S. Sugar plans to increase output. For homogeneous products like refined sugar, Plaintiff's Merger Guidelines explain that unilateral effects can arise if a firm can engage in "a unilateral output suppression strategy," HMG § 6.3, meaning it can reduce output to successfully extract a higher price. That is not possible here, and there is no evidence that United has even ever contemplated reducing output post-acquisition. DFOF ¶ 204.

United does not dictate how much refined sugar its members produce, but United must sell all of it. DFOF ¶¶ 23, 202. United cannot withhold supply even temporarily because it is cost-prohibitive for United to store sugar and, regardless, United would eventually have to sell everything it stored anyway at even lower prices. *Id.* Once, seven years ago, United tried storing sugar so it could sell later in the year and it was a financial disaster of high storage costs and the fact that United later had even more sugar it had to sell. *Id.* ¶ 203. So much so that United's members told Mr. Wineinger that he would lose his job if United ever tried something like that

again.  *Id.*  Post-merger, United will have to sell all of Imperial's sugar too, and will have to remain aggressive on price to fulfill its obligations to its members.  *Id.* ¶ 200.

Moreover, U.S. Sugar—which will ultimately control the amount of refined sugar produced at the Port Wentworth facility, as well as its Clewiston refinery—plans to *increase* output after acquiring Imperial.  *Id.* ¶¶ 104-05.[15]  Ordinary course documents and the testimony of multiple witnesses show that increased output is an integral part of the acquisition plan and that U.S. Sugar controls domestic raws which will allow it to implement the plan.  *Id.*

Against this backdrop, Plaintiff has presented no evidence that U.S. Sugar, United, or any of United's other members would, or could, restrict output if the transaction is permitted to close. To the contrary, Dr. Rothman conceded that he was *not* offering an opinion on United's ability to constrain output.  Tr. 678:10-13 (Rothman), and he has not seen a single document indicating that United intends to raise prices or reduce output as a result of the proposed transaction.  DFOF ¶¶ 201, 204.  Dr. Rothman also testified that higher prices would *decrease* the amount of sugar sold, meaning that United would not be able to sell all of its members' sugar if it tried to raise prices.  Tr. 680:2-5 (Rothman).  Thus, Plaintiff's own expert admitted that United would be unable to unilaterally increase prices based on the market dynamics.

### 2. Plaintiff Has Not Established That Any Loss Of Competition Between U.S. Sugar And Imperial Will Result In Higher Prices

Plaintiff contends there is head-to-head competition between the parties today that will not exist post-closing and that, as such, the transaction is likely to lead to unilateral effects.  Pl. Br. at 24-27 (discussing instances where the parties compete which will be lost if the transaction closes).

---

[15] Each of United's four members is financially incentivized to produce as much sugar as it can because each is paid based on the volume of sugar it delivers to United for sale.  DFOF ¶ 24.  A member will receive a higher total payment from United if it produces more refined sugar, so U.S. Sugar will maximize its profits by producing as much refined sugar as possible.  *Id.* ¶ 199.

As a matter of law, however, Plaintiff's burden is not to just show that the parties compete today, but that the loss of this head-to-head competition is *likely* to lead to *substantial* competitive harm in the relevant market—not simply cause a few customers to *potentially* have to solicit bids from new suppliers.  *See Evonik*, 436 F. Supp. 3d at 318 (refusing to block merger despite evidence parties competed head-to-head for "some customers"); *Oracle*, 331 F. Supp. 2d at 1172 (same). Plaintiff's suggestion that some lost head-to-head competition equates to likely unilateral effects is not persuasive for two reasons that are endemic to the refined sugar industry.

### a) The Refined Sugar Industry Features Numerous Competitors Who Already Supply Customers In Plaintiff's Markets Today

The sale of refined sugar is competitive and the evidence confirms that customers can, do, and will continue to turn to other suppliers to defeat any attempt at a price increase, including by turning to particularly "price aggressive competitors" like Cargill and NSM and "disruptor" CSC. DFOF ¶¶ 33, 40, 56.  Indeed, customer testimony presented at trial illustrates the wide number of competitive options customers already have today.  *Id.* ¶¶ 183-85.  Critically, *not a single customer testified that it has concerns that if the transaction closes, it will not have suppliers to turn to obtain competitive pricing for their refined sugar purchases*.  DFOF ¶ 185.

Plaintiff claims to have "numerous examples of head-to-head competition" that prove the transaction will result in unilateral effects, but it only cites four examples in its post-trial brief, and none of them provide evidence that the transaction will result in *customers in the relevant market* paying higher prices (substantial or otherwise).  Notably, only one of those four customers testified at trial about any lost competition—Piedmont.  In fact, beyond Piedmont, which admittedly has unique sugar needs, not a single customer expressed any complaints about the proposed

transaction.  DFOF ¶ 185.  And although Plaintiff laments it "cannot tell every customer's story," it still must carry its evidentiary burden, which it has not.[16]

Plaintiff cites Piedmont as an example of a company that has benefitted from price competition, (Pl. Br. at 25-26), but Mr. Cagle conceded that ███████████████████ ████████████████████████████, and that it has not investigated other options that are available to it, including up to a dozen suppliers closer to it than U.S. Sugar.  Tr. 378:25-379:3, 403:16-404:4 (Cagle/Piedmont).[17]  Plaintiff also cites the fact that United lowered its price to Danone to win business where it thought that Imperial may have been in the mix.  Pl. Br. at 26. But, Ms. Petibon from Danone testified that Imperial was not in the mix because Danone has not solicited bids or purchased any refined sugar from Imperial for at least four years.  DFOF ¶ 182(c). This example also says nothing about the possible price effects from the deal given that Danone testified that it also purchases sugar from ASR, CSC, Zucarmex, and BSYD (an importer of Brazilian sugar), and could pivot to these other buyers.  *Id.* ¶ 184(d).

Despite not calling a witness from the company, Plaintiff suggests Pepsi received a lower price from United due to the presence of Imperial.  There is no evidence to support that claim. United responded to Pepsi's national RFP, which included the Wytheville location as well as 75-80 other locations.  Although Imperial bid only for Wytheville, United evaluated its bid holistically across all locations and focused on Pepsi's overall sugar spend, not any one location.  *Id.* ¶ 195. Moreover, United is serving Wytheville today with sugar from the Red River Valley, not from

---

[16] Tellingly, neither Plaintiff nor Dr. Rothman ever represented that they had any more examples of head-to-head competition that benefitted customers than those they presented.

[17] Piedmont also has unique specification requirements which, when combined with its lack of interest in finding new suppliers, make it an outlier among industrial sugar users and, by its own admission, not representative of the average buyer.  Tr. 399:8-12, 403:16-404:9 (Cagle/Piedmont). Neither Mr. Cagle nor Plaintiff has presented any evidence of another customer with comparable unique purchasing limitations.  *See* Tr. 399:18-400:3 (Cagle/Piedmont).

Florida.  *Id.*  Plaintiff also highlights Bud's Best as a customer that United and Imperial have both supplied in the past.  The evidentiary record on Bud's Best is very thin and, notably, no representative from Bud's Best testified at trial.  Plaintiff has presented no evidence whatsoever that Bud's Best lacks alternative supply options or will be in any way impacted by the transaction.

The many and varied examples of competitive supply alternatives to Imperial undercut any suggestion that the transaction will have unilateral effects.  These numerous other options explain why and how if United raised prices, customers would simply defeat a price increase by purchasing from one of the many other suppliers in the market.  The ability of these other suppliers to compete will only become greater in the future.  LSR—which has particularly aggressive pricing through Cargill—is in the midst of an expansion ████████████████████████████████████████ ██████████████████.  *Id.* ¶¶ 30-33.  And CSC is particularly well-situated with its cost-effective micro-refinery model to quickly move in and take over business when a customer has price or quality issues with a supplier.  *Id.* ¶¶ 56-59.  Here, there are far *more* "well positioned" alternative suppliers than the three remaining competitors that the *Evonik* court found sufficient to reject Plaintiff's unilateral effects theory.  436 F. Supp. 3d at 320.

### b)   Imperial Is Not A Maverick, But Is Instead a High-Cost, High-Priced Competitor

Plaintiff's theory that "United and Imperial are close head-to-head competitors today" also ignores the repeated evidence establishing that Imperial is a high-cost, high-priced supplier—serving primarily a backup or residual role for customers.  Imperial is not substantially constraining prices today.  Courts repeatedly have recognized that a linchpin to finding price effects from the elimination of a competitor is evidence that the competitor to be acquired has itself been aggressive.  *Compare New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 239 (S.D.N.Y. 2020) (rejecting unilateral effects theory where target firm was not a maverick), *with United States*

34

*v. Aetna Inc.*, 240 F. Supp. 3d 1, 43 (D.D.C. 2017) (finding unilateral effects where merging firm had "aggressively expand[ed]," putting it on a "collision course" with other firm); *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 65 (D.D.C. 2015) (finding unilateral effects based on "many specific instances in the record demonstrating fierce competition" and evidence the transaction "removed a key price competitor"); *Staples*, 970 F. Supp. at 1083 (finding anticompetitive effects where the "merger would result in the elimination of a particularly aggressive competitor" and removed competition between "the two lowest cost and lowest priced firms").

Imperial is high-cost because, unlike United, LSR/Cargill, NSM, Michigan, and other domestic suppliers, it is not vertically integrated and has to purchase expensive imported raw sugar from the global market.  DFOF ¶¶ 47, 49-51.  Indeed, Imperial's raw sugar costs are "very high," making "up to 70 to 80 percent of [its] total costs," meaning Imperial generally "can't compete on price" with the other domestic producers who "have an enormous head start."  Tr. 795:22-796:7, 798:5-16 (Gorrell/Imperial); DFOF ¶¶ 49-50.  Imperial also is a "residual" seller that sells most of its sugar later in the year after the cooperatives sell out.  *Id.* ¶¶ 186-87.  As a result, Imperial does not drive prices down in the industry or competitively constrain other firms' pricing, and United itself does not consider Imperial a particularly close competitor.  *Id.* ¶¶ 181-82, 188.

Imperial is far from "an aggressive maverick firm," *Deutsche Telekom*, 439 F. Supp. 3d at 239, and the loss of its limited competition with United will not result in substantial anticompetitive effects because Imperial is not a uniquely or significant competitor today.[18]

---

[18] Plaintiff argues that competition is "[p]oised [t]o [i]ntensify [a]bsent [t]he [t]ransaction" because a few years ago United discussed expanding bagging capacity at Clewiston.  Pl. Br. at 27.  But United abandoned that idea for reasons that had nothing to do with U.S. Sugar's acquisition of Imperial.  DFOF ¶ 197.

### 3. The Economic Evidence Confirms The Transaction Will Not Result In Substantial Unilateral Effects

Dr. Rothman's testimony likewise fails to carry Plaintiff's burden to show that the transaction will likely lead to substantial harm. Plaintiff argues that "a precise quantification of the loss of competition is not required to enjoin a merger." Pl. Br. at 28. That is a red herring. Defendants' point is that, as Dr. Rothman concedes, he conducted *no analysis* of the frequency of head-to-head competition or the significance of that competition at all. Tr. 636:4-20 (Rothman) (conceding that he "hadn't done an analysis that quantifies the . . . total amount of head-to-head competition;" had not attempted to calculate how frequently Imperial lowered its price in response to a United quote; and that he likewise had not attempted to quantify how frequently United competes with Imperial as opposed to other suppliers). This is a remarkable omission given that Plaintiff stakes *its entire unilateral effects case* on the thesis that (1) the parties are "meaningful direct competitors," (Pl. Br. at 24); (2) "direct competition" between the two companies "across the southeast benefits customers," (*id.* at 24-25); and (3) economic analysis "confirms a reasonable probability of harm from the elimination of head-to-head competition," (*id.* at 28). Not having analyzed the frequency with which the parties compete head-to-head, Dr. Rothman has no basis to conclude that Plaintiff's handful of examples of head-to-head competition reflect competitive realities or that the deal is likely to substantially harm competition. *See generally Oracle*, 331 F. Supp. 2d at 1172 (rejecting plaintiff's unilateral effects case where significant head-to-head competition was uncontested, but plaintiff "failed to prove that there are a significant number of customers . . . who regard [the merging firms] as their first and second choices"). This is especially true given that, as Dr. Hill testified, there are at least 430 customers in Plaintiff's alleged Georgia Plus market and 550 customers in Plaintiff's alleged southeast market. DFOF ¶ 192.

Dr. Rothman's analysis based on his second-score bidding model fares no better. To begin with, the model fails a basic reliability check. If well-designed, this model should predict margins for the merging parties that match their actual margins. But Dr. Rothman's model predicts margins that are nowhere close, rendering the model unreliable. DFOF ¶ 213(a). Moreover, the model predicts very low price effects anyway. If applied to all customers in the alleged markets—i.e., the customers Plaintiff claims will be harmed—Dr. Rothman's model predicts a price increase of only 1-2 percent. DFOF ¶ 216. Even that number is an overstatement because it does not factor in competitive pressure from distributors, merger efficiencies, or competitor entry. DFOF ¶ 215. But still, Plaintiff does not even attempt to argue such an increase would be "substantial." Instead, Plaintiff contends that the Court should divide the small predicted price increase among only United's and Imperial's customers, a tactic that inflates Dr. Rothman's prediction to a still very small 3-4 percent effect. Pl. Br. at 30. But that makes no sense when Plaintiff's allegation is that the merger will increase prices to all customers in the alleged markets, not just to Defendants' customers.[19] Nor would it be accurate, as Dr. Hill's models show that even assuming Plaintiff's flawed markets, price effects are "de minimis"—well below 1%. DFOF ¶¶ 211-12.

## B. Plaintiff Failed To Establish That The Transaction Is Likely To Result In Coordinated Effects

Plaintiff argues that, even if it has not proven unilateral effects, the Court should still block the transaction for the "independent" reason that it is likely to result in "anticompetitive coordination between United and Domino." Pl. Br. at 30. To prove that this transaction is likely to substantially harm competition based on a coordinated effects theory, Plaintiff had to show that

---

[19] Plaintiff has effectively abandoned Dr. Rothman's gross upward pricing pressure ("GUPPI") analysis, relegating it to one sentence in a footnote. Pl. Br. at 29 n.10. That is because after Dr. Rothman was forced to fix an error in his calculation, the result failed to show any substantial price effect. DFOF ¶¶ 213(b), 217.

(1) the transaction creates or increases the likelihood of "tacit" coordination between United and Domino to "restrict output and achieve profits above competitive levels," *Evonik*, 436 F. Supp. 3d at 313, and (2) that "the merger may enhance that vulnerability." *Id.* Plaintiff proved neither. No court has ever granted DOJ a permanent injunction solely based on finding that a transaction might result in increased coordinated effects. The facts here do not justify this case being the first.

### 1.   Plaintiff Failed To Prove That The Sugar Industry Is Vulnerable to Coordination

Plaintiff did not prove that there is anything about the sugar industry that makes it any more susceptible to coordination than other industries. Instead Plaintiff points to a handful of internal emails in which United, Domino, and Imperial are purportedly "strategically account[ing] for both the price signals they are sending and the ones they are receiving." Pl. Br. at 32. Ironically, those emails primarily focus on NSM (an entity Plaintiff claims is competitively insignificant) because it competes so aggressively (e.g., *id.* (citing PTX-450, PTX-426)). Regardless, as the Court recognized, this type of behavior is common in virtually every industry. Tr. 1212:16-25 (Pl. Closing). All businesses consider what their competitors are doing and how they might respond to certain actions. That companies make decisions in a "balanced, thoughtful" way (PTX-483; Pl. Br. at 32 (citing same)) is hardly the hallmark of a competition concern and is not enough to block a merger. Plaintiff was required to prove that the specific characteristics of the sugar industry make it vulnerable to actual price coordination. *Evonik*, 436 F. Supp. 3d at 313. It failed to do so.

### a)   United Cannot Withhold Sugar In Coordination With Domino To Increase Price

A coordinated effects theory requires a threshold showing that remaining firms will be able to coordinate "in order to restrict output and achieve profits above competitive levels." *Id.* Plaintiff's cases all recognize that firms must be able to restrict output in order to coordinate within the meaning of Section 7. *See* Pl. Br. at 30-34 (citing cases). Plaintiff's expert agrees. DFOF ¶

218.  Indeed, Dr. Rothman's theory of coordinated effects here relies on an assumption that United and Domino would stop bidding against each other on 30% of opportunities post-merger and that, as a result, United would sell less sugar (PFOF ¶¶ 153-54)—even though, as the Court recognized, there is no evidence that has ever happened or ever would happen.  *See* Tr. 1210:15-23 (Pl. Closing) (Court: "There is no evidence that United, for example, is going to sit out a certain sale so that ASR gets them or vice versa, because United has to sell all of their product. . . .").

A threshold showing of the ability to restrict output is rarely at issue in Section 7 cases because in most industries, firms can easily do so.  Using Plaintiff's cases as examples (Pl. Br. at 32-33), it is relatively easy for baby food companies to make fewer jars; for hospitals to let beds go unused; for tax preparers to offer fewer products for free; and for chemical and tobacco companies to idle plants.  In fact, the defendants in *FTC v. Tronox Limited* had a documented history of slowing plant production precisely to increase prices.  332 F. Supp. 3d 187, 208 (D.D.C. 2018).  But this case is different from the ones that Plaintiff cites because United and other suppliers (including NSM and Michigan) are agricultural cooperatives.

As discussed above, United's cooperative structure and inability to store sugar not only prevent it from withholding sugar from the marketplace, but also require United to sell *even more sugar* post-transaction.  DFOF ¶¶ 202-04.  Moreover, it would make no rational business sense for United (or Domino) to sit out of bids when other major suppliers like NSM, Michigan, and Western also have obligations as cooperatives to sell all their members' sugar and thus could just swoop in and take all of those opportunities.  *Id.* ¶ 220.  Defendants are not aware of any case in which a court has found that an industry is vulnerable to coordination in the face of evidence that the merged entity (and other major industry participants) cannot withhold output.  *Cf. United States v. Archer-Daniels-Midland Co.*, 781 F. Supp. 1400, 1423 (S.D. Iowa 1991) ("This economic

incentive to maintain full production, combined with seasonal excess capacity, works against the likelihood of any collusive price raising scheme which would require output restrictions.").

> **b)** **Numerous Other Characteristics Of The Sugar Industry Alleviate Any Concern That It Is Vulnerable To Coordination**

Wholly apart from United's cooperative structure, there are many other characteristics of the domestic sugar industry that courts have recognized make it not vulnerable to coordination. For example, refined sugar is sold pursuant to confidential RFPs that incentivize suppliers to submit aggressive bids. DFOF ¶ 221; *Evonik*, 436 F. Supp. 3d at 314; *Arch Coal*, 329 F. Supp. 2d at 143-44. The vast majority of refined sugar sales are for large, annual contracts where each sale is high stakes. DFOF ¶¶ 77, 79, 221; *Evonik*, 436 F. Supp. 3d at 314-15. Actual transaction prices between suppliers and customers are kept confidential. DFOF ¶ 221; 436 F. Supp. 3d at 315-16. Refined sugar is sold to sophisticated and powerful customers like General Mills, Kraft, Post, PepsiCo, McKee, and Hershey, which are well-equipped to defeat any attempted coordination. DFOF ¶¶ 80, 221; 436 F. Supp. 3d at 315. And refined sugar sales have heterogeneous and unpredictable pricing—sugar is priced on a delivered basis to specific customer locations that incorporates freight cost and other cost differentials. DFOF ¶ 223; 436 F. Supp. 3d at 316 (finding pricing heterogeneity where freight was a factor). Plaintiff ignores all of these facts.[20]

> **2.** **Plaintiff Is Wrong That United And Domino Are Coordinating Today**

Unable to establish the required predicate facts for a coordinated effects theory, Plaintiff resorts to misstating the evidence and making unfounded accusations of potential antitrust violations. Pl. Br. at 32-33; PFOF ¶¶ 140-41. Plaintiff argues that United and Domino "*already send signals to each other—through an intermediary—about current pricing, future pricing, pricing*

---

[20] A 48-year old consent decree that was never litigated and did not involve any of the parties to this transaction (PFOF ¶ 151) does not establish any relevant history of prior coordination.

strategies and sold positions."  Pl. Br. at 32-33.  Plaintiff also claims this conduct is "*not* acceptable under existing antitrust laws."  PFOF ¶ 140.  None of this is correct.

United and Domino have not "used" a third party to share information with each other; instead, they each provided their own information to Richard Wistisen for his company's monthly industry-wide publication so that the publication would be accurate.  DFOF ¶¶ 231, 236.  None of the information each firm provided—whether about "spot" prices (otherwise known as list prices), sold position or anything else—was competitively sensitive, as all the witnesses confirmed.  *Id.* ¶¶ 232-35.  That information did not impact, or reveal, the specific price that any customer actually paid.  *Id.* ¶¶ 232-33.  Indeed, numerous third parties and the USDA publish information similar to what Mr. Wistisen provides to track trends in the industry.  *Id.*  There is nothing remarkable about monitoring pricing trends in an industry, and that is why courts do not regard it as evidence that an industry is conducive to coordination.[21]  *See Evonik*, 436 F. Supp. 3d at 316 ("Suppliers have information about general pricing trends in the industry and each other's production costs, but systematic attempts by suppliers to track each other's prices have largely failed.").

The communications with Mr. Wistisen do not reflect actual coordination between United and Domino; they do not contain any confidential competitively sensitive information; they did not impact the final price that any customer actually paid for sugar; and they do not change the reality that United cannot withhold output.  They are thus irrelevant to whether U.S. Sugar's acquisition of Imperial is likely to increase coordination between United and Domino.

---

[21] Contrary to Plaintiff's insinuation (PFOF ¶ 140), this conduct does not come close to a Sherman Act violation.  *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978) (even direct information exchanges can "render markets more, rather than less, competitive").

### 3. Even If The Market Were Vulnerable To Coordination, Plaintiff Failed To Prove That The Merger Would Enhance That Vulnerability

Even if the sugar industry were vulnerable to coordination (which it is not), Plaintiff's coordinated effects theory would still fail because Plaintiff failed to prove that the merger will enhance any such vulnerability. *Id*. at 313 (citing HMG § 7.1).

Plaintiff argues that removing Imperial risks increased coordination because today only three players in the market matter, and post-merger there will be just two: United and Domino. Pl. Br. at 33. Plaintiff disregards all other competitors, including NSM, CSC, and Cargill, because they have smaller shares. *Id.* But "the tendency towards anticompetitive coordination 'may well be thwarted by the presence of small but significant competitors.'" *Deutsche Telekom*, 439 F. Supp. 3d at 237 (citation omitted). NSM and Cargill (among others) clearly qualify as "significant competitors"; the very emails Plaintiff cites highlight those two suppliers as among the most aggressive competitors in the marketplace today, and Cargill is in the process of a large expansion. *See, e.g.*, Pl. Br. at 33 (citing PTX-426 (discussing NSM)); PFOF ¶ 144 (citing PTX-406 (Cargill is "the markets [sic] most aggressive sellers")); *id.* ¶ 137 (citing PTX-450 (discussing NSM)).

Because the real-world evidence is that "significant competitors" other than United and Domino will continue to compete post-transaction, it is not enough for Plaintiff merely to argue that coordination will be easier with one fewer firm in the marketplace. Plaintiff's market concentration figures already account for that change. Plaintiff must have "an independent basis to conclude that a merger will increase the likelihood of coordination, apart from whatever evidence [Plaintiff] offers to show undue market concentration." *Evonik*, 436 F. Supp. 3d at 317 (citing HMG § 7.1). Plaintiff had to prove that there is something specific about the loss of Imperial that will make it easier for United and Domino to coordinate. *Id.* It failed to do so. Moreover, where a transaction involves the loss of a firm that does not behave as a "maverick",

courts find that the transaction is unlikely to lead to increased coordination.  *Arch Coal*, 329 F. Supp. 2d at 150; *see Deutsche Telekom*, 439 F. Supp. 3d at 235 (finding remaining pricing mavericks as a reason why increased coordination was not likely).  Imperial is no maverick.

## IV.    THE COURT SHOULD NOT CREDIT DR. ROTHMAN'S TESTIMONY

Dr. Rothman made a series of aggressive and questionable assumptions and decisions, including: (1) excluding all distributor sales from his market share and concentration figures; (2) treating United's independent members as a single entity to evaluate competitive effects; and (3) not choosing the candidate markets for his market definition analysis.  DFOF ¶¶ 127-29, 166(a), 178(a), 179.  Beyond that, Dr. Rothman's opinions in this matter also reflect and incorporate numerous serious errors that qualified economists typically do not make.  These go beyond minor miscalculations and are fundamental errors that undermine the credibility of his analysis in this matter.  To list but a few examples, Dr. Rothman: (1) incorrectly calculated the alleged markets as being "highly concentrated," causing him to retract and issue a "corrected" report; (2) admittedly used the wrong formula in his GUPPI analysis; (3) repeated a prior error by applying the GUPPI to a commodity product; and (4) misinterpreted an economic paper as saying demand for sugar is inelastic, when the paper reported the opposite.  DFOF ¶¶ 213(b), 213(b) n.17, 224 n.18.

This is not the first time Dr. Rothman's work in antitrust matters has been criticized. Several judges have found Dr. Rothman's economic analysis to be flawed: "Dr. Rothman's post-Transaction HHI calculations are not economically sound," Initial Decision at 91, *In re Altria Group, Inc. & JUUL Labs, Inc.*, No. 9393 (F.T.C. Feb. 23, 2022); "Dr. Rothman's study allegedly showing supracompetitive prices is seriously flawed," based on a "bare assertion," and devoid of any "economic analysis," *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, No. 17-205, 2020 WL 3414662, at *4 (S.D. Cal. June 22, 2020); his analysis is "unreliable under the *Daubert* standard and of marginal relevance," *Aya Healthcare Sers., Inc. v. AMN Healthcare, Inc.*, No. 17-

205, 2020 WL 2553181, at *18 (S.D. Cal. May 20, 2020); his product and geographic markets are "ill-conceived," and his calculation of a GUPPI is "unreliable" and inapplicable to the industry at issue, *Evonik*, 436 F. Supp. 3d at 319 & n.33.  No court has relied on Dr. Rothman's opinions with respect to product market, geographic market, or anticompetitive effects in a Section 7 case.

## V.    USDA'S INDUSTRY EXPERT CONFIRMED THAT THE TRANSACTION WILL NOT HARM COMPETITION AND IS LIKELY TO BENEFIT CONSUMERS

With respect to USDA, Plaintiff attacks a strawman.  Pl. Br. at 38-39.  Defendants have never argued that this transaction is "immune" from antitrust scrutiny because USDA operates the Federal Sugar Program.  Defendants' point has always been that, as a matter of law, the Court cannot ignore USDA's role altogether when it scrutinizes the deal under Section 7, no matter how much Plaintiff would like it to do so.  This is not the Defendants' say-so; it is the Supreme Court's.

A merger must be "viewed[] in the context of its particular industry," and only a close "examination of the particular market—its structure, history and probable future—can provide the appropriate setting for judging the probable anticompetitive effect of the merger."  *Brown Shoe*, 370 U.S. at 321-22 & n.38.  The analysis of anticompetitive effects must consider the impact of industry regulation.  *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 411 (2004); *see also United States v. Marine Bancorp.*, 418 U.S. 602, 627, 639 (1974) (review of bank merger "must take into account the extensive federal and state regulation of banks").  That is because regulation can "endow the industry with special characteristics," *United States v. National Ass'n of Broadcasters*, 536 F. Supp. 149, 156 (D.D.C. 1982), which is certainly true here. USDA's regulatory role is important here because (1) USDA has expertise on the sugar industry, and (2) industry actors know USDA intervention can affect the market and that impacts their business decisions.  *Cf. Kaufman v. Time Warner*, 836 F.3d 137, 145-46 (2d Cir. 2016) (finding anticompetitive effects unlikely where regulation limited potential profits).

No one knows the sugar industry better than USDA's economist Dr. Fecso.  She has studied the industry and talked to its participants regularly for the last two decades while she has been running the Federal Sugar Program.  Dr. Fecso confirmed the facts as to why this transaction is not likely to harm competition, wholly apart from any actions USDA might take, including: (1) Imperial is not meaningfully constraining competition today because it is a high-cost, high-priced residual supplier that depends on imported raw sugar, which USDA controls, DFOF ¶ 240(a); (2) U.S. Sugar's acquisition of Imperial is likely to lead to *lower* prices, not higher prices, because U.S. Sugar will give Imperial's facility a domestic source of supply, run the Port Wentworth facility more efficiently, and help lobby USDA for more raw sugar imports, *id.* ¶ 240(b); (3) it would not make any sense for United to try to raise prices post-transaction because sugar would flow into the "southeast" region without any USDA action, drive prices right back down, and ultimately result in United losing sales; Dr. Fecso has observed sugar flowing like this many times, *id.* ¶ 240(c); and (4) it also would not make any sense for United to try to raise prices post-transaction because United knows that could cause USDA to increase supply, which, again, would drive prices back down and jeopardize sales, *id.* ¶ 240(d).

Dr. Fecso also testified that if United did try to raise prices and the domestic supply response were not enough to lower prices, USDA has ample tools available that it could use to increase supply and lower prices.  *id.* ¶ 241.  This type of regulatory backstop—which did not exist in any Section 7 case Plaintiff cites and would come into play only if multiple other competitive bulwarks failed—in no way renders the deal immune from antitrust scrutiny.  But it does disincentivize suppliers from attempting to raise prices, and provides extra insurance to alleviate any possible concern that this deal might result in anticompetitive effects.

MORRIS NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jack B. Blumenfeld*

OF COUNSEL:

Lawrence E. Buterman
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

Amanda P. Reeves
Jennifer L. Giordano
Lindsey S. Champlin
Molly M. Barron
David L. Johnson
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2200

Christopher S. Yates
Kelly S. Fayne
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600

Elyse M. Greenwald
LATHAM & WATKINS LLP
10250 Constellation Boulevard, Suite 1100
Los Angeles, CA 90067
(213) 485-1234

Jack B. Blumenfeld (#1014)
Brian P. Egan (#6227)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
began@morrisnichols.com

*Attorneys for Defendant United States Sugar Corporation*

HOGAN MCDANIEL

*/s/ Daniel K. Hogan*

OF COUNSEL:

Peter J. Schwingler
Jonathan Ripa
STINSON LLP
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
(612) 335-1974

Daniel K. Hogan (#2814)
Daniel C. Kerrick (#5027)
1311 Delaware Avenue, Suite 1
Wilmington, DE 19806
(302) 656-7540
dan@dkhogan.com
dckerrick@dkhogan.com

*Attorneys for Defendant United Sugars Corporation*

RICHARDS, LAYTON & FINGER, P.A.

*/s/ Kelly E. Farnan*

OF COUNSEL:

Christine A. Varney
David R. Marriott
Peter T. Barbur
Timothy G. Cameron
Daniel K. Zach
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019

Amanda L. Wait
Vic Domen
NORTON ROSE FULBRIGHT US LLP
799 Ninth Street, NW, Suite 1000
Washington, DC 20001
(202) 662-4550

Darryl Wade Anderson
NORTON ROSE FULBRIGHT US LLP
1301 McKinney Street, Suite 5100
Houston, TX 77010
(713) 651-5562

Kelly E. Farnan (#4395)
920 North King Street
Wilmington, DE 19801
(302) 651-7700
farnan@rlf.com

*Attorneys for Defendants Imperial Sugar Company and Louis Dreyfus Company LLC*

47

## <u>CERTIFICATE OF SERVICE</u>

        I hereby certify that on May 20, 2022, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

        I further certify that I caused copies of the foregoing document to be served on May 20, 2022, upon the following in the manner indicated:

Laura D. Hatcher, Esquire                          *VIA ELECTRONIC MAIL*
Shamoor Anis, Esquire
UNITED STATES ATTORNEY'S OFFICE
DISTRICT OF DELAWARE
1313 North Market Street, Suite 400
Wilmington, DE  19801
*Attorneys for Plaintiff*

Brian Hanna, Esquire                              *VIA ELECTRONIC MAIL*
John R. Thornburgh II, Esquire
Jonathan Y. Mincer, Esquire
Jessica J. Taticchi, Esquire
Jenigh J. Garrett, Esquire
Chinita M. Sinkler, Esquire
Jill Ptacek, Esquire
Curtis Wayne Strong, Esquire
Michael E. Wolin, Esquire
George C. Nierlich, Esquire
Stephanie E. Pearl, Esquire
Brian R. Young, Esquire
David A. Geiger, Esquire
Robert.Lepore, Esquire
Soyoung.Choe, Esquire
U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
450 Fifth Street, NW, Suite 8000
Washington, DC  20530
*Attorneys for Plaintiff*

Thomas P. DeMatteo, Esquire                                          *VIA ELECTRONIC MAIL*
UNITED STATES DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Avenue NW
Washington, DC  20530
*Attorneys for Plaintiff*

Ryan M. Sandrock, Esquire                                          *VIA ELECTRONIC MAIL*
UNITED STATES DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
450 Golden Gate Avenue
San Francisco, CA  94102
*Attorneys for Plaintiff*


                                        */s/ Jack B. Blumenfeld*
                                        _____
                                        Jack B. Blumenfeld (#10140)