# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA,     )
     )
         *Plaintiff*,     )
     )
    vs.     )
     )   C.A. No. 21-cv-1644 (MN)
UNITED STATES SUGAR     )
CORPORATION, UNITED SUGARS     )   REDACTED - PUBLIC VERSION
CORPORATION, IMPERIAL SUGAR     )   Original filing date: May 20, 2022
COMPANY, and LOUIS DREYFUS     )   Redacted filing date: May 26, 2022
COMPANY LLC,     )
     )
         *Defendants*.     )
     )

## DEFENDANTS' PROPOSED FINDINGS OF FACT

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Brian P. Egan (#6227)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
began@morrisnichols.com

*Attorneys for Defendant United States Sugar
Corporation*

HOGAN MCDANIEL
Daniel K. Hogan (# 2841)
Daniel C. Kerrick (#5027)
1311 Delaware Avenue, Suite 1
Wilmington, DE 19806
(302) 656-7540
dhogan@dkhogan.com
dckerrick@dkhogan.com

*Attorneys for Defendant United Sugars
Corporation*

RICHARDS, LAYTON & FINGER. P.A.
Kelly E. Farnan (# 4395)
One Rodney Square
Wilmington, DE 19801
(302) 651-7700
farnan@rlf.com

*Attorneys for Defendants Imperial Sugar
Company and Louis Dreyfus Company LLC*

May 20, 2022

## TABLE OF CONTENTS

I.  THE REFINED SUGAR INDUSTRY AND ITS PARTICIPANTS ...................................1

    A.  Refined Sugar Overview.................................................................................1

    B.  Key Characteristics Of The Refined Sugar Industry ...............................................1

        1.  Sugar Flows Into And Throughout The U.S. ................................................1

        2.  Many Refined Sugar Suppliers Are Cooperatives .......................................3

        3.  Sugar Producers Are Incentivized To Maximize Output............................3

        4.  Weather Dramatically Impacts Sugar Supply.............................................3

        5.  Refined Sugar Is Highly Regulated In The U.S...........................................4

    C.  Many Refined Sugar Suppliers Throughout The U.S. Compete To Supply Customers .......................................................................................................4

        1.  Vertically-Integrated Producers And Their Marketers ..............................4

        2.  Imperial ......................................................................................................11

        3.  Liquid Sugar Refiners ...............................................................................13

        4.  Distributors ...............................................................................................15

        5.  Foreign Importers ......................................................................................17

    D.  Sales To Refined Sugar Customers..........................................................................18

        1.  Long-Term Contracts And RFPs ...............................................................18

        2.  Blind Bidding RFP Processes ...................................................................18

        3.  Buyer Power Provides Favorable Pricing .................................................19

        4.  Customers Use Cane And Beet Sugar Interchangeably............................20

        5.  Many Customers Use Liquid Sugar ..........................................................20

    E.  USDA Heavily Regulates Refined Sugar Supply .................................................21

        1.  Marketing Allotments Control Supply......................................................23

        2.  Raw And Refined Sugar Imports .............................................................23

        3.  Tier II Sugar Constrains Prices ................................................................24

        4.  Industry Stakeholders Closely Monitor, And Frequently Lobby For, USDA Action .....................................................................................24

II. U.S. SUGAR'S PROPOSED ACQUISITION OF IMPERIAL .......................................25

    A.  U.S. Sugar Is Acquiring Imperial To Improve The Port Wentworth Refinery, Increase Its Sugar Output, And Benefit Customers ..............................26

        1.  Improved Raw Sugar Supply .....................................................................26

        2.  Increased Output At Port Wentworth ........................................................26

        3.     Transportation Cost Savings ...................................................................27

        4.     Better Supply Security For Customers ....................................................27

        5.     Broader Product Slate For Customers......................................................27

   B.     Absent The Transaction, Imperial Faces An Uncertain Future .............................28

III.    PLAINTIFF DID NOT MEET ITS BURDEN TO PROVE EITHER ITS PRODUCT OR GEOGRAPHIC MARKETS ............................................................28

   A.     Plaintiff Failed To Prove That The "Production And Sale of Refined Sugar" Is A Relevant Product Market ....................................................28

        1.     Customers Constantly Substitute Sugar Sold By Non-Producers For Sugar Sold By Producers.....................................................29

        2.     Distributors Use Their Competitive Advantages To Compete .................30

        3.     Distributors Source Refined Sugar From Many Different Suppliers, Including Foreign Imports .........................................................30

        4.     Distributors Compete Against Other Suppliers For Sales To A Wide Range Of Customers ....................................................31

        5.     United's "Chicago Strategy" Confirms Aggressive Competition With Distributors ..............................................................33

        6.     Plaintiff Inconsistently Includes Sales Made By United In Its Product Market Even Though United Does Not Produce Refined Sugar ...............................................................................33

        7.     Plaintiff Ignores Differences Among Wholesale Customers...................35

   B.     Plaintiff Failed To Prove A Relevant Geographic Market Because The Evidence Clearly Establishes That Sugar Flows Throughout The U.S. ...............36

        1.     Plaintiff's Geographic Markets Ignore The Fact That Sugar Flows..........37

        2.     Transportation Costs Do Not Impede Sugar From Flowing .....................38

        3.     Plaintiff's Geographic Markets Ignore The High Likelihood Of Arbitrage And Sugar Flowing Into The Alleged Markets ........................42

        4.     No Ordinary Course Documents Support Plaintiff's "Southeast"............45

        5.     The Only Ordinary Course Document That Supposedly Supports Plaintiff's "Georgia Plus" Market Shows That Sugar Flows...................46

        6.     Plaintiff's Geographic Markets Do Not Include States In Which Imperial And United Both Supply Refined Sugar ....................................47

        7.     Plaintiff Has Not Established That Sugar Prices Are Different In The Alleged Geographic Markets Than Elsewhere .................................47

        8.     Dr. Rothman's Geographic Market Analysis Is Unreliable......................48

9.      Plaintiff Has Presented No Evidence To Support Its New Alleged "USDA South" Market .................................................................49

10.     Dr. Hill's Proposed Alternative Markets Are More Appropriate .............50

C.     Dr. Rothman's Market Concentration Calculations Are Flawed...........................53

IV.   THE PROPOSED TRANSACTION IS NOT LIKELY TO LEAD TO ANTICOMPETITIVE EFFECTS.........................................................................54

A.     The Transaction Is Not Likely To Lead To A Substantial Reduction Of Competition In Any Relevant Market.....................................................55

1.      Imperial Is Not A Constraint On Sugar Prices Today ..............................55

2.      Customers Have, And Will Continue To Have, Many Supply Options.........................................................................................56

3.      United And Imperial Do Not Compete Closely...................................58

4.      There Is Minimal Head-To-Head Competition.........................................59

5.      Plaintiff Has Not Proven That Competition Between Imperial And United Would Intensify But For The Transaction ....................................61

6.      The Transaction Will Lead To Lower, Not Higher, Prices.......................62

7.      Entry And Expansion From Competitors Would Be Timely, Likely, And Sufficient .................................................................63

8.      Dr. Hill's Economic Analysis Confirms That The Transaction Is Not Likely To Lead To Higher Prices ........................................................65

9.      Dr. Rothman's Economic Modeling Is Unreliable ...................................66

10.     Even Dr. Rothman's Economic Modeling Results In Low Predicted Price Increases ..................................................................67

B.     Plaintiff Has Not Proven The Proposed Transaction Will Increase The Probability Of Coordination ...............................................................68

1.      The Sugar Industry Is Not Conducive To Coordination ...........................68

2.      The Proposed Transaction Will Not Remove A Maverick Competitor And Actual Mavericks Will Remain ....................................70

3.      The Information That United And Domino Provided To A Third-Party Industry Analyst Is Not Confidential ..............................................70

4.      Dr. Rothman's Economic Analysis Regarding Coordinated Effects Is Unreliable And Unsupported ...............................................................73

V.    USDA'S INDUSTRY EXPERT CONFIRMED THAT THE TRANSACTION WILL NOT HARM COMPETITION AND IS LIKELY TO BENEFIT CONSUMERS ...............................................................................74

## TABLE OF ABBREVIATIONS

| ABBREVIATION | DEFINITION |
|---|---|
| Amalgamated | Amalgamated Sugar Company |
| ADM | Archer Daniels Midland |
| ASR or Domino | American Sugar Refining, Inc. |
| Batory | Batory Foods |
| Compl. | Complaint (D.I. 1) |
| CSC | CSC Sugar or Sugaright |
| cwt | Hundredweight (100 lbs) |
| Evergreen | Evergreen Sweeteners |
| FOB | Free on board |
| GM | General Mills |
| IFPC | International Food Products Company |
| Imperial | Imperial Sugar Company |
| Indiana | Indiana Sugars |
| Kraft | Kraft Heinz |
| LDC | Louis Dreyfus Company LLC |
| LSR | Louisiana Sugar Refining |
| Michigan | Michigan Sugar |
| NSM | National Sugar Marketing |
| NSP | Net selling price |
| PFOF | Plaintiff's Proposed Findings of Fact (D.I. 215) |
| Piedmont | Piedmont Candy Co. |
| Pl. Br. | Plaintiff United States of America's Post-Trial Brief (D.I. 214) |
| SOF | Parties' Statement of Admitted Facts (D.I. 168-1) |
| Southern Minn | Southern Minnesota Beet Sugar Cooperative |
| Sucro | Sucro Sourcing or Sucro Can |
| SUGAR | Louisiana Sugar Growers and Refiners, Inc. |
| Ton or Short Ton | 2,000 lbs |
| TRQ | Tariff Rate Quota |
| United | United Sugars Corporation |
| U.S. Sugar | United States Sugar Corporation |
| USDA | United States Department of Agriculture |
| Western | Western Sugar Cooperative |

iv

## TABLE OF CONVERSIONS

| CONVERSION | CALCULATION | EXAMPLE |
|---|---|---|
| Pounds (lbs) to Hundredweight (cwt) | Divide pounds by 100 | 100 million lbs equals 1 million cwt |
| Pounds (lbs) to Tons | Divide pounds by 2,000 | 100 million lbs equals 50,000 tons |
| Hundredweight (cwt) to Pounds (lbs) | Multiply cwt by 100 | 1 million cwt equals 100 million lbs |
| Hundredweight (cwt) to Tons | Divide cwt by 20 | 1 million cwt equals 50,000 tons |
| Tons to Pounds (lbs) | Multiply tons by 2,000 | 50,000 tons equals 100 million lbs |
| Tons to Hundredweight (cwt) | Multiply tons by 20 | 50,000 tons equals 1 million cwt |

# I.      THE REFINED SUGAR INDUSTRY AND ITS PARTICIPANTS

## A.      Refined Sugar Overview

1.      Refined sugar is a food-grade sugar that is produced by refining sugar cane or processing sugar beets.  SOF ¶ 49.  Refined sugar produced from sugar beets is chemically identical to that produced from sugar cane.  Tr. 395:19-21 (Cagle/Piedmont); Tr. 74:12-16 (Riippa/GM); Tr. 1023:8-11 (Crown/Post).

2.      U.S. farmers grow sugar cane in Florida, Louisiana, and Texas.  SOF ¶ 50.  After it is harvested, sugar cane is milled into raw sugar at sugar mills, and the raw sugar is refined into refined sugar at refineries.  *Id.* ¶ 52; Tr. 766:5-767:3 (Buker/U.S. Sugar).

3.      U.S. farmers grow sugar beets in eleven states in the West and Midwest: California, Colorado, Idaho, Michigan, Minnesota, Montana, Nebraska, North Dakota, Oregon, Washington, and Wyoming.  SOF ¶ 51.  Once harvested, sugar beets are processed and converted into refined sugar (with no milling process required).  *Id.* ¶ 53.

4.      White granulated sugar, brown sugar, powdered sugar, and liquid sugar are all types of refined sugar.  *Id.* ¶ 54; Tr. 794:9-13 (Gorrell/Imperial).  Brown sugar, powdered sugar, and liquid sugar are produced by further processing granulated refined sugar.  SOF ¶ 85; Tr. 806:14-18 (Gorrell/Imperial).  Liquid sugar can be made by melting granulated refined sugar or refining directly from raw sugar.  SOF ¶ 81; Tr. 1036:7-10 (Farmer/CSC).

## B.      Key Characteristics Of The Refined Sugar Industry

### 1.      Sugar Flows Into And Throughout The U.S.

5.      A nationwide network of railroads, interstate highways, and transfer stations enables customers to buy refined sugar at competitive prices from suppliers located throughout the country. Tr. 552:24-553:6, 554:9-24 (Wineinger/United); Tr. 1109:8-10 (Carter/Cargill) (Cargill's "rail and truck network allow it to distribute sugar throughout the United States"); Tr. 288:2-15

(Henneberry/Imperial) (transfer stations keep costs low and allow for long-distance shipping); Tr. 856:23-857:2 (Fecso/USDA) (agreeing "refined sugar can travel pretty long distances").

6.     Sugar flows throughout the U.S. from areas of surplus to areas of deficit to meet customer demand.  Tr. 927:3-928:6 (Hill) ("extensive evidence" of sugar flowing); Tr. 173:9-174:16 (Swart/ United) (discussing PTX-452, at -449 and how "sugar flows throughout the U.S."); Tr. 552:24-553:6, 554:9-18 (Wineinger/United) ("we can ship sugar quite freely because sugar does flow easily").   As Dr. Barbara Fecso, the chief economist for the USDA Federal Sugar Program, explained, "if there is a shortage of sugar the price will go up and that will attract available sugar from other sources to that area."  Tr. 856:15-22 (Fecso/USDA).  There are "market forces that could cause sugar to flow to areas of tightness."  *Id.* at 855:5-17.  Even Plaintiff acknowledges the market reality that sugar flows.  Tr. 1206:6-12 (Pl. Closing) ("[W]e've all recognized . . . sugar flows" and if prices were to increase in one area, "sugar would flow in from other places").

7.     The southern U.S. is an area of sugar surplus and the northeastern U.S. is an area of sugar deficit.  As a result, sugar moves from the south to the northeast "all the time."  Tr. 815:6-19 (Gorrell/Imperial); DTX-193, at -595.  Sugar also flows from surplus regions in the west and upper-midwest to the east coast and into the south.  Tr. 173:9-174:16 (Swart/United) (discussing PTX-452, at -449); Tr. 217:8-218:10 (Hanson/United) (same).

8.     The reality that sugar flows is evident from the fact that today, nearly half of the sugar sold in Plaintiff's "Southeast" was produced outside of those states and flowed in to meet demand. Compl. ¶ 4, D.I. 1 (13% from United's beet producers, 9% from LSR, 3% from NSM); Tr. 611:19-612:1 (Rothman) (7% from imports, 1% from Michigan, 1% from Western); DTX-517, at 3-4 (█████ ████████████████████████████████████████████); Tr. 918:8-10 (Hill) (total sales in "Southeast" is about 50 million cwt).

9.      Large amounts of raw and refined sugar also flow into the U.S. from abroad.  Tr. 935:19-936:11 (Hill); Tr. 751:11-22 (Olson/Domino); *infra* ¶ 73.  Approximately 40 countries have "preferential agreements" that allow them to export sugar into the U.S. on favorable terms.  Tr. 830:19-831:2 (Gorrell/Imperial); Tr. 870:3-6 (Fecso/USDA).  The U.S. has the highest priced sugar in the world and other countries are always looking to sell refined sugar into the U.S.  Tr. 870:15-871:4 (Fecso/USDA).

### 2.      Many Refined Sugar Suppliers Are Cooperatives

10.     Many sugar suppliers are agricultural cooperatives, including United, NSM, Michigan, and Western.  *See infra* § I.C.1.  Cooperatives sell the refined sugar that their grower-members produce.  Tr. 548:22-25 (Wineinger/United); Tr. 341:3-11, 342:11-13 (Simons/NSM).  Cooperatives do not control the amount of sugar that their members produce each year (the members do) but they must sell all of the refined sugar their members produce.  Tr. 169:5-22 (Swart/United); Tr. 550:3-551:9 (Wineinger/United); Tr. 342:14-25 (Simons/NSM); Tr. 710:17-22 (Figueroa/Michigan).

### 3.      Sugar Producers Are Incentivized To Maximize Output

11.     Because sugar production is a high fixed-cost business, producers have strong incentives to operate their facilities at as close to full capacity utilization as possible.  Tr. 770:15-771:10 (Buker/U.S. Sugar) (U.S. Sugar's fixed costs are the same whether it produces 100 lbs or 1 million lbs).  As U.S. Sugar's CEO, Robert Buker, testified, "we have to run [the refinery] full out," and failure to do so "would be devastating economically because our unit costs . . . would just skyrocket."  *Id.* at 770:13-14, 771:3-6.

### 4.      Weather Dramatically Impacts Sugar Supply

12.     Because refined sugar is derived from agricultural crops that are vulnerable to weather events, the amount of sugar produced each year can, and does, vary dramatically.  Tr. 1130:13-18, 1133:17-23 (Faucheux/LSR) (███████████████████████████████); Tr. 436:4-

11 (Sproull/Domino) (), 438:24-439:7 (

); Tr. 554:25-555:12 (Wineinger/United) (weather events, like

the beet freeze, can impact output); Tr. 710:13-16 (Figueroa/Michigan) (sugar beet crop impacted

by "Mother Nature").  The CEO of NSM testified that

Tr. 345:15-346:9, 353:7-11 (Simons/NSM).

### 5.    Refined Sugar Is Highly Regulated In The U.S.

13.    The sale of raw and refined sugar in the U.S. is heavily regulated.  The Federal Sugar

Program—a series of statutes, regulations, and international trade agreements that govern the

supply of raw and refined sugar in the U.S.—is run by the USDA.  Tr. 851:2-7 (Fecso/USDA); Tr.

797:4-798:2 (Gorrell/Imperial); Tr. 172:2-4 (Swart/United); *see also infra* § I.E.

### C.    Many Refined Sugar Suppliers Throughout The U.S. Compete To Supply Customers

14.    Many types of companies produce and/or sell refined sugar in the U.S. including:

(i) vertically-integrated producers and marketing cooperatives, (ii) import-based cane refiners; (iii)

liquid sugar refiners; (iv) distributors; and (v) importers.  Tr. 802:4-14 (Gorrell/Imperial).

### 1.    Vertically-Integrated Producers And Their Marketers

15.    Vertically-integrated producers have their own domestic supply of raw sugar or sugar

beets.  Tr. 802:25-803:17 (Gorrell/Imperial).  The same is true for marketing cooperatives, which

must sell all the sugar their members produce.  *See supra* ¶ 10; *infra* ¶¶ 202, 220.  Vertically-

integrated producers' access to a dedicated domestic source of raw sugar or sugar beets helps to

keep their costs lower than companies without such access.  Tr. 802:25-803:17 (Gorrell/Imperial).

### a.    U.S. Sugar

16.    U.S. Sugar is a 90-year old farming company located in Clewiston, Florida, that farms

sugar cane, citrus, and sweet corn.  SOF ¶ 1; Tr. 765:15-23 (Buker/U.S. Sugar).  U.S. Sugar's
owners include its employees, a children's hospital, and charities.  Tr. 765:2-9 (Buker/U.S. Sugar).

17.     U.S. Sugar owns and operates a sugar mill and a sugar refinery in Clewiston.  SOF ¶ 3.  It
produces granulated and liquid sugar; it does not produce brown or powdered sugar.  *Id.* ¶ 6.  The
Clewiston refinery produces about 850,000 tons of refined sugar annually, which is less than 7%
of nationwide capacity.  *Id.* ¶ 5; DTX-028, at -022 (total U.S. capacity is 12.9 million tons).

18.     U.S. Sugar does not sell the refined sugar it produces.  Tr. 767:4-10 (Buker/U.S. Sugar).
Instead, U.S. Sugar is a member of United, an agricultural cooperative that markets and sells all
the refined sugar produced by U.S. Sugar and three other members that produce beet sugar.  SOF
¶ 12.  U.S. Sugar has been a member of United since 1998.  *Id.* ¶ 13.

19.     U.S. Sugar currently grows more sugar cane than it can mill or refine and, each year, sells
its excess sugar cane (about 750,000 to 1,500,000 tons) to third-party mills in Florida.  SOF ¶¶ 8,
9; Tr. 769:20-25, 770:4-8 (Buker/U.S. Sugar).  U.S. Sugar's Clewiston refinery cannot refine
additional sugar because it is already operating at full capacity.  Tr. 770:9-14 (Buker/U.S. Sugar).

### b.     United

20.     United is a Capper-Volstead agricultural marketing cooperative based in Edina, Minnesota.
SOF ¶ 14.  It markets and sells all of the refined sugar produced by U.S. Sugar and its three other
members:  American Crystal Sugar, Minn-Dak Farmers Cooperative, and Wyoming Sugar
Company.  *Id.* ¶¶ 12, 15.  United's beet producer members have eight facilities in Minnesota,
Montana, North Dakota, and Wyoming, in an area known as the Red River Valley.  *Id.* ¶¶ 16, 17;
Tr. 124:21-23 (Swart/United).

21.     United sells refined sugar derived from sugar cane and sugar beets across 45 states.  Tr.
552:12-15 (Wineinger/United).  United sells beet sugar from the Red River Valley into Plaintiff's
"Southeast" and sells cane sugar produced in Clewiston inside and outside of the "Southeast."  *Id.*

at 553:20-554:8; PTX-452, at -449 (map of sugar flowing), -460 (map of Clewiston deliveries).

22.     Under their marketing agreements, United's four members agree to contribute all of the refined sugar they produce to the cooperative's refined sugar pool.  SOF ¶ 19.  Each of United's members has appointed United as its sole worldwide agent for the sale and marketing of its refined sugar output.  *Id.* ¶ 21.  United is responsible for marketing all of its members' refined sugar, which includes identifying customer opportunities, and negotiating and selling refined sugar to those customers.  *Id.* ¶ 25.  United—not its members—sets refined sugar prices and decides the customers to which United sells.  Tr. 767:11-16 (Buker/U.S. Sugar); SOF ¶ 25.

23.     United's members—not United—each decide unilaterally how much refined sugar to produce each year.  SOF ¶ 22; Tr. 169:5-11 (Swart/United); Tr. 550:9-11 (Wineinger/U.S. Sugar).  United, however, is obligated to sell all of the sugar produced by its members regardless of the amount produced.   Tr. 169:18-22, 176:12-15 (Swart/United) (United is "[r]esponsible and obligated to sell" all of its members' sugar); Tr. 550:21-24 (Wineinger/United) ("Our mission is to sell all of the sugar that our members produce on an annual basis . . . .").  If United does not sell all of its members' sugar each year, United must pay significant carrying costs—about $4 per cwt—which lowers its members' returns, and still must eventually sell all the sugar.  Tr. 176:24-177:7 (Swart/United); Tr. 550:25-551:9 (Wineinger/United).   When faced with the choice of holding out for a higher price or securing a long-term contract at a lower price, United's sales team secures the contract because it "cannot afford" to try and wait out the market.  Tr. 552:1-11 (Wineinger/United).

24.     All United members are paid the same price for the sale of refined sugar based on a net selling price ("NSP").  SOF ¶ 20.  NSP is the revenue United receives from a sale minus United's costs (e.g., freight costs, packaging, warehousing, and overhead costs).   Tr. 169:23-170:4

(Swart/United).  NSP is **not** the price that a customer pays United, and increasing NSP does **not** mean that any customer pays a higher price.  Tr. 548:14-17 (Wineinger/United); Tr. 170:8-13 (Swart/United).  United's goal is to maximize NSP by selling sugar efficiently, i.e., keeping its costs low, not by raising customer prices.  Tr. 169:23-171:5 (Swart/United).  Each year United pays each member the NSP multiplied by the volume of sugar that the member contributed to the pool.  *Id.* at 127:13-16.  A member will receive a higher share of the pool if it produces more sugar. Tr. 768:11-15 (Buker/U.S. Sugar).

25.     United's members can leave United with one year's notice, and previous members, including Southern Minn, have done so.  Tr. 549:1-10 (Wineinger/United).

### c.     LSR/Cargill

26.     LSR is a joint venture between Cargill and SUGAR, a cooperative of sugar cane growers in Louisiana, that began operations in 2011.  SOF ¶¶ 66-67; PTX-293, at 2(c).  LSR refines the raw sugar that SUGAR produces ███████████████████████████████.  SOF ¶¶ 68-70; Tr. 1105:15-1106:22 (Carter/Cargill); JTX-024, at -324, § 1.1.  LSR operates a refinery in Gramercy, Louisiana ██████████████████████████████████████████ ███.  SOF ¶ 65; JTX-001, at -038.

27.     Cargill sells LSR's refined sugar throughout the U.S., including to customers on both coasts and nearly all states in-between.  Tr. 1111:1-24 (Carter/Cargill); DTX-028, at -024; DTX-025; DTX-026. ████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████.  *Id.*; Tr. 1121:17-20 (Carter/Cargill).

28.     Cargill delivers sugar to customers via rail (70%) and truck (30%), and has distribution terminals in Tennessee and Maryland; storage facilities in Louisiana and Mississippi; and access to multiple third-party terminals.  JTX-001, at -038; Tr. 1108:4-1109:2, 1125:4-10 (Carter/Cargill).

LSR's Louisiana refinery is located on rail lines from which Cargill can access "most other rail lines in the U.S." Tr. 1109:3-10 (Carter/Cargill). Cargill's "rail and truck network" allows it to distribute sugar throughout the U.S. *Id.* at 1109:8-10.

29. LSR currently has capacity to produce approximately ████████████████████ of refined sugar annually, and has plans to expand its output by 20 to 25% ██████████████ ████. Tr. 1112:11-14, 1113:7-1116:6 (Carter/Cargill); DTX-028, at -022 to -025; Tr. 1128:11-1129:12 (Faucheux/LSR); JTX-022, at -176; JTX-050, at 2. ██████████████████ ████████████████████████████████████. Tr. 1128:22-1129:20 (Faucheux/LSR); JTX-022, at -176.

30. LSR's expansion plans at Gramercy include ████████████████████, and adding packaging capability, more railcars, ████████████████. Tr. 1117:23-1118:11, 1132:24-1133:4, 1136:6-19 (Carter/Cargill); Tr. 1132:6-20 (Faucheux/LSR); JTX-022, at -176; JTX-050, at 2. ██████████████████████████████ ███████████████████████████████████. Tr. 1118:12-18, 1135:24-1136:5 (Carter/Cargill).

31. ████████████████████████████████ ██████████████████████████████ Tr. 1113:24-1115:1 (Carter/Cargill); DTX-028, at -023. ████████████████████████ ██████████████████████████. Tr. 1118:19-1119:17 (Carter/Cargill).

32. ████████████████████████████████ ████████████████████████████████████. Tr. 1114:5-1115:6 (Carter/Cargill); DTX-028, at -024. ██████████████ ████████████████████ Tr. 1114:21-1115:1 (Carter/Cargill),

████████████████████████████████████████████████

████████████████ Tr. 1116:13-1117:10 (Carter/Cargill); DTX-028, at -028, -029.

33.     Cargill is frequently recognized as one of the "most price aggressive competitors" and is on a "growth projection." Tr. 177:8-14 (Swart/United); Tr. 1104:17-20 (Carter/Cargill); *see also* Tr. 478:20-479:6 (Speece/United) (discussing PTX-406, at -136). ████████████████████████

████████████████████████████ Tr. 434:10-435:20 (Sproull/Domino).

### d.     Domino

34.     Domino and its affiliates own and operate five sugar cane refineries in Louisiana, Maryland, Florida, New York, and California, and raw sugar mills in Florida. SOF ¶¶ 61-63. Although Domino sources raw sugar domestically, it also imports raw sugar because it cannot purchase enough domestic raw sugar to operate its refineries. Tr. 754:9-11 (Olson/Domino).

35.     In 2021, Domino sold approximately ████████████ of refined sugar to customers in all 50 states. DTX-517, at 1-2; Tr. 420:15-421:4 (Sproull/Domino). Domino's refinery in Louisiana produced over ████████████ of refined sugar in 2021, which Domino sold to customers ████ ████, DTX-517, at 3-4, and Domino's refinery in Florida produced about ████████████ of refined sugar in 2021, which Domino sold ████████. *Id.* at 5-6.

### e.     NSM

36.     NSM is a cooperative and markets the beet sugar produced by its members Southern Minn and Amalgamated. SOF ¶ 77. Southern Minn and Amalgamated produce refined sugar at facilities in Minnesota, Idaho, and California. *Id.* ¶¶ 75, 76. NSM is also the exclusive marketer of refined cane sugar that Sucden Americas, which has operations in Miami, Florida, imports into the U.S. *Id.* ¶¶ 77, 78; Tr. 341:3-11, 343:4-13 (Simons/NSM).

37.     NSM is obligated to sell "all of the refined sugar produced by its members" each year and has no control over the amount of sugar its members produce. Tr. 342:11-20 (Simons/NSM).

38. 

█████████████████████████████████. Tr. 345:10-346:9 (Simons/NSM). ████████████████████████. *Id.* at 347:11-13.

39.   NSM sells sugar "everywhere" in the U.S., including to customers located in ██████ ████████████████████████████████████, among other states.  Tr. 354:25-355:4, 357:9-15 (Simons/NSM); JTX-049 (NSM sales data); JTX-042 (████████████████████████████████████ ██████████████████████████).

40.   NSM competes throughout the country, including in Plaintiff's "Southeast," by transporting sugar by rail from the upper-midwest ███████████ ██████. Tr. 354:22-357:5 (Simons, NSM); Tr. 256:20-257:11 (Hines/Imperial) (NSM competes for sales in Georgia by sending beet sugar in by rail).  NSM's sales in Plaintiff's "Southeast" have tripled from 2019 to 2021.  Tr. 674:19-675:6, 675:13-19 (Rothman).  United considers NSM to be one of its "most price aggressive competitors of late."  Tr. 177:8-14 (Swart/United).

### f.   Michigan

41.   Michigan is a cooperative and must produce as much sugar as it can from its members' sugar beets and then market the entire production.  Tr. 710:17-22 (Figueroa/Michigan).  Michigan has four beet processing plants in Michigan and a liquification facility in Ohio.  SOF ¶ 79.

42.   Michigan currently sells approximately 1.3 billion pounds (13 million cwt) of refined sugar each year, across approximately 25 states in the midwest, northeast, and south, including in Alabama, Florida, Georgia, South Carolina, North Carolina, Tennessee, Kentucky, Virginia, West Virginia, and Maryland.   DTX-244;  Tr.  702:23-703:3,716:15-717:13  (Figueroa/Michigan) (validating DTX-244 as the "best source of information" for where Michigan is selling its sugar).

43.   Michigan is currently expanding its production and sales.  In August 2021, Michigan

announced that it was building a new desugarization facility by Spring 2024 to increase Michigan's annual output by 80 million lbs.  Tr. 713:16-714:6, 714:18-20 (Figueroa/Michigan).  To sell its additional volumes, Michigan is willing to expand the areas in which it sells, including making more sales in states like Tennessee, North Carolina, Virginia, and Georgia. *Id.* at 714:21-715:11.

44.    Michigan has both the ability and desire to sell even more sugar but currently cannot do so because the Federal Sugar Program limits the amount of sugar that domestic processors can sell. Tr. 711:11-712:9, 712:14-18 (Figueroa/Michigan); Tr. 867:8-19 (Fecso/USDA).  USDA can grant Michigan a larger sales "allotment," and, if USDA does so, Michigan will sell more sugar.  Tr. 712:7-18 (Figueroa/Michigan); Tr. 867:20-23 (Fecso/USDA).

### g.    Western

45.    Western is a cooperative that owns and operates four sugar beet plants located in Colorado, Montana, Nebraska, and Wyoming.  SOF ¶ 80.  Western's annual capacity is approximately ███████████████████████████████████████████████.  DTX-028, at -022.

46.    Western competes today for sales into Plaintiff's "Southeast."  For example, ███████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████ (██████████████████████████████████████████████).

### 2.    Imperial

47.    Unlike the producers and suppliers described above, Imperial is an import-based cane refiner that does not own or grow any sugar cane or sugar beets, or process sugar cane into raw sugar.  Tr. 794:2-4 (Gorrell/Imperial); SOF ¶ 36.  Instead, Imperial depends on purchased raw sugar and imports over 90% of the raw sugar needed for its Port Wentworth refinery, near Savannah, Georgia.  Tr. 252:5-13 (Hines/Imperial); Tr. 793:25-794:4 (Gorrell/Imperial).

48.    Imperial is an indirect, wholly-owned subsidiary of LDC.  SOF ¶ 27; Tr. 793:9-10 (Gorrell/

Imperial).  LDC is an indirect, wholly-owned U.S. subsidiary of Louis Dreyfus Company B.V., which is headquartered in the Netherlands.  SOF ¶ 29.  In addition to its refinery, Imperial also leases and operates a sugar transfer and liquification facility in Ludlow, Kentucky.  *Id.* ¶¶ 30, 35; Tr. 793:22-24 (Gorrell/Imperial).

49.     Imperial's reliance on high-cost imports makes it less competitive.  Imperial cannot compete with vertically-integrated cane refiners (like LSR/Cargill) or domestic beet processors (like NSM) because of its higher input costs.  Tr. 798:5-16, 803:8-21 (Gorrell/Imperial) (Imperial "can't compete").  Imperial's documents describe it as an "import-based, price-uncompetitive sugar refinery" that is "structurally uncompetitive."  DTX-219, at -219.

50.     The price of raw sugar comprises about 80% of the delivered price of Imperial's refined sugar.  Tr. 283:20-284:5 (Henneberry/Imperial); Tr. 798:3-16 (Gorrell/Imperial).  Imperial's pricing to customers is thus driven by the ever-changing price for raw sugar in the U.S., which is tracked on a public futures commodity index called the "Number 16."  Tr. 263:1-9 (Hines/Imperial);  Tr.  284:20-285:1  (Henneberry/Imperial);  Tr.  517:22-519:3,  522:5-15 (Henderson/Domino).  Imperial uses a pricing formula based on the Number 16 price which produces "a range of a top and a bottom" that reflects Imperial's margin and other costs; Imperial can negotiate prices within that range but "will not go below th[e] bottom" price that the formula provides.  Tr. 263:1-9 (Hines/Imperial).  Imperial often sees instances where the price of refined sugar sold by vertically-integrated processors is lower than the raw sugar component of Imperial's refined sugar.  Tr. 285:10-15 (Henneberry/Imperial).

51.     Imperial's reliance on high-cost imported raw sugar also impacts Imperial's operations. Because Imperial does not have a reliable supply of raw sugar, it is only able to run its Port Wentworth refinery at about 75% capacity on average (and 60-65% in some years), which

increases its per unit costs.  Tr. 794:5-8, 798:3-10 (Gorrell/Imperial).

52.     Imperial sells refined sugar into more than 40 states, including Texas, Indiana, Pennsylvania, and Ohio, among others.  Tr. 254:12-255:1 (Hines/Imperial); Tr. 287:22-288:1 (Henneberry/Imperial); DTX-516.  Even if operating at capacity (which it is not), Port Wentworth represents only about 7% of estimated nationwide capacity.  DTX-028, at -022.

### 3.     Liquid Sugar Refiners

53.     Numerous U.S. companies convert raw sugar directly into liquid sugar, including CSC, Sucro, and Zucarmex.  Tr. 803:22-804:8 (Gorrell/Imperial).  ████████████████

████████████████████████████████████████████████████████

████████████████████████.  DTX-043, at -466; DTX-041, at -558.

#### a.     CSC

54.     CSC, which began its liquid sugar operations in 2006, is the largest company in the country that refines raw sugar directly into liquid sugar.  SOF ¶ 82; Tr. 1045:25-1046:2 (Farmer/CSC).  CSC refines liquid sugar at refineries in Tennessee, Virginia, Pennsylvania, and Texas.  SOF ¶ 83.

55.     CSC sells liquid sugar to customers located in ████████████████████

████████████████████████████████████████████████████████

████████████████████.  JTX-002, at Tab "LBS by State by Cust."

56.     CSC is an innovator and "disruptor" in the sugar industry.  CSC created a liquid sugar product tailored to customer needs with low production costs.  Its liquid sugar has become the industry standard for almost all dairy products.  Tr. 1048:3-19, 1054:8-1055:4  (Farmer/CSC); DTX-314, at -880-81, -883, -887-88.  Customers like General Mills agree CSC is a "disruptor in the sugar space" because CSC builds facilities close to customers and produces high-quality liquid sugar at a low cost.  Tr. 111:16-112:20 (Riippa/GM); JTX-007, at -407.

57.     CSC has repeatedly won new business by building facilities in close proximity to

customers, within 6 months to a year, and for about $5-7 million dollars (plus the cost of land). Tr. 1047:1-1048:2, 1048:16-1051:21, 1053:17-1054:7, 1055:9-15 (Farmer/CSC); DTX-314, at -895 (███████████████████████████████████████████████████████████); Tr. 804:18-24 (Gorrell/Imperial); DTX-041, at -585 (███████████████████████████████████████). As an example, CSC displaced Domino at a Danone plant in Virginia and then opened a refinery near the Danone plant a year later.  Tr. 1049:8-1050:8 (Farmer/CSC).  Since 2006, CSC has built seven refineries.  *Id*. at 1045:25-1046:25.

58.      CSC's total sales have increased ███████████████████████████████████ ████████.  Tr. 1040:1-8, 1052:22-1053:10 (Farmer/CSC); JTX-002; DTX-314, at -906 (charting CSC's growth); DDX008-20 (showing CSC's rapid growth in alleged "Southeast").

59.      CSC's competitors are threatened by its rapid growth.  █████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ █████████████████████████████████████████████.  Imperial has also lost sales to CSC.  Tr. 804:18-24 (Gorrell/Imperial); Tr. 261:6-19 (Hines/Imperial); DTX-145.

### b.      Sucro

60.      Sucro produces liquid sugar directly from raw cane sugar.  SOF ¶ 84; Tr. 567:22-568:2 (Wineinger/United).  It has a refinery in Lackawanna, New York capable of converting raw sugar into liquid sugar, and plans to develop the facility to produce granulated sugar as well.  *Id.* ¶ 84; DTX-041, at -567; Tr. 941:11-942:8 (Hill).

61.      ███████████████████████████████████████████████████████████████ ███████████████████████████████████.  DTX-043, at -490.  Sucro competes for sales to customers including

Kellogg's and ███████ in Memphis, Tennessee.  Tr. 804:4-24 (Gorrell/Imperial); DTX-066, at Row 25; PTX-370; Tr. 461:18-25 (Speece/United); Tr. 693:12-22 (Rothman).

62.     Sucro has also supplied and competed to supply sugar to other customers in Plaintiff's "Southeast," including Danone and Post.  Tr. 1100:3-9 (Petibon/Danone); Tr. 1023:15-1024:4 (Crown/Post); *see also* Tr. 556:6-10 (Wineinger/United) (United competes with Sucro); Tr. 177:22-178:1 (Swart/United) (same); Tr. 804:16-24 (Gorrell/Imperial) (Imperial competes with Sucro); Tr. 752:16-25 (Olson/Domino) (███████████████).

### c.     Zucarmex

63.     Zucarmex is a vertically-integrated Mexican company that processes sugar cane into raw sugar.  Tr. 802:25-803:7 (Gorrell/Imperial).  Zucarmex recently opened a facility in San Diego, California that refines imported raw sugar into liquid sugar.  *Id.* ████████████████ ███████████████████.  Tr. 436:12-17 (Sproull/ Domino); DTX-041, at -565.

64.     Zucarmex sells imported refined sugar to customers located in the "Southeast."  Tr. 804:25-805:10 (Gorrell/Imperial); Tr. 752:16-25 (Olson/Domino) (███████████████); Tr. 1095:5-14, 1099:10-1100:2 (Petibon/Danone) (Danone purchases from Zucarmex); DTX-039.

### 4.     Distributors

65.     Distributors account for approximately 25% of sales of refined sugar in the U.S., Tr. 807:4-10 (Gorrell/Imperial), which is more than U.S. Sugar and Imperial combined.  *Supra* ¶¶ 17, 52. Distributors purchase refined sugar and sell it, often after further processing or other value-added services, such as packaging, warehousing, grinding into powdered sugar, processing into brown sugar, and/or liquefying into liquid sugar.  Tr. 1061:4-11 (Yonover/Indiana); Tr. 806:4-22 (Gorrell/Imperial).  Distributors selling refined sugar include, among many others:  Indiana Sugars, IFPC, Batory, Evergreen, St. Charles Trading, ICI Foods, Atlantic Ingredients, ADM, Sweetener

Supply, Sweeteners Plus, Pullman, and L&S Sweeteners.  Tr. 805:20-806:3 (Gorrell/Imperial); DTX-043, at -462, -490 (███████████████████████████).

66.      Those distributors, and others, compete for sales in Plaintiff's alleged geographic markets by, for example, leveraging nationwide storage facilities to buy domestic and imported sugar opportunistically when prices are low and selling later when prices are higher or in areas that command higher prices, and offering nationwide shipping using rail transfer stations and trucking fleets.  Tr. 806:4-807:3 (Gorrell/Imperial); Tr. 290:3-21 (Henneberry/Imperial); *see also* Tr. 570:19-571:11 (Campbell/United) (United competes against distributors Evergreen, Batory, and Indiana Sugars in the "Southeast" among others); Tr. 256:17-19 (Hines/Imperial) (Imperial competes against ADM, Batory, ICI, and others).

### a.      Indiana Sugars

67.      Indiana Sugars is a value-added distributor that has been in business for over 100 years. Tr. 1061:4-7, 1064:1-7 (Yonover/Indiana).  Indiana Sugars buys imported and domestic refined sugar from many different sources and packages, liquefies, grinds, warehouses, and distributes it across the country.  *Id*. at 1061:4-11, 1061:23-1062:10; DTX-115 (Indiana Sugars' suppliers).  In 2021, Indiana Sugars sold approximately ███████████ of refined sugar nationwide.  Tr. 1073:6-8 (Yonover, Indiana).  Approximately ██████████ of those sales were to customers in Plaintiff's "Southeast."   JTX-010 (sales into "Southeast").   That represents ████ of sugar sold in the "Southeast."  Tr. 918:4-11 (Hill).

68.      Indiana Sugars has "pretty significantly" increased its sales in the "Southeast" over time. Tr. 1071:2-21 (Yonover/Indiana); JTX-010 (sales into "Southeast").  And, it is planning to build a new facility there within 12-18 months because of its sales success and because it believes it has enough customers there to expand.  Tr. 1063:4-13, 1070:9-1072:4 (Yonover/Indiana).

### b.      Batory

69.     Batory is "one of the largest food ingredient distributors in the United States."  Tr. 323:10-12 (Kling/Batory).   In 2021, Batory purchased refined sugar from ███████████████████ ████████ and sold █████████████████████████████ of refined sugar.  JTX-047, at "summary" tab (purchase data); JTX-046 (sales data); Tr. 325:23-326:2 (Kling/Batory).

70.     Batory has four manufacturing facilities which produce powdered sugar, brown sugar, liquid sucrose, and liquid invert.  These facilities also break down larger shipments of bulk sugar into 50 pound bags and totes. ████████████████████████████████████████. JTX-045; Tr. 326:11-22 (Kling/Batory). ████████████████████████████████████ ████████████████████████████████████████. JTX-045; Tr. 326:11-22 (Kling/Batory).

71.     ██████████████████████████████████████████ ████████████████████████████████████████████████. Tr. 339:21-25 (Kling/Batory); JTX-046. ██████████████████████ ██████████████████ Tr. 329:5-7 (Kling/Batory).

72.     Batory is growing rapidly:  its customer base has grown by more than 10% in the past few years.  Tr. 323:15-23, 324:12-15 (Kling/Batory). ██████████████████████ ████████████████████████████████████████████ █████████████████. ████████████████████████ ██████████████████████████.

### 5.      Foreign Importers

73.     Between 1 million and 1.5 million tons (or 20 million to 30 million cwt) of refined sugar is imported into the U.S. annually, including into Florida, Alabama, and up the East Coast.  Tr. 805:11-19, 814:13-16 (Gorrell/Imperial).  These volumes are primarily sold by distributors.  Tr. 219:10-14 (Hanson/United).  The volume of imports changes based on U.S. prices and USDA's

administration of the Federal Sugar Program; however, U.S. sugar prices are generally the highest in the world and other countries are always looking to sell sugar into the U.S.  Tr. 870:15-871:4 (Fecso/USDA).  Imports account for approximately 7% of sales in both of Plaintiff's alleged geographic markets.  Tr. 611:12-612:1 (Rothman).

### D.    Sales To Refined Sugar Customers

74.    Sugar suppliers sell to a diverse set of customers, including retail, food service, and industrial customers, as well as distributors.  Tr. 535:3-5 (Wineinger/United); Tr. 522:16-25 (Henderson/Domino); Tr. 255:2-9 (Hines/Imperial).

75.    Customers buy refined sugar in bulk, a variety of package sizes, or liquid form, depending on their business needs.  SOF ¶¶ 54, 56.

### 1.    Long-Term Contracts And RFPs

76.    Industrial customers typically issue requests for proposals ("RFPs") and execute supply contracts for their refined sugar purchases.  SOF ¶ 59; *see also* Tr. 256:10-13 (Hines/Imperial); Tr. 456:3-10 (Speece/United); Tr. 741:21-742:7 (Hamill/Kraft); Tr. 1126:12-14 (Carter/Cargill).

77.    Industrial customers generally purchase refined sugar through annual, year-long contracts. Tr. 346:10-15 (Simons/NSM); Tr. 77:15-19 (Riippa/GM); Tr. 372:21-22 (Cagle/Piedmont); Tr. 741:15-20 (Hamill/Kraft); Tr. 1075:15-18 (Bechard/Hostess).

78.    Many large customers, including ▮▮▮▮, Pepsi, and General Mills, use national RFPs, which seek bids for their sugar needs at plant locations throughout the country.  ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮; Tr. 185:21-186:2 (Swart/United); Tr. 80:18-20 (Riippa/GM).

### 2.    Blind Bidding RFP Processes

79.    Sugar suppliers typically do not know who they are bidding against, or the prices submitted by their competitors, because customers use blind bidding RFP processes.  Tr. 167:8-12 (Swart/United) ("[W]e rarely understand who is in"); Tr. 571:18-21 (Campbell/United) ("Majority

of time I don't know who I am competing against."); Tr. 256:14-16 (Hines/Imperial) (Imperial does not know prices submitted by competitors); Tr. 1067:25-1068:7 (Yonover/Indiana) ("Very rarely do we know exactly who we are competing with."); *see also* Tr. 374:7-10 (Cagle/Piedmont) (Piedmont does not tell suppliers who else is competing).

### 3.   Buyer Power Provides Favorable Pricing

80.     Large and sophisticated industrial customers use their buying power to negotiate favorable pricing.  Tr. 106:18-25 (Riippa/GM); Tr. 1079:4-9 (Bechard/Hostess) ("The more you buy . . . the better price you're going to get."); *see also* Tr. 738:1-2, 740:3-9 (Hamill/Kraft) (Kraft has a "large procurement team" ███████████████████); Tr. 523:19-525:8 (Henderson/Domino) (industrial customers negotiate toll agreements that allow them to choose the price at which raw sugar is purchased for their orders).  As an example, ████████████████████

████████████████████████████████████████

███████████████████████████  DTX-098, at -032;

Tr. 119:4-22 (Riippa/GM) (United lost volume because of its "inability to reach target price").

81.     Industrial customers also use volume contracts to obtain favorable pricing.  Under a volume contract, a customer agrees to purchase a particular volume of sugar at a given price.  Tr. 77:23-78:3 (Riippa/GM).  One reason customers enter into blanket volume agreements is for the flexibility to shift sugar among their various locations, depending on business needs. *Id.* at 107:15-108:5.  General Mills uses blanket volume agreements by which it agrees to purchase a set volume across a number of facilities, at specified prices, but has the flexibility to shift sugar among its facilities as needed, e.g., shifting sugar from its Cedar Rapids, Iowa facility to its Murfreesboro, Tennessee facility or vice versa. *Id.* at 77:23-78:3, 103:11-20, 107:1-108:5.

82.     When negotiating a volume agreement that covers multiple facilities, customers care about the overall sugar spend, not the price charged for any one location.  For example, for calendar year

2022, General Mills' blanket volume agreement with United covers nine General Mills facilities. General Mills allowed United to increase the price it charged for sugar delivered to General Mills' Covington, Tennessee facility if United agreed to reduce the price for sugar delivered to other facilities because General Mills cares about its overall sugar spend and not the particular price into any one facility, including Covington.  Tr. 103:11-105:5 (Riippa/GM).  Similarly, with a volume agreement that covers multiple facilities, the price that a customer pays at each location does not matter to suppliers.  Instead, suppliers look at the agreement pricing "holistically" across customer locations.  Tr. 186:3-22 (Swart/United) (discussing Pepsi national RFP).

#### 4.     Customers Use Cane And Beet Sugar Interchangeably

83.     Because cane and beet sugar are chemically identical, *see supra* ¶ 1, most industrial customers can use either one.  Tr. 1023:8-14 (Crown/Post) (Post is "indifferent" about whether it uses beet or cane sugar); Tr. 1086:1-2 (Krause/McKee) (McKee purchases both beet and cane); Tr. 117:19-24 (Riippa/GM); ██████████████████████████████████████

██████████████████.  One customer—Piedmont—testified that it is unwilling to use beet sugar to produce its peppermint puffs; however, Piedmont is "not aware of any" other company that has its same unique product preferences.  Tr. 395:15-18, 396:1-5 (Cagle/Piedmont).

#### 5.     Many Customers Use Liquid Sugar

84.     Many industrial customers, including General Mills, ███, Danone, ████, Unilever, Kellogg's, █████, █████████████, █████, █████████, ████████████, and ████████████████ use liquid sugar.  Tr. 74:22-23 (Riippa/GM); Tr. 1039:10-18 (Farmer/CSC); JTX-002; Tr. 804:16-24 (Gorrell/Imperial); Tr. 1093:9-18 (Petibon/Danone); DTX-028, at -029.  Customers purchase liquid sugar for use in a wide variety of products including ████████████████████████████

████████████████████████████████████████████.  DTX-314, at -885; Tr.

1038:25-1039:9, 1050:9-1051:21 (Farmer/CSC).[1]

### E.   USDA Heavily Regulates Refined Sugar Supply

85.   The U.S. has long had a federal policy to support American farmers, including American sugar cane and sugar beet farmers, to ensure that they can make enough money from their crops to stay in business. Tr. 859:7-17 (Fecso/USDA). At the same time, the federal government wants to ensure that sugar prices do not get too high for the many businesses (known as sugar "users") that buy sugar to use in their products. *Id.* at 860:10-861:10. This federal policy is embodied in the Federal Sugar Program, which is run by USDA. *Id.* at 851:2-7; *see supra* ¶ 13.

86.   Dr. Fecso, the Commodity Analysis Branch Chief of the Economic and Policy Analysis Division of Farm Production and Conservation Business Office at the USDA, testified extensively about the Federal Sugar Program. Tr. 849:20-850:2 (Fecso/USDA). Dr. Fecso is a Ph.D. economist and has worked at USDA for almost 30 years and with the Sugar Program for almost 20 years. *Id.* at 850:3-19. She collects and publishes data on beet and cane processors and refiners and uses that data to forecast supply and demand. *Id.* at 851:8-14. She advises USDA undersecretaries on whether and when to take actions to rebalance the sugar market and increase the supply of sugar. *Id.* at 851:14-25. Dr. Fecso has a long tenure making recommendations to the undersecretaries for the Federal Sugar Program. *Id.* at 852:20-24.

87.   By statute, USDA must ensure that (i) raw and refined sugar prices are above loan forfeiture levels,[2] and (ii) there are adequate supplies of raw and refined sugar in the domestic market. SOF

---

[1]   Plaintiff claims that "80% or more of customers in the relevant markets . . . require dry granulated sugar," PFOF ¶ 166, but there is no evidence to support that proposition. Dr. Rothman testified that 80% of ***the sugar*** sold ***today*** in the alleged markets is dry (not that 80% of customers "require" dry granulated sugar), Tr. 632:19-20 (Rothman), and as the growth of CSC shows, customers are increasingly turning to liquid sugar. *See supra* ¶ 58.

[2]   Under the Federal Sugar Program, beet processors and sugar cane processors can obtain annual non-recourse loans at favorable interest rates. SOF ¶ 88. The beet and sugar cane processors may choose to forfeit their sugar to the USDA in lieu of repaying the loans and interest.

¶ 86.  USDA "manage[s] the program to provide adequate supplies of both raw and refined sugar at reasonable prices."  DTX-278, at -947 (Former Secretary of Agriculture Perdue); *see also* Tr. 862:24-863:5, 872:21-25 (Fecso/USDA); SOF ¶ 94 (USDA may increase Tariff Rate Quote ("TRQ") imports "[w]henever [it] believes that domestic supplies of sugar may be inadequate to meet domestic demand at reasonable prices").

88.     To accomplish these objectives, the Federal Sugar Program gives USDA tools to control the supply of raw and refined sugar that is available for sale.  Controlling supply is one way that the government can also control price.  Tr. 859:18-22 (Fecso/USDA).  If USDA increases the supply of sugar, then prices decline.  *Id.* at 860:5-9.  Conversely, if prices are too high, this indicates that additional sugar may be needed. *Id.* at 862:18-23.  If USDA does not allow sufficient sugar imports or domestic production, then sugar prices will increase.  *Id.* at 858:13-21.  USDA uses its tools to ensure that prices do not get too high (due to undersupply) or too low (due to oversupply).  *Id.* at 862:24-863:5, 865:10-866:8.[3]

89.     USDA monitors industry metrics, including sugar prices, to determine when to increase supply.  Tr. 856:6-14, 866:22-867:3 (Fecso/USDA).  USDA speaks with suppliers and customers every day.  *Id.* at 852:6-12, 861:15-18, 863:13-25; Tr. 751:5-13 (Olson/Domino).  USDA also speaks with sugar industry analysts and reads their publications.  Tr. 877:24-878:5 (Fecso/USDA).  And because beet and cane processors and cane refiners are required to submit detailed information

---

*Id.*  The purpose behind this loan program is to support the price of sugar and provide a guaranteed price floor to producers.  Tr. 859:7-17 (Fecso/USDA).

[3]      One metric that USDA uses to maintain reasonable prices is the "stocks-to-use ratio" or SUR, which is the ratio of ending sugar stocks divided by total use.  Tr. 864:17-20 (Fecso/USDA). Since the 1990s, USDA has managed the Federal Sugar Program to keep the SUR between 13.5% and 15.5%.  *Id.* at 865:18-866:11.  USDA generally considers the prices that result from that range to be reasonable.  *Id.*  When the SUR veers above 15.5% or below 13.5%, USDA will take action to bring the SUR back in range.  *Id.*  However, USDA often takes actions to increase sugar supplies even when the SUR is within the 13.5% to 15.5% range.  *Id.* at 866:16-21; DTX-515, at 26.

to USDA each month, USDA has data going back to 1996 showing producers' stocks, melt rates, production rates, deliveries, and ending stocks.  *Id.* at 898:4-12.

90.     The Federal Sugar Program gives USDA the power to increase sugar supply in three main ways:  (i) marketing allotments for domestic sugar processors, Tr. 867:8-12 (Fecso/USDA); (ii) a system of tariff rate quotas on sugar imports under various World Trade Organization and free trade agreement rules, *id.* at 869:23-870:2, and (iii) control over Mexican imports under agreements known as the U.S.-Mexico Suspension Agreements, *id.* at 873:25-874:11.

### 1.     Marketing Allotments Control Supply

91.     "Marketing allotments" allow USDA to restrict or increase the amount of sugar that domestic processors are permitted to sell.  Tr. 867:8-23 (Fecso/USDA).  Although "marketing allotments" limit the supply of sugar available for sale from domestic sources, USDA can and frequently does increase those limits so that domestic processors can sell more sugar.  *Id.* at 867:8-12; SOF ¶ 87.  For example, in December 2021, USDA increased the overall allotment quantity and reassigned allotments to increase supply, and it did so specifically to address "current high sugar prices."  Tr. 868:4-869:1 (Fecso/USDA); DTX-464, at 2.  This action allowed, for example, Michigan to sell additional refined sugar.  Tr. 868:18-869:15 (Fecso/USDA); DTX-464, at 2.

### 2.     Raw And Refined Sugar Imports

92.     USDA also controls the amount of foreign sugar that can be imported into the U.S. at low or no duty under the TRQ system and the Mexican Suspension Agreements.  Tr. 869:23-872:12, 874:3-11 (Fecso/USDA); SOF ¶¶ 91, 93.[4]

93.     The TRQ system sets the amount of sugar that can enter the country at low or no duty from countries other than Mexico.  Tr.  871:14-872:5 (Fecso/USDA); SOF ¶ 91.  USDA uses several

---

[4]      In the absence of the Federal Sugar Program, imports would flood the U.S. market and prices would crater.  Tr. 870:15-872:3 (Fecso/USDA).

tools to increase TRQs if it determines additional supply of sugar is needed to maintain reasonable prices. *Id.* at 872:9-25. Because TRQ sugar enters the country at low or no duty, it serves as an "effective price constraint in the U.S. marketplace." *Id.* at 872:9-12.

94.     USDA routinely increases the supply of sugar available in the U.S. The March 2022 *Sugar and Sweeteners Outlook* published by USDA identifies over 30 actions to increase imports since October 2007, Tr. 876:14-877:2 (Fecso/USDA); DTX-515, at 26, and these represent only *some* of the actions USDA took during that time. Tr. 876:20-22 (Fecso/USDA).

95.     USDA also controls how much duty-free sugar can enter the country from Mexico. SOF ¶ 93; Tr. 873:25-874:11 (Fecso/USDA). USDA increases the Mexican export limit throughout the year when USDA determines that the U.S. market needs additional supply of raw or refined sugar to maintain reasonable prices. *Id.*; DTX-515, at 26 (USDA increases of Mexican imports).

### 3.     Tier II Sugar Constrains Prices

96.     Sugar in excess of the TRQ amounts can always enter the U.S. at the full-duty rate. Tr. 871:24-872:6 (Fecso/USDA). Such sugar is referred to as "high-tier" or "Tier II" sugar. SOF ¶ 92; Tr. 559:19-24 (Wineinger/United). For practical purposes, there is an unlimited amount of "Tier II" sugar available on the international market for import into the U.S. Tr. 871:24-872:3 (Fecso/USDA) ("unlimited"); Tr. 751:20-22 (Olson/Domino) ("[i]nfinity" available); Tr. 559:25-560:2 (Wineinger/United) ("no limit"). And, as a general matter, the Tier II sugar price functions as a price ceiling on U.S. prices. Tr. 873:21-24 (Fecso/USDA). Sugar suppliers like United consider the price of Tier II sugar when they price their sugar because customers could always buy Tier II sugar. Tr. 560:3-18 (Wineinger/United).

### 4.     Industry Stakeholders Closely Monitor, And Frequently Lobby For, USDA Action

97.     Sugar suppliers are well aware that USDA has the ability to increase the supply of sugar in

the U.S. market and frequently does so.  Tr. 878:20-879:1 (Fecso/USDA); Tr. 558:7-559:11
(Wineinger/United).  For example, Michigan's top sugar seller believes that "[t]o the extent that
domestic production falls . . . USDA has the tools at its disposal to immediately increase imports
from Mexico (both raw and refined) as well as other quota programs to ensure adequate supply."
DTX-034, at -010; Tr. 709:24-710:9 (Figueroa/Michigan).  Other suppliers similarly testified to
the importance of monitoring USDA action.  Tr. 1064:8-13 (Yonover/Indiana) (Mr. Yonover is
"very familiar" with the Program because "it pretty much dictates the entire business"); Tr. 750:12-
751:13 (Olson/Domino) (USDA "manage[s] basically supply and demand in the whole system").

98.     Customers closely monitor USDA action.  For example, General Mills monitors USDA
activity, as the Federal Sugar Program "fundamentally governs how sugar operates in this country
so you become very well versed in that program."  Tr. 85:3-10 (Riippa/GM).  And Piedmont
discusses USDA actions with suppliers because of the effects of those actions on prices.  Tr. 413:8-
414:4 (Cagle/Piedmont); JTX-026, at -002; *see also* Tr. 943:13-944:3 (Hill).

99.     Stakeholders also actively and frequently advocate for USDA to take specific actions.  Both
sugar buyers and sellers lobby USDA with their own views on whether USDA should take actions
to increase the supply of sugar in the U.S.  Tr. 861:15-18 (Fecso/USDA); Tr. 777:14-24
(Buker/U.S. Sugar).  For example, General Mills advocated in early 2021 for USDA to increase
the supply of sugar from Mexico.  Tr. 85:17-86:6 (Riippa/GM).  Domino lobbies USDA for more
raw sugar every day because Domino would like to buy raw sugar at the cheapest price possible.
Tr. 751:5-13  (Olson/Domino).

100.    USDA tries to balance the demands of users and sellers as best it can under the law and
regulations.  Tr. 860:10-21 (Fecso/USDA).

II.     **U.S. SUGAR'S PROPOSED ACQUISITION OF IMPERIAL**

101.    On March 24, 2021, U.S. Sugar signed an Asset Purchase Agreement to acquire Imperial

for $315 million.  SOF ¶ 44.  On December 31, 2021, U.S. Sugar and LDC agreed to amend certain

closing conditions and adjusted the purchase price to $297 million.  *Id.*  Pursuant to an agreement

between U.S. Sugar and United, post-transaction, United will market all of the refined sugar

produced at Port Wentworth on U.S. Sugar's behalf.  SOF ¶ 48.

### A.   U.S. Sugar Is Acquiring Imperial To Improve The Port Wentworth Refinery, Increase Its Sugar Output, And Benefit Customers

102.    U.S. Sugar is acquiring Imperial to integrate its sugar cane farming operations with

Imperial's Port Wentworth refinery to create a more competitive, cost-effective, and efficient

refinery.  Tr. 771:21-773:11 (Buker/U.S. Sugar); JTX-034, at 2.  The transaction will result in a

number of improvements, including the following:

### 1.   Improved Raw Sugar Supply

103.    Imperial has no committed raw sugar source and must buy expensive, imported raw sugar

to make refined sugar.  *Supra* ¶ 47.  U.S. Sugar grows more sugar cane than it can currently process

and refine.  *See supra* ¶ 19.  Under an agreement between U.S. Sugar and SCGC—one of the third-

party mills to which U.S. Sugar sells its excess sugar cane—U.S. Sugar will be able to provide

Port Wentworth with between 1.5 and 3 million cwt of raw sugar each year after the transaction.

Tr. 774:21-775:1 (Buker/U.S. Sugar). SOF ¶¶ 10, 11; DTX-514.  By doing so, U.S. Sugar will be

able to refine all of the raw sugar produced from its excess sugar cane, and provide Port Wentworth

with a more secure supply of raw sugar, allowing Port Wentworth to be less dependent on foreign

imports.  Tr. 771:21-772:4, 775:13-25 (Buker/U.S. Sugar); JTX-034, at 2.

### 2.   Increased Output At Port Wentworth

104.    U.S. Sugar plans to increase Port Wentworth's annual production from 16.1 to 17.5 million

cwt, an increase of 140 million lbs of refined sugar.  Tr. 776:8-10 (Buker/U.S. Sugar); Tr. 839:6-

8 (Smith/U.S. Sugar); JTX-035, at 15; Tr. 1012:13-17 (Hill).  U.S. Sugar intends to make this

increase Port Wentworth's "steady state" production level.  Tr. 776:23-777:10 (Buker/U.S. Sugar).

105.     To achieve this increase, U.S. Sugar will apply the same strategy at Port Wentworth that it deployed successfully at Clewiston:  targeted capital expenditures to improve the capacity utilization of the facility and its operational excellence program.  Tr. 839:15-840:6, 845:17-18 (Smith/U.S. Sugar); JTX-035, at 2, 16.  Between about 2006 and 2019, U.S. Sugar's refinery's production increased from 11.1 million to 17.9 million cwt annually, the number of operating days increased from 310 to 355 days per year.  Tr. 836:8-19, Tr. 838:2-5 (Smith/U.S. Sugar); JTX-035, at 12, 13.  Port Wentworth currently operates on average 300 days per year.  JTX-035, at 15 (2016 to 2020).  U.S. Sugar plans to increase the operating days to 355 per year.  Tr. 838:23-839:3 (Smith/U.S. Sugar).  Port Wentworth will be unable to achieve this increased output and efficiency without U.S. Sugar's investment, expertise, and additional raw sugar.  *Id.* at 840:7-14.

### 3.     Transportation Cost Savings

106.     Adding Imperial's Port Wentworth facility into the United network is expected to result in at least $8-12 million in transportation cost savings by optimizing United's freight economics, which United can pass on to customers.  JTX-034, at 2; Tr. 560:19-561:9 (Wineinger/United). United will not be able to achieve those savings absent the transaction.  *Id.* at 561:5-9.

### 4.     Better Supply Security For Customers

107.     Acquiring Imperial will also provide U.S. Sugar and United with additional supply-chain flexibility to meet demand and protect against weather events that are increasingly frequent in Florida.  Tr. 555:22-556:5 (Wineinger/United); Tr. 772:25-773:7 (Buker/U.S. Sugar).

### 5.     Broader Product Slate For Customers

108.     By acquiring Imperial's Dixie Crystals and Imperial Sugar retail brands, the transaction will expand United's offering of branded sugar that is available for retail customers.  SOF ¶ 96. The acquisition will also allow U.S. Sugar to make products that it does not currently produce at

Clewiston, including brown and powdered sugar, and various sizes of bagged products. Tr. 772:16-17 (Buker/U.S. Sugar).

**B.     Absent The Transaction, Imperial Faces An Uncertain Future**

109.     Imperial has been struggling for the last 20 years.  It went bankrupt in 2001, had a "terrible accident" in 2008, was put up for sale, and then, shortly after it was purchased by LDC, regulatory changes made the outlook for the business "very uncertain." Tr. 794:16-795:11 (Gorrell/Imperial). As a result, LDC and Imperial limit their capital expenditures at Port Wentworth to maintenance and safety, health, and environmental so that the facility is safe to operate. *Id.* at 795:12-796:15.[5]

110.     Due to Imperial's high cost structure, Imperial is principally a residual or back-up supplier, *see infra* ¶ 186, and its customer base is shrinking.  In 2021, Imperial had 208 customers.  That number fell by more than 10%, to 183 customers, for 2022.  Tr. 257:12-21 (Hines/Imperial). Imperial's market share is declining.  Tr. 898:4-22 (Fecso/USDA).[6]

111.     LDC has been trying to sell Imperial over the past five years.  Tr. 795:22-796:7 (Gorrell/Imperial).  Absent acquisition by U.S. Sugar, Imperial's CEO is "quite worried" about Imperial's future prospects. *Id.* at 816:19-23.

**III.     PLAINTIFF DID NOT MEET ITS BURDEN TO PROVE EITHER ITS PRODUCT OR GEOGRAPHIC MARKETS**

**A.     Plaintiff Failed To Prove That The "Production And Sale of Refined Sugar" Is A Relevant Product Market**

112.     Plaintiff only alleged, and Plaintiff's expert testified in support of, only one product market:

---

[5]     Plaintiff emphasizes that Imperial has a "state-of-the-art" packaging facility. Pl. Br. at 35. Imperial rebuilt that only because of a terrible explosion in 2008. Tr. 794:16-24 (Gorrell/Imperial).
[6]     Plaintiff claims that Imperial's shares of the alleged markets have "been stable." Pl. Br. at 35. Dr. Rothman, however, relied on data from 2018 to 2021, during which time Imperial's shares were inflated temporarily due to the beet freeze. Tr. 630:24-631:4, 675:8-12 (Rothman); Tr. 831:8-25 (Gorrell/Imperial) (2020 was an aberration).  Dr. Fecso's opinion, in contrast, is based on monthly data USDA has collected going back decades.  Tr. 898:4-12 (Fecso/USDA).

the "production and sale of refined sugar to wholesale customers."  Tr. 665:22-666:1 (Rothman).

113.    Plaintiff's product market excludes distributors of refined sugar from the market.  Tr. 606:4-17 (Rothman).  That exclusion, however, is at odds with Dr. Rothman's testimony that "any supplier that makes sales to customers in the market is a market participant" and "part of the market."  Tr. 601:6-9, 602:7-8 (Rothman).  It is also inconsistent with Dr. Rothman's admissions that: (i) he "could see a customer choosing to purchase a product from a distributor or from a refiner," *id.* at 609:19-20; (ii) distributors have beaten Imperial for sales, *id.* at 693:12-25; (iii) distributors and refiners bids for the same customers, *id.*; and (iv) "there is some competition" between distributors and refiners for sales to wholesale customers.  *Id.*

114.    Plaintiff's product market is inappropriate because customers do not care whether their supplier also produced the sugar and there is no logical basis to exclude distributors' sales.  Tr. 907:4-14;  917:23-919:8  (Hill).  Plaintiff's  product  market  is  also  flawed  because  it (i) inappropriately treats United and U.S. Sugar as a single entity, *id.* at 914:4-917:22, and (ii) fails to account for the differences among various types of wholesale customers.  *Infra* ¶¶ 131-34.

### 1.    Customers Constantly Substitute Sugar Sold By Non-Producers For Sugar Sold By Producers

115.    Customers do not view non-producers' sugar as different from producer-and-sellers' sugar.  Customers solicit bids for, and purchase refined sugar from, a wide range of entities, including cooperatives that do not produce sugar (e.g., United and NSM), vertically-integrated refiners that produce and sell refined sugar (e.g., Domino), and firms that sell refined sugar but do not produce it, including distributors (e.g., Cargill and Indiana Sugars):

    a.    General Mills has purchased refined sugar from Cargill, Michigan, NSM, United, Western, Domino, Imperial, CSC, Batory, Indiana Sugars, among others.  Tr. 112:24-113:7, 115:3-116:1 (Riippa/GM); JTX-007, at -394, -404.   Only half of those

companies—Domino, Imperial, Michigan, Western, and CSC—sell refined sugar that

they also produce; the others sell refined sugar produced by other companies.

b.   Post buys refined sugar from companies that produce sugar (Michigan, Imperial,
Domino, CSC), and companies that do not (United, NSM, Cargill, Sucro, Sweetener
Supply, and Indiana Sugars).  Tr. 1023:15-1024:8 (Crown/Post).

c.   ███████   solicits bids from entities that produce sugar (███████████), as well as
from entities that just sell refined sugar (██████████████████████████
██████).  ███████████████████████████████████████████.

116.   Customers also purchase sugar from importers who do not produce their own sugar.  For

example, between 2018 and 2021, Danone purchased more than ███████ of organic refined

sugar from BSYD, an importer of Brazilian sugar.  Tr. 1093:19-1094:24 (Petibon/Danone); DTX-

037 (██████████████████████████████████).

### 2.   Distributors Use Their Competitive Advantages To Compete

117.   Distributors have certain competitive advantages over vertically-integrated producers and

marketing cooperatives, which enable them to sell large amounts of refined sugar to customers

throughout the U.S.  Distributors purchase refined sugar at advantageous prices and sell it at times,

or in areas, that command a higher price.  Tr. 324:18-22 (Kling/Batory).  They do so by utilizing

storage and warehousing facilities, and transportation networks, and providing value-added

services (e.g., processing it further into powdered, brown, or liquid sugar).  Tr. 806:4-807:3

(Gorrell/Imperial); Tr. 325:8-11 (Kling/Batory); *see also supra* ¶¶ 65-66.

### 3.   Distributors Source Refined Sugar From Many Different Suppliers, Including Foreign Imports

118.   Distributors purchase refined sugar from many different sources, including a significant

amount of imports.  DDX008-06 (showing that imports constitute the largest source of supply for

distributors).[7]  For example, ███████████████████████████████████

███████████████████████████████████.  Indiana Sugars purchases refined

sugar from "every single U.S. producer of sugar," and also buys imported refined sugar.  Tr.

1061:23-1062:10, 1065:12-1066:9 (Yonover/Indiana); DTX-115 (███████████████████

███████████).  IFPC purchases refined sugar from United, Domino, Western, Cargill, NSM, and

Imperial, as well as from importers.  Tr. 719:18-19, 727:7-11 (Brown/IFPC).

119.   Distributors' ability to purchase large quantities of refined sugar from many different

sources, including foreign importers, gives them independence from any single or group of

domestic producers and allows them to keep their prices competitive.  Tr. 918:17-919:1 (Hill).

████████████████████████████████████████████████████████████

████████████████████    ███████████████████████.  And,

Mr. Yonover explained that "the size of our buys" allows Indiana Sugars to purchase and sell

refined sugar at competitive prices.  Tr. 1069:4-7 (Yonover/Indiana).

### 4.    Distributors Compete Against Other Suppliers For Sales To A Wide Range Of Customers

120.   Distributors compete for sales to wholesale customers of all sizes, including large industrial

customers.  Tr. 1062:11-18 (Yonover/Indiana) (customers range from "little mom and pop food

companies, all the way up to top five consumer packaged goods companies."); DTX-116 (Indiana

Sugars sells sugar to ███████████████████, among others); *see also* Tr. 807:6-10

(Gorrell/Imperial) (rejecting idea that distributors only sell small volumes).

121.   There are many examples of customers purchasing large quantities of sugar from

distributors in the record.  Indiana Sugars sold over ███████████ of refined sugar in 2021 (or █

---

[7]      Plaintiff admits that distributors purchase large amounts of imports.  PFOF ¶ 32
("distributors tend to purchase the majority of these imports").

██████) with a mean shipment size of ██████. JTX-010. More than ████ of its shipments were for ████████████, and ██████████████████ of its shipments were for ████ ██████████ of sugar. *Id.* In 2021, IFPC sold over ██████████ of cane sugar to ████████ ████████; over ████████████ of liquid sugar to ████████████████; and over ████████ ████ of liquid sugar to ██████████████████. DTX-113. And, Generals Mills annually purchases upwards of ██████████ of powdered sugar from ██████. JTX-007, at -404.

122.    Distributors also regularly compete head-to-head against the suppliers from whom they purchase refined sugar.  Indiana Sugars "frequently" competes for customers, regardless of whether its suppliers are competing; indeed, Mr. Yonover explained that Indiana Sugars purchases refined sugar on an FOB basis, keeping its customers' identities confidential, because Indiana Sugars views its suppliers as its competitors.   Tr. 1063:14-1064:7, 1068:5-15, 1069:8-25 (Yonover/Indiana); Tr. 428:15-21 (Sproull/Domino) ("We both sell to [Indiana] and compete against them."); *see also* D.I. 183-1 at 12 (requesting sealing because "Indiana Sugars' competitors are also its suppliers"). ████████████████████████████████████████████ ████████████████████████████████████. ████████████████████████████ ████████████████████████████████████████████.

123.    Distributors compete on price against other suppliers.  For example, ████████████ ████████████████████████████████████████████████ ████████████████████████. ████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████.

124.    Other suppliers view distributors as competitors:  United competes against distributors including  in  Plaintiff's  "Southeast."  Tr.  117:25-180:4  (Swart/United);  Tr.  556:6-19

32

(Wineinger/United) (same).  Imperial also competes against distributors including Indiana Sugars, Batory, Evergreen, ICI Foods, Atlantic Ingredients, and others, Tr. 805:20-806:3 (Gorrell/Imperial), and often sees distributors "competing with us with our own bags later in the year selling them cheaper than we're currently selling them." Tr. 290:3-21 (Henneberry/Imperial); *see also* Tr. 693:12-25 (Rothman) (admitting Imperial competes with distributors).  Michigan "frequently" competes against distributors, Tr. 706:25-707:9 (Figueroa/Michigan), as does Cargill. Tr. 1126:12-14 (Carter/Cargill).  Domino competes with "melt houses" and distributors.  Tr. 428:2-21 (Sproull/Domino); DTX-066 (███████████████████████████████████████████████████ ██████████████████████████████████████████████████).

### 5.   United's "Chicago Strategy" Confirms Aggressive Competition With Distributors

125.   The "Chicago Strategy" refers to an effort by United to compete more aggressively with distributors and sell more bagged sugar directly to small and medium customers in the Chicago area.  Tr. 178:20-179:3 (Swart/United).  Following this strategy, United beat out distributors for bagged sugar sales to customers in the Chicago area, which resulted in lower prices for those customers.  *Id.* at 179:4-10.  Because United was competing more aggressively against distributors for these sales and making more sales to end use customers, distributors bought less of their sugar from United and turned to other suppliers instead.  *Id.* at 179:17-180:4.

126.   Because distributors have many sources of supply beyond United, distributors have continued to compete aggressively in the Chicago area and competition with distributors remains "intense" today.  Tr. 179:17-180:4 (Swart/United); *see also* Tr. 336:13-20 (Kling/Batory) (Batory turned to other suppliers including ███████████████████████████████████████).

### 6.   Plaintiff Inconsistently Includes Sales Made By United In Its Product Market Even Though United Does Not Produce Refined Sugar

127.   Although Plaintiff's product market excludes sales from distributors because they do not

produce refined sugar, it inexplicably **includes** sales made by United, even though United does not produce refined sugar.  Tr. 549:24-25 (Wineinger/United); Tr. 676:10-677:21 (Rothman).[8]

128.    Plaintiff's product market includes sales by United only because Dr. Rothman incorrectly treats U.S. Sugar and United's other members as a single entity with perfectly aligned interests. Tr. 914:4-21, 916:5-917:22 (Hill).  Dr. Rothman, however, conducted no analysis to support his conclusion that all United members should be treated as a single entity for purposes of this case. And, Dr. Hill testified that there can be circumstances on the production side when U.S. Sugar's interests are not always perfectly aligned with the other members of United, but Dr. Rothman's position requires perfect alignment.  *Id.* at 914:4-917:22, 946:8-14.

129.    For example, the members of United do not have perfectly aligned interests when it comes to production decisions.  Tr. 914:14-916:4, 946:8-14 (Hill).  Each member of United independently determines its output.  *Supra* ¶ 23; *infra* ¶ 202.  If, for example, U.S. Sugar unilaterally decides to increase its production while the other members of United keep their production levels constant, total market quantity will increase, putting downward pressure on price.  Tr. 914:8-915:21 (Hill) (discussing DDX008-3, -4).  U.S. Sugar can benefit from this because its higher production means it will get a higher share of United's revenue, while other members will get a smaller share.  *Id.*

130.    The beet freeze in late 2019 and early 2020 provides a real world example.  Tr. 916:5-917:4 (Hill).  The beet freeze severely damaged the sugar beet crop in the upper-midwest and caused United's beet producers to produce less sugar.  U.S. Sugar, based in Florida, was not impacted.  *Id.*; Tr. 554:25-555:15 (Wineinger/United).  The beet freeze, and the resulting decrease in output for United's beet producers, led to an increase in revenue for U.S. Sugar and a decrease

---

[8]    Dr. Rothman also includes in his product market sales made by NSM and Cargill, *see* Tr. 611:19-25 (Rothman), even though they produce no refined sugar.  *See supra* ¶¶ 26, 36, 115.

in revenue for United's beet members.  Tr. 916:7-917:4 (Hill); *see also* DDX008-4.

### 7.      Plaintiff Ignores Differences Among Wholesale Customers

131.    Dr. Rothman includes in his definition of "wholesale customers" industrial food and beverage manufacturers, retailers, food service companies, and distributors, Tr. 668:7-15 (Rothman), even though the only customer evidence that Plaintiff put forward is from industrial customers (i.e., General Mills and Piedmont).  Dr. Rothman performed no analysis to determine if the competitive conditions for the sale of refined sugar to industrial customers are the same as the competitive conditions for sales to other wholesale customers (e.g., retailers), or even whether customers that receive sugar from different modes of transportation (e.g., truck vs. train) are similarly situated.  Tr. 668:7-669:5 (Rothman) ("My analysis was not that granular.").

132.    Sugar suppliers do not believe that all wholesale customers are similarly situated.  Indeed, suppliers view wholesale customers in distinct sales channels (e.g., retail, food service, industrial, specialty, and distributors) differently, and utilize separate sales teams and strategies to sell to them.  This is because the various wholesale customer types have different sugar needs and purchasing practices.  Tr. 166:15-24 (Swart/United); Tr. 214:12-23 (Hanson/United); Tr. 522:16-523:7 (Henderson/Domino); DTX-028, at -027 (███████████████████████████████████████ ██████████████████████████████).

133.    United has separate sales teams for industrial and retail customers.  Tr. 166:15-24 (Swart/United); Tr. 214:12-23 (Hanson/United).  United's EVP of Industrial Sales, Dirk Swart, lacks sales and pricing authority for retail customers.  Tr. 166:15-24 (Swart/United).  United's documents confirm different supply and demand conditions and sales strategies for industrial and retail customers.  *Compare* PTX-452, at -449 ("Industrial Bulk Demand") *with id.* at -451 ("Retail/Foodservice Demand"); Tr. 153:9-15 (Swart/United).

134.    Domino also has different sales teams for grocery, food service, industrial, specialty, and

export sales.  Tr. 522:16-25 (Henderson/Domino); Tr. 430:25-432:4 (Sproull/Domino).  ████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████.  DTX-094, at -296 to -299.

135.   Suppliers also differ in how their sales break down among the various types of wholesale

customers.  Approximately 90% of United's sales are to industrial customers.  Tr. 166:25-167:3

(Swart/United).  In comparison, about half of Domino's sales are to industrial customers (with 15-

25% going to distributors), while the remainder are to food service, grocery, and specialty

customers.  Tr. 522:16-523:14 (Henderson/Domino).  Imperial makes approximately 21% of its

sales each year to retail customers.  Tr. 255:10-12 (Hines/Imperial).

> **B.    Plaintiff Failed To Prove A Relevant Geographic Market Because The
>         Evidence Clearly Establishes That Sugar Flows Throughout The U.S.**

136.   Plaintiff alleged two relevant geographic markets: (i) a "broader" or "Southeast" market

that includes Alabama, Delaware, the District of Columbia, Florida, Georgia, Kentucky, Maryland,

Mississippi, North Carolina, South Carolina, Tennessee, Virginia, and West Virginia, and (ii) a

"narrower" "Georgia Plus" market that includes Georgia and its bordering states of Alabama,

Florida, North Carolina, South Carolina, and Tennessee.  Compl. ¶¶ 31-33, D.I. 1.

137.   Dr. Rothman testified that those two markets, which Plaintiff defined for him, constitute

relevant geographic markets for antitrust purposes.  Tr. 648:5-24 (Rothman).  Dr. Rothman did not

evaluate any other geographic market.  *See infra* ¶¶ 167-68.

138.   Plaintiff's geographic markets fail because the evidence overwhelmingly establishes that

sugar flows throughout the U.S. and customers turn to suppliers located both inside and outside of

Plaintiff's alleged geographic markets for their sugar needs.  *See infra* ¶¶ 139-55.  Dr. Hill testified

that Dr. Rothman's two relevant geographic markets are too "narrow," "flawed," and "arbitrary,"

and proposed two alternative geographic regions as more plausible:  a competitive overlap region

and a national region.  Tr. 909:3-15, 921:10-922:3 (Hill).

### 1. Plaintiff's Geographic Markets Ignore The Fact That Sugar Flows

139.    Sugar flows throughout the U.S. from areas of surplus to areas of deficit.  Indeed, today, nearly half of the sugar sold in Plaintiff's alleged "Southeast" was produced outside of those states and flowed in to meet demand.  *See supra* ¶ 8.

140.    Dr. Fecso also explained that market forces cause sugar to flow from areas of surplus to areas of deficit, Tr. 855:5-17 (Fecso/USDA), and that sugar can flow long distances from where it is produced.  *Id.* at 856:15-857:9 (agreeing that "refined sugar goes where the market wants it to go" and that "the cure for high prices is . . . high prices").  Dr. Fecso has witnessed over and over that when a supplier attempts to raise prices in one area of the country, other competitors will react and come in and sell sugar, which would bring prices down.  *Id.* at 857:10-21 ("market forces work to redistribute sugar to where it's needed").

141.    Large amounts of refined sugar—approximately 20 to 30 million cwt annually—also flow into the U.S. from other countries, and are largely sold to customers by distributors.  *Supra* ¶ 73.

142.    Refined sugar easily flows across the U.S. and suppliers effectively serve customers located far outside of the states near their facilities.  For example:



a.    ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████.[9]

b.    Domino ships ████████ of sugar from ████████ to customers in ████████,
and ████████████ to customers in ████████.  DTX-517, at -3; Tr. 423:7-11,

---

[9]    Plaintiff claims freight lanes from the Gulf to the east are ineffective.  PFOF ¶ 57.  In reality, ████████████████████████████████████████████████
████████████.  DTX-517; DTX-518.  ████████████████████████
████████████████████████████████████████████; *see infra* ¶ 148.

423:18-21 (Sproull/Domino).  Domino has also shipped ██████████ of sugar from ██████ to customers in ██████, and another ██████████ to customers in ██████.  DTX-517, at 5; Tr. 424:7-18 (Sproull/Domino).

c.      Imperial has shipped ██████████ of sugar from Georgia to customers in Texas, over 1,000 miles from its refinery.  Tr. 927:3-10 (Hill); DTX-516, at 1.

d.      NSM rails beet sugar produced in the upper-midwest to customers "everywhere" in the U.S. including ██████████, ██████████████████, ████████ ██████████, and Post in North Carolina.  Tr. 347:25-348:8, 350:7-352:7 (Simons/NSM); Tr. 1030:9-18 (Crown/Post).

e.      United regularly ships beet sugar from the Red River Valley to customers in the "Southeast" including General Mills in Murfreesboro, Tennessee, Pepsi in Wytheville, Virginia, Wal-Mart in Florida, and Post in North Carolina.  Tr. 109:3-11 (Riippa/GM); 186:23-187:8 (Swart/United); Tr. 554:4-8 (Wineinger/United); Tr. 1028:10-14 (Crown/Post).  United also sells cane sugar produced at U.S. Sugar's Clewiston refinery to customers in Michigan, Texas, New York, and elsewhere.  PTX-452, at -460.

143.   The commercial reality that sugar flows long distances is fundamentally inconsistent with Plaintiff's alleged geographic markets.  Because sugar flows, customers can defeat any regional price increase through "arbitrage" and suppliers in all regions will seek out opportunities to sell at higher prices, which will—as a result—defeat any regional price increase.  Tr. 926:16-930:22 (Hill); Tr. 896:24-897:9 (Fecso/USDA); *see infra* § III.B.3.  Indeed, Dr. Rothman admits that suppliers "impose competitive pressure on each other" and "win business even when they are not the closest in terms of transportation."  Tr. 672:21-673:1 (Rothman).

### 2.      Transportation Costs Do Not Impede Sugar From Flowing

144.   Plaintiff bases its alleged geographic markets on the faulty premise that sugar is costly to

transport and customers can only economically buy from nearby refiners.  *See, e.g.*, Pl. Br. at 6-9; PFOF ¶¶ 49-58.  The evidence, however, shows otherwise: sugar flows long distances and many customers purchase from suppliers located outside of their immediate geographic area.  *See supra* § III.B.1, *infra* § III.B.3.

145.    Although customers pay a delivered price for sugar, freight costs represent only about 5% of that delivered price.  Tr. 287:14-21 (Henneberry/Imperial); Tr. 455:12-15 (Speece/United); *see also* Tr. 553:11-19 (Wineinger/United) (sugar is relatively inexpensive to transport).

146.    In some instances, a supplier located closer to a customer may have a "freight advantage," which could allow that supplier to supply the customer more efficiently (i.e., obtain a higher margin).  Tr. 174:17-175:10 (Swart/United).  Having a "freight advantage," however, does not allow a supplier to charge a higher delivered price to a customer or mean that suppliers only sell sugar in areas where they are "freight advantaged."  *Id.*  As Mr. Swart explained, suppliers like United cannot, and do not, hold sugar back to sell it only close to home; they have to sell all their sugar and are looking to maximize their return, whether in states close to home or not.  *Id.* at 174:3-16.  Other suppliers corroborated Mr. Swart's testimony:

    a.     LSR/Cargill and Domino sell sugar throughout the entire U.S., undermining Plaintiff's "freight advantage" theory.  *See supra* ¶¶ 27, 35.

    b.     Although NSM's sales are largely in two-thirds of the U.S., it sells "everywhere" and "look[s] for opportunities anywhere. . . that make[] business sense."  Tr. 347:25-348:8 (Simons/NSM).

    c.     Although Michigan primarily sells sugar in the Midwest, Michigan must sell all its members' sugar and sells sugar outside the Midwest including into states like Tennessee, North Carolina, Virginia, and Georgia, in order to do so.  DTX-244 (sales

data, "Ship To City" column); Tr. 716:15-717:13 (Figueroa/Michigan) (agreeing the "data is the best source" of "where Michigan Sugar is selling").

147.    Plaintiff agrees that transportation costs do not dictate which suppliers can serve a given customer.    PFOF ¶ 129 ("transportation costs are not 'the only thing that matters' for competition . . . suppliers find other ways to impose competitive pressure on each other").    And, the data show that the supplier with the lowest transportation costs to serve a particular customer does not always, or even usually, win the business.    For 89% of the customers that United supplies, it does not have the lowest transportation costs.    Tr. 672:18-21 (Rothman); *see also* Tr. 215:18-20 (Hanson/United) (freight is not the only factor that affects a supplier's ability to compete); Tr. 1007:22-1009:4 (Hill) (same).

148.    Shipping shorter distances is also not always cheaper than shipping longer distances because "different shipping lanes, railways, they have different costs and sometimes it can be less expensive to go further in terms of miles."    Tr. 423:12-17 (Sproull/Domino).    For example,

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ .

149.    For Imperial, in particular, freight charges "are negligible" compared to the differences in Imperial's and other suppliers' costs.    Tr. 801:20-802:3 (Gorrell/Imperial).    Even if Imperial has a locational or "freight advantage" due to its proximity to a customer, Imperial may "still be unable to compete" because of its higher input costs.    Tr. 292:5-14 (Henneberry/Imperial).    For example:

a.    In 2022, Imperial was one of the closest suppliers to Kraft's Delaware facility ████████

████████████████████████████████ .    ████████████████████████████████

███████████████████████████████████████████

███████████████████████.

b.   Imperial is not competitive on price into Post's Asheboro, North Carolina facility, even though it is one of the closest suppliers.  Tr. 1030:19-1031:15, 1034:17-1035:2 (Crown/Post); Tr. 260:6-18 (Hines/Imperial) (Imperial received feedback from Post that its prices were "too high"); DTX-145, at -424.

c.   Imperial's CEO has also observed instances when sugar shipped from Idaho was sold in North Carolina and Georgia for less than what Imperial pays to acquire raw sugar. Tr. 813:21-814:16 (Gorrell/Imperial).  And, Mr. Henneberry testified that although Diamond Crystal Brands (DCB) is located only 8 miles from Port Wentworth, Imperial competes with beet sugar from the Red River Valley and cane sugar from Florida, and does not always win DCB's business.  Tr. 288:16-289:8 (Henneberry/Imperial).

150.   Although Dr. Rothman initially tried to justify Plaintiff's geographic markets on the basis that refined sugar is costly to transport, he later abandoned that theory.  In his initial report, Dr. Rothman justified Plaintiff's geographic markets on the basis that: (i) "refined sugar is costly to transport which means that geographic proximity to wholesale customers matters," Tr. 669:21-25 (Rothman); (ii) "as a consequence of where United and Imperial operate refineries, they're both relatively well situated to supply wholesale customers in the Department of Justice's alleged markets," *id.* at 670:1-9; and (iii) customers will tend to purchase from suppliers that are closer to them that can supply at a lower overall cost, so competition can differ geographically."  *Id.* at 670:10-15.  In his reply report, however, Dr. Rothman undermined the very foundation of his (and Plaintiff's) regional market rationale by opining that: (i) "a supplier with a transportation cost disadvantage can exert competitive pressure by offering a competitive price and earning a lower

margin"; (ii) "suppliers can exert competitive pressure even if they do not have the lowest transportation costs"; and (iii) "there are many potential reasons why a supplier might be willing and able to offer a competitive bid that is unrelated to freight cost."  *Id.* at 671:19-672:8.  There simply is no logical rationale underpinning Plaintiff's alleged geographic markets.

### 3. Plaintiff's Geographic Markets Ignore The High Likelihood Of Arbitrage And Sugar Flowing Into The Alleged Markets

151.    Plaintiff's geographic markets also fail to account for the reality that sugar would flow from outside the alleged markets into those markets in response to a price increase.  Tr. 926:11-927:17, 934:19-937:18 (Hill); *see also supra* ¶ 8 (today, nearly half of the sugar sold into Plaintiff's "Southeast" originates from outside those states).

152.    Customers located in Plaintiff's alleged geographic markets already source substantial quantities of refined sugar from suppliers located outside of the alleged markets:



a.    ███████████████████████████████████████████

███████████████  ███████████████████████. Cargill also ships

sugar to Post in North Carolina, Tr. 1028:15-1029:15 (Crown/Post), General Mills in

Tennessee, Tr. 108:25-109:15 (Riippa/GM), and ███████████████████

███████████████. ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████. *See supra* ¶ 32.

b.    ████████████████████████████████████████████

████████████████████████████████████████████

███████████. Tr. 354:25-355:15 (Simons/NSM).  NSM is delivering beet sugar from

Idaho or Minnesota to █████████, ████████████████, ████████████,

and Post in North Carolina.  *Id.* at 355:16-356:14; Tr. 1030:9-18 (Crown/Post); ██████████████████████████.

c.   Michigan already sells refined sugar into Plaintiff's alleged "Southeast," *see supra* ¶ 42, and ██████████████████████████████████████████ ████████████████████████████████████████.

d.   United ships beet sugar from the Red River Valley into Plaintiff's "Southeast."  *See supra* ¶¶ 21, 142(e), 149(c).  In 2019, United shipped 4.4 million cwt of refined sugar from the Red River Valley into Georgia, South Carolina, North Carolina, Tennessee, Alabama, Mississippi, and Kentucky.  PTX-452, at -461.

e.   Indiana Sugars sells refined sugar to companies including ██████████████ ████████████████████████████████████████ Tr. 1072:5-13 (Yonover/Indiana) (discussing DTX-116, ████████████████); *see supra* ¶¶ 67-68.

f.   ██████████████████████████████████████████████ ████████████████████████████████████████████.

g.   ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████ ██████████████████ ██████████████████████.

h.   Importers currently account for 7% of sales in both Plaintiff's "Southeast" and "Georgia Plus" markets in 2021. Tr. 611:12-612:1 (Rothman).  Customers, including Danone, already purchase refined sugar directly from importers.  Tr. 1093:19-1095:4 (Petibon/Danone); DTX-039; DTX-037, at "pivot" tab; DTX-038, at "pivot" tab;

Tr. 428:2-9 (Sproull/Domino) (Domino competes against imports).

153.    The many suppliers currently selling into Plaintiff's alleged geographic markets from elsewhere (Cargill, NSM, Michigan, Western, Indiana Sugars, Batory, and other distributors) could easily make additional sales into Plaintiff's alleged geographic markets if demand conditions so warranted.  For example:

a.    In 2021, Cargill shipped . DTX-518.  Those railcars could easily stop along the way.

b.    In 2021, Domino shipped ████████████████████████████████████ ██████████████████████████████████████████████. DTX-517.

c.    Suppliers like Cargill, CSC, Indiana Sugars, and ████████ are expanding and ████████ ██████████████████████████████████. *See supra* ¶¶ 29-32, 57-59, 68, 72.

d.    Importers could also redirect imports to ports located in the alleged geographic markets. Tr. 935:19-936:11 (Hill); Tr. 813:24-814:16 (Gorrell/Imperial).   In 2020, importers brought 18 million cwt of refined sugar into states other than the "Georgia Plus" area, which they could instead deliver into that region.  Tr. 935:21-936:11 (Hill).

154.    If prices were to rise within Plaintiff's alleged geographic markets, customers also have the ability to pick up refined sugar at locations outside of those markets and move it in.  Today, 30-35% of customers pick up sugar at their supplier and 3% of customers pick up sugar at a supplier location outside of Plaintiff's geographic markets and move it in.  Tr. 936:12-22 (Hill).

Distributors, for example, often buy sugar FOB so they can then resell anywhere.  Tr. 1069:8-16 (Yonover/Indiana); Tr. 1119:3-17 (Carter/Cargill) (█████████████████).

155.    Customers with multiple locations could also purchase sugar outside of Plaintiff's alleged markets and transport it to their locations inside the alleged markets to avoid a price increase.  Tr. 936:23-937:18 (Hill).  More than 75% of sugar purchased in Plaintiff's alleged geographic markets is bought by customers with locations outside of those markets, enabling customers to shift supply among their plants located inside and outside of Plaintiff's geographic markets to defeat any price increase.  *Id.*; *supra* ¶ 81 (General Mills has the ability to shift sugar among plants).

### 4.    No Ordinary Course Documents Support Plaintiff's "Southeast"

156.    There are no ordinary course business documents in this case that support Plaintiff's contention that the "Southeast," as defined in the Complaint, is a relevant geographic market.  Dr. Rothman admits that he has not identified a single document that labels the "Southeast" as the set of states that Plaintiff has defined as the "Southeast."  Tr. 662:22-663:4 (Rothman).

157.    In the ordinary course, Imperial does not define a region as the "Southeast."  Tr. 255:19-21 (Hines/Imperial).[10]  Neither do other suppliers.  NSM does not think about the "Southeast" in the way that Plaintiff has alleged.  Tr. 349:12-16 (Simons/NSM).  █████████ ordinary course documents do not match Plaintiff's alleged geographic markets either: █████ puts Texas and Florida in one region and considers Delaware and Virginia to be in the same region as Maine.  ███ ████████████████████████████.

---

[10]    Plaintiff claims that Imperial executives "reviewed" a map that defined Imperial's "Primary Marketing Region" as states in the "broader market."  Pl. Br. at 10.  But McKeany-Flavell (not Imperial) created the map; it contains inaccuracies; and Imperial never used it in the ordinary course.  Tr. 227:14-25, 262:2-13 (Hines/Imperial).  Plaintiff also asserts that ██████ "defined a 'Southeast' region" of "the exact same states as the narrower market."  Pl. Br. at 10; PFOF ¶ 71.  But again, McKeany-Flavell created that map, not █████ ████████████.

### 5. The Only Ordinary Course Document That Supposedly Supports Plaintiff's "Georgia Plus" Market Shows That Sugar Flows

158.    Plaintiff's "Georgia Plus" market is based almost entirely on a single slide within a single United presentation. PTX-452, at -448. This "Supplier Backyards" slide was part of a presentation prepared in March 2020 when United and U.S. Sugar were discussing a potential expansion of Clewiston's bagged sugar capabilities. *Id.* at -429; Tr. 216:8-11 (Hanson/United). Prior to that presentation, United had never grouped states in the way that they are shown on the "Supplier Backyards" slide, and United has never grouped states in the same way again. Tr. 172:13-18 (Swart/United) ("[W]e have never done this before and haven't done it since.") (discussing PTX-452, at -448). The author of the "Supplier Backyards" slide, Steve Hanson, testified that the slide is not the way that United typically categorizes states. Tr. 217:1-4 (Hanson/United).

159.    Mr. Swart testified that the colored regions on the "Supplier Backyards" map reflect United's "assessment at a point in time" of where various suppliers would have a "freight advantage," but do not reflect where producers actually sell.   Tr. 172:5-12, 174:3-16 (Swart/United). The slide right before the "Supplier Backyards" map shows the U.S. regions divided in a ***different*** way. PTX-452, at -447; Tr. 171:19-172:4 (Swart/United); Tr. 216:20-25 (Hanson/United). And the slides that follow use arrows to show that refined sugar flows across the country from areas of surplus to areas of deficit, as shown below, PTX-452, at -449, -450:



6.      **Plaintiff's Geographic Markets Do Not Include States In Which Imperial And United Both Supply Refined Sugar**

160.    Plaintiff's alleged geographic markets arbitrarily exclude states where Imperial makes large quantities of sales but include states where Imperial makes few sales.  Tr. 922:24-923:17 (Hill).  For example, Plaintiff's "Southeast" excludes three of Imperial's ten largest states by sales volume—Texas, Indiana, and Pennsylvania—but includes states where Imperial made few sales, like Alabama.  *Id.*; Tr. 692:9-18 (Rothman); DTX-516.  In the mid-Atlantic, Plaintiff excludes Pennsylvania and New Jersey, but includes Maryland and Delaware where the parties have significantly less sales.  Tr. 924:2-16 (Hill); DTX-516.  The alleged "Southeast" and "narrower" regions exclude 33% and 47% of Imperial's sales, respectively.  Tr. 696:5-10 (Rothman).

7.      **Plaintiff Has Not Established That Sugar Prices Are Different In The Alleged Geographic Markets Than Elsewhere**

161.    Plaintiff attempted to define a "price discrimination" market, which is a geographic market defined around the location of customers.  Tr. 920:10-17 (Hill).  In a price discrimination market, "prices may differentially change for a group of customers in [that] particular geographic market."  *Id.*  If prices have historically been significantly higher in the proposed market, it may indicate that the area is subject to price discrimination.  *Id.* at 908:11-21, 928:7-18.

162.    Plaintiff did not demonstrate that its alleged markets are proper price discrimination markets.  As Dr. Hill explained, his analyses show that prices historically have not differed inside and outside of the alleged markets.  Tr. 928:19-929:19 (Hill) ("there is no meaningful differences in prices between the states in Dr. Rothman's regions and the states that border it"); DDX008-14.

163.    Dr. Hill also evaluated a "natural experiment" of the 2019/2020 beet freeze, which showed the consequences of a supply shortage in one area of the country.  Tr. 930:4-931:6 (Hill).  After performing a regression analysis and graphical analysis, Dr. Hill concluded that prices "seemed to adjust nationally rather than regionally" and did not differ by region.  *Id.*, *see also id.* at 931:11-

15, 932:8-10; Tr. 555:13-21 (Wineinger/United).  That is, "prices are equalized across all the regions." Tr. 936:17-18 (Hill).[11]  This is consistent with the fundamental reality that sugar flows throughout the U.S. from areas of surplus to areas of deficit.  *Supra* ¶¶ 139-40.

164.    Dr. Hill is familiar with the indicia of a proper price-discrimination market and testified about the characteristics of such a market in *FTC v. Tronox*.  There, Dr. Hill found, and the court agreed, that a price discrimination market of North America was appropriate for chloride titanium dioxide because: (i) the industry had "broad recognition" of North America "as a separate region of interest"; (ii) prices in North America varied "significantly compared to other regions and over time it was as high as 20 percent above other regions"; (iii) a natural experiment of lost production from a plant fire in Europe caused prices to substantially rise in Europe, but not in North America; and (iv) there were essentially no imports of the product into North America.  Tr. 932:24-933:21 (Hill).  Here, Dr. Hill concluded that Plaintiff's proposed geographic markets do not meet the requirements for a proper price discrimination market because there is no history of regional price differences and they ignore the likelihood of arbitrage.  *Id.* at 922:19-23; 928:7-933:21.

165.    Dr. Rothman put forward no analysis demonstrating that prices have ever been meaningfully higher in either of Plaintiff's alleged geographic markets than in other parts of the country.  Tr. 932:8-23 (Hill).

## 8.    Dr. Rothman's Geographic Market Analysis Is Unreliable

166.    Dr. Rothman's opinions regarding the relevant geographic markets are unreliable and should be disregarded for at least the following reasons:

    a.    Dr. Rothman did not apply economic principles to identify a candidate geographic market, as he testified was proper to do.  Instead, Plaintiff's lawyers provided him with

---

[11]    Plaintiff's claim that Dr. Hill did not conclude that prices "equalize" and did not study actual prices is inexplicable, PFOF ¶ 63, as he testified to both.  *See supra* ¶¶ 162, 163.

markets that they defined and he "evaluated" them.  Tr. 592:8-14, 648:5-14 (Rothman).

Dr. Rothman only assessed whether or not the markets given to him passed his

application of a hypothetical monopolist test; he did not test any market narrower than

the alleged markets to see if it passed the hypothetical monopolist test.  *Id.* at 650:21-

24.  Dr. Rothman's approach was improper.  Tr. 909:8-15, 921:10-922:6 (Hill).

b. Dr. Rothman has no opinion as to whether either of the geographic markets is superior

to the other, and he has not identified one market as better suited to assess the effects

of the transaction than the other.  Tr. 658:1-19 (Rothman).

c. Dr. Rothman does not have a Ph.D in economics, and multiple courts have disagreed

with his economic analysis in merger cases, finding his opinions "unreliable."

Tr. 642:22-24, 688:20-689:13 (Rothman).

### 9. Plaintiff Has Presented No Evidence To Support Its New Alleged "USDA South" Market

167. Plaintiff's complaint does not allege that the "USDA South" is a relevant geographic

market.  Compl. ¶¶ 29, 31-33, D.I. 1 (alleging only "Two Relevant Geographic Markets").

Nonetheless, Plaintiff now argues for the first time that the "USDA South" *also* constitutes a

relevant geographic market.  PFOF ¶ 48. Plaintiff, however, has not provided any expert testimony

or other evidence that the "USDA South" is a relevant geographic market.  Critically:

a. Dr. Rothman did not evaluate the "USDA South" as a geographic market.  Tr. 591:20-

592:14 (Rothman) ("[T]he United States defined two markets, and I evaluated whether

those markets are well-defined . . . ."); *id.* at 650:25-651:6 (admitting that he only

"evaluated the markets the United States has alleged").  Dr. Rothman did not perform

a hypothetical monopolist test for the "USDA South" or attempt to calculate whether

arbitrage renders that area an inappropriate market.  *Id.*

b.     Neither Plaintiff nor Dr. Rothman presented any market shares for competitors in the "USDA South." Tr. 611:10-612:1 (Rothman) (shares for two alleged markets only).

c.     Dr. Rothman has not presented any evidence of prices being meaningfully higher in the "USDA South" than elsewhere, nor has he calculated any alleged price effects resulting from the proposed transaction in the "USDA South." *See* Tr. 686:13-21 (Rothman) (discussing effects of the transaction on Plaintiff's alleged markets only).

168.    There is insufficient data in the record on any unalleged geographic markets, including the "USDA South," as discovery was largely limited to the two alleged markets. *See, e.g.*, JTX-042



(                      ); JTX-010 (                ); DTX-039 (                  ).

169.    Although Plaintiff's failures of proof doom its attempt to allege a new geographic market, the "USDA South" would also exclude states where Imperial has higher market shares than states included in the market. For example, the "USDA South" would exclude 5 of Imperial's top 15 states by volume (Indiana, Pennsylvania, Ohio, Missouri, and New Jersey) but include states where Imperial has few sales (Delaware, West Virginia, and the District of Columbia). DTX-516.

## 10.    Dr. Hill's Proposed Alternative Markets Are More Appropriate

170.    Dr. Hill identified two alternative plausible markets that are more appropriate than Plaintiff's proposed markets: (i) a "competitive overlap" region and (ii) the entire United States. Tr. 909:17:24, 939:12-940:15 (Hill).[12]

---

[12]    Dr. Hill has a Ph.D. in economics from Johns Hopkins University, Tr. 900:19-23 (Hill), and worked for over a decade as an economist at the U.S. Department of Justice Antitrust Division and the Federal Trade Commission. *Id.* at 900:24-901:10. Dr. Hill has worked on more than 100 mergers. *Id.* at 901:15-18. Multiple courts have accepted his opinions in antitrust cases, including his testimony regarding product and geographic markets, and whether an industry is susceptible to coordination post-transaction. *Id.* at 901:19-902:5, 932:24-933:21, 969:11-970:6.

### a.    A "Competitive Overlap" Region Is A More Plausible Geographic Market

171.    To assess where the transaction is likely to affect competition, it is reasonable to define the market around the area where the merging parties' sales overlap.  Tr. 939:7-11 (Hill).  Looking at Imperial's sales data and where its sales overlap with United's sales, Dr. Hill identified an area of "competitive overlap."  *Id.* at 938:25-939:6, 909:17-24.  This consists of all the states in Plaintiff's "Southeast" market plus Arkansas, Indiana, Louisiana, Michigan, New Jersey, Ohio, Oklahoma, Pennsylvania, and Texas.  DDX008-18.  This competitive overlap area captures 95% of Imperial's sales by volume.  DTX-516.  Dr. Hill testified that this is a more plausible geographic market than the markets Plaintiff identified.  Tr. 938:20-23 (Hill).

172.    Dr. Rothman does not dispute that Dr. Hill's "competitive overlap" region is based on the principle of identifying states that both parties supply, and agrees that the "competitive overlap" region would pass his hypothetical monopolist test.  Tr. 657:11-13, 659:3-7 (Rothman).

173.    Using Plaintiff's conservative approach of incorrectly excluding distributors' sales and grouping together United's members' sales, the 2021 market shares for Dr. Hill's "competitive overlap market" are:  Domino (27%), United (26%), Imperial (11%), Michigan (9%), Cargill (8%), Imports (8%), CSC (6%), NSM (4%), and Western (2%).  Tr. 992:17-994:1 (Hill) (discussing Hill Report Figure 23).  The HHI calculations for this region do not lead to a presumption of harm under the Horizontal Merger Guidelines.  *Id.* at 939:25-940:15, 942:10-943:4.  The post-merger HHI in this market is 2,360, and the change in HHI is 574.  *Id.*; DDX008-19; *see also* Tr. 994:2-17 (Hill) (discussing Hill Report Figure 24).

### b.    A National Region Is Also An Appropriate Geographic Market

174.    Dr. Hill also testified that a geographic region consisting of the entire U.S. would be more appropriate for assessing the competitive effects of the proposed transaction than either of

Plaintiff's markets. A U.S. market would take into account sugar flowing long distances, suppliers shifting sales throughout the U.S., arbitrage from imports, customers with multiple facilities throughout the country, and customers arranging their own transportation. Tr. 910:3-17, 934:19-937:18 (Hill). Dr. Rothman admitted that the entire U.S. would pass his hypothetical monopolist test. Tr. 651:25-652:9 (Rothman).[13]

175.    In a national market, it is not necessary for a supplier in California to be as competitive in Florida as a supplier located in Florida. Tr. 910:3-17 (Hill). Instead, the question is whether prices equalize nationally as a result of competitive dynamics. *Id.* That can occur where producers redirect sales to different parts of the country, even if there is not direct head-to-head competition between suppliers on the coasts. *Id.* If there is evidence that prices adjust nationally, then it is not feasible for suppliers to raise price in an isolated part of the country. *Id.* at 929:20-930:3. The beet freeze shows that sugar prices adjusted similarly nationally, not just in the upper-midwest area where the freeze occurred. Tr. 930:4-22 (Hill); DDX008-15; Tr. 554:25-555:21 (Wineinger/United); *see supra* ¶¶ 130, 162-63.

176.    Other evidence supports a national market: because sugar flows across the country, the USDA thinks about the market "nationally in the aggregate." Tr. 857:18-858:1 (Fecso/USDA). For the same reason, United considers the market for refined sugar to be "a national market." Tr. 555:13-21 (Wineinger/United). U.S. Sugar also believes that buyers and "everyone else" view sugar supply and demand nationally. Tr. 779:5-8 (Buker/U.S. Sugar).

177.    Even using Plaintiff's approach of incorrectly excluding distributors' sales and grouping

---

[13]    Plaintiff claims that Dr. Hill "takes no . . . position" on whether there is a national market. PFOF ¶ 64. But Dr. Hill testified that Plaintiff's alleged markets are inappropriate and the entire U.S. or the "competitive overlap market" are both "more plausible" than Plaintiff's alleged markets. Tr. 909:3-6, 909:17-24, 921:10-922:23; 938:16-23; 939:25-940:15 (Hill).

together United's members' sales, the market shares in the U.S. for 2021 are as follows:  Domino
(25%), United (25%), Imperial (6%), Michigan (5%), Cargill (7%), Imports (8%), CSC (4%),
NSM (15%), Western (4%).  Tr. 992:17-994:1 (Hill) (discussing Hill Report Figure 23); *id.* at
994:2-17 (Hill) (discussing Hill Report Figure 54).  The HHI calculations for a national market do
not lead to a presumption of harm under the Horizontal Merger Guidelines.  *Id.* at 939:25-940:15,
942:10-943:4.  The post-merger HHI is 2,044, and the change in HHI is 323.  *Id.* at 939:25-940:15;
DDX008-19; *see also* Tr. 994:2-17 (Hill) (discussing Hill Report Figure 54).

### C.   Dr. Rothman's Market Concentration Calculations Are Flawed

178.   By limiting the alleged geographic markets to unduly narrow and arbitrarily selected states,
Dr. Rothman generates unreliable and inflated market shares and market concentration predictions.
Tr. 921:7-9 (Hill).[14]  Dr. Rothman's market share and market concentration calculations are flawed
and do not accurately reflect competition for the supply of refined sugar for many reasons:

a.   Dr. Rothman incorrectly excludes sales by distributors to wholesale customers, which
inflates the parties' market shares and overstates market concentration.  Tr. 918:12-15,
919:2-8 (Hill); Tr. 666:2-9 (Rothman).  Plaintiff conceded that it does not have
evidence reflecting distributors' market shares as downstream suppliers, and did not
include those numbers in its market share calculations.  Tr. 1143:5-11 (Pl. Closing);
Tr. 664:22-24 (Rothman).

b.   The market concentration calculations inappropriately group together all of United's
sales.  Tr. 676:10-18 (Rothman).  This has the effect of overstating market
concentration.  Tr. 917:5-22 (Hill).

---

[14]   Dr. Rothman's market share calculations have been rejected before:  the Administrative
Law Judge in the proposed merger of Altria and JUUL Labs "disagreed" with Dr. Rothman's
market share calculations.  Tr. 689:3-6 (Rothman).

c.      The calculations also group together all importers as a single entity, Tr. 611:10-612:1 (Rothman), which also inflates market concentration.

d.      Although there is no evidence that shares remain stable or static in sugar industry, Dr. Rothman's market concentration calculations are static and based on a single year: 2021. Tr. 674:5-675:2 (Rothman). Dr. Rothman did not take into account increasing competition, including from NSM and CSC. *Id.* at 675:15-676:9. Nor did he account for fluctuations in market shares, including those related to weather events which are prevalent in the industry. *Id.*

179.    Dr. Rothman has not analyzed market concentration statistics for any proposed markets other than the two geographic markets alleged in the complaint. He did not evaluate concentration in the "USDA South." Although Dr. Rothman testified that, in a market composed of the "USDA South," "the post transaction HHI would be greater than 2,500 and the change in HHI would be greater than 200," Tr. 614:2-7 (Rothman), there is no evidence in the record, including market shares or HHI calculations, to support those assertions. Dr. Rothman did not provide the pre-merger HHI, post-merger HHI, or change in HHI underlying that assertion. *Id.* Nor did he identify the market participants, market shares, or time periods associated with his claim. *Id.* Moreover, any estimate Dr. Rothman offered regarding the "USDA South" would still be flawed and overstated because he excluded non-producers from all of his calculations and always combined sales by United's members. *See supra* ¶ 178(a)-(b).

## IV.   THE PROPOSED TRANSACTION IS NOT LIKELY TO LEAD TO ANTICOMPETITIVE EFFECTS

180.    U.S. Sugar's proposed acquisition of Imperial is unlikely to substantially reduce competition in any relevant market, lead to higher prices, or increase the likelihood of coordination. *See, e.g.*, Tr. 906:8-18, 910:18-911:9, 911:22-912:20 (Hill).

A.      **The Transaction Is Not Likely To Lead To A Substantial Reduction Of Competition In Any Relevant Market**

1.      **Imperial Is Not A Constraint On Sugar Prices Today**

181.    Imperial is an import-based cane refiner and its higher costs translate into higher prices for customers.  Tr. 793:25-794:4, 798:3-16 (Gorrell/Imperial); *see supra* ¶¶ 47-51.  Imperial regularly receives feedback from customers that its prices are too high, and nearly all of the customers who testified at trial said that Imperial is not competitive on price:

    a.      Imperial has not been competitive on price for ▮▮▮▮▮ business, and ▮▮▮▮▮ has not purchased any refined sugar from Imperial, since at least 2016.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

    b.      Imperial has not been competitive on price into Post's Asheboro, North Carolina facility despite being one of the closest suppliers.  Tr. 1030:19-1031:20, 1034:17-1035:2 (Crown/Post).

    c.      Imperial's bids for Hostess's Columbus, Georgia facility are "higher" than bids received from other suppliers.  Tr. 1081:12-1082:4 (Bechard/Hostess).

    d.      Imperial is the most expensive supplier into ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ for 2022.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

    e.      Imperial's pricing to General Mills is higher than other suppliers, and General Mills' view is that Imperial "doesn't price its refined sugar to win General Mills' business."  Tr. 114:4-11 (Riippa/GM).

182.    Customer testimony also shows that Imperial is not acting as a competitive constraint on sugar prices today:

    a.      Imperial is consistently the highest priced bidder into Hostess's Columbus, Georgia facility, and as a result, Mr. Bechard could not say that he would prefer to have Imperial

as an independent, active refiner in the market. Tr. 1084:10-14 (Bechard/Hostess).

b.  ██████████████████████████████████████████
██████████████████████████████████████.

c.  Danone has not solicited bids from, or purchased any refined sugar from, Imperial since
at least 2018, and Imperial does "not . . . compete for Danone's business." Tr. 1096:19-
1097:18 (Petibon/Danone).

d.  General Mills has not contracted with Imperial for any bulk sugar for 2022 and ██████
██████████████████████████████. Tr. 119:23-120:6
(Riippa/GM); JTX-008.

e.  ██████████████████████████████████████████
██████████████████████████████████████████
██ . ████████████████████████████████████
██████████████████████████ . ████████
██████████████████████████ .



## 2. Customers Have, And Will Continue To Have, Many Supply Options

183. Today, wholesale customers in Plaintiff's alleged geographic markets seek bids, and
purchase refined sugar from, a wide range of suppliers, and will continue to do so if the transaction
is permitted to close. *See generally supra* § I.C. The following entities, among others, currently
sell into Plaintiff's alleged geographic markets and will remain options for customers after the
transaction: LSR/Cargill, Domino, NSM, Michigan, Western, CSC, Sucro, Zucarmex, Indiana
Sugars, Batory, Evergreen, and a host of other distributors and importers. *See id.*

184. Customer witness testimony confirms that customers have, and will continue to have, many
supply options:

a.  Post purchases sugar from NSM, Michigan, Cargill, Imperial, Domino, CSC, Sucro,

Sweetener Supply, Indiana Sugars, and United.  Tr. 1023:15-1024:8 (Crown/Post).

b.   Hostess receives bids from NSM, Domino, Michigan, Indiana, "local guys," Pullman Sugar, and Cargill.  Tr. 1076:13-1077:1 (Bechard/Hostess).  Mr. Bechard testified that getting quotes from just one or two other suppliers would give him leverage to effectively negotiate against United, Hostess's current supplier.  *Id*. at 1080:6-10.

c.   For 2022, General Mills contracted to purchase bulk refined sugar from ███████, ██████, ██████, ████████, and ██████ (but not Imperial).  Tr. 119:23-120:6 (Riippa/GM); JTX-008 (awards for 2022).  General Mills has historically purchased refined sugar from Michigan, United, NSM, Cargill, Western, Domino, Imperial, CSC, Batory Foods, and Indiana Sugars.  Tr. 115:11-116:10 (Riippa/GM); JTX-007, at -394; JTX-009, at -438.

d.   Danone has solicited bids to its Florida and Virginia plants from ████████████████████████████████████████████.  DTX-039.  Danone has purchased sugar for those two plants from ████████████████████████████████████.  DTX-037; DTX-038; DTX-039; Tr. 1097:19-1099:16 (Petibon/Danone).

e.   ██████████████████████████████████████ ████████████████ ████████████████████████████████.

f.   McKee typically contracts with four suppliers ████████████████████████, Tr. 1087:14-1088:3 (Krause/McKee), and ████████████████████████████ ████████████████████████.  DTX-239 ("Contracting" tab).

g.   Piedmont solicits bids for its Lexington, North Carolina facility from ████████████████ ████████████████████████████████.  *See* JTX027; DTX-248; DTX-249.  And, if needed, Piedmont can receive quotes from other suppliers to ensure a competitive price for sugar.  Tr. 400:14-18, 406:5-9 (Cagle/Piedmont).

185.    Not a single customer testified that it has concerns that if the transaction closes, it will not have suppliers to turn to obtain competitive pricing for their refined sugar purchases.  Indeed, not a single customer other than Piedmont, which admittedly has unique requirements, Tr. 399:18-400:3 (Cagle/Piedmont), had any complaints about the proposed transaction.

### 3.    United And Imperial Do Not Compete Closely

186.    Imperial's high-cost structure means that it is typically a residual seller or back-up supplier.  Tr.  807:22-808:14  (Gorrell/Imperial);  Tr.  255:22-256:9  (Hines/Imperial);  Tr.  287:7-13 (Henneberry/Imperial); *supra* ¶¶ 47-51.  Because of this, it generally sells smaller volumes to customers.   Tr.  956:16-957:7  (Hill);  Tr.  807:25-808:18  (Gorrell/Imperial);  Tr.  1033:10-23 (Crown/Post) .  United, in comparison, sells larger volumes pursuant to long-term contracts.  Tr. 956:16-957:7 (Hill).

187.    Suppliers with access to domestic sources of raw sugar, including United, typically sell their sugar earlier in year.  Tr. 556:23-557:18 (Wineinger/United).  Imperial generally sells its sugar later in the year (late summer and early fall) after domestic processors are at the end of their campaigns.  Tr. 285:24-286:21 (Henneberry/Imperial) (Imperial is "relegated to waiting" until later in the year to make sales); Tr. 808:1-14 (Gorrell/Imperial) (same).

188.    Because of the discrepancy in timing and nature of their sales, United and Imperial are not close competitors.  Tr. 556:20-557:12 (Wineinger/United) (United does not consider "residual sellers," like Imperial, "to be particularly close competitors to United"); Tr. 955:10-14 (Hill) (United and Imperial are not "close competitors").

189.    ███████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████ . ████████████████████████████

███████████████████████████████████████████████████████

███████ .  ████████████████████████████████

████████████████████████ .  ██████████████████

██████████████████████████████ .

### 4.   There Is Minimal Head-To-Head Competition

#### a.   Dr. Rothman Did Not Analyze The Frequency Of Head-To-Head Competition

190.   Dr. Rothman failed to perform any analysis quantifying how often Imperial and United compete head-to-head in Plaintiff's alleged geographic markets; how often either company has lowered prices in response to competition from the other; or whether the merging parties more frequently compete against other suppliers.  Tr. 635:16-637:6 (Rothman).[15]

191.   Dr. Rothman identified from documents 17 instances of what he deemed to be "direct" competition between United and Imperial.  Tr. 637:7-638:24 (Rothman).  There was no testimony from 13 of those customers.  One of the customers that Dr. Rothman identified as evidence of "switching" between Imperial and United was Danone.  *Id.*; *see also id.* at 639:4-640:12.  But Imperial has not bid to supply Danone in years.  Tr. 1095:23-1097:12 (Petibon/Danone).

#### b.   Plaintiff Has Not Proven Meaningful Head-To-Head Competition Between United And Imperial

192.   There are approximately 550 wholesale customers in Plaintiff's "Southeast" and 430 in Plaintiff's "Georgia Plus" market.  Tr. 957:11-17 (Hill).  Of those customers, Plaintiff points to a handful of "examples" of "head-to-head" competition between United and Imperial that

---

[15]   Plaintiff claims that Dr. Hill found that "United overlaps on 54% of Imperial customers in the narrower market and 56% of Imperial customers in the broader market."  PFOF ¶ 109.  That is incorrect.  Dr. Hill clearly testified that the percentages Plaintiff cites relate only to the top 50 customers in the alleged markets, not all customers.  Tr. 999:20-25 (Dr. Hill).  And Dr. Hill does not endorse these figures as "reliable" because they treat even the smallest sale as an overlap.  *Id.* at 1000:6-8.

supposedly resulted in lower prices for customers.   PFOF ¶¶ 110-116.   Plaintiff's examples, however, do not show meaningful competition between United and Imperial, and in any event, represent a trivial fraction of the wholesale customers in Plaintiff's alleged markets.

193.   **General Mills.**  Plaintiff claims 

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████.  PFOF ¶ 112. But that is not what the evidence at trial showed.  Mr. Riippa testified that, for 2022, General Mills entered into a blanket volume agreement with United that covers nine of its plants, including its two Covington, Georgia plants.  Tr. 103:4-15 (Riippa/GM).  Imperial did not bid on any other plants that are covered by United's blanket volume agreement, including Centerville, Tennessee or Murfreesboro, Tennessee—one of General Mills' largest plants.  *Id.* at 103:21-24, 106:7-13, 108:6-24; JTX-008 (2022 bids and awards).  The price that General Mills paid for deliveries to Covington was impacted—not by Imperial's pricing—but by its negotiation of its national blanket volume agreement with United.  Tr. 103:16-20, 104:23-105:5 (Riippa/GM); *supra* ¶ 82.

194.   Although Imperial bid to supply General Mills' Rome, Georgia plant for 2022, ██████ ██████████████████████████████████████████████████████████████. Tr. 105:6-21 (Riippa/GM); JTX-008.  Imperial did not bid to supply General Mills' ██████████ ████████ plant in ██████ and has not supplied that plant in years because its prices are not competitive.  JTX-008; Tr. 258:4-17 (Hines/Imperial).  Imperial supplied less than 1% of General Mills' sugar needs in 2021 and, in 2022, General Mills did not even contract with Imperial for any bulk sugar.  Tr. 117:3-6, 119:23-120:3 (Riippa/GM).  Mr. Riippa testified about his many suppliers and did not raise any concerns regarding the proposed transaction.

195.   **Pepsi.**  According to Plaintiff, United and Imperial have been in a "protracted battle to win

Pepsi's business in Wytheville, Virginia." PFOF ¶ 113. That too is incorrect. United responded to Pepsi's national RFP, which included the Wytheville location, as well as 75-80 other locations. Tr. 185:15-186:22 (Swart/United). While Imperial only bid to supply Wytheville, United evaluated "the totality" of its bid across all locations and focused on Pepsi's overall spend, and not the price to any one location. *Id.* Plaintiff argues that United "bid aggressively by increasing the competitive discount" offered to Pepsi, PFOF ¶ 113, but ***Pepsi***—not United—determined the amount of the "competitive discount[]." Tr. 186:3-22 (Swart/United). Moreover, United is serving Wytheville today with sugar from the Red River Valley, not from Florida. *Id.* at 186:23-187:14.

196.  **Piedmont**. ████████████████████████████████████████

████, Piedmont is admittedly not a representative sugar purchaser. Tr. 399:24-400:3 (Cagle/Piedmont). Piedmont has very specific requirements: it only accepts dry refined cane sugar in 2,000 lb totes delivered to its North Carolina facility by truck from a single supplier. *Id.* at 397:21-398:8, 399:8-12. Despite these specifications, Mr. Cagle conceded that Piedmont receives bids from ████████████████████████████; believes Piedmont is able to receive competitive prices for refined sugar and could get additional quotes if it needed to; and that he has not investigated other options that are available to Piedmont, including up to a dozen suppliers closer to it than U.S. Sugar. *Id.* at 378:25-379:3 (discussing JTX-027), 400:9-18, 403:16-404:9.[16]

### 5.   Plaintiff Has Not Proven That Competition Between Imperial And United Would Intensify But For The Transaction

197.  Plaintiff asserts that absent the proposed transaction, competition between United and Imperial would intensify. Pl. Br. at 27-28; PFOF ¶¶ 119-125. This is supposedly because, prior to the proposed transaction, U.S. Sugar and United considered expanding U.S. Sugar's packaging

---

[16]   Plaintiff's remaining "examples" of head-to-head competition are largely based on a single field in an Imperial spreadsheet that Imperial does not use and does not reflect customers' competitive options. Tr. 263:10-264:2 (Hines/Imperial); Tr. 291:7-25 (Henneberry/Imperial).

line at Clewiston, which would have made United an "even closer" competitor with Imperial. Pl. Br. at 27-28. However, there is no evidence to support this theory. Mr. Wineinger testified that U.S. Sugar and United decided not to expand Clewiston's packaging capabilities because of the cost and the difficulty of building on the sand in Florida. Tr. 561:19-562:13 (Wineinger/United). The decision not to pursue a packaging line expansion had nothing to do with the Imperial transaction. *Id.*

### 6. The Transaction Will Lead To Lower, Not Higher, Prices

198. The evidence showed that U.S. Sugar intends to increase output at Port Wentworth, and consistent with basic economics, an increase in supply will result in lower—not higher—prices. Tr. 778:16-779:2 (Buker/U.S. Sugar); Tr. 859:23-860:9 (Fecso) (if you increase supply, "basic economics" means that prices will come down); *see also supra ¶¶* 104-05.

### a. U.S. Sugar Plans To Maximize Output

199. U.S. Sugar seeks to maximize its refined sugar output because its business has high fixed-costs, and when U.S. Sugar produces more refined sugar, it increases its share of revenues from United. Tr. 768:11-15, 770:15-771:10 (Buker/U.S. Sugar); *see also supra ¶¶* 11, 24. Post-transaction, U.S. Sugar plans to increase production at Port Wentworth and make the refinery more efficient, just as it did at Clewiston. *See supra ¶¶* 103-05.

### b. United Does Not Intend To Raise Prices

200. There is no evidence that United intends to raise prices if the proposed transaction is allowed to close. United's CEO, Mr. Wineinger, testified that the transaction will not enable United to increase prices and that it is not United's intention to do so. Tr. 563:6-18 (Wineinger/United). Mr. Swart also testified that United does not intend to, and will not be able to, raise prices anywhere in the U.S. as a result of the transaction. Tr. 176:5-23, 178:11-14 (Swart/United). Instead, because Imperial will no longer be a residual seller and United will have to market all of

the refined sugar that U.S. Sugar produces at Port Wentworth, United anticipates that the proposed transaction will result in lower—not higher—prices because of the additional 15-plus million cwt that United will need to sell.  Tr. 557:19-558:6 (Wineinger/United); Tr. 176:5-23 (Swart/United).

201.    Even Dr. Rothman concedes that he has not seen a single document indicating that United intends to raise prices as a result of the proposed transaction.  Tr. 677:14-18 (Rothman).

c.    <strong>United Cannot Reduce Output In Order To Raise Prices</strong>

202.    If the proposed transaction closes, United would be unable to reduce output in order to raise prices because United is a cooperative and must sell all of the sugar that its members produce. Tr. 176:12-23 (Swart/United); Tr. 550:21-551:9 (Wineinger/United); *see supra* ¶ 23.  As even Dr. Rothman does not dispute, United does not have control over the amount of sugar that U.S. Sugar or its other members produce, and cannot tell U.S. Sugar or any other member to produce less sugar.  Tr. 677:19-678:5, 678:15-18 (Rothman).

203.    United also cannot withhold supply because it is cost-prohibitive for United to store refined sugar and, regardless, United would have to sell everything it stored eventually, in addition to more recent production.  Tr. 176:24-177:7 (Swart/United); Tr. 550:25-552:5 (Wineinger/United).  Seven years ago, United tried a strategy that involved storing refined sugar and it was a financial disaster, so much so that United's members told United's CEO that he would lose his job if United ever tried something like that again.  Tr. 550:25-552:5 (Wineinger/United).

204.    Dr. Rothman admits that he has seen no evidence that the purpose of the proposed transaction is to reduce output.  Tr. 680:13-21 (Rothman).

7.    <strong>Entry And Expansion From Competitors Would Be Timely, Likely, And Sufficient</strong>

205.    If the merged firm were to attempt to raise prices post-transaction, competitors would quickly expand production and sales or enter the market, making any price increase unprofitable.

63

Tr. 941:11-942:8 (Hill).  This entry and expansion would be timely, likely, and sufficient to defeat

a price increase.  *Id.*  Indeed, expansion efforts by competitors, including LSR/Cargill, Michigan,

CSC, and Indiana Sugars, are already underway.  *See supra* ¶¶ 29-30, 43, 57, 68.

206.    While Plaintiff attempts to portray these expansion efforts as " ██████████████ " or

insufficient, *see* PFOF ¶¶ 158-166, that is not what the record shows:

207.    **Cargill**:  Mr. Carter testified that LSR intends to expand the output of its Gramercy refinery

by  20-25% ████████████████████ , and ██████████████████████

████████████████ .  *See supra* ¶ 30.[17] ████████████████████████

██████████████████ .  *Supra* ¶ 31.  And, ████████████████████

████████████████████ .  *Supra* ¶ 31-32.

208.    **Michigan**:  Mr. Figueroa testified that Michigan has an expansion project underway that

will increase Michigan's annual output by 80 million lbs annually that will be complete by Spring

2024.  *Supra* ¶ 43.  Michigan already sells into Plaintiff's alleged "Southeast," *see supra* ¶ 42, and

is willing to expand the areas in which it sells, including to states in Plaintiff's "Southeast," in

order to sell all its sugar.  *Supra* ¶ 43.

209.    **CSC**:  Plaintiff attempts to minimize CSC as a competitor by arguing that some customers

cannot use liquid sugar for certain products or at certain plants, PFOF ¶ 164, but the evidence

shows that most customers can, and many are, using liquid sugar.  *See supra* ¶ 84.  Mr. Farmer

testified that CSC can quickly set-up raw-to-liquid refineries close to customers for $5-7 million

and that CSC is rapidly expanding, particularly in Plaintiff's "Southeast."  *See supra* ¶¶ 57-58; *see*

---

[17]    While Plaintiff tries to characterize LSR's expansion as a " ████████████ " with an
unknown completion date, Pl. Br. at 43, the testimony Plaintiff cites relates only to LSR's long-
term plan ████████████████ , not to LSR's immediate efforts to increase capacity by 20-
25% or ████████████████ , both of which are underway.  *See supra* ¶¶ 29-30.

*also* Tr. 943:9-12 (Hill) (discussing DDX008-20 (showing CSC's rapid expansion in the "Southeast")).  Customers, like General Mills, recognize CSC as a "disruptor" because of its ability and willingness to quickly build raw-to-liquid plants near their facilities.  Tr. 111:16-112:5 (Riippa/GM); JTX-007, at -407; *see also* Tr. 1048:23-1050:4 (Farmer/CSC) (█████████████ ████████████████████████████████████████████████████████).

### 8.   Dr. Hill's Economic Analysis Confirms That The Transaction Is Not Likely To Lead To Higher Prices

210.   Dr. Hill used two economic models to analyze whether the proposed transaction is likely to result in substantial unilateral price effects:  (i) a bidding model and (ii) a relative cost model.  To be conservative, Dr. Hill used Dr. Rothman's assumptions (excluding distributors and grouping together all United members' sales).  Even with those assumptions, Dr. Hill's models predict very minimal, if any, price effects.  Tr. 911:17-912:3 (Hill)

211.   **Bidding Model:**  Dr. Hill's bidding model considers customers for which United and Imperial are the two best options based on transportation cost and then compares the transportation cost of the next best supplier.  Tr. 958:10-959:1 (Hill).  The model predicts "minimal" price increases, regardless of the market to which it is applied.  *Id.* at 959:2-9.  The highest price increases predicted were 0.2% in Plaintiff's "Southeast" and 0.3% in Plaintiff's "Georgia Plus" market.  DDX008-32.  These results likely *overstate* the potential for price increases because the model does not account for price reductions from mitigating factors (e.g., competition from distributors, USDA action, or entry and expansion by other suppliers).  Tr. 957:19-958:9 (Hill).

212.   **Relative Cost Model:**  Dr. Hill's relative cost model uses actual sales data to analyze the price customers are paying, and how the price varies based on the transportation cost of the current supplier and other suppliers to serve the customer.  The model estimates the effect of removing Imperial as an option and as a constraint on United.  Tr. 959:20-960:10 (Hill).  The results show

that, regardless of region, the predicted prices effects are "*de minimis*." *Id.* at 960:11-21; DDX008-33 (highest price increase predicted was 0.2%). These results likely *overstate* the potential price increases because the model does not take into account mitigating factors. Tr. 957:19-958:9 (Hill).

### 9.    Dr. Rothman's Economic Modeling Is Unreliable

213.    Dr. Rothman employed two models to assess the supposed price effects of the proposed transaction—a second score bidding model and a GUPPI model—and both are unreliable:

a.    **Second Score Bidding Model:**  As Dr. Hill testified, the "first check" on whether this model is reliable is if it accurately predicts margins for the merging parties that are close to their actual margins. Tr. 951:19-25 (Hill). Even though Dr. Rothman observed that in the real world there is a 16 percentage point difference between United's and Imperial's margins, the model fails the validity check by predicting that Imperial and United "have substantially the same margin." *Id.* at 951:8-953:13. Dr. Rothman's attempt to re-do the test using margins for one company at a time had "the exact same problem"—the model predicted incorrect margins for the company whose margins were not inputted. *Id.* at 952:23-953:13.

b.    **GUPPI Model:**  Plaintiff appears to have abandoned Dr. Rothman's GUPPI model, relegating discussion of it to a footnote, Pl. Br. at 29 n.10; however, that model is also unreliable because Dr. Rothman applied the wrong formula which inflated his predictions of the potential price effects from the merger. Tr. 687:15-19, 688:12-19 (Rothman); Tr. 961:12-18 (Hill). When he corrected that error, it showed that the transaction was unlikely to increase prices.[18] *See infra* ¶ 217. Another court previously

---

[18]    Dr. Rothman retracted his initial report because he incorrectly concluded that Plaintiff's alleged markets are "highly concentrated," when, in fact, they are not. Tr. 687:20-688:11 (Rothman). Despite issuing a "corrected" report, Dr. Rothman *still* continued to use the wrong GUPPI formula. *Id.* at 688:12-19.

found Dr. Rothman's GUPPI analysis unreliable, including because he inappropriately

applied it to a commodity like sugar.  Tr. 688:20-22, 667:12-668:6 (Rothman).

214.    Both of Dr. Rothman's models rest on Plaintiff's alleged product and geographic markets.

Tr. 686:13-21 (Rothman).  If the Court finds that Plaintiff has failed to prove any of those markets

for any reason, then the models are useless; they do not apply to any other market.  *Id.*

### 10.    Even Dr. Rothman's Economic Modeling Results In Low Predicted Price Increases

215.    Even ignoring the errors in Dr. Rothman's economic models, both show very low or no

price effects resulting from the transaction.  Tr. 906:22-907:1 (Hill).  Despite being very low, all

of Dr. Rothman's estimated price increases are also *overstatements* because they do not factor-in

competitive pressure from distributors, merger efficiencies, or competitor entry.  *Id.* at 905:25-

906:7, 910:21-911:16, 945:24-946:14, 948:21-949:9, 957:25-958:4.

216.    According to Dr. Rothman, his second score bidding model predicts price increases of

3.6% in Plaintiff's "narrower" market, and 3.2% in Plaintiff's "broader" market.  Tr. 685:20-

686:16 (Rothman).  Those percentages, however, allocate all of the alleged unilateral price

increase to only United's and Imperial's customers instead of across all of the customers in

Plaintiff's alleged markets.  Tr. 961:19-962:16 (Hill).  When accounting for all of the customers

in the alleged markets, the purported price increases that Dr. Rothman calculates are only 1.9%

and 1.5%.  *Id.* at 962:17-23; DDX008-27, -34, -35.  Those are not significant price effects.

Tr. 953:14-954:3 (Hill).  Additionally, when Dr. Rothman re-ran his model using only Imperial's

margin as the margin input, those estimates dropped below 1%.  *Id.* at 961:19-962:5.

217.    After Dr. Rothman corrected the errors in his GUPPI model, Tr. 687:15-688:19 (Rothman),

the model predicted pricing pressure *below* 5% for the merged firm, indicating that there is not

likely to be any price increase resulting from the transaction (which may be why Plaintiff now

seeks to abandon the analysis).  Tr. 949:12-20 (Hill).

> **B.**     **Plaintiff Has Not Proven The Proposed Transaction Will Increase The Probability Of Coordination**

218.     A coordinated effects theory requires that the firms remaining post-merger will be able to coordinate their behavior in order to restrict output and achieve profits above competitive levels. Tr. 964:24-965:21 (Hill).  Dr. Rothman agrees.  Tr. 679:19-680:11 (Rothman) (conceding that "higher prices from the proposed transaction *would result in a decrease in the quantity sold* in the relevant markets") (emphasis added).  Dr. Rothman's theory of coordinated effects is that, post-merger, United and Domino would stop bidding against each other on 30% of opportunities and, as a result, United would sell less sugar.  PFOF ¶¶ 153-54.  There is no evidence in the record to support those opinions.  *See* Tr. 1210:15-23 (Court).

> **1.**     **The Sugar Industry Is Not Conducive To Coordination**

219.     Coordination involves competitors foregoing short-run profits in the hope of gaining larger profits in the long-run by coordinating with each other to not compete.  Tr. 965:5-21 (Hill).  In the short run, if competitors are only competing softly, it may be possible for a firm to easily steal business from another.  *Id.* at 965:13-21.  Thus, there is a tradeoff between the short-run incentive to "cheat" on coordination by stealing business from one's rivals, and the potential long-run payoff one might receive if all industry participants agree not to compete.  *Id.* at 965:22-966:1.  Successful coordination typically requires some way to punish other firms if they elect to compete instead of coordinating.  *Id.* at 965:13-21.  The sugar industry has numerous characteristics that make coordination unlikely, including the following:

220.     **Suppliers cannot restrict output**:  Several major suppliers—United, NSM, Michigan, and Western—are cooperatives, and must sell all of the refined sugar produced by their members, even though they have no control over the volume that each member produces.  *Supra* ¶¶ 10, 15.  As a

result, suppliers, including United, have no practical ability to strategically withhold output in order to increase prices.  *Supra* ¶¶ 23, 203.  Furthermore, post-transaction, U.S. Sugar plans to increase output at Port Wentworth; so United will have more sugar to sell and will have to price even more aggressively.  *Supra* ¶¶ 104, 198, 200.  Further, USDA regulates supply and would increase allocations and imports if domestic producers decreased production.  *Supra* ¶¶ 91, 95.

221.   **Sugar is sold to sophisticated customers who use RFPs, blind-bidding, and long-term contracts**:  Refined sugar is primarily sold through RFPs, with blind-bidding, that incentivize suppliers to bid aggressively.  *Supra* ¶¶ 76-79.  The vast majority of sales are for large, annual contracts where each sale is high stakes.  *Supra* ¶¶ 77-78, 81-82.  And, refined sugar is purchased by sophisticated industrial customers, such as General Mills, Kraft, Post, and Pepsi.  *Supra* ¶ 80.

222.   **Output is variable**:  Because refined sugar is produced from agricultural products, there is significant variation in the quantity of refined sugar that suppliers have available to market in any given year. *See supra* ¶ 12.

223.   **Pricing is heterogeneous and unpredictable**:  Refined sugar sales have heterogeneous and unpredictable pricing because sugar is priced on a delivered basis that incorporates freight costs and other customer-specific variables.  Tr. 502:1-6 (Henderson/Domino) ("[E]very contract we do has unique circumstances and different pricing.");  Tr. 270:17-23, 283:20-284:5 (Henneberry/Imperial) (describing the many factors influencing price).  Dr. Rothman admits that prices are individually negotiated and "customer specific."  Tr. 602:1-8 (Rothman).

224.   **Demand for sugar is elastic**:  Dr. Hill testified that demand for sugar is elastic, *i.e.*, if suppliers charge higher prices, customers will buy significantly less, which lowers the likelihood of coordination because suppliers would have more to lose by increasing prices. Tr. 967:15-968:6 (Hill) (a 10% increase in price would cause customers to decrease the amount of sugar they

purchase by more than 10%).[19]

225.    **There is no history of coordination**:  Within the past 40 years, there has been no history of coordination in the sugar industry.  Tr. 912:19-20, 966:4-10, 969:11-970:6, 976:3-16 (Hill).

226.    Defendants' expert Dr. Hill testified for the government about coordinated effects in the *Tronox* case, and the court accepted his opinion.  Tr. 969:11-970:6 (Hill).  In that case, Dr. Hill found coordinated effects likely because (i) the transaction was eliminating a maverick firm that was trying to expand; (ii) the chloride titanium dioxide industry had recent allegations of coordination; and (iii) the industry involved competitors making public statements when demand was falling, encouraging other competitors "to collectively work together to keep the price high." *Id.*  Dr. Hill testified that the sugar industry does not contain any of those same characteristics.  *Id.*

### 2.    The Proposed Transaction Will Not Remove A Maverick Competitor And Actual Mavericks Will Remain

227.    A "maverick" is a firm with an incentive to compete aggressively, even if that may lower prices.  Tr. 913:19-22 (Hill).  Mavericks sharpen competition and make coordination less likely. *Id.* at 966:4-8.  Imperial is a high-cost refiner that struggles to compete; it is not a "maverick."  *Id.* at 913:23-914:3; *see also supra* ¶ 49.  Pricing mavericks, like Cargill and CSC, will remain post-merger, are expanding, and thus will have an even greater incentive to price aggressively.  *Id.* at 912:15-20, 913:9-18, 966:2-10 (Hill); Tr. 478:20-479:6 (Speece/United); PTX-406, at -136 (referring to Cargill as one of the "most aggressive sellers").

### 3.    The Information That United And Domino Provided To A Third-Party Industry Analyst Is Not Confidential

228.    Plaintiff's theory of coordinated effects relies on emails exchanged between individuals at

---

[19]    Dr. Rothman stated in his initial report that demand for sugar is inelastic but he misread the paper he was relying on which, in fact, concluded that demand for sugar is elastic.  Tr. 967:15-968:6 (Hill).  Plaintiff's proposed findings of fact do not mention inelasticity at all.

United and a third-party analyst, Richard Wistisen, and individuals at Domino and the same analyst.  *See* Pl. Br. at 32-33.  Those documents, however, do not show actual coordination or that the industry is vulnerable to coordination.  Tr. 968:7-969:10 (Hill).

229.   Although he neither testified at trial nor was deposed or subpoenaed, Mr. Wistisen is a sugar industry analyst for Commodity Information.  Tr. 448:23-24 (Sproull/Domino); Tr. 464:13-15 (Speece/United).  Commodity Information publishes a monthly report called the Domestic Sugar Monthly Report that contains information about weather, sugar beet and sugar cane crops, imports, USDA action, sugar supply and demand, and sugar spot pricing guidance.  Tr. 501:18-19, 519:20-521:17 (Henderson/Domino); PTX-042.  This report is available to the entire industry, including customers and the USDA.  Tr. 180:16-181:11 (Swart/United); Tr. 495:25-496:3, 500:23-501:17, 505:7-10 (Henderson/Domino); Tr. 877:15-23 (Fecso/USDA).

230.   From time to time (either once a month, or once every other month), United shared information with Mr. Wistisen for his industry report.  Tr. 464:19-21, 485:14-19 (Speece/United). Domino also shared information with Mr. Wistisen "to put in [Mr. Wistisen's] publication." Tr. 501:8-9 (Henderson/Domino).

231.   Both United and Domino spoke with Mr. Wistisen to ensure that the information he had for his publication was accurate.   Tr. 181:3-11 (Swart/United); Tr. 495:25-496:3 (Henderson/Domino).  Customers read industry reports and speak with industry analysts to inform their purchasing decisions.   Tr. 493:7-12, 495:22-496:3, 519:9-19 (Henderson/Domino); Tr. 450:22-451:5 (Sproull/Domino); Tr. 181:3-11 (Swart/United).  The USDA also reads the same industry reports and speaks with industry analysts to inform its decision-making on the Federal Sugar Program.  Tr. 877:15-878:5 (Fecso/USDA).  United and Domino had a legitimate interest in making sure their information was reported accurately by Mr. Wistisen in his publication.

Tr. 181:3-11 (Swart/United); Tr. 505:5-10 (Henderson/Domino).

232.    The information that United and Domino shared with Mr. Wistisen was not competitively sensitive.  Tr. 485:14-19 (Speece/United); Tr. 501:8-9 (Henderson/Domino).  United never shared any information with Mr. Wistisen—whether about prices, sold position, or anything else—that it was not freely sharing with its customers, prospective customers, or the USDA at the same time.  Tr. 485:14-19 (Speece/United); Tr. 182:21-23, 183:19-22, 184:8-11 (Swart/United).  And, United never shared with Mr. Wistisen (or anyone else) information "about a specific customer negotiation," and never received "any information about a competitor, related to a specific customer negotiation."  Tr. 485:25-486:7 (Speece/United).

233.    The only pricing information that United and Domino shared was publicly available.  The prices United shared with Mr. Wistisen, and other third-party analysts, are spot or "list" prices (and not the price paid by any particular customer).  Tr. 485:20-24 (Speece/United).  United's spot prices are available to customers at any time on United's customer portal.  Tr. 182:7-23 (Swart/United).  The pricing information that Domino shared with industry analysts was Domino's "current pricing guidelines," Tr. 505:18-20 (Henderson/Domino), which "can change on a daily basis" in response to fluctuations in the U.S. raw sugar futures commodity index.  *Id.* at 493:19-494:12, 517:22-518:24, 522:8-15.[20]

234.    Sold position is no different and is not sensitive.  While there may be times when United chooses not to make its sold position public, there are many times when United shares its position freely—and those are the only times it shares that information with Mr. Wistisen.  Tr. 183:4-185:22

---

[20]    Plaintiff's assertion that Domino shared both "spot prices and contract prices" with Mr. Wistisen is misleading.  PFOF ¶ 141.  Mr. Henderson explained that "contract price" just refers to a quote for a price at a future time, e.g. June 2023, based on the Number 16 price, which is a futures contract index and "changes daily."  Tr. 493:19-494:6, 522:5-15 (Henderson/Domino).  "Contract price," as used by Mr. Henderson, does not refer to any specific customer price.  *Id.*

(Swart/United).  Being open with customers about the quantity United has left to sell helps to maintain good customer relationships and ensures that customers who want to buy from United can do so before United runs out.  *Id.*; JTX-026 (United shared its sold position with Piedmont).

235.    Information about competitors' public pricing guidelines and coverage or sold positions is publicly available from a number of sources, including industry trade reports and customer feedback that suppliers receive on a "daily basis."  Tr. 488:17-22, 498:4-10, 522:1-4 (Henderson/ Domino); Tr. 468:15-469:4 (Speece/United); Tr. 182:11-183:22 (Swart/United); JTX-026.

236.    Information that United receives from industry analysts, including Mr. Wistisen, does not impact the price that United charges customers for refined sugar.  Tr. 185:3-10 (Swart/United); Tr. 486:8-11 (Speece/United).  And, Domino places far more emphasis on information originating from customers than information from analysts or other intermediaries; Mr. Henderson testified that he treats information from Mr. Wistisen "just as another bit of information" with "no idea" "whether it's accurate or not."  Tr. 494:17-21, 505:1-4 (Henderson/Domino).

237.    Dr. Fecso testified that she finds her conversations with industry analysts helpful when making decisions about the Federal Sugar Program, and that she reads a variety of industry reports, including Commodity Information.  Tr. 877:8-878:1 (Fecso/USDA).  And, USDA publishes on its website the same type of information that Mr. Wistisen includes in his monthly report because USDA believes transparency about pricing trends is good for the industry.  Tr. 520:11-22 (Henderson/Domino); PTX-042 (Wistisen Report); Tr. 876:23-878:19 (Fecso/USDA).

####     4.    Dr. Rothman's Economic Analysis Regarding Coordinated Effects Is Unreliable And Unsupported

238.    Dr. Rothman did not conduct any empirical analysis to determine whether any communications by United, Domino, or anyone else with Mr. Wistisen resulted in any customer paying a higher price for refined sugar.  Tr. 684:6-25 (Rothman).

239.    Dr. Rothman's calculations *assume* that, today, United and Domino are foregoing bidding against each other for 10% of opportunities, and *assume* that post-transaction they will forego bidding against each other for 30% of opportunities.  Tr. 626:14-627:12 (Rothman).  Dr. Rothman, however, did not identify any evidence to support either assumption and there is none.  *Id.* at 685:1-12; Tr. 962:24-964:4, 966:15-967:3 (Hill); Tr. 1210:15-23 (Court).  Dr. Rothman's theory also does not take into account the fact that, as a cooperative, United cannot withhold sugar and cannot refrain from bidding on opportunities and risk having to store unsold sugar.  *Supra* ¶¶ 23, 203.[21]

## V.    USDA'S INDUSTRY EXPERT CONFIRMED THAT THE TRANSACTION WILL NOT HARM COMPETITION AND IS LIKELY TO BENEFIT CONSUMERS

240.    Dr. Fecso confirmed, based on her decades of experience in the sugar industry, that there are several reasons why the proposed transaction is not likely to harm competition, wholly apart from any actions USDA might take.  Specifically, Dr. Fecso testified that:

a.    Imperial is not meaningfully constraining competition today because it is a high-cost, high-price residual supplier that depends on imported raw sugar, which USDA controls. Tr. 858:22-859:6 (Fecso/USDA).

b.    U.S. Sugar's acquisition of Imperial is likely to lead to ***lower*** prices, not higher prices, because U.S. Sugar will give Imperial a domestic source of supply, run the Port Wentworth facility more efficiently, and help lobby USDA for more raw sugar imports. *Id.* at 853:6-855:4 ("Q.  Do you believe that if this transaction is allowed to conclude, that it is likely to lead to higher sugar prices anywhere in the U.S.?  A.  I think the likelihood is – that prices could in fact be lowered.").

c.    It would not make sense for United to try to raise prices post-transaction because sugar

---

[21]    Dr. Rothman has never offered an opinion in a case involving an agricultural cooperative, Tr. 640:24-641:2 (Rothman), and in *Evonik*, where Dr. Rothman opined that a merger would result in increased coordination, the court rejected his analysis.  Tr. 682:8-25 (Rothman).

would flow into Plaintiff's alleged "Southeast" without any USDA action, drive prices right back down, and ultimately, result in United losing sales; Dr. Fecso has observed sugar flowing like this many times.  *Id.* at 855:5-17, 856:12-857:21, 897:5-10.

d.      It also would not make any sense for United to try to raise prices post-transaction because United knows that could cause USDA to increase supply, which, again, would drive prices back down and jeopardize sales.  *Id.* at 879:6-11.

e.      It does not make sense to think about the sugar market regionally because sugar flows.  *Id.* at 896:24-897:10.

241.    Dr. Fecso also testified that if, for some reason, United did try to raise prices, and if, for some reason, the domestic supply response were not enough to lower prices back down, then USDA has ample tools available that it could use to increase supply and lower prices.  Tr. 855:18-24 (Fecso/USDA) ("Yes, USDA has a set of tools it can use to bring in more sugar to get prices down"); *id.* at 899:9-22 ("Q.  And if the anticompetitive behavior were to result in higher prices, would the USDA be able to address that aspect?  A.  Yes.").

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

OF COUNSEL:

Lawrence E. Buterman
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

Amanda P. Reeves
Jennifer L. Giordano
Lindsey S. Champlin
Molly M. Barron
David L. Johnson
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2200

Christopher S. Yates
Kelly S. Fayne
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600

Elyse M. Greenwald
LATHAM & WATKINS LLP
10250 Constellation Boulevard, Suite 1100
Los Angeles, CA 90067
(213) 485-1234

*/s/ Jack B. Blumenfeld*

Jack B. Blumenfeld (#1014)
Brian P. Egan (#6227)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
began@morrisnichols.com

*Attorneys for Defendant United States Sugar
Corporation*

HOGAN MCDANIEL

*/s/ Daniel K. Hogan*

OF COUNSEL:

Peter J. Schwingler
STINSON LLP
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
(612) 335-1564

Daniel K. Hogan (# 2814)
1311 Delaware Ave.
Wilmington, DE 19806
(302) 656-7540
dan@dkhogan.com

*Attorneys for Defendant United Sugars
Corporation*

RICHARDS, LAYTON & FINGER, P.A.

*/s/ Kelly E. Farnan*

OF COUNSEL:

Amanda L. Wait
Vic Domen
NORTON ROSE FULBRIGHT US LLP
799 Ninth Street, NW, Suite 1000
Washington, DC 20001
(202) 662-4550

Kelly E. Farnan (# 4395)
920 N. King St.
Wilmington, DE 19801
(302) 651-7700
farnan@rlf.com

Darryl Wade Anderson
NORTON ROSE FULBRIGHT US LLP
McKinney St., Suite 5100
Houston, TX 77010
(713) 651-5562

Christine A. Varney
David R. Marriott
Peter T. Barbur
Timothy G. Cameron
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eight Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Defendants Imperial Sugar
Company and Louis Dreyfus Company LLC*

## CERTIFICATE OF SERVICE

I, Jack B. Blumenfeld, certify that this 20th day of May, 2022, I caused a true and correct copy of the foregoing Defendants' Proposed Findings Of Fact to be served upon all counsel of record, to include the below, via electronic mail in accordance with the Local Rule 5.2(b).

Laura D. Hatcher                                              *VIA ELECTRONIC MAIL*
Shamoor Anis
UNITED STATES ATTORNEY'S OFFICE
DISTRICT OF DELAWARE
1313 North Market Street, Suite 400
Wilmington, DE 19801
*Attorneys for Plaintiff*

Brian Hanna                                                   *VIA ELECTRONIC MAIL*
John R. Thornburgh II
Jonathan Y. Mincer
Jessica J. Taticchi
Jenigh J. Garrett
Chinita M. Sinkler
Jill Ptacek
Curtis W. Strong
Michael E. Wolin
Stephanie E. Pearl
Ryan M. Sandrock
David Geiger
Thomas P. DeMatteo
Soyoung Choe
U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
450 Fifth Street NW, Suite 8000
Washington, DC 20530
*Attorneys for Plaintiff*

*/s/ Jack B. Blumenfeld*
Jack B. Blumenfeld (#1014)