# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA,

                *Plaintiff*,

     v.

UNITED STATES SUGAR CORPORATION,
UNITED SUGARS CORPORATION,
IMPERIAL SUGAR COMPANY, and LOUIS
DREYFUS COMPANY LLC.
                *Defendants*.

Civil Action No. 1:21-cv-01644-MN

FILED UNDER SEAL

## PLAINTIFF UNITED STATES OF AMERICA'S POST-TRIAL REPLY BRIEF

## TABLE OF CONTENTS

I. INTRODUCTION AND SUMMARY OF ARGUMENT ...................................................... 1

II. MARKET DEFINITION AND THE PRESUMPTION ...................................................... 1

   A. Distributors Are Properly Excluded From The Relevant Market ................................... 1

   B. All Wholesale Customers Are Part Of The Relevant Product Market........................... 4

   C. Defendants' Critiques Of The Relevant Geographic Markets Are Unavailing .............. 4

   D. The Proposed Acquisition Is Presumptively Unlawful .................................................. 7

III. THE MERGER WOULD LIKELY CAUSE UNILATERAL EFFECTS........................... 8

   A. United And Imperial Are Close Head-To-Head Competitors.......................................... 9

   B. United Is Capable Of Exercising Market Power ........................................................... 10

IV. THE MERGER WILL LIKELY CAUSE COORDINATED EFFECTS .......................... 12

V. DEFENDANTS FAIL TO REBUT THE UNITED STATES' PRIMA FACIE CASE.... 15

   A. Imperial Is Not A Weakened Firm Under *General Dynamics* ...................................... 15

   B. Potential Expansion And Entry Are Insufficient To Rebut The Prima Facie Case ....... 16

   C. Sophisticated Buyers Cannot Prevent The Resulting Competitive Harm...................... 18

   D. Defendants' Supposed Intent Is Not A Recognized Defense......................................... 18

VI. THE ATTACKS ON DR. ROTHMAN'S CREDIBILITY ARE BASELESS................. 19

VII. DR. FECSO'S OPINION IS NOT SUPPORTED BY THE FULL TRIAL RECORD..... 20

# TABLE OF AUTHORITIES

**Cases**

*Allen-Myland, Inc. v. International Business Machines Corp.*,
  33 F.3d 194 (3d Cir. 1994) ................................................................................. 2, 3

*American Crystal Sugar Co. v. Cuban-American Sugar Co.*,
  152 F. Supp. 387 (S.D.N.Y. 1957) ..................................................................... 2, 4

*American Crystal Sugar Co. v. Cuban-American Sugar Co.*,
  259 F.2d 524 (2d Cir. 1958) ................................................................................ 2

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962) ............................................................................................ 2, 4

*Chicago Bridge & Iron Co., N.V. v. FTC*,
  534 F.3d 410 (5th Cir. 2008) .............................................................................. 18

*FTC v. Advocate Health Care Network*,
  841 F.3d 460 (7th Cir. 2016) .............................................................................. 5, 6

*FTC v. Arch Coal, Inc.*,
  329 F. Supp. 2d 109 (D.D.C. 2004) .................................................................... 15, 16

*FTC v. Cardinal Health, Inc.*,
  12 F. Supp. 2d 34 (D.D.C. 1998) ........................................................................ 2

*FTC v. Elders Grain, Inc.*,
  868 F2d 901 (7th Cir. 1989) ............................................................................... 12

*FTC v. Hackensack Meridian Health*,
  30 F.4th 160, 166 (3d Cir. 2022) ........................................................................ 5, 8, 19

*FTC v. Penn State Hershey Medical Center*,
  838 F.3d 327 (3d Cir. 2016) ............................................................................... 5, 11, 18

*FTC v. RAG-Stiftung*,
  436 F. Supp. 3d 278 (D.D.C. 2020) .................................................................... 8, 19

*FTC v. Staples, Inc.*,
  190 F. Supp. 3d 100 (D.D.C. 2016) .................................................................... 9

*FTC v. Swedish Match*,
  131 F. Supp. 2d 151 (D.D.C. 2000) .................................................................... 13

*FTC v. Sysco Corp.*,
   113 F. Supp. 3d 1 (D.D.C. 2015) ........................................................ 8, 9, 10

*FTC v. Tronox Ltd.*,
   332 F. Supp. 3d 187 (D.D.C. 2018) ........................................................ 12

*FTC v. University Health, Inc.*,
   938 F.2d 1206 (11th Cir. 1991) .................................................. 15, 16, 17

*FTC v. Wilhelm Wilhelmsen Holding ASA*,
   341 F. Supp. 3d 27 (D.D.C. 2018) ................................................ 18, 19

*Hospital Corp. of America v. FTC*,
   807 F.2d 1381 (7th Cir. 1986) ........................................................ 13

*In the Matter of Altria Group, Inc. and JUUL Labs, Inc.*,
   FTC Docket No. 9393 ........................................................ 19

*Maryland & Virginia Milk Producers Association v. United States*,
   362 U.S. 458 (1960) ........................................................ 11

*New York v. Deutsche Telekom AG*,
   439 F. Supp. 3d 179 (S.D.N.Y. 2020) ........................................................ 16

*Promedica Health System, Inc. v. FTC*,
   749 F.3d 559 (6th Cir. 2014) ........................................................ 15, 16

*Sugar Institute, Inc. v. United States*,
   297 U.S. 553 (1936) ........................................................ 14

*United States v. Aluminum Co. of America*,
   148 F.2d 416 (2d Cir. 1945) ........................................................ 2, 3

*United States v. Anthem, Inc.*,
   236 F. Supp. 3d 171 (D.D.C. 2017) ........................................................ 3, 9, 18

*United States v. Archer-Daniels-Midland Co.*,
   781 F. Supp. 1400 (S.D. Iowa 1991) ........................................................ 6

*United States v. Baker Hughes*,
   908 F.2d 981 (D.C. Cir. 1990) ........................................................ 16

*United States v. Container Corp. of America*,
   393 U.S. 333 (1969) ........................................................ 14

*United States v. E. I. du Pont de Nemours & Co.,*
    2353 U.S. 586 (1957) ................................................................................ 19

*United States v. Energy Solutions, Inc.,*
    265 F. Supp. 3d 415 (D. Del. 2017) ......................................... 7, 8, 9, 17

*United States v. General Dynamics Corp.,*
    415 U.S. 486 (1974) ........................................................................... 15, 16

*United States v. H & R Block, Inc.,*
    *833 F. Supp. 2d 36 (D.D.C. 2011)* ....................................... 8, 9, 12, 17

*United States v. Philadelphia National Bank,*
    374 U.S. 321 (1963) ................................................................... 3, 6, 8

*United States v. Sabre Corp.,*
    452 F. Supp. 3d 97 (D. Del. 2020) .................................................... 8

*United States v. Sabre Corp.,*
    No. 20-1767, 2020 WL 4915824 (3d Cir. 2020) ............................... 8

*United States v. United States Gypsum Co.,*
    438 U.S. 422 (1978) ........................................................................ 14

*United States v. United Tote, Inc.,*
    768 F. Supp. 1064 (D. Del. 1991) ................................................... 18

*United States v. UPM-Kymmene Oyj,*
    2003 WL 21781902 (N.D. Ill. Jul. 25, 2003) ................................ 12

**Statutes**

7 U.S.C. § 1359dd ........................................................................... 17

**Treatises**

*Phillip Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and*
    *Their Application,* (4th ed. 2018) ................................................. 19

**Other Authorities**

*DOJ & FTC, Horizontal Merger Guidelines* (2010) ................................ passim

iv

## I.     INTRODUCTION AND SUMMARY OF ARGUMENT

The evidence at trial demonstrates that U.S. Sugar's proposed acquisition of Imperial is anticompetitive and should be enjoined. So, Defendants ignore the evidence and instead make novel and illogical arguments that contradict well-settled law and would turn antitrust enforcement on its head. Nothing in Defendants' post-trial briefing disturbs the inevitable conclusion that the merger is illegal: it would substantially increase concentration in properly defined relevant markets, is presumptively harmful, would eliminate important competition benefitting refined sugar customers today, and should be blocked.

Defendants attempt to undermine the structural presumption that the merger of two of the three largest sugar refiners in the relevant markets is illegal by arguing that the geographic markets are too narrow and that distributors should be assigned market shares. Tellingly, Defendants presented no analysis to show how their abstract criticisms of the relevant markets would translate into a different result. Additionally, the evidence at trial showed that the acquisition is reasonably likely to lead to both unilateral *and* coordinated effects; both reinforce the United States' prima facie case based on market shares, and either is an independently sufficient reason to block the merger, even absent a structural presumption.

## II.    MARKET DEFINITION AND THE PRESUMPTION

### A.     Distributors Are Properly Excluded From The Relevant Market

Defendants' argument that distributors should be included in the relevant market is contrary to basic principles of antitrust law and to the facts of this industry. First, according to Defendants' illogical argument, it would be permissible for every single producer of refined sugar in the United States to merge into one monopoly so long as distributors remained independent. This absurd result would, of course, gut enforcement of the Clayton Act and eviscerate antitrust law in most major industries. For this reason, Defendants do not—and

1

cannot—cite a single Section 7 case that assigned market shares to both producers and resellers of the same physical goods. *Cf. Brown Shoe Co. v. U.S.*, 370 U.S. 294, 341 n.69 (1962) (affirming decision to assign resales by "wholesale distributors" to original manufacturer for calculating market shares); United States' Post-Trial Brief, D.I. 214 ("Br.") 17–20. Defendants also still ignore that the appellate court in *American Crystal* upheld the district court assigning market shares only to sugar refiners. *Am. Crystal Sugar Co. v. Cuban-Am. Sugar Co.*, 259 F.2d 524, 527–28 (2d Cir. 1958); *Am. Crystal Sugar Co. v. Cuban-Am. Sugar Co.*, 152 F. Supp. 387, 401 (S.D.N.Y. 1957).

Second, to the extent new supply was reflected in distributor sales, the United States appropriately accounted for it. When calculating market shares, the United States accounted for all sales of sugar, including distributors' imports from foreign refiners, and attributed them to the refiner that produced that sugar. Br. 17 & n.4. Defendants' assertion that distributors should be assigned separate shares effectively asks the Court to double count by assigning market shares to both refiners and distributors for the sale of the same sugar. *Allen-Myland, Inc. v. IBM Corp.*, 33 F.3d 194, 202 (3d Cir. 1994) (rejecting "double counting" of items sold or leased by original manufacturers and lessors).

This treatment of distributors is also supported by the clear evidence at trial. Refiners collectively control distributors' supply of refined sugar, so distributors do not competitively constrain refiners, but are at the mercy of refiners' exercise of market power. *See United States v. Aluminum Co. of Am.* ("*Alcoa*"), 148 F.2d 416, 425 (2d Cir. 1945). That distributors, "at some level, compete" with refiners does not mean that distributors constrain refiners' pricing or production decisions. *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 47 (D.D.C. 1998) ("[T]he mere fact that a firm may be termed a competitor in the overall marketplace does not necessarily

2

require that it be included in the relevant . . . market for antitrust purposes."). Here, the evidence

shows that distributors do not. United States' Proposed Findings of Fact, D.I. 215 ("PFOF")

§ IV.A.2. And notably, when refiners seek and exchange information on their competitors'

pricing and capacity through intermediaries, they never appear to inquire about distributors'

information. *See* PFOF § IV.C.2.

While distributors may occasionally bid on the same RFPs as refiners, Defendants' Post-

Trial Brief, D.I. 220 ("Def. Br.") 7–8, that is insufficient to consider them participants in the

same market given their complete dependence on refiners for their supply and their need to add a

markup on top of refiners' prices for the resale to be profitable. The Supreme Court reached an

analogous conclusion in *United States v. Philadelphia National Bank* when it held that small-

loan companies were not in the same market with commercial banks with which they

"compete[d]" because "small-loan companies' rates [we]re invariably much higher than the

banks', in part . . . because the companies' working capital consist[ed] in substantial part of bank

loans." 374 U.S. 321, 356 (1963).

Defendants claim that the United States cannot exclude distributors unless it shows that

"a single company" has the ability to deny inputs to distributors, Def. Br. 8–9, but Defendants

cite no case that adopted such a test. Instead, *Philadelphia National Bank* excluded small-loan

companies even though they were dependent on multiple banks, not "a single company." 374

U.S. at 356; *see also United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 226 (D.D.C. 2017)

(excluding entities that relied on the "Big Four" insurers).[1]

Finally, Defendants *never rebut* the evidence that, even adopting their incorrect view,

---

[1] While Defendants note that the specific defendants in *Alcoa* and *Allen-Myland* had enough
market power to foreclose inputs on their own, Def. Br. 9, neither case suggests a single firm's
ability to foreclose is a prerequisite to excluding resellers.

including distributors in the market shares would be inconsequential. *See* PFOF ¶ 101.

    **B.**    **All Wholesale Customers Are Part Of The Relevant Product Market**

Defendants' last-minute argument that the relevant product market is too broad because not all wholesale refined sugar customers are similarly situated, Def. Br. 10, severely misstates the basic legal and factual principles of product market definition. It is well established that "[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use." *Brown Shoe*, 370 U.S. at 325. Defendants offer no support for the proposition that *customers* of a product must be interchangeable, nor cite any case in which a product market was rejected because it included different kinds of customers of the exact same product. Even if customers needed to be homogenous, which they do not, there is no reason to believe that competition for industrial users and retailers differs meaningfully in this case. Defendants make only the unremarkable point that suppliers organize their sales teams around customer types, Def. Br. 10, but the evidence shows that retailers and industrial customers have the same limited supplier options, PTX452 at -448–52 (showing "Retail/Food Service Demand" has the same supply options as Industrial demand); PTX330 at 5 (retail, distributor, and food processor customers supplied by same refiners); PTX154 at -281 (Imperial mentioning only "United cane" as competition for Costco's southeast business).[2] Moreover, limiting the market to industrial customers would likely make the market shares *even higher* because both United and Imperial sell *roughly 80-90%* of their sugar to industrial customers. Defendants' Proposed Findings of Fact, D.I. 221 ("DFOF") ¶ 135.

    **C.**    **Defendants' Critiques Of The Relevant Geographic Markets Are Unavailing**

Defendants' abstract attack on the United States' proposed geographic markets boils

---

[2] In *American Crystal*, the relevant market included sales to both industrial and retail customers of refined sugar. 152 F. Supp. at 398.

4

down to the assertion that the United States drew their bounds too narrowly. Yet courts across the country, including the Third Circuit, routinely use an analytical tool to evaluate this very question: the hypothetical monopolist test. *FTC v. Hackensack Meridian Health*, 30 F.4th 160, 169 (3d Cir. 2022). Dr. Rothman conducted a rigorous analysis using this test and found that the United States' proposed markets were not too narrow. PFOF ¶¶ 77–82. He did not, as Defendants claim, simply "accept[] the markets Plaintiff proposed and assert[] that those markets passed the hypothetical monopolist test." Def. Br. 13. Defendants' economic expert, on the other hand, never even attempted to run a hypothetical monopolist test, nor did he demonstrate that his proposed modifications to Dr. Rothman's methodology actually led to a different result. PFOF ¶ 84; Tr. 984:13–985:15 (Hill). Defendants also fail to respond to Dr. Rothman's main arbitrage finding: purchasing from distributors outside the relevant markets would be insufficient to defeat a small but significant price increase. Tr. 600:1–20 (Rothman). Rather than demonstrating how the markets fail the test, Defendants attack the test itself, deriding it (falsely) as "a test that could not be failed." Def. Br. 13. But, of course, the Third Circuit and other courts would not rely on a useless standard. *E.g.*, *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 338 (3d Cir. 2016).

Defendants' efforts to enlarge the geographic market definition thwarts the purpose of the exercise: to help identify the customers who are most likely to be harmed by the merger. Tr. 597:13–22, 602:16–605:4, 613:24–614:2 (Rothman); Dep't of Justice and Fed. Trade Comm'n Horizontal Merger Guidelines ("Guidelines") § 4.1.1. Overly broad geographic markets bring in customers with significantly different competitive options, which has the effect of understating the harm to customers located close to Defendants' refineries. PFOF ¶¶ 87–88; *see FTC v. Advocate Health Care Network*, 841 F.3d 460, 472 (7th Cir. 2016) ("If the analysis uses geographic markets that are too large, consumers will be harmed because the likely

anticompetitive effects of hospital mergers will be understated.").

Defendants claim that "sugar flows" across regions, Def. Br. 12, but this does not defeat the United States' geographic market definition. The markets are defined around customer locations—as both sides' experts agree is proper, Br. 5 n.2; PFOF ¶ 76—which means the markets include "[a]ll producers of refined sugar" that sell to customers in those markets "regardless of where the producers themselves are located." Tr. 605:20–606:3 (Rothman). In other words, the fact that sugar flows across regions is already baked into the market definitions. Tr. 600:2–601:15 (Rothman). Defendants' broader markets would not bring in additional *suppliers* because all those suppliers *are already included in the market shares*; broader markets would simply bring in more *customers* that rely on these suppliers to different degrees and are differentially affected by the merger. Tr. 601:16–25, 603:11–604:13 (Rothman). This would obscure, not illuminate, the potential harm to customers located close to Defendants' refineries.

The same is true for Defendants' proposal to include additional states where Imperial makes sales far from its refinery, such as Texas. This approach would serve only to bring in customers facing significantly different competitive options from those located close to Defendants' refineries, thus "understat[ing]" the "likely anticompetitive effects" on customers most likely to be harmed. *Advocate Health*, 841 F.3d at 472; *see also United States v. Archer-Daniels-Midland Co.*, 781 F. Supp. 1400, 1413 (S.D. Iowa 1991) ("A given geographic area may be a relevant market notwithstanding: (1) sales by firms within that area to customers outside that area; or (2) sales by firms producing outside that area to customers within that area.") (citing *Phila. Nat'l Bank*, 374 U.S. at 359–61).

Defendants' other critiques of the geographic markets are also unavailing. Defendants claim that prices "equalize" across regions, but they ignore the evidence that prices actually

6

differ. Br. 8–9. Defendants contend that the United States was obligated to present a document that defined the geographic markets exactly as the complaint did; this ignores the consistent trial evidence that competition in the sugar industry is regional and industry participants define regions similar to the alleged geographic markets. Br. § III.B.[3] Defendants conflate Dr. Rothman's testimony that transportation costs are not *determinative* with their own flawed argument that transportation costs do not constrain competition. Def. Br. § I.B.4. Dr. Rothman explained that, while the high cost of transporting refined sugar long distances means that "competition is regional," "suppliers that are well situated to supply customers" within each region compete based on transportation costs and other factors. Tr. 596:4–597:12, 672:5–17.

Finally, Defendants conflate "repositioning and arbitrage" by arguing that suppliers focused on different regions would respond to price increases post-acquisition by expanding their sales in the relevant markets. Def. Br. 15, 20. Expansion and repositioning arguments are attempts to rebut the United States' presumption, not valid critiques of market definition. Guidelines § 4 (market definition depends "solely on demand substitution factors," not on "[t]he responsive actions of suppliers," which are considered at a different stage); *United States v. Energy Sols., Inc.*, 265 F. Supp. 3d 415, 443 (D. Del. 2017) (entry and expansion are rebuttal arguments). These rebuttal arguments are addressed *infra* § V.B. *See also* Br. § VIII.D.

### D.    The Proposed Acquisition Is Presumptively Unlawful

It is undisputed that the proposed acquisition is presumptively illegal in the United States' product and geographic markets. Even assuming arguendo that it were necessary to broaden them to the USDA South or even to a geographic market proposed by Dr. Hill, the

---

[3] Defendants are incorrect that ███████████████████████████████
████████████████████████████████████████████████.

presumption would still apply. Br. 21–23. In each of the markets proposed by Dr. Hill, concentration would increase significantly (with an HHI increase well over 200), *see* Tr. 994:6–17 (Hill), and the combined firm would have over 30% market share, Tr. 992:21–993:20 (Hill). Under *Philadelphia National Bank*, those figures mean the merger is illegal. 374 U.S. at 364; *accord Energy Sols.*, 265 F. Supp. 3d at 441. *See also Hackensack*, 30 F.4th at 173 ("Anticompetitive effects can occur at even lower thresholds.").

Defendants' statement that it would be "improper" (Def. Br. 21), to enjoin the merger based on these alternative markets—such as those offered by their own expert—is contrary to black-letter law. *See* Br. 22 n.7; *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 300 (D.D.C. 2020) (even though government's originally alleged market failed, it was court's "duty" to consider record evidence of different market). The cases Defendants cite in which courts did not consider alternative markets are inapposite; all dealt with significantly more complex questions than whether to add a few more states, and none considered alternative markets *proposed by Defendants themselves* and for which there was extensive record evidence of market shares and concentration. *Cf., e.g.*, *United States v. Sabre Corp.*, 452 F. Supp. 3d 97, 142 n.20 (D. Del. 2020), *vacated as moot by* No. 20-1767, 2020 WL 4915824 (3d Cir. July 20, 2020).[4]

## III.    THE MERGER WOULD LIKELY CAUSE UNILATERAL EFFECTS

The United States has also shown a "reasonable likelihood" that the merger would lead to unilateral effects. *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 88–89 (D.D.C. 2011). Such evidence strengthens the United States' prima facie case, *FTC v. Sysco Corp.*, 113 F. Supp.

---

[4] Defendants rely heavily on *Sabre* but never indicate that the decision was vacated as moot by the Third Circuit because defendants abandoned their merger while the United States was pursuing an appeal. Even as persuasive authority, *Sabre* is particularly inapposite because the district court's decision turned on its legal conclusion that the merging parties *could not compete* in the same relevant product market. 452 F. Supp. 3d at 136. Here, by contrast, there is no dispute that United and Imperial compete to sell sugar.

3d 1, 65–66 (D.D.C. 2015), and also provides an independent basis to enjoin the transaction, *H & R Block*, 833 F. Supp. 2d at 81.

### A.     United And Imperial Are Close Head-To-Head Competitors

For the merger to cause unilateral effects, United and Imperial need only be *close* head-to-head competitors to one another—they need not be the only or even the *closest* competitors. *See Anthem*, 236 F. Supp. 3d at 216; *Sysco*, 113 F. Supp. 3d at 62.[5] Defendants argue repeatedly that Imperial is a "residual or backup seller," Def. Br. 2, based on nothing more than their executives' say-so. But that—even if true—does not negate the evidence of head-to-head competition in the record. The United States established close competition between Defendants through ordinary-course-of-business documents, including an Imperial analysis describing United as a "close competitor[]," PFOF ¶¶ 105–08, 111–16; the testimony of customers, *e.g.*, PFOF ¶¶ 112, 114; evidence that pre-merger, United was poised to "attack the market" in Imperial's home turf, PFOF ¶¶ 119–25; economic analyses of Defendants' sales and margin data, PFOF ¶¶ 109, 126–28; evidence that Defendants are part of a limited number of choices for customers with specific need for cane sugar, *see* PFOF ¶ 108; and extensive evidence of the economic reality that refiners in close geographic proximity to one another, like Imperial and U.S. Sugar, often are close substitutes for nearby customers due to freight costs, Br. § III.A; PFOF § III.B.1. *See Anthem*, 236 F. Supp. 3d at 216 (listing the "[r]elevant evidence of a merger's potential unilateral effects").

---

[5] Defendants wrongly suggest that the United States must show Imperial is a "maverick" firm to prove unilateral effects. Def. Br. § III.A.2.b. While elimination of a maverick firm can be one factor that contributes to the likelihood of *coordinated* effects, *see generally* Guidelines § 7; *H & R Block*, 833 F. Supp. 2d at 79–81, for unilateral effects, the question is simply whether the merging parties are close substitutes, *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 131 (D.D.C. 2016) (citing Guidelines § 6). The acquisition of even a less "effective" competitor can still cause harm. *Energy Sols.*, 265 F. Supp. 3d at 439; Br. § VIII.A–B.

Once again, rather than refute this clear evidence of head-to-head competition, Defendants try to raise the evidentiary bar so high that it would be impossible to meet. Defendants fault Dr. Rothman for not calculating the exact frequency of head-to-head competition, Def. Br. 36, but Dr. Rothman's merger simulation auction model in fact uses available share and margin data to estimate the precise question at issue: how often United and Imperial are next-best substitutes for customers in the relevant markets, Tr. 624:1–25.[6] *See* Guidelines § 6.2. This modeling predicts the merger will cause tens of millions of dollars in harm annually from unilateral effects alone. PFOF §§ 126–28. Defendants demand a *different* analysis that was impossible here because the merging parties do not keep data on all of their customer bids. *See* Tr. 697:21–698:1 (Rothman). The unavailability of perfect data does not mean a merger is lawful; rather courts make predictions using the data available. *See Sysco*, 113 F. Supp. 3d at 54. Dr. Rothman used available data and a well-accepted economic model to construct a reasonable estimate of unilateral effects. Br. 28–29; *Sysco*, 113 F. Supp. 3d at 66–67 (crediting an auction model merger simulation using similar available share and margin data). Dr. Rothman's quantitative estimate was fully consistent with the customer testimony and business documents noted above establishing significant head-to-head competition, as well as with economic theory, which predicts that in an industry with high freight costs, nearby competitors are likely to be close competitors. *See* Tr. 596:4–597:12 (Rothman).

### B.    United Is Capable Of Exercising Market Power

Defendants suggest United cannot exercise market power because, as a cooperative that supposedly must "sell all of it," it cannot reduce output to raise prices. Def. Br. § III.A.1. This

---

[6] By contrast, Dr. Hill's models do not assess how frequently United and Imperial are next-best substitutes because they simply assume that transportation cost differences "dictate" the bid winner, ignoring the other ways in which sugar suppliers compete. PFOF ¶¶ 129–30.

assertion is wrong. Potential output suppression is one mechanism by which a merger could lead to harmful unilateral effects. Guidelines § 6.3. But it is not the only one: if a "merger between two competing sellers" would "prevent[] buyers from playing those sellers off against each other in negotiations," that "alone" could lead to unilateral effects. *Id*. § 6.2. Both sides' experts modeled unilateral effects on this theory of harm, Tr. 623:1–624:25 (Rothman), 958:10–959:1 (Hill), and the record shows customers do play Imperial and United off one another, Tr. 615:1– 17 (Rothman); *supra* § III.A. Eliminating this competition will enable United to raise prices for customers even without reducing total output. Br. 27 n.9.

Moreover, contrary to Defendants' assertion that United cannot reduce output one iota, United recognizes it has levers to adjust exactly when and to whom it sells its sugar to drive up prices. *See* PFOF ¶ 3; PTX490 at -120 ("We increase our share at the most profitable customers and let the least profitable fall off the back of the wagon" which allows United "to 'margin-up', increasing revenue to all our members"). United also considered a post-acquisition strategy of selling Imperial's sugar seasonally where United "[w]ould have to reduce total Seine [Imperial] production." PTX348 at -26. And, by acquiring Imperial, United can avoid investments to compete more closely with Imperial in the southeast. PFOF ¶ 125; *Penn State*, 838 F.3d at 350 (forgoing expansion "is a reduction in output").

Finally, the assumption that agricultural cooperatives like United are unable to exercise market power because they cannot reduce output implies that cooperatives cannot be liable under Section 7, and thus is wrong as a matter of law. *See Md. & Va. Milk Producers Ass'n v. United States*, 362 U.S. 458, 468–70 (1960) (enjoining acquisition by an agricultural cooperative). This argument suggests United's members could acquire every other sugar producer, leaving United as the only seller of sugar, and yet because of its "sell it all" directive, not be found in violation

11

of Section 7. *See* Tr. 588:1–15 (Rothman). Unchecked by competition, there is no question United would raise prices as much as possible, as it is incentivized to do. Br. 27 n.9; PFOF ¶ 96 (United CEO's bonus tied to getting the highest net selling price); PTX450 at -378 (United had a "[b]usy week" as it "tried to push prices higher" by "putting a closeout date [] on existing offers before we raised prices," ending in United "re-set[ting] the minimum[]" prices).

## IV.    THE MERGER WILL LIKELY CAUSE COORDINATED EFFECTS

A proposed acquisition violates Section 7 when there is a "reasonable probability" that it will make coordination more likely. Br. 31. Such coordination may take the form of parallel conduct, such as increasing prices in response to similar actions by rivals, and it need not be pursuant to any agreement. Guidelines § 7.

Defendants' contention that a Section 7 coordinated effects theory requires rare facts is plainly wrong. Even Defendants' carefully worded claim (at Def. Br. 38) that "[n]o court" has ever "granted DOJ" a "permanent injunction" "solely" based on coordinated effects is wrong. *See, e.g.*, *H & R Block*, 833 F. Supp. 3d at 81 ("Since the Court has already found that the preponderance of the evidence shows a reasonable likelihood of coordinated effects, the Court need not reach the issue of unilateral effects."). And it ignores that courts have regularly issued preliminary injunctions blocking mergers based solely on coordinated effects in cases brought by both the FTC and DOJ. *See, e.g.*, *FTC v. Elders Grain, Inc.*, 868 F2d 901, 905 (7th Cir. 1989) (enjoining merger that would reduce players in a market from six to five, thus threatening to make "it easier for leading members of the industry to collude on price, and output without committing a detectable violation of section 1 of the Sherman Act"); *FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187, 210 (D.D.C. 2018); *United States v. UPM-Kymmene Oyj*, 2003 WL 21781902, at *9, *12 (N.D. Ill. Jul. 25, 2003).

In this case, the United States has proven a reasonable probability of coordinated effects

due to the structure of the industry, which is characterized by few producers and pricing interdependence. Br. 32. Even more striking here, there was overwhelming evidence at trial that Domino and United, the industry's two largest players, are already coordinating by exchanging detailed, competitively sensitive information through an intermediary in a manner that can help would-be competitors coordinate on limiting competition. Br. § VII; PFOF § IV.C.2. And, evidence that Domino already pulls competitive punches to send signals to United. PFOF ¶ 150. If the merger occurs, this behavior will cover an even larger share of the market and bring Imperial in line with United and Domino. (Imperial has refused to share sensitive information with competitors and, according to its CEO, would never do so. PFOF ¶¶ 146, 148.)

Defendants argue, without merit, that this information exchange is "irrelevant" because the information is shared with customers and published in third-party sources. Def. Br. 41. First, even if such information *were* widely available, that wide availability would only further demonstrate that the industry is vulnerable to coordination and eliminating Imperial as a constraint on that coordination would make it even easier. *See, e.g.*, *Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1389 (7th Cir. 1986); *FTC v. Swedish Match*, 131 F. Supp. 2d 151, 168 (D.D.C. 2000); Guidelines § 7.2 (transparent pricing makes coordination easier).

Defendants' argument is also false as a matter of fact. First, a seller's sold position is confidential and competitively sensitive; United's CEO acknowledged it keeps this information close to the vest. PFOF ¶ 146. A seller's sold position affects its aggressiveness on price when competing for customers: when sellers know their competitors are low on inventory, they can demand higher prices, secure in the knowledge their rivals are unlikely to undercut them. PFOF ¶¶ 147, 149. Second, individual refiners' current sugar prices are competitively sensitive. Sugar refiners have policies against sharing pricing information with competitors and do not publish

13

the current prices on their websites. PFOF ¶ 146. The pricing information shared through Mr. Wistisen extends far beyond "spot" prices, *see* PFOF ¶ 141, but even sharing of spot prices can facilitate coordinated price increases—exactly the sort of coordinated effect with which Section 7 cases are concerned. Spot prices can be the basis for contract prices and can form a contract price, PFOF ¶ 141, and companies treat spot prices as competitively sensitive, PFOF ¶ 146. This is in stark contrast to the prices published by the USDA and other third parties, which are *aggregated* numbers, are not attributable to specific refiners, and are published on a delay, unlike the real-time, company-specific information passed between Domino and United via Mr. Wistisen. PFOF ¶¶ 141–45; Tr. 890:3–7 (Fecso).

Furthermore, even outside the merger context, courts have long recognized that the exchange of information, like that exchanged between United and Domino, can be illegal even absent an agreement to fix prices. *See, e.g.*, *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978) ("[e]xchanges of current price information, of course, have the greatest potential for generating anticompetitive effects"); *United States v. Container Corp. of Am.*, 393 U.S. 333, 337 (1969) (finding that the exchange of pricing information among competitors in an industry "dominated by relatively few sellers" violated the Sherman Act); *Sugar Inst. v. United States*, 297 U.S. 553, 604 (1936) (upholding a decree preventing sugar refiners from exchanging "statistical information regarding melt, sales, deliveries, [and] stocks on hand"). Whether the exchange of price and sold-through information between United and Domino rises to the level of an independent violation of law is a question for another day. At a minimum, this information exchange demonstrates just how vulnerable the refined sugar industry already is to coordination and, because the merger will increase the risks to competition from such an exchange, it supports preventing further consolidation. *See* Br. 33–34.

14

**V.      DEFENDANTS FAIL TO REBUT THE UNITED STATES' PRIMA FACIE CASE**

**A.      Imperial Is Not A Weakened Firm Under *General Dynamics***

The weakened competitor defense is "probably the weakest ground of all for justifying a

merger," *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1221 (11th Cir. 1991), so Defendants' "Hail-

Mary" attempt to meet its requirements, *ProMedica Health Sys. v. FTC*, 749 F.3d 559, 572 (6th

Cir. 2014), predictably falls short. As described in *United States v. General Dynamics Corp.*, the

weakened competitor argument requires Defendants to show that historical market statistics do

not accurately reflect Imperial's "probable future ability to compete." 415 U.S. 486, 503 (1974).

A firm's "difficulties" are thus "relevant only where they indicate that *market shares would*

*decline in the future* and by enough to bring the merger below the threshold of presumptive

illegality," thereby "genuinely undercut[ting] the statistical showing of anticompetitive market

concentration." *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 154 (D.D.C. 2004) (emphasis

added). This evidence must demonstrate the market shares fail to "sufficiently account for [the

target's] alleged shortcomings." *Univ. Health*, 938 F.2d at 1221.

Defendants cannot meet this burden simply by arguing (incorrectly) that Imperial has

higher costs than its competitors and "is not aggressive on price." Def. Br. 26. Defendants do not

dispute that Imperial's market shares from 2018 to 2021 have been stable; they only

mischaracterize these shares as "inflated temporarily due to the beet freeze" even though they

include years both before and after the beet freeze. PFOF ¶¶ 205–06; DFOF ¶ 110 n.6.

"Aggressive" or not, and notwithstanding higher costs, Imperial wins significant business.[7]

Imperial is profitable today, has been profitable in the past, and, *with the same cost structure*, is

---

[7] The record is blanketed with examples of Imperial competing on price, PFOF § IV.B.1–2; Br.
24–26, and on other qualitative metrics, PFOF § IV.B.3; Br. 25.

expected to be profitable in the future.[8] *See* PFOF ¶ 207. In short, Defendants fail to rebut the market shares by showing that they do not "sufficiently account" for any shortcomings Imperial *already has today* and might have in the future. *Univ. Health*, 938 F.2d at 1220–21 (citing *Gen. Dynamics*, 415 U.S. at 500–04). This is in stark contrast to firms deemed "weakened competitors" in other cases. *E.g.*, *Gen. Dynamics*, 415 U.S. at 493 (acquired coal company's reserves were depleted); *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 220 (S.D.N.Y. 2020) ("even the most optimistic analyst reports projected a shortfall of $6 billion" of free cash flows, "similarly dismal" EBITDA); *Arch Coal*, 329 F. Supp. 2d at 157 (acquired coal company had low reserves, weak credit, and high and increasing costs).[9]

Finally, Defendants cannot meet this requirement by claiming "U.S. Sugar is the only buyer to make an acceptable offer in five years." Def. Br. 25. Defendants must "make[] a substantial showing that the acquired firm's weakness" could not "be resolved by any competitive means." *Univ. Health*, 938 F.2d at 1221; *ProMedica*, 749 F.3d at 572 (same). Simply asserting that LDC did not receive another buyout offer that it viewed as providing an "acceptable" profit does not meet this burden. *See also* Br. 36 (LDC's investment in Imperial has been profitable). Moreover, for nearly four of the last five years, either United or U.S. Sugar has pursued an acquisition of Imperial, PFOF ¶¶ 11–13, and in May 2020, U.S. Sugar and Imperial entered into an exclusivity agreement *prohibiting* third-party solicitations, PFOF ¶ 212.

### B.   Potential Expansion And Entry Are Insufficient To Rebut The Prima Facie Case

Defendants cannot "carry the burden to show that ease of expansion is sufficient to fill

---

[8] Defendants also assert "LDC is not making material capital improvements at Imperial going forward." Def. Br. 25. But LDC has made at least $101 million capex investments in Imperial, PFOF ¶ 208, and U.S. Sugar's plans are similar to Imperial's existing plans. PFOF ¶¶ 195–97.

[9] Contrary to Defendants' suggestion, *United States v. Baker Hughes* was not a weakened competitor case. 908 F.2d 981 (D.C. Cir. 1990).

the competitive void that will result if [U.S. Sugar is] permitted to purchase" Imperial, *H & R Block*, 833 F. Supp. 2d at 73 (quotations omitted), and that this expansion would be "timely, likely and sufficient in its magnitude, character, and scope" to replace the competition lost by the elimination of Imperial, *Energy Sols.*, 265 F. Supp. 3d at 44.

First, Defendants' contention that the United States' market statistics are "static" and thus "inconsistent" with the competitive realities of the market is wrong. The United States' economic expert calculated market shares not just for one year, but for four years (2018–2021), finding that, despite any alleged expansion or entry, Imperial's market share remained consistent. PFOF ¶¶ 205–06. These calculations included all competitors selling into the relevant markets, including any sugar that "flowed" into the relevant markets from more distant competitors. *Supra* § II.C. To rebut this evidence, Defendants must show why these shares do not "sufficiently account" for market realities, including the ability of competitors to enter, expand, or reposition. *Univ. Health*, 938 F.2d at 1220–21. They do not even attempt to do so.

Second, Defendants' limited examples do not show that expansion could sufficiently "fill the competitive void" from losing Imperial as an independent competitor, *H & R Block*, 833 F. Supp. 2d at 73. *See also* Br. 42–43; PFOF § V. Defendants point to Indiana Sugars, but that company is a distributor, not a sugar refiner. DFOF ¶ 67. As discussed, distributors do not independently constrain refiners because they *depend* on refiners, like Imperial and United, to obtain refined sugar. *Supra* § II.A. Even if included, Indiana Sugars would account for less than ███ of sales in the United States' broader market. PFOF ¶ 101. In addition, despite suggesting entry is ongoing, Defendants cite no evidence that *new* refiners have recently entered the relevant markets or would do so in the future. Nor do they address the stringent entry requirements for new domestic sugar producers to receive a marketing allotment from the USDA. *See* 7 U.S.C. §

1359dd. Finally, Defendants overstate the competitive significance of potential expansion by existing sugar producers in the relevant markets. *See* Br. § VIII.D; PFOF ¶¶ 158–68.

### C.    Sophisticated Buyers Cannot Prevent The Resulting Competitive Harm

If the merger occurs, sugar customers of all sizes will no longer be able to negotiate with an independent Imperial. Defendants claim that the mere existence of "sophisticated" buyers is sufficient to rebut the United States' prima facie case, Def. Br. § II.C. But this is plainly incorrect. *Anthem*, 236 F. Supp. 3d at 221 (quoting Guidelines § 8). Sophisticated sugar customers, like all customers, rely on competition. *See, e.g.*, PFOF ¶¶ 111–13. Larger customers may have greater leverage to negotiate favorable pricing than smaller customers, but that is no basis to permit United to increase its own leverage to raise prices through an anticompetitive merger. *See Penn State*, 838 F.3d at 346 (rejecting defense to hospital merger that insurance companies have significant bargaining leverage); *accord* Guidelines § 8; *FTC v. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 70–71 (D.D.C. 2018); *Chicago Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 440 (5th Cir. 2008) ("[T]he economic argument for even partially rebutting a presumptive case, because a market is dominated by large buyers, is weak."). Finally, courts reject this defense where, as here, some customers may be large and sophisticated, but others are not. *See United States v. United Tote, Inc.*, 768 F. Supp. 1064, 1085 (D. Del. 1991).

### D.    Defendants' Supposed Intent Is Not A Recognized Defense

Defendants' argument that a lack of anticompetitive intent, or the existence of a benign "deal rationale," rebuts the prima facie case, *see* Def. Br. 28, is contrary to law. Under this flawed logic, a merger to monopoly could not be challenged so long as there was scant evidence of bad intent. That would undercut Congress' purpose to arrest anticompetitive effects in their incipiency. A lack of anticompetitive intent documents (or the presence of documents supposedly showing a benevolent motive) does not undermine the prima facie case. *United*

*States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586, 607 (1957) ("It is not requisite to the proof of a violation of § 7 to show that restraint or monopoly was intended.").[10] In effect, Defendants are arguing—with no caselaw support—that even if they cannot meet the standard to show the transaction will create efficiencies, evidence that they *wanted* to create efficiencies is enough to rebut the prima facie case. Defendants are free to abandon the efficiencies defense, *see* Def. Br. 27–28, but they cannot evade its "stringent" requirements by simply calling it something else, *Hackensack*, 30 F.4th at 176 (rejecting effort by defendants to claim a "procompetitive benefits" argument is not an efficiencies defense). *See also* Br. § VIII.E; PFOF § VII.

## VI.   THE ATTACKS ON DR. ROTHMAN'S CREDIBILITY ARE BASELESS

Defendants' attacks on Dr. Rothman's credibility fall flat. Dr. Rothman is a well-recognized economic expert, and courts have credited Dr. Rothman's opinions in Section 7 cases, including his views on market definition and competitive effects. *See RAG-Stiftung*, 436 F. Supp. 3d at 293, 300, 304 (market definition and competitive effects); *Wilhelmsen*, 341 F. Supp. 3d at 72–73 (efficiencies); *In re Altria Grp., Inc.*, FTC Docket No. 9393, at 88–90 (Initial ALJ Decision Feb. 23, 2022, on appeal to FTC) (market shares). Sensing the danger of Dr. Rothman's robust analysis, Defendants desperately attack his work in this expedited case based on his correction of small mistakes that did not impact his ultimate conclusions.[11] By contrast, the flaws in Dr. Hill's analysis were far more consequential and substantive. *See, e.g.*, PFOF ¶¶ 63–64, 75,

---

[10] Defendants have been exploring this acquisition since late 2018, PFOF § I.B., have been well counseled over that entire period, and know it would be "foolish to make discoverable statements that are so damaging." AREEDA & HOVENKAMP, ANTITRUST LAW ¶964c.

[11] The flimsy bases on which Defendants attack Dr. Rothman's credibility are (1) a typo—that was promptly corrected—describing the *premerger* HHIs, which are irrelevant to the analysis; (2) an error in the GUPPI formula that had little effect on the result and that—though it was properly applied in this case, which involves heterogeneous competition—Dr. Rothman did not rely on at trial because his merger simulation was a more sophisticated tool, Tr. 623:1–11, 628:6–629:7; and (3) a single incorrect citation to an economic paper that did not change the *undisputed* conclusion that refined sugar lacks good substitutes, PFOF ¶ 45.

80–88, 97–98, 100–01, 127–30, 155, 157, 161–69, 190, 194, 199–200.

## VII.   DR. FECSO'S OPINION IS NOT SUPPORTED BY THE FULL TRIAL RECORD

Dr. Fecso is not an "industry expert" for this case; she is a fact witness who lacked access to the full trial record, and testified only as to her personal opinion. PFOF ¶ 175. The USDA, including Dr. Fecso, has "no involvement" in the relationship between sugar producers and their customers and cannot monitor contract prices. PFOF ¶ 172. Nor does the USDA get involved in the customer service offered by refined sugar producers. *Id.* Without visibility into the prices and services refined sugar customers receive today, Dr. Fecso lacks the information necessary to provide an informed opinion on how the proposed transaction is likely to *change* the prices and service offered to these customers.

Dr. Fecso's personal opinion about the purported benefits of the proposed transaction is based solely on her own conversations with Defendants' executives. *See* Tr. 882:16–23 (opinion "based on the conversation" with the CEOs "the day before they announced the transaction," "[a]nd knowing these people as long as I have, it sounded – I had high faith that it was good"). Dr. Fecso acknowledged that her testimony about any potential efficiencies—including the potential for lower prices—is an educated guess based on no data. PFOF ¶ 175. Dr. Fecso did not undertake any quantitative analyses of the effects of the proposed transaction. PFOF ¶ 175. Her personal opinion about the transaction and its potential anticompetitive effects should not be given any weight,[12] and the merger should be declared unlawful and blocked.

---

[12] Dr. Fecso's testimony about Imperial's sales performance is illustrative of her information gap concerning this transaction. Dr. Fecso testified that she believed Imperial's market position has been decreasing in recent years, Tr. 898:4–22, but the undisputed data in the record is that Imperial's shares in the relevant markets have been steady, if not increasing. PFOF ¶¶ 175, 205.

Respectfully submitted,


/s/ Shamoor Anis
SHAMOOR ANIS
LAURA D. HATCHER (#5098)
Chief, Civil Division
United States Attorney's Office
District of Delaware
1313 N. Market Street, Suite 400
Wilmington, Delaware 19801
Tel.: (302) 573-6205
shamoor.anis@usdoj.gov
laura.hatcher@usdoj.gov


/s/ Brian Hanna
BRIAN HANNA
STEPHANIE PEARL
ROBERT LEPORE
JONATHAN MINCER
JOHN THORNBURGH
CHINITA SINKLER
JILL PTACEK
CURTIS STRONG
DAVID GEIGER

Attorneys for the United States
U.S. Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 8000
Washington, DC 20530
Tel.: (202) 460-4294
brian.hanna2@usdoj.gov

21

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 27, 2022, a true and correct copy of the foregoing was served on all counsel of record via email.

/s/ Brian Hanna
BRIAN HANNA
U.S. Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 8000
Washington, DC 20530
Tel.: (202) 460-4294
brian.hanna2@usdoj.gov
