## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff,* | |
| v. | C.A. No. 21-cv-1644-MN |
| UNITED STATES SUGAR CORPORATION, UNITED SUGARS CORPORATION, IMPERIAL SUGAR COMPANY, and LOUIS DREYFUS COMPANY, LLC, | **CONFIDENTIAL – FILED UNDER SEAL** |
| *Defendants.* | |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S
## EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL

On September 26, 2022, the United States filed a protective notice of appeal in this case. The Antitrust Division and the Solicitor General are currently reviewing the Court's opinion ("D.I. 242") to determine whether to proceed with an appeal.[1] The United States respectfully requests that the Court (a) enjoin the proposed acquisition of Imperial Sugar Company ("Imperial") by United States Sugar Corporation ("U.S. Sugar") for thirty days to give the Antitrust Division and the Solicitor General an opportunity to review the Court's opinion and determine whether to pursue an appeal and (b) if the United States pursues an appeal, enjoin the proposed acquisition pending appeal. Alternatively, the United States moves for a fourteen-day

---

[1] Only the Solicitor General can authorize the United States to pursue an appeal, but a protective notice of appeal can be filed before an appeal is authorized.

injunction to pursue an expedited motion pursuant to Federal Rule of Appellate Procedure 8 in the United States Court of Appeals for the Third Circuit.[2]

The requested relief is necessary to protect purchasers and consumers of refined sugar and to preserve the United States' ability to obtain an effective remedy if it pursues an appeal. In the absence of an injunction pending appeal, Defendants could consummate their transaction at 12:01 A.M. on October 3, 2022. *See* Timing Agreement, Ex. A ¶ IV.B (providing that Defendants will not consummate their transaction until the tenth day after the entry of an appealable judgment by this Court).

There is no dispute that United Sugars Corporation ("United"), which markets and sells all of U.S. Sugar's refined sugar, competes with Imperial in the sale of refined sugar. *See, e.g.*, Trial Tr. 1137:24–1138:13. If Defendants are permitted to close their merger on October 3, 2022, prior to final resolution of an appeal, this competition would be extinguished, and Defendants will be able to consolidate services and personnel, share sensitive information about their competitive pricing strategies, enter into agreements with third parties, and make other changes that will render it impossible to restore completely the status quo level of competition. As the Third Circuit has recognized, after a merger is consummated, "since it is extraordinarily difficult to unscramble the egg, it will be too late to preserve competition if no . . . injunction has issued." *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 353 (3d Cir. 2016) (internal quotation marks and citation omitted). Defendants, by contrast, would not be injured substantially by

---

[2] The United States respectfully requests that the Court rule on this motion promptly.  Unless this Court quickly grants at least a temporary injunction, the United States may need to move for an injunction in the Third Circuit later this week to provide the appeals court with time to consider the motion before the proposed merger has been consummated.

continuing to operate as separate businesses, as they have for many years (including the last 18 months under an acquisition agreement while antitrust review and litigation have proceeded).

The United States respectfully submits that, as explained further below, the Court's decision raises serious and substantial legal issues on which the United States has at least a reasonable probability of prevailing on appeal. In a recent merger case that, like this one, presented substantial questions about market definition, the Third Circuit issued an injunction pending appeal and subsequently applied de novo review to reverse the district court's misapplication of legal standards governing the relevant market. *See FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 338–46 (3d Cir. 2016); Order, *FTC v. Penn State Hershey Med. Ctr.*, No. 16-2365 (3d Cir. May 24, 2016); Emergency Motion of FTC and Commonwealth of Pa. for an Injunction Pending Appeal and to Expedite Appeal, *FTC v. Penn State Hershey Med. Ctr.*, No. 16-2365, D.I. 003112292306 (3d Cir. May 24, 2016). Just as the Third Circuit did in *Penn State*, this Court should enjoin consummation of the merger so that, if the United States pursues an appeal, questions vital to competition in the U.S. sugar industry can be fully litigated before the Court of Appeals.

## I.     The Legal Standard

Under Rule 62(d) of the Federal Rules of Civil Procedure, the Court has the discretion to grant an injunction pending appeal. Fed. R. Civ. P. 62(d). An injunction pending appeal "does not decide the ultimate issue in the litigation . . . . The Rule 62(d) [order] instead merely maintains the status quo" during resolution of the appeal. *In re Trans World Airlines, Inc.*, 18 F.3d 208, 215 (3d Cir. 1994).

Courts traditionally consider four factors in determining whether to issue a Rule 62(d) order: "(1) whether the . . . applicant has made a strong showing that he is likely to succeed on

the merits; (2) whether the applicant will be irreparably injured . . . ; (3) whether issuance . . .

will substantially injure the parties interested in the proceeding; and (4) where the public interest

lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *see Crystallex Int'l Corp. v. PDV Holding

Inc.*, No. 15-CV-1082-LPS, 2019 WL 6785504, at *2 (D. Del. Dec. 12, 2019) (applying *Hilton*

factors to grant motion to stay); *Cipla Ltd. v. Amgen Inc.*, C.A. No. 19-44-LPS, 2019 WL

2053055, at *1 (D. Del. May 9, 2019) (applying *Hilton* factors to assess whether to issue

injunction pending appeal); *see also Prometheus Radio Project v. FCC*, No. 03-3388, 2003 WL

22052896, at *1 (3d Cir. Sept. 3, 2003) (per curiam) (granting stay when petitioner "has alleged

harms from industry consolidation contending they would be … irreversible if they occurred"). If

the movant makes a sufficient showing of likelihood of success and irreparable injury, then the

court "considers the remaining two factors and determines in its sound discretion if all four

factors, taken together, balance in favor of granting the requested preliminary relief." *Reilly v.

City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017) (addressing standard for preliminary

injunctions and noting that factors considered for stay pending appeal are same as for

preliminary injunctions). Under the Third Circuit's sliding-scale framework, the greater the

moving party's showing of irreparable harm, the lesser its showing need be on the merits.  *In re

Revel AC, Inc.*, 802 F.3d 558, 569–70 (3d Cir. 2015) (addressing stay pending appeal in

bankruptcy matter).

The first two factors are "the most critical." *Nken v. Holder*, 556 U.S. 418, 434

(2009). "As to the first factor, a strong showing of the likelihood of success exists if there is 'a

reasonable chance, or probability, of winning.'" *Singer Mgmt. Consultants, Inc. v. Milgram*, 650

F.3d 223, 229 (3d Cir. 2011) (en banc). "A likelihood does not mean more likely than not," *id.*,

and the court is "concerned only to find out if the [movant] 'has . . . raised questions going to the

merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation,'" *R.R. Yardmasters of Am. v. Pa. R.R. Co.*, 224 F.2d 226, 229 (3d Cir. 1955) (quoting *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953)); *In re Revel AC*, 802 F.3d at 570 (likelihood-of-success factor requires showing "serious questions going to the merits"). As for the second factor, the movant must show irreparable harm is "likely." *Reilly*, 858 F.3d at 179. When the United States establishes a likelihood of success on the merits in a Section 7 case, the court presumes that this second factor is satisfied.  *See United States v. Ingersoll-Rand Co.*, 320 F.2d 509, 524 (3d Cir. 1963). The moving party has the burden of showing that the balance of factors weighs in its favor. *Nken*, 556 U.S. at 433–34.

## II.     The United States Has Made a Strong Showing of a Likelihood of Success on the Merits

Granting an injunction is appropriate in this case because the United States has made a strong showing that the proposed transaction is unlawful under Section 7 of the Clayton Act, 15 U.S.C. § 18. The proposed acquisition would extinguish competition between United and Imperial, putting sugar customers across the southeast and mid-Atlantic regions at the mercy of United and Domino, an effective duopoly that would control about three-quarters of sales in that area. Tr. 611:12–25 (Rothman). The post-merger entity alone would control over 45% of refined sugar in even the broader geographic market proposed by the United States, which—along with the increased market concentration precipitated by the merger—establishes a presumption that the acquisition may substantially lessen competition in the relevant markets. Tr. 611:12–25, 613:2–5 (Rothman); *see United States v. Phila. Nat'l Bank*, 374 U.S. 321, 364 (1963) ("Without attempting to specify the smallest market share which would still be considered to threaten undue concentration, we are clear that 30% presents that threat."). Even more striking, this presumption

5

holds even if *defendants'* geographic markets are accepted: In those markets, the post-merger entity would become the new market leader with at least 30% market share. Tr. 992:17–993:8, 993:12–19 (Hill). And, no matter which market the court selected, the United States showed that the acquisition is reasonably probable to eliminate substantial head-to-head competition between United and Imperial and to increase coordination in the relevant markets, potentially resulting in 5–7% price increases for the defendants' customers. Tr. 614:16–616:8, 622:8–24, 625:4–21, 627:16–628:4.

To begin with, with respect to the definition of both product and geographic markets, the United States respectfully submits that the Court ran afoul of controlling market-definition precedent and misapplied the hypothetical monopolist test in several key respects. As the Third Circuit has made clear, the hypothetical monopolist test is one useful tool to "take into account the commercial realities of the specific industry involved." *Penn State*, 838 F.3d at 342, 344. In concluding that the United States' proposed markets  "ignore the commercial realities of sugar supply in the U.S," D.I. 242 at 41, 47 (product market), 51 (geographic market), however, the Court's opinion misapplied well-settled principles of this market-definition exercise.

The United States has a number of credible grounds to challenge this Court's product-market analysis. First, the Court's determination that distributors should be included in the relevant product market would involve the double-counting of distributor-sold sugar, because the United States' market definitions already account for sugar sold through distributors. Most distributors purchase their entire supply of refined sugar from refiners, and the relevant markets the United States proposed already included any of that sugar distributed within those markets.[3]

---

[3] If a distributor also produced its own refined sugar or purchased all or part of its supply of refined sugar from foreign refiners that were *not* already included in the United States'

If distributors' *resales* of the same sugar were then added to the refiners' market shares, as the Court's logic seems to require, the result would be substantial double-counting sugar already reflected in refiners' market shares.

In examining mergers involving a distribution chain, the Supreme Court and the Third Circuit have addressed and validated the logic of calculating market shares for distributed goods on the basis of the suppliers that produced them. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 341 n.69 (1962) (calculating market shares by assigning distributors' sales to manufacturer whose products were being distributed); *Phila. Nat'l Bank*, 374 U.S. at 356 (small-loan companies not in same market as commercial banks because "companies' working capital consist[ed] in substantial part of bank loans"); *Allen-Myland, Inc. v. Int'l Bus. Machines Corp.*, 33 F.3d 194, 202–04 (3d Cir. 1994) (computer lessors not in same relevant market as manufacturers because former obtained their equipment from latter); *see also United States v. Aluminum Co. of Am.*, 148 F.2d 416, 425 (2d Cir. 1945) (declining to assign market shares to aluminum-ingot *re*sellers in market for aluminum ingot). This Court's treatment of distributors is inconsistent with this longstanding precedent.

Second, treating distributors as market participants based on their current competitive capabilities, as in D.I. 242 at 44–47, misapplies the hypothetical monopolist test. Even if distributors' current supply relationships with refiners place them in a position to compete with refiners for sales to wholesale customers, a hypothetical monopolist of the market for production and sale of refined sugar would control all sugar sold to distributors and thus could demand terms that would prevent refiner-distributor competition. The hypothetical monopolist test treats

---

defined market, the United States assigned market shares to account for those distributors and importers. Tr. 605:20–606:3, 611:6–25.

distributors as the hypothetical monopolist's customers (who would be at the mercy of any price increases imposed by the monopolist), not as its competitors.

In addition, the Court's view that the United States should have disaggregated industrial and retail customers (D.I. 242 at 48) does not find support in the case law, which imposes no requirement that customers be identically situated. This holding also overlooks that the disaggregation would only have strengthened the presumption that the merger may substantially lessen competition: Because United and Imperial each sell roughly 80–90% of their sugar to industrial customers while their major competitor, Domino, sells only about 50% of its sugar to industrial customers (Tr. 166:25–167:3, 255:10–12), the already high market-share and market-concentration statistics put forward by the United States would have *increased* if industrial customers were considered independently. *See Brown Shoe*, 370 U.S. at 327 (declining to divide market where appellant could "point to no advantage it would enjoy were finer divisions . . . employed"). That showing of reasonably probable harm to industrial customers should have been enough to establish a *prima facie* case. *See Brown Shoe*, 370 U.S. at 325 (if reasonable probability of harm exists in any "submarket," "the merger is proscribed").The United States is also likely to succeed in challenging the Court's geographic-market analysis. First, while the Court found that it was "simply not credible" for both the entire United States and a six-state region to pass the hypothetical monopolist test (D.I. 242 at 50–51), the test looks only at whether a market is "too narrow" to constitute a relevant market, *see Penn State*, 838 F.3d at 338, not at whether it is too broad; that a broader market satisfies the test says nothing about whether a narrower market would do so. Courts recognize that multiple markets may pass the hypothetical monopolist test and "ordinarily" look to "the smallest . . . market" that satisfies the test. *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 58–60 (D.D.C. 2011); *see also FTC v. Tronox*

*Ltd.*, 332 F. Supp. 3d 187, 201–02 (D.D.C. 2018) (discussing this principle); *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 26 (D.D.C. 2015) (same); *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 120 (D.D.C. 2004) (same); *cf. Times-Picayune Pub'g Co. v. United States*, 345 U.S. 594, 612 n.31 (1953) ("The circle must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn."). The Supreme Court itself has defined multiple concentric relevant markets, *United States v. Pabst Brewing Co.*, 384 U.S. 546, 552 (1966) (Wisconsin, three-state region including Wisconsin, and United States as a whole all relevant geographic markets), and has confirmed that "a geographic submarket" of a broader market may be "the appropriate 'section of the country'" in which to analyze a merger's competitive effects, *Brown Shoe*, 370 U.S. at 336.

Second, while the Court believed that the United States' geographic markets failed to account for the "commercial realit[y]" that "sugar flows" (D.I. 242 at 52), the Court overlooked that the United States proposed a customer-based geographic market in this case. As the term suggests, a customer-based geographic market is one that focuses on customers' locations—and thus does not exclude any refiners from outside the region that sell sugar into it.  The United States' markets already accounted for this commercial reality.

Third, the Court invoked potential seller repositioning to undermine the United States' proposed geographic markets (D.I. 242 at 51–52), but this factor is properly addressed in considering defendants' rebuttal case, not in assessing market definition. *Penn State*, 838 F.3d at 351 (treating possibility of competitors' "repositioning" as rebuttal factor); *Chi. Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 424, 427, 436 (5th Cir. 2008) (treating entry as rebuttal factor). At the market-definition stage, repositioning and supply substitution—i.e., sellers' ability to offer alternative supply in the face of a hypothetical monopolist—is not considered. When competitive

repositioning does come into play at the rebuttal stage, it is subject to stringent requirements that the Court never applied here: To be relevant to a rebuttal case, repositioning must be "timel[y], likel[y], and sufficien[t]"—factors that the defendants, like the defendants in *Penn State*, would not have been able to meet. *See* 838 F.3d at 351.

Finally, the Court's analysis of competitive effects provides additional grounds for a successful appeal. First, if the Court did not believe the markets proposed by the United States provided an appropriate basis to evaluate the transaction, the Court should have examined effects in whatever market(s) it believed appropriate. *See United States v. Cont'l Can Co.*, 378 U.S. 441, 457 (1964) (finding reasonable probability of harm in a market that was "not pressed upon" the court by the parties); *FTC v. AbbVie Inc.*, 976 F.3d 327, 373 (3d Cir. 2020) (district court "defined the relevant antitrust market in terms no expert had endorsed" but FTC argued defendant "still possessed monopoly power" in that market); *United States v. Energy Sols., Inc.*, 265 F. Supp. 3d 415, 436–37 (D. Del. 2017) (finding different market than the one alleged by United States). In this case, the United States' evidence established potential anticompetitive effects in markets other than the ones proposed by the government, including the defendants' own proposed markets. The United States' evidence of market shares and market concentration established a presumption that the acquisition may substantially harm competition in the defendants' proposed geographic markets, and the United States' evidence of unilateral and coordinated effects similarly established potential anticompetitive effects in any of the markets that the Court could have selected to assess competitive effects. Tr. 614:16–616:8, 622:8–24, 625:4–21, 627:16–628:4, 992:21–993:20, 994:6–17.

In addition, the Court's conclusion that the United States Department of Agriculture can counteract any anticompetitive effects (D.I. 242 at 54–58) improperly fails to apply Section 7 in

regulated industries. Section 7 generally applies with full force to both regulated and unregulated industries except where there is an express or implied immunity from the antitrust laws—which Defendants have not argued, and could not argue, is the case here. *See, e.g.*, *Md. & Va. Milk Producers Ass'n v. United States*, 362 U.S. 458, 469–70 (1960) (Agricultural Adjustment Act did not displace application of Section 7 to acquisition by agricultural cooperative). The Court did not reference this principle, nor did it distinguish any of the cases cited by the United States establishing that, where regulations merely restrict prices to a "zone of reasonableness" (as the Department of Agriculture's regulations do, *see* 7 U.S.C. §§ 1359bb *et seq.*; Tr. 859:6–16, 886:12–24, 887:24–888:9, 889:23-891:1), anticompetitive conduct "within that zone" can "constitute violations of the anti-trust laws." *Georgia v. Pa. R.R. Co.*, 324 U.S. 439, 460–62 (1945); *see Phila. Nat'l Bank*, 374 U.S. at 328 (blocking merger in heavily regulated bank industry because, "[i]n the range between the maximum fixed by state usury laws and the practical minimum set by federal fiscal policies . . . , bankers are free to price their loans as they choose"). Instead, the Court cited *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 412 (2004), but that was a case about the details of regulated access to facilities that has never been understood to displace Section 7 merger analysis, even in the highly regulated telecommunications industry, which has frequently been subject to merger challenges brought by the United States. *See, e.g.*, *United States v. AT&T*, No. 1:11-cv-01560 (D.D.C. Aug. 31, 2011) (Doc. 1).

### III.     The United States Will Be Harmed Irreparably if the Merger Proceeds

The United States and American consumers would be harmed irreparably absent an injunction. In the preliminary-injunction context, the Third Circuit presumes irreparable injury upon a showing by the United States of likelihood of success on the merits of a Section 7 claim.

*United States v. Ingersoll-Rand Co.*, 320 F.2d 509, 524 (3d Cir. 1963) ("[T]he United States is not required to prove public detriment from a merger which would violate the provisions of Section 7."), *disapproved on other grounds by United States v. FMC Corp.*, 84 S. Ct. 4 (1963) (Goldberg, J., in chambers); *see also United States v. Siemens Corp.*, 621 F.2d 499, 506 (2d Cir. 1980) ("[O]nce the Government demonstrates a reasonable probability that § 7 has been violated, irreparable harm to the public should be presumed."); *United States v. Calmar, Inc.*, 612 F. Supp. 1298, 1300 (D.N.J. 1985) ("In an action brought by the United States to enforce Section 7 of the Clayton Act irreparable injury is presumed once the government has established a reasonable likelihood of success on the merits.") (citing *Ingersoll-Rand*, 320 F.2d 509); *United States v. Am. Tech. Indus., Inc.*, No. 73-246, 1974 WL 823, at *2 (M.D. Pa. Jan. 8, 1974) (in Section 7 case, "the plaintiff, the United States Government, need not show irreparable injury" to obtain preliminary injunction); *United States v. Chrysler Corp.*, 232 F. Supp. 651, 657 (D.N.J. 1964) (in Section 7 case, "[t]he Government need not show that it will suffer irreparable damage qua Government, but only that there is a probability that it would prevail upon a trial on the merits"); *cf. Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (government suffers irreparable injury when it is enjoined from "effectuating statutes enacted by representatives of its people.").

Beyond the presumption, irreparable harm will result absent an injunction because Defendants will be free to consummate the merger on October 3, 2022 and commingle their assets. The United States would then be prejudiced in its ability to obtain adequate relief if the Court of Appeals finds the transaction to be unlawful since a divestiture order—an "unscrambling of the eggs"—would be required. As many courts have recognized, unwinding a merger to restore lost competition can be extremely difficult or may not succeed in fully

restoring the status quo ante. *See, e.g.*, *Penn State*, 838 F.3d at 352–53 (noting that after a merger is consummated, "since it is extraordinarily difficult to unscramble the egg, it will be too late to preserve competition if no preliminary injunction has issued") (citation omitted); *FTC v. Whole Foods Market, Inc.*, 548 F.3d 1028, 1033–34 (D.C. Cir. 2008); *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 904 (7th Cir. 1989) (Posner, J.); *FTC v. PPG Indus., Inc.*, 798 F.2d 1500, 1508-09 (D.C. Cir. 1986); *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1165 (9th Cir. 1984). Permitting Defendants to merge prior to resolution of any appeal could render a victory at the Court of Appeals hollow.

In this case, as soon as their merger is consummated, Defendants may immediately begin combining their operations and sharing confidential information, depriving customers of the "benefits of competition *pendente lite* and perhaps forever." *Elders Grain*, 868 F.2d at 904. For example, United would become the exclusive marketer and seller of sugar produced at Imperial's sugar refinery, "pooling [that] sugar" with the rest of its member-owners' production. PTX490 at -112; Parties' Statement of Admitted Facts ("PSAF"), D.I. 173A, ¶¶ 21, 48. United would also make decisions as a single firm about what refined sugar to offer and under what terms. PTX490 at -112 (United stating "[w]e sell and price as a pool. . . . We like to call this the 'Power of One'."); Trial Tr. 538:8–12 (Wineinger/United) (confirming that United competes as one in the market). Accordingly, United could enter long-term contracts that raise prices, reduce service reliability, or reduce product quality to customers for which Defendants currently compete with each other. United, U.S. Sugar, and Imperial also may share plans for production, pricing, strategy, and negotiations with customers. *See, e.g.*, PSAF ¶ 23 ("United tells its members what further processing their refined sugar might need . . . and what packaging to use."); PTX348 at -26 (United considering a post-acquisition strategy of selling Imperial's sugar seasonally where

13

United "[w]ould have to reduce total Seine [i.e., Imperial] production"). United would also immediately learn Imperial's competitively sensitive information, such as its pricing and sold position, and that information may also become subject to United's existing information sharing with Domino and other competitors. *See* United States' Proposed Findings of Fact, D.I. 215 ("PFOF") § IV.C.2 (summarizing exchange of competitively sensitive information between United and Domino and contrasting it with Imperial's refusal to share similar information). Once this information is shared, it cannot be unlearned. Accordingly, a brief consummation of the merger could have a negative effect on competition for years to come, even if the United States is later successful on appeal.

## IV.    Defendants Will Not Be Injured Substantially by Entry of an Injunction

Defendants, by contrast, will not be injured substantially by a brief delay if the United States appeals the Court's decision. An injunction would maintain the status quo, under which Defendants have operated as separate businesses for many years, for a relatively short additional window of time relative to the 18 months that the merger agreement has already been in place. The United States is amenable to an expedited briefing schedule in the Court of Appeals, which would mitigate any putative harm to Defendants.

Defendants may argue that they will incur injury in the form of additional financing costs or that one of the parties may walk away from the deal during the pendency of the appeal. But courts, including the Third Circuit, have held consistently that "private equities are afforded little weight" and "cannot outweigh effective enforcement of the antitrust laws." *Penn State*, 838 F.3d at 352; *see also United States v. Siemens Corp.*, 621 F.2d 499, 506 (2d Cir. 1980) ("private interests must be subordinated to public ones"); *United States v. Ivaco, Inc.*, 704 F. Supp. 1409, 1430 (W.D. Mich. 1989) ("This private, financial harm must, however, yield to the public

interest in maintaining effective competition."); *United States v. Atl. Richfield Co.*, 297 F. Supp. 1061, 1074 (S.D.N.Y. 1969) (potential abandonment of proposed merger "cannot outweigh the public interest in preventing this merger from taking effect pending trial"). The costs of delay pending appeal would not be substantial, particularly in comparison to the significant irreparable harm that would arise from consummation of the merger while the United States seeks relief.

## V.     The Public Interest Weighs Strongly in Favor of an Injunction

American consumers have a strong interest in the protection of competition in the production and sale of refined sugar. As the Third Circuit has recognized, "the public's interest in effective enforcement of the antitrust laws" is a "principal equity weighing in favor of issuance of [an] injunction." *Penn State*, 838 F.3d at 352; *see also United States v. G. Heileman Brewing Co.*, 563 F. Supp. 642, 648 (D. Del. 1983) ("In federal antitrust litigation, it is the United States, not private parties, which 'must alone speak for the public interest.' Congress has vested in the United States the duty to protect the public interest.") (quoting *Buckeye Coal & Ry. Co. v. Hocking Valley Ry. Co.*, 269 U.S. 42, 49 (1925) (citation omitted)).

Once the merger is consummated, customers will no longer be able to choose between United and Imperial for their supply of refined sugar. Instead, Imperial's production will become pooled with the other sugar that United sells, and the price, quality, and service benefits that Imperial provides customers will be lost. Therefore, the public interest is best served by preserving Imperial as an independent producer and seller of refined sugar pending any appeal. At the very least, a temporary injunction will serve the public interest by permitting interested third parties—who have not yet seen the Court's opinion—to review a redacted version of the opinion once it is filed on the public docket and submit any views about the need for an

15

injunction pending appeal to this Court or the Third Circuit before the proposed merger has been consummated.

## VI.    Conclusion

For the foregoing reasons, the United States respectfully requests that the Court (a) enjoin the proposed acquisition of Imperial by U.S. Sugar for thirty days to give the Antitrust Division and the Solicitor General an opportunity to review the Court's opinion and determine whether an appeal should be taken and (b) if the United States files an appeal, enjoin the proposed acquisition pending appeal. In the alternative, the United States requests that the Court issue a fourteen-day injunction to allow the United States to pursue an expedited motion pursuant to Federal Rule of Appellate Procedure 8 in the United States Court of Appeals for the Third Circuit.

September 26, 2022


Respectfully submitted,

/s/ Shamoor Anis
SHAMOOR ANIS
LAURA D. HATCHER (#5098)
    Chief, Civil Division
United States Attorney's Office
District of Delaware
1313 N. Market Street, Suite 400
Wilmington, DE 19801
Tel.: (302) 573-6205
shamoor.anis@usdoj.gov
laura.hatcher@usdoj.gov


/s/ Brian Hanna
BRIAN HANNA
JONATHAN MINCER

Attorneys for the United States
U.S. Department of Justice
Antitrust Division
450 5th Street, NW, Suite 8000
Washington, DC 20530
Tel.: (202) 460-4294
brian.hanna2@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 26, 2022, a true and correct copy of the foregoing was served on all counsel of record via e-mail.

s/ Brian Hanna
BRIAN HANNA

U.S. Department of Justice, Antitrust Division
450 Fifth Street, NW, Suite 8000
Washington, DC 20530
Phone: (202) 460-4294
Email: brian.hanna2@usdoj.gov

*Attorney for Plaintiff United States of America*

18