IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-1644 (MN) |
| | ) | |
| UNITED STATES SUGAR | ) | **PUBLIC VERSION** |
| CORPORATION, UNITED SUGARS | ) | |
| CORPORATION, IMPERIAL SUGAR | ) | |
| COMPANY and LOUIS DREYFUS | ) | |
| COMPANY LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

Laura D. Hatcher, Chief, Civil Division, Shamoor Anis, UNITED STATES ATTORNEY'S OFFICE, Wilmington, DE; Brian Hanna, Jonathan Y. Mincer, Jenigh Garrett, Jill Ptacek, UNITED STATES DEPARTMENT OF JUSTICE, Antitrust Division, Washington, DC – attorneys for Plaintiff

Jack B. Blumenfeld, Brian P. Egan, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; Lawrence E. Buterman, LATHAM & WATKINS LLP, New York, NY; Amanda P. Reeves, LATHAM & WATKINS LLP, Washington, DC; Elyse M. Greenwald, LATHAM & WATKINS LLP, Los Angeles, CA – attorneys for Defendant United States Sugar Corporation

Daniel K. Hogan, Daniel C. Kerrick, HOGAN MCDANIEL, Wilmington, DE; Peter J. Schwingler, STINSON LLP, Minneapolis, MN – attorneys for Defendant United Sugars Corporation

Kelly E. Farnan, RICHARDS, LAYTON & FINGER, P.A., Wilmington, DE; Amanda L. Wait, Vic Domen, NORTON ROSE FULBRIGHT US LLP, Washington, DC; Darryl Wade Anderson, NORTON ROSE FULBRIGHT US LLP, Houston, TX; Christine A. Varney, David R. Marriott, Peter T. Parbur, Timothy G. Cameron, CRAVATH, SWAINE & MOORE LLP, New York, NY – attorneys for Defendants Imperial Sugar Company and Louis Dreyfus Company LLC

September 23, 2022
Wilmington, Delaware

NOREIKA, U.S. DISTRICT JUDGE:

In this antitrust case under the Clayton Act, the United States of America ("the Government") seeks to prevent the proposed acquisition of Imperial Sugar Company ("Imperial") by United States Sugar Corporation ("U.S. Sugar"). The Court presided over a four-day bench trial in April 2022. (D.I. 222, 223, 224 & 225 ("Tr.")). After trial, the parties submitted proposed findings of fact and post-trial briefs. (*See* D.I. 214, 215, 220, 221 & 233; *see also* D.I. 238 & 240). For the reasons set forth below, the Court finds that the Government has failed to meet its burden of proof and, as a result, the Court will not enjoin U.S. Sugar's proposed acquisition of Imperial. This opinion constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I.   BACKGROUND

On November 23, 2021, the Government initiated this antitrust action under Section 7 of the Clayton Act, ultimately seeking to permanently enjoin U.S. Sugar from acquiring Imperial. (*See generally* D.I. 1). In addition to U.S. Sugar and Imperial, the Government also named as defendants Louis Dreyfus Company LLC ("Louis Dreyfus"), which owns Imperial, and United Sugars Corporation ("United"), a sugar-selling agricultural cooperative in Minnesota (collectively, U.S. Sugar, Imperial, Louis Dreyfus and United are "Defendants"). The Government alleged that U.S. Sugar's acquisition of Imperial would leave only two entities – United and Domino[1] – in control of roughly 75% of the sugar sales in the Southeastern United States. (D.I. 1 ¶ 4). On December 3, 2021, Defendants filed a motion to transfer this action to the Southern District of Georgia, where Imperial's Port Wentworth refinery (*i.e.*, the main target asset) is located.

---

[1]   American Sugar Refining Group International, Inc. ("ASR") is often referred to by its "Domino" brand name. (D.I. 1 ¶ 3).

(*See* D.I. 13, 14, 15, 16, 17 & 18; *see also* D.I. 30, 32, 33 & 37).  On January 10, 2022, Defendants answered the Complaint, denying that that proposed transaction would harm customers or competition in any relevant geographic market.  (*See generally* D.I. 72).  The next day, the Court denied Defendants' motion to transfer.  (*See* D.I. 73 & 74).  Discovery ensued and the parties proceeded to an expedited trial in April of 2022.

## II.   FINDINGS OF FACT

This section contains the Court's findings of fact ("FF") on disputes raised by the parties during trial, as well as uncontested facts to which the parties have stipulated.  Certain findings of fact are also provided in connection with the Court's conclusions of law.  (*See infra* § IV).

### A.   The Parties and the Proposed Transaction

1.   U.S. Sugar is a Delaware corporation, headquartered in Clewiston, Florida. (SAF ¶ 1).[2]  U.S. Sugar grows sugar cane in South-Central Florida, and it owns and operates a cane mill and cane refinery in Clewiston.  (SAF ¶¶ 2-3).  U.S. Sugar currently grows more sugar cane than it has the capacity to process at its mill and each year sells sugar cane to third-party mills in Florida.  (SAF ¶¶ 8-9; *see also* Tr. at 769:20-25 & 770:9-14).  U.S. Sugar's Clewiston refinery – which is operating at maximum capacity – produces about 850,000 tons of refined sugar cane annually.  (SAF ¶ 5; *see also* Tr. at 770:9-14).  The 850,000 tons of refined sugar produced annually at the refinery is less than 7% of nationwide capacity.  (SAF ¶ 5; DTX-028 at -022 (total U.S. capacity is about 12.9 million tons)).  The Clewiston refinery only produces granulated and liquid sugar (*i.e.*, not brown or powdered sugar) and U.S. Sugar does not itself sell the refined sugar that it produces.  (SAF ¶ 6; Tr. at 767:4-10).

---

[2]   Citations to "SAF" are to the Parties' Statement of Admitted Facts in the Pretrial Order. (*See* D.I. 168, Ex. 1; *see also* D.I. 176).

2.      United is a Capper-Volstead[3] agricultural cooperative based in Edina, Minnesota that markets and sells refined sugar for U.S. Sugar and three other refined sugar producers. (SAF ¶¶ 12 & 14).  Since becoming a member of United in 1998, all of U.S. Sugar's refined sugar has been marketed and sold by United.  (SAF ¶¶ 12-13).  The other three member-owners of United are American Crystal Sugar Corporation, Minn-Dak Farmers Cooperative and Wyoming Sugar Company, LLC, all of which grow and process sugar beets.  (SAF ¶¶ 15-16).  In addition to refined sugar from U.S. Sugar's Clewiston refinery, United markets refined sugar produced at eight other member-owned sugar production facilities located in Minnesota, Montana, North Dakota, and Wyoming in an area known as the Red River Valley.  (SAF ¶ 17; *see also* Tr. at 124:21-23).  United sells refined sugar made from sugar cane and sugar beets across 45 states.  (Tr. at 552:12-15). United has no control over the amount of sugar that its members produce and its mission is to sell all of its members' sugar every year.  (*Id.* at 169:5-22; *id.* at 550:3-24).

3.      Louis Dreyfus is a Delaware limited liability company and an indirect, wholly-owned U.S. subsidiary of Louis Dreyfus Company B.V., which is headquartered in the Netherlands.  (SAF ¶¶ 28-29).

4.      Imperial is headquartered in Sugar Land, Texas, and it is an indirect, wholly-owned subsidiary of Louis Dreyfus.  (SAF ¶ 27; *see also* Tr. at 793:7-10).  Imperial does not own any cane farming or milling assets, and instead primarily refines imported raw sugar.  (SAF ¶ 36). Through its subsidiaries, Imperial operates a cane sugar refinery and integrated liquid sugar production facility located in Port Wentworth, Georgia (near Savannah).  (SAF ¶ 30).  Imperial's Port Wentworth facility can make a variety of refined sugar products, including brown sugar,

---

[3]      Capper-Volstead cooperatives are agricultural cooperatives that are exempt from certain antitrust scrutiny.  *See* 7 U.S.C. §§ 291 & 291.

powdered sugar, and liquid sugar, and it is one of Imperial's main assets to be acquired in the U.S. Sugar transaction.  (SAF ¶¶ 31 & 45).  Imperial sells refined sugar into more than 40 states, including Texas, Indiana, Pennsylvania, and Ohio.  (Tr. at 254:12-255:1 & 287:22-288:1; *see also* DTX-516).

5.      On March 24, 2021, U.S. Sugar and Louis Dreyfus entered into an Asset Purchase Agreement, whereby U.S. Sugar[4] would acquire all of Imperial's assets – including the Port Wentworth facility – for $315 million ("the Proposed Transaction").  (SAF ¶¶ 44-45; *see also* PTX-287 (Asset Purchase Agreement)).  In addition to the Port Wentworth facility, the to-be-acquired assets also include Imperial's leasehold interest in a sugar transfer and liquification facility in Ludlow, Kentucky and four retail sugar brands (*i.e.*, Imperial Sugar, Dixie Crystals, White Gold, and Holly Sugar).  (SAF ¶ 45).  Under the Asset Purchase Agreement, the Outside Date is September 24, 2022 but the parties can mutually agree to extend this date.  (PTX-287 § 10.1(b)).

6.      Also on March 24, 2021, United and U.S. Sugar entered into a letter agreement in connection with the Proposed Transaction whereby United agreed to comply with certain obligations of the Asset Purchase Agreement.  (SAF ¶ 46).

7.      On April 20, 2021, United and its member-owners entered into a letter agreement providing that United would market all of the refined sugar produced at Port Wentworth on behalf of U.S. Sugar.  (SAF ¶ 48; *see also* JTX-41 (United and member-owners agreement)).  The agreement between United and its member-owners is to become effective as of the closing of U.S. Sugar's acquisition of Imperial.  (SAF ¶ 48).

---

[4]      The specific acquiring entity was U.S. Sugar's subsidiary, Ibis Acquisition, LLC (now United States Sugar Savannah Refinery, LLC).  (SAF ¶ 44).

8.     By letter agreement dated December 31, 2021, U.S. Sugar and Louis Dreyfus amended certain conditions to closing and reduced the cash payment for the Proposed Transaction to $297 million (subject to adjustments specified in the Asset Purchase Agreement).  (SAF ¶ 44).

**B.    Sugar Processing**

9.     Refined sugar is a food-grade sugar that is produced by refining sugar cane or processing sugar beets.  (SAF ¶ 49).

10.     U.S. farmers grow sugar cane in Florida, Louisiana, and Texas.  (SAF ¶ 50).  After it is harvested, sugar cane is milled into raw sugar at sugar mills, and the raw sugar is then refined into refined sugar at refineries.  (SAF ¶ 52; Tr. at 766:5-767:3).

11.     In the U.S., sugar beets are grown in a range of temperate climate conditions across eleven states:  California, Colorado, Idaho, Michigan, Minnesota, Montana, Nebraska, North Dakota, Oregon, Washington, and Wyoming.  (SAF ¶ 51).  Harvested sugar beets are processed and converted into refined sugar directly with no milling process required.  (SAF ¶ 53).

12.     Refined sugar produced from sugar beets is chemically identical to that produced from sugar cane.  (*See, e.g.*, Tr. at 74:12-16, 395:19-21 & 1023:8-11).

13.     Refined sugar includes white granulated sugar, brown sugar, powdered sugar, and liquid sugar.  (SAF ¶ 54; Tr. at 794:9-13).  Brown sugar, powdered sugar, and liquid sugar are produced by further processing of white granulated sugar.  (SAF ¶ 85; Tr. at 806:14-18).  Liquid sugar can be made by melting granulated sugar or refining directly from raw sugar.  (*See* SAF ¶ 81; Tr. at 803:22-804:1 & 1036:7-10).

14.     Whether ultimately derived from sugar cane or beets, refined sugar is produced in locations across the U.S.  (*See* SAF ¶¶ 61, 62 & 65 (sugar cane refineries in California, Louisiana,

Maryland, New York, and Florida); SAF ¶¶ 75, 76, 79 & 80 (sugar beet processing plants in Idaho, Minnesota, Michigan, California, Colorado, Montana, Nebraska, and Wyoming)).

### C. Sugar Producers and Refiners in the United States

#### 1. Louisiana Sugar Refining / Cargill

15.     Louisiana Sugar Refining, LLC ("LSR") operates a refinery in Gramercy, Louisiana that produces granulated sugar, turbinado (raw) sugar, liquid sugar, and brown sugar. (SAF ¶ 65; JTX-001 at -038).  LSR is a joint venture between Cargill Inc. and the Louisiana Sugar Growers and Refiners, Inc. ("SUGAR"), a cooperative of eight sugar cane growers and mills. (SAF ¶¶ 66-67).  LSR began operations in 2011.  (PTX-293 at 2(c)).  LSR refines the raw sugar that SUGAR produces ███████████████████████████████████████████████████. (SAF ¶¶ 68-69).  ████████████████████████████████████████████████ ████████████████████████████████████████████████. (SAF ¶¶ 71-72; Tr. at 1134:8-12).

16.     Cargill sells all of the refined sugar produced by LSR.  (Tr. at 1105:15-1106:22; *see also* JTX-024 § 1.1).  Cargill sells LSR's refined sugar throughout the U.S., including to customers on both coasts and nearly all states in-between.  (Tr. at 1111:1-24; DTX-028 at -024; DTX-025; DTX-026; *see also* DTX-518).  In 2021, Cargill sold ███████████████ cwt[5] of refined sugar across ██ states.  (DTX-518).

17.     Cargill delivers sugar to customers via rail (70%) and truck (30%) and has distribution terminals in Tennessee and Maryland, as well as storage facilities in Louisiana and Mississippi (and access to multiple third-party terminals).  (*See* JTX-001 at -038; Tr. at 1108:4-

---

[5]     The term "cwt" stands for hundredweight (100 pounds).

1109:2 & 1125:4-10).  Cargill's LSR refinery is located on rail lines and its rail and truck network

allows it to distribute refined sugar throughout the U.S.  (Tr. at 1109:3-10).

18.     LSR currently has capacity to produce approximately 1 million tons of refined

sugar annually, with plans to expand its output by 20-25% within ████████████ months.

(Tr. at 1112:11-14 & 1113:7-1116:6; DTX-028 at -022 to -025; *see also* Tr. at 1128:11-1129:12;

JTX-022 at -176; JTX-050 at 2; SAF ¶ 73).  LSR's strategic plan is to become the first U.S. refinery

to process 1.5 million tons of raw sugar annually, a 50% increase to its current capacity.  (Tr. at

1128:22-1129:20; JTX-022 at -176).  Part of LSR's plan includes an additional refinery, as well

as adding packaging capability, more railcars, ████████████.  (Tr. at 1117:23-1118:11,

1132:6-1133:4 & 1136:6-19; *see also* Tr. at 1132:6-20; JTX-022 at -176; JTX-050 at 2).  Cargill

expects that the additional production will enable it to ████████████████████

████████████████████.  (Tr. at 1114:5-1115:6;

DTX-028 at -024).

2.     <u>American Sugar Refining / Domino</u>

19.     ASR is also known as Domino.  (SAF ¶ 60; *see also supra* n.1).  Domino operates

cane refineries in California, Louisiana, Maryland, and New York.  (SAF ¶ 61).  One of Domino's

parent companies – Florida Crystals Corporation – owns and operates a refinery in Florida as well.

(SAF ¶ 62).  Florida Crystals Corporation also owns and operates sugar cane mills in Florida,

which process sugar cane into raw sugar.  (SAF ¶ 63).  Domino also imports raw sugar because it

cannot purchase enough raw sugar domestically to satisfy its requirements.  (Tr. at 754:9-11).

Domino sells refined sugar to retail customers under the brand names Domino, C&H, and Florida

Crystals (among others).  (SAF ¶ 64).

20.     In 2021, Domino sold approximately ██████ cwt of refined sugar to customers in all 50 states.  (DTX-517 at 1-2; Tr. at 420:15-421:15).  Domino's refinery in Louisiana produced more than ██████ cwt of refined sugar in 2021, which Domino sold to customers in 44 states (DTX-517 at 3-4), and Domino's refinery in Florida produced about ██████ cwt of refined sugar in 2021, which Domino sold in ██ states (*id.* at 5-6).

3.     <u>National Sugar Marketing</u>

21.     National Sugar Marketing Cooperative, Inc. ("NSM") is a cooperative of sugar producers that markets the refined beet sugar produced by its members Southern Minnesota Beet Sugar Cooperative ("Southern Minn") and Amalgamated Sugar Company ("Amalgamated"). (SAF ¶ 77).  Southern Minn and Amalgamated produce refined sugar from beets at facilities in Minnesota, Idaho, and California.  (SAF ¶¶ 75-76).  NSM is also the exclusive marketer of refined cane sugar that Sucden Americas (operating in Florida) imports into the U.S.  (SAF ¶¶ 77-78; *see also* Tr. at 341:3-11 & 343:1-13).  Sucden does not produce refined sugar in the U.S. and predominantly sells imported sugar.  (SAF ¶ 78; *see also* Tr. at 343:4-13).

22.     NSM is obligated to sell "all of the refined sugar produced by its members" each year and has no control over the amount of sugar its members produce.  (Tr. at 342:11-20).  NSM sells sugar "everywhere" in the U.S., including to customers located in ████████████████ ████████████████████████████████████ (among others).  (Tr. at 354:25-355:4 & 357:9-15; JTX-049 (NSM sales data)).  ██████ percent of NSM's sales each year is to ████████ (Tr. at 347:11-13).

23.     NSM competes throughout the country by transporting sugar by rail from the upper-midwest and also by relying on cane sugar imported by Sucden.  (Tr. at 354:22-357:5; *see also id.*

at 256:20-257:11 (NSM competes for sales in Georgia by sending beet sugar in by rail)).  United considers NSM to be one of its "most price aggressive competitors of late." (*Id.* at 177:8-14).

### 4.   Michigan Sugar

24.     Michigan Sugar Company ("Michigan Sugar") is a grower-owned cooperative that owns and operates four beet processing plants in Michigan, as well as a liquification facility in Ohio.  (SAF ¶ 79; *see also* Tr. at 703:4-23).  Michigan Sugar must produce as much sugar as it can from its members' sugar beets and then market the entire production.  (Tr. at 710:17-22).

25.     Michigan Sugar currently sells approximately 1.3 billion pounds (13 million cwt) of refined sugar each year, across approximately 25 states in the midwest, northeast, and south, including in Alabama, Florida, Georgia, South Carolina, North Carolina, Tennessee, Kentucky, Virginia, West Virginia, and Maryland.  (*See* DTX-244; *see also* Tr. at 702:23-703:3 & 716:15-717:13 (DTX-244 is the "best source of information" for where Michigan is selling its sugar)).

26.     In August 2021, Michigan Sugar announced that it was building a new desugarization facility by Spring 2024, which will allow Michigan Sugar to increase its annual output by 80 million pounds.  (Tr. at 713:16-714:6 & 714:18-20).  To sell its additional volumes, Michigan Sugar is willing to expand the areas in which it sells, including potentially in states like Tennessee, North Carolina, Virginia, and Georgia.  (*Id.* at 714:21-715:11).

### 5.   Western Sugar

27.     Western Sugar Cooperative ("Western Sugar") is a cooperative that owns and operates four sugar beet plants in Colorado, Montana, Nebraska, and Wyoming.  (SAF ¶ 80). Western Sugar's annual capacity is approximately ███ short tons of ██████ (or ██ cwt).  (DTX-028 at -022).  Western Sugar has, at times, displaced sales to large players (*e.g.*, Domino) with its aggressive pricing.  (*See, e.g.*, DTX-094 at -297).

6.    CSC Sugar

28.    CSC, which began its liquid operations in 2006, is the largest independent company

in the U.S. that converts raw sugar directly to liquid sugar.  (SAF ¶ 82; *see also* Tr. at 1045:25-

1046:2).  CSC produces refined liquid sugar at refineries in Tennessee, Texas, Pennsylvania, and

Virginia.  (SAF ¶ 83).  CSC sells liquid sugar to customers located in ███████████████

████████████████████████████████████████████████████████████████

████████ (among others).  (JTX-002 at Tab "LBS by State by Cust.").

29.    CSC created an innovative liquid sugar product tailored to customer needs and its

liquid sugar has become the industry standard for almost all dairy products.  (Tr. at 1048:3-19 &

1054:8-1055:4; *see also* DTX-314 at -880 to -881, -883 & -887 to -888).  CSC builds facilities

close to customers and produces high-quality liquid sugar at a low cost.  (Tr. at 1053:22-1054:7;

*see also* JTX-007 at -407 ("CSC has built a business around ██████████████████████

█████████████████████████")).  By building facilities close to customers, CSC has been

able to leverage new customers within 6 months to a year and for about $5-7 million dollars for a

base refinery (plus the cost of land).  (*See* Tr. at 1047:1-1048:2, 1048:16-1051:21, 1053:17-1054:7

& 1055:9-15; DTX-314 at -895 (CSC's "strategic footprint is highly scalable and can be

opportunistically expanded to address specific customer opportunities"); Tr. at 804:18-24

(Imperial has lost customers to CSC); DTX-041 at -585 (indicating customers ██████████████

lost to CSC)).  Since 2006, CSC has built seven refineries.  (Tr. at 1045:25-1046:25).

30.    CSC's total sales have increased more than █████ from █████████████ in 2011

to ████████████████ in 2021.  (*See* Tr. at 1052:22-1053:10; *see also* JTX-002; DTX-314 at -906

(charting CSC's growth █████████████████████████████████████████)).

7. <u>Sucro Can Sourcing</u>

31.     Sucro Can Sourcing LLC d/b/a Sucro Sourcing ("Sucro") produces liquid refined sugar directly from raw cane sugar.  (SAF ¶ 84; Tr. at 567:22-568:2).  Sucro has a refinery in Lackawanna, New York that is capable of converting raw sugar into liquid sugar, with plans to begin producing granulated sugar as well.  (SAF ¶ 84; *see also* DTX-041 at -567).

32.     Sucro also refines raw sugar into liquid sugar at a facility in Memphis, Tennessee operated by Sugar Services.  (DTX-043 at -490 (depicting ████████████████ facilities in U.S.)).  Sucro competes against Imperial, United, Domino, and others.  (*See, e.g.*, Tr. at 804:4-24 (Imperial has lost business to Sucro liquid sugar); *id.* at 177:22-25 & 556:6-10 (United competes with Sucro); *id.* at 752:16-25 (Domino has to compete with Sucro)).

8. <u>Zucarmex</u>

33.     Zucarmex is a Mexican company that processes sugar cane into raw sugar and recently opened a facility in California that refines imported raw sugar into liquid sugar.  (*See* Tr. at 802:25-803:7).  Zucarmex apparently has plans to convert its California facility into a refinery capable of producing granulated sugar.  (*Id.* at 436:12-17; *see also* DTX-041 at -565).

**D.     Sugar Distributors in the United States**

34.     Distributors purchase refined sugar and may repackage it or further process it into liquid, invert, brown, or powdered sugar before reselling.[6]  (SAF ¶ 85; *see also* Tr. at 1061:4-11; Tr. at 806:4-22).  Distributors compete against producers and refiners throughout the U.S. by leveraging nationwide storage facilities to buy domestic and imported sugar opportunistically when prices are low and selling later when prices are higher or in areas that command higher

---

[6]     Those distributors that further process the refined sugar before reselling are sometimes referred to as "value-added distributors."  (*See* Tr. at 1061:8-11).

prices.  (*See, e.g.*, Tr. at 256:17-19, 290:3-21 & 806:4-807:3 (Imperial's experience competing against distributors); *id.* at 570:19-571:11 (United's experience competing against distributors in southeastern U.S.)).  Distributors are also able to offer nationwide shipping using rail transfer stations and their own trucking fleets.  (*See id.* at 806:12-807:5).

35.     Indiana Sugars is a value-added distributor that has been in business for more than 100 years.  (Tr. at 1061:4-18 & 1064:6-7).  Indiana Sugars buys imported and domestic refined sugar from many different sources and then packages, liquefies, grinds, warehouses, and distributes it across the country.  (*Id.* at 1061:4-11 & 1061:23-1062:10; DTX-115 (Indiana Sugars suppliers)).  In fact, Indiana Sugars buys refined sugar from every U.S. producer of cane sugar and beet sugar.  (Tr. at 1062:1-3).  In 2021, Indiana Sugars sold approximately ▮▮▮▮▮ cwt of refined sugar nationwide, with an average shipment size of about ▮▮▮ pounds.  (*Id.* at 1073:6-8; *see also* JTX-010 (average shipment size for 2021 calculated as ▮▮▮ pounds)).  Indiana Sugars has "pretty significantly" increased its sales in the southeastern U.S. over time.  (*See* Tr. at 1071:2-21; JTX-010 (sales into "Southeast")).  And it is planning to build a new facility there within 12-18 months because of its sales success and because it believes it has enough customers there to expand.  (Tr. at 1063:4-13 & 1070:9-1072:4).

36.     Batory Foods ("Batory") is one of the largest distributors of food ingredients in the U.S. and is growing rapidly, with its customer base growing by more than 10% in the past few years.  (*See* Tr. at 323:10-23 & 324:12-15).  Batory is also a value-added sugar distributor that produces ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in facilities located in ▮▮▮▮▮▮▮▮▮▮▮▮▮.  (*Id.* at 326:11-22 & JTX-045 ("refined sugar formats produced from these sites")).  Batory has six distribution centers in the U.S. located in Georgia, Illinois, Minnesota, Texas, and California.  (JTX-045; Tr. at 326:11-22).  In 2021, Batory sold more than



cwt (███████ pounds) of refined sugar that it had purchased from various domestic and foreign suppliers.  (Tr. at 325:23-326:2 & JTX-046 (sales data); *see also* JTX-047 at summary tab (depicting ████████████ suppliers ██████ )).  Batory ships ██████ from its ████████████ facilities into southeastern states, including ██████ ████████████████ . (Tr. at 339:21-25 & JTX-046).  Batory ████ entered into an agreement ██████ to purchase ████████████ sugar ████ ████████████████████ . (Tr. at 1119:3-6).  Batory ████████████████████ can sell it anywhere. (*Id.* at 1118:12-1119:17).

37.     Other examples of distributors selling refined sugar include (among many others): International Food Products Company, Evergreen, St. Charles Trading, ICI Foods, Atlantic Ingredients, ADM, Sweetener Supply, Sweeteners Plus, Pullman, and L&S Sweeteners.  (*See* Tr. at 805:20-806:3; *see also* DTX-043 at -462 (map ████████████████ )).

### E.    Sugar Flows in the United States

38.     Customers can buy refined sugar in bulk, packaged, or liquid form.  (SAF ¶ 54). Bulk refined sugar may be delivered by rail, truck, or barge.  (SAF ¶ 55).

39.     A nationwide network of railroads, interstate highways, and transfer stations enables customers to buy refined sugar from suppliers located throughout the country.  (Tr. at 552:24-553:6 & 554:9-24; *id.* at 1109:8-10 (Cargill's "rail and truck network allow it to distribute sugar throughout the United States"); *id.* at 288:2-15 (transfer stations keep costs low and allow for long-distance shipping); *id.* at 856:23-857:2 (agreeing "refined sugar can travel pretty long distances")).  Sugar flows throughout the U.S. from areas of surplus to areas of deficit to meet customer demand.  (Tr. at 927:3-928:6 ("extensive evidence" of sugar flowing); *id.* at 173:9-

174:16 (discussing PTX-452 at -449 and how "sugar flows throughout the U.S."); Tr. at 552:24-

553:6 & 554:9-18 ("we [United] can ship sugar quite freely because sugar does flow easily")).  If

a shortage of sugar exists in an area, the price of sugar will increase and attract sugar from other

sources to compensate.  (Tr. at 856:15-22).

       40.     The southern U.S. is an area of sugar surplus and the northeastern U.S. is an area

of sugar deficit.  (Tr. at 815:12-19).  As a result, sugar moves from the south to the northeast "all

the time."  (*Id.* at 815:6-19; DTX-193 at -595).  For example, Cargill has shipped more than

███ pounds of sugar from Louisiana to a customer in ███ (Tr. at 1115:13-24) and

███ pounds to customers in ███ (*id.* at 1111:4-9 & DTX-518).  Similarly, Domino

has shipped ███ pounds of sugar from Louisiana to customers in Pennsylvania.  (DTX-

517 at 3 & Tr. at 423:7-11; *see also* DTX-517 at 3 (Domino also has shipped more than ███

pounds from Louisiana to customers in California)).  And Domino has also shipped more than

███ pounds of sugar from Florida to customers in New York.  (DTX-517 at 5 & Tr. at 424:7-

18; *see also* DTX-517 at 5 (Domino also has shipped nearly ███ pounds from Florida to

customers in California)).

       41.     Sugar also flows from surplus regions in the west and upper-midwest to the east

coast and into the south.  (Tr. at 173:9-174:16 (discussing PTX-452 at -449); Tr. at 217:8-218:10

(same)).  For example, NSM rails beet sugar produced in the upper-midwest to customers

"everywhere" in the U.S., including ███████████████████

███████████████, and Post in North Carolina.  (Tr. at 347:25-348:8 & 350:7-352:7;

*see also* Tr. at 1030:9-18).

42.     Transportation costs are relatively low and usually not determinative of whether a particular sugar supplier will supply a location.[7]  (*See, e.g.*, Tr. at 287:14-21 (Imperial senior vice president testifying that freight costs are only about 5% of delivered price of sugar); *id.* at 455:12-15 (director of strategic accounts at United testifying that freight costs are 5-12% of FOB price); *id.* at 553:11-19 (president and chief executive officer of United testifying that "sugar is relatively inexpensive to transport")).  Although a supplier located closer to a customer may have a "freight advantage" that could allow that supplier to supply the customer more efficiently, having a "freight advantage" does not allow a supplier to charge a higher delivered price to a customer or mean that suppliers only sell sugar in areas where they are "freight advantaged."  (*Id.* at 174:17-175:10).  That many suppliers already sell and ship sugar to customers throughout the U.S. – including to distant locations – indicates that transportation costs are not a meaningful barrier to sugar flowing across the country to meet competitive demand.  (*See, e.g.*, *id.* at 174:3-175:10 (United only selling sugar close to home "not a realistic strategy" because other sales opportunities arise and fit margin requirements despite being farther from home); DTX-244 (Michigan Sugar primarily sells sugar in the midwest but sells sugar outside the midwest including into states like Tennessee, North Carolina, Virginia, and Georgia to be able to sell all inventory); FF ¶¶ 40-41 (Cargill, Domino, and NSM selling large volumes of sugar to geographically distant locations)).

---

[7]     Shipping shorter distances is also not always cheaper than shipping longer distances because "different shipping lanes, railways, they have different costs and sometimes it can be less expensive to go further in terms of miles."  (Tr. at 423:12-17).  For example, Domino "primarily" serves Kraft Heinz's Dover, Delaware facility with rail cars from its Chalmette, Louisiana refinery instead of Domino's much closer Baltimore refinery because "it takes the same amount of time to get from Baltimore to Dover, Delaware via rail as it takes from Chalmette to go to Dover, Delaware" because the rail lines outside Baltimore are "messy."  (*Id.* at 743:2-23).

43.     Large amounts of raw and refined sugar also flow into the U.S. from abroad. (*See* Tr. at 935:19-936:11; *see also id.* at 751:11-22).  Although the United States Department of Agriculture ("USDA") sets quotas on the amount of raw sugar coming into the U.S. at no or low duty (*infra* FF ¶¶ 51-52), approximately 40 countries have "preferential agreements" that allow them to export sugar into the U.S. on favorable terms.  (Tr. at 830:19-831:2; *see also id.* at 870:3-6).  The U.S. has the highest priced sugar in the world and, as a result, other countries look to sell refined sugar into the U.S.  (*Id.* at 870:15-871:4).

44.     Between 1 million and 1.5 million tons (20 million to 30 million cwt) of refined sugar is imported into the U.S. annually, including into Florida, Alabama, and up the east coast. (Tr. at 805:2-19 & 814:13-16).  Imported refined sugar is primarily sold by distributors.  (*Id.* at 219:10-14).

**F.     The Federal Sugar Program Administered by USDA**

45.     The sale of raw and refined sugar in the U.S. is heavily regulated through the Federal Sugar Program, a series of statutes, regulations, and international trade agreements that govern the supply of raw and refined sugar in the U.S.  (Tr. at 851:2-7; *see also id.* at 172:2-4 & 797:4-798:2).  The Federal Sugar Program, as run by the USDA, purports to balance somewhat competing government policies that impact the price of sugar – *i.e.*, the Government's support of American sugar cane and sugar beet farmers by ensuring that there is a guaranteed floor price to be able to stay in business and the Government's interest in ensuring that sugar prices do not get too high for the many businesses (known as sugar "users") that buy sugar to use in their products. (*Id.* at 851:2-7, 859:7-17 & 860:10-861:10).

46.     The USDA is statutorily mandated[8] to ensure that (a) raw and refined sugar prices are above loan forfeiture levels[9] and (b) there are adequate supplies of raw and refined sugar in the domestic market.  (SAF ¶ 86; *see also* Tr. at 797:4-14, 859:7-860:2 & 886:13-25).  The USDA purports to "manage the program to provide adequate supplies of both raw and refined sugar at reasonable prices."  (DTX-278 at -947 (Former Secretary of Agriculture Perdue); *see also* Tr. at 862:24-863:5 & 872:21-25).

47.     The USDA does not monitor individual contract prices between sugar producers and their customers, and the USDA has no ability to set the particular price at which domestic refiners sell refined sugar.  (Tr. at 890:14-891:2; *see also id.* at 791:16-792:2).  But the Federal Sugar Program gives the USDA tools to control the supply of raw and refined sugar that is available for sale, which ultimately controls price.  (*Id.* at 859:18-22).  If the USDA increases the supply of sugar, then prices decline.  (*Id.* at 860:5-9).  Conversely, if the USDA does not allow sufficient sugar imports or domestic production, then sugar prices will increase.  (*Id.* at 858:13-21 & 862:18-23).  Using these tools, the USDA ensures that prices do not get too high (due to undersupply) or too low (due to oversupply).  (*Id.* at 862:24-863:5 & 865:10-866:8).

48.     The USDA monitors industry metrics, including sugar prices, to determine whether to increase supply.  (Tr. at 856:6-14 & 866:22-867:3).  The USDA speaks with suppliers and customers regularly.  (*Id.* at 852:6-12, 861:15-18 & 863:13-25; *see also id.* at 751:5-13).  The USDA also speaks with sugar industry analysts and reads their publications.  (*Id.* at 877:11-878:5).

---

[8]     *See generally* 7 U.S.C. § 7272.

[9]     Under the Federal Sugar Program, beet processors and sugar cane processors can obtain annual non-recourse loans at favorable interest rates.  (SAF ¶ 88).  The beet and sugar cane processors may choose to forfeit their sugar to the USDA in lieu of repaying the loans and interest.  (*Id.*).  The purpose behind this loan program is to support the price of sugar and provide a guaranteed price floor to producers.  (Tr. at 859:7-17).

And because beet and cane processors and cane refiners are required to submit detailed information to the USDA each month, the USDA has data going back to 1996 on producers' stocks, melt rates, production rates, deliveries, and ending stocks.  (*Id.* at 898:4-12).

49.     Once it determines that the supply of sugar in the U.S. should be increased, the USDA has the ability through the Federal Sugar Program to increase the supply of sugar in the following ways:  (1) marketing allotments for domestic sugar processors (Tr. at 867:8-12), (2) a system of tariff rate quotas on sugar imports under various World Trade Organization and free trade agreement rules (*id.* at 869:23-870:9), and (3) control over Mexican imports under agreements known as the U.S.-Mexico Suspension Agreements (*id.* at 873:25-874:11).

50.     Domestic marketing allotments allow the USDA to restrict or increase the amount of sugar that domestic processors are permitted to sell.  (Tr. at 867:8-23).  Any sugar produced in excess of a company's allotment for a given fiscal year will ordinarily be blocked from the market – *i.e.*, the excess cannot be sold.  (*See, e.g.*, *id.* at 711:20-25; DTX-464 ("blocked stock" refers to sugar supplies exceeding marketing allocation)).  Although marketing allotments limit the supply of sugar available for sale from domestic sources, the USDA can and frequently does increase those limits so that domestic processors can sell more sugar.  (Tr. at 867:8-12; SAF ¶ 87).  For example, in December 2021, the USDA increased the overall domestic allotment quantity and reassigned allotments to increase supply, doing so specifically to address "high sugar prices." (Tr. at 868:4-869:1; DTX-464 at 2).

51.     The USDA also controls the amount of foreign sugar that can be imported into the U.S. at low or no duty under the tariff-rate quota ("TRQ") system and the U.S.-Mexico Suspension Agreements.  (Tr. at 869:23-872:12 & 874:11; *see also* SAF ¶¶ 91 & 93).  The TRQ system governs sugar imports from all countries other than Mexico.  (*See, e.g.*, Tr. at 872:4-6).  Unlimited amounts

of sugar may be imported into the U.S., but any foreign sugar in excess of the TRQs ("out-of-quota sugar") enters at the full-duty rate. (SAF ¶ 92; *see also* Tr. at 871:24-872:5). Such sugar is referred to as "high-tier" or "Tier 2" sugar. (SAF ¶ 92). At any time and in its sole discretion, the USDA can increase TRQs whenever additional sugar supply is necessary in the U.S. to maintain reasonable prices. (Tr. at 872:9-873:5; *see also* SAF ¶ 94). Because TRQ sugar enters the country at low or no duty, it serves as an effective price constraint in the U.S. marketplace. (Tr. at 872:9-12). Tier II sugar price generally functions as a price ceiling on U.S. prices. (*Id.* at 873:21-24).

52. The USDA controls the amount of duty-free sugar that can enter the U.S. from Mexico under the U.S.-Mexico Suspension Agreements. (SAF ¶ 93; *see also* Tr. at 873:25-874:11). As with the TRQ system, the USDA maintains the ability to increase the Mexican export limit when the U.S. market needs more raw or refined sugar to maintain reasonable prices. (Tr. at 874:9-11; *see also* DTX-515 at 26 (depicting examples of USDA increases of Mexican imports)).

53. Since 2007, USDA has taken at least 30 actions to increase foreign sugar imports into the U.S. when it believed that additional supply was necessary. (*See* DTX-515 at 26; *see also* Tr. at 875:18-877:2). Sugar suppliers and customers regularly monitor USDA action and know that the USDA has the ability to modify the supply of sugar in the U.S. (*See, e.g.*, Tr. 879:6-11 (Dr. Fecso agreeing that "most" of the sugar suppliers "are well aware that USDA has all these tools at its disposal to [] increase supply"); Tr. at 558:7-21 (United aware of Federal Sugar Program and ability to bring in more sugar); DTX-034 at -010 (Michigan Sugar's understanding of the Federal Sugar Program and issues with marketing allotments); Tr. at 1064:8-13 (Indiana Sugars president and chief operating officer testifying that the Federal Sugar Program "pretty much dictates the entire business"); Tr. at 750:12-751:22 (vice president of trading for Domino testifying that USDA "manage[s] supply and demand in the whole system"); Tr. at 84:24-85:16 (sourcing

business leader at General Mills understands that USDA can solve sugar supply problems in the U.S.)).

54.     Both sugar buyers and sellers lobby the USDA with their own views on whether the USDA should take actions to increase the supply of sugar in the U.S.  (Tr. at 861:15-18; *see also id.* at 777:14-24).  For example, General Mills advocated in early 2021 for USDA to increase the supply of sugar from Mexico.  (*Id.* at 85:17-86:6).  Domino lobbies the USDA for more raw sugar every day because Domino would like to buy raw sugar at the cheapest price possible.  (*Id.* at 751:5-13).

55.     Without the Federal Sugar Program, imports would flood the U.S. market and sugar prices in the U.S. would plummet.  (*See* Tr. at 870:15-872:3).

56.     Dr. Barbara Fecso, the commodity analysis branch chief of economic and policy analysis division of farm production and conservation business officer of USDA (Tr. at 849:13-850:2), was called to testify at trial by Defendants.  Dr. Fecso is responsible for collecting, publishing, and analyzing data on beet and cane processors and cane refiners on a monthly basis for the Federal Sugar Program in order to determine whether action is needed to rebalance the sugar market.  (*Id.* at 851:8-17).  She has worked with the Federal Sugar Program for almost 20 years.  (*Id.* at 850:3-19).

**G.     Imperial's High-Cost Business Model and Financial Decline**

57.     Imperial is an import-based cane refiner that does not grow any sugar cane or sugar beets, nor does Imperial process sugar cane into raw sugar.  (Tr. at 794:2-4; SAF ¶ 36).  Instead, Imperial depends on purchased raw sugar and it imports more than 90% of the raw sugar needed for its Port Wentworth refinery.  (Tr. at 252:5-13 & 793:25-794:4).  Imperial is only able to run its

Port Wentworth refinery at about 75% capacity on average (and at 60-65% in some years), which increases its per unit costs.  (*See id.* at 794:5-8 & 798:3-10).

58.     The price of raw sugar comprises about 70-80% of the delivered price of Imperial's refined sugar.  (Tr. at 283:20-284:5 & 798:3-16).  Imperial's pricing to customers is thus driven by the price of raw sugar in the U.S., which is constantly changing and tracked on a public futures commodity index called the "Number 16."  (*Id.* at 284:20-285:1; *see also id.* at 517:22-519:3 & 522:5-15).  Imperial's reliance on high-cost imports makes it less competitive and, as such, it struggles to compete with vertically-integrated cane refiners (like LSR / Cargill) or domestic beet processors (like NSM) because of its higher input costs.  (*Id.* at 798:5-16 & 802:25-803:21).

59.     Imperial has been struggling financially for years and some parts of the Port Wentworth facility still use equipment from the 1940s.  (Tr. at 794:16-21).  The company went bankrupt in 2001 and had a "terrible accident" in 2008 and then, "almost immediately" after that, was offered for sale.  (*Id.* at 794:21-795:9).  Shortly after it was purchased by Louis Dreyfus, regulatory changes apparently made the business outlook for Imperial "very uncertain."  (*Id.* at 795:9-11).  As such, Louis Dreyfus and Imperial limit their capital expenditures at the Port Wentworth facility to maintenance, as well as safety, health, and environmental expenditures to ensure that the facility is safe to operate.  (*Id.* at 795:12-796:15.5).

60.     Imperial's documents describe it as an "import-based, price-uncompetitive sugar refinery" that is "structurally uncompetitive."  (DTX-219 at -219).  Due to Imperial's high-cost structure, Imperial is principally a residual or back-up supplier.  (Tr. at 807:22-808:14; *see also id.* at 255:22-256:9 & 287:7-13).  Imperial's customer base is shrinking:  in 2021, Imperial had 208 customers, whereas in 2022, Imperial had 183 customers – a roughly 10% drop from the previous

year.  (*See id.* at 257:12-21).  Imperial's market position has been declining over the last several years, with a bigger decline year over year.  (*Id.* at 898:4-22).

61.    Even if operating at capacity, Imperial's Port Wentworth facility represents only about 7% of estimated nationwide capacity.  (DTX-028 at -022).

62.    Louis Dreyfus has been trying to sell Imperial for the past five years.  (Tr. at 795:22-796:7).

### H.    Benefits of U.S. Sugar Acquiring Imperial

63.    U.S. Sugar grows more sugar cane than it can currently process and refine.  (*See* FF ¶ 1).  U.S. Sugar is acquiring Imperial to integrate its sugar cane farming operations with Imperial's Port Wentworth refinery to create a more competitive, cost-effective, and efficient refinery.  (Tr. at 771:21-773:11; JTX-034 at 2).  After the transaction, U.S. Sugar will be able to provide Port Wentworth with between 1.5 and 3 million cwt of raw sugar each year.  (Tr. at 774:21-775:1).  This will allow U.S. Sugar to refine all of the raw sugar produced from its excess sugar cane and provide Port Wentworth with a more secure supply of raw sugar, allowing Port Wentworth to be somewhat less dependent on foreign imports.  (*See id.* at 771:21-772:4 & 775:13-25; JTX-034 at 2).

64.    U.S. Sugar plans to increase Port Wentworth's annual production from 16.1 to 17.5 million cwt, an increase of 140 million pounds of refined sugar.  (*See* Tr. at 776:8-10 & 839:6-8; JTX-035 at 15).  This increase in production will be a "steady state" increase in production output, rather than occasionally having high production years.  (Tr. at 776:23-777:10).  U.S. Sugar plans to draw on its experience in restoring "troubled plants" to achieve this improvement in operation at the Port Wentworth facility.  (*Id.* at 839:6-840:6).  In particular, U.S. Sugar will use targeted capital expenditures to increase the capacity utilization of Port Wentworth.  (*Id.* at 845:17-18;

*see also* JTX-035 at 2 & 16).  U.S. Sugar also plans to increase the number of operating days at Port Wentworth to 355 days per year.  (Tr. at 838:23-839:3; *see also* JTX-035 at 15 (number of operating days at Port Wentworth ranged from 298 to 345 in the last several years)).

65.    U.S. Sugar will be able to add Imperial's Port Wentworth facility into the United network, which is expected to result in at least $8-12 million in transportation cost savings by optimizing United's freight economics.  (Tr. at 560:19-561:9; *see also* JTX-034 at 2 ("5. Create synergistic cost savings, including transportation")).  United can then pass on those cost savings to customers, which United would not be able to do absent the transaction.  (Tr. at 561:5-9).

66.    Acquiring Imperial will also provide U.S. Sugar and United with additional supply-chain flexibility to meet demand and protect against weather events in the Red River Valley (where United's sugar beets are grown and processed) and Florida (where U.S. Sugar grows its sugar cane).[10]  (Tr. at 555:22-556:5 & 772:25-773:7).

67.    By acquiring Imperial, U.S. Sugar will be able to leverage Imperial's ability to make sugar products that U.S. Sugar itself cannot – *e.g.*, brown and powdered sugar.  (*See* Tr. at 772:16-18).  U.S. Sugar's acquisition of Imperial's Dixie Crystals and Imperial Sugar retail brands will also expand United's offering of branded refined sugar.  (SAF ¶ 96).

68.    If the U.S. Sugar acquisition does not proceed, Imperial's CEO is "quite worried" about Imperial's future prospects.  (Tr. at 816:19-23).

---

[10]    Because refined sugar is derived from agricultural crops that are vulnerable to weather events, the amount of sugar produced each year can vary dramatically.

I.      **Dr. Rothman's Analysis**

69.     In attempting to prove that the Proposed Transaction should be enjoined as anticompetitive, the Government relies on the economics analysis[11] of Dr. Dov Rothman, a managing principal at Analysis Group, Inc.  (Tr. at 582:12-14).  Although he has previously testified as an expert in the field of economics on behalf of the Government, Dr. Rothman's analysis in this case was flawed and largely unpersuasive.

70.     As an initial matter, there is little evidence in the record as to Dr. Rothman's background or experience in the field of economics.  The Government did not enter his full credentials into the record.  On direct, he testified that he received a B.S. and Ph.D. from University of California at Berkley and "a degree" from Cambridge University.  (Tr. at 581:25-582:3).  He explained that his Ph.D. is in business administration, but there is no evidence as to what fields his B.S. and other "degree" are in.  (*Id.* at 582:2-9; *see also id.* at 582:7-9 ("Just to avoid confusion, my training is economics, and in my [Ph.D.] program I took the core economics class in the economics department."); *id.* at 642:22-24 ("Q. Dr. Rothman, you don't have a Ph.D. in economics, do you?  A. No.")).  Prior to joining his current firm, Dr. Rothman was an assistant professor at the School of Public Health at Columbia University (*id.* at 582:10-12), and he has taught a course on merger economics at Harvard University (*id.* at 582:14-16).

71.     Although the Court is not wholesale excluding Dr. Rothman from offering an economics opinion, his credentials and experience appear to be lacking (*see supra* FF ¶ 70), especially when compared to Dr. Nicholas Hill, Defendants' economic expert, who the Court

---

[11]     At trial, Defendants seemed to object to Dr. Rothman being recognized as an expert in the field of economics but stated that they would address that issue in post-trial briefing. (*See* Tr. at 583:5-16).  Although Defendants argue that Dr. Rothman's analysis is unreliable for a variety of reasons (D.I. 220 at 43-44), there is no argument in Defendants' post-trial briefing that the Court should not recognize Dr. Rothman as an economics expert.

found to be particularly credible.  Dr. Hill received a Ph.D. in economics from Johns Hopkins University (Tr. at 900:19-21), after which he worked for seven years at the U.S. Department of Justice in the Antitrust Division, followed by two years at the Federal Trade Commission as a staff economist and another three years at the Department of Justice as a supervising economist (*id.* at 900:24-901:5).  Dr. Hill is currently a partner at the Bates White Consulting firm, working largely on merger cases in various industries.  (*Id.* at 900:17-18 & 901:11-18).

72.     Dr. Rothman's assumptions about the refined sugar product market are flawed.  In attempting to define a product market that would purportedly be harmed by U.S. Sugar's acquisition of Imperial, Dr. Rothman's definition was at times internally inconsistent.  He opined that "any seller that makes a sale to customers in the market is part of the market" (Tr. at 602:7-8) but then he excludes many sellers from the market – *e.g.*, all distributors.  And despite articulating the product market as "the production and sale of refined sugar" (*id.* at 592:18-25), which would appear to be limited to sugar suppliers that sell sugar they refine, Dr. Rothman includes entities that market sugar refined by others – *e.g.*, NSM and United.  (*See id.* at 611:19-25 & 676:10-677:21).

73.     Additionally, as will be addressed more fully below (*infra* § II.J), Dr. Rothman excludes all refined sugar distributors from the proposed product market because they are assumed to be "purchasers" who would be "hit with the higher prices themselves" if competition were eliminated.  (Tr. at 589:2-4 & 593:7-15).  In his view, distributors are merely partners for the refiners to sell more sugar, rather than entities that can meaningfully compete.  (*See id.* at 606:4-609:20).  The Court does not view Dr. Rothman's assumption as valid, however, in light of the many witnesses at trial whose testimony was inconsistent with that assumption.  (*See, e.g.*, *id.* at 389:4-11 (Piedmont's Chief Financial Officer testified that the prices that distributors have

competitive significance and that he disagreed with the Government's position that distributors are not part of the market); *id.* at 112:24-113:7, 115:3-116:1 & JTX-███████████████████ ███████████████████████████; Tr. at 1023:15-1024:8 (Post purchases from distributors, refiners, and cooperatives)).

74.     As to the proposed geographic markets (*infra* § II.L), Dr. Rothman opined on two markets defined by the Government in determining whether antitrust harm would result from the Proposed Transaction.  (Tr. at 648:5-10).  Dr. Rothman did not select the states included in either proposed market and he did not perform any meaningful analysis to test the propriety of the defined markets provided by the Government.  (*Id.* at 648:11-650:4; *see also id.* at 592:8-14).  Dr. Rothman also did not attempt to craft or test any market narrower than "Georgia Plus" to determine if a smaller region was a relevant geographic market.  (*Id.* at 650:21-24).

75.     Despite using the hypothetical monopolist test to assess the propriety of the Government's proposed geographic markets, Dr. Rothman acknowledged that the hypothetical monopolist test has its limits.  After agreeing that all four proposed geographic markets at issue in this case pass the hypothetical monopolist test, Dr. Rothman asserted that that does not mean all are relevant geographic markets within which the Court is to look for antitrust harm.  (*See* Tr. at 651:21-24 ("[M]ultiple markets can pass the hypothetical monopolist test.  That doesn't mean that a national market is the relevant market for evaluating competitive effects for the proposed transaction.")).  He offered no explanation for why he believed some (*i.e.*, the Government's) were relevant markets but others (*i.e.*, Defendants') were not.

76.     In a number of other antitrust cases, Dr. Rothman's economic analysis has been found unpersuasive on various issues:  *In re Altria Group, Inc. & JUUL Labs, Inc.*, No. 9393 (F.T.C. Feb. 23, 2022) (Initial Decision at 91) ("Dr. Rothman's post-Transaction HHI calculations

are not economically sound"); *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, No. 17-205, 2020 WL 3414662, at *4 (S.D. Cal. June 22, 2020) ("Dr. Rothman's study allegedly showing supracompetitive prices is seriously flawed."); *Aya Healthcare Sers., Inc. v. AMN Healthcare, Inc.*, No. 17-205, 2020 WL 2553181, at *18 (S.D. Cal. May 20, 2020) (Dr. Rothman's failure to account for certain market factors renders his opinion on an issue "unreliable under the *Daubert* standard and of marginal relevance"); *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 319 (D.D.C. 2020) (*Evonik*) ("Dr. Rothman provides no evidence to support his .8 pass-through rate of cost to price.").

### J.    The Relevant Product Market Must Include Refined Sugar Distributors

77.    The relevant product market is centered on the sale of refined sugar to customers. (Tr. at 665:22-666:1; *see also id.* at 907:2-908:2).  The product market includes refined sugar in all forms – granulated, powdered, brown, or liquid – whether derived from sugar beets or sugar cane.  (*Id.* at 1137:24-1138:20 (all parties agreeing that refined sugar defines the relevant product market and includes sugar from cane and beets); *see also id.* at 1023:8-14 (Post is "indifferent" about whether it uses beet or cane sugar); *id.* at 1086:1-2 (McKee purchases both beet and cane); *id.* at 117:19-24 & JTX-███████████████████████████)).[12]  There are no reasonable substitutes for refined sugar.  (Tr. at 592:18-593:6).  The Government defined the relevant product market as "the production and sale of refined sugar to wholesale customers."  (*Id.* at 665:22-666:1).

---

[12]    At trial, only one customer – Piedmont Candy – testified that it is unwilling to use beet sugar to produce its peppermint puffs. (Tr. at 394:25-395:14).  There was no other evidence that any customer ***required*** cane sugar over beet sugar for purposes of product quality, although some do prefer cane sugar for other reasons.  (*See, e.g.*, *id.* at 441:7-12 (some Domino customers express a preference for cane sugar); *id.* at 707:10-21 (Michigan Sugar's vice president sees some customers willing to pay a premium on cane sugar over beet sugar); *id.* at 734:6-18 (Kraft Heinz's ██████ facility ████████████)).

78.     Sugar refiners are undisputedly significant participants in the relevant product market.  Although Dr. Rothman asserts that any supplier that sells to customers in the market is part of the market (Tr. at 602:7-8), he excludes sugar distributors from the relevant product market (*id.* at 606:4-17).  Yet wholesale customers do not care whether the sugar they purchase is coming directly from the sugar producer / refiner or from a cooperative or distributor.  (*See id.* at 907:4-14 & 917:23-919:8; *see also id.* at 112:24-113:7, 115:3-116:1 & JTX-████████████

████████████████████████████████████████

████████████████████████████████████████

████ ));  Tr. at 1023:15-1024:8 (Post has purchased refined sugar from sugar producer / refiners (Michigan, Imperial, and Domino), as well as non-producing cooperatives and distributors (United, Cargill, National Sugar Marketing, Cargill, Sucro, Sweetener Supply, and Indiana Sugar));  Tr. at 386:4-15, 387:24-388:15, JTX-027 & DTX-249 (Piedmont has sought to purchase refined sugar from sugar producer / refiners ████████████████, as well as non-producing cooperatives and distributors ████████████████████ )).

79.     Distributors have the ability to purchase large quantities of refined sugar from many different sources, including foreign importers, and this allows distributors to price resales competitively.  (*See, e.g.*, Tr. at 325:23-326:2 & JTX-047 (████████████████████████

████████████████████████████ );  Tr. at 1069:4-7 (Indiana Sugars is able to buy and sell refined sugar competitively because of "the size of [its] buys"); *see also* Tr. at 918:17-919:1 (Dr. Hill explaining that distributors buy from a variety of sources, which gives them independence and the ability to compete with refiners in the market)).  Indeed, distributors tend to purchase the majority of foreign-produced refined sugar imports.  (*See, e.g.*, Tr. at 1062:4-10 & DTX-115 (Indiana Sugars buys imported refined sugar);  Tr. at 719:18-22 (about █% of

International Food Products Company's purchased refined sugar is imported); Tr. at 219:10-14 (United witness testifying that distributors are the primary importers of refined imports)). Distributors may repackage the refined sugar that they purchase or further process it into liquid, inverted, brown, or powdered sugar before reselling. (SAF ¶ 85).

80.    Distributors account for approximately 25% of sales of refined sugar in the U.S. (Tr. at 807:4-10).  Examples of distributors selling refined sugar include (among many others): Indiana Sugars, IFPC, Batory, Evergreen, St. Charles Trading, ICI Foods, Atlantic Ingredients, ADM, Sweetener Supply, Sweeteners Plus, Pullman, and L&S Sweeteners.  (*See id.* at 805:20-806:3; *see also* DTX-043 at -462 (map ███████████████████)).

81.    At trial, there were many examples of customers purchasing large quantities of sugar from distributors.  (*See, e.g.*, Tr. at 1073:6-8 & JTX-010 (distributor Indiana Sugars sold over █████ cwt of refined sugar in 2021 (or █████ pounds) with a mean shipment size of █████ pounds, with more than █% of shipments for more than █████ pounds); DTX-113 (in 2021, distributor International Food Products Company sold over █████ pounds of ███ sugar to ██████████, over █████ pounds of ███ sugar to ██████████████, and over █████ pounds of ███ sugar to ██████████████); JTX-007 at -404 (Generals Mills annually purchases upwards of █████ pounds of powdered sugar from ██████████); Tr. at 807:6-10 (Imperial Sugar rejecting idea that distributors only sell small volumes)).

82.    Distributors sell large volumes of sugar into the southeastern U.S.  Of the roughly █████ cwt of refined sugar that Indiana Sugars sold nationally in 2021, about █████ cwt of that was to customers in the Government's "Southeast" market.  (*See* Tr. at 1073:6-8 & JTX-010 (refine by 2021 sales into the relevant "Southeast" states to get roughly █████ pounds sold,

which is just under ███████ cwt); *see also infra* FF ¶ 91 (defining "Southeast")).[13]  In that market, Indiana Sugars sells refined sugar to companies ████████████████████████████

██████████████.  (*See* DTX-116 & Tr. at 1072:5-13 (explaining that DTX-116 lists "top five customers" in "Southeast")).   International Food Products Company sold more than

███████ pounds of sugar in 2021 into the alleged "Southeast," including sales and shipments from its ██████ facility.  (DTX-113 at G124 (sum of sales into "Southeast" states for 2021); *see also* Tr. at 726:2-16).  Batory ships ███████████ sugar from its ███████████ facilities into the "Southeast."  (Tr. at 339:21-25).  For example, in January and February 2022, ██ of the ██ shipments (██%) that Batory made into the "Southeast" came from ███████████

████████████████████████ (*See* JTX-046 at Thru Feb 2022 tab (refine "ST" column by sales into the relevant "Southeast" states)).

83.     Although distributors do not compete for every customer, distributors do compete for sales to wholesale customers of all sizes, including large industrial customers.  (Tr. at 1062:11-18 (customers of Indiana Sugars range from "little mom and pop food companies, all the way up to top five consumer packaged goods companies"); *id.* at 388:6-18 & JTX-027 (█████████████

bid to supply Piedmont for calendar year 2021 was █████████████████████████

██████); *see also, e.g.*, DTX-116 (Indiana Sugars sells sugar to ██████████████████ among others); DTX-113 (distributor International Food Products Company sells to ██████████

███████████████████, among others)).  Indeed, distributors regularly compete against the suppliers from whom they purchase refined sugar.  (*See, e.g.*, Tr. at 1063:14-18 & 1067:25-1069:7 (Indiana Sugars often competes with its own suppliers); *id.* at 428:15-21 (Domino supplies refined sugar to Indiana Sugars and sometimes loses industrial sales to Indiana Sugars); *id.* at

---

[13]     This corresponds to about ██% of all sugar sold into the "Southeast."  (Tr. at 918:4-11).

727:7-22 (

); *id.* at 330:8-11 (

)).

84.     Refined sugar suppliers view distributors as competitors.  United competes against distributors.  (*See* Tr. at 556:6-19).  Imperial also competes against distributors, including Indiana Sugars, Batory, Evergreen Sweeteners, ICI Foods, and others.  (*Id.* at 805:20-806:3).   In fact, Imperial Sugar often sees distributors competing with "[Imperial's] own bags later in the year, selling them cheaper than [Imperial is] currently selling them."  (*Id.* at 290:3-21; *see also id.* at 693:12-25 (Dr. Rothman admitting Imperial competes with distributors in relevant geographic market)).  Michigan Sugar competes against distributors "pretty often."  (*Id.* at 706:25-707:9).  The same is true for Cargill.  (*Id.* at 1126:12-14).  And Domino competes with "melt houses"[14] and distributors.  (*Id.* at 428:2-21; *see also* DTX-066 (column G

)).

85.     The Government introduced no evidence at trial that purchasers care whether their sugar supplier is a refiner producer, a marketing entity, a cooperative or a distributor.

86.     Because there is ample evidence in the record that distributors are competing with other suppliers, including the very ones that supply the distributors, the Court finds that distributors of refined sugar must be included in the relevant product market.

---

[14]     The term "melt house" refers to an entity that purchases sugar in various forms (*e.g.*, raw, refined, etc.) and produces liquid sugar from that.  (Tr. at 428:10-14).

**K.      The Relevant Product Market Should Not Include All Wholesale Customers**

87.      In the Government's proffered product market, wholesale customers include industrial food and beverage manufacturers, retailers, food service companies, and distributors.[15] (*See* Tr. at 668:7-15).  Dr. Rothman did not differentiate between refined sugar sales to industrial customers and refined sugar sales to retail customers.  (*Id.* at 668:16-24).  Yet Dr. Rothman admitted that he made no attempt to consider whether industrial consumers have the same competitive alternatives as other customers.  (*See id.* at 668:25-669:5).

88.      Because the various wholesale customer types have different sugar needs and purchasing practices, sugar suppliers – *i.e.*, the sellers of sugar to customers – do not view all wholesale customers the same.  For example, United has separate sales teams for industrial and retail customers.  (*See* Tr. at 166:15-24 & 214:12-23; *see also id.* at 166:15-24 (United's vice president of industrial sales has no sales or pricing authority for retail customers); *compare also* PTX-452 at -449 (United presentation with slide on "Industrial Bulk Demand"), *with* PTX-452 at -451 (same United presentation with separate slide on "Retail/Foodservice Demand"), *and* PTX-452 at -461 (differing United strategies for industrial and retail customers)).  In a similar vein, Domino also has different sales teams for grocery, food service, industrial, specialty, and export sales.  (Tr. at 522:16-25 & 430:25-432:4; *see also* DTX-094 at -296 to -299 (████ analyzing market conditions ████████████████████████████████████████ ████ )).  ████ similarly differentiates among customer types.  (*See* DTX-028 at -027).

89.      The amount of sugar sold to the various types of wholesale customers differs widely among suppliers.  For example, about 90% of United's sales are to industrial customers (Tr. at

---

[15]      The Government treats distributors as customers because it does not consider them to be relevant suppliers.  As previously addressed, however, the Court finds that distributors must be considered part of the relevant product market along with the other suppliers.

166:25-167:3), whereas about half of Domino's sales are to industrial customers with the remainder to food service, grocery, and specialty customers (*id.* at 522:16-523:14).  As another example, about 21% of Imperial's sales last year went to retail customers.  (*Id.* at 255:10-12).

90.     At trial, the Government offered no testimony or documentary evidence from or about non-industrial customers to show that they are similarly situated to industrial customers such that all should be grouped together as "wholesale customers" in the relevant product market.

### L.     The Government Has Not Proven a Relevant Geographic Market

91.     The Government offered two potential geographic markets where competition would purportedly be harmed by U.S. Sugar's acquisition of Imperial Sugar:  (1) the broader region defined by the U.S. Census Bureau as the East South Central and South Atlantic United States (Alabama, the District of Columbia, Delaware, Florida, Georgia, Kentucky, Maryland, Mississippi, North Carolina, South Carolina, Tennessee, Virginia, and West Virginia) (referred to as the "Southeast") and (2) the narrower region of Georgia and its bordering states (Alabama, Florida, Georgia, North Carolina, South Carolina, and Tennessee) (referred to as "Georgia Plus").



(Demonstrative prepared by Dr. Hill to show the Government's geographic market proposals).

92.     As explained above, Dr. Rothman simply used two geographic markets selected by the Government in performing his analysis.  (FF ¶ 74).  He cites no document from any party or the USDA that groups the states together in the way the Government has in its proposed "Southeast" market.  (Tr. at 662:22-663:4).  And Dr. Rothman acknowledges there is only one document that supports the Government's proposed "Georgia Plus" market.  (*Id.* at 663:4-90; *see also* PTX-452 at -448 ("Supplier Backyards" slide in United presentation that Government relies on for "Georgia Plus" market)).  Dr. Rothman did not attempt to define any other potentially relevant geographic market.

93.     As set forth in further detail below, both of the Government's proposed geographic markets are too narrow and ignore the commercial realities that exist in the U.S. with regard to sugar supply, namely that sugar flows freely throughout the country.  (*See* Tr. at 855:5-17 & 856:15-857:6 (Dr. Fecso explaining that sugar flows in response to supply and demand and can do so over long distances); *see also id.* at 857:10-21 ("market forces work to redistribute sugar to where it's needed")).

1.      The Government's Proposed Geographic Markets Are Too Narrow

94.     Customers located within the Government's "Georgia Plus" and "Southeast" markets purchase and receive refined sugar – in large quantities – from many locations and suppliers outside of that geographic region.   A few noteworthy examples discussed below demonstrate the ease with which sugar flows into these areas from beyond that defined market.[16]

95.     Many customers within the proposed "Southeast" and "Georgia Plus" markets purchase sugar from Louisiana, where LSR / Cargill own and operate a refinery and have storage

---

[16]     These examples exclude the large volume of refined sugar flowing in from distributors as the only way the Court would reach the geographic market is assuming distributors are properly excluded.

warehouses.  (*See* FF ¶¶ 15-17).  For example, Cargill ships sugar from Louisiana by rail to Kraft's facility in Dover, Delaware, over 1,200 miles away.  (*See* Tr. at 743:2-23 & JTX-014 at -067 (█████ pounds shipped)).  Cargill also ships sugar by rail to Post in North Carolina and is sometimes the sole supplier for that location.  (*See* Tr. at 1028:15-1029:15).  Cargill also ships a large amount of bulk sugar from Louisiana to General Mills in Tennessee.  (*See id.* at 108:25-109:15).  And Cargill ships sugar by rail to ███████████.  (*Id.* at 1086:9-14).  Approximately █% of Cargill's 2021 sales were to customers in the proposed "Southeast."  (*See* DTX-518).  Approximately █% of Cargill's 2021 sales were to customers in the proposed "Georgia Plus" market.  (*See id.*).

96.     NSM ships sugar from Minnesota and Idaho to customers in the "Southeast," including in ████████████████████████████████████ █████████.  (Tr. at 354:25-355:15; *see also* JTX-042 & JTX-049).  NSM delivers beet sugar from Idaho or Minnesota to █████████████████████████████, and Post in North Carolina.  (*See* Tr. at 355:16-356:14; *see also id.* at 1030:9-18 & 1086:17-22).  Many of those customers are also located within the "Georgia Plus" market as well.

97.     Michigan Sugar sells refined sugar into the alleged "Southeast."  (DTX-244 (listing Michigan Sugar sales, including into Alabama, Florida, Georgia, Maryland, North Carolina, South Carolina, Tennessee, Virginia, and Kentucky)).  Michigan Sugar recently beat out Domino for sales to ████████████████ in Tennessee, which is in both "Georgia Plus" and the "Southeast." (Tr. at 431:4-16; DTX-094 at -297).  Because Michigan Sugar only has sugar beet factories in Michigan and bulk storage facilities in Ohio, this sugar is being shipped from either Michigan or Ohio into states in the "Southeast" and "Georgia Plus" markets.  (*See* Tr. at 703:12-23).

98.     United sells refined sugar derived from sugar cane and sugar beets across 45 states. (Tr. at 552:12-15).   United sells beet sugar from the Red River Valley into the Government's proposed markets using bulk rail, bulk trucks, boxcars, and semi vans to ship the sugar.   (*Id.* at 553:20-554:24).   Indeed, United regularly ships beet sugar from the Red River Valley to customers in the "Southeast" and "Georgia Plus" markets, including General Mills in Tennessee, Pepsi in Virginia, Wal-Mart in Florida, and Post in North Carolina.   (*See* Tr. at 109:3-11, 186:23-187:8, 554:4-8 & 1028:10-14).   In 2019, United shipped 4.4 million cwt of refined sugar from the Red River Valley into Georgia, South Carolina, North Carolina, Tennessee, Alabama, Mississippi, and Kentucky.   (PTX-452 at -461).   United also sells cane sugar produced at U.S. Sugar's Clewiston, Florida refinery both inside and outside of the "Southeast" market.   (PTX-452 at -460).   For example, "United cane" always wins the Molson Coors facility in Georgia over Imperial.   (*See* Tr. at 131:8-12 & PTX-163 at -833).

99.     According to Dr. Rothman's analysis, importers currently account for 7% of sales in both the "Southeast" and "Georgia Plus" markets in 2021.   (*See* Tr. at 611:12-612:1). Customers, including Danone, already purchase refined sugar directly from importers.   (*Id.* at 1093:19-1095:4 (one of two major suppliers for Danone's Florida and Virginia facilities is a Brazilian supplier); DTX-039; DTX-037 at "pivot" tab; *see also* Tr. at 428:2-9 (Domino competes against imports)).

100.    Many of these suppliers who are located outside the proposed "Southeast" and "Georgia Plus" markets but shipping to customers within them have additional supply that could also be sent to the area.   For example, in 2021, only ██% of ██████ sugar went into the "Southeast," leaving more than ██% of ██████████ available ████████████████ ██████████ .   (Tr. at 1121:17-20; *see also* DTX-518).   Much of that additional sugar already

travels ███████████████████████████ to reach customers in states ███████████

███████████████, and others.  (*See* FF ¶¶ 16-17; *see also* DTX-518 (listing Cargill customers

and sales by state)).  It would not be logistically or economically difficult for Cargill to deliver

additional sugar to customers in the "Southeast."  Similarly, in 2021, Domino shipped more than

███████ cwt from Louisiana to Pennsylvania, New Jersey, New York, Michigan, and

Massachusetts (DTX-517), passing through the "Southeast" and "Georgia Plus" markets along the

way.  Domino could also redirect sugar traveling to northeastern states from Louisiana to

"Southeast" and "Georgia Plus" states.

101.    Customers also have the ability to pick up refined sugar at locations outside of those

markets and move it in.  Today, 30-35% of customers pick up sugar at their supplier and 3% of

customers pick up sugar at a supplier location outside of the Government's geographic markets

and move it in.  (Tr. at 936:12-22).  Customers with multiple locations could also purchase sugar

outside of the proposed markets and transport it to their locations inside the alleged markets to

avoid a price increase.  (*Id.* at 936:23-937:18).  More than 75% of sugar purchased in these

geographic markets is bought by customers with locations outside of those markets, enabling

customers to shift supply among their plants located inside and outside of the Government's

geographic markets to defeat any price increase.  (*Id.*; *see also id.* at 107:1-108:5 (General Mills

has flexibility to shift sugar among its facilities as needed, *e.g.*, shifting sugar from its Cedar

Rapids, Iowa facility to its Murfreesboro, Tennessee facility or vice versa)).

102.    A number of suppliers are undergoing expansions and targeting additional sales

into the "Southeast."  Most notably is LSR / Cargill.  LSR's plans to expand its output capacity at

its Louisiana facility by adding another refinery are already underway.  (*See* FF ¶ 18).  And Cargill

███████████████████████████████████████████████████████████████

(Tr. at 1113:24-1115:1 & DTX-028 at -023).  Cargill expects that LSR's additional production will enable Cargill to ██████████████████████████████████████████████████ ███████████████████████████████ (Tr. at 1114:5-1115:6; DTX-028 at -024).  Cargill has identified the states in this region as a ████████████████████ (Tr. at 1114:21-1115:1), and Cargill is targeting ████████ customers there[17] for additional sales, including ████████████████ ████████████████, among others.  (*See* Tr. at 1116:13-1117:10; *see also* DTX-028 at -028 & -029).

103.    Additionally, the Government's "Southeast" and "Georgia Plus" markets exclude three of Imperial's ten largest states by sugar sales volume –Texas, Indiana, and Pennsylvania. (Tr. at 922:24-923:15; DTX-516 at pg. 1; *see also* Tr. at 692:9-18).   But the Government's "Southeast" includes states where Imperial made few sales, like Alabama.  (Tr. at 923:2-17; DTX-516 at pg. 1; *see also* Tr. at 692:9-18).   In fact, the alleged "Southeast" (and thus the narrower "Georgia Plus")[18] excludes 33% of Imperial's sales.  (Tr. at 696:5-10 & 923:18-23).

104.    The foregoing evidence shows that customers located in the proposed "Southeast" and "Georgia Plus" markets already regularly purchase and receive sugar from outside of these markets.  The ease with which sugar flows across the country enables this to happen.  In the event that U.S. Sugar's acquisition of Imperial led to price increases within either the "Southeast" or "Georgia Plus" markets, customers located within the area easily could (and likely would) turn to outside the area for additional sugar supply.  This demonstrates that the "Southeast" and "Georgia Plus" markets as defined by the Government are too narrow to be the relevant geographic market.

---

[17]    Cargill is frequently recognized as one of the "most price aggressive competitors" and is on a "growth projection."  (Tr. at 177:8-14 & 1104:17-20).   Competitors expect the expansion to make the market "very, very competitive."  (*See, e.g.*, *id.* at 434:10-435:20).

[18]    "Georgia Plus" actually excludes 47% of Imperial's sales.  (Tr. at 923:18-23).

2.   Defendants' Proposed Geographic Markets

105.   Defendants' economics expert, Dr. Hill, proposed two alternative geographic markets that were broader than the "Southeast" or "Georgia Plus." (*See* Tr. at 909:17-24). One of those markets was the entire U.S. (*See id.* at 910:3-17). The other market constructed and analyzed by Dr. Hill was termed the "Competitive Overlap" region, which encompassed areas in which United and Imperial compete with each other. (*Id.* at 939:2-6). Dr. Hill's "Competitive Overlap" market includes all the states in the Government's "Southeast" market and adds in Arkansas, Indiana, Louisiana, Michigan, New Jersey, Ohio, Oklahoma, Pennsylvania, and Texas. (*See, e.g.*, DDX-008 at -18). Dr. Rothman asserted that both alternative markets offered by Dr. Hill would pass the hypothetical monopolist test but he did not analyze them separately (Tr. at 657:11-13 & 651:25-652:9), and the Government only offered conclusory argument as to antitrust harm if the Court is persuaded to use either of Dr. Hill's markets (*see* D.I. 214 at 22-23).[19]

III.   **LEGAL STANDARDS**

Section 7 of the Clayton Act prohibits any merger or acquisition "in any line of commerce or in any activity affecting commerce in any section of the country" whose "effect[s] . . . may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. To prevail on a claim under Section 7, the government must show a "reasonable probability that the merger will substantially lessen competition." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). Although the government does not need to show "with certainty" that the proposed transaction will have anticompetitive effects, it is "not enough" to show "[t]he mere possibility of the prohibited restraint." *FTC v. Consol. Foods Corp.*, 380 U.S. 592, 598 (1965) (cleaned up).

---

[19]   Given that the Government failed to establish both a relevant product and geographic market, the outcome of this case is clear and the Court does not endeavor to make further factual findings based on the proposals offered by the parties.

"[O]nly an acquisition which in the long run may reasonably be expected to substantially lessen competition within a relevant market[] will violate § 7." *Am. Crystal Sugar Co. v. Cuban-Am. Sugar Co.*, 259 F.2d 524, 527 (2d Cir. 1958).

Section 7 merger challenges are reviewed under a burden-shifting framework. First, the Court determines whether the government has established a *prima facie* case that the proposed merger is anticompetitive by (1) identifying the proper relevant market and (2) showing that the effects of the merger are likely to be anticompetitive. *See FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 337-38 (3d Cir. 2016). If the government succeeds at this first step, the Court next determines whether the defendants have rebutted the government's *prima facie* case. *See id.* at 337. If so, "the burden of production shifts back to the [g]overnment and merges with the ultimate burden of persuasion, which is incumbent on the [g]overnment at all times." *Id.* Ultimately, the government must prove by a preponderance of the evidence that there is a reasonable probability the proposed merger will substantially lessen competition. *See United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 192 (D.D.C. 2017), *aff'd*, 855 F.3d 345 (D.C. Cir. 2017).

"[D]etermination of the relevant market is a necessary predicate to a finding of a violation of the Clayton Act." *Brown Shoe*, 370 U.S. at 324. "The relevant market is defined as the area of effective competition." *Ohio v. American Express Co.*, 138 S. Ct. 2274, 2285 (2018) (cleaned up). It consists of two components: a "product market" and a "geographic market." *Brown Shoe*, 370 U.S. at 324. A properly identified relevant market "must correspond to the commercial realities of the industry." *American Express*, 138 S. Ct. at 2285 (cleaned up). Because a plaintiff has "the burden of defining the relevant market," the failure to properly define either a product or geographic market is fatal to a plaintiff's case. *See Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,

124 F.3d 430, 436-42 (3d Cir. 1997); *see also FTC v. Tenet Health Care Corp.*, 186 F.3d 1045, 1053 (8th Cir. 1999).

## IV.   <u>DISCUSSION</u>

### A.   **The Government Has Failed to Establish a *Prima Facie* Case**

To establish its *prima facie* case, the Government must (1) identify the proper relevant market and (2) show that the effects of the merger are likely to be anticompetitive.  *See Penn State Hershey*, 838 F.3d at 337-38.  For reasons set forth above in the findings of fact and further developed below, the Court finds that the Government has failed to establish a *prima facie* case. The Government has failed to identify the proper relevant market because its product market and geographic markets ignore the commercial realities of sugar supply in the U.S.  *See FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 168 (3d Cir. 2022) (a reviewing court "must ***always*** consider the commercial realities of the industry involved" (emphasis added)).  Because the Government has not identified the proper relevant market, it cannot prove its *prima facie* case under Section 7 of the Clayton Act and the Court will not enjoin the Proposed Transaction.  *See United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 618 (1974) ("Determination of the relevant product and geographic markets is 'a necessary predicate' to deciding whether a merger contravenes the Clayton Act.").

### 1.   <u>The Government Failed to Identify a Relevant Product Market</u>

"The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."  *Brown Shoe*, 370 U.S. at 325.  Within a product market, there may be "well-defined submarkets" that are their own markets for antitrust purposes.  *Id.*  In determining the existence and boundaries of any submarket, courts look to "practical indicia" such as "industry or

public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes and specialized vendors."  *Id.*  Determining whether a submarket exists is designed to answer the question of whether products are reasonably interchangeable such that they should be grouped together in the same product market for antitrust purposes.  *See Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 496 (2d Cir. 2004) ("The term 'submarket' is somewhat of a misnomer, since the 'submarket' analysis simply clarifies whether two products are in fact 'reasonable' substitutes and are therefore part of the same market.").

The fundamental purpose of the interchangeability and cross-elasticity inquiry is to recognize where competition exists.  *Brown Shoe*, 370 U.S. at 326; *see also id.* ("[T]he boundaries of the relevant market must be drawn with sufficient breadth to include the competing products of each of the merging companies and to recognize competition where, in fact, competition exists."). Indeed, as the Third Circuit has described the analysis, "defining a relevant product market is a process of describing those groups of producers which, because of the similarity of their products, have the ability actual or potential to take significant amounts of business away from each other." *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1063 (3d Cir. 1978); *see also Geneva Pharms*, 386 F.3d at 496 ("The goal in defining the relevant market is to identify the market participants and competitive pressures that restrain an individual firm's ability to raise prices or restrict output.").[20]  Without knowing the boundaries of the relevant product market, the Court lacks the

---

[20]     *SmithKline* arises under the Section 2 of the Sherman Act.  Although the Clayton Act and Sherman Act are separate antitrust statutes directed to different anticompetitive behavior, determining a relevant market follows the same inquiry under either statute.  *See United States v. Grinnell Corp.*, 86 S. Ct. 1698, 1705 (1966) ("We see no reason to differentiate between 'line' of commerce in the context of the Clayton Act [§ 7] and 'part' of commerce for purposes of the Sherman Act [§ 2].");  *cf. also Kellam Energy, Inc. v. Duncan*, 616 F.

appropriate context in which it must judge any potential anticompetitive harm that could arise from a proposed acquisition.

Here, the Government proposes that the relevant product market is "the production and sale of refined sugar to wholesale customers." (*See* D.I. 214 at 15-20).[21]  There is no dispute that the relevant product market in this case includes refined sugar in all forms (*i.e.*, granulated, brown, liquid, powdered) regardless of whether the sugar is derived from sugar cane or sugar beets. (*See* FF ¶ 77).  The parties diverge, however, on who that refined sugar must come from (and who it is sold to) for it to be included in the relevant product market.  In the Government's view, sugar distributors are excluded from the product market, while all wholesale customers are included regardless of type or industry – *i.e.*, retail customers like grocery stores are included alongside industrial food and beverage producers.  (*See* FF ¶¶ 78 & 87).  Ultimately disagreeing that distributors should be excluded or that all wholesale customers should be treated the same, the Court will address each of these points in turn.

As to distributors, the Government argues that sugar distributors should be excluded from the product market because they do not produce the refined sugar they are selling.  (*See* D.I. 214 at 15-16).  Instead, the product market should purportedly be crafted around the characteristics of the to-be acquired Imperial – *i.e.*, an entity that sells the refined sugar that it produces.  (*See id.* at 16 ("Here, the market is defined around the top level of the refined sugar supply chain . . . because

---

Supp. 215, 218 n.3 (D. Del. 1985) ("[T]he standards for geographic market definition under Section 7 of the Clayton Act and Sections 1 and 2 of the Sherman Act are the same.").

[21]  Curiously, the Government's brief addresses the *prima facie* case in reverse – setting forth arguments about the relevant geographic market before the product market.  (*Compare* D.I. 214 at 5-15 (addressing geographic market), *with id.* at 15-20 (addressing product market)).  It would be difficult to properly define a relevant geographic market without first knowing the boundaries of the product market, which includes interchangeability of products (and therefore the various suppliers).

that is the level of the supply chain where Imperial competes today and where its competition will be eliminated by the proposed acquisition.")).  According to the Government, sugar distributors are more properly considered customers[22] because they do not produce sugar and would have to shoulder any increased price of refined sugar resulting from the Proposed Transaction.  (*Id.* at 17).  Defendants argue that distributors must be included in the product market because they are highly relevant and competitive sellers of refined sugar in the various geographic markets at play in this case.  (*See* D.I. 220 at 6-10).  In Defendants' view, the "competitive set" of suppliers that customers can turn to if prices increase must include sugar distributors because they offer an interchangeable product (*i.e.*, the same product) at competitive prices.  (*Id.* at 7).  The Court agrees with Defendants.

Based on the evidence presented at trial, the Court cannot accept the proposition that distributors do not compete with and are incapable of being effective price constraints on refiners and other sugar suppliers.  As an initial matter, distributors account for approximately 25% of sales of refined sugar in the U.S. (Tr. at 807:4-10), and it is counterintuitive to exclude such a large volume of sales from the product market, particularly when the distributors' product is identical to the product sold by the refiners and cooperatives – *i.e.*, refined sugar.  But on a more granular level, even if distributors must first purchase refined sugar from producers like Domino or Imperial, the ultimate fate of that sugar is not simply resale at a price largely outside of a distributor's control and uncompetitive with producers.  The record is replete with evidence of distributors competing with refiner producers like Domino and Imperial, as well as with

---

[22]    In its proposed findings, the Government includes a single paragraph that asserts with minimal support that including distributors would "likely" be inconsequential. (*See* D.I. 215 ¶ 101).  But, as set forth below, the record contains ample evidence to support the finding that wholesale customers could and would turn to distributors if the price of refined sugar sold by the new entity were to increase, thereby indicating that distributors are part of the relevant product market.

cooperatives like United.  (*See, e.g.*, Tr. at 428:15-21 (Domino supplies Indiana Sugars and sometimes loses industrial sales to Indiana Sugars); *id.* at 256:17-19, 290:3-21 & 806:4-807:3 (Imperial's experience competing against distributors); *id.* at 570:19-571:11 (United's experience competing against distributors in southeastern U.S.); *see also* FF ¶¶ 80, 83 & 84).   Indeed, distributors sell millions of pounds of sugar to large industrial customers like Anheuser-Busch, General Mills, and ████████.  (FF ¶ 80).

The ability of distributors to remain competitive with producers is based on several factors that are well-supported by the record.  For example, distributors can purchase large volumes of sugar from a variety of sources and move that sugar to other locations in the country experiencing a sugar deficit or high prices.  (FF ¶ 79).  Distributor Indiana Sugars purchases refined sugar from every supplier of cane and beet sugar in the U.S. and then sells that sugar nationally.  (Tr. at 1062:1-3).  Similarly, Batory buys from ██████████████ suppliers and distributes that sugar across the U.S.  (*Id.* at 325:23-326:2; *see also* JTX-046 (sales data) & JTX-047 (suppliers)).  And Indiana Sugars sold about ████████ cwt and Batory sold over ██████ cwt of refined sugar in 2021.  (*See* Tr. at 1073:6-8 (Indiana Sugars); *id.* at 325:23-326:2 & JTX-046 (Batory)).  Distributors also purchase massive amounts of foreign imports.  (*See, e.g.*, Tr. at 1062:4-10 & DTX-115 (Indiana Sugars); Tr. at 719:18-22 (about █% of International Food Products Company's purchased refined sugar is imported); Tr. at 219:10-14 (United witness testifying that distributors are the primary importers of refined imports)).  Maintaining a diversity of supply – domestic and foreign – means that distributors are able to obtain their refined sugar supply at competitive prices and locations and thus resell the sugar at competitive prices.  Moreover, distributors can also leverage their large network of transportation and storage to maintain and ship an adequate supply of refined sugar to exert competitive pressure when and where necessary.  (FF ¶ 34).

The Court also heard substantial evidence that suggests customers are largely indifferent as to whether they are purchasing refined sugar from the sugar producer or from a distributor.  (FF ¶ 78).  Indeed, large industrial customers like General Mills and Post purchase sugar from refiner producers right alongside distributors.  (*See* Tr. at 112:24-113:7, 115:3-116:1 & JTX-007 (General Mills); Tr. at 1023:15-1024:8 (Post)).   Additionally, many suppliers in the industry view distributors as competitors.  (*See* Tr. at 556:6-19 (United); *id.* at 805:20-807:3 (Imperial); *id.* at 706:25-707:9 (Michigan Sugar); *id.* at 1126:12-14 (Cargill); *id.* at 428:2-21 (Domino)).  Thus, not only do customers view distributors as attractive competitive options, but the other sugar suppliers in the market also view distributors as competition.

Tying all of this evidence together, Defendants' expert, Dr. Hill, explained how distributors are independent actors within the market and this allows them to compete effectively with other suppliers.  (*See* Tr. at 918:4-919:1).  For example, he noted that Indiana Sugars accounts for roughly 4% of all sugar sales into the Government's broader "Southeast" market.[23]  (*Id.* at 918:6-11).  And, owing to its increasing success in targeting this market, Indiana Sugars has plans to build a new facility there in the next year or so and further expand its sales.  (*Id.* at 1063:4-13 & 1070:9-1072:4; *see also* FF ¶ 35).  In Dr. Hill's opinion, excluding distributors "tend[s] to overstate [Dr. Rothman's] market shares for the parties and it will tend to overstate his concentration, because he's assuming that the distributors are not independent."  (Tr. at 919:5-8).  The Court is similarly persuaded.

Essentially, the Government is asking the Court to find that refined sugar sold by distributors is a submarket separate from refined sugar sold by refiners and cooperatives.  Given

---

[23]     In the Court's view, that is not an insubstantial amount of refined sugar being sold into one of the Government's proposed geographic markets.

that distributors already do compete with the various other suppliers for business, it is not difficult for the Court to conclude that customers would turn to distributors for refined sugar if producers and cooperatives were to increase their price for refined sugar.[24]  The evidence thus shows that there is high cross-elasticity of demand between distributors' refined sugar and other suppliers' refined sugar and they may properly be considered part of the same market.  *Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1313 (10th Cir. 2017) ("If two products share a high cross-elasticity of demand – in that an increase in the price of one product causes consumers to switch to the other, and vice versa – then those products likely are interchangeable and may properly be considered part of the same product market.").  The Government's proposed product market ignores this high cross-elasticity between "refiner or cooperative sold" refined sugar and "distributor sold" refined sugar.

Because a division of the refined sugar market into "refiner or cooperative sold" refined sugar and "distributor sold" refined sugar would be inconsistent with the commercial realities of the industry, the Court must reject the Government's proposed product market.  And as the Government admits that it does not have evidence to prove its case if distributors are included in the product market (*see* Tr. at 1143:5-14), and there is no alternative product market offered, the Government cannot prevail in this case.  *See, e.g.*, *F.T.C. v. Lundbeck, Inc.*, 650 F.3d 1236, 1240 (8th Cir. 2011) (judgment against government proper where it failed to prove relevant product market that grouped Indocin IV and NeoProfen together because evidence at trial supported a finding of low cross-elasticity of demand between Indocin IV and NeoProfen, thereby leading to

---

[24]     Although distributors may suffer some effect from increased prices, the Court believes that distributors would nevertheless remain a competitive constraint on price to end customers given distributors' ability to purchase sugar from a diverse array of sources (and locations) and to store and transport large amounts of sugar in response to shifting market conditions.

a conclusion that the two drugs were not in the same product market); *Berlyn Inc. v. The Gazette Newspapers, Inc.*, 73 F. App'x 576, 584 (4th Cir. 2003) (summary judgment on Clayton Act § 7 claim proper without reaching geographic market where relevant product market improperly excluded direct mail and non-print advertisers in action involving acquisition of newspaper company).

Moreover, there is a second problem with the Government's proposed product market – *i.e.*, it assumes that all wholesale customers are the same without regard to economic realities. That is, industrial food and beverage producers (*e.g.*, General Mills) are grouped together with retail companies (*e.g.*, grocery chains) and food service companies (*e.g.*, restaurants), all being treated as equal consumers in the product market. The fundamental problem with this proposal, however, is that there is no evidence in the record to support such a conclusion. At trial, the Government introduced no evidence to support a finding that industrial customers have the same competitive options and purchasing behavior as any other wholesale customer included in its proposed market. Indeed, Dr. Rothman admitted that he did not even consider whether retail customers have the same competitive alternatives as industrial customers. (Tr. at 668:16-669:5). Moreover, there is some evidence that tends to suggest that industrial customers are, in fact, treated differently by suppliers in the competitive landscape. (*See* FF ¶¶ 88-89 (many suppliers have distinct sales teams and channels for industrial customers as compared to retail customers presumably because of differing commercial realities facing each type of consumer)). The lack of sufficient evidence to support treating wholesale industrial customers the same as all other wholesale customers is yet another reason that the Government's proposed product market fails.

2.       The Government's Geographic Markets Are Too Narrow

As noted above, the Government's failure to prove a relevant product market is dispositive and requires judgment in favor of Defendants.  Yet even assuming the relevant product market properly excluded distributors while treating all wholesale customers the same, the outcome would be no different as the Government has failed to identify a relevant geographic market as well.

"The relevant geographic market is that area in which a potential buyer may rationally look for the goods or services he seeks." *Penn State Hershey*, 838 F.3d at 338 (cleaned up); *see also Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 726 (3d Cir. 1991) ("[T]he geographic market is not comprised of the region in which the seller attempts to sell its product, but rather is comprised of the area where his customers would look to buy such a product.").  An often-used tool for determining a relevant geographic market is the hypothetical monopolist test.  *See* U.S. Dep't of Just. & Fed. Trade Comm'n, Horizontal Merger Guidelines § 4 (2010) (setting forth hypothetical monopolist test).  "A proposed market is properly defined, under this test, if a hypothetical monopolist who owns all the firms in the proposed market could profitably impose a small but significant non-transitory increase in price ('SSNIP') on buyers in that market." *Hackensack*, 30 F.4th at 167.  "If, however, consumers would respond to a SSNIP by purchasing the product from outside the proposed market, thereby making the SSNIP unprofitable, the proposed market definition is too narrow." *Penn State Hershey*, 838 F.3d at 338.

The Government offers two possible geographic markets:  "Georgia Plus" and the "Southeast."  The narrower "Georgia Plus" market includes Alabama, Florida, Georgia, North Carolina, South Carolina, and Tennessee.  (FF ¶ 91).  The "Southeast" market is broader, including all of these states in addition to the District of Columbia, Delaware, Kentucky, Maryland, Mississippi, Virginia, and West Virginia.  (*Id.*).  As a threshold matter, competitive overlap does

exist between United and Imperial in the "Southeast" and "Georgia Plus" markets.  (*Compare* PTX-452 at -460 & -461 (depicting United sales by state for sugar originating from the Red River Valley and U.S. Sugar's Clewiston refinery), *with* DTX-516 (Imperial customers and sales by state); *see also* Tr. at 999:20-1000:21 (Dr. Hill agreeing significant competitive overlap between Imperial and United exists in the broader and narrower markets)).  This overlap suggests that the areas could be a proper starting point in identifying a relevant geographic market to assess potential antitrust harm that may result from the Proposed Transaction.  *See United States v. Philadelphia Nat. Bank*, 374 U.S. 321, 357 (1963) ("The proper question to be asked in this case is not where the parties to the merger do business or even where they compete, but where, within the area of competitive overlap, the effect of the merger on competition will be direct and immediate.").

Against the backdrop of competitive overlap, the Government has identified its two proposed geographic markets based on customer locations, rather than supplier locations.  (*See* Tr. at 601:1-602:8 (Dr. Rothman testifying as to his use of customer-location market)).  In determining whether these markets were appropriate relevant geographic markets for antitrust purposes, Dr. Rothman analyzed each under the hypothetical monopolist test.  (Tr. at 589:14-592:7; *see also id.* at 599:9-600:13; FF ¶¶ 74 & 92 (Dr. Rothman did not identify the "Georgia Plus" or "Southeast" markets, instead merely using what was provided by the Government)).  Dr. Rothman has no opinion on which of the "Georgia Plus" and "Southeast" markets is better suited to the economic realities in this case.  (*See* Tr. at 658:1-19)  He also asserted – without analysis – that Defendants' proposed "Competitive Overlap" and entire U.S. markets would each pass the hypothetical monopolist test.  (*Id.* at 652:8-9 & 657:11-13)  In essence, according to Dr. Rothman and his application of the hypothetical monopolist test, a market that is merely six

states in the southeastern U.S. is as relevant a geographic market as the entire U.S. in this case. That is simply not credible.

A more fundamental problem with the proposed markets is that they ignore the abundant evidence of sugar consumers located in the "Southeast" and "Georgia Plus" markets purchasing their refined sugar outside those geographic regions.  (*See, e.g.*, FF ¶ 95 (large volumes of sugar going into the "Southeast" and "Georgia Plus" from LSR / Cargill in Louisiana); FF ¶ 96 (NSM shipping beet sugar from Minnesota and Idaho into "Southeast" and "Georgia Plus"); FF ¶ 97 (Michigan Sugar selling sugar from Michigan and Ohio into "Southeast" and "Georgia Plus" markets)).  Many of these and other suppliers have additional refined sugar to sell into these proposed markets, sugar that is already traveling through the region.  (FF ¶ 100).  And many customers either pick up their purchased refined sugar at locations outside these markets or have the capacity to do so in the future.  (FF ¶ 101).  None of this is particularly surprising given the low cost to transport sugar and the ease with which it can travel long distances.  (FF ¶¶ 39 & 42). Moreover, at least one of the significant players outside of the "Southeast" – LSR / Cargill – has plans to increase their sales into the "Georgia Plus" and "Southeast" regions.  (FF ¶ 102).

Despite the large volumes of sugar coming in from states outside the proposed geographic markets, under the Government's customer-based hypothetical monopolist test, expanding the region would be improper because the markets already account for sellers outside the region and expanding it only brings in additional ***customers*** with different competitive choices.  (*See* D.I. 233 at 5-6).  That is, because the market is formulated around customer locations, all relevant sellers to the area are already considered.  The Court finds it hard to credit that the proposed markets properly account for the real-world impact of these sellers, especially given that Dr. Rothman discounted any potential for nearby LSR / Cargill to meaningfully increase their sales in the area

in response to a price increase in the region.  (Tr. at 662:4-12).  This stands in stark contrast to ███████████ actual plans ████████████ .  (FF ¶ 18).  Similarly, as to the assertion that expanding the region would only bring in customers with different competitive options, there is no factual support offered – just conclusory testimony from Dr. Rothman, who was not particularly credible.  (*See* D.I. 233 at 6).  The Court recognizes the important role that the hypothetical monopolist test plays in antitrust cases but, regardless of how articulated, the process of identifying the relevant geographic market must conform to the economic realities of the industry to recognize competition where competition exists.  Any rigid application of the hypothetical monopolist test must yield to the economic realities of the industry.  Here, the economic reality is that sugar flows easily across the country from areas of surplus to deficit in response to prices and demand.

The Government's proposed geographic markets ignore the commercial realities of the sugar industry in this country – namely, that sugar flows freely and over long distances in response to market forces.  The evidence establishes that customers already look beyond the Government's proposed markets for competitive alternatives.  Finding that they would continue to do so in the face of increased sugar prices is not difficult.  *See Tenet Health Care*, 186 F.3d at 1050 & 1053-54 (proposed geographic market too narrow where evidence showed that significant number of patients already traveled outside of that area to obtain similar treatment services).  The Government's proposed geographic markets are too narrow and neither can constitute a relevant geographic market.

Finally, the Court briefly addresses a third proposed geographic market that made its way into the Government's case in post-trial papers.  That market, called "the USDA South" is purportedly an alternative relevant geographic market for purposes of assessing antitrust harm in this case.  (*See, e.g.*, D.I. 214 at 22 ("Thus, even if the Court concluded that the only relevant

market for this transaction was as broad as the entire USDA South, the transaction would still be presumptively unlawful."); D.I. 215 ¶ 48 ("Although overbroad (because there are meaningfully different competitive options for customers in Texas) . . . the USDA South could also constitute an antitrust market." (citations omitted))).  In a footnote, the Government suggests that the Court may construct any geographic market that will suffer competitive harm based on the record. (*See* D.I. 214 at 22 n.7 ("[T]he Court should enjoin the merger if the Court finds a reasonable probability of harm in any relevant market based on the evidence presented.")).  Yet the Government's expert only offered opinions under the two markets provided to him by the Government – the "Southeast" and "Georgia Plus" markets.  (Tr. at 591:20-592:14 & 650:25-651:6).  The only testimony from Dr. Rothman that could remotely be considered to touch upon a broader market (*e.g.*, "the USDA South") was a mere five lines in the abstract or a conclusory assertion as to post-transaction effects.  (*Id.* at 626:6-13 ("So the effect on the broadening market brings in areas in which the potential effects of the transaction are different from, in the market that is defined, that effects the harm for customer, but in a broader market there are more sales, so the total mark would be greater."); *id.* at 613:22-614:7 (Dr. Rothman opining on a post-transaction market concentration in "the USDA South" without analysis or supporting evidence)).  Dr. Rothman did not present market shares for competitors in "the USDA South" and he did not present evidence of any price effects in that area if the Proposed Transaction were allowed.  (*See id.* at 611:10-612:1 & 686:10-21).  And there is scant evidence in the record on sales or behaviors of customers specifically in "the USDA South" as discovery (including expert discovery) was limited to only the markets alleged in the Complaint.  (*See* D.I. 1 ¶¶ 29-35).  Such proof cannot be sufficient to carry the burden of demonstrating that the USDA South is a relevant geographic market.

In reality, what the Government is asking the Court to do is figure out which market allows the Government to prevail and then to use that market.  The Court declines to do so.  *See, e.g.*, *United States v. Sabre Corp.*, 452 F. Supp. 3d 97, 142 (D. Del. 2020), *vacated*, No. 20-1767, 2020 WL 4915824 (3d Cir. July 20, 2020) ("The Court agrees with Defendants that, to the extent DOJ is now inviting the Court to 'unilaterally change the defective market allegations if necessary to save its case,' it would be wrong for the Court to do so under the circumstances here, which include that both parties (and the Court) have already devoted enormous resources to the case the government chose to bring.").[25]  Because the Government has failed to identify the relevant market for analyzing any proposed competitive injury resulting from U.S. Sugar's acquisition of Imperial, the Government cannot establish its *prima facie* case.  The Court need not and does not reach the second prong of the *prima facie* case – *i.e.*, whether the Government has shown that the effects of the acquisition are likely to be anticompetitive.

**B.     Even if the Government Established the Proposed Transaction Could Affect Sugar Prices, USDA Has Tools to Protect Against Anticompetitive Effects**

In any action challenging a proposed acquisition under Section 7 of the Clayton Act, the transaction must be viewed "in the context of its particular industry."  *Brown Shoe*, 370 U.S. at 321-22.  To understand that context, the reviewing court must also consider the "structure, history and probable future" of the market in which the proposed transaction exists.  *Id.* at 322 n.38.  "Antitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue.  Part of that attention to economic context is an awareness of the significance of regulation."  *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 411 (2004).

---

[25]     The decision in *Sabre* was vacated because the proposed transaction was abandoned.  The Third Circuit, however, explicitly noted that its order "should not be construed as detracting from the persuasive force of the District Court's decision[] should courts and litigants find its reasoning persuasive."  2020 WL 4915824, at *1 (3d Cir. July 20, 2020).

The supply of sugar in the U.S. is tightly controlled by the federal government, the consequence of which is that sugar prices are artificially held high in this country. *See United States v. Archer-Daniels-Midland Co.*, 866 F.2d 242, 246 (8th Cir. 1988) ("[W]e cannot ignore the fact that Congress has enacted a sugar program that has artificially inflated the price of sugar."). Although the USDA prefers to keep the price of sugar high, there are a number of tools at the USDA's disposal that can easily be deployed to modify the sugar supply (and thus price) in the U.S. As such, U.S. Sugar's acquisition of Imperial will not happen in a vacuum and must be viewed against the backdrop of the USDA's intimate involvement with the U.S. sugar industry. (*See generally supra* § II.F (setting forth details about the Federal Sugar Program)).

The USDA's official position on U.S. Sugar's acquisition of Imperial is that it has no position on whether it will affect sugar competition or prices in the U.S. (*See* Tr. at 882:4-8). It is noteworthy that the Government did not offer any documentary or testimonial evidence from USDA as to its view of the anticipated effects of U.S. Sugar's acquisition of Imperial. In essence, the Government decided to shield USDA officials from having to answer questions about the interplay between free market competition and the Federal Sugar Program. (*See id.* at 641:20-642:21 (Dr. Rothman admitting that he did not speak with anyone at the USDA to understand USDA's role in the sugar industry)). But Defendants called USDA's Dr. Fecso at trial and, with her testimony, the Court endeavors to discuss some additional context about the sugar industry in the U.S. and the various price constraints at play – some of which tightly controlled by the federal government. The Court firmly believes that USDA's power to manipulate sugar supply in the market would act as a safeguard against potential anticompetitive effects of the Proposed Transaction even if the Court were to find any such effects existed.

The Court is mindful of the fact that Dr. Fecso was not testifying on behalf of USDA at trial, but rather offering testimony in her personal capacity.  That being said, Dr. Fecso is a Ph.D. economist who has worked at USDA for almost 30 years.  (Tr. at 850:3-15).  Moreover, Dr. Fecso has worked with the Federal Sugar Program for almost 20 years.  (*Id.* at 850:16-19).  She collects and publishes data on beet and cane processors and refiners and uses that data to forecast supply and demand.  (*Id.* at 851:8-14).  And using her analyses, she advises USDA undersecretaries on whether and when to take actions to rebalance the sugar market and increase the supply of sugar.  (*Id.* at 851:14-25).  There is no one else at USDA that has a longer tenure working on the Federal Sugar Program or in making recommendations to the undersecretaries for the Federal Sugar Program.  (*Id.* at 852:20-24).  The Court found Dr. Fecso to be an exceptionally knowledgeable and particularly credible witness.

In Dr. Fecso's view, U.S. Sugar's acquisition of Imperial is not likely to lead to higher prices in the U.S.  (*See* Tr. at 854:25-855:4).  In fact, she anticipates sugar prices in the U.S. may be lowered if the Proposed Transaction is allowed to proceed.  (*See id.*).  Indeed, Dr. Fecso believes that the deal will have an overall positive impact on the sugar industry in this country.  (*Id.* at 853:6-11).  In particular, having spoken to the parties and hearing U.S. Sugar and Imperial's plans post-merger, she believes that a number of efficiencies can be gained by the deal:

> There is a potential for Florida to send supplies of raw sugar to Imperial.  Right now Imperial doesn't have a domestic source of sugar.  There is a potential for another voice to be heard besides Imperial Sugar when they come to USDA and ask for us to increase imports to relieve tightness in the raw market.  And because of the efficiencies that I see are possible with this merger, the engineers, for instance, from US Sugar revitalizing the Imperial facility, things like that, there could be cost savings and those cost savings could result in lower refined prices.

(*Id.* at 853:19-854:4).  Dr. Fecso anticipates that the Port Wentworth facility having a domestic supply of raw sugar (from U.S. Sugar's Florida location) would reduce the facility's reliance on

imports, thereby lowering the cost of producing refined sugar (and in turn the selling price).  (*Id.* at 854:5-24).  Even if the Proposed Transaction were to ultimately lead to a regional increase in refined sugar prices, Dr. Fecso believes that sugar would flow in from other locations to bring the prices back down.  (*Id.* at 855:5-17; *see also supra* § II.E (setting forth evidence of sugar flowing in response to market conditions)).  And failing that, she believes that the USDA is equipped to respond appropriately.  (Tr. at 855:18-24).  This latter point is well-supported by the record.

The amount of sugar that is available for sale in the U.S. each year is largely controlled by the USDA.  It monitors and estimates how much sugar will be necessary and how much will be produced each year.  (SAF ¶ 86); *see also* 7 U.S.C. § 1359bb(a)(1).  No less than 85% of all sugar sold in this country must come from domestic suppliers (whether beet or cane).  7 U.S.C. § 1359bb(b)(1)(B).  Moreover, within this overall domestic marketing cap, the USDA dictates how much sugar any given domestic seller may market in any given year.  (Tr. at 867:8-23).  That is, any U.S. company selling domestic sugar has a volume cap on the amount of sugar it is allowed to sell each year.  (*Id.* at 867:16-19; *see also id.* at 285:20-22 ("Each year the USDA sets 85 percent of the market for the domestic processors and allocates sugar to each one of them to sell . . . .");  PTX-330 at pg. 10; *see also* DTX-464 at 2 (showing initial 2022 allotments)).  If a company has excess sugar, it is not permitted to sell the sugar unless the USDA increases the marketing allotments or reassigns allotments from one company to another.  (Tr. at 711:20-25 & 868:2-17;  SAF ¶ 87).  That the USDA is able to modify domestic marketing allotments means that it has the power to do so in response to changes in market conditions – *e.g.*, an increase in sugar price that may result from the Proposed Transaction.  Indeed, the USDA recently increased and reassigned marketing allotments to address high sugar prices (and excess supply).  (*See* Tr. at 868:2-869:15 & DTX-464 ("Given the expected large amount of blocked beet sugar stocks and current high sugar prices, USDA is increasing the FY 2022 [overall sugar marketing allotment quantity.")).

Beyond just the domestic suppliers, the USDA also has power to increase the amount of imported sugar flowing into the U.S.  Unlimited amounts of sugar can come into the U.S. from abroad, but only a limited amount is imported at low or no duty through the TRQ system and U.S.-Mexico Suspension Agreements.  (*See* FF ¶¶ 51-52).  Imported sugar beyond the limits of either system is imported as expensive "Tier II" sugar, which is effectively the price ceiling for sugar in the U.S.  (SAF ¶ 92 & Tr. at 873:21-24; *see also* Tr. at 560:5-6 ("We [United] always know where Tier II sugar is priced because it sets the ceiling for us.")).  The USDA maintains the discretionary ability to increase the amounts imported under the TRQ system and U.S.-Mexico Suspension Agreements in order to maintain reasonable prices.  (*See* FF ¶¶ 51-52).  If U.S. Sugar's acquisition of Imperial were to lead to higher sugar prices, the USDA has the ability to increase the amount of low- or no-duty sugar that can be imported into the U.S. to combat these effects.  Doing so would increase the available sugar for sale in the U.S., thereby bringing prices back down.  And to be sure, there is ample supply located outside of the U.S. – foreign suppliers are always looking to sell more sugar into this country because the price of sugar is so high.  (*See* Tr. at 870:15-25).  Thus, even if U.S. Sugar's acquisition of Imperial were likely to have any anticompetitive effects, the Court believes that the USDA has the ability to counteract those effects.

In the end, the Court finds it more than curious that the Government is purportedly concerned about anticompetitive harm and increased prices in an industry where the Government itself keeps the prices high and, in many ways, controls the competition.  But even so, the Government has failed to meet its burden under the Clayton Act and the Proposed Transaction will not be enjoined.

V.    **<u>CONCLUSION</u>**

For the foregoing reasons, the Court finds that the Government has failed to prove that the proposed acquisition of Imperial Sugar by U.S. Sugar is likely to substantially lessen competition or tend to create a monopoly under Section 7 of the Clayton Act.  Therefore, the Court will not enjoin the Proposed Transaction and judgment will be entered in favor of Defendants.